# AMENDED SOLICITATION AND DISCLOSURE STATEMENT

**LEE ENTERPRISES, INCORPORATED AND THOSE OF ITS SUBSIDIARIES REFERENCED HEREIN HAVE NOT FILED FOR RELIEF UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE, AND THIS AMENDED SOLICITATION AND DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH OR APPROVED BY THE BANKRUPTCY COURT, THE SECURITIES AND EXCHANGE COMMISSION OR ANY OTHER GOVERNMENTAL OR REGULATORY AGENCY. IF THESE COMPANIES FILE PETITIONS FOR RELIEF UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE AND SEEK CONFIRMATION OF THE AMENDED JOINT PREPACKAGED PLAN OF REORGANIZATION DESCRIBED HEREIN, THIS AMENDED SOLICITATION AND DISCLOSURE STATEMENT WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL.**

**Solicitation of Votes with Respect to the
Amended Joint Prepackaged Plan of Reorganization of:**

**LEE ENTERPRISES, INCORPORATED
AND
CERTAIN OF ITS SUBSIDIARIES**

**From the Holders of:**

**Prepetition Credit Agreement Claims
PD LLC Notes Claims**

**THE DEADLINE TO ACCEPT OR REJECT THE PLAN IS 4:00 P.M., PREVAILING EASTERN TIME, ON DECEMBER 9, 2011, UNLESS EXTENDED AS PROVIDED HEREIN (THE "VOTING DEADLINE")**

The Prospective Debtors[1] hereby transmit this amended Solicitation and Disclosure Statement dated December 2, 2011 (the "Amended Solicitation and Disclosure Statement" and, together with the First Solicitation and Disclosure Statement defined herein, the

---

[1] The Prospective Debtors in the chapter 11 cases, which shall be referred to herein collectively as the "Debtors", the "Prospective Debtors", or the "Company", along with the last four digits of each Prospective Debtor's federal tax identification number are: Lee Enterprises, Incorporated ("Lee Enterprises") (3980); Accudata, Inc. (3648); Fairgrove LLC (N/A); Flagstaff Publishing Co. (4796); Hanford Sentinel, Inc. (0775); Home Choice LLC (3701); HSTAR LLC (N/A); INN Partners, L.C. ("INN Partners") (9478); Journal Star Printing Co. (6412); Kauai Publishing Co. (7036); Klamath Falls Basin Publishing, Inc. (3285); Lee Consolidated Holdings Co. (2158); Lee Procurement Solutions Co. (6292); Lee Publications, Inc. (1886); Napa Valley Publishing Co. (7802); NIPC, Inc. (9541); NLPC LLC (7381); Northern Lakes Publishing Co. (9679); NVPC LLC (N/A); Pantagraph Publishing Co. (7058); Pulitzer Missouri Newspapers, Inc. (1960); Pulitzer Network Systems LLC (5359); Pulitzer Newspapers, Inc. (1560); Pulitzer Technologies Inc. (8892); Pulitzer Utah Newspapers, Inc. (1884); Pulitzer, Inc. ("Pulitzer") (9711); Santa Maria Times, Inc. (3801); SHTP LLC (N/A); Sioux City Newspapers, Inc. (9191); SOPC LLC (5551); Southwestern Oregon Publishing Co. (0741); St. Louis Post-Dispatch LLC ("PD LLC") (5357); STL Distribution Services LLC ("DS LLC") (0922); Suburban Journals of Greater St. Louis LLC ("Suburban Journals") (6217); and Ynez Corporation (5443). The Debtors' corporate headquarters and the mailing address for each Debtor is 201 N. Harrison Street, Suite 600, Davenport, IA 52801.

"<u>Solicitation and Disclosure Statement</u>") in order to continue solicitation from Holders of Prepetition Credit Agreement Claims and Holders of PD LLC Notes Claims of votes to accept or reject the joint prepackaged chapter 11 plan of reorganization for the Prospective Debtors.  A copy of the Prospective Debtors' Amended Joint Prepackaged Plan of Reorganization dated December 2, 2011 is attached hereto as <u>Exhibit A</u> (as initially proposed on November 7, 2011, as amended thereafter, and as may further be amended, the "<u>Plan</u>").

This amended Solicitation and Disclosure Statement amends the prior Solicitation and Disclosure Statement dated November 7, 2011 (the "<u>First Solicitation and Disclosure Statement</u>").  Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them by the Plan.

**THE PLAN IS BEING PROPOSED TO RESTRUCTURE THE PROSPECTIVE DEBTORS' INDEBTEDNESS CONSISTENT WITH THE TERMS OF (I) THAT CERTAIN SUPPORT AGREEMENT DATED AS OF AUGUST 11, 2011 AND EFFECTIVE AS OF SEPTEMBER 8, 2011, AND AMENDED AS OF DECEMBER 2, 2011, AMONG THE PROSPECTIVE DEBTORS, THE PREPETITION ADMINISTRATIVE AGENT, AND THE MAJORITY OF LENDERS UNDER THE PREPETITION CREDIT AGREEMENT (INCLUDING ALL EXHIBITS AND ATTACHMENTS THERETO AND AS MAY BE FURTHER AMENDED OR MODIFIED FROM TIME TO TIME IN ACCORDANCE WITH THE TERMS THEREOF, THE "<u>LEE SUPPORT AGREEMENT</u>") AND (II) THAT CERTAIN SUPPORT AGREEMENT DATED AS OF DECEMBER 2, 2011 AMONG CERTAIN OF THE PROSPECTIVE DEBTORS, STAR PUBLISHING COMPANY, AND THE MAJORITY OF HOLDERS OF PD LLC NOTES CLAIMS (INCLUDING ALL EXHIBITS AND ATTACHMENTS THERETO AND AS MAY BE FURTHER AMENDED OR MODIFIED FROM TIME TO TIME IN ACCORDANCE WITH THE TERMS THEREOF, THE "<u>PULITZER SUPPORT AGREEMENT</u>" AND, TOGETHER WITH THE LEE SUPPORT AGREEMENT, THE "<u>SUPPORT AGREEMENTS</u>").  ONLY HOLDERS OF PREPETITION CREDIT AGREEMENT CLAIMS AND HOLDERS OF PD LLC NOTES CLAIMS AS OF THE APPLICABLE VOTING RECORD DATE ARE ENTITLED TO VOTE ON THE PLAN.**

**THE PROSPECTIVE DEBTORS BEGAN SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN ON NOVEMBER 7, 2011 BY TRANSMITTING BALLOTS TOGETHER WITH THE FIRST SOLICITATION AND DISCLOSURE STATEMENT (INCLUDING EXHIBITS A, B, C, AND E THERETO) AND THE PLAN (WITHOUT EXHIBITS) TO HOLDERS OF PREPETITION CREDIT AGREEMENT CLAIMS.  THE PROSPECTIVE DEBTORS ARE CONTINUING SOLICITATION BY TRANSMITTING ON DECEMBER 3, 2011: (I) BALLOTS, THIS AMENDED SOLICITATION AND DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS HERETO), AND THE PLAN (INCLUDING ALL EXHIBITS THERETO) TO HOLDERS OF PD LLC NOTES CLAIMS THAT ARE "PRIVATE SIDE HOLDERS" OR HAVE AGREED TO TEMPORARY TRADING RESTRICTIONS IN CONNECTION WITH THE RECEIPT OF MATERIAL NON-PUBLIC INFORMATION RESPECTING THE COMPANY; (II) BALLOTS, THIS AMENDED SOLICITATION AND DISCLOSURE STATEMENT (INCLUDING EXHIBITS A, B, C, D, E, AND G HERETO), AND THE PLAN (WITHOUT  EXHIBITS) TO HOLDERS OF PD LLC NOTES CLAIMS THAT**

**ARE NOT "PRIVATE SIDE HOLDERS" AND HAVE NOT AGREED TO TEMPORARY TRADING RESTRICTIONS IN CONNECTION WITH THE RECEIPT OF MATERIAL NON-PUBLIC INFORMATION RESPECTING THE COMPANY; (III) THIS AMENDED SOLICITATION AND DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS HERETO), AND THE PLAN (INCLUDING ALL EXHIBITS THERETO) TO HOLDERS OF PREPETITION CREDIT AGREEMENT CLAIMS THAT ARE "PRIVATE SIDE LENDERS" OR HAVE AGREED TO TEMPORARY TRADING RESTRICTIONS IN CONNECTION WITH THE RECEIPT OF MATERIAL NON-PUBLIC INFORMATION RESPECTING THE COMPANY; AND (IV) THIS AMENDED SOLICITATION AND DISCLOSURE STATEMENT (INCLUDING EXHIBITS A, B, C, D, E, AND G HERETO), AND THE PLAN (WITHOUT EXHIBITS) TO HOLDERS OF PREPETITION CREDIT AGREEMENT CLAIMS THAT ARE NOT "PRIVATE SIDE LENDERS" AND HAVE NOT AGREED TO TEMPORARY TRADING RESTRICTIONS IN CONNECTION WITH THE RECEIPT OF MATERIAL NON-PUBLIC INFORMATION RESPECTING THE COMPANY. IN ADDITION, ANY EXHIBITS TO THE PLAN OR TO THE SOLICITATION AND DISCLOSURE STATEMENT WHICH HAVE NOT ALREADY BEEN DISCLOSED TO HOLDERS OF PD LLC NOTES CLAIMS OR PREPETITION CREDIT AGREEMENT CLAIMS WILL BE DISTRIBUTED BY THE COMPANY TO SUCH HOLDERS IN THE EVENT SUCH EXHIBITS ARE PUBLICLY DISCLOSED. THE SOLICITATION AND DISCLOSURE STATEMENT PROVIDES DISCLOSURE INFORMATION FOR BOTH PREPETITION CREDIT AGREEMENT CLAIMS AND PD LLC NOTES CLAIMS.**

**PRIORITY NON-TAX CLAIMS, OTHER SECURED CLAIMS, THE HERALD CLAIM, GENERAL UNSECURED CLAIMS, AND INTERCOMPANY CLAIMS AGAINST, AS WELL AS INTERESTS IN, ALL OF THE PROSPECTIVE DEBTORS WILL NOT BE IMPAIRED BY THE PLAN, AND AS A RESULT VOTES ON THE PLAN ARE NOT BEING SOLICITED FROM HOLDERS OF SUCH CLAIMS AND INTERESTS. DURING THE CHAPTER 11 CASES, THE PROSPECTIVE DEBTORS INTEND TO OPERATE THEIR BUSINESSES IN THE ORDINARY COURSE AND WILL SEEK AUTHORIZATION FROM THE BANKRUPTCY COURT TO PAY ALL OBLIGATIONS OWED TO THEIR TRADE CREDITORS, CUSTOMERS AND EMPLOYEES, AMONG OTHERS.**

**THE PROSPECTIVE DEBTORS RECOMMEND THAT ALL HOLDERS OF PREPETITION CREDIT AGREEMENT CLAIMS AND HOLDERS OF PD LLC NOTES CLAIMS SUBMIT BALLOTS TO ACCEPT THE PLAN.**

The date of this Amended Solicitation and Disclosure Statement is December 2, 2011.

LA1 2333469v.1

THIS AMENDED SOLICITATION AND DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH OR REVIEWED BY, AND THE SECURITIES TO BE ISSUED ON THE EFFECTIVE DATE WILL NOT HAVE BEEN THE SUBJECT OF A REGISTRATION STATEMENT FILED WITH, THE SEC OR ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER THE SECURITIES ACT OR UNDER ANY STATE SECURITIES OR "BLUE SKY" LAW.  THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.  THIS AMENDED SOLICITATION AND DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

**THE COMPANY ANTICIPATES THAT THE ISSUANCE OF THE NEW COMMON STOCK AND THE NEW PD LLC NOTES WILL BE EXEMPTED FROM REGISTRATION UNDER THE SECURITIES ACT AND RELATED STATE STATUTES BY REASON OF SECTION 1145 OF THE BANKRUPTCY CODE.**

THIS AMENDED SOLICITATION AND DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  ANY PARTY DESIRING ANY SUCH ADVICE SHOULD CONSULT WITH ITS OWN ADVISORS.

EACH HOLDER OF A PREPETITION CREDIT AGREEMENT CLAIM AND EACH HOLDER OF A PD LLC NOTES CLAIM SHOULD REVIEW THIS AMENDED SOLICITATION AND DISCLOSURE STATEMENT AND THE PLAN, AND ALL EXHIBITS HERETO AND THERETO, BEFORE CASTING A BALLOT.  THIS AMENDED SOLICITATION AND DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN AND CERTAIN OTHER DOCUMENTS AND FINANCIAL INFORMATION.  THE PROSPECTIVE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE AS OF THE DATE HEREOF AND PROVIDE ADEQUATE INFORMATION WITH RESPECT TO THE DOCUMENTS SUMMARIZED; HOWEVER, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THOSE DOCUMENTS AND AS OTHERWISE PROVIDED HEREIN.

THE SOLICITATION AND DISCLOSURE STATEMENT CONTAINS PROJECTED FINANCIAL INFORMATION REGARDING THE PROSPECTIVE DEBTORS AND CERTAIN OTHER FORWARD-LOOKING STATEMENTS, ALL OF WHICH ARE BASED ON VARIOUS ESTIMATES AND ASSUMPTIONS.  SUCH INFORMATION AND STATEMENTS ARE SUBJECT TO INHERENT UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE RISKS, INCLUDING THOSE SUMMARIZED HEREIN.

ACTUAL EVENTS, CIRCUMSTANCES, EFFECTS AND RESULTS MAY VARY SIGNIFICANTLY FROM THOSE INCLUDED IN, OR CONTEMPLATED BY, THE PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS CONTAINED HEREIN AND IN THE FIRST SOLICITATION AND

DISCLOSURE STATEMENT.  SUCH PROJECTIONS AND STATEMENTS ARE NOT
NECESSARILY INDICATIVE OF THE FUTURE FINANCIAL CONDITION OR RESULTS
OF OPERATIONS OF THE REORGANIZED DEBTORS AND SHOULD NOT BE
REGARDED AS REPRESENTATIONS BY THE PROSPECTIVE DEBTORS, THEIR
ADVISORS OR ANY OTHER PERSONS THAT THE PROJECTED FINANCIAL
CONDITION OR RESULTS CAN OR WILL BE ACHIEVED.

      NEITHER THE PROSPECTIVE DEBTORS' INDEPENDENT AUDITORS
NOR ANY OTHER INDEPENDENT ACCOUNTANTS HAVE COMPILED, EXAMINED OR
PERFORMED ANY PROCEDURES WITH RESPECT TO THE FINANCIAL PROJECTIONS
OR THE LIQUIDATION ANALYSIS DESCRIBED IN THE SOLICITATION AND
DISCLOSURE STATEMENT, NOR HAVE THEY EXPRESSED ANY OPINION OR ANY
OTHER FORM OF ASSURANCE AS TO SUCH INFORMATION OR ITS
ACHIEVABILITY, NOR DO THEY ASSUME ANY RESPONSIBILITY FOR OR CLAIM
ANY ASSOCIATION WITH THE FINANCIAL PROJECTIONS OR THE LIQUIDATION
ANALYSIS.

      ANY FORWARD-LOOKING STATEMENTS CONTAINED IN THE
SOLICITATION AND DISCLOSURE STATEMENT ARE PROVIDED PURSUANT TO THE
SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION
REFORM ACT AND SHOULD BE EVALUATED IN THE CONTEXT OF THE
ESTIMATES, ASSUMPTIONS, UNCERTAINTIES AND RISKS DESCRIBED HEREIN.

      SEE THE SECTION ENTITLED "RISK FACTORS" OF THE SOLICITATION
AND DISCLOSURE STATEMENT FOR A DISCUSSION OF CERTAIN RISK FACTORS
THAT SHOULD BE CONSIDERED IN CONNECTION WITH THE PLAN.

      THE SOLICITATION AND DISCLOSURE STATEMENT HAS BEEN
PREPARED IN ACCORDANCE WITH SECTIONS 1125 AND 1126 OF THE
BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY
PROCEDURE.  THE SOLICITATION AND DISCLOSURE STATEMENT AND ANY
ACCOMPANYING DOCUMENTS ARE THE ONLY DOCUMENTS TO BE USED IN
CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN.  NO
SOLICITATION OF VOTES COULD BE OR WAS MADE EXCEPT AFTER
DISTRIBUTION OF THE FIRST SOLICITATION AND DISCLOSURE STATEMENT.

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................... vi

INDEX OF EXHIBITS...................................................................................................... xi

I. INTRODUCTION ...........................................................................................................1

    A.    PURPOSE OF THE PLAN AND NEGOTIATIONS RELATING TO THE PLAN ...............................................................................................1

    B.    SUMMARY OF THE TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN...................................................................................3

        1.    Summary Description. ..................................................................3

        2.    Summary Chart. ..........................................................................5

    C.    ADDITIONAL INFORMATION.............................................................10

    D.    SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS.......11

    E.    SUMMARY OF THE SOLICITATION ...................................................12

    F.    VOTING PROCEDURES, BALLOTS, AND VOTING DEADLINE.................14

        1.    Voting Deadline. ........................................................................14

        2.    Holders of Claims Entitled to Vote. ............................................15

        3.    Vote Required for Acceptance by a Class of Claims.......................15

        4.    Ballots. ....................................................................................16

        5.    Withdrawal or Change of Votes on the Plan. ...............................17

    G.    CONFIRMATION HEARING................................................................17

II. GENERAL INFORMATION .........................................................................................18

    A.    OVERVIEW OF CHAPTER 11.............................................................18

    B.    THE PROSPECTIVE DEBTORS' BUSINESSES AND PROPERTIES.............18

        1.    Company Overview. ...................................................................18

        2.    Properties. ................................................................................19

    C.    OPERATIONAL STRUCTURE OF THE PROSPECTIVE DEBTORS.............20

        1.    Print Products and Services. .......................................................21

        2.    Digital Products and Services. ....................................................22

        3.    Sources of Revenue....................................................................23

        4.    Raw Materials. ..........................................................................23

        5.    Employees.................................................................................24

        6.    Recent Operations.....................................................................24

        7.    Corporate History and Business Acquisitions. ..............................25

    D.    MANAGEMENT OF THE PROSPECTIVE DEBTORS ..............................26

        1.    Board of Directors......................................................................26

        2.    Executive Officers and Management Team Members.....................26

        3.    Indemnification of Directors and Officers....................................26

    E.    COMPENSATION AND BENEFITS PROGRAMS.....................................27

        1.    Bonus Programs. .......................................................................27

        2.    Long-Term Incentive Program. ...................................................28

        3.    Other Incentive Programs. ..........................................................28

        4.    Executive Agreements. ...............................................................28

        5.    Retirement Plans. ......................................................................29

        6.    Other Post-Retirement Benefit Programs. ...................................29

    F.    DEBT AND CAPITAL STRUCTURE OF THE COMPANY .........................30

        1.    Summary of Long-Term Indebtedness. ........................................30

2.      Prepetition Credit Facilities. ...................................................30
3.      PD LLC Notes..........................................................................31
4.      Herald Claim. ..........................................................................32
5.      Trade Debt. ..............................................................................32
6.      Intercompany Claims. ..............................................................33
7.      Equity of Lee Enterprises.........................................................33
G.      PENDING LITIGATION AGAINST THE PROSPECTIVE DEBTORS ...........35
H.      EVENTS LEADING UP TO CHAPTER 11................................................36
III. ANTICIPATED CHAPTER 11 CASES OF THE DEBTORS .............................................38
A.      FIRST DAY MOTIONS AND ORDERS .............................................................38
1.      Debtor-In-Possession Financing and Conversion to Exit Facility.............38
2.      Motion Seeking to Approve Consensual Use of Noteholders' Cash
        Collateral and to Provide Adequate Protection............................................41
3.      Motion of the Debtors For an Order (I) Scheduling a Combined
        Hearing to (A) Approve Adequacy of Solicitation and Disclosure
        Statement, (B) Approve Prepetition Solicitation Procedures and
        (C) Confirm the Joint Prepackaged Plan of Reorganization; (II)
        Establishing Deadlines and Procedures For Filing Objections to
        Approval of Solicitation and Disclosure Statement, Approval of
        Prepetition Solicitation Procedures and Confirmation of Plan; and
        (III) Approving Form and Manner of Notice of Objection Deadline
        and Confirmation Hearing. ......................................................................42
4.      Motion to Pay Prepetition Obligations in the Ordinary Course of
        Business. ..................................................................................................42
5.      Motion to Pay Prepetition Wages and Other Benefits to
        Employees. ...............................................................................................42
6.      Motion For Authority to (i) Honor Prepetition Customer
        Obligations and Continue Customer Programs; (ii) Pay Prepetition
        Taxes to Federal, State and Local Taxing Authorities; (iii) Pay
        Prepetition Amounts to Brokers, Shippers and Warehousemen; (iv)
        Continue Prepetition Insurance Programs and Pay Prepetition
        Obligations in Respect Thereof; and (v) Pay Critical Vendors. ...............43
7.      Motion Seeking Continued Use of Existing Cash Management
        System, Bank Accounts and Business Forms. ..........................................43
8.      Motion Prohibiting Utility Companies from Discontinuing,
        Altering or Refusing Service. ...................................................................43
9.      Motion Seeking Joint Administration of the Chapter 11 Cases.................44
10.     Motion to Reimburse Backstop Lender Fees and Expenses......................44
B.      NEXT DAY MOTIONS AND ORDERS.............................................................44
1.      Retention of Professionals by the Debtors' Estates. .................................44
2.      Motion Seeking a Waiver of 341 Meeting and Requirement to File
        Schedules. ................................................................................................45
IV. THE PLAN OF REORGANIZATION ..................................................................45
A.      GENERAL...........................................................................................................45
B.      CLASSIFICATION AND ALLOWANCE OF CLAIMS & EQUITY
        INTERESTS GENERALLY ................................................................................46

C.    PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSE
      CLAIMS, DIP REVOLVING FACILITY CLAIMS, PRIORITY TAX
      CLAIMS, AND SECTION 507(B) CLAIMS ........................................46
      1.    Administrative Expense Claims....................................................46
      2.    DIP Revolving Facility Claims.....................................................47
      3.    Priority Tax Claims.......................................................................48
      4.    Section 507(b) Claims...................................................................48
D.    NON-SUBSTANTIVE CONSOLIDATION AND CLASSIFICATION
      OF CLAIMS ........................................................................................49
E.    PROVISIONS FOR TREATMENT OF CLAIMS AND INTERESTS ................50
      1.    Priority Non-Tax Claims (Classes 1A through 35A)..................50
      2.    Other Secured Claims (Class 1B through 35B). ........................50
      3.    Prepetition Credit Agreement Claims (Classes 1C through 9C). .............50
      4.    PD LLC Notes Claims (Classes 10C through 35C)....................51
      5.    General Unsecured Claims Against the Lee Debtors (Classes 1D
            through 9D)....................................................................................52
      6.    General Unsecured Claims Against the Pulitzer Debtors (Classes
            10D through 35D)..........................................................................52
      7.    Intercompany Claims (Classes 1E through 35E)........................52
      8.    Herald Claim (Classes 12F and 14F)..........................................53
      9.    Interests in the Lee Debtors (Classes 1G through 9G)..............53
      10.   Interests in Pulitzer Debtors (Classes 10G through 35G).........53
F.    IDENTIFICATION OF CLASSES OF CLAIMS AND INTERESTS
      THAT ARE IMPAIRED; ACCEPTANCE OR REJECTION OF THE
      PLAN ...................................................................................................54
      1.    Impaired Classes of Claims Entitled to Vote.............................54
      2.    Acceptance by an Impaired Class. ..............................................54
G.    MEANS FOR IMPLEMENTATION OF THE PLAN.......................................55
      1.    Corporate Governance, Directors, Officers and Corporate Action............55
      2.    Issuance and Distribution of New Securities.............................56
      3.    Reporting Requirements Under Securities Exchange Act of 1934............57
      4.    New Debt Documents. ...................................................................57
      5.    Binding Effect. ..............................................................................60
      6.    Continued Corporate Existence and Vesting of Assets in the
            Reorganized Debtors.....................................................................61
      7.    Cancellation of Certain Credit and Debt Documents. ..............61
      8.    Cancellation of Liens. ...................................................................61
      9.    Additional Transactions Authorized Under the Plan. ...............62
H.    PROVISIONS GOVERNING DISTRIBUTIONS.................................................62
      1.    General Matters..............................................................................62
      2.    Interest on Claims. ........................................................................63
      3.    Record Date for Distributions.....................................................63
      4.    Undeliverable and Unclaimed Distributions.............................63
      5.    Allocation of Plan Distributions Between Principal and Interest. .............63
      6.    Means of Cash Payment................................................................64
      7.    Setoff and Recoupment.................................................................64
      8.    Fractional Shares...........................................................................64

I.     TREATMENT OF EXECUTORY CONTRACTS, UNEXPIRED
       LEASES, INSURANCE POLICIES AND EMPLOYEE BENEFIT
       PLANS ...................................................................................................64
J.     PROCEDURES FOR RESOLVING DISPUTED CLAIMS.........................66
K.     CONFIRMATION AND CONSUMMATION OF THE PLAN........................66
       1.     Condition to Confirmation.......................................................66
       2.     Conditions to Effective Date....................................................67
       3.     Waiver of Conditions................................................................68
       4.     Consequences of Non-Occurrence of Effective Date. ..............68
L.     EFFECT OF PLAN CONFIRMATION .....................................................68
       1.     Binding Effect. ........................................................................68
       2.     Discharge, Releases and Exculpation. ......................................68
       3.     Term of Bankruptcy Injunction or Stays. .................................71
M.     MISCELLANEOUS PLAN PROVISIONS .................................................71
       1.     Retention of Jurisdiction. ........................................................71
       2.     Surrender of Instruments.........................................................72
       3.     Post-Confirmation Date Retention of Professionals.................72
       4.     Bar Date for Certain Administrative Expense Claims................72
       5.     Effectuating Documents and Further Transactions....................72
       6.     Exemption from Transfer Taxes. ..............................................73
       7.     Payment of Consenting Lender Fees, Consenting Noteholder Fees,
              and Backstop Lender Fees. ......................................................73
       8.     Support Agreements.................................................................73
       9.     Amendment or Modification of the Plan. .................................73
       10.    Severability of Plan Provisions.................................................73
       11.    Revocation, Withdrawal or Non-Consummation of the Plan. ...................74
V. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN .......................74
A.     ACCEPTANCE ....................................................................................75
B.     FAIR AND EQUITABLE TEST ..............................................................75
C.     FEASIBILITY ......................................................................................76
D.     BEST INTERESTS TEST AND LIQUIDATION ANALYSIS .........................77
VI. RISK FACTORS ...........................................................................................78
A.     GENERAL BANKRUPTCY LAW CONSIDERATIONS................................79
       1.     General. ..................................................................................79
       2.     Failure to Satisfy Vote Requirement........................................79
       3.     Method of Solicitation. ...........................................................79
       4.     Risks Associated with Resolicitation........................................80
       5.     Nonacceptance of the Plan—Confirmation by Nonconsensual
              "Cram Down". .........................................................................80
       6.     Certain Risks of Nonconfirmation or Delay of Confirmation. ..................81
       7.     Alternatives to Confirmation and Consummation of the Plan....................82
B.     OTHER RISK FACTORS .......................................................................82
       1.     Variances from Projections May Affect Ability to Pay Obligations. ........82
       2.     Extent of Leverage May Limit Ability to Obtain Additional
              Financing for Operations. ........................................................83
       3.     The Debtors May Have Insufficient Liquidity to Successfully
              Operate Their Businesses.........................................................84

4. Historical Financial Information May Not Be Comparable. .....................84
5. Market and Business Risks May Adversely Affect Business Performance. .........................................................................................84
6. Failure to Maintain Customer Relationships May Adversely Affect Financial Results. .........................................................................85
7. Failure to Attract and Maintain Employees May Adversely Affect Financial Results. .........................................................................85
8. Cost of Compliance with Government Regulation May Adversely Affect Financial Results. ..................................................................85
9. Intellectual Property May Not Be Adequately Protected. .........................86
10. Failure of the Company to Maintain its Listing on the NYSE. .................86
C. RISKS TO CREDITORS WHO WILL RECEIVE NEW SECURITIES ............86
1. Lack of Trading Market and Restrictions on Transfer..............................86
2. Reorganized Lee Enterprises Common Stock May Be Diluted................87
3. Restrictions on Funds to Make Payments on New PD LLC Notes and Reorganized Lee Enterprises Common Stock....................................87
4. Recovery Priority of Reorganized Lee Enterprises Common Stock. .........87
VII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.......................87
A. GENERAL TAX CONSIDERATIONS ....................................................87
B. FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS................88
C. FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS ..............................................................................................89
1. General Tax Consequences to Holders of Claims. ...................................90
2. Holders of Allowed Prepetition Credit Agreement Claims. .....................91
3. Holders of Allowed Prepetition PD LLC Notes Claims...........................93
4. Sale, Exchange or Other Disposition of New Common Stock or New PD LLC Notes. .........................................................................93
5. Consent Fees. ...................................................................................93
6. Backup Withholding and Information Reporting. ....................................94
7. Original Issue Discount......................................................................94
8. Market Discount................................................................................95
9. Definition of Security. .......................................................................95
10. Non-U.S. Persons..............................................................................96
D. IMPORTANCE OF OBTAINING PROFESSIONAL TAX ASSISTANCE ..........................................................................................96
E. RESERVATION OF RIGHTS .................................................................96
VIII. CERTAIN FEDERAL AND STATE SECURITIES LAW CONSIDERATIONS.............96
A. EXEMPTION FROM REGISTRATION REQUIREMENTS FOR NEW COMMON STOCK AND NEW PD LLC NOTES...................................96
B. SUBSEQUENT TRANSFERS OF NEW COMMON STOCK AND NEW PD LLC NOTES .........................................................................97
IX. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN .......97
A. CONTINUATION OF THE CHAPTER 11 CASES ..........................................98
B. LIQUIDATION UNDER CHAPTER 7 OR CHAPTER 11...................................98
X. CONCLUSION AND RECOMMENDATION.......................................................98

## INDEX OF EXHIBITS

Exhibit A    -    Joint Prepackaged Plan of Reorganization

Exhibit B    -    Lee Support Agreement

Exhibit C    -    Selected Historical Financial Statements

Exhibit D    -    Liquidation Analysis

Exhibit E    -    Corporate Structure Chart

Exhibit F    -    Projections

Exhibit G    -    Pulitzer Support Agreement

LA1 2333469v.1

# I.  INTRODUCTION

## A.    PURPOSE OF THE PLAN AND NEGOTIATIONS RELATING TO THE PLAN

The Plan attached hereto as Exhibit A has been proposed by the Prospective Debtors to restructure their long-term debt to, among other things, (a) extend the maturities of such debt from their current maturity date of April 28, 2012 until the end of 2015 or later and (b) convert a portion of the Prepetition Credit Facilities (as defined below in Section II.F.2) to which certain of the Prospective Debtors are party into a New Second Lien Term Loan Facility.  The Prospective Debtors' current capital structure and the elements of their proposed new indebtedness to be entered into pursuant to the Plan are discussed in detail in the Solicitation and Disclosure Statement, as well as in the Plan itself.

The Plan is the product of extensive negotiations between the Prospective Debtors and their existing stakeholders.  During the months leading up to the solicitation, the Company and its legal and financial advisors engaged in extensive negotiations with the Prepetition Administrative Agent under the Prepetition Credit Agreement and certain lenders party thereto (all lenders from time to time party to the Prepetition Credit Agreement are referred to herein as the "Prepetition Lenders").  As a result of those negotiations, as of September 8, 2011, each of the Prospective Debtors and Prepetition Lenders holding more than 50% in number and 66.67% in amount of Claims under the Prepetition Credit Facilities had entered into the Lee Support Agreement attached to the Solicitation and Disclosure Statement as Exhibit B, as such Lee Support Agreement was amended as of December 2, 2011.  The Lee Support Agreement, among other things, commits the parties thereto to support a restructuring of the Company's debt structure subject to the terms set forth in the term sheet attached to the Lee Support Agreement.  Those terms are embodied in the Plan.

In addition to the negotiations that led to the Lee Support Agreement, the Prospective Debtors, the Prepetition Administrative Agent, and representatives of the Prepetition Lenders also negotiated with certain Holders of the PD LLC Notes Claims (all entities holding PD LLC Notes Claims are referenced herein as "Noteholders" or "Holders of PD LLC Notes Claims") to achieve a consensual refinancing of the PD LLC Notes.  These negotiations began prior to the commencement of solicitation (as described below) and continued until a consensual arrangement for the restructuring of PD LLC Notes Claims, consistent with the terms of the Lee Support Agreement, had been reached.  As of December 2, 2011, the Prospective Pulitzer Debtors and Star Publishing Company ("Star Publishing") have entered into the Pulitzer Support Agreement attached hereto as Exhibit G with Noteholders holding more than 50% in number and 66.67% in amount of PD LLC Notes Claims.  The Pulitzer Support Agreement, among other things, commits the parties thereto to support confirmation of the Plan on terms consistent with the Lee Support Agreement and the Pulitzer Support Agreement.

The Lee Support Agreement provides that the restructuring described therein and in the exhibits thereto could be conducted without the commencement of chapter 11 cases by the Prospective Debtors in the event that, among other things, Prepetition Lenders holding ninety-five percent (95%) or more of the claims under the Prepetition Credit Facilities become signatories to the Lee Support Agreement (or otherwise joined the Lee Support Agreement) and the Prospective Debtors are able to obtain a commitment for a new debt facility to retire the existing PD LLC Notes and the claims of Prepetition Lenders which did not become signatories to the Lee Support Agreement.  Neither (i) a commitment for a facility to retire the existing PD LLC Notes and claims of non-consenting Prepetition Lenders, nor (ii) the 95% threshold of support from Prepetition Credit Agreement Claims, was achieved as of November 7, 2011, the date by which the Prospective

Debtors were required by the Lee Support Agreement to deliver a notice to the Prepetition Administrative Agent that the Prospective Debtors intended to pursue the restructuring contemplated by the Lee Support Agreement and the term sheet attached thereto through a prepackaged chapter 11 plan (the "Prepackaged Alternative Notice"), subject to the Prospective Debtors' rights to withdraw such notice and not commence chapter 11 cases as provided in the Lee Support Agreement.  The Prospective Debtors delivered the Prepackaged Alternative Notice on November 7, 2011 and began solicitation of votes on the Plan on that date.

      The Support Agreements specify timetables by which certain tasks need to be completed respecting the Prospective Debtors' restructuring, or the Support Agreements may terminate.  Specifically, and subject to certain rights of the Prospective Debtors to withdraw the Prepackaged Alternative Notice, the Prospective Debtors were required to commence the solicitation of votes on the Plan on the date the Prospective Debtors delivered the Prepackaged Alternative Notice to the Prepetition Administrative Agent, which, pursuant to the Lee Support Agreement, was required to occur before the sixtieth (60th) day after the September 8, 2011 effective date of the Lee Support Agreement.  The Prepackaged Alternative Notice was delivered on November 7, 2011, and the solicitation of votes to accept or reject the Plan was commenced on November 7, 2011, in conformance with such requirements.  The Prospective Debtors are also required to commence the Chapter 11 Cases (i) in the case of the Lee Support Agreement, on or before the earlier of (a) the first business day that is thirty-five (35) days after the date of delivery of the Prepackaged Alternative Notice to the Prepetition Administrative Agent or (b) the first business day that is ninety-five (95) days after the September 8, 2011 effective date of the Lee Support Agreement; and (ii) in the case of the Pulitzer Support Agreement, on or before December 12, 2011.  The Company, however, retains the right to withdraw the Prepackaged Alternative Notice if, prior to commencing the Chapter 11 Cases, Prepetition Lenders holding ninety-five percent (95%) or more in aggregate principal of claims under the Prepetition Credit Facilities have executed and delivered the Lee Support Agreement.  The foregoing dates may be extended with the consent of the Prepetition Administrative Agent, the Initial Backstop Lenders, the Required Consenting Lenders, and the Required Consenting Noteholders (as defined in the Pulitzer Support Agreement), as applicable and as provided in the Support Agreements.

      The Prospective Debtors request that all Holders of Prepetition Credit Agreement Claims and Holders of PD LLC Notes Claims timely return the Ballots that have been sent with the Solicitation and Disclosure Statement and vote to ACCEPT the Plan on those Ballots.  The materials sent with the Solicitation and Disclosure Statement, including a copy of the Plan attached as Exhibit A, provide detailed information concerning the Plan, the Prospective Debtors, their history and businesses, and their existing capital structure and proposed capital structure following the restructuring contemplated by the Plan.

      The Prospective Debtors have not commenced chapter 11 cases as of the date of this Amended Solicitation and Disclosure Statement.  Following the solicitation period, if the Holders of Claims under the Prepetition Credit Facilities and Holders of PD LLC Notes Claims vote to accept the Plan in a number and dollar amount sufficient to satisfy the requirements for class acceptance of the Plan in accordance with the Bankruptcy Code, the Prospective Debtors intend, among other things, to commence the Chapter 11 Cases and pursue Confirmation of the Plan, all in accordance with the Support Agreements.  Confirmation of the Plan is subject to, among other things, judicial approval of the Solicitation and Disclosure Statement and the Plan.  If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Holders of Prepetition Credit Agreement Claims and Holders of PD LLC Notes Claims (including, in each case, those who do not submit Ballots,

those who submit Ballots to reject the Plan and those whose Ballots are rejected because they are illegible, incomplete or unsigned), as well as all other Holders of Claims against and Interests in the Debtors, will be bound by the Plan and the transactions contemplated thereby.

CONSISTENT WITH THE TERMS OF THE SUPPORT AGREEMENTS AND THE COMMITMENTS OF THE PARTIES THERETO, THE PROSPECTIVE DEBTORS RECOMMEND THAT YOU VOTE IN FAVOR OF THE PLAN.

**B.    SUMMARY OF THE TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN**

1.    Summary Description.

The following summary is a general overview only, which is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements and notes thereto appearing elsewhere in the Solicitation and Disclosure Statement and the Plan.  For a more detailed description of the terms and provisions of the Plan, see Article IV, "The Plan of Reorganization."  The Prospective Debtors reserve the right to modify the Plan consistent with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, subject to the terms and conditions of the Support Agreements.

(a)    Unimpaired Claims and Interests

If the Plan is confirmed and becomes effective, with the exception of Prepetition Credit Agreement Claims and PD LLC Notes Claims, all Allowed Claims against and Interests in the Debtors will be Reinstated or paid in full in Cash and are therefore Unimpaired under the Plan. Specifically, to describe the treatment proposed under the Plan for most Holders of Claims and Interests other than Claims under the Prepetition Credit Facilities and PD LLC Notes Claims:

- Holders of General Unsecured Claims against the Prospective Debtors, such as trade claims incurred in the ordinary course of business, will be paid in full in Cash, either as such claims become due and payable in accordance with their terms or on the Effective Date;

- the Herald Claim will be Reinstated under the Plan; and

- Holders of equity Interests in the Prospective Debtors will have such Interests Reinstated under the Plan.

(b)    Prepetition Credit Agreement Claims

Holders of Allowed Prepetition Credit Agreement Claims will receive a Pro Rata Share of the loans under a new first-lien term loan facility of up to $689,510,000 in aggregate amount; provided that each Holder of Allowed Prepetition Credit Agreement Claims other than the Backstop Lenders (discussed and defined below) that either (x) has entered into the Lee Support Agreement or a Lender Joinder and made the appropriate irrevocable election at the time of so doing to convert up to such Holder's Maximum Exchange Amount of funded Prepetition Credit Agreement Claims or (y) has not entered into the Lee Support Agreement or a Lender Joinder, but makes the appropriate election on the Ballot it receives to convert up to its Maximum Exchange Amount of funded Prepetition Credit Agreement Claims (which election shall become irrevocable after the

Voting Deadline), will receive such Holder's Second Lien Pro Rata Share (as defined in Section 1.126 of the Plan) of (i) loans under a new second-lien term loan facility to be entered into by the Prospective Debtors (as described in more detail herein, the "New Second Lien Term Loan Facility") and (ii) the 15.0% of the common stock of Reorganized Lee Enterprises to be issued under Reorganized Lee Enterprises' governing documents in connection with the Plan (the "New Common Stock"), calculated on a pre-issuance basis.  The amount of Prepetition Credit Agreement Claims that a Holder thereof validly converts into New Second Lien Term Loans will reduce, on a dollar for dollar basis, such Holder's Prepetition Credit Agreement Claims and the aggregate amount of Prepetition Credit Agreement Claims that are being converted into the New First Lien Term Loan.

Certain Holders of Prepetition Credit Agreement Claims, Goldman Sachs Lending Partners LLC, Mutual Quest Fund, Monarch Master Funding Ltd, Mudrick Distressed Opportunity Fund Global, LP and Blackwell Partners, LLC (collectively, the "Initial Backstop Lenders" and, together with any assignees thereof, the "Backstop Lenders"), have committed to acquire, pursuant to the terms and conditions of certain Amended and Restated Backstop Commitment Letters and Backstop Commitment Letters dated as of December 2, 2011 (the "Backstop Commitment Letters"), up to a maximum amount of $166,250,000 (net of original issue discount) of loans under the New Second Lien Term Loan Facility.  This commitment also includes the potential payment of up to $10,000,000 in aggregate of Backstop Cash to Reorganized Lee Enterprises on the Effective Date to acquire such loans, pursuant to the terms and conditions of the Backstop Commitment Letters.

On the Effective Date, upon the election of the Lee Debtors and subject to satisfaction of the conditions set forth in the DIP Revolving Facility Agreement (as defined in the Plan), all commitments, revolving loans and letters of credit outstanding under the DIP Revolving Facility Agreement shall convert to commitments, revolving loans and letters of credit under the New First Lien Revolving Credit Facility, subject to the terms thereof.  All obligations under the New First Lien Revolving Credit Facility shall be secured by first priority liens on substantially all of the assets of the Reorganized Lee Debtors and shall be superior in payment priority to all other obligations under the New First Lien Credit Facility (which, for the avoidance of doubt, shall include all New First Lien Term Loan obligations) as set forth in the New First Lien Credit Facility Documents.  All obligations under the New Second Lien Term Loan Facility shall be secured by second priority liens on all of the assets of the Reorganized Lee Debtors securing the Prepetition Credit Agreement Claims and on all of the assets of Reorganized Pulitzer and its subsidiaries securing the New PD LLC Notes (described below), as set forth in the New Second Lien Term Loan Documents.

(c)     PD LLC Notes Claims

To effectuate the restructuring of the PD LLC Notes in accordance with the Pulitzer Support Agreement and the Plan, Noteholders are to receive (i) secured promissory notes (the "New PD LLC Notes") in an amount calculated with reference to the principal amount of PD LLC Notes outstanding on the Effective Date and (ii) certain payments, some of which will reduce the principal amount of PD LLC Notes outstanding for purposes of calculating the amount of New PD LLC Notes Reorganized PD LLC will issue and some of which will reduce the principal amount outstanding of the New PD LLC Notes.  As more particularly described in the term sheet attached to the Pulitzer Support Agreement (the "Pulitzer Term Sheet"), no later than the first business day following the effective date of the Pulitzer Support Agreement, the Restricted Cash Reserve Account, the Asset Sale Proceeds Account, and the Excess Cash Flow Account (as such terms are defined in the Pulitzer Support Agreement) will have been terminated, and the amounts on deposit in all three accounts (rounded down, in the aggregate, to the nearest $10,000 increment), and not less than $5,145,000 in aggregate, will have been paid to the Noteholders to reduce the principal amount of the PD LLC

Notes.  In addition, no later than the first business day following the effective date of the Pulitzer Support Agreement, either PD LLC or Pulitzer will have paid $5,000,000 to the Noteholders (from funds then held in Pulitzer's operating accounts) to further reduce the principal amount of PD LLC Notes outstanding.  These payments will reduce the outstanding principal balance of the PD LLC Notes to approximately $127,855,000 as of December 5, 2011.  Lee Enterprises will also return to Pulitzer the $2,692,000 in cash it received from Pulitzer on or about November 9, 2011 pursuant to the Prepetition Credit Agreement, which amount shall reduce the subordinated intercompany payable from Lee Enterprises to Pulitzer on a dollar for dollar basis.

On the Effective Date of the Plan, the existing PD LLC Notes shall be cancelled, and in exchange for the existing PD LLC Notes each Noteholder shall receive the respective Noteholder's Pro Rata Share of (i) the New PD LLC Notes, (ii) a payment of $5,000,000 to be made by Reorganized PD LLC to the Noteholders, using funds made available to Reorganized PD LLC by Reorganized Lee Enterprises, substantially concurrently with the issuance of the New PD LLC Notes, which payment shall be deemed to be a prepayment of the New PD LLC Notes in such amount (the "Lee Closing Date Payment"), and (iii) any accrued interest on the PD LLC Notes, calculated at the non-default rate under the PD LLC Notes Documents, through the Effective Date, that has not previously been paid to the Noteholders, including, but not limited to, as adequate protection under applicable orders of the Bankruptcy Court.  The New PD LLC Notes shall be distributed in an aggregate principal amount equal to (i) the principal amount of the PD LLC Notes outstanding on the Effective Date, minus (ii) the Lee Closing Date Payment, plus (iii) a non-refundable fee of $3,500,000, which shall be earned in full on the Effective Date and payable-in-kind.  As the Prospective Debtors anticipate that the outstanding principal balance of the PD LLC Notes on the Effective Date will be approximately $127,855,000, the Prospective Debtors further anticipate that the aggregate principal amount of the New PD LLC Notes at issuance will be approximately $126,355,000 (i.e., $127,855,000 - $5,000,000 + $3,500,000).  To give effect to the Lee Closing Date Payment, the intercompany payable owed by Reorganized Lee to Reorganized Pulitzer shall be reduced by $5,000,000.

As more particularly described in the Pulitzer Term Sheet, the New PD LLC Notes will, among other things, (i) mature on December 31, 2015; (ii) bear interest at an initial fixed rate of 10.55%, increasing by 75 bps on a yearly basis beginning January 1, 2013; (iii) be secured by first priority security interests in and liens upon all of the assets of Pulitzer and its subsidiaries (except Star Publishing, as to which the Noteholders will receive first priority security interests in and liens upon (a) assets of Star Publishing that are not related to TNI Partners ("TNI") and (b) the intercompany notes issued by Pulitzer in favor of Star Publishing (unless such intercompany notes are cancelled prior to the Closing Date under the Pulitzer Term Sheet, which assets are also pledged, on a second priority basis, to secure the Second Lien Term Loans (as defined in the Lee Support Agreement)); (iv) be guaranteed by all entities currently guaranteeing the PD LLC Notes, plus Star Publishing; and (v) be subject to certain financial covenants, other restrictions, and mandatory prepayment and other obligations detailed in the Pulitzer Term Sheet.

2.    Summary Chart.

A chart summarizing the projected distributions to Holders of Allowed Claims against and Interests in each of the Debtors under the Plan is set forth below.  Although every reasonable effort has been made to be accurate, projections of estimated recoveries are only an estimate.  Any estimates of Claims or Interests in the Solicitation and Disclosure Statement may vary from the final amounts Allowed by the Bankruptcy Court.  As a result of the foregoing and other uncertainties which are inherent in the estimates, the estimated recoveries in the Solicitation and

Disclosure Statement may vary from the actual recoveries received. In addition, the ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation of the Plan and meet the conditions to effectiveness of the Plan, as discussed in the Solicitation and Disclosure Statement. Reference should be made to the entire Solicitation and Disclosure Statement and the Plan for a complete description of the classification and treatment of Allowed Claims against and Interests in each of the Debtors.

| SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS | |
| --- | --- |
| **Class & Description** | **Treatment Under the Plan** |
| **Administrative Expense Claims:**[2]<br><br>Any Claim, other than a DIP Revolving Facility Claim or Section 507(b) Claim, for costs and expenses of administration of the Chapter 11 Cases that are Allowed under sections 328, 330, 363, 365, 503(b), or 507(a)(2) of the Bankruptcy Code. | Subject to the provisions of sections 328, 330, 331 and 503(b) of the Bankruptcy Code, on either: (i) the latest to occur of (x) the Effective Date, (y) the date upon which such Administrative Expense Claim becomes an Allowed Claim and (z) such other date as agreed upon by the Debtors and the Holder of such Administrative Expense Claim, or (ii) such other date as the Bankruptcy Court may order, each Holder of an Allowed Administrative Expense Claim shall receive, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Administrative Expense Claim, (a) Cash equal to the full unpaid amount of such Allowed Administrative Expense Claim, or (b) such other less favorable treatment as the applicable Debtor and such Holder shall have agreed; provided, however, that Allowed Administrative Expense Claims not yet due or that represent obligations incurred by the Debtors in the ordinary course of their business during the Chapter 11 Cases, or assumed by the Debtors during the Chapter 11 Cases, shall be paid or performed when due in the ordinary course of business and in accordance with the terms and conditions of the particular agreements governing such obligations.<br><br>**Estimated Percentage Recovery: 100%** |

---

[2] Although treatment of Administrative Expense Claims, DIP Revolving Facility Claims, Priority Tax Claims and Section 507(b) Claims is included in this chart for informational purposes, none of these categories of Claims are classified for purposes of the Plan.

| | |
|---|---|
| **DIP Revolving Facility Claims:**<br><br>Any Claim against the Lee Debtors held by the DIP Revolving Facility Agent and the DIP Revolving Facility Lenders pursuant to the DIP Revolving Facility Documents and the interim order and Final Order approving the Lee Debtors' entry into and performance of their obligations under the DIP Revolving Facility Documents. | On the Effective Date, all Allowed DIP Revolving Facility Claims shall, at the Debtors' option, in accordance with and on the terms set forth in the DIP Revolving Facility Agreement, either (i) convert into revolving loans and commitments outstanding under the New First Lien Revolving Credit Facility pursuant to the New First Lien Credit Facility Documents and the DIP Revolving Facility Commitment Letter; provided, however, that all accrued and unpaid interest and all fees and expenses due and payable on or prior to the Effective Date under the terms of the DIP Revolving Facility Agreement shall be indefeasibly paid in full in Cash on the Effective Date by the Lee Debtors, or (ii) be indefeasibly paid in full in Cash by the Lee Debtors, and, in each case, the "Commitments" (as defined in the DIP Revolving Facility Agreement) under the DIP Revolving Facility Agreement shall be irrevocably cancelled and the "Letters of Credit" (as defined in the DIP Revolving Facility Agreement) shall be returned undrawn.  Notwithstanding anything to the contrary in the Plan, the Liens and security interests securing the DIP Revolving Facility Claims shall continue in full force and effect until the DIP Revolving Facility Claims (a) convert into revolving loans and commitments outstanding under the New First Lien Revolving Credit Facility or (b) are indefeasibly paid in full in Cash by the Lee Debtors, the "Commitments" (as defined in the DIP Revolving Facility Agreement) are irrevocably cancelled, and the "Letters of Credit" (as defined in the DIP Revolving Facility Agreement) are returned undrawn on the Effective Date.<br><br>**Estimated Percentage Recovery:  100%** |
| **Priority Tax Claims:**<br><br>Any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code. | Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment (in which event such other agreement shall govern), each Holder of an Allowed Priority Tax Claim against any of the Debtors that is due and payable on or before the Effective Date shall receive, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Priority Tax Claim, Cash equal to the amount of such Allowed Priority Tax Claim on the later of (i) the Effective Date and (ii) the date such Priority Tax Claim becomes an Allowed Claim or as soon thereafter as practicable.  All Allowed Priority Tax Claims against any of the Debtors which are not due and payable on the Effective Date shall be paid in the ordinary course of business by the Reorganized Debtors in accordance with the terms thereof.<br><br>**Estimated Percentage Recovery:  100%** |

| | |
|---|---|
| **Section 507(b) Claims:**<br><br>Any Claim pursuant to section 507(a)(2) of the Bankruptcy Code that the Bankruptcy Court orders is entitled to the superpriority status afforded by section 507(b) of the Bankruptcy Code, which superpriority claim may be granted by the Bankruptcy Court to (i) the Prepetition Administrative Agent and the Holders of Prepetition Credit Agreement Claims under the Bankruptcy Court's interim and/or final orders approving the Lee Debtors' entry into and performance of their obligations under the DIP Revolving Facility Documents and (ii) the PD LLC Notes Collateral Agent and the Holders of PD LLC Notes Claims under the Bankruptcy Court's interim and/or final orders approving the Pulitzer Debtors' use of cash collateral. | On the Effective Date, as a consequence of the implementation of the New First Lien Credit Facility, the Reorganized Debtors' entry into the New Second Lien Term Loan Documents, the issuance of the New Common Stock, and the treatment of PD LLC Notes Claims in accordance with section 3.3.3(c) of the Plan, all Section 507(b) Claims shall be settled, released by the Holders of such Claims, and discharged.<br><br>**Estimated Percentage Recovery: 100%** |
| **Priority Non-Tax Claims:**<br><br>Classes 1A through 35A consist of all Claims entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code, other than  Administrative Expense Claims, DIP Revolving Facility Claims and Priority Tax Claims. | On the Effective Date, each Holder of an Allowed Priority Non-Tax Claim against any of the Debtors shall have such Claim Reinstated.<br><br>**Estimated Percentage Recovery: 100%** |
| **Other Secured Claims:**<br><br>Classes 1B though 35B consist of all Secured Claims other than Prepetition Credit Agreement Claims, DIP Revolving Facility Claims and PD LLC Notes Claims. | On the Effective Date, each Holder of an Allowed Other Secured Claim against any of the Debtors shall have its Claim Reinstated.<br><br>**Estimated Percentage Recovery: 100%** |

| | |
|---|---|
| **Prepetition Credit Agreement Claims:**<br><br>Classes 1C though 9C consist of all Claims arising under, evidenced by, or secured pursuant to, the Prepetition Credit Agreement Documents. | On the Effective Date, each Holder of an Allowed Prepetition Credit Agreement Claim against the Lee Debtors shall receive on account of, in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Claim, such Holder's Pro Rata Share of (i) the New First Lien Term Loan and (ii) any accrued and unpaid interest on the Prepetition Credit Agreement Claims, calculated at the non-default rate under the Prepetition Credit Agreement Documents, through the Effective Date, that has not been previously paid to the Holders of Prepetition Credit Agreement Claims, including, but not limited to, as adequate protection under applicable orders of the Bankruptcy Court; provided, however, that each Converting Lender shall receive, for the Prepetition Credit Agreement Claim(s) that such Converting Lender elects to convert pursuant to such Converting Lender's New Second Lien Term Loan Election (which converted amount shall be deducted both from the amount of such Converting Lender's Allowed Prepetition Credit Agreement Claim and the total amount of Allowed Prepetition Credit Agreement Claims solely for purposes of determining the Holders' Pro Rata Shares of the New First Lien Term Loan), such Converting Lender's Second Lien Pro Rata Share of (i) the New Second Lien Term Loan and (ii) the New Common Stock. In addition, on the Effective Date, any unexpired letters of credit outstanding under the Prepetition Credit Agreement shall be deemed made or issued, as applicable, under the New First Lien Revolving Credit Facility. |
| **PD LLC Notes Claims:**<br><br>Classes 10C though 35C consist of all Claims against the Pulitzer Debtors arising under, evidenced by, or secured pursuant to, the PD LLC Notes Documents. | On the Effective Date, each Holder of an Allowed PD LLC Notes Claim shall receive on account of, in full and complete satisfaction, settlement, release and discharge of, and in exchange for such Claim, such Holder's Pro Rata Share of (i) the New PD LLC Notes, (ii) the Lee Closing Date Payment, which shall be deemed to be a prepayment of the New PD LLC Notes held by such Holder, and (iii) any accrued interest on the PD LLC Notes, calculated at the non-default rate under the PD LLC Notes Documents, through the Effective Date, that has not previously been paid to the PD LLC Noteholders, including, but not limited to, as adequate protection under applicable orders of the Bankruptcy Court. |
| **General Unsecured Claims against Lee Debtors:**<br><br>Classes 1D though 9D consist of all General Unsecured Claims against the Lee Debtors. | On or as soon as reasonably practicable after the latest to occur of (i) the Effective Date or (ii) the date on which an Allowed General Unsecured Claim against any of the Lee Debtors becomes due and payable in accordance with the applicable non-bankruptcy law governing such Claim, the Holder of such Allowed General Unsecured Claim against any of the Lee Debtors shall receive Cash from the Lee Debtors equal to the full unpaid amount of such Claim, together with interest thereon, at the applicable non-default rate, to which the Holder of such Claim may be entitled under applicable non-bankruptcy law through the Effective Date.<br><br>**Estimated Percentage Recovery: 100%** |
| **General Unsecured Claims against Pulitzer Debtors:**<br><br>Classes 10D though 35D consist of all General Unsecured Claims against the Pulitzer Debtors. | On or as soon as reasonably practicable after the latest to occur of (i) the Effective Date or (ii) the date on which an Allowed General Unsecured Claim against any of the Pulitzer Debtors becomes due and payable in accordance with the applicable non-bankruptcy law governing such Claim, the Holder of such Allowed General Unsecured Claim against any of the Pulitzer Debtors shall receive Cash from the Pulitzer Debtors equal to the full unpaid amount of such Claim, together with interest thereon, at the applicable non-default rate, to which the Holder of such Claim may be entitled under applicable non-bankruptcy law through the Effective Date.<br><br>**Estimated Percentage Recovery: 100%** |

| Intercompany Claims:<br><br>Classes 1E through 35E consist of all Claims against a Debtor that are held by another Debtor or a non-Debtor Affiliate of any Debtor. | On the Effective Date each Holder of an Allowed Intercompany Claim against any of the Debtors shall have such Claim Reinstated; provided, however, that the Intercompany Claim held by Pulitzer against Lee Enterprises shall be reduced by the amount of the Lee Closing Date Payment.<br><br>**Estimated Percentage Recovery: 100%** |
|---|---|
| Herald Claim:<br><br>Classes 12F and 14F consist of the Herald Claim against PD LLC and DS LLC. | On the Effective Date, the Herald Claim shall be Reinstated, and shall, in accordance with the treatment afforded to such Claim under that certain Redemption Agreement dated February 18, 2009, (i) not be redeemed for Cash unless all obligations under the New First Lien Term Loan, the New Second Lien Term Loan, and the New Revolving Credit Facility have been paid in full in Cash and all obligations of PD LLC and DS under the New PD LLC Notes Documents have been paid in full in Cash, and (ii) be junior and subordinate in all respects to the obligations of Reorganized PD LLC and Reorganized DS LLC under the New PD LLC Notes Documents in the same manner as the Herald Claim was junior and subordinate in all respects to the obligations of PD LLC and DS LLC under the PD LLC Notes Documents.<br><br>**Estimated Percentage Recovery: 100%** |
| Interests in the Lee Debtors:<br><br>Classes 1G through 9G consist of all Interests in the Lee Debtors. | On the Effective Date, each Holder of an Interest in the Lee Debtors shall have such Interest Reinstated.<br><br>**Estimated Percentage Recovery: 100%** |
| Interests in the Pulitzer Debtors:<br><br>Classes 10G through 35G consist of all Interests in the Pulitzer Debtors. | On the Effective Date, each Holder of an Interest in the Pulitzer Debtors shall have such Interest Reinstated.<br><br>**Estimated Percentage Recovery: 100%** |

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, DIP Revolving Facility Claims, Priority Tax Claims, and Section 507(b) Claims have not been classified (as set forth in Article II of the Plan).

## C.    ADDITIONAL INFORMATION

The Solicitation and Disclosure Statement and the Plan (and all exhibits, schedules and appendices hereto and thereto), the forms of Ballots, and the related materials delivered herewith and previously as part of the solicitation process for the Plan are being furnished, as applicable, to Holders of Prepetition Credit Agreement Claims and Holders of PD LLC Notes Claims pursuant to sections 1125(g) and 1126(b) of the Bankruptcy Code, in connection with the solicitation of votes to accept or reject the Plan (and the transactions contemplated thereby, as described herein).  The New Common Stock issued to certain Holders of Prepetition Credit Agreement Claims and the New PD LLC Notes issued to Holders of PD LLC Notes Claims in accordance with the Plan will be issued pursuant to the exemption from the registration requirements of the Securities Act provided by section 1145 of the Bankruptcy Code.

The Voting Agent for the Plan is Garden City Group, Inc.:

Lee Enterprises, Incorporated
c/o GCG
P.O. Box 9812
Dublin, Ohio  43017-5712

The Company's legal advisors are:

SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
312-853-7000
Attn: Larry J. Nyhan, Kenneth P. Kansa, and Bojan Guzina

and

YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
302-571-6600
Attn: Robert S. Brady, Edwin J. Harron, and Edmon L. Morton

_____

All exhibits to the Solicitation and Disclosure Statement, whether distributed with this Amended Solicitation and Disclosure Statement or with the First Solicitation and Disclosure Statement, are incorporated into and are a part of the Solicitation and Disclosure Statement as if fully set forth therein.

No person has been authorized to give any information or make any representation on behalf of the Prospective Debtors not contained, or incorporated by reference, in the Solicitation and Disclosure Statement or the Plan and, if given or made, such information or representation must not be relied upon as having been authorized.

The delivery of the First Solicitation and Disclosure Statement or this Amended Solicitation and Disclosure Statement will not, under any circumstances, create any implication that the information  contained therein (or incorporated by reference from other documents or reports) is correct as of any time subsequent to the date hereof or thereof (or the date of a document or report incorporated by reference), or that there has been no change in the information set forth herein or therein (or in a document or report incorporated by reference) or in the Prospective Debtors' or Debtors' affairs since the date hereof (or thereof).  All statements contained in this Amended Solicitation and Disclosure Statement are made as of the date hereof unless otherwise specified.

**D.**    **SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS**

CERTAIN OF THE INFORMATION CONTAINED IN THE SOLICITATION AND DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY

DIFFERENT FROM ACTUAL FUTURE RESULTS.  THE WORDS "BELIEVE," "MAY," "WILL," "ESTIMATE," "CONTINUE," "ANTICIPATE," "INTEND," "EXPECT" AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING STATEMENTS.  THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED IN ARTICLE VI, "RISK FACTORS."  IN LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THE SOLICITATION AND DISCLOSURE STATEMENT MAY NOT OCCUR, AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS.  NONE OF THE PROSPECTIVE DEBTORS, NOR THE DEBTORS, NOR THE REORGANIZED DEBTORS UNDERTAKES ANY OBLIGATION TO UPDATE PUBLICLY OR REVISE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE.

THE PROSPECTIVE DEBTORS ARE MAKING AVAILABLE AS PART OF THIS AMENDED SOLICITATION AND DISCLOSURE STATEMENT PROJECTIONS PREPARED BY MANAGEMENT, IN CONSULTATION WITH THE PROSPECTIVE DEBTORS' FINANCIAL ADVISORS.  WHILE THE PROSPECTIVE DEBTORS PRESENT THESE PROJECTIONS WITH NUMERICAL SPECIFICITY, THEY HAVE NECESSARILY BASED THE PROJECTIONS ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, THOUGH CONSIDERED REASONABLE BY THE PROSPECTIVE DEBTORS' MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH WILL BE BEYOND THE DEBTORS' OR REORGANIZED DEBTORS' CONTROL.  THE PROSPECTIVE DEBTORS CAUTION THAT THEY CANNOT MAKE ANY REPRESENTATIONS AS TO THE ACCURACY OF THESE PROJECTIONS OR TO THE DEBTORS' OR REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS.  SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHERMORE, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE PROJECTIONS WERE PREPARED MAY DIFFER FROM ANY ASSUMED FACTS AND CIRCUMSTANCES.  ALTERNATIVELY, ANY EVENTS AND CIRCUMSTANCES THAT COME TO PASS MAY WELL HAVE BEEN UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER.  THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

## E.    <u>SUMMARY OF THE SOLICITATION</u>

This summary does not contain all of the information that is important to Holders of Prepetition Credit Agreement Claims and Holders of PD LLC Notes Claims and is qualified in its entirety by the more detailed information included elsewhere in the Ballots, the Solicitation and Disclosure Statement, the accompanying Plan, and any additional solicitation materials distributed by the Prospective Debtors.

| | |
|---|---|
| **Background Information:** | The Prospective Debtors expect to commence the Chapter 11 Cases as soon as practicable after obtaining the requisite number of votes accepting the Plan from Holders of Prepetition Credit Agreement Claims who submit Ballots and Holders of PD LLC Notes Claims who submit Ballots, and in any event not later than the times set forth in the Support Agreements.  If the requisite votes are received in advance of the Voting Deadline, the Prospective Debtors reserve the right to commence the Chapter 11 Cases prior to the expiration of the solicitation period in advance of the Voting Deadline (although the Voting Deadline may remain unchanged).  To confirm the Plan, the Bankruptcy Code requires acceptance by creditors in each of Classes 1C through 9C (Prepetition Credit Agreement Claims) and Classes 10C through 35C (PD LLC Notes Claims) that hold at least two-thirds in dollar amount and a majority in number of Claims in those Classes, in both cases counting only those Claims that have been properly voted to accept or reject the Plan. |
| **The Solicitation:** | The Prospective Debtors began soliciting votes to accept or reject the Plan from the Holders of Prepetition Credit Agreement Claims on November 7, 2011, and are soliciting votes to accept or reject the Plan from Holders of Prepetition Credit Agreement Claims and Holders of PD LLC Notes Claims only.  All other Claims against and Interests in the Debtors are either Reinstated or otherwise Unimpaired by the Plan and the Holders of such Claims and Interests are accordingly not entitled to vote to accept or reject the Plan. |
| **Voting Record Date:** | Only Holders of Prepetition Credit Agreement Claims as of November 4, 2011 and Holders of PD LLC Notes Claims as of November 30, 2011 (collectively, the "Voting Record Date"), will be entitled to vote on the Plan. The Prospective Debtors reserve the right to set a later Voting Record Date. |
| **Voting Deadline; Extension:** | The Voting Deadline is 4:00 p.m., prevailing Eastern time, on December 9, 2011, unless the Prospective Debtors in their sole discretion extend the date by which Ballots will be accepted.  If the Prospective Debtors extend the Voting Deadline, the term Voting Deadline will mean the time and date designated by the Prospective Debtors.  Any extension of the Voting Deadline will be followed as promptly as practicable by notice of the extension. |
| **Voting Procedures:** | Holders of Prepetition Credit Agreement Claims and Holders of PD LLC Notes Claims should deliver a properly completed Ballot to the Voting Agent.  Ballots must be received by the Voting Agent on or before the Voting Deadline to be counted.  Ballots may be delivered via mail, overnight mail or other delivery service, facsimile or email attaching a .pdf of the executed Ballot. |
| **Revocation or Withdrawal of Ballots:** | Upon the expiration or termination of the solicitation, except as provided in Section IV.M.11 hereof, no Holders of Prepetition Credit Agreement Claims or PD LLC Notes Claims may revoke or withdraw their Ballots; provided that, prior to the Voting Deadline, as may be extended, voting Holders may |

| | |
|---|---|
| | withdraw any Ballots cast even if such Ballots have been delivered to the Voting Agent. |
| **Voting Agent:** | The Garden City Group, Inc. has been retained by the Prospective Debtors as the Voting Agent in connection with this solicitation.  Deliveries of Ballots should be directed to The Garden City Group, Inc. as set forth below or pursuant to the instructions contained in the Ballots. |

## F.    VOTING PROCEDURES, BALLOTS, AND VOTING DEADLINE

The following instructions for voting to accept or reject the Plan, together with the instructions contained in the Ballots, constitute the Voting Instructions.  To vote on the Plan, a party must be a Holder of a Prepetition Credit Agreement Claim or a Holder of a PD LLC Notes Claim as of the applicable Voting Record Date and fill out and sign the Ballot enclosed herewith in accordance with the Voting Instructions.

1.    Voting Deadline.

TO BE CONSIDERED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN, ALL BALLOTS MUST BE **RECEIVED BY** THE VOTING AGENT NO LATER THAN THE VOTING DEADLINE OF 4:00 P.M. PREVAILING EASTERN TIME ON DECEMBER 9, 2011.  ONLY THOSE BALLOTS ACTUALLY RECEIVED BY THE VOTING AGENT BEFORE THE VOTING DEADLINE WILL BE COUNTED AS EITHER ACCEPTING OR REJECTING THE PLAN.  ALL BALLOTS MUST BE SENT TO THE FOLLOWING ADDRESS/FACSIMILE NUMBER/EMAIL ADDRESS (AS APPLICABLE):

IF BY FIRST CLASS MAIL:

Lee Enterprises, Incorporated
c/o GCG
P.O. Box 9812
Dublin, Ohio  43017-5712

IF BY OVERNIGHT MAIL OR HAND-DELIVERY:

Lee Enterprises, Incorporated
c/o GCG
5151 Blazer Parkway, Suite A
Dublin, Ohio 43017

IF BY FACSIMILE:

(888) 424-1095

IF BY EMAIL:

LETBalloting@gcginc.com

Votes cannot be transmitted orally.  Ballots may be delivered via mail, overnight mail or other delivery service, facsimile or email attaching a .pdf of the executed Ballot.  Holders of

Prepetition Credit Agreement Claims and Holders of PD LLC Notes Claims are urged to return their signed and completed Ballots promptly.

The Prospective Debtors have extended the Voting Deadline to December 9, 2011 at 4:00 p.m. prevailing Eastern time from the earlier voting deadline of December 5, 2011 that was set forth in the First Solicitation and Disclosure Statement and on the Ballots that were distributed to the Holders of Prepetition Credit Agreement Claims with the First Solicitation and Disclosure Statement.  The Voting Deadline as extended applies to all Prepetition Credit Agreement Claims and PD LLC Notes Claims.

2.    Holders of Claims Entitled to Vote.

Prepetition Credit Agreement Claims in Classes 1C-9C and PD LLC Notes Claims in Classes 10C-35C are the only Claims that are Impaired by the Plan.  As a result, only Holders of Prepetition Credit Agreement Claims and Holders of PD LLC Notes Claims are entitled to vote to accept or reject the Plan.

Under section 1124 of the Bankruptcy Code, a class of claims or equity interests is deemed to be "impaired" under a plan unless (1) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or equity interest entitles the holder thereof or (2) notwithstanding any legal right to an accelerated payment of such claim or equity interest, the plan (a) cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy or defaults of a kind that do not require cure), (b) reinstates the maturity of such claim or equity interest as it existed before the default, (c) compensates the holder of such claim or equity interest for any damages from such holder's reasonable reliance on such legal right to an accelerated payment, (d) if such claim or such interest arises from a failure to perform nonmonetary obligations, other than a default arising from a failure to operate a nonresidential real property lease, compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure and (e) does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

Classes 1A-35A (Priority Non-Tax Claims), Classes 1B-35B (Other Secured Claims), Classes 1D-35D (General Unsecured Claims), Classes 1E-35E (Intercompany Claims), Classes 12F and 14F (Herald Claim against PD LLC and DS LLC), and Classes 1G-35G (Interests) are either Reinstated or otherwise Unimpaired under the Plan, and the Holders of Claims and Interests in each of these Classes are conclusively presumed to have accepted the Plan and are not entitled to vote on the Plan.

In accordance with sections 1126 and 1129 of the Bankruptcy Code, Classes 1C-9C (Prepetition Credit Agreement Claims) and Classes 10C-35C (PD LLC Notes Claims) are Impaired under the Plan and the Holders of such Claims will receive distributions under the Plan as described in Section 3.2.3 and Section 3.3.3 of the Plan, respectively.  As a result, the holders of Claims in each of these Classes are entitled to vote to accept or reject the Plan.

3.    Vote Required for Acceptance by a Class of Claims.

A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (⅔) in amount and more than one-half (½) in number of the Claims in such Class that have voted on the Plan.

4.      Ballots.

        After carefully reviewing the materials in the Solicitation and Disclosure Statement and its exhibits, including the Plan, and the detailed instructions accompanying the Ballot, each Holder of either a Prepetition Credit Agreement Claim or PD LLC Notes Claim should indicate (i) its acceptance or rejection of the Plan on its Ballot and (ii) if it is a Holder of a Prepetition Credit Agreement Claim and has not entered into the Lee Support Agreement or a Lender Joinder, whether such Holder elects to convert any portion of its funded Prepetition Credit Agreement Claims, subject to the limitations set forth in Section 3.2.3 of the Plan, by completing the Ballot.  All votes to accept or reject the Plan cast by Holders of Prepetition Credit Agreement Claims and Holders of PD LLC Notes Claims must be cast by properly submitting the duly completed and executed form of Ballot. Holders of Prepetition Credit Agreement Claims and Holders of PD LLC Notes Claims voting on the Plan should complete and sign the Ballot in accordance with the Voting Instructions, being sure to check the appropriate box entitled "Accept the Plan" or "Reject the Plan."  In addition, each Holder of a Prepetition Credit Agreement Claim or PD LLC Notes Claim may elect, by checking the appropriate box on the Ballot and subject to the terms of the Lee Support Agreement and the Pulitzer Support Agreement, respectively, not to grant the releases contained in Section 10.3 of the Plan. Please refer to Section 10.3 of the Plan and Section IV.L.2 hereof for details regarding the relevant release provisions.

        In order for its vote to be counted, a Holder of a Prepetition Credit Agreement Claim or Holder of PD LLC Notes Claim must complete and sign an original Ballot and return it to the Voting Agent in accordance with the Voting Instructions.  Each Ballot has been coded to reflect particular Prepetition Credit Agreement Claims and PD LLC Notes Claims.  Accordingly, in voting to accept or reject the Plan, Holders of Prepetition Credit Agreement Claims and Holders of PD LLC Notes Claims must use only the coded Ballot or Ballots sent to them by the Voting Agent.  Holders of Prepetition Credit Agreement Claims received a Ballot in connection with distribution of the First Solicitation and Disclosure Statement and will not receive another Ballot in connection with the Amended Solicitation and Disclosure Statement.  If you are a Holder of a Prepetition Credit Agreement Claim or PD LLC Notes Claim and did not receive a Ballot, received a damaged Ballot, lost your Ballot or if you have any questions regarding the procedures for voting on the Plan, you should contact the Voting Agent:

Lee Enterprises, Incorporated
c/o GCG
P.O. Box 9812
Dublin, Ohio  43017-5712
Tel: (888) 714-2539

        Ballots must be delivered to the Voting Agent, at the address, facsimile or email set forth above, and received by the Voting Deadline.  THE METHOD OF SUCH DELIVERY IS AT THE ELECTION AND RISK OF THE VOTER.  If such delivery is by mail, it is recommended that voters use an air courier with a guaranteed next day delivery or registered mail, properly insured, with return receipt requested.  In all cases, sufficient time should be allowed to ensure timely delivery.

        **BALLOTS WILL NOT BE COUNTED IF THEY ARE RECEIVED BY THE VOTING AGENT AFTER THE VOTING DEADLINE (EXCEPT IN THE SOLE DISCRETION OF THE PROSPECTIVE DEBTORS) OR ARE ILLEGIBLE, INCOMPLETE OR UNSIGNED.**

**In order for a vote to be counted, a Ballot must be properly completed in accordance with the Voting Instructions on the Ballot and received no later than the Voting Deadline by the Voting Agent (as defined herein).**

**Any executed Ballot that does not indicate either an acceptance or rejection of the Plan or indicates both an acceptance and rejection of the Plan, in whole or in part, will not be counted as a vote either to accept or reject the Plan.**

The Prospective Debtors reserve the right to terminate the solicitation at any time prior to the Voting Deadline, subject to the terms and conditions of the Lee Support Agreement. Additionally, upon notice to the Holders of Prepetition Credit Agreement Claims and Holders of PD LLC Notes Claims, the Prospective Debtors reserve the right to amend the solicitation at any time prior to the Voting Deadline. The Prospective Debtors also reserve the right to extend the Voting Deadline. Any such extension will be followed as promptly as practicable by notice thereof. If the Prospective Debtors extend the Voting Deadline, the Prospective Debtors reserve the right to establish a later Voting Record Date.

    5.    <u>Withdrawal or Change of Votes on the Plan</u>.

After the Voting Deadline, except as provided in Section IV.M.11 hereof, no vote may be withdrawn without the prior consent of the Prospective Debtors or the Debtors (as the case may be), which consent shall be given in the Prospective Debtors' or the Debtors' sole discretion.

Any Holder of Prepetition Credit Agreement Claims or PD LLC Notes Claims who has submitted to the Voting Agent prior to the Voting Deadline a properly completed Ballot may change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed Ballot. If more than one timely, properly completed Ballot is received with respect to the same Claim (including if such Ballots are received on the same date), the Ballot that will be counted for purposes of determining whether sufficient acceptances have been received will be the Ballot that the Voting Agent determines was the last to be received. If the Voting Agent is unable to determine which of such Ballots was the last to be received and such Ballots are voted inconsistently, the Voting Agent will reject all such Ballots.

## G.    CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing to consider Confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan of reorganization.

Once the Prospective Debtors commence the Chapter 11 Cases and seek Confirmation of the Plan, the Bankruptcy Court will schedule the Confirmation Hearing to consider whether the Plan satisfies the various requirements of the Bankruptcy Code. In connection therewith, the Debtors will submit a report to the Bankruptcy Court concerning the votes for acceptance or rejection of the Plan by the parties entitled to vote thereon. The Prospective Debtors intend to seek a "first day order" scheduling the Confirmation Hearing for approximately forty (40) days after the Chapter 11 Cases are commenced. At the Confirmation Hearing, the Prospective Debtors intend to seek approval of the Solicitation and Disclosure Statement and Confirmation of the Plan pursuant to sections 1125, 1128 and 1129 of the Bankruptcy Code. The notice of the Confirmation Hearing (the "<u>Confirmation Hearing Notice</u>") will be provided to all Holders of Claims and Interests or their representatives as required by Bankruptcy Rule 2002. Objections to

Confirmation must be filed with the Bankruptcy Court and served on the parties specified in the Confirmation Hearing Notice by the date designated in the Confirmation Hearing Notice, and are otherwise governed by Bankruptcy Rules 3020(b) and 9014 and the local rules of the Bankruptcy Court.

## II.  GENERAL INFORMATION

### A.  OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and its equity security holders.  In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote the equality of treatment of similarly situated creditors and equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the commencement date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case.  A plan of reorganization sets forth the means for satisfying claims against and equity interests in the debtor.  The "prepackaged" Plan of reorganization that has been proposed by the Prospective Debtors is described in detail in Article IV below and is attached hereto as Exhibit A.

In "prepackaged" chapter 11 cases, such as the chapter 11 cases contemplated by the Plan and the Solicitation and Disclosure Statement, agreement is reached among prospective debtors and one or more classes of their creditors on the terms of a restructuring before the bankruptcy filing occurs, and the bankruptcy cases are used to implement the agreed-upon plan and to address the claims of creditors with whom there is no agreement.  The votes of creditors with whom the prospective debtors have agreed are solicited before the bankruptcy filing, and the plan confirmation process starts immediately upon filing the chapter 11 cases. Prepackaged chapter 11 cases often take less time to complete than more conventional bankruptcy cases and usually have little, if any, effect on debtors' business operations.  Greater certainty of results and reduced costs are other benefits generally associated with prepackaged bankruptcy cases.

### B.  THE PROSPECTIVE DEBTORS' BUSINESSES AND PROPERTIES

1.  Company Overview.

Based in Davenport, Iowa, the Company is a leading provider of local news and information, and is a major source of advertising, in primarily midsize markets in the Midwest, Mountain West and West regions of the United States.  The Company, together with its non-Debtor affiliates, publishes 48 daily newspapers and nearly 300 weekly newspapers and specialty publications in 23 states, holds a joint interest in four other daily newspapers,[3] and provides rapidly growing digital products.  The Company currently employs approximately 6,200 employees

---

[3] Of these operations, non-Debtor affiliates of the Company publish one daily newspaper and hold the joint interests in four other daily newspapers.

nationwide.  Lee Enterprises' Annual Report on Form 10-K for the year ended September 26, 2010 and Quarterly Report on Form 10-Q for the quarter ended June 26, 2011 have been attached collectively as Exhibit C hereto, in order to provide historical financial information respecting the Prospective Debtors.

The markets in which the Company operates, including four state capitals, have established retail bases, and most are regional shopping hubs.  Six of the Company's top ten markets by revenue include major universities, and seven are home to major corporate headquarters.  Through its print and digital platforms, the Company reaches an overwhelming majority of adults in its markets.  Unlike many other newspaper publishers, the Company does not face significant competition from other local daily newspapers in most of its markets, although there is significant competition for readers and viewers in those markets from other media.  In its top ten markets by revenue, only two have significant local daily print competition.  In the balance of its markets, the Company has little or no local daily print competition.  The Company intends to increase its share of local advertising through increased sales activities in its existing markets and, over time, to increase print and digital audiences through internal expansion into existing and contiguous markets and enhancement of digital products.

2.    Properties.

The Company leases its executive offices at 201 North Harrison Street, Suite 600, Davenport, Iowa.  The initial lease term expires in 2019.  All of the Company's principal facilities except (i) Madison, Wisconsin (which is owned by Madison Newspapers Inc. ("MNI"), a non-Debtor affiliate of Lee Enterprises); (ii) Tucson, Arizona (which is jointly owned by Star Publishing and Citizen Publishing Company ("Citizen")); and (iii) leased land for the (a) Helena, Montana and (b) Lihue, Hawaii plants, are owned.  All facilities are well maintained, in good condition, suitable for existing office and publishing operations, as applicable, and adequately equipped.  With the exception of its St. Louis facility, none of the Company's facilities is individually significant to its business.

The Company's St. Louis printing facilities are both owned and leased.  PD LLC owns 749,000 square feet and leases 23,000 square feet, while Suburban Journals of Greater St. Louis owns 89,000 square feet and leases 39,000 square feet.

Several of the Company's daily newspapers, as well as many of its and its non-Debtor affiliate Madison Newspapers Inc.'s nearly 300 other publications, are printed at other Company facilities, or such printing is outsourced to enhance operating efficiency.  The Company continues to evaluate additional insourcing and outsourcing opportunities in order to manage its operating and capital costs more effectively.  The Company's newspapers and other publications also have formal or informal backup arrangements for printing in the event of a disruption in production capability.  As of the date of this Amended Solicitation and Disclosure Statement, while the Company has not adopted any new plans to close any of its facilities, it will continue to offer for sale four properties it has offered for sale prior to the date of this Amended Solicitation and Disclosure Statement: (i) an office/warehouse facility in St. Charles, MO; (ii) an industrial building in Oceanside, CA; (iii) an office facility in Eau Claire, WI; and (iv) several developed lots in Polson, MT.

## C.    OPERATIONAL STRUCTURE OF THE PROSPECTIVE DEBTORS

Lee Enterprises currently has thirty-four (34) domestic wholly-owned subsidiaries, all but one of which are debtors in these Chapter 11 Cases.[4]  In addition, the Company has partnered with certain third parties (as discussed further below) to publish other newspapers and publications in certain markets.  These endeavors are pursued through one majority-owned Prospective Debtor and three 50% owned, non-Debtor affiliates. A chart depicting the Company's corporate structure is annexed hereto as Exhibit E.

The Company publishes the following daily newspapers[5] and maintains the following primary digital sites:

| Newspaper | Primary Website | Location | Paid Circulation | |
|---|---|---|---|---|
| | | | **Daily** | **Sunday** |
| *St. Louis Post-Dispatch* | stltoday.com | St. Louis, MO | 191,631 | 332,825 |
| *The Times* | nwitimes.com | Munster, Valparaiso, and Crown Point, IN | 86,894 | 91,701 |
| *North County Times and the Californian* | nctimes.com | Escondido and Temecula, CA | 75,727 | 80,920 |
| Lincoln Group | | | | |
| *Lincoln Journal Star* | journalstar.com | Lincoln, NE | 59,955 | 70,819 |
| *Columbus Telegram* | columbustelegram.com | Columbus, NE | 7,638 | 8,709 |
| *Fremont Tribune* | fremonttribune.com | Fremont, NE | 7,398 | - |
| *Beatrice Daily Sun* | beatricedailysun.com | Beatrice, NE | 5,039 | - |
| Quad-Cities Group | | | | |
| *Quad-City Times* | qctimes.com | Davenport, IA | 45,360 | 59,482 |
| *Muscatine Journal* | muscatinejournal.com | Muscatine, IA | 5,834 | - |
| *The Pantagraph* | pantagraph.com | Bloomington, IL | 39,349 | 42,786 |
| *The Courier* | wcfcourier.com | Waterloo and Cedar Falls, IA | 37,994 | 44,950 |
| *Billings Gazette* | billingsgazette.com | Billings, MT | 37,310 | 44,689 |
| *Sioux City Journal* | siouxcityjournal.com | Sioux City, IA | 33,837 | 38,114 |
| *The Daily Herald* | heraldextra.com | Provo, UT | 27,948 | 43,586 |
| Central Illinois Newspaper Group | | | | |
| *Herald & Review* | herald-review.com | Decatur, IL | 28,018 | 43,089 |
| *JG-TC* | jg-tc.com | Mattoon/Charleston, IL | 12,773 | - |
| *The Post-Star* | poststar.com | Glens Falls, NY | 26,133 | 29,719 |
| River Valley Newspaper Group | | | | |
| *La Crosse Tribune* | lacrossetribune.com | La Crosse, WI | 25,720 | 45,332 |
| *Winona Daily News* | winonadailynews.com | Winona, MN | 9,240 | 10,351 |
| *The Chippewa Herald* | chippewa.com | Chippewa Falls, WI | 5,388 | 5,462 |
| Missoula Group | | | | |
| *Missoulian* | missoulian.com | Missoula, MT | 25,966 | 28,917 |
| *Ravalli Republic* | ravallinews.com | Hamilton, MT | 4,363 | - |

---

[4] Star Publishing is not a debtor in these Chapter 11 Cases.

[5] Newspapers published by non-Debtor affiliates have not been included in this list.

| The Southern Illinoisan | thesouthern.com | Carbondale, IL | 25,845 | 33,471 |
| The Journal Times | journaltimes.com | Racine, WI | 25,532 | 28,330 |
| The Bismarck Tribune | bismarcktribune.com | Bismarck, ND | 25,393 | 28,643 |
| Rapid City Journal | rapidcityjournal.com | Rapid City, SD | 24,842 | 29,829 |
| Casper Star-Tribune | trib.com | Casper, WY | 24,516 | 24,172 |
| The Daily News | tdn.com | Longview, WA | 22,695 | 24,078 |
| Magic Valley Group | | | | |
| The Times-News | magicvalley.com | Twin Falls, ID | 17,508 | 21,509 |
| Elko Daily Free Press | elkodaily.com | Elko, NV | 5,654 | - |
| Central Coast Newspapers | | | | |
| Santa Maria Times | santamariatimes.com | Santa Maria, CA | 13,961 | 18,382 |
| The Lompoc Record | lompocrecord.com | Lompoc, CA | 2,492 | 3,647 |
| Mid-Valley News Group | | | | |
| Albany Democrat-Herald | democratherald.com | Albany, OR | 14,399 | 15,084 |
| Corvallis Gazette-Times | gazettetimes.com | Corvallis, OR | 10,351 | 10,517 |
| Globe Gazette | globegazette.com | Mason City, IA | 14,049 | 18,380 |
| Napa Valley Register | napavalleyregister.com | Napa, CA | 12,710 | 12,722 |
| The Times and Democrat | thetandd.com | Orangeburg, SC | 11,863 | 12,351 |
| Independent Record | helenair.com | Helena, MT | 12,740 | 13,510 |
| The Sentinel | cumberlink.com | Carlisle, PA | 12,118 | 13,556 |
| The Montana Standard | mtstandard.com | Butte, MT | 12,432 | 12,637 |
| Arizona Daily Sun | azdailysun.com | Flagstaff, AZ | 10,000 | 10,541 |
| The World | theworldlink.com | Coos Bay, OR | 9,697 | - |
| The Sentinel | hanfordsentinel.com | Hanford, CA | 8,556 | - |
| The Garden Island | kauaiworld.com | Lihue, HI | 11,259 | 8,763 |
| The Citizen | auburnpub.com | Auburn, NY | 8,659 | 10,406 |
| The Ledger Independent | maysville-online.com | Maysville, KY | 6,697 | - |
| Daily Journal | dailyjournalonline.com | Park Hills, MO | 5,814 | - |

The Company estimates that, in an average week, the newspapers and digital products published by it and its non-Debtor affiliates reach approximately 81% of adults in its larger markets. The Company is reaching an increasingly larger share of its markets through the combination of stable newspaper readership and rapid digital audience growth, as well as through additional specialty and niche publications.

1.    Print Products and Services.

The Company itself publishes 47 daily and 37 Sunday newspapers in 23 states, including the *St. Louis Post-Dispatch*, *Lincoln Journal Star*, and *Quad-City Times*. The Company's daily and Sunday newspapers had average total newspaper circulation units, including non-debtor affiliates TNI and MNI, of 1.3 million and 1.6 million, respectively, for the six months ended September 2011. The Company and its non-Debtor affiliates also publish nearly 300 weekly newspapers and classified and niche publications.

Several of the Company's publications operate in geographic groups, or "clusters," which provide operational efficiencies and extend sales penetration. Operational efficiencies are obtained through consolidation of sales forces, back office operations such as finance or human

resources, management and/or production of the publications.  Clustering can also improve sales penetration when the sales effort is successful in cross-selling advertising into multiple publications.

The Company also partners with third parties, such as Citizen, a subsidiary of Gannett Co., Inc., ("Gannett"), and The Capital Times Company ("TCT"), in publishing other newspapers and publications.  Pulitzer, through its non-Debtor subsidiary Star Publishing, owns a 50% partnership interest in non-Debtor TNI, a Tucson, Arizona newspaper partnership.  TNI, acting as agent for Star Publishing and Citizen, the owner of the remaining 50% partnership interest in TNI, is responsible for printing, delivery, advertising and circulation of the *Arizona Daily Star* and its related digital products and specialty publications.  TNI collects all receipts and income and pays substantially all operating expenses incident to the partnership's operations and publication of the newspapers and other media.  Under the amended and restated operating agreement between Star Publishing and Citizen, the *Arizona Daily Star* remains the separate property of Star Publishing; however, TNI's income or loss (before income taxes) is allocated equally to Star Publishing and Citizen.[6]  In addition, Lee Enterprises owns 50% of the capital stock of non-Debtor MNI and 17% of the nonvoting common stock of non-Debtor TCT, which owns the remaining 50% of the capital stock of MNI.  MNI publishes daily and Sunday newspapers, and other publications in Madison, Wisconsin, and other Wisconsin locations, and supports their related digital products.  The Company has a contract to furnish the editorial and news content for the *Wisconsin State Journal*, which is published by MNI, and periodically to provide other services to MNI.  Prospective Debtor Accudata, Inc. owns 50% of the membership interests in non-Debtor Community Distribution Partners, LLC, which provides racking and racking services for free publications at select locations.

2.    Digital Products and Services.

The Company's digital activities include maintaining websites to support each of its daily newspapers and certain of its other publications.  These websites (including those maintained by non-Debtor affiliates) attracted almost 22 million unique visitors in the month of September 2011, a 12.6% increase from September 2010, with over 191 million page views.  Certain of the Company's website content is also available through output to mobile devices, including telephones and tablet devices.  This introduction in 2010 and 2011 of new mobile and tablet applications positively impacted the Company's digital audiences.  The mobile sites maintained by the Company and its non-Debtor affiliates attracted 22.6 million views in September 2011, a 230.6% increase from September 2010.

In 2007, in conjunction with several other major publishing organizations, including The Hearst Corporation, Belo Corp., Affiliated Media, Inc., Media General and others (the "Consortium"), the Company entered into a strategic alliance with Yahoo! Inc. ("Yahoo!"), in which the Consortium offers its classified employment advertising customer base the opportunity to post job listings and other employment products on Yahoo!'s HotJobs national platform.  The HotJobs platform was acquired in August 2010 by Monster Worldwide, Inc., which has assumed the relationship with the Consortium under the amended Yahoo! contract.  In addition, the Consortium and Yahoo! have worked together to provide new behavioral targeting, search, content and local applications across the newspapers' digital products, further enhancing the value of these sites as a

---

[6] The TNI Agency Agreement ("Agency Agreement"), which has governed the operation of TNI since 1940, expires in 2015.  However, it contains an option, which may be exercised by either party, to renew the agreement for successive periods of 25 years each.  Star Publishing and Citizen also have a reciprocal right of first refusal to acquire the 50% interest in TNI owned by Citizen and Star Publishing, respectively, under certain circumstances.

destination for digital users.  The Consortium currently includes more than 30 companies and approximately 800 local newspapers across the United States.

Prospective Debtor INN Partners (doing business as TownNews.com), an Internet service company which is 82.5% owned by Accudata, Inc. and 17.5% owned by Marc E. Wilson, Virginia R. Wilson, and Robert D. Keenan, provides digital infrastructure and digital publishing services for more than 1,500 daily and weekly newspapers and shoppers, including those of the Company.

    3.    <u>Sources of Revenue</u>.

Advertising provides over 70% of the Prospective Debtors' revenues.  The Prospective Debtors' largest share of advertising revenue derives from sales of display advertising space in their publications, or for preprinted advertising inserted in their publications, to local accounts or regional and national businesses with local retail operations.  The Prospective Debtors' next largest share of advertising revenue derives from sales of advertising space in the classified section of their publications or from publications consisting primarily of classified advertising, which includes employment, automotive, real estate for sale or rent, legal and other categories.  Classified publications are available in racks or delivered free, by carriers or third-class mail, to all, or selected, households in a particular geographic area.  After classified advertising, the Prospective Debtors' next largest share of advertising revenue derives from digital advertising consisting of display, banner, behavioral targeting, search, rich media, directories, classified or other advertising on websites or mobile devices associated and integrated with the Prospective Debtors' print publications, other digital applications, or on third party affiliated websites, such as Yahoo!.  After digital advertising, the Prospective Debtors' next largest share of advertising revenues derives from national advertising, consisting of display advertising space or preprinted advertising inserted in a publication, which is sold to national accounts if there is no local retailer representing the account in the market.  The Prospective Debtors' niche publications, such as lifestyle, business, health or home improvement publications, also contain significant amounts of advertising.

The Prospective Debtors' newspapers, classified and specialty publications, and digital products face competition from a variety of sources.  These competitors include newspapers having national, regional or local circulation; magazines; radio; network, cable and satellite television; other advertising media such as outdoor, mobile, and movie theater promotions; other classified and specialty publications; direct mail; yellow pages directories; and other information content providers such as digital sites.  Competition for advertising is based on audience size and composition, circulation levels, readership demographics, distribution and display mechanisms, price and advertiser results.  In addition, the advertising rate structures in the Prospective Debtors' many geographic markets differ and can be highly complex.  A single operation has scores of rate alternatives.  Nevertheless, the Prospective Debtors estimate that they capture a substantial share of the total advertising dollars spent in each of their markets.

After advertising, print circulation is the Prospective Debtors' largest source of revenue.  The Prospective Debtors charge for digital access to content in only a small number of markets at this time.

    4.    <u>Raw Materials</u>.

The basic raw material of newspapers and classified and specialty publications is newsprint.  The Prospective Debtors purchase newsprint from U.S. and Canadian producers and

believe they will continue to receive a supply of newsprint adequate for their needs. Newsprint is one of the largest cost items for the Prospective Debtors which, together with ink, represented approximately 8% of revenue for the year ended September 25, 2011. Newsprint prices are volatile and fluctuate based upon factors that include foreign currency exchange rates and both foreign and domestic production capacity and consumption. Price fluctuations can have a significant effect on the Prospective Debtors' results of operations. The Prospective Debtors manage this risk through instruments such as purchase orders and non-cancelable supply contracts. The Prospective Debtors also participate in a buying cooperative with other publishing companies, primarily for the acquisition of newsprint.

> 5.   <u>Employees</u>.

As of September 25, 2011, the Prospective Debtors employed approximately 6,200 active employees, including approximately 1,550 part-time employees. Of the Prospective Debtors' active employees, approximately 4,100 are hourly employees and 2,100 are salaried employees. In addition, the Prospective Debtors typically utilize the services of independent contractors (the "<u>Independent Contractors</u>") and temporary workers (the "<u>Temporary Workers</u>") throughout the year. From 2008-2011, the Prospective Debtors reduced headcount by approximately 24%.

Approximately 518, or seventy percent (70%), of the employees of PD LLC are represented by unions and are covered by one of seven collective bargaining agreements (the "<u>CBAs</u>") with expiration dates through 2015. The St. Louis Newspaper Guild/CWA Local 36047 ("<u>St. Louis Newspaper Guild</u>") represents approximately 207 union employees. The Miscellaneous Drivers, Helpers, and Health Care and Public Employee's Local Union 610 represents approximately five (5) dock employees. The CWA Local 6300, Print and Media Sector ("<u>Print and Media Union</u>") represents approximately five (5) typographical employees. The Graphic Communications Conference/IBT Local 38N ("<u>Graphic Communications Union</u>") represents approximately sixty-eight (68) press operators. The International Association of Machinists and Aerospace Workers, District No. 9 ("<u>Machinists Union</u>") represents approximately nine (9) machinists and six (6) electricians. The Communication Workers of America AFL-CIO Local 14620 represents approximately 218 mailers ("<u>Communication Workers Union</u>"). The current CBA with the Machinists Union regarding the electricians expired earlier in 2011, negotiations on a new CBA have completed, and a new CBA is anticipated. Approximately 62 employees in six (6) additional locations are also represented by collective bargaining units. The CBA at one of these locations has expired and negotiations are ongoing.

The Prospective Debtors intend under the Plan to assume all CBAs to which any of the Debtors are a party.

> 6.   <u>Recent Operations</u>.

As of September 25, 2011, the Prospective Debtors, together with their affiliates, reported total assets having a book value of approximately $1.2 billion and total liabilities of approximately $1.3 billion. The Prospective Debtors, together with their affiliates, had a loss attributable to Lee Enterprises, Incorporated of approximately $147 million for the year ending September 25, 2011 (during which the Prospective Debtors recognized non-cash impairment charges totaling $217 million), and income attributable to Lee Enterprises, Incorporated of $46.1 million for the year ending September 26, 2010. The Prospective Debtors have experienced a drop in revenue due to the recent economic environment, trends in their industry, and an increase in competition from other media.

In 2011, approximately 71% of the revenue earned by the Prospective Debtors and their affiliates derived from advertising, and the comparable figure was approximately 72% in 2010. The Prospective Debtors intend to increase their share of local advertising through increased sales activities in their existing markets and, over time, to increase their print and digital audiences through internal expansion into existing and contiguous markets and enhancement of digital products. The Prospective Debtors' advertising results have historically benchmarked favorably to national averages, as compiled by the Newspaper Association of America. The Prospective Debtors' digital businesses experienced rapid growth in the second half of 2010 and 2011 after recession-related declines in 2009 and 2008.

      7.    <u>Corporate History and Business Acquisitions</u>.

Lee Enterprises was founded in 1890 in Ottumwa, Iowa, by A.W. Lee. Most of its newspapers trace their beginnings to the mid-1800s. Among the Company's alumni are Mark Twain, Willa Cather and Thornton Wilder. Lee Enterprises was incorporated in 1950, and listed on the New York Stock Exchange in 1978. Until 2001, the Prospective Debtors operated a number of network-affiliated and satellite television stations in addition to their print businesses. The Prospective Debtors and their affiliates have acquired and divested a number of businesses in the last decade. The more significant of these transactions are discussed more fully below.

In 2005, Lee Enterprises acquired Pulitzer, which at the time published 14 daily newspapers and more than 100 weekly newspapers and specialty publications. Pulitzer also owned, and continues to own, an indirect 50% interest in TNI, as discussed above. The acquisition of Pulitzer increased Lee Enterprises' paid circulation by more than 50% and revenue by more than 60% at that time. The acquisition was financed primarily with debt, as discussed further below in Section II.F.3.

Pulitzer and its subsidiaries and affiliates currently publish 12 daily newspapers and support related digital products, as well as approximately 75 weekly newspapers, shoppers and niche publications that serve markets in the Midwest, Southwest and West. Pulitzer newspaper operations include St. Louis, Missouri, where its subsidiary, PD LLC, publishes the *St. Louis Post-Dispatch*, the only major daily newspaper serving the greater St. Louis metropolitan area. Pulitzer's operations also include publishing the Suburban Journals of Greater St. Louis, a group of weekly newspapers and niche publications that focus on separate communities within the metropolitan area.

In 2006, the Company sold the assets of *The Daily News* in Rhinelander, Wisconsin, the smallest of Pulitzer's daily newspapers. In 2008, the Company sold the assets of *The Daily Chronicle* in DeKalb, Illinois.

As discussed more fully above, the Company also owns 50% of the capital stock of MNI, and 17% of the nonvoting common stock and less than 2% of the voting stock of TCT, which the Company purchased over the course of several years. In 2006, MNI sold the assets of its Shawano, Wisconsin, daily newspaper. In 2008, one of MNI's daily newspapers in Madison, *The Capital Times*, decreased print publication from six days per week to one day per week.

**D.      MANAGEMENT OF THE PROSPECTIVE DEBTORS**

1.      Board of Directors.

The Board of Directors of Lee Enterprises currently consists of eleven members. Nine out of eleven members are independent, as are all members of the Board's Audit, Executive Compensation and Nominating and Corporate Governance committees. One of the Directors serves as Lee Enterprises' President and Chief Executive Officer. The final Director serves as Vice President – Interactive Media. Directors are recommended by the Nominating and Corporate Governance Committee, nominated by the entire Board, and elected by shareholder vote for three-year terms.

The Directors of Lee Enterprises as of the date of this Amended Solicitation and Disclosure Statement are: Mary E. Junck, Richard R. Cole, Nancy S. Donovan, Leonard J. Elmore, Brent Magid, William E. Mayer, Herbert W. Moloney III, Andrew E. Newman, Gordon D. Pritchett, Gregory P. Schermer, and Mark B. Vittert.

If the Plan is confirmed, the Prospective Debtors expect that each of the existing directors of Lee Enterprises will continue as a director of Reorganized Lee Enterprises.

2.      Executive Officers and Management Team Members.

Set forth below are the executive officers of Lee Enterprises as of the date of this Amended Solicitation and Disclosure Statement and each officer's position within Lee Enterprises.

| **Name** | **Position** |
|---|---|
| Mary E. Junck | Chairman, President and Chief Executive Officer |
| Carl G. Schmidt | Vice President, Chief Financial Officer and Treasurer |
| Michael R. Gulledge | Vice President – Publishing, Publisher of *Billings Gazette* |
| Vytenis P. Kuraitis | Vice President – Human Resources |
| Kevin D. Mowbray | Vice President – Publishing, Publisher of *St. Louis Post-Dispatch* |
| Gregory P. Schermer | Vice President – Interactive Media |
| Greg R. Veon | Vice President – Publishing, Publisher of *Quad-City Times* |

In addition to the executive officers of Lee Enterprises, the following individuals serve on Lee Enterprises' management team:

| **Name** | **Position** |
|---|---|
| Joyce L. Dehli | Vice President – News |
| Paul M. Farrell | Vice President – Sales & Marketing |
| Suzanna M. Frank | Vice President – Audience |
| Daniel K. Hayes | Vice President – Corporate Communications |
| Michele Fennelly White | Vice President – Information Technology and Chief Information Officer |

3.      Indemnification of Directors and Officers.

Lee Enterprises has entered into indemnification agreements with each of its directors and executive officers. These agreements require Lee Enterprises to indemnify such individuals, to the fullest extent permitted by Delaware law, for certain liabilities to which they may become subject

as a result of their affiliation with Lee Enterprises.  Section 10.6 of the Plan provides that the Reorganized Debtors will continue to honor these indemnification obligations after the Effective Date.

## E.   COMPENSATION AND BENEFITS PROGRAMS

In the ordinary course of business, the Prospective Debtors have implemented a number of compensation and benefits programs, which are designed to reward the Prospective Debtors' management and non-management employees for excellent service, incentivize future performance, and provide employees with a competitive compensation and benefits package.  Except and to the extent previously assumed by an order of the Bankruptcy Court, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Employee Benefit Plans of the Prospective Debtors, as amended or modified, including programs subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before, on or after the Petition Date and not since terminated, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed except for (i) any executory contracts or plans specifically rejected pursuant to the Plan, and (ii) any executory contracts or plans that become the subject of a motion to reject or have been specifically waived by the beneficiaries of any plans or contracts; provided, however, that the Debtors shall pay all "retiree benefits" (as defined in section 1114(a) of the Bankruptcy Code).[7]

Certain of these employee compensation and benefits programs are generally described below, with the blanket exception of insured and self-insured programs (*e.g.*, health plans), customary fringe benefit policies (*e.g.*, vacation, sick leave) and individual employment or similar agreements or arrangements.  The list of programs and descriptions set forth below is not, and is not intended to be, exhaustive or comprehensive.  All such plans and other programs are governed by applicable plan and program terms and conditions, as in effect or amended from time to time.  In addition, the Prospective Debtors reserve the right to modify, amend or terminate any or all of their employee benefit and compensation programs in the ordinary course of business in their sole discretion, subject to applicable modification, amendment or termination provisions and/or applicable law.

1.   Bonus Programs.

Historically in the ordinary course of business, the Prospective Debtors awarded certain bonuses and commissions to certain employees in order to recognize and encourage exceptional individual and overall Company performance (the "Bonuses").  The Bonuses were generally based on achievement of pre-set performance metrics and were paid in arrears.  With a few exceptions, Bonuses have been suspended Company-wide for the past four years, and have only been partially restored in 2012.  Bonuses may be reinstituted more broadly in the future.  In addition, in accordance with industry practice, certain sales employees are compensated on a commission basis.

---

[7]  The Prospective Debtors' intention to pay all "retiree benefits" and to pay General Unsecured Claims of its employees does not and shall not constitute any admission as to any allegations raised in the California Litigation or the Retiree Cases, as such terms are defined in Section II.G hereof, or in any other litigation.

2.      Long-Term Incentive Program.

The Lee Enterprises, Incorporated 1990 Long-Term Incentive Plan (as last amended effective January 6, 2010, the "LTIP") is a stock-based plan designed to provide long-term incentive compensation to certain executive officers and others based on individual performance.  In the case of the CEO, performance is evaluated by the Executive Compensation Committee with reference to achievement of certain adjusted operating cash flow targets.  In the case of other Named Executive Officers ("NEOs"), performance is evaluated by the CEO and the Executive Compensation Committee.

For 2010, the Executive Compensation Committee continued the suspension of grants under the LTIP, implemented in late-2009, due to difficult economic conditions affecting the Prospective Debtors, the publishing industry and the overall economy.  In 2011, the Executive Compensation Committee granted non-qualified stock options to the NEOs and other key executives under the LTIP.

3.      Other Incentive Programs.

The Annual Incentive Plan ("AIP") is a cash-based plan designed to provide short-term incentive compensation to NEOs in order to support the Prospective Debtors' objective of delivering positive annual operating results.  Awards under the AIP were tied to (i) the Prospective Debtors' financial performance as measured by a combination of (a) revenue and adjusted operating cash flow for the Company in general and (b) revenue and adjusted operating cash flow for enterprises for which the NEO is responsible, both relative to the Prospective Debtors' current year operating plan; and (ii) specific individual performance goals established for each management person prior to the start of the fiscal year.  In addition, from time to time, the Executive Compensation Committee developed special incentive programs and approved the CEO's determination of discretionary bonuses to the NEOs (other than the CEO) based on specific performance.  For 2010 and 2011, the Prospective Debtors continued the suspension of all annual cash incentives implemented in 2009, due to continuing difficult economic conditions affecting the Prospective Debtors, the publishing industry and the overall economy.  No discretionary bonuses were paid to the NEOs in 2010 or 2011.  The AIP has been partially restored for 2012, and will be based upon corporate-wide and enterprise-wide operating cash flows.

4.      Executive Agreements.

In 2008, Lee Enterprises approved an amended form of employment agreement between itself and each of Ms. Junck, Mr. Schmidt, Mr. Veon, Mr. Mowbray, Mr. Kuraitis, Mr. Schermer, and certain other executives of the Company, which entitles these executives to severance and other benefits upon termination without cause or for good reason that becomes effective only upon a change of control (the "Executive Employment Agreement").  A change of control is defined in section 2 of the Executive Employment Agreement to include certain mergers and acquisitions, other reorganizations (subject to certain qualifications discussed below), liquidation or dissolution of Lee Enterprises, changes in the membership of Lee Enterprises' Board of Directors, or acquisition of certain thresholds of outstanding stock of Lee Enterprises by certain parties from sources other than the Company.  Absent a change of control, the agreements do not require Lee Enterprises to retain the executives or to pay them any specified level of compensation or benefits, and they remain employees at will.

In relevant part and subject to the terms therein, section 2(c) of the Executive Employment Agreement provides that the consummation of a reorganization of Lee Enterprises or any of its subsidiaries (together with other similar transactions listed therein, a "Business Combination") will trigger a change of control unless (i) substantially all pre-Business Combination beneficial holders of Lee Enterprises' common stock beneficially own more than 60% of the common stock post-Business Combination, (ii) no Person (defined as any individual, entity or group within the meaning of section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended) beneficially owns 20% or more of the common stock of Reorganized Lee Enterprises, and (iii) at least a majority of the members of the Board of Directors of Reorganized Lee Enterprises were members of the Board of Directors of Lee Enterprises at the time it authorizes the filing of Lee Enterprises' bankruptcy petition. Based upon information publicly available regarding significant institutional holdings of Lee Enterprises' common stock, even if the Backstop Lenders would be considered as a Person for the purposes of the Executive Employee Agreements, to the best of the Company's knowledge, the transactions contemplated by the Plan would not constitute a change of control for purposes of the Executive Employment Agreements as of the date of this Amended Solicitation and Disclosure Statement.

    5.    Retirement Plans.

Retirement benefits are provided to certain employees through savings and pension plans sponsored either by the Prospective Debtors or by applicable unions, which are generally described below (the "Employee Retirement Plans").

    (a)    The Lee Enterprises, Incorporated Employees' Retirement Account Plan

Company contributions under the Lee Enterprises, Incorporated Employees' Retirement Account Plan ("Retirement Account Plan") were reinstated in January 2011. The Prospective Debtors contribute 40% for each dollar contributed by a participating employee, up to a maximum of 5% of each participating employee's salary (including bonus and commissions), and contributions made by the Prospective Debtors are fully vested for participants who have completed six (6) years of service with the Company. Approximately 4,734 active employees participate in the Retirement Account Plan.

    (b)    Union-Only Plans

The Company also contributes to three (3) multi-employer pension plans pursuant to CBAs covering a number of facilities in the United States (the "Multi-Employer Plans"). The Prospective Debtors' Multi-Employer Plan contribution requirements vary by CBA and generally are based on a percentage of earnings as calculated on a shift, hourly, or weekly basis.

    6.    Other Post-Retirement Benefit Programs.

    (a)    Supplemental Retirement Plans

In addition to the Employee Retirement Plans described above, the Prospective Debtors maintain a nonqualified defined contribution plan, the Lee Enterprises, Incorporated Supplementary Benefit Plan, which is intended to provide benefits to certain individuals in excess of applicable IRS annual limits.

(b)    Health Care and Life Insurance Continuation

The Prospective Debtors maintain a self-insured plan and a fully-insured plan that collectively provide different levels of medical, dental, vision and prescription drug programs to approximately 500 retired union and non-union former employees or their beneficiaries (collectively, the "Retiree Medical Benefits"). Medical coverage provided as part of the Retiree Medical Benefits is administered through UnitedHealthcare and Group Health Plan. The Prospective Debtors also provide retiree life insurance administered by MetLife. Approximately 590 retired former employees are eligible for life insurance.

(c)    Severance Benefits

Prior to the date of this Amended Solicitation and Disclosure Statement and in the ordinary course of business, the Prospective Debtors maintained severance plans for certain of their union and non-union employees. Eligible employees' severance payments and benefits vary depending on several factors, including whether the employee's employment is governed by a CBA; however, in general, upon a severable event, an eligible employee is typically entitled to receive a cash benefit tied to length of service and annual salary, as well as a continuation of health and life insurance benefits under COBRA.

## F.    **DEBT AND CAPITAL STRUCTURE OF THE COMPANY**

1.    Summary of Long-Term Indebtedness.

The Prospective Debtors' long-term secured debt structure is comprised of two principal components: (a) the Prepetition Credit Facilities and (b) the PD LLC Notes. As of the date hereof, the total principal amount owed under these secured debt facilities is approximately $993 million. As of the date hereof, the Prospective Debtors do not have any funded unsecured debt obligations such as unsecured bond or note obligations, although they have obligations to trade and other unsecured creditors and two of the Prospective Debtors – PD LLC and DS LLC – have an additional obligation to make a payment on the "Herald Claim", which is described in Section II.F.4, below. Details on the proposed long-term debt structure for the Reorganized Debtors post-confirmation are set forth in Section IV.G.4, below.

2.    Prepetition Credit Facilities.

Lee Enterprises, as borrower, is party to that certain Amended and Restated Credit Agreement, dated as of December 21, 2005, together with Deutsche Bank Trust Company Americas, as administrative agent (in such capacity, the "Prepetition Administrative Agent"), SunTrust Capital Markets, Inc., as joint lead arranger, Deutsche Bank Securities Inc., as book running manager and joint lead arranger, SunTrust Bank, as syndication agent, and the Prepetition Lenders (as amended from time to time, the "Prepetition Credit Agreement" and together with all agreements, documents, notes, instruments and any other agreements delivered pursuant thereto or in connection therewith, the "Prepetition Credit Agreement Documents"). The Prepetition Credit Agreement is fully and unconditionally guaranteed on a joint and several basis by each of the Prospective Lee Subsidiary Debtors. None of the Prospective Pulitzer Debtors are party to the Prepetition Credit Agreement or any of the Prepetition Credit Agreement Documents, and the Prepetition Credit Agreement Documents provide that none of the Prospective Pulitzer Debtors will become parties to such documents for so long as their doing so would violate the terms of the PD LLC Notes.

The Prepetition Credit Agreement is secured by first-priority security interests in the stock and other equity interests owned by the Prospective Lee Debtors in their respective subsidiaries. This includes the common stock of Pulitzer, in which a first-priority security interest was granted by its immediate parent, Lee Publications, Inc. In addition, as a result of a comprehensive restructuring of the Prepetition Credit Agreement executed on February 18, 2009, which supplemented amendments consummated in late 2008 (together, the "2009 Amendments"), the Prospective Lee Debtors pledged substantially all of their tangible and intangible assets, and granted mortgages covering certain real estate, as collateral for the payment and performance of their obligations under the Prepetition Credit Agreement (collectively, the "Prepetition Credit Agreement Collateral"). Neither Pulitzer nor any of its subsidiaries is an obligor or a guarantor under the Prepetition Credit Agreement Documents. The assets of Pulitzer and its subsidiaries, TNI, Lee Enterprises' ownership interest in, as well as the assets of, MNI, and certain employee benefit plan assets are excluded from the Prepetition Credit Agreement Collateral.

The Prepetition Credit Agreement initially provided for aggregate borrowing of up to $1,435,000,000 and replaced a $1,550,000,000 credit agreement consummated in 2005. In accordance with the 2009 Amendments, the Prepetition Credit Agreement currently provides for (i) revolving loans in an aggregate committed amount of up to $375 million (the "Prepetition Revolving Loan Facility") and (ii) a term loan in an aggregate principal amount of $548.385 million (the "Prepetition Term Loan Facility," and, together with the Prepetition Revolving Loan Facility, the "Prepetition Credit Facilities"). As of the date of this Amended Solicitation and Disclosure Statement, the outstanding principal amount of the Prepetition Term Loan Facility is approximately $548.385 million (subject to adjustment prior to the Petition Date), while the outstanding principal amount under the Prepetition Revolving Loan Facility is $306.425 million.

3.    PD LLC Notes.

In 2000, Pulitzer and The Herald Company Inc. ("Herald Inc.") completed the transfer of their respective interests in the assets and operations of the *St. Louis Post-Dispatch* and certain related businesses to a new joint venture, known as PD LLC. In conjunction with its formation, PD LLC borrowed $306 million in principal amount of notes (the "PD LLC Notes") from certain institutional lenders. The aggregate principal amount of the PD LLC Notes was originally payable in April 2009.

On February 18, 2009, the PD LLC Notes and the Guaranty Agreement described below were amended (the "Notes Amendment"). Under the Notes Amendment, PD LLC repaid $120 million of the principal amount of the debt obligation using substantially all of its previously restricted cash. The remaining debt balance of $186 million, of which approximately $127.9 million in principal amount remains outstanding as of the distribution of this Amended Solicitation and Disclosure Statement, had its maturity extended until April 2012, among other modifications to the terms of such indebtedness, as a result of the Notes Amendment.

The PD LLC Notes are guaranteed by Pulitzer pursuant to a Guaranty Agreement dated May 1, 2000 (as amended from time to time, the "Pulitzer Guaranty Agreement") with the Noteholders. The Notes Amendment provides that the obligations under the PD LLC Notes are fully and unconditionally guaranteed on a joint and several basis by Pulitzer's existing and future subsidiaries (excluding PD LLC, Star Publishing and TNI), pursuant to a Subsidiary Guaranty Agreement entered into by the relevant subsidiaries of Pulitzer in connection with the Notes Amendment (the "PD LLC Notes Subsidiary Guaranty Agreement" and, together with the Pulitzer Guaranty Agreement, the "PD LLC Notes Guaranty Agreements"). Also, as a result of the Notes

Amendment, Pulitzer and each of its subsidiaries pledged substantially all of their tangible and intangible assets, and granted mortgages covering certain real estate, as collateral for the payment and performance of their obligations under the PD LLC Notes Guaranty Agreements (the "Notes Collateral"). The assets and stock of Star Publishing, the Company's ownership interest in TNI and certain employee benefit plan assets are excluded from the Notes Collateral.  The Prospective Lee Debtors are neither obligors nor guarantors under the PD LLC Notes or any of the PD LLC Notes Guaranty Agreements.

     4.     <u>Herald Claim</u>.

     Under the terms of PD LLC's Operating Agreement entered into at the time PD LLC was formed in 2000 (the "<u>Operating Agreement</u>"), Herald Publishing Company, LLC ("<u>Herald</u>"), as successor to Herald Inc., received a one-time right to require PD LLC to redeem its interest in PD LLC, together with its interest, if any, in Prospective Debtor DS LLC (the "<u>2010 Redemption</u>").  In February 2009, contemporaneously with various of the Prospective Debtors entering into the restructuring of the Prepetition Credit Agreement and the Notes Amendment, PD LLC redeemed the 5% interest in PD LLC and DS LLC owned by Herald pursuant to a Redemption Agreement (the "<u>Redemption Agreement</u>") and adopted conforming amendments to the Operating Agreement.  As a result, (i) Herald's ability to exercise its rights under the 2010 Redemption was terminated and (ii) the value of Herald's former interest in PD LLC and DS LLC will be settled, at a date determined by Herald between April 2013 and April 2015, based on a calculation of 10% of the fair market value of PD LLC and DS LLC at the time of settlement, less the balance, as adjusted, of the PD LLC Notes or the equivalent successor debt, if any (as defined in the Plan, the "<u>Herald Claim</u>").

     The Herald Claim is, pursuant to the terms of the Redemption Agreement, junior and subordinate in all respects to the obligations of PD LLC and DS LLC under the PD LLC Notes Documents.  In addition, the ability of PD LLC and DS LLC to pay the Herald Claim in Cash is limited by certain provisions of the Prepetition Credit Agreement Documents.  If the Herald Claim is not paid in Cash, the Redemption Agreement provides that the Herald Claim is to be satisfied through payment of the Herald Claim in common stock of Lee Enterprises.

     The actual amount of the Herald Claim will depend on such variables as future cash flows and indebtedness of PD LLC and DS LLC, market valuations of newspaper properties and the timing of the request for redemption.

     As discussed in more detail in Section IV.E.8 below, on the Effective Date, the Herald Claim will be Reinstated, and will be junior and subordinate in all respects to the obligations of Reorganized PD LLC and DS LLC under the New PD LLC Notes Documents in the same manner as the Herald Claim was junior and subordinate in all respects to the obligations of PD LLC and DS LLC under the PD LLC Notes Documents.

     5.     <u>Trade Debt</u>.

     As of the date of this Amended Solicitation and Disclosure Statement, the Prospective Debtors had accrued approximately $11.9 million in trade debt, which the Prospective Debtors have been paying in the ordinary course of business as such obligations become due.  The outstanding trade debt, primarily for goods such as newsprint and ink and services such as shipping and warehousing, constitutes a small percentage of the Prospective Debtors' overall prepetition debt profile.

The Prospective Debtors intend to move the Bankruptcy Court to allow them to continue paying trade claims and all other General Unsecured Claims during the pendency of their Chapter 11 Cases.  Although the Prospective Debtors expect that such relief will be granted, in the event it is not, the Debtors will pay trade claims and all other General Unsecured Claims in full in Cash on the Effective Date of the Plan, plus any interest thereon, at the non-default rate, that may be required under applicable non-bankruptcy law.

6.    Intercompany Claims.

In the normal operations of the Company's business, the Company engages in intercompany transactions involving intercompany trade and intercompany capital needs, which intercompany transactions have been in compliance with the terms of the Prepetition Credit Agreement, the Notes Amendment, and the PD LLC Notes Guaranty Agreements.  As a result, there are numerous Intercompany Claims that reflect intercompany receivables and intercompany payables made and/or accrued in the ordinary course of the Company's business.  These intercompany transactions include, but are not limited to:

Accounts Receivable, Accounts Payable and Payroll.  In the ordinary course of business, the Prospective Debtors and certain of their non-Debtor affiliates use a centralized cash management system to collect funds from their operations and to pay operating and administrative expenses.  The Prospective Debtors' accounts reflect the net position of both receipts and disbursements received or made on behalf of each Prospective Debtor.  The Prospective Debtors account for this intercompany movement of cash in their intercompany books and records.

Centrally Billed Expenses.  In the ordinary course of business, the Prospective Debtors and their non-Debtor affiliates incur centrally billed expenses, such as employee medical costs, insurance premiums, certain taxes (including real estate, franchise, sales, etc.) and leased equipment.  These charges are allocated among the Prospective Debtors and their non-Debtor affiliates and are reflected on the Prospective Debtors' intercompany accounts, to the extent not settled in cash.

Corporate Expense Allocation.  Charges for certain corporate expenses provided to the Prospective Debtors and their non-Debtor affiliates are allocated among the Prospective Debtors and certain of their non-Debtor affiliates based upon the cost of services provided, directly identifiable costs and other allocation methods in addition to a services fee.

The Company maintains records of all intercompany transactions and can ascertain, trace and account for all intercompany transactions.  The Plan provides that all Intercompany Claims will be Reinstated under the Plan.

7.    Equity of Lee Enterprises.

Lee Enterprises' certificate of incorporation authorizes the issuance of 120,000,000 shares of common stock ("Common Stock"), of which 44,957,601 were outstanding on September 25, 2011.  Lee Enterprises' certificate of incorporation further authorizes the issuance of 30,000,000 shares of Class B Common Stock ("Class B Shares"), none of which are outstanding as of the date of this Amended Solicitation and Disclosure Statement.  Lee Enterprises is authorized to issue up to 500,000 shares of serial convertible preferred stock but has no preferred stock outstanding as of the date of this Amended Solicitation and Disclosure Statement.

As of the date of this Amended Solicitation and Disclosure Statement, Lee Enterprises' Common Stock was publicly traded on the New York Stock Exchange.  On July 8, 2011, and on August 15, 2011, respectively, Lee Enterprises was notified by NYSE Regulation, Inc. ("NYSE Regulation") that the Company had fallen below the continued listing standards of the New York Stock Exchange, Inc. (the "NYSE") due to its failure to maintain over a 30 trading-day period (i) an adequate share price and (ii) the required minimum average market capitalization and stockholders' equity.  NYSE Regulation informed the Company that it would have until January 8, 2012 and February 15, 2013, respectively, to cure these deficiencies.

In Lee Enterprises' Proxy Statement Schedule 14A on Form DEF 14A filed January 13, 2011, Lee Enterprises listed two entities – Ariel Investments, LLC and Cedar Rock Capital Limited – as beneficial owners of five percent (5%) or more of Lee Enterprises' Common Stock as of November 30, 2010.  Since that time, proxy statements have been filed indicating that, (i) as of February 11, 2011, Dimensional Fund Advisors LP had acquired a beneficial interest in 5% or more of Lee Enterprises' Common Stock; and (ii) as of May 31, 2011, Ariel Investments, LLC no longer held a beneficial interest in 5% or more of Lee Enterprises' Common Stock.  On April 5, 2011, the Company announced that, in accordance with sunset provisions established in 1986 whereby all outstanding shares of its Class B Shares convert to shares of its Common Stock when shares of Class B Shares outstanding total less than 5.6 million, holders of shares of its Class B Shares were deemed to be holders of a like number of shares of the Company's Common Stock.  As a result, such holders now have one vote per share on all future matters, instead of the 10 votes per share held by Class B Shares.  After giving effect to the conversion, certain prior holders of Class B Shares may be considered as beneficial owners of five percent or more of Lee Enterprises' Common Stock.[8]

Lee Enterprises remains able, under its certificate of incorporation, to issue up to 120,000,000 shares of Common Stock, or over 75,000,000 shares of Common Stock in addition to those currently issued and outstanding.  Therefore, in accordance with its governing documents, Lee Enterprises remains able to issue additional shares measuring approximately 167% of those outstanding and over 62.5% of the total number of shares authorized under its certificate of incorporation, subject, in certain instances, to prior stockholder approval.

Lee Enterprises maintains a Shareholder Rights Plan (the "Rights Plan"), pursuant to which one Preferred Share Purchase Right ("Right") for each outstanding share of Common Stock or Class B Share was issued to holders of such shares in and as of 1998.  Rights are attached to, and automatically trade with, Lee Enterprises' Common Stock.  Rights become exercisable only in the event that (i) any person or group of affiliated persons becomes a holder of 25% or more of Lee Enterprises' outstanding Common Stock held for passive investment or (ii) any person or group of affiliated persons other than a passive investor becomes a holder of 15% or more of Lee Enterprises' outstanding Common Stock, or commences a tender or exchange offer which, if consummated, would result in that person or group of affiliated persons owning at least 15% of Lee Enterprises' outstanding Common Stock.  Once the Rights become exercisable, they entitle all other stockholders to purchase, by payment of a $150 exercise price, one one-thousandth of a share of Series A Participating Preferred Stock, subject to adjustment, with a value of twice the exercise price.  In addition, at any time after a 15% position is acquired and prior to the acquisition of a 50% position, the Board of Directors may require, in whole or in part, each outstanding Right (other than Rights held by the acquiring person or group of affiliated persons) to be exchanged for one share of

---

[8] Lloyd G. Schermer ("LGS"), Betty A. Schermer ("BAS"), Gregory P. Schermer ("GPS"), and Grant E. Schermer ("GES") may be deemed to be members of a "group" under Section 13(d) of the Exchange Act.  If deemed such a group, this group would beneficially own 2,769,295 shares or 6.15% of the outstanding shares of Common Stock.

Common Stock or one one-thousandth of a share of Series A Preferred Stock. The Rights may be redeemed at a price of $0.001 per Right at any time prior to their expiration. Currently, the Plan is set to expire on May 31, 2018.

Lee Enterprises also maintains the LTIP, pursuant to which 3,243,875 shares of Common Stock remain available for grants of options to key employees. As of the date of this Amended Solicitation and Disclosure Statement, options to purchase 1,795,841 shares of Common Stock under the LTIP have been granted and are outstanding, and options to purchase 14,900 shares of Common Stock have been exercised in fiscal year 2011. The Executive Compensation Committee of Lee Enterprises sets the exercise price and conditions for vesting of such options.

In addition, Lee Enterprises maintains the Lee Enterprises, Incorporated 1996 Stock Plan for Non-Employee Directors, through which, as of September 30, 2011, 182,455 shares of Common Stock were available for award to non-employee directors of Lee Enterprises. Lee Enterprises also maintains an Employee Stock Purchase Plan (the "ESPP") and a Supplemental Employee Stock Purchase Plan (the "SPP"), pursuant to which 278,821 shares of Common Stock were available for issuance as of September 30, 2011. In 2009, the ESPP and SPP were suspended and remain suspended.

## G.    PENDING LITIGATION AGAINST THE PROSPECTIVE DEBTORS

The Prospective Debtors are involved from time to time in a variety of litigation that is incidental to their businesses. Upon commencement of the Chapter 11 Cases, all pending claims and litigation against the Debtors will be automatically stayed pursuant to section 362 of the Bankruptcy Code. As of the date of this Amended Solicitation and Disclosure Statement, the Prospective Debtors are only involved in four potentially significant lawsuits.

In 2008, a group of newspaper carriers filed a lawsuit against Lee Publications, Inc. ("Lee Publications"), which is currently pending in the United States District Court for the Southern District of California (the "California Litigation"), in which the plaintiffs claimed to be employees of Lee Publications and not independent contractors. The plaintiffs seek relief related to alleged violations of various employment-based statutes, and request punitive damages and attorneys' fees. In July 2010, the trial court granted the plaintiffs' petition for class certification. Lee Publications filed an interlocutory appeal, which was denied. After concluding discovery, Lee Publications filed a motion to reverse the class certification ruling. This motion is currently pending before the trial court. Lee Publications denies the allegations of employee status, consistent with its past practices and industry practices, and intends to vigorously contest the action, which is not covered by insurance.

In 2009, the Graphic Communications Union filed a lawsuit against PD LLC in the United States District Court for the Eastern District of Missouri (the "Pressmen Litigation"). In the Pressmen Litigation, the Graphic Communications Union sought to compel PD LLC to participate in arbitration under the union contract after PD LLC increased retiree premium cost for those under age 65 and eliminated coverage for those 65 and older. The trial court dismissed the second amended complaint, and the Graphic Communications Union appealed. The Eighth Circuit Court of Appeals court ruled in favor of PD LLC in May 2011. To date, the Graphic Communications Union has taken no further action in this matter.

In 2009 and 2011, the St. Louis Newspaper Guild filed three separate lawsuits against PD LLC in the Eastern District of Missouri. In these cases, the St. Louis Newspaper Guild sought to

compel PD LLC to participate in arbitration under two different union contracts regarding changes made by PD LLC to retiree medical benefits.  Two cases involving the same union contract were consolidated into one lawsuit, in which the trial court judge granted the St. Louis Newspaper Guild's motion for summary judgment and ordered arbitration.  PD LLC successfully appealed that decision, and the appellate court remanded the matter back to the trial court.  Lee Enterprises then filed class action lawsuits under both union contracts at issue (collectively with the lawsuits initially filed by the St. Louis Newspaper Guild, the "Newspaper Guild Litigation"), seeking a declaratory judgment that the medical benefit rights were not vested under those contracts and that PD LLC had the right to change the retiree benefits without arbitration.  The Newspaper Guild Litigation is now currently pending in two consolidated cases before one judge in the Eastern District of Missouri.

On September 28, 2011, the Communication Workers Union filed a lawsuit against PD LLC in the Eastern District of Missouri (the "CWU Litigation" and, together with the Pressmen Litigation and the Newspaper Guild Litigation, the "Retiree Cases"), in which plaintiff seeks to compel PD LLC to participate in arbitration under the union contract after PD LLC increased retiree premium cost for those under age 65 and eliminated coverage for those 65 and older.  The matter is currently before the Eastern District of Missouri.

The description of litigation set forth in this section is not, and is not intended to be, a comprehensive list of all claims and actions involving the Prospective Debtors and specifically excludes, among others, administrative actions and workers compensation actions.  Inclusion of the California Litigation and Retiree Cases in this section is for disclosure purposes only and is not an admission, and is not intended to be an admission, of liability with respect to any claim alleged in those actions.

The Prospective Debtors anticipate that, to the extent any litigation is not resolved prior to the Effective Date of the Plan and/or removed by the Debtors to federal court consistent with their powers under applicable law, such litigation will continue after the Effective Date in the forum(s) in which it was initiated.  Any adverse judgment in any of these actions would constitute a Claim that would be treated in accordance with the provisions of the Plan, so long as such Claim was otherwise allowable because it complied with the applicable requirements of the Chapter 11 Cases and the Bankruptcy Code.

## H.    EVENTS LEADING UP TO CHAPTER 11

As described above, the Company has significant long-term debt outstanding that is scheduled to mature in April 2012.  As of the date of this Amended Solicitation and Disclosure Statement, the amount of such long-term debt totaled approximately $995 million.  Absent the filing of these Chapter 11 Cases, the Company was facing roughly $1 billion in principal payments scheduled to be made before the end of April 2012 on the maturing Prepetition Term Loan Facility, Prepetition Revolving Loan Facility, and the PD LLC Notes.

In April 2011, the Company announced a plan to offer to qualified institutional buyers (as defined in Rule 144A of the Securities Act), subject to market conditions, $680,000,000 of first priority lien senior secured notes due in 2017, $375,000,000 of second priority lien senior secured notes due in 2018 and up to 8,928,175 shares of newly-issued common stock.  The proceeds from the offerings, net of offering costs, would have been used to refinance the obligations under the Prepetition Credit Agreement and PD LLC Notes.  Although the Company was encouraged by the response to this proposal, the level of interest in refinancing the Company's indebtedness on the

terms provided by the proposed refinancing was not at the level necessary to complete such a refinancing, and the Company terminated the offering process in May 2011.

Thereafter, the Company and its legal and financial advisors began extensive discussions with the Prepetition Administrative Agent and certain Prepetition Lenders, as well as certain Noteholders, regarding the terms of potential restructuring transactions to, among other things, amend and extend the maturity of the Company's Prepetition Credit Facilities and refinance the PD LLC Notes as part of an overall effort to restructure the Prospective Debtors' balance sheet. Through these negotiations, the Company and the Prepetition Administrative Agent, along with certain Prepetition Lenders, agreed on the terms of the restructuring set forth in the Lee Support Agreement.  In addition, as part of the transactions contemplated under the Lee Support Agreement, the Company entered into the Backstop Commitment Letters with the Initial Backstop Lenders, pursuant to which the Initial Backstop Lenders agreed to subscribe for a maximum principal amount of up to $166,250,000 of the New Second Lien Term Loan (net of a five percent (5%) original issue discount).  Pursuant to the terms and conditions of the Lee Support Agreement, the Company launched an effort to restructure the Prepetition Credit Facilities on August 11, 2011.  Thereafter, the Prospective Debtors agreed upon terms for a consensual refinancing of the PD LLC Notes with the Holders of a majority of PD LLC Notes Claims, which terms are consistent with the Lee Support Agreement.

The terms of these consensual refinancings are outlined in the Support Agreements and their exhibits, which establish the framework for the Plan and the restructuring of the Prospective Debtors' long-term indebtedness, by providing for the refinancing of obligations under the Prepetition Credit Agreement into obligations under the New First Lien Term Loan Facility and the New Second Lien Term Loan Facility, establishment of the New Revolving Credit Facility, and the exchange of the PD LLC Notes for the New PD LLC Notes. The Support Agreements and their exhibits also set out the means by which the restructuring would be implemented; i.e., through an out-of-court process in certain circumstances, or, in certain other circumstances, through the prepackaged Plan.

The Prospective Debtors received commitments (i) subject to the terms of the Lee Support Agreement, from Holders of more than 66.67% in amount and more than 50% in number of Prepetition Credit Agreement Claims and (ii) subject to the terms of the Pulitzer Support Agreement, from Holders of more than 66.67% in amount and more than 50% in number of PD LLC Notes Claims, to vote to accept, and otherwise to support, the Plan.  On November 7, 2011, the Company delivered the Prepackaged Alternative Notice to the Prepetition Administrative Agent, which provided that the Company would proceed to solicit votes on the Plan and pursue the restructuring through the Chapter 11 Cases, subject to the Company's rights in certain circumstances to elect not to commence the Chapter 11 Cases.  The Company also commenced the solicitation of votes on the Plan on November 7, 2011 by transmitting the First Solicitation and Disclosure Statement, the Plan, and related materials to the Holders of Prepetition Credit Agreement Claims.  On December 3, 2011, the Company continued solicitation of votes on the Plan by transmitting this Amended Solicitation and Disclosure Statement, the Plan, and certain related materials to Holders of PD LLC Notes Claims and Holders of Prepetition Credit Agreement Claims.

## III.  ANTICIPATED CHAPTER 11 CASES OF THE DEBTORS

### A.    FIRST DAY MOTIONS AND ORDERS

On the first day of the Chapter 11 Cases or as soon as practicable thereafter, the Prospective Debtors intend to seek relief in the form of various "first day orders" from the Bankruptcy Court as to a number of matters, certain of which are described below.  The Prospective Debtors believe that each of the requests, if granted, will facilitate smooth administration of the Chapter 11 Cases and will enable the Prospective Debtors to transition in and out of the Chapter 11 Cases with minimal disruption to their businesses.  There can be no assurance, however, that the Bankruptcy Court will grant any such relief.  The following list and discussion of "first day motions" and "first day orders" is not exhaustive, and the Prospective Debtors reserve the right to seek further orders and additional relief from the Bankruptcy Court to the extent that they determine that such orders and relief are necessary or appropriate at such time as the bankruptcy proceedings are commenced, or not to seek portions of the relief described below.

1.    Debtor-In-Possession Financing and Conversion to Exit Facility.

The Prospective Lee Debtors have negotiated the terms of the DIP Revolving Facility with Deutsche Bank Trust Company Americas ("DBTCA") and Deutsche Bank Securities Inc. ("DBSI" and, together with DBTCA, "DB").  DB has structured, arranged and syndicated a revolving credit facility with a syndicate of banks, financial institutions and other entities, including DBTCA and certain lenders under the Prepetition Credit Agreement (together with their successors and assigns, the "DIP Revolving Facility Lenders").  DBTCA has agreed to serve as sole Administrative Agent and sole Collateral Agent (in those capacities, the "DIP Revolving Facility Agent"), and DBSI and Goldman Sachs Lending Partners LLC have agreed to serve as joint lead arrangers and  joint bookrunners.  Lee Enterprises will be the Borrower under the DIP Revolving Facility, and the Lee Subsidiary Debtors will guaranty Lee Enterprises' obligations (collectively for the purposes of this section, Lee Enterprises and the Lee Subsidiary Debtors, the "Guarantors", are referred to as the "Credit Parties").[9]  The Lee Subsidiary Debtors will also guaranty the New First Lien Credit Facility.

The DIP Revolving Facility contemplates a superpriority, senior secured revolving credit facility, which will be available to the Prospective Lee Debtors (the "Commitment") from the Closing Date until the Maturity Date for loans or letters of credit (the "Revolving Loans" and the "Letters of Credit", respectively), subject to a sublimit of $20,000,000 during the period governed by, and subject to the terms of, the Interim DIP Order (as defined below), providing for borrowings in an aggregate principal amount of up to $40,000,000, less the aggregate face amount of all letters of credit issued and outstanding under the Prepetition Credit Agreement.  The proceeds from the DIP Revolving Facility will be used (i) to provide working capital from time to time for Lee Enterprises and its subsidiaries and (ii) for other general corporate purposes consistent with a thirteen-week cash flow forecast for the period beginning with the week which includes the Petition Date through the thirteenth week thereafter (as thereafter updated on a bi-weekly basis, the "DIP Budget"), in substance satisfactory to the DIP Revolving Facility Lenders and in form consistent with the cash flow forecasts previously delivered by Lee Enterprises pursuant to the Prepetition Credit Agreement.

---

[9] Capitalized terms not otherwise defined in this section or in the Plan shall have the meaning ascribed to such terms in the DIP Revolving Facility Agreement.

The Prospective Debtors anticipate that the DIP Revolving Facility will be converted into a new superpriority exit revolving facility as of the Effective Date that will form a part of the New First Lien Credit Facility.  Subject to the Credit Parties' option to convert the DIP Revolving Facility to an exit facility with a maturity date of December 31, 2015 upon the satisfaction of the Exit Conditions (defined below), the DIP Revolving Facility will mature on the earlier of (a) the later of (1) the six-month anniversary of the Petition Date and (2) March 31, 2012; and (b) the Effective Date.

The Debtors will file a motion on the first day of the Chapter 11 Cases seeking entry of an order approving the Credit Parties' entry into the DIP Revolving Facility on an interim basis (the "Interim DIP Order") and subsequent entry of an order approving the Credit Parties' entry into the DIP Revolving Facility on a final basis (the "Final DIP Order" and, together with the Interim DIP Order, the "DIP Orders").  The Lee Support Agreement obligates the Debtors to obtain entry of the Interim DIP Order within three (3) business days following the Petition Date and entry of the Final DIP Order within thirty (30) days following the Petition Date.  There can be no assurance that the Bankruptcy Court will enter an order approving the DIP Revolving Facility.  In the event the Bankruptcy Court does not enter an order authorizing the Credit Parties' entry into the DIP Revolving Facility in accordance with the terms set forth below, the Prospective Debtors reserve any and all rights to seek approval of modified terms without resoliciting votes on the Plan.

The principal terms of the proposed DIP Revolving Facility are summarized below. The foregoing and following descriptions of the DIP Revolving Facility are qualified in their entirety by the terms of the DIP Revolving Facility Agreement and related documents.

(a)     Interest:  Loans under the DIP Revolving Facility and, upon conversion, under the Exit Facility, will bear interest at a rate equal to either (i) for Eurodollar Loans, 5.5%, subject to a 1.25% Eurodollar floor; or (ii) for Base Rate Loans, 4.5%.

(b)     Default Rates:  Upon the occurrence of any event of default, interest on the obligations will be payable in an amount equal to 2.00% per annum above (x) the rate otherwise applicable thereto or (y) the interest rate applicable to Base Rate Loans.

(c)     Fees:  Letters of Credit are subject to fees of 5.5% per annum on the aggregate face amount outstanding.  In addition, Lee Enterprises will pay to DIP Revolving Facility Lenders holding Commitments a commitment fee of 0.50% per annum on the average daily unused portion of the Commitments, payable monthly in arrears.

(d)     Security/Collateral:  To secure all obligations of Lee Enterprises under the DIP Revolving Facility, and subject to the Carve-Out (defined below), the obligations under the DIP Revolving Facility at all times will be secured by: (a) pursuant to section 364(c)(2) of the Bankruptcy Code, a perfected first priority lien on all property of the Credit Parties' respective estates in the Chapter 11 Cases that is not subject to valid, perfected and non-avoidable liens as of the Petition Date; provided, however, that such lien will not encumber Avoidance Actions, but, upon entry of the Final DIP Order, such lien will attach to any proceeds of successful Avoidance Actions; (b) pursuant to section 364(c)(3) of the Bankruptcy Code, a perfected junior lien on all property of the Credit Parties' respective estates in the Chapter 11 Cases that is subject to valid, perfected and non-avoidable liens in existence at the time of the commencement of the Chapter 11 Cases or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code (other than property that is subject to the existing liens that secure obligations under the Prepetition Credit Agreement, which

liens will be primed by the liens to be granted to the DIP Revolving Facility Agent as described in clause (c)); and (c) pursuant to section 364(d)(1) of the Bankruptcy Code, a perfected first priority, senior priming lien on all of the property of the Credit Parties' respective estates in the Chapter 11 Cases that is subject to the existing liens that secure the obligations of the Credit Parties under or in connection with the Prepetition Credit Agreement (the liens thereunder, the "Primed Liens"), which will be primed by and made subject and subordinate to the perfected first priority senior liens to be granted to the DIP Revolving Facility Agent, which senior priming liens in favor of the DIP Revolving Facility Agent will also prime any liens granted after the commencement of the Chapter 11 Cases to provide adequate protection in respect of any of the Primed Liens but will not prime liens, if any, to which the Primed Liens are subject as of the Petition Date.

(e)    Superpriority Claims:  As will be more fully set forth in the DIP Orders (and qualified in its entirety by the terms thereof), all obligations of Lee Enterprises under the DIP Revolving Facility and all guaranties by the Guarantors will, subject to the Carve-Out, be entitled to joint and several superpriority administrative expense claim status in the Chapter 11 Cases pursuant to section 364(c)(1) of the Bankruptcy Code ("Superpriority Claims").

(f)    Carve-Out:  Subject to the terms of the Interim DIP Order, the DIP Revolving Facility Agent's Liens on the Collateral owned by the Credit Parties and the DIP Revolving Facility Agent's and the DIP Revolving Facility Lenders' respective Superpriority Claims will be subject to the following (hereafter referred to as the "Carve-Out"): (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the U.S. Trustee, and (ii) at any time after the first Business Day after the occurrence and during the continuance of an Event of Default as defined in and under the DIP Revolving Facility Agreement and delivery of notice thereof to the U.S. Trustee and each of the lead counsel for the Debtors and any statutory committee (if any) (a "Committee") appointed in the Cases (the "Carve-Out Notice"), to the extent allowed at any time, whether before or after delivery of a Carve-Out Notice, whether by interim order, procedural order or otherwise, the payment of accrued and unpaid professional fees, costs and expenses (collectively, the "Professional Fees") incurred by persons or firms retained by the Debtors and the Committee (if any) and allowed by the Bankruptcy Court, in an aggregate amount not exceeding $2,500,000 for the Credit Parties (plus all unpaid Professional Fees allowed by this Court at any time that were incurred on or prior to the Business Day following delivery of the Carve-Out Notice).

(g)    Conditions to Priming:  The Prepetition Lenders whose liens are primed as described above (the "Primed Parties") will receive adequate protection in an amount equal to the aggregate diminution in value of the Primed Parties' respective prepetition collateral, which adequate protection must be reasonably satisfactory to the DIP Revolving Facility Agent, including the following: (i) a superpriority claim as contemplated by section 507(b) of the Bankruptcy Code in the Bankruptcy Cases of the Credit Parties, which superpriority claim shall be immediately junior to the claims under section 364(c)(1) of the Bankruptcy Code held by the DIP Revolving Facility Agent and the DIP Revolving Facility Lenders, (ii) a replacement lien on the collateral securing the DIP Revolving Facility, which will have a priority immediately junior to the priming and other liens to be granted in favor of the DIP Revolving Facility Agent, (iii) payment of cash interest at the non-default rate specified in the Prepetition Credit Agreement for accrued and unpaid prepetition interest and at the Eurodollar rate set forth in the Prepetition Credit Agreement for postpetition interest, and (iv) the payment of the reasonable fees and expenses incurred by the Prepetition Administrative Agent and by the Backstop Lenders and the continuation of the payment on a current basis of the administration fees that are provided for thereunder.  So long as there are any borrowings outstanding under the DIP Revolving Facility, or the Commitments under the DIP Revolving

Facility are in effect, the Primed Parties will not be permitted to take any action in the Bankruptcy Court or otherwise related to the enforcement of such adequate protection liens or the Primed Liens. Under the Plan, the Primed Parties' adequate protection liens and superpriority claims will be settled, released and discharged on the Effective Date in consideration for the treatment the Primed Parties receive on account of their Prepetition Credit Agreement Claims.

(h)     Events of Default:  Prior to the date of conversion, events of default consist of the types of events of default contained in the Prepetition Credit Agreement, with such additions and modifications as may be agreed upon to provide for the transactions contemplated by the term sheet in respect of the DIP Revolving Facility, including the occurrence of a termination event under the Lee Support Agreement.

(i)     Exit Conditions: The "Conversion Date" will be the date on which, in addition to certain conditions precedent of the type set forth in the Prepetition Credit Agreement, as supplemented or modified to provide for the transactions contemplated by the Plan, the following conditions (the "Exit Conditions") are also satisfied: (a) the Confirmation Order, in form and substance reasonably satisfactory to the DIP Revolving Facility Agent, has been entered and is not subject to any stay, the conditions precedent to the Effective Date have been satisfied (or waived) to the reasonable satisfaction of the DIP Revolving Facility Agent, and the Effective Date has occurred; (b) the sum of (1) unrestricted cash and cash equivalents of Lee Enterprises and the Guarantors and (2) unused availability under Revolving Credit Facility immediately after giving effect to the Conversion Date is not less than $26 million (as reflected in a certificate of the Borrower delivered to the DIP Revolving Facility Agent on or prior to the anticipated Conversion Date and based on Lee Enterprises' good faith assumptions); (c) on the Conversion Date, all Revolving Loans and other obligations of Lee Enterprises under the DIP Revolving Facility have been converted to loans under the New First Lien Revolving Credit Facility and all letters of credit under the Prepetition Credit Agreement have been converted to Letters of Credit under the New First Lien Revolving Credit Facility; (d) pro forma compliance with certain enumerated financial covenants after giving effect to the occurrence of the Effective Date; and (e) no default or event of default under the DIP Revolving Facility exists or would exist under the New First Lien Revolving Credit Facility after giving effect to the occurrence of the Effective Date.

2.     Motion Seeking to Approve Consensual Use of Noteholders' Cash Collateral and to Provide Adequate Protection.[10]

The Motion Seeking to Approve Consensual Use of Noteholders' Cash Collateral and to Provide Adequate Protection seeks, among other things, entry of an interim order and a final order authorizing the consensual use of cash collateral of the Noteholders and providing adequate protection to the Noteholders, including (i) the current payment (at the non-default rate specified in the PD LLC Notes Agreement) of all accrued and unpaid interest on the PD LLC Notes as of the Petition Date and all interest accruing on the PD LLC Notes after the Petition Date; (ii) liens on unencumbered assets of Pulitzer and its subsidiaries (except with respect to Star Publishing, in which case the assets shall be limited to (a) any assets of Star Publishing that are not related to TNI and (b) the intercompany notes issued by Pulitzer in favor of Star Publishing); (iii) replacement liens; (iv) superpriority administrative claims as contemplated by section 507(b); and (v) the payment of reasonable fees and expenses of (a) counsel for The Bank of New York Mellon Trust Company, N.A., in its capacity as collateral agent under the PD LLC Notes Documents (the "PD LLC Notes

---

[10] The relief described in this section may be sought as part of a joint motion seeking consensual use of both the Prepetition Lenders' and Noteholders' cash collateral.

Collateral Agent"); (b) Bingham McCutchen LLP and Morris, Nichols, Arsht & Tunnell LLP (and other local counsel as appropriate) as counsel for the Consenting Noteholders; and (c) Conway Del Genio Gries & Co., as financial advisor for the Consenting Noteholders.

3.    Motion of the Debtors For an Order (I) Scheduling a Combined Hearing to (A) Approve Adequacy of Solicitation and Disclosure Statement, (B) Approve Prepetition Solicitation Procedures and (C) Confirm the Joint Prepackaged Plan of Reorganization; (II) Establishing Deadlines and Procedures For Filing Objections to Approval of Solicitation and Disclosure Statement, Approval of Prepetition Solicitation Procedures and Confirmation of Plan; and (III) Approving Form and Manner of Notice of Objection Deadline and Confirmation Hearing.

The Motion of the Debtors For an Order (I) Scheduling a Combined Hearing to (A) Approve Adequacy of Solicitation and Disclosure Statement, (B) Approve Prepetition Solicitation Procedures and (C) Confirm the Joint Prepackaged Plan of Reorganization; (II) Establishing Deadlines and Procedures For Filing Objections to Approval of Solicitation and Disclosure Statement, Approval of Prepetition Solicitation Procedures and Confirmation of Plan; and (III) Approving Form and Manner of Notice of Objection Deadline and Confirmation Hearing (the "Scheduling Motion") seeks, among other things, entry of an order (i) scheduling a combined hearing to be held within forty (40) days of the commencement of the Chapter 11 Cases to (a) approve the adequacy of the Solicitation and Disclosure Statement, (b) approve the prepetition solicitation procedures, and (c) confirm the Plan; (ii) setting deadlines and procedures for filing objections to the Solicitation and Disclosure Statement, the solicitation procedures, and the Plan; and (iii) approving the form and manner of the notices appended as exhibits to the Scheduling Motion regarding the relevant objection deadline and the date and time of the Confirmation Hearing.

4.    Motion to Pay Prepetition Obligations in the Ordinary Course of Business.

The Motion of the Debtors for an Order Authorizing, but not Directing, the Debtors to Pay Prepetition Claims as They Become Due (the "Prepetition Claims Motion") seeks Bankruptcy Court authorization, but not direction, to pay certain fixed, liquidated, noncontingent, and undisputed prepetition claims of the Debtors' general unsecured creditors in the ordinary course of business. Pursuant to the terms of the Plan, all General Unsecured Claims against the Debtors, including trade claims of suppliers and vendors, will be Reinstated and paid in full. The Prospective Debtors accordingly intend to seek Bankruptcy Court relief to continue making payments to such parties on an uninterrupted basis to ensure that the Chapter 11 Cases have a minimal effect on the Debtors' ongoing business operations. If the relief requested in this Motion is granted, the Debtors will continue to make payments on the undisputed claims of unsecured creditors in the ordinary course of their business as such claims become due in accordance with their terms.

5.    Motion to Pay Prepetition Wages and Other Benefits to Employees.

In connection with this first day motion, the Debtors shall seek authority, in accordance with their stated policies, to: (a) pay all prepetition employee wages, salaries and other accrued compensation; (b) reimburse all prepetition employee business expenses; (c) make all contributions to prepetition benefit programs and continue such programs in the ordinary course of business; (d) honor workers' compensation obligations; (e) make all payments for which prepetition payroll deductions were made; (f) pay all processing costs and administrative expenses relating to the foregoing payments and contributions; and (g) make all payments to third parties incident to the foregoing payments and contributions. If the relief requested in this Motion is granted, the Debtors

will continue to pay their obligations to employees on account of wages, salaries, and employee benefits on an uninterrupted basis, which will further facilitate the continued, stable operation of the Debtors' businesses and their transition into and out of the Chapter 11 Cases.

6.    Motion For Authority to (i) Honor Prepetition Customer Obligations and Continue Customer Programs; (ii) Pay Prepetition Taxes to Federal, State and Local Taxing Authorities; (iii) Pay Prepetition Amounts to Brokers, Shippers and Warehousemen; (iv) Continue Prepetition Insurance Programs and Pay Prepetition Obligations in Respect Thereof; and (v) Pay Critical Vendors.

The Motion for Authority to (i) Honor Prepetition Customer Obligations and Continue Customer Programs; (ii) Pay Prepetition Taxes to Federal, State and Local Taxing Authorities; (iii) Pay Prepetition Amounts to Brokers, Shippers and Warehousemen; (iv) Continue Prepetition Insurance Programs and Pay Prepetition Obligations in Respect Thereof; and (v) Pay Critical Vendors (the "First-Day Payment and Programs Motion"), seeks authority, but not direction, to pay certain specific categories of prepetition claims. First, the First-Day Payment and Programs Motion seeks Bankruptcy Court authorization to continue certain prepetition customer programs, such as customer rebates, pre-payment and bill and hold arrangements, in the ordinary course of business. Second, the First-Day Payment and Programs Motion seeks Bankruptcy Court authorization to pay certain taxes in the ordinary course of business. Third, the First-Day Payment and Programs Motion seeks Bankruptcy Court authorization to pay certain claims to the Debtors' brokers, shippers, and warehousemen in the ordinary course of business. Fourth, the First-Day Payment and Programs Motion seeks Bankruptcy Court authorization to continue the Debtors' prepetition insurance programs and to pay related prepetition obligations in the ordinary course of business. Fifth, the First-Day Payment and Programs Motion seeks Bankruptcy Court authorization to pay certain prepetition claims held by the Debtors' critical vendors. Pursuant to the terms of the Plan, all of the Debtors' unsecured claims will be reinstated and paid in full, so the First-Day Payment and Programs Motion will only affect the timing, and not amount, of such payments.

7.    Motion Seeking Continued Use of Existing Cash Management System, Bank Accounts and Business Forms.

In this first day motion, the Debtors shall seek entry of an order (i) authorizing and approving the Debtors' continued use of their existing cash management system, (ii) authorizing the Debtors to continue using prepetition bank accounts and business forms, and (iii) waiving the requirements of 11 U.S.C. § 345(b) on an interim basis with respect to the Debtors' deposit practices.

8.    Motion Prohibiting Utility Companies from Discontinuing, Altering or Refusing Service.

By this first day motion, the Debtors shall seek entry of (i) a bridge order and (ii) a final order (a) prohibiting the Debtors' utility providers from altering, refusing, or discontinuing service to the Debtors on account of prepetition invoices, including the making of demands for security deposits or accelerated payment terms; (b) providing that the utility providers have "adequate assurance of payment" within the meaning of section 366 of the Bankruptcy Code, based, *inter alia*, on the Debtors' establishment of a segregated account containing an amount equal to fifty percent (50%) of the Debtors' estimated aggregate monthly cost of utility service; and (c) establishing procedures for resolving requests for additional adequate assurance and authorizing the Debtors to provide adequate assurance of future payment to the utility providers. As with other

General Unsecured Claims, the Prospective Debtors intend to pay their obligations to utility providers in the ordinary course of business as they come due.

        9.      <u>Motion Seeking Joint Administration of the Chapter 11 Cases</u>.

        The Motion of the Debtors Pursuant to Federal Rule of Bankruptcy Procedure 1015(b) for an Order Directing Joint Administration of Related Chapter 11 Cases (the "<u>Joint Administration Motion</u>") seeks Bankruptcy Court authority to jointly administer and consolidate the Debtors' Chapter 11 Cases for procedural purposes.

        10.     <u>Motion to Reimburse Backstop Lender Fees and Expenses</u>.

        The Debtors shall file a motion requesting authority to pay commitment fees equal to 0.5% of the Backstop Lenders' aggregate Backstop Commitment Amounts (the "<u>Backstop Lender Fees</u>") and the reasonable professional fees and expenses of Goldman Sachs Lending Partners LLC, Mutual Quest Fund, Monarch Master Funding Ltd, Mudrick Distressed Opportunity Fund Global, LP and Blackwell Partners, LLC, as the Initial Backstop Lenders.  This motion, which is contemplated by the terms of the Lee Support Agreement, will request that the Debtors receive authority from the Bankruptcy Court to pay the Backstop Lender Fees in accordance with the Backstop Commitment Letters, as well as the reasonable fees and expenses incurred by the Backstop Lenders in connection with the Debtors' restructuring proceedings as such fees and expenses come due.

## B.    <u>NEXT DAY MOTIONS AND ORDERS</u>

        As soon as practicable after the commencement of the Chapter 11 Cases, the Prospective Debtors also intend to seek relief, after notice and, if necessary, a hearing, in the form of "next day" motions and orders from the Bankruptcy Court as to various matters, certain of which are described below.  There can be no assurance that the Bankruptcy Court will grant any such relief. The "next day motions" described in this section are not exhaustive, and the Prospective Debtors reserve the right to seek further orders and additional relief from the Bankruptcy Court to the extent that the Debtors determine that such orders and relief are necessary or appropriate at such time as the bankruptcy proceedings are commenced, or not to seek portions of the relief described below.

        1.      <u>Retention of Professionals by the Debtors' Estates</u>.

        The Prospective Debtors intend to apply for entry of an order authorizing the retention of counsel to assist them in the Chapter 11 Cases; specifically (i) Sidley Austin LLP as their general reorganization and bankruptcy counsel under section 327(a) of the Bankruptcy Code, and (ii) Young Conaway Stargatt and Taylor LLP as Delaware bankruptcy co-counsel in the Chapter 11 Cases, also under section 327(a) of the Bankruptcy Code.  The Prospective Debtors further intend to apply for entry of an order authorizing the retention of Lane & Waterman LLP as their general outside counsel for corporate, litigation, employment, real estate, intellectual property, securities and similar matters, pursuant to section 327(e) of the Bankruptcy Code.

        In addition to the retention of counsel, the Prospective Debtors intend to file an application to retain The Blackstone Group ("<u>Blackstone</u>") as their investment bankers.  To assist them further in carrying out their duties as debtors-in-possession and to otherwise represent their interests in the Chapter 11 Cases, the Prospective Debtors also intend to seek to retain The Garden City Group, Inc., as claims, noticing and Voting Agent.

2.     <u>Motion Seeking a Waiver of 341 Meeting and Requirement to File Schedules</u>.

In this motion, the Debtors will seek entry of an order granting the Debtors an additional forty-five (45) days to file their schedules and statements of financial affairs, and, assuming the Debtors confirm the Plan prior to the expiration of such extended period, waiving the requirement that such schedules and statements of financial affairs be filed.  In this motion, the Debtors also intend to seek entry of an order directing the U.S. Trustee not to convene a 341 meeting if the Plan is confirmed within ninety (90) days after the Petition Date.

## IV.  THE PLAN OF REORGANIZATION

### A.    GENERAL

The consummation of a plan of reorganization is the principal objective of a chapter 11 case.  A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan and any creditor of or equity interest holder in the debtor, whether or not such creditor or equity interest holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan.  Subject to certain limited exceptions and other than as provided in the Plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan, and terminates all rights and interests of prepetition equity security holders.

The confirmation requirements of section 1129(a) of the Bankruptcy Code must be satisfied separately with respect to each Debtor.  Therefore, notwithstanding the combination of the separate plans of reorganization of each of the Prospective Debtors in the Plan for purposes of, among other things, economy and efficiency, the Plan shall be deemed a separate Chapter 11 plan for each such Prospective Debtor.

A "prepackaged" plan must comply with all requirements otherwise applicable to plans confirmed in non-prepackaged Chapter 11 cases.  However, in the context of a "prepackaged" plan, solicitation occurs before the petition date, and a plan will only be filed as "prepackaged" if, based upon the prepetition solicitation, it can be confirmed without additional, post-petition solicitation.

**THE FOLLOWING SECTIONS SUMMARIZE CERTAIN KEY INFORMATION CONTAINED IN THE PLAN.  THIS SUMMARY REFERS TO, AND IS QUALIFIED IN ITS ENTIRETY BY, THE PLAN, A COPY OF WHICH IS ATTACHED HERETO AS <u>EXHIBIT A</u>.  THE TERMS OF THE PLAN WILL GOVERN IN THE EVENT ANY INCONSISTENCY ARISES BETWEEN THIS SUMMARY AND THE PLAN.  THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THE SOLICITATION AND DISCLOSURE STATEMENT.  IN OTHER WORDS, THE TERMS OF THE PLAN DO NOT YET BIND ANY PERSON OR ENTITY.  IF THE BANKRUPTCY COURT DOES CONFIRM THE PLAN, HOWEVER, THEN IT WILL BIND ALL CLAIM AND INTEREST HOLDERS.**

**CAPITALIZED TERMS USED IN THIS ARTICLE IV THAT ARE NOT OTHERWISE DEFINED IN THIS ARTICLE IV SHALL HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN.**

**B.    CLASSIFICATION AND ALLOWANCE OF CLAIMS & EQUITY INTERESTS GENERALLY**

Section 1123 of the Bankruptcy Code provides that, except for certain types of claims, such as administrative expense claims and priority tax claims, a plan of reorganization must categorize claims against and equity interests in a debtor into individual classes.  Although the Bankruptcy Code gives a debtor significant flexibility in classifying claims and interests, section 1122 of the Bankruptcy Code dictates that a plan of reorganization may only place a claim or an equity interest into a class containing claims or equity interests that are substantially similar.

The Plan creates several "Classes" of Claims and Interests.  These Classes take into account the differing nature and priority of Claims against and Interests in the Prospective Debtors.  Administrative Expense Claims, DIP Revolving Facility Claims, Priority Tax Claims, and Section 507(b) Claims are not classified for purposes of voting or receiving distributions under the Plan, but are treated separately as unclassified Claims.

The Plan provides specific treatment for each Class of Claims and Interests.  Only holders of Allowed Claims and Interests are entitled to receive distributions under the Plan.

Unless otherwise provided in the Plan or the Confirmation Order (including, without limitation, where a Claim or Interest is Reinstated under the Plan), the treatment of any Claim or Interest under the Plan will be in full satisfaction, settlement, release and discharge of, and in exchange for, such Claim or Interest.

**C.    PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS, DIP REVOLVING FACILITY CLAIMS, PRIORITY TAX CLAIMS, AND SECTION 507(B) CLAIMS**

1.    Administrative Expense Claims.

Administrative Expense Claims are Claims for costs and expenses of administration of the Chapter 11 Cases arising on or after the Petition Date and prior to the Effective Date under sections 328, 330, 363, 365, 503(b), or 507(a)(2) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary costs and expenses of preserving the Estates and operating the businesses of the Debtors from and after the Petition Date (such as wages, salaries and commissions for services and payments for inventory, leased equipment and premises) and Claims of governmental units for taxes (including tax audit Claims) related to tax years commencing after the Petition Date, but excluding Claims related to tax periods, or portions thereof, ending on or before the Petition Date; (b) all compensation for actual and necessary legal, financial, advisory, accounting and other services provided by the Professionals and the reimbursement of actual and necessary expenses incurred by the Professionals pursuant to sections 328 or 330 of the Bankruptcy Code; (c) with the exception of Section 507(b) Claims, any indebtedness or obligations incurred or assumed by the Debtors during the Chapter 11 Cases; (d) any payment to be made under the Plan or otherwise to cure a default under an executory contract or unexpired lease that has been or will be assumed by any of the Debtors; or (e) any fees and charges assessed against the Estates under section 1930, Chapter 123, of Title 28 of the United States Code.

The Bankruptcy Code does not require that administrative expense claims be classified under a plan. It does, however, require that allowed administrative expense claims be paid in full in cash in order for a plan to be confirmed, unless the holder of such claim consents to different treatment.

Pursuant to the Plan and subject to the provisions of sections 328, 330, 331 and 503(b) of the Bankruptcy Code, on either: (i) the latest to occur of (x) the Effective Date, (y) the date upon which such Administrative Expense Claim becomes an Allowed Claim and (z) such other date as agreed upon by the Debtors and the Holder of such Administrative Expense Claim, or (ii) such other date as the Bankruptcy Court may order, each Holder of an Allowed Administrative Expense Claim shall receive, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Administrative Expense Claim, (a) Cash equal to the full unpaid amount of such Allowed Administrative Expense Claim, or (b) such other less favorable treatment as the applicable Debtor and such Holder shall have agreed; provided, however, that Allowed Administrative Expense Claims not yet due or that represent obligations incurred by the Debtors in the ordinary course of their business during the Chapter 11 Cases, or assumed by the Debtors during the Chapter 11 Cases, shall be paid or performed when due in the ordinary course of business and in accordance with the terms and conditions of the particular agreements governing such obligations.

Each Allowed Administrative Expense Claim will be paid from, and to the extent of available assets of, the respective Debtor's Estate to which such Claim applies or has been allocated. To the extent that an Administrative Expense Claim is Allowed against the Estate of more than one Debtor, there shall be only a single recovery on account of such Allowed Claim.

2.    DIP Revolving Facility Claims.

DIP Revolving Facility Claims are Claims against the Lee Debtors held by the DIP Revolving Facility Agent and the DIP Revolving Facility Lenders pursuant to the DIP Revolving Facility Documents and the Final DIP Order.

The Plan contemplates that the DIP Revolving Facility Claims will be entitled to priority as superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code. The Plan further contemplates that the DIP Revolving Facility Claims will also be treated as Secured Claims as a result of liens granted by the Lee Debtors and authorized by the Bankruptcy Court pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code. Incurrence of the DIP Revolving Facility Claims and the granting of the liens relating thereto will be subject to approval of the Bankruptcy Court in the Interim DIP Order and the Final DIP Order, discussed in Section III.A.1, above. The Plan presumes that such orders will be granted by the Bankruptcy Court and will embody substantially the terms set out in the DIP Revolving Facility Commitment Letter and the exhibits thereto.

On the Effective Date, all Allowed DIP Revolving Facility Claims shall, at the Debtors' option, in accordance with and on the terms set forth in the DIP Revolving Facility Agreement, either (i) convert into revolving loans and commitments outstanding under the New First Lien Revolving Credit Facility pursuant to the New First Lien Credit Facility Documents and the DIP Revolving Facility Commitment Letter; provided, however, that all accrued and unpaid interest and all fees and expenses due and payable on or prior to the Effective Date under the terms of the DIP Revolving Facility Agreement shall be indefeasibly paid in full in Cash on the Effective Date by the Lee Debtors, or (ii) be indefeasibly paid in full in Cash by the Lee Debtors, and, in each case, the

"Commitments" (as defined in the DIP Revolving Facility Agreement) under the DIP Revolving Facility Agreement shall be irrevocably cancelled and the "Letters of Credit" (as defined in the DIP Revolving Facility Agreement) shall be returned undrawn.  Notwithstanding anything to the contrary in the Plan, the Liens and security interests securing the DIP Revolving Facility Claims shall continue in full force and effect until the DIP Revolving Facility Claims (a) convert into revolving loans and commitments outstanding under the New First Lien Revolving Credit Facility or (b) are indefeasibly paid in full in Cash by the Lee Debtors, the "Commitments" (as defined in the DIP Revolving Facility Agreement) are irrevocably cancelled, and the "Letters of Credit" (as defined in the DIP Revolving Facility Agreement) are returned undrawn on the Effective Date.

    3.    <u>Priority Tax Claims</u>.

       Priority Tax Claims are Claims of governmental units for taxes owed by the Debtors that are entitled to priority in payment pursuant to sections 502(i) and 507(a)(8) of the Bankruptcy Code.  These taxes include (a) taxes on income or gross receipts that meet the requirements of section 507(a)(8)(A), (b) property taxes meeting the requirements of section 507(a)(8)(B), (c) taxes that were required to be collected or withheld by the Debtors and for which the Debtors are liable in any capacity as described in section 507(a)(8)(C), (d) employment taxes on wages, salaries, or commissions that are entitled to priority pursuant to section 507(a)(4), to the extent such taxes also meet the requirements of section 507(a)(8)(D), (e) excise taxes of the kind specified in section 507(a)(8)(E), (f) customs duties arising out of the importation of merchandise that meet the requirements of section 507(a)(8)(F), and (g) prepetition penalties relating to any of the foregoing taxes to the extent such penalties are in compensation for actual pecuniary loss as provided in section 507(a)(8)(G).

       The Bankruptcy Code does not require that priority tax claims be classified under a plan.  It does, however, require that such claims receive the treatment described below in order for a plan to be confirmed unless the holder of such claims consents to different treatment.

       Pursuant to the Plan, except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment (in which event such other agreement shall govern), each Holder of an Allowed Priority Tax Claim against any of the Debtors that is due and payable on or before the Effective Date shall receive, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Priority Tax Claim, Cash equal to the amount of such Allowed Priority Tax Claim on the later of (i) the Effective Date and (ii) the date such Priority Tax Claim becomes an Allowed Claim or as soon thereafter as practicable.  All Allowed Priority Tax Claims against any of the Debtors which are not due and payable on the Effective Date shall be paid in the ordinary course of business by the Reorganized Debtors in accordance with the terms thereof.

    4.    <u>Section 507(b) Claims</u>.

       Section 507(b) Claims are any Claims pursuant to section 507(a)(2) of the Bankruptcy Code that the Bankruptcy Court orders are entitled to the superpriority status afforded by section 507(b) of the Bankruptcy Code, which superpriority claims may be granted by the Bankruptcy Court to (i) the Prepetition Administrative Agent and the Holders of Prepetition Credit Agreement Claims under the Interim DIP Order and/or the Final DIP Order and (ii) the PD LLC Notes Collateral Agent and the Holders of PD LLC Notes Claims under the Bankruptcy Court's interim and/or final orders approving the Pulitzer Debtors' use of cash collateral.

The Bankruptcy Code does not require that claims enjoying superpriority status under 11 U.S.C. § 507(b), as a subset of claims under 11 U.S.C. § 507(a)(2), be classified under a plan.  It does, however, require that such claims receive priority of payment, which will be satisfied by the treatment described below.

On the Effective Date, as a consequence of the implementation of the New First Lien Credit Facility, the Reorganized Debtors' entry into the New Second Lien Term Loan Documents, the issuance of the New Common Stock, and the treatment of PD LLC Notes Claims in accordance with section 3.3.3(c) of the Plan, all Section 507(b) Claims shall be settled, released by the Holders of such Claims, and discharged.

## D.    NON-SUBSTANTIVE CONSOLIDATION AND CLASSIFICATION OF CLAIMS

The Plan is a joint plan that does not provide for substantive consolidation of the Debtors' Estates, and, on the Effective Date, the Debtors' Estates shall not be deemed to be substantively consolidated for purposes thereof.  Allowed Claims held against one Debtor will be satisfied solely from the Cash and assets of such Debtor and its Estate; provided that, to the extent of any insufficiency, funds or other property may be advanced to the relevant Debtor(s) by (x) with respect to a Lee Debtor, any of the other Lee Debtors and (y) with respect to a Pulitzer Debtor, any of the other Pulitzer Debtors.  Except as specifically set forth in the Plan, nothing in the Plan or the Solicitation and Disclosure Statement shall constitute or be deemed to constitute an admission that one Debtor is subject to or liable for any claim against any other Debtor.

Additionally, claimants holding Claims against more than one Debtor, to the extent Allowed in each such Debtor's case, will be treated as Holders of separate Claims against each such Debtor's Estate, provided, however, that no Holder shall be entitled to receive more than payment in full of its Allowed Claim (plus postpetition interest, if and to the extent provided in the Plan), and such Claims will be administered and treated in the manner provided in the Plan.

The categories of Claims and Interests listed below, which exclude Administrative Expense Claims, DIP Revolving Facility Claims, Priority Tax Claims and Section 507(b) Claims in accordance with section 1123(a)(1) of the Bankruptcy Code, are classified for all purposes, including, without limitation, voting, Confirmation, and distribution pursuant to the Plan, as follows:

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| Classes 1A-35A | Priority Non-Tax Claims | Unimpaired | No |
| Classes 1B-35B | Other Secured Claims | Unimpaired | No |
| Classes 1C-9C | Prepetition Credit Agreement Claims | Impaired | Yes |
| Classes 10C-35C | PD LLC Notes Claims | Impaired | Yes |
| Classes 1D-35D | General Unsecured Claims | Unimpaired | No |
| Classes 1E-35E | Intercompany Claims | Unimpaired | No |
| Classes 12F & 14F | Herald Claim | Unimpaired | No |
| Classes 1G-9G | Interests in Lee Debtors | Unimpaired | No |
| Classes 10G-35G | Interests in Pulitzer Debtors | Unimpaired | No |

E.    **PROVISIONS FOR TREATMENT OF CLAIMS AND INTERESTS**

The classification and treatment of Claims against and Interests in the Debtors are set forth in detail in the Plan.  A summary of that treatment is provided below.

1.    Priority Non-Tax Claims (Classes 1A through 35A).

Priority Non-Tax Claims are Claims entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code, other than Administrative Expense Claims or Priority Tax Claims.

On the Effective Date, each Holder of an Allowed Priority Non-Tax Claim shall have such Claim Reinstated.  Such Claims are Unimpaired under the Plan, and the Holders of such Claims are not entitled to vote on the Plan.

2.    Other Secured Claims (Class 1B through 35B).

Other Secured Claims are Claims (other than Prepetition Credit Agreement Claims, DIP Revolving Facility Claims or PD LLC Notes Claims) that are secured by a Lien on collateral to the extent of the value of such collateral (i) as set forth in the Plan, (ii) as agreed to by the Holder of such Claim and the relevant Debtor(s) or (iii) as determined pursuant to a Final Order of the Bankruptcy Court in accordance with section 506(a) of the Bankruptcy Code or, in the event that such Claim is subject to setoff under section 553 of the Bankruptcy Code, to the extent of such setoff.

On the Effective Date, each Holder of an Allowed Other Secured Claim shall have its Claim Reinstated.  Such Claims are Unimpaired under the Plan, and the Holders of such Claims are not entitled to vote on the Plan.

3.    Prepetition Credit Agreement Claims (Classes 1C through 9C).

Prepetition Credit Agreement Claims are all Claims arising under, evidenced by, or secured pursuant to, the Prepetition Credit Agreement Documents.  Prepetition Credit Agreement Claims shall be Allowed on the Effective Date pursuant to the Plan in the aggregate principal amount thereof, plus (i) any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement through the Effective Date of the Plan and (ii) all other unpaid monetary Obligations as defined in the Prepetition Credit Agreement Documents, except to the extent that such Claims are otherwise provided in the Plan or any of the documents entered into in accordance with the Plan to be paid or satisfied, and shall not be subject to avoidance, objection, challenge, deduction, subordination, recharacterization or offset.

Prepetition Credit Agreement Claims are classified against the Lee Debtors only under the Plan, given that only the Lee Debtors are obligated, either as borrower or as guarantors under the Prepetition Credit Agreement.  None of the Pulitzer Debtors are obligated on account of the Prepetition Credit Agreement Claims.

On the Effective Date, each Holder of an Allowed Prepetition Credit Agreement Claim against the Lee Debtors shall receive on account of, in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Claim, such Holder's Pro Rata Share of (i) the New First Lien Term Loan and (ii) any accrued and unpaid interest on the Prepetition

Credit Agreement Claims, calculated at the non-default rate under the Prepetition Credit Agreement Documents, through the Effective Date, that has not been previously paid to the Holders of Prepetition Credit Agreement Claims, including, but not limited to, as adequate protection under applicable orders of the Bankruptcy Court; provided, however, that each Converting Lender shall receive, for the Prepetition Credit Agreement Claim(s) that such Converting Lender elects to convert pursuant to such Converting Lender's New Second Lien Term Loan Election (which converted amount shall be deducted both from the amount of such Converting Lender's Allowed Prepetition Credit Agreement Claim and the total amount of Allowed Prepetition Credit Agreement Claims solely for purposes of determining the Holders' Pro Rata Shares of the New First Lien Term Loan), such Converting Lender's Second Lien Pro Rata Share of (i) the New Second Lien Term Loan and (ii) the New Common Stock.  In addition, on the Effective Date, any unexpired letters of credit outstanding under the Prepetition Credit Agreement shall be deemed made or issued, as applicable, under the New First Lien Revolving Credit Facility.

The Prospective Debtors intend to request that the Bankruptcy Court approve, as adequate protection for the Holders of Prepetition Credit Agreement Claims in connection with the entry of the Lee Debtors into the DIP Revolving Facility, payment during the pendency of the Chapter 11 Cases of current interest at the non-default rate and such other adequate protection consistent with the terms of the Lee Support Agreement and as shall be provided in the interim and final orders approving the Lee Debtors' entry into and performance of their obligations under the DIP Revolving Facility.

Prepetition Credit Agreement Claims are Impaired under the Plan.  Holders of such Claims are accordingly entitled to vote on the Plan.

4.    PD LLC Notes Claims (Classes 10C through 35C).

PD LLC Notes Claims are all Claims arising under, evidenced by, or secured pursuant to, the PD LLC Notes Documents.  PD LLC Notes Claims are classified against the Pulitzer Debtors only under the Plan, given that the PD LLC Notes were issued by PD LLC and guaranteed by Pulitzer and the other Pulitzer Debtors.  None of the Lee Debtors is obligated under the PD LLC Notes.

The Plan provides that the PD LLC Notes Claims shall be Allowed thereunder in the aggregate principal amount thereof as of the Effective Date, plus (i) any accrued but unpaid interest thereon at the non-default rate under the PD LLC Notes Documents through the Effective Date of the Plan and (ii) all other Obligations (as defined in the PD LLC Notes documents), except to the extent that such Claims are otherwise provided in the Plan or any of the documents entered into in accordance with the Plan to be paid or satisfied, and shall not be subject to avoidance, objection, challenge, deduction, subordination, recharacterization, or offset.  On the Effective Date, each Holder of an Allowed PD LLC Notes Claim shall receive on account of, in full and complete satisfaction, settlement, release and discharge of, and in exchange for such Claim, such Holder's Pro Rata Share of (i) the New PD LLC Notes, (ii) the Lee Closing Date Payment, which shall be deemed to be a prepayment of the New PD LLC Notes held by such Holder, and (iii) any accrued interest on the PD LLC Notes, calculated at the non-default rate under the PD LLC Notes Documents, through the Effective Date, that has not previously been paid to the PD LLC Noteholders, including, but not limited to, as adequate protection under applicable orders of the Bankruptcy Court.

The Prospective Debtors intend to provide adequate protection to the PD LLC Noteholders for the use of cash collateral as described in Section III.A.2 of the Solicitation and Disclosure Statement, consistent with the terms of the Lee Support Agreement.

PD LLC Notes Claims are Impaired under the Plan, and the Holders of such Claims are entitled to vote on the Plan.

5.      General Unsecured Claims Against the Lee Debtors (Classes 1D through 9D).

General Unsecured Claims are Claims against any Debtor that are not Administrative Expense Claims, DIP Revolving Facility Claims, Priority Tax Claims, Priority Non-Tax Claims, Section 507(b) Claims, Other Secured Claims, Prepetition Credit Agreement Claims, PD LLC Notes Claims, Intercompany Claims, or the Herald Claim.

On or as soon as reasonably practicable after the latest to occur of (i) the Effective Date or (ii) the date on which an Allowed General Unsecured Claim against any of the Lee Debtors becomes due and payable in accordance with the applicable non-bankruptcy law governing such Claim, the Holder of such Allowed General Unsecured Claim against any of the Lee Debtors shall receive Cash from the Lee Debtors equal to the full unpaid amount of such Claim, together with interest thereon, at the applicable non-default rate, to which the Holder of such Claim may be entitled under applicable non-bankruptcy law through the Effective Date.

6.      General Unsecured Claims Against the Pulitzer Debtors (Classes 10D through 35D).

On or as soon as reasonably practicable after the latest to occur of (i) the Effective Date or (ii) the date on which an Allowed General Unsecured Claim against any of the Pulitzer Debtors becomes due and payable in accordance with the applicable non-bankruptcy law governing such Claim, the Holder of such Allowed General Unsecured Claim against any of the Pulitzer Debtors shall receive Cash from the Pulitzer Debtors equal to the full unpaid amount of such Claim, together with interest thereon, at the applicable non-default rate, to which the Holder of such Claim may be entitled under applicable non-bankruptcy law through the Effective Date.  General Unsecured Claims against the Pulitzer Debtors are Unimpaired under the Plan, and the Holders of such Claims are not entitled to vote on the Plan.

7.      Intercompany Claims (Classes 1E through 35E).

Intercompany Claims are all Claims against any one Debtor held by another Debtor or a non-Debtor Affiliate of any Debtor.

On the Effective Date each Holder of an Allowed Intercompany Claim against any of the Debtors shall have such Claim Reinstated; provided, however, that the Intercompany Claim held by Pulitzer against Lee Enterprises shall be reduced by the amount of the Lee Closing Date Payment.

Intercompany Claims are Unimpaired under the Plan, and the Holders of such Claims shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject the Plan.

8.    Herald Claim (Classes 12F and 14F).

The Herald Claim is the Claim of Herald against PD LLC and DS LLC (two of the Pulitzer Debtors) arising under and pursuant to that certain Redemption Agreement dated as of February 18, 2009, as discussed in more detail in Section II.F.4, above.

On the Effective Date, the Herald Claim shall be Reinstated, and shall, in accordance with the treatment afforded to such Claim under that certain Redemption Agreement dated February 18, 2009, (i) not be redeemed for Cash unless all obligations under the New First Lien Term Loan, the New Second Lien Term Loan, and the New Revolving Credit Facility have been paid in full in Cash and all obligations of PD LLC and DS  under the New PD  LLC Notes Documents have been paid in full in Cash, and (ii) be junior and subordinate in all respects to the obligations of Reorganized PD LLC and Reorganized DS LLC under the New PD LLC Notes Documents in the same manner as the Herald Claim was junior and subordinate in all respects to the obligations of PD LLC and DS LLC under the PD LLC Notes Documents.  The Herald Claim is Unimpaired under the Plan, and the Holder of the Herald Claim is not entitled to vote on the Plan.

9.    Interests in the Lee Debtors (Classes 1G through 9G).

Interests in the Lee Debtors are the Interests of any holder of equity securities of any Lee Debtor represented by any issued and outstanding common stock, preferred stock, limited liability company interest, partnership interest, or any other instrument evidencing an ownership interest in such Lee Debtor prior to the Effective Date (including prior to the Petition Date), whether or not transferable, and any restricted stock units, calls, rights, puts, awards, commitments, repurchase rights, unvested or unexercised options, warrants, unvested common interests, unvested preferred interests or any other agreements of any character related to the common or preferred interests of any such Lee Debtor, obligating any such Lee Debtor to issue, transfer, purchase, redeem, or sell any equity interests or other equity securities, any rights under any equity incentive plans, voting agreements and registration rights agreements regarding equity securities of any such Lee Debtor, any claims arising from the rescission of a purchase, sale or other acquisition of any outstanding common stock, preferred stock or other equity securities (or any right, claim, or interest in and to any common stock, preferred stock or other equity securities) of any such Lee Debtor, any Claims for the payment of any distributions with respect to any common stock, preferred stock, or other equity interests in or securities of such Lee Debtor, and any claims for damages or any other relief arising from the purchase, sale, or other acquisition of any such Lee Debtor's outstanding common stock, preferred stock, or other equity interests or securities.

On the Effective Date, each Holder of an Interest in the Lee Debtors shall have such Interest Reinstated.  Such Interests are Unimpaired under the Plan, and the Holders of such Interests are not entitled to vote on the Plan.

10.    Interests in Pulitzer Debtors (Classes 10G through 35G).

Interests in the Pulitzer Debtors are the Interests of any holder of equity securities of any Pulitzer Debtor represented by any issued and outstanding common stock, preferred stock, limited liability company interest, partnership interest, or any other instrument evidencing an ownership interest in such Pulitzer Debtor prior to the Effective Date (including prior to the Petition Date), whether or not transferable, and any restricted stock units, calls, rights, puts, awards, commitments, repurchase rights, unvested or unexercised options, warrants, unvested common interests, unvested preferred interests or any other agreements of any character related to the

common or preferred interests of any such Pulitzer Debtor, obligating any such Pulitzer Debtor to issue, transfer, purchase, redeem, or sell any equity interests or other equity securities, any rights under any equity incentive plans, voting agreements and registration rights agreements regarding equity securities of any such Pulitzer Debtor, any claims arising from the rescission of a purchase, sale or other acquisition of any outstanding common stock, preferred stock or other equity securities (or any right, claim, or interest in and to any common stock, preferred stock or other equity securities) of any such Pulitzer Debtor, any Claims for the payment of any distributions with respect to any common stock, preferred stock, or other equity interests in or securities of such Pulitzer Debtor, and any claims for damages or any other relief arising from the purchase, sale, or other acquisition of any such Pulitzer Debtor's outstanding common stock, preferred stock, or other equity interests or securities.

On the Effective Date, each Holder of an Interest in the Pulitzer Debtors shall have such Interest Reinstated.  Such Interests are Unimpaired under the Plan, and the Holders of such Interests are not entitled to vote on the Plan.

F.    **IDENTIFICATION OF CLASSES OF CLAIMS AND INTERESTS THAT ARE IMPAIRED; ACCEPTANCE OR REJECTION OF THE PLAN**

1.    Impaired Classes of Claims Entitled to Vote.

Each of Classes 1C through 9C (Prepetition Credit Agreement Claims against the Lee Debtors) and Classes 10C through 35C (PD LLC Notes Claims against the Pulitzer Debtors) is Impaired, and the holders of Claims in such Classes are entitled to vote to accept or reject the Plan. Prepetition Credit Agreement Claims and PD LLC Notes Claims comprise the only Classes of Claims that are Impaired under the Plan.

All other Classes of Claims are Unimpaired under the Plan and the Holders of Claims in such Classes are accordingly not entitled to vote to accept or reject the Plan.  Specifically, each of Classes 1A-35A (Priority Non-Tax Claims), Classes 1B-35B (Other Secured Claims), Classes 1D-35D (General Unsecured Claims), Classes 1E-35E (Intercompany Claims), Classes 12F and 14F (Herald Claim), and Classes 1G-35G (Interests) is Unimpaired by the Plan, and the Holders of Claims and Interests in each of such Classes are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

2.    Acceptance by an Impaired Class.

In accordance with section 1126(c) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if the Plan is accepted by the Holders of at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of the Allowed Claims in such Class that have timely and properly voted to accept or reject the Plan.  As a result, if at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of the Prepetition Credit Agreement Claims and at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of the PD LLC Notes Claims vote to accept the Plan, the Plan shall be accepted by the only Impaired Classes of Claims.

As of the effective date of the Lee Support Agreement, Holders of more than 50% of the Prepetition Credit Agreement Claims, who collectively held more than 66.67% in dollar amount of the Prepetition Credit Agreement Claims, had executed and delivered the Lee Support Agreement. As a result of execution and delivery of the Lee Support Agreement, those Holders of Prepetition

Credit Agreement Claims signatory thereto committed to, among other things, support and vote in favor of the Plan.  Likewise, as of the effective date of the Pulitzer Support Agreement, Holders of more than 50% of the PD LLC Notes Claims, who collectively held more than 66.67% in dollar amount of the PD LLC Notes Claims, had executed and delivered the Pulitzer Support Agreement. As a result of execution and delivery of the Pulitzer Support Agreement, those Holders of PD LLC Notes Claims signatory thereto committed to, among other things, support and vote in favor of the Plan.  The Prospective Debtors accordingly believe that the Classes of Prepetition Credit Agreement Claims and expect that the Classes of PD LLC Notes Claims will vote to accept the Plan by more than one-half (1/2) in number and two-thirds (2/3) in dollar amount of their respective Classes.

### G.    MEANS FOR IMPLEMENTATION OF THE PLAN

     1.    Corporate Governance, Directors, Officers and Corporate Action.

     (a)    Certificate of Incorporation; By-Laws; Limited Liability Company Agreements

On the Effective Date, the Certificate of Incorporation and the By-Laws shall be substantially in the form of Exhibit 1.18 and Exhibit 1.16 to the Plan, respectively.  Consistent with, but only to the extent required by, section 1123(a)(6) of the Bankruptcy Code, on the Effective Date, the Certificate of Incorporation shall be amended to prohibit the issuance of non-voting equity securities.  The certificates or articles of incorporation, by-laws, certificates of formation, limited liability company agreements, or similar governing documents, as applicable, of the other Debtors or Reorganized Debtors shall be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code.  After the Effective Date, the Reorganized Debtors may amend and restate their certificates or articles of incorporation, by-laws, certificates of formation, limited liability company agreements, partnership agreements or similar governing documents, as applicable, as permitted by applicable law.

     (b)    Directors and Officers of Reorganized Lee Enterprises

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, on the Effective Date, the initial directors and officers of Reorganized Lee Enterprises shall be the persons identified in Exhibit 5.2.2 to the Plan.  After the Effective Date, the Certificate of Incorporation and the By-Laws, as each may be amended thereafter from time to time, shall govern the designation and election of directors, subject to the applicable restrictions, if any, in the New First Lien Credit Facility Documents, the New Second Lien Term Loan Documents, and the New PD LLC Notes Documents.

As stated in Section II.D.1, above, the Prospective Debtors intend that each of the existing directors and officers of Lee Enterprises will continue as a director and/or officer of Reorganized Lee Enterprises from and after the Effective Date.  The Prospective Debtors further intend that the directors and officers of Reorganized Lee Enterprises shall, from and after the Effective Date, continue to be compensated in accordance with Lee Enterprises' existing compensation and bonus programs, and employee benefit plans, as applicable and as detailed elsewhere in this Solicitation and Disclosure Statement and in Lee Enterprises' filings with the Securities and Exchange Commission, subject to revision in the judgment of Lee Enterprises' and/or Reorganized Lee Enterprises' directors and management.

(c)    Directors and Officers of the Reorganized Debtors Other than Reorganized Lee Enterprises

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, on the Effective Date, the initial directors and officers of the Reorganized Debtors other than Reorganized Lee Enterprises shall be the persons identified in Exhibit 5.2.3 to the Plan.  After the Effective Date, the certificates or articles of incorporation, by-laws, certificates of formation, limited liability company agreements, or similar governing documents, as applicable, of the Reorganized Debtors other than Reorganized Lee Enterprises, as each may be amended thereafter from time to time, shall govern the designation and election of directors of such Reorganized Debtors, subject to the applicable restrictions, if any, in the New First Lien Credit Facility Documents, the New Second Lien Term Loan Documents, and the New PD LLC Notes Documents.

In addition, the Prospective Debtors intend that each of the existing directors and officers of each of the Reorganized Debtors other than Reorganized Lee Enterprises, to the extent applicable, will continue as a director and/or officer of such Reorganized Debtor from and after the Effective Date.  The Prospective Debtors further intend that the directors and officers of each of the Reorganized Debtors other than Reorganized Lee Enterprises, to the extent applicable, shall, from and after the Effective Date, continue to be compensated in accordance with those compensation and bonus programs and employee benefit plans in effect prior to the Petition Date, as applicable and as detailed elsewhere in this Solicitation and Disclosure Statement and in Lee Enterprises' filings with the Securities and Exchange Commission, subject to revision in the judgment of the Prospective Debtors' and/or Reorganized Debtors' directors and management.

(d)    Corporate Action

On the Effective Date, the amendment of the Certificate of Incorporation, the selection of directors and officers for Reorganized Lee Enterprises and each other Reorganized Debtor, and all other actions contemplated by the Plan shall be deemed authorized and approved in all respects (subject to the provisions of the Plan).  All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan, shall be deemed to have timely occurred in accordance with applicable law and shall be in effect, without any requirement of further action by the security holders or directors of the Debtors or the Reorganized Debtors.  On and after the Effective Date, the appropriate officers of Reorganized Lee Enterprises and/or the other Reorganized Debtors and members of the boards of directors of Reorganized Lee Enterprises and/or the other Reorganized Debtors will be authorized and directed to issue, execute and deliver the agreements, documents, securities and instruments contemplated by the Plan in the name of and on behalf of Reorganized Lee Enterprises and/or the other Reorganized Debtors.

2.    Issuance and Distribution of New Securities.

(a)    Issuance of New Common Stock and New PD LLC Notes

On the Effective Date, (i) as authorized by the Certificate of Incorporation, Reorganized Lee Enterprises shall issue shares of New Common Stock equal to fifteen percent (15%) of the total number of issued and outstanding shares of common stock of Reorganized Lee Enterprises, computed on a pre-issuance basis, together with any and all instruments, certificates and other documents required to be issued or distributed pursuant to the Plan in order to effect such

issuance of New Common Stock without further act or action under applicable law, regulation, order or rule, and (ii) Reorganized PD LLC shall issue the New PD LLC Notes for distribution in accordance with the terms of the New PD LLC Notes Documents and the Plan.

The issuance and distribution of the New Common Stock and the New PD LLC Notes under or in connection with the Plan shall be, and shall be deemed to be, exempt from registration under any applicable federal or state securities laws to the fullest extent permissible under applicable bankruptcy law and non-bankruptcy law, including, without limitation, section 1145(a) of the Bankruptcy Code. Without limiting the effect of section 1145 of the Bankruptcy Code, all documents, agreements and instruments entered into on or as of the Effective Date contemplated by or in furtherance of the Plan shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto. In addition, all of the shares of New Common Stock and the New PD LLC Notes issued under or in connection with the Plan shall be fully paid and non-assessable and freely tradable under section 1145 of the Bankruptcy Code.

(b)    Distribution of New Common Stock and New PD LLC Notes

On the Effective Date, (i) all of the shares of the New Common Stock shall be distributed to the Converting Lenders as provided in Section 3.2.3(c) of the Plan and (ii) the New PD LLC Notes shall be distributed to the Holders of Allowed PD LLC Notes Claims as provided in Section 3.3.3(c) of the Plan and pursuant to the terms of the New PD LLC Notes Documents. Distribution of the New Common Stock may be made by means of book-entry exchange through the facilities of the DTC in accordance with the customary practices of the DTC, as and to the extent practicable. In connection with such book-entry exchange, the Disbursing Agent(s) shall deliver instructions to the DTC instructing the DTC to effect distributions of New Common Stock as provided under the Plan. In the period pending distribution of the New Common Stock to any Converting Lender, such Converting Lender shall be entitled to exercise any voting rights and receive any dividends or other distributions payable in respect of such Converting Lender's New Common Stock and to exercise all other rights in respect of the New Common Stock (so that such Converting Lender shall be deemed for tax and all other purposes to be the owner of the New Common Stock).

3.    <u>Reporting Requirements Under Securities Exchange Act of 1934</u>.

As discussed above in Section II.F.7, the Company was informed on July 8, 2011 and August 15, 2011, respectively, that it was below compliance relating to its failure to maintain over a 30 trading-day period (i) an adequate share price and (ii) the required minimum average market capitalization and stockholders' equity. The Company subsequently proposed a plan to return to compliance with NYSE Regulation, which plan was approved by the NYSE and signed by both the Company and NYSE. Under this plan, the Debtors will be subject to both informal and formal reporting requirements during the Chapter 11 Cases. However, continued listing is subject to ongoing reassessment by the NYSE and the return to compliance with other quantitative listing requirements, which would require an increase in the average closing price to $1 per share. Upon emergence, Reorganized Lee Enterprises shall continue to be a mandatory reporting company under section 12 of the Securities Exchange Act of 1934, as amended. Assuming continued listing on the NYSE, Reorganized Lee Enterprises will file a supplemental listing application such that the New Common Stock will be listed on the NYSE.

4.    <u>New Debt Documents</u>.

(a)    New First Lien Credit Facility

On the Effective Date, the Reorganized Lee Debtors will be authorized under the Plan to enter into the New First Lien Credit Agreement as well as any notes, documents or agreements delivered in connection therewith, including, without limitation, any documents required in connection with the creation or perfection of liens in connection therewith.  Such documents are expected to include, without limitation, the New Lee Intercreditor Agreement, which shall define the relative rights of DBTCA, as collateral agent under the New First Lien Credit Facility Documents (the "First Lien Collateral Agent"),  and the New First Lien Lenders, on the one hand, and Wilmington Trust, N.A., as collateral agent under the New Second Lien Term Loan Documents (the "Second Lien Collateral Agent"), and the New Second Lien Lenders, on the other hand, in the assets and property of the Lee Subsidiary Debtors that are being pledged as collateral to secure the relevant Reorganized Debtors' obligations under both the New First Lien Credit Facility and the New Second Lien Term Loan Documents.  A copy of the New First Lien Credit Agreement is attached as Exhibit 1.73 to the Plan.

The New First Lien Lenders will have valid, binding and enforceable liens on the collateral specified in the New First Lien Credit Facility Documents.  The guarantees, mortgages, pledges, liens and other security interests granted pursuant to the New First Lien Credit Facility Documents will be granted in good faith as an inducement to the New First Lien Lenders to extend credit thereunder and will be deemed not to constitute a fraudulent conveyance or fraudulent transfer, will not otherwise be subject to avoidance, and the priorities of such liens and security interests will be as set forth in the New First Lien Credit Facility Documents.  The New First Lien Revolving Credit Facility will be a superpriority revolving credit facility with payment priority over the New First Lien Term Loan, and the provisions of the New First Lien Credit Facility Documents setting forth the payment priority of the New First Lien Revolving Credit Facility shall be fully enforceable in accordance with their terms, and the parties to the New First Lien Credit Facility Documents shall be enjoined from avoiding, circumventing, recharacterizing or otherwise frustrating the enforcement of the priority provisions thereof.

(b)    New First Lien Credit Facility Documents

On the Effective Date, the parties to each New First Lien Credit Facility Document shall be deemed to have executed such New First Lien Credit Facility Document and shall become bound thereto, regardless of whether any party actually executes such New First Lien Credit Facility Document.

(c)    Conversion or Repayment of DIP Revolving Facility Claims

On the Effective Date, in accordance with and on the terms set forth in the DIP Revolving Facility Agreement, the DIP Revolving Facility Claims shall either be (x) indefeasibly paid in full in Cash from the Lee Debtors (and the "Commitments" (as defined in the DIP Revolving Facility Agreement) shall be irrevocably cancelled and the "Letters of Credit" (as defined in the DIP Revolving Credit Facility Agreement) shall be returned undrawn) in accordance with Section 2.2 of the Plan or (y) converted into revolving loans and commitments outstanding under the New First Lien Revolving Credit Facility pursuant to the New First Lien Credit Facility Documents.

(d)    New Second Lien Term Loan

On the Effective Date, the Reorganized Lee Debtors will be authorized under the Plan to enter into the New Second Lien Term Loan Agreement and the Reorganized Lee Debtors and the Reorganized Pulitzer Debtors shall be authorized to enter into any notes, guarantees, documents or agreements delivered, executed, or entered in connection therewith, including, without limitation, any documents required in connection with the creation or perfection of liens in connection therewith including without limitation the New Second Lien Term Loan Documents. The New Second Lien Term Loan Agreement is attached to the Plan as Exhibit 1.89 thereto, with such modifications, if any, that are reasonably satisfactory to the Prepetition Administrative Agent and the Initial Backstop Lenders.

The New Second Lien Lenders will have valid, binding and enforceable liens on the collateral specified in the New Second Lien Term Loan Documents. The guarantees, mortgages, pledges, liens and other security interests granted pursuant to the New Second Lien Term Loan Documents will be granted in good faith as an inducement to the New Second Lien Lenders to extend credit thereunder and will be deemed not to constitute a fraudulent conveyance or fraudulent transfer, will not otherwise be subject to avoidance, and the priorities of such liens and security interests will be as set forth in the New Second Lien Term Loan Documents.

(e)    New Second Lien Term Loan Documents

On the Effective Date, in connection with entry into the New Second Lien Term Loan Agreement, the Second Lien Agent shall enter into (i) the New Lee Intercreditor Agreement, which is attached to the Plan as Exhibit 1.79 thereto, and (ii) the New PD LLC Intercreditor Agreement, which is attached to the Plan as Exhibit 1.80 thereto. The New Lee Intercreditor Agreement, as described above, defines the relative rights of the First Lien Collateral Agent and the New First Lien Lenders, on the one hand, and the Second Lien Collateral Agent and the New Second Lien Lenders, on the other hand, in the collateral securing the relevant Reorganized Debtors' obligations under both the New First Lien Credit Facility Documents and the New Second Lien Term Loan Documents. The New PD LLC Intercreditor Agreement, as described below, defines the relative rights of the PD LLC Notes Collateral Agent and the New PD LLC Noteholders, on the one hand, and the Second Lien Collateral Agent and the New Second Lien Lenders, on the other hand, in the collateral securing the relevant Reorganized Pulitzer Debtors' obligations under both the New PD LLC Notes Documents and the New Second Lien Term Loan Documents.

Notwithstanding the foregoing, on the Effective Date, the parties to each New Second Lien Term Loan Document shall be deemed to have executed such New Second Lien Term Loan Document and shall become bound thereto, regardless of whether any party actually executes such New Second Lien Term Loan Document.

(f)    New Second Lien Term Loan Election

Consenting Lenders that made the New Second Lien Term Loan Election at the time of their execution and delivery of the Lee Support Agreement or Lender Joinder thereto shall receive a percentage interest in the New Second Lien Term Loan and the New Common Stock, in each case computed in accordance with the Lee Support Agreement, as provided in Section 3.2.3 of the Plan. The Ballot for such Consenting Lenders to accept or reject the Plan shall have referenced the applicable amount of the Prepetition Credit Agreement Claims that each such Consenting Lender is anticipated to convert under the Plan into a percentage interest in the New Second Lien Term Loan and the New Common Stock. Holders of Prepetition Credit Agreement Claims that are not Consenting Lenders as of the date on which votes to accept or reject the Plan are solicited shall have

been afforded the option on their Ballots to make the New Second Lien Term Loan Election regardless of how they vote on the Plan, provided, however, that if any such Holder makes the New Second Lien Term Loan Election, such election shall be subject to the limitations set forth in Section 3.2.3 of the Plan.

      (g)    New PD LLC Notes

On the Effective Date, Reorganized PD LLC shall be authorized to enter into the New PD LLC Notes Agreement and issue the New PD LLC Notes, and the Reorganized Pulitzer Debtors shall be authorized to enter into any documents or agreements delivered in connection therewith, including, without limitation, any documents required in connection with the creation or perfection of liens in connection therewith.  Such documents are expected to include, without limitation, the New PD LLC Intercreditor Agreement, which shall define the relative rights of the PD LLC Notes Collateral Agent, and the New PD LLC Noteholders, on the one hand, and the Second Lien Collateral Agent and the New Second Lien Lenders, on the other hand, in the assets and property of the Reorganized Pulitzer Debtors that are being pledged as collateral to secure the relevant Reorganized Pulitzer Debtors' obligations under both the New PD LLC Notes Documents and the New Second Lien Term Loan Documents.

The New PD LLC Noteholders shall have valid, binding and enforceable liens on the collateral specified in the New PD LLC Notes Documents.  The guarantees, mortgages, pledges, liens and other security interests granted pursuant to the New PD LLC Notes Documents and payments made (including, but not limited to, payments of principal of the PD LLC Notes and the Lee Closing Date Payment) with respect to the restructuring of the PD LLC Notes pursuant to, and identified in, the Pulitzer Support Agreement are granted  and made in good faith as an inducement to the New PD LLC Noteholders to extend credit thereunder and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, and the priorities of such liens and security interests shall be as set forth in the New PD LLC Notes Documents.

      (h)    New PD LLC Notes Documents

On the Effective Date, the parties to each New PD LLC Notes Document shall be deemed to have executed such New PD LLC Notes Document and shall become bound thereto, regardless of whether any party actually executes such New PD LLC Notes Document.

     5.    <u>Binding Effect</u>.

On the Effective Date, except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, all provisions of the Plan, including all agreements, instruments and other documents filed in connection with the Plan and executed by the Debtors or the Reorganized Debtors in connection with the Plan, shall be binding upon the Debtors, the Reorganized Debtors, all Holders of Claims against and Interests in each of the Debtors, and such Holder's respective successors and assigns, whether or not the Claim or Interest of such Holder is Impaired under the Plan and whether or not such Holder has accepted the Plan, and all other parties that are affected in any manner by the Plan.  All agreements, instruments and other documents filed in connection with the Plan shall be given full force and effect, and shall bind all parties referred to therein as of the Effective Date, whether or not such agreements are actually issued, delivered or recorded on the Effective Date or thereafter and whether or not a party has actually executed such agreement.

6.     Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors.

On and after the Effective Date, each of the Reorganized Debtors shall continue to exist as separate entities in accordance with the applicable law in the respective jurisdiction in which they are formed and pursuant to their respective certificates or articles of incorporation (or similar organizational documents) and by-laws in effect prior to the Effective Date, except to the extent such certificates or articles of incorporation (or similar organizational documents) and by-laws are to be amended and/or restated pursuant to the terms of the Plan.  Notwithstanding anything to the contrary in the Plan, the Reinstated Claims against and Interests in a particular Debtor or Reorganized Debtor shall remain the obligations solely of such Debtor or Reorganized Debtor following the Effective Date and shall not become obligations of any other Debtor or Reorganized Debtor by virtue of the Plan, the Chapter 11 Cases, or otherwise.  Pursuant to section 1141(b) of the Bankruptcy Code, except as otherwise provided under the Plan, all property of the respective Estate of each Debtor, including all claims, rights and causes of action and any property acquired by the Debtors or the Reorganized Debtors under or in connection with the Plan, together with any property of each Debtor that is not property of its Estate and that is not specifically disposed of pursuant to the Plan, shall revest in the applicable Reorganized Debtor on the Effective Date free and clear of all Claims, Liens, charges, other encumbrances and Interests, provided that such revesting shall not relieve any Reorganized Debtor from such Reorganized Debtor's obligations under the applicable terms and provisions of the New First Lien Credit Facility Documents, the New Second Lien Term Loan Documents, and the New PD LLC Notes Documents. Thereafter, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code and the Bankruptcy Rules.  As of the Effective Date, all property of each Reorganized Debtor shall be free and clear of all Liens and non-Reinstated Claims and Interests, except as specifically provided in the Plan or the Confirmation Order.

7.     Cancellation of Certain Credit and Debt Documents.

On the Effective Date, in consideration for the distributions to be made on the Effective Date pursuant to the Plan and except as otherwise provided therein, all (a) Prepetition Credit Agreement Documents, PD LLC Notes, PD LLC Notes Documents, DIP Revolving Facility Documents, and any other instruments, documents, plans or agreements evidencing or creating any indebtedness or obligations of a Debtor related thereto shall be cancelled, and (b) the obligations of any of the Debtors under any Prepetition Credit Agreement Documents, PD LLC Notes, PD LLC Notes Documents, DIP Revolving Facility Documents, or any other agreements evidencing or creating any indebtedness or obligations of a Debtor that relate to Claims or Interests related thereto shall be discharged pursuant to Section 10.1 of the Plan.

8.     Cancellation of Liens.

Except as otherwise provided in the Plan, on the Effective Date, in consideration for the distributions to be made on the Effective Date pursuant to the Plan, all Liens, charges, encumbrances and rights related to any Claim or Interest, including, without limitation, those existing under the Prepetition Credit Agreement Documents, the PD LLC Notes Documents, and the DIP Revolving Facility Documents, but excluding any Lien securing an Other Secured Claim that is Reinstated pursuant to the Plan, shall be terminated, null and void and of no effect.  The Holders of Secured Claims (other than Other Secured Claims that are Reinstated pursuant to the Plan) shall be authorized and directed to release any collateral or other property of any Debtor (including any Cash collateral) held by such Holder and to take such actions as may be requested by the Debtors (or the Reorganized Debtors, as the case may be) to evidence the release of any Liens, including the

execution, delivery, and filing or recording of such release documents as may be requested by the Debtors (or the Reorganized Debtors, as the case may be).

        9.      <u>Additional Transactions Authorized Under the Plan</u>.

On or prior to the Effective Date, the Debtors shall be authorized to take any such actions as may be necessary or appropriate to Reinstate Claims or Interests or render Claims or Interests Unimpaired, as provided for under the Plan.

## H.      <u>PROVISIONS GOVERNING DISTRIBUTIONS</u>

THE FOLLOWING IS A SUMMARY OF THE PROVISIONS GOVERNING DISTRIBUTIONS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY THE TERMS OF THE PLAN.

        1.      <u>General Matters</u>.

Pursuant to Article VII of the Plan, unless the Holder of an Allowed Claim and the Debtors or the Reorganized Debtors agree to a different Distribution Date and except as otherwise provided in the Plan or as ordered by the Bankruptcy Court, distributions to be made on account of Claims that are Allowed as of the Effective Date shall be made on the Effective Date. Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day. Distributions on account of Claims that first become Allowed Claims after the Effective Date shall be made as soon as practicable after the date that such Claim becomes Allowed. Distributions to be made on the Effective Date shall be deemed actually made on the Effective Date if made either (a) on the Effective Date or (b) as soon as practicable thereafter, but in no event later than ten (10) Business Days after the Effective Date, except as otherwise provided for in the Plan; <u>provided</u>, <u>however</u>, that, notwithstanding anything to the contrary in the Plan, distributions to (i) Holders of Allowed Prepetition Credit Agreement Claims in Classes 1C through 9C and (ii) Holders of Allowed PD LLC Notes Claims in Classes 10C through 35C shall be made on the Effective Date pursuant to Section 3.2.3(c) and Section 3.3.3(c), respectively, of the Plan.

Other than as specifically set forth in the Plan, the Disbursing Agent(s) shall make all distributions required to be made under the Plan. Distributions on account of the PD LLC Notes Claims shall be made in accordance with the New PD LLC Notes Agreement or in accordance with the Plan where the New PD LLC Notes Agreement is silent. The Reorganized Debtors may act as Disbursing Agent or may employ or contract with other Entities to assist in or make the distributions required by the Plan.

In connection with the Plan and all distributions thereunder, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions under the Plan shall be subject to any such withholding and reporting requirements. The Reorganized Debtors shall be authorized under the Plan to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements. All persons holding Claims or Interests shall be required to provide any information necessary to effect information reporting and the withholding of such taxes. Each Holder of an Allowed Claim that is to receive a distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution. No

distribution shall be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements satisfactory to the Reorganized Debtors for the payment and satisfaction of such tax obligations.

2.    Interest on Claims.

As provided for in Section 7.4 of the Plan, except as otherwise specifically provided for in the Plan (including, for the avoidance of doubt, with respect to Prepetition Credit Agreement Claims, PD LLC Notes Claims, and General Unsecured Claims), the Confirmation Order or other order of the Bankruptcy Court, or required by applicable bankruptcy or non-bankruptcy law, post-petition interest shall not accrue or be paid on any Claims (other than Secured Claims), and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.

3.    Record Date for Distributions.

Under the terms of the Plan, the Distribution Record Date shall be the Confirmation Date or such other date as may be designated in the Confirmation Order.  Pursuant to Section 7.7 of the Plan, the Reorganized Debtors and the Disbursing Agent(s) will have no obligation to but may, in their sole and absolute discretion, recognize the transfer of, or the sale of any participation in, any Allowed Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes under the Plan to recognize and distribute only to those Holders of Allowed Claims that are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date.

4.    Undeliverable and Unclaimed Distributions.

Pursuant to Section 7.6.2 of the Plan, if the distribution to any Holder of an Allowed Claim is returned to the Reorganized Debtors or the Disbursing Agent(s) as undeliverable or is otherwise unclaimed, no further distributions shall be made to such Holder unless and until the Reorganized Debtors or the Disbursing Agent(s) are notified in writing of such Holder's then-current address.  Any Holder of an Allowed Claim that does not assert a claim pursuant to the Plan for an undeliverable or unclaimed distribution within one (1) year after the Effective Date shall be deemed to have forfeited its claim for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such claim for an undeliverable or unclaimed distribution against the Debtors or their Estates or the Reorganized Debtors or their property.  In such cases, any Cash for distribution on account of such claims for undeliverable or unclaimed distributions shall become the property of the Estates and the Reorganized Debtors free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary.  Any New Common Stock or New PD LLC Notes held for distribution on account of such Claim shall be canceled and of no further force or effect.  Nothing contained in the Plan shall require any Disbursing Agent, including, but not limited to, any of the Reorganized Debtors, to attempt to locate any Holder of an Allowed Claim.

5.    Allocation of Plan Distributions Between Principal and Interest.

As provided for in Section 7.8 of the Plan, to the extent that any Allowed Claim entitled to a distribution under the Plan comprises indebtedness and accrued but unpaid interest thereon, such distribution shall, for all income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent that the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

6.    Means of Cash Payment.

Payments of Cash made pursuant to the Plan shall be in U.S. dollars and shall be made, at the option and in the sole discretion of the Reorganized Debtors, by (a) checks drawn on or (b) wire transfers from a bank selected by the Reorganized Debtors. Cash payments to foreign creditors may be made, at the option of the Reorganized Debtors, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

7.    Setoff and Recoupment.

As provided by Section 7.11 of the Plan, the Reorganized Debtors may, pursuant to sections 553 and/or 558 of the Bankruptcy Code or applicable non-bankruptcy laws, but shall not be required to, set off and/or recoup against any Claim the payments or other distributions to be made pursuant to the Plan in respect of such Claim, or claims of any nature whatsoever that any of the Debtors or the Reorganized Debtors may have against the Holder of such Claim; provided, however, that neither the failure to assert such rights of setoff and/or recoupment nor the allowance of any Claim under the Plan shall constitute a waiver or release by any of the Reorganized Debtors of any claim that any of the Debtors or the Reorganized Debtors may assert against any Holder of an Allowed Claim.

8.    Fractional Shares.

Pursuant to Section 7.12 of the Plan, no fractional shares of New Common Stock shall be distributed.  Where a fractional share of New Common Stock would otherwise be called for, the actual issuance shall reflect a rounding up (in the case of more than .50) of such fraction to the nearest whole share of New Common Stock, or a rounding down of such fraction (in the case of .50 or less than .50) to the nearest whole share of New Common Stock.  The total number of shares of New Common Stock to be distributed pursuant to the Plan shall be adjusted as necessary to account for the rounding provided for in Section 7.12 of the Plan.

## I.    TREATMENT OF EXECUTORY CONTRACTS, UNEXPIRED LEASES, INSURANCE POLICIES AND EMPLOYEE BENEFIT PLANS

THE FOLLOWING IS A SUMMARY OF THE PROVISIONS GOVERNING THE TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY THE TERMS OF THE PLAN.

On the Effective Date, all executory contracts or unexpired leases of the Debtors will be deemed assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, unless such executory contract or unexpired lease (i) was previously assumed or rejected by the relevant Debtor(s) or (ii) previously expired or terminated pursuant to its own terms.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Each executory contract and unexpired lease assumed pursuant to Article VI of the Plan shall revest in and be fully enforceable by the respective Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption.

In addition, all Collective Bargaining Agreements shall be deemed to have been assumed by the applicable Debtor(s) party thereto upon the occurrence of the Effective Date.  Entry

of the Confirmation Order shall constitute the Bankruptcy Court's approval of the pertinent Reorganized Debtor's assumption of each Collective Bargaining Agreement to which it is a party for the remaining term of agreement of each such Collective Bargaining Agreement as in effect on the Effective Date, except to the extent that such agreements have already been assumed prior to the Effective Date.

Furthermore, insurance policies issued to, or insurance agreements entered into by, the Prospective Debtors prior to the Petition Date (including, without limitation, any policies covering directors' or officers' conduct) shall continue in effect after the Effective Date. To the extent that such insurance policies or agreements are considered to be executory contracts, the Plan shall constitute a motion to assume or ratify such insurance policies and agreements, and, subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute approval of such assumption pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of each Debtor and its Estate. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments shall be required to cure any defaults of the Debtors existing as of the Confirmation Date with respect to each such insurance policy.

Any monetary amounts by which each executory contract and unexpired lease to be assumed is in default shall be satisfied, pursuant to section 365(b)(l) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or on such other terms as the parties to each such executory contract or unexpired lease may otherwise agree. In the event of a dispute regarding (a) the amount of any cure payments, (b) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to assumption, the cure payments required by section 365(b)(l) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption. Pending the Bankruptcy Court's ruling on such motion, the executory contract or unexpired lease at issue shall be deemed assumed by the relevant Debtor unless otherwise ordered by the Bankruptcy Court.

From and after the Effective Date, each of the Reorganized Debtors shall continue to perform its obligations (whether statutory or contractual) under all employment and severance contracts and all Employee Benefit Plans applicable to its employees, retirees and non-employee directors, including, without limitation, the payment of all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, that such Reorganized Debtor had the obligation to pay and was paying prior to the Petition Date, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of the Bankruptcy Code at any time prior to the Confirmation Date, for the duration of the period (if any) that the applicable Reorganized Debtor(s) are obligated to provide such benefits. In addition, notwithstanding anything in the Plan or the Confirmation Order to the contrary, on the Effective Date, the Pension Plans shall be sponsored by and become obligations of the Reorganized Debtors that sponsored such Pension Plans prior to the Petition Date, with such Reorganized Debtors assuming all statutory obligations with respect to the Pension Plans, and shall otherwise be unaffected by Confirmation of the Plan.

All contracts, agreements and leases that were entered into by the Debtors or assumed by the Debtors after the Petition Date shall be deemed assigned by the Debtors to the Reorganized Debtors on the Effective Date.

**J.**    **PROCEDURES FOR RESOLVING DISPUTED CLAIMS**

THE FOLLOWING IS A SUMMARY OF THE PROVISIONS FOR TREATMENT OF DISPUTED CLAIMS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY THE TERMS OF THE PLAN.

As set forth in Article VIII of the Plan, after the Effective Date, only the Reorganized Debtors may object to the allowance of any Claim or Administrative Expense Claim.  After the Effective Date, the Reorganized Debtors will have the power and authority under the Plan to allow or settle and compromise any Claim without notice to any other party, or approval of, or notice to the Bankruptcy Court.  In addition, the Debtors or the Reorganized Debtors may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Reorganized Debtors have previously objected to such Claim.

No payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order and the Disputed Claim, or some portion thereof, has become an Allowed Claim.  To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent(s) shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any post-Effective Date interest to be paid on account of such Claim.

Notwithstanding anything contained herein to the contrary, nothing shall affect, diminish or impair the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Reinstated Claim or Interest, including, but not limited to, legal and equitable rights of setoff and/or recoupment against the Holders of any Reinstated Claims.

**K.**    **CONFIRMATION AND CONSUMMATION OF THE PLAN**

1.    Condition to Confirmation.

The Plan shall not be confirmed unless and until the Confirmation Order, in form and substance reasonably satisfactory to the Debtors, the Prepetition Administrative Agent, the Initial Backstop Lenders, the Required Consenting Lenders, and the Required Consenting Noteholders shall have been entered not later than forty-five (45) calendar days after the Petition Date, unless (i) otherwise agreed by the Prepetition Administrative Agent, the Initial Backstop Lenders, the Required Consenting Lenders, and the Required Consenting Noteholders or (ii) waived in accordance with Section 9.3 of the Plan.  The Scheduling Motion to be filed by the Prospective Debtors on the first day of the Chapter 11 Cases will propose a schedule to the Bankruptcy Court for the Chapter 11 Cases that would, if approved by the Bankruptcy Court, schedule the Confirmation Hearing approximately forty (40) days after the Petition Date.

2.      <u>Conditions to Effective Date</u>.

The Plan shall not become effective and the Effective Date shall not occur unless and until the following conditions shall have been satisfied or waived in accordance with Section 9.3 of the Plan:

(a)      The condition to Confirmation in Section 9.1 of the Plan shall have been either satisfied or waived in accordance with Section 9.3 of the Plan.

(b)      The Confirmation Order confirming the Plan shall have been entered by the Bankruptcy Court and there shall not be a stay or injunction (or similar prohibition) in effect with respect thereto.

(c)      The Backstop Commitment Letters shall have become effective (and shall not have thereafter terminated) in accordance with the terms set forth therein and the conditions precedent to the obligations of the Backstop Lenders thereunder shall have been satisfied (including but not limited to, the payment of fees and expenses).

(d)      Either (1) the DIP Revolving Facility Claims shall have been indefeasibly paid in full in Cash by the Lee Debtors, the "Commitments" (as defined in the DIP Revolving Facility Agreement) irrevocably cancelled, and the "Letters of Credit" (as defined in the DIP Revolving Facility Agreement) returned undrawn or (2) all conditions for converting the DIP Revolving Facility Claims into revolving loans and commitments outstanding under the New First Lien Revolving Facility shall have been satisfied.

(e)      The New First Lien Credit Facility Documents, the New Second Lien Term Loan Documents, and the New PD LLC Notes Documents shall have become effective in accordance with their respective terms (and all conditions precedent thereunder have been met, including, but not limited to, the payment of fees and expenses) on the Effective Date or shall be deemed to become effective on the Effective Date as a result of the coming into effect of the Plan.

(f)      All authorizations, consents, certifications, approvals, rulings, no-action letters, opinions or other documents or actions required by any law, regulation or order to be received or to occur in order to implement the Plan on the Effective Date shall have been obtained or shall have occurred unless failure to do so will not have a material adverse effect on the Reorganized Debtors.

The Effective Date will occur on the Business Day on which each of the above conditions precedent to the Effective Date is satisfied and the Debtors file with the Bankruptcy Court a notice indicating that such conditions have been satisfied and transmit a copy of such notice to counsel to the Prepetition Administrative Agent and the Backstop Lenders.

Read together, the Support Agreements provide that the Effective Date must occur on or before the earlier of fifteen (15) days after entry of the order confirming the Plan and February 10, 2012, in the absence of an extension in accordance with the Support Agreements.  The Scheduling Motion to be filed by the Prospective Debtors on the first day of the Chapter 11 Cases will propose a schedule to the Bankruptcy Court for the Chapter 11 Cases that would allow for this deadline to be achieved, assuming entry of the order confirming the Plan by the Bankruptcy Court on the timetable to be set forth in the Scheduling Motion.

3.      Waiver of Conditions.

Each of the conditions set forth in Sections 9.1 and 9.2 of the Plan may be waived in whole or in part by the Debtors with the written consent of the Prepetition Administrative Agent, the Initial Backstop Lenders, the Required Consenting Lenders, and the Required Consenting Noteholders after notice to the Bankruptcy Court and parties in interest but without the need for a hearing.

4.      Consequences of Non-Occurrence of Effective Date.

If the Confirmation Order is vacated, (a) the Plan shall be null and void in all respects; (b) any settlement of Claims or Interests provided for in the Plan shall be null and void without further order of the Bankruptcy Court; and (c) the time within which the Debtors may assume and assign or reject all executory contracts and unexpired leases shall be extended for a period of one hundred twenty (120) days after the date the Confirmation Order is vacated.

## L.    EFFECT OF PLAN CONFIRMATION

1.      Binding Effect.

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any Holder of a Claim against, or Interest in, the Debtors and such Holder's respective successors and assigns, whether or not the Claim or Interest of such Holder is Impaired under the Plan and whether or not such Holder has accepted the Plan.

2.      Discharge, Releases and Exculpation.

(a)      Discharge of Non-Reinstated Claims; Non-Discharge of Interests

The Plan provides for the discharge of Claims against the Debtors other than those Claims that are being Reinstated under the Plan.  Specifically, on the Effective Date, pursuant to Section 10.1 of the Plan, the Debtors will be deemed discharged and released under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims not Reinstated under the Plan, including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code.  Except as otherwise provided in the Plan (including with respect to all Claims that are Reinstated under the Plan) or in the Confirmation Order, all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims of any nature whatsoever against the Debtors or any of their Estates, assets, properties or interests in property.

All Interests in the Debtors are Reinstated under the Plan.  Accordingly, Interests will not be discharged by the Plan.

The Plan further provides that the Bankruptcy Court will issue an injunction supporting the discharge of Claims against the Debtors (other than those Claims that are being Reinstated under the Plan).  Specifically, as of the Effective Date, except as otherwise expressly provided in the Plan or the Confirmation Order, all Entities shall be precluded from asserting against the Debtors or the Reorganized Debtors and their respective assets, property and Estates, any other or further Claims (other than those Reinstated under the Plan), or any other obligations, suits,

judgments, damages, debts, rights, remedies, causes of action or liabilities of any nature whatsoever, relating to any of the Debtors or Reorganized Debtors or any of their respective assets, property and Estates, based upon any act, omission, transaction or other activity of any nature that occurred prior to the Effective Date. In accordance with the foregoing, except as expressly provided in the Plan or the Confirmation Order, the Confirmation Order shall constitute a judicial determination, as of the Effective Date, of the discharge of all non-Reinstated Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void and extinguish any judgment obtained against the Debtors, the Reorganized Debtors, or any of their respective assets, property and Estates at any time, to the extent such judgment is related to a discharged Claim, debt or liability.

      (b)     Releases by Debtors

      The Plan provides, at Section 10.2, that the Debtors and the Reorganized Debtors will grant certain releases in favor of the Released Parties. The Released Parties, as defined in the Plan, are comprised of (i) the Debtors, (ii) the Consenting Lenders, (iii) the Backstop Lenders, (iv) the Prepetition Administrative Agent, (v) the Consenting Noteholders, (vi) the PD LLC Notes Collateral Agent, (vii) the DIP Revolving Facility Agent, (viii) the DIP Revolving Facility Lenders, and (ix) the Related Persons of each of the foregoing. The Related Persons of each of the Released Parties are defined in the Plan as each Released Party's predecessors, successors and assigns (whether by operation of law or otherwise) and their respective present and former affiliates and each of their respective current and former members, partners, equity-holders, officers, directors, employees, managers, shareholders, partners, financial advisors, attorneys, accountants, investment bankers, consultants, agents and professionals each acting in such capacity, and any Person claiming by or through any of them (including their respective officers, directors, managers, shareholders, partners, employees, equity-holders, members, and professionals).

      **The releases granted by the Debtors and Reorganized Debtors under the Plan in favor of the Released Parties provide that except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each of the Debtors and Reorganized Debtors on its own behalf and as a representative of its respective Estate, shall, and shall be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally, each and all of the Released Parties of and from any and all Claims and causes of action (including, without limitation, Avoidance Actions), any and all other obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are or may be based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to any of the Debtors, the Reorganized Debtors, their respective assets, property and Estates, the Chapter 11 Cases, the Lee Support Agreement, the Pulitzer Support Agreement, the Plan, or the Solicitation and Disclosure Statement that may be asserted by or on behalf of any of the Debtors, the Reorganized Debtors or their respective Estates against any of the Released Parties; provided, however, that nothing in Section 10.2 of the Plan shall be construed to release any Released Party from willful misconduct or gross negligence as determined by a Final Order.**

(c)      Releases by Certain Holders of Claims

The Plan also provides, at Section 10.3, that Holders of Prepetition Credit Agreement Claims will grant certain releases in favor of each of the Debtors and their respective Related Persons.

**The releases granted by Holders of Prepetition Credit Agreement Claims under Section 10.3 of the Plan provide that, except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each Holder of a Claim entitled to vote on the Plan shall be deemed to have completely and forever released, waived, and discharged unconditionally each of the Debtors and their respective Related Persons of and from any and all Claims, any and all other obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever (including, without limitation, those arising under the Bankruptcy Code),  whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are or may be based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to any of the Debtors, the Reorganized Debtors or their respective assets, property and Estates, the Chapter 11 Cases, the Plan, and/or the Solicitation and Disclosure Statement; provided, however, that each Holder of a Claim that has submitted a Ballot may elect, by checking the appropriate box on its Ballot, not to grant the releases set forth in Section 10.3 of the Plan, unless otherwise bound by the Lee Support Agreement or the Pulitzer Support Agreement to do so, with respect to the Debtors and their respective Related Persons; and provided further, however, that nothing in Section 10.3 of the Plan shall be construed to release the Debtors or their respective Related Persons, if any, from willful misconduct or gross negligence as determined by a Final Order.  For the avoidance of doubt, nothing in this Section 10.3 shall release the Reorganized Debtors and their respective Related Persons from their obligations under the New First Lien Credit Facility Documents, the New Second Lien Term Loan Documents, or the New PD LLC Notes Documents.**

(d)      Exculpation

From and after the Effective Date, the Released Parties shall neither have nor incur any liability to, or be subject to any right of action by, any Holder of a Claim or an Interest, or any other party in interest, or any of their respective employees, representatives, financial advisors, attorneys, or agents acting in such capacity, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, formulating, negotiating or implementing the Lee Support Agreement, the Pulitzer Support Agreement, the Plan, and/or the Solicitation and Disclosure Statement, the solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, the administration of the Plan, the property to be distributed under the Plan, or any other act taken or omitted to be taken in connection with or in contemplation of the Chapter 11 Cases or implementation of the Plan; provided, however, that the exculpation provisions of the Plan shall not apply to release (x) obligations under the Plan, and obligations under the contracts, instruments, releases, agreements, and documents delivered, Reinstated or assumed under the Plan, and (y) any claims or causes of action arising out of willful misconduct or gross negligence as determined by a Final Order.  Any of the Released Parties shall be entitled to rely, in all respects, upon the advice of counsel with respect to their duties and responsibilities under the Plan.

(e)      Injunction Related to Exculpation

Except as expressly provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons and Entities that hold, have held, or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, cause of action or liability of any nature whatsoever, of the types described in Section 10.4 of the Plan and relating to any of the Debtors or the Reorganized Debtors or any of their respective assets, property and/or Estates, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions against any Released Party or its property on account of such released liabilities, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities:  (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation that is discharged under Section 10.1 of the Plan; and/or (v) commencing or continuing in any manner any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.

(f)      Survival of Indemnification Obligations

The obligations of the Debtors to indemnify any past and present directors, officers, agents, employees and representatives, pursuant to certificates or articles of incorporation, by-laws, contracts and/or applicable statutes, in respect of all actions, suits and proceedings against any of such officers, directors, agents, employees and representatives, based upon any act or omission related to service with, for or on behalf of the Debtors, shall not be discharged or impaired by Confirmation or consummation of the Plan and shall be assumed by the Reorganized Debtors.

3.      Term of Bankruptcy Injunction or Stays.

All injunctions or stays provided for in the Chapter 11 Cases under section 105 or section 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

## M.      MISCELLANEOUS PLAN PROVISIONS

THE FOLLOWING IS A SUMMARY OF CERTAIN MISCELLANEOUS PROVISIONS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY THE TERMS OF THE PLAN.

1.      Retention of Jurisdiction.

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, as more specifically described in Article XI of the

Plan.  Article XI of the Plan also sets forth numerous specific matters over which the Bankruptcy Court will retain jurisdiction after the Effective Date.

      2.      <u>Surrender of Instruments</u>.

      As a condition to participation in distributions under the Plan, each PD LLC Noteholder and the Holder(s) of any evidence of indebtedness of the Debtors relating to a non-Reinstated Claim that desires to receive the property to be distributed on account of an Allowed non-Reinstated Claim based on such PD LLC Note or evidence of indebtedness shall surrender such PD LLC Note or evidence of indebtedness to the Debtors, or their designee, and shall execute and deliver such other documents as are necessary to effectuate the Plan.  Except as otherwise provided in Section 12.1 of the Plan, if no surrender of a PD LLC Note or evidence of indebtedness relating to a non-Reinstated Claim occurs and a claimant does not provide an affidavit and indemnification agreement, in form and substance reasonably satisfactory to the Debtors, that such PD LLC Note or evidence of indebtedness was lost, then no distribution may be made to any claimant whose Claim is based on such security, note, debenture or evidence of indebtedness thereof.  The Debtors shall make subsequent distributions only to the persons who surrender PD LLC Notes or evidence of indebtedness, as applicable, for exchange (or their assignees) and the record holders of such PD LLC Notes or other indebtedness shall be those holders of record as of the Distribution Record Date.

      3.      <u>Post-Confirmation Date Retention of Professionals</u>.

      Pursuant to Section 12.2 of the Plan, upon the Effective Date, any requirement that Professionals employed by the Reorganized Debtors comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate, and the Reorganized Debtors will be authorized to employ and compensate professionals in the ordinary course of business and without the need for application to or approval by the Bankruptcy Court.

      4.      <u>Bar Date for Certain Administrative Expense Claims</u>.

      Under Section 12.3 of the Plan, all applications for final allowance of compensation or reimbursement of expenses incurred by any Professional, and all other requests for the payment of Administrative Expense Claims, including all requests for the allowance of any Administrative Expense Claim pursuant to section 503(b)(3)(D) of the Bankruptcy Code for substantial contributions made in the Chapter 11 Cases (but excluding all requests for the payment of obligations incurred by the Debtors in the ordinary course of their business operations after the Petition Date), must be filed with the Bankruptcy Court and served on the Reorganized Debtors and their counsel at the addresses set forth in Section 12.14 of the Plan not later than thirty (30) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.  Any request for the payment of an Administrative Expense Claim that is not timely filed and served shall be discharged and forever barred and the Holder of such Administrative Expense Claim shall be enjoined from commencing or continuing any action, process, or act to collect, offset or recover such Claim.  The Debtors and the Reorganized Debtors shall have sole responsibility for filing objections to and resolving all requests for the allowance of Administrative Expense Claims.

      5.      <u>Effectuating Documents and Further Transactions</u>.

      Each of the Debtors and the Reorganized Debtors is authorized to execute, deliver, file or record such contracts, instruments, certificates, notes, releases and other agreements or

documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the New Common Stock and New PD LLC Notes issued pursuant to the Plan.

6.      Exemption from Transfer Taxes.

As provided in Section 12.6 of the Plan, pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer or exchange of notes or equity securities under the Plan; (b) the creation of any mortgage, deed of trust, lien, pledge or other security interest; (c) the making or assignment of any lease or sublease; or (d) the making or delivery of any deed or other instrument of transfer under the Plan, including, without limitation, merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale, and transfers of tangible property, will not be subject to any stamp tax or other similar tax.

7.      Payment of Consenting Lender Fees, Consenting Noteholder Fees, and Backstop Lender Fees.

Notwithstanding anything to the contrary in the Plan, the Consenting Lender Fees, the Consenting Noteholder Fees, and the Backstop Lender Fees incurred in connection with the Lee Support Agreement, the Pulitzer Support Agreement, and Backstop Commitment Letters, respectively, shall be paid in full, in Cash, on the Effective Date to the Consenting Lenders, the Consenting Noteholders, and the Backstop Lenders, as applicable, and the Debtors shall pay such other fees and expenses on the Effective Date as may have been agreed to by the Debtors prior to the Effective Date, including, without limitation, the PD LLC Noteholder Fees and any fees or expenses required to be paid under any Backstop Commitment Letter.

8.      Support Agreements.

Until the Effective Date, notwithstanding any provision of the Plan to the contrary, nothing in the Plan shall relieve the parties to the Lee Support Agreement and the Pulitzer Support Agreement from any of their obligations thereunder.

9.      Amendment or Modification of the Plan.

Pursuant to the terms of Section 12.10 of the Plan, and subject to section 1127 of the Bankruptcy Code, the Debtors may alter, amend or modify the Plan or the Exhibits at any time prior to or after the Confirmation Date but prior to the substantial consummation of the Plan, provided that the Plan and the Exhibits remain in form and substance satisfactory to the Prepetition Administrative Agent, the Initial Backstop Lenders, and the Required Consenting Noteholders.  Any Holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Interest of such Holder.

10.     Severability of Plan Provisions.

Pursuant to the terms of Section 12.11 of the Plan, if, prior to the Confirmation Date, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or

provision will then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

11.    Revocation, Withdrawal or Non-Consummation of the Plan.

Subject to certain restrictions and requirements set forth in the Plan (including, without limitation, Section 12.9 of the Plan), in section 1127 of the Bankruptcy Code and in Bankruptcy Rule 3019, the Debtors reserve the right to revoke or withdraw the Plan as to any or all of the Debtors prior to the Confirmation Date and to file one or more subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan as to any or all of the Debtors or if Confirmation or consummation of the Plan as to any or all of the Debtors does not occur, then, with respect to such Debtors, (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtors or any other Person, (ii) prejudice in any manner the rights of such Debtors or any other Person or (iii) constitute an admission of any sort by the Debtors or any other Person.

In addition, upon termination of any of the Support Agreements, any and all votes to accept or reject the Plan delivered by a Consenting Lender or a Consenting Noteholder (as applicable) prior to such termination may be withdrawn and, to the extent withdrawn, such votes shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Company Parties (as such term is defined in the Support Agreements).

## V.  STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for Confirmation are that the Plan (i) is accepted by all Impaired Classes of Claims and Interests or, if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, (ii) is feasible and (iii) is in the "best interests" of Holders of Claims and Interests Impaired under the Plan.

THE BANKRUPTCY CODE CONTAINS PROVISIONS FOR CONFIRMATION OF A PLAN EVEN IF IT IS NOT ACCEPTED BY ALL CLASSES.  THESE SO-CALLED "CRAMDOWN" PROVISIONS ARE SET FORTH IN SECTION 1129(B) OF THE BANKRUPTCY CODE, WHICH PROVIDES THAT A PLAN OF REORGANIZATION CAN BE CONFIRMED EVEN IF IT HAS NOT BEEN ACCEPTED BY ALL IMPAIRED CLASSES OF CLAIMS AND INTERESTS AS LONG AS AT LEAST ONE IMPAIRED CLASS OF NON-INSIDER CLAIMS HAS VOTED TO ACCEPT THE PLAN.  THE PROSPECTIVE DEBTORS RESERVE THE RIGHT TO SEEK CONFIRMATION OF THE PLAN BY UTILIZING THE "CRAMDOWN" PROVISIONS IN SECTION 1129 OF THE BANKRUPTCY CODE TO THE EXTENT NECESSARY.

A.     **ACCEPTANCE**

Prepetition Credit Agreement Claims in Classes 1C through 9C and PD LLC Notes Claims in Classes 10C through 35C are Impaired under the Plan, and, therefore, must accept the Plan in order for it to be confirmed without application of the "fair and equitable test," described below, to such Classes.  As stated above, Impaired Classes of Claims will have accepted the Plan if the Plan is accepted by at least two-thirds in dollar amount and a majority in number of the Claims of each such Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

As of the date of this Amended Solicitation and Disclosure Statement, (i) the Holders of more than 50% in number and more than 66.67% in dollar amount of the Prepetition Credit Agreement Claims have entered into the Lee Support Agreement and (ii) the Holders of more than 50% in number and more than 66.67% in dollar amount of the PD LLC Notes Claims have entered into the Pulitzer Support Agreement.  The Lee Support Agreement committed the Consenting Lenders and the Pulitzer Support Agreement committed the Consenting Noteholders, among other things, to vote to accept the Plan.  The Prospective Debtors accordingly believe that the Classes comprising Prepetition Credit Agreement Claims and PD LLC Notes Claims will vote to accept the Plan by the majorities required for Confirmation of the Plan.

Classes 1A-35A (Priority Non-Tax Claims), Classes 1B-35B (Other Secured Claims), Classes 1D-35D (General Unsecured Claims), Classes 1E-35E (Intercompany Claims), Classes 12F and 14F (Herald Claim) and Classes 1G-35G (Interests) are Unimpaired under the Plan.  As a result, Holders of Allowed Claims and Interests in each of these Classes are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

If, notwithstanding the terms of the Support Agreements or the classification of Claims under the Plan, any Impaired Class votes to or is deemed to reject the Plan, Confirmation of the Plan will require application of the "fair and equitable test," described below.

B.     **FAIR AND EQUITABLE TEST**

To obtain Confirmation in the event of a dissenting Impaired Class, the Debtors must demonstrate that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each such dissenting Impaired Class.  A plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class receives more than it is entitled to on account of its claims or interests.  Although no Class of Claims or Interests is expected to reject the Plan, the Prospective Debtors believe that the Plan would nonetheless satisfy these requirements.

The Bankruptcy Code establishes different "fair and equitable" tests for secured claims, unsecured claims and equity interests, as follows:

(a)     Secured Creditors.  Either (i) each holder of an impaired secured claim retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the

property securing the claim is sold free and clear of liens, with such liens attaching to the proceeds of the sale and the treatment of such liens on proceeds is as provided in clauses (i) or (ii) above.

(b)     Unsecured Creditors.  Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan.

(c)     Interest Holders.  Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greater of the fixed liquidation preference to which such holder is entitled, or the fixed redemption price to which such holder is entitled or the value of the equity interest, or (ii) the holders of equity interests that are junior to the nonaccepting class will not receive or retain any property under the plan.

**THE PROSPECTIVE DEBTORS BELIEVE THAT ALL CLASSES OF CLAIMS AGAINST AND INTERESTS IN THE PROSPECTIVE DEBTORS WILL ACCEPT OR WILL BE DEEMED TO ACCEPT THE PLAN.  ALL CLASSES OF CLAIMS AND INTERESTS OTHER THAN PREPETITION CREDIT AGREEMENT CLAIMS AND PD LLC NOTES CLAIMS ARE UNIMPAIRED UNDER THE PLAN AND ARE ACCORDINGLY DEEMED TO ACCEPT THE PLAN.  HOLDERS OF PREPETITION CREDIT AGREEMENT CLAIMS AND HOLDERS OF PD LLC NOTES CLAIMS HAVE COMMITTED TO VOTE IN FAVOR OF THE PLAN BY MORE THAN THE STATUTORY MAJORITIES OF ONE-HALF IN NUMBER AND TWO-THIRDS IN AMOUNT BY EXECUTING THE LEE SUPPORT AGREEMENT AND PULITZER SUPPORT AGREEMENT, RESPECTIVELY.  THE PROSPECTIVE DEBTORS DO NOT ANTICIPATE THAT THEY WILL NEED TO UTILIZE THE "CRAMDOWN" PROVISIONS OF SECTION 1129(b) OF THE BANKRUPTCY CODE AT THE CONFIRMATION HEARING.  HOWEVER, IN THE EVENT SUCH A DEMONSTRATION IS NECESSARY, THE PROSPECTIVE DEBTORS BELIEVE THAT THE PLAN WILL SATISFY THE REQUIREMENTS OF THAT SECTION WITH RESPECT TO ANY NON-ACCEPTING CLASS OF CLAIMS OR INTERESTS.**

**C.     FEASIBILITY**

Pursuant to section 1129(a)(11) of the Bankruptcy Code, among other things, the Bankruptcy Court must determine that Confirmation of the Plan is not likely to be followed by the liquidation or need for further financial reorganization of the Debtors or any successors to the Debtors under the Plan.  This condition is often referred to as the "feasibility" of the Plan.  The Prospective Debtors believe that the Plan satisfies this requirement.

For purposes of determining whether the Plan meets this requirement, the Prospective Debtors' financial advisors have analyzed the Prospective Debtors' ability to meet their obligations under the Plan.  In conjunction with that analysis, the Prospective Debtors have included as Exhibit F hereto consolidated projected financial results for each of the years ending 2011 through and including 2015.  EXHIBIT F WILL BE DISTRIBUTED TO (I) HOLDERS OF PREPETITION CREDIT AGREEMENT CLAIMS AND (II) HOLDERS OF PD LLC NOTES CLAIMS THAT ARE "PRIVATE SIDE LENDERS" OR "PRIVATE SIDE HOLDERS", AS APPLICABLE, OR HAVE AGREED TO TEMPORARY TRADING RESTRICTIONS IN CONNECTION WITH THE RECEIPT OF MATERIAL NON-PUBLIC INFORMATION RESPECTING THE COMPANY.  IN

ADDITION, ANY EXHIBITS WHICH HAVE NOT ALREADY BEEN DISCLOSED TO
HOLDERS OF PD LLC NOTES CLAIMS OR PREPETITION CREDIT AGREEMENT CLAIMS
WILL BE DISTRIBUTED BY THE COMPANY TO SUCH HOLDERS IN THE EVENT SUCH
EXHIBITS ARE PUBLICLY DISCLOSED.  These Projections are based upon certain assumptions
that the Company believes to be reasonable under the current circumstances.  Those assumptions the
Company considers to be significant are described in the notes which are part of the Projections.
Holders of Prepetition Credit Agreement Claims and Holders of PD LLC Notes Claims are urged to
examine carefully all of the assumptions on which the Projections are based in evaluating the Plan.

## D.      BEST INTERESTS TEST AND LIQUIDATION ANALYSIS

The "best interests" test under section 1129 of the Bankruptcy Code requires as a
condition to confirmation of a plan of reorganization that each holder of impaired claims or impaired
interests receive property with a value not less than the amount such holder would receive in a
Chapter 7 liquidation.  As indicated above, the Prospective Debtors believe that under the Plan,
Holders of Impaired Claims will receive property with a value equal to or in excess of the value such
Holders would receive on account of their Claims in a liquidation of the Debtors under Chapter 7 of
the Bankruptcy Code.  The Chapter 7 liquidation analysis set forth below and as Exhibit D hereto
will demonstrate that the Plan satisfies the requirements of the "best interests" test.

To estimate potential returns to Holders of Claims in a Chapter 7 liquidation, the
Prospective Debtors determined, as might a Bankruptcy Court conducting such an analysis, the
amount of liquidation proceeds that might be available for distribution (net of liquidation-related
costs and fees the Prospective Debtors assume would be funded from the collateral of secured
creditors) and the allocation of such proceeds among the Classes of Claims based on their relative
priority as set forth in the Bankruptcy Code.  The liquidation proceeds available for distribution to
Holders of Claims against the Debtors would consist of the net proceeds from the disposition of the
Debtors' assets, augmented by any other Cash that the Debtors held and generated during the
assumed holding period stated in the Plan and after deducting the incremental expenses of operating
the business pending disposition.

In general, as to each entity, liquidation proceeds would be allocated in the following
priority:

- first, to the Claims of secured creditors (including the Prepetition Credit Agreement
  Claims and the PD LLC Notes Claims) to the extent of the value of their collateral;

- second, to other costs, fees and expenses of the liquidation, as well as other
  administrative expenses of the Debtors' Chapter 7 cases, including tax liabilities;

- third, to unpaid Administrative Expense Claims;

- fourth, to Priority Tax Claims and Priority Non-Tax Claims entitled to priority in
  payment under the Bankruptcy Code;

- fifth, to General Unsecured Claims (including the Claims of secured creditors to the
  extent the value of their collateral was insufficient to satisfy their Claims in full, pursuant
  to section 506 of the Bankruptcy Code) and other unsecured Claims, such as the Herald
  Claim, after taking into account any applicable subordination provisions and/or
  applicable contractual provisions; and

- sixth, to Interests.

In addition, unpaid DIP Revolving Facility Claims would be paid in accordance with any superpriority liens and claims (including priming liens under section 364(d) of the Bankruptcy Code and Section 507(b) Claims) approved by the Bankruptcy Court in the DIP Orders.

The Debtors' liquidation costs in Chapter 7 cases would include the compensation of a bankruptcy trustee, as well as compensation of counsel and other professionals retained by such trustee, asset disposition expenses, applicable taxes, litigation costs, and Claims arising from the Debtors' operation during the pendency of the Chapter 7 cases. The liquidation itself might also trigger certain Priority Tax Claims and/or Priority Non-Tax Claims and would likely accelerate Claims or, in the case of taxes, make it likely that the Internal Revenue Service would assert all of its claims as Priority Tax Claims rather than asserting them in due course as is expected to occur under the Chapter 11 Cases. The Claims described in the foregoing sentence would be paid in full out of the net liquidation proceeds, after payment of secured Claims, Chapter 7 costs of administration and other Administrative Expense Claims, and before the balance would be made available to pay General Unsecured Claims or to make any distribution in respect of Interests.

The foregoing discussion and Chapter 7 liquidation analysis set forth on Exhibit D hereto are provided solely to discuss the effects of a hypothetical Chapter 7 liquidation of the Prospective Debtors, are subject to the assumptions set forth herein and in Exhibit D, and have not been independently audited or verified. The Prospective Debtors cannot provide assurances that these assumptions would be accepted by a Bankruptcy Court.

## VI.  RISK FACTORS

THE IMPLEMENTATION OF THE PLAN IS SUBJECT TO A NUMBER OF MATERIAL RISKS, INCLUDING THOSE ENUMERATED BELOW.

IN EVALUATING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF PREPETITION CREDIT AGREEMENT CLAIMS AND HOLDERS OF PD LLC NOTES CLAIMS SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE SOLICITATION AND DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER THEREWITH AND/OR INCORPORATED BY REFERENCE THEREIN), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION, OR ALTERNATIVES TO THE PLAN.

THESE RISK FACTORS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE COMPANY, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, THE PRICES AT WHICH THE COMPANY CAN SELL ITS PRODUCTS, THE AVAILABILITY AND COST OF NEWSPRINT AND OTHER RAW MATERIALS, CHANGES IN CREDIT TERMS FROM SUPPLIERS, CURRENCY EXCHANGE RATE FLUCTUATIONS, THE DEVELOPMENT OF NEW

TECHNOLOGIES, ECONOMIC DOWNTURN, NATURAL DISASTERS AND UNUSUAL WEATHER CONDITIONS, TERRORIST ACTIONS OR ACTS OF WAR, OPERATING EFFICIENCIES, LABOR RELATIONS, ACTIONS OF GOVERNMENTAL BODIES AND OTHER MARKET AND COMPETITIVE CONDITIONS.  HOLDERS OF PREPETITION CREDIT AGREEMENT CLAIMS AND HOLDERS OF PD LLC NOTES CLAIMS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE.  ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS.  NO PARTY, INCLUDING, WITHOUT LIMITATION, THE PROSPECTIVE DEBTORS, THE DEBTORS OR THE REORGANIZED DEBTORS, UNDERTAKES ANY OBLIGATION TO UPDATE SUCH STATEMENTS.

## A.    **GENERAL BANKRUPTCY LAW CONSIDERATIONS**

1.    General.

The filing of bankruptcy petitions by the Prospective Debtors and the publicity attendant thereto may have an adverse effect on the Prospective Debtors' businesses.  Any such adverse effects may worsen during the pendency of a protracted bankruptcy case if the Plan is not timely confirmed and consummated as expected.

2.    Failure to Satisfy Vote Requirement.

If the Prospective Debtors obtain the requisite votes from the Holders of Prepetition Credit Agreement Claims and the Holders of PD LLC Notes Claims to accept the Plan in accordance with the requirements of the Bankruptcy Code, the Prospective Debtors intend to file voluntary petitions for reorganization under chapter 11 of the Bankruptcy Code and to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received from the Holders of Prepetition Credit Agreement Claims and/or the Holders of PD LLC Notes Claims, the Prospective Debtors nevertheless may file petitions for relief under chapter 11 of the Bankruptcy Code.  In such event, however, the Debtors will likely seek to accomplish an alternative restructuring of their capital structure and obligations.  The Prospective Debtors may decide to seek consent to any such restructuring plan by means of another out-of-court solicitation for acceptance of a plan of reorganization.  There can be no assurance that the terms of any such alternative restructuring would be similar to or as favorable to Holders of Claims and Interests as the restructuring proposed in the Plan.

3.    Method of Solicitation.

Section 1126(b) of the Bankruptcy Code provides that the holder of a claim against, or interest in, a debtor who accepts or rejects a plan of reorganization before the commencement of a chapter 11 case is deemed to have accepted or rejected such plan under the Bankruptcy Code so long as the solicitation of such acceptance was made in accordance with applicable non-bankruptcy law governing the adequacy of disclosure in connection with such solicitations, or, if such laws do not exist, such acceptance was solicited after disclosure of "adequate information," as defined in section 1125 of the Bankruptcy Code.

In addition, Bankruptcy Rule 3018(b) states that a holder of a claim or interest who has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code

shall not be deemed to have accepted or rejected the plan if the court finds that the plan was not transmitted to substantially all creditors and equity security holders of the same class, that an unreasonably short time was prescribed for such creditors and equity security holders to accept or reject the plan, or that the solicitation was not in compliance with section 1126(b) of the Bankruptcy Code.

To satisfy the requirements of section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b), the Prospective Debtors have distributed the Solicitation and Disclosure Statement (including the Plan as <u>Exhibit A</u>) to all Holders of (i) Prepetition Credit Agreement Claims, at the addresses for all such Holders on the register of lenders maintained by the Prepetition Administrative Agent, as of the Voting Record Date applicable to such Claims, and (ii) PD LLC Notes Claims, at the addresses for all such Holders provided to the Company by such Holders in accordance with the agreements governing the PD LLC Notes, as of the Voting Record Date applicable to such Claims.  In addition, the Holders of Prepetition Credit Agreement Claims will have had access to a draft version of the Plan setting forth the material terms of the treatment of their claims through Intralinks for nearly two months prior to the formal solicitation.  Furthermore, the Holders of Prepetition Credit Agreement Claims and the Holders of PD LLC Notes Claims received numerous other communications, and had the opportunity to participate in calls and other communications, relating to the Prospective Debtors' restructuring.  As a result, while the process of soliciting votes to accept or reject the Plan began on November 7, 2011, many if not most of the Holders of Prepetition Credit Agreement Claims and certain Holders of PD LLC Notes Claims will have had access to the terms of the Prospective Debtors' restructuring for significantly longer than the solicitation period.

As a result of their efforts, the Prospective Debtors believe that the solicitation of votes to accept or reject the Plan will be found by the Bankruptcy Court to be proper under applicable non-bankruptcy law, rules and regulations.  The Prospective Debtors cannot be certain, however, that the solicitation of acceptances or rejections will be approved by the Bankruptcy Court and, if such approval is not obtained, Confirmation of the Plan could be denied.  If the Bankruptcy Court were to conclude that the solicitation of acceptances or rejections did not satisfy the solicitation requirements, then the Debtors may seek to resolicit votes to accept or reject the Plan or to solicit votes to accept or reject the Plan from one or more Classes that were not previously solicited.  The Prospective Debtors cannot provide any assurances that such a resolicitation would be successful.

    4.    <u>Risks Associated with Resolicitation</u>.

In the event that the Prospective Debtors or Debtors resolicit acceptances of the Plan from parties entitled to vote thereon, Confirmation of the Plan could be delayed and possibly jeopardized.  Nonconfirmation of the Plan could result in an extended chapter 11 proceeding, which could have a negative effect on the Debtors' business operations.

    5.    <u>Nonacceptance of the Plan—Confirmation by Nonconsensual "Cram Down"</u>.

Even if one or more Classes of Claims or Interests reject the Plan, the Bankruptcy Court nevertheless may confirm the Plan at the Debtors' request pursuant to the "cram down" provisions of the Bankruptcy Code if at least one Impaired Class of Claims or Interests has accepted the Plan (with such acceptance being determined without including the acceptance of any "insider" in such Class) and, as to each Impaired Class which has not accepted the Plan, the Bankruptcy Court

determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Impaired Class.

Under the Plan, all Classes of Claims and Interests, other than Prepetition Credit Agreement Claims and PD LLC Notes Claims, are Unimpaired and are accordingly deemed to accept the Plan.  The Holders of Prepetition Credit Agreement Claims executed the Lee Support Agreement prior to the date of the First Solicitation and Disclosure Statement in sufficient numbers such that the Prospective Debtors believe the Classes of Prepetition Credit Agreement Claims will vote to accept the Plan by more than one-half in number and at least two-thirds in amount as required by section 1126(d) of the Bankruptcy Code.  Likewise, the Holders of PD LLC Notes Claims executed the Pulitzer Support Agreement prior to the distribution of this Amended Solicitation and Disclosure Statement in sufficient numbers such that the Prospective Debtors believe the Classes of PD LLC Notes Claims will vote to accept the Plan by more than one-half in number and at least two-thirds in amount as required by section 1126(d) of the Bankruptcy Code.  If the Bankruptcy Court does not conclude that all Classes of Claims and Interests other than Prepetition Credit Agreement Claims and PD LLC Notes Claims are Unimpaired, or the Holders of Prepetition Credit Agreement Claims or Holders of PD LLC Notes Claims do not vote to accept the Plan by the necessary majorities, the Prospective Debtors reserve the right to pursue Confirmation of the Plan by means of the "cram down" provisions in section 1129(b) of the Bankruptcy Code.  In addition, if the Bankruptcy Court does not confirm the Plan, either on a consensual basis or through use of the "cram down" provisions, the Debtors may pursue one of the following alternatives: (i) confirmation of an alternative plan or plans of reorganization under chapter 11 of the Bankruptcy Code, (ii) dismissal of the Chapter 11 Cases or (iii) liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.

6.    Certain Risks of Nonconfirmation or Delay of Confirmation.

It is possible that the Chapter 11 Cases could evolve into lengthy and contested cases, the results of which cannot be predicted.

Regardless of whether all Classes of Claims or Interests accept or are deemed to have accepted the Plan, the Plan still may not be confirmed by the Bankruptcy Court, which sits as a court of equity and may exercise substantial discretion.  A nonaccepting creditor might challenge the adequacy of the disclosure respecting the Plan contained in the Solicitation and Disclosure Statement, the solicitation procedures and results, or the terms of the Plan as not being in compliance with the Bankruptcy Code.  If any such challenges are successful, the Debtors may seek to resolicit acceptances of the Plan.  In such circumstances, Confirmation of the Plan could be delayed and possibly jeopardized.  Additionally, there can be no assurance that the Plan will not require significant modifications for Confirmation, or that such modifications would (a) be consistent with the Debtors' obligations under or the timing requirements in the Support Agreements and/or (b) not require a resolicitation of acceptances.

Even if the Bankruptcy Court were to determine that the disclosure and the solicitation procedures were appropriate and the results were accurate and appropriate, the Bankruptcy Court could nevertheless decline to confirm the Plan if it were to find that any statutory conditions to Confirmation had not been met, including that the terms of the Plan are fair and equitable to nonaccepting Classes.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, a finding by the Bankruptcy Court that the Plan "does not unfairly discriminate" and is "fair and equitable" with respect to any nonaccepting Classes, that Confirmation of the Plan is not likely to be followed by a liquidation or a

81

need for further financial reorganization of the Debtors, and that the value of distributions to nonaccepting Holders of Impaired Claims and Impaired Interests will not be less than the value of distributions such Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Although the Prospective Debtors believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court would reach the same conclusion.

The Confirmation and consummation of the Plan also are subject to certain other conditions, which are set forth in Article IX of the Plan. No assurance can be given that these conditions will be satisfied or waived.

If the Plan is not confirmed in a timely manner, it is unclear whether the restructuring of the Debtors' indebtedness contemplated thereby could be implemented and what Holders of Claims and Interests would ultimately receive in respect of their Claims and Interests. If an alternative plan of reorganization could not be agreed to, it is possible that the Debtors would have to liquidate their assets, in which case it is likely that Holders of Claims would receive less than they would have received pursuant to the Plan. Moreover, nonconfirmation of the Plan could result in an extended chapter 11 proceeding, which could have a negative effect on the Debtors' business operations. Furthermore, if commencement of the Chapter 11 Cases, Confirmation of the Plan and/or the Effective Date are significantly delayed, there is a risk that the Debtors will not be able to meet the timing conditions set forth in the Support Agreements, with the result that the Support Agreements may expire or be terminated in accordance with their terms.

      7.    <u>Alternatives to Confirmation and Consummation of the Plan</u>.

There can be no assurance that the Plan will be confirmed or consummated. If the Prospective Debtors commence the Chapter 11 Cases and the Plan is not subsequently confirmed by the Bankruptcy Court and consummated, the alternatives include (i) confirmation of an alternative plan or plans of reorganization under chapter 11 of the Bankruptcy Code, (ii) dismissal of the Chapter 11 Cases or (iii) liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code. The Prospective Debtors believe the Plan is significantly more attractive than these alternatives because they believe, among other things, that it will minimize disputes concerning the restructuring of the Debtors' indebtedness, significantly shorten the time required to accomplish such restructuring, reduce the expenses of cases under chapter 11 of the Bankruptcy Code, minimize the disruption to the Debtors' businesses that could result from protracted and contested bankruptcy cases and ultimately result in a greater preservation of value for the benefit of and/or distributions to Holders of Claims and Interests than would other types of reorganizations under chapter 11 of the Bankruptcy Code or a liquidation under chapter 7 of the Bankruptcy Code.

## B.    **OTHER RISK FACTORS**

      1.    <u>Variances from Projections May Affect Ability to Pay Obligations</u>.

The Prospective Debtors have prepared projected financial information relating to the Reorganized Debtors in order to present the anticipated effects of the Plan and the transactions contemplated thereby, which information has been made available, at a minimum, to those Holders of Prepetition Credit Agreement Claims and Holders of PD LLC Notes Claims that are "private side lenders" or "private side holders", as applicable, or have entered into temporary trading restrictions respecting their claims relating to the receipt of material non-public information. The Projections are intended to illustrate the estimated effects of the Plan and certain related transactions on the results of operations, cash flow and financial position of the Reorganized Debtors for the periods

indicated.  The Projections are qualified by the introductory paragraphs thereto and the accompanying assumptions, and must be read in conjunction with such introductory paragraphs and assumptions, which constitute an integral part of the Projections.  The Projections are based upon a variety of assumptions as set forth therein, and the Reorganized Debtors' future operating results are subject to and likely to be affected by a number of factors, including significant business, economic and competitive uncertainties, many of which are beyond the control of the Reorganized Debtors.  In addition, unanticipated events and circumstances occurring subsequent to the date of the Solicitation and Disclosure Statement may affect the actual financial results of the Reorganized Debtors' operations.  Accordingly, actual results may vary materially from those shown in the Projections, which may adversely affect the ability of the Reorganized Debtors to make payments on indebtedness incurred after Confirmation of the Plan.

The businesses in which the Reorganized Debtors will operate are volatile due to numerous factors, all of which make accurate forecasting very difficult.  Although it is not possible to predict all risks associated with the Projections and their underlying assumptions, there are some risks which the Prospective Debtors' management is presently able to identify.  The Projections assume that all aspects of the Plan will be successfully implemented on the terms set forth in the Solicitation and Disclosure Statement and that the publicity associated with the bankruptcy proceedings contemplated by the Plan will not adversely affect the Reorganized Debtors' operating results.  There can be no assurance that these two assumptions are accurate, and the failure of the Plan to be successfully implemented, or adverse publicity, could have a materially detrimental effect on the Reorganized Debtors' business, results of operations and financial condition.

Moreover, the Projections have not been prepared with a view toward public disclosure or with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information.  Rather, the Projections have been developed in connection with the planning, negotiation and development of the Plan.  The Reorganized Debtors do not undertake any obligation to update or otherwise revise the Projections to reflect events or circumstances existing or arising after the date of this Amended Solicitation and Disclosure Statement or to reflect the occurrence of unanticipated events.  In the view of the Prospective Debtors' management, however, the Projections have been prepared on a reasonable basis and represent a reasonable view of the expected future financial performance of the Reorganized Debtors after the Effective Date.  Nevertheless, the Projections should not be regarded as a representation, guaranty or other assurance by any of the Prospective Debtors, the Debtors, or the Reorganized Debtors, or any other person, that the Projections will be achieved, and Holders are therefore cautioned not to place undue reliance on any projected financial information contained in the Solicitation and Disclosure Statement.

2.      Extent of Leverage May Limit Ability to Obtain Additional Financing for Operations.

Although the Plan will result in the restructuring of approximately $856 million of Prepetition Credit Agreement Claims and approximately $138 million of PD LLC Notes Claims, the Reorganized Debtors will have three significant types of secured debt obligations following the Effective Date:  the New First Lien Credit Facility, the New Second Lien Term Loan Facility, and the New PD LLC Notes (collectively, the "New Debt Obligations").  Each of those sets of obligations will be secured by some or substantially all of the assets of various of the Reorganized Debtors.  As a result of the entry into the New Debt Obligations and the documents related thereto, the Reorganized Debtors will continue to have a significant amount of secured indebtedness, as reflected in the financial information exhibited to and described in the Solicitation and Disclosure Statement.

The New Debt Obligations contain restrictions on the ability of various of the Debtors to incur additional indebtedness, obtain additional financing for working capital, capital expenditures, product development, debt service requirements, acquisitions and general corporate or other purposes. The restrictions contained in the New Debt Obligations and the extent of the indebtedness of the various Debtors thereunder may also limit the ability of the Reorganized Debtors to adjust to changing market conditions and to withstand competitive pressures, possibly leaving the Reorganized Debtors vulnerable in a downturn in general economic conditions or in their businesses or unable to carry out capital spending that is important to their growth and productivity improvement programs.

3.     <u>The Debtors May Have Insufficient Liquidity to Successfully Operate Their Businesses</u>.

The Prospective Debtors expect to incur significant costs as a result of their restructuring, including the Chapter 11 Cases. The Prospective Debtors are financing operations during their reorganization using Cash on hand and Cash generated by operations. The use of such Cash by the Prospective Debtors is subject to restrictions set forth in the Prepetition Credit Agreement Documents and the PD LLC Notes Documents and/or constitutes cash collateral for certain of the Prospective Debtors' prepetition secured obligations. In the event that the Debtors do not obtain authority to use certain cash collateral or do not obtain Bankruptcy Court approval to enter into the DIP Revolving Facility Agreement at the outset of their Chapter 11 Cases, and do not otherwise have sufficient liquidity to fund their operations, there can be no assurance as to the Debtors' ability to obtain sufficient financing on acceptable terms or at all. The challenges of obtaining financing, if necessary, would be exacerbated by adverse conditions in the general economy and the volatility and tightness in the financial and credit markets. These conditions and the Debtors' Chapter 11 Cases would make it more difficult for the Debtors to obtain financing.

4.     <u>Historical Financial Information May Not Be Comparable</u>.

As a result of the consummation of the Plan and the transactions contemplated thereby, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Prospective Debtors' historical financial statements.

5.     <u>Market and Business Risks May Adversely Affect Business Performance</u>.

In the normal course of business, the Prospective Debtors are subject to the following types of risks and variables, which may materially affect the business performance of the Reorganized Debtors following the Effective Date:[11]

- Retail advertising revenue may be impacted by merger and consolidation of major customers, as well as the continuing economic downturn.

- Classified advertising revenue may further decline due to high unemployment, the stagnant real estate market, and the continuing economic downturn more generally.

---

[11] <u>See also</u> Lee Enterprises' Annual Report on Form 10-K for the year ended September 26, 2010 and the additional "Risk Factors" contained therein.

- Future circulation price increases may be difficult to accomplish as a result of future declines in circulation unit sales, and price decreases may be necessary to retain or grow circulation unit volume. Declines in circulation unit sales could also adversely impact advertising revenue.

- Circulation of the Reorganized Debtors' newspapers may be adversely affected by increasing audience attention on digital media, which may decrease circulation revenue and exacerbate declines in print advertising. If the Reorganized Debtors are not successful in growing their digital businesses to offset declines in revenues from their print products, their business, financial condition and prospects will be adversely affected.

6.      <u>Failure to Maintain Customer Relationships May Adversely Affect Financial Results</u>.

The loss of one or more major customers, or a material reduction in sales to these customers as a result of competition or other factors, could have a material adverse effect on the Company's results of operations.

7.      <u>Failure to Attract and Maintain Employees May Adversely Affect Financial Results</u>.

The Prospective Debtors believe that among their most valuable assets are their highly skilled employees, who have the ability to leave their employment with the Prospective Debtors and deprive the Prospective Debtors of valuable skills and knowledge that contribute substantially to their business operations. The Prospective Debtors cannot be sure that they will ultimately be able to retain employees during the pendency of the Chapter 11 Cases and, if not, that they will be able to replace such personnel with comparable personnel. In addition, the Prospective Debtors cannot be sure that such key personnel will not leave after consummation of the Plan and emergence from Chapter 11. Because the Prospective Debtors believe their success depends to a significant degree upon the continued contributions of their employees, the Prospective Debtors believe further attrition may hinder their ability to operate efficiently, which could have a material adverse effect on their results of operations and financial condition.

In addition, following the Effective Date of the Plan, the Reorganized Debtors may need to attract and retain new personnel, including key management, sales, marketing, and other personnel. Accomplishing this may be difficult due to many factors, including uncertainty created by the Chapter 11 Cases. The failure to continue to attract and retain such individuals could materially and adversely affect the Reorganized Debtors' ability to compete.

8.      <u>Cost of Compliance with Government Regulation May Adversely Affect Financial Results</u>.

The Prospective Debtors are subject to various federal, state and local laws and regulations that affect the conduct of their operations. The Prospective Debtors cannot provide assurance that compliance with these laws and regulations or the adoption of modified or additional laws and regulations will not require large expenditures by the Prospective Debtors or otherwise have a significant effect on their financial condition or results of operations.

9.       Intellectual Property May Not Be Adequately Protected.

The Prospective Debtors rely on copyrights, trademarks and licenses to protect their intellectual property, which is significant to their businesses.  In addition to their own copyrights and other intellectual property, the Prospective Debtors license from other parties the right to use some of their intellectual property.  The Prospective Debtors routinely seek to protect their copyrights, trademarks and other intellectual property, but their precautions may not provide meaningful protection against competitors or protect the value of their intellectual property.

10.      Failure of the Company to Maintain its Listing on the NYSE.

The Company was informed on July 8, 2011 and August 15, 2011, respectively, that it was below compliance relating to its failure to maintain over a 30 trading-day period (i) an adequate share price and (ii) the required minimum average market capitalization and stockholders' equity.  The Company subsequently proposed a plan to return to compliance with NYSE Regulation, which plan was approved by the NYSE and signed by both the Company and NYSE.  Under this plan, the Debtors will be subject to both informal and formal reporting requirements during the Chapter 11 Cases.  However, continued listing is subject to ongoing reassessment by the NYSE and the return to compliance with other quantitative listing requirements, which would require an increase in the average closing price to $1 per share. Delisting of the Company's Common Stock may have an adverse effect on its market liquidity and the market price could become more volatile. Further, delisting also could make it more difficult for the Company to raise additional capital.

C.       **RISKS TO CREDITORS WHO WILL RECEIVE NEW SECURITIES**

The Plan contemplates that Converting Lenders will receive, in addition to a distribution of loans under the New Second Lien Term Loan, New Common Stock in Reorganized Lee Enterprises that will be equal to approximately fifteen percent (15%) of the issued and outstanding shares of common stock in Reorganized Lee Enterprises on a pre-issuance basis.  The Plan also contemplates that each Holder of a PD LLC Notes Claim will receive its Pro Rata Share of New PD LLC Notes.  The ultimate recoveries under the Plan to Converting Lenders and Holders of PD LLC Notes Claims will depend in part on the realizable value of the New Common Stock and New PD LLC Notes, respectively.  The New Common Stock and New PD LLC Notes are subject to a number of material risks, including, but not limited to, those specified below.

1.       Lack of Trading Market and Restrictions on Transfer.

The New PD LLC Notes to be issued under the Plan will not be listed on or traded on any nationally recognized market or exchange.  If a Holder is able to sell such securities in the future, the price will depend on many factors, including price declines and volatility in the market for similar securities, as well as by any changes in our results of operations or financial condition. There can be no assurance that an active market for the New PD LLC Notes will develop, nor can any assurance be given that a Holder of New PD LLC Notes will be able to sell such securities in the future, nor given as to the price at which such securities might be sold.

The New PD LLC Notes to be issued under the Plan have not been registered and are not expected to be registered under the Securities Act of 1933 (as amended, together with the rules and regulations promulgated thereunder, the "Securities Act"), any state securities laws or the laws of any other jurisdiction.  Absent such registration, the New PD LLC Notes may be offered or sold only in transactions that are not subject to or that are exempt from the registration requirements of

the Securities Act and other applicable securities laws.  As explained in more detail in Article VIII (Certain Federal and State Securities Law Considerations), most recipients of New PD LLC Notes will be able to resell such securities without registration pursuant to the exemption provided by Section 4(1) of the Securities Act.

    2.    <u>Reorganized Lee Enterprises Common Stock May Be Diluted</u>.

    Although no options or warrants will be issued under the Plan, the issuance of options or warrants following the Effective Date to purchase common stock in Reorganized Lee Enterprises or the issuance of additional shares of common stock in Reorganized Lee Enterprises would dilute the ownership percentage and/or value represented by the New Common Stock distributed pursuant to the Plan.

    3.    <u>Restrictions on Funds to Make Payments on New PD LLC Notes and Reorganized Lee Enterprises Common Stock</u>.

    Other than the Lee Closing Date Payment, the only source of cash available to the Reorganized Debtors to make payments on the New PD LLC Notes and to pay dividends on the New Common Stock will be cash generated by the operations of the Reorganized Pulitzer Debtors in the case of the New PD LLC Notes and Reorganized Debtors in the case of the New Common Stock.

    The Prospective Debtors do not anticipate that the Reorganized Debtors will generate sufficient net profits to allow Reorganized Lee Enterprises to pay cash dividends on the New Common Stock for the foreseeable future.  In addition, provisions in the New First Lien Credit Facility Documents, New Second Lien Term Loan Documents and New PD LLC Notes Documents will likely prohibit Reorganized Lee Enterprises from paying dividends on the New Common Stock, except in certain circumstances detailed in the New First Lien Credit Facility Documents, the New Second Lien Term Loan Documents and New PD LLC Notes Documents.

    4.    <u>Recovery Priority of Reorganized Lee Enterprises Common Stock</u>.

    The New Common Stock will, as a matter of structure, rank junior to all existing and future liabilities of Reorganized Lee Enterprises and to any preferred stock that Reorganized Lee Enterprises may issue.  In the event of a subsequent bankruptcy, liquidation or winding-up of Reorganized Lee Enterprises, its assets will be available to Holders of the New Common Stock (and all common stock of Reorganized Lee Enterprises) only after all indebtedness and other liabilities of Reorganized Lee Enterprises have been paid.  In addition, Reorganized Lee Enterprises may in the future incur substantial amounts of additional debt and other obligations that, as a matter of structure, will rank senior to the Reorganized Lee Enterprises common stock.

## VII.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    GENERAL TAX CONSIDERATIONS

    The following discussion is a summary of certain material federal income tax consequences expected to result from the consummation of the Plan.  This summary is for general information purposes only, and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular Holder of a Claim.  This discussion does not purport to be a complete analysis or listing of all potential tax considerations.  This discussion does not address aspects of federal income taxation that may be relevant to a particular Holder of a

Claim subject to special treatment under federal income tax laws (such as foreign taxpayers, broker-dealers, banks, thrifts, insurance companies, financial institutions, regulated investment companies, real estate investment trusts and pension plans and other tax-exempt investors), and does not discuss any aspects of state, local or foreign tax laws.  Furthermore, this summary does not address all of the federal income tax consequences that may be relevant to a Holder of a Claim, such as the potential application of the alternative minimum tax.

This discussion is based on existing provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), existing and proposed Treasury Regulations promulgated thereunder, and current administrative rulings and court decisions.  Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the federal income tax consequences of the Plan.  Any such changes or interpretations may be retroactive and could significantly affect the federal income tax consequences of the Plan.

No ruling has been requested or obtained from the Internal Revenue Service (the "IRS") with respect to any tax aspects of the Plan and no opinion of counsel has been sought or obtained with respect thereto.  No representations or assurances are being made to the Holders of Claims with respect to the federal income tax consequences described herein.

Accordingly, the following summary of certain federal income tax consequences of the Plan is for informational purposes only and is not a substitute for careful tax planning or advice based upon the individual circumstances pertaining to a particular Holder of a Claim.  Each Holder of a Claim is strongly urged to consult with its own tax advisors regarding the federal, state, local and other tax consequences of the Plan.

*        *        *        *        *

Any discussion of federal tax issues set forth in the Solicitation and Disclosure Statement has been prepared solely in connection with the Confirmation of the Plan to which the transactions described in the Solicitation and Disclosure Statement are ancillary.  Such discussion is not intended or written to be legal or tax advice to any person and is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding any federal tax penalties that may be imposed on such person.  Each Holder of a Claim should seek advice based on its particular circumstances from an independent tax advisor.

*        *        *        *        *

## B.    FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS

Under the IRC, a taxpayer generally must recognize income from the cancellation of debt ("COD Income") to the extent that its indebtedness is discharged during the taxable year.  Section 108(a)(1)(A) of the IRC provides an exception to this rule (the "Bankruptcy Exception"), where a taxpayer is in bankruptcy and where the discharge is granted, or is effected pursuant to a plan approved, by the bankruptcy court.  Even if the Bankruptcy Exception applies, instead of recognizing income the taxpayer is required, under section 108(b) of the IRC, to reduce certain of its tax attributes by the amount of COD Income.  The attributes of the taxpayer generally are reduced in the following order:  any net operating loss ("NOL") for the taxable year of the discharge, NOL carryovers from prior years, general business and minimum tax credit carryforwards, capital loss

carryforwards, the basis of the taxpayer's assets, passive activity loss and credit carryovers, and finally, foreign tax credit tax carryforwards (collectively, "Tax Attributes").

Special rules apply to COD Income realized by a debtor corporation that is a member of a group filing a consolidated federal income tax return (the "Consolidated Attribute Reduction Rules"). The Consolidated Attribute Reduction Rules generally provide that the Tax Attributes attributable to the debtor member are the first to be reduced. For this purpose, Tax Attributes attributable to the debtor member include consolidated Tax Attributes (such as consolidated NOLs) that are attributable to the debtor member, and also include the basis of property of the debtor (including subsidiary stock), all of which are reduced in the order described above. To the extent that the COD Income of the debtor member exceeds the Tax Attributes attributable to it, the consolidated Tax Attributes attributable to other members of the consolidated group (including the portion of the consolidated NOLs attributable to other members, but not including the basis of property of other members) must be reduced. In the case of a consolidated group with multiple debtor members, each debtor member's Tax Attributes must be reduced before such member's COD Income can reduce the Tax Attributes attributable to other members of the consolidated group. In addition, to the extent that a debtor corporation is required to reduce its basis in the stock of another group member, the lower-tier member also must reduce its Tax Attributes, including the consolidated Tax Attributes attributable to that lower-tier member. Any required attribute reduction takes place after the consolidated group has determined its taxable income, and any federal income tax liability, for the taxable year in which the COD Income is realized.

The Company expects to realize COD Income as a result of the implementation of the Plan. The precise amount of COD Income will depend on, among other things, the issue prices of the New First Lien Credit Facility, the New Second Lien Credit Facility, and the New PD LLC Notes (discussed further, below), and the fair market value of the New Common Stock, which cannot be known with certainty until after the Effective Date. Because the Company does not have an NOL or other significant carryforwards, it expects that it will be required to reduce tax basis in assets by the amount of any COD.

## C.    FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS

The federal income tax consequences of the transactions contemplated by the Plan to Holders of Claims that are United States Persons will depend upon a number of factors. For purposes of the following discussion, a "United States Person" is any person or entity (1) who is a citizen or resident of the United States, as determined for federal income tax purposes, (2) that is a corporation created or organized in or under the laws of the United States or any state thereof, (3) that is an estate, the income of which is subject to federal income taxation regardless of its source or (4) that is a trust (a) the administration over which a United States person can exercise primary supervision and all of the substantial decisions of which one or more United States persons have the authority to control; or (b) that has validly elected under applicable Treasury Regulations to continue to be treated as a United States Person for federal income tax purposes. In the case of a partnership, the tax treatment of its partners will depend on the status of the partner and the activities of the partnership. United States Persons who are partners in a partnership should consult their tax advisors. A "Non-United States Person" is any person or entity that is not a United States Person. For purposes solely of the following discussion and unless otherwise noted below, the term "Holder" shall mean a holder of a Claim that is a United States Person.

The federal income tax consequences to Holders and the character and amount of income, gain or loss recognized as a consequence of the Plan and the distributions provided for

thereby will depend upon, among other things, (1) the manner in which a Holder acquired a Claim; (2) the length of time the Claim has been held; (3) whether the Claim was acquired at a discount; (4) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current year or prior years; (5) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; (6) the method of tax accounting of the Holder; and (7) whether the Claim is an installment obligation for federal income tax purposes.  Certain holders of Claims (such as foreign persons, S corporations, regulated investment companies, insurance companies, financial institutions, small business investment companies, broker-dealers and tax-exempt organizations) may be subject to special rules not addressed in this summary of federal income tax consequences.  There also may be state, local, and/or foreign income or other tax considerations or federal estate and gift tax considerations applicable to holders of Claims, which are not addressed herein.  EACH HOLDER OF A CLAIM AFFECTED BY THE PLAN IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR REGARDING THE SPECIFIC TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.

1.    General Tax Consequences to Holders of Claims.

A Holder who receives Cash or other consideration (including, without limitation, the New First Lien Term Loan, the New Second Lien Term Loan, the New Common Stock or New PD LLC Notes) in satisfaction of its Claims may recognize ordinary income or loss to the extent that any portion of such consideration is characterized as accrued interest.  A Holder who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Plan, will be treated as having received interest income to the extent that any consideration received is characterized for federal income tax purposes as interest, regardless of whether such Holder realizes an overall gain or loss as a result of surrendering its Claim.  A Holder who previously included in its income accrued but unpaid interest attributable to its Claim should recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such Holder realizes an overall gain or loss as a result of the distribution it may receive under the Plan on account of its Claim.  The manner in which consideration is to be allocated between accrued interest and principal for these purposes is unclear under present law. In accordance with the terms of the Plan, the Prospective Debtors will allocate for federal income tax purposes the consideration paid pursuant to the Plan with respect to a Claim, first to the principal amount of such Claim as determined for federal income tax purposes and then to accrued interest, if any, with respect to such Claim.  Accordingly, in any cases where a Holder is deemed to receive less than the principal amount of its Claim, the Prospective Debtors intend to allocate the full amount of consideration transferred to such Holder to the principal amount of such obligation and to take the position that no amount of the consideration to be received by such Holder is attributable to accrued interest.  There is no assurance that such allocation will be respected by the IRS for federal income tax purposes.

If not otherwise so required, a Holder that receives shares of New Common Stock in exchange for its Claim will be required to treat gain recognized on a subsequent sale or other taxable disposition of such stock as ordinary income to the extent of (i) any bad debt deductions taken with respect to the Claim and any ordinary loss deductions incurred upon satisfaction of the Claim, less any income (other than interest income) recognized by the Holder upon satisfaction of its Claim, and (ii) any amounts which would have been included in a Holder's gross income if the Holder's Claim had been satisfied in full, but which was not included in income because of the application of the cash method of accounting.

2.      Holders of Allowed Prepetition Credit Agreement Claims.

Holders of Prepetition Credit Agreement Claims will exchange their Claims for either (i) a portion of the New First Lien Term Loan or (ii) a portion of each of the New First Lien Term Loan, the New Second Lien Term Loan and the New Common Stock.

The tax consequences to a Holder who exchanges its Prepetition Credit Agreement Claim depend in part on whether the Claim is a "security" for federal income tax purposes.  Whether a debt instrument constitutes a security depends upon a variety of factors, including the term of the instrument (see "Definition of Security," below).  If a Claim constitutes a security for federal income tax purposes, then the exchange of the Claim for New Common Stock (and the New First Lien Term Loan or New Second Lien Term Loan to the extent these instruments were treated as securities) would be treated as a tax-free transaction for federal income tax purposes.  In such a case, the Holder should not recognize any gain or loss realized for federal income tax purposes with respect to the exchange of its Claim.  A Holder receiving only a portion of the New First Lien Term Loan will have an initial tax basis in the New First Lien Term Loan equal to the adjusted tax basis of its Claim.  A Holder's holding period in the New First Lien Term Loan will include the holding period of the Claim.  A Holder receiving a portion of the New First Lien Term Loan, the New Second Lien Term Loan, and the New Common Stock will allocate its adjusted tax basis in its Claim across the New First Lien Term Loan, the New Second Lien Term Loan, and the New Common Stock to determine the tax basis of each.  A Holder's holding period in the New First Lien Term Loan, the New Second Lien Term Loan, and the New Common Stock will include the holding period of the Claim.

If the Prepetition Credit Agreement Claims are not securities for federal income tax purposes, the Holder of a Prepetition Credit Agreement Claim will be required to recognize gain or loss equal to the full amount of its gain or loss realized on the exchange.  The amount of gain or loss will equal the difference between (i) the adjusted tax basis in the Prepetition Credit Agreement Claim surrendered in the exchange, determined immediately prior to the Effective Date, and (ii) the sum of (A) the "issue price" of each of the New First Lien Term Loan and New Second Lien Term Loan and (B) the fair market value of the New Common Stock it receives in the exchange.

For Holders who elect to receive only a portion of the New First Lien Term Loan, the "issue price" of the New First Lien Term Loan is generally expected to equal the stated redemption price at maturity (as discussed below in "Original Issue Discount") thereof if neither the Prepetition Credit Agreement Claim nor the New First Lien Term Loan is treated as "publicly traded."  If the New First Lien Term Loan is treated as "publicly traded," the issue price is generally expected to equal the fair market value of the New First Lien Term Loan on the Effective Date. If the New First Lien Term Loan is not treated as "publicly traded," but the Prepetition Credit Agreement Claim is treated as "publicly traded," the issue price is generally expected to equal the fair market value of the Prepetition Credit Agreement Claim on the Effective Date.

For Holders who elect to receive portions of both the New First Lien Term Loan and New Second Lien Term Loan, and the New Common Stock, the "issue price" of each of the New First Lien Term Loan and New Second Lien Term Loan depends upon whether the Prepetition Credit Agreement Claim, or either the New First Lien Term Loan or New Second Lien Term Loan, is treated as "publicly traded." If the New First Lien Term Loan is treated as "publicly traded," then the issue price is generally expected to equal its fair market value on the Effective Date. Similarly, if the New Second Lien Term Loan is treated as "publicly traded," the issue price is generally expected to equal its fair market value on the Effective Date.

If the New First Lien Term Loan is not "publicly traded," then its issue price depends on whether the Prepetition Credit Agreement Claim is treated as "publicly traded." If the Prepetition Credit Agreement Claim is treated as "publicly traded," then the issue price of the New First Lien Term Loan is generally expected to equal the fair market value of the Prepetition Credit Agreement Claim on the Effective Date, and is otherwise expected to equal the stated redemption price at maturity of the New First Lien Term Loan. Similarly, if the New Second Lien Term Loan is not "publicly traded," then its issue price depends on whether the Prepetition Credit Agreement Claim is treated as "publicly traded." If the Prepetition Credit Agreement Claim is treated as "publicly traded," then the issue price of the New Second Lien Term Loan is generally expected to equal the fair market value of the Prepetition Credit Agreement Claim on the Effective Date, and is otherwise expected to equal the stated redemption price at maturity of the New Second Lien Term Loan.

For these purposes, a debt instrument generally is treated as "publicly traded" if, at any time during the 60-day period ending 30 days after the issue date, (i) the debt is listed on a national securities exchange or quoted on an interdealer quotation system sponsored by a national securities association, (ii) it appears on a system of general circulation (including a computer listing disseminated to subscribing brokers, dealers or traders) that provides a reasonable basis to determine fair market value by disseminating either recent price quotations (including rates, yields or other pricing information) of one or more identified brokers, dealers or traders or actual prices (including rates, yields or other pricing information) of recent sales transactions or (iii) if, in certain circumstances, price quotations are readily available from dealers, brokers or traders.

Furthermore, (i) the Holder of a Prepetition Credit Agreement Claim will have an initial tax basis in the New First Lien Term Loan and New Second Lien Term Loan it receives in exchange for its Prepetition Credit Agreement Claim equal to the issue prices of such New First Lien Term Loan and New Second Lien Term Loan, and will have an initial tax basis in the New Common Stock it receives in such exchange equal to the fair market value of such stock and (ii) the holding period in the New First Lien Term Loan, New Second Lien Term Loan and New Common Stock a Holder of a Prepetition Credit Agreement Claim receives in the exchange will commence on the day after the Effective Date.

The New First Lien Term Loan and New Second Lien Term Loan will be treated as issued with original issue discount ("OID") equal to the excess of their "stated redemption price at maturity" over their "issue price," having the consequences detailed below under "Original Issue Discount."

If a Holder receives a distribution with respect to the New Common Stock, such Holder will generally be required to include the amount of such distribution in gross income as a dividend to the extent of the current and accumulated "earnings and profits" of Reorganized Lee Enterprises, as computed for federal income tax purposes. In general, for taxable years beginning on or before December 31, 2012, dividends received by a non-corporate Holder will be eligible to be taxed at the preferential tax rates applicable to long-term capital gains.

To the extent that a distribution exceeds current and accumulated "earnings and profits," such distribution will be treated first as a tax-free return of capital to the extent of a Holder's tax basis in the New Common Stock and thereafter as gain from the sale or exchange of the New Common Stock. Furthermore, on the sale, exchange, redemption or other taxable disposition of the New Common Stock, Holders will generally recognize gain or loss in an amount equal to the

difference between the amount realized on such disposition and the Holder's adjusted tax basis in the New Common Stock.  Any such gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if the New Common Stock is held for more than one year.

3.      Holders of Allowed Prepetition PD LLC Notes Claims.

Holders of PD LLC Notes Claims will exchange their Claims for New PD LLC Notes and the Lee Closing Date Payment. The Holder of a Claim will be required to recognize gain or loss equal to the full amount of its gain or loss realized on the exchange.  The amount of gain or loss will equal the difference between (i) the adjusted tax basis in the PD LLC Notes Claim surrendered in the exchange, determined immediately prior to the Effective Date, and (ii) the "issue price" of the New PD LLC Notes the Holder receives in the exchange prior to taking into account the Lee Closing Date Payment.

The "issue price" of the New PD LLC Notes  is generally expected to equal the stated redemption price at maturity (as discussed below in "Original Issue Discount") thereof if neither the PD LLC Notes Claim nor the New PD LLC Notes are treated as "publicly traded."  If the New PD LLC Notes are treated as "publicly traded," the issue price is generally expected to equal the fair market value of the New PD LLC Notes on the Effective Date. If the New PD LLC Notes are not treated as "publicly traded," but the PD LLC Notes Claim is treated as "publicly traded," the issue price is generally expected to equal the fair market value of the PD LLC Notes Claim on the Effective Date. For a discussion of when a debt instrument generally is treated as "publicly traded," see "Holders of Allowed Prepetition Credit Agreement Claims," above.

Furthermore, (i) the Holder of a PD LLC Notes Claim will have an initial tax basis in the New PD LLC Notes it receives in exchange for its PD LLC Notes Claim equal to the issue price of such New PD LLC Notes and (ii) the holding period in the New PD LLC Notes a Holder of a PD LLC Notes Claim receives in the exchange will commence on the day after the Effective Date.

4.      Sale, Exchange or Other Disposition of New Common Stock or New PD LLC Notes.

Upon the sale, exchange or other taxable disposition of New Common Stock or New PD LLC Notes, a Holder generally will recognize gain or loss equal to the difference between (i) the amount of Cash and the fair market value of any property received upon the disposition and (ii) the Holder's adjusted tax basis in the New Common Stock or New PD LLC Notes, as applicable.  Such gain or loss generally will be a capital gain or loss and will be long-term if the Holder's holding period in the New Common Stock or New PD LLC Notes is more than one year.  The deductibility of capital losses is subject to certain limitations.

5.      Consent Fees.

There are no cases or published rulings that directly address the federal income tax consequences of the receipt by a Holder of a Consenting Noteholder Fee, Consenting Lender Fee, or Backstop Lender Fee (each a "Consent Fee", and together, the "Consent Fees").  Possible characterizations of the Consent Fees include treating the Consent Fees as Cash received in the exchange and treating the Consent Fees as consideration received separate from the exchange. If a Consent Fee is treated as Cash received in the exchange, it will increase the amount of gain recognized by the Holder on the exchange. If a Consent Fee is treated as consideration received separate from the exchange, the Consent Fee will be taxable separately as ordinary income and will

not affect the computation of the Holder's gain on the exchange. Holders should consult their own tax advisors regarding the federal, state, local and foreign income and other tax consequences of the receipt of the Consent Fees.

> 6.      <u>Backup Withholding and Information Reporting</u>.

All distributions to Holders under the Plan are subject to any applicable backup withholding requirements under the IRC.  Backup withholding generally applies if the Holder (i) fails to furnish his or her social security number or other taxpayer identification number ("<u>TIN</u>"), (ii) furnishes an incorrect TIN and the payor is so notified by the IRS, (iii) fails to report interest or dividends properly, or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding.  Backup withholding is not an additional tax.  Rather, any amounts withheld from payment to a Holder under the backup withholding rules are allowed as a refund or a credit against such Holder's federal income tax, provided that the required information is furnished to the IRS.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.  Holders should consult their tax advisors regarding the application of backup withholding to their particular situations, the availability of an exemption therefrom and the procedure for obtaining such an exemption, if available.

The Reorganized Debtors (or their Disbursing Agent(s)) may be obligated to provide information statements to the IRS and to Holders who receive distributions under the Plan, reporting such payments (except with respect to Holders that are exempt from the information reporting rules).

> 7.      <u>Original Issue Discount</u>.

The stated redemption price at maturity of a debt instrument is the sum of all payments provided by the debt instrument other than "qualified stated interest" payments.  The term "qualified stated interest" generally means stated interest that is unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually at a single fixed rate.  A Holder generally must include OID in gross income as it accrues, in advance of the receipt of cash attributable to that income, regardless of such Holder's method of accounting for federal income tax purposes. Qualified stated interest on a debt instrument will be taxable to a Holder as ordinary income at the time it is paid or accrued in accordance with such Holder's method of accounting for federal income tax purposes.

The interest on the New First Lien Term Loan and the New Second Lien Term Loan should constitute qualified stated interest and thus the New First Lien Term Loan and the New Second Lien Term Loan will be treated as having OID only to the extent the stated redemption price at maturity of the New First Lien Term Loan exceeds its issue price by more than a specified <u>de minimis</u> amount.

For a debt instrument, the amount of OID required to be included in gross income by a Holder in a taxable year is the sum of the daily portions of OID with respect to the debt instrument for each day during the taxable year on which the Holder is the beneficial owner of the debt instrument.  The daily portion is determined by allocating to each day in any accrual period a pro rata portion of the OID allocable to that accrual period.  Accrual periods with respect to the debt instrument may be of any length and may vary in length over the terms of the debt instrument as

long as (i) no accrual period is longer than one year and (ii) each scheduled payment of interest or principal on the debt instrument occurs on either the first or final day of an accrual period.

The amount of OID that accrues on a debt instrument during an accrual period is equal to the excess, if any, of (i) the product of the debt instrument's "adjusted issue price" at the beginning of the accrual period and the debt instrument's yield to maturity (determined on the basis of compounding at the close of each accrual period and properly adjusted for the length of the accrual period) over (ii) the sum of the amounts payable as qualified stated interest on the debt instrument during the accrual period.

The adjusted issue price of a debt instrument at the beginning of any accrual period is the issue price, increased by the amount of accrued OID for each prior accrual period and decreased by the amount of any payments previously made that were not qualified stated interest payments. The yield to maturity on the debt instrument is the discount rate that, when used in computing the present value of all payments to be made on the debt instrument, produces an amount equal to the issue price of the debt instrument.

The rules regarding OID are complex.  Accordingly, Holders should consult their own tax advisors regarding their application.

8.    Market Discount.

The market discount provisions of the IRC may apply to Holders of certain Claims. In general, a debt obligation acquired by a Holder in the secondary market is a "market discount bond" as to that Holder if its stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, its revised issue price) exceeds, by more than a statutory *de minimis* amount, the tax basis of the debt obligation in the Holder's hands immediately after its acquisition. If a Holder has accrued market discount with respect to its Claims and such Holder realizes gain upon the exchange of its Claims for property pursuant to the Plan, such Holder may be required to include as ordinary income the amount of such accrued market discount to the extent of such realized gain less any portion of such accrued market discount previously included in the Holder's income pursuant to an election.  Holders who have accrued market discount with respect to their Claims should consult their tax advisors as to the application of the market discount rules to them in view of their particular circumstances.

9.    Definition of Security.

The term "security" is not defined in the IRC or in the Treasury Regulations. Whether an instrument constitutes a "security" for federal income tax purposes is determined based on all of the facts and circumstances.  Certain authorities have held that one factor to be considered is the length of the initial term of the debt instrument.  These authorities have indicated that an initial term of less than five years is evidence that the instrument is not a security, whereas an initial term of ten years or more is evidence that it is a security.  Treatment of an instrument with an initial term between five and ten years is generally unsettled.  Numerous factors other than the term of an instrument could be taken into account in determining whether a debt instrument is a security, including, but not limited to, whether repayment is secured, the level of creditworthiness of the obligor, whether or not the instrument is subordinated, whether the holders have the right to vote or otherwise participate in the management of the obligor, whether the instrument is convertible into an equity interest, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or are accrued.

     10.    Non-U.S. Persons.

     A Holder that is a Non-United States Person generally will not be subject to federal income tax with respect to property (including money) received in exchange for a Claim pursuant to the Plan, unless such Non-United States Person (i) is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effectively connected" for federal income tax purposes, or (ii) is an individual and is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met. A Holder who is a Non-U.S. Person engaged in the conduct of a U.S. trade or business will be subject to U.S. federal income tax with respect to gain resulting from receipt of property (including money) received in exchange for a Claim if such gain is effectively connected with such U.S. trade or business.

## D.    IMPORTANCE OF OBTAINING PROFESSIONAL TAX ASSISTANCE

     THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON THE PARTICULAR CIRCUMSTANCES OF A HOLDER OF A CLAIM. ACCORDINGLY, CLAIM HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## E.    RESERVATION OF RIGHTS

     This tax section is subject to change (possibly substantially) based on subsequent changes to other provisions of the Plan. The Prospective Debtors and their advisors reserve the right to further modify, revise or supplement this Article VII and the other tax-related sections of the Plan prior to the date by which objections to Confirmation of the Plan must be filed and served.

## VIII.  CERTAIN FEDERAL AND STATE SECURITIES LAW CONSIDERATIONS

## A.    EXEMPTION FROM REGISTRATION REQUIREMENTS FOR NEW COMMON STOCK AND NEW PD LLC NOTES

     The Debtors will rely on section 1145 of the Bankruptcy Code to exempt the issuance of the New PD LLC Notes and New Common Stock from the registration requirements of the Securities Act and of any state securities laws. Section 1145 of the Bankruptcy Code exempts from registration the offer or sale of securities of the debtor or a successor to a debtor under a chapter 11 plan if such securities are offered or sold in exchange for a claim against, or equity interest in, or a claim for an administrative expense in a case concerning, the debtor or a successor to the debtor under the Plan. The Prospective Debtors believe that the distribution of the New PD LLC Notes and New Common Stock under the Plan will satisfy the requirements of section 1145, and that distribution of both will therefore be exempt from the registration requirements of the Securities Act and state securities laws.

**B.**      **SUBSEQUENT TRANSFERS OF NEW COMMON STOCK AND NEW PD LLC NOTES**

In general, and to the extent that distribution of New Common Stock and New PD LLC Notes satisfies section 1145 of the Bankruptcy Code, recipients of the New Common Stock and New PD LLC Notes will be able to resell the New Common Stock and New PD LLC Notes without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(1) of the Securities Act, unless the holder of such securities is an "underwriter" within the meaning of section 1145(b) of the Bankruptcy Code. In addition, the New Common Stock and New PD LLC Notes generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states. However, Converting Lenders that receive New Common Stock and Noteholders that receive New PD LLC Notes issued pursuant to the Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

Section 1145(b) of the Bankruptcy Code defines "underwriter" as one who (a) purchases a claim with a view to distribution of any security to be received in exchange for such claim, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution, or (d) is an "issuer" of the relevant security, as such term is used in section 2(11) of the Securities Act. Under section 2(11) of the Securities Act, an "issuer" includes any "affiliate" of the issuer, which means any person directly or indirectly through one or more intermediaries controlling, controlled by or under common control with the issuer.

To the extent that recipients of the New Common Stock or New PD LLC Notes under the Plan are deemed to be "underwriters," the resale of the New Common Stock or New PD LLC Notes would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable laws. Persons deemed to be underwriters may, however, be permitted to sell such New Common Stock or New PD LLC Notes, as applicable, without registration pursuant to the provisions of Rule 144 under the Securities Act. This rule permits the public resale of securities received by "underwriters" if current information regarding the issuer is publicly available and if certain volume limitations and other conditions are met.

GIVEN THE COMPLEX NATURE OF THE QUESTIONS RAISED IN THIS ARTICLE, THE PROSPECTIVE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN THE SHARES OF NEW COMMON STOCK OR NEW PD LLC NOTES ISSUED UNDER THE PLAN. THE PROSPECTIVE DEBTORS RECOMMEND THAT CONVERTING LENDERS AND NOTEHOLDERS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES WITHOUT REGISTRATION UNDER THE SECURITIES ACT.

## IX.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed, the alternatives include (a) continuation of the Chapter 11 Cases and formulation of an alternative plan or plans of reorganization or (b) liquidation of the Debtors under Chapter 7 or Chapter 11 of the Bankruptcy Code. Each of these possibilities is discussed in turn below.

A.    **CONTINUATION OF THE CHAPTER 11 CASES**

If the Debtors remain in Chapter 11, the Debtors could continue to operate their businesses and manage their properties as debtors in possession, but they would remain subject to the restrictions imposed by the Bankruptcy Code.  It is not clear whether the Debtors could continue as viable going concerns if the Chapter 11 Cases become protracted.  In particular, the Debtors could face increased costs, more restrictive credit terms from vendors and suppliers, less certain financing terms, and eroding confidence of their customers and trade vendors if the Chapter 11 Cases were to continue indefinitely.  If the Debtors were able to obtain financing and continue as viable going concerns, the Debtors (or other parties in interest) could ultimately propose another plan or plans or attempt to liquidate the Debtors under Chapter 7 or Chapter 11.  Such plans might involve either a reorganization and continuation of the Debtors' businesses, or an orderly liquidation of their assets, or a combination of both.

B.    **LIQUIDATION UNDER CHAPTER 7 OR CHAPTER 11**

If the Plan is not confirmed, the Debtors' Chapter 11 Cases could be converted to liquidation cases under Chapter 7 of the Bankruptcy Code.  In Chapter 7, a trustee would be appointed to liquidate the assets of the Debtors.

The Prospective Debtors believe that in a liquidation under Chapter 7, before creditors received any distributions, additional administrative expenses involved in the appointment of a trustee and attorneys, accountants, and other professionals to assist such trustee, along with an increase in expenses associated with an increase in the number of unsecured claims that would be expected, would cause a substantial diminution in the value of the Estates.  The assets available for distribution to creditors and equity holders would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of the Debtors' operations and the failure to realize the greater going concern value of the Debtors' assets.

The Debtors could also be liquidated pursuant to the provisions of a Chapter 11 plan of reorganization.  In a liquidation under Chapter 11, the Debtors' assets could be sold in a more orderly fashion over a longer period of time than in a liquidation under Chapter 7.  Thus, Chapter 11 liquidation might result in larger recoveries than in a Chapter 7 liquidation, but the delay in distributions could result in lower present values being received and higher administrative costs.  Because a trustee is not required in a Chapter 11 case, expenses for professional fees could be lower than in a Chapter 7 case, in which a trustee must be appointed.  Any distributions to the holders of Claims or Interests under a Chapter 11 liquidation plan probably would be delayed substantially.

**X.  CONCLUSION AND RECOMMENDATION**

The Prospective Debtors believe that Confirmation of the Plan is preferable to the alternatives described above because it provides the greatest distributions and opportunity for distributions to Holders of Claims against and Interests in the Prospective Debtors.  In addition, any alternative to Confirmation of the Plan could result in extensive delays and increased administrative expenses.

Accordingly, the Prospective Debtors urge all Holders of Prepetition Credit Agreement Claims and Holders of PD LLC Notes Claims to vote to accept the Plan and to evidence

such acceptance by returning their Ballots so that they are received no later than 4:00 p.m., prevailing Eastern Time, on December 9, 2011.

Dated: December 2, 2011

Respectfully submitted,

LEE ENTERPRISES, INCORPORATED
(for itself and on behalf of the other Prospective Debtors)


 /s/        *Carl G. Schmidt*                              .
Name:  Carl G. Schmidt
Title:  Vice President, Chief Financial Officer and Treasurer


SIDLEY AUSTIN LLP
Larry J. Nyhan
Kenneth P. Kansa
Bojan Guzina
Christina M. Craige
One South Dearborn Street
Chicago, Illinois 60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

- and -

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Robert S. Brady (No. 2847)
Edwin J. Harron (No. 3396)
Edmon L. Morton (No. 3856)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

Counsel to the Prospective Debtors