# EXHIBIT A

Joint Prepackaged Plan of Reorganization

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| LEE ENTERPRISES, INCORPORATED, <u>et al.</u>,[1] | Case No. 11-_____ ([      ]) |
| Debtors. | Jointly Administered |

## AMENDED JOINT PREPACKAGED PLAN OF REORGANIZATION FOR
## <u>LEE ENTERPRISES, INCORPORATED AND ITS DEBTOR SUBSIDIARIES</u>

SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois  60603
Larry J. Nyhan
Kenneth P. Kansa
Bojan Guzina
Kerriann S. Mills
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Robert S. Brady (No. 2847)
Edwin J. Harron (No. 3396)
Edmon L. Morton (No. 3856)
Wilmington, Delaware 19899-0391
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

Counsel to the Debtors and Debtors in Possession

Dated:  December 2, 2011

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Lee Enterprises, Incorporated (3980); Accudata, Inc. (3648); Fairgrove LLC (N/A); Flagstaff Publishing Co. (4796); Hanford Sentinel, Inc. (0775); Home Choice LLC (3701); HSTAR LLC (N/A); INN Partners, L.C. (9478); Journal Star Printing Co. (6412); Kauai Publishing Co. (7036); Klamath Falls Basin Publishing, Inc. (3285); Lee Consolidated Holdings Co. (2158); Lee Procurement Solutions Co. (6292); Lee Publications, Inc. (1886); Napa Valley Publishing Co. (7802); NIPC, Inc. (9541); NLPC LLC (7381); Northern Lakes Publishing Co. (9679); NVPC LLC (N/A); Pantagraph Publishing Co. (7058); Pulitzer Missouri Newspapers, Inc. (1960); Pulitzer Network Systems LLC (5359); Pulitzer Newspapers, Inc. (1560); Pulitzer Technologies Inc. (8892); Pulitzer Utah Newspapers, Inc. (1884); Pulitzer, Inc. (9711); Santa Maria Times, Inc. (3801); SHTP LLC (N/A); Sioux City Newspapers, Inc. (9191); SOPC LLC (5551); Southwestern Oregon Publishing Co. (0741); St. Louis Post-Dispatch LLC (5357); STL Distribution Services LLC (0922); Suburban Journals of Greater St. Louis LLC (6217); and Ynez Corporation (5443).  The Debtors' corporate headquarters and the mailing address for each Debtor is 201 N. Harrison Street, Suite 600, Davenport, IA  52801.

# TABLE OF CONTENTS

PAGE

ARTICLE I: DEFINED TERMS AND RULES OF INTERPRETATION....................................................... 1

ARTICLE II: TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS,  DIP REVOLVING
    FACILITY CLAIMS, PRIORITY TAX CLAIMS, AND SECTION 507(b) CLAIMS .............. 16

    2.1.    Administrative Expense Claims........................................................................ 16
    2.2.    DIP Revolving Facility Claims ........................................................................ 17
    2.3.    Priority Tax Claims.......................................................................................... 17
    2.4.    Section 507(b) Claims ..................................................................................... 17

ARTICLE III: CLASSIFICATION AND TREATMENT OF  CLASSIFIED CLAIMS AND
    INTERESTS ....................................................................................................................... 18

    3.1.    Summary of Classification and Treatment of Classified Claims and Interests................. 18
    3.2.    Classification and Treatment of Claims Against and Interests in the Lee Debtors
        (Debtors 1-9)..................................................................................................... 19
    3.3.    Classification and Treatment of Claims Against and Interests in the Pulitzer
        Debtors (Debtors 10-35) .................................................................................. 21
    3.4.    Unimpaired Claims and Interests..................................................................... 24

ARTICLE IV: ACCEPTANCE OR REJECTION OF THE PLAN ......................................................... 24

    4.1.    Impaired Classes of Claims Entitled to Vote .................................................. 24
    4.2.    Acceptance by an Impaired Class .................................................................... 24
    4.3.    Presumed Acceptances by Unimpaired Classes............................................... 24
    4.4.    Confirmability and Severability of this Plan ................................................... 24

ARTICLE V: MEANS FOR IMPLEMENTATION OF THE PLAN ....................................................... 25

    5.1.    Non-Substantive Consolidation ...................................................................... 25
    5.2.    Corporate Governance, Directors, Officers and Corporate Action.................. 25
    5.3.    Issuance and Distribution of New Securities ................................................... 26
    5.4.    Reporting Requirements Under Securities Exchange Act of 1934 ................... 27
    5.5.    New Debt Documents....................................................................................... 27
    5.6.    Conversion or Repayment of DIP Revolving Facility Claims.......................... 28
    5.7.    New Second Lien Term Loan Election.............................................................. 28
    5.8.    New First Lien Credit Facility ......................................................................... 28
    5.9.    New Second Lien Term Loan ........................................................................... 28
    5.10.    New PD LLC Notes ......................................................................................... 29
    5.11.    Binding Effect.................................................................................................. 29
    5.12.    Continued Corporate Existence and Vesting of Assets in the Reorganized
        Debtors............................................................................................................. 29
    5.13.    Cancellation of Certain Credit and Debt Documents........................................ 30
    5.14.    Cancellation of Liens ....................................................................................... 30
    5.15.    Additional Transactions Authorized Under this Plan ...................................... 30

ARTICLE VI: TREATMENT OF EXECUTORY CONTRACTS, UNEXPIRED LEASES,
    INSURANCE POLICIES AND EMPLOYEE BENEFIT PLANS ............................................... 31

6.1.    Assumption of Executory Contracts and Unexpired Leases............................................. 31
6.2.    Cure of Defaults Under Assumed Executory Contracts and Unexpired Leases............... 31
6.3.    Assumption of Collective Bargaining Agreements ......................................................... 31
6.4.    Insurance Policies and Agreements ................................................................................ 31
6.5.    Employee Compensation and Benefit Plans .................................................................. 32
6.6.    Post-Petition Contracts and Leases ............................................................................... 32

ARTICLE VII: PROVISIONS GOVERNING DISTRIBUTIONS ............................................................ 32

7.1.    Distributions on Account of Claims Allowed as of the Effective Date ............................ 32
7.2.    Distributions on Account of Claims that Become Allowed after the Effective
    Date................................................................................................................................ 32
7.3.    Distribution Date............................................................................................................ 32
7.4.    Interest on Claims .......................................................................................................... 33
7.5.    Distributions by Disbursing Agent(s) ............................................................................ 33
7.6.    Delivery of Distributions and Undeliverable or Unclaimed Distributions ..................... 33
7.7.    Record Date for Distributions........................................................................................ 33
7.8.    Allocation of Plan Distributions Between Principal and Interest .................................... 34
7.9.    Means of Cash Payment ................................................................................................. 34
7.10.    Withholding and Reporting Requirements ..................................................................... 34
7.11.    Setoff and Recoupment.................................................................................................. 34
7.12.    Fractional Shares ........................................................................................................... 34

ARTICLE VIII: PROCEDURES FOR RESOLVING DISPUTED CLAIMS .......................................... 35

8.1.    Objection to and Estimation of Claims........................................................................... 35
8.2.    No Distributions Pending Allowance ............................................................................. 35
8.3.    Distributions on Account of Disputed Claims Once They Are Allowed........................ 35
8.4.    Reinstated Claims and Interests ..................................................................................... 35

ARTICLE IX: CONFIRMATION AND CONSUMMATION OF THE PLAN ....................................... 35

9.1.    Condition to Confirmation.............................................................................................. 35
9.2.    Conditions to Effective Date........................................................................................... 35
9.3.    Waiver of Conditions..................................................................................................... 36
9.4.    Vacation of Confirmation Order ..................................................................................... 36
9.5.    Notice of Effective Date ................................................................................................. 36

ARTICLE X: EFFECT OF PLAN CONFIRMATION ........................................................................... 37

10.1.    Discharge ....................................................................................................................... 37
10.2.    **Releases by the Debtors** ............................................................................................. 37
10.3.    **Releases by Certain Holders of Claims** ...................................................................... 38
10.4.    Exculpation .................................................................................................................... 38
10.5.    Injunction Related to Exculpation .................................................................................. 39
10.6.    Survival of Indemnification Obligations ........................................................................ 39
10.7.    Term of Bankruptcy Injunction or Stays ....................................................................... 39

ARTICLE XI: RETENTION OF JURISDICTION ................................................................................... 39

ARTICLE XII: MISCELLANEOUS PROVISIONS ............................................................................ 41

    12.1.    Surrender of Instruments .............................................................................. 41
    12.2.    Post-Confirmation Date Retention of Professionals ........................................... 42
    12.3.    Bar Date for Certain Administrative Expense Claims ........................................ 42
    12.4.    Effectuating Documents and Further Transactions ............................................ 42
    12.5.    Corporate Action ........................................................................................ 42
    12.6.    Exemption from Transfer Taxes ..................................................................... 43
    12.7.    Payment of Statutory Fees ............................................................................ 43
    12.8.    Payment of Consenting Lender Fees, Consenting Noteholder Fees, and Backstop
           Lender Fees ................................................................................................ 43
    12.9.    Support Agreements ..................................................................................... 43
    12.10.    Amendment or Modification of this Plan ........................................................ 43
    12.11.    Severability of Plan Provisions ..................................................................... 43
    12.12.    Successors and Assigns ................................................................................ 44
    12.13.    Revocation, Withdrawal or Non-Consummation .............................................. 44
    12.14.    Notice ........................................................................................................ 44
    12.15.    Governing Law ........................................................................................... 45
    12.16.    Tax Reporting and Compliance ..................................................................... 45
    12.17.    Exhibits ..................................................................................................... 45
    12.18.    Filing of Additional Documents .................................................................... 45
    12.19.    Reservation of Rights ................................................................................... 45

## EXHIBITS

Exhibit 1.16     –   Amended and Restated By-Laws of Reorganized Lee Enterprises

Exhibit 1.18     –   Amended and Restated Certificate of Incorporation of Reorganized Lee
                     Enterprises

Exhibit 1.73     –   New First Lien Credit Agreement (inclusive of all exhibits thereto)

Exhibit 1.79     –   New Lee Intercreditor Agreement

Exhibit 1.80     –   New PD LLC Intercreditor Agreement

Exhibit 1.83     –   New PD LLC Notes Agreement (inclusive of all exhibits thereto)

Exhibit 1.85     –   New PD LLC Notes Subsidiary Guaranty Agreement

Exhibit 1.86     –   New Pulitzer Guaranty Agreement

Exhibit 1.89     –   New Second Lien Term Loan Agreement (inclusive of all exhibits thereto)

Exhibit 5.2.2    –   Directors and Officers of Reorganized Lee Enterprises

Exhibit 5.2.3    –   Directors and Officers of the Reorganized Debtors other than Reorganized
                     Lee Enterprises

# INTRODUCTION

Lee Enterprises, Incorporated ("Lee Enterprises") and those Affiliates of Lee Enterprises listed in footnote 1 hereto hereby propose the following joint plans of reorganization for their reorganization cases under Chapter 11 of the Bankruptcy Code for the resolution of the outstanding Claims against and Interests in each of the Debtors. Capitalized terms used but not defined in this paragraph have the meanings assigned to them in Article I of this Plan. The classification and treatment of Claims against and Interests in the Debtors is set forth in Article II and Article III of this Plan. The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code. Reference is made to the Disclosure Statement, distributed contemporaneously herewith, for a discussion of the Debtors' history, business, properties and operations, projections for those operations, risk factors, a summary and analysis of this Plan, and related matters.

## ARTICLE I:
## DEFINED TERMS AND RULES OF INTERPRETATION

A.    Defined Terms.  As used in this Plan, capitalized terms shall have the meanings set forth in this Article I.  Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

1.1    Administrative Expense Claim means a Claim for costs and expenses of administration of the Chapter 11 Cases arising on or after the Petition Date and prior to the Effective Date under sections 328, 330, 363, 365, 503(b), or 507(a)(2) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary costs and expenses of preserving the Estates and operating the businesses of the Debtors from and after the Petition Date (such as wages, salaries and commissions for services and payments for inventory, leased equipment and premises) and Claims of governmental units for taxes (including tax audit Claims) related to tax years commencing after the Petition Date, but excluding Claims related to tax periods, or portions thereof, ending on or before the Petition Date; (b) all compensation for actual and necessary legal, financial, advisory, accounting and other services provided by the Professionals and the reimbursement of actual and necessary expenses incurred by the Professionals pursuant to sections 328 or 330 of the Bankruptcy Code; (c) with the exception of Section 507(b) Claims, any indebtedness or obligations incurred or assumed by the Debtors during the Chapter 11 Cases; (d) any payment to be made under this Plan or otherwise to cure a default under an executory contract or unexpired lease that has been or will be assumed by any of the Debtors; or (e) any fees and charges assessed against the Estates under section 1930, Chapter 123, of Title 28 of the United States Code.

1.2    Affiliate has the meaning assigned to such term in section 101(2) of the Bankruptcy Code and when used in this Plan with reference to any Debtor shall include, but not be limited to, each of the other Debtors.

1.3    Allowed means, with respect to any Claim or Interest, or any portion thereof, in any Class or category specified, a Claim or Interest arising on or before the Effective Date (a) (i) as to which no objection to allowance has been interposed in accordance with Section 8.1 of this

Plan or (ii) as to which any objection has been settled, waived, withdrawn or denied by a Final Order; or (b) that is expressly allowed (i) by a Final Order, (ii) by an agreement between the Holder of such Claim or Interest and the Debtors or the Reorganized Debtors, or (iii) pursuant to the terms of this Plan; provided, however, that, as to subparagraph (a) only, "Allowed" shall not include any Claim subject to disallowance in accordance with section 502(d) of the Bankruptcy Code.

1.4     Allowed           Claim or Interest means a Claim or Interest in a particular Class or of a particular type that is also an Allowed Claim or Interest.  For example, an Allowed Administrative Expense Claim is an Administrative Expense Claim that is also an Allowed Claim.

1.5     Avoidance Actions means causes of action arising under sections 542, 544, 545, 547, 548, 549, 550, 551 or 553(b) of the Bankruptcy Code, or under similar or related state or federal statutes or common law, including fraudulent transfer laws, in each case whether or not litigation to prosecute such causes of action was commenced prior to the Effective Date.

1.6     Backstop Cash means an amount of Cash, up to an aggregate amount of $10,000,000, that one or more Backstop Lenders may pay to Reorganized Lee Enterprises on the Effective Date to acquire the portion of the New Second Lien Term Loan that such Backstop Lender has committed to acquire pursuant to the terms and conditions of the applicable Backstop Commitment Letter.

1.7     Backstop Commitment Amount(s) means, individually or collectively, the maximum amount of Prepetition Credit Agreement Claims that each Backstop Lender has committed, pursuant to the terms and conditions of the relevant Backstop Commitment Letter, to convert (and, if necessary, pay Backstop Cash) to acquire up to $175,000,000, which amount includes an original issue discount of 5%, of the New Second Lien Term Loan Facility.

1.8     Backstop Commitment Letter(s) means, individually or collectively, (a) that certain Amended and Restated Backstop Commitment Letter between Lee Enterprises and Goldman Sachs Lending Partners LLC, dated December 2, 2011, (b) that certain Amended and Restated Backstop Commitment Letter between Lee Enterprises and Mutual Quest Fund, dated December 2, 2011, (c) that certain Amended and Restated Backstop Commitment Letter between Lee Enterprises and Monarch Master Funding Ltd, dated December 2, 2011, (d) that certain Backstop Commitment Letter between Lee Enterprises and Mudrick Distressed Opportunity Fund Global, LP, dated December 2, 2011, and (e) that certain Backstop Commitment Letter between Lee Enterprises and Blackwell Partners, LLC, dated December 2, 2011.

1.9     Backstop Lender(s) means, individually or collectively, the Initial Backstop Lenders and any assignee thereof, in accordance with the terms of the applicable Backstop Commitment Letter.

1.10    Backstop Lender Fees means commitment fees equal to 0.5% of the Backstop Lenders' aggregate Backstop Commitment Amounts, incurred by the Lee Debtors in connection with the transactions contemplated by the Backstop Commitment Letters.

1.11     Ballot means the ballot form for accepting or rejecting this Plan and making certain elections under this Plan, distributed with the Disclosure Statement to the Holders of Claims that are Impaired under this Plan and entitled to vote to accept or reject this Plan pursuant to Article III and Article IV hereof.

1.12     Bankruptcy Code means Title 11 of the United States Code, 11 U.S.C. §§ 101 through 1532, as in effect on the Petition Date, together with any amendments and modifications thereto that may subsequently be made applicable to the Chapter 11 Cases.

1.13     Bankruptcy Court means the United States Bankruptcy Court for the District of Delaware or any other court with jurisdiction over the Chapter 11 Cases.

1.14     Bankruptcy Rules means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of Title 28 of the United States Code and any local rules of the Bankruptcy Court, as in effect on the Petition Date, together with any amendments and modifications thereto that may subsequently be made applicable to the Chapter 11 Cases.

1.15     Business Day means any day other than a Saturday, a Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

1.16     By-Laws means the Amended By-Laws of Lee Enterprises, effective May 17, 2007, together with any amendments thereto, which shall be substantially in the form of Exhibit 1.16 to this Plan.

1.17     Cash means legal tender of the United States of America.

1.18     Certificate of Incorporation means the Restated Certificate of Incorporation of Lee Enterprises, as of March 3, 2005, as amended in accordance with Section 5.2.1 of this Plan. The Certificate of Incorporation shall be substantially in the form of Exhibit 1.18 to this Plan.

1.19     Chapter 11 Cases means the voluntary cases under Chapter 11 of the Bankruptcy Code commenced by the Debtors in the Bankruptcy Court on the Petition Date.

1.20     Claim means a "claim," as defined in section 101(5) of the Bankruptcy Code.

1.21     Class means each category of Holders of Claims or Interests established under Article III of this Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

1.22     Collective Bargaining Agreements means all collective bargaining agreements to which any of the Debtors is a party on the Confirmation Date.

1.23     Confirmation means the entry of the Confirmation Order by the Bankruptcy Court.

1.24     Confirmation Date means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the Bankruptcy Court's docket.

3

1.25    Confirmation Hearing means the hearing held by the Bankruptcy Court on confirmation of this Plan, as such hearing may be continued from time to time.

1.26    Confirmation Order means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, which order shall be in form and substance reasonably satisfactory to the Prepetition Administrative Agent, the Initial Backstop Lenders, and the Required Consenting Noteholders.

1.27    Consenting Lenders means (a) those certain Holders of Prepetition Credit Agreement Claims that are signatories to the Lee Support Agreement and (b) any Joining Lender Party.

1.28    Consenting Lender Fees means the balance of the consent fees not paid to the Consenting Lenders prior to the Petition Date, as set forth in section 4.6 of the Lee Support Agreement and incurred by the Lee Debtors in connection with the transactions contemplated by the Lee Support Agreement.

1.29    Consenting Noteholders means (a) those certain Holders of PD LLC Notes Claims that are signatories to the Pulitzer Support Agreement and (b) any Joining Noteholder Party.

1.30    Consenting Noteholder Fees means the balance of the consent fees not paid to the Consenting Noteholders prior to the Petition Date, as set forth in section 4.6 of the Pulitzer Support Agreement and incurred by the Pulitzer Debtors in connection with the transactions contemplated by the Pulitzer Support Agreement.

1.31    Converting Lenders means those certain Holders (or an advisor, nominee, or investment manager for beneficial holder(s)) of Prepetition Credit Agreement Claims that elect to convert all or a portion of their funded Prepetition Credit Agreement Claims into an applicable share of the New Second Lien Term Loan by making the New Second Lien Term Loan Election and, for the avoidance of doubt, includes each Backstop Lender.

1.32    DBSI means Deutsche Bank Securities Inc.

1.33    DBTCA means Deutsche Bank Trust Company Americas.

1.34    Debtor(s) means, individually or collectively, the debtors and debtors in possession identified in footnote 1 hereto.

1.35    DIP Revolving Facility Agent means DBTCA in its capacity as the administrative agent under the DIP Revolving Facility Agreement.

1.36    DIP Revolving Facility Agreement means that certain Credit and Guaranty Agreement, by and among Lee Enterprises, as borrower, the Lee Subsidiary Debtors, as guarantors, the DIP Revolving Facility Agent, and the DIP Revolving Facility Lenders, as the same may be amended, modified, or supplemented from time to time.

1.37    DIP Revolving Facility Claims means all Claims against the Lee Debtors held by the DIP Revolving Facility Agent and the DIP Revolving Facility Lenders pursuant to the DIP Revolving Facility Documents and the interim order and Final Order approving the Lee Debtors' entry into and performance of their obligations under the DIP Revolving Facility Documents.

1.38    DIP Revolving Facility Commitment Letter means that certain commitment letter, entered into by and among Lee Enterprises, DBTCA, DBSI, and the other "Commitment Parties" (as defined therein), including all exhibits and attachments thereto.

1.39    DIP Revolving Facility Documents means collectively, the DIP Revolving Facility Agreement and all other agreements (including, without limitation, any guaranty agreements, pledge and collateral agreements, and intercompany subordination agreements), documents and instruments delivered in connection therewith.

1.40    DIP Revolving Facility Lenders means the "Commitment Parties" (and their successors and assigns) as defined in and pursuant to the DIP Revolving Facility Commitment Letter.

1.41    Disallowed Claim means any Claim, including any portion thereof, that has been disallowed, denied, dismissed, expunged, or overruled pursuant to a Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

1.42    Disbursing Agent(s) means any Entity in its capacity as a disbursing agent under this Plan.

1.43    Disclosure Statement means the disclosure statement relating to this Plan, including, without limitation, all exhibits and schedules thereto, as the same may be amended, supplemented or otherwise modified from time to time, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

1.44    Disputed Claim means any Claim, including any portion thereof, (a) that is neither an Allowed Claim nor a Disallowed Claim, or (b) to the extent the Debtors or any party in interest have interposed a timely objection or request for estimation of such Claim, which objection or request for estimation has not been withdrawn or determined pursuant to a Final Order.

1.45    Distribution Record Date means the Confirmation Date or such other date as may be designated in the Confirmation Order.

1.46    DS LLC means STL Distribution Services LLC.

1.47    DTC means The Depository Trust Company.

1.48    Effective Date means, and shall occur on, the Business Day on which (i) each of the conditions precedent to the occurrence of the Effective Date set forth in Article IX of this Plan has been satisfied or waived in accordance with the terms thereof and (ii) the Debtors file with the Bankruptcy Court a notice indicating the same and transmit a copy of such notice to (a)

counsel to the Prepetition Administrative Agent and the Backstop Lenders and (b) counsel to the Required Consenting Noteholders.

1.49    <u>Employee Benefit Plans</u> means any employment, tax qualified or non-tax qualified Pension Plan, Multiemployer Pension Plan, welfare, healthcare, bonus, incentive compensation, sick leave and other leave, vacation pay, business expense reimbursement, dependent care, retirement, savings, deferred compensation, supplemental pension, workers compensation, life insurance, disability, dependent care, dependent healthcare, education, severance or other compensation or benefit plans, agreements or arrangements for the benefit of the current or former directors, officers or employees (whether salaried or hourly, active or retired) of the applicable Debtor.

1.50    <u>Entity</u> means an entity as defined in section 101(15) of the Bankruptcy Code.

1.51    <u>Estate(s)</u> means, individually or collectively, the estate or estates of the Debtors created in the Chapter 11 Cases under section 541 of the Bankruptcy Code.

1.52    <u>Exhibit(s)</u> means, individually or collectively, the exhibits to this Plan.

1.53    <u>Final Order</u> means an order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases (or on the docket of any other court of competent jurisdiction), which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for <u>certiorari</u> or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for <u>certiorari</u> or other proceedings for a new trial, reargument or rehearing shall then be pending, or (b) if an appeal, writ of <u>certiorari</u>, new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or <u>certiorari</u> shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for <u>certiorari</u> or move for a new trial, reargument or rehearing shall have expired; <u>provided</u>, <u>however</u>, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause such order not to be a Final Order.

1.54    <u>General Unsecured Claim</u> means a Claim against any Debtor that is not an Administrative Expense Claim, a DIP Revolving Facility Claim, a Priority Tax Claim, a Section 507(b) Claim, a Priority Non-Tax Claim, an Other Secured Claim, a Prepetition Credit Agreement Claim, a PD LLC Notes Claim, an Intercompany Claim, or the Herald Claim.

1.55    <u>Herald Claim</u> means the Claim of The Herald Publishing Company LLC against PD LLC and DS LLC arising under and pursuant to that certain Redemption Agreement dated as of February 18, 2009, which Claim is, <u>inter alia</u>, subordinated in all respects to the PD LLC Notes Claims.

1.56    <u>Holder</u> means an Entity holding a Claim against, or Interest in, any Debtor.

1.57    <u>Impaired</u> means "impaired" within the meaning of section 1124 of the Bankruptcy Code.

1.58    Initial Backstop Lender(s) means, individually or collectively, (a) Goldman Sachs Lending Partners LLC, (b) Mutual Quest Fund, (c) Monarch Master Funding Ltd, (d) Mudrick Distressed Opportunity Fund Global, LP, and (e) Blackwell Partners, LLC, each party to its own Backstop Commitment Letter.

1.59    Intercompany Claim means any Claim against a Debtor that is held by another Debtor or a non-Debtor Affiliate of any Debtor.

1.60    Interest means the interest of any Holder of equity securities in any Debtor that is represented by any issued and outstanding common stock, preferred stock, limited liability company interest, partnership interest, or any other instrument evidencing an ownership interest in such Debtor prior to the Effective Date (including prior to the Petition Date), whether or not transferable, and any restricted stock units, calls, rights, puts, awards, commitments, repurchase rights, unvested or unexercised options, rights of conversion, warrants, unvested common interests, unvested preferred interests or any other agreements of any character related to the common or preferred interests of any such Debtor, obligating any such Debtor to issue, transfer, purchase, redeem, or sell any equity interests or other equity securities, any rights under any equity incentive plans, voting agreements and registration rights agreements regarding equity securities of any such Debtor, any claims arising from the rescission of a purchase, sale or other acquisition of any outstanding common stock, preferred stock or other equity securities (or any right, claim, or interest in and to any common stock, preferred stock or other equity securities) of any such Debtor, any Claims for the payment of any distributions with respect to any common stock, preferred stock, or other equity interests in or securities of such Debtor, and any claims for damages or any other relief arising from the purchase, sale, or other acquisition of any such Debtor's outstanding common stock, preferred stock, or other equity interests or securities.

1.61    Joining Lender Party means any Person or Entity that (a) receives or acquires a portion of the Prepetition Credit Agreement Claims pursuant to a sale, assignment, transfer, hypothecation or other disposition of such Claims by a Consenting Lender and (b) executes a Lender Joinder, in each case in accordance with the terms of the Lee Support Agreement.

1.62    Joining Noteholder Party means any Person or Entity that (a) receives or acquires a portion of the PD LLC Notes Claims pursuant to a sale, assignment, transfer, hypothecation or other disposition of such Claims by a PD LLC Noteholder and (b) executes a Noteholder Joinder, in each case in accordance with the terms of the Pulitzer Support Agreement.

1.63    Lee Closing Date Payment means a payment of $5,000,000 to be made by Reorganized PD LLC, utilizing funds made available to it by Reorganized Lee Enterprises, to the Holders of the New PD LLC Notes on the Effective Date, concurrently with the other transactions that will be authorized on the Effective Date pursuant to Article V of this Plan, which payment shall be deemed a prepayment of the New PD LLC Notes in the amount of $5,000,000, in accordance with the terms of the New PD LLC Notes Agreement.

1.64    Lee Debtors means, collectively, Lee Enterprises and the Lee Subsidiary Debtors.

1.65    Lee Enterprises has the meaning set forth in the Introduction to this Plan.

1.66    Lee Subsidiary Debtors means, collectively, Accudata, Inc.; INN Partners, L.C.; Journal-Star Printing Co.; Klamath Falls Basin Publishing, Inc.; Lee Consolidated Holdings Co.; Lee Publications, Inc.; Lee Procurement Solutions Co.; and Sioux City Newspapers, Inc.

1.67    Lee Support Agreement means that certain Support Agreement, entered into by and among the Debtors and the Consenting Lenders, dated as of August 11, 2011 (including all exhibits and attachments thereto) and which became effective on September 8, 2011, as amended by the First Amendment to Support Agreement dated December 2, 2011 and as it may be further amended or otherwise modified from time to time in accordance with the terms thereof.  A copy of the Lee Support Agreement is attached to the Disclosure Statement as Exhibit B.

1.68    Lender Joinder means a joinder to the Lee Support Agreement that complies with the requirements set forth in section 7.1(c) of the Lee Support Agreement and is executed by a Joining Lender Party and delivered to counsel to the Debtors and counsel to the Prepetition Administrative Agent.

1.69    Lien means, with respect to any interest in property, any mortgage, lien, pledge, charge, security interest, easement or encumbrance of any kind whatsoever affecting such interest in property.

1.70    Maximum Exchange Amount means the maximum amount of funded Prepetition Credit Agreement Claims that a particular Holder of Prepetition Credit Agreement Claims can convert into loans under the New Second Lien Term Loan, which shall be equal to $166,250,000 multiplied by the amount of such Holder's funded Prepetition Credit Agreement Claims divided by the aggregate amount of all funded Prepetition Credit Agreement Claims, with such calculation determined as of (a) with respect to Consenting Lenders, the date such Consenting Lender executed its signature page to the Lee Support Agreement or Lender Joinder, as applicable, or (b) with respect to Holders of funded Prepetition Credit Agreement Claims that are not Consenting Lenders, the date such Holder executed and delivered its Ballot; provided, however, that the Maximum Exchange Amount shall not apply to the funded Prepetition Credit Agreement Claims converted by the Backstop Lenders into loans under the New Second Lien Term Loan.

1.71    Multiemployer Pension Plan means a plan (i) to which more than one employer is required to contribute, (ii) which is maintained pursuant to one or more collective bargaining agreements between one or more employee organizations and more than one employer, and (iii) which satisfies such other requirements contained in regulations promulgated by the United States Department of Labor.

1.72    New Common Stock means the approximately 6,743,640 shares of duly and validly issued new common stock in Reorganized Lee Enterprises, which will be issued (or shall be authorized to be issued) by Reorganized Lee Enterprises on, or as soon as reasonably practicable after, the Effective Date pursuant to this Plan and distributed to the Converting Lenders as set forth in Sections 3.2.3(c) and 5.3 of this Plan.

1.73    New First Lien Credit Agreement means that certain credit agreement, effective as of the Effective Date, by and among Reorganized Lee Enterprises, as borrower, DBTCA, as

administrative agent and sole collateral agent, and the New First Lien Lenders, which shall be substantially in the form of <u>Exhibit 1.73</u> to this Plan.

      1.74    <u>New First Lien Credit Facility</u> means, collectively, the New First Lien Term Loan and the New First Lien Revolving Credit Facility.

      1.75    <u>New First Lien Credit Facility Documents</u> means, collectively, the New First Lien Credit Agreement, the New Lee Intercreditor Agreement, and all other agreements (including, without limitation, any guaranty agreements, pledge and collateral agreements, and intercompany subordination agreements), documents and instruments delivered in connection therewith.

      1.76    <u>New First Lien Lenders</u> means, as of the Effective Date, all Holders of Prepetition Credit Agreement Claims and DIP Revolving Facility Claims that receive loans under the New First Lien Term Loan or hold commitments or loans under the New First Lien Revolving Credit Facility and, after the Effective Date, their permitted assigns.

      1.77    <u>New First Lien Revolving Credit Facility</u> means that certain superpriority revolving facility in an aggregate principal amount of up to $40,000,000 provided under the New First Lien Credit Agreement.

      1.78    <u>New First Lien Term Loan</u> means that certain term loan facility in an aggregate principal amount of up to $689,510,000 provided under the New First Lien Credit Agreement.

      1.79    <u>New Lee Intercreditor Agreement</u> means that certain intercreditor agreement, effective as of the Effective Date, by and among DBTCA, as collateral agent under the New First Lien Credit Facility Documents, Wilmington Trust, N.A. as collateral agent under the New Second Lien Term Loan Documents, and Reorganized Lee Enterprises, as the borrower thereunder, and each of the other loan parties party thereto, which shall be substantially in the form of <u>Exhibit 1.79</u> to this Plan.

      1.80    <u>New PD LLC Intercreditor Agreement</u> means that certain Intercreditor Agreement, effective as of the Effective Date, by and among Wilmington Trust, N.A. as collateral agent under the New Second Lien Term Loan Documents, certain of the Reorganized Debtors, and the PD LLC Notes Collateral Agent, which shall be substantially in the form of <u>Exhibit 1.80</u> to this Plan.

      1.81    <u>New PD LLC Noteholder</u> means the Holder of a New PD LLC Note.

      1.82    <u>New PD LLC Notes</u> means the secured promissory notes that will be issued by Reorganized PD LLC on the Effective Date pursuant to the New PD LLC Notes Agreement and this Plan, in an aggregate principal amount equal to (i) the principal amount of the PD LLC Notes outstanding on the Effective Date minus the Lee Closing Date Payment plus (ii) a non-refundable fee in the amount of $3,500,000, which shall be earned in full on the Effective Date and payable-in-kind (such that, for the avoidance of doubt, the aggregate principal amount of the New PD LLC Notes on the Effective Date shall be $126,355,000), the terms of which are set forth in the New PD LLC Notes Agreement.

1.83    New PD LLC Notes Agreement means that certain amended and restated PD LLC Notes Agreement, effective as of the Effective Date, by and among PD LLC and the New PD LLC Noteholders party thereto on the Effective Date, pursuant to which the New PD LLC Notes will be issued.  The New PD LLC Notes Agreement shall be substantially in the form of Exhibit 1.83 to this Plan.

1.84    New PD LLC Notes Documents means collectively, the New PD LLC Notes, the New PD LLC Notes Agreement, the New PD LLC Intercreditor Agreement, the New PD LLC Notes Subsidiary Guaranty Agreement, the New Pulitzer Guaranty Agreement, and all agreements (including, without limitation, any pledge and collateral agreements, and intercompany subordination agreements), documents and instruments delivered in connection therewith.

1.85    New PD LLC Notes Subsidiary Guaranty Agreement means that certain Guaranty Agreement, effective as of the Effective Date, made by (i) the Pulitzer Subsidiary Debtors other than PD LLC and (ii) Star Publishing Company, an Arizona corporation, in favor of the holders of the New PD LLC Notes, which shall be in substantially the form of Exhibit 1.85 to this Plan.

1.86    New Pulitzer Guaranty Agreement means that certain Guaranty Agreement, effective as of the Effective Date, made by Pulitzer in favor of the holders of the New PD LLC Notes, which shall be in substantially the form of Exhibit 1.86 to this Plan.

1.87    New Second Lien Lenders means, as of the Effective Date, all Holders of Prepetition Credit Agreement Claims that receive loans under the New Second Lien Term Loan Agreement and, after the Effective Date, their permitted assigns.

1.88    New Second Lien Term Loan means that certain second lien term loan in an aggregate principal amount of $175,000,000 provided under the New Second Lien Term Loan Agreement.

1.89    New Second Lien Term Loan Agreement means that certain second lien term loan agreement, effective as of the Effective Date, by and among Reorganized Lee Enterprises, as borrower, Wilmington Trust, N.A., as administrative agent and collateral agent, and the New Second Lien Lenders.  The New Second Lien Term Loan Agreement shall be substantially in the form of Exhibit 1.89 to this Plan, with such modifications, if any, that are reasonably satisfactory to the Prepetition Administrative Agent and the Initial Backstop Lenders.

1.90    New Second Lien Term Loan Documents means, collectively, the New Second Lien Term Loan Agreement, the New Lee Intercreditor Agreement, the New PD LLC Intercreditor Agreement, and all other agreements (including, without limitation, any guaranty agreements and pledge and collateral agreements), documents and instruments delivered in connection therewith, in each case with such modifications, if any, that are reasonably satisfactory to the Prepetition Administrative Agent and the Initial Backstop Lenders.

1.91    New Second Lien Term Loan Election means an irrevocable election made by certain Holders of Allowed Prepetition Credit Agreement Claims (or an advisor, nominee, or investment manager for beneficial holder(s)) to convert all or a portion of such Holder's funded Prepetition Credit Agreement Claims into a pro rata share of the New Second Lien Term Loan.

Each such Holder's converted amount shall be (a) as set forth on Annex II to the Lee Support Agreement or, in the case of a Backstop Lender, as set forth on Annex II to the Lee Support Agreement plus any additional amounts converted pursuant to such Backstop Lender's commitments under the relevant Backstop Commitment Letter, (b) as set forth on the annex to the Lender Joinder executed by such Holder if such Holder is a Joining Lender Party, or (c) to the extent such Holder has not executed the Lee Support Agreement or a Lender Joinder, as set forth on the Ballot completed by such Holder; provided, however, that for each Holder of an Allowed Prepetition Credit Agreement Claim that executed and delivered the Lee Support Agreement and made the New Second Lien Term Loan Election, the converted amount shall also appear on such Holder's Ballot; provided further, with respect to any Holder other than a Backstop Lender, in no event shall such Holder's New Second Lien Term Election exceed such Holder's Maximum Exchange Amount; and provided further that each Backstop Lender shall be obligated (on the terms and subject to the conditions set forth in the applicable Backstop Commitment Letter) to convert into the New Second Lien Term Loan the amount of such Backstop Lender's funded Prepetition Credit Agreement Claims that is necessary to satisfy such Backstop Lender's commitments under the applicable Backstop Commitment Letter.

1.92    Noteholder Joinder means a joinder to the Pulitzer Support Agreement that complies with the requirements set forth in section 7.1(c) of the Pulitzer Support Agreement and is executed by a Joining Noteholder Party and delivered to counsel to the Debtors.

1.93    Other Secured Claim means any Secured Claim other than a DIP Revolving Facility Claim, a Prepetition Credit Agreement Claim or a PD LLC Notes Claim.

1.94    PD LLC means St. Louis Post-Dispatch LLC.

1.95    PD LLC Noteholder means the Holder of a PD LLC Note.

1.96    PD LLC Noteholders' Fees means the reasonable fees, expenses, disbursements and indemnity claims, including, without limitation, attorney and agent fees, expenses and disbursements, incurred by the PD LLC Noteholders, whether prior to or after the Petition Date, and until the Effective Date, as required to be paid by PD LLC pursuant to the PD LLC Notes Agreement.

1.97    PD LLC Notes means the notes issued and outstanding under the PD LLC Notes Documents, which have been issued Private Placement Number 85229*AB2 by Standard & Poor's CUSIP Service Bureau.

1.98    PD LLC Notes Agreement means the PD LLC Note Agreement, dated as of May 1, 2000, as amended by (i) Amendment No. 1 to Note Agreement dated as of November 23, 2004, (ii) Amendment No. 2 to Note Agreement dated as of February 1, 2006, (iii) Amendment No. 3 to Note Agreement dated as of November 19, 2008, (iv) the Limited Waiver to Note Agreement and Guaranty Agreement (as amended), dated as of December 26, 2008, (v) Amendment No. 4 and First Amendment to Limited Waiver to Note Agreement and Guaranty Agreement, dated as of January 16, 2009, (vi) Limited Waiver and Amendment No. 5 to Note Agreement, dated as of February 18, 2009, (vii) Amendment No. 6 to Note Agreement dated as of April 6, 2011; and (viii) and Limited Amendment No. 7 to Note Agreement dated as of

November 7, 2011, as such agreement may be further amended, modified, or supplemented from time to time.

1.99  PD LLC Notes Claims means all Claims against the Debtors arising under, evidenced by, or secured pursuant to, the PD LLC Notes Documents.

1.100  PD LLC Notes Collateral Agent means The Bank of New York Mellon Trust Company, N.A., in its capacity as collateral agent under the PD LLC Notes Security Agreement.

1.101  PD LLC Notes Documents means, collectively, the PD LLC Notes Agreement and all other agreements (including, without limitation, any guaranty agreements, pledge agreements, and collateral agreements), documents, and instruments delivered in connection therewith.

1.102  PD LLC Notes Guaranty Agreements means, collectively, (i) that certain Guaranty Agreement, dated as of May 1, 2000, as amended by (a) Amendment No. 1 to Guaranty Agreement, dated as of August 7, 2000, (b) Amendment No. 2 to Guaranty Agreement, dated as of November 23, 2004, (c) Amendment No. 3 to Guaranty Agreement, dated as of June 3, 2005, (d) Amendment No. 4 to Guaranty Agreement, dated as of February 1, 2006, and (e) Limited Waiver and Amendment No. 5 to Guaranty Agreement, dated as of February 18, 2009, in each case between Pulitzer and the PD LLC Noteholders then party to the PD LLC Notes Agreement and (ii) that certain Subsidiary Guaranty Agreement, dated as of February 18, 2009, between the Pulitzer Debtors other than Pulitzer, on the one hand, and the PD LLC Noteholders then party to the PD LLC Notes Agreement, on the other hand.

1.103  PD LLC Notes Security Agreement means that certain Security Agreement dated as of February 18, 2009 (as amended, restated, supplemented, or otherwise modified) by Pulitzer and certain of its subsidiaries in favor of the PD LLC Notes Collateral Agent, on behalf of and for the benefit of the PD LLC Noteholders.

1.104  Pension Plan means an employee pension benefit plan within the meaning of section (2)(A) of the Employee Retirement Income Security Act of 1974, as amended, but excludes Multiemployer Pension Plans.

1.105  Person means any individual, corporation, partnership, association, joint stock company, joint venture, limited liability company, limited liability partnership, trust, estate, unincorporated organization or other entity, or any domestic or foreign government, governmental agency, or any subdivision, department or other instrumentality thereof.

1.106  Petition Date means the date on which the Debtors commenced the Chapter 11 Cases.

1.107  Plan means this Chapter 11 plan of reorganization, including all Exhibits, supplements, appendices and schedules hereto, either in its present form or as the same may be altered, amended or modified from time to time in accordance with the provisions of the Bankruptcy Code, the terms hereof, the Lee Support Agreement, and the Pulitzer Support Agreement.

1.108   Prepetition Administrative Agent means DBTCA, in its capacity as administrative agent under the Prepetition Credit Agreement.

1.109   Prepetition Credit Agreement means that certain Amended and Restated Credit Agreement, dated as of December 21, 2005, by and among Lee Enterprises, the lenders from time to time party thereto, DBTCA, as Administrative Agent, DBSI and SunTrust Capital Markets, Inc., as Joint Lead Arrangers, DBSI, as Book Running Manager, SunTrust Bank, as Syndication Agent, and Bank of America, N.A., The Bank of New York and The Bank of Tokyo-Mitsubishi, Ltd., Chicago Branch, as Co-Documentation Agents, as amended by that First Amendment dated as of September 29, 2008, that Second Amendment dated as of October 29, 2008, that Third Amendment dated as of February 18, 2009, and that Fourth Amendment dated as of December 2, 2011, as such agreement may be further amended, modified, or supplemented from time to time.

1.110   Prepetition Credit Agreement Claims means all Claims arising under, evidenced by, or secured pursuant to, the Prepetition Credit Agreement Documents.

1.111   Prepetition Credit Agreement Documents means, collectively, the Prepetition Credit Agreement and all other agreements (including, without limitation, any guaranty agreements, pledge and collateral agreements, intercreditor agreements, and intercompany subordination agreements), documents and instruments delivered in connection therewith.

1.112   Priority Non-Tax Claim means any Claim entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code, other than an Administrative Expense Claim or a Priority Tax Claim.

1.113   Priority Tax Claim means any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.114   Professional means any Person retained by the Debtors or a statutory committee, if any, pursuant to a Final Order of the Bankruptcy Court entered pursuant to sections 327, 328 or 1103 of the Bankruptcy Code.

1.115   Pro Rata or Pro Rata Share means the proportion that the amount of any Allowed Claim in a particular Class bears to the aggregate amount of all Allowed Claims in such Class, except in reference to a specific type of Claim, in which case Pro Rata or Pro Rata Share means the proportion that an Allowed Claim of such type bears to the aggregate amount of all Allowed Claims of such type.

1.116   Pulitzer means Pulitzer Inc.

1.117   Pulitzer Debtors means, collectively, Pulitzer and the Pulitzer Subsidiary Debtors.

1.118   Pulitzer Subsidiary Debtors means, collectively, Pulitzer Technologies, Inc.; PD LLC; Fairgrove LLC; DS LLC; Suburban Journals of Greater St. Louis LLC; Pulitzer Network Systems LLC; Pulitzer Newspapers, Inc.; Flagstaff Publishing Co.; Hanford Sentinel Inc.; HomeChoice, LLC; Kauai Publishing Co.; Napa Valley Publishing Co.; NIPC, Inc. f/k/a Northern Illinois Publishing Co., Inc.; NVPC LLC; Northern Lakes Publishing Co.; NLPC LLC;

13

Pantagraph Publishing Co.; HSTAR LLC; Pulitzer Missouri Newspapers, Inc.; Pulitzer Utah Newspapers, Inc.; Santa Maria Times, Inc.; SHTP LLC; Southwestern Oregon Publishing Co.; SOPC LLC; and Ynez Corporation.

1.119   Pulitzer Support Agreement means that certain Support Agreement, entered into by and among PD LLC, Star Publishing Company, the Guarantors (as defined in the Pulitzer Support Agreement), the Lee Debtors, and the Consenting Noteholders, including all exhibits and attachments thereto, which became effective on December 2, 2011, as amended or otherwise modified from time to time in accordance with the terms thereof.

1.120   Reinstate, Reinstated or Reinstatement means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim or Interest entitles the Holder of such Claim or Interest, or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity of such Claim or Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Interest arises from any failure to perform a nonmonetary obligation other than a default arising from failure to operate under a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim or Interest (other than any Debtor or an insider of any Debtor) for any pecuniary loss incurred by such Holder as the result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim or Interest entitles the Holder thereof.

1.121   Related Persons means, with respect to any Person, such Person's predecessors, successors and assigns (whether by operation of law or otherwise) and their respective present and former affiliates and each of their respective current and former members, partners, equity holders, officers, directors, employees, managers, shareholders, partners, financial advisors, attorneys, accountants, investment bankers, consultants, agents and professionals each acting in such capacity, and any Person claiming by or through any of them (including their respective officers, directors, managers, shareholders, partners, employees, equity holders, members, and professionals).

1.122   Released Parties means (i) the Debtors, (ii) the Consenting Lenders, (iii) the Backstop Lenders, (iv) the Prepetition Administrative Agent, (v) the Consenting Noteholders, (vi) the PD LLC Notes Collateral Agent, (vii) the DIP Revolving Facility Agent, (viii) the DIP Revolving Facility Lenders, and (ix) the Related Persons of each of the foregoing.

1.123   Reorganized _____ means, individually or collectively, each of the reorganized Debtors and any successors thereto by merger, consolidation, conversion or otherwise, on or after the Effective Date, after giving effect to the transactions occurring on or prior to the Effective Date in accordance with this Plan.  For example, (i) Reorganized Lee Enterprises means reorganized Lee Enterprises or any successors thereto by merger, consolidation, conversion or otherwise, on or after the Effective Date, after giving effect to the transactions occurring on the Effective Date in accordance with this Plan and (ii) Reorganized

14

Debtors means, collectively, each of the reorganized Debtors or any successors thereto by merger, consolidation, conversion or otherwise, on or after the Effective Date, after giving effect to the transactions occurring on or prior to the Effective Date in accordance with this Plan.

1.124    Required Consenting Lenders means, collectively, the Consenting Lenders holding greater than 50.0% of the aggregate outstanding amount of the funded Prepetition Credit Agreement Claims held by all of the Consenting Lenders.

1.125    Required Consenting Noteholders means (a) at any time that there are more than two non-affiliated Consenting Noteholders (which, for the avoidance of doubt, shall not include Pulitzer or any of its affiliates), the Consenting Noteholders holding greater than 60% of the aggregate outstanding PD LLC Notes held by all Consenting Noteholders, so long as at least two Consenting Noteholders are not affiliates, and (b) otherwise, the Consenting Noteholders holding 51% of the aggregate outstanding PD LLC Notes held by the Consenting Noteholders.

1.126    Second Lien Pro Rata Share means (i) with respect to each Converting Lender (other than a Backstop Lender), the percentage obtained by dividing (x) the amount of New Second Lien Term Loan that such Converting Lender validly elected to receive pursuant to its New Second Lien Term Loan Election by (y) the aggregate amount of the New Second Lien Term Loan (without giving effect to any original issue discount for purpose of clauses (x) and (y)) and (ii) with respect to each Backstop Lender, the percentage obtained by dividing (x) the aggregate amount of New Second Lien Term Loan that such Backstop Lender receives in accordance with its Backstop Commitment Letter by (y) the aggregate amount of the New Second Lien Term Loan (without giving effect to any original issue discount for purpose of clauses (x) and (y)).

1.127    Section 507(b) Claims means any superpriority Claims pursuant to section 507(b) of the Bankruptcy Code that may be granted by the Bankruptcy Court to (i) the Prepetition Administrative Agent and the Holders of Prepetition Credit Agreement Claims under the Bankruptcy Court's interim and/or final orders approving the Lee Debtors' entry into and performance of their obligations under the DIP Revolving Facility Documents and (ii) the PD LLC Notes Collateral Agent and the Holders of PD LLC Notes Claims under the Bankruptcy Court's interim and/or final orders approving the Pulitzer Debtors' use of cash collateral.

1.128    Secured Claim means any Claim secured by a Lien on collateral to the extent of the value of such collateral (i) as set forth in this Plan, (ii) as agreed to by the Holder of such Claim and the relevant Debtor(s) or (iii) as determined pursuant to a Final Order of the Bankruptcy Court in accordance with section 506(a) of the Bankruptcy Code or, in the event that such Claim is subject to setoff under section 553 of the Bankruptcy Code, to the extent of such setoff.

1.129    Unimpaired means with respect to a Claim or Interest, a Claim or Interest that is not Impaired.

1.130    Voting Deadline means the deadline for returning Ballots to accept or reject this Plan.

B.    Rules of Interpretation.  For purposes of this Plan, unless otherwise provided herein:  (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) unless otherwise provided in this Plan, any reference in this Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (c) any reference in this Plan to an existing document, schedule or Exhibit filed or to be filed means such document, schedule or Exhibit, as it may have been or may be amended, modified, or supplemented pursuant to this Plan; (d) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors and assigns; (e) all references in this Plan to Sections or Articles are references to Sections or Articles of or to this Plan, as the same may be amended, waived or modified from time to time; (f) the words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to this Plan as a whole and not to any particular Section, subsection or clause contained in this Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (h) the rules of construction set forth in section 102 of the Bankruptcy Code will apply; and (i) in computing any period of time prescribed or allowed by this Plan, Bankruptcy Rule 9006(a) will apply.

C.    Exhibits.  All Exhibits to this Plan are incorporated into and are a part of this Plan as if set forth in full herein.  Exhibits to this Plan that are not annexed hereto shall be filed with the Clerk of the Bankruptcy Court no later than ten (10) days prior to the deadline established for objecting to Confirmation of this Plan.  Holders of Claims and Interests may obtain a copy of the filed Exhibits upon written request to the Debtors.  Upon their filing, the Exhibits may be inspected in the office of the Clerk of the Bankruptcy Court during normal business hours or at the Bankruptcy Court's website at http://www.deb.uscourts.gov.

D.    Deemed Acts.  Whenever an act or event is expressed under this Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred by virtue of this Plan and/or Confirmation Order without any further act by any party.

## ARTICLE II:
## TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS,  DIP REVOLVING FACILITY CLAIMS, PRIORITY TAX CLAIMS, AND SECTION 507(b) CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, DIP Revolving Facility Claims, Priority Tax Claims, and Section 507(b) Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III.

2.1.    Administrative Expense Claims.  Subject to the provisions of sections 328, 330, 331 and 503(b) of the Bankruptcy Code, on either:  (i) the latest to occur of (x) the Effective Date, (y) the date upon which such Administrative Expense Claim becomes an Allowed Claim and (z) such other date as agreed upon by the Debtors and the Holder of such Administrative Expense Claim, or (ii) such other date as the Bankruptcy Court may order, each Holder of an Allowed Administrative Expense Claim shall receive, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Administrative Expense

16

Claim, (a) Cash equal to the full unpaid amount of such Allowed Administrative Expense Claim, or (b) such other less favorable treatment as the applicable Debtor and such Holder shall have agreed; provided, however, that Allowed Administrative Expense Claims not yet due or that represent obligations incurred by the Debtors in the ordinary course of their business during the Chapter 11 Cases, or assumed by the Debtors during the Chapter 11 Cases, shall be paid or performed when due in the ordinary course of business and in accordance with the terms and conditions of the particular agreements governing such obligations.

     2.2.     <u>DIP Revolving Facility Claims</u>.  The DIP Revolving Facility Claims shall be Allowed on the Effective Date pursuant to this Plan.  On the Effective Date, all Allowed DIP Revolving Facility Claims shall, at the Debtors' option, in accordance with and on the terms set forth in the DIP Revolving Facility Agreement, either (i) convert into revolving loans and commitments outstanding under the New First Lien Revolving Credit Facility pursuant to the New First Lien Credit Facility Documents and the DIP Revolving Facility Commitment Letter; provided, however, that all accrued and unpaid interest and all fees and expenses due and payable on or prior to the Effective Date under the terms of the DIP Revolving Facility Agreement shall be indefeasibly paid in full in Cash on the Effective Date by the Lee Debtors, or (ii) be indefeasibly paid in full in Cash by the Lee Debtors, and, in each case, the "Commitments" (as defined in the DIP Revolving Facility Agreement) under the DIP Revolving Facility Agreement shall be irrevocably cancelled and the "Letters of Credit" (as defined in the DIP Revolving Facility Agreement) shall be returned undrawn.  Notwithstanding anything to the contrary in this Plan, the liens and security interests securing the DIP Revolving Facility Claims shall continue in full force and effect until the DIP Revolving Facility Claims (a) convert into revolving loans and commitments outstanding under the New First Lien Revolving Credit Facility or (b) are indefeasibly paid in full in Cash by the Lee Debtors, the "Commitments" (as defined in the DIP Revolving Facility Agreement)  are irrevocably cancelled, and the "Letters of Credit" (as defined in the DIP Revolving Facility Agreement) are returned undrawn on the Effective Date.

     2.3.     <u>Priority Tax Claims</u>.  Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment (in which event such other agreement shall govern), each Holder of an Allowed Priority Tax Claim against any of the Debtors that is due and payable on or before the Effective Date shall receive, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Priority Tax Claim, Cash equal to the amount of such Allowed Priority Tax Claim on the later of (i) the Effective Date and (ii) the date such Priority Tax Claim becomes an Allowed Claim or as soon thereafter as practicable.  All Allowed Priority Tax Claims against any of the Debtors which are not due and payable on the Effective Date shall be paid in the ordinary course of business by the Reorganized Debtors in accordance with the terms thereof.

     2.4.     <u>Section 507(b) Claims</u>.  On the Effective Date, as a consequence of the implementation of the New First Lien Credit Facility, the Reorganized Debtors' entry into the New Second Lien Term Loan Documents, the issuance of the New Common Stock, and the treatment of PD LLC Notes Claims in accordance with section 3.3.3(c) of this Plan, all Section 507(b) Claims shall be settled, released by the Holders of such Claims, and discharged.

# ARTICLE III:
## CLASSIFICATION AND TREATMENT OF
## CLASSIFIED CLAIMS AND INTERESTS

3.1.    <u>Summary of Classification and Treatment of Classified Claims and Interests</u>.

    3.1.1    <u>General</u>.

        (a)    Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims and Interests are classified for all purposes, including, without limitation, voting, Confirmation and distribution pursuant to this Plan, as set forth herein.  A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.  A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

        (b)    This Plan constitutes, and shall be deemed to constitute, a separate chapter 11 plan of reorganization for each Debtor.  For purposes of brevity and convenience, the classification and treatment of Claims and Interests has been set forth in two (2) groups: the Lee Debtors (Debtors 1-9) and (ii) the Pulitzer Debtors (Debtors 10-35).  Each group is specifically listed in Appendices A and B to this Plan, and each Debtor is ascribed a numerical designation therein that corresponds to the applicable Debtor.

    3.1.2    <u>Identification of Classes Against the Lee Debtors</u>.  The following chart assigns a letter to each Class with respect to the Lee Debtors (Debtors 1-9) for purposes of identifying each separate Class:

| CLASS | CLAIM OR INTEREST |
|---|---|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | Prepetition Credit Agreement Claims |
| D | General Unsecured Claims |
| E | Intercompany Claims |
| G | Interests in the Lee Debtors |

    3.1.3    <u>Identification of Classes Against the Pulitzer Debtors</u>.  The following chart assigns a letter to each Class with respect to the applicable Pulitzer Debtors (Debtors 10-35) for purposes of identifying each separate Class:

| CLASS | CLAIM OR INTEREST |
|-------|-------------------|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | PD LLC Notes Claims |
| D | General Unsecured Claims |
| E | Intercompany Claims |
| F | Herald Claim (against PD LLC and DS LLC only) |
| G | Interests in the Pulitzer Debtors |

3.2.    Classification and Treatment of Claims Against and Interests in the Lee Debtors (Debtors 1-9).

3.2.1    Classes 1A through 9A:  Priority Non-Tax Claims.

(a)    Classification:  Classes 1A through 9A consist of all Priority Non-Tax Claims against the Lee Debtors.

(b)    Treatment:  On the Effective Date, each Holder of an Allowed Priority Non-Tax Claim against any of the Lee Debtors shall have such Claim Reinstated.

(c)    Voting:  Claims in Classes 1A through 9A are Unimpaired. Each Holder of an Allowed Claim in Classes 1A through 9A shall be conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject this Plan.

3.2.2    Classes 1B through 9B:  Other Secured Claims.

(a)    Classification:  Classes 1B through 9B consist of all Other Secured Claims against the Lee Debtors.

(b)    Treatment:  On the Effective Date, each Holder of an Allowed Other Secured Claim against any of the Lee Debtors shall have its Claim Reinstated.

(c)    Voting:  Claims in Classes 1B through 9B are Unimpaired. Each Holder of an Allowed Claim in Classes 1B through 9B shall be conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject this Plan.

3.2.3    Classes 1C through 9C:  Prepetition Credit Agreement Claims.

19

(a)     Classification:  Classes 1C through 9C consist of all Prepetition Credit Agreement Claims against the Lee Debtors.

(b)     Allowance:  The Prepetition Credit Agreement Claims shall be Allowed on the Effective Date pursuant to this Plan in the aggregate principal amount thereof, plus (i) any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement through the Effective Date of this Plan and (ii) all other unpaid monetary Obligations as defined in the Prepetition Credit Agreement Documents, except to the extent that such Claims are otherwise provided in this Plan or any of the documents entered into in accordance with this Plan to be paid or satisfied, and shall not be subject to avoidance, objection, challenge, deduction, subordination, recharacterization or offset.

(c)     Treatment:  On the Effective Date, each Holder of an Allowed Prepetition Credit Agreement Claim against the Lee Debtors shall receive on account of, in full and complete satisfaction, settlement, release and discharge of, and in exchange for such Claim, such Holder's Pro Rata Share of (i) the New First Lien Term Loan and (ii) any accrued and unpaid interest on the Prepetition Credit Agreement Claims, calculated at the non-default rate under the Prepetition Credit Agreement Documents, through the Effective Date, that has not been previously paid to the Holders of Prepetition Credit Agreement Claims, including, but not limited to, as adequate protection under applicable orders of the Bankruptcy Court; provided, however, that each Converting Lender shall receive, for the Prepetition Credit Agreement Claim(s) that such Converting Lender elects to convert pursuant to such Converting Lender's New Second Lien Term Loan Election (which converted amount shall be deducted both from the amount of such Converting Lender's Allowed Prepetition Credit Agreement Claim and the total amount of Allowed Prepetition Credit Agreement Claims solely for purposes of determining the Holders' Pro Rata Shares of the New First Lien Term Loan), such Converting Lender's Second Lien Pro Rata Share of (i) the New Second Lien Term Loan and (ii) the New Common Stock.  In addition, on the Effective Date, any unexpired letters of credit outstanding under the Prepetition Credit Agreement shall be deemed made or issued, as applicable, under the New First Lien Revolving Credit Facility.

(d)     Voting:  Claims in Classes 1C through 9C are Impaired.  Each Holder of an Allowed Claim in Classes 1C through 9C shall be entitled to vote to accept or reject this Plan.

### 3.2.4     Classes 1D through 9D:  General Unsecured Claims.

(a)     Classification:  Classes 1D through 9D consist of all General Unsecured Claims against the Lee Debtors.

(b)     Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Effective Date or (ii) the date on which an Allowed General Unsecured Claim against any of the Lee Debtors becomes due and payable in accordance with the applicable non-bankruptcy law governing such Claim, the Holder of such Allowed General Unsecured Claim against any of the Lee Debtors shall receive Cash from the Lee Debtors equal to the full unpaid amount of such Claim, together with interest thereon, at the applicable non-

default rate, to which the Holder of such Claim may be entitled under applicable non-bankruptcy law through the Effective Date.

(c)    Voting:  Claims in Classes 1D through 9D are Unimpaired. Each Holder of an Allowed Claim in Classes 1D through 9D shall be conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject this Plan.

3.2.5    Classes 1E through 9E:  Intercompany Claims.

(a)    Classification: Classes 1E through 9E consist of all Intercompany Claims against the Lee Debtors.

(b)    Treatment:  On the Effective Date each Holder of an Allowed Intercompany Claim against any of the Lee Debtors shall have such Claim Reinstated; provided, however, that the Intercompany Claim held by Pulitzer against Lee Enterprises shall be reduced by the amount of the Lee Closing Date Payment.

(c)    Voting:  Claims in Classes 1E through 9E are Unimpaired. Each Holder of an Allowed Claim in Classes 1E through 9E shall be conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject this Plan.

3.2.6    Classes 1G through 9G:  Interests in the Lee Debtors.

(a)    Classification:  Classes 1G through 9G consist of all Interests in the Lee Debtors.

(b)    Treatment:  On the Effective Date, each Holder of an Interest in the Lee Debtors shall have such Interest Reinstated.

(c)    Voting:  Interests in Classes 1G through 9G are Unimpaired. Each Holder of an Interest in Classes 1G through 9G shall be conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject this Plan.

3.3.    Classification and Treatment of Claims Against and Interests in the Pulitzer Debtors (Debtors 10-35).

3.3.1    Classes 10A through 35A:  Priority Non-Tax Claims.

(a)    Classification:  Classes 10A through 35A consist of all Priority Non-Tax Claims against the Pulitzer Debtors.

(b)    Treatment:  On the Effective Date, each Holder of an Allowed Priority Non-Tax Claim against any of the Pulitzer Debtors shall have such Claim Reinstated.

(c)    Voting:  Claims in Classes 10A through 35A are Unimpaired. Each Holder of an Allowed Claim in Classes 10A through 35A shall be conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject this Plan.

3.3.2       Classes 10B through 35B:  Other Secured Claims.

(a)    Classification:  Classes 10B through 35B consist of all Other Secured Claims against the Pulitzer Debtors.

(b)    Treatment:  On the Effective Date, each Holder of an Allowed Other Secured Claim against any of the Pulitzer Debtors shall have its Claim Reinstated.

(c)    Voting:  Claims in Classes 10B through 35B are Unimpaired. Each Holder of an Allowed Claim in Classes 10B through 35B shall be conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject this Plan.

3.3.3       Classes 10C through 35C:  PD LLC Notes Claims.

(a)    Classification:  Classes 10C through 35C consist of all PD LLC Notes Claims against the Pulitzer Debtors.

(b)    Allowance:  The PD LLC Notes Claims shall be Allowed pursuant to this Plan in the aggregate principal amount thereof as of the Effective Date, plus (i) any accrued but unpaid interest thereon at the non-default rate under the PD LLC Notes Documents through the Effective Date of this Plan and (ii) all other Obligations (as defined in the PD LLC Notes Documents), except to the extent that such Claims are otherwise provided in this Plan or any of the documents entered into in accordance with this Plan to be paid or satisfied, and shall not be subject to avoidance, objection, challenge, deduction, subordination, recharacterization, or offset.

(c)    Treatment:  On the Effective Date, each Holder of an Allowed PD LLC Notes Claim shall receive on account of, in full and complete satisfaction, settlement, release and discharge of, and in exchange for such Claim, such Holder's Pro Rata Share of (i) the New PD LLC Notes, (ii) the Lee Closing Date Payment, which shall be deemed to be a prepayment of the New PD LLC Notes held by such Holder, and (iii) any accrued interest on the PD LLC Notes, calculated at the non-default rate under the PD LLC Notes Documents, through the Effective Date, that has not previously been paid to the PD LLC Noteholders, including, but not limited to, as adequate protection under applicable orders of the Bankruptcy Court.

(d)    Voting:  Claims in Classes 10C through 35C are Impaired. Each Holder of an Allowed Claim in Classes 10C through 35C shall be entitled to vote to accept or reject this Plan.

3.3.4       Classes 10D through 35D:  General Unsecured Claims.

(a)      Classification:  Classes 10D through 35D consist of all General Unsecured Claims against the Pulitzer Debtors.

(b)      Treatment:  On or as soon as reasonably practicable after the latest to occur of (a) the Effective Date or (b) the date on which an Allowed General Unsecured Claim against any of the Pulitzer Debtors becomes due and payable in accordance with the applicable non-bankruptcy law governing such Claim, the Holder of such Allowed General Unsecured Claim against any of the Pulitzer Debtors shall receive Cash from the Pulitzer Debtors equal to the full unpaid amount of such Claim, together with interest thereon, at the applicable non-default rate, to which the Holder of such Claim may be entitled under applicable non-bankruptcy law through the Effective Date.

(c)      Voting:  Claims in Classes 10D through 35D are Unimpaired. Each Holder of an Allowed Claim in Classes 10D through 35D shall be conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject this Plan.

3.3.5      Classes 10E through 35E:  Intercompany Claims.

(a)      Classification:  Classes 10E through 35E consist of all Intercompany Claims against the Pulitzer Debtors.

(b)      Treatment:  On the Effective Date each Holder of an Allowed Intercompany Claim against any of the Pulitzer Debtors shall have such Claim Reinstated; provided, however, that any Intercompany Claims owed by any of the Pulitzer Debtors to any others of the Pulitzer Debtors shall be capable of being cancelled notwithstanding such Reinstatement with the agreement of the Pulitzer Debtors in question.

(c)      Voting:  Claims in Classes 10E through 35E are Unimpaired. Each Holder of an Allowed Claim in Classes 10E through 35E shall be conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject this Plan.

3.3.6      Classes 12F and 14F:  Herald Claim against PD LLC and DS LLC.

(a)      Classification:  Classes 12F and 14F consist of the Herald Claim against PD LLC and DS LLC.

(b)      Treatment:  On the Effective Date, the Herald Claim shall be Reinstated, and shall, in accordance with the treatment afforded to such Claim under that certain Redemption Agreement dated February 18, 2009, (i) not be redeemed for Cash unless all obligations under the New First Lien Term Loan, the New Second Lien Term Loan, and the New First Lien Revolving Credit Facility have been paid in full in Cash and all obligations of PD LLC and DS LLC under the New PD LLC Notes Documents have been paid in full in Cash, and (ii) be junior and subordinate in all respects to the obligations of Reorganized PD LLC and Reorganized DS LLC under the New PD LLC Notes Documents in the same manner as the Herald Claim was junior and subordinate in all respects to the obligations of PD LLC and DS LLC under the PD LLC Notes Documents.

23

(c)     Voting:  The Herald Claim in Classes 12F and 14F is Unimpaired.  The Holder of the Herald Claim in Classes 12F and 14F shall be conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject this Plan.

3.3.7     Classes 10G through 35G:  Interests in the Pulitzer Debtors.

(a)     Classification:  Classes 10G through 35G consist of all Interests in the Pulitzer Debtors.

(b)     Treatment:  On the Effective Date, each Holder of an Interest in the Pulitzer Debtors shall have such Interest Reinstated.

(c)     Voting:  Interests in Classes 10G through 35G are Unimpaired. Each Holder of an Interest in Classes 10G through 35G shall be conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject this Plan.

3.4.     Unimpaired Claims and Interests.  Except as otherwise explicitly provided in this Plan, nothing herein shall affect the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Unimpaired Claims or Interests, including, but not limited to, the legal and equitable defenses of setoff or recoupment with respect to the Unimpaired Claims.

**ARTICLE IV:**
**ACCEPTANCE OR REJECTION OF THE PLAN**

4.1.     Impaired Classes of Claims Entitled to Vote.  Holders of Claims in Classes 1C through 9C (Prepetition Credit Agreement Claims against the Lee Debtors) and 10C through 35C (PD LLC Notes Claims against the Pulitzer Debtors) are Impaired and entitled to vote to accept or reject this Plan.

4.2.     Acceptance by an Impaired Class.  In accordance with section 1126(c) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted this Plan if this Plan is accepted by the Holders of at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of the Allowed Claims in such Class that have timely and properly voted to accept or reject this Plan.

4.3.     Presumed Acceptances by Unimpaired Classes.  Classes 1A through 35A (Priority Non-Tax Claims against the Debtors), 1B through 35B (Other Secured Claims against the Debtors), 1D through 35D (General Unsecured Claims against the Debtors), 1E through 35E (Intercompany Claims against the Debtors), 12F and 14F (Herald Claim against PD LLC and DS LLC), and 1G through 35G (Interests in the Debtors) are Unimpaired by this Plan.  Pursuant to section 1126(f) of the Bankruptcy Code, the Holders of Claims and Interests in such Classes are conclusively presumed to have accepted this Plan and therefore shall not be entitled to vote to accept or reject this Plan.

4.4.     Confirmability and Severability of this Plan.

24

4.4.1    Consensual Confirmation.  The confirmation requirements of section 1129(a) of the Bankruptcy Code must be satisfied separately with respect to each Debtor. Therefore, notwithstanding the combination of the separate plans of reorganization for all Debtors in this Plan for purposes of, among other things, economy and efficiency, this Plan shall be deemed a separate chapter 11 plan for each such Debtor.

4.4.2    Reservation of Rights.  The Debtors reserve the right to amend, modify, or supplement this Plan for any reason, including, without limitation, in the event that any separate plan for a particular Debtor is not confirmed.

## ARTICLE V:
## MEANS FOR IMPLEMENTATION OF THE PLAN

5.1.    Non-Substantive Consolidation.  This Plan is a joint plan that does not provide for substantive consolidation of the Estates and, on the Effective Date, the Estates shall not be deemed to be substantively consolidated for purposes hereof.  Except as specifically set forth herein, nothing in this Plan or the Disclosure Statement shall constitute or be deemed to constitute an admission that any one of the Debtors is subject to or liable for any claim against any other Debtor.  Additionally, claimants holding Claims against multiple Debtors, to the extent such Claims are Allowed in each Debtor's case, will be treated as Holders of separate Claims against each applicable Estate for all purposes (including, but not limited to, voting and distributions); provided, however, that no Holder shall be entitled to receive more than payment in full of its Allowed Claim (plus post-petition interest, if and to the extent provided in this Plan), and such Claims will be administered and treated in the manner provided in this Plan.  Unless otherwise provided by this Plan or the Confirmation Order, Allowed Claims held against any Debtor shall be satisfied solely from the Cash and other assets of such Debtor and its Estate, provided that, to the extent of any insufficiency, funds or other property may be advanced to the relevant Debtor(s) by (x) with respect to a Lee Debtor, any of the other Lee Debtors and (y) with respect to a Pulitzer Debtor, any of the other Pulitzer Debtors.

5.2.    Corporate Governance, Directors, Officers and Corporate Action.

5.2.1    Certificate of Incorporation; By-Laws; Limited Liability Company Agreements.  On the Effective Date, the Certificate of Incorporation and the By-Laws shall be substantially in the form of Exhibit 1.18 and Exhibit 1.16, respectively. Consistent with, but only to the extent required by, section 1123(a)(6) of the Bankruptcy Code, on the Effective Date, the Certificate of Incorporation shall be amended to prohibit the issuance of non-voting equity securities.  The certificates or articles of incorporation, by-laws, certificates of formation, limited liability company agreements, or similar governing documents, as applicable, of the other Debtors or Reorganized Debtors shall be amended as necessary to satisfy the provisions of this Plan and the Bankruptcy Code.  After the Effective Date, the Reorganized Debtors may amend and restate their certificates or articles of incorporation, by-laws, certificates of formation, limited liability company agreements, partnership agreements or similar governing documents, as applicable, as permitted by applicable law.

5.2.2    Directors and Officers of Reorganized Lee Enterprises.  Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy

25

Code, on the Effective Date, the initial directors and officers of Reorganized Lee Enterprises shall be the persons identified in Exhibit 5.2.2. After the Effective Date, the Certificate of Incorporation and the By-Laws, as each may be amended thereafter from time to time, shall govern the designation and election of directors, subject to the applicable restrictions, if any, in the New First Lien Credit Facility Documents, the New Second Lien Term Loan Documents, and the New PD LLC Notes Documents.

5.2.3    Directors and Officers of the Reorganized Debtors Other than Reorganized Lee Enterprises. Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, on the Effective Date, the initial directors and officers of the Reorganized Debtors other than Reorganized Lee Enterprises shall be the persons identified in Exhibit 5.2.3. After the Effective Date, the certificates or articles of incorporation, by-laws, certificates of formation, limited liability company agreements, or similar governing documents, as applicable, of the Reorganized Debtors other than Reorganized Lee Enterprises, as each may be amended thereafter from time to time, shall govern the designation and election of directors, subject to the applicable restrictions, if any, in the New First Lien Credit Facility Documents, the New Second Lien Term Loan Documents, and the New PD LLC Notes Documents.

5.2.4    Corporate Action. On the Effective Date, the amendment of the Certificate of Incorporation, the selection of directors and officers for Reorganized Lee Enterprises and each other Reorganized Debtor, and all other actions contemplated by this Plan shall be deemed authorized and approved in all respects (subject to the provisions of this Plan). All matters provided for in this Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with this Plan, shall be deemed to have timely occurred in accordance with applicable law and shall be in effect, without any requirement of further action by the security holders or directors of the Debtors or the Reorganized Debtors. On and after the Effective Date, the appropriate officers of Reorganized Lee Enterprises and/or the other Reorganized Debtors and members of the boards of directors of Reorganized Lee Enterprises and/or the other Reorganized Debtors shall be authorized and directed to issue, execute and deliver the agreements, documents, securities and instruments contemplated by this Plan in the name of and on behalf of Reorganized Lee Enterprises and/or the other Reorganized Debtors.

5.3.    Issuance and Distribution of New Securities.

5.3.1    Issuance of New Common Stock and New PD LLC Notes. On the Effective Date, (i) as authorized by the Certificate of Incorporation, Reorganized Lee Enterprises shall issue shares of New Common Stock equal to fifteen percent (15%) of the total number of issued and outstanding shares of common stock of Reorganized Lee Enterprises, computed on a pre-issuance basis, together with any and all instruments, certificates and other documents required to be issued or distributed pursuant to this Plan in order to effect such issuance of New Common Stock without further act or action under applicable law, regulation, order or rule, and (ii) Reorganized PD LLC shall issue the New PD LLC Notes for distribution in accordance with the terms of the New PD LLC Notes Documents and this Plan. The issuance and distribution of the New Common Stock and the New PD LLC Notes under or in connection with this Plan shall be, and shall be deemed to be, exempt from registration under any applicable federal or state

securities laws to the fullest extent permissible under applicable bankruptcy law and non-bankruptcy law, including, without limitation, section 1145(a) of the Bankruptcy Code. Without limiting the effect of section 1145 of the Bankruptcy Code, all documents, agreements and instruments entered into on or as of the Effective Date contemplated by or in furtherance of this Plan shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto. In addition, all of the shares of New Common Stock and the New PD LLC Notes issued under or in connection with this Plan shall be fully paid and non-assessable and freely tradable under section 1145 of the Bankruptcy Code.

5.3.2    Distribution of New Common Stock and New PD LLC Notes. On the Effective Date, (i) all of the shares of the New Common Stock shall be distributed to the Converting Lenders as provided in Section 3.2.3(c) of this Plan and (ii) the New PD LLC Notes shall be distributed to the Holders of Allowed PD LLC Notes Claims as provided in Section 3.3.3(c) of this Plan and pursuant to the terms of the New PD LLC Notes Documents. Distribution of the New Common Stock may be made by means of book-entry exchange through the facilities of the DTC in accordance with the customary practices of the DTC, as and to the extent practicable. In connection with such book-entry exchange, the Disbursing Agent(s) shall deliver instructions to the DTC instructing the DTC to effect distributions of New Common Stock as provided under this Plan. In the period pending distribution of the New Common Stock to any Converting Lender, such Converting Lender shall be entitled to exercise any voting rights and receive any dividends or other distributions payable in respect of such Converting Lender's New Common Stock and to exercise all other rights in respect of the New Common Stock (so that such Converting Lender shall be deemed for tax and all other purposes to be the owner of the New Common Stock).

5.4.    Reporting Requirements Under Securities Exchange Act of 1934. Reorganized Lee Enterprises shall continue to be a mandatory reporting company under section 12 of the Securities Exchange Act of 1934, as amended.

5.5.    New Debt Documents.

5.5.1    New First Lien Credit Facility Documents. On the Effective Date, the parties to each New First Lien Credit Facility Document shall be deemed to have executed such New First Lien Credit Facility Document and shall become bound thereto, regardless of whether any party actually executes such New First Lien Credit Facility Document.

5.5.2    New Second Lien Term Loan Documents. On the Effective Date, the parties to each New Second Lien Term Loan Document shall be deemed to have executed such New Second Lien Term Loan Document and shall become bound thereto, regardless of whether any party actually executes such New Second Lien Term Loan Document.

5.5.3    New PD LLC Notes Documents. On the Effective Date, the parties to each New PD LLC Notes Document shall be deemed to have executed such New PD LLC Notes Document and shall become bound thereto, regardless of whether any party actually executes such New PD LLC Notes Document.

5.6.    <u>Conversion or Repayment of DIP Revolving Facility Claims</u>.  On the Effective Date, in accordance with and on the terms set forth in the DIP Revolving Facility Agreement, the DIP Revolving Facility Claims shall either be (x) indefeasibly paid in full in Cash from the Lee Debtors (and the "Commitments" (as defined in the DIP Revolving Facility Agreement) shall be irrevocably cancelled and the "Letters of Credit" (as defined in the DIP Revolving Credit Facility Agreement) shall be returned undrawn) in accordance with Section 2.2 of this Plan or (y) converted into revolving loans and commitments outstanding under the New First Lien Revolving Credit Facility pursuant to the New First Lien Credit Facility Documents.

5.7.    <u>New Second Lien Term Loan Election</u>.  Consenting Lenders that made the New Second Lien Term Loan Election at the time of their execution and delivery of the Lee Support Agreement or Lender Joinder thereto shall receive a percentage interest in the New Second Lien Term Loan and the New Common Stock, in each case computed in accordance with the Lee Support Agreement, as provided in Section 3.2.3 of this Plan.  The Ballot for such Consenting Lenders to accept or reject this Plan shall have referenced the applicable amount of the Prepetition Credit Agreement Claims that each such Consenting Lender is anticipated to convert under this Plan into a percentage interest in the New Second Lien Term Loan and the New Common Stock.  Holders of Prepetition Credit Agreement Claims that are not Consenting Lenders as of the date on which votes to accept or reject this Plan are solicited shall have been afforded the option on their Ballots to make the New Second Lien Term Loan Election regardless of how they vote on this Plan, <u>provided</u>, <u>however</u>, that if any such Holder makes the New Second Lien Term Loan Election, such election shall be subject to the limitations set forth in Section 3.2.3 of this Plan.

5.8.    <u>New First Lien Credit Facility</u>.  On the Effective Date, the Reorganized Lee Debtors shall be authorized to enter into the New First Lien Credit Agreement as well as any notes, documents or agreements delivered in connection therewith, including, without limitation, any documents required in connection with the creation or perfection of liens in connection therewith.  The New First Lien Lenders shall have valid, binding and enforceable liens on the collateral specified in the New First Lien Credit Facility Documents.  The guarantees, mortgages, pledges, liens and other security interests granted pursuant to the New First Lien Credit Facility Documents are granted in good faith as an inducement to the New First Lien Lenders to extend credit thereunder and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, and the priorities of such liens and security interests shall be as set forth in the New First Lien Credit Facility Documents.  The New First Lien Revolving Credit Facility shall be a superpriority revolving credit facility with payment priority over the New First Lien Term Loan, and the provisions of the New First Lien Credit Facility Documents setting forth the payment priority of the New First Lien Revolving Credit Facility shall be fully enforceable in accordance with their terms and the parties to the New First Lien Credit Facility Documents shall be enjoined from avoiding, circumventing, recharacterizing or otherwise frustrating the enforcement of the priority provisions thereof.

5.9.    <u>New Second Lien Term Loan</u>.  On the Effective Date, the Reorganized Lee Debtors shall be authorized to enter into the New Second Lien Term Loan Agreement and the Reorganized Lee Debtors and the Reorganized Pulitzer Debtors shall be authorized to enter into any notes, guarantees, documents or agreements delivered, executed, or entered in connection therewith, including, without limitation, any documents required in connection with the creation

or perfection of liens in connection therewith including, without limitation, the New Second Lien Term Loan Documents. The New Second Lien Lenders shall have valid, binding and enforceable liens on the collateral specified in the New Second Lien Term Loan Documents. The guarantees, mortgages, pledges, liens and other security interests granted pursuant to the New Second Lien Term Loan Documents are granted in good faith as an inducement to the New Second Lien Lenders to extend credit thereunder and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, and the priorities of such liens and security interests shall be as set forth in the New Second Lien Term Loan Documents.

5.10.   <u>New PD LLC Notes</u>. On the Effective Date, Reorganized PD LLC shall be authorized to enter into the New PD LLC Notes Agreement and issue the New PD LLC Notes, and the Reorganized Pulitzer Debtors shall be authorized to enter into any documents or agreements delivered in connection therewith, including, without limitation, any documents required in connection with the creation or perfection of liens in connection therewith. The New PD LLC Noteholders shall have valid, binding and enforceable liens on the collateral specified in the New PD LLC Notes Documents. The guarantees, mortgages, pledges, liens and other security interests granted pursuant to the New PD LLC Notes Documents and payments made (including, but not limited to, payments of principal of the PD LLC Notes and the Lee Closing Date Payment) with respect to the restructuring of the PD LLC Notes pursuant to, and identified in, the Pulitzer Support Agreement are granted and made in good faith as an inducement to the Holders of New PD LLC Notes to extend credit thereunder and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, and the priorities of such liens and security interests shall be as set forth in the New PD LLC Notes Documents.

5.11.   <u>Binding Effect</u>. On the Effective Date, except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, all provisions of this Plan, including all agreements, instruments and other documents filed in connection with this Plan and executed by the Debtors or the Reorganized Debtors in connection with this Plan, shall be binding upon the Debtors, the Reorganized Debtors, all Holders of Claims against and Interests in each of the Debtors and such Holder's respective successors and assigns, whether or not the Claim or Interest of such Holder is Impaired under this Plan and whether or not such Holder has accepted this Plan, and all other parties that are affected in any manner by this Plan. All agreements, instruments and other documents filed in connection with this Plan shall be given full force and effect, and shall bind all parties referred to therein as of the Effective Date, whether or not such agreements are actually issued, delivered or recorded on the Effective Date or thereafter and whether or not a party has actually executed such agreement.

5.12.   <u>Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors</u>. On and after the Effective Date, each of the Reorganized Debtors shall continue to exist as separate entities in accordance with the applicable law in the respective jurisdiction in which they are formed and pursuant to their respective certificates or articles of incorporation (or similar organizational documents) and by-laws in effect prior to the Effective Date, except to the extent such certificates or articles of incorporation (or similar organizational documents) and by-laws are to be amended and/or restated pursuant to the terms of this Plan. Notwithstanding anything to the contrary in this Plan, the Reinstated Claims against and Interests in a particular

Debtor or Reorganized Debtor shall remain the obligations solely of such Debtor or Reorganized Debtor following the Effective Date and shall not become obligations of any other Debtor or Reorganized Debtor by virtue of this Plan, the Chapter 11 Cases, or otherwise.  Pursuant to section 1141(b) of the Bankruptcy Code, except as otherwise provided under this Plan, all property of the respective Estate of each Debtor, including all claims, rights and causes of action and any property acquired by the Debtors or the Reorganized Debtors under or in connection with this Plan, together with any property of each Debtor that is not property of its Estate and that is not specifically disposed of pursuant to this Plan, shall revest in the applicable Reorganized Debtor on the Effective Date free and clear of all Claims, Liens, charges, other encumbrances and Interests, <u>provided</u> that such revesting shall not relieve any Reorganized Debtor from such Reorganized Debtor's obligations under the applicable terms and provisions of the New First Lien Credit Facility Documents, the New Second Lien Term Loan Documents, and the New PD LLC Notes Documents. Thereafter, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code and the Bankruptcy Rules.  As of the Effective Date, all property of each Reorganized Debtor shall be free and clear of all Liens and non-Reinstated Claims and Interests, except as specifically provided in this Plan or the Confirmation Order.

5.13.  <u>Cancellation of Certain Credit and Debt Documents</u>.  On the Effective Date, in consideration for the distributions to be made on the Effective Date pursuant to this Plan and except as otherwise provided herein, all (a) Prepetition Credit Agreement Documents, PD LLC Notes, PD LLC Notes Documents, DIP Revolving Facility Documents, and any other instruments, documents, plans or agreements evidencing or creating any indebtedness or obligations of a Debtor related thereto shall be cancelled, and (b) the obligations of any of the Debtors under any Prepetition Credit Agreement Documents, PD LLC Notes, PD LLC Notes Documents, DIP Revolving Facility Documents, or any other agreements evidencing or creating any indebtedness or obligations of a Debtor that relate to Claims or Interests related thereto shall be discharged pursuant to Section 10.2 of this Plan.

5.14.  <u>Cancellation of Liens</u>.  Except as otherwise provided in this Plan, on the Effective Date, in consideration for the distributions to be made on the Effective Date pursuant to this Plan, all Liens, charges, encumbrances and rights related to any Claim or Interest, including, without limitation, those existing under the Prepetition Credit Agreement Documents, the PD LLC Notes Documents,  and the DIP Revolving Facility Documents, but excluding any Lien securing an Other Secured Claim that is Reinstated pursuant to this Plan, shall be terminated, null and void and of no effect.  The Holders of Secured Claims (other than Other Secured Claims that are Reinstated pursuant to this Plan) shall be authorized and directed to release any collateral or other property of any Debtor (including any Cash collateral) held by such Holder and to take such actions as may be requested by the Debtors (or the Reorganized Debtors, as the case may be) to evidence the release of any Liens, including the execution, delivery, and filing or recording of such release documents as may be requested by the Debtors (or the Reorganized Debtors, as the case may be).

5.15.  <u>Additional Transactions Authorized Under this Plan</u>.  On or prior to the Effective Date, the Debtors shall be authorized to take any such actions as may be necessary or appropriate to Reinstate Claims or Interests or render Claims or Interests not Impaired, as provided for under this Plan.

## ARTICLE VI:
## TREATMENT OF EXECUTORY CONTRACTS,
## UNEXPIRED LEASES, INSURANCE POLICIES AND EMPLOYEE BENEFIT PLANS

6.1.    <u>Assumption of Executory Contracts and Unexpired Leases</u>.  On the Effective Date, all executory contracts or unexpired leases of the Debtors will be deemed assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, <u>unless</u> such executory contract or unexpired lease (i) was previously assumed or rejected by the relevant Debtor(s) or (ii) previously expired or terminated pursuant to its own terms.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Each executory contract and unexpired lease assumed pursuant to this <u>Article VI</u> shall revest in and be fully enforceable by the respective Reorganized Debtor in accordance with its terms, except as modified by the provisions of this Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption.

6.2.    <u>Cure of Defaults Under Assumed Executory Contracts and Unexpired Leases</u>. Any monetary amounts by which each executory contract and unexpired lease to be assumed is in default shall be satisfied, pursuant to section 365(b)(l) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or on such other terms as the parties to each such executory contract or unexpired lease may otherwise agree.  In the event of a dispute regarding (a) the amount of any cure payments, (b) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to assumption, the cure payments required by section 365(b)(l) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption.  Pending the Bankruptcy Court's ruling on such motion, the executory contract or unexpired lease at issue shall be deemed assumed by the relevant Debtor unless otherwise ordered by the Bankruptcy Court.

6.3.    <u>Assumption of Collective Bargaining Agreements</u>.  All Collective Bargaining Agreements shall be deemed to have been assumed by the applicable Debtor(s) party thereto upon the occurrence of the Effective Date.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the pertinent Reorganized Debtor's assumption of each Collective Bargaining Agreement to which it is a party for the remaining term of agreement of each such Collective Bargaining Agreement as in effect on the Effective Date, except to the extent that such agreements have already been assumed prior to the Effective Date.

6.4.    <u>Insurance Policies and Agreements</u>.  Insurance policies issued to, or insurance agreements entered into by, the Debtors prior to the Petition Date (including, without limitation, any policies covering directors' or officers' conduct) shall continue in effect after the Effective Date.  To the extent that such insurance policies or agreements are considered to be executory contracts, this Plan shall constitute a motion to assume or ratify such insurance policies and agreements, and, subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute approval of such assumption pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of each Debtor and its Estate.  Unless otherwise determined by the Bankruptcy Court pursuant to a

31

Final Order or agreed to by the parties thereto prior to the Effective Date, no payments shall be required to cure any defaults of the Debtors existing as of the Confirmation Date with respect to each such insurance policy.

       6.5.   <u>Employee Compensation and Benefit Plans</u>.  From and after the Effective Date, each of the Reorganized Debtors shall continue to perform its obligations (whether statutory or contractual) under all employment and severance contracts and all Employee Benefit Plans applicable to its employees, retirees and non-employee directors, including, without limitation, the payment of all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, that such Reorganized Debtor had the obligation to pay and was paying prior to the Petition Date, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of the Bankruptcy Code at any time prior to the Confirmation Date, for the duration of the period (if any) that the applicable Reorganized Debtor(s) are obligated to provide such benefits.  In addition, notwithstanding anything in this Plan or the Confirmation Order to the contrary, on the Effective Date, the Pension Plans shall be sponsored by and become obligations of the Reorganized Debtors that sponsored such Pension Plans prior to the Petition Date, with such Reorganized Debtors assuming all statutory obligations with respect to the Pension Plans, and shall otherwise be unaffected by Confirmation of this Plan.

       6.6.   <u>Post-Petition Contracts and Leases</u>.  All contracts, agreements and leases that were entered into by the Debtors or assumed by the Debtors after the Petition Date shall be deemed assigned by the Debtors to the Reorganized Debtors on the Effective Date.

## ARTICLE VII:
## PROVISIONS GOVERNING DISTRIBUTIONS

       7.1.   <u>Distributions on Account of Claims Allowed as of the Effective Date</u>.  Unless the Holder of an Allowed Claim and the Debtors or the Reorganized Debtors agree to a different Distribution Date and except as otherwise provided herein or as ordered by the Bankruptcy Court, distributions to be made on account of Claims that are Allowed as of the Effective Date shall be made on the Effective Date.  Any payment or distribution required to be made under this Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

       7.2.   <u>Distributions on Account of Claims that Become Allowed after the Effective Date</u>.  Distributions on account of Claims that first become Allowed Claims after the Effective Date shall be made as soon as practicable after the date that such Claim becomes Allowed.

       7.3.   <u>Distribution Date</u>. Distributions to be made on the Effective Date shall be deemed actually made on the Effective Date if made either (a) on the Effective Date or (b) as soon as practicable thereafter, but in no event later than ten (10) Business Days after the Effective Date, except as otherwise provided for herein; <u>provided</u>, <u>however</u>, that, notwithstanding anything to the contrary herein, distributions to (i) Holders of Allowed Prepetition Credit Agreement Claims in Classes 1C through 9C and (ii) Holders of Allowed PD LLC Notes Claims in Classes 10C through 35C shall be made on the Effective Date pursuant to Section 3.2.3(c) and Section 3.3.3(c), respectively, of this Plan.

7.4.    <u>Interest on Claims</u>.  Except as otherwise specifically provided for in this Plan (including, for the avoidance of doubt, with respect to Prepetition Credit Agreement Claims, PD LLC Notes Claims, and General Unsecured Claims), the Confirmation Order or other order of the Bankruptcy Court, or required by applicable bankruptcy or non-bankruptcy law, post-petition interest shall not accrue or be paid on any Claims (other than Secured Claims), and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.

7.5.    <u>Distributions by Disbursing Agent(s)</u>.  Other than as specifically set forth in this Plan, the Disbursing Agent(s) shall make all distributions required to be made under this Plan.  Distributions on account of the PD LLC Notes Claims shall be made in accordance with the New PD LLC Notes Agreement or in accordance with this Plan where the New PD LLC Notes Agreement is silent.  The Reorganized Debtors may act as Disbursing Agent or may employ or contract with other Entities to assist in or make the distributions required by this Plan.

7.6.    <u>Delivery of Distributions and Undeliverable or Unclaimed Distributions</u>.  The following terms shall govern the delivery of distributions and undeliverable or unclaimed distributions with respect to Claims.

7.6.1    <u>Delivery of Distributions in General</u>.  Distributions to Holders of Allowed Claims shall be made at the addresses set forth in the Debtors' records.

7.6.2    <u>Undeliverable and Unclaimed Distributions</u>.

(a)    <u>Holding and Investment of Undeliverable and Unclaimed Distributions</u>.  If the distribution to any Holder of an Allowed Claim is returned to the Reorganized Debtors or the Disbursing Agent(s) as undeliverable or is otherwise unclaimed, no further distributions shall be made to such Holder unless and until the Reorganized Debtors or the Disbursing Agent(s) are notified in writing of such Holder's then-current address.

(b)    <u>Failure to Claim Undeliverable Distributions</u>.  Any Holder of an Allowed Claim that does not assert a claim pursuant to this Plan for an undeliverable or unclaimed distribution within one (1) year after the Effective Date shall be deemed to have forfeited its claim for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such claim for an undeliverable or unclaimed distribution against the Debtors or their Estates or the Reorganized Debtors or their property.  In such cases, any Cash for distribution on account of such claims for undeliverable or unclaimed distributions shall become the property of the Estates and the Reorganized Debtors free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary.  Any New Common Stock or New PD LLC Notes held for distribution on account of such Claim shall be canceled and of no further force or effect.  Nothing contained in this Plan shall require any Disbursing Agent, including, but not limited to, any of the Reorganized Debtors, to attempt to locate any Holder of an Allowed Claim.

7.7.    <u>Record Date for Distributions</u>.  The Reorganized Debtors and the Disbursing Agent(s) will have no obligation to but may, in their sole and absolute discretion, recognize the transfer of, or the sale of any participation in, any Allowed Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to

recognize and distribute only to those Holders of Allowed Claims that are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date.

7.8.    <u>Allocation of Plan Distributions Between Principal and Interest</u>.  To the extent that any Allowed Claim entitled to a distribution under this Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for all income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent that the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

7.9.    <u>Means of Cash Payment</u>.  Payments of Cash made pursuant to this Plan shall be in U.S. dollars and shall be made, at the option and in the sole discretion of the Reorganized Debtors, by (a) checks drawn on or (b) wire transfers from a bank selected by the Reorganized Debtors.  Cash payments to foreign creditors may be made, at the option of the Reorganized Debtors, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

7.10.    <u>Withholding and Reporting Requirements</u>.  In connection with this Plan and all distributions thereunder, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.  The Reorganized Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.  All persons holding Claims or Interests shall be required to provide any information necessary to effect information reporting and the withholding of such taxes.  Each Holder of an Allowed Claim that is to receive a distribution pursuant to this Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution.  No distribution shall be made to or on behalf of such Holder pursuant to this Plan unless and until such Holder has made arrangements satisfactory to the Reorganized Debtors for the payment and satisfaction of such tax obligations.

7.11.    <u>Setoff and Recoupment</u>.  The Reorganized Debtors may, pursuant to sections 553 and/or 558 of the Bankruptcy Code or applicable non-bankruptcy laws, but shall not be required to, set off and/or recoup against any Claim the payments or other distributions to be made pursuant to this Plan in respect of such Claim, or claims of any nature whatsoever that any of the Debtors or the Reorganized Debtors may have against the Holder of such Claim; <u>provided</u>, <u>however</u>, that neither the failure to assert such rights of setoff and/or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by any of the Reorganized Debtors of any claim that any of the Debtors or the Reorganized Debtors may assert against any Holder of an Allowed Claim.

7.12.    <u>Fractional Shares</u>.  No fractional shares of New Common Stock shall be distributed.  Where a fractional share of New Common Stock would otherwise be called for, the actual issuance shall reflect a rounding up (in the case of more than .50) of such fraction to the nearest whole share of New Common Stock, or a rounding down of such fraction (in the case of .50 or less than .50) to the nearest whole share of New Common Stock.  The total number of

shares of New Common Stock to be distributed pursuant to this Plan shall be adjusted as necessary to account for the rounding provided for herein.

## ARTICLE VIII:
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

8.1.    Objection to and Estimation of Claims.  After the Effective Date, only the Reorganized Debtors may object to the allowance of any Claim or Administrative Expense Claim.  After the Effective Date, the Reorganized Debtors shall be accorded the power and authority to allow or settle and compromise any Claim without notice to any other party, or approval of, or notice to the Bankruptcy Court.  In addition, the Debtors or the Reorganized Debtors may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Reorganized Debtors have previously objected to such Claim.

8.2.    No Distributions Pending Allowance.  No payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order and the Disputed Claim, or some portion thereof, has become an Allowed Claim.

8.3.    Distributions on Account of Disputed Claims Once They Are Allowed.  To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of this Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent(s) shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under this Plan as of the Effective Date, without any post-Effective Date interest to be paid on account of such Claim.

8.4.    Reinstated Claims and Interests.  Notwithstanding anything contained herein to the contrary, nothing shall affect, diminish or impair the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Reinstated Claim or Interest, including, but not limited to, legal and equitable rights of setoff and/or recoupment against the Holders of any Reinstated Claims.

## ARTICLE IX:
## CONFIRMATION AND CONSUMMATION OF THE PLAN

9.1.    Condition to Confirmation.  This Plan shall not be confirmed unless and until the Confirmation Order, in form and substance reasonably satisfactory to the Debtors, the Prepetition Administrative Agent, the Initial Backstop Lenders, the Required Consenting Lenders, and the Required Consenting Noteholders shall have been entered not later than forty-five (45) calendar days after the Petition Date, unless (i) otherwise agreed by the Prepetition Administrative Agent, the Initial Backstop Lenders, the Required Consenting Lenders, and the Required Consenting Noteholders or (ii) waived in accordance with Section 9.3 of this Plan.

9.2.    Conditions to Effective Date.  This Plan shall not become effective and the Effective Date shall not occur unless and until the following conditions shall have been satisfied or waived in accordance with Section 9.3 of this Plan:

35

9.2.1        The condition to confirmation in Section 9.1 of this Plan shall have been either satisfied or waived in accordance with Section 9.3 of this Plan.

9.2.2        The Confirmation Order confirming this Plan shall have been entered by the Bankruptcy Court and there shall not be a stay or injunction (or similar prohibition) in effect with respect thereto.

9.2.3        The Backstop Commitment Letters shall have become effective (and shall not have thereafter terminated) in accordance with the terms set forth therein and the conditions precedent to the obligations of the Backstop Lenders thereunder shall have been satisfied (including, but not limited to, the payment of fees and expenses).

9.2.4        Either (a) the DIP Revolving Facility Claims shall have been indefeasibly paid in full in Cash by the Lee Debtors, the "Commitments" (as defined in the DIP Revolving Facility Agreement) irrevocably cancelled, and the "Letters of Credit" (as defined in the DIP Revolving Facility Agreement) returned undrawn or (b) all conditions for converting the DIP Revolving Facility Claims into revolving loans and commitments outstanding under the New First Lien Revolving Facility shall have been satisfied.

9.2.5        The New First Lien Credit Facility Documents, the New Second Lien Term Loan Documents, and the New PD LLC Notes Documents shall have become effective in accordance with their respective terms (and all conditions precedent thereunder have been met, including, but not limited to, the payment of fees and expenses) on the Effective Date or shall be deemed to become effective on the Effective Date as a result of the coming into effect of this Plan.

9.2.6        All authorizations, consents, certifications, approvals, rulings, no-action letters, opinions or other documents or actions required by any law, regulation or order to be received or to occur in order to implement this Plan on the Effective Date shall have been obtained or shall have occurred unless failure to do so will not have a material adverse effect on the Reorganized Debtors.

9.3.    <u>Waiver of Conditions</u>.  Each of the conditions set forth in Sections 9.1 and 9.2 of this Plan may be waived in whole or in part by the Debtors with the written consent of the Prepetition Administrative Agent, the Initial Backstop Lenders, the Required Consenting Lenders, and the Required Consenting Noteholders after notice to the Bankruptcy Court and parties in interest but without the need for a hearing.

9.4.    <u>Vacation of Confirmation Order</u>.  If the Confirmation Order is vacated, (a) this Plan shall be null and void in all respects; (b) any settlement of Claims or Interests provided for hereby shall be null and void without further order of the Bankruptcy Court; and (c) the time within which the Debtors may assume and assign or reject all executory contracts and unexpired leases shall be extended for a period of one hundred twenty (120) days after the date the Confirmation Order is vacated.

9.5.    <u>Notice of Effective Date</u>.  The Debtors shall file with the Bankruptcy Court a notice of the occurrence of the Effective Date within a reasonable period of time after the

36

conditions in Section 9.2 of this Plan have been satisfied or waived pursuant to Section 9.3 of this Plan.

## ARTICLE X:
## EFFECT OF PLAN CONFIRMATION

10.1. Discharge.

10.1.1 Discharge of Non-Reinstated Claims. On the Effective Date, the Debtors shall be deemed discharged and released under section 1141(d)(l)(A) of the Bankruptcy Code from any and all Claims not Reinstated under this Plan, including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code. Except as otherwise provided herein (including with respect to all Claims that are Reinstated hereunder) or in the Confirmation Order, all consideration distributed under this Plan shall be in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims of any nature whatsoever against the Debtors or any of their Estates, assets, properties or interests in property.

10.1.2 Non-Discharge of Interests. All Interests in the Debtors are Reinstated under this Plan. Accordingly, Interests shall not be discharged by this Plan.

10.1.3 Discharge Injunction. As of the Effective Date, except as otherwise expressly provided in this Plan or the Confirmation Order, all Entities shall be precluded from asserting against the Debtors or the Reorganized Debtors and their respective assets, property and Estates, any other or further Claims (other than those Reinstated under this Plan), or any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities of any nature whatsoever, relating to any of the Debtors or Reorganized Debtors or any of their respective assets, property and Estates, based upon any act, omission, transaction or other activity of any nature that occurred prior to the Effective Date. In accordance with the foregoing, except as expressly provided in this Plan or the Confirmation Order, the Confirmation Order shall constitute a judicial determination, as of the Effective Date, of the discharge of all non-Reinstated Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void and extinguish any judgment obtained against the Debtors, the Reorganized Debtors, or any of their respective assets, property and Estates at any time, to the extent such judgment is related to a discharged Claim, debt or liability.

10.2. **Releases by the Debtors. Except as otherwise expressly provided in this Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each of the Debtors and Reorganized Debtors on its own behalf and as a representative of its respective Estate, shall, and shall be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally, each and all of the Released Parties of and from any and all Claims and causes of action (including, without limitation, Avoidance Actions), any and all other obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then**

existing or thereafter arising, in law, equity or otherwise that are or may be based in whole or in part on any act, omission, transaction, event or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to any of the Debtors, the Reorganized Debtors, their respective assets, property and Estates, the Chapter 11 Cases, the Lee Support Agreement, the Pulitzer Support Agreement, this Plan, or the Disclosure Statement  that may be asserted by or on behalf of any of the Debtors, the Reorganized Debtors or their respective Estates against any of the Released Parties; **provided**, **however**, that nothing in this Section 10.2 shall be construed to release any Released Party from willful misconduct or gross negligence as determined by a Final Order.

10.3.    **Releases by Certain Holders of Claims**.  Except as otherwise expressly provided in this Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each Holder of a Claim entitled to vote on this Plan shall be deemed to have completely and forever released, waived, and discharged unconditionally each of the Debtors and their respective Related Persons of and from any and all Claims, any and all other obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever (including, without limitation, those arising under the Bankruptcy Code), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are or may be based in whole or in part on any act, omission, transaction, event or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to any of the Debtors, the Reorganized Debtors or their respective assets, property and Estates, the Chapter 11 Cases, this Plan, and/or the Disclosure Statement; **provided**, **however**, that each Holder of a Claim that has submitted a Ballot may elect, by checking the appropriate box on its Ballot, not to grant the releases set forth in this Section 10.3, unless otherwise bound by the Lee Support Agreement or the Pulitzer Support Agreement to do so, with respect to the Debtors and their respective Related Persons; and **provided** **further**, **however**, that nothing in this Section 10.3 shall be construed to release the Debtors or their respective Related Persons, if any, from willful misconduct or gross negligence as determined by a Final Order.  For the avoidance of doubt, nothing in this Section 10.3 shall release the Reorganized Debtors and their respective Related Persons from their obligations under the New First Lien Credit Facility Documents, the New Second Lien Term Loan Documents, or the New PD LLC Notes Documents.

10.4.    Exculpation.  From and after the Effective Date, the Released Parties shall neither have nor incur any liability to, or be subject to any right of action by, any Holder of a Claim or an Interest, or any other party in interest, or any of their respective employees, representatives, financial advisors, attorneys, or agents acting in such capacity, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, formulating, negotiating or implementing the Lee Support Agreement, the Pulitzer Support Agreement, this Plan, and/or the Disclosure Statement, the solicitation of acceptances of this Plan, the pursuit of Confirmation of this Plan, the Confirmation of this Plan, the consummation of this Plan, the administration of this Plan, the property to be distributed under this Plan, or any other act taken or omitted to be taken in connection with or in

contemplation of the Chapter 11 Cases or implementation of this Plan; provided, however, that this Section 10.4 shall not apply to release (x) obligations under this Plan, and obligations under the contracts, instruments, releases, agreements, and documents delivered, Reinstated or assumed under this Plan, and (y) any claims or causes of action arising out of willful misconduct or gross negligence as determined by a Final Order.  Any of the Released Parties shall be entitled to rely, in all respects, upon the advice of counsel with respect to their duties and responsibilities under this Plan.

     10.5.   Injunction Related to Exculpation.  Except as expressly provided in this Plan or the Confirmation Order, as of the Effective Date, all Persons and Entities that hold, have held, or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, cause of action or liability of any nature whatsoever, of the types described in Section 10.4 of this Plan and relating to any of the Debtors or the Reorganized Debtors or any of their respective assets, property and/or Estates, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions against any Released Party or its property on account of such released liabilities, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities:  (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation that is discharged under Section 10.1 of this Plan; and/or (v) commencing or continuing in any manner any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of this Plan or the Confirmation Order.

     10.6.   Survival of Indemnification Obligations.  The obligations of the Debtors to indemnify any past and present directors, officers, agents, employees and representatives, pursuant to certificates or articles of incorporation, by-laws, contracts and/or applicable statutes, in respect of all actions, suits and proceedings against any of such officers, directors, agents, employees and representatives, based upon any act or omission related to service with, for or on behalf of the Debtors, shall not be discharged or impaired by Confirmation or consummation of this Plan and shall be assumed by the Reorganized Debtors.

     10.7.   Term of Bankruptcy Injunction or Stays.  All injunctions or stays provided for in the Chapter 11 Cases under section 105 or section 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

**ARTICLE XI:**
**RETENTION OF JURISDICTION**

11.1.    Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and this Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

11.1.1    allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim, Priority Tax Claim, DIP Revolving Facility Claim, or Section 507(b) Claim and the resolution of any objections to the allowance or priority of Claims or Interests;

11.1.2    resolve any matters related to the assumption or assumption and assignment of any executory contract or unexpired lease to which any Debtor is a party or with respect to which any Debtor or Reorganized Debtor may be liable and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

11.1.3    ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

11.1.4    decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

11.1.5    enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all contracts, instruments, releases and other agreements or documents created in connection with this Plan, the Disclosure Statement or the Confirmation Order, and issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of this Plan or the Confirmation Order;

11.1.6    resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation, or enforcement of this Plan or any contract, instrument, release or other agreement or document that is executed or created pursuant to this Plan, or any entity's rights arising from or obligations incurred in connection with this Plan or such documents;

11.1.7    approve any modification of this Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or approve any modification of the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with this Plan, the Disclosure Statement or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with this Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate this Plan;

11.1.8      subject to Section 12.2 of this Plan, hear and determine all applications for compensation and reimbursement of expenses of Professionals under this Plan or under sections 330, 331, 363, 503(b), 1103 and 1129(c)(9) of the Bankruptcy Code, which shall be payable by the Debtors only upon allowance thereof pursuant to an order of the Bankruptcy Court;

11.1.9      hear and determine causes of action by or on behalf of the Debtors or the Reorganized Debtors;

11.1.10      hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

11.1.11      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated, or if distributions pursuant to this Plan are enjoined or stayed;

11.1.12      determine any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement, or document created in connection with this Plan, the Disclosure Statement or the Confirmation Order;

11.1.13      enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases;

11.1.14      hear and determine all matters related to (i) the property of the Estates from and after the Confirmation Date and (ii) the activities of the Reorganized Debtors;

11.1.15      hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under the Bankruptcy Code; and

11.1.16      enter an order closing the Chapter 11 Cases.

11.2.   Notwithstanding anything in this Article XI to the contrary, any disputes arising under the New First Lien Credit Facility Documents, the New Second Lien Term Loan Documents, any Backstop Commitment Letter, or the New PD LLC Notes Documents will be governed by the jurisdictional provisions thereof.

## ARTICLE XII:
## MISCELLANEOUS PROVISIONS

12.1.   Surrender of Instruments.  As a condition to participation in distributions under this Plan, each PD LLC Noteholder and the Holder(s) of any evidence of indebtedness of the Debtors relating to a non-Reinstated Claim that desires to receive the property to be distributed on account of an Allowed non-Reinstated Claim based on such PD LLC Note or evidence of indebtedness shall surrender such PD LLC Note or evidence of indebtedness to the Debtors, or their designee, and shall execute and deliver such other documents as are necessary to effectuate this Plan.  Except as otherwise provided in this Section 12.1, if no surrender of a PD LLC Note

41

or evidence of indebtedness relating to a non-Reinstated Claim occurs and a claimant does not provide an affidavit and indemnification agreement, in form and substance reasonably satisfactory to the Debtors, that such PD LLC Note or evidence of indebtedness was lost, then no distribution may be made to any claimant whose Claim is based on such security, note, debenture or evidence of indebtedness thereof.  The Debtors shall make subsequent distributions only to the persons who surrender PD LLC Notes or evidence of indebtedness, as applicable, for exchange (or their assignees) and the record holders of such PD LLC Notes or other indebtedness shall be those holders of record as of the Distribution Record Date.

      12.2.   Post-Confirmation Date Retention of Professionals.  On the Effective Date, any requirement that Professionals employed by the Reorganized Debtors comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate, and the Reorganized Debtors will be authorized to employ and compensate professionals in the ordinary course of business and without the need for application to or approval by the Bankruptcy Court.

      12.3.   Bar Date for Certain Administrative Expense Claims.  All applications for final allowance of compensation or reimbursement of expenses incurred by any Professional, and all other requests for the payment of Administrative Expense Claims, including all requests for the allowance of any Administrative Expense Claim pursuant to section 503(b)(3)(D) of the Bankruptcy Code for substantial contributions made in the Chapter 11 Cases (but excluding all requests for the payment of obligations incurred by the Debtors in the ordinary course of their business operations after the Petition Date), must be filed with the Bankruptcy Court and served on the Reorganized Debtors and their counsel at the addresses set forth in Section 12.15 of this Plan not later than thirty (30) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.  Any request for the payment of an Administrative Expense Claim that is not timely filed and served shall be discharged and forever barred and the Holder of such Administrative Expense Claim shall be enjoined from commencing or continuing any action, process, or act to collect, offset or recover such Claim.  The Debtors and the Reorganized Debtors shall have sole responsibility for filing objections to and resolving all requests for the allowance of Administrative Expense Claims.

      12.4.   Effectuating Documents and Further Transactions.  Each of the Debtors and the Reorganized Debtors is authorized to execute, deliver, file or record such contracts, instruments, certificates, notes, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of this Plan and the New Common Stock and New PD LLC Notes issued under or in connection with to this Plan.

      12.5.   Corporate Action.  Prior to, on, or after the Effective Date (as appropriate), all matters expressly provided for under this Plan that would otherwise require approval of the stockholders or directors of one or more of the Debtors or the Reorganized Debtors shall be deemed to have occurred and shall be in effect prior to, on, or after the Effective Date (as appropriate) pursuant to the applicable general corporation law of the states in which the Debtors or the Reorganized Debtors are incorporated or organized without any requirement of further action by the stockholders or directors of the Debtors or the Reorganized Debtors.

12.6.   <u>Exemption from Transfer Taxes</u>.  Pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer or exchange of notes or equity securities under this Plan; (b) the creation of any mortgage, deed of trust, lien, pledge or other security interest; (c) the making or assignment of any lease or sublease; or (d) the making or delivery of any deed or other instrument of transfer under this Plan, including, without limitation, merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale, and transfers of tangible property, will not be subject to any stamp tax or other similar tax.

12.7.   <u>Payment of Statutory Fees</u>.  All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.

12.8.   <u>Payment of Consenting Lender Fees, Consenting Noteholder Fees, and Backstop Lender Fees</u>.  Notwithstanding anything to the contrary in this Plan, the Consenting Lender Fees, the Consenting Noteholder Fees, and the Backstop Lender Fees incurred in connection with the Lee Support Agreement, the Pulitzer Support Agreement, and Backstop Commitment Letters, respectively, shall be paid in full, in Cash, on the Effective Date to the Consenting Lenders, the Consenting Noteholders, and the Backstop Lenders, as applicable, and the Debtors shall pay such other fees and expenses on the Effective Date as may have been agreed to by the Debtors prior to the Effective Date, including, without limitation, the PD LLC Noteholder Fees and any fees or expenses required to be paid under any Backstop Commitment Letter.

12.9.   <u>Support Agreements</u>.  Until the Effective Date, notwithstanding any provision of this Plan to the contrary, nothing in this Plan shall relieve the parties to the Lee Support Agreement and the Pulitzer Support Agreement from any of their obligations thereunder.

12.10.   <u>Amendment or Modification of this Plan</u>.  Subject to section 1127 of the Bankruptcy Code, the Debtors may alter, amend or modify this Plan or the Exhibits at any time prior to or after the Confirmation Date but prior to the substantial consummation of this Plan provided that this Plan and the Exhibits remain in form and substance satisfactory to the Prepetition Administrative Agent, the Initial Backstop Lenders, and the Required Consenting Noteholders.  Any Holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Interest of such Holder.

12.11.   <u>Severability of Plan Provisions</u>.  If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and

will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

12.12.  <u>Successors and Assigns</u>.  This Plan shall be binding upon and inure to the benefit of the Debtors, and their respective successors and assigns, including, without limitation, the Reorganized Debtors.  The rights, benefits and obligations of any entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

12.13.  <u>Revocation, Withdrawal or Non-Consummation</u>.  Subject to certain restrictions and requirements set forth herein (including, without limitation, Section 12.9 of this Plan), in section 1127 of the Bankruptcy Code and in Bankruptcy Rule 3019, the Debtors reserve the right to revoke or withdraw this Plan as to any or all of the Debtors prior to the Confirmation Date and to file one or more subsequent chapter 11 plans.  If the Debtors revoke or withdraw this Plan as to any or all of the Debtors or if confirmation or consummation of this Plan as to any or all of the Debtors does not occur, then, with respect to such Debtors, (a) this Plan shall be null and void in all respects, (b) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or leases affected by this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void and (c) nothing contained in this Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtors or any other Person, (ii) prejudice in any manner the rights of such Debtors or any other Person or (iii) constitute an admission of any sort by the Debtors or any other Person.

12.14.  <u>Notice</u>.  All notices, requests and demands to or upon the Debtors or the Reorganized Debtors to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

LEE ENTERPRISES, INCORPORATED
201 N. Harrison Street, Suite 600
Davenport, IA  52801
Telephone:  563-383-2179
Facsimile: 563-327-2600
Attn:  Carl G. Schmidt

with a copy to:

SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036
Attn:  Larry J. Nyhan
Attn:  Kenneth P. Kansa

*-and-*

YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
Attn:  Robert S. Brady

Counsel to Debtors and Debtors-in-Possession

12.15.  <u>Governing Law</u>.  Subject to the provisions of any contract, certificates or articles of incorporation, by-laws, instruments, releases, or other agreements or documents entered into in connection with this Plan, and subject further to Section 11.2 of this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with (i) the Bankruptcy Code, the Bankruptcy Rules or other federal law to the extent applicable and (ii) if none of such law is applicable, the laws of the State of Delaware, without giving effect to the principles of conflicts of law of such jurisdiction.

12.16.  <u>Tax Reporting and Compliance</u>.  The Reorganized Debtors are hereby authorized, on behalf of each of the Debtors, to request an expedited determination under section 505 of the Bankruptcy Code of the tax liability of the Debtors for all taxable periods ending after the Petition Date through, and including, the Effective Date.

12.17.  <u>Exhibits</u>.  All Exhibits to this Plan are incorporated into and are a part of this Plan as if set forth in full herein.

12.18.  <u>Filing of Additional Documents</u>.  On or before substantial consummation of this Plan, the Reorganized Debtors and the Debtors shall, as applicable, file such agreements and other documents as may be necessary or appropriate to effectuate and evidence further the terms and conditions of this Plan.

12.19.  <u>Reservation of Rights</u>.  Except as expressly set forth herein, this Plan shall have no force and effect unless the Bankruptcy Court has entered the Confirmation Order.  The filing of this Plan, any statement or provision contained in this Plan, or the taking of any action

45

by the Debtors with respect to this Plan shall not be and shall not be deemed to be an admission or waiver of any rights of the Debtors or any other Person with respect to Claims against and Interests in the Debtors.

Dated:  December 2, 2011

Respectfully submitted,

LEE ENTERPRISES, INCORPORATED
(for itself and on behalf of the other Debtors)


 /s/ *Carl G. Schmidt*
Name:  Carl G. Schmidt
Title:  Vice President, Chief Financial Officer and
Treasurer

SIDLEY AUSTIN LLP
Larry J. Nyhan
Kenneth P. Kansa
Bojan Guzina
Kerriann S. Mills
One South Dearborn Street
Chicago, Illinois 60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

- and -

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Robert S. Brady (No. 2847)
Edwin J. Harron (No. 3396)
Edmon L. Morton (No. 3856)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

Counsel to the Debtors and Debtors-in-Possession

## Appendix A

**Lee Debtors**

| Debtor Number | Debtor Name |
|:---:|:---|
| 1. | Lee Enterprises |
| 2. | Journal-Star Printing Co. |
| 3. | Accudata, Inc. |
| 4. | INN Partners, L.C. |
| 5. | K.  Falls Basin Publishing, Inc. |
| 6. | Lee Consolidated Holdings Co. |
| 7. | Lee Publications, Inc. |
| 8. | Lee Procurement Solutions Co. |
| 9. | Sioux City Newspapers, Inc. |

**Appendix B**

**Pulitzer Debtors**

| Debtor Number | Debtor Name |
|---|---|
| 10. | Pulitzer Inc. |
| 11. | Pulitzer Technologies, Inc. |
| 12. | St. Louis Post-Dispatch LLC |
| 13. | Fairgrove LLC |
| 14. | STL Distribution Services LLC |
| 15. | Suburban Journals of Greater St. Louis LLC |
| 16. | Pulitzer Network Systems LLC |
| 17. | Pulitzer Newspapers, Inc. |
| 18. | Flagstaff Publishing Co. |
| 19. | Hanford Sentinel Inc. |
| 20. | HomeChoice, LLC |
| 21. | Kauai Publishing Co. |
| 22. | Napa Valley Publishing Co. |
| 23. | NIPC, Inc. f/k/a Northern Illinois Publishing Co., Inc. |
| 24. | NVPC LLC |
| 25. | Northern Lakes Publishing Co. |
| 26. | NLPC LLC |
| 27. | Pantagraph Publishing Co. |
| 28. | HSTAR LLC |
| 29. | Pulitzer Missouri Newspapers, Inc. |
| 30. | Pulitzer Utah Newspapers, Inc. |
| 31. | Santa Maria Times, Inc. |
| 32. | SHTP LLC |
| 33. | Southwestern Oregon Publishing Co. |
| 34. | SOPC LLC |
| 35. | Ynez Corporation |

## **Exhibit 1.16**

*Amended and Restated By-Laws of Reorganized Lee Enterprises*

AMENDED AND RESTATED BY-LAWS

OF

<u>LEE ENTERPRISES, INCORPORATED</u>

(A Delaware corporation)

Effective as of _____, 2012


<u>ARTICLE I</u>

<u>OFFICES</u>

SECTION 1.  <u>Principal Office</u>.  The principal office shall be at 229 South State Street, in the City of Dover, County of Kent, State of Delaware, and the name of the resident agent in charge thereof is THE PRENTICE-HALL CORPORATION SYSTEM, INC.

SECTION 2.  <u>Other Offices</u>.  The corporation may also have an office or offices at such other place or places, within or without the State of Delaware, as the Board of Directors may from time to time designate or the business of the corporation require.


<u>ARTICLE II</u>

<u>STOCKHOLDERS' MEETINGS</u>

SECTION 1.  <u>Annual Meetings</u>.  An annual meeting of the stockholders of the corporation shall be held at such time and place within or without the State of Delaware as may be determined by the Board of Directors, and as shall be designated in the notice of said meeting, for the purpose of electing directors and for the transaction of such other proper business, notice of which was given in the notice of the meeting.

SECTION 2.  <u>Nomination of Directors and Other Business</u>.

(a)  Only persons who are nominated in accordance with the following procedures shall be eligible for election as directors.  Nominations of persons for election as directors may be made at a meeting of stockholders only (x) by or at the direction of the Board of Directors,  (y) by any person or persons authorized to do so by the Board or (z) by any stockholder of the corporation entitled to vote for the election of directors at the meeting who complies with the notice procedures set forth in this Section 2.  Any such nomination, other than those made by or at the direction of the Board or by persons authorized by the Board, shall be made pursuant to timely notice in writing to the Chairman of the Nominating Committee of the Board of Directors. Such

stockholder's notice of a proposed nomination shall set forth, as to each person whom the stockholder proposes to nominate for election or re-election as a director, (i) the name, age, business address and residence address of the person, (ii) the principal occupation or employment of the person, (iii) the class and number of shares of capital stock of the corporation which are beneficially owned by the person, and (iv) any other information relating to the person that is required to be disclosed in solicitations for proxies for election of directors pursuant to Regulation 14A under the Securities Exchange Act of 1934, as now or hereafter amended; and as to the stockholder giving the notice, (v) the name and record address of such stockholder and (vi) the class and number of shares of the corporation which are beneficially owned by such stockholder. The corporation may require any proposed nominee to furnish such other information as may reasonably be required by the corporation to determine the eligibility of such proposed nominee to serve as director.  No person shall be eligible for election as a director of the corporation unless nominated in accordance with the procedures set forth herein and unless qualified under the other provisions of these bylaws.  If the chairman of the meeting determines that a nomination was not made in accordance with the foregoing procedure, he or she shall so declare to the meeting and the defective nomination shall be disregarded.

          (b)  To be properly brought before any annual or special meeting of stockholders, business must be either (x) specified in the notice of meeting (or any supplement thereto) given by or at the direction of the Board, (y) otherwise properly brought before the meeting by or at the direction of the Board, or (z) otherwise properly brought before the meeting by a stockholder.  In addition to any other applicable requirements, for business to be properly brought before a meeting by a stockholder, the stockholder must have given timely notice thereof in writing to the Secretary of the corporation.  A stockholder's notice to the Secretary shall set forth with respect to each matter the stockholder proposes to bring before the meeting (i) a brief description of the business desired to be brought before the meeting and the reasons for conducting such business at the meeting, (ii) the name and record address of the stockholder proposing such business,    (iii) the class and number of shares of the corporation which are beneficially owned by the stockholder, and (iv) any material interest of the stockholder in such business.  Notwithstanding anything in these bylaws to the contrary, no business shall be conducted at any meeting of stockholders except in accordance with the procedures set forth in this Section 2, provided, however, that nothing in this Section 2 shall be deemed to preclude discussion by any stockholder of any business properly brought before the meeting.  If the chairman of the meeting determines that such business was not properly brought before the meeting in accordance with the foregoing procedure, he or she shall so declare to the meeting, and any such business not properly brought before the meeting shall not be transacted.

          (c)  To be timely, a stockholder's notice of nomination or other business must be delivered to, or mailed and received at, the principal executive offices of the corporation, as to the annual meeting of stockholders, not later than the date fixed annually by the Board of Directors and set forth in the proxy statement for the preceding annual meeting.  As to any other meeting such notice shall be given not less than 40 days nor more that 65 days prior to the meeting; provided, however, that in the event

that less than 45 days' notice or prior public disclosure of the date of the meeting is given or made to stockholders, notice by the stockholder to be timely must be so received not later than the close of business on the 15th day following the day on which such notice of the date of the special meeting was mailed or such public disclosure was made, whichever first occurs.

SECTION 3.  <u>Special Meetings</u>.  Special meetings of the stockholders may be held at such time and place within or without the State of Delaware as may be designated in the notice of said meeting, upon call of the Board of Directors or Chairman and President.

SECTION 4.  <u>Notice of Meetings and Adjourned Meetings</u>.  Unless otherwise provided by law, written notice of any meeting of the stockholders stating the place, date, hour and purpose or purposes of the meeting shall be given not less than ten (10) nor more than fifty (50) days before the date of the meeting to each stockholder entitled to vote at such meeting.  If mailed, notice shall be deemed for all purposes to have been given when deposited in the United States mail, postage prepaid, directed to the stockholder at the address of the stockholder as it appears on the records of the corporation.  An affidavit of the Secretary or an Assistant Secretary or of the transfer agent of the corporation that the notice has been given shall, in the absence of fraud, be prima facie evidence of the facts stated therein.

When a meeting is adjourned to another time or place, notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken, provided that if the adjournment is for more than thirty (30) days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

SECTION 5.  <u>Record Date for Determination of Stockholders</u>.  In order that the corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, or entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, the stock record books of the corporation shall not be closed, but the Board of Directors shall fix, in advance, a record date, which shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting, nor more than sixty (60) days prior to any other action.

A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for the adjourned meeting.

SECTION 6.  <u>Quorum</u>.  Except as otherwise provided by law or the Amended and Restated Certificate of Incorporation of the corporation (the "Amended and Restated Certificate of Incorporation"), a quorum of all meetings of stockholders

shall consist of the holders of record of stock representing a majority of the voting power of all classes of the corporation, issued and outstanding, entitled to vote at the meeting, present in person or by proxy.  For purposes of the foregoing, two or more classes or series of stock shall be considered a single class if the holders thereof are entitled to vote together as a single class at the meeting.  In the absence of a quorum at any meeting or any adjournment thereof, a majority of the voting power of those present in person or by proxy and entitled to vote may adjourn such meeting from time to time.  At any adjourned meeting at which a quorum is present any business may be transacted which might have been transacted at the meeting as originally called.

SECTION 7.  <u>Organization</u>.  Meetings of the stockholders shall be presided over by the Chairman and President.  If he or she is not present, a Vice President shall preside.  In their absence or inability to act, another person designated by the Chairman and President shall preside.  The Secretary of the corporation, or an Assistant Secretary, shall act as secretary of every meeting, but if neither the Secretary nor an Assistant Secretary is present, the presiding officer shall choose any person present to act as secretary of the meeting.

SECTION 8.  <u>Voting</u>.  Except as provided in Section 9 or as otherwise provided by law, each stockholder entitled to vote at any meeting of stockholders shall be entitled to such number of votes as is specified, in respect of the class or series of capital stock held by such stockholder, in the Amended and Restated Certificate of Incorporation, and a proportionate vote for each fraction of a share of capital stock held by such stockholder.  Any vote of stock of the corporation may be given by the stockholder entitled thereto in person or by his or her proxy appointed by an instrument in writing, subscribed by such stockholder or his or her attorney thereto authorized and delivered to the Secretary of the meeting; provided, however, that no proxy shall be voted on after three (3) years from its date unless said proxy provides for a longer period.  Except as otherwise required by law or the Amended and Restated Certificate of Incorporation or these Amended and Restated By-Laws ("By-Laws"), or in electing directors, all matters coming before any meeting of the stockholders shall be decided by the vote of a majority of the voting power of all classes of stock of the corporation present in person or by proxy at such meeting and entitled to vote thereat, a quorum being present.  At all elections of directors the voting may, but need not be, by ballot and a plurality of the votes cast thereat shall elect.

SECTION 9.  <u>Voting of Shares by Aliens</u>.  No more than twenty percent (20%) of the outstanding shares of stock of the corporation entitled to vote on any matter submitted to stockholders (including the election of directors) shall be voted, directly or indirectly, by or for the account of all aliens as a group.  All references herein to "alien" shall include the representatives, associates and affiliates of such alien.  The term "alien", "representative", "associate", and "affiliate" shall be defined as set forth in Subdivision (J) to Article FOURTH of the Amended and Restated Certificate of Incorporation.

SECTION 10.  <u>List of Stockholders</u>.  The officer who has charge of the stock ledger of the corporation shall prepare and make, at least ten (10) days before

every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder.  Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours, for a period of at least ten (10) days prior to the meeting, either at a place within the city where the meeting is to be held, which place shall be specified in the notice of the meeting, or, if not so specified, at the place where the meeting is to be held.  The list shall also be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present.

SECTION 11.  <u>Inspectors of Voting</u>.  Except as otherwise provided by statute, the Chairman and President or in his or her absence the chairman of the meeting, shall appoint one or more inspectors of voting for each meeting of stockholders.

SECTION 12.  <u>Meeting Procedures</u>.  Meetings of stockholders shall be conducted in a fair manner but need not be governed by any prescribed rules of order.  The presiding officer's rulings on procedural matters shall be final.  The presiding officer is authorized to impose reasonable time limits on the remarks of individual stockholders and may take such steps as such officer may deem necessary or appropriate to assure that the business of the meeting is conducted in a fair and orderly manner including, without limitation, to adjourn any meeting and determine the date, time and place at which any adjourned meeting shall be reconvened, unless otherwise determined by the Board of Directors.


<u>ARTICLE III</u>

<u>DIRECTORS</u>

SECTION 1.  <u>Powers, Number, Qualification, Term, Quorum and Vacancies</u>.  The property, affairs and business of the corporation shall be managed by its Board of Directors, consisting of such number as shall be fixed from time to time by resolution adopted at a meeting of the stockholders or as may be determined by the Board of Directors as hereinafter provided.  The number of directors shall never be less than three (3).  The directors shall be divided into three classes as nearly equal in number as possible, with the term of office of one class expiring each year.  Following expiration of terms for which they were elected, each class of directors shall thereafter be elected for a three-year term.  The directors shall have power from time to time, and at any time, when the stockholders as such are not assembled in a meeting, regular or special, to increase or decrease their own number.  During the intervals between annual meetings of stockholders, any vacancy occurring in the Board of Directors caused by resignation, removal, death or incapacity, and any newly created directorships resulting from an increase in the number of directors, shall be filled by a majority vote of the directors then in office, whether or not a quorum.  Each director chosen to fill a vacancy shall hold office for the unexpired term in respect of which such vacancy occurred.

Each director chosen to fill a newly created directorship shall hold office until the next election of the class for which such director shall have been chosen.  When the number of directors is changed, any newly created directorships or any decrease in directorships shall be so apportioned among the classes as to make all classes as nearly equal in number as possible.  Each director shall serve until a successor shall have been duly elected and qualified, except in the event of resignation, removal, death or other incapacity.

Directors need not be stockholders.  No alien (including the representatives, associates and affiliates thereof) shall be eligible to serve as a director of the corporation.  The terms "alien", "representative", "associate", and "affiliate", shall be defined as set forth in Subparagraph (J) to Article FOURTH of the Amended and Restated Certificate of Incorporation.

A majority of the members of the Board of Directors then acting, but in no event less than one-third nor less than two (2) of the number of directors authorized, acting at a meeting duly assembled, shall constitute a quorum for the transaction of business, but if at any meeting of the Board of Directors there shall be less than a quorum present, a majority of those present may adjourn the meeting, without further notice, from time to time until a quorum shall have been obtained.

SECTION 2.  <u>Meetings</u>.  Meetings of the Board of Directors shall be held at such place within or outside the State of Delaware as may from time to time be fixed by resolution of the Board of Directors, or as may be specified in the notice of the meeting.  Regular meetings of the Board of Directors shall be held at such times as may from time to time be fixed by resolution of the Board of Directors, and special meetings may be held at any time upon the call of the Chairman and President or any two (2) directors by oral, telegraphic, facsimile or other written notice duly communicated to, served on, sent, or mailed to each director at his or her principal address as recorded in the records of the corporation not less than twenty-four (24) hours before such meeting. A meeting of the Board of Directors shall be held without notice immediately after the annual meeting of stockholders.  Notice need not be given of regular meetings of the Board of Directors held at times fixed by resolution of the Board of Directors.  Meetings may be held at any time without notice if all the directors are present, or if at any time before or after the meeting those not present waive notice of the meeting in writing.

SECTION 3.  <u>Action Without Meeting</u>.  Any action required or permitted to be taken at any meeting of the Board of Directors, or any committee thereof, may be taken without a meeting if all members of the Board or committee, as the case may be, consent thereto in writing, and the writing or writings are filed with the minutes of the proceedings of the Board or committee.

SECTION 4.  <u>Committees</u>.  The Board of Directors may, by resolution passed by a majority of the whole Board, designate one or more committees, each committee to consist of two (2) or more of the directors of the corporation.  The Board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.  Any such

committee, to the extent provided in the resolution, shall have and may exercise the powers of the Board of Directors in the management of the business and affairs of the corporation, and may authorize the seal of the corporation to be affixed to all papers which may require it; provided, however, that in the absence or disqualification of any member of such committee or committees, the member or members thereof present at any meeting and not disqualified from voting, whether or not he or she or they constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member.

SECTION 5.  <u>Dividends</u>.  Subject always to the provisions of the law and the Amended and Restated Certificate of Incorporation, the Board of Directors shall have full power to determine whether any, and if any, what part of any, funds legally available for the payment of dividends shall be declared in dividends and paid to stockholders; the division of the whole or any part of such funds of the corporation shall rest wholly within the lawful discretion of the Board of Directors, and it shall not be required at any time, against such discretion, to divide or pay any part of such funds among or to the stockholders as dividends or otherwise; and the Board of Directors may fix a sum which may be set aside or reserved over and above the capital paid in of the corporation as working capital for the corporation or as a reserve for any proper purpose, and from time to time may increase, diminish, and vary the same in its absolute judgment and discretion.

SECTION 6.  <u>Removal of Directors</u>.  A director may be removed from office at any time, but only for cause, by the affirmative vote of the holders of a majority of the outstanding shares of stock entitled to vote for the election of directors at a meeting of the stockholders called for that purpose.

SECTION 7.  <u>Indemnification of Officers, Directors, Employees and Aliens</u>.

(a) Each officer, director, employee and agent of the corporation and each person serving at the request of the corporation as an officer, director, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall be indemnified (including payment of expenses in advance) by the corporation to the full extent from time to time provided or authorized by the General Corporation Law of the State of Delaware.  This right of indemnification shall not be exclusive of other indemnification rights to which any such person may be entitled under contract, by-law, vote of stockholders or disinterested directors, policy of insurance or otherwise.  The subsequent provisions of this By-law shall not limit or otherwise modify the foregoing provision.

(b) The corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the corporation) by reason of the fact that he or she is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses

(including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him or her in connection with such action, suit or proceeding if he or she acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interest of the corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his or her conduct was unlawful.  The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he or she reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his or her conduct was unlawful.

(c) The corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the corporation to procure a judgment in its favor by reason of the fact that he or she is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by him or her in connection with the defense or settlement of such action or suit if he or she acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the corporation and except that no indemnification shall be made in respect of any claim, issue or matter as to which such persons shall have been adjudged to be liable to the corporation unless and only to the extent that the Court of Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

(d) To the extent that a director, officer, employee or agent of a corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in subsections (b) and (c), or in defense of any claim, issue or matter therein, he or she shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by him or her in connection therewith.

(e) Any indemnification under subsections (b) and (c) (unless ordered by a court) shall be made by the corporation only as authorized in the specific case upon a determination that indemnification of the director, officer, employee or agent is proper in the circumstances because he or she has met the applicable standard of conduct set forth in subsections (b) and (c).  Such determination shall be made (1) by the board of directors by a majority vote of a quorum consisting of directors who were not parties to such action, suit or proceeding, or (2) if such a quorum is not obtainable, or, even if obtainable a quorum of disinterested directors so directs, by independent legal counsel in a written opinion, or (3) by the stockholders.

(f) Expenses incurred by an officer or director in defending a civil or criminal action, suit or proceeding may be paid by the corporation in advance of the final

disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such director or officer to repay such amount if it shall ultimately be determined that he or she is not entitled to be indemnified by the corporation as authorized in this Section.  Such expenses incurred by other employees and agents may be so paid upon such terms and conditions, if any, as the board of directors deems appropriate.

(g) The indemnification and advance of expenses provided by or granted pursuant to, the other subsections of this section shall not be deemed exclusive of any other rights to which those seeking indemnification and advancement of expenses may be entitled under any by-law, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in his or her official capacity and as to action in another capacity while holding such office.  The corporation shall have authority to enter into indemnification agreements with its officers and directors, the terms of which shall be approved by the Board of Directors.

(h) The corporation shall have power to purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against him or her and incurred by him or her in any such capacity, or arising out of his or her status as such, whether or not the corporation would have the power to indemnify him or her against such liability under the provisions of this section.

(i) For purposes of this Section, references to "the corporation" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, and employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under the provisions of this Section with respect to the resulting or surviving corporation as he or she would have with respect to such constituent corporation if its separate existence had continued.

(j) For purposes of this Section, references to "other enterprises" shall include employee benefit plans; references to "fines" shall include any excise taxes assessed on a person with respect to any employee benefit plan; and references to "serving at the request of the corporation" shall include any service as a director, officer, employee or agent of the corporation which imposes duties on, or involves services by, such director, officer, employee, or agent with respect to an employee benefit plan, its participants, or beneficiaries; and a person who acted in good faith and in a manner he or she reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interests of the corporation" as referred to in this Section.  References to

"actions" or "proceedings" shall include administrative or investigative inquiries as well as suits at law or in equity.

(k) The indemnification and advancement of expenses provided by, or granted pursuant to, this section shall, unless otherwise provided when authorized or ratified, continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a person.

ARTICLE IV

OFFICERS, GROUPS AND STAFF

SECTION 1.  Number.  The Board of Directors at its first meeting after each annual meeting of the stockholders, or at any time thereafter, shall elect a Chairman and President (acting as Chief Executive Officer), one or more Vice Presidents (the number to be determined by the Board of Directors), a Secretary and a Treasurer.  The Board of Directors may elect or appoint from time to time one or more Group Presidents, Vice Presidents, Assistant Secretaries and Assistant Treasurers and such other officers and agents as it shall deem necessary.

SECTION 2.  Term and Removal.  Each elective officer shall hold office until the next annual meeting of the Board of Directors, or until his or her successor is elected and qualifies.  Each appointive officer shall hold office at the will of the Board of Directors.  Any officer elected or appointed by the Board of Directors may be removed, either with or without cause, at any time, by the affirmative vote of a majority of the members of the Board of Directors then in office.  A vacancy in any office arising from any cause may be filled by the Board of Directors.

SECTION 3.  Chairman and President.  The Chairman and President shall be Chief Executive Officer of the corporation, shall preside at all meetings of the Board of Directors, and shall have general supervision of the business, affairs and property of the corporation and over its several officers, subject to the control of the Board of Directors.  He or she shall be ex officio a member of all standing committees, other than the Audit and Executive Compensation Committees, and shall see that all orders and resolutions of the Board of Directors are carried into effect.  He or she shall make recommendations to the Board of Directors with respect to corporate policies and other matters of importance which he or she believes should be submitted for Board consideration.  He or she shall have all the powers usually vested in the office of a general manager and chief executive officer of a corporation.  He or she shall have power to execute contracts and other documents on behalf of the corporation, under seal or otherwise, except as to those matters as may be specifically reserved to the Board of Directors by resolution adopted from time to time by the Board of Directors.

SECTION 4.  Group Presidents.  Each Group President shall be a corporate officer and within the limitations placed by the policies adopted by the Board

of Directors or the Chairman and President, shall be the chief operating officer of the operating group assigned and shall in general supervise and control such business and affairs of the group and operations assigned thereto and perform such other duties as may be prescribed from time to time by the Chairman and President or the Board of Directors.

SECTION 5.  <u>Vice Presidents</u>.  Each Vice President shall have such powers and perform such duties as may be assigned to him or her by the Chairman and President or the Board of Directors.

SECTION 6.  <u>Secretary</u>.  The Secretary shall attend all sessions of the Board of Directors and all meetings of the stockholders and record all votes and the minutes of all proceedings in a book to be kept for that purpose.  He or she shall give, or cause to be given, notice of all meetings of the stockholders and special meetings of the Board of Directors and shall perform such other duties as may be prescribed by the Chairman and President or the Board of Directors.  He or she shall keep in safe custody the seal of the corporation and, when authorized to do so, affix the same to any instrument requiring it, and when so affixed it shall be attested by his or her signature or by the signature of the Treasurer or an Assistant Secretary.

SECTION 7.  <u>Treasurer</u>.  The Treasurer shall have charge and custody of and be responsible for all funds and securities of the corporation; receive and give receipts for monies due and payable to the corporation from any source whatsoever and deposit all such monies in the name of the corporation in such banks, trust companies or other depositaries as shall be selected in accordance with the provisions of Article VI of these By-Laws; and, in general, perform all of the duties incident to the office of Treasurer and such other duties as shall from time to time be assigned to him or her by the Chairman and President or the Board of Directors.

SECTION 8.  <u>Assistant Secretaries and Assistant Treasurers</u>.  Assistant Secretaries and Assistant Treasurers, if any, shall be elected or appointed by the Board of Directors and shall have such powers and shall perform such duties as shall be assigned to them by the Chairman and President or the Board of Directors.

SECTION 9.  <u>Establishment of Groups</u>.  The Board of Directors or the Chairman and President may cause the business of the corporation to be divided into one or more groups, based upon product or service, geographical territory, character and type of operations, or upon such other basis as the Board of Directors or the Chairman and President may from time to time determine to be advisable.  A group shall operate under the authority and direction of a Group President and may operate under trade names approved for such purpose as may be authorized by the Board of Directors or the Chairman and President.

SECTION 10.  <u>Group Officers</u>.  The Group President of a group, after authorization by the Chairman and President, may appoint any number of group officers (who shall not, by virtue of such appointment, be corporate officers), and may remove any such group officer.  Such officers shall have such authority as may from time to time

be assigned by the Group President.

SECTION 11.  <u>Staff Officers</u>.  The Chairman and President may appoint any number of staff officers (who shall not, by virtue of such appointment, be corporate officers), and may remove any such staff officer as the Chairman and President may deem appropriate from time to time.  Such officers shall have such authority as may from time to time be assigned by the Chairman and President.


<u>ARTICLE V</u>


<u>CERTIFICATES OF STOCK AND UNCERTIFICATED STOCK</u>


SECTION 1.  <u>Certificates of Shares and Uncertificated Shares</u>.  The Board of Directors may authorize the issuance of some or all of the shares of its common stock without certificates.  The authorization does not affect shares already represented by certificates until they are surrendered to the corporation.  The corporation shall be permitted to issue fractional shares.  Shares of stock held by or for the account of aliens (including the representatives, associates, and affiliates thereof) shall be represented by "Foreign Share Certificates".  The terms "alien", "representative", "associate" and "affiliate" shall be defined as set forth in Subparagraph (J) of Article FOURTH of the Amended and Restated Certificate of Incorporation.  All such other shares of stock shall be represented by either "Domestic Share Certificates" or, in the case of uncertificated stock, by such written statements issued by the corporation in respect of uncertificated shares.  All such certificates or written statements shall be in such form and design as the Board of Directors may approve, and each certificate or written statement shall express on its face its number, date of issuance, the number of shares for which and the person to whom issued.

SECTION 2.  <u>Ownership, Control and Transfer of Shares</u>.  Not more than twenty percent (20%) of the outstanding shares of stock of the corporation shall at any time be owned or controlled, directly or indirectly, by or for the account of all aliens as a group.  Shares of stock shall be transferable on the books of the corporation by the holder thereof in person or by duly authorized attorney upon the surrender of the certificate representing shares to be transferred, properly endorsed, or, in the case of uncertificated stock, by the registration of the transfer of the uncertificated shares on the books of the corporation by the holder thereof; provided, however, that shares of stock other than shares represented by foreign share certificates shall be transferable to aliens or any person holding for the account thereof only when the aggregate number of shares of stock owned by or for the account of all aliens as a group will not then be more than twenty percent (20%) of the number of shares outstanding.  The Board of Directors may direct that, before shares of stock shall be transferred on the books of the corporation, the corporation may require information as to whether the proposed transferee is an alien or will own the stock for the account of an alien.  The issuance or transfer of any of the shares of stock at any time outstanding to an alien contrary to the provisions of this Section shall be void.  All references herein to "alien" shall include the

representatives, associates and affiliates of such alien.  The terms "alien", "representative", "affiliate", "associate", "control" and "person" shall be defined as set forth in Subparagraph (J) to Article FOURTH of the Amended and Restated Certificate of Incorporation.

Transfers of shares of the capital stock of the corporation shall be made only on the books of the corporation by the registered holder thereof, or by his or her attorney thereunto authorized by power of attorney duly executed and filed with the Secretary of the corporation, or with a transfer clerk or a transfer agent appointed as in Section 4 of this Article provided, and on surrender of the certificate or certificates for such shares properly endorsed and the payment of all taxes thereon, or, in the case of uncertificated stock, by the registration of the transfer of the uncertificated shares and the payment of all taxes thereon.  The person in whose name shares of stock stand on the books of the corporation shall be deemed the owner thereof for all purposes as regards the corporation; provided that whenever any transfer of shares shall be made for collateral security, and not absolutely, such fact, if known to the Secretary of the corporation, shall be so expressed in the entry of transfer.  The Board may, from time to time, make such additional rules and regulations as it may deem expedient, not inconsistent with these By-Laws, concerning the issue, transfer, and registration of certificates for shares or uncertificated shares of the capital stock of the corporation.

The certificates of stock shall be signed by the Chairman and President or a Vice President and by the Secretary or an Assistant Secretary or the Treasurer or an Assistant Treasurer, and sealed with the seal of the corporation.  If a certificate of stock is countersigned (1) by a transfer agent other than the corporation or its employee, or (2) by a registrar other than the corporation or its employee, any other signature on the certificate may be a facsimile.  In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate of stock shall have ceased to be such officer, transfer agent or registrar before such certificate of stock is issued, it may be issued by the corporation with the same effect as if he or she were such officer, transfer agent or registrar at the date of issue.

SECTION 3.  Lost, Destroyed or Stolen Certificates.  No certificate for shares of stock in the corporation or uncertificated shares in place of any certificate or certificates previously issued by the corporation shall be issued in place of any certificate alleged to have been lost, destroyed or stolen, except on production of such evidence of such loss, destruction or theft and on delivery to the corporation, if the Board of Directors shall so require, of a bond of indemnity in such amount (not exceeding twice the value of the shares represented by such certificate), upon such terms and secured by such surety as the Board of Directors may in its discretion require.

SECTION 4.  Transfer Agent and Registrar.  The Board of Directors may appoint one or more Transfer Clerks or one or more Transfer Agents and one or more Registrars, and may require all certificates of stock to bear the signature or signatures of any of them.

SECTION 5.  <u>Rules and Regulations</u>.  The Board of Directors shall have power and authority to make all such rules and regulations as it may deem expedient concerning the issue, transfer and registration of certificates for shares of the capital stock of the corporation.

<div align="center">

ARTICLE VI

BANK ACCOUNTS, CHECKS, LOANS, ETC.

</div>

SECTION 1.  <u>Bank Accounts and Checks</u>.  Such officers or agents of the corporation as from time to time shall be designated by the Board of Directors shall have authority to deposit any funds of the corporation in such banks or trust companies as shall from time to time be designated by the Board of Directors; and such officers or agents as from time to time shall be designated by the Board of Directors shall have authority to withdraw from time to time any or all of the funds of the corporation so deposited in any bank or trust company, upon checks, drafts or other instruments or orders for the payment of money, drawn against the account or in the name or behalf of the corporation, and made or signed by such officers or agents; and each bank or trust company with which funds of the corporation are so deposited is authorized to accept, honor, cash and pay, without limit as to amount, all checks, drafts or other instruments or orders for the payment of money, when drawn, made or signed by officers or agents so designated by the Board of Directors, regardless of whether the same are payable to the order of any officer or agent signing the same, until written notice of the revocation by the Board of Directors of the authority of such officers or agents shall have been received by such bank or trust company.  The officers of the corporation or any of them shall from time to time certify to the banks or trust companies in which funds of the corporation are deposited, the signatures of the officers or agents of the corporation so authorized to draw against the same, and such signatures may include the signature of such certifying officer or officers.

SECTION 2.  <u>Loans</u>.  Such officers or agents of the corporation as from time to time shall be designated by the Board of Directors shall have authority to effect loans, advances or other forms of credit at any time or times for the corporation from such banks or trust companies as the Board of Directors shall from time to time designate, and as security for the repayment of such loans, advances or other forms of credit to assign, transfer, endorse and deliver, either originally or in addition or substitution, any or all stocks, bonds, rights and interests of any kind in or to stocks or bonds, certificates of such rights or interests, deposits, accounts, documents covering merchandise, bills receivable and other commercial paper and evidences of debt, at any time held by the corporation; and for such loans, advances, or other forms of credit to make, execute and deliver one or more notes, acceptances or other written obligations of the corporation on such terms, and with such provisions as to the securities including the sale or disposition thereof, as such officers or agents shall deem proper; and also to sell to, or discount or rediscount with, such banks or trust companies any and all commercial paper, bills receivable, acceptances and other instruments and evidences of debt at any time held by the corporation, and to that end to endorse, transfer and

deliver the same.  The officers of the corporation or any of them shall from time to time certify the signatures of the officers or agents so authorized, which may include the signature of such certifying officer or officers, to each bank or trust company so designated by the Board of Directors; and each such bank or trust company is authorized to rely upon such certification until written notice of the revocation by the Board of Directors of the authority of such officers or agents shall have been received by such bank or trust company.

## ARTICLE VII

## FISCAL YEAR

The fiscal year of the corporation shall be a 52 or 53 week period which begins on the first Monday after the last Sunday in September and ends on the last Sunday in the following September, unless otherwise determined by the Board of Directors.

## ARTICLE VIII

## CORPORATE SEAL

The corporate seal of the corporation shall consist of two concentric circles, between which shall be the name of the corporation, and in the center shall be inscribed the year of its incorporation and the words, "Corporate Seal, Delaware".

## ARTICLE IX

## AMENDMENTS

The By-Laws of the corporation shall be subject to alteration, amendment or repeal and new By-Laws not inconsistent with any provision of the Amended and Restated Certificate of Incorporation or statute may be made, either by the affirmative vote of the holders of record of stock representing a majority of the voting power of all classes of stock of the corporation present in person or by proxy at any annual or special meeting of the Stockholders and entitled to vote thereat, a quorum being present, or by the affirmative vote of a majority of the whole Board, given at any regular or special meeting of the Board, provided that notice of the proposal to so make, alter, amend or repeal such By-Laws be included in the notice of such meeting of the Board or the Stockholders, as the case may be.  By-Laws made, altered or amended by the Board may be altered, amended or repealed by the Stockholders at any annual or special meeting thereof.

# **Exhibit 1.18**

*Amended and Restated Certificate of Incorporation of
Reorganized Lee Enterprises*

**AMENDED AND RESTATED CERTIFICATE OF
INCORPORATION
OF
LEE ENTERPRISES, INCORPORATED**

Lee Enterprises, Incorporated (hereinafter referred to as the "Corporation"), a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware (as amended from time to time, the "DGCL"), DOES HEREBY CERTIFY AS FOLLOWS:

The original certificate of incorporation of the Corporation was filed in the office of the Secretary of State on September 22, 1950.  This Amended and Restated Certificate of Incorporation was duly adopted in accordance with the provisions of Sections 103, 242, 245 and 303 of the DGCL, and amends and restates, in their entirety, the provisions of the Corporation's Certificate of Incorporation.  Provision for the making of this Amended and Restated Certificate of Incorporation is contained in the order of the United States Bankruptcy Court for the District of Delaware dated as of [____ _____], 2012 confirming the Amended Joint Prepackaged Plan of Reorganization for Lee Enterprises, Incorporated and its Debtor Subsidiaries Proposed by the Debtors within the meaning of Section 1129 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and filed  pursuant to Section 1121(a) of the Bankruptcy Code.

The Corporation's Certificate of Incorporation is hereby amended and restated so as to read in its entirety as follows:

FIRST: The name of the Corporation  is and shall be:

LEE ENTERPRISES, INCORPORATED

SECOND:  The name and address of its registered agent is Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, DE  19808.

THIRD: The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the DGCL.

FOURTH:  The total number of shares of all classes of stock which the Corporation shall have authority to issue is 150,500,000, consisting of 500,000 shares of Serial Convertible Preferred Stock, without par value, 120,000,000 shares of Common Stock, par value $0.01 per share ("Common Stock"), and 30,000,000 shares of Class B Common Stock, par value $2.00 per share ("Class B Common Stock").

Notwithstanding anything herein to the contrary, the Corporation shall not be authorized to issue non-voting capital stock of any class, series or other designation

to the extent prohibited by Section 1123(a)(6) of the Bankruptcy Code; provided, however, that the foregoing restriction shall (i) have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (ii) only have such force and effect for so long as such Section 1123(a)(6) is in effect and applies to the Corporation and (iii) be deemed void or eliminated if required under applicable law.

The following is a statement of the designations, preferences and rights, and the qualifications, limitations and restrictions thereof, in respect of the Common Stock and the Class B Common Stock and the Serial Convertible Preferred Stock, except such thereof as the Board of Directors is herein expressly authorized to fix.

COMMON STOCK AND CLASS B COMMON STOCK

(A) The powers, preferences and rights of the Common Stock and Class B Common Stock, and the qualifications, limitations or restrictions thereof, shall be in all respects identical, except as otherwise required by law or expressly provided in this Amended and Restated Certificate of Incorporation.

(B) At each annual or special meeting of stockholders, each holder of Common Stock shall be entitled to one (1) vote in person or by proxy for each share of Common Stock standing in his name on the stock transfer records of the Corporation and each holder of Class B Common Stock shall be entitled to ten (10) votes in person or by proxy for each share of Class B Common Stock standing in his name on the stock transfer records of the Corporation. Except as set forth below, all actions submitted to a vote of stockholders shall be voted on by the holders of Common Stock and Class B Common Stock voting together as a single class. The holders of Common Stock and Class B Common Stock shall vote separately as classes with respect to amendments to this Amended and Restated Certificate of Incorporation that alter or change the powers, preferences or special rights of their respective classes of stock so as to affect them adversely, and with respect to such other matters as may require class votes under the DGCL. The holders of all outstanding shares of capital stock of the Corporation entitled to vote shall vote together as a single class upon any proposal to authorize additional shares of Common Stock or Class B Common Stock, or upon any proposal to issue authorized but unissued shares of Class B Common Stock other than (i) pursuant to stock dividends, stock splits or (ii) issuances pursuant to the 1977 Employee Stock Purchase Plan for 1985-86 and the 1975 and 1982 Stock Option Plans respecting outstanding stock options for which shares of Class B Common Stock have been duly reserved for issuance on the record date for the initial distribution of shares of Class B Common Stock (the "Record Date").

(C) If and when dividends on the Common Stock and Class B Common Stock are declared payable from time to time by the Board of Directors from funds legally available therefor, whether payable in cash, in property or in shares of stock of the Corporation, the holders of Common Stock and the holders of Class B Common Stock shall be entitled to share equally, share for share, in such dividends, except that, if dividends are declared that are payable in shares of Common Stock or Class B

Common Stock, dividends shall be declared that are payable at the same rate on both classes of stock and the dividends payable in shares of Common Stock shall be payable to holders of that class of stock and the dividends payable in shares of Class B Common Stock shall be payable to holders of that class of stock. If the Corporation shall in any manner subdivide or combine the outstanding shares of Common Stock or Class B Common Stock, the outstanding shares of the other such class of stock shall be proportionally subdivided or combined in the same manner and on the same basis as the outstanding shares of Common Stock or Class B Common Stock, as the case may be, have been subdivided or combined.

(D) (1) The holder of each outstanding share of Class B Common Stock shall have the right at any time, or from time to time, at such holder's option to convert such share into one fully paid and non-assessable share of Common Stock, on and subject to the terms and conditions hereinafter set forth.

(2) In order to exercise his conversion privilege, the holder of any shares of Class B Common Stock to be converted shall present and surrender the certificate representing such shares during usual business hours at any office or agency of the Corporation maintained for the transfer of Class B Common Stock and shall deliver a written notice of the election of the holder to convert the shares represented by such certificate or any portion thereof specified in such notice. Such notice shall also state the name or names (with address) in which the certificate or certificates for shares of Common Stock which shall be issuable on such conversion shall be issued. If so required by the Corporation, any certificate for shares surrendered for conversion shall be accompanied by instruments of transfer, in form satisfactory to the Corporation, duly executed by the holder of such shares or his duly authorized representative. Each conversion of shares of Class B Common Stock shall be deemed to have been effected on the date (the "conversion date") on which the certificate or certificates representing such shares shall have been surrendered and such notice and any required instruments of transfer shall have been received as aforesaid, and the person or persons in whose name or names any certificate or certificates for shares of Common Stock shall be issuable on such conversion shall be deemed to have become immediately prior to the close of business on the conversion date the holder or holders of record of the shares of Common Stock represented thereby.

(3) As promptly as practicable after the presentation and surrender for conversion, as herein provided, of any certificate for shares of Class B Common Stock, the Corporation shall issue and deliver at such office or agency, to or upon the written order of the holder thereof, certificates for the number of shares of Common Stock issuable upon such conversion. In case any certificate for shares of Class B Common Stock shall be surrendered for conversion of a part only of the shares represented thereby, the Corporation shall deliver at such office or agency, to or upon the written order of the holder thereof, a certificate or certificates for the number of shares of Class B Common Stock represented by such surrendered certificate, which are not being converted. The issuance of certificates for shares of Common Stock issuable upon the conversion of shares of Class B Common Stock shall be made without charge to the

converting holder for any tax imposed on the Corporation in respect of the issue thereof. The Corporation shall not, however, be required to pay any tax which may be payable with respect to any transfer involved in the issue and delivery of any certificate in a name other than that of the holder of the shares being converted, and the Corporation shall not be required to issue or deliver any such certificate unless and until the person requesting the issue thereof shall have paid to the Corporation the amount of such tax or has established to the satisfaction of the Corporation that such tax has been paid.

(4) Upon any conversion of shares of Class B Common Stock into shares of Common Stock pursuant hereto, no adjustment with respect to dividends shall be made; only those dividends shall be payable on the shares so converted as may be declared and may be payable to holders of record of shares of Class B Common Stock on a date prior to the conversion date with respect to the shares so converted; and only those dividends shall be payable on shares of Common Stock issued upon such conversion as may be declared and may be payable to holders of record of shares of Common Stock on or after such conversion date.

(5) In case of any consolidation or merger of the Corporation as a result of which the holders of Common Stock shall be entitled to receive stock, other securities or other property with respect to or in exchange for Common Stock or in case of any sale or conveyance of all or substantially all of the property or business of the Corporation as an entirety, a holder of a share of Class B Common Stock shall have the right thereafter, so long as the conversion right hereunder shall exist, to convert such share into the kind and amount of shares of stock and other securities and properties receivable upon such consolidation, merger, sale or conveyance by a holder of one share of Common Stock and shall have no other conversion rights with regard to such share. The provisions of this subparagraph (5) shall similarly apply to successive consolidations, mergers, sales or conveyances.

(6) All shares of Class B Common Stock which shall have been surrendered for conversion as herein provided shall no longer be deemed to be outstanding, and all rights with respect to such shares, including the rights, if any, to receive notices and to vote, shall thereupon cease and terminate, except only the right of the holders thereof, subject to the provisions of subparagraph (3) of this subdivision (D), to receive shares of Common Stock in exchange therefor.

(7) Such number of shares of Common Stock as may from time to time be required for such purpose shall be reserved for issuance upon conversion of outstanding shares of Class B Common Stock.

(E) (1) No person holding shares of Class B Common Stock (hereinafter called a "Class B Holder") may transfer, and the Corporation shall not register the transfer of, such shares of Class B Common Stock, whether by sale, assignment, gift, bequest, appointment or otherwise, except to a Permitted Transferee of such Class B Holder, which term shall have the following meanings:

(a) In the case of a Class B Holder who is a natural person and the holder of record and beneficial owner of the shares of Class B Common Stock subject to said proposed transfer, "Permitted Transferee" means (A) the spouse of such Class B Holder, (B) a lineal descendant of a great grandparent of such Class B Holder or a spouse of any such lineal descendant, (C) the trustee of a trust (including a voting trust) for the benefit of one or more Class B Holders, other lineal descendants of a great grandparent of such Class B Holder, the spouse of such Class B Holder, the spouses of such other lineal descendants and an organization contributions to which are deductible for federal income, estate or gift tax purposes (hereinafter called a "Charitable Organization"), and for the benefit of no other person, provided that such trust may grant a general or special power of appointment to the spouse of such Class B Holder, any lineal descendant of such Class B Holder or the spouse of any such lineal descendant, and may permit trust assets to be used to pay taxes, legacies and other obligations of the trust or the estate of such Class B Holder payable by reason of the death of such Class B Holder and provided that such trust prohibits transfer of shares of Class B Common Stock to persons other than Permitted Transferees, as defined in clause (b) below, (D) a Charitable Organization established by such Class B Holder, such Class B Holder's spouse, a lineal descendant of a great grandparent of such Class B Holder, a spouse of any such lineal descendant, the Corporation or employees or former employees of the Corporation, and (E) a corporation all the outstanding capital stock of which is owned by, or a partnership all the partners of which are, one or more of such Class B Holders, other lineal descendants of a great grandparent of such Class B Holder or a spouse of any such lineal descendant, and the spouse of such Class B Holder, provided that if any share of capital stock of such a corporation (or of any survivor of a merger or consolidation of such a corporation), or any partnership interest in such a partnership, is acquired by any person who is not within such class of persons, all shares of Class B Common Stock then held by such corporation or partnership, as the case may be, shall be deemed without further act to be converted into shares of Common Stock, and stock certificates formerly representing such shares of Class B Common Stock shall thereupon and thereafter be deemed to represent the like number of shares of Common Stock.

(b) In the case of a Class B Holder holding the shares of Class B Common Stock subject to said proposed transfer as trustee pursuant to a trust other than a trust described in clause (c) below, "Permitted Transferee" means (A) the person who established such trust and (B) a Permitted Transferee of such person determined pursuant to clause (a) above.

(c) In the case of a Class B Holder holding the shares of Class B Common Stock subject to said proposed transfer as trustee pursuant to a trust which was irrevocable on the Record Date, for determining the persons to whom the Class B Common Stock is first issuable by the Corporation "Permitted Transferee" means any person to whom or for whose benefit principal may be distributed either during or at the end of the term of such trust whether by power of appointment or otherwise or any "Permitted Transferee" of such person determined pursuant to clause (a), (b), (d), (e) or (f) hereof, as the case may be.

5

(d) In the case of a Class B Holder who is the record (but not beneficial) owner of the shares of Class B Common Stock subject to said proposed transfer as nominee for the person who was the beneficial owner thereof on the Record Date, "Permitted Transferee" means such beneficial owner and a Permitted Transferee of such beneficial owner determined pursuant to clause (a), (b), (c), (e) or (f) hereof, as the case may be.

(e) In the case of a Class B Holder which is a partnership and the holder of record and beneficial owner of the shares of Class B Common Stock subject to said proposed transfer, "Permitted Transferee" means any partner of such partnership or any "Permitted Transferee" of such partner determined pursuant to clause (a), (b), (c), (d) or (f) hereof, as the case may be.

(f) In the case of a Class B Holder which is a corporation (other than a Charitable Organization described in subclause (D) of clause (a) above) and the holder of record and beneficial owner of the shares of Class B Common Stock subject to said proposed transfer, "Permitted Transferee" means any stockholder of such corporation receiving shares of Class B Common Stock through a dividend or through a distribution made upon liquidation of such corporation and the survivor of a merger or consolidation of such corporation or any "Permitted Transferee" of such stockholder determined pursuant to clause (a), (b), (c), (d) or (e) hereof, as the case may be.

(g) In the case of a Class B Holder which is the estate of a deceased Class B Holder, or which is the estate of a bankrupt or insolvent Class B Holder, and provided such deceased, bankrupt or insolvent Class B Holder, as the case may be, was the record and beneficial owner of the shares of Class B Common Stock subject to said proposed transfer, "Permitted Transferee" means a Permitted Transferee of such deceased, bankrupt or insolvent Class B Holder as determined pursuant to clauses (a), (e), or (f) above, as the case may be.

(2) Notwithstanding anything to the contrary set forth herein, any Class B Holder may pledge such Holder's shares of Class B Common Stock to a pledgee pursuant to a bona fide pledge of such shares as collateral security for indebtedness due to the pledgee, provided that such shares shall not be transferred to or registered in the name of the pledgee and shall remain subject to the provisions of this subdivision (E). In the event of foreclosure or other similar action by the pledgee, such pledged shares of Class B Common Stock may only be transferred to a Permitted Transferee of the pledgor or converted into shares of Common Stock, as the pledgee may elect.

(3) For purposes of this subdivision (E):

(a) The relationship of any person that is derived by or through legal adoption shall be considered a natural one.

(b) Each joint owner of shares of Class B Common Stock shall be considered a "Class B Holder" of such shares.

(c) A minor for whom shares of Class B Common Stock are held pursuant to a Uniform Gifts to Minors Act or similar law shall be considered a Class B Holder of such shares.

(d) Unless otherwise specified, the term "person" means both natural persons and legal entities.

(4) Any purported transfer of shares of Class B Common Stock not permitted hereunder shall result in the conversion of the transferee's shares of Class B Common Stock into shares of Common Stock, effective on the date of such purported transfer. The Corporation may, as a condition to the transfer or the registration of transfer of shares of Class B Common Stock to a purported Permitted Transferee, require the furnishing of such affidavits or other proof as it deems necessary to establish that such transferee is a Permitted Transferee.

(F) (1) Shares of Class B Common Stock shall be registered in the name(s) of the beneficial owner(s) thereof (as hereafter defined) and not in "street" or "nominee" names; provided, however, certificates representing shares of Class B Common Stock issued as a stock dividend on the Corporation's then outstanding Common Stock may be registered in the same name and manner as the certificates representing the shares of Common Stock with respect to which the shares of Class B Common Stock were issued. For the purposes of this subdivision (F), the term "beneficial owner(s)" of any shares of Class B Common Stock shall mean the person or persons who possess the power to dispose, or to direct the disposition, of such shares.

(2) The Corporation shall note on the certificates representing the shares of Class B Common Stock that there are restrictions on transfer and registration of transfer imposed by subdivision (E) and this subdivision (F).

(G) Except as otherwise provided in subdivisions (B) and (C) above and except for shares of Class B Common Stock duly reserved for issuance as of the record date for the distribution of shares of Class B Common Stock, the Corporation shall not issue additional shares of Class B Common Stock after the date shares of Class B Common Stock are first issued by the Corporation. All shares of Class B Common Stock surrendered for conversion shall resume the status of authorized but unissued shares of Class B Common Stock.

(H) If at any time following the initial issuance of shares of Class B Common Stock the number of outstanding shares of Class B Common Stock as reflected on the stock transfer books of the Company is less than 2,800,000 (as adjusted for any stock splits, combinations or stock dividends effected after the record date for the initial distribution of shares of Class B Common Stock), then the outstanding shares of Class B Common Stock shall be deemed without further act to be

converted into shares of Common Stock, and stock certificates formerly representing outstanding shares of Class B Common Stock shall thereupon and thereafter be deemed to represent a like number of shares of Common Stock, and any outstanding right to receive Class B Common Stock shall automatically become the right to receive a like number of shares of Common Stock.

(I) The Common Stock and Class B Common Stock are subject to all the powers, rights, privileges, preferences and priorities of the Serial Convertible Preferred Stock as may be stated herein and as shall be stated and expressed in any resolution or resolutions adopted by the Board of Directors pursuant to authority expressly granted to and vested in it by the provisions of this Article FOURTH.

PREFERRED STOCK

(A) The Board of Directors is hereby empowered to cause the shares of Serial Convertible Preferred Stock to be issued in one or more series from time to time. Each series shall be designated by the Board of Directors so as to distinguish the shares thereof from the shares of all other series. All shares of the Serial Convertible Preferred Stock of all series shall be of equal rank and all shares of any particular series shall be identical except as to the date or dates from which dividends thereon shall be cumulative as provided in subdivision (B) hereof. The shares of Serial Convertible Preferred Stock of different series, subject to any applicable provision of law, may vary as to the following designations, preferences and relative, participating, optional or other special rights and qualifications, limitations or restrictions thereof, which the Board of Directors is expressly authorized to fix, in the case of each such series, at any time prior to the issuance of the shares thereof: (1) the annual dividend rate for the particular series and the date from which dividends on all shares of such series issued prior to the record date for the first dividend for such series shall be cumulative; (2) the redemption price or prices for the particular series; (3) the terms and amount of any sinking fund provided for the purchase or redemption of shares of the particular series; and (4) the conversion (which shall be into Common Stock and not into Class B Common Stock), participating or other special rights, and the qualifications, limitations or restrictions thereof, if any, of the particular series.

(B) The holders of each series of the Serial Convertible Preferred Stock at the time outstanding shall be entitled to receive, but only when and as declared by the Board of Directors, out of funds legally available for the payment of dividends, dividends at the annual rate for the particular series fixed therefor as herein provided, payable quarterly on the 1st day of January, April, July and October in each year, to stockholders of record on the respective dates, not exceeding 50 days preceding such dividend payment dates, fixed for the purpose by the Board of Directors in advance of the payment of the respective dividends. No dividend shall be declared on any series of the Serial Convertible Preferred Stock in respect of any quarter-yearly dividend period unless there shall likewise be declared on all shares of all series of the Serial Convertible Preferred Stock at the time outstanding, like proportionate dividends, ratably, in proportion to the annual dividend rates fixed therefor in respect of the same

8

quarter-yearly dividend period, to the extent that such shares are entitled to receive such dividend for such quarter-yearly dividend period. The dividends on shares of all series of the Serial Convertible Preferred Stock shall be cumulative. In the case of all shares of each particular series, the dividends on shares of such series shall be cumulative: (1) if issued prior to the record date for the first dividend on the shares of such series, then from the date for the particular series fixed therefor by the Board of Directors at any time prior to the issuance of shares of the particular series; (2) if issued during the period commencing on a record date for a dividend and terminating at the close of the payment date for such dividend, then from such dividend payment date; and (3) otherwise from the quarter-yearly dividend payment date next preceding the date of issue of such shares, so that unless dividends on all outstanding shares of each series of the Serial Convertible Preferred Stock, at the annual dividend rate and from the dates for accumulation thereof fixed as herein provided shall have been paid or declared and set aside for payment for all past quarter-yearly dividend periods, but without interest on cumulative dividends, no dividends shall be paid or declared and no other distribution shall be made on the Common Stock or Class B Common Stock and no Common Stock or Class B Common Stock shall be purchased or otherwise acquired for value by the Corporation. The holders of the Serial Convertible Preferred Stock of any series shall not be entitled to receive any dividends thereon other than the dividends referred to in this subdivision (B).

(C) The Corporation, by action of its Board of Directors, may redeem the whole or any part of any series of the Serial Convertible Preferred Stock, at any time or from time to time, by paying in cash the redemption price of the shares of the particular series fixed therefor as herein provided, together with a sum in the case of each share of each series so to be redeemed, computed at the annual dividend rate for the series of which the particular share is a part from the date from which dividends on such share became cumulative to the date fixed for such redemption, less the aggregate of the dividends theretofore or on such redemption date paid thereon. At least 30 days' and not more than 90 days' notice of every such redemption shall be mailed to the holders of record of the shares of the Serial Convertible Preferred Stock so to be redeemed, at their respective addresses as the same shall appear on the books of the Corporation; but no failure to mail such notice nor any defect therein or in the mailing thereof shall affect the validity of the proceedings for the redemption of any shares of the Serial Convertible Preferred Stock so to be redeemed. In case of the redemption of a part only of any series of the Serial Convertible Preferred Stock at the time outstanding, the Corporation shall select by lot or in such other manner as the Board of Directors may determine, the shares so to be redeemed. The Board of Directors shall have full power and authority, subject to the limitations and provisions herein contained, to prescribe the manner in which and the terms and conditions upon which the shares of the Serial Convertible Preferred Stock shall be redeemed from time to time. If such notice of redemption shall have been duly given, and if on or before the redemption date specified in such notice all funds necessary for such redemption shall have been set aside by the Corporation, separate and apart from its other funds, in trust for the account of the holders of the shares to be redeemed, so as to be and continue to be available therefor, then, notwithstanding that any certificate for such shares so called for

redemption shall not have been surrendered for cancellation, from and after the date fixed for redemption, the shares represented thereby shall no longer be deemed outstanding, the right to receive dividends thereon shall cease to accrue and all rights with respect to such shares so called for redemption shall forthwith on such redemption date cease and terminate, except only the right of the holders thereof to receive, out of the funds so set aside in trust, the amount payable upon redemption thereof, without interest; provided, however, that the Corporation may at any time prior to the redemption date specified in such notice, deposit in trust, for the account of the holders of the shares to be redeemed, funds necessary for such redemption with a bank or trust company in good standing, organized under the laws of the State of Iowa or the State of Illinois or of the United States of America, doing business in the City of Davenport, Iowa, or the City of Chicago, Illinois, having capital, surplus and undivided profits aggregating at least $500,000, designated in such notice of redemption, and, upon such deposit in trust, all shares with respect to which such deposit shall have been made shall no longer be deemed to be outstanding, and all rights with respect to such shares shall forthwith cease and terminate, except only the right of the holders thereof to receive, out of the funds so deposited in trust, from and after the date of such deposit, the amount payable upon the redemption thereof, without interest. Nothing herein contained shall limit any legal right of the Corporation to purchase or otherwise acquire any shares of the Serial Convertible Preferred Stock.

(D) Before any amount shall be paid to or any assets distributed among the holders of Common Stock or Class B Common Stock upon any liquidation, dissolution or winding up of the Corporation, and after paying or providing for the payment of all creditors of the Corporation, the holders of each series of Serial Convertible Preferred Stock at the time outstanding shall be entitled to be paid in cash the amount for the particular series fixed therefor as herein provided, together with a sum in the case of each such share of each series, computed at the annual dividend rate for the series of which the particular share is apart, from the date from which dividends on such share became cumulative to the date fixed for the payment of such distributive amount, less the aggregate of the dividends theretofore or on such date paid thereon; but no payments on account of such distributive amounts shall be made to the holders of any series of the Serial Convertible Preferred Stock unless there shall likewise be paid at the same time to the holders of each other series of the Serial Convertible Preferred Stock at the time outstanding like proportionate distributive amounts, ratably, in proportion to the full distributive amounts to which they are respectively entitled as herein provided. The holders of Serial Convertible Preferred Stock of any series shall not be entitled to receive any amounts with respect thereto upon any liquidation, dissolution or winding up of the Corporation other than the amounts referred to in this subdivision (D). Neither the consolidation or merger of the Corporation with any other corporation or corporations, nor the sale or transfer by the Corporation of all or any part of its assets, shall be deemed to be a liquidation, dissolution or winding up of the Corporation.

(E) Whenever the full dividends on all series of the Serial Convertible Preferred Stock at the time outstanding for all past quarter-yearly dividend periods shall

have been paid or declared and set apart for payment, then such dividends (payable in cash or Common Stock or Class B Common Stock, as the case may be), as may be determined by the Board of Directors, may be declared and paid on the Common Stock and Class B Common Stock but only out of funds legally available for the payment of dividends.

(F) In the event of any liquidation, dissolution or winding up of the Corporation, all assets and funds of the Corporation remaining after paying or providing for the payment of all creditors of the Corporation and after paying or providing for the payment to the holders of shares of all series of the Serial Convertible Preferred Stock of the preferential amount specified in subdivision (D) hereof to which they are respectively entitled, shall be divided among and paid to the holders of the Common Stock and Class B Common Stock according to their respective rights and interests.

(G) (1) So long as any shares of the Serial Convertible Preferred Stock of any series are outstanding, the Corporation shall not, without the consent (given in writing or by vote at a meeting called for that purpose) of the holders of at least two-thirds of the total number of shares of the Serial Convertible Preferred Stock of all series then outstanding:

(a) Create or authorize any class of stock ranking prior to the Serial Convertible Preferred Stock, or create or authorize any obligation or security convertible into shares of stock of any such class; or

(b) Amend, alter, change or repeal any of the express terms of the Serial Convertible Preferred Stock or of any series of the Serial Convertible Preferred Stock then outstanding in a manner prejudicial to the holders thereof; provided, however, that if any such amendment, alteration, change or repeal would be prejudicial to the holders of one or more, but not all, of the series of the Serial Convertible Preferred Stock at the time outstanding, only such consent of the holders of two-thirds of the total number of shares of all series so affected shall be required; or

(c) Issue any shares of any series of the Serial Convertible Preferred Stock unless the net earnings of the Corporation (calculated in accordance with the accounting principles followed by the Corporation during the period for which such net earnings are calculated) available for the payment of dividends on the Serial Convertible Preferred Stock for any twelve consecutive calendar months within the fifteen calendar months immediately preceding the calendar month within which such additional shares of stock shall be issued, shall have been at least two times the dividend requirements for a twelve months' period upon the entire amount of the Serial Convertible Preferred Stock to be outstanding immediately after such issue (including the shares proposed to be issued but not including any shares proposed to be redeemed or otherwise retired in connection with such issue).

(2) So long as any shares of the Serial Convertible Preferred Stock of any series are outstanding, the Corporation shall not, without the consent (given in writing or

11

by vote at a meeting called for that purpose) of the holders of a majority of the total number of shares of the Serial Convertible Preferred Stock of all series then outstanding increase the total authorized amount of the Serial Convertible Preferred Stock of all series.

(3) Provided that the consent of the holders of the Serial Convertible Preferred Stock (or of any series thereof) required by the provisions of subparagraphs (1) and (2) of this subdivision (G), if any such consent be so required, shall have been obtained, the Corporation may create or authorize any class of stock ranking prior to or on a parity with or subordinate to the Serial Convertible Preferred Stock or may increase the total authorized amount of the Serial Convertible Preferred Stock or of any other class of stock of the Corporation or may amend, alter, change or repeal any of the rights, privileges, terms and conditions of the Serial Convertible Preferred Stock or of any series of the Serial Convertible Preferred Stock then outstanding upon the vote, given at a meeting called for that purpose, of the holders of a majority of the total number of shares of stock of the Corporation then outstanding and entitled to vote thereon.

(H) Each share of Serial Convertible Preferred Stock of any series may, at the option of the holder thereof, be converted into Common Stock at any time prior to the close of business on the 10th day preceding the date fixed for redemption thereof into the number of shares of Common Stock designated by the Board of Directors at the time of authorization of such series, subject to the following terms and conditions:

(1) No adjustment of dividends will be made upon the exercise of the conversion privilege.

(2) In case the Corporation shall at any time or from time to time subdivide the outstanding shares of Common Stock into a greater number of shares or pay a dividend thereon in Common Stock, or combine the outstanding shares of Common Stock into a smaller number of shares, then with respect to each such subdivision or Common Stock dividend the number of shares of Common Stock deliverable upon the conversion of each share of Serial Convertible Preferred Stock shall be increased proportionately and with respect to each such combination shall be decreased proportionately.

(3) In case the Corporation shall offer to the holders of Common Stock any right to subscribe for stock or other securities of the Corporation, the holders of each series of Serial Convertible Preferred Stock outstanding as of the date the record is taken of the holders of Common Stock entitled to receive such rights, shall be entitled to subscribe for and purchase at the same price at which such stock or securities are offered to the holders of Common Stock, and upon the same terms, the number of shares of such stock or the amount of such securities for which they would have been entitled to subscribe if they had been holders of record of the number of shares of Common Stock into which their Serial Convertible Preferred Stock was convertible on such record date.

(4) If during any fiscal year the Board of Directors shall declare cash dividends on the Common Stock in excess of the amount of dividends declared during such year on any series of the Serial Convertible Preferred Stock, then the Corporation shall give notice of the amount of such excess dividend to all holders of such series of Serial Convertible Preferred Stock at least 20 days prior to the record date for determination of shareholders entitled to such dividend. Such notice shall be given by mailing a copy thereof to each holder of record of such series of Serial Convertible Preferred Stock at his address last appearing on the books of the Corporation and shall be deemed to have been given when mailed.

(5) So long as any of the Serial Convertible Preferred Stock remains outstanding, no reorganization of the Corporation and no consolidation of the Corporation and no consolidation or merger thereof with or into any other corporation or corporations and no conveyance of all or substantially all of its properties and business, as an entity, to any other corporation, shall be made, unless as part of such reorganization, consolidation, merger or conveyance, arrangements shall be made whereby the holders of each series of Serial Convertible Preferred Stock then outstanding shall thereafter be entitled to convert such Serial Convertible Preferred Stock into any stock or securities given in exchange for Common Stock of the Corporation on such reorganization, or in connection with such consolidation, merger or conveyance, in such amounts as would at the time have been given in exchange for the Common Stock then issuable upon conversion of such Serial Convertible Preferred Stock.

(6) Whenever any shares of Serial Convertible Preferred Stock shall be redeemed or converted into Common Stock, such shares shall be restored to the status of unissued shares of Serial Convertible Preferred Stock and the number of authorized shares of Serial Convertible Preferred Stock shall not be reduced as a result thereof.

(I) Subject to the provisions of Subdivision (J) hereof, every holder of the Serial Convertible Preferred Stock and every holder of the Common Stock shall have one vote, and every holder of Class B Common Stock shall have ten votes, for each share of stock held by him for the election of directors and upon all other matters.

(J) (1) No more than twenty per cent (20%) of the outstanding shares of stock of the Corporation shall at any time be owned or controlled, directly or indirectly, by or for the account of all aliens as a group (including the representatives, associates and affiliates thereof).

(2) No more than twenty per cent (20%) of the outstanding shares of stock of the Corporation entitled to vote on any matter submitted to stockholders (including the election of directors) shall be voted, directly or indirectly, by or for the account of all aliens as a group (including the representatives, associates and affiliates thereof).

(3) No alien (including the representatives, associates and affiliates thereof) shall be eligible to serve as a director of the Corporation.

For the purposes of this Subdivision (J):

(a)      The term "alien" includes:

(i) all persons not citizens of the United States of America, without regard to residence;

(ii) All corporations organized under laws other than those of the United States of America or the several States; and/or

(iii) all foreign governments.

(b) The term "representative" means any person acting at the request or direction of, or in anticipation of benefit (economic or otherwise) from, the person specified, either directly or through one or more intermediaries.

(c) The term "affiliate" includes any person who directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified.

(d) The term "associate" includes: (i) any person of which the person specified is an officer or partner or is, directly or indirectly, the beneficial owner of 10 per cent or more of any class or equity securities; (ii) any trust or other estate in which the specified person has a substantial beneficial interest or as to which the person specified serves as trustee or in a similar capacity, or (iii) any relative or spouse of the person specified or any relative of such spouse, who has the same home as the person specified or who is a director or officer of the person specified or any corporation which controls or is controlled by the person specified.

(e) The term "control" means the possession directly or indirectly, of the power to direct or cause the direction of management, actions, decisions or policies of a person, whether through the ownership of voting securities, by contract or otherwise.

(f) The term "person" includes all individuals and legal entities (including corporations, partnerships, trusts and estates).

The By-laws of the Corporation shall establish rules, regulations and procedures to assure compliance with and enforcement of this Subdivision (J).

Each of the foregoing provisions (1, 2 and 3) is separate and severable. In the event of the unenforceability of any one or more of said provisions, all of the remaining provisions shall continue in full force and effect.

FIFTH: For the management of the business and for the conduct of the affairs of the Corporation, and in further definition, limitation and regulation of the powers of the Corporation and of its directors and stockholders, it is further provided:

(A) The election of directors need not be by ballot.

(B) The Board of Directors is expressly authorized and empowered to make, alter, amend and repeal By-Laws, subject to the power of the stockholders to alter or repeal the By-Laws made by the Board of Directors.

(C) Any officer elected or appointed by the stockholders or by the Board of Directors may be removed at any time in such manner as shall be provided in the By-Laws of the Corporation.

(D) No person who is or was at any time a Director of the Corporation shall have any personal liability to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a Director; provided, however, that unless and except to the extent otherwise permitted from time to time by applicable law, the provisions of this Subdivision shall not eliminate or limit the liability of a Director (i) for any breach of the Director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions by the Director which are not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the DGCL, (iv) for any transaction from which the Director derived an improper personal benefit, or (v) for any act or omission occurring prior to the date this Subdivision becomes effective.

(E) Notwithstanding the provisions of Section 228 of the DGCL, no corporate action without a meeting of stockholders shall be taken by less than unanimous written consent of the stockholders of the Corporation.

(F) Special meetings of the stockholders may be called by the Board of Directors or the Chairman of the Board.

SIXTH: The number of Directors of the Corporation shall be such as from time to time shall be fixed by, or in the manner provided in, the By-Laws, but in no event less than three. The Directors shall be divided into three classes as nearly equal in number as possible, with the term of office of one class expiring each year. Each class of Directors shall be elected for a three year term. During the intervals between annual meetings of stockholders, any vacancy occurring in the Board of Directors caused by resignation, removal, death or incapacity, and any newly created directorships resulting from an increase in the number of Directors, shall be filled by a majority vote of the Directors then in office whether or not a quorum. Each Director chosen to fill a vacancy shall hold office for the unexpired term in respect of which such vacancy occurred. Each

Director chosen to fill a newly created directorship shall hold office until the next election of the class for which such Director shall have been chosen. When the number of Directors is changed, any newly created directorships or any decrease in directorships shall be so apportioned among the classes as to make all classes as nearly equal in number as possible. Each Director shall serve until a successor shall have been duly elected and qualified, except in the event of resignation, removal, death or other incapacity. A Director may be removed from office at any time, but only for cause, by the affirmative vote of the holders of a majority of the outstanding shares of stock entitled to vote for the election of Directors at a meeting of the stockholders called for that purpose.

SEVENTH: Any proposal that the Corporation (1) enter into a merger or consolidation with any person, or (2) sell, lease, transfer, exchange, mortgage, pledge or otherwise dispose of all or a substantial portion of its assets or business to any person, or (3) issue voting securities of the corporation in exchange or payment for the securities or assets of any person, or (4) be liquidated or dissolved, and any proposal, (5) that the stockholders increase or decrease the number of Directors of the corporation, however effectuated, shall require for approval the affirmative vote of the holders of not less than seventy-five per cent (75%) of the outstanding shares entitled to vote thereon. Provided, however, that the foregoing shall not apply to any such proposal which has been approved by the affirmative vote of not less than two-thirds of the Directors of the Corporation nor to any merger, consolidation or sale of assets or business or the issuance of voting securities between this corporation and another corporation fifty per cent (50%) or more of the voting stock of which is owned by this Corporation. For the purposes of this Article, the term "person" includes all individuals and other legal entities, including corporations, partnerships, trusts and estates.

EIGHTH: The provisions set forth in Subdivision (J) of Article FOURTH and in Articles SIXTH and SEVENTH of this Amended and Restated Certificate of Incorporation and this Article EIGHTH shall not be repealed or amended in any respect unless such repeal or amendment is approved by the affirmative vote of the holders of not less than seventy-five per cent (75%) of the outstanding shares of stock of the corporation entitled to vote thereon.

NINTH: (A) The Board of Directors of the Corporation, when evaluating any offer of another party to (a) make a tender or exchange offer for any equity security of the Corporation, (b) merge or consolidate the Corporation with another corporation, or (c) purchase or otherwise acquire all or substantially all of the properties and assets of the Corporation, shall, in connection with the exercise of its judgment in determining what is in the best interests of the Corporation and its stockholders, give due consideration to all relevant factors, including without limitation the social and economic effects on the employees, customers, suppliers and other constituents of the Corporation and its subsidiaries and on the communities in which the Corporation and its subsidiaries operate or are located.

(B) This Article shall not be repealed or amended in any respect unless such repeal or amendment is approved by the affirmative vote of the holders of not less than seventy-five per cent (75%) of the outstanding shares of stock of the Corporation entitled to vote thereon.

## **Exhibit 1.73**

*New First Lien Credit Agreement (inclusive of all exhibits thereto)*

_____

EXIT CREDIT AGREEMENT[1]

among

LEE ENTERPRISES, INCORPORATED,

VARIOUS LENDERS

and

DEUTSCHE BANK TRUST COMPANY AMERICAS,
as ADMINISTRATIVE AGENT and COLLATERAL AGENT

_____

Dated as of [_____]
_____

DEUTSCHE BANK SECURITIES INC.
and

GOLDMAN SACHS LENDING PARTNERS LLC
as JOINT LEAD ARRANGERS
and

as JOINT BOOK RUNNING MANAGERS

_____

---

[1]  The Credit Parties (i) acknowledge that no disclosure schedules or similar information contemplated by this Agreement have been provided as of the date of this draft, (ii) agree that, to the extent that the information set forth in such disclosure schedules or other information differs in any respect from the information provided to the Lenders prior to the Effective Date (as defined in the Support Agreement), the Lenders reserve the right in their reasonable discretion to make appropriate changes to this Agreement and (iii) agree that the Lenders reserve the right, but have no obligation, to conform this Agreement or any other Credit Document in respect of any change made to any Pulitzer Debt Document or Second Lien Loan Document made to the forms thereof agreed as of December 2, 2011 to be exhibited to the Plan.

EXIT CREDIT AGREEMENT, dated as of [___], among LEE ENTERPRISES, INCORPORATED, a Delaware corporation (the "Borrower"), the Lenders party hereto from time to time, DEUTSCHE BANK TRUST COMPANY AMERICAS, as Administrative Agent and Collateral Agent, DEUTSCHE BANK SECURITIES INC., and GOLDMAN SACHS LENDING PARTNERS LLC, as Joint Lead Arrangers and Joint Book Running Managers.  All capitalized terms used herein and defined in Section 1 are used herein as therein defined.

W I T N E S S E T H:

WHEREAS, on _____, 2011 (the "Petition Date"), the Borrower and certain of its Subsidiaries (collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of Title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and continued in the possession of their property and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, on _____, 2012, the Bankruptcy Court entered an order confirming the Joint Prepackaged Plan of Reorganization for Lee Enterprises Incorporated and its Debtor Subsidiaries, dated _____, 2011 (as in effect on the date of confirmation thereof pursuant to the Confirmation Order and as it thereafter may be amended in accordance with the Support Agreement and the DIP Credit Agreement, the "Plan of Reorganization"); and

WHEREAS, in connection with the confirmation and implementation of the Plan of Reorganization and, together with the consummation of the transactions contemplated by the Second Lien Loan Agreement, in full and complete satisfaction, settlement, release and discharge of the Prepetition Credit Agreement Claims and the DIP Revolving Facility Claims, the holders of the Prepetition Credit Agreement Claims and the holders of the DIP Revolving Facility Claims shall automatically become, or deemed to have become, parties to this Agreement on the Conversion Date;

NOW, THEREFORE, the parties hereby agree as follows:

SECTION 1.    Definitions and Accounting Terms.

1.01    Defined Terms.

As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Additional Permitted Indebtedness" shall have the meaning provided in Section 10.04(xii).

"Additional Second Lien Indebtedness" shall have the meaning provided in Section 10.04(xiv).

"Additional Second Lien Indebtedness Documents" shall mean any credit or loan agreement, indenture, purchase agreement or other document, agreement or note relating to (or evidencing) any Additional Second Lien Indebtedness, including without limitation, any guaranty, security agreement, pledge agreement, mortgage or other document relating to the collateral securing such Additional Second Lien Indebtedness.

"Additional Security Documents" shall have the meaning provided in Section 9.12(b).

"Adjusted Consolidated Net Income" shall mean, as to any Person for any period, Consolidated Net Income for such period for such Person and its Subsidiaries (A) plus the sum of (without duplication) (i) the amount of all net non-cash charges (including, without limitation, depreciation, amortization, deferred tax expense, non-cash stock-based compensation and non-cash interest expense) and net non-cash losses which were included in arriving at Consolidated Net Income for such period and (ii) any extraordinary cash gains and any cash gains from the sale or other disposition of assets in each case to the extent not already included in arriving at Consolidated Net Income for such period and (B) less the sum of (without duplication) (i) the amount of all net non-cash gains and non-cash credits which were included in arriving at Consolidated Net Income for such period and (ii) any extraordinary cash losses and any cash losses from the sale or other disposition any assets in each case to the extent not already included in arriving at Consolidated Net Income for such period.

"Adjusted Consolidated Working Capital" shall mean, at any time, Consolidated Current Assets (but excluding therefrom all cash and Cash Equivalents) less Consolidated Current Liabilities at such time.

"Adjusted Lee Net Income" shall mean, for any period, the Adjusted Consolidated Net Income of the Borrower and its Subsidiaries minus the Adjusted Consolidated Net Income of the Pulitzer Entities.

"Administrative Agent" shall mean DBTCA, in its capacity as Administrative Agent for the Lenders hereunder and under the other Credit Documents, and shall include any successor to the Administrative Agent appointed pursuant to Section 12.09.

"Affiliate" shall mean, with respect to any Person, any other Person directly or indirectly controlling (including, but not limited to, all directors and officers of such Person), controlled by, or under direct or indirect common control with, such Person. A Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power (i) to vote 5% or more of the securities having ordinary voting power for the election of directors (or equivalent governing body) of such Person or (ii) to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise; provided, however, that neither any Agent (nor any Affiliate thereof) nor any Lender (nor any Affiliate thereof) shall be considered an Affiliate of the Borrower or any Subsidiary thereof.

"Agent" shall mean and include each of the Administrative Agent, the Collateral Agent, the Joint Lead Arrangers and the Joint Book Running Managers.

-2-

"Agreement" shall mean this Exit Credit Agreement, as modified, supplemented, amended, restated (including any amendment and restatement hereof), extended or renewed from time to time.

"Anti-Money Laundering Laws" shall have the meaning provided in Section 8.23(c).

"Applicable Commitment Commission Percentage" and "Applicable Margin" shall mean on and after the Conversion Date, (A) with respect to Commitment Commission in respect of the Revolving Credit Commitments, a percentage per annum equal to 0.50%, (B) with respect to Revolving Loans (including Swingline Loans) maintained as (i) Base Rate Loans, a percentage per annum equal to 4.50%, and (ii) Eurodollar Loans, a percentage per annum equal to 5.50%, and (C) with respect to Term Loans maintained as (i) Base Rate Loans, a percentage per annum equal to 5.25%, and (ii) Eurodollar Loans, a percentage per annum equal to 6.25%.

"Applicable Excess Cash Flow Recapture Percentage" shall mean, at any time, 75%.

"Asset Sale" shall mean any sale, transfer or other disposition by the Borrower or any of its Subsidiaries to any Person (including by way of redemption by such Person) other than to the Borrower or a Wholly-Owned Subsidiary of the Borrower of any asset (including, without limitation, any capital stock or other securities of, or Equity Interests in, another Person), but excluding sales, transfers or other dispositions of assets pursuant to Sections 10.02(ii), (iii), (vi), (vii) (viii), (ix), (x) and (xi).

"Assignment and Assumption Agreement" shall mean an Assignment and Assumption Agreement substantially in the form of Exhibit L (appropriately completed).

"Authorized Officer" shall mean, with respect to (i) delivering Notices of Borrowing, Notices of Conversion/Continuation and similar notices, any person or persons that has or have been authorized by the board of directors of the Borrower to deliver such notices pursuant to this Agreement and that has or have appropriate signature cards on file with the Administrative Agent, the Swingline Lender or the respective Issuing Lender, as the case may be, (ii) delivering financial information and officer's certificates pursuant to this Agreement, the chief financial officer, the treasurer or the principal accounting officer of the Borrower, and (iii) any other matter in connection with this Agreement or any other Credit Document, any officer (or a person or persons so designated by any two officers) of the Borrower.

"Bankruptcy Code" shall have the meaning provided in Section 11.05.

"Bankruptcy Court" shall have the meaning provided in the recitals hereto.

"Base Rate" shall mean, at any time, the highest of (i) the Prime Lending Rate at such time, (ii) 1/2 of 1% in excess of the overnight Federal Funds Rate at such time and (iii) the Eurodollar Rate for a Eurodollar Loan with a one-month Interest Period commencing at such time plus 1.0%. For the purposes of this definition, the Eurodollar Rate shall be determined using the Eurodollar Rate as otherwise determined by the Administrative Agent in accordance with the definition of Eurodollar Rate, except that (x) if a given day is a Business Day, such

-3-

determination shall be made on such day (rather than two Business Days prior to the commencement of an Interest Period) or (y) if a given day is not a Business Day, the Eurodollar Rate for such day shall be the rate determined by the Administrative Agent pursuant to preceding clause (x) for the most recent Business Day preceding such day.  Any change in the Base Rate due to a change in the Prime Lending Rate, the Federal Funds Rate or such Eurodollar Rate shall be effective as of the opening of business on the day of such change in the Prime Lending Rate, the Federal Funds Rate or such Eurodollar Rate, respectively.

"Base Rate Loan" shall mean (i) each Swingline Loan and (ii) each other Loan designated or deemed designated as such by the Borrower at the time of the incurrence thereof or conversion thereto.

"Blocked Person" shall have the meaning provided in Section 8.23(a).

"Borrower" shall have the meaning provided in the first paragraph of this Agreement.

"Borrowing" shall mean the borrowing of one Type of Loan of a single Tranche from all the Lenders having Commitments or Loans of the respective Tranche (or from the Swingline Lender in the case of Swingline Loans) on a given date (or resulting from a conversion or conversions on such date) having in the case of Eurodollar Loans the same Interest Period, provided that Base Rate Loans incurred pursuant to Section 2.10(b) shall be considered part of the related Borrowing of Eurodollar Loans.

"Business Day" shall mean (i) for all purposes other than as covered by clause (ii) below, any day except Saturday, Sunday and any day which shall be in New York, New York, a legal holiday or a day on which banking institutions are authorized or required by law or other government action to close, and (ii) with respect to all notices and determinations in connection with, and payments of principal and interest on, Eurodollar Loans, any day which is a Business Day described in clause (i) above and which is also a day for trading by and between banks in U.S. dollar deposits in the applicable interbank Eurodollar market.

"Calculation Period" shall mean, with respect to any Significant Asset Sale, any incurrence of Additional Permitted Indebtedness or Additional Second Lien Indebtedness or any other event expressly required to be calculated on a Pro Forma Basis pursuant to the terms of this Agreement, the Test Period most recently ended prior to the date of such Significant Asset Sale, incurrence of Additional Permitted Indebtedness, Additional Second Lien Indebtedness or other event for which financial statements have been delivered to the Lenders pursuant to this Agreement.

"Capital Expenditures" shall mean, with respect to any Person, all expenditures by such Person which should be capitalized in accordance with GAAP and, without duplication, the amount of Capitalized Lease Obligations incurred by such Person.

"Capitalized Lease Obligations" shall mean, with respect to any Person, all rental obligations of such Person which, under GAAP, are or will be required to be capitalized on the books of such Person, in each case taken at the amount thereof accounted for as indebtedness in accordance with such principles.

-4-

"Cash Equivalents" shall mean, as to any Person, (i) securities issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof (provided that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than twelve months from the date of acquisition, (ii) marketable direct obligations issued by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within twelve months from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either S&P or Moody's, (iii) Dollar denominated time deposits, certificates of deposit and bankers acceptances of any Lender or any commercial bank having, or which is the principal banking subsidiary of a bank holding company having, a long-term unsecured debt rating of at least "A" or the equivalent thereof from S&P or "A2" or the equivalent thereof from Moody's with maturities of not more than twelve months from the date of acquisition by such Person, (iv) repurchase obligations with a term of not more than seven days for underlying securities of the types described in clause (i) above entered into with any bank meeting the qualifications specified in clause (iii) above, (v) commercial paper issued by any Person incorporated in the United States rated at least A-1 or the equivalent thereof by S&P or at least P-1 or the equivalent thereof by Moody's and in each case maturing not more than twelve months after the date of acquisition by such Person, (vi) investments in money market funds substantially all of whose assets are comprised of securities of the types described in clauses (i) through (v) above, and (vii) in the case of any Foreign Subsidiary of the Borrower only, direct obligations of the sovereign nation (or any agency thereof) in which such Foreign Subsidiary is organized and is conducting business or in obligations fully and unconditionally guaranteed by such sovereign nation (or any agency thereof) in each case having maturities of not more than twelve months from the date of acquisition thereof.

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as the same has been amended and may hereafter be amended from time to time, 42 U.S.C. § 9601 et seq.

"Change in Law" shall have the meaning provided in Section 11.06.

"Change of Control" shall mean (i) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act as in effect on the Conversion Date) (A) is or shall become the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act as in effect on the Conversion Date), directly or indirectly, of 50% or more on a fully diluted basis of the Voting Equity Interests of the Borrower or (B) shall have obtained the power (whether or not exercised) to elect a majority of the Borrower's directors, (ii) the board of directors of the Borrower shall cease to consist of a majority of Continuing Directors or (iii) a "change of control" or similar event shall occur which results in a default or a mandatory prepayment or redemption of Indebtedness under any Second Lien Loan Documents, any Additional Second Lien Indebtedness Document, any Pulitzer Debt Document, any Permitted Pulitzer Debt Refinancing Indebtedness (or any documentation governing the same), or any Additional Permitted Indebtedness (or any documentation governing the same), in each case with an aggregate outstanding principal amount of at least $25,000,000.

"Claims" shall have the meaning provided in the definition of "Environmental Claims" contained herein.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder. Section references to the Code are to the Code, as in effect at the date of this Agreement and any subsequent provisions of the Code, amendatory thereof, supplemental thereto or substituted therefor.

"Collateral" shall mean all property (whether real or personal) with respect to which any security interests have been granted (or purported to be granted) pursuant to any Security Document, including, without limitation, all Pledge Agreement Collateral, all Security Agreement Collateral, all Mortgaged Properties and all cash and Cash Equivalents delivered as collateral pursuant to this Agreement and the other Credit Documents.

"Collateral Agent" shall mean the Administrative Agent acting as collateral agent for the Secured Creditors pursuant to the Security Documents.

"Commitment" shall mean a Revolving Loan Commitment.

"Commitment Commission" shall have the meaning provided in Section 4.01(a).

"Company" shall mean any corporation, limited liability company, partnership or other business entity (or the adjectival form thereof, where appropriate).

"Company Affiliate" shall mean any Affiliate of the Borrower, except a Subsidiary.

"Confirmation Order" shall have the meaning provided to such term in the Plan of Reorganization.

"Consolidated Current Assets" shall mean, at any time, the consolidated current assets of the Lee Entities at such time, but excluding the current portion of deferred income taxes and the current portion of any valuation allowance of deferred tax assets.

"Consolidated Current Liabilities" shall mean, at any time, the consolidated current liabilities of the Lee Entities at such time, but excluding the current portion of deferred income taxes, the current portion of any Indebtedness under this Agreement and the current portion of any other long-term Indebtedness which would otherwise be included therein.

"Consolidated EBITDA" shall mean, as to any Person, for any period, Consolidated Net Income for such period of such Person and its Subsidiaries (1) plus all amounts deducted in the computation of Consolidated Net Income on account of (without duplication) (a) Consolidated Interest Expense, (b) depreciation and amortization expense, (c) income and profits taxes, (d) any curtailment losses relating to any Plan maintained by such Person and its Subsidiaries and (e) in the case of the Borrower and its Subsidiaries only, in the case of any fiscal period (beginning with the fiscal period ending June 2011) (i) the fees and expenses incurred in connection with the restructuring pursuant to this Agreement, the Second Lien Documents and the Pulitzer Debt (in each case as in effect on, and after giving effect to, the Conversion Date) and (ii) if applicable, all bankruptcy-related professional fees and expenses payable by the Borrower and its Subsidiaries and other Restructuring Charges actually recorded or accrued during such period and (2) minus to the extent included in the statement of such

-6-

Consolidated Net Income for such period, any curtailment gains relating to any Plan maintained by such Person and its Subsidiaries.

"Consolidated Indebtedness" shall mean, as to any Person, at any time, the sum of (without duplication) (i) all Indebtedness of such Person and its Subsidiaries (on a consolidated basis) as would be required to be reflected as debt or Capitalized Lease Obligations on the liability side of a consolidated balance sheet of such Person and its Subsidiaries in accordance with GAAP, (ii) all Indebtedness of such Person and its Subsidiaries of the type described in clauses (ii), (vii) and (viii) of the definition of Indebtedness and (iii) all Contingent Obligations of such Person and its Subsidiaries in respect of Indebtedness of any third Person of the type referred to in preceding clauses (i) and (ii); provided that the amount of Indebtedness in respect of any Interest Rate Protection Agreements and Other Hedging Agreements shall be at any time (a) if any such Interest Rate Protection Agreements or Other Hedging Agreements have been closed out, the unamortized termination value thereof, and (b) in all other cases, the unrealized net loss position, if any, of such Person and/or its Subsidiaries thereunder on a marked-to-market basis determined no more than one month prior to such time.

"Consolidated Interest Expense" shall mean, as to any Person, for any period, the sum for such Person and its Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP, of all amounts which would be deducted in computing Consolidated Net Income for such Person and its Subsidiaries on account of interest on Indebtedness, (including (whether or not so deducted) (i) imputed interest in respect of Capitalized Lease Obligations, (ii) the "deemed interest expense" (i.e., the interest expense which would have been applicable if the respective obligations were structured as on-balance sheet financing arrangements) with respect to all Indebtedness of such Person and its Subsidiaries of the type described in clause (viii) of the definition of "Indebtedness" contained herein (to the extent same does not arise from a financing arrangement constituting an operating lease), (iii) amortization of debt discount and expense, (iv) all commissions, discounts and other regularly accruing commitment, letter of credit and other banking fees and charges (including all Commitment Commissions, Letter of Credit Fees and Facing Fees) and (v) interest arising in connection with curtailment gains or losses relating to any Plan maintained by such Person and its Subsidiaries.

"Consolidated Net Income" shall mean, as to any Person (the "Reference Person"), for any period, the net income (or loss) of such Reference Person and its Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP (after deduction for minority interests), excluding:

(a)    any gains arising from (i) the sale or other disposition of any assets (other than current assets) to the extent that the aggregate amount of the gains during such period exceeds the aggregate amount of the losses during such period from the sale, abandonment or other disposition of assets (other than current assets), (ii) any write-up of assets or (iii) the acquisition of outstanding securities of the Reference Person or any of its Subsidiaries;

(b)    any losses arising from the sale or other disposition of any assets (other than current assets) to the extent the aggregate amount of losses during such period exceeds the aggregate amount of gains during such period from such sale;

(c)    any amount representing any interest in the undistributed earnings of (i) any other Person that is not a Subsidiary of the Reference Person, (ii) Madison Newspapers, Inc., (iii) TNI Partners and (iv) any other Subsidiary of the Reference Person that is accounted for by the Reference Person by the equity method of accounting;

(d)    except for determinations expressly required to be made on a <u>Pro</u> <u>Forma</u> Basis, any earnings, prior to the date of acquisition, of any Person acquired in any manner, and any earnings of any Subsidiary of the Reference Person acquired prior to its becoming a Subsidiary of the Reference Person;

(e)    any earnings of a successor to or transferee of the assets of the Reference Person prior to its becoming such successor or transferee;

(f)    any deferred credit (or amortization of a deferred credit) arising from the acquisition of any other Person;

(g)    any extraordinary gains or extraordinary losses not covered by clause (a) or (b) above;

(h)    any non-cash charges related to goodwill and asset write-offs and write-downs; and

(i)    any other non-cash income or expense, including non-cash interest income or expense.

"<u>Contingent Obligation</u>" shall mean, as to any Person, any obligation of such Person as a result of such Person being a general partner of any other Person, unless the under-lying obligation is expressly made non-recourse as to such general partner, and any obligation of such Person guaranteeing or intended to guarantee any Indebtedness, leases, dividends or other obligations ("<u>primary obligations</u>") of any other Person (the "<u>primary obligor</u>") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constitut-ing direct or indirect security therefor, (ii) to advance or supply funds (x) for the purchase or pay-ment of any such primary obligation or (y) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; <u>provided</u>, <u>however</u>, that the term Contingent Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

"<u>Continuing Directors</u>" shall mean the directors of the Borrower on, and after giving effect to, the Conversion Date and each other director if such director's nomination for

election to the board of directors of the Borrower is recommended by a majority of the then Continuing Directors.

"Controlled Entity" shall mean any of the Subsidiaries of the Borrower and any of their or the Borrower's respective Controlled Company Affiliates.  As used in this definition, "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Conversion Date" shall have the meaning provided in Section 13.10.

"Converted Loans" shall mean outstanding loans under the Prepetition Credit Agreement in an aggregate principal amount of $166,250,000 which shall be converted on the Conversion Date to loans under the Second Lien Loan Agreement pursuant to the terms thereof and of the Plan of Reorganization.

"Credit Documents" shall mean this Agreement, the Subsidiaries Guaranty, the Pledge Agreement, the Security Agreement, the Intercompany Subordination Agreement, the Intercreditor Agreement and, after the execution and delivery thereof pursuant to the terms of this Agreement, each Note and each other Security Document.

"Credit Event" shall mean the making of any Loan or the issuance of any Letter of Credit.

"Credit Party" shall mean the Borrower and each Subsidiary Guarantor.

"DBSI" shall mean Deutsche Bank Securities Inc.

"DBTCA" shall mean Deutsche Bank Trust Company Americas, in its individual capacity, and any successor corporation thereto by merger, consolidation or otherwise.

"Debtors" shall have the meaning provided in the recitals hereto.

"Default" shall mean any event, act or condition which with notice or lapse of time, or both, would constitute an Event of Default.

"Defaulting Lender" shall mean any Lender with respect to which a Lender Default is in effect.

"DIP Credit Agreement" shall mean the Credit and Guaranty Agreement dated as of [___] among the Debtors, Deutsche Bank Trust Company Americas, as administrative agent, the lenders from time to time party thereto, and the other agents party thereto, as amended, supplemented or otherwise modified in accordance with the terms thereof as of the Conversion Date.

"DIP Revolving Facility Claims" shall have the meaning provided in the Plan of Reorganization.

-9-

"Disclosure Statement" shall mean the disclosure statement relating to the Plan of Reorganization, in the form approved by the Bankruptcy Court on [_____], 2012.

"Dividend" shall mean, with respect to any Person, that such Person has declared or paid a dividend or distribution or returned any equity capital to its stockholders, partners or members or authorized or made any other distribution, payment or delivery of property (other than common Equity Interests of such Person) or cash to its stockholders, partners or members in their capacity as such, or redeemed, retired, purchased or otherwise acquired, directly or indirectly, for a consideration any shares of any class of its capital stock or any other Equity Interests outstanding on or after the Conversion Date (or any options or warrants issued by such Person with respect to its capital stock or other Equity Interests), or set aside any funds for any of the foregoing purposes, or shall have permitted any of its Subsidiaries to purchase or otherwise acquire for a consideration any shares of any class of the capital stock or any other Equity Interests of such Person outstanding on or after the Conversion Date (or any options or warrants issued by such Person with respect to its capital stock or other Equity Interests).   Without limiting the foregoing, "Dividends" with respect to any Person shall also include all payments made or required to be made by such Person with respect to any stock appreciation rights, plans, equity incentive or achievement plans or any similar plans or setting aside of any funds for the foregoing purposes.

"Dollars" and the sign "$" shall each mean freely transferable lawful money of the United States.

"Domestic Subsidiary" of any Person shall mean any Subsidiary of such Person incorporated or organized in the United States or any State thereof or the District of Columbia.

"Drawing" shall have the meaning provided in Section 3.05(b).

"Eligible Transferee" shall mean and include a commercial bank, an insurance company, a finance company, a financial institution, any fund that invests in loans or any other "accredited investor" (as defined in Regulation D of the Securities Act), but in any event excluding the Borrower and its Subsidiaries.

"Environmental Claims" shall mean any and all administrative, regulatory or judicial actions, suits, demands, demand letters, directives, claims, liens, notices of noncompli-ance or violation, investigations or proceedings relating in any way to any Environmental Law or any permit issued, or any approval given, under any such Environmental Law (hereafter, "Claims"), including, without limitation, (a) any and all Claims by governmental or regulatory authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law, and (b) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief in connection with alleged injury or threat of injury to health, safety or the environment due to the presence of Hazardous Materials.

"Environmental Law" shall mean any Federal, state, foreign or local statute, law, rule, regulation, ordinance, code, guideline, policy and rule of common law now or hereafter in effect and in each case as amended, and any judicial or administrative interpretation thereof,

-10-

including any judicial or administrative order, consent decree or judgment, relating to the environment, employee health and safety or Hazardous Materials, including, without limitation, CERCLA; the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; the Safe Drinking Water Act, 42 U.S.C. § 3803 et seq.; the Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq.; the Emergency Planning and the Community Right-to-Know Act of 1986, 42 U.S.C. § 11001 et seq.; the Hazardous Material Transportation Act, 49 U.S.C. § 1801 et seq.; the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq.; and any state and local or foreign counterparts or equivalents, in each case as amended from time to time.

"Equity Interests" of any Person shall mean any and all shares, interests, rights to purchase, warrants, options, participation or other equivalents of or interest in (however designated) equity of such Person, including any common stock, any preferred stock, any limited or general partnership interest and any limited liability company membership interest.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder. Section references to ERISA are to ERISA, as in effect at the date of this Agreement and any subsequent provisions of ERISA, amendatory thereof, supplemental thereto or substituted therefor.

"ERISA Affiliate" shall mean each person (as defined in Section 3(9) of ERISA) which together with the Borrower or a Subsidiary of the Borrower would be deemed to be a "single employer" (i) within the meaning of Section 414(b), (c), (m) or (o) of the Code or (ii) as a result of the Borrower or a Subsidiary of the Borrower being or having been a general partner of such person.

"Eurodollar Loan" shall mean each Loan (other than a Swingline Loan) designated as such by the Borrower at the time of the incurrence thereof or conversion thereto.

"Eurodollar Rate" shall mean (a) with respect to each Interest Period for a Eurodollar Loan, (i) the rate per annum determined on the basis of the rate for deposits in Dollars for a period equal to such Interest Period commencing on the first day of such Interest Period appearing on the Reuters Screen LIBOR01 (or any successor page) as of 11:00 A.M. (London time), on the applicable Interest Determination Date, provided that, to the extent that an interest rate is not ascertainable pursuant to the foregoing provisions of this clause (a), the rate above instead shall be the offered quotation to first-class banks in the New York interbank Eurodollar market by the Administrative Agent for Dollar deposits of amounts in immediately available funds comparable to the outstanding principal amount of the Eurodollar Loan of the Administrative Agent (in its capacity as a Lender (or, if the Administrative Agent is not a Lender with respect thereto, taking the average principal amount of the Eurodollar Loan then being made by the various Lenders pursuant thereto)) with maturities comparable to the Interest Period applicable to such Eurodollar Loan commencing two Business Days thereafter as of 10:00 A.M. (New York time) on the applicable Interest Determination Date, in either case divided (and rounded upward to the nearest 1/100 of 1%) by (b) a percentage equal to 100% minus the then stated maximum rate of all reserve requirements (including, without limitation, any marginal, emergency, supplemental, special or other reserves required by applicable law) applicable to any

-11-

member bank of the Federal Reserve System in respect of Eurocurrency funding or liabilities as defined in Regulation D (or any successor category of liabilities under Regulation D). Notwithstanding the foregoing in no event shall the Eurodollar Rate be less than 1.25%.

"Event of Default" shall have the meaning provided in Section 11.

"Excess Cash Flow" shall mean, for any fiscal quarter of the Borrower, the remainder of:

(a) the sum of, without duplication, (i) Adjusted Lee Net Income for such fiscal quarter, (ii) the decrease, if any, in Adjusted Consolidated Working Capital from the first day to the last day of such fiscal quarter, and (iii) any Dividends or other distributions paid, distributed or made by a Pulitzer Entity in favor, or for the benefit of, a Lee Entity to the extent such Dividend or other distribution is declared, paid or made in cash, minus

(b) the sum of, without duplication, (i) the aggregate amount of all Capital Expenditures made by the Lee Entities during such fiscal quarter (other than Capital Expenditures to the extent financed with equity proceeds, Equity Interests, asset sale proceeds (other than current assets), insurance proceeds or Indebtedness (other than Revolving Loans and Swingline Loans)), (ii) the aggregate amount of expenditures that are paid during such fiscal quarter and capitalized on the books of the Lee Entities with respect to (A) the fees and expenses incurred in connection with restructuring pursuant to this Agreement, the Second Lien Loan Documents and the Pulitzer Debt and (B) if applicable, bankruptcy-related professional fees and expenses payable by the Borrower and its Subsidiaries and other Restructuring Charges, (iii) the aggregate amount of all permanent principal payments of Indebtedness for borrowed money of the Lee Entities and the amount of all permanent repayments of the principal component of Capitalized Lease Obligations of the Lee Entities during such fiscal quarter (other than (1) repayments made with the proceeds of asset sales (other than current assets), equity proceeds, Equity Interests, insurance or Indebtedness and (2) repayments of Loans, provided that repayments of Loans shall be deducted in determining Excess Cash Flow to the extent such repayments were (x) required as a result of a Scheduled Term Loan Repayment pursuant to Section 5.02(b) or (y) made as a voluntary prepayment pursuant to Section 5.01 with internally generated funds (but in the case of a voluntary prepayment of Revolving Loans or Swingline Loans, only to the extent accompanied by a voluntary reduction of the Total Revolving Loan Commitment in an amount equal to such prepayment), (iv) the increase, if any, in Adjusted Consolidated Working Capital from the first day to the last day of such fiscal quarter, (v) the amount of charges incurred by the Lee Entities during such fiscal quarter for payments made, or to be made, by the Lee Entities for the benefit of the Pulitzer Entities with respect to Pulitzer Intercompany Charges, (vi) any amount applied to Investments permitted under Section 10.05(xiv) or (xvi) during such fiscal quarter, and (vii) the aggregate amount of Excess Cash Flow in prior fiscal quarters that was less than zero (and not previously deducted pursuant to this clause (vii) in any prior fiscal quarter).

"Excess Cash Flow Payment Date" shall mean the first Business Date on or after the date occurring 45 days after the last day of each fiscal quarter of the Borrower (commencing with the fiscal quarter of the Borrower ending after the Conversion Date).

-12-

"Excess Cash Flow Payment Period" shall mean, with respect to the repayment required on each Excess Cash Flow Payment Date, the immediately preceding fiscal quarter of the Borrower; provided, that with respect to the first Excess Cash Flow Payment Date occurring after the Conversion Date, the Excess Cash Flow Payment Period shall include, in addition to the immediately preceding fiscal quarter of the Borrower, any additional fiscal quarter of the Borrower ended after the Petition Date.

"Excess Cash Flow Repayment Amount" shall mean, with respect to any Excess Cash Flow Payment Period, an amount equal to (i) the difference between (x) Excess Cash Flow, minus (y) an aggregate amount of such Excess Cash Flow deposited in the Lee Reserve of up to $20,000,000 on deposit at any time, or such lesser amount as may be determined by the Borrower, multiplied by (ii) the Applicable Cash Flow Recapture Percentage.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Excluded Domestic Subsidiary" shall mean Pulitzer and each Domestic Subsidiary of Pulitzer, but only so long as Pulitzer and its Domestic Subsidiaries have not become Subsidiary Guarantors by virtue of the restrictions set forth in any of the Pulitzer Debt Documents, in any of the documents evidencing Permitted Pulitzer Debt Refinancing Indebtedness or in the Second Lien Loan Documents, as the case may be.

"Excluded Real Property" shall have the meaning provided in Section 9.12(b).

"Excluded TNI Assets" shall mean all Equity Interests in TNI Partners, all real and person property which is leased to or used in the operations or business of TNI Partners, and all proceeds of any of the foregoing.

"Existing Indebtedness" shall have the meaning provided in Section 8.21.

"Existing Indebtedness Agreements" shall have the meaning provided in Section 6.05.

"Existing Letter of Credit" shall have the meaning provided in Section 3.01(c).

"Facility" shall mean each of the Term Loan Facility and the Revolving Facility, as applicable.

"Facing Fee" shall have the meaning provided in Section 4.01(c).

"Fair Market Value" shall mean, with respect to any asset (including Equity Interests of any Person), the price at which a willing buyer, not an Affiliate of the seller, and a willing seller who does not have to sell, would agree to purchase and sell such asset, as determined in good faith by the board of directors or other governing body or, pursuant to a specific delegation of authority by such board of directors or governing body, a designated senior executive officer, of the Borrower, or the Subsidiary of the Borrower selling such asset.

-13-

"Federal Funds Rate" shall mean, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal Funds transactions with members of the Federal Reserve System arranged by Federal Funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three Federal Funds brokers of recognized standing selected by the Administrative Agent.

"Fees" shall mean all amounts payable pursuant to or referred to in Section 4.01.

"Foreign Pension Plan" shall mean any plan, fund (including, without limitation, any superannuation fund) or other similar program established or maintained outside the United States by the Borrower or any one or more of its Subsidiaries primarily for the benefit of employees of the Borrower or such Subsidiaries residing outside the United States, which plan, fund or other similar program provides, or results in, retirement income, a deferral of income in contemplation of retirement or payments to be made upon termination of employment, and which plan is not subject to ERISA or the Code.

"Foreign Subsidiary" of any Person shall mean any Subsidiary of such Person that is not a Domestic Subsidiary.

"GAAP" shall mean generally accepted accounting principles in the United States as in effect from time to time; provided that determinations in accordance with GAAP for purposes of the Applicable Commitment Commission Percentage, the Applicable Margins and Sections 5.02, 9.15 and 10, including defined terms as used therein, and for all purposes of determining the Lee Leverage Ratio, are subject (to the extent provided therein) to Section 13.07(a).

"Hazardous Materials" shall mean (a) any petroleum or petroleum products, radioactive materials, asbestos in any form that is or could become friable, urea formaldehyde foam insulation, dielectric fluid containing levels of polychlorinated biphenyls, and radon gas; (b) any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "hazardous waste," "hazardous materials," "extremely hazardous substances," "restricted hazardous waste," "toxic substances," "toxic pollutants," "contaminants," or "pollutants," or words of similar import, under any applicable Environmental Law; and (c) any other chemical, material or substance, the exposure to, or Release of which is prohibited, limited or regulated by any governmental authority.

"Herald" shall mean The Herald Publishing Company, LLC, a New York limited liability company (and the successor to The Herald Company, Inc., a New York corporation).

"Indebtedness" shall mean, as to any Person, without duplication, (i) all indebtedness of such Person for borrowed money or for the deferred purchase price of property acquired by such Person or services, (ii) the maximum amount available to be drawn or paid under all letters of credit, bankers' acceptances, bank guaranties, surety and appeal bonds and similar obligations issued for the account of such Person and all unpaid drawings and unreimbursed

-14-

payments in respect of such letters of credit, bankers' acceptances, bank guaranties, surety and appeal bonds and similar obligations, (iii) all indebtedness of the types described in clause (i), (ii), (iv), (v), (vi), (vii) or (viii) of this definition secured by any Lien on any property owned by such Person, whether or not such indebtedness has been assumed by such Person (provided that, if the Person has not assumed or otherwise become liable in respect of such indebtedness, such indebtedness shall be deemed to be in an amount equal to the lesser of the amount of such indebtedness and the Fair Market Value of the property to which such Lien relates), (iv) all Capitalized Lease Obligations of such Person, (v) all obligations of such Person to pay a specified purchase price for goods or services, whether or not delivered or accepted, i.e., take-or-pay and similar obligations, (vi) all Contingent Obligations of such Person, (vii) all obligations under any Interest Rate Protection Agreement, any Other Hedging Agreement or under any similar type of agreement and (viii) all Off-Balance Sheet Liabilities of such Person. Notwithstanding the foregoing, Indebtedness shall not include trade payables, accrued expenses and deferred tax and other credits incurred by any Person in accordance with customary practices and in the ordinary course of business of such Person.

"Intercompany Debt" shall mean any Indebtedness, payables or other obligations, whether now existing or hereafter incurred, owed by the Borrower or any Subsidiary Guarantor to the Borrower or any Subsidiary of the Borrower.

"Intercompany Loans" shall have the meaning provided in Section 10.05(viii).

"Intercompany Note" shall mean a promissory note evidencing Intercompany Loans, duly executed and delivered substantially in the form of Exhibit M (or such other form as shall be satisfactory to the Administrative Agent), with blanks completed in conformity herewith.

"Intercompany Subordination Agreement" shall have the meaning provided in Section 6.09(b).

"Intercreditor Agreement" shall mean the Intercreditor Agreement to be executed and delivered by the Collateral Agent, the collateral agent under the Second Lien Loan Documents (and, if applicable, the collateral agent under any Additional Second Lien Indebtedness Documents) and the Borrower, substantially in the form of Exhibit N.

"Interest Determination Date" shall mean, with respect to any Eurodollar Loan, the second Business Day prior to the commencement of any Interest Period relating to such Eurodollar Loan.

"Interest Period" shall have the meaning provided in Section 2.09.

"Interest Rate Protection Agreement" shall mean any interest rate swap agreement, interest rate cap agreement, interest collar agreement, interest rate hedging agreement or other similar agreement or arrangement.

"Investments" shall have the meaning provided in Section 10.05.

"Issuing Lender" shall mean (i) each of DBTCA (except as otherwise provided in Section 12.09) and any other RL Lender reasonably acceptable to the Administrative Agent

-15-

which agrees to issue Letters of Credit hereunder and (ii) with respect to the Existing Letters of Credit, the Lender designated as the issuer thereof on Schedule III.  Any Issuing Lender may, in its discretion, arrange for one or more Letters of Credit to be issued by one or more Affiliates of such Issuing Lender (and such Affiliate shall be deemed to be an "Issuing Lender" for all purposes of the Credit Documents).  To the extent that any Affiliate of the Administrative Agent is an Issuing Lender hereunder, such Affiliate also shall cease to be an Issuing Lender hereunder as provided in Section 12.09 to the same extent as the Administrative Agent.

"Joint Book Running Managers" shall mean DBSI and Goldman Sachs Lending Partners LLC in their capacity as joint book running managers in respect of the credit facilities provided for herein.

"Joint Lead Arrangers" shall mean DBSI and Goldman Sachs Lending Partners LLC, in their capacity as joint lead arrangers in respect of the credit facilities provided for herein on the Conversion Date.

"Joint-Venture Transaction" shall mean up to two joint venture transactions pursuant to each of which either (x) the Borrower or one or more of its Subsidiaries contributes, sells, leases or otherwise transfers assets (including without limitation, Equity Interests) to a joint venture or (y) a Subsidiary of the Borrower issues Equity Interests to a Person other than the Borrower or its Subsidiaries for the purpose of forming a joint venture or similar arrangement.

"L/C Supportable Obligations" shall mean (i) obligations of the Borrower or any of its Wholly-Owned Subsidiaries with respect to workers compensation, surety bonds and other similar statutory obligations and (ii) such other obligations of the Borrower or any of its Wholly-Owned Subsidiaries as are reasonably acceptable to the respective Issuing Lender and otherwise permitted to exist pursuant to the terms of this Agreement (other than obligations in respect of (u) the Second Lien Loan Documents, (v) the Additional Second Lien Indebtedness Documents, (w) the Pulitzer Debt Documents, (x) the Permitted Pulitzer Debt Refinancing Indebtedness, (y) any Indebtedness or other obligations that are subordinated to the Obligations (including, without limitation, the Additional Permitted Indebtedness) and (z) any Equity Interests).

"Leaseholds" of any Person shall mean all the right, title and interest of such Person as lessee or licensee in, to and under leases or licenses of land, improvements and/or fixtures.

"Lee EBITDA" shall mean, for any period, the sum of (a) Consolidated EBITDA of the Borrower and its Subsidiaries for such period less (b) the Pulitzer EBITDA.

"Lee Entities" shall mean the Borrower and its Subsidiaries, excluding the Pulitzer Entities.

"Lee Indebtedness" shall mean, at any time, Consolidated Indebtedness of the Lee Entities.

"Lee Interest Expense" shall mean, for any period, Consolidated Interest Expense of the Lee Entities (excluding any amortization of debt discount and expense on debt of the Lee

022537-0191-13470-Active.12537490.17

Entities with respect to debt incurred pursuant to this Agreement, the Second Lien Loan Documents and the Pulitzer Debt).

"Lee Interest Expense Coverage Ratio" shall mean, for any period, the ratio of (a) Lee EBITDA for such period to (b) Lee Interest Expense for such period.

"Lee Leverage Ratio" shall mean, on any date of determination, the ratio of (x) Lee Indebtedness on such date to (y) Lee EBITDA for the Test Period most recently ended on or prior to such date; provided that for purposes of any calculation of the Lee Leverage Ratio pursuant to this Agreement, Lee EBITDA shall be determined on a Pro Forma Basis in accordance with clause (iii) of the definition of "Pro Forma Basis" contained herein.

"Lee Reserve" shall mean cash from Excess Cash Flow that has been deposited by the Lee Entities from and after the Conversion Date in one or more deposit accounts that are subject to a Lien in favor of the Secured Creditors pursuant to documentation reasonably satisfactory to the Collateral Agent.  For avoidance of doubt, as of the Conversion Date, any of the Borrower's accounts nos. [_____] or [_____] satisfy the requirements herein.

"Lender" shall mean each financial institution listed on Schedule I as of the Conversion Date, subject to any Person that ceases to be or becomes a "Lender" hereunder pursuant to Section 2.13 or 13.04(b).

"Lender Default" shall mean (i) the wrongful refusal (which has not been retracted) or the failure of a Lender (in either case) to make available its portion of any Borrowing (including any Mandatory Borrowing) or to fund its portion of any unreimbursed payment under Section 3.04(c), (ii) a Lender having notified in writing the Borrower and/or the Administrative Agent that such Lender does not intend to comply with its obligations under Section 2.01(c), 2.01(d) or 3 or having made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement or under other agreements generally in which it commits to extend credit, (iii) a Lender otherwise failing to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within three Business Days of the date when due, or (iv) (x) a Lender becoming or being insolvent or having a parent company that has become or is insolvent, in each case as adjudicated or determined by any governmental authority having regulatory authority over such Lender or its assets or (y) becoming the subject of a bankruptcy or insolvency proceeding, or having a receiver, conservator, trustee or custodian appointed for it, or having taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or having a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee or custodian appointed for it, or having taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment, provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender, or any direct or indirect parent company thereof, by a governmental authority so long as such ownership interest does not result nor provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such governmental authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.

-17-

"Letter of Credit" shall have the meaning provided in Section 3.01(a).

"Letter of Credit Fee" shall have the meaning provided in Section 4.01(b).

"Letter of Credit Outstandings" shall mean, at any time, the sum of (i) the Stated Amount of all outstanding Letters of Credit at such time and (ii) the aggregate amount of all Unpaid Drawings in respect of all Letters of Credit at such time.

"Letter of Credit Request" shall have the meaning provided in Section 3.03(a).

"Lien" shall mean any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), preference, priority or other security agreement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement, any financing or similar statement or notice filed under the UCC or any other similar recording or notice statute, and any lease having substantially the same effect as any of the foregoing) and any attachment or judgment lien.

"Loan" shall mean each Term Loan, each Revolving Loan and each Swingline Loan.

"Majority Lenders" of any Tranche shall mean those Non-Defaulting Lenders which would constitute the Required Lenders under, and as defined in, this Agreement if all outstanding Obligations under the other Tranches under this Agreement were repaid in full and all Commitments with respect thereto were terminated.

"Mandatory Borrowing" shall have the meaning provided in Section 2.01(f).

"Margin Stock" shall have the meaning provided in Regulation U.

"Material Adverse Effect" shall mean (x) a material adverse effect on the business, operations, property, assets, liabilities or condition (financial or otherwise) of the Borrower or of the Borrower and its Subsidiaries taken as a whole or (y) a material adverse effect on (i) the rights or remedies of the Lenders, the Administrative Agent or the Collateral Agent hereunder or under any other Credit Document or (ii) the ability of any Credit Party to perform its obligations to the Lenders, the Administrative Agent or the Collateral Agent hereunder or under any other Credit Document.

"Maturity Date" shall mean, with respect to the relevant Facility, the Term Loan Maturity Date or the Revolving Loan Maturity Date, as the case may be.

"Maximum Swingline Amount" shall mean $10,000,000.

"Minimum Borrowing Amount" shall mean (i) for Term Loans, $5,000,000, (ii) for Revolving Loans maintained as (x) Eurodollar Loans, $2,000,000 and (y) Base Rate Loans, $1,000,000, and (iii) for Swingline Loans, $300,000.

"Moody's" shall mean Moody's Investors Service, Inc.

-18-

"Mortgage" shall mean a mortgage, deed of trust, deed to secure debt or similar security instrument.

"Mortgage Policy" shall mean a Lender's title insurance policy (Form 2006).

"Mortgaged Property" shall mean any Real Property owned by the Borrower or any other Credit Party which is encumbered (or required to be encumbered) by a Mortgage pursuant to the terms hereof.

"NAIC" shall mean the National Association of Insurance Commissioners.

"Net Cash Proceeds" shall mean for any event requiring a reduction of the Total Revolving Loan Commitment and/or repayment of Term Loans pursuant to Section 5.02(c), (d) or (f), as the case may be, the gross cash proceeds (including any cash received by way of deferred payment pursuant to a promissory note, receivable or otherwise, but only as and when received) received from such event, net of reasonable transaction costs (including, as applicable, any underwriting, brokerage or other customary commissions and reasonable legal, advisory and other fees and expenses associated therewith) paid in respect of any such event, but excluding any such gross cash proceeds arising from the issuance of any Indebtedness or Equity Interest of, or Recovery Event relating to any assets of, any Excluded Domestic Subsidiary.

"Net Sale Proceeds" shall mean for any sale or other disposition of assets pursuant to an Asset Sale, the gross cash proceeds (including any cash received by way of deferred payment pursuant to a promissory note, receivable or otherwise, but only as and when received) received from such Asset Sale, net of (i) reasonable transaction costs (including, without limitation, any underwriting, brokerage or other customary selling commissions, reasonable legal, advisory and other fees and expenses (including title and recording expenses), associated therewith) and sales, VAT and transfer taxes arising therefrom, (ii) payments of unassumed liabilities relating to the assets sold or otherwise disposed of at the time of, or within 30 days after, the date of such Asset Sale, (iii) the amount of such gross cash proceeds required to be used in the case of any assets of the Borrower or any of its Subsidiaries (other than any Excluded Domestic Subsidiary) so sold or disposed of, to permanently repay any Indebtedness (other than Indebtedness of the Lenders pursuant to this Agreement) which is secured by the respective assets which were sold or otherwise disposed of, and (iv) the estimated net marginal increase in income taxes which will be payable by the Borrower's consolidated group or any Subsidiary of the Borrower with respect to the fiscal year of the Borrower in which the sale or other disposition occurs as a result of such sale or other disposition; provided, however, that such gross proceeds shall not include (A) any such gross cash proceeds arising from an Asset Sale by any Excluded Domestic Subsidiary and (B) any portion of such gross cash proceeds which the Borrower determines in good faith should be reserved for post-closing adjustments (to the extent the Borrower delivers to the Administrative Agent a certificate signed by an Authorized Officer of the Borrower as to such determination), it being understood and agreed that on the day that all such post-closing adjustments have been determined (which shall not be later than 360 days following the date of the respective asset sale), the amount (if any) by which the reserved amount in respect of such Asset Sale exceeds the actual post-closing adjustments payable by the Borrower or any of its Subsidiaries shall constitute Net Sale Proceeds on such date received by the Borrower and/or any of its Subsidiaries from such Asset Sale.

-19-

"Non-Defaulting Lender" and "Non-Defaulting RL Lender" shall mean and include each Lender or RL Lender, as the case may be, other than a Defaulting Lender.

"Non-Public Information" shall mean material non-public information (within the meaning of United States federal, state or other applicable securities laws) with respect to the Borrower or its Affiliates or their respective securities.

"Non-Wholly Owned Subsidiary" shall mean, as to any Person, each Subsidiary of such Person which is not a Wholly-Owned Subsidiary of such Person.

"Note" shall mean each Term Note, each Revolving Note and the Swingline Note.

"Notice of Borrowing" shall have the meaning provided in Section 2.03(a).

"Notice of Conversion/Continuation" shall have the meaning provided in Section 2.06.

"Notice Office" shall mean (i) for credit notices, the office of the Administrative Agent located at 60 Wall Street, New York, New York 10005, Attention: Stephen Cayer, Telephone No. (212) 250-3536, and Telecopier No.: (212) 797-5904, and (ii) for operational notices, the office of the Administrative Agent located at 90 Hudson Street, 5th Floor, Jersey City, New Jersey 07302, Attention: John Quinn, Telephone No.: (201) 593-2177, and Telecopier No.: (201) 593-2308/2309, or such other office or person as the Administrative Agent may hereafter designate in writing as such to the other parties hereto.

"Obligations" shall mean all amounts owing to the Administrative Agent, the Collateral Agent, any Issuing Lender, the Swingline Lender or any Lender pursuant to the terms of this Agreement and each other Credit Document, including, without limitation, all amounts in respect of any principal, premium, interest (including any interest, fees and/or expenses accruing subsequent to the filing of a petition in bankruptcy, reorganization or similar proceeding at the rate provided for in this Agreement, whether or not such interest, fees and/or expenses are an allowed claim under any such proceeding or under applicable state, federal or foreign law), penalties, fees, expenses, indemnifications, reimbursements (including Unpaid Drawings with respect to Letters of Credit), damages and other liabilities, and guarantees of the foregoing amounts.

"OFAC" shall have the meaning provided in Section 8.23(a).

"OFAC Listed Person" shall have the meaning provided in Section 8.23(a).

"Off-Balance Sheet Liabilities" of any Person shall mean (i) any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person, (ii) any liability of such Person under any sale and leaseback transactions that do not create a liability on the balance sheet of such Person, (iii) any obligation under a Synthetic Lease or (iv) any obligation arising with respect to any other transaction which is the functional equivalent of or takes the place of borrowing but which does not constitute a liability on the balance sheet of such Person.

-20-

"Other Hedging Agreements" shall mean any foreign exchange contracts, currency swap agreements, commodity agreements or other similar arrangements, or arrangements designed to protect against fluctuations in currency values or commodity prices.

"Other Taxes" shall mean any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Credit Document, including any interest, additions to tax or penalties applicable thereto.

"Participant" shall have the meaning provided in Section 3.04(a).

"Patriot Act" shall have the meaning provided in Section 13.18.

"Payment Office" shall mean the office of the Administrative Agent located at 90 Hudson Street, Jersey City, New Jersey 07302 or such other office as the Administrative Agent may hereafter designate in writing as such to the other parties hereto.

"PBGC" shall mean the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto.

"PD LLC" shall mean St. Louis Post-Dispatch LLC, a Delaware limited liability company.

"PD LLC Indemnity Agreement" shall mean the Indemnity Agreement, dated as of May 1, 2000, between Herald and Pulitzer, as in effect on, and after giving effect to, the Conversion Date and as the same may be amended, modified and supplemented from time to time in accordance with the terms hereof and thereof.

"PD LLC Operating Agreement" shall mean the Operating Agreement of PD LLC, dated as of May 1, 2000, among Herald, Pulitzer, Pulitzer Technologies, Inc. and the other members of PD LLC from time to time party thereto, as in effect on, and after giving effect to, the Conversion Date and as the same may be amended, modified or supplemented from time to time in accordance with the terms thereof and hereof.

"Permitted Encumbrance" shall mean:

(i)      Liens created pursuant to the Second Lien Loan Documents and Liens securing any Additional Second Lien Indebtedness; provided that, in each case, such Liens are subject to the terms of the Intercreditor Agreement;

(ii)      inchoate Liens for taxes, assessments or governmental charges or levies not yet due or Liens for taxes, assessments or governmental charges or levies being contested in good faith and by appropriate proceedings for which adequate reserves have been established in accordance with GAAP;

(iii)      Liens in respect of property or assets of the Borrower or any of its Subsidiaries imposed by law, which were incurred in the ordinary course of business and do not

-21-

secure Indebtedness for borrowed money, such as carriers', warehousemen's, material men's and mechanics' liens and other similar Liens arising in the ordinary course of business, which are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing the forfeiture or sale of the property or assets subject to any such Lien;

(iv)    easements, rights-of-way, restrictions, covenants, encroachments and other similar charges or encumbrances, including without limitation, any encumbrances which would be reflected by an accurate survey of the property, and minor title deficiencies, in each case not securing Indebtedness and not materially interfering with the conduct of the business of the Borrower or any of its Subsidiaries; and

(v)    any exceptions to title as set forth in the Mortgage Policy, as reasonably approved by the Collateral Agent.

"Permitted Liens" shall have the meaning provided in Section 10.01.

"Permitted Pulitzer Debt Refinancing Incremental Amount" shall have the meaning provided in the defined term "Permitted Pulitzer Debt Refinancing Indebtedness".

"Permitted Pulitzer Debt Refinancing Indebtedness" shall mean Indebtedness solely of the Pulitzer Entities so long as (i) the proceeds of such Indebtedness are used solely to refinance in full the Pulitzer Debt (or other Permitted Pulitzer Debt Refinancing Indebtedness) outstanding at such time, to pay reasonable fees and expenses incurred in connection with obtaining such Indebtedness and, in the case of any permitted surplus over the Pulitzer Debt refinanced, for other purposes permitted hereunder and thereunder, (ii) such Indebtedness does not have any amortization, redemption, sinking fund, maturity or similar requirement prior to the maturity date of the Pulitzer Debt under the Pulitzer Debt Agreement as in effect on, and after giving effect to, the Conversion Date or as thereafter amended or modified in accordance with the terms thereof and hereof (including, without limitation, Section 10.10(v)), other than for amortization payments or prepayments prior to final maturity on terms, in the aggregate, no more restrictive than those set forth in the Pulitzer Debt Agreement as in effect on, and after giving effect to, the Conversion Date or as thereafter amended or modified in accordance with the terms thereof and hereof (including, without limitation, Section 10.10(v)), (iii) such Indebtedness contains no restrictions, conditions or other limitations on any Credit Party's ability to make any required payment of principal or interest in respect of any Obligations pursuant to the terms of this Agreement or the other Credit Documents that are more restrictive in the aggregate than the Pulitzer Debt Agreement as in effect on, and after giving effect to, the Conversion Date, (iv) the aggregate principal amount of such Indebtedness shall not be more than the sum of the aggregate principal amount of the Pulitzer Debt outstanding at such time, plus up to $[23,645,000] (any such amount, the "Permitted Pulitzer Debt Refinancing Incremental Amount"), (v) the restrictions on the ability of Pulitzer and its Subsidiaries to pay cash Dividends and make Intercompany Loans to, and otherwise engage in transactions with, the Borrower and its other Subsidiaries shall be no more restrictive than those restrictions that exist in the Pulitzer Debt Documents as in effect on, and after giving effect to, the Conversion Date, (vi) the terms thereof, in the aggregate, shall be no more restrictive on, and no more burdensome to, the applicable Credit Parties in any material respect, in each case than the Pulitzer Debt Documents as in effect on, and after giving effect to, the Conversion Date or as thereafter amended or modified in

-22-

accordance with the terms thereof and hereof (including, without limitation, Section 10.10(v)) and (vii) all of the other terms and conditions thereof (and the documentation with respect thereto) are in form and substance reasonably satisfactory to the Administrative Agent.

"<u>Person</u>" shall mean any individual, partnership, joint venture, firm, corporation, association, limited liability company, trust or other enterprise or any government or political subdivision or any agency, department or instrumentality thereof.

"<u>Petition Date</u>" shall have the meaning provided in the recitals hereto.

"<u>Plan</u>" shall mean any pension plan as defined in Section 3(2) of ERISA, which is maintained or contributed to by (or to which there is an obligation to contribute of) the Borrower or a Subsidiary of the Borrower or an ERISA Affiliate, and each such plan for the five year period immediately following the latest date on which the Borrower, a Subsidiary of the Borrower or an ERISA Affiliate maintained, contributed to or had an obligation to contribute to such plan.

"<u>Plan of Reorganization</u>" shall have the meaning provided in the recitals hereto.

"<u>Platform</u>" shall have the meaning provided in Section 9.01(l).

"<u>Pledge Agreement</u>" shall have the meaning provided in Section 6.10.

"<u>Pledge Agreement Collateral</u>" shall mean all "Collateral" as defined in the Pledge Agreement.

"<u>Pledgee</u>" shall have the meaning provided in the Pledge Agreement.

"<u>Preferred Equity</u>", as applied to the Equity Interests of any Person, shall mean Equity Interests of such Person (other than common Equity Interests of such Person) of any class or classes (however designed) that ranks prior, as to the payment of dividends or as to the distribution of assets upon any voluntary or involuntary liquidation, dissolution or winding up of such Person, to shares of Equity Interests of any other class of such Person, and shall include any Qualified Preferred Stock of the Borrower.

"<u>Prepetition Credit Agreement</u>" shall mean the Amended and Restated Credit Agreement, dated as of December 21, 2005, among the Borrower, the lenders from time to time party thereto, Deutsche Bank Trust Company Americas, as administrative agent, and the other agents party thereto, as amended, supplemented or otherwise modified as of the Petition Date.

"<u>Prepetition Credit Agreement Claims</u>" shall have the meaning provided to such term in the Plan of Reorganization.

"<u>Prime Lending Rate</u>" shall mean the rate which the Administrative Agent announces from time to time as its prime lending rate, the Prime Lending Rate to change when and as such prime lending rate changes.  The Prime Lending Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer by the Administra-

-23-

tive Agent, which may make commercial loans or other loans at rates of interest at, above or below the Prime Lending Rate.

"Pro Forma Basis" shall mean, in connection with any calculation of compliance with any financial covenant or financial term, the calculation thereof after giving effect on a pro forma basis to (x) the incurrence of any Indebtedness (other than revolving Indebtedness, except to the extent same is incurred to refinance other outstanding Indebtedness) after the first day of the relevant Calculation Period or Test Period, as the case may be, as if such Indebtedness had been incurred (and the proceeds thereof applied) on the first day of such Test Period or Calculation Period, as the case may be, (y) the permanent repayment of any Indebtedness (other than revolving Indebtedness, except to the extent accompanied by a corresponding permanent commitment reduction) after the first day of the relevant Test Period or Calculation Period, as the case may be, as if such Indebtedness had been retired or repaid on the first day of such Test Period or Calculation Period, as the case may be, and (z) any Significant Asset Sale then being consummated as well as any other Significant Asset Sale if consummated after the first day of the relevant Test Period or Calculation Period, as the case may be, and on or prior to the date of the respective Significant Asset Sale, as the case may be, then being effected, with the following rules to apply in connection therewith:

(i)      all Indebtedness (x) (other than revolving Indebtedness, except to the extent same is incurred to refinance other outstanding Indebtedness) incurred or issued after the first day of the relevant Test Period or Calculation Period (whether incurred to refinance Indebtedness or otherwise) shall be deemed to have been incurred or issued (and the proceeds thereof applied) on the first day of such Test Period or Calculation Period, as the case may be, and remain outstanding through the date of determination and (y) (other than revolving Indebtedness, except to the extent accompanied by a corresponding permanent commitment reduction) permanently retired or redeemed after the first day of the relevant Test Period or Calculation Period shall be deemed to have been retired or redeemed on the first day of such Test Period or Calculation Period, as the case may be, and remain retired through the date of determination;

(ii)      all Indebtedness assumed to be outstanding pursuant to preceding clause (i) shall be deemed to have borne interest at (x) the rate applicable thereto, in the case of fixed rate indebtedness, or (y) the rates which would have been applicable thereto during the respective period when same was deemed outstanding, in the case of floating rate Indebtedness (although interest expense with respect to any Indebtedness for periods while same was actually outstanding during the respective period shall be calculated using the actual rates applicable thereto while same was actually outstanding); provided that all Indebtedness (whether actually outstanding or deemed outstanding) bearing interest at a floating rate of interest shall be tested on the basis of the rates applicable at the time the determination is made pursuant to said provisions; and

(iii)      in making any determination of Consolidated EBITDA on a Pro Forma Basis, pro forma effect shall be given to any Significant Asset Sale if effected during the respective Calculation Period or Test Period (or thereafter, for purposes of determinations pursuant to Section 9.15 and the definition of "Applicable Commitment Commission

-24-

Percentage" and "Applicable Margin" contained herein only) as if same had occurred on the first day of the respective Calculation Period or Test Period, as the case may be.

"Projections" shall mean the five-year projections that were prepared by or on behalf of the Borrower in connection with the Disclosure Statement and attached thereto as Exhibit [__].

"Public Lenders" shall mean Lenders that do not wish to receive Non-Public Information with respect to the Borrower, its Subsidiaries or their respective securities.

"Pulitzer" shall mean Pulitzer Inc., a Delaware corporation.

"Pulitzer Debt" shall mean the debt arising and the notes issued under the Pulitzer Debt Agreement.

"Pulitzer Debt Agreement" shall mean the Note Agreement, dated as of [__], 2011, entered into by and among PD LLC and the purchasers party thereto, as in effect on, and after giving effect to, the Conversion Date and as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof and thereof.

"Pulitzer Debt Documents" shall mean the Pulitzer Debt, the Pulitzer Debt Agreement, the Pulitzer Debt Guaranty and all other instruments, agreements and other documents (including, without limitation, all Collateral Documents (as defined in the Pulitzer Debt Agreement)) executed and delivered in connection with the Pulitzer Debt or the Pulitzer Debt Agreement, as in effect on, and after giving effect to, the Conversion Date and as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof and thereof.

"Pulitzer Debt Guaranty" shall mean (i) that certain Guaranty Agreement, dated as of the Conversion Date, from Pulitzer in favor of the holders from time to time of the Pulitzer Debt and (ii) that certain Subsidiary Guaranty Agreement, dated as of the Conversion Date, from all of the Subsidiaries of Pulitzer in favor of the holders from time to time of the Pulitzer Debt, in each case as in effect on, and after giving effect to, the Conversion Date and as the same may be further amended, restated, modified and/or supplemented from time to time in accordance with the terms thereof and hereof.

"Pulitzer EBITDA" shall mean, for any period, Consolidated EBITDA of the Pulitzer Entities for such period, plus all non-cash amounts deducted in the computation thereof on account of (without duplication) Pulitzer Intercompany Charges.

"Pulitzer Entities" shall mean Pulitzer and its Subsidiaries.

"Pulitzer Financial Covenant Default" shall have the meaning provided in Section 11.04.

"Pulitzer Indebtedness" shall mean, at any time, Consolidated Indebtedness of the Pulitzer Entities.

-25-

"Pulitzer Intercompany Charges" shall mean charges to the Pulitzer Entities in an aggregate amount not to exceed $20,000,000 in any fiscal year of the Borrower for (i) fees for the procurement by the Lee Entities of goods and services from third parties for the benefit of the Pulitzer Entities (but, for the avoidance of doubt, excluding reimbursements to the Lee Entities for the actual cost of such goods and services except for those items identified in clause (iv) of this definition), (ii) the corporate overhead of the Lee Entities (including, without limitation, administration, financial services, legal, human resources, building services, editorial support, and Lee Lodge facilities), (iii) management, corporate sales and marketing, and information technology costs of the Lee Entities, (iv) (a) online fees, (b) allocated audit and consulting charges, (c) compensation of publishers, and (d) compensation of outside directors, in the case of the foregoing subclauses (a) to (d), inclusive, to the extent actually paid or deemed paid by, or credited to payment by, the Lee Entities and (v) interest on such charges (both cash and non-cash) and on intercompany loans to the extent in excess of intercompany loans owed by the applicable Pulitzer Entity to the applicable Lee Entity; the charges referred to in the foregoing clauses (i) to (v), inclusive, shall be allocated to the Pulitzer Entities in a manner consistent with past practices.

"Pulitzer Interest Expense" shall mean, for any period, Consolidated Interest Expense of the Pulitzer Entities.

"Pulitzer Lenders" shall mean the purchasers party to the Pulitzer Debt Agreement.

"Qualified Preferred Stock" shall mean any Preferred Equity of the Borrower so long as the terms of any such Preferred Equity (v) do not contain any mandatory put, redemption, repayment, sinking fund or other similar provision prior to April 28, 2018 (other than as a result of the conversion of such Preferred Equity into common stock of the Borrower without any cash payment), (w) do not require the cash payment of dividends or distributions not otherwise permitted at such time pursuant to this Agreement, (x) do not contain any covenants (other than periodic reporting covenants), (y) do not grant the holders thereof any voting rights except for (I) voting rights required to be granted to such holders under applicable law and (II) limited customary voting rights on fundamental matters such as mergers, consolidations, sales of all or substantially all of the assets of the Borrower, or liquidations involving the Borrower, and (z) are otherwise reasonably satisfactory to the Administrative Agent.

"Qualified Subsidiary" shall mean (i) each Qualified Wholly-Owned Domestic Subsidiary and (ii) each other Subsidiary of the Borrower that is not subject to the restrictions set forth in any Pulitzer Debt Documents or any Permitted Pulitzer Debt Refinancing Indebtedness (or any guaranty thereof).

"Qualified Wholly-Owned Domestic Subsidiary" shall mean each Wholly-Owned Domestic Subsidiary of the Borrower that is not subject to the restrictions set forth in any Pulitzer Debt Document or any Permitted Pulitzer Debt Refinancing Indebtedness (or any guaranty thereof).

"Qualified Wholly-Owned Domestic Subsidiary Guarantor" shall mean each Wholly-Owned Domestic Subsidiary of the Borrower that is a Subsidiary Guarantor and whose

guaranty of the Obligations pursuant to the Subsidiaries Guaranty is not limited because of the restrictions set forth in any Pulitzer Debt Document or by any restrictions set forth in the Permitted Pulitzer Debt Refinancing Indebtedness (or any guaranty thereof).

"Qualified Wholly-Owned Foreign Subsidiary" shall mean each Wholly-Owned Foreign Subsidiary that is also a Qualified Subsidiary.

"Qualified Wholly-Owned Subsidiary" shall mean (i) each Qualified Wholly-Owned Domestic Subsidiary (ii) each other Qualified Subsidiary of the Borrower that is also a Wholly-Owned Subsidiary of the Borrower.

"Quarterly Payment Date" shall mean the last Business Day of each March, June, September and December occurring after the Conversion Date.

"Quarterly Pricing Certificate" shall have the meaning provided in the definition of "Applicable Commitment Commission Percentage" and "Applicable Margin" contained herein.

"Real Property" of any Person shall mean all the right, title and interest of such Person in and to land, improvements and fixtures, including Leaseholds.

"Recovery Event" shall mean the receipt by the Borrower or any of its Subsidiaries of any cash insurance proceeds or condemnation awards payable (i) by reason of theft, loss, physical destruction, damage, taking or any other similar event with respect to any property or assets of the Borrower or any of its Subsidiaries and (ii) under any policy of insurance required to be maintained under Section 9.03 (other than business interruption insurance proceeds).

"Register" shall have the meaning provided in Section 13.15.

"Regulation D" shall mean Regulation D of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof establishing reserve requirements.

"Regulation T" shall mean Regulation T of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"Regulation U" shall mean Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"Regulation X" shall mean Regulation X of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"Release" shall mean actively or passively disposing, discharging, injecting, spilling, pumping, leaking, leaching, dumping, emitting, escaping, emptying, pouring, seeping,

-27-

migrating or the like, into or upon any land or water or air, or otherwise entering into the environment.

"Replaced Lender" shall have the meaning provided in Section 2.13.

"Replacement Lender" shall have the meaning provided in Section 2.13.

"Reportable Event" shall mean an event described in Section 4043(c) of ERISA with respect to a Plan that is subject to Title IV of ERISA other than those events as to which the 30-day notice period is waived under subsection .22, .23, .25, .27 or .28 of PBGC Regulation Section 4043.

"Required Lenders" shall mean, at any time, Non-Defaulting Lenders the sum of whose outstanding Term Loans and Revolving Loan Commitments at such time (or, after the termination thereof, outstanding Revolving Loans and RL Percentages of (x) outstanding Swingline Loans at such time and (y) Letter of Credit Outstandings at such time) represents at least a majority of the sum of (i) all outstanding Term Loans of Non-Defaulting Lenders at such time and (ii) the Total Revolving Loan Commitment in effect at such time less the Revolving Loan Commitments of all Defaulting Lenders at such time (or, after the termination thereof, the sum of the then total outstanding Revolving Loans of Non-Defaulting Lenders and the aggregate RL Percentages of all Non-Defaulting Lenders of the total outstanding Swingline Loans and Letter of Credit Outstandings at such time).

"Restricted" shall mean, when referring to cash or Cash Equivalents of the Borrower or any of its Subsidiaries, that such cash or Cash Equivalents (i) appears (or would be required to appear) as "restricted" on a consolidated balance sheet of the Borrower or of any such Subsidiary (unless such appearance is related to the Credit Documents or Liens created thereunder), (ii) are subject to any Lien in favor of any Person other than the Collateral Agent for the benefit of the Secured Creditors or (iii) are not otherwise generally available for use by the Borrower or such Subsidiary.

"Restructuring Charges" shall mean non-recurring one-time restructuring charges incurred by the Borrower or any of its Subsidiaries during the twelve-month period immediately preceding the Conversion Date which are approved by the Administrative Agent based upon reasonably satisfactory evidence thereof delivered by the Borrower to the Administrative Agent.

"Returns" shall have the meaning provided in Section 8.09.

"Revolving Facility" shall mean the Revolving Loan Commitments, the Revolving Loans and the participations in respect of Letters of Credit and Swingline Loans by the RL Lenders.

"Revolving Facility Fee Letter" shall mean the fee letter dated as of [_], 2011 among the Borrower and each RL Lender party thereto.

"Revolving Loan" shall have the meaning set forth in Section 2.01(c).

-28-

"Revolving Loan Commitments" shall mean, for each RL Lender, the amount set forth opposite such RL Lender's name in Schedule I directly below the column entitled "Revolving Loan Commitment," as same may be (x) reduced from time to time or terminated pursuant to Sections 4.02, 4.03 and/or 11, as applicable, or (y) adjusted from time to time as a result of assignments to or from such Lender pursuant to Section 2.13 or 13.04(b).

"Revolving Loan Maturity Date" shall mean December 31, 2015.

"Revolving Note" shall have the meaning provided in Section 2.05(a).

"RL Lender" shall mean a Lender with a Revolving Loan Commitment or with outstanding Revolving Loans.

"RL Percentage" of any RL Lender at any time shall mean a fraction (expressed as a percentage) the numerator of which is the Revolving Loan Commitment of such RL Lender at such time and the denominator of which is the Total Revolving Loan Commitment at such time, provided that if the RL Percentage of any RL Lender is to be determined after the Total Revolving Loan Commitment has been terminated, then the RL Percentages of such RL Lender shall be determined immediately prior (and without giving effect) to such termination.

"S&P" shall mean Standard & Poor's Ratings Services, a division of McGraw-Hill, Inc.

"Scheduled Term Loan Repayment" shall have the meaning provided in Section 5.02(b)(i).

"Scheduled Term Loan Repayment Date" shall have the meaning provided in Section 5.02(b)(i).

"SEC" shall have the meaning provided in Section 9.01(g).

"Second Lien Loan Agreement" shall mean the Second Lien Loan Agreement, dated as of the Conversion Date, among the Borrower, Wilmington Trust, National Association, as administrative agent and collateral agent and the other agents and lenders party thereto, as in effect on, and after giving effect to, the Conversion Date and as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof and thereof.

"Second Lien Loan Documents" shall mean the Second Lien Loan Agreement and all other instruments, agreements and other documents (including, without limitation, the Credit Documents (as defined in the Second Lien Loan Agreement)) executed and delivered with respect to the Second Lien Loan Agreement, as in effect on, and after giving effect to, the Conversion Date and as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof and thereof.

"Second Lien Term Loans" shall mean the term loans made in an aggregate principal amount of up to $175,000,000 on the Conversion Date under the Second Lien Loan Agreement.

"Section 5.04(b)(ii) Certificate" shall have the meaning provided in Section 5.04(b)(ii).

"Secured Creditors" shall have the meaning assigned that term in the respective Security Documents.

"Secured Hedging Agreements" shall have the meaning assigned that term in the respective Security Documents.

"Securities Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Security Agreement" shall have the meaning provided in Section 6.10.

"Security Agreement Collateral" shall mean all "Collateral" as defined in the Security Agreement.

"Security Document" shall mean and include each of the Security Agreement, the Pledge Agreement, each Mortgage and, after the execution and delivery thereof, each Additional Security Document.

"Shareholders' Agreements" shall have the meaning provided in Section 6.05.

"Significant Asset Sale" shall mean each Asset Sale (or series of related Asset Sales) which generates Net Sale Proceeds of at least $5,000,000.

"Star Publishing" shall mean Star Publishing Company, an Arizona corporation and a Subsidiary of Pulitzer.

"Stated Amount" of each Letter of Credit shall mean, at any time, the maximum amount available to be drawn thereunder (in each case determined without regard to whether any conditions to drawing could then be met).

"Subsidiaries Guaranty" shall have the meaning provided in Section 6.08(a).

"Subsidiary" shall mean, as to any Person, (i) any corporation more than 50% of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person and/or one or more Subsidiaries of such Person and (ii) any partnership, limited liability company, association, joint venture or other entity in which such Person and/or one or more Subsidiaries of such Person has more than a 50% equity interest at the time. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Subsidiary Guarantor" shall mean each Domestic Subsidiary of the Borrower (other than an Excluded Domestic Subsidiary so long as it remains an Excluded Domestic

-30-

Subsidiary) and, to the extent required by Section 9.14, each Foreign Subsidiary of the Borrower (in each case, whether existing on the Conversion Date or established, created or acquired after the Conversion Date), unless and until such time as the respective Subsidiary is released from all of its obligations under the Subsidiaries Guaranty in accordance with the terms and provisions thereof.

"Support Agreement" shall mean the Support Agreement, dated as of August 11, 2011, by and among the Debtors and certain of the holders of claims against the Debtors arising under the Prepetition Credit Agreement, as amended, supplemented or otherwise modified from time to time.

"Swingline Expiry Date" shall mean that date which is five Business Days prior to the Revolving Loan Maturity Date.

"Swingline Lender" shall mean the Administrative Agent, in its capacity as Swingline Lender hereunder.

"Swingline Loan" shall have the meaning provided in Section 2.01(e).

"Swingline Note" shall have the meaning provided in Section 2.05(a).

"Synthetic Lease" shall mean a lease transaction under which the parties intend that (i) the lease will be treated as an "operating lease" by the lessee and (ii) the lessee will be entitled to various tax and other benefits ordinarily available to owners (as opposed to lessees) of like property.

"Tax Sharing Agreements" shall have the meaning provided in Section 6.05.

"Taxes" shall have the meaning provided in Section 5.04(a).

"Term Lender" shall mean a Lender under the Prepetition Credit Agreement that agreed to, or, pursuant to the Plan of Reorganization, is deemed to have agreed to, (i) extend the maturity of its "Term Loans" under the Prepetition Credit Agreement outstanding as of the Petition Date (excluding any Converted Loans of such Lender) to the Term Loan Maturity Date and/or (ii) convert its "Revolving Loans" under the Prepetition Credit Agreement to Term Loans, in each case (x) pursuant to this Agreement and the Plan of Reorganization and (y) in the aggregate amount for such Lender set forth on Schedule I opposite such Lender's name and below the column entitled "Term Loans"; and including in each case any successor or permitted assign thereof.

"Term Loan" shall mean a Loan deemed made pursuant to Section 2.01(a). The aggregate amount of Term Loans deemed made on the Conversion Date shall be $[_____].

"Term Loan Facility" shall mean the Term Loans.

"Term Loan Maturity Date" shall mean December 31, 2015.

-31-

"Term Loan Percentage" shall mean, at any time, as to any Term Lender, a fraction (expressed as a percentage), the numerator of which is equal to the aggregate outstanding principal amount of all Term Loans of such Term Lender at such time and the denominator of which is equal to the aggregate outstanding principal amount of all Term Loans of all Term Lenders.

"Term Note" shall have the meaning provided in Section 2.05(a).

"Test Period" shall mean each period of four consecutive fiscal quarters of the Borrower then last ended, in each case taken as one accounting period.

"TNI Partners" shall mean TNI Partners, a general partnership formed under the laws of the State of Arizona pursuant to the terms of the Amended and Restated Partnership Agreement, dated as of November 30, 2009, as amended, by and between Star Publishing Company and Citizen Publishing Company.

"Total Commitment" shall mean, at any time, the sum of the Commitments of each of the Lenders at such time.

"Total Revolving Loan Commitment" shall mean, at any time, the sum of the Revolving Loan Commitments of each of the RL Lenders at such time.

"Total Unutilized Revolving Loan Commitment" shall mean, at any time, an amount equal to the remainder of (x) the Total Revolving Loan Commitment in effect at such time less (y) the sum of (i) the aggregate principal amount of all Revolving Loans and Swingline Loans outstanding at such time plus (ii) the aggregate amount of all Letter of Credit Outstandings at such time.

"Tranche" shall mean the respective Facility and commitments utilized in making Loans hereunder, with there being two separate Tranches on the Conversion Date, i.e., Term Loans and Revolving Loans.

"Type" shall mean the type of Loan determined with regard to the interest option applicable thereto, i.e., whether a Base Rate Loan or a Eurodollar Loan.

"UCC" shall mean the Uniform Commercial Code as from time to time in effect in the relevant jurisdiction.

"Unfunded Current Liability" of any Plan subject to Title IV of ERISA (other than a multiemployer plan as defined under Title IV of ERISA) shall mean the amount, if any, by which the value of the accumulated plan benefits under the Plan determined on a plan termination basis in accordance with actuarial assumptions at such time consistent with those prescribed by the PBGC for purposes of Section 4044 of ERISA, exceeds the Fair Market Value of all plan assets allocable to such liabilities under Title IV of ERISA (excluding any accrued but unpaid contributions).

"United States" and "U.S." shall each mean the United States of America.

-32-

"Unpaid Drawing" shall have the meaning provided in Section 3.05(a).

"Unrestricted" shall mean, when referring to cash or Cash Equivalents of the Borrower or any of its Subsidiaries, that such cash or Cash Equivalents are not Restricted.

"Unutilized Revolving Loan Commitment" shall mean, with respect to any RL Lender at any time, such RL Lender's Revolving Loan Commitment at such time less the sum of (i) the aggregate outstanding principal amount of all Revolving Loans made by such RL Lender at such time and (ii) such RL Lender's RL Percentage of the Letter of Credit Outstandings at such time.

"Voting Equity Interests" shall mean, as to any Person, any class or classes of outstanding Equity Interests of such Person pursuant to which the holders thereof have the general voting power under ordinary circumstances to elect at least a majority of the board of directors of such Person.

"Wholly-Owned Domestic Subsidiary" shall mean, as to any Person, any Wholly-Owned Subsidiary of such Person which is a Domestic Subsidiary.

"Wholly-Owned Foreign Subsidiary" shall mean, as to any Person, any Wholly-Owned Subsidiary of such Person which is a Foreign Subsidiary.

"Wholly-Owned Subsidiary" shall mean, as to any Person, (i) any corporation 100% of whose capital stock is at the time owned by such Person and/or one or more Wholly-Owned Subsidiaries of such Person and (ii) any partnership, association, joint venture or other entity in which such Person and/or one or more Wholly-Owned Subsidiaries of such Person has a 100% equity interest at such time (other than, in the case of a Foreign Subsidiary of the Borrower with respect to preceding clauses (i) and (ii), director's qualifying shares and/or other nominal amount of shares required to be held by Persons other than the Borrower and its Subsidiaries under applicable law).

SECTION 2.    Amount and Terms of Credit.

2.01    Loans.  (a) Subject to the terms and conditions hereof and to give effect to the Plan of Reorganization and provide for, together with the consummation of the transactions contemplated by the Second Lien Loan Agreement, full and complete satisfaction, settlement, release and discharge of the Prepetition Credit Agreement Claims, each Term Lender shall be deemed to have made a term loan to the Borrower on the Conversion Date in an amount equal to the amount set forth opposite such Lender's name on Schedule I bellow the column entitled "Term Loans" (such term loan, a "Term Loan" and, collectively, the "Term Loans"). Such Term Loan shall (i) be denominated in Dollars and (ii) except as hereinafter provided, shall, at the option of the Borrower, be maintained as, and/or converted into, Base Rate Loans or Eurodollar Loans, provided that except as otherwise specifically provided in Section 2.10(b), all Term Loans comprising the same Borrowing shall at all times be of the same Type.  Once repaid, Term Loans may not be reborrowed.

(b)    Subject to and upon the terms and conditions set forth herein, each Lender with a Revolving Loan Commitment severally agrees to make, at any time and from time to time

-33-

on or after the Conversion Date and prior to the Revolving Loan Maturity Date, a revolving loan or revolving loans (each, a "Revolving Loan" and, collectively, the "Revolving Loans") to the Borrower, which Revolving Loans (i) shall be denominated in Dollars, (ii) shall, at the option of the Borrower, be incurred and maintained as, and/or converted into, Base Rate Loans or Eurodollar Loans, provided that except as otherwise specifically provided in Section 2.10(b), all Revolving Loans comprising the same Borrowing shall at all times be of the same Type, (iii) may be repaid and reborrowed in accordance with the provisions hereof, and (iv) shall not exceed for any such Lender at any time outstanding that aggregate principal amount which, when added to the product of (x) such Lender's RL Percentage and (y) the sum of (I) the aggregate amount of all Letter of Credit Outstandings (exclusive of Unpaid Drawings which are repaid with the proceeds of, and simultaneously with the incurrence of, the respective incurrence of Revolving Loans) at such time and (II) the aggregate principal amount of all Swingline Loans (exclusive of Swingline Loans which are repaid with the proceeds of, and simultaneously with the incurrence of, the respective incurrence of Revolving Loans) then outstanding, equals the Revolving Loan Commitment of such Lender at such time.

(c)    On the Conversion Date, automatically and without any further consent or action required by the Borrower and notwithstanding anything to the contrary in Section 2.02 or 2.03, the Administrative Agent or any Lender, (i) the Borrower, in its capacity as reorganized Lee Enterprises, Incorporated and each Subsidiary Guarantor, in its capacity as a reorganized Debtor shall assume all obligations in respect of the DIP Credit Agreement and all other obligations in respect hereof, and, immediately thereafter, (ii) the DIP Credit Agreement and the Prepetition Credit Agreement each shall terminate and be superseded and replaced by, and deemed amended and restated in their entirety in the form of this Agreement, and (1) the "Borrower" and the "Subsidiary Guarantors" under and as defined in the DIP Credit Agreement and the Prepetition Credit Agreement shall be the Borrower and Subsidiary Guarantors hereunder, (2) each "Revolving Loan" under and as defined in the DIP Credit Agreement shall be a Revolving Loan hereunder, (3) each "Lender" under and as defined in the DIP Credit Agreement or in the Prepetition Credit Agreement shall be a Lender hereunder, (4) the "Revolving Loan Commitments" under and as defined in the DIP Credit Agreement shall be Revolving Loan Commitments hereunder, and (5) the "Letters of Credit" outstanding under and as defined in the DIP Credit Agreement and the Prepetition Credit Agreement shall be Letters of Credit hereunder.   Notwithstanding the foregoing, all obligations of the Borrower and the Subsidiary Guarantors to the "Administrative Agent", the "Issuing Bank" and the "Lenders" under and as defined under the DIP Credit Agreement and any other "Credit Document" under and as defined in the DIP Credit Agreement which are expressly stated in the DIP Credit Agreement or such other credit document as surviving such agreement's termination shall, as so specified, survive without prejudice and remain in full force and effect.   Each of the Credit Parties, the Administrative Agent, the Lenders and the Issuing Bank shall take such actions and execute and deliver such agreements, instruments or other documents as the Administrative Agent may reasonably request to give effect to the provisions of this Section 2.01(c).

(d)    Subject to and upon the terms and conditions set forth herein, the Swingline Lender agrees to make, at any time and from time to time on or after the Conversion Date and prior to the Swingline Expiry Date, a revolving loan or revolving loans (each, a "Swingline Loan" and, collectively, the "Swingline Loans") to the Borrower, which Swingline Loans (i) shall be incurred and maintained as Base Rate Loans, (ii) shall be denominated in

-34-

Dollars, (iii) may be repaid and reborrowed in accordance with the provisions hereof, (iv) shall not exceed in aggregate principal amount at any time outstanding, when combined with the aggregate principal amount of all Revolving Loans then outstanding and the aggregate amount of all Letter of Credit Outstandings at such time, an amount equal to the Total Revolving Loan Commitment at such time, and (v) shall not exceed in aggregate principal amount at any time outstanding the Maximum Swingline Amount.    Notwithstanding anything to the contrary contained in this Section 2.01(d), (i) the Swingline Lender shall not be obligated to make any Swingline Loans at a time when a Lender Default exists with respect to a RL Lender unless the Swingline Lender has entered into arrangements satisfactory to it and the Borrower to eliminate the Swingline Lender's risk with respect to the Defaulting Lender's or Defaulting Lenders' participation in such Swingline Loans, including by cash collateralizing such Defaulting Lender's or Defaulting Lenders' RL Percentage of the outstanding Swingline Loans, and (ii) the Swingline Lender shall not make any Swingline Loan after it has received written notice from the Borrower, any other Credit Party or the Required Lenders stating that a Default or an Event of Default exists and is continuing until such time as the Swingline Lender shall have received written notice (A) of rescission of all such notices from the party or parties originally delivering such notice or notices or (B) of the waiver of such Default or Event of Default by the Required Lenders.

(e)    On any Business Day, the Swingline Lender may, in its sole discretion, give notice to the RL Lenders that the Swingline Lender's outstanding Swingline Loans shall be funded with one or more Borrowings of Revolving Loans (provided that such notice shall be deemed to have been automatically given upon the occurrence of a Default or an Event of Default under Section 11.05 or upon the exercise of any of the remedies provided in the last paragraph of Section 11), in which case one or more Borrowings of Revolving Loans constituting Base Rate Loans (each such Borrowing, a "Mandatory Borrowing") shall be made on the immediately succeeding Business Day by all RL Lenders pro rata based on each such RL Lender's RL Percentage (determined before giving effect to any termination of the Revolving Loan Commitments pursuant to the last paragraph of Section 11) and the proceeds thereof shall be applied directly by the Swingline Lender to repay the Swingline Lender for such outstanding Swingline Loans. Each RL Lender hereby irrevocably agrees to make Revolving Loans upon one Business Day's notice pursuant to each Mandatory Borrowing in the amount and in the manner specified in the preceding sentence and on the date specified in writing by the Swingline Lender notwithstanding (i) the amount of the Mandatory Borrowing may not comply with the Minimum Borrowing Amount otherwise required hereunder, (ii) whether any conditions specified in Section 7 are then satisfied, (iii) whether a Default or an Event of Default then exists, (iv) the date of such Mandatory Borrowing, and (v) the amount of the Total Revolving Loan Commitment at such time. In the event that any Mandatory Borrowing cannot for any reason be made on the date otherwise required above (including, without limitation, as a result of the commencement of a proceeding under the Bankruptcy Code with respect to the Borrower), then each RL Lender hereby agrees that it shall forthwith purchase (as of the date the Mandatory Borrowing would otherwise have occurred, but adjusted for any payments received from the Borrower on or after such date and prior to such purchase) from the Swingline Lender such participations in the outstanding Swingline Loans as shall be necessary to cause the RL Lenders to share in such Swingline Loans ratably based upon their respective RL Percentages (determined before giving effect to any termination of the Revolving Loan Commitments pursuant to the last paragraph of Section 11), provided that (x) all interest payable on the Swingline Loans

shall be for the account of the Swingline Lender until the date as of which the respective partici-pation is required to be purchased and, to the extent attributable to the purchased participation, shall be payable to the participant from and after such date, and (y) at the time any purchase of participations pursuant to this sentence is actually made, the purchasing RL Lender shall be required to pay the Swingline Lender interest on the principal amount of participation purchased for each day from and including the day upon which the Mandatory Borrowing would otherwise have occurred to but excluding the date of payment for such participation, at the overnight Federal Funds Rate for the first three days and at the interest rate otherwise applicable to Revolving Loans maintained as Base Rate Loans hereunder for each day thereafter.

2.02    <u>Minimum Amount of Each Borrowing</u>.  The aggregate principal amount of each Borrowing of Loans under a respective Tranche shall not be less than the Minimum Borrowing Amount applicable to such Tranche.  More than one Borrowing may occur on the same date, but at no time shall there be outstanding more than fifteen Borrowings of Eurodollar Loans in the aggregate for all Tranches of Loans (or such greater number of Borrowings of Eurodollar Loans as may be acceptable to the Administrative Agent).

2.03    <u>Notice of Borrowing</u>.  (a) Whenever the Borrower desires to incur (x) Eurodollar Loans hereunder, the Borrower shall give the Administrative Agent at the Notice Office at least three Business Days' prior notice of each Eurodollar Loan to be incurred hereunder, and (y) Base Rate Loans hereunder (excluding Swingline Loans and Revolving Loans made pursuant to a Mandatory Borrowing), the Borrower shall give the Administrative Agent at the Notice Office at least one Business Day's prior notice of each Base Rate Loan to be incurred hereunder, <u>provided</u> that (in each case) any such notice shall be deemed to have been given on a certain day only if given before 11:00 A.M. (New York time) on such day.  Each such notice (together with each notice delivered pursuant to Section 2.03(b)(i), a "<u>Notice of Borrowing</u>"), except as otherwise expressly provided in Section 2.10, shall be irrevocable and shall be in writ-ing, or by telephone promptly confirmed in writing, in the form of Exhibit A-1, appropriately completed to specify:  (i) the aggregate principal amount of the Revolving Loans to be incurred pursuant to such Borrowing; (ii) the date of such Borrowing (which shall be a Business Day); and (iii) whether the Revolving Loans being incurred pursuant to such Borrowing are to be initially maintained as Base Rate Loans or, to the extent permitted hereunder, Eurodollar Loans and, if Eurodollar Loans, the initial Interest Period to be applicable thereto.  The Administrative Agent shall promptly give each Lender which is required to make Revolving Loans notice of such proposed Borrowing, of such Lender's proportionate share thereof and of the other matters required by the immediately preceding sentence to be specified in the Notice of Borrowing.

(b)    (i) Whenever the Borrower desires to incur Swingline Loans hereunder, the Borrower shall give the Swingline Lender no later than 1:00 P.M. (New York time) on the date that a Swingline Loan is to be incurred, written notice or telephonic notice promptly confirmed in writing of each Swingline Loan to be incurred hereunder.  Each such Notice of Borrowing shall be irrevocable and specify in each case (A) the date of Borrowing (which shall be a Business Day), and (B) the aggregate principal amount of the Swingline Loans to be incurred pursuant to such Borrowing.

-36-

(ii)     Mandatory Borrowings shall be made upon the notice specified in Section 2.01(e), with the Borrower irrevocably agreeing, by its incurrence of any Swingline Loan, to the making of the Mandatory Borrowings as set forth in Section 2.01(e).

(c)     Without in any way limiting the obligation of the Borrower to confirm in writing any telephonic notice of any Borrowing or prepayment of Loans, the Administrative Agent or the Swingline Lender, as the case may be, may act without liability upon the basis of telephonic notice of such Borrowing or prepayment, as the case may be, believed by the Administrative Agent or the Swingline Lender, as the case may be, in good faith to be from an Authorized Officer of the Borrower, prior to receipt of written confirmation.  In each such case, the Borrower hereby waives the right to dispute the Administrative Agent's or the Swingline Lender's record of the terms of such telephonic notice of such Borrowing or prepayment of Loans, as the case may be, absent manifest error.

2.04     <u>Disbursement of Funds</u>.  No later than 1:00 P.M. (New York time) on the date specified in each Notice of Borrowing (or (x) in the case of Swingline Loans, no later than 4:00 P.M. (New York time) on the date specified pursuant to Section 2.03(b)(i) or (y) in the case of Mandatory Borrowings, no later than 1:00 P.M. (New York time) on the date specified in Section 2.01(e)), each Lender with a Revolving Loan Commitment will make available its <u>pro rata</u> portion (determined in accordance with Section 2.07) of each such Borrowing requested to be made on such date (or in the case of Swingline Loans, the Swingline Lender will make available the full amount thereof).  All such amounts will be made available in Dollars and in immediately available funds at the Payment Office, and the Administrative Agent will, except in the case of Revolving Loans made pursuant to a Mandatory Borrowing, make available to the Borrower at the Payment Office the aggregate of the amounts so made available by the Lenders.  Unless the Administrative Agent shall have been notified by any Lender prior to the date of Borrowing that such Lender does not intend to make available to the Administrative Agent such Lender's portion of any Borrowing to be made on such date, the Administrative Agent may assume that such Lender has made such amount available to the Administrative Agent on such date of Borrowing and the Administrative Agent may (but shall not be obligated to), in reliance upon such assumption, make available to the Borrower a corresponding amount.  If such corre-sponding amount is not in fact made available to the Administrative Agent by such Lender, the Administrative Agent shall be entitled to recover such corresponding amount on demand from such Lender. If such Lender does not pay such corresponding amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent shall promptly notify the Borrower and the Borrower shall immediately pay such corresponding amount to the Administrative Agent.  The Administrative Agent also shall be entitled to recover on demand from such Lender or the Borrower, as the case may be, interest on such corresponding amount in respect of each day from the date such corresponding amount was made available by the Administrative Agent to the Borrower until the date such corresponding amount is recovered by the Administrative Agent, at a rate per annum equal to (i) if recovered from such Lender, the overnight Federal Funds Rate for the first three days and at the interest rate otherwise applicable to such Loans for each day thereafter, and (ii) if recovered from the Borrower, the rate of interest applicable to the respective Borrowing, as determined pursuant to Section 2.08.  Nothing in this Section 2.04 shall be deemed to relieve any Lender from its obligation to make Loans hereunder or to prejudice any rights which the Borrower may have against any Lender as a result of any failure by such Lender to make Loans hereunder.

-37-

2.05    Notes.  (a)  The Borrower's obligation to pay the principal of, and interest on, the Loans made by each Lender shall be evidenced in the Register maintained by the Administrative Agent pursuant to Section 13.15 and shall, if requested by such Lender, also be evidenced (i) in the case of Term Loans, by a promissory note duly executed and delivered by the Borrower substantially in the form of Exhibit B-1, with blanks appropriately completed in conformity herewith (each, a "Term Note" and, collectively, the "Term Notes"), (ii) in the case of Revolving Loans, by a promissory note duly executed and delivered by the Borrower substantially in the form of Exhibit B-2, with blanks appropriately completed in conformity herewith (each, a "Revolving Note" and, collectively, the "Revolving Notes"), and (iii) in the case of Swingline Loans, by a promissory note duly executed and delivered by the Borrower substantially in the form of Exhibit B-3, with blanks appropriately completed in conformity herewith (the "Swingline Note").

(b)    The Term Note issued to each Term Lender that has outstanding Term Loans shall (i) be executed by the Borrower, (ii) be payable to such Term Lender or its registered assigns and be dated the Conversion Date (or, if issued after the Conversion Date, be dated the date of issuance thereof), (iii) be in a stated principal amount equal to the Term Loans of such Term Lender as of the Conversion Date (or, if issued after the Conversion Date, be in a stated principal amount equal to the outstanding Term Loans of such Term Lender at such time) and be payable in the outstanding principal amount of Term Loans evidenced thereby from time to time, (iv) mature on the Term Loan Maturity Date, (v) bear interest as provided in the appropriate clause of Section 2.08 in respect of the Base Rate Loans and Eurodollar Loans, as the case may be, evidenced thereby, (vi) be subject to voluntary prepayment as provided in Section 5.01, and mandatory repayment as provided in Section 5.02, and (vii) be entitled to the benefits of this Agreement and the other Credit Documents.

(c)    The Revolving Note issued to each Lender that has a Revolving Loan Commitment or outstanding Revolving Loans shall (i) be executed by the Borrower, (ii) be payable to such Lender or its registered assigns and be dated the Conversion Date (or, if issued after the Conversion Date, be dated the date of the issuance thereof), (iii) be in a stated principal amount equal to the Revolving Loan Commitment of such Lender (or, if issued after the termination thereof, be in a stated principal amount equal to the outstanding Revolving Loans of such Lender at such time) and be payable in the outstanding principal amount of the Revolving Loans evidenced thereby from time to time, (iv) mature on the Revolving Loan Maturity Date, (v) bear interest as provided in the appropriate clause of Section 2.08 in respect of the Base Rate Loans and Eurodollar Loans, as the case may be, evidenced thereby, (vi) be subject to voluntary prepayment as provided in Section 5.01, and mandatory repayment as provided in Section 5.02, and (vii) be entitled to the benefits of this Agreement and the other Credit Documents.

(d)    The Swingline Note issued to the Swingline Lender shall (i) be executed by the Borrower, (ii) be payable to the Swingline Lender or its registered assigns and be dated the Conversion Date, (iii) be in a stated principal amount equal to the Maximum Swingline Amount and be payable in the outstanding principal amount of the Swingline Loans evidenced thereby from time to time, (iv) mature on the Swingline Expiry Date, (v) bear interest as provided in the appropriate clause of Section 2.08 in respect of the Base Rate Loans evidenced thereby, (vi) be subject to voluntary prepayment as provided in Section 5.01, and mandatory

repayment as provided in Section 5.02, and (vii) be entitled to the benefits of this Agreement and the other Credit Documents.

(e)    Each Lender will note on its internal records the amount of each Loan made by it and each payment in respect thereof and prior to any transfer of any of its Notes will endorse on the reverse side thereof the outstanding principal amount of Loans evidenced thereby. Failure to make any such notation or any error in such notation shall not affect the Borrower's obligations in respect of such Notes or Loans.

(f)    Notwithstanding anything to the contrary contained above in this Section 2.05 or elsewhere in this Agreement, Notes shall only be delivered to Lenders which at any time specifically request the delivery of such Notes.  No failure of any Lender to request or obtain a Note evidencing its Loans shall affect or in any manner impair the obligations of the Borrower to pay the Loans (and all related Obligations) which would otherwise be evidenced thereby in accordance with the requirements of this Agreement, and shall not in any way affect the security or guaranties therefor provided pursuant to the various Credit Documents.  Any Lender which does not have a Note evidencing its outstanding Loans shall in no event be required to make the notations otherwise described in preceding clause (e).  At any time when any Lender requests the delivery of a Note to evidence any of its Loans, the Borrower shall promptly execute and deliver to the respective Lender the requested Note in the appropriate amount or amounts to evidence such Loans. On or after the Conversion Date, any Lender can request the replacement of Notes outstanding under the Existing Credit Agreement by new Notes reflecting the Commitments or Loans of such Lender under the applicable Tranche, and the Borrower shall promptly execute and deliver to the respective Lender the requested Note in the appropriate amount or amounts to evidence such Loans.

2.06    <u>Conversions</u>.   The Borrower shall have the option to convert, on any Business Day, all or a portion equal to at least the Minimum Borrowing Amount of the outstanding principal amount of Loans (other than Swingline Loans which may not be converted pursuant to this Section 2.06) made pursuant to one or more Borrowings (so long as of the same Tranche) of one or more Types of Loans into a Borrowing (of the same Tranche) of another Type of Loan, <u>provided</u> that (i) except as otherwise provided in Section 2.10(b), Eurodollar Loans may be converted into Base Rate Loans only on the last day of an Interest Period applicable to the Loans being converted and no such partial conversion of Eurodollar Loans shall reduce the outstanding principal amount of such Eurodollar Loans made pursuant to a single Borrowing to less than the Minimum Borrowing Amount applicable thereto, (ii) unless the Required Lenders otherwise agree, Base Rate Loans may only be converted into Eurodollar Loans if no Default or Event of Default is in existence on the date of the conversion, and (iii) no conversion pursuant to this Section 2.06 shall result in a greater number of Borrowings of Eurodollar Loans than is permitted under Section 2.02.  Each such conversion shall be effected by the Borrower by giving the Administrative Agent at the Notice Office prior to 11:00 A.M. (New York time) at least (x) in the case of conversions of Base Rate Loans into Eurodollar Loans, three Business Days' prior notice, and (y) in the case of conversions of Eurodollar Loans into Base Rate Loans, one Business Day's prior notice (each, a "<u>Notice of Conversion/Continuation</u>"), in each case in the form of Exhibit A-2, appropriately completed to specify the Loans to be so converted, the Borrowing or Borrowings pursuant to which such Loans were incurred and, if to be converted into Eurodollar Loans, the Interest Period to be initially applicable thereto.  The Administrative

-39-

Agent shall give each Lender prompt notice of any such proposed conversion affecting any of its Loans.

2.07    Pro Rata Borrowings.    All Borrowings of Revolving Loans under this Agreement after the Conversion Date shall be incurred from the RL Lenders pro rata on the basis of their Revolving Loan Commitments.  It is understood that no Lender shall be responsible for any default by any other Lender of its obligation to make Loans hereunder and that each Lender shall be obligated to make the Loans provided to be made by it hereunder, regardless of the failure of any other Lender to make its Loans hereunder.

2.08    Interest.

(a)    The Borrower agrees to pay interest in respect of the unpaid principal amount of each Base Rate Loan from the date of Borrowing thereof until the earlier of (i) the maturity thereof (whether by acceleration or otherwise) and (ii) the conversion of such Base Rate Loan to a Eurodollar Loan pursuant to Section 2.06 or 2.09, as applicable, at a rate per annum which shall be equal to the sum of the relevant Applicable Margin plus the Base Rate.

(b)    The Borrower agrees to pay interest in respect of the unpaid principal amount of each Eurodollar Loan from the date of Borrowing thereof until the earlier of (i) the maturity thereof (whether by acceleration or otherwise) and (ii) the conversion of such Eurodollar Loan to a Base Rate Loan pursuant to Section 2.06, 2.09 or 2.10, as applicable, at a rate per annum which shall, during each Interest Period applicable thereto, be equal to the sum of the relevant Applicable Margin plus the Eurodollar Rate for such Interest Period.

(c)    Notwithstanding anything to the contrary contained in this Agreement, the unpaid principal amount of each Loan shall bear interest at a rate per annum equal to the rate which is 2% in excess of the rate otherwise applicable to such Loan, at all times that an Event of Default shall have occurred and be continuing. In addition (but without duplication of any amounts payable pursuant to the immediately preceding sentence), overdue principal and, to the extent permitted by law, overdue interest in respect of each Loan shall, in each case, bear interest at a rate per annum equal to (A) in the case of Loans, the greater of (x) the rate which is 2% in excess of the rate then borne by such Loans and (y) the rate which is 2% in excess of the rate otherwise applicable to Base Rate Loans of the respective Tranche from time to time and (B) in the case of other overdue amounts payable hereunder and under any other Credit Document, at a rate per annum equal to the rate which is 2% in excess of the rate applicable to Revolving Loans that are maintained at Base Rate Loans from time to time.  Interest that accrues under this Section 2.08(c) shall be payable on demand.  Payment or acceptance of the increased rates of interest provided for in this Section 2.08(c) is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the Administrative Agent or any Lender.

(d)    Accrued (and theretofore unpaid) interest shall be payable in cash (i) in respect of each Base Rate Loan,  (x) quarterly in arrears on each Quarterly Payment Date, (y) on the date of any repayment or prepayment in full of all outstanding Base Rate Loans, and (z) at maturity (whether by acceleration or otherwise) and, after such maturity, on demand and (ii) in respect of each Eurodollar Loan, (x) on the last day of each Interest Period applicable thereto

and, in the case of an Interest Period in excess of three months, on each date occurring at three month intervals after the first day of such Interest Period, (y) on the date of any repayment or prepayment (on the amount repaid or prepaid), and (z) at maturity (whether by acceleration or otherwise) and, after such maturity, on demand.

(e)     Upon each Interest Determination Date, the Administrative Agent shall determine the Eurodollar Rate for each Interest Period applicable to the respective Eurodollar Loans and shall promptly notify the Borrower and the Lenders thereof.  Each such determination shall, absent manifest error, be final and conclusive and binding on all parties hereto.

2.09    Interest Periods. At the time the Borrower gives any Notice of Borrowing or Notice of Conversion/Continuation in respect of the making of, or conversion into, any Eurodollar Loan (in the case of the initial Interest Period applicable thereto), or prior to 11:00 A.M. (New York time) on the third Business Day prior to the expiration of an Interest Period applicable to such Eurodollar Loan (in the case of any subsequent Interest Period), the Borrower shall have the right to elect the interest period (each, an "Interest Period") applicable to such Eurodollar Loan, which Interest Period shall, at the option of the Borrower, be a one, two, three or six month period, provided that (in each case):

(i)     all Eurodollar Loans comprising a Borrowing shall at all times have the same Interest Period;

(ii)     the initial Interest Period for any Eurodollar Loan shall commence on the date of Borrowing of such Eurodollar Loan (including the date of any conversion thereto from a Base Rate Loan) and each Interest Period occurring thereafter in respect of such Eurodollar Loan shall commence on the day on which the next preceding Interest Period applicable thereto expires;

(iii)     if any Interest Period for a Eurodollar Loan begins on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period, such Interest Period shall end on the last Business Day of such calendar month;

(iv)     if any Interest Period for a Eurodollar Loan would otherwise expire on a day which is not a Business Day, such Interest Period shall expire on the next succeeding Business Day; provided, however, that if any Interest Period for a Eurodollar Loan would otherwise expire on a day which is not a Business Day but is a day of the month after which no further Business Day occurs in such month, such Interest Period shall expire on the next preceding Business Day;

(v)     unless the Required Lenders otherwise agree, no Interest Period may be selected at any time when a Default or an Event of Default is then in existence; and

(vi)     no Interest Period in respect of any Borrowing of any Tranche of Loans shall be selected which extends beyond the Maturity Date for such Tranche of Loans.

If by 11:00 A.M. (New York time) on the third Business Day prior to the expiration of any Interest Period applicable to a Borrowing of Eurodollar Loans, the Borrower has failed to elect,

-41-

or is not permitted to elect, a new Interest Period to be applicable to such Eurodollar Loans as provided above, the Borrower shall be deemed to have elected to convert such Eurodollar Loans into Base Rate Loans effective as of the expiration date of such current Interest Period.

2.10    Increased Costs, Illegality, etc.  (a)  In the event that any Lender shall have determined (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto but, with respect to clause (i) below, may be made only by the Administrative Agent):

(i)    on any Interest Determination Date that, by reason of any changes arising after the date of this Agreement affecting the interbank Eurodollar market, adequate and fair means do not exist for ascertaining the applicable interest rate on the basis provided for in the definition of Eurodollar Rate; or

(ii)    at any time, that such Lender shall incur increased costs or reductions in the amounts received or receivable hereunder with respect to any Eurodollar Loan because of (x) any change since the Conversion Date in any applicable law or governmental rule, regulation, order, guideline or request (whether or not having the force of law) or in the interpretation or administration thereof and including the introduction of any new law or governmental rule, regulation, order, guideline or request, such as, but not limited to:   (A) a change in the basis of taxation of payment to any Lender of the principal of or interest on the Loans or the Notes or any other amounts payable hereunder (except for changes in the rate of tax on, or determined by reference to, the net income or net profits of such Lender pursuant to the laws of the jurisdiction in which it is organized or in which its principal office or applicable lending office is located or any subdivision thereof or therein) or (B) a change in official reserve requirements but, in all events, excluding reserves required under Regulation D to the extent included in the computation of the Eurodollar Rate and/or (y) other circumstances arising since the Conversion Date affecting such Lender, the interbank Eurodollar market or the position of such Lender in such market, provided that notwithstanding anything herein to the contrary, this provision shall apply to the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, regardless of the date enacted, adopted or issued; or

(iii)    at any time, that the making or continuance of any Eurodollar Loan has been made (x) unlawful by any law or governmental rule, regulation or order, (y) impossible by compliance by any Lender in good faith with any governmental request (whether or not having force of law) or (z) impracticable as a result of a contingency occurring after the Conversion Date which materially and adversely affects the interbank Eurodollar market;

then, and in any such event, such Lender (or the Administrative Agent, in the case of clause (i) above) shall promptly give notice (by telephone promptly confirmed in writing) to the Borrower

-42-

and, except in the case of clause (i) above, to the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each of the other Lenders). Thereafter (x) in the case of clause (i) above, Eurodollar Loans shall no longer be available until such time as the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice by the Administrative Agent no longer exist, and any Notice of Borrowing or Notice of Conversion/Continuation given by the Borrower with respect to Eurodollar Loans which have not yet been incurred (including by way of conversion) shall be deemed rescinded by the Borrower, (y) in the case of clause (ii) above, the Borrower agrees to pay to such Lender, upon such Lender's written request therefor, such additional amounts (in the form of an increased rate of, or a different method of calculating, interest or otherwise as such Lender in its sole discretion shall determine) as shall be required to compensate such Lender for such increased costs or reductions in amounts received or receivable hereunder (a written notice as to the additional amounts owed to such Lender, showing in reasonable detail the basis for the calculation thereof, submitted to the Borrower by such Lender shall, absent manifest error, be final and conclusive and binding on all the parties hereto) and (z) in the case of clause (iii) above, the Borrower shall take one of the actions specified in Section 2.10(b) as promptly as possible and, in any event, within the time period required by law.

(b)    At any time that any Eurodollar Loan is affected by the circumstances described in Section 2.10(a)(ii), the Borrower may, and in the case of a Eurodollar Loan affected by the circumstances described in Section 2.10(a)(iii), the Borrower shall, either (x) if the affected Eurodollar Loan is then being made initially or pursuant to a conversion, cancel such Borrowing by giving the Administrative Agent telephonic notice (confirmed in writing) on the same date that the Borrower was notified by the affected Lender or the Administrative Agent pursuant to Section 2.10(a)(ii) or (iii) or (y) if the affected Eurodollar Loan is then outstanding, upon at least three Business Days' written notice to the Administrative Agent, require the affected Lender to convert such Eurodollar Loan into a Base Rate Loan, provided that, if more than one Lender is affected at any time, then all affected Lenders must be treated the same pursuant to this Section 2.10(b).

(c)    If any Lender determines that after the Conversion Date the introduction of or any change in any applicable law or governmental rule, regulation, order, guideline, directive or request (whether or not having the force of law) concerning capital adequacy, or any change in interpretation or administration thereof by the NAIC or any governmental authority, central bank or comparable agency, will have the effect of increasing the amount of capital required or expected to be maintained by such Lender or any corporation controlling such Lender based on the existence of such Lender's Commitments hereunder or its obligations hereunder, then the Borrower agrees to pay to such Lender, upon its written demand therefor, such additional amounts as shall be required to compensate such Lender or such other corporation for the increased cost to such Lender or such other corporation or the reduction in the rate of return to such Lender or such other corporation as a result of such increase of capital.  In determining such additional amounts, each Lender will act reasonably and in good faith and will use averaging and attribution methods which are reasonable, provided that such Lender's determination of compensation owing under this Section 2.10(c) shall, absent manifest error, be final and conclusive and binding on all the parties hereto.  Each Lender, upon determining that any additional amounts will be payable pursuant to this Section 2.10(c), will give prompt written notice

thereof to the Borrower, which notice shall show in reasonable detail the basis for calculation of such additional amounts.

2.11    Compensation.  The Borrower agrees to compensate each Lender, upon its written request (which request shall set forth in reasonable detail the basis for requesting such compensation), for all losses, expenses and liabilities (including, without limitation, any loss, expense or liability incurred by reason of the liquidation or reemployment of deposits or other funds required by such Lender to fund its Eurodollar Loans but excluding loss of anticipated profits) which such Lender may sustain:  (i) if for any reason (other than a default by such Lender or the Administrative Agent) a Borrowing of, or conversion from or into, Eurodollar Loans does not occur on a date specified therefor in a Notice of Borrowing or Notice of Conversion/Continuation (whether or not withdrawn by the Borrower or deemed withdrawn pursuant to Section 2.10(a)); (ii) if any prepayment or repayment (including any prepayment or repayment made pursuant to Section 5.01, Section 5.02 or as a result of an acceleration of the Loans pursuant to Section 11) or conversion of any of its Eurodollar Loans occurs on a date which is not the last day of an Interest Period with respect thereto; (iii) if any prepayment of any of its Eurodollar Loans is not made on any date specified in a notice of prepayment given by the Borrower; or (iv) as a consequence of (x) any other default by the Borrower to repay Eurodollar Loans when required by the terms of this Agreement or any Note held by such Lender or (y) any cancellation or conversion made pursuant to Section 2.10(b).

2.12    Change of Lending Office.  Each Lender agrees that on the occurrence of any event giving rise to the operation of Section 2.10(a)(ii) or (iii), Section 2.10(c), Section 3.06 or Section 5.04 with respect to such Lender, it will, if requested by the Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans or Letters of Credit affected by such event, provided that such designation is made on such terms that such Lender and its lending office suffer no economic, legal or regulatory disadvantage, with the object of avoiding the consequence of the event giving rise to the operation of such Section.  Nothing in this Section 2.12 shall affect or postpone any of the obligations of the Borrower or the right of any Lender provided in Sections 2.10, 3.06 and 5.04.

2.13    Replacement of Lenders.  (x)  If any Lender becomes a Defaulting Lender, (y) upon the occurrence of any event giving rise to the operation of Section 2.10(a)(ii) or (iii), Section 2.10(c), Section 3.06 or Section 5.04 with respect to any Lender which results in such Lender charging to the Borrower increased costs in excess of those being generally charged by the other Lenders or (z) in the case of a refusal by a Lender to consent to a proposed change, waiver, discharge or termination with respect to this Agreement which has been approved by the Required Lenders as (and to the extent) provided in Section 13.12(b), the Borrower shall have the right, in accordance with Section 13.04(b), if no Default or Event of Default then exists or would exist after giving effect to such replacement, to replace such Lender (the "Replaced Lender") with one or more other Eligible Transferees, none of whom shall constitute a Defaulting Lender at the time of such replacement (collectively, the "Replacement Lender") and each of which shall be reasonably acceptable to the Administrative Agent or, in the case of a replacement as provided in Section 13.12(b) where the consent of the respective Lender is required with respect to less than all Tranches of its Loans or Commitments, to replace the Commitments and/or outstanding Loans of such Lender in respect of each Tranche where the

-44-

consent of such Lender would otherwise be individually required, with identical Commitments and/or Loans of the respective Tranche provided by the Replacement Lender; provided that:

      (a)     at the time of any replacement pursuant to this Section 2.13, the Replacement Lender shall enter into one or more Assignment and Assumption Agreements pursuant to Section 13.04(b) (and with all fees payable pursuant to said Section 13.04(b) to be paid by the Replacement Lender) pursuant to which the Replacement Lender shall acquire all of the Commitments and outstanding Loans of the applicable Tranche of, and, in the case of the replacement of Revolving Loan Commitments or Revolving Loans of the respective Lender, all participations in Letters of Credit by, the respective Replaced Lender and, in connection therewith, shall pay to (x) the Replaced Lender in respect thereof an amount equal to the sum of (A) an amount equal to the principal of, and all accrued interest on, all outstanding Loans of the respective Replaced Lender under each Tranche with respect to which such Replaced Lender is being replaced, (B) an amount equal to all Unpaid Drawings (unless there are no Unpaid Drawings with respect to the Tranche being replaced) that have been funded by (and not reimbursed to) such Replaced Lender, together with all then unpaid interest with respect thereto at such time, and (C) an amount equal to all accrued, but theretofore unpaid, Fees owing to the Replaced Lender (but only with respect to the relevant Tranche, in the case of the replacement of less than all Tranches of Loans then held by the respective Replaced Lender) pursuant to Section 4.01, (y) in the case of the replacement of Revolving Loan Commitments or Revolving Loans, each Issuing Lender an amount equal to such Replaced Lender's RL Percentage of any Unpaid Drawing relating to Letters of Credit issued by such Issuing Lender (which at such time remains an Unpaid Drawing) to the extent such amount was not theretofore funded by such Replaced Lender and (z) in the case of any replacement of Revolving Loan Commitments, the Swingline Lender an amount equal to such Replaced Lender's RL Percentage of any Mandatory Borrowing to the extent such amount was not theretofore funded by such Replaced Lender to the Swingline Lender; and

      (b)     all obligations of the Borrower then owing to the Replaced Lender (other than those (i) specifically described in clause (a) above in respect of which the assignment purchase price has been, or is concurrently being, paid, but including all amounts, if any, owing under Section 2.11 or (ii) relating to any Tranche of Loans and/or Commitments of the respective Replaced Lender which will remain outstanding after giving effect to the respective replacement) shall be paid in full to such Replaced Lender concurrently with such replacement.

Upon receipt by the Replaced Lender of all amounts required to be paid to it pursuant to this Section 2.13, the Administrative Agent shall be entitled (but not obligated) and authorized to execute an Assignment and Assumption Agreement on behalf of such Replaced Lender, and any such Assignment and Assumption Agreement so executed by the Administrative Agent and the Replacement Lender shall be effective for purposes of this Section 2.13 and Section 13.04. Upon the execution of the respective Assignment and Assumption Agreement, the payment of amounts referred to in clauses (a) and (b) above, recordation of the assignment on the Register by the Administrative Agent pursuant to Section 13.15 and, if so requested by the Replacement Lender, delivery to the Replacement Lender of the appropriate Note or Notes executed by the

022537-0191-13470-Active.12537490.17

Borrower, (x) the Replacement Lender shall become a Lender hereunder and, unless the respective Replaced Lender continues to have outstanding Term Loans and/or a Revolving Loan Commitment hereunder, the Replaced Lender shall cease to constitute a Lender hereunder, except with respect to indemnification provisions under this Agreement (including, without limitation, Sections 2.10, 2.11, 3.06, 5.04, 12.06, 13.01 and 13.06), which shall survive as to such Replaced Lender, and (y) except in the case of the replacement of only outstanding Term Loans pursuant to this Section 2.13, the RL Percentages of the Lenders shall be automatically adjusted at such time to give effect to such replacement.

SECTION 3.    Letters of Credit.

3.01    Letters of Credit.  (a)  Subject to and upon the terms and conditions set forth herein, the Borrower may request that an Issuing Lender issue, at any time and from time to time on and after the Conversion Date and prior to the 30th day prior to the Revolving Loan Maturity Date, for the account of the Borrower and for the benefit of (x) any holder (or any trustee, agent or other similar representative for any such holders) of L/C Supportable Obligations, an irrevocable standby letter of credit, in a form customarily used by such Issuing Lender or in such other form as is reasonably acceptable to such Issuing Lender, and (y) sellers of goods to the Borrower or any of its Wholly-Owned Subsidiaries, an irrevocable trade letter of credit, in a form customarily used by such Issuing Lender or in such other form as has been approved by such Issuing Lender (which approval shall not be unreasonably withheld or delayed by such Issuing Lender) (each such letter of credit and each Existing Letter of Credit, a "Letter of Credit" and, collectively, the "Letters of Credit").  All Letters of Credit shall be denominated in Dollars and shall be issued on a sight basis only.

(b)    Subject to and upon the terms and conditions set forth herein, each Issuing Lender agrees that it will, at any time and from time to time on and after the Conversion Date and prior to the 30th day prior to the Revolving Loan Maturity Date, following its receipt of the respective Letter of Credit Request, issue for account of the Borrower, one or more Letters of Credit as are permitted to remain outstanding hereunder without giving rise to a Default or an Event of Default, provided that no Issuing Lender shall be under any obligation to issue any Letter of Credit of the types described above if at the time of such issuance:

(i)    any order, judgment or decree of any governmental authority or arbitrator shall purport by its terms to enjoin or restrain such Issuing Lender from issuing such Letter of Credit or any requirement of law applicable to such Issuing Lender or any request or directive (whether or not having the force of law) from any governmental authority with jurisdiction over such Issuing Lender shall prohibit, or request that such Issuing Lender refrain from, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon such Issuing Lender with respect to such Letter of Credit any restriction or reserve or capital requirement (for which such Issuing Lender is not otherwise compensated hereunder) not in effect with respect to such Issuing Lender on the Conversion Date, or any unreimbursed loss, cost or expense which was not applicable or in effect with respect to such Issuing Lender as of the Conversion Date and which such Issuing Lender reasonably and in good faith deems material to it; or

-46-

(ii)     such Issuing Lender shall have received from the Borrower, any other Credit Party or the Required Lenders prior to the issuance of such Letter of Credit notice of the type described in the second sentence of Section 3.03(b).

(c)     Schedule III contains a description of letters of credit that were issued by an Issuing Lender for the account of the Borrower prior to the Conversion Date and which remain outstanding on the Conversion Date (and setting forth, with respect to each such letter of credit, (i) the name of the issuing lender, (ii) the letter of credit number, (iii) the name of the account party, (iv) the stated amount (which shall be in Dollars), (v) the name of the beneficiary, (vi) the expiry date and (vii) whether such letter of credit constitutes a standby letter of credit or a trade letter of credit).  Each such letter of credit, including any extension or renewal thereof in accordance with the terms thereof and hereof (each, as amended from time to time in accordance with the terms thereof and hereof, an "Existing Letter of Credit") shall constitute a "Letter of Credit" for all purposes of this Agreement and shall be deemed issued on the Conversion Date.

3.02     Maximum Letter of Credit Outstandings; Final Maturities.  Notwithstanding anything to the contrary contained in this Agreement, (i) no Letter of Credit shall be issued the Stated Amount of which, when added to the Letter of Credit Outstandings (exclusive of Unpaid Drawings which are repaid on the date of, and prior to the issuance of, the respective Letter of Credit) at such time would exceed either (x) $20,000,000 or (y) when added to the sum of (I) the aggregate principal amount of all Revolving Loans then outstanding and (II) the aggregate principal amount of all Swingline Loans then outstanding, an amount equal to the Total Revolving Loan Commitment at such time, and (ii) each Letter of Credit shall by its terms terminate (x) in the case of standby Letters of Credit, on or before the earlier of (A) the date which occurs 12 months after the date of the issuance thereof (although any such standby Letter of Credit may be extendible for successive periods of up to 12 months, but, in each case, not beyond the tenth Business Day prior to the Revolving Loan Maturity Date, on terms acceptable to the respective Issuing Lender) and (B) ten Business Days prior to the Revolving Loan Maturity Date, and (y) in the case of trade Letters of Credit, on or before the earlier of (A) the date which occurs 180 days after the date of issuance thereof and (B) 30 days prior to the Revolving Loan Maturity Date.

3.03     Letter of Credit Requests; Minimum Stated Amount.  (a) Whenever the Borrower desires that a Letter of Credit be issued for its account, the Borrower shall give the Administrative Agent and the respective Issuing Lender at least five Business Days' (or such shorter period as is acceptable to such Issuing Lender) written notice thereof (including by way of facsimile).  Each notice shall be in the form of Exhibit C, appropriately completed (each, a "Letter of Credit Request").

(b)     The making of each Letter of Credit Request shall be deemed to be a representation and warranty by the Borrower to the Lenders that such Letter of Credit may be issued in accordance with, and will not violate the requirements of, Section 3.02.  Unless the respective Issuing Lender has received notice from the Borrower, any other Credit Party or the Required Lenders before it issues a Letter of Credit that one or more of the conditions specified in Section 7 are not then satisfied, or that the issuance of such Letter of Credit would violate Section 3.02, then such Issuing Lender shall, subject to the terms and conditions of this Agreement, issue the requested Letter of Credit for the account of the Borrower in accordance

-47-

with such Issuing Lender's usual and customary practices.  Upon the issuance of or modification or amendment to any standby Letter of Credit, each Issuing Lender shall promptly notify the Borrower and the Administrative Agent, in writing of such issuance, modification or amendment and such notice shall be accompanied by a copy of such Letter of Credit or the respective modification or amendment thereto, as the case may be.  Promptly after receipt of such notice the Administrative Agent shall notify the Participants, in writing, of such issuance, modification or amendment.  On the first Business Day of each week, each Issuing Lender shall furnish the Administrative Agent with a written (including via facsimile) report of the daily aggregate outstandings of trade Letters of Credit issued by such Issuing Lender for the immediately preceding week.  Notwithstanding anything to the contrary contained in this Agreement, in the event that a Lender Default exists with respect to a RL Lender, no Issuing Lender shall be required to issue any Letter of Credit unless such Issuing Lender has entered into arrangements satisfactory to it and the Borrower to eliminate such Issuing Lender's risk with respect to the participation in Letters of Credit by the Defaulting Lender or Lenders, including by cash collateralizing such Defaulting Lender's or Lenders' RL Percentage of the Letter of Credit Outstandings.

(c)     The initial Stated Amount of each Letter of Credit shall not be less than $100,000 or such lesser amount as is acceptable to the respective Issuing Lender.

3.04     <u>Letter of Credit Participations</u>. (a) Immediately upon the issuance by an Issuing Lender of any Letter of Credit, such Issuing Lender shall be deemed to have sold and transferred to each RL Lender, and each such RL Lender (in its capacity under this Section 3.04, a "<u>Participant</u>") shall be deemed irrevocably and unconditionally to have purchased and received from such Issuing Lender, without recourse or warranty, an undivided interest and participation, to the extent of such Participant's RL Percentage, in such Letter of Credit, each drawing or payment made thereunder and the obligations of the Borrower under this Agreement with respect thereto, and any security therefor or guaranty pertaining thereto.  Upon any change in the Revolving Loan Commitments or RL Percentages of the Lenders pursuant to Section 2.13, 4.02(b) or 13.04(b), it is hereby agreed that, with respect to all outstanding Letters of Credit and Unpaid Drawings relating thereto, there shall be an automatic adjustment to the participations pursuant to this Section 3.04 to reflect the new RL Percentages of the assignor and assignee Lender, as the case may be.

(b)     In determining whether to pay under any Letter of Credit, no Issuing Lender shall have any obligation relative to the other Lenders other than to confirm that any documents required to be delivered under such Letter of Credit appear to have been delivered and that they appear to substantially comply on their face with the requirements of such Letter of Credit.  Any action taken or omitted to be taken by an Issuing Lender under or in connection with any Letter of Credit issued by it shall not create for such Issuing Lender any resulting liability to the Borrower, any other Credit Party, any Lender or any other Person unless such action is taken or omitted to be taken with gross negligence or willful misconduct on the part of such Issuing Lender (as determined by a court of competent jurisdiction in a final and non-appealable decision).

(c)     In the event that an Issuing Lender makes any payment under any Letter of Credit issued by it and the Borrower shall not have reimbursed such amount in full to such Issuing Lender pursuant to Section 3.05(a), such Issuing Lender shall promptly notify the

-48-

Administrative Agent, which shall promptly notify each Participant of such failure, and each Participant shall promptly and unconditionally pay to such Issuing Lender the amount of such Participant's RL Percentage of such unreimbursed payment in Dollars and in same day funds. If the Administrative Agent so notifies, prior to 12:00 Noon (New York time) on any Business Day, any Participant required to fund a payment under a Letter of Credit, such Participant shall make available to the respective Issuing Lender in Dollars such Participant's RL Percentage of the amount of such payment on such Business Day in same day funds. If and to the extent such Participant shall not have so made its RL Percentage of the amount of such payment available to respective Issuing Lender, such Participant agrees to pay to such Issuing Lender, forthwith on demand such amount, together with interest thereon, for each day from such date until the date such amount is paid to such Issuing Lender at the overnight Federal Funds Rate for the first three days and at the interest rate applicable to Revolving Loans that are maintained as Base Rate Loans for each day thereafter. The failure of any Participant to make available to an Issuing Lender its RL Percentage of any payment under any Letter of Credit issued by such Issuing Lender shall not relieve any other Participant of its obligation hereunder to make available to such Issuing Lender its RL Percentage of any payment under any Letter of Credit on the date required, as specified above, but no Participant shall be responsible for the failure of any other Participant to make available to such Issuing Lender such other Participant's RL Percentage of any such payment.

(d)    Whenever an Issuing Lender receives a payment of a reimbursement obligation as to which it has received any payments from the Participants pursuant to clause (c) above, such Issuing Lender shall pay to each such Participant which has paid its RL Percentage thereof, in Dollars and in same day funds, an amount equal to such Participant's share (based upon the proportionate aggregate amount originally funded by such Participant to the aggregate amount funded by all Participants) of the principal amount of such reimbursement obligation and interest thereon accruing after the purchase of the respective participations.

(e)    Upon the request of any Participant, each Issuing Lender shall furnish to such Participant copies of any standby Letter of Credit issued by it and such other documentation as may reasonably be requested by such Participant.

(f)    The obligations of the Participants to make payments to each Issuing Lender with respect to Letters of Credit shall be irrevocable and not subject to any qualification or exception whatsoever and shall be made in accordance with the terms and conditions of this Agreement under all circumstances, including, without limitation, any of the following circumstances:

(i)    any lack of validity or enforceability of this Agreement or any of the other Credit Documents;

(ii)    the existence of any claim, setoff, defense or other right which the Borrower or any of its Subsidiaries may have at any time against a beneficiary named in a Letter of Credit, any transferee of any Letter of Credit (or any Person for whom any such transferee may be acting), the Administrative Agent, any Participant, or any other Person, whether in connection with this Agreement, any Letter of Credit, the transactions contemplated herein or any unrelated transactions (including any underlying transaction between

-49-

the Borrower or any Subsidiary of the Borrower and the beneficiary named in any such Letter of Credit);

(iii)    any draft, certificate or any other document presented under any Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect;

(iv)    the surrender or impairment of any security for the performance or observance of any of the terms of any of the Credit Documents; or

(v)    the occurrence of any Default or Event of Default.

3.05    <u>Agreement to Repay Letter of Credit Drawings</u>.  (a) The Borrower agrees to reimburse each Issuing Lender, by making payment to the Administrative Agent in immediately available funds at the Payment Office, for any payment or disbursement made by such Issuing Lender under any Letter of Credit issued by it (each such amount, so paid until reimbursed by the Borrower, an "<u>Unpaid Drawing</u>"), not later than one Business Day following receipt by the Borrower of notice of such payment or disbursement (<u>provided</u> that no such notice shall be required to be given if a Default or an Event of Default under Section 11.05 shall have occurred and be continuing, in which case the Unpaid Drawing shall be due and payable immediately without presentment, demand, protest or notice of any kind (all of which are hereby waived by the Borrower)), with interest on the amount so paid or disbursed by such Issuing Lender, to the extent not reimbursed prior to 12:00 Noon (New York time) on the date of such payment or disbursement, from and including the date paid or disbursed to but excluding the date such Issuing Lender was reimbursed by the Borrower therefor at a rate per annum equal to the Base Rate as in effect from time to time plus the Applicable Margin as in effect from time to time for Revolving Loans that are maintained as Base Rate Loans; <u>provided</u>, <u>however</u>, to the extent such amounts are not reimbursed prior to 12:00 Noon (New York time) on the third Business Day following the receipt by the Borrower of notice of such payment or disbursement or following the occurrence of a Default or an Event of Default under Section 11.05, interest shall thereafter accrue on the amounts so paid or disbursed by such Issuing Lender (and until reimbursed by the Borrower) at a rate per annum equal to the Base Rate as in effect from time to time plus the Applicable Margin for Revolving Loans that are maintained as Base Rate Loans as in effect from time to time <u>plus</u> 2%, with such interest to be payable on demand.  Each Issuing Lender shall give the Borrower prompt written notice of each Drawing under any Letter of Credit issued by it, <u>provided</u> that the failure to give any such notice shall in no way affect, impair or diminish the Borrower's obligations hereunder.

(b)    The obligations of the Borrower under this Section 3.05 to reimburse each Issuing Lender with respect to drafts, demands and other presentations for payment under Letters of Credit issued by it (each, a "<u>Drawing</u>") (including, in each case, interest thereon) shall be absolute and unconditional under any and all circumstances and irrespective of any setoff, counterclaim or defense to payment which the Borrower or any Subsidiary of the Borrower may have or have had against any Lender (including in its capacity as an Issuing Lender or as a Participant), including, without limitation, any defense based upon the failure of any drawing under a Letter of Credit to conform to the terms of the Letter of Credit or any nonapplication or misapplication by the beneficiary of the proceeds of such Drawing; <u>provided</u>, <u>however</u>, that the

-50-

Borrower shall not be obligated to reimburse any Issuing Lender for any wrongful payment made by such Issuing Lender under a Letter of Credit issued by it as a result of acts or omissions constituting willful misconduct or gross negligence on the part of such Issuing Lender (as determined by a court of competent jurisdiction in a final and non-appealable decision).

3.06    Increased Costs.  If at any time after the Conversion Date, the introduction of or any change in any applicable law, rule, regulation, order, guideline or request or in the interpretation or administration thereof by the NAIC or any governmental authority charged with the interpretation or administration thereof, or compliance by any Issuing Lender or any Participant with any request or directive by the NAIC or by any such governmental authority (whether or not having the force of law), shall either (i) impose, modify or make applicable any reserve, deposit, capital adequacy or similar requirement against letters of credit issued by any Issuing Lender or participated in by any Participant, or (ii) impose on any Issuing Lender or any Participant any other conditions relating, directly or indirectly, to this Agreement or any Letter of Credit; and the result of any of the foregoing is to increase the cost to any Issuing Lender or any Participant of issuing, maintaining or participating in any Letter of Credit, or reduce the amount of any sum received or receivable by any Issuing Lender or any Participant hereunder or reduce the rate of return on its capital with respect to Letters of Credit (except for changes in the rate of tax on, or determined by reference to, the net income or net profits of such Issuing Lender or such Participant pursuant to the laws of the jurisdiction in which it is organized or in which its principal office or applicable lending office is located or any subdivision thereof or therein), then, upon the delivery of the certificate referred to below to the Borrower by any Issuing Lender or any Participant (a copy of which certificate shall be sent by such Issuing Lender or such Participant to the Administrative Agent), the Borrower agrees to pay to such Issuing Lender or such Participant such additional amount or amounts as will compensate such Issuing Lender or such Participant for such increased cost or reduction in the amount receivable or reduction on the rate of return on its capital.  Any Issuing Lender or any Participant, upon determining that any additional amounts will be payable to it pursuant to this Section 3.06, will give prompt written notice thereof to the Borrower, which notice shall include a certificate submitted to the Borrower by such Issuing Lender or such Participant (a copy of which certificate shall be sent by such Issuing Lender or such Participant to the Administrative Agent), setting forth in reasonable detail the basis for the calculation of such additional amount or amounts necessary to compensate such Issuing Lender or such Participant.  The certificate required to be delivered pursuant to this Section 3.06 shall, absent manifest error, be final and conclusive and binding on the Borrower.

SECTION 4.    Commitment Commission; Fees; Reductions of Commitment.

4.01    Fees.  (a) The Borrower agrees to pay to the Administrative Agent for distribution to each Non-Defaulting RL Lender a commitment commission (the "Commitment Commission") for the period from and including the Conversion Date to and including the Revolving Loan Maturity Date (or such earlier date on which the Total Revolving Loan Commitment has been terminated) computed at a rate per annum equal to the Applicable Commitment Commission of the Unutilized Revolving Loan Commitment of such Non-Defaulting RL Lender as in effect from time to time.  Accrued Commitment Commission shall be due and payable quarterly in arrears on each Quarterly Payment Date and on the date upon which the Total Revolving Loan Commitment is terminated.

(b)    The Borrower agrees to pay to the Administrative Agent for distribution to each RL Lender (based on each such RL Lender's respective RL Percentage) a fee in respect of each Letter of Credit (the "Letter of Credit Fee") for the period from and including the date of issuance of such Letter of Credit to and including the date of termination or expiration of such Letter of Credit, computed at a rate per annum equal to the Applicable Margin during such period with respect to Revolving Loans that are maintained as Eurodollar Loans on the daily Stated Amount of each such Letter of Credit.  Accrued Letter of Credit Fees shall be due and payable quarterly in arrears on each Quarterly Payment Date and on the first day on or after the termination of the Total Revolving Loan Commitment upon which no Letters of Credit remain outstanding.

(c)    The Borrower agrees to pay to each Issuing Lender, for its own account, a facing fee in respect of each Letter of Credit issued by it (the "Facing Fee") for the period from and including the date of issuance of such Letter of Credit to and including the date of termination or expiration of such Letter of Credit, computed at a rate per annum equal to 1/8 of 1% on the daily Stated Amount of such Letter of Credit, provided that in any event the minimum amount of Facing Fees payable in any twelve-month period for each Letter of Credit shall be not less than $500, it being agreed that, on the day of issuance of any Letter of Credit and on each anniversary thereof prior to the termination or expiration of such Letter of Credit, if $500 will exceed the amount of Facing Fees that will accrue with respect to such Letter of Credit for the immediately succeeding twelve-month period, the full $500 shall be payable on the date of issuance of such Letter of Credit and on each such anniversary thereof.  Except as otherwise provided in the proviso to the immediately preceding sentence, accrued Facing Fees shall be due and payable quarterly in arrears on each Quarterly Payment Date and upon the first day on or after the termination of the Total Revolving Loan Commitment upon which no Letters of Credit remain outstanding.

(d)    The Borrower agrees to pay to each Issuing Lender, for its own account, upon each payment under, issuance of, or amendment to, any Letter of Credit issued by it, such amount as shall at the time of such event be the administrative charge and the reasonable expenses which such Issuing Lender is generally imposing in connection with such occurrence with respect to letters of credit.

(e)    The Borrower agrees to pay to the Administrative Agent such fees as may be agreed to in writing from time to time by the Borrower or any of its Subsidiaries and the Administrative Agent.

4.02    Voluntary Termination of Unutilized Revolving Loan Commitments.  (a) Upon at least three Business Day's prior written notice to the Administrative Agent at the Notice Office (which notice the Administrative Agent shall promptly transmit to each of the Lenders), the Borrower shall have the right, at any time or from time to time, without premium or penalty to terminate the Total Unutilized Revolving Loan Commitment in whole, or reduce it in part, pursuant to this Section 4.02(a), in an integral multiple of $5,000,000 in the case of partial reductions to the Total Unutilized Revolving Loan Commitment, provided that each such reduction shall apply proportionately to permanently reduce the Revolving Loan Commitment of each RL Lender.

-52-

(b)    In the event of certain refusals by a Lender to consent to certain proposed changes, waivers, discharges or terminations with respect to this Agreement which have been approved by the Required Lenders as (and to the extent) provided in Section 13.12(b), the Borrower shall have the right, subject to obtaining the consents required by Section 13.12(b), upon five Business Days' prior written notice to the Administrative Agent at the Notice Office (which notice the Administrative Agent shall promptly transmit to each of the Lenders), to terminate the entire Revolving Loan Commitment of such Lender, so long as all Loans, together with accrued and unpaid interest, Fees and all other amounts, owing to such Lender (including all amounts, if any, owing pursuant to Section 2.11 but excluding amounts owing in respect of Loans of any Tranche maintained by such Lender, if such Loans are not being repaid pursuant to Section 5.01(b)) are repaid concurrently with the effectiveness of such termination (at which time Schedule I shall be deemed modified to reflect such changed amounts) and such Lender's RL Percentage, if any, of (x) all outstanding Letters of Credit is cash collateralized in a manner satisfactory to the Administrative Agent and the respective Issuing Lenders and (y) all Mandatory Borrowings not theretofore funded by such Lender are paid in full to the Swingline Lender, and at such time, unless the respective Lender continues to have outstanding Term Loans hereunder, such Lender shall no longer constitute a "Lender" for purposes of this Agreement with respect to the Revolving Loan Commitment of such Lender so terminated, except with respect to indemnifications under this Agreement (including, without limitation, Sections 2.10, 2.11, 3.06, 5.04, 12.06, 13.01 and 13.06), which shall survive as to such repaid Lender (but only in respect of the period of time during which such repaid Lender was a Lender hereunder).

4.03    <u>Mandatory Reduction of Commitments and Revolving Loan Repayments</u>.

The Total Revolving Loan Commitment (and the Revolving Loan Commitment of each RL Lender) shall terminate in its entirety upon the earlier of (i) the Revolving Loan Maturity Date and (ii) unless the Required Lenders otherwise agree in writing, the date on which a Change of Control occurs.

SECTION 5.    <u>Prepayments; Payments; Taxes</u>.

5.01    <u>Voluntary Prepayments</u>.  (a) Subject to Section 5.05, the Borrower shall have the right to prepay the Loans, without premium or penalty, in whole or in part at any time and from time to time on the following terms and conditions:  (i) the Borrower shall give the Administrative Agent prior to 12:00 Noon (New York time) at the Notice Office (x) at least one Business Day's prior written notice (or telephonic notice promptly confirmed in writing) of its intent to prepay Base Rate Loans (or same day notice in the case of a prepayment of Swingline Loans) and (y) at least three Business Days' prior written notice (or telephonic notice promptly confirmed in writing) of its intent to prepay Eurodollar Loans, which notice (in each case) shall specify whether Term Loans, Revolving Loans or Swingline Loans shall be prepaid, the amount of such prepayment and the Types of Loans to be prepaid and, in the case of Eurodollar Loans, the specific Borrowing or Borrowings pursuant to which such Eurodollar Loans were made, and which notice the Administrative Agent shall, except in the case of a prepayment of Swingline Loans, promptly transmit to each of the Lenders; (ii) (x) each partial prepayment of Term Loans pursuant to this Section 5.01(a) shall be in an aggregate principal amount of at least $5,000,000 (or such lesser amount as is acceptable to the Administrative Agent), (y) each partial prepayment of Revolving Loans pursuant to this Section 5.01(a) shall be in an aggregate principal amount of

-53-

at least $1,000,000 (or such lesser amount as is acceptable to the Administrative Agent) and (z) each partial prepayment of Swingline Loans pursuant to this Section 5.01(a) shall be in an aggregate principal amount of at least $300,000 (or such lesser amount as is acceptable to the Administrative Agent), provided that if any partial prepayment of Eurodollar Loans made pursuant to any Borrowing shall reduce the outstanding principal amount of Eurodollar Loans made pursuant to such Borrowing to an amount less than the Minimum Borrowing Amount applicable thereto, then such Borrowing may not be continued as a Borrowing of Eurodollar Loans (and same shall automatically be converted into a Borrowing of Base Rate Loans) and any election of an Interest Period with respect thereto given by the Borrower shall have no force or effect; (iii) each prepayment pursuant to this Section 5.01(a) in respect of any Revolving Loans made pursuant to a Borrowing shall be applied to the Revolving Loans, with each RL Lender to be allocated its applicable RL Percentage of the amount of such prepayment, provided that at the Borrower's election in connection with any prepayment of Revolving Loans pursuant to this Section 5.01(a), such prepayment shall not, so long as no Default or Event of Default then exists, be applied to any Revolving Loan of a Defaulting Lender; (iv) each voluntary prepayment in respect of any Term Loans made pursuant to this Section 5.01(a) shall be allocated to the Term Loans, with each Term Lender to be allocated its applicable Term Loan Percentage of the amount of such prepayment; and (v) each voluntary prepayment of the Term Loans pursuant to this Section 5.01(a) (in excess of amounts required to be paid for the applicable period pursuant to Section 5.02) shall be applied to reduce the remaining Scheduled Term Loan Repayments of such Term Loans in inverse order of maturity.

(b)    In the event of certain refusals by a Lender to consent to certain proposed changes, waivers, discharges or terminations with respect to this Agreement which have been approved by the Required Lenders as (and to the extent) provided in Section 13.12(b), the Borrower may, upon five Business Days' prior written notice to the Administrative Agent at the Notice Office (which notice the Administrative Agent shall promptly transmit to each of the Lenders), repay all Loans of such Lender (including all amounts, if any, owing pursuant to Section 2.11), together with accrued and unpaid interest, Fees and all other amounts then owing to such Lender (or owing to such Lender with respect to each Tranche which gave rise to the need to obtain such Lender's individual consent) in accordance with, and subject to the requirements of, said Section 13.12(b), so long as (A) in the case of the repayment of Revolving Loans of any Lender pursuant to this clause (b), (x) the Revolving Loan Commitment of such Lender is terminated concurrently with such repayment pursuant to Section 4.02(b) (at which time Schedule I shall be deemed modified to reflect the changed Revolving Loan Commitments) and (y) such Lender's RL Percentage, if any, of all outstanding Letters of Credit is cash collateralized in a manner satisfactory to the Administrative Agent and the respective Issuing Lenders and (B) the consents, if any, required by Section 13.12(b) in connection with the repayment pursuant to this clause (b) shall have been obtained.  Each prepayment of the Term Loans pursuant to this Section 5.01(b) shall be applied to reduce the then remaining Scheduled Term Loan Repayments of such Term Loans on a pro rata basis (based upon the remaining principal amount of each such Scheduled Term Loan Repayments after giving effect to all prior reductions thereto).

5.02    Mandatory Repayments.  (a)  On any day on which the sum of (I) the aggregate outstanding principal amount of all Revolving Loans (after giving effect to all other repayments thereof on such date), (II) the aggregate outstanding principal amount of all Swingline Loans (after giving effect to all other repayments thereof on such date) and (III) the

-54-

aggregate amount of all Letter of Credit Outstandings exceeds the Total Revolving Loan Commitment at such time, the Borrower shall prepay on such day the principal of Swingline Loans and, after all Swingline Loans have been repaid in full or if no Swingline Loans are outstanding, Revolving Loans in an amount equal to such excess. If, after giving effect to the prepayment of all outstanding Swingline Loans and Revolving Loans, the aggregate amount of the Letter of Credit Outstandings exceeds the Total Revolving Loan Commitment at such time, the Borrower shall pay to the Administrative Agent at the Payment Office on such day an amount of cash and/or Cash Equivalents equal to the amount of such excess (up to a maximum amount equal to the Letter of Credit Outstandings at such time), such cash and/or Cash Equivalents to be held as security for all Obligations of the Borrower to the Issuing Lenders and the Lenders hereunder in a cash collateral account to be established by the Administrative Agent.

(b)      Subject to Section 5.05, in addition to any other mandatory repayments pursuant to this Section 5.02, on the 15th day (or, if not a Business Day, the immediately preceding Business Day) of the last month of each of the Borrower's fiscal quarters set forth below, the Borrower shall be required to repay the principal amount of Term Loans, to the extent then outstanding, as set forth opposite each such fiscal quarter below, and the aggregate principal amount of all Term Loans then outstanding shall be repaid on the Term Loan Maturity Date (each such date, a "Scheduled Term Loan Repayment Date"; each such repayment, as the same may be reduced as provided in Section 5.01(a) or 5.01(b), a "Scheduled Term Loan Repayment"):

| Scheduled Term Loan Repayment Date | Amount |
|---|---|
| The fiscal quarters ending on or closest to June 30, 2012, September 30, 2012, December 31, 2012 and March 31, 2013 | $2,500,000 |
| The fiscal quarters ending on or closest to June 30, 2013, September 30, 2013, December 31, 2013 and March 31, 2014 | $3,000,000 |
| The fiscal quarter ending on or closest to June 30, 2014 and each fiscal quarter of the Borrower ended thereafter prior to the Extended Term Loan Maturity Date | $3,375,000 |

(c)      (i) In addition to any other mandatory repayments pursuant to this Section 5.02, on each date on or after the Conversion Date upon which the Borrower or any of its Subsidiaries receives any Net Cash Proceeds from any issuance or incurrence by the Borrower or any of its Subsidiaries of (x) Indebtedness for borrowed money (other than Indebtedness for borrowed money permitted to be incurred pursuant to Section 10.04 as in effect on the Conversion Date (but including (i) Additional Permitted Indebtedness or Additional Second Lien Indebtedness, in either case to the extent not applied to repay outstanding Second Lien Term Loans and (ii) any Permitted Pulitzer Debt Refinancing Incremental Amount to the extent

-55-

required under Section 10.04(xi) which shall be applied as otherwise provided by this Section 5.02(c)) and (y) Equity Interests (other than Qualified Preferred Equity or to the extent Net Cash Proceeds thereof are applied to repay outstanding Second Lien Term Loans), an amount equal to 100% of the Net Cash Proceeds of the respective issuance or incurrence of such Indebtedness or Equity Interests shall be applied on such date as a mandatory repayment in accordance with the requirements of Sections 5.02(g) and (h).

(ii)      In addition to any other mandatory repayments pursuant to this Section 5.02, on each date on or after the Conversion Date upon which the Borrower or any of its Subsidiaries receives any Net Cash Proceeds from any issuance of Qualified Preferred Stock, the first $50,000,000 of the Net Cash Proceeds therefrom, and any other Net Cash Proceeds therefrom that are not applied to repay outstanding Second Lien Term Loans, shall be applied on such date as a mandatory repayment in accordance with the requirements of Sections 5.02(g) and (h).

(d)      In addition to any other mandatory repayments pursuant to this Section 5.02, on each date on or after the Conversion Date upon which the Borrower or any of its Subsidiaries receives any Net Sale Proceeds from any Asset Sale, an amount equal to 100% of the Net Sale Proceeds therefrom shall be applied within one Business Day after receipt as a mandatory repayment in accordance with the requirements of Sections 5.02(g) and (h).

(e)      On each Excess Cash Flow Payment Date after the Conversion Date, an amount equal to the Excess Cash Flow Repayment Amount shall be applied as a mandatory repayment in accordance with the requirements of Sections 5.02(g) and (h).

(f)      In addition to any other mandatory repayments pursuant to this Section 5.02, within 10 days following each date on or after the Conversion Date upon which the Borrower or any of its Subsidiaries receives any Net Cash Proceeds from any Recovery Event (other than Recovery Events where the Net Cash Proceeds therefrom do not exceed $500,000), an amount equal to 100% of the Net Cash Proceeds from such Recovery Event shall be applied within such 10 day period as a mandatory repayment in accordance with the requirements of Sections 5.02(g) and (h); provided, however, that so long as no Default or Event of Default then exists, such Net Cash Proceeds shall not be required to be so applied within such 10 day period to the extent that such Net Cash Proceeds shall be used to replace or restore any properties or assets in respect of which such Net Cash Proceeds were paid within 360 days following the date of the receipt of such Net Cash Proceeds, and provided further, that (x) so long as no Default or Event of Default then exists and to the extent that the amount of such Net Cash Proceeds equals or exceeds $25,000,000, the amount of such Net Cash Proceeds, together with other cash available to the Borrower and its Subsidiaries and permitted to be spent by them on Capital Expenditures during the relevant period, equals at least 100% of the cost of replacement or restoration of the properties or assets in respect of which such Net Cash Proceeds were paid as determined by the Borrower and as supported by such information as the Administrative Agent may reasonably request, then the entire amount of the Net Cash Proceeds from such Recovery Event (and not just the portion thereof in excess of $25,000,000) shall be deposited with the Administrative Agent pursuant to a cash collateral arrangement reasonably satisfactory to the Administrative Agent whereby such proceeds shall be disbursed to the Borrower from time to time as needed to pay or reimburse the Borrower or such Subsidiary for the actual costs incurred by it in connection with the replacement or restoration of the respective properties or assets

-56-

(pursuant to such certification requirements as may be reasonably established by the Administrative Agent), although at any time while an Event of Default has occurred and is continuing, the Required Lenders may direct the Administrative Agent (in which case the Administrative Agent shall, and is hereby authorized by the Borrower to, follow said directions) to apply any or all proceeds then on deposit in such collateral account in accordance with the requirements of Sections 5.02(g) and (h) and (y) if all or any portion of such Net Cash Proceeds not required to be so applied pursuant to the preceding proviso are not so used within 360 days after the date of the receipt of such Net Cash Proceeds (or such earlier date, if any, as the Borrower or the relevant Subsidiary determines not to reinvest the Net Cash Proceeds relating to such Recovery Event as set forth above), such remaining portion shall be applied on the last day of such period (or such earlier date, as the case may be) as provided above in this Section 5.02(f) without regard to the preceding proviso.

(g)    (I) Subject to Section 5.05, each amount required to be applied pursuant to Sections 5.02(c), (d) and (f) shall be applied ratably to repay outstanding Term Loans and Revolving Loans, on a pro rata basis among the Lenders within each such Tranche.

(II)    Subject to Section 5.05, each amount required to be applied pursuant to Section 5.02(e) on each Excess Cash Flow Payment Date shall be applied to repay the Term Loans, on a pro rata basis among the Lenders within such Tranche in accordance with clause (III) below.

(III)    The amount of each principal repayment of Term Loans pursuant to (A) clause (I) above shall be applied to reduce the then remaining Scheduled Term Loan Repayments in inverse order of maturity and (B) clause (II) above shall be applied to reduce the remaining Scheduled Term Loan Repayments, after (without duplication) deduction for the amount of the Scheduled Term Loan Repayment (without giving effect to any reductions thereof after the Conversion Date) due during the applicable Excess Cash Flow Payment Period and actually applied to make such Scheduled Term Loan Repayment (the remaining amount after such deduction, the "Excess Cash Flow Payment Amount"), to prepay the Term Loans and applied (1) first, to the extent the Excess Cash Flow Payment Amount is positive, to reduce the Scheduled Term Loan Repayment due in the calendar quarter immediately succeeding such Excess Cash Flow Payment Period and (2) thereafter, to the remaining Scheduled Term Loan Repayments in inverse order of maturity.

(h)    With respect to each repayment of Loans required by this Section 5.02, the Borrower may designate the Types of Loans of the respective Tranche which are to be repaid and, in the case of Eurodollar Loans, the specific Borrowing or Borrowings of the respective Tranche pursuant to which such Eurodollar Loans were made, provided that:  (i) repayments of Eurodollar Loans pursuant to this Section 5.02 may only be made on the last day of an Interest Period applicable thereto unless all Eurodollar Loans of the respective Tranche with Interest Periods ending on such date of required repayment and all Base Rate Loans of the respective Tranche have been paid in full; (ii) if any repayment of Eurodollar Loans made pursuant to a single Borrowing shall reduce the outstanding Eurodollar Loans made pursuant to such Borrowing to an amount less than the Minimum Borrowing Amount applicable thereto, such Borrowing shall be automatically converted into a Borrowing of Base Rate Loans; and (iii) each repayment of any Loans made pursuant to a Borrowing shall be applied pro rata among such

-57-

Loans within its applicable Tranche.   In the absence of a designation by the Borrower as described in the preceding sentence, the Administrative Agent shall, subject to the above, make such designation in its sole discretion.

(i)       In addition to any other mandatory repayments pursuant to this Section 5.02, (i) all then outstanding Swingline Loans shall be repaid in full on the Swingline Expiry Date, (ii) all then outstanding Loans shall be repaid in full on the respective Maturity Date for such Tranche of Loans, and (iii) unless the Required Lenders otherwise agree in writing, all then outstanding Loans and other Obligations shall be repaid in full on the date on which a Change of Control occurs.

5.03    Method and Place of Payment.   Except as otherwise specifically provided herein, all payments under this Agreement and under any Note shall be made to the Administrative Agent for the account of the Lender or Lenders entitled thereto not later than 12:00 Noon (New York time) on the date when due and shall be made in Dollars in immediately available funds at the Payment Office.   Whenever any payment to be made hereunder or under any Note shall be stated to be due on a day which is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest shall be payable at the applicable rate during such extension.

5.04    Net Payments.   (a)  All payments made by or on behalf of the Borrower hereunder and under any Note will be made without setoff, counterclaim or other defense. Except as provided in Section 5.04(b), all such payments will be made free and clear of, and without deduction or withholding for, any present or future taxes, levies, imposts, duties, fees, assessments or other charges of whatever nature now or hereafter imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein with respect to such payments (but excluding, (i) except as provided in the second succeeding sentence, any tax imposed on or measured by the net income or net profits of a Lender pursuant to the laws of the jurisdiction in which it is organized or the jurisdiction in which the principal office or applicable lending office of such Lender is located or any subdivision thereof or therein and (ii) any United States Federal withholding tax that would not have been imposed but for a failure by such recipient (or any financial institution through which any payment is made to such recipient) to comply with the applicable requirements of Sections 1471 through 1474 of the Code, as of the date of this Agreement, and any regulations or official interpretations thereof) and all interest, penalties or similar liabilities with respect to such non-excluded taxes, levies, imposts, duties, fees, assessments or other charges (all such non-excluded taxes, levies, imposts, duties, fees, assessments or other charges being referred to collectively as "Taxes").   If any Taxes are so levied or imposed, the Borrower agrees to pay the full amount of such Taxes, and such additional amounts as may be necessary so that every payment of all amounts due under this Agreement or under any Note, after withholding or deduction for or on account of any Taxes, will not be less than the amount provided for herein or in such Note as if such Taxes had not been levied or imposed.   If any amounts are payable in respect of Taxes pursuant to the preceding sentence, the Borrower agrees to reimburse each Lender, upon the written request of such Lender, for taxes imposed on or measured by the net income or net profits of such Lender pursuant to the laws of the jurisdiction in which such Lender is organized or in which the principal office or applicable lending office of such Lender is located or under the laws of any political subdivision or taxing authority of any such jurisdiction in which such Lender is organized or in which the principal

-58-

office or applicable lending office of such Lender is located and for any withholding of taxes as such Lender shall determine are payable by, or withheld from, such Lender, in respect of such amounts so paid to or on behalf of such Lender pursuant to the preceding sentence and in respect of any amounts paid to or on behalf of such Lender pursuant to this sentence.  The Borrower will furnish to the Administrative Agent within 45 days after the date the payment of any Taxes is due pursuant to applicable law certified copies of tax receipts evidencing such payment by such Borrower.  The Borrower agrees to indemnify and hold harmless each Lender, and reimburse such Lender upon its written request, for the amount of any Taxes so levied or imposed and paid by such Lender (other than for any interest or penalties directly attributable to any failure of a Lender to file any returns or pay any Taxes directly attributable to this Agreement, to the extent such Lender was legally required to file such returns and/or pay such Taxes and was reasonably informed by the Borrower about such requirements and had all information necessary to file such returns and/or pay such Taxes).  For purposes of this Section 5.04(a), Taxes shall include Other Taxes.

(b)  Each Lender that is a "United States person" (as such term is defined in Section 7701(a)(30) of the Code) agrees to deliver to the Borrower and the Administrative Agent on or prior to the Conversion Date or, in the case of a Lender that is an assignee, transferee or acquiror of an interest under this Agreement pursuant to Section 2.12, 2.13 or 13.04(b) (unless the respective Lender was already a Lender hereunder immediately prior to such assignment, transfer or acquisition), on the date of such assignment, transfer or acquisition to or by such Lender, two properly completed and duly signed copies of Internal Revenue Service Form W-9 (or any successor form) certifying that such Lender is exempt from U.S. Federal withholding tax. Each Lender that is not a United States person (as such term is defined in Section 7701(a)(30) of the Code) for U.S. Federal income tax purposes agrees to deliver to the Borrower and the Administrative Agent on or prior to the Conversion Date or, in the case of a Lender that is an assignee, transferee or acquiror of an interest under this Agreement pursuant to Section 2.12, 2.13 or 13.04(b) (unless the respective Lender was already a Lender hereunder immediately prior to such assignment, transfer or acquisition), on the date of such assignment, transfer or acquisition to or by such Lender, (i) two accurate and complete original signed copies of Internal Revenue Service Form W-8ECI, Form W-8BEN (with respect to a complete exemption under an income tax treaty) or Form W-8IMY (together with any applicable underlying Internal Revenue Service forms) (or successor forms) certifying to such Lender's entitlement as of such date to a complete exemption from United States withholding tax with respect to payments to be made under this Agreement and under any Note, (ii) if the Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code and cannot deliver either Internal Revenue Service Form W-8ECI or Form W-8BEN (with respect to a complete exemption under an income tax treaty) or W-8IMY (or any successor forms) pursuant to clause (i) above, (x) a certificate substantially in the form of Exhibit D (any such certificate, a "Section 5.04(b)(ii) Certificate") and (y) two accurate and complete original signed copies of applicable Internal Revenue Service Form W-8 (with respect to the portfolio interest exemption) (or successor form) certifying to such Lender's entitlement as of such date to a complete exemption from United States withholding tax with respect to payments of interest to be made under this Agreement and under any Note, or  (iii) any other form prescribed by applicable requirements of U.S. Federal income tax law as a basis for claiming exemption from or a reduction in U.S. Federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable requirements of law to permit the Borrower and the Administrative Agent to determine the withholding or deduction

-59-

required to be made.  In addition, each Lender agrees that from time to time after the Conversion Date, when a lapse in time or change in circumstances renders the previous certification obsolete or inaccurate in any material respect and from time to time thereafter upon the request of the Borrower or the Administrative Agent, such Lender will deliver to the Borrower and the Administrative Agent two new accurate and complete original signed copies of Internal Revenue Service Form W-8ECI, Form W-8BEN (with respect to the benefits of any income tax treaty), Form W-8IMY (together with any applicable underlying Internal Revenue Service forms) or applicable Form W-8 (with respect to the portfolio interest exemption) and a Section 5.04(b)(ii) Certificate, as the case may be, and such other forms as may be required in order to confirm or establish the entitlement of such Lender to a continued exemption from or reduction in United States withholding tax with respect to payments under this Agreement and any Note, or such Lender shall immediately notify the Borrower and the Administrative Agent of its inability to deliver any such Form or Certificate, in which case such Lender shall not be required to deliver any such Form or Certificate pursuant to this Section 5.04(b).  Notwithstanding anything to the contrary contained in Section 5.04(a), but subject to Section 13.04(b) and the immediately suc-ceeding sentence, (x) the Borrower shall be entitled, to the extent it is required to do so by law, to deduct or withhold income or similar taxes imposed by the United States (or any political sub-division or taxing authority thereof or therein) from interest, Fees or other amounts payable here-under for the account of any Lender which is not a United States person (as such term is defined in Section 7701(a)(30) of the Code) for U.S. Federal income tax purposes to the extent that such Lender has not provided to the Borrower U.S. Internal Revenue Service Forms that establish a complete exemption from such deduction or withholding and (y) the Borrower shall not be obli-gated pursuant to Section 5.04(a) to gross-up payments to be made to a Lender in respect of income or similar taxes imposed by the United States if (I) such Lender has not provided to the Borrower the Internal Revenue Service Forms required to be provided to the Borrower pursuant to this Section 5.04(b) or (II) in the case of a payment, other than interest, to a Lender described in clause (ii) above, to the extent that such forms do not establish a complete exemption from withholding of such taxes.  Notwithstanding anything to the contrary contained in the preceding sentence or elsewhere in this Section 5.04 and except as set forth in Section 13.04(b), the Borrower agrees to pay any additional amounts and to indemnify each Lender in the manner set forth in Section 5.04(a) (without regard to the identity of the jurisdiction requiring the deduction or withholding) in respect of any amounts deducted or withheld by it as described in the immediately preceding sentence as a result of any changes that are effective after the Conversion Date in any applicable law, treaty, governmental rule, regulation, guideline or order, or in the interpretation thereof, relating to the deducting or withholding of such Taxes.

        (c)     Each Lender shall indemnify the Administrative Agent for the full amount of any taxes, levies, imposts, duties, charges, fees, deductions, withholdings or similar charges imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein (but only to the extent that the Borrower has not already reimbursed the Administrative Agent for such taxes, levies, imposts, duties, charges, fees, deductions, withholdings or similar charges and without limiting the obligation of the Borrower to do so)  that are attributable to such Lender and that are payable or paid by the Administrative Agent, together with all interest, penalties, reasonable costs and expenses arising therefrom or with respect thereto in connection with any Credit Document, as determined by the Administrative Agent in good faith. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.

-60-

5.05    Priority of Revolving Facility.  Notwithstanding anything to the contrary in Section 5, at any time during the occurrence and continuation of a Default or Event of Default (unless the Administrative Agent has commenced the exercise of rights and remedies, in which case Section 13.17 shall apply), any payment of the Loans pursuant to Section 5 shall be applied as follows:  first, to any outstanding Swingline Loans, second, to any outstanding Revolving Loans, third, to the cash collateralization of outstanding Letters of Credit, and fourth, to the Term Loans as otherwise provided in Section 5 (without giving effect to this Section 5.05).  If any Lender collects or receives any amounts received on account of Obligations to which it is not entitled as a result of the application of this Section 5.05, such Lender shall hold the same in trust for the Revolving Lenders and shall forthwith deliver the same to the Administrative Agent, for the account of the Revolving Lenders, to be applied in accordance with this Section 5.05 or, if then applicable, Section 13.17.  Without limiting the generality of the foregoing, this Section 5.05 is intended to constitute and shall be deemed to constitute a "subordination agreement" within the meaning of Section 510(a) of the Bankruptcy Code and is intended to be and shall be interpreted to be enforceable to the maximum extent permitted pursuant to applicable non-bankruptcy law.

SECTION 6.    Conditions Precedent to the Conversion Date.

The occurrence of the Conversion Date pursuant to Section 13.10 and the obligation of each Lender to make Loans, and the obligation of each Issuing Lender to issue Letters of Credit, on the Conversion Date, are subject at the time of the occurrence of the Conversion Date to the satisfaction of the following conditions:

6.01    Execution of Agreement; Notes.  On or prior to the Conversion Date, (i) this Agreement shall have been executed and delivered as provided in Section 13.10 and (ii) there shall have been delivered to the Administrative Agent for the account of each of the Lenders that has requested same the appropriate Term Note and/or Revolving Note executed by the Borrower and, if requested by the Swingline Lender, the Swingline Note executed by the Borrower, in each case in the amount, maturity and as otherwise provided herein.

6.02    Officer's Certificate.  On the Conversion Date, the Administrative Agent shall have received a certificate, dated the Conversion Date and signed on behalf of the Borrower by the chairman of the board, the chief executive officer, the president or any vice president of the Borrower, certifying on behalf of the Borrower that all of the conditions in Sections 6.06 through 6.08, inclusive, and 7.01 have been satisfied on such date.

6.03    Opinions of Counsel.  On the Conversion Date, the Administrative Agent shall have received (i) from Lane & Waterman LLP and from Sidley Austin LLP, special counsels to the Credit Parties, opinions in form and substance reasonably satisfactory to the Administrative Agent addressed to the Administrative Agent and each of the Lenders and dated the Conversion Date covering the matters set forth in Exhibit E and such other matters incident to the transactions contemplated herein as the Administrative Agent may reasonably request, and (ii) from local counsel in each state in which a Subsidiary Guarantor (other than K. Falls Basin Publishing, Inc., but only to the extent that such entity is a non-operating entity and has no material assets or liabilities) is organized, an opinion in form and substance reasonably satisfactory to the Administrative Agent addressed to the Administrative Agent and each of the

-61-

Lenders, dated the Conversion Date and covering such matters incident to the transactions contemplated herein as the Administrative Agent may reasonably request.

6.04    Company Documents; Proceedings; etc.

(a) On the Conversion Date, the Administrative Agent shall have received a certificate from each Credit Party, dated the Conversion Date, signed by the chairman of the board, the chief executive officer, the president or any vice president of such Credit Party, and attested to by the secretary or any assistant secretary of such Credit Party, in the form of Exhibit F with appropriate insertions, together with copies of the certificate or articles of incorporation and by-laws (or other equivalent organizational documents), as applicable, of such Credit Party and the resolutions of such Credit Party referred to in such certificate, and each of the foregoing shall be in form and substance reasonably acceptable to the Administrative Agent.

(b)    On the Conversion Date, all Company and legal proceedings and all instruments and agreements in connection with the transactions contemplated by this Agreement and the other Credit Documents shall be reasonably satisfactory in form and substance to the Agents, and the Administrative Agent shall have received all information and copies of all documents and papers, including records of Company proceedings, governmental approvals, good standing certificates and bring-down telegrams or facsimiles, if any, which the Administrative Agent reasonably may have requested in connection therewith, such documents and papers where appropriate to be certified by proper Company or governmental authorities.

6.05    Shareholders' Agreements; Tax Sharing Agreements; Existing Indebtedness Agreements.  On the Conversion Date, the Administrative Agent shall have received a certificate from the Borrower, dated the Conversion Date, attaching true and correct copies of the following documents, certified as such by an Authorized Officer of the Borrower:

(i)    all agreements entered into by the Borrower or any of its Subsidiaries governing the terms and relative rights of its Equity Interests and any agreements entered into by its shareholders relating to any such entity with respect to its Equity Interests (collectively, the "Shareholders' Agreements");

(ii)    all tax sharing, tax allocation and other similar agreements entered into by the Borrower or any of its Subsidiaries (collectively, the "Tax Sharing Agreements"); and

(iii)    all agreements evidencing or relating to Indebtedness of the Borrower or any of its Subsidiaries which is to remain outstanding after giving effect to the Conversion Date (collectively, the "Existing Indebtedness Agreements"), although the Borrower shall not be required to deliver a copy of any Existing Indebtedness Agreement to the extent that same relates to an item of Indebtedness (including unused commitments in respect thereof) of less than $5,000,000.

6.06    Conversion of the DIP Credit Agreement.

(a)    The Confirmation Order shall be in form and substance reasonably satisfactory to the Administrative Agent and shall have been entered, shall not be subject to any

-62-

stay and the conditions precedent to the effectiveness of the Plan of Reorganization shall have been satisfied (or waived) to the reasonable satisfaction of the Administrative Agent.

(b)    The sum of (1) Unrestricted cash and Cash Equivalents of the Lee Entities and (2) unused availability under the Revolving Facility immediately after giving effect to the Conversion Date shall not be less than $26,000,000, and the Borrower shall have delivered a certificate to the Administrative Agent to such effect on or before the Conversion Date, based on the Borrower's good faith assumptions.

(c)    The Borrower shall be in compliance with all financial covenants set forth in Section 10.08 and 10.09 on a *pro forma* basis after giving effect to the Conversion Date.

(d)    No Default or Event of Default under and as defined in the DIP Credit Agreement shall exist or would exist immediately prior to or after giving effect to the occurrence of the Conversion Date.

6.07    <u>Adverse Change, Approvals</u>.

(a)    Since September 25, 2011, nothing shall have occurred (and neither any Agent nor the Required Lenders shall have become aware of any facts or conditions not previously known) which any Agent or the Required Lenders shall reasonably determine has had, or could reasonably be expected to have, a Material Adverse Effect.

(b)    On or prior to the Conversion Date, all necessary governmental (domestic and foreign) and material third party approvals and/or consents in connection with this Agreement, the other transactions contemplated hereby and the granting of Liens under the Security Documents shall have been obtained and remain in effect, and all applicable waiting periods with respect thereto shall have expired without any action being taken by any competent authority which restrains, prevents or imposes materially adverse conditions upon the consummation of this Agreement or the other transactions contemplated hereby or otherwise referred to herein or therein.  On the Conversion Date, there shall not exist any judgment, order, injunction or other restraint issued or filed or a hearing seeking injunctive relief or other restraint pending or notified prohibiting or imposing materially adverse conditions upon this Agreement or the other transactions contemplated hereby or otherwise referred to herein or therein.  On the Conversion Date, the Collateral Agent shall have continuing, perfected Liens in the Collateral as and to the extent required under the terms hereof and of the Security Documents.

6.08    <u>Litigation</u>.  On the Conversion Date, there shall be no actions, suits or proceedings pending or threatened with respect to this Agreement, any other Credit Document or otherwise which any Agent or the Required Lenders shall reasonably determine has had, or could reasonably be expected to have, a Material Adverse Effect.

6.09    <u>Subsidiaries Guaranty; Intercompany Subordination Agreement</u>.

(a)    On the Conversion Date, each Subsidiary Guarantor shall have duly authorized, executed and delivered the Amended and Restated Subsidiaries Guaranty in the form of Exhibit G (as further amended, modified or supplemented from time to time in accordance

-63-

with the terms hereof and thereof, the "<u>Subsidiaries Guaranty</u>"), and the Subsidiaries Guaranty shall be in full force and effect.

(b)      On the Conversion Date, each Credit Party and each other Subsidiary of the Borrower which is an obligee with respect to any Intercompany Debt shall have duly authorized, executed and delivered the Amended and Restated Intercompany Subordination Agreement in the form of Exhibit H (as amended, modified, restated and/or supplemented from time to time in accordance with the terms hereof and thereof, the "<u>Intercompany Subordination Agreement</u>"), and the Intercompany Subordination Agreement shall be in full force and effect.

(c)      On the Conversion Date, each party thereto shall have duly authorized, executed and delivered the Intercreditor Agreement, and the Intercreditor Agreement shall be in full force and effect.

6.10    <u>Security Documents</u>.

(a)      On the Conversion Date, each Credit Party shall have duly authorized, executed and delivered the Pledge Agreement in the form of Exhibit I-1 (as amended, modified, restated and/or supplemented from time to time in accordance with the terms hereof and thereof, the "<u>Pledge Agreement</u>") and shall have delivered (or shall have previously delivered) to the Collateral Agent, as Pledgee thereunder, all of the Pledge Agreement Collateral, if any, referred to therein and then owned by such Credit Party, together with executed and undated endorse-ments for transfer in the case of Equity Interests constituting certificated Pledge Agreement Collateral, along with evidence that all other actions necessary or, in the reasonable opinion of the Collateral Agent, desirable, to perfect the security interests purported to be created by the Pledge Agreement have been taken and the Pledge Agreement shall be in full force and effect.

(b)      On the Conversion Date, each Credit Party shall have duly authorized, executed and delivered the Security Agreement in the form of Exhibit I-2 (as amended, modified, restated and/or supplemented from time to time in accordance with the terms hereof and thereof, the "<u>Security Agreement</u>") covering all of such Credit Party's Security Agreement Collateral, together with:

(i)      proper financing statements (Form UCC-1 or the equivalent) fully executed or authorized for filing under the UCC or other appropriate filing offices of each jurisdiction as may be necessary or, in the reasonable opinion of the Collateral Agent, desirable, to perfect the security interests purported to be created by the Security Agreement;

(ii)      certified copies of requests for information or copies (Form UCC-11), or equivalent reports as of a recent date, listing all effective financing statements that name the Borrower or any of the other Credit Parties as debtor and that are filed in the jurisdictions referred to in clause (i) above, together with copies of such other financing statements that name the Borrower or any other Credit Party as debtor (none of which shall cover any of the Collateral except (x) to the extent evidencing Permitted Liens or (y) those in respect of which the Collateral Agent shall have received termination

-64-

statements (Form UCC-3) or such other termination statements as shall be required by local law fully executed for filing);

(iii)    evidence of the completion of all other recordings and filings of, or with respect to, the Security Agreement as may be necessary or, in the reasonable opinion of the Collateral Agent, desirable, to perfect the security interests intended to be created by the Security Agreement; and

(iv)    evidence that all other actions necessary or, in the reasonable opinion of the Collateral Agent, desirable to perfect and protect the security interests purported to be created by the Security Agreement have been taken, and the Security Agreement shall be in full force and effect.

6.11    <u>Mortgage; Title Insurance; Survey; Landlord Waivers; etc</u>.

Subject to Section 9.12, the Borrower shall deliver, or cause the applicable other Credit Party to deliver to the Collateral Agent:

(i)    fully executed counterparts of Mortgages and corresponding UCC Fixture Filings, in form and substance reasonably satisfactory to the Collateral Agent, which Mortgages and UCC Fixture Filings shall cover each Real Property owned by the Borrower or any other Credit Party as set forth on Part A of Schedule X (it being understood that this excludes Real Property listed on Part B of Schedule X that is currently being held for sale and Excluded Real Property), together with evidence that counterparts of such Mortgages and UCC Fixture Filings have been delivered to the title insurance company insuring the Lien of such Mortgage for recording;

(ii)    a Mortgage Policy relating to each Mortgage of the Mortgaged Property referred to above, issued by a title insurer reasonably satisfactory to the Collateral Agent, in an insured amount satisfactory to the Collateral Agent and insuring the Collateral Agent that the Mortgage on each such Mortgaged Property is a valid and enforceable first priority mortgage lien on such Mortgaged Property, free and clear of all defects and encumbrances except Permitted Encumbrances, with each such Mortgage Policy to be in form and substance reasonably satisfactory to the Collateral Agent;

(iii)    to induce the title company to issue the Mortgage Policies referred to in subsection (ii) above, such affidavits, certificates, information and instruments of indemnification (including, without limitation, a so-called "gap" indemnification) as shall be required by such title company, together with payment by the Borrower of all Mortgage Policy premiums, search and examination charges, mortgage recording taxes, fees, charges, costs and expenses required for the recording of such Mortgages and issuance of such Mortgage Policies;

(iv)    to the extent requested by the Collateral Agent and otherwise reasonably available to the Borrower, a survey of each Mortgaged Property (and all improvements thereon) in form and substance reasonably satisfactory to the Collateral Agent;

(v)    flood certificates covering each Mortgaged Property in form and substance

-65-

acceptable to the Administrative Agent, certified to the Collateral Agent in its capacity as such and setting forth whether or not each such Mortgaged Property is located in a flood hazard area, as determined by designation of each such Mortgaged Property in a specified flood hazard zone by reference to the applicable FEMA map; and

(vi)    from local counsel in each state in which a Mortgaged Property is located, an opinion in form and substance reasonably satisfactory to the Collateral Agent addressed to the Collateral Agent in its capacity as such, and each of the Lenders and covering such matters incident to the transactions contemplated herein as the Collateral Agent may reasonably request including, but not limited to, the enforceability of each Mortgage.

6.12    <u>Historical Financial Statements; Projections</u>.    On or prior to the Conversion Date, the Administrative Agent shall have received true and correct copies of the historical financial statements and the Projections referred to in Sections 8.05(a) and (d), which historical financial statements and Projections shall be in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders.

6.13    <u>Solvency Certificate; Insurance Certificates, etc</u>.

On the Conversion Date, the Administrative Agent shall have received:

(i)    a solvency certificate from the chief financial officer of the Borrower in the form of Exhibit J; and

(ii)    certificates of insurance complying with the requirements of Section 9.03 for the business and properties of the Borrower and its Subsidiaries, in form and substance reasonably satisfactory to the Administrative Agent.

6.14    <u>Fees, etc</u>.

On the Conversion Date, the Borrower shall have paid to each Agent (and/or its relevant Affiliate) and each Lender all costs, fees and expenses and other compensation contemplated hereby and in the Revolving Facility Fee Letter payable to each Agent (and/or its relevant Affiliate) or such Lender to the extent then due, which payments may be made from the proceeds of Revolving Loans made on the Conversion Date, subject to the requirements of Section 6.06(b).

6.15    <u>Transaction Documents</u>.    (a) On the Conversion Date, the Second Lien Loan Agreement, the Intercreditor Agreement and the other Second Lien Documents shall have become (or concurrently with the Conversion Date shall become) effective in accordance with the terms hereof, thereof and of the Support Agreement, and the Administrative Agent shall have received true, correct and complete (including all exhibits, schedules and annexes thereto), fully executed copies thereof, certified as such by an Authorized Officer of the Borrower as required by Section 6.05.

(b)    On the Conversion Date, the Pulitzer Debt Documents shall have become (or concurrently with the Conversion Date shall become) effective in accordance with the terms

-66-

hereof, thereof and of the Support Agreement, and the Administrative Agent shall have received true, correct and complete (including all exhibits, schedules and annexes thereto), fully executed copies thereof, certified as such by an Authorized Officer of the Borrower as required by Section 6.05.

SECTION 7.    <u>Conditions Precedent to All Credit Events</u>.

The obligation of each Lender to make Loans (including without limitation, the Loans contemplated to be converted on the Conversion Date) and the obligation of each Issuing Lender to issue Letters of Credit (including without limitation, the deemed issuance of the Existing Letters of Credit under the Revolving Facility), is subject, at the time of each such Credit Event (except as hereinafter indicated), to the Conversion Date having occurred and to the satisfaction of the following conditions:

7.01    <u>No Default; Representations and Warranties</u>.    At the time of each such Credit Event and also after giving effect thereto (i) there shall exist no Default or Event of Default and (ii) all representations and warranties contained herein and in the other Credit Documents shall be true and correct in all material respects with the same effect as though such representations and warranties had been made on the date of such Credit Event (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date).

7.02    <u>Notice of Borrowing; Letter of Credit Request</u>.    (a)  Prior to the making of each Loan (other than a Swingline Loan or a Revolving Loan made pursuant to a Mandatory Borrowing), the Administrative Agent shall have received a Notice of Borrowing meeting the requirements of Section 2.03(a).  Prior to the making of each Swingline Loan, the Swingline Lender shall have received a Notice of Borrowing meeting the requirements of Section 2.03(b)(i).

(b)    Prior to the issuance of each Letter of Credit, the Administrative Agent and the respective Issuing Lender shall have received a Letter of Credit Request meeting the requirements of Section 3.03(a).

The occurrence of the Conversion Date and the acceptance of the benefits of each Credit Event shall constitute a representation and warranty by the Borrower to the Administrative Agent and each of the Lenders that all the conditions specified in this Section 7 and applicable to such Credit Event are satisfied as of that time.  All of the documents and papers referred to in this Section 7 shall be in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders and, unless otherwise specified, shall be delivered to the Administrative Agent at the Notice Office for the account of each of the Lenders.

7.03    <u>No Excess Cash</u>.  The obligation of each Lender to make Revolving Loans (other than pursuant to a Mandatory Borrowing), and the obligation of the Swingline Lender to make Swingline Loans, in each case, shall be subject to the satisfaction of the condition that the Borrower shall have delivered to the Administrative Agent together with the relevant Notice of

-67-

Borrowing, a certificate of an Authorized Officer of the Borrower certifying (x) in detail reasonably satisfactory to the Administrative Agent, as to the use of the proceeds of such Borrowing, and (y) that as of the date of such requested Borrowing, the aggregate amount of Unrestricted cash and Cash Equivalents owned or held by the Borrower and its Subsidiaries (other than Excluded Domestic Subsidiaries), determined after giving pro forma effect to such Borrowing and the application of proceeds therefrom, including without limitation, any such application to outstanding interest and amortization payments on the Loans (which application shall be made within two Business Days of the date of such Borrowing and the proceeds thereof applied in a manner consistent with the foregoing certifications) and from any other Unrestricted cash and Cash Equivalents then held or owned by the Borrower and its Subsidiaries (other than Excluded Domestic Subsidiaries) (to the extent such proceeds and/or other Unrestricted cash and Cash Equivalents are to be utilized by the Borrower and its Subsidiaries (other than Excluded Domestic Subsidiaries) within two Business Days of such date for a permitted purpose under this Agreement other than an Investment in Unrestricted cash and Cash Equivalents or in a Subsidiary of the Borrower), shall not exceed $20,000,000.

7.04    No Pulitzer Financial Covenant Default.  The obligation of each Lender to make Revolving Loans (other than pursuant to a Mandatory Borrowing), and the obligation of the Swingline Lender to make Swingline Loans, in each case, shall be subject to the satisfaction of the condition that there shall exist no Pulitzer Financial Covenant Default.

SECTION 8.    Representations, Warranties and Agreements.

In order to induce the Lenders to enter into this Agreement and to make the Loans, and issue (or participate in) the Letters of Credit as provided herein, the Borrower makes the following representations, warranties and agreements, in each case after giving effect to the Conversion Date, all of which shall survive the execution and delivery of this Agreement and the Notes and the making of the Loans and the issuance of the Letters of Credit, with the occurrence of the Conversion Date and the occurrence of each Credit Event on or after the Conversion Date being deemed to constitute a representation and warranty that the matters specified in this Section 8 are true and correct in all material respects on and as of the Conversion Date and on the date of each such other Credit Event (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date).

8.01    Company Status.  Each of the Borrower and each of its Subsidiaries (i) is a duly organized and validly existing Company in good standing under the laws of the jurisdiction of its organization, (ii) has the Company power and authority to own its property and assets and to transact the business in which it is engaged and presently proposes to engage and (iii) is duly qualified and is authorized to do business and is in good standing in each jurisdiction where the ownership, leasing or operation of its property or the conduct of its business requires such qualifications except for failures to be so qualified or authorized which, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

8.02    Power and Authority.  Each Credit Party has the Company power and authority to execute, deliver and perform the terms and provisions of each of the Credit Documents to which it is party and has taken all necessary Company action to authorize the

-68-

execution, delivery and performance by it of each of such Credit Documents.  Each Credit Party has duly executed and delivered each of the Credit Documents to which it is party, and each of such Credit Documents constitutes its legal, valid and binding obligation enforceable in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law).

8.03    <u>No Violation</u>.  Neither the execution, delivery or performance by any Credit Party of the Credit Documents to which it is a party, nor compliance by it with the terms and provisions thereof, (i) contravenes any provision of any law, statute, rule or regulation or any order, writ, injunction or decree of any court or governmental instrumentality, (ii) conflicts with or results in any breach of any of the terms, covenants, conditions or provisions of, or constitutes a default under, or results in the creation or imposition of (or the obligation to create or impose) any Lien (except (x) pursuant to the Security Documents and (y) the Liens permitted under Sections 10.01(xvii) and 10.01(xviii)) upon any of the property or assets of any Credit Party or any of its Subsidiaries pursuant to the terms of any material indenture, mortgage, deed of trust, credit agreement or loan agreement, or any other material agreement, contract or instrument, in each case to which any Credit Party or any of its Subsidiaries is a party or by which it or any its property or assets is bound or to which it may be subject, or (iii) violates any provision of the certificate or articles of incorporation, certificate of formation, limited liability company agreement or by-laws (or equivalent organizational documents), as applicable, of any Credit Party or any of its Subsidiaries.

8.04    <u>Approvals</u>.  All necessary governmental (domestic and foreign) and material third party approvals and/or consents in connection with this Agreement and the other transactions contemplated hereby and by the other Credit Documents shall have been obtained and remain in effect, and all applicable waiting periods with respect thereto shall have expired without any action being taken by any competent authority which restrains, prevents or imposes materially adverse conditions upon the consummation of this Agreement or the other transactions contemplated hereby and by the other Credit Documents or otherwise referred to herein or therein.  No order, consent, approval, license, authorization or validation of, or filing, recording or registration with (except for those that have otherwise been obtained or made on or prior to the Conversion Date and which remain in full force and effect on the Conversion Date and for the filings for perfection or recordation of the Liens under the Credit Documents set forth in Section 8.11), or exemption by, any governmental or public body or authority, or any subdivision thereof, is required to be obtained or made by, or on behalf of, any Credit Party to authorize, or is required to be obtained or made by, or on behalf of, any Credit Party in connection with, (i) the execution, delivery and performance of any Credit Document or (ii) the legality, validity, binding effect or enforceability of any such Credit Document.

8.05    <u>Financial Statements; Financial Condition; Undisclosed Liabilities; Projections</u>.  (a)  The consolidated balance sheets of the Borrower and its Subsidiaries at September 25, 2011 and September 26, 2010, and the related consolidated statements of income and cash flows and changes in shareholders' equity of the Borrower and its Subsidiaries for the Borrower's respective fiscal year ended on each such date, in each case furnished to the Lenders prior to the Conversion Date, present fairly in all material respects the consolidated financial

<div align="center">-69-</div>

position of the Borrower and its Subsidiaries at the dates of said financial statements and the consolidated results of their operations for the periods covered thereby. The consolidated balance sheets of Pulitzer and its Subsidiaries at September 25, 2011 and September 26, 2010 and the related consolidated statements of income and cash flows and changes in shareholders' equity of Pulitzer and its Subsidiaries for Pulitzer's fiscal year ended on each such date, furnished to the Lenders prior to the Conversion Date, present fairly in all material respects the consolidated financial condition of Pulitzer and its Subsidiaries at the date of said financial statements and the consolidated results of their operations for the periods covered thereby. All such financial statements have been prepared in accordance with GAAP consistently applied except to the extent provided in the notes to said financial statements and subject, in the case of the unaudited interim consolidated financial statements of the Borrower and Pulitzer, to normal year-end audit adjustments (all of which are of a recurring nature and none of which, individually or in the aggregate, would be material) and the absence of footnotes.

(b)     On and as of the Conversion Date, and after giving effect to all Indebtedness (including the Loans) being incurred or assumed and Liens created by the Credit Parties in connection therewith, (i) the sum of the assets, at a fair valuation, of the Borrower (on a stand-alone basis) and of the Borrower and its Subsidiaries (taken as a whole) will exceed its or their respective debts, (ii) the Borrower (on a stand-alone basis) and the Borrower and its Subsidiaries (taken as a whole) has or have not incurred and does or do not intend to incur, and does or do not believe that it or they will incur, debts beyond its or their respective ability to pay such debts as such debts mature, and (iii) the Borrower (on a stand-alone basis) and the Borrower and its Subsidiaries (taken as a whole) will have sufficient capital with which to conduct its or their respective businesses. For purposes of this Section 8.05(b), "debt" means any liability on a claim, and "claim" means (a) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured or (b) right to an equitable remedy for breach of performance if such breach gives rise to a payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured. The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

(c)     Except as fully disclosed in the financial statements delivered pursuant to Section 8.05(a) and for the Indebtedness incurred under this Agreement, the Pulitzer Debt Documents and the Second Lien Loan Documents, there were as of the Conversion Date no liabilities or obligations with respect to the Borrower or any of its Subsidiaries of any nature whatsoever (whether absolute, accrued, contingent or otherwise and whether or not due) which, either individually or in the aggregate, could reasonably be expected to be material to the Borrower and its Subsidiaries taken as a whole. As of the Conversion Date, the Borrower knows of no basis for the assertion against it or any of its Subsidiaries of any liability or obligation of any nature whatsoever that is not fully disclosed in the financial statements delivered pursuant to Section 8.05(a) or referred to in the immediately preceding sentence which, either individually or in the aggregate, could reasonably be expected to be material to the Borrower and its Subsidiaries taken as a whole.

022537-0191-13470-Active.12537490.17

(d)    The Projections delivered to the Administrative Agent and the Lenders prior to the Conversion Date have been prepared in good faith and are based on reasonable assumptions, and there are no statements or conclusions in the Projections which are based upon or include information known to the Borrower to be misleading in any material respect or which fail to take into account material information known to the Borrower regarding the matters reported therein.   On the Conversion Date, the Borrower believes that the Projections are reasonable and attainable, it being recognized by the Lenders, however, that projections as to future events are not to be viewed as facts and that the actual results during the period or periods covered by the Projections may differ from the projected results.

(e)    Since September 25, 2011, nothing has occurred that has had, or could reasonably be expected to have, a Material Adverse Effect (it being understood that the filing of the voluntary petitions under Chapter 11 of the Bankruptcy Code on the Petition Date shall not, in and of itself, be deemed to have had or, reasonably be expected to have, a Material Adverse Effect).

8.06    <u>Litigation</u>.  Except as set forth in Schedule XII[2] (it being understood that disclosure on Schedule XII is not a representation that a matter to which the disclosure relates is expected to have a Material Adverse Effect), there are no actions, suits, proceedings or governmental investigations pending or, to the knowledge of the Borrower, threatened with respect to any Credit Document or otherwise that have had, or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect (it being understood that the filing of the voluntary petitions under Chapter 11 of the Bankruptcy Code on the Petition Date shall not, in and of itself, be deemed to have had or, reasonably be expected to have, a Material Adverse Effect).

8.07    <u>True and Complete Disclosure</u>.  All factual information (taken as a whole) theretofore furnished by or on behalf of the Borrower in writing to the Administrative Agent or any Lender (including, without limitation, all information contained in the Credit Documents, the Plan of Reorganization and the Disclosure Statement) for purposes of or in connection with this Agreement, the other Credit Documents or any transaction contemplated herein or therein is true and accurate in all material respects on the date as of which such information is dated or certified and not incomplete by omitting to state any fact necessary to make such information (taken as a whole) not misleading in any material respect at such time in light of the circumstances under which such information was provided, it being understood and agreed that for purposes of this Section 8.07, such factual information shall not include the Projections or any <u>pro</u> <u>forma</u> financial information.

8.08    <u>Use of Proceeds; Margin Regulations</u>.  (a)  All proceeds of the Revolving Loans and the Swingline Loans, and all amounts on deposit in the Lee Reserve, will be used for the working capital and general corporate purposes of the Borrower and its Subsidiaries.

---

[2]    This schedule and other schedules in Credit Documents are subject to satisfactory review of Lenders.

022537-0191-13470-Active.12537490.17

(b)    No part of any Credit Event (or the proceeds thereof) will be used to purchase or carry any Margin Stock or to extend credit for the purpose of purchasing or carrying any Margin Stock.  Neither the making of any Loan nor the use of the proceeds thereof nor the occurrence of any other Credit Event will violate or be inconsistent with the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System.

8.09    <u>Tax Returns and Payments</u>.    Each of the Borrower and each of its Subsidiaries has timely filed or caused to be timely filed (in each case giving effect to all applicable and permitted extensions) with the appropriate taxing authority all Federal and other material returns, statements, forms and reports for taxes (the "<u>Returns</u>") required to be filed by, or with respect to the income, properties or operations of, the Borrower and/or any of its Subsidiaries.  The Returns accurately reflect in all material respects all liability for taxes of the Borrower and its Subsidiaries, as applicable, for the periods covered thereby.  Each of the Borrower and each of its Subsidiaries has paid all taxes and assessments payable by it which have become due, other than those that are immaterial and those that are being contested in good faith and adequately disclosed and fully provided for on the financial statements of the Borrower and its Subsidiaries in accordance with GAAP.  There is no material action, suit, proceeding, investigation, audit or claim now pending or, to the knowledge of the Borrower, threatened by any authority regarding any material taxes relating to the Borrower or any of its Subsidiaries. Neither the Borrower nor any of its Subsidiaries has incurred, nor will any of them incur, any material tax liability in connection with transactions contemplated in this Agreement, the Second Lien Credit Agreement or the Pulitzer Debt Agreement (it being understood that (x) the representation contained in this sentence does not cover any future tax liabilities of the Borrower or any of its Subsidiaries arising as a result of the operation of their businesses in the ordinary course of business and (y) the consummation of the Plan of Reorganization may result in tax consequences to the Borrower, including an adjustment of asset values or tax basis as a result of cancellation of indebtedness resulting from the Plan of Reorganization).

8.10    <u>Compliance with ERISA</u>.  (a)  Schedule IV sets forth each Plan as of the Conversion Date.    Except as disclosed on Schedule IV or otherwise as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect (it being understood that disclosure on Schedule IV is not a representation that such item is expected to have a Material Adverse Effect):   each Plan (and each related trust, insurance contract or fund) is in compliance with its terms and with all applicable laws, including without limitation ERISA and the Code; each Plan (and each related trust, if any) which is intended to be qualified under Section 401(a) of the Code has received a determination letter from the Internal Revenue Service to the effect that it meets the requirements of Sections 401(a) and 501(a) of the Code, has applied for such a determination letter within the time period permitted by the Internal Revenue Service, or has time remaining within the time period permitted by the Internal Revenue Service in which to apply for such a determination letter; no Reportable Event has occurred; the Borrower has not been notified by any Plan which is a multiemployer plan (as defined in Section 4001(a)(3) of ERISA) that it is insolvent or in reorganization; no Plan has an Unfunded Current Liability; no Plan which is subject to Section 412 of the Code or Section 302 of ERISA has an accumulated funding deficiency or failure to meet applicable minimum funding standards, within the meaning of such sections of the Code or ERISA, or has applied for or received either a waiver of such standards or an extension of any amortization period (to the extent applicable), within the meaning of Section 412 of the Code or Section 302 of ERISA; all

-72-

contributions required to be made with respect to a Plan have been timely made; neither the Borrower nor any ERISA Affiliate has incurred any liability (including any indirect, contingent or secondary liability to or on account of a Plan) pursuant to Sections 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or Sections 401(a)(29), 4971 or 4975 of the Code or expects to incur any liability under any of the foregoing sections with respect to any Plan; no condition exists which presents a risk to the Borrower or any ERISA Affiliate of incurring a liability to or on account of a Plan pursuant to the foregoing provisions of ERISA and the Code; no proceedings have been instituted to terminate or appoint a trustee to administer any Plan which is subject to Title IV of ERISA; no action, suit, proceeding, hearing, audit or investigation with respect to the administration, operation or the investment of assets of any Plan (other than routine audits and claims for benefits) is pending, expected or threatened; using actuarial assumptions and computation methods consistent with Part 1 of subtitle E of Title IV of ERISA, the aggregate liabilities of the Borrower and its ERISA Affiliates to all Plans which are multiemployer plans (as defined in Section 4001(a)(3) of ERISA) in the event of a complete withdrawal therefrom, as of the close of the most recent fiscal year of each such Plan ended prior to the date of the most recent Credit Event, would not exceed $10,000,000; each group health plan (as defined in Section 607(1) of ERISA or Section 4980B(g)(2) of the Code) which covers or has covered employees or former employees of the Borrower or any ERISA Affiliate has at all times been operated in compliance with the provisions of Part 6 of subtitle B of Title I of ERISA and Section 4980B of the Code; each group health plan (as defined in 45 Code of Federal Regulations Section 160.103) which covers or has covered employees or former employees of the Borrower or any ERISA Affiliate has at all times been operated in compliance with the provisions of the Health Insurance Portability and Accountability Act of 1996 and the regulations promulgated thereunder; no lien imposed under the Code or ERISA on the assets of the Borrower or any ERISA Affiliate exists or is likely to arise on account of any Plan; and the Borrower and its ERISA Affiliates may cease contributions to or terminate any employee maintained by any of them without incurring any liability (other than any termination of employees which, individually or in the aggregate, may trigger a complete or partial withdrawal from a multiemployer pension fund).

(b)     Except as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect: each Foreign Pension Plan has been maintained in compliance with its terms and with the requirements of any and all applicable laws, statutes, rules, regulations and orders and has been maintained, where required, in good standing with applicable regulatory authorities; all contributions required to be made with respect to a Foreign Pension Plan have been timely made; neither the Borrower nor any of its Subsidiaries has incurred any obligation in connection with the termination of, or withdrawal from, any Foreign Pension Plan; and the present value of the accrued benefit liabilities (whether or not vested) under each Foreign Pension Plan, determined as of the end of the Borrower's most recently ended fiscal year on the basis of actuarial assumptions, each of which is reasonable, did not exceed the current value of the assets of such Foreign Pension Plan allocable to such benefit liabilities.

8.11    <u>Security Documents</u>.  (a) The provisions of the Security Agreement are effective to create in favor of the Collateral Agent for the benefit of the Secured Creditors a legal, valid and enforceable security interest in all right, title and interest of the Credit Parties in the Security Agreement Collateral described therein, and the Collateral Agent, for the benefit of

the Secured Creditors, has a fully perfected security interest in all right, title and interest in all of the Security Agreement Collateral described therein, subject to no other Liens other than Permitted Liens. The recordation of (x) the Grant of Security Interest in U.S. Patents and (y) the Grant of Security Interest in U.S. Trademarks in the respective form attached to the Security Agreement, in each case in the United States Patent and Trademark Office, together with filings on Form UCC-1 made pursuant to the Security Agreement, creates, as may be perfected by such filings and recordation, a perfected security interest in the United States trademarks and patents covered by the Security Agreement, and the recordation of the Grant of Security Interest in U.S. Copyrights in the form attached to the Security Agreement with the United States Copyright Office, together with filings on Form UCC-1 made pursuant to the Security Agreement, creates, as may be perfected by such filings and recordation, a perfected security interest in the United States copyrights covered by the Security Agreement.

(b)     The security interests created under the Pledge Agreement in favor of the Collateral Agent, as Pledgee, for the benefit of the Secured Creditors, constitute perfected security interests in the Pledge Agreement Collateral described in the Pledge Agreement, subject to no security interests of any other Person other than Permitted Liens applicable thereto.

(c)     Upon the filing thereof, each Mortgage creates, as security for the obliga-tions purported to be secured thereby, a valid and enforceable perfected security interest in and mortgage lien on the respective Mortgaged Property in favor of the Collateral Agent (or such other trustee as may be required or desired under local law) for the benefit of the Secured Creditors, superior and prior to the rights of all third Persons (except that the security interest and mortgage lien created on such Mortgaged Property may be subject to the Permitted Encumbrances related thereto) and subject to no other Liens (other than Permitted Encumbrances related thereto).

8.12   <u>Properties</u>.  Each of the Borrower and each of its Subsidiaries has good and indefeasible title to all material properties (and to all buildings, fixtures and improvements located thereon) owned by it, including all material property reflected in the most recent historical balance sheets referred to in Section 8.05(a) (except as sold or otherwise disposed of since the date of such balance sheet in the ordinary course of business or as permitted by the terms of this Agreement), free and clear of all Liens, other than Permitted Liens.  Each of the Borrower and each of its Subsidiaries has a valid and indefeasible leasehold interest in the material properties leased by it free and clear of all Liens other than Permitted Liens.

8.13   <u>Capitalization</u>.  On and after giving effect to the Conversion Date, the authorized capital stock of the Borrower consists of (a) 120,000,000 shares of common stock, $0.01 par value per share, (b) 30,000,000 shares of Class B common stock, $2.00 par value per share and (c) 500,000 shares of serial convertible preferred stock.  All outstanding shares of the capital stock of the Borrower have been duly and validly issued, are fully paid and non-assessable and have been issued free of preemptive rights.  The Borrower does not have outstanding any capital stock or other securities convertible into or exchangeable for its capital stock or any rights to subscribe for or to purchase, or any options for the purchase of, or any agreement providing for the issuance (contingent or otherwise) of, or any calls, commitments or claims of any character relating to, its capital stock or any stock appreciation or similar rights, except for (x) options, warrants and rights to purchase shares of the Borrower's common stock

-74-

which may be issued from time to time and (y) shares of Qualified Preferred Stock of the Borrower which may be convertible into shares of the Borrower's common stock.

8.14    <u>Subsidiaries</u>.  On and as of the Conversion Date, the Borrower has no Subsidiaries other than those Subsidiaries listed on Schedule V.  Schedule V sets forth, as of the Conversion Date, (i) the percentage ownership (direct and indirect) of the Borrower in each class of capital stock or other Equity Interests of each of its Subsidiaries and also identifies the direct owner thereof, and (ii) the jurisdiction of organization of each such Subsidiary.  All outstanding shares of Equity Interests of each Subsidiary of the Borrower have been duly and validly issued, are fully paid and non-assessable and have been issued free of preemptive rights.  No Subsidiary of the Borrower has outstanding any securities convertible into or exchangeable for its Equity Interests or outstanding any right to subscribe for or to purchase, or any options or warrants for the purchase of, or any agreement providing for the issuance (contingent or otherwise) of or any calls, commitments or claims of any character relating to, its Equity Interests or any stock appreciation or similar rights.

8.15    <u>Compliance with Statutes, etc.</u>  Each of the Borrower and each of its Subsidiaries is in compliance with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all governmental bodies, domestic or foreign, in respect of the conduct of its business and the ownership of its property (including, without limitation, applicable statutes, regulations, orders and restrictions relating to environmental standards and controls), except such noncompliances as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

8.16    <u>Investment Company Act</u>.  Neither the Borrower nor any of its Subsidiaries is an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended.

8.17    <u>[Reserved]</u>.

8.18    <u>Environmental Matters</u>. (a) Each of the Borrower and each of its Subsidiaries is in compliance with all applicable Environmental Laws and the requirements of any permits issued under such Environmental Laws.  There are no pending or, to the knowledge of the Borrower, threatened Environmental Claims against the Borrower or any of its Subsidiaries or any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries (including any such claim arising out of the ownership, lease or operation by the Borrower or any of its Subsidiaries of any Real Property formerly owned, leased or operated by the Borrower or any of its Subsidiaries but no longer owned, leased or operated by the Borrower or any of its Subsidiaries).  There are no facts, circumstances, conditions or occurrences with respect to the business or operations of the Borrower or any of its Subsidiaries, or any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries (including any Real Property formerly owned, leased or operated by the Borrower or any of its Subsidiaries but no longer owned, leased or operated by the Borrower or any of its Subsidiaries) or, to the knowledge of the Borrower, any property adjoining or adjacent to any such Real Property that could be reasonably expected (i) to form the basis of an Environmental Claim against the Borrower or any of its Subsidiaries or any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries or (ii) to cause any Real Property owned, leased or operated

by the Borrower or any of its Subsidiaries to be subject to any restrictions on the ownership, lease, occupancy or transferability of such Real Property by the Borrower or any of its Subsidiaries under any applicable Environmental Law.

(b)     Hazardous Materials have not at any time been generated, used, treated or stored on, or transported to or from, or Released on or from, any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries or, to the knowledge of the Borrower, any property adjoining or adjacent to any Real Property, where such generation, use, treatment, storage, transportation or Release has violated or could be reasonably expected to violate any applicable Environmental Law or give rise to an Environmental Claim.

(c)     Notwithstanding anything to the contrary in this Section 8.18, the representations and warranties made in this Section 8.18 shall be untrue only if the effect of any or all conditions, violations, claims, restrictions, failures and noncompliances of the types described above could, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

8.19     <u>Employment and Labor Relations</u>.     Neither the Borrower nor any of its Subsidiaries is engaged in any unfair labor practice that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.  There is (i) no unfair labor practice complaint pending against the Borrower or any of its Subsidiaries or, to the knowledge of the Borrower, threatened against any of them, before the National Labor Relations Board, and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement is so pending against the Borrower or any of its Subsidiaries or, to the knowledge of the Borrower, threatened against any of them, (ii) no strike, labor dispute, slowdown or stoppage pending against the Borrower or any of its Subsidiaries or, to the knowledge of the Borrower, threatened against the Borrower or any of its Subsidiaries, (iii) no union representation question exists with respect to the employees of the Borrower or any of its Subsidiaries, (iv) no equal employment opportunity charges or other claims of employment discrimination are pending or, to the Borrower's knowledge, threatened against the Borrower or any of its Subsidiaries, and (v) no wage and hour department investigation has been made of the Borrower or any of its Subsidiaries, except (with respect to any matter specified in clauses (i) through (v) above, either individually or in the aggregate) such as could not reasonably be expected to have a Material Adverse Effect.

8.20     <u>Intellectual Property, etc</u>.     Each of the Borrower and each of its Subsidiaries owns or has the right to use all the patents, trademarks, permits, domain names, service marks, trade names, copyrights, licenses, franchises, inventions, trade secrets, proprietary information and know-how of any type, whether or not written (including, but not limited to, rights in computer programs and databases) and formulas, or rights with respect to the foregoing, and has obtained assignments of all leases, licenses and other rights of whatever nature, necessary for the present conduct of its business, without any known conflict with the rights of others which, or the failure to own or have which, as the case may be, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

8.21     <u>Indebtedness</u>.  Schedule VI sets forth a list of all Indebtedness (including Contingent Obligations) of the Borrower and its Subsidiaries as of the Conversion Date

-76-

(excluding the Obligations, the Second Lien Term Loans, the Pulitzer Debt and the Pulitzer Debt Guaranty) (collectively, the "<u>Existing Indebtedness</u>"), in each case showing the aggregate principal amount thereof and the name of the respective borrower and any Credit Party or any of its Subsidiaries which directly or indirectly guarantees any such Indebtedness.

8.22    <u>Insurance</u>.  Schedule VII sets forth a listing of all insurance maintained by the Borrower and its Subsidiaries as of the Conversion Date, with the amounts insured (and any deductibles) set forth therein.

8.23    <u>Foreign Assets Control Regulations, Etc.</u>

(a)    Neither the Borrower nor any Controlled Entity is (i) a Person whose name appears on the list of Specially Designated Nationals and Blocked Persons published by the Office of Foreign Assets Control, U.S. Department of Treasury ("<u>OFAC</u>") (an "<u>OFAC Listed Person</u>") or (ii) a department, agency or instrumentality of, or is otherwise controlled by or acting on behalf of, directly or indirectly, (x) any OFAC Listed Person or (y) any Person, entity, organization, foreign country or regime that is subject to any OFAC Sanctions Program (each OFAC Listed Person and each other Person, entity, organization and government of a country described in clause (ii), a "<u>Blocked Person</u>").

(b)    Neither the Borrower nor any Controlled Entity has any investments in, or engages in any dealings or transactions with, any Person where such investments, dealings or transactions would cause the receipt of any payment or exercise of any rights in respect of, this Agreement by the Administrative Agent or any Lender to be in violation of any of the laws or regulations identified in this Section 8.23.

(c)    To the Borrower's actual knowledge after making due inquiry, neither the Borrower nor any Controlled Entity (i) is under investigation by any Governmental Authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist-related activities or other money laundering predicate crimes under any applicable law (collectively, "<u>Anti-Money Laundering Laws</u>"), (ii) has been assessed civil penalties under any Anti-Money Laundering Laws or (iii) has had any of its funds seized or forfeited in an action under any Anti-Money Laundering Laws. The Borrower has taken reasonable measures appropriate to the circumstances (in any event as required by applicable law) to ensure that the Borrower and each Controlled Entity is and will continue to be in compliance with all applicable current and future Anti-Money Laundering Laws.

(d)    The Borrower has taken reasonable measures appropriate to the circumstances (in any event as required by applicable law) to ensure that the Borrower and each Controlled Entity is and will continue to be in compliance with all applicable current and future anti-corruption laws and regulations.

8.24    <u>Representations and Warranties in Other Documents</u>. All representations and warranties set forth in the other Credit Documents, the Support Agreement, the Second Lien Loan Documents and the Pulitzer Debt Documents were true and correct in all material respects at the time as of which such representations and warranties were made (or deemed made) and shall be true and correct in all material respects as of the Conversion Date as if such representa-

-77-

tions or warranties were made on and as of such date (it being understood and agreed that any such representation or warranty which by its terms is made as of a specified date shall be true and correct in all material respects as of such specified date).

SECTION 9.  Affirmative Covenants.

The Borrower hereby covenants and agrees that on and after the Conversion Date and until the Total Revolving Loan Commitment and all Letters of Credit have terminated and the Term Loans and Unpaid Drawings (in each case together with interest thereon), Fees and all other Obligations with respect to the Facilities (other than indemnities described in Section 13.13 which are not then due and payable) incurred hereunder and thereunder, are paid in full:

9.01    Information Covenants.  The Borrower will furnish to the Administrative Agent (which shall promptly furnish to each Lender in accordance with Section 9.01(o), subject to the Borrower's compliance with the second sentence thereof):

(a)    Quarterly Financial Statements.  Within 45 days after the close of each of the first three quarterly accounting periods in each fiscal year of the Borrower, (i) the consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such quarterly accounting period and the related consolidated statements of income and cash flows for such quarterly accounting period and for the elapsed portion of the fiscal year ended with the last day of such quarterly accounting period, in each case setting forth comparative figures for the corresponding quarterly accounting period in the prior fiscal year and comparable budgeted figures for such quarterly accounting period as set forth in the respective budget delivered pursuant to Section 9.01(d), all of which shall be certified by an Authorized Officer of the Borrower that they fairly present in all material respects in accordance with GAAP the financial condition of the Borrower and its Subsidiaries as of the dates indicated and the results of their operations for the periods indicated, subject to normal year-end audit adjustments and the absence of footnotes, (ii) the consolidating and consolidated balance sheets of Pulitzer and its Subsidiaries as at the end of such quarterly accounting period and the related consolidating and consolidated statements of income and consolidated statement of cash flows for such quarterly accounting period and for the elapsed portion of the fiscal year ended with the last day of such quarterly accounting period, in each case setting forth comparative figures for the corresponding quarterly accounting period in the prior fiscal year, all of which shall be certified by an Authorized Officer of the Borrower that they fairly present in all material respects in accordance with GAAP the financial condition of Pulitzer and its Subsidiaries as of the dates indicated and the results of their operations for the periods indicated, subject to normal year-end audit adjustments and the absence of footnotes, and (iii) management's discussion and analysis of the important operational and financial developments during such quarterly accounting period; provided that to the extent prepared to comply with SEC requirements and delivered to each Lender within the time requirement set forth above in this Section 9.01(a), a copy of the SEC Form 10-Q filed by the Borrower with the SEC for each such quarterly accounting period shall satisfy the requirements of clauses (i) and (iii) of this Section 9.01(a) except for any required comparison against budget as provided above (which comparison will still need to be delivered to each Lender separately pursuant to this Section 9.01(a)).

-78-

(b)    <u>Annual Financial Statements</u>.  Within 90 days after the close of each fiscal year of the Borrower, (i) the consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal year and the related consolidated statements of income and stockholders' equity and statement of cash flows for such fiscal year setting forth comparative figures for the preceding fiscal year and audited by KPMG LLP or other independent certified public accountants of recognized national standing reasonably acceptable to the Administrative Agent (which audit shall be without a "going concern" or like qualification or exception and without any qualification or exception as to scope of audit; <u>provided</u>, <u>however</u>, that (1) the audit opinions in respect of the Borrower's fiscal year ended on or ending closest to September 30, 2015 may contain a "going concern" qualification solely as a result of the existing Pulitzer Indebtedness being treated as current obligations on the Borrower's consolidated balance sheet and/or the financing arrangements under this Agreement, the Second Lien Loan Documents and the Pulitzer Debt and (2) such a qualification or exception shall not be deemed to exist as a result of any qualification or exception solely arising from Madison Newspapers, Inc. being separately audited by a different accounting firm), together with  a report of such accounting firm (unless the internal policies of such accounting firm would not permit the delivery of such report) stating that in the course of its regular audit of the financial state-ments of the Borrower and its Subsidiaries, which audit was conducted in accordance with generally accepted auditing standards, such accounting firm obtained no knowledge of any Default or an Event of Default under Section 10.08 or 10.09 which has occurred and is continuing or, if in the opinion of such accounting firm such a Default or an Event of Default has occurred and is continuing, a statement as to the nature thereof, (ii) the consolidating and consolidated balance sheets of Pulitzer and its Subsidiaries as at the end of such fiscal year and the related consolidating and consolidated statements of income and consolidated statement of cash flows and stockholders' equity for such fiscal year, in each case setting forth comparative figures for the preceding fiscal year and (x) in the case of such consolidated financial statements, audited by KPMG LLP or other independent certified public accountants of recognized national standing reasonably acceptable to the Administrative Agent (which audit shall be without a "going concern" or like qualification or exception and without any qualification or exception as to scope of audit except as otherwise described in the proviso to clause (i) above) and (y) in the case of such consolidating financial statements, certified by an Authorized Officer of the Borrower that they fairly present in all material respects in accordance with GAAP the financial condition of Pulitzer and its Subsidiaries as of the dates indicated and the results of their operations for the periods indicated, and (iii) management's discussion and analysis of the important operational and financial developments during such fiscal year; <u>provided</u> that to the extent prepared to comply with SEC requirements and delivered to each Lender within the time requirement set forth above in this Section 9.01(b), a copy of the SEC Form 10-K filed by the Borrower with the SEC for such fiscal year shall satisfy the requirements of clauses (i) and (iii) of this Section 9.01(b) except for the opinion of the accounting firm as to no Default or Event of Default under Section 10.08 or 10.09 (which opinion will still need to be delivered to each Lender separately pursuant to this Section 9.01(b)).

022537-0191-13470-Active.12537490.17

(c)    <u>Management Letters</u>.  Promptly after the Borrower's or any of its Subsidiaries' receipt thereof, a copy of any "management letter" received from its certified public accountants and management's response thereto.

(d)    <u>Budgets</u>.  No later than 60 days following the first day of each fiscal year of the Borrower (commencing with the Borrower's fiscal year ended on or ending closest to September 30, 2012), a budget in form reasonably satisfactory to the Administrative Agent (including budgeted statements of income and sources and uses of cash for the Borrower and its Subsidiaries on a consolidated basis) for each of the four fiscal quarters of such fiscal year prepared in detail and setting forth, with appropriate discussion, the principal assumptions upon which such budget is based.

(e)    <u>Officer's Certificates</u>.  At the time of the delivery of the financial statements provided for in Sections 9.01(a) and (b), a compliance certificate from an Authorized Officer of the Borrower in the form of Exhibit K certifying on behalf of the Borrower that, to such officer's knowledge after due inquiry, no Default or Event of Default has occurred and is continuing or, if any Default or Event of Default has occurred and is continuing, specifying the nature and extent thereof, which certificate shall (i) set forth in reasonable detail the calculations required to establish whether the Borrower and its Subsidiaries were in compliance with the provisions of Sections 5.02(d), 5.02(f), 10.01(x), 10.01(xii), 10.01(xvi), 10.02(iv), 10.03(iii), 10.04(iv), 10.04(viii), 10.04(xii), 10.04(viii), 10.04(xiv), 10.05(v), 10.05(viii), 10.05(xiii), 10.05(xiv), 10.05(xv), 10.05(xvi), 10.05(xvii), 10.05(xviii) and 10.07 through 10.09, inclusive, at the end of such quarterly accounting period or fiscal year, as the case may be, (ii) if delivered with the financial statements required by Section 9.01(a), set forth in reasonable detail the amount of (and the calculations required to establish the amount of) Excess Cash Flow for the respective Excess Cash Flow Payment Period, and (iii) certify that there have been no changes to the Annexes of each of the Pledge Agreement and the Security Agreement, in each case since the Conversion Date or, in either case, if later, since the date of the most recent certificate delivered pursuant to this Section 9.01(e), or if there have been any such changes, a list in reasonable detail of such changes (but, in each case with respect to this clause (iii), only to the extent that such changes are required to be reported to the Collateral Agent pursuant to the terms of the Security Documents) and whether the Borrower and the other Credit Parties have otherwise taken all actions required to be taken by them pursuant to the Security Documents in connection with any such changes.

(f)    <u>Notice of Default, Litigation and Material Adverse Effect</u>. Promptly, and in any event within ten Business Days (or five Business Days in the case of succeeding sub-clause (i)) after any senior or executive officer of the Borrower or any of its Subsidiaries obtains knowledge thereof, notice of (i) the occurrence of any event which constitutes (A) a Default or an Event of Default or (B) a default or an event of default under any of the Second Lien Loan Documents, the Additional Second Lien Indebtedness Documents, the Pulitzer Debt Documents or any Permitted Pulitzer Debt Refinancing Indebtedness (or any document governing the same), (ii) any litigation or governmental investigation or proceeding pending against the Borrower or any of its Subsidiaries (x) which, either individually or in the aggregate, has had, or could reasonably be expected to have, a Material Adverse Effect or (y) with respect to any

022537-0191-13470-Active.12537490.17

Credit Document, or (iii) any other event, change or circumstance that has had, or could reasonably be expected to have, a Material Adverse Effect.

(g)    Other Reports and Filings.  Promptly after the filing or delivery thereof, copies of all financial information, proxy materials, compliance certificates and reports, if any, which the Borrower or any of its Subsidiaries shall publicly file with the Securities and Exchange Commission or any successor thereto (the "SEC") or deliver to holders (or any trustee, agent or other representative therefor) of its material Indebtedness (including, without limitation, the Second Lien Loan Documents, the Additional Second Lien Indebtedness Documents, the Pulitzer Debt or any Permitted Pulitzer Debt Refinancing Indebtedness) pursuant to the terms of the documentation governing such Indebtedness.

(h)    Environmental Matters.  Promptly after any senior or executive officer of the Borrower or any of its Subsidiaries obtains knowledge thereof, notice of one or more of the following environmental matters to the extent that such environmental matters, either individually or when aggregated with all other such environmental matters, could reasonably be expected to have a Material Adverse Effect:

(i)    any pending or threatened Environmental Claim against the Borrower or any of its Subsidiaries or any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries;

(ii)    any condition or occurrence on or arising from any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries that (a) results in noncompliance by the Borrower or any of its Subsidiaries with any applicable Environmental Law or (b) could reasonably be expected to form the basis of an Environmental Claim against the Borrower or any of its Subsidiaries or any such Real Property;

(iii)    any condition or occurrence on any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries that could reasonably be expected to cause such Real Property to be subject to any restrictions on the ownership, lease, occupancy, use or transferability by the Borrower or any of its Subsidiaries of such Real Property under any Environmental Law; and

(iv)    the taking of any removal or remedial action in response to the actual or alleged presence of any Hazardous Material on any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries as required by any Environmental Law or any governmental or other administrative agency; provided that in any event the Borrower shall deliver to each Lender all notices received by the Borrower or any of its Subsidiaries from any government or governmental agency under, or pursuant to, CERCLA which identify the Borrower or any of its Subsidiaries as potentially responsible parties for remedia-tion costs or which otherwise notify the Borrower or any of its Subsidiaries of potential liability under CERCLA.

All such notices shall describe in reasonable detail the nature of the claim, investigation, condition, occurrence or removal or remedial action and the Borrower's or such Subsidiary's response thereto.

(i)    Other Information.  From time to time, such other information or documents (financial or otherwise) with respect to the Borrower or any of its Subsidiaries as any Lender (through the Administrative Agent) may reasonably request.

(j)    Monthly Reports.  Within 30 days after the end of each fiscal month of the Borrower, the consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal month and the related consolidated statements of income and, to the extent prepared, statements of cash flows for such fiscal month and for the elapsed portion of the fiscal year ended with the last day of such fiscal month, in each case setting forth comparative figures for the corresponding fiscal month in the prior fiscal year.

(k)    Projected Cash Flows.  No later than the first Business Day of every other week (beginning on [_____], 2012), a forecast for the succeeding 13-week period of the projected consolidated cash flows of the Borrower and its Subsidiaries, taken as a whole, together with a variance report of actual cash flow for the immediately preceding period for which a forecast was delivered against the then current forecast for such preceding period.

(l)    Officer's Report.  Promptly, and in any event within 45 days following the end of each fiscal quarter in each fiscal year of the Borrower, a written report of an Authorized Officer, in form and scope reasonably satisfactory to the Administrative Agent, setting forth a summary in reasonable detail of all Restricted Intercompany Charges (as defined in the Pulitzer Debt Guaranty), including cash and non-cash activities, organized by category of intercompany activity, by and among the Borrower and its Subsidiaries (other than the Pulitzer Entities), on one hand, and the Pulitzer Entities, on the other hand, and a reconciliation of intercompany balances.

(m)    Management Reports.  Promptly, and in any event within 30 days following the end of each fiscal month of the Borrower, a management report describing the financial performance and operations of the Borrower and its subsidiaries in a form consistent with, and containing the same level of detail as, reports made available to the holders of the Prepetition Notes (as defined in the Pulitzer Debt Agreement) commencing in October, 2011.

(n)    Second Lien and Pulitzer Debt Information.  Concurrently with, or promptly after, delivery of any information, documents or certificates to any Lender or Agent under (and each as defined in) the Second Lien Loan Agreement pursuant to Section 9.01 (or similar reporting provisions) of the Second Lien Loan Agreement, Section 6A (or any corresponding or similar provision) of the Pulitzer Debt Agreement or Section 4.1 (or any corresponding or similar provision) of the Pulitzer Debt Guaranty or in respect of any Permitted Pulitzer Debt Refinancing Indebtedness (or any documentation governing the same) or the Additional Second Lien Indebtedness Documents, complete copies of all such information, documents and certificates, in each case other than such information, documents and certificates

delivered pursuant to Section 9.01(i) of the Second Lien Loan Agreement or any analogous reporting provision of the Additional Second Lien Indebtedness Documents or the Pulitzer Debt Agreement or the documentation governing any Permitted Pulitzer Debt Refinancing Indebtedness except to the extent any such information, document or certificate delivered pursuant to such Section 9.01(i) or analogous provision is provided to all Lenders (as defined in the Second Lien Loan Agreement) or all Pulitzer Lenders, as the case may be, and relates to the financial (including, without limitation, accounting) or economic condition, results, developments or prospects of any Credit Party.

(o)    _Certification of Public Information_.    The Borrower and each Lender acknowledge that certain of the Lenders may be Public Lenders and, if documents or notices required to be delivered pursuant to this Section 9.01 or otherwise are being distributed through IntraLinks/IntraAgency, SyndTrak or another relevant website or other information platform (the "_Platform_"), any document or notice that the Borrower has indicated contains Non-Public Information shall not be posted on that portion of the Platform designated for such Public Lenders.    The Borrower agrees to clearly designate all information provided to the Administrative Agent or the Lenders by or on behalf of the Borrower which is suitable to make available to Public Lenders (provided that neither Borrower nor any other Credit Party shall have any obligation to ensure that Non-Public Information is not so posted on the portion of the Platform designated for Public Lenders).

9.02    _Books, Records and Inspections; Quarterly Meetings_. (a)    The Borrower will, and will cause each of its Subsidiaries to, keep proper books of record and accounts in which full, true and correct entries in conformity with GAAP and all requirements of law shall be made of all dealings and transactions in relation to its business and activities.    The Borrower will, and will cause each of its Subsidiaries to, permit officers and designated representatives of the Administrative Agent or any Lender to visit and inspect, under guidance of officers of the Borrower or such Subsidiary, any of the properties of the Borrower or such Subsidiary, and to examine the books of account of the Borrower or such Subsidiary and discuss the affairs, finances and accounts of the Borrower or such Subsidiary with, and be advised as to the same by, its and their officers and independent accountants, all upon reasonable prior notice and at such reasonable times and intervals and to such reasonable extent as the Administrative Agent or any such Lender may reasonably request; _provided_, however, so long as no Default or Event of Default has occurred and is continuing, neither the Administrative Agent nor any Lender may exercise its rights under this Section 9.02(a) more than once per calendar year.

(b)    At a date to be mutually agreed upon between the Administrative Agent and the Borrower occurring on or prior to the 60th day after the close of each quarterly accounting period of the Borrower, the Borrower will, at the request of the Administrative Agent, hold a meeting (which may be done via a conference call or video conference) with all of the Lenders at which meeting will be reviewed the financial results of the Borrower and its Subsidiaries for the previous quarterly accounting period (and, in the case of the last quarterly accounting period of each fiscal year, for the previous fiscal year) and the budgets presented for the current fiscal year of the Borrower.

9.03   <u>Maintenance of Property; Insurance</u>.  (a)  The Borrower will, and will cause each of its Subsidiaries to, (i) keep all material property necessary to the business of the Borrower and its Subsidiaries in good working order and condition, ordinary wear and tear excepted and subject to the occurrence of casualty events, (ii) maintain with financially sound and reputable insurance companies, insurance (including self-insurance retentions on a basis consistent with past practice) on all such property and against all such risks as is consistent and in accordance with industry practice for companies similarly situated owning similar properties and engaged in similar businesses as the Borrower and its Subsidiaries, and (iii) furnish to the Administrative Agent, upon its request therefor, full information as to the insurance carried.

(b)      If the Borrower or any of its Subsidiaries shall fail to maintain insurance in accordance with this Section 9.03, the Administrative Agent shall have the right (but shall be under no obligation) to procure such insurance and the Borrower agrees to reimburse the Administrative Agent for all reasonable costs and expenses of procuring such insurance.

(c)      The Borrower will, and will cause each other Credit Party to, at all times keep its property insured in favor of the Collateral Agent, and all policies or certificates (or certified copies thereof) with respect to such insurance (i) shall be endorsed to the Collateral Agent's satisfaction for the benefit of the Collateral Agent (including, without limitation, by naming the Collateral Agent as loss payee (in respect of property insurance) and/or additional insured (in respect of all insurance)), (ii) shall state that the respective insurer shall endeavor to provide at least 30 days' prior written notice to the Collateral Agent prior to the cancellation of any such insurance policy, and (iii) shall be deposited with the Collateral Agent.

9.04   <u>Existence; Franchises</u>.  The Borrower will, and will cause each of its Subsidiaries to, do or cause to be done, all things necessary to preserve and keep in full force and effect (x) its existence and (y) all rights, franchises, licenses, permits, copyrights, trademarks and patents as are in the aggregate necessary for the conduct of its business in the manner in which such business is being conducted as of the Conversion Date; <u>provided</u>, <u>however</u>, that nothing in this Section 9.04 shall prevent (i) sales of assets and other transactions by the Borrower or any of its Subsidiaries in accordance with Section 10.02 or (ii) the withdrawal by the Borrower or any of its Subsidiaries of its qualification as a foreign Company in any jurisdiction if such withdrawal could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

9.05   <u>Compliance with Statutes, etc</u>.  (a)  The Borrower will, and will cause each of its Subsidiaries to, comply with all applicable statutes, ordinances or governmental rules, regulations and orders of, and all applicable restrictions imposed by, all governmental bodies, domestic or foreign, in respect of the conduct of its business and the ownership of its property (including applicable statutes, regulations, orders and restrictions relating to (i) environmental standards and controls and (ii) ERISA), except such noncompliances as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)      Within five Business Days after the date on which the Borrower is required by applicable law, statute, rule or regulation (including any applicable extension of such date), the Borrower will file (or cause to be filed) with the SEC all reports, financial information

-84-

and certifications required to be filed by the Borrower pursuant to any such applicable law, statute, rule or regulation.

9.06    Compliance with Environmental Laws. (a)  The Borrower will comply, and will cause each of its Subsidiaries to comply, with all Environmental Laws and permits applicable to, or required by, the ownership, lease or use of its Real Property now or hereafter owned, leased or operated by the Borrower or any of its Subsidiaries, except such noncompliances as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and will promptly pay or cause to be paid all costs and expenses incurred in connection with such compliance, and will keep or cause to be kept all such Real Property free and clear of any Liens imposed pursuant to such Environmental Laws.  Neither the Borrower nor any of its Subsidiaries will generate, use, treat, store, Release or dispose of, or permit the generation, use, treatment, storage, Release or disposal of Hazardous Materials on any Real Property now or hereafter owned, leased or operated by the Borrower or any of its Subsidiaries, or transport or permit the transportation of Hazardous Materials to or from any such Real Property, except for Hazardous Materials generated, used, treated, stored, Released or disposed of at any such Real Properties in compliance in all material respects with all applicable Environmental Laws.

(b)    (i) After the receipt by the Administrative Agent or any Lender of any notice of the type described in Section 9.01(h), (ii) at any time that the Borrower or any of its Subsidiaries are not in compliance with Section 9.06(a) or (iii) in the event that the Administrative Agent or the Lenders have exercised any of the remedies pursuant to the last paragraph of Section 11, the Borrower will (in each case) provide, at the sole expense of the Borrower and at the request of the Administrative Agent, an environmental site assessment report concerning any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries, prepared by an environmental consulting firm reasonably approved by the Administrative Agent, indicating the presence or absence of Hazardous Materials and the potential cost of any removal or remedial action in connection with such Hazardous Materials on such Real Property.  If the Borrower fails to provide the same within 30 days after such request was made, the Administrative Agent may order the same, the cost of which shall be borne by the Borrower, and the Borrower shall grant and hereby grants to the Administrative Agent and the Lenders and their respective agents access to such Real Property and specifically grants the Administrative Agent and the Lenders an irrevocable non-exclusive license, subject to the rights of tenants, to undertake such an assessment at any reasonable time upon reasonable notice to the Borrower, all at the sole expense of the Borrower.

9.07    ERISA.    As soon as possible and, in any event, within fifteen (15) Business Days after the Borrower or any ERISA Affiliate knows or has reason to know of the occurrence of any of the following, the Borrower will deliver to each of the Lenders a certificate of an Authorized Officer of the Borrower setting forth the details as to such occurrence and the action, if any, that the Borrower or such ERISA Affiliate is required or proposes to take, together with any notices required or proposed to be given or filed by the Borrower, the Plan administrator or such ERISA Affiliate to or with the PBGC or any other government agency, or a Plan participant and any notices received by the Borrower or ERISA Affiliate from the PBGC or any other government agency, or a Plan participant with respect thereto:  that a Reportable Event has occurred (except to the extent that the Borrower has previously delivered to the Lenders a

-85-

certificate and notices (if any) concerning such event pursuant to the next clause hereof); that a contributing sponsor (as defined in Section 4001(a)(13) of ERISA) of a Plan subject to Title IV of ERISA is subject to the advance reporting requirement of PBGC Regulation Section 4043.61 (without regard to subparagraph (b)(1) thereof), and an event described in subsection .62, .63, .64, .65, .66, .67 or .68 of PBGC Regulation Section 4043 is reasonably expected to occur with respect to such Plan within the following 30 days; that an accumulated funding deficiency or failure to meet minimum funding standards, each within the meaning of Section 412 of the Code or Section 302 of ERISA, has been incurred or an application has been made for a waiver or modification of the minimum funding standard (including any required installment payments) or an extension of any amortization period under Section 412 of the Code or Section 302 of ERISA with respect to a Plan; that any material contribution required to be made with respect to a Plan or Foreign Pension Plan has not been timely made; that a Plan has been or may be terminated, reorganized, partitioned or declared insolvent under Title IV of ERISA; that a Plan has an Unfunded Current Liability which, when added to the aggregate amount of Unfunded Current Liabilities with respect to all other Plans, exceeds the aggregate amount of such Unfunded Current Liabilities that existed on the Conversion Date by $10,000,000; that proceedings may be or have been instituted to terminate or appoint a trustee to administer a Plan (other than a member of the board of trustees of a Plan which is a multiemployer plan (as defined in Section 4001(a)(3) of ERISA)) which is subject to Title IV of ERISA; that a proceeding has been instituted pursuant to Section 515 of ERISA to collect a delinquent contribution to a Plan; that the Borrower or any ERISA Affiliate has incurred any material liability (including any indirect, contingent, or secondary liability) to or on account of the termination of or withdrawal from a Plan under Section 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or with respect to a Plan under Section 401(a)(29), 4971, 4975 or 4980 of the Code or Section 409, 502(i) or 502(l) of ERISA or with respect to a group health plan (as defined in Section 607(1) of ERISA or Section 4980B(g)(2) of the Code) under Section 4980B of the Code; or that the Borrower or any ERISA Affiliate of the Borrower has incurred (or is alleged in any proceeding to have incurred) any material liability pursuant to any employee welfare benefit plan (as defined in Section 3(1) of ERISA) that provides benefits to retired employees or other former employees (other than as required by Section 601 of ERISA) or any Plan or any Foreign Pension Plan.  The Borrower will deliver to each of the Lenders copies of any records, documents or other information that must be furnished to the PBGC with respect to any Plan pursuant to Section 4010 of ERISA.  The Borrower will also deliver to each Lender, to the extent requested by such Lender, a complete copy of the annual report (on Form 5500 series) of each Plan (including, to the extent required, any related financial and actuarial statements and opinions and other supporting statements, certifications, schedules and information) required to be filed with the Internal Revenue Service. In addition to any certificates or notices delivered to the Lenders pursuant to the first sentence hereof, copies of annual reports and any records, documents or other information required to be furnished to the PBGC or any other government agency, and any material notices received by the Borrower or any ERISA Affiliate with respect to any Plan or Foreign Pension Plan shall be delivered to each Lender, to the extent requested by such Lender, no later than fifteen (15) days after the date such annual report or such records, documents and/or information has been filed or furnished, as appropriate, to any appropriate and applicable government agency or such notice has been received by the Borrower or the ERISA Affiliate, as applicable.  The Borrower and each of its applicable Subsidiaries shall ensure that all Foreign Pension Plans administered by it or into which it makes payments obtains or retains (as applicable) registered status under and as

-86-

required by applicable law and is administered in a timely manner in all respects in compliance with all applicable laws except where the failure to do any of the foregoing, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

9.08     End of Fiscal Years.  The Borrower will, for financial reporting purposes, cause its fiscal years to end on the last Sunday of September of each calendar year.

9.09     Performance of Obligations.  The Borrower will, and will cause each of its Subsidiaries to, perform all of its obligations under the terms of each mortgage, indenture, security agreement, loan agreement or credit agreement and each other agreement, contract or instrument by which it is bound, except such non-performances as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

9.10     Payment of Taxes.  The Borrower will pay and discharge, and will cause each of its Subsidiaries to pay and discharge, all taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or upon any properties belonging to it, prior to the date on which penalties attach thereto, and all lawful claims which, if unpaid, might become a Lien or charge upon any properties of the Borrower or any of its Subsidiaries not otherwise permitted under Section 10.01(i); provided that neither the Borrower nor any of its Subsidiaries shall be required to pay any such tax, assessment, charge, levy or claim which is immaterial or which is being contested in good faith and by proper proceedings if it has maintained adequate reserves with respect thereto in accordance with GAAP.

9.11     Use of Proceeds.  The Borrower will use the proceeds of the Loans and the Letters of Credit only as provided in Section 8.08.

9.12     Excluded Domestic Subsidiaries; Further Assurances; etc.    (a) The Borrower will cause (i) each of its Domestic Subsidiaries (other than an Excluded Domestic Subsidiary so long as it remains an Excluded Domestic Subsidiary) created or acquired after the Conversion Date to become party to the Subsidiaries Guaranty, the Security Agreement and/or the Pledge Agreement in accordance with the terms of the Subsidiaries Guaranty, the Security Agreement and/or the Pledge Agreement and (ii) each Excluded Domestic Subsidiary that has not entered into the Subsidiaries Guaranty, the Security Agreement and/or the Pledge Agreement because to have done so would have violated the terms and conditions contained in the applicable Pulitzer Debt Documents (as in effect on, and after giving effect to, the Conversion Date) or the Permitted Pulitzer Debt Refinancing Indebtedness, to take all actions required for such Excluded Domestic Subsidiary to become a party to the Subsidiaries Guaranty, the Security Agreement and/or the Pledge Agreement in accordance with the terms of the Subsidiaries Guaranty, the Security Agreement and/or the Pledge Agreement upon the date upon which the restrictions set forth in the applicable Pulitzer Debt Documents or Permitted Pulitzer Debt Refinancing Indebtedness, as the case may be, cease to apply to such Excluded Domestic Subsidiary (provided that in no event will any Lien be granted or required to be created as a result thereof on any Excluded TNI Assets).   On the date on which any Excluded Domestic Subsidiary becomes a party to the Subsidiaries Guaranty, the Security Agreement and the Pledge Agreement pursuant to this Section 9.12(a), such Excluded Domestic Subsidiary shall no longer be an "Excluded Domestic Subsidiary" but instead shall be a "Subsidiary Guarantor" for all purposes of this Agreement and each other Credit Document.

-87-

(b)    The Borrower will, and will cause each other Credit Party to, grant to the Collateral Agent for the benefit of the Secured Creditors security interests and Mortgages in such assets and Real Property of the Borrower and such other Credit Party as are not covered by the Security Documents as in effect on the Conversion Date (other than Real Property listed on Part B of Schedule X that is currently being held for sale, Excluded TNI Assets and Excluded Real Property) and  as may be reasonably requested from time to time by the Administrative Agent or the Required Lenders (collectively, the "Additional Security Documents").  All such security interests and Mortgages shall be granted pursuant to documentation reasonably satisfactory in form and substance to the Collateral Agent and shall constitute valid and enforceable perfected security interests, hypothecations and Mortgages superior to and prior to the rights of all third Persons and enforceable against third parties and subject to no other Liens except for Permitted Liens or, in the case of Real Property, the Permitted Encumbrances related thereto.  The Additional Security Documents or instruments related thereto shall have been duly recorded or filed in such manner and in such places as are required by law to establish, perfect, preserve and protect the Liens in favor of the Collateral Agent required to be granted pursuant to the Additional Security Documents and all taxes, fees and other charges payable in connection therewith shall have been paid in full.  Notwithstanding the foregoing, this Section 9.12(b) shall not apply to (and the Borrower and the other Credit Parties shall not be required to grant a Mortgage in) any Real Property the fair market value (as determined in good faith by the Borrower) of which individually is less than $3,000,000 (any such Real Property, "Excluded Real Property").

(c)    The Borrower will, and will cause each of the other Credit Parties to, at the expense of the Borrower, make, execute, endorse, acknowledge, file and/or deliver to the Collateral Agent from time to time such vouchers, invoices, schedules, confirmatory assignments, conveyances, financing statements, transfer endorsements, powers of attorney, certificates, copies of its most recent real property surveys, reports, landlord waivers, bailee agreements, control agreements and other assurances or instruments and take such further steps relating to the Collateral covered by any of the Security Documents (other than with respect to Excluded Real Property and excluding Excluded TNI Assets) as the Collateral Agent may reasonably require.  In addition, at the time that the actions required or requested to be taken pursuant to clause (a) above are taken, the Borrower will cause the respective Excluded Domestic Subsidiary or Domestic Subsidiaries to execute and deliver, or cause to be executed and delivered, all relevant documentation (including, but not limited to, opinions of counsel and officers' certificates) of the type described in each of (x) Section 6 as each such Excluded Domestic Subsidiary or Domestic Subsidiary would have had to deliver if it were a Credit Party on the Conversion Date and (y) Section 9.17 as each such Excluded Domestic Subsidiary or Domestic Subsidiary would have had to deliver if it were a Credit Party on the Conversion Date. Furthermore, the Borrower will, and will cause the other Credit Parties to, deliver to the Collateral Agent such opinions of counsel, officers' certificates, title insurance and other related documents as may be reasonably requested by the Administrative Agent to assure itself that this Section 9.12 has been complied with.

(d)    If the Administrative Agent or the Required Lenders reasonably determine that they are required by law or regulation to have appraisals prepared in respect of any Real Property of the Borrower and the other Credit Parties constituting Collateral, the Borrower will, at its own expense, provide to the Administrative Agent appraisals which satisfy the applicable

-88-

requirements of the Real Estate Appraisal Reform Amendments of the Financial Institution Reform, Recovery and Enforcement Act of 1989, as amended, and which shall otherwise be in form and substance reasonably satisfactory to the Administrative Agent.

(e)    The Borrower agrees that each action required by clauses (a), (b) and (c) of this Section 9.12 shall be completed as soon as possible, but in no event later than 15 days (or, in the case of Mortgages, 60 days) after such action is required to be taken or requested to be taken by the Administrative Agent; provided that, in no event will the Borrower or any of its Subsidiaries be required to take any action, other than using its best efforts, to obtain consents from third parties with respect to its compliance with this Section 9.12.

(f)    The Borrower agrees that, to the extent that it is unable to deliver to the Collateral Agent on or prior to the Conversion Date any of the documents described in Section 6.11, the Borrower shall and shall cause each of its Subsidiaries to deliver to the Collateral Agent such documents as soon as commercially reasonable and no later than 30 calendar days after the Conversion Date or such other later date as the Collateral Agent may reasonable agree.

9.13    Ownership of Subsidiaries; etc.  Except as otherwise permitted by Section 10.05(iii) or (xiii), the Borrower will, and will cause each of its Subsidiaries to, own 100% of the Equity Interests of each of their Subsidiaries (other than, in the case of a Foreign Subsidiary, directors' qualifying shares and/or other nominal amounts of shares required to be held by local nationals in each case to the extent required by applicable law).

9.14    Foreign Subsidiaries Security.  If following a change in the relevant sections of the Code or the regulations, rules, rulings, notices or other official pronouncements issued or promulgated thereunder, counsel for the Borrower reasonably acceptable to the Administrative Agent does not within 30 days after a request from the Administrative Agent or the Required Lenders deliver evidence, in form and substance mutually satisfactory to the Administrative Agent and the Borrower, with respect to any Foreign Subsidiary of the Borrower which has not already had all of its Equity Interests pledged pursuant to the Pledge Agreement to secure all of the Obligations (as defined in the Pledge Agreement) that (i) a pledge of more than 66-2/3% of the total combined voting power of all classes of Equity Interests of such Foreign Subsidiary entitled to vote, (ii) the entering into by such Foreign Subsidiary of a pledge agreement in substantially the form of the Pledge Agreement, (iii) the entering into by such Foreign Subsidiary of a guaranty in substantially the form of the Subsidiaries Guaranty and (iv) the entering into by such Foreign Subsidiary of a security agreement in substantially the form of the Security Agreement, in any such case could reasonably be expected to cause the undistributed earnings of such Foreign Subsidiary as determined for Federal income tax purposes to be treated as a deemed dividend to such Foreign Subsidiary's United States parent for Federal income tax purposes, then in the case of a failure to deliver the evidence described in clause (i) above, that portion of such Foreign Subsidiary's outstanding Equity Interests so issued by such Foreign Subsidiary, in each case not theretofore pledged pursuant to the Pledge Agreement to secure all of the Obligations (as defined in the Pledge Agreement) shall be pledged to the Collateral Agent for the benefit of the Secured Creditors pursuant to the Pledge Agreement (or another pledge agreement in substantially similar form, if needed), and in the case of a failure to deliver the evidence described in clause (ii) or (iv) above, such Foreign Subsidiary shall execute and deliver the Pledge Agreement (or another pledge agreement in substantially similar form, if

-89-

needed) or the Security Agreement (or another security agreement in substantially similar form, if needed), as the case may be, granting to the Collateral Agent for the benefit of the Secured Creditors a security interest in all assets, promissory notes and Equity Interests owned by such Foreign Subsidiary and securing the obligations of the Borrower under the Credit Documents and under any Interest Rate Protection Agreement or Other Hedging Agreement and, in the event the Subsidiaries Guaranty shall have been executed by such Foreign Subsidiary, the obligations of such Foreign Subsidiary thereunder, and in the case of a failure to deliver the evidence described in clause (iii) above, such Foreign Subsidiary shall execute and deliver the Subsidiaries Guaranty (or another guaranty in substantially similar form, if needed), guaranteeing the obligations of the Borrower under the Credit Documents and under any Interest Rate Protection Agreement or Other Hedging Agreement, in each case to the extent that the entering into of such Security Agreements, the Pledge Agreement or the Subsidiaries Guaranty (or substantially similar document) is permitted by the laws of the respective foreign jurisdiction and with all documents delivered pursuant to this Section 9.14 to be in form and substance reasonably satisfactory to the Administrative Agent and/or the Collateral Agent.

       9.15    <u>Terrorism Sanctions Regulations.</u>    The Borrower will not and will not permit any Controlled Entity to (a) become a Blocked Person or (b) have any investments in or engage in any dealings or transactions with any Blocked Person if such investments, dealings or transactions would cause any Lender to be in violation of any laws or regulations that are applicable to such Lender.

       SECTION 10. <u>Negative Covenants</u>.

       The Borrower hereby covenants and agrees that on and after the Conversion Date and until the Total Revolving Loan Commitment and all Letters of Credit have terminated and the Term Loans and Unpaid Drawings (in each case together with interest thereon), Fees and all other Obligations with respect to the Facilities (other than indemnities described in Section 13.13 which are not then due and payable) incurred hereunder and thereunder, are paid in full:

       10.01    <u>Liens</u>.  The Borrower will not, and will not permit any of its Subsidiaries to, create, incur, assume or suffer to exist any Lien upon or with respect to any property or assets (real or personal, tangible or intangible) of the Borrower or any of its Subsidiaries, whether now owned or hereafter acquired, or sell any such property or assets subject to an understanding or agreement, contingent or otherwise, to repurchase such property or assets (including sales of accounts receivable with recourse to the Borrower or any of its Subsidiaries), or assign any right to receive income or permit the filing of any financing statement under the UCC or any other similar notice of Lien under any similar recording or notice statute; <u>provided</u> that the provisions of this Section 10.01 shall not prevent the creation, incurrence, assumption or existence of the following (Liens described below are herein referred to as "<u>Permitted Liens</u>"):

       (i)    inchoate Liens for taxes, assessments or governmental charges or levies not yet due or Liens for taxes, assessments or governmental charges or levies being contested in good faith and by appropriate proceedings for which adequate reserves have been established in accordance with GAAP;

(ii)      Liens in respect of property or assets of the Borrower or any of its Subsidiaries imposed by law, which were incurred in the ordinary course of business and do not secure Indebtedness for borrowed money, such as carriers', warehousemen's, materialmen's and mechanics' liens and other similar Liens arising in the ordinary course of business, and (x) which do not in the aggregate materially detract from the value of the Borrower's or such Subsidiary's property or assets or materially impair the use thereof in the operation of the business of the Borrower or such Subsidiary or (y) which are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing the forfeiture or sale of the property or assets subject to any such Lien;

(iii)      Liens in existence on the Petition Date which remain in effect on, and after giving effect to, the Conversion Date and are listed, and the property subject thereto described, in Schedule VIII, but only to the respective date, if any, set forth in such Schedule VIII for the removal, replacement and termination of any such Liens, plus renewals, replacements and extensions of such Liens to the extent set forth on such Schedule VIII, provided that (x) the aggregate principal amount of the Indebtedness, if any, secured by such Liens does not increase from that amount outstanding at the time of any such renewal, replacement or extension and (y) any such renewal, replacement or extension does not encumber any additional assets or properties of the Borrower or any of its Subsidiaries;

(iv)      Liens created pursuant to the Credit Documents;

(v)      licenses, sublicenses, leases or subleases granted to other Persons not materially interfering with the conduct of the business of the Borrower or any of its Subsidiaries;

(vi)      Liens upon assets of the Borrower or any of its Subsidiaries subject to Capitalized Lease Obligations to the extent such Capitalized Lease Obligations are permitted by Section 10.04(iv), provided that (x) such Liens only serve to secure the payment of Indebtedness arising under such Capitalized Lease Obligation and (y) the Lien encumbering the asset giving rise to the Capitalized Lease Obligation does not encumber any other asset of the Borrower or any Subsidiary of the Borrower;

(vii)      Liens placed upon equipment or machinery used in the ordinary course of business of the Borrower or any of its Subsidiaries and placed at the time of the acquisition thereof by the Borrower or such Subsidiary or within 90 days thereafter to secure Indebtedness incurred to pay all or a portion of the purchase price thereof or to secure Indebtedness incurred solely for the purpose of financing the acquisition of any such equipment or machinery or extensions, renewals or replacements of any of the foregoing for the same or a lesser amount, provided that (x) the Indebtedness secured by such Liens is permitted by Section 10.04(iv) and (y) in all events, the Lien encumbering the equipment or machinery so acquired does not encumber any other asset of the Borrower or such Subsidiary;

(viii)      easements, rights-of-way, restrictions, encroachments and other similar charges or encumbrances, and minor title deficiencies, in each case not securing

-91-

Indebtedness and not materially interfering with the conduct of the business of the Borrower or any of its Subsidiaries;

(ix)    Liens arising from precautionary UCC financing statement filings regarding operating leases entered into in the ordinary course of business;

(x)    Liens arising out of the existence of judgments or awards in respect of which the Borrower or any of its Subsidiaries shall in good faith be prosecuting an appeal or proceedings for review and in respect of which there shall have been secured a subsisting stay of execution pending such appeal or proceedings, provided that the aggregate amount of all cash and the Fair Market Value of all other property subject to such Liens (other than any such Liens securing judgments or awards to the extent covered by a reputable and solvent insurance company and not otherwise giving rise to an Event of Default under Section 11.10) does not exceed $10,000,000 at any time outstanding;

(xi)    statutory and common law landlords' liens under leases to which the Borrower or any of its Subsidiaries is a party;

(xii)    Liens (other than Liens imposed under ERISA) incurred in the ordinary course of business in connection with workers compensation claims, unemployment insurance and social security benefits and Liens on cash deposits securing the performance of bids, tenders, leases and contracts in the ordinary course of business, statutory obligations, surety bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business and consistent with past practice (exclusive of obligations in respect of the payment for borrowed money), provided that the aggregate amount of all cash and the Fair Market Value of all other property subject to all Liens permitted by this clause (xii) shall not at any time exceed $10,000,000;

(xiii)    Liens arising out of any conditional sale, title retention, consignment or other similar arrangements for the sale of goods entered into by the Borrower or any of its Subsidiaries in the ordinary course of business to the extent such Liens do not attach to any assets other than the goods subject to such arrangements;

(xiv)    Liens (x) incurred in the ordinary course of business in connection with the purchase or shipping of goods or assets (or the related assets and proceeds thereof), which Liens are in favor of the seller or shipper of such goods or assets and only attach to such goods or assets, and (y) in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(xv)    bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by the Borrower or any Subsidiary, in each case granted in the ordinary course of business in favor of the bank or banks with which such accounts are maintained, securing amounts owing to such bank or banks with respect to cash management and operating account arrangements;

(xvi)    additional Liens of the Borrower or any Subsidiary of the Borrower not

-92-

otherwise permitted by this Section 10.01 that (v) were not incurred in connection with borrowed money, (w) do not encumber Collateral or Equity Interests of a Subsidiary of the Borrower, (x) do not encumber any other assets of the Borrower or any of its Subsidiaries the Fair Market Value of which exceeds the amount of the Indebtedness or other obligations secured by such assets, (y) do not materially impair the use of such assets in the operation of the business of the Borrower or such Subsidiary and (z) do not secure obligations in excess of $1,000,000 in the aggregate for all such Liens at any time;

(xvii)  Liens solely on the assets of Pulitzer and its Subsidiaries (other than the Excluded TNI Assets) to secure their respective obligations in respect of the Pulitzer Debt Documents and any Permitted Pulitzer Debt Refinancing Indebtedness incurred in accordance with this Agreement (including any guaranty or pledge thereof by Pulitzer and/or one or more of its Subsidiaries);

(xviii) Liens created pursuant to the Second Lien Loan Documents and Liens securing any Additional Second Lien Indebtedness incurred in accordance with this Agreement, provided that, in each case, such Liens are subject to the terms of the Intercreditor Agreement; and

(xix)   any other Permitted Encumbrance.

10.02  <u>Consolidation, Merger, Purchase or Sale of Assets, etc.</u>  The Borrower will not, and will not permit any of its Subsidiaries to, wind up, liquidate or dissolve its affairs or enter into any partnership, joint venture, or transaction of merger or consolidation, or convey, sell, lease or otherwise dispose of all or any part of its property or assets (other than sales of inventory in the ordinary course of business), or enter into any sale-leaseback transactions, or purchase or otherwise acquire (in one or a series of related transactions) any part of the property or assets (other than purchases or other acquisitions of inventory, materials and equipment in the ordinary course of business) of any Person (or agree to do any of the foregoing at any future time), except that:

(i)      Capital Expenditures by the Borrower and its Subsidiaries shall be permitted to the extent not in violation of Section 10.07;

(ii)     the Borrower and its Subsidiaries may sell, convey or otherwise dispose of obsolete or worn-out property in the ordinary course of business;

(iii)    Investments may be made to the extent permitted by Section 10.05 or 10.06(viii);

(iv)    the Borrower and its Subsidiaries may sell assets (other than the capital stock or other Equity Interests of any Wholly-Owned Subsidiary of the Borrower, unless all of the capital stock or other Equity Interests of such Wholly-Owned Subsidiary are sold in accordance with this clause (iv)), so long as (v) no Default or Event of Default then exists or would result therefrom, (w) each such sale is in an arm's-length transaction and the Borrower or the respective Subsidiary receives at least Fair Market Value, (x) the consideration received by the Borrower or such Subsidiary consists of at least 90% cash and is paid at the time of the closing of such sale, (y) with respect to an asset sale by the

-93-

Borrower or any of its Qualified Subsidiaries, the Net Sale Proceeds therefrom are applied as (and to the extent) required by Section 5.02(d) or, with respect to an asset sale by any Subsidiary that is not a Qualified Subsidiary, the net sale proceeds are applied as (and to the extent) required by the Pulitzer Debt Agreement (or by the documentation governing the Permitted Pulitzer Debt Refinancing Indebtedness) and (z) the assets sold pursuant to this clause (iv) shall not, in the aggregate, be comprised of assets that generated in any fiscal year of the Borrower more than 5% of Consolidated EBITDA of the Borrower and its Subsidiaries for the immediately preceding fiscal year of the Borrower;

(v)    each of the Borrower and its Subsidiaries may lease (as lessee) or license (as licensee) real or personal property (so long as any such lease or license does not create a Capitalized Lease Obligation except to the extent permitted by Section 10.04(iv));

(vi)    each of the Borrower and its Subsidiaries may sell or discount, in each case without recourse and in the ordinary course of business, accounts receivable arising in the ordinary course of business, but only in connection with the compromise or collection thereof and not as part of any financing transaction;

(vii)    each of the Borrower and its Subsidiaries may grant licenses, sublicenses, leases or subleases to other Persons not materially interfering with the conduct of the business of the Borrower or any of its Subsidiaries, in each case so long as no such grant otherwise affects the Collateral Agent's security interest in the asset or property subject thereto;

(viii)    (x) any Subsidiary of the Borrower may convey, lease, license, sell or otherwise transfer all or any part of its business, properties and assets to the Borrower or to any Qualified Wholly-Owned Domestic Subsidiary, so long as any security interests granted to the Collateral Agent for the benefit of the Secured Creditors pursuant to the Security Documents in the assets so transferred shall remain in full force and effect and perfected (to at least the same extent as in effect immediately prior to such transfer) and all actions required to maintain said perfected status have been taken and (y) any Pulitzer Entity may convey, lease, license, sell or otherwise transfer all or any part of its business, properties and assets to any other Pulitzer Entity;

(ix)    (x) any Subsidiary of the Borrower (other than an Excluded Domestic Subsidiary) may merge or consolidate with and into, or be dissolved or liquidated into, the Borrower or any Qualified Wholly-Owned Domestic Subsidiary, so long as (i) in the case of any such merger, consolidation, dissolution or liquidation involving the Borrower, the Borrower is the surviving or continuing entity of any such merger, consolidation, dissolution or liquidation, (ii) in all other cases, a Qualified Wholly-Owned Domestic Subsidiary is the surviving or continuing entity of any such merger, consolidation, dissolution or liquidation, and (iii) any security interests granted to the Collateral Agent for the benefit of the Secured Creditors pursuant to the Security Documents in the assets of such Subsidiary shall remain in full force and effect and perfected (to at least the same extent as in effect immediately prior to such merger, consolidation, dissolution or

-94-

liquidation) and all actions required to maintain said perfected status have been taken and (y) any Pulitzer Entity may merge or consolidate with and into, or be dissolved or liquidated into, any other Pulitzer Entity, so long as a Pulitzer Entity is the surviving or continuing entity;

(x)      any Foreign Subsidiary of the Borrower may be merged, consolidated or amalgamated with and into, or be dissolved or liquidated into, or transfer any of its assets to, any Qualified Wholly-Owned Foreign Subsidiary of the Borrower, so long as (i) such Qualified Wholly-Owned Foreign Subsidiary of the Borrower is the surviving or continuing corporation of any such merger, consolidation, amalgamation, dissolution or liquidation and (ii) any security interests granted to the Collateral Agent for the benefit of the Secured Creditors pursuant to the Security Documents in the Equity Interests of such Qualified Wholly-Owned Foreign Subsidiary and such Foreign Subsidiary shall remain in full force and effect and perfected and enforceable (to at least the same extent as in effect immediately prior to such merger, consolidation, amalgamation, dissolution, liquidation or transfer) and all actions required to maintain said perfected status have been taken; and

(xi)      the Borrower and its Subsidiaries may sell, convey or otherwise dispose of cash and Cash Equivalents in the ordinary course of business, in each case for cash at Fair Market Value.

To the extent the Required Lenders waive the provisions of this Section 10.02 with respect to the sale of any Collateral, or any Collateral is sold as permitted by this Section 10.02 (other than to the Borrower or a Subsidiary thereof), such Collateral shall be sold free and clear of the Liens created by the Security Documents, and the Administrative Agent and the Collateral Agent shall be authorized to take any actions deemed appropriate in the reasonable opinion of the Administrative Agent or the Collateral Agent in order to effect the foregoing.

10.03   Dividends.   The Borrower will not, and will not permit any of its Subsidiaries to, authorize, declare or pay any Dividends with respect to the Borrower or any of its Subsidiaries, except that:

(i)      (A) any Subsidiary of the Borrower may pay cash Dividends to the Borrower or to any Wholly-Owned Domestic Subsidiary of the Borrower, (B) any Foreign Subsidiary of the Borrower may pay cash Dividends to any Wholly-Owned Foreign Subsidiary of the Borrower and (C) and any Subsidiary of Pulitzer may pay cash Dividends to a Pulitzer Entity;

(ii)      any Non-Wholly-Owned Subsidiary of the Borrower (other than any Lee Entity to the extent the recipient is a Pulitzer Entity) may pay cash Dividends to its shareholders, members or partners generally, so long as the Borrower or its respective Subsidiary which owns the Equity Interest in the Subsidiary paying such Dividends receives at least its proportionate share thereof (based upon its relative holding of the Equity Interest in the Subsidiary paying such Dividends and taking into account the relative preferences, if any, of the various classes of Equity Interests of such Subsidiary);

(iii)    so long as no Default or Event of Default exists at the time of the respective Dividend or would exist immediately after giving effect thereto, the Borrower may redeem or repurchase Equity Interests of the Borrower from officers, employees and directors of the Borrower or its Subsidiaries (or their estates) after the death, disability, retirement or termination of employment or service as a director of any such Person, or otherwise in accordance with any stock option plan or any employee stock ownership plan that has been approved by the board of directors of the Borrower, provided that the aggregate amount of Dividends made by the Borrower pursuant to this clause (iii) shall not exceed $250,000 during any fiscal year of the Borrower;

(iv)    the Borrower may declare and pay regularly scheduled Dividends on its Qualified Preferred Stock pursuant to the terms thereof through the issuance of additional shares of such Qualified Preferred Stock rather than in cash, provided that in lieu of issuing additional shares of such Qualified Preferred Stock as Dividends, the Borrower may increase the liquidation preference of the shares of Qualified Preferred Stock in respect of which such Dividends have accrued; and

(v)    the Borrower and its Subsidiaries may make the payments and deliveries contemplated in Section 10.04(xi) and Section 10.05(xvi) and the Pulitzer Entities may make payments and deliveries in satisfaction of the obligations owed to Herald as described in note 19 to the Borrower's Annual Report on Form 10-K for the fiscal year ended September 26, 2010.

10.04    Indebtedness.    The Borrower will not, and will not permit any of its Subsidiaries to, contract, create, incur, assume or suffer to exist any Indebtedness, except:

(i)    Indebtedness incurred pursuant to this Agreement and the other Credit Documents;

(ii)    Existing Indebtedness outstanding on the Petition Date (to the extent remaining outstanding on, and after giving effect to, the Conversion Date) and listed on Schedule VI (as reduced by any repayments of principal thereof), without giving effect to any subsequent extension, renewal or refinancing thereof except to the extent set forth on Schedule VI, provided that the aggregate principal amount of the Indebtedness to be extended, renewed or refinanced does not increase from that amount outstanding at the time of any such extension, renewal or refinancing;

(iii)    Indebtedness of the Borrower under (x) Interest Rate Protection Agreements entered into with respect to other Indebtedness permitted under this Section 10.04 and (y) Other Hedging Agreements entered into in the ordinary course of business and providing protection to the Borrower and its Subsidiaries against fluctuations in currency values or commodity prices in connection with the Borrower's or any of its Subsidiaries' operations, in either case so long as the entering into of such Interest Rate Protection Agreements or Other Hedging Agreements are *bona fide* hedging activities and are not for speculative purposes;

-96-

(iv)    Indebtedness of the Borrower and its Subsidiaries evidenced by Capitalized Lease Obligations (to the extent permitted pursuant to Section 10.07) and purchase money Indebtedness described in Section 10.01(vii), provided that in no event shall the sum of the aggregate principal amount of all Capitalized Lease Obligations and purchase money Indebtedness permitted by this clause (iv) exceed $30,000,000 at any time outstanding;

(v)    Indebtedness constituting Intercompany Loans to the extent permitted by Section 10.05(viii);

(vi)    (A) Indebtedness consisting of guaranties by the Borrower and the Qualified Wholly-Owned Domestic Subsidiaries of each other's Indebtedness and lease and other contractual obligations permitted under this Agreement and (B) Indebtedness consisting of guaranties by Pulitzer Entities of each other's Indebtedness and lease and other contractual obligations permitted under this Agreement (in each case, other than obligations (if any) in respect of the Second Lien Loan Documents, Additional Second Lien Indebtedness Documents, the Pulitzer Debt, the Pulitzer Debt Guaranty and the Permitted Pulitzer Debt Refinancing Indebtedness);

(vii)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, so long as such Indebtedness is extinguished within four Business Days after its incurrence;

(viii)    Indebtedness of the Borrower and its Subsidiaries with respect to performance bonds, surety bonds, appeal bonds or customs bonds required in the ordinary course of business or in connection with the enforcement of rights or claims of the Borrower or any of its Subsidiaries or in connection with judgments that do not result in a Default or an Event of Default, provided that the aggregate outstanding amount of all such performance bonds, surety bonds, appeal bonds and customs bonds permitted by this clause (viii) shall not at any time exceed $10,000,000;

(ix)    Indebtedness of the Borrower or any of its Subsidiaries which may be deemed to exist in connection with agreements providing for indemnification, purchase price adjustments and similar obligations in connection with the acquisition or disposition of assets in accordance with the requirements of this Agreement, so long as any such obligations are those of the Person making the respective acquisition or sale, and are not guaranteed by any other Person except as permitted by Section 10.04(vi);

(x)    Indebtedness of Pulitzer or PD LLC under the Pulitzer Debt and the other Pulitzer Debt Documents and of Pulitzer and one or more of the Subsidiaries of Pulitzer under the Pulitzer Debt Guaranty and the other Pulitzer Debt Documents, in an aggregate principal amount (without duplication in the case of amounts owing by Pulitzer and its other Subsidiaries under the Pulitzer Debt Guaranty) not to exceed $126,355,000 (less the amount of any repayments of principal thereof after the Conversion Date);

(xi)    Indebtedness of Pulitzer or PD LLC incurred pursuant to the Permitted

-97-

Pulitzer Debt Refinancing Indebtedness and one or more of the Subsidiaries of Pulitzer under a guaranty thereof complying with the requirements set forth in the definition of "Permitted Pulitzer Debt Refinancing Indebtedness" in Section 1.01, provided that, to the extent that any such Permitted Pulitzer Debt Refinancing Indebtedness includes a Permitted Pulitzer Debt Refinancing Incremental Amount, an amount of not less than $7,700,000 of such Permitted Pulitzer Debt Refinancing Incremental Amount shall be applied, subject to Section 5.05, to prepay the Term Loans in the manner set forth in Section 5.02(c);

(xii)    additional    unsecured    subordinated    Indebtedness    of    the    Borrower ("Additional Permitted Indebtedness"), so long as (i) no Default or Event of Default then exists or would result from the incurrence or issuance of any such Additional Permitted Indebtedness, (ii) the Borrower shall have given the Administrative Agent at least five Business Days prior written notice of the incurrence or issuance of any such Additional Permitted Indebtedness, the Borrower shall have delivered to the Administrative Agent a certificate executed by an Authorized Officer of the Borrower setting forth (in reasonable detail) the recalculation of the Lee Interest Expense Coverage Ratio and the Lee Leverage Ratio on a Pro Forma Basis for the Calculation Period then most recently ended prior to the date of such incurrence or issuance for which financial statements have been delivered to the Lenders under this Agreement (and determined as if such Additional Permitted Indebtedness had been incurred or issued on the first day of, and had remained outstanding throughout, such Calculation Period, and also taking into account the aggregate principal amount of all other Additional Permitted Indebtedness theretofore incurred or issued after the first day of such Calculation Period), and such recalculation shall show that the Borrower would have been in compliance with Sections 10.08 and 10.09 as of the last day of such Calculation Period, (iii) such Additional Permitted Indebtedness (A) is not guaranteed by any Subsidiary of the Borrower that is not a Subsidiary Guarantor, (B) matures no earlier than 180 days after the Maturity Date for the Facilities, (C) requires no payment of principal (whether by way of scheduled amortization, mandatory redemption, mandatory prepayment, sinking fund or otherwise) prior to its maturity, except (x) upon the occurrence of a change of control (the definition of which shall be acceptable to the Administrative Agent) so long as the terms thereof do not require any such redemption or other action unless (and until) all Obligations under the Facilities have been paid in full and the Total Commitment and all Letters of Credit have been terminated or the requisite consents under this Agreement have been obtained to permit such redemption or other action upon the occurrence of a change of control and (y) as a customary mandatory offer to repurchase following an asset sale, (D) does not require the Borrower or any of its Subsidiaries to maintain any specified financial condition (whether stated as a covenant, event of default or otherwise), and (E) contains subordination and other provisions that are reasonably satisfactory to the Administrative Agent and (iv) 100% of the Net Cash Proceeds of the respective issuance or incurrence of such Additional Permitted Indebtedness, after any application thereof to any outstanding Second Lien Term Loans, are applied as a mandatory repayment in accordance with Section 5.02(c);

(xiii)    Indebtedness under the Second Lien Loan Documents in an aggregate principal amount not to exceed $175,000,000 (less the amount of any repayments of

-98-

principal thereof after the Conversion Date); and

(xiv)    additional second lien Indebtedness of the Borrower ("Additional Second Lien Indebtedness"), so long as (i) the proceeds of such Indebtedness are used solely to refinance the  Second Lien Term Loans and all other obligations outstanding under the Second Lien Loan Documents in full and/or repay Loans outstanding at such time pursuant to clause (v) below and to pay any fees and expenses incurred in connection with obtaining such Indebtedness, (ii) no Default or Event of Default then exists or would result from the incurrence or issuance of any such Additional Second Lien Indebtedness, (iii) at least five Business Days prior to the incurrence or issuance of any such Additional Second Lien Indebtedness, the Borrower shall have delivered to the Administrative Agent a certificate executed by an Authorized Officer of the Borrower setting forth (in reasonable detail) the recalculation of the Lee Interest Expense Coverage Ratio and the Lee Leverage Ratio on a Pro Forma Basis for the Calculation Period then most recently ended prior to the date of such incurrence or issuance for which financial statements have been delivered to the Lenders under this Agreement (and determined as if such Additional Second Lien Indebtedness had been incurred or issued on the first day of, and had remained outstanding throughout, such Calculation Period, and also taking into account the aggregate principal amount of all other Additional Second Lien Indebtedness theretofore incurred or issued after the first day of such Calculation Period), and such recalculation shall show that the Borrower would have been in compliance with Sections 10.08 and 10.09 as of the last day of such Calculation Period, (iv) such Additional Second Lien Indebtedness (A) matures no earlier than 180 days after the Maturity Date for the Facilities, and in any event no earlier than any Second Lien Term Loans, (B) shall have terms, taken as a whole, that are not materially worse than the terms of the Second Lien Term Loans, and, in any event, shall not require (I) any payment of principal (whether by way of scheduled amortization, mandatory redemption, mandatory prepayment, sinking fund or otherwise) prior to the date which is 180 days after the Maturity Date for the Facilities, or (II) the Borrower or any of its Subsidiaries to maintain any specified financial condition (whether stated as a covenant, event of default or otherwise), and (C) shall be subject to the Intercreditor Agreement, (v) 100% of the Net Cash Proceeds of the respective issuance or incurrence of such Additional Second Lien Indebtedness, after any application thereof to the outstanding Second Lien Term Loans, are applied as a mandatory repayment in accordance with Section 5.02(c)(ii), and (vi) all of the other terms and conditions thereof (and the Additional Second Lien Indebtedness Documents) are in form and substance reasonably satisfactory to the Administrative Agent.

10.05    Advances, Investments and Loans.  The Borrower will not, and will not permit any of its Subsidiaries to, directly or indirectly, lend money or credit or make advances to any Person, or purchase or acquire any stock, obligations or securities of, or any other Equity Interest in, or make any capital contribution to, any other Person, or purchase or own a futures contract or otherwise become liable for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract, or hold any cash or Cash Equivalents (each of the foregoing an "Investment" and, collectively, "Investments"), except that the following shall be permitted:

-99-

(i)    the Borrower and its Subsidiaries may acquire and hold accounts receivable owing to any of them, if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms of the Borrower or such Subsidiary;

(ii)    the Borrower and its Subsidiaries may acquire and hold cash and Cash Equivalents, provided that during any time that Revolving Loans or Swingline Loans are outstanding, the aggregate amount of Unrestricted cash and Cash Equivalents permitted to be held by the Borrower and its Subsidiaries (excluding Excluded Domestic Subsidiaries) (the "Aggregate Cash Amount") shall not exceed $25,000,000 for any period of five consecutive Business Days, provided, further, that if the Aggregate Cash Amount exceeds $25,000,000 for any period of five consecutive Business Days while Revolving Loans or Swingline Loans are outstanding, the Borrower shall prepay the Loans (without reduction to the Revolving Loan Commitments) in an amount equal to the lesser of (x) the aggregate amount of Revolving Loans and Swingline Loans outstanding and (y) the amount by which the Aggregate Cash Amount exceeds $20,000,000;

(iii)    the Borrower and its Subsidiaries may hold the Investments held by them on the Petition Date to the extent continued to be held by them on, and after giving effect to, the Conversion Date  and described on Schedule IX, provided that any additional Investments made with respect thereto shall be permitted only if permitted under the other provisions of this Section 10.05;

(iv)    the Borrower and its Subsidiaries may acquire and own investments (including debt obligations) received in connection with the bankruptcy or reorganization of suppliers and customers and in good faith settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the ordinary course of business;

(v)    the Borrower and its Subsidiaries may make loans and advances to their officers and employees for moving, relocation and travel expenses and other similar expenditures, in each case in the ordinary course of business in an aggregate outstanding amount not to exceed $2,500,000 at any time (determined without regard to any write-downs or write-offs of such loans and advances);

(vi)    the Borrower may acquire and hold obligations of the officers and employees of the Borrower or any of its Subsidiaries in connection with such officers' and employees' acquisition of shares of common Equity Interests of the Borrower so long as no cash is actually advanced by the Borrower or any of its Subsidiaries in connection with the acquisition of such Equity Interests;

(vii)    the Borrower may enter into Interest Rate Protection Agreements and Other Hedging Agreements to the extent permitted by Section 10.04(iii);

(viii)    (A)(I) the Borrower and its Wholly-Owned Domestic Subsidiaries may make intercompany loans and advances between and among one another and (II) Qualified Wholly-Owned Foreign Subsidiaries may make intercompany loans and advances between and among one another and to the Borrower and the Qualified Wholly-

-100-

Owned Domestic Subsidiaries (all such intercompany loans and advances pursuant to this Section 10.05(viii), other than under clause (B) below, collectively, the "Intercompany Loans"), provided that (x) Intercompany Loans made by the Borrower and the Qualified Wholly-Owned Domestic Subsidiaries to Wholly-Owned Domestic Subsidiaries that are not Qualified Wholly-Owned Domestic Subsidiaries shall not be permitted (except for Intercompany Loans outstanding on the Conversion Date, together with interest accruing thereon, Intercompany Loans made for purposes permitted pursuant to Section 10.05(xiv), (xvi) and (xviii) and Intercompany Loans reflecting Pulitzer Intercompany Charges not settled in cash in amounts consistent with past practices or which arise from reasonably expected and identifiable cost-saving measures relating to goods and services not settled in cash to the extent permitted by the Pulitzer Debt Documents or any agreement governing the Permitted Pulitzer Debt Refinancing Indebtedness) and (y) each Intercompany Loan constituting Intercompany Debt shall be subject to the terms and conditions contained in the Intercompany Subordination Agreement; and (B) any Pulitzer Entity may make intercompany loans and advances to any other Pulitzer Entity;

(ix)    the Borrower and any Subsidiary Guarantor may make capital contributions to any Qualified Wholly-Owned Domestic Subsidiary Guarantor; and any Pulitzer Entity may make capital contributions to any other Pulitzer Entity;

(x)    the Borrower and its Subsidiaries may own the Equity Interests of their respective Subsidiaries created or acquired in accordance with the terms of this Agreement (so long as all amounts invested in such Subsidiaries are independently justified under another provision of this Section 10.05);

(xi)    Contingent Obligations permitted by Section 10.04, to the extent constituting Investments;

(xii)    the Borrower and its Subsidiaries may receive and hold promissory notes and other non-cash consideration received in connection with any Asset Sale permitted by Section 10.02(iv);

(xiii)    up to two Joint-Venture Transactions, provided that immediately after giving effect to each such Joint-Venture Transaction, (a) the aggregate book value of all such assets and Equity Interests contributed, sold, leased or otherwise transferred, and all Equity Interests issued, to Persons other than the Borrower or a Subsidiary of the Borrower pursuant to both such Joint-Venture Transactions subsequent to the Conversion Date shall not exceed (x) $35,000,000 for one Joint-Venture Transaction and (y) $25,000,000 for the other Joint-Venture Transaction, (b) with respect to such Joint-Venture Transaction exceeding $25,000,000, such joint venture is a Subsidiary of the Borrower, (c) cash contributed to such joint ventures shall not exceed $250,000 in the aggregate for each such Joint-Venture Transaction and (d) the Equity Interests of the Borrower and its Subsidiaries in each such joint venture shall be pledged to secure the Obligations pursuant to Section 9.12;

(xiv)    (A) Investments made in connection with the funding of contributions under qualified or non-qualified pension, retirement or similar employee compensation

-101-

plan, including without limitation split-dollar insurance policies, in such amounts consistent with applicable law and the Borrower's and its Subsidiaries' past practices, provided that any such contributions by the Borrower and the Qualified Wholly-Owned Domestic Subsidiaries to Wholly-Owned Domestic Subsidiaries that are not Qualified Wholly-Owned Domestic Subsidiaries shall not exceed $2,000,000 in any fiscal year of the Borrower (including, for the avoidance of doubt, for the applicable fiscal year, any such Investments made after the Petition Date but prior to the Conversion Date) and (B) the contribution of equity interests in or assets of Sandler Capital Partners V, L.P. to one or more qualified or non-qualified pension, retirement or similar employee compensation plans;

(xv)    Investments in the Associated Press Digital Rights Agency or any successor thereto or any Affiliate thereof in an aggregate amount not to exceed $1,500,000 at any time outstanding;

(xvi)    payments or deliveries to be made to satisfy certain obligations owed to Herald as described in note 19 to the Borrower's Annual Report on Form 10-K for the fiscal year ended September 26, 2010; provided that any such payments or deliveries made by the Borrower and the Qualified Wholly-Owned Domestic Subsidiaries to Wholly-Owned Domestic Subsidiaries that are not Qualified Wholly-Owned Domestic Subsidiaries shall not exceed $3,500,000 in the aggregate;

(xvii)    Investments of up to a $1,000,000 cash Investment in Metrix4Media for up to 8% of the Equity Interests of such Person, (II) up to a $1,000,000 cash Investment in Kaango for up to 5% of the Equity Interests of such Person and (III) up to a $1,000,000 cash Investment in The Port for up to 9% of the Equity Interests of such Person; and

(xviii)    in addition to Investments permitted by clauses (i) through (xvii) of this Section 10.05, the Borrower and its Subsidiaries may make additional loans, advances and other Investments to or in a Person in an aggregate amount for all loans, advances and other Investments (determined without regard to any write-downs or write-offs thereof), net of cash repayments of principal in the case of loans, sale proceeds in the case of Investments in the form of debt instruments and cash equity returns (whether as a distribution, dividend, redemption or sale) in the case of equity investments, not to exceed $2,000,000 in any fiscal year, provided that no such Investments may be used, directly or indirectly, to purchase, repurchase, redeem, defease or otherwise acquire or retire for value any (i) Additional Permitted Indebtedness, (ii) unsecured Indebtedness of the Borrower or a Subsidiary Guarantor, (iii) junior lien obligations of the Borrower or a Subsidiary Guarantor, including without limitation, the Second Lien Term Loans and any Additional Second Lien Indebtedness, or (iv) the Pulitzer Debt or any Permitted Pulitzer Debt Refinancing Indebtedness.

10.06    Transactions with Affiliates.  The Borrower will not, and will not permit any of its Subsidiaries to, enter into any transaction or series of related transactions with any Affiliate of the Borrower or any of its Subsidiaries, other than in the ordinary course of business and on terms and conditions substantially as favorable to the Borrower or such Subsidiary as would reasonably be obtained by the Borrower or such Subsidiary at that time in a comparable

-102-

arm's-length transaction with a Person other than an Affiliate, except that the following in any event shall be permitted:

(i)       Dividends may be paid to the extent provided in Section 10.03;

(ii)      loans may be made and other transactions may be entered into by the Borrower and its Subsidiaries to the extent permitted by Sections 10.02, 10.04 and 10.05;

(iii)     customary fees may be paid to non-officer directors of the Borrower and its Subsidiaries;

(iv)      the Borrower may issue shares of its Equity Interests as otherwise permitted by this Agreement;

(v)       the Borrower and its Subsidiaries may enter into, and may make payments under, employment agreements, employee benefits plans, stock option plans, indemnification provisions and other similar compensatory arrangements with officers, employees and directors of the Borrower and its Subsidiaries in the ordinary course of business;

(vi)      (x) Subsidiaries of the Borrower may pay management fees, licensing fees and similar fees to the Borrower or to any Qualified Wholly-Owned Domestic Subsidiary and (y) Subsidiaries of the Borrower which are not Qualified Subsidiaries may pay management fees, licensing fees and similar fees to any Subsidiary of the Borrower which is not a Qualified Wholly-Owned Domestic Subsidiary;

(vii)     the Credit Parties may enter into, and may exercise their respective rights and perform their respective obligations under and pursuant to, the Credit Documents, the Second Lien Loan Documents and the Additional Second Lien Indebtedness Documents, as applicable, in each case as in effect on, and after giving effect to, the Conversion Date (or, if later, the original date thereof) and as thereafter amended or modified in accordance with the terms thereof and hereof;

(viii)    the Borrower may repay in cash, on the Conversion Date, to the holders of the Pulitzer Debt, on behalf of PD LLC, outstanding principal under the Pulitzer Debt in an amount not to exceed $5,000,000 in the aggregate; provided, that the principal amount of the Intercompany Loan outstanding on the Conversion Date in the aggregate principal amount of $[260,000,000] payable by the Borrower to Pulitzer shall automatically be reduced dollar-for-dollar by the amount so paid by the Borrower in respect of the Pulitzer Debt;

(ix)      the Pulitzer Entities may pay or reimburse fees and expenses payable to counsel for, and financial advisers to, (x) the Borrower and its Subsidiaries (including the Pulitzer Entities), (y) the "Noteholders" under and as defined in the Pulitzer Debt Agreement, and (z) the other parties to the Pulitzer Debt Documents, in each case in connection with the issuance of the Notes as contemplated by (and as defined in) the Pulitzer Debt Agreement and each of the other transactions contemplated thereunder, under the Support Agreement and under the Plan of Reorganization;

-103-

(x)    the Pulitzer Entities may enter into, and may exercise their respective rights and perform their respective obligations under and pursuant to, the Pulitzer Debt Documents and the documentation governing any Permitted Pulitzer Debt Refinancing Indebtedness, as applicable, in each case as in effect on, and after giving effect to, the Conversion Date (or, if later, the original date thereof) and as thereafter amended or modified in accordance with the terms thereof and hereof; and

(xi)    the Borrower and its Subsidiaries may engage in the activities described on Schedule XI.

Notwithstanding anything to the contrary contained in this Agreement, except to the extent expressly permitted by clauses (i) through (x) above, the transactions between the Borrower and its Subsidiaries (other than Pulitzer and its Subsidiaries) on the one hand, and Pulitzer and its Subsidiaries on the other hand, shall be limited to those activities described on Schedule XI.

10.07    Capital Expenditures.

(a)    The Borrower will not, and will not permit any of its Subsidiaries to, make any Capital Expenditures, except that the Borrower and its Subsidiaries may make Capital Expenditures during any fiscal year of the Borrower (taken as one accounting period) so long as the aggregate amount of such Capital Expenditures does not exceed $20,000,000 during such fiscal year.

(b)    In addition to the foregoing, in the event that the amount of Capital Expenditures permitted to be made by the Borrower and its Subsidiaries pursuant to clause (a) above in any fiscal year of the Borrower (before giving effect to any increase in such permitted Capital Expenditure amount pursuant to this clause (b)) is greater than the amount of Capital Expenditures actually made by the Borrower and its Subsidiaries during such fiscal year, the lesser of (x) such excess and (y) 50% of the applicable permitted scheduled Capital Expenditure amount as set forth in such clause (a) above for such fiscal year may be carried forward and utilized to make Capital Expenditures in the immediately succeeding fiscal year, provided that (x) no amounts once carried forward pursuant to this Section 10.07(b) may be carried forward to any fiscal year of the Borrower thereafter and (y) no amounts may be carried forward pursuant to this Section 10.07(b) in respect of any fiscal year of the Borrower ended prior to the Conversion Date.

(c)    In addition to the foregoing, the Borrower and its Subsidiaries may make additional Capital Expenditures (which Capital Expenditures will not be included in any determination under Section 10.07(a) or (b)) with the amount of Net Cash Proceeds received by the Borrower or any of its Subsidiaries from any Recovery Event so long as such Net Cash Proceeds are used to replace or restore any properties or assets in respect of which such Net Cash Proceeds were paid within 360 days following the date of receipt of such Net Cash Proceeds from such Recovery Event, but only to the extent that such Net Cash Proceeds are not otherwise required to be applied as a mandatory repayment and/or commitment reduction pursuant to Section 5.02(f) or the corresponding provision of the Pulitzer Debt Documents or with respect to Permitted Pulitzer Refinancing Indebtedness.

-104-

10.08   Lee Interest Expense Coverage Ratio.  The Borrower will not permit the Lee Interest Expense Coverage Ratio for any Test Period ending on the last day of a fiscal quarter of the Borrower ending on or closest to the relevant date set forth below to be less than the ratio set forth opposite such fiscal quarter below:

| Fiscal Quarter Ending on or Closest to | Ratio |
|---|---|
| March 31, 2012 | 1.50:1.00 |
| June 30, 2012 | 1.50:1.00 |
| September 30, 2012 | 1.25:1.00 |
| December 31, 2012 | 1.10:1.00 |
| March 31, 2013 through September 30, 2014 | 1.08:1.00 |
| December 31, 2014 through December 31, 2015 | 1.10:1.00 |

10.09   Lee Leverage Ratio.

The Borrower will not permit the Lee Leverage Ratio at any time during a period set forth below to be greater than the ratio set forth opposite such period below:

| Period | Ratio |
|---|---|
| From the Conversion Date through and including the day before the last day of the Borrower's fiscal quarter ending on or closest to September 30, 2013 | 10.00:1.00 |
| The last day of the Borrower's fiscal quarter ending on or closest to September 30, 2013 through and including the day before the last day of the Borrower's fiscal quarter ending on or closest to June 30, 2014 | 9.90:1.00 |
| The last day of the Borrower's fiscal quarter ending on or closest to June 30, 2014 through and including the day before the last day of the Borrower's fiscal quarter ending on or closest to September 30, 2014 | 9.70:1.00 |
| The last day of the Borrower's fiscal quarter ending on or closest to September 30, 2014 through and including the day before the last day of the Borrower's fiscal quarter ending on or closest to December 31, 2014 | 9.60:1.00 |
| The last day of the Borrower's fiscal quarter ending on or closest to December 31, 2014 through and including the day before the last day of the Borrower's fiscal quarter ending on or closest to June 30, 2015 | 9.50:1.00 |

-105-

| Period | Ratio |
|:---:|:---:|
| The last day of the Borrower's fiscal quarter ending on or closest to June 30, 2015 through and including the day before the last day of the Borrower's fiscal quarter ending on or closest to September 30, 2015 | 9.30:1.00 |
| The last day of the Borrower's fiscal quarter ending on or closest to September 30, 2015 through and including the day before the last day of the Borrower's fiscal quarter ending on or closest to December 31, 2015 | 9.20:1.00 |
| The last day of the Borrower's fiscal quarter ending on or closest to December 31, 2015 | 9.10:1.00 |

10.10  <u>Modifications of Second Lien Loan Documents, Certificate of Incorporation, By-Laws and Certain Other Agreements; Limitations on Voluntary Payments, etc</u>.

The Borrower will not, and will not permit any of its Subsidiaries to:

(i)    amend, modify or change its certificate or articles of incorporation (including, without limitation, by the filing or modification of any certificate or articles of designation), certificate of formation, limited liability company agreement or by-laws (or the equivalent organizational documents), as applicable, or any agreement entered into by it with respect to its capital stock or other Equity Interests (including any Shareholders' Agreement) in any material respect, or enter into any new agreement with respect to its capital stock or other Equity Interests, unless such amendment, modification, change or other action contemplated by this clause (i) could not reasonably be expected to be adverse to the interests of the Lenders in any material respect;

(ii)    amend, modify or change any provision of any Tax Sharing Agreement or enter into any new tax sharing agreement, tax allocation agreement or similar agreement without the prior written consent of the Administrative Agent;

(iii)    make any payment or prepayment on or redemption, repurchase or acquisition for value of (including, without limitation, by way of depositing with the trustee with respect thereto or any other Person money or securities before due for the purpose of paying when due), or any prepayment or redemption as a result of any asset sale or similar event, of principal of the Pulitzer Debt, the Pulitzer Debt Guaranty or the Permitted Pulitzer Debt Refinancing Indebtedness, <u>provided</u> that (w) the Pulitzer Entities may make optional or voluntary payments or prepayments on or redemptions, repurchases or acquisitions for value of the Pulitzer Debt or any Permitted Pulitzer Debt Refinancing Indebtedness, (x) the Pulitzer Entities may make payments on the Pulitzer Debt or any Permitted Pulitzer Debt Refinancing Indebtedness at par (A) in connection with a Change of Control (as defined in the Pulitzer Debt Agreement or any documents evidencing Permitted Pulitzer Debt Refinancing Indebtedness) as required pursuant to the Pulitzer Debt Agreement as in effect on, and after giving effect to, the Conversion Date

-106-

(or subject to substantially the same terms in documents evidencing Permitted Pulitzer Debt Refinancing Indebtedness), (B) with proceeds of Asset Sales and/or Recovery Events to the extent representing proceeds from assets of Pulitzer and its Subsidiaries or (C) to the extent permitted by Section 10.06(viii), (y) the Pulitzer Entities may make amortization payments of the Pulitzer Debt or any Permitted Pulitzer Debt Refinancing Indebtedness in an aggregate amount in any fiscal year not to exceed $6,400,000, and (z) the Pulitzer Entities may make periodic payments from excess cash flow as required pursuant to the Pulitzer Debt Agreement as in effect on, and after giving effect to, the Conversion Date (or subject to the same terms in documents evidencing Permitted Pulitzer Debt Refinancing Indebtedness);

(iv)     amend or modify, or permit the amendment or modification of, any provision of any Pulitzer Debt Document, the PD LLC Indemnity Agreement or any indenture, purchase agreement, loan agreement, security document or other agreement or instrument relating to the Permitted Pulitzer Debt Refinancing Indebtedness, in each case other than such amendments or modifications (i) with the prior written consent of the Administrative Agent or (ii) which could not reasonably be expected to be adverse to the Lenders in any material respect; provided, that any such amendment or modification the effect of which is to (w) increase or effectively increase the interest rates or yield (in each case whether payable in cash or in-kind) applicable to any Indebtedness thereunder from such rates or yield as in effect on, and after giving effect to, the Conversion Date (or, in the case of Permitted Pulitzer Debt Refinancing Indebtedness, the date such Indebtedness is incurred in accordance with the terms of this Agreement), (x) grant a Lien (other than a Permitted Lien) securing any Indebtedness thereunder on all or any portion of the Collateral, (y) prohibit the performance by the Credit Parties of their obligations under the Credit Documents or (z) make the terms thereof, in the aggregate, more burdensome to the applicable Credit Parties in any material respect than the terms thereof as in effect on, and after giving effect to, the Conversion Date or as thereafter amended or modified in accordance with the terms thereof and hereof (including, without limitation, this Section 10.10(iv)), shall, in each case described in preceding clauses (w), (x), (y) and (z), be deemed to be materially adverse to the Lenders;

(v)     make (or give any notice in respect of) any voluntary or optional payment or prepayment on or redemption, repurchase or acquisition for value of, or any prepayment or redemption as a result of any asset sale, change of control or similar event of (including, in each case without limitation, by way of depositing with the trustee with respect thereto or any other Person money securities before due for the purpose of paying when due), any Additional Permitted Indebtedness; or

(vi)     after the execution and delivery thereof, amend or modify, or permit the amendment or modification of, any provision of any indenture, purchase agreement or other document, agreement or note relating to (or evidencing) any Additional Permitted Indebtedness (or any guaranty thereof); or

(vii)     make (or give any notice in respect of) any voluntary or optional payment or prepayment on or redemption, repurchase or acquisition for value of, or any prepayment or redemption as a result of any asset sale, change of control or similar event

-107-

of (including, in each case without limitation, by way of depositing with the trustee with respect thereto or any other Person money securities before due for the purpose of paying when due), any Second Lien Term Loans or any Additional Second Lien Indebtedness, except that the Second Lien Term Loans may be prepaid with the proceeds of Additional Second Lien Indebtedness or of Additional Permitted Indebtedness or from the issuance of Qualified Preferred Stock, <u>provided</u> that, in each case, the Borrower otherwise complies with the requirements of Section 5.02(c); or

(viii)    amend or modify, or permit the amendment or modification of, any provision of any Second Lien Loan Documents or the Additional Second Lien Indebtedness Documents, other than any such amendments or modifications (i) with the prior written consent of the Administrative Agent or (ii) which could not reasonably be expected to be adverse to the Lenders in any material respect; <u>provided</u>, that any such amendment or modification the effect of which is to (w) increase or effectively increase the interest rates or yield (in each case whether payable in cash or in-kind) applicable to any Indebtedness under any Second Lien Loan Document or Additional Second Lien Indebtedness, in each case from such respective rates or yield as in effect on, and after giving effect to, the Conversion Date or, in the case of any Additional Second Lien Indebtedness, the original date of incurrence thereof, (x) grant a Lien (other than a Permitted Lien) securing any Indebtedness thereunder on all or any portion of the Collateral which is not subordinated to the Obligations pursuant to the Intercreditor Agreement or subordinate the Lien securing the "Obligations" (as defined in the Second Lien Loan Agreement or any Additional Second Lien Indebtedness) on all or any portion of the Collateral to any Lien securing any Indebtedness not constituting Obligations, (y) prohibit the performance by the Credit Parties of their obligations under the Credit Documents or (z) make the terms thereof, in the aggregate, more burdensome to the applicable Credit Parties in any material respect than the terms thereof as in effect on, and after giving effect to, the Conversion Date or as thereafter amended or modified in accordance with the terms thereof and hereof (including, without limitation, this Section 10.10(viii)), shall, in each case described in preceding clauses (w), (x), (y) and (z), be deemed to be materially adverse to the Lenders;

Notwithstanding anything to the contrary contained herein or in any other Credit Document, in no event shall (x) the Borrower or any of its Subsidiaries (other than Pulitzer and its Subsidiaries) be permitted to pay any fee to the holders of the Pulitzer Debt (or any agent or advisor in respect thereof) in connection with any amendment, modification, change or waiver of, or forbearance with respect to, any term or provision of any Pulitzer Debt Document or Permitted Pulitzer Debt Refinancing Indebtedness or, except as otherwise permitted in Section 10.06, make any other payment on behalf of Pulitzer or any of its Subsidiaries, (y) the Borrower or any of its Subsidiaries (other than Pulitzer and its Subsidiaries) be permitted to prepay or repay any amounts (including in respect of interest) owing to Pulitzer or any of its Subsidiaries in respect of any Intercompany Loans or other Intercompany Debt (other than as otherwise permitted in Section 10.06(viii) and other than the set-off and netting arrangements as, and to the extent, described on Schedule XI) or (z) the Borrower or any of its Subsidiaries be permitted to make any payments (whether in cash, property or securities) to Herald or any of its Affiliates in satisfaction of the obligations owed to Herald as described in note 19 to the Borrower's Annual

-108-

Report on Form 10-K for the fiscal year ended September 26, 2010, except as otherwise permitted by Section 10.03(v) and 10.05(xvi).

10.11   <u>Limitation on Certain Restrictions on Subsidiaries</u>.  The Borrower will not, and will not permit any of its Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any encumbrance or restriction on the ability of any such Subsidiary to (a) pay dividends or make any other distributions on its capital stock or any other Equity Interest or participation in its profits owned by the Borrower or any of its Subsidiaries, or pay any Indebtedness owed to the Borrower or any of its Subsidiaries, (b) make loans or advances to the Borrower or any of its Subsidiaries or (c) transfer any of its properties or assets to the Borrower or any of its Subsidiaries, except for such encumbrances or restrictions existing under or by reason of (i) applicable law, (ii) this Agreement and the other Credit Documents, (iii) the Pulitzer Debt Documents as in effect on, and after giving effect to, the Conversion Date and the Permitted Pulitzer Debt Refinancing Indebtedness (as in effect at the time of the issuance or incurrence thereof so long as such encumbrances or restrictions are no more restrictive in any material respect than those encumbrances or restrictions set forth in the Pulitzer Debt Documents as in effect on, and after giving effect to, the Conversion Date), in each case so long as such restrictions apply solely to Pulitzer and/or its applicable Subsidiaries, (iv) the Second Lien Loan Documents as in effect on, and after giving effect to, the Conversion Date and the Additional Second Lien Indebtedness Documents (as in effect at the time of the issuance or incurrence thereof so long as such restrictions are no more restrictive in any material respect than those restrictions set forth in the Second Lien Loan Documents as in effect on, and after giving effect to, the Conversion Date), (v) customary provisions restricting subletting or assignment of any lease governing any leasehold interest of the Borrower or any of its Subsidiaries, (vi) customary provisions restricting assignment of any licensing agreement (in which the Borrower or any of its Subsidiaries is the licensee) or other contract entered into by the Borrower or any of its Subsidiaries in the ordinary course of business, (vii) restrictions on the transfer of any asset pending the close of the sale of such asset, and (vii) restrictions on the transfer of any asset subject to a Lien permitted by Section 10.01(iii), (vi), (vii), (x), (xiii), (xiv) or (xv).

10.12   <u>Limitation on Issuance of Equity Interests</u>.  (a)  The Borrower will not, and will not permit any of its Subsidiaries to, issue (i) any Preferred Equity (other than Qualified Preferred Stock of the Borrower) or (ii) any redeemable common stock or other redeemable common Equity Interests other than common stock or other redeemable common Equity Interests that is or are redeemable at the sole option of the Borrower or such Subsidiary, as the case may be.

(b)     The Borrower will not permit any of its Subsidiaries to issue any capital stock or other Equity Interests (including by way of sales of treasury stock) or any options or warrants to purchase, or securities convertible into, capital stock or other Equity Interests, except (i) for transfers and replacements of then outstanding shares of capital stock or other Equity Interests, (ii) for stock splits, stock dividends and issuances which do not decrease the percentage ownership of the Borrower or any of its Subsidiaries in any class of the capital stock or other Equity Interests of such Subsidiary, (iii) in the case of Foreign Subsidiaries of the Borrower, to qualify directors and other nominal amounts held by local nationals in each case to the extent required by applicable law, or (iv) for issuances by Subsidiaries of the Borrower which are newly created or acquired in accordance with the terms of this Agreement.

-109-

10.13  Business; etc.  The Borrower will not, and will not permit any of its Subsidiaries to, engage directly or indirectly in any business other than the businesses engaged in by the Borrower and its Subsidiaries as of the Conversion Date and with reasonable extensions thereof and business ancillary or complimentary thereto.

10.14  Limitation on Creation of Subsidiaries.  The Borrower will not, and will not permit any of its Subsidiaries to, establish, create or acquire after the Conversion Date any Subsidiary, provided that (x) the Borrower and its Wholly-Owned Subsidiaries shall be permitted to establish, create and, to the extent permitted by this Agreement, acquire Wholly-Owned Subsidiaries, and (y) the Borrower and its Subsidiaries shall be permitted to establish, create and acquire Non-Wholly Owned Subsidiaries to the extent permitted by Section 10.05(xviii) so long as (i) at least 5 days' prior written notice thereof is given by the Borrower to the Administrative Agent (or such shorter period of time as is acceptable to the Administrative Agent in any given case), (ii) the capital stock or other Equity Interests of such new Subsidiary are promptly pledged pursuant to, and to the extent required by, this Agreement and the Pledge Agreement and the certificates, if any, representing such stock or other Equity Interests, together with stock or other appropriate powers duly executed in blank, are delivered to the Collateral Agent, and (iii) each such new Domestic Subsidiary (and, to the extent required by Section 9.14, each such new Foreign Subsidiary) executes a counterpart of the Subsidiaries Guaranty, the Security Agreement, the Pledge Agreement and the Intercompany Subordination Agreement; provided, however, until such time as Pulitzer and its Domestic Subsidiaries become Qualified Wholly-Owned Domestic Subsidiaries, any such Person that is not a Qualified Wholly-Owned Domestic Subsidiary may not acquire any new Subsidiary pursuant to an Investment made pursuant to Section 10.05(xviii).  In addition, each new Subsidiary that is required to execute any Credit Document shall execute and deliver, or cause to be executed and delivered, all other relevant documentation (including opinions of counsel) of the type described in each of (x) Section 6 as such new Subsidiary would have had to deliver if such new Subsidiary were a Credit Party on the Conversion Date and (y) Section 9.14 as each such Excluded Domestic Subsidiary would have had to deliver if it were a Credit Party on the Conversion Date.

SECTION 11. Events of Default.

Upon the occurrence of any of the following specified events (each, an "Event of Default"):

11.01  Payments.  The Borrower shall (i) default in the payment when due of any principal of any Loan, Note or Unpaid Drawing or (ii) default, and such default shall continue unremedied for three or more Business Days, in the payment when due of any interest on any Loan, Note or Unpaid Drawing or any Fees or any other amounts owing hereunder or under any other Credit Document; or

11.02  Representations, etc.  Any representation, warranty or statement made or deemed made by any Credit Party herein or in any other Credit Document or in any certificate delivered to the Administrative Agent or any Lender pursuant hereto or thereto shall prove to be untrue in any material respect on the date as of which made or deemed made; or

-110-

11.03   Covenants.  (i)(A)The Borrower or any of its Subsidiaries shall default in the due performance or observance by it of any term, covenant or agreement contained in Section 9.01(f)(i), 9.08, 9.11, 9.15 or Section 10 or (B) the Borrower shall default in the due performance or observance by it of any term, covenant or agreement contained in Section 9.04 or (ii) the Borrower or any of its Subsidiaries shall default in the due performance or observance by it of any other term, covenant or agreement contained in this Agreement (other than those set forth in Sections 11.01 and 11.02) and such default shall continue unremedied for a period of 30 days after written notice thereof to the defaulting party by the Administrative Agent or the Required Lenders; or

11.04   Default Under Other Agreements.   (i) The Borrower or any of its Subsidiaries shall (x) default in any payment of any Indebtedness (other than the Obligations) beyond the period of grace, if any, provided in an instrument or agreement under which such Indebtedness was created or (y) default in the observance or performance of any agreement or condition relating to any Indebtedness (other than the Obligations) or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause (determined without regard to whether any notice is required), any such Indebtedness to become due (and/or, in the case of an Interest Rate Protection Agreement or Other Hedging Agreement, to be terminated) prior to its stated maturity, or (ii) any Indebtedness (other than the Obligations) of the Borrower or any of its Subsidiaries shall be declared to be (or shall become) due and payable (and/or, in the case of an Interest Rate Protection Agreement or Other Hedging Agreement, to be terminated), or required to be prepaid (and/or terminated, as the case may be) other than by a regularly scheduled required prepayment, prior to the stated maturity thereof, <u>provided</u> that it shall not be a Default or an Event of Default under this Section 11.04 unless the aggregate principal amount of all Indebtedness as described in preceding clauses (i) and (ii) is at least $10,000,000 or unless such Indebtedness is in respect of the Second Lien Term Loans, the Additional Second Lien Indebtedness, the Pulitzer Debt, the Permitted Pulitzer Debt Refinancing Indebtedness or the Additional Permitted Indebtedness; provided, however, that with respect to any default under Section 5.1 of the Pulitzer Debt Guaranty or any analogous financial maintenance covenants in any Permitted Pulitzer Debt Refinancing Indebtedness (such default, a "Pulitzer Financial Covenant Default"), such default shall only constitute an Event of Default hereunder if such default occurs and is not cured or waived within 30 days after the occurrence of such default; or

11.05   Bankruptcy, etc.  The Borrower or any of its Subsidiaries shall commence a voluntary case concerning itself under Title 11 of the United States Code entitled "Bankruptcy," as now or hereafter in effect, or any successor thereto (the "Bankruptcy Code"); or an involuntary case is commenced against the Borrower or any of its Subsidiaries, and the petition is not controverted within 15 days, or is not dismissed within 60 days after the filing thereof; or a custodian (as defined in the Bankruptcy Code) is appointed for, or takes charge of, all or substantially all of the property of the Borrower or any of its Subsidiaries, to operate all or any substantial portion of the business of the Borrower or any of its Subsidiaries, or the Borrower or any of its Subsidiaries commences any other proceeding under any reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction whether now or hereafter in effect relating to the Borrower or any

-111-

of its Subsidiaries, or there is commenced against the Borrower or any of its Subsidiaries any such proceeding which remains undismissed for a period of 60 days after the filing thereof, or the Borrower or any of its Subsidiaries is adjudicated insolvent or bankrupt; or any order of relief or other order approving any such case or proceeding is entered; or the Borrower or any of its Subsidiaries makes a general assignment for the benefit of creditors; or any Company action is taken by the Borrower or any of its Subsidiaries for the purpose of effecting any of the foregoing; or

11.06  <u>ERISA</u>.  (a)  Any Plan shall fail to satisfy the minimum funding standard required for any plan year or part thereof under Section 412 of the Code or Section 302 of ERISA or a waiver of such standard or extension of any amortization period is requested or granted under Section 412 of the Code or Section 302 of ERISA; a Reportable Event shall have occurred; a contributing sponsor (as defined in Section 4001(a)(13) of ERISA) of a Plan subject to Title IV of ERISA shall be subject to the advance reporting requirement of PBGC Regulation Section 4043.61 (without regard to subparagraph (b)(1) thereof) and an event described in subsection .62, .63, .64, .65, .66, .67 or .68 of PBGC Regulation Section 4043 shall be reasonably expected to occur with respect to such Plan within the following 30 days; any Plan which is subject to Title IV of ERISA shall have had or is likely to have a trustee (other than a member of the board of trustees of a Plan which is a multiemployer plan  (as defined in Section 4001(a)(3) of ERISA))  appointed to administer such Plan; any Plan which is subject to Title IV of ERISA is or shall have been terminated or the subject of termination proceedings under ERISA; any Plan shall have an Unfunded Current Liability which, when added to the aggregate amount of Unfunded Current Liabilities with respect to all other Plans, exceeds the aggregate amount of such Unfunded Current Liabilities that existed on the Conversion Date by $10,000,000; a contribution required to be made with respect to a Plan or a Foreign Pension Plan has not been timely made; the Borrower or any ERISA Affiliate has incurred any liability to or on account of a Plan under Sections 409, 502(i), 502(l), 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or Sections 401(a)(29), 4971 or 4975 of the Code or on account of a group health plan (as defined in Section 607(1) of ERISA, Section 4980B(g)(2) of the Code or 45 Code of Federal Regulations Section 160.103) under Section 4980B of the Code and/or the Health Insurance Portability and Accountability Act of 1996; the Borrower or any ERISA Affiliate of the Borrower has incurred liabilities pursuant to one or more employee welfare benefit plans (as defined in Section 3(1) of ERISA) that provide benefits to retired employees or other former employees (other than as required by Section 601 of ERISA) or Plans or Foreign Pension Plans; or a "default," within the meaning of Section 4219(c)(5) of ERISA has been determined by a multiemployer plan (as defined in Section 4001(a)(3) of ERISA) to have occurred with respect to any Plan; (b) there shall result from any such event or events the imposition of a lien, the granting of a security interest, or a liability or a material risk of incurring a liability; and (c) such lien, security interest or liability, either individually or in the aggregate, has had, or could reasonably be expected to have, a Material Adverse Effect; or

11.07  <u>Security Documents</u>.  Any of the Security Documents shall cease to be in full force and effect, or shall cease to give the Collateral Agent for the benefit of the Secured Creditors the Liens, rights, powers and privileges purported to be created thereby (including, without limitation, a perfected security interest in, and Lien on, all of the Collateral, in favor of the Collateral Agent, superior to and prior to the rights of all third Persons (except as permitted by Section 10.01), and subject to no other Liens (except as permitted by Section 10.01), or any

-112-

Credit Party shall default in the due performance or observance of any term, covenant or agreement on its part to be performed or observed pursuant to any such Security Document and such default shall continue beyond the period of grace, if any, specifically applicable thereto pursuant to the terms of such Security Document; or

11.08    Subsidiaries Guaranty.    The Subsidiaries Guaranty or any provision thereof shall cease to be in full force or effect as to any Subsidiary Guarantor (except as a result of a release of any Subsidiary Guarantor in accordance with the terms of the Subsidiaries Guaranty), or any Subsidiary Guarantor or any Person acting for or on behalf of such Subsidiary Guarantor shall deny or disaffirm such Subsidiary Guarantor's obligations under the Subsidiaries Guaranty or any Subsidiary Guarantor shall default in the due performance or observance of any term, covenant or agreement on its part to be performed or observed pursuant to the Subsidiaries Guaranty; or

11.09    Intercompany    Subordination    Agreement.    The    Intercompany Subordination Agreement or any provision thereof shall cease to be in full force or effect as to the Borrower or any Subsidiary of the Borrower party thereto (except as a result of a release of any such Person in accordance with the terms of the Intercompany Subordination Agreement), or the Borrower, any Subsidiary of the Borrower or any Person acting for or on behalf of the Borrower or any Subsidiary of the Borrower shall deny or disaffirm the Borrower's or such Subsidiary's obligations under the Intercompany Subordination Agreement or the Borrower or any of its Subsidiaries shall default in the due performance or observance of any term, covenant or agreement on its part to be performed or observed pursuant to the Intercompany Subordination Agreement; or

11.10    Judgments.    One or more judgments or decrees shall be entered against the Borrower or any Subsidiary of the Borrower involving in the aggregate for the Borrower and its Subsidiaries a liability (not paid or to the extent not covered by a reputable and solvent insurance company) and such judgments and decrees either shall be final and non-appealable or shall not be vacated, discharged or stayed or bonded pending appeal for any period of 30 consecutive days, and the aggregate amount of all such judgments equals or exceeds $10,000,000; or

11.11    Change of Control.    A Change of Control shall occur; or

11.13    Intercreditor Agreement. The Liens securing the Second Lien Term Loans or the Additional Second Lien Indebtedness or any guarantees thereof shall cease, for any reason, to be validly subordinated to the Liens securing the Obligations as provided in the Intercreditor Agreement or the Intercreditor Agreement or any provision thereof shall cease to be in full force or effect, or the Borrower, any Subsidiary of the Borrower or any Person acting for or on behalf of the Borrower or any Subsidiary of the Borrower shall deny or disaffirm the Borrower's or such Subsidiary's obligations under the Intercreditor Agreement or the Borrower or any of its Subsidiaries shall default in the due performance or observance of any term, covenant or agreement on its part to be performed or observed pursuant to the Intercreditor Agreement;

then, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, the Administrative Agent, upon the written request of the Required Lenders, shall by written notice to the Borrower, take any or all of the following actions, without prejudice to the

rights of the Administrative Agent, any Lender or the holder of any Note to enforce its claims against any Credit Party (provided that, if an Event of Default specified in Section 11.05 shall occur with respect to the Borrower, the result which would occur upon the giving of written notice by the Administrative Agent as specified in clauses (i) and (ii) below shall occur automatically without the giving of any such notice):  (i) declare the Total Commitment terminated, whereupon all Commitments of each Lender shall forthwith terminate immediately and any Commitment Commission shall forthwith become due and payable without any other notice of any kind; (ii) declare the principal of and any accrued interest in respect of all Loans and the Notes and all Obligations owing hereunder and thereunder to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Credit Party; (iii) terminate any Letter of Credit which may be terminated in accordance with its terms; (iv) direct the Borrower to pay (and the Borrower agrees that upon receipt of such notice, or upon the occurrence of an Event of Default specified in Section 11.05 with respect to the Borrower, it will pay) to the Collateral Agent at the Payment Office such additional amount of cash or Cash Equivalents, to be held as security by the Collateral Agent, as is equal to the aggregate Stated Amount of all Letters of Credit issued for the account of the Borrower and then outstanding; (v) enforce, as Collateral Agent, all of the Liens and security interests created pursuant to the Security Documents; and (vi) apply any cash collateral held by the Administrative Agent pursuant to Section 5.02 to the repayment of the Obligations.

SECTION 12. The Administrative Agent.

12.01  Appointment.  The Lenders hereby irrevocably designate and appoint DBTCA as Administrative Agent (for purposes of this Section 12 and Section 13.01, the term "Administrative Agent" also shall include DBTCA in its capacity as Collateral Agent pursuant to the Security Documents) to act as specified herein and in the other Credit Documents.  Each Lender hereby irrevocably authorizes, and each holder of any Note by the acceptance of such Note shall be deemed irrevocably to authorize, the Administrative Agent to take such action on its behalf under the provisions of this Agreement, the other Credit Documents and any other instruments and agreements referred to herein or therein and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of the Administrative Agent by the terms hereof and thereof and such other powers as are reasonably incidental thereto.  The Administrative Agent may perform any of its respective duties hereunder by or through its officers, directors, agents, employees or affiliates.

12.02  Nature of Duties.  (a) The Administrative Agent shall not have any duties or responsibilities except those expressly set forth in this Agreement and in the other Credit Documents.  Neither the Administrative Agent nor any of its officers, directors, agents, employees or affiliates shall be liable for any action taken or omitted by it or them hereunder or under any other Credit Document or in connection herewith or therewith, unless caused by its or their gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).  The duties of the Administrative Agent shall be mechanical and administrative in nature; the Administrative Agent shall not have by reason of this Agreement or any other Credit Document a fiduciary relationship in respect of any Lender or the holder of any Note; and nothing in this Agreement or in any other Credit Document, expressed or implied, is intended to or shall be so construed as to impose upon the

-114-

Administrative Agent any obligations in respect of this Agreement or any other Credit Document except as expressly set forth herein or therein.

(b)     Notwithstanding any other provision of this Agreement or any provision of any other Credit Document, the Joint Lead Arrangers and the Joint Book Running Managers and are named as such for recognition purposes only, and in their respective capacities as such shall have no powers, duties, responsibilities or liabilities with respect to this Agreement or the other Credit Documents or the transactions contemplated hereby and thereby; it being understood and agreed that the Joint Lead Arrangers and the Joint Book Running Managers shall each be entitled to all indemnification and reimbursement rights in favor of the Administrative Agent as, and to the extent, provided for under Sections 12.06 and 13.01. Without limitation of the foregoing, none of the Joint Lead Arrangers or the Joint Book Running Managers shall, solely by reason of this Agreement or any other Credit Documents, have any fiduciary relationship in respect of any Lender or the holder of any Note.

12.03   Lack of Reliance on the Administrative Agent. Independently and without reliance upon the Administrative Agent, each Lender and the holder of each Note, to the extent it deems appropriate, has made and shall continue to make (i) its own independent investigation of the financial condition and affairs of the Borrower and its Subsidiaries in connection with the making and the continuance of the Loans and the taking or not taking of any action in connection herewith and (ii) its own appraisal of the creditworthiness of the Borrower and its Subsidiaries and, except as expressly provided in this Agreement, the Administrative Agent shall not have any duty or responsibility, either initially or on a continuing basis, to provide any Lender or the holder of any Note with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter. The Administrative Agent shall not be responsible to any Lender or the holder of any Note for any recitals, statements, information, representations or warranties herein or in any document, certificate or other writing delivered in connection herewith or for the execution, effectiveness, genuineness, validity, enforceability, perfection, collectibility, priority or sufficiency of this Agreement or any other Credit Document or the financial condition of the Borrower or any of its Subsidiaries or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement or any other Credit Document, or the financial condition of the Borrower or any of its Subsidiaries or the existence or possible existence of any Default or Event of Default.

12.04   Certain Rights of the Administrative Agent. If the Administrative Agent requests instructions from the Required Lenders with respect to any act or action (including failure to act) in connection with this Agreement or any other Credit Document, the Administrative Agent shall be entitled to refrain from such act or taking such action unless and until the Administrative Agent shall have received instructions from the Required Lenders; and the Administrative Agent shall not incur liability to any Lender by reason of so refraining. Without limiting the foregoing, neither any Lender nor the holder of any Note shall have any right of action whatsoever against the Administrative Agent as a result of the Administrative Agent acting or refraining from acting hereunder or under any other Credit Document in accordance with the instructions of the Required Lenders.

12.05    <u>Reliance</u>.  The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, telex, teletype or telecopier message, cablegram, radiogram, order or other document or telephone message signed, sent or made by any Person that the Administrative Agent reasonably believed to be the proper Person, and, with respect to all legal matters pertaining to this Agreement and any other Credit Document and its duties hereunder and thereunder, upon advice of counsel selected by the Administrative Agent.

12.06    <u>Indemnification</u>.  To the extent the Administrative Agent (or any affiliate thereof) is not reimbursed and indemnified by the Borrower, the Lenders will reimburse and indemnify the Administrative Agent (and any affiliate thereof) in proportion to their respective "percentage" as used in determining the Required Lenders (determined as if there were no Defaulting Lenders) for and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, costs, expenses or disbursements of whatsoever kind or nature which may be imposed on, asserted against or incurred by the Administrative Agent (or any affiliate thereof) in performing its duties hereunder or under any other Credit Document or in any way relating to or arising out of this Agreement or any other Credit Document with respect to such duties or its role as Administrative Agent; <u>provided</u> that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, claims, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's (or such affiliate's) gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

12.07    <u>The Administrative Agent in its Individual Capacity</u>.  With respect to its obligation to make (or be deemed to have made) Loans, or issue or participate in Letters of Credit, under this Agreement, the Administrative Agent shall have the rights and powers specified herein for a "<u>Lender</u>" and may exercise the same rights and powers as though it were not performing the duties specified herein; and the term "<u>Lender</u>", "<u>Required Lenders</u>", "<u>Majority Lenders</u>" or any similar terms shall, unless the context clearly indicates otherwise, include the Administrative Agent in its respective individual capacities.  The Administrative Agent and its affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, investment banking, trust or other business with, or provide debt financing, equity capital or other services (including financial advisory services) to any Credit Party or any Affiliate of any Credit Party (or any Person engaged in a similar business with any Credit Party or any Affiliate thereof) as if they were not performing the duties specified herein, and may accept fees and other consideration from any Credit Party or any Affiliate of any Credit Party for services in connection with this Agreement and otherwise without having to account for the same to the Lenders.

12.08    <u>Holders</u>.  The Administrative Agent may deem and treat the payee of any Note as the owner thereof for all purposes hereof unless and until a written notice of the assign-ment, transfer or endorsement thereof, as the case may be, shall have been filed with the Administrative Agent.  Any request, authority or consent of any Person who, at the time of mak-ing such request or giving such authority or consent, is the holder of any Note shall be conclusive and binding on any subsequent holder, transferee, assignee or endorser, as the case may be, of such Note or of any Note or Notes issued in exchange therefor.

<div align="center">-116-</div>

12.09  <u>Resignation by the Administrative Agent</u>.  (a)  The Administrative Agent may resign from the performance of all its respective functions and duties hereunder and/or under the other Credit Documents at any time by giving 30 days' prior written notice to the Lenders and, unless a Default or an Event of Default under Section 11.05 then exists, the Borrower.  Any such resignation by an Administrative Agent hereunder shall also constitute its (and its applicable Affiliate's) resignation as an Issuing Lender and/or the Swingline Lender, as the case may be, in which case the resigning Administrative Agent (and its applicable Affiliates) (x) shall not be required to issue any further Letters of Credit or make any additional Swingline Loans hereunder and (y) shall maintain all of its rights as Issuing Lender or Swingline Lender, as the case may be, with respect to any Letters of Credit issued by it, or Swingline Loans made by it, prior to the date of such resignation.  Such resignation shall take effect upon the appointment of a successor Administrative Agent pursuant to clauses (b) and (c) below or as otherwise provided below.

(b)    Upon any such notice of resignation by the Administrative Agent, the Required Lenders shall appoint a successor Administrative Agent hereunder or thereunder who shall be a commercial bank or trust company reasonably acceptable to the Borrower, which acceptance shall not be unreasonably withheld, delayed or conditioned (<u>provided</u> that the Borrower's approval shall not be required if an Event of Default then exists).

(c)    If a successor Administrative Agent shall not have been so appointed within such 30 day period, the Administrative Agent, with the consent of the Borrower (which consent shall not be unreasonably withheld or delayed, <u>provided</u> that the Borrower's consent shall not be required if an Event of Default then exists), shall then appoint a successor Adminis-trative Agent who shall serve as Administrative Agent hereunder or thereunder until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided above.

(d)    If no successor Administrative Agent has been appointed pursuant to clause (b) or (c) above by the 35th day after the date any such notice of resignation was given by the Administrative Agent, the Administrative Agent's resignation shall become effective and the Required Lenders shall thereafter perform all the duties of the Administrative Agent hereunder and/or under any other Credit Document until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided above.

(e)    Upon a resignation of the Administrative Agent pursuant to this Section 12.09, such former Administrative Agent shall remain indemnified to the extent provided in this Agreement and the other Credit Documents and the provisions of this Section 12 (and the analogous provisions of the other Credit Documents) shall continue in effect for the benefit of such former Administrative Agent for all of its actions and inactions while serving as the Administrative Agent.

12.10  <u>Collateral Matters</u>.  (a)  Each Lender authorizes and directs the Collateral Agent to enter into the Security Documents for the benefit of the Lenders and the other Secured Creditors.  Each Lender hereby agrees, and each holder of any Note by the acceptance thereof will be deemed to agree, that, except as otherwise set forth herein, any action taken by the Required Lenders (or all of the Lenders hereunder, to the extent required by Section 13.12) in accordance with the provisions of this Agreement or the Security Documents, and the exercise

-117-

by the Required Lenders (or all the Lenders, as the case may be) of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Lenders.  The Collateral Agent is hereby authorized on behalf of all of the Lenders, without the necessity of any notice to or further consent from any Lender, from time to time prior to an Event of Default, to take any action with respect to any Collateral or the Security Documents which may be necessary to perfect and maintain perfected the security interest in and liens upon the Collateral granted pursuant to the Security Documents.

(b)    The Lenders hereby authorize the Collateral Agent, at its option and in its discretion, to release any Lien granted to or held by the Collateral Agent upon any Collateral (i) upon termination of the Commitments and payment and satisfaction of all of the Obligations at any time arising under or in respect of this Agreement or the Credit Documents or the trans-actions contemplated hereby or thereby, (ii) constituting property being sold or otherwise dis-posed of (to Persons other than the Borrower and its Subsidiaries) upon the sale or other disposi-tion thereof in compliance with Section 10.02, (iii) if approved, authorized or ratified in writing by the Required Lenders (or all of the Lenders hereunder, to the extent required by Section 13.12) or (iv) as otherwise may be expressly provided in this Agreement and/or the relevant Security Documents.  Upon request by the Administrative Agent at any time, the Lenders will confirm in writing the Collateral Agent's authority to release particular types or items of Collateral pursuant to this Section 12.10.

(c)    The Collateral Agent shall have no obligation whatsoever to the Lenders or to any other Person to assure that the Collateral exists or is owned by any Credit Party or is cared for, protected or insured or that the Liens granted to the Collateral Agent herein or pursuant hereto have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise or to continue exercising at all or in any manner or under any duty of care, disclosure or fidelity any of the rights, authorities and powers granted or available to the Collateral Agent in this Section 12.10 or in any of the Security Documents, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Collateral Agent may act in any manner it may deem appropriate, in its sole discretion, given the Collateral Agent's own interest in the Collateral as one of the Lenders and that the Collateral Agent shall have no duty or liability whatsoever to the Lenders, except for its gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

12.11  <u>Delivery of Information</u>.  The Administrative Agent shall not be required to deliver to any Lender originals or copies of any documents, instruments, notices, communications or other information received by the Administrative Agent from any Credit Party, any Subsidiary, the Required Lenders, any Lender or any other Person under or in connection with this Agreement or any other Credit Document except (i) as specifically provided in this Agreement or any other Credit Document and (ii) as specifically requested from time to time in writing by any Lender with respect to a specific document, instrument, notice or other written communication received by and in the possession of the Administrative Agent at the time of receipt of such request and then only in accordance with such specific request.

-118-

SECTION 13. <u>Miscellaneous</u>.

    13.01  <u>Payment of Expenses, etc.</u>  The Borrower hereby agrees to: (i) whether or not the transactions herein contemplated are consummated, pay all reasonable out-of-pocket costs and expenses of each Agent (including, without limitation, the reasonable fees and disbursements of Simpson Thacher & Bartlett LLP and each Agent's other counsel and consultants) in connection with the preparation, execution, delivery and administration of this Agreement and the other Credit Documents and the documents and instruments referred to herein and therein and any amendment, waiver or consent relating hereto or thereto, of each Agent and its Affiliates in connection with its or their syndication efforts with respect to this Agreement and of each Agent and, after the occurrence and during the continuance of an Event of Default, each of the Issuing Lenders and Lenders in connection with the enforcement of this Agreement and the other Credit Documents and the documents and instruments referred to herein and therein or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or pursuant to any insolvency or bankruptcy proceedings (including, in each case without limitation, the reasonable fees and disbursements of counsel and consultants for each Agent and, after the occurrence and during the continuance of an Event of Default, counsel for each of the Issuing Lenders and Lenders); (ii) without duplication with Section 5.04(a), pay and hold each Agent, each of the Issuing Lenders and each of the Lenders harmless from and against any and all present and future stamp, excise and other similar documentary taxes with respect to the foregoing matters and save each Agent, each of the Issuing Lenders and each of the Lenders harmless from and against any and all liabilities with respect to or resulting from any delay or omission (other than to the extent attributable to such Agent, such Issuing Lender or such Lender) to pay such taxes; and (iii) indemnify each Agent, each Issuing Lender and each Lender, and each of their respective officers, directors, employees, representatives, agents, affiliates, trustees and investment advisors from and hold each of them harmless against any and all liabilities, obligations (including removal or remedial actions), losses, damages, penalties, claims, actions, judgments, suits, costs, expenses and disbursements (including reasonable attorneys' and consultants' fees and disbursements) of whatsoever kind or nature incurred by, imposed on or assessed against any of them as a result of, or arising out of, or in any way related to, or by reason of, (a) any investigation, litigation or other proceeding (whether or not any Agent, any Issuing Lender or any Lender is a party thereto and whether or not such investigation, litigation or other proceeding is brought by or on behalf of any Credit Party) related to the entering into and/or performance of this Agreement or any other Credit Document or the use of any Letter of Credit or the proceeds of any Loans hereunder or the consummation of any transactions contemplated herein or in any other Credit Document or the exercise of any of their rights or remedies provided herein or in the other Credit Documents or in any other way relating to or arising out of this Agreement or any other Credit Document, or (b) the actual or alleged presence of Hazardous Materials in the air, surface water or groundwater or on the surface or subsurface of any Real Property at any time owned, leased or operated by the Borrower or any of its Subsidiaries, the generation, storage, transportation, handling or disposal of Hazardous Materials by the Borrower or any of its Subsidiaries at any location, whether or not owned, leased or operated by the Borrower or any of its Subsidiaries, the non-compliance by the Borrower or any of its Subsidiaries with any Environmental Law (including applicable permits thereunder) applicable to any Real Property, or any Environmental Claim asserted against the Borrower, any of its Subsidiaries or any Real Property at any time owned, leased or operated by the Borrower or

-119-

any of its Subsidiaries, including, in each case, without limitation, the reasonable fees and disbursements of counsel and other consultants incurred in connection with any such investigation, litigation or other proceeding (but excluding any losses, liabilities, claims, damages or expenses to the extent incurred by reason of the gross negligence or willful misconduct of the Person to be indemnified (as determined by a court of competent jurisdiction in a final and non-appealable decision)).  To the extent that the undertaking to indemnify, pay or hold harmless any Agent, any Issuing Lender or any Lender set forth in the preceding sentence may be unenforceable because it is violative of any law or public policy, the Borrower shall make the maximum contribution to the payment and satisfaction of each of the indemnified liabilities which is permissible under applicable law.

13.02  <u>Right of Setoff</u>.  (a) In addition to any rights now or hereafter granted under applicable law or otherwise, and not by way of limitation of any such rights, upon the occurrence and during the continuance of an Event of Default, the Administrative Agent, each Issuing Lender and each Lender is hereby authorized at any time or from time to time, without presentment, demand, protest or other notice of any kind to any Credit Party or to any other Person, any such notice being hereby expressly waived, to set off and to appropriate and apply any and all deposits (general or special) and any other Indebtedness at any time held or owing by the Administrative Agent, such Issuing Lender or such Lender (including, without limitation, by branches and agencies of the Administrative Agent, such Issuing Lender or such Lender wherever located) to or for the credit or the account of the Borrower or any other Credit Party against and on account of the Obligations and liabilities of the Credit Parties to the Administrative Agent, such Issuing Lender or such Lender under this Agreement or under any of the other Credit Documents, including, without limitation, all interests in Obligations purchased by such Lender pursuant to Section 13.06(b), and all other claims of any nature or description arising out of or connected with this Agreement or any other Credit Document, irrespective of whether or not the Administrative Agent, such Issuing Lender or such Lender shall have made any demand hereunder and although said Obligations, liabilities or claims, or any of them, shall be contingent or unmatured.

(b)    **NOTWITHSTANDING THE FOREGOING SUBSECTION (a), AT ANY TIME THAT THE LOANS OR ANY OTHER OBLIGATION SHALL BE SECURED BY REAL PROPERTY LOCATED IN CALIFORNIA, NO LENDER SHALL EXERCISE A RIGHT OF SETOFF, LIEN OR COUNTERCLAIM OR TAKE ANY COURT OR ADMINISTRATIVE ACTION OR INSTITUTE ANY PROCEEDING TO ENFORCE ANY PROVISION OF THIS AGREEMENT OR ANY NOTE UNLESS IT IS TAKEN WITH THE CONSENT OF THE REQUIRED LENDERS OR APPROVED IN WRITING BY THE ADMINISTRATIVE AGENT, IF SUCH SETOFF OR ACTION OR PROCEEDING WOULD OR MIGHT (PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 580a, 580b, 580d AND 726 OF THE CALIFORNIA CODE OF CIVIL PROCEDURE OR SECTION 2924 OF THE CALIFORNIA CIVIL CODE, IF APPLICABLE, OR OTHERWISE) AFFECT OR IMPAIR THE VALIDITY, PRIORITY OR ENFORCEABILITY OF THE LIENS GRANTED TO THE COLLATERAL AGENT PURSUANT TO THE SECURITY DOCUMENTS OR THE ENFORCEABILITY OF THE NOTES AND OTHER OBLIGATIONS HEREUNDER, AND ANY ATTEMPTED EXERCISE BY ANY LENDER OF ANY SUCH RIGHT WITHOUT OBTAINING SUCH CONSENT OF THE REQUIRED LENDERS OR THE ADMINISTRATIVE AGENT**

**SHALL BE NULL AND VOID. THIS SUBSECTION (b) SHALL BE SOLELY FOR THE BENEFIT OF EACH OF THE LENDERS AND THE ADMINISTRATIVE AGENT HEREUNDER.**

13.03  <u>Notices</u>.  Except as otherwise expressly provided herein, all notices and other communications provided for hereunder shall be in writing (including telegraphic, telex, telecopier or cable communication) and mailed, telegraphed, telexed, telecopied, cabled or delivered:  if to any Credit Party, at the address specified opposite its signature below or in the other relevant Credit Documents; if to any Lender, at its address specified on Schedule II; and if to the Administrative Agent, at the Notice Office; or, as to any Credit Party or the Administrative Agent, at such other address as shall be designated by such party in a written notice to the other parties hereto and, as to each Lender, at such other address as shall be designated by such Lender in a written notice to the Borrower and the Administrative Agent.  All such notices and communications shall, when mailed, telegraphed, telexed, telecopied, or cabled or sent by overnight courier, be effective when deposited in the mails, delivered to the telegraph company, cable company or overnight courier, as the case may be, or sent by telex or telecopier, except that notices and communications to the Administrative Agent and the Borrower shall not be effective until received by the Administrative Agent or the Borrower, as the case may be.

13.04  <u>Benefit of Agreement; Assignments; Participations</u>.  (a)  This Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto; <u>provided</u>, <u>however</u>, the Borrower may not assign or transfer any of its rights, obligations or interest hereunder without the prior written consent of each Lender and, <u>provided further</u>, that, although any Lender may transfer, assign or grant participations in its rights hereunder, such Lender shall remain a "Lender" for all purposes hereunder (and may not transfer or assign all or any portion of its Commitments hereunder except as provided in Sections 2.13 and 13.04(b)) and the transferee, assignee or participant, as the case may be, shall not constitute a "Lender" hereunder and, <u>provided further</u>, that no Lender shall transfer or grant any participation under which the participant shall have rights to approve any amendment to or waiver of this Agreement or any other Credit Document except to the extent such amendment or waiver would (i) extend the final scheduled maturity of any Loan, Note or Letter of Credit (unless such Letter of Credit is not extended beyond the Revolving Loan Maturity Date) in which such participant is participating, or reduce the rate or extend the time of payment of interest or Fees thereon (except in connection with a waiver of applicability of any post-default increase in interest rates) or reduce the principal amount thereof (it being understood that any amendment or modification to the financial definitions in this Agreement or to Section 13.07(a) shall not constitute a reduction in the rate of interest or Fees payable hereunder), or increase the amount of the participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default or of a mandatory reduction in the Total Commitment shall not constitute a change in the terms of such participation, and that an increase in any Commitment (or the available portion thereof) or Loan shall be permitted without the consent of any participant if the participant's participation is not increased as a result thereof), (ii) consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement or (iii) release all or substantially all of the Collateral under all of Security Documents (except as expressly provided in the Credit Documents) supporting the Loans or Letters of Credit hereunder in which such participant is participating.  In the case of any such participation, the participant shall not have any rights under this Agreement or any of the

-121-

other Credit Documents (including, without limitation, any rights of set-off) (the participant's rights against such Lender in respect of such participation to be those set forth in the agreement executed by such Lender in favor of the participant relating thereto) and all amounts payable by the Borrower hereunder shall be determined as if such Lender had not sold such participation.

(b)    Notwithstanding the foregoing, any Lender (or any Lender together with one or more other Lenders) may (x) assign all or a portion of its Commitments and related outstanding Obligations (or, if the Commitments with respect to the relevant Tranche have terminated, outstanding Obligations) hereunder to (i)(A) its parent company and/or any affiliate of such Lender which is at least 50% owned by such Lender or its parent company or (B) to one or more other Lenders or any affiliate of any such other Lender which is at least 50% owned by such other Lender or its parent company (provided that any fund that invests in loans and is managed or advised by the same investment advisor of another fund which is a Lender (or by an Affiliate of such investment advisor) shall be treated as an affiliate of such other Lender for the purposes of this sub-clause (x)(i)(B)), or (ii) in the case of any Lender that is a fund that invests in loans, any other fund that invests in loans and is managed or advised by the same investment advisor of any Lender or by an Affiliate of such investment advisor or (y) assign all, or if less than all, a portion equal to at least $1,000,000 in the aggregate for the assigning Lender or assigning Lenders, of such Commitments and related outstanding Obligations (or, if the Commitments with respect to the relevant Tranche have terminated, outstanding Obligations) hereunder to one or more Eligible Transferees (treating any fund that invests in loans and any other fund that invests in loans and is managed or advised by the same investment advisor of such fund or by an Affiliate of such investment advisor as a single Eligible Transferee), each of which assignees shall become a party to this Agreement as a Lender by execution of an Assignment and Assumption Agreement, provided that (i) at such time, Schedule I shall be deemed modified to reflect the Commitments and/or outstanding Loans, as the case may be, of such new Lender and of the existing Lenders, (ii) upon the surrender of the relevant Notes by the assigning Lender (or, upon such assigning Lender's indemnifying the Borrower for any lost Note pursuant to a customary indemnification agreement) new Notes will be issued, at the Borrower's expense, to such new Lender and to the assigning Lender upon the request of such new Lender or assigning Lender, such new Notes to be in conformity with the requirements of Section 2.05 (with appropriate modifications) to the extent needed to reflect the revised Commitments and/or outstanding Loans, as the case may be, (iii) the consent of the Administrative Agent and, so long as no Default or Event of Default then exists, the Borrower, shall be required in connection with any such assignment pursuant to clause (y) above (each of which consents shall not be unreasonably withheld or delayed), (iv) the Administrative Agent shall receive at the time of each such assignment, from the assigning or assignee Lender, the payment of a non-refundable assignment fee of $3,500, and (v) no such transfer or assignment will be effective until recorded by the Administrative Agent on the Register pursuant to Section 13.15.  To the extent of any assignment pursuant to this Section 13.04(b), the assigning Lender shall be relieved of its obligations hereunder with respect to its assigned Commitments and outstanding Loans.  At the time of each assignment pursuant to this Section 13.04(b) to a Person which is not already a Lender hereunder, the respective assignee Lender shall, to the extent legally entitled to do so, provide to the Borrower the appropriate Internal Revenue Service Forms (and, if applicable, a Section 5.04(b)(ii) Certificate described in Section 5.04(b).  To the extent that an assignment of all or any portion of a Lender's Commitments and related outstanding Obligations pursuant to Section 2.13 or this Section 13.04(b) would, at the time of such assignment, result in increased costs

-122-

under Section 2.10, 3.06 or 5.04 from those being charged by the respective assigning Lender prior to such assignment, then the Borrower shall not be obligated to pay such increased costs (although the Borrower, in accordance with and pursuant to the other provisions of this Agreement, shall be obligated to pay any other increased costs of the type described above resulting from changes after the date of the respective assignment).

(c)    Nothing in this Agreement shall prevent or prohibit any Lender from pledging its Loans and Notes hereunder to a Federal Reserve Bank in support of borrowings made by such Lender from such Federal Reserve Bank and, with prior notification to the Administrative Agent (but without the consent of the Administrative Agent or the Borrower), any Lender which is a fund may pledge all or any portion of its Loans and Notes to its trustee or to a collateral agent providing credit or credit support to such Lender in support of its obligations to such trustee, such collateral agent or a holder of such obligations, as the case may be.  No pledge pursuant to this clause (c) shall release the transferor Lender from any of its obligations hereunder.

13.05    No Waiver; Remedies Cumulative.  No failure or delay on the part of the Administrative Agent, the Collateral Agent, any Issuing Lender or any Lender in exercising any right, power or privilege hereunder or under any other Credit Document and no course of dealing between the Borrower or any other Credit Party and the Administrative Agent, the Collateral Agent, any Issuing Lender or any Lender shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or under any other Credit Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder or thereunder.  The rights, powers and remedies herein or in any other Credit Document expressly provided are cumulative and not exclusive of any rights, powers or remedies which the Administrative Agent, the Collateral Agent, any Issuing Lender or any Lender would otherwise have.  No notice to or demand on any Credit Party in any case shall entitle any Credit Party to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Administrative Agent, the Collateral Agent, any Issuing Lender or any Lender to any other or further action in any circumstances without notice or demand.

13.06    Payments Pro Rata.  (a)  Except as otherwise provided in this Agreement, the Administrative Agent agrees that promptly after its receipt of each payment from or on behalf of the Borrower in respect of any Obligations hereunder, the Administrative Agent shall distribute such payment to the Lenders entitled thereto (other than any Lender that has consented in writing to waive its pro rata share of any such payment) pro rata based upon their respective shares, if any, of the Obligations with respect to which such payment was received.

(b)    Except as otherwise provided in this Agreement, each of the Lenders agrees that, if it should receive any amount hereunder (whether by voluntary payment, by realization upon security, by the exercise of the right of setoff or banker's lien, by counterclaim or cross action, by the enforcement of any right under the Credit Documents, or otherwise), which is applicable to the payment of the principal of, or interest on, the Loans, Unpaid Drawings, Commitment Commission or Letter of Credit Fees, of a sum which with respect to the related sum or sums received by other Lenders is in a greater proportion than the total of such Obligation then owed and due to such Lender bears to the total of such Obligation then owed and

022537-0191-13470-Active.12537490.17

due to all of the Lenders immediately prior to such receipt, then such Lender receiving such excess payment shall purchase for cash without recourse or warranty from the other Lenders an interest in the Obligations of the respective Credit Party to such Lenders in such amount as shall result in a proportional participation by all the Lenders in such amount; provided that if all or any portion of such excess amount is thereafter recovered from such Lenders, such purchase shall be rescinded and the purchase price restored to the extent of such recovery, but without interest.

(c)     Notwithstanding anything to the contrary contained herein, the provisions of the preceding Sections 13.06(a) and (b) shall be subject to the express provisions of this Agreement which require, or permit, differing payments to be made to Non-Defaulting Lenders as opposed to Defaulting Lenders.

13.07  Calculations; Computations.  (a) The financial statements to be furnished to the Lenders pursuant hereto shall be made and prepared in accordance with GAAP consistently applied throughout the periods involved (except as set forth in the notes thereto or as otherwise disclosed in writing by the Borrower to the Lenders); provided that, (i) except as otherwise specifically provided herein, all computations of Excess Cash Flow and the Applicable Margin, and all computations and all definitions (including accounting terms) used in determining compliance with Sections 10.07, 10.08 and 10.09 shall utilize GAAP and policies in conformity with those used to prepare the audited financial statements of the Borrower referred to in Section 8.05(a) for the Borrower's fiscal year ended September 25, 2011 and (ii) to the extent expressly provided herein, certain calculations shall be made on a Pro Forma Basis.

(b)     All computations of interest, Commitment Commission and other Fees hereunder shall be made on the basis of a year of 360 days for the actual number of days (including the first day but excluding the last day; except that in the case of Letter of Credit Fees and Facing Fees, the last day shall be included) occurring in the period for which such interest, Commitment Commission or Fees are payable.

13.08  GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF JURY TRIAL.  (a) THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL , EXCEPT AS OTHERWISE PROVIDED IN ANY MORTGAGE, BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE INTERNAL LAW OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.  ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, IN EACH CASE WHICH ARE LOCATED IN THE COUNTY OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT THE BORROWER HEREBY IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE PERSONAL JURISDICTION OF THE AFORESAID COURTS.  THE BORROWER HEREBY FURTHER IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH COURTS LACK PERSONAL JURISDICTION OVER THE BORROWER, AND AGREES NOT TO PLEAD OR CLAIM, IN ANY LEGAL ACTION PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT

-124-

DOCUMENT BROUGHT IN ANY OF THE AFOREMENTIONED COURTS, THAT SUCH COURTS LACK PERSONAL JURISDICTION OVER THE BORROWER.  THE BORROWER FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PRO-CEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE BORROWER AT ITS ADDRESS SET FORTH OPPOSITE ITS SIGNATURE BELOW, SUCH SERVICE TO BECOME EFFECTIVE 30 DAYS AFTER SUCH MAILING.  THE BORROWER HEREBY IRREVOCABLY WAIVES ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER OR UNDER ANY OTHER CREDIT DOCUMENT THAT SERVICE OF PROCESS WAS IN ANY WAY INVALID OR INEFFECTIVE.  NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE ADMINISTRATIVE AGENT, ANY LENDER OR THE HOLDER OF ANY NOTE TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST THE BORROWER IN ANY OTHER JURISDICTION.

(b)    THE BORROWER HEREBY IRREVOCABLY WAIVES ANY OBJEC-TION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (a) ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)    EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVO-CABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER CREDIT DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

13.09    Counterparts.  This Agreement may be executed in any number of counterparts (including by facsimile or other electronic transmission) and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.  A set of counterparts executed by all the parties hereto shall be lodged with the Borrower and the Administrative Agent.

13.10    Effectiveness.  This Agreement shall become effective on the date (the "Conversion Date") on which (i) the Borrower, the Administrative Agent and each of the Lenders shall have signed (or shall be deemed to have signed) a counterpart hereof (whether the same or different counterparts) and shall have delivered the same (including by facsimile or other electronic transmission) to the Administrative Agent at the Notice Office and (ii) each of the conditions precedent set forth in Section 6 shall have been satisfied.  The Administrative Agent will give the Borrower and each Lender prompt written notice of the occurrence of the Conversion Date.

13.11  <u>Headings Descriptive</u>.    The headings of the several sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

13.12  <u>Amendment or Waiver; etc</u>.

 (a)  Neither this Agreement nor any other Credit Document nor any terms hereof or thereof may be changed, waived, discharged or terminated unless such change, waiver, discharge or termination is in writing signed by the respective Credit Parties party hereto or thereto and the Required Lenders (although additional parties may be added to (and annexes may be modified to reflect such additions), and Subsidiaries of the Borrower may be released from, the Subsidiaries Guaranty and the Pledge Agreement in accordance with the provisions hereof and thereof without the consent of the other Credit Parties party thereto or the Required Lenders), <u>provided</u> that no such change, waiver, discharge or termination shall, without the consent of each Lender (other than a Defaulting Lender) (with Obligations being directly affected in the case of following clause (i)), (i)(x) extend the final scheduled maturity of any Loan or Note or extend the stated expiration date of any Letter of Credit beyond its Maturity Date, or reduce the rate or extend the time of payment of interest or Fees thereon (except in connection with the waiver of applicability of any post-default increase in interest rates), or reduce the principal amount thereof (it being understood that any amendment or modification to the financial definitions in this Agreement or to Section 13.07(a) shall not constitute a reduction in the rate of interest or Fees for the purposes of this clause (i)), or (y) reduce the amount of, or extend the date of, any Scheduled Term Loan Repayment of the Term Loans, (ii) release all or substantially all of the Collateral (except as expressly provided in the Credit Documents) under the Pledge Agreement, (iii) amend, modify or waive any provision of this Section 13.12(a) (except for technical amendments with respect to additional extensions of credit pursuant to this Agreement which afford the protections to such additional extensions of credit of the type provided to the Term Loans and the Revolving Loan Commitments on the Conversion Date), (iv) reduce the percentage specified in the definition of Required Lenders (it being understood that, with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Required Lenders on substantially the same basis as the extensions of Term Loans and Revolving Loan Commitments are included on the Conversion Date) or (v) consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement; <u>provided further</u>, that no such change, waiver, discharge or termination shall (1) increase the Commitments of any Lender over the amount thereof then in effect without the consent of such Lender (it being understood that waivers or modifications of conditions precedent, covenants, Defaults or Events of Default or of a mandatory reduction in the Total Commitment shall not constitute an increase of the Commitment of any Lender, and that an increase in the available portion of any Commitment of any Lender shall not constitute an increase of the Commitment of such Lender), (2) except in cases where additional extensions of term loans and/or revolving loans are being afforded substantially the same treatment afforded to the Term Loans and Revolving Loans pursuant to this Agreement as in effect on, and after giving effect to, the Conversion Date, (x) without the consent of the Majority Lenders of each Tranche which is being allocated a lesser prepayment, repayment or commitment reduction as a result of the actions described below, alter the required application of any prepayments or repayments (or commitment reduction), as between the various Tranches, pursuant to Section 5.01(a) or 5.02 (excluding Section 5.02(b)) (although, subject to clause (7) below, the Required Lenders may

-126-

waive, in whole or in part, any such prepayment, repayment or commitment reduction, so long as the application, as amongst the various Tranches, of any such prepayment, repayment or commitment reduction which is still required to be made is not altered) or (y) without the consent of each Lender of each Tranche which is adversely affected by such amendment, amend the definition of Majority Lenders (it being understood that with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Majority Lenders on substantially the same basis as the extensions of Term Loans and Revolving Loan Commitments are included on the Conversion Date), (3) without the consent of each Issuing Lender, amend, modify or waive any provision of Section 3 or alter its rights or obligations with respect to Letters of Credit, (4) without the consent of the Swingline Lender, alter the Swingline Lender's rights or obligations with respect to Swingline Loans, (5) without the consent of the Administrative Agent, amend, modify or waive any provision of Section 12 or any other provision as same relates to the rights or obligations of the Administrative Agent, (6) without the consent of Collateral Agent, amend, modify or waive any provision relating to the rights or obligations of the Collateral Agent, (7) without the written consent of the Majority Lenders with respect to the Revolving Facility, amend, modify or waive (i) any condition precedent set forth in Section 7 with respect to the making of Revolving Loans, Swingline Loans or the issuance of Letters or Credit (it being understood that a general waiver of an existing Default or Event of Default by the required Lenders or an amendment approved by the required Lenders that has the effect of "curing" an existing Default or Event of Default and permitting the making of Loans or other extension of credit shall constitute a waiver of a condition precedent governed by this clause) or (ii) Section 5.01(a) or 5.02 (excluding Section 5.02(b)) to alter the required application of prepayments or repayments (or Commitment reduction) either in a manner (x) adverse to the RL Lenders or (y) that would alter the priority, or reduce the amount, of any payment received by the RL Lenders, or (8) without the written consent of each RL Lender (other than a Defaulting Lender), amend, modify or waive Section 5.05, Section 13.17, Section 7.4 of the Security Agreement or Section 9 of the Pledge Agreement to alter the required application of prepayments or repayments or application of proceeds in a manner adverse to the RL Lenders.

(b)     If, in connection with any proposed change, waiver, discharge or termination of or to any of the provisions of this Agreement as contemplated by clauses (i) through (v), inclusive, of the first proviso to Section 13.12(a), the consent of the Required Lenders is obtained but the consent of one or more of such other Lenders whose consent is required is not obtained, then the Borrower shall have the right, so long as all non-consenting Lenders whose individual consent is required are treated as described in either clause (A) or (B) below, to either (A) replace each such non-consenting Lender or Lenders (or, at the option of the Borrower, if the respective Lender's consent is required with respect to less than all Tranches of Loans (or related Commitments), to replace only the Revolving Loan Commitments and/or Loans of the respective non-consenting Lender which gave rise to the need to obtain such Lender's individual consent) with one or more Replacement Lenders pursuant to Section 2.13 so long as at the time of such replacement, each such Replacement Lender consents to the proposed change, waiver, discharge or termination or (B) terminate such non-consenting Lender's Revolving Loan Commitment (if such Lender's consent is required as a result of its Revolving Loan Commitment) and/or repay each Tranche of outstanding Loans of such Lender which gave rise to the need to obtain such Lender's consent and/or cash collateralize its applicable RL Percentage of the Letter of Credit of Outstandings, in accordance with Sections 4.02(b) and/or 5.01(b), provided that, unless the

-127-

Commitments which are terminated and Loans which are repaid pursuant to preceding clause (B) are immediately replaced in full at such time through the addition of new Lenders or the increase of the Commitments and/or outstanding Loans of existing Lenders (who in each case must specifically consent thereto), then in the case of any action pursuant to preceding clause (B), the Required Lenders (determined after giving effect to the proposed action) shall specifically consent thereto, provided further, that the Borrower shall not have the right to replace a Lender, terminate its Commitment or repay its Loans solely as a result of the exercise of such Lender's rights (and the withholding of any required consent by such Lender) pursuant to the second proviso to Section 13.12(a).

13.13    Survival.  All indemnities set forth herein including, without limitation, in Sections 2.10, 2.11, 3.06, 5.04, 12.06 and 13.01 shall survive the execution, delivery and termination of this Agreement and the Notes and the making and repayment of the Obligations.

13.14    Domicile of Loans.  Each Lender may transfer and carry its Loans at, to or for the account of any office, Subsidiary or affiliate of such Lender.  Notwithstanding anything to the contrary contained herein, to the extent that a transfer of Loans pursuant to this Section 13.14 would, at the time of such transfer, result in increased costs under Section 2.10, 2.11, 3.06 or 5.04 from those being charged by the respective Lender prior to such transfer, then the Borrower shall not be obligated to pay such increased costs (although the Borrower shall be obligated to pay any other increased costs of the type described above resulting from changes after the date of the respective transfer).

13.15    Register.  The Borrower hereby designates the Administrative Agent to serve as its agent, solely for purposes of this Section 13.15, to maintain a register (the "Register") on which it will record the Commitments from time to time of each of the Lenders, the Loans made by each of the Lenders and each repayment in respect of the principal amount of the Loans of each Lender.  Failure to make any such recordation, or any error in such recordation, shall not affect the Borrower's obligations in respect of such Loans.  With respect to any Lender, the transfer of the Commitments of such Lender and the rights to the principal of, and interest on, any Loan made pursuant to such Commitments shall not be effective until such transfer is recorded on the Register maintained by the Administrative Agent with respect to ownership of such Commitments and Loans and prior to such recordation all amounts owing to the transferor with respect to such Commitments and Loans shall remain owing to the transferor. The registration of assignment or transfer of all or part of any Commitments and Loans shall be recorded by the Administrative Agent on the Register only upon the acceptance by the Administrative Agent of a properly executed and delivered Assignment and Assumption Agreement pursuant to Section 13.04(b).  Coincident with the delivery of such an Assignment and Assumption Agreement to the Administrative Agent for acceptance and registration of assignment or transfer of all or part of a Loan, or as soon thereafter as practicable, the assigning or transferor Lender shall surrender the Note (if any) evidencing such Loan, and thereupon one or more new Notes in the same aggregate principal amount shall be issued to the assigning or transferor Lender and/or the new Lender at the request of any such Lender.  The Borrower agrees to indemnify the Administrative Agent from and against any and all losses, claims, damages and liabilities of whatsoever nature which may be imposed on, asserted against or incurred by the Administrative Agent in performing its duties under this Section 13.15.  Each Lender that sells a participation, acting solely for this purpose as an agent of the Borrower, shall maintain a register on which it

-128-

enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Loans or other obligations under this Agreement (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any participant or any information relating to a participant's interest in any Commitments, Loans, Letters of Credit or its other obligations under this Agreement) except to the extent that such disclosure is necessary to establish that such Commitment, Loan, Letter of Credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive, and such Lender, each Credit Party and the Administrative Agent shall treat each person whose name is recorded in the Participant Register pursuant to the terms hereof as the owner of such participation for all purposes of this Agreement, notwithstanding notice to the contrary.

13.16  Confidentiality.  (a)  Subject to the provisions of clause (b) of this Section 13.16, each Lender agrees that it will use its reasonable efforts not to disclose without the prior consent of the Borrower (other than to its employees, auditors, advisors or counsel or to another Lender if such Lender or such Lender's holding or parent company in its sole discretion determines that any such party should have access to such information, provided such Persons shall be subject to the provisions of this Section 13.16 to the same extent as such Lender) any non-public confidential information with respect to the Borrower or any of its Subsidiaries which is now or in the future furnished pursuant to this Agreement or any other Credit Document, provided that any Lender may disclose any such information (i) as has become generally available to the public other than by virtue of a breach of this Section 13.16(a) by the respective Lender or is or has become available to such Lender on a non-confidential basis, (ii) as may be required or appropriate in any report, statement or testimony submitted to any municipal, state or Federal regulatory body having or claiming to have jurisdiction over such Lender or to the Federal Reserve Board or the Federal Deposit Insurance Corporation or similar organizations (whether in the United States or elsewhere) or their successors, (iii) as may be required or appropriate in respect to any summons or subpoena or in connection with any litigation, (iv) in order to comply with any law, order, regulation or ruling applicable to such Lender, (v) to the Administrative Agent or the Collateral Agent, (vi) to any direct or indirect contractual counterparty in any swap, hedge or similar agreement (or to any such contractual counterparty's professional advisor) or to any credit insurance provider relating to the Borrower and its obligations, so long as such contractual counterparty (or such professional advisor) or credit insurance provider agrees to be bound by the provisions of this Section 13.16 and (vii) to any prospective or actual transferee or participant in connection with any contemplated transfer or participation of any of the Notes or Commitments or any interest therein by such Lender, provided that such prospective transferee agrees to be bound by the confidentiality provisions contained in this Section 13.16.

(b)     The Borrower hereby acknowledges and agrees that each Lender may share with any of its affiliates, and such affiliates may share with such Lender, any information related to the Borrower or any of its Subsidiaries (including, without limitation, any non-public customer information regarding the creditworthiness of the Borrower and its Subsidiaries), in each case only if such Lender or affiliate shall have determined in its sole discretion that the Lender or affiliate with whom the information is to be shared should have access to such information; provided that such Persons shall be subject to the provisions of this Section 13.16 to the same extent as such Lender.

-129-

13.17  <u>Application of Proceeds</u>.

(a)     After the exercise of remedies (including rights of setoff) provided for in Section 11 (or after the Loans and the Obligations owing hereunder have automatically become immediately due and payable as set forth in Section 11), any amounts received on account of the Obligations (whether as a result of a payment under the Subsidiaries Guaranty, any realization on the Collateral, any setoff rights, any distribution in connection with any proceedings or otherwise and whether received in cash or otherwise) shall be applied in the following order:

*First*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including legal fees and expenses payable under the Security Documents) payable to the Collateral Agent in its capacity as such;

*Second*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including legal fees and expenses payable under Section 13.01 and amounts payable under Sections 2.10, 2.11 and 5.04) payable to the Administrative Agent in its capacity as such;

*Third*, to payment of that portion of the Obligations under the Revolving Facility constituting Fees, indemnities and other fees and amounts (other than principal and interest) payable to the RL Lenders (including legal fees and expenses payable under Section 13.01 and amounts payable under Sections 2.10, 2.11 and 5.04), ratably among them in proportion to the amounts described in this clause *Third* payable to them;

*Fourth*, to payment of that portion of the Obligations under the Revolving Facility constituting accrued and unpaid interest on the Revolving Loans and Unpaid Drawings, ratably among the RL Lenders in proportion to the respective amounts described in this clause *Fourth* payable to them;

*Fifth*, (i) to payment of that portion of the Obligations under the Revolving Facility constituting unpaid principal of the Revolving Loans and Unpaid Drawings under Letters of Credit, (ii) to the Administrative Agent for the account of the Issuing Lender, to cash collateralize the Stated Amount of all Letters of Credit (other than Unpaid Drawings) then outstanding and (iii) to the payment of that portion of the Obligations under the Secured Hedging Agreements (other than indemnities, fees (including, without limitation, attorney's fees) and similar obligation and liabilities), ratably among the applicable Secured Creditors in proportion to the respective amounts described in this clause *Fifth* held by them;

*Sixth*, to the payment of all other Obligations under the Revolving Facility of the Credit Parties that are due and payable to the Administrative Agent and the other applicable Secured Creditors on such date, ratably based upon the respective aggregate amounts of all such Obligations under the Revolving Facility owing to the Administrative Agent and the other applicable Secured Creditors on such date;

*Seventh*, to payment of that portion of the Obligations under the Term Loan Facility constituting fees, indemnities and other amounts (other than principal and

-130-

interest) payable to the applicable Secured Creditors (including legal fees and expenses payable under Section 13.01 and amounts payable under Sections 2.10, 2.11 and 5.04), ratably among them in proportion to the amounts described in this clause *Seventh* payable to them;

*Eighth*, to payment of that portion of the Obligations under the Term Loan Facility constituting accrued and unpaid interest on the Term Loans, ratably among the applicable Secured Creditors in proportion to the respective amounts described in this clause *Eighth* payable to them;

*Ninth*, to payment of that portion of the Obligations under the Term Loan Facility constituting unpaid principal of the Term Loans, ratably among the applicable Secured Creditors in proportion to the respective amounts described in this clause *Ninth* payable to them;

*Tenth*, to the payment of all other Obligations under the Term Loan Facility of the Credit Parties that are due and payable to the Administrative Agent and the other applicable Secured Creditors on such date, ratably based upon the respective aggregate amounts of all such Obligations under the Term Loan Facility owing to the Administrative Agent and the other applicable Secured Creditors on such date;

*Last*, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Borrower or as otherwise required by Law;

Amounts used to cash collateralize the Stated Amount of Letters of Credit pursuant to clause *fifth* above shall be applied to satisfy drawings under such Letters of Credit as they occur.  If any amount remains on deposit as cash collateral after all Letters of Credit have either been fully drawn or expired, such remaining amount shall be applied to the other Obligations, if any, in the order set forth above and, if no Obligations remain outstanding, such remaining amount shall be paid to the Borrower or as otherwise required by Law.

(b)      Each Credit Party shall allocate its Obligations among its Obligations under the Revolving Facility and its Obligations under the Term Loan Facility as such Credit Party shall determine in good faith is a reasonable allocation thereof.

(c)      Without limiting the generality of the foregoing, this Section 13.17 is intended to constitute and shall be deemed to constitute a "subordination agreement" within the meaning of Section 510(a) of the Bankruptcy Code and is intended to be and shall be interpreted to be enforceable to the maximum extent permitted pursuant to applicable nonbankruptcy law. Amounts applied pursuant to  clauses *First* through *Tenth* of Section 13.17(a) are to be applied, for the avoidance of doubt, in the order required by such clauses until the payment in full in cash of the applicable Obligations referred to in the applicable clause.

(d)      If any Secured Creditor collects or receives any amounts received on account of the Obligations to which it is not entitled under Section 13.17(a) hereof, such Secured Creditor shall hold the same in trust for the applicable Secured Creditors entitled thereto and shall forthwith deliver the same to the Administrative Agent, for the account of such Secured

-131-

Creditors, to be applied in accordance with Section 13.17(a) hereof, in each case until the prior payment in full in cash of the applicable Obligations of such Secured Creditors.

(e)    It is the intention of the parties hereto that (and to the maximum extent permitted by law the parties hereto agree that) the Obligations under the Revolving Facility (and the security therefor) constitute a separate and distinct class (and separate and distinct claims) from the Obligations (and security therefor) under the other Facilities.

(f)    EACH LENDER WITH OUTSTANDING TERM LOANS ACKNOWLEDGES AND AGREES THAT THE OBLIGATIONS IN RESPECT OF THE REVOLVING LOAN COMMITMENTS (INCLUDING OUTSTANDING REVOLVING LOANS, SWINGLINE LOANS AND LETTERS OF CREDIT) ARE ENTITLED TO DISTRIBUTIONS PURSUANT TO THIS SECTION 13.17 (INCLUDING DISTRIBUTIONS PURSUANT TO AN INSOLVENCY PROCEEDING) PRIOR TO ANY DISTRIBUTIONS BEING APPLIED TO THE OBLIGATIONS IN RESPECT OF OUTSTANDING TERM LOANS.

13.18    <u>The Patriot Act</u>.  Each Lender subject to the USA PATRIOT ACT (Title 111 of Pub. L. 107-56 (signed into law October 26, 2001)) (the "<u>Patriot Act</u>") hereby notifies the Borrower that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Borrower and the other Credit Parties and other information that will allow such Lender to identify the Borrower and the other Credit Parties in accordance with the Patriot Act.

*    *    *

022537-0191-13470-Active.12537490.17

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized officers to execute and deliver this Agreement as of the date first above written.

# TABLE OF CONTENTS

Page

SECTION 1.   Definitions and Accounting Terms. .................................................1
1.01   Defined Terms .........................................................................................1

SECTION 2.   Amount and Terms of Credit ...........................................................33
2.01   Loans .......................................................................................................33
2.02   Minimum Amount of Each Borrowing ................................................36
2.03   Notice of Borrowing ..............................................................................36
2.04   Disbursement of Funds .........................................................................37
2.05   Notes .......................................................................................................38
2.06   Conversions ...........................................................................................39
2.07   Pro Rata Borrowings .............................................................................40
2.08   Interest ....................................................................................................40
2.09   Interest Periods ......................................................................................41
2.10   Increased Costs, Illegality, etc. ............................................................42
2.11   Compensation ........................................................................................44
2.12   Change of Lending Office .....................................................................44
2.13   Replacement of Lenders ........................................................................44

SECTION 3.   Letters of Credit ..............................................................................46
3.01   Letters of Credit .....................................................................................46
3.02   Maximum Letter of Credit Outstandings; Final Maturities ................47
3.03   Letter of Credit Requests; Minimum Stated Amount ..........................47
3.04   Letter of Credit Participations ..............................................................48
3.05   Agreement to Repay Letter of Credit Drawings ..................................50
3.06   Increased Costs ......................................................................................51

SECTION 4.   Commitment Commission; Fees; Reductions of Commitment ............51
4.01   Fees ........................................................................................................51
4.02   Voluntary Termination of Unutilized Revolving Loan Commitments ...............52
4.03   Mandatory Reduction of Commitments and Revolving Loan Repayments ..........53

SECTION 5.   Prepayments; Payments; Taxes .......................................................53
5.01   Voluntary Prepayments ........................................................................53
5.02   Mandatory Repayments ........................................................................54
5.03   Method and Place of Payment ..............................................................58
5.04   Net Payments .........................................................................................58
5.05   Priority of Revolving Facility ...............................................................61

SECTION 6.   Conditions Precedent to the Conversion Date ...................................61
6.01   Execution of Agreement; Notes ...........................................................61
6.02   Officer's Certificate ..............................................................................61

(i)

Page

6.03    Opinions of Counsel ...............................................................................61
6.04    Company Documents; Proceedings; etc .................................................62
6.05    Shareholders' Agreements; Tax Sharing Agreements; Existing Indebtedness
          Agreements .............................................................................................62
6.06    Conversion of the DIP Credit Agreement..............................................62
6.07    Adverse Change, Approvals ...................................................................63
6.08    Litigation.................................................................................................63
6.09    Subsidiaries Guaranty; Intercompany Subordination Agreement .........63
6.10    Security Documents ................................................................................64
6.11    Mortgage; Title Insurance; Survey; Landlord Waivers; etc ..................65
6.12    Historical Financial Statements; Projections .........................................66
6.13    Solvency Certificate; Insurance Certificates, etc ..................................66
6.14    Fees, etc..................................................................................................66
6.15    Transaction Documents ..........................................................................66

SECTION 7.    Conditions Precedent to All Credit Events ............................................67

7.01    No Default; Representations and Warranties...........................................67
7.02    Notice of Borrowing; Letter of Credit Request .....................................67
7.03    No Excess Cash.......................................................................................67
7.04    No Pulitzer Financial Covenant Default .................................................68

SECTION 8.    Representations, Warranties and Agreements .........................................68

8.01    Company Status ......................................................................................68
8.02    Power and Authority ...............................................................................68
8.03    No Violation.............................................................................................69
8.04    Approvals .................................................................................................69
8.05    Financial Statements; Financial Condition; Undisclosed Liabilities;
          Projections...............................................................................................69
8.06    Litigation.................................................................................................71
8.07    True and Complete Disclosure ................................................................71
8.08    Use of Proceeds; Margin Regulations.....................................................71
8.09    Tax Returns and Payments......................................................................72
8.10    Compliance with ERISA.........................................................................72
8.11    Security Documents ................................................................................73
8.12    Properties ................................................................................................74
8.13    Capitalization ..........................................................................................74
8.14    Subsidiaries .............................................................................................75
8.15    Compliance with Statutes, etc.................................................................75
8.16    Investment Company Act ........................................................................75
8.17    [Reserved] ...............................................................................................75
8.18    Environmental Matters............................................................................75
8.19    Employment and Labor Relations ...........................................................76
8.20    Intellectual Property, etc .........................................................................76
8.21    Indebtedness ............................................................................................76
8.22    Insurance .................................................................................................77
8.23    Foreign Assets Control Regulations, Etc ................................................77

(ii)

Page

8.24    Representations and Warranties in Other Documents ..........................................77

SECTION 9.    Affirmative Covenants..........................................................................78

9.01    Information Covenants..........................................................................78
9.02    Books, Records and Inspections; Quarterly Meetings...........................83
9.03    Maintenance of Property; Insurance .....................................................84
9.04    Existence; Franchises..........................................................................84
9.05    Compliance with Statutes, etc...............................................................84
9.06    Compliance with Environmental Laws..................................................85
9.07    ERISA ..................................................................................................85
9.08    End of Fiscal Years..............................................................................87
9.09    Performance of Obligations ..................................................................87
9.10    Payment of Taxes.................................................................................87
9.11    Use of Proceeds...................................................................................87
9.12    Excluded Domestic Subsidiaries; Further Assurances; etc....................87
9.13    Ownership of Subsidiaries; etc. ............................................................89
9.14    Foreign Subsidiaries Security ..............................................................89
9.15    Terrorism Sanctions Regulations .........................................................90

SECTION 10.    Negative Covenants .............................................................................90

10.01    Liens...................................................................................................90
10.02    Consolidation, Merger, Purchase or Sale of Assets, etc. .....................93
10.03    Dividends ...........................................................................................95
10.04    Indebtedness......................................................................................96
10.05    Advances, Investments and Loans ......................................................99
10.06    Transactions with Affiliates................................................................102
10.07    Capital Expenditures.........................................................................104
10.08    Lee Interest Expense Coverage Ratio ...............................................105
10.09    Lee Leverage Ratio ..........................................................................105
10.10    Modifications of Second Lien Loan Documents, Certificate of
        Incorporation, By-Laws and Certain Other Agreements; Limitations on
        Voluntary Payments, etc ...................................................................106
10.11    Limitation on Certain Restrictions on Subsidiaries .............................109
10.12    Limitation on Issuance of Equity Interests .........................................109
10.13    Business; etc.....................................................................................110
10.14    Limitation on Creation of Subsidiaries ...............................................110

SECTION 11.    Events of Default .................................................................................110

11.01    Payments ..........................................................................................110
11.02    Representations, etc ..........................................................................110
11.03    Covenants..........................................................................................111
11.04    Default Under Other Agreements .......................................................111
11.05    Bankruptcy, etc ..................................................................................111
11.06    ERISA ...............................................................................................112
11.07    Security Documents ...........................................................................112
11.08    Subsidiaries Guaranty ........................................................................113

Page

11.09   Intercompany Subordination Agreement .......................................................113
11.10   Judgments ......................................................................................................113
11.11   Change of Control ..........................................................................................113
11.12   Intercreditor Agreement .................................................................................113

SECTION 12. The Administrative Agent ...........................................................................114

12.01   Appointment ..................................................................................................114
12.02   Nature of Duties .............................................................................................114
12.03   Lack of Reliance on the Administrative Agent ..............................................115
12.04   Certain Rights of the Administrative Agent ...................................................115
12.05   Reliance ..........................................................................................................116
12.06   Indemnification ..............................................................................................116
12.07   The Administrative Agent in its Individual Capacity .....................................116
12.08   Holders ...........................................................................................................116
12.09   Resignation by the Administrative Agent .......................................................117
12.10   Collateral Matters ..........................................................................................117
12.11   Delivery of Information ..................................................................................118

SECTION 13. Miscellaneous ..............................................................................................119

13.01   Payment of Expenses, etc. .............................................................................119
13.02   Right of Setoff ...............................................................................................120
13.03   Notices ...........................................................................................................121
13.04   Benefit of Agreement; Assignments; Participations .......................................121
13.05   No Waiver; Remedies Cumulative .................................................................123
13.06   Payments Pro Rata .........................................................................................123
13.07   Calculations; Computations ...........................................................................124
13.08   GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE;
          WAIVER OF JURY TRIAL ...........................................................................124
13.09   Counterparts ...................................................................................................125
13.10   Effectiveness ..................................................................................................125
13.11   Headings Descriptive ......................................................................................126
13.12   Amendment or Waiver; etc .............................................................................126
13.13   Survival ..........................................................................................................128
13.14   Domicile of Loans ..........................................................................................128
13.15   Register ...........................................................................................................128
13.16   Confidentiality ...............................................................................................129
13.17   Application of Proceeds ..................................................................................130
13.18   The Patriot Act ...............................................................................................132

(iv)

SCHEDULE I          Commitments
SCHEDULE II         Lender Addresses
SCHEDULE III        Existing Letters of Credit
SCHEDULE IV         Plans
SCHEDULE V          Subsidiaries
SCHEDULE VI         Existing Indebtedness
SCHEDULE VII        Insurance
SCHEDULE VIII       Existing Liens
SCHEDULE IX         Existing Investments
SCHEDULE X          Real Property
SCHEDULE XI         Transactions
SCHEDULE XII        Litigation


EXHIBIT A-1         Form of Notice of Borrowing
EXHIBIT A-2         Form of Notice of Conversion/Continuation
EXHIBIT B-1         Form of Term Note
EXHIBIT B-2         Form of Revolving Note
EXHIBIT B-3         Form of Swingline Note
EXHIBIT C           Form of Letter of Credit Request
EXHIBIT D           Form of Section 5.04(b)(ii) Certificate
EXHIBIT E           Form of Opinion of Lane & Waterman LLP and Sidley Austin LLP,
                    special counsel to the Credit Parties
EXHIBIT F           Form of Officers' Certificate
EXHIBIT G           Form of Subsidiaries Guaranty
EXHIBIT H           Form of Intercompany Subordination Agreement
EXHIBIT I-1         Form of Pledge Agreement
EXHIBIT I-2         Form of Security Agreement
EXHIBIT J           Form of Solvency Certificate
EXHIBIT K           Form of Compliance Certificate
EXHIBIT L           Form of Assignment and Assumption Agreement
EXHIBIT M           Form of Intercompany Note
EXHIBIT N           Form of Intercreditor Agreement

STB Draft 12/02/11

Exhibit A-1
Page 1

FORM OF NOTICE OF BORROWING

[Date]

Deutsche Bank Trust Company Americas, as
  Administrative Agent (the "Administrative
  Agent") for the Lenders party to the Credit
  Agreement referred to below
90 Hudson Street
5th Floor
Jersey City, New Jersey 07302
Attention: John Quinn

Ladies and Gentlemen:

         The undersigned, Lee Enterprises, Incorporated, a Delaware corporation (the
"Borrower"), refers to the Exit Credit Agreement, dated as of [____], (as amended, restated,
modified and/or supplemented from time to time, the "Credit Agreement"; the capitalized terms
defined therein being used herein as therein defined), among the Borrower, the lenders from time
to time party thereto (each, a "Lender" and collectively, the "Lenders"), Deutsche Bank
Securities Inc. and Goldman Sachs Lending Partners LLC, as Joint Lead Arrangers and Joint
Book Running Managers, and you, as Administrative Agent and Collateral Agent for such
Lenders, and hereby gives you notice, irrevocably, pursuant to Section [2.03(a)] [2.03(b)(i)] of
the Credit Agreement, that the undersigned hereby requests a Borrowing under the Credit
Agreement, and in that connection sets forth below the information relating to such Borrowing
(the "Proposed Borrowing") as required by Section [2.03(a)] [2.03(b)(i)] of the Credit
Agreement:

         (i)      The Business Day of the Proposed Borrowing is _____ __, ____.[1]

         (ii)     The aggregate principal amount of the Proposed Borrowing is
$_____.

         (iii)    The Loans to be made pursuant to the Proposed Borrowing shall consist of
[Revolving Loans] [Swingline Loans].

---

[1]      Shall be a Business Day at least one Business Day in the case of Base Rate Loans (or same day notice in the
case of Swingline Loans) and at least three Business Days in the case of Eurodollar Loans, in each case, after
the date hereof, provided that (in each case) any such notice shall be deemed to have been given on a certain
day only if given before 11:00 A.M. (New York time) (or 1:00 P.M. (New York time) in the case of Swingline
Loans) on such day.

(iv)     The Loans to be made pursuant to the Proposed Borrowing shall be initially maintained as [Base Rate Loans] [Eurodollar Loans].

(v)     The initial Interest Period for the Proposed Borrowing is [one month] [two months] [three months] [six months].[2]

The undersigned hereby certifies that the following statements are true on the date hereof, and will be true on the date of the Proposed Borrowing:

[(A)     all of the conditions precedent to the Conversion Date set forth in Section 6 of the Credit Agreement shall have been satisfied (or waived in accordance with the terms of the Credit Agreement)[3];]

[(B)][(A)]     the representations and warranties contained in the Credit Agreement and in the other Credit Documents are and will be true and correct in all material respects, before and after giving effect to the Proposed Borrowing, as though made on such date, unless stated to relate to a specific earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date; and

[(C)][(B)]     no Default or Event of Default has occurred and is continuing, or would result from such Proposed Borrowing.

Attached hereto as Annex A is a certificate of an Authorized Officer of the Borrower as required under Section 7.03 of the Credit Agreement.

Very truly yours,

LEE ENTERPRISES, INCORPORATED

By:_____
     Name:
     Title:

---

[2]     To be included for a Proposed Borrowing of Eurodollar Loans.

[3]     To be included only for a Proposed Borrowing on the Conversion Date.

Annex A

Certificate of Authorized Officer

### FORM OF NOTICE OF CONVERSION/CONTINUATION

[Date]

Deutsche Bank Trust Company Americas,
    as Administrative Agent for the Lenders party
    to the Credit Agreement
    referred to below
90 Hudson Street
5th Floor
Jersey City, New Jersey 07302

Attention: John Quinn

Ladies and Gentlemen:

       The undersigned, Lee Enterprises, Incorporated (the "Borrower"), refers to the Exit Credit Agreement, dated as of [_____], (as amended, restated, modified and/or supplemented from time to time, the "Credit Agreement"; the capitalized terms defined therein being used herein as therein defined), among the Borrower, the lenders from time to time party thereto (the "Lenders"), Deutsche Bank Securities Inc. and Goldman Sachs Lending Partners LLC, as Joint Lead Arrangers and Joint Book Running Managers, and Deutsche Bank Trust Company Americas, as Administrative Agent and Collateral Agent, and hereby gives you notice, irrevocably, pursuant to Section [2.06] [2.09] of the Credit Agreement, that the undersigned hereby requests to [convert] [continue] the Borrowing of [Term Loans] [Revolving Loans] referred to below, and in that connection sets forth below the information relating to such [conversion] [continuation] (the "Proposed [Conversion] [Continuation]") as required by Section [2.06] [2.09] of the Credit Agreement:

       (i)    The Proposed [Conversion] [Continuation] relates to the Borrowing of [Term Loans] [Revolving Loans] originally made on _____ __, 20__ (the "Outstanding Borrowing") in the principal amount of $_____ and currently maintained as a Borrowing of [Base Rate Loans] [Eurodollar Loans with an Interest Period ending on _____ __, ____].

       (ii)    The Business Day of the Proposed [Conversion] [Continuation] is _____ __, ____.[4]

---

[4]    Shall be a Business Day at least three Business Days (or one Business Day in the case of a conversion into Base Rate Loans) after the date hereof; provided that such notice shall be deemed to have been given on a certain day only if given before 11:00 A.M. (New York time) on such day.

(iii)    The Outstanding Borrowing shall be [continued as a Borrowing of Eurodollar Loans with an Interest Period of [one month] [two months] [three months] [six months]] converted into a Borrowing of [Base Rate Loans] [Eurodollar Loans with an Interest Period of [one month] [two months] [three months] [six months]].[5]

[The undersigned hereby certifies that no Default or Event of Default has occurred and will be continuing on the date of the Proposed [Conversion] [Continuation] or will have occurred and be continuing on the date of the Proposed [Conversion] [Continuation]].[6]

Very truly yours,

LEE ENTERPRISES, INCORPORATED

By: _____
    Name:
    Title:

---

[5]   In the event that either (x) only a portion of the Outstanding Borrowing is to be so converted or continued or (y) the Outstanding Borrowing is to be divided into separate Borrowings with different Interest Periods, the Borrower should make appropriate modifications to this clause to reflect same.

[6]   In the case of a Proposed Conversion or Continuation, insert this sentence only in the event that the conversion is from a Base Rate Loan to a Eurodollar Loan or in the case of a continuation of a Eurodollar Loan.

### FORM OF TERM NOTE

$_____                                                    New York, New York
                                                              _____ __, ____


      FOR VALUE RECEIVED, LEE ENTERPRISES, INCORPORATED, a Delaware corporation (the "Borrower"), hereby promises to pay to _____ or its registered assigns (the "Lender"), in lawful money of the United States of America in immediately available funds, at the Payment Office (as defined in the Agreement referred to below) initially located at 90 Hudson Street, 5th Floor, Jersey City, New Jersey 07302 on the Extended Term Loan Maturity Date (as defined in the Agreement) the principal sum of _____ DOLLARS ($_____) or, if less, the unpaid principal amount of all Term Loans (as defined in the Agreement) made by the Lender pursuant to the Agreement, payable at such times and in such amounts as are specified in the Agreement.

      The Borrower also promises to pay interest on the unpaid principal amount of each Term Loan made by the Lender in like money at said office from the date hereof until paid at the rates and at the times provided in Section 2.08 of the Agreement.

      This Note is one of the Term Notes referred to in the Exit Credit Agreement, dated as of [_____], among the Borrower, the lenders from time to time party thereto (including the Lender), Deutsche Bank Securities Inc. and Goldman Sachs Lending Partners LLC, as Joint Lead Arrangers and Joint Book Running Managers, and Deutsche Bank Trust Company Americas, as Administrative Agent and Collateral Agent (as amended, restated, modified and/or supplemented from time to time, the "Agreement"; the capitalized terms defined therein being used herein as therein defined), and is entitled to the benefits thereof and of the other Credit Documents.  This Note is secured by the Security Documents and is entitled to the benefits of the Subsidiaries Guaranty.  As provided in the Agreement, this Note is subject to voluntary prepayment and mandatory repayment prior to the Term Loan Maturity Date, in whole or in part, and Term Loans may be converted from one Type into another Type to the extent provided in the Agreement.

      In case an Event of Default shall occur and be continuing, the principal of and accrued interest on this Note may be declared to be due and payable in the manner and with the effect provided in the Agreement.

      The Borrower hereby waives presentment, demand, protest or notice of any kind in connection with this Note.

**THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK.**

LEE ENTERPRISES, INCORPORATED


By:_____
         Name:
         Title:

## FORM OF REVOLVING NOTE

$_____                                              New York, New York

_____ __, ____

       FOR VALUE RECEIVED, LEE ENTERPRISES, INCORPORATED, a Delaware corporation (the "Borrower"), hereby promises to pay to _____ or its registered assigns (the "Lender"), in lawful money of the United States of America in immediately available funds, at the Payment Office (as defined in the Agreement referred to below) initially located at 90 Hudson Street, 5th Floor, Jersey City, New Jersey 07302 on the Revolving Loan Maturity Date (as defined in the Agreement) the principal sum of _____ DOLLARS ($_____) or, if less, the unpaid principal amount of all Revolving Loans (as defined in the Agreement) made by the Lender pursuant to the Agreement, payable at such times and in such amounts as are specified in the Agreement.

       The Borrower also promises to pay interest on the unpaid principal amount of each Revolving Loan made by the Lender in like money at said office from the date hereof until paid at the rates and at the times provided in Section 2.08 of the Agreement.

       This Note is one of the Revolving Notes referred to in the Exit Credit Agreement, dated as of [_____], among the Borrower, the lenders from time to time party thereto (including the Lender), Deutsche Bank Securities Inc. and Goldman Sachs Lending Partners LLC, as Joint Lead Arrangers and Joint Book Running Managers, and Deutsche Bank Trust Company Americas, as Administrative Agent and Collateral Agent (as amended, restated, modified and/or supplemented from time to time, the "Agreement"; the capitalized terms defined therein being used herein as therein defined), and is entitled to the benefits thereof and of the other Credit Documents.  This Note is secured by the Security Documents and is entitled to the benefits of the Subsidiaries Guaranty.  As provided in the Agreement, this Note is subject to voluntary prepayment and mandatory repayment prior to the Revolving Loan Maturity Date, in whole or in part, and Revolving Loans may be converted from one Type into another Type to the extent provided in the Agreement.

       In case an Event of Default shall occur and be continuing, the principal of and accrued interest on this Note may be declared to be due and payable in the manner and with the effect provided in the Agreement.

       The Borrower hereby waives presentment, demand, protest or notice of any kind in connection with this Note.

**THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK.**

LEE ENTERPRISES, INCORPORATED


By:_____
    Name:
    Title:

<div align="right">**Exhibit B-3**</div>

## FORM OF SWINGLINE NOTE

$_____                                    New York, New York

_____ __, ____

   FOR VALUE RECEIVED, LEE ENTERPRISES, INCORPORATED, a Delaware Corporation (the "Borrower"), hereby promises to pay to _____ or its registered assigns (the "Lender"), in lawful money of the United States of America in immediately available funds, at the Payment Office (as defined in the Agreement referred to below) initially located at 90 Hudson Street, 5th Floor, Jersey City, New Jersey 07302 on the Swingline Expiry Date (as defined in the Agreement) the principal sum of _____ DOLLARS ($_____) or, if less, the unpaid principal amount of all Swingline Loans (as defined in the Agreement) made by the Lender pursuant to the Agreement, payable at such times and in such amounts as are specified in the Agreement.

   The Borrower also promises to pay interest on the unpaid principal amount of each Swingline Loan made by the Lender in like money at said office from the date hereof until paid at the rates and at the times provided in Section 2.08 of the Agreement.

   This Note is the Swingline Note referred to in the Exit Credit Agreement, dated as of [_____], among the Borrower, the lenders from time to time party thereto (including the Lender), Deutsche Bank Securities Inc. and Goldman Sachs Lending Partners LLC, as Joint Lead Arrangers and Joint Book Running Managers, and Deutsche Bank Trust Company Americas, as Administrative Agent and Collateral Agent (as amended, restated, modified and/or supplemented from time to time, the "Agreement"; the capitalized terms defined therein being used herein as therein defined), and is entitled to the benefits thereof and of the other Credit Documents.  This Note is secured by the Security Documents and is entitled to the benefits of the Subsidiaries Guaranty.  As provided in the Agreement, this Note is subject to voluntary prepayment and mandatory repayment prior to the Swingline Expiry Date, in whole or in part.

   In case an Event of Default shall occur and be continuing, the principal of and accrued interest on this Note may be declared to be due and payable in the manner and with the effect provided in the Agreement.

   The Borrower hereby waives presentment, demand, protest or notice of any kind in connection with this Note.

**THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK.**

LEE ENTERPRISES, INCORPORATED

By:_____
    Name:
    Title:

Exhibit C

# FORM OF LETTER OF CREDIT REQUEST

Dated _____[7]_____

Deutsche Bank Trust Company Americas, as Administrative
Agent, under the Exit Credit Agreement, dated as of
[_____], (as amended, restated, modified and/or
supplemented from time to time, the "Credit Agreement"),
among Lee Enterprises, Incorporated (the "Borrower"), the
lenders from time to time party thereto, Deutsche Bank
Securities Inc. and Goldman Sachs Lending Partners LLC,
as Joint Lead Arrangers and Joint Book Running Managers,
and Deutsche Bank Trust Company Americas, as
Administrative Agent and Collateral Agent
90 Hudson Street
5th Floor
Jersey City, New Jersey  07302
Attention: John Quinn

[[_____[8]_____], as Issuing Lender
under the Credit Agreement
_____
_____
_____]
Attention: [_____]

Ladies and Gentlemen:

          Pursuant to Section 3.03 of the Credit Agreement, we hereby request that the
Issuing Lender referred to above issue a [trade] [standby] Letter of Credit for the account of the
undersigned on _____[9]_____ (the "Date of Issuance") in the aggregate Stated Amount of _____[10]_____.

_____

[7]    Date of Letter of Credit Request.

[8]    Insert name and address of Issuing Lender.  For standby Letters of Credit issued by Deutsche Bank Trust
Company Americas insert:  Deutsche Bank Trust Company Americas, 60 Wall Street, New York, NY 10005-
MS NYC 60-3812, Attention: Global Loan Operations, Standby Letter of Credit Unit.  For trade Letters of
Credit issued by Deutsche Bank Trust Company Americas, insert: Deutsche Bank Trust Company Americas, 60
Wall Street, New York, NY 10005, Attention: Trade and Risk Services, Import LC.  For Letters of Credit issued
by another Issuing Lender, insert the correct notice information for that Issuing Lender.

[9]    Date of Issuance which shall be a Business Day at least 5 Business Days after the date hereof (or such earlier date
as is acceptable to the respective Issuing Lender in any given case).

[10]   Aggregate initial Stated Amount of the Letter of Credit which shall not be less than $100,000 (or such lesser
amount as is acceptable to the respective Issuing Lender).

Exhibit C

For purposes of this Letter of Credit Request, unless otherwise defined herein, all capitalized terms used herein which are defined in the Credit Agreement shall have the respective meaning provided therein.

The beneficiary of the requested Letter of Credit will be _____[11], and such Letter of Credit will be in support of _____[12] and will have a stated expiration date of _____[13].

We hereby certify that:

(A)     the representations and warranties contained in the Credit Agreement and in the other Credit Documents are and will be true and correct in all material respects on the Date of Issuance, both before and after giving effect to the issuance of the Letter of Credit requested hereby, unless stated to relate to a specific earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date; and

(B)     no Default or Event of Default has occurred and is continuing nor, after giving effect to the issuance of the Letter of Credit requested hereby, would such a Default or Event of Default occur.

Copies of all documentation with respect to the supported transaction are attached hereto.

LEE ENTERPRISES, INCORPORATED

By:_____
        Name:
        Title:

---

[11]   Insert name and address of beneficiary.

[12]   Insert a description of L/C Supportable Obligations (in the case of standby Letters of Credit) and insert description of permitted trade obligations of the Borrower or any of its Subsidiaries (in the case of trade Letters of Credit).

[13]   Insert the last date upon which drafts may be presented which may not be later than (i) in the case of standby Letters of Credit, the earlier of (x) one year after the Date of Issuance and (y) the 10th Business Day preceding the Revolving Loan Maturity Date and (ii) in the case of trade Letters of Credit, the earlier of (x) 180 days after the Date of Issuance and (y) 30 days prior to the Revolving Loan Maturity Date.

### FORM OF SECTION 5.04(b)(ii) CERTIFICATE

(For Non-U.S. Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Exit Credit Agreement, dated as of [_____], among Lee Enterprises, Incorporated, the Lenders from time to time party thereto, Deutsche Bank Securities Inc. and Goldman Sachs Lending Partners LLC, as Joint Lead Arrangers and Joint Book Running Managers, and Deutsche Bank Trust Company Americas, as Administrative Agent and Collateral Agent (as amended, restated, modified and/or supplemented from time to time, the "Credit Agreement").  Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Pursuant to the provisions of Section 5.04(b)(ii) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code and (v) the interest payments in question are not effectively connected with the undersigned's conduct of a U.S. trade or business.

The undersigned has furnished the Administrative Agent and the Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF LENDER]

By:_____
    Name:
    Title:

Date: _____, _____

## FORM OF SECTION 5.04(b)(ii) CERTIFICATE

### (For Non-U.S. Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Exit Credit Agreement, dated as of [_____], among Lee Enterprises, Incorporated, the Lenders from time to time party thereto, Deutsche Bank Securities Inc. and Goldman Sachs Lending Partners LLC, as Joint Lead Arrangers and Joint Book Running Managers, and Deutsche Bank Trust Company Americas, as Administrative Agent and Collateral Agent (as amended, restated, modified and/or supplemented from time to time, the "Credit Agreement").  Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Pursuant to the provisions of Section 5.04(b)(ii) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this Credit Agreement, neither the undersigned nor any of its partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, (v) none of its partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code, and (vi) the interest payments in question are not effectively connected with the undersigned's or its partners/members' conduct of a U.S. trade or business.

The undersigned has furnished the Administrative Agent and the Borrower with IRS Form W-8IMY accompanied by an IRS Form W-8BEN from each of its partners/members claiming the portfolio interest exemption.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF LENDER]


By:_____
    Name:
    Title:


Date: _____, _____

## FORM OF OFFICERS' CERTIFICATE

I, the undersigned, [Chairman/Chief Executive Officer/President/Vice-President] of [Name of Credit Party], a [corporation] organized and existing under the laws of the State of [_____] (the "Company"), [which corporation constitutes the general partner of _____, a _____ [general] [limited] partnership (the "Partnership"),] [which corporation constitutes the managing member of _____, a _____ limited liability company (the "Limited Liability Company"),] do hereby certify, solely in my capacity as an officer of the Company and not in my individual capacity, on behalf of the Company[, as the general partner of the Partnership] [, as the managing member of the Limited Liability Company], that:

1.     This Certificate is furnished pursuant to the Exit Credit Agreement, dated as of [_____], among [Lee Enterprises, Incorporated] [the Company], the lenders from time to time party thereto, Deutsche Bank Securities Inc. and Goldman Sachs Lending Partners LLC, as Joint Lead Arrangers and Joint Book Running Managers, and Deutsche Bank Trust Company Americas, as Administrative Agent and Collateral Agent (such Credit Agreement, as in effect on the date of this Certificate, being herein called the "Credit Agreement").  Unless otherwise defined herein, capitalized terms used in this Certificate shall have the meanings set forth in the Credit Agreement.

2.     The following named individuals are duly elected or appointed officers of the Company, and each holds the office of the Company set forth opposite such individual's name. The signature written opposite the name and title of each such officer is such officer's genuine signature.

| Name[14] | Office | Signature |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

3.     Attached hereto as Exhibit A is a certified copy of the [Certificate of Incorporation of the Company][Certificate of Partnership of the Partnership] [Certificate of Formation of the Limited Liability Company], as filed in the Office of the Secretary of State of the State of [_____] on [_____ __, ____], together with all amendments thereto adopted through the date hereof.

4.     Attached hereto as Exhibit B is a [true and correct copy of the By-Laws of the Company which were duly adopted and are in full force and effect on the date hereof], [certified copy of the [Partnership Agreement of the Partnership] [Limited Liability Company Agreement of the Limited Liability Company], as filed in the office of the Secretary of State of

---

[14] Include name, office and signature of each officer who will sign any Credit Document on behalf of the Company, including the officer who will sign the certification at the end of this Certificate or related documentation.

the State of [_____] on [_____ __, ____], together with all amendments thereto adopted through the date hereof.]

5.      Attached hereto as Exhibit C is a true and correct copy of resolutions which were duly adopted on _____ __, ____ [by unanimous written consent of the Board of Directors of the Company] [by a meeting of the Board of Directors of the Company at which a quorum was present and acting throughout], and said resolutions have not been rescinded, amended or modified.  Except as attached hereto as Exhibit C, no resolutions have been adopted by the Board of Directors of the Company which deal with the execution, delivery or performance of any of the Credit Documents to which the Company[, as the general partner of the Partnership,] [, as the managing member of the Limited Liability Company,] is a party or the transactions contemplated thereby.

6.      Attached hereto as Exhibit D is a true and complete copy of a "good standing" certificate (or equivalent) in respect of the Company issued as of a recent date by the Secretary of State or other appropriate governmental authority of the Company's jurisdiction of organization.

[7.      On the date hereof, all of the conditions set forth in Sections 6.06 through 6.08, inclusive, and 7.01 of the Credit Agreement have been satisfied.

8.      Attached hereto as Exhibit E are true and correct copies of the financial statements and Projections referred to in Sections 8.05(a) and (d) of the Credit Agreement and required to be delivered to the Administrative Agent pursuant to Section 6.12 of the Credit Agreement.

9.      Attached hereto as Exhibit F are true and correct copies of all Shareholders' Agreements of the Company and its Subsidiaries required to be delivered to the Administrative Agent pursuant to Section 6.05(i) of the Credit Agreement.

10.      Attached hereto as Exhibit G are true and correct copies of all Tax Sharing Agreements of the Company and its Subsidiaries required to be delivered to the Administrative Agent pursuant to Section 6.05(ii) of the Credit Agreement.

11.      Attached hereto as Exhibit H are true and correct copies of all Existing Indebtedness Agreements of the Company and its Subsidiaries required to be delivered to the Administrative Agent pursuant to Section 6.05(iii) of the Credit Agreement][15]

[7.][12.]      On the date hereof, the representations and warranties of the Company or any of its Subsidiaries contained in the Credit Agreement and the other Credit Documents are true and correct in all material respects with the same effect as though such representations and warranties had been made on the date hereof, both before and after giving effect to each Credit Event to occur on the date hereof, unless stated to relate to a specific earlier

---

[15] Insert bracketed items 7 through 11 only in the Certificate delivered on behalf of the Borrower.

date, in which case such representations and warranties were true and correct in all material respects as of such earlier date.

[8.][13.]      On the date hereof, no Default or Event of Default has occurred and is continuing or would result from any Credit Event to occur on the date hereof.

[9.][14.]      There is no pending proceeding for the dissolution or liquidation of [the Company] [and/or the [Partnership] [Limited Liability Company]] or, to the knowledge of the undersigned, threatening its existence.

IN WITNESS WHEREOF, I have hereunto set my hand this __ day of _____, ____.

[NAME OF CREDIT PARTY]

By:_____
   Name:
   Title:

I, the undersigned, [Secretary/Assistant Secretary] of the Company, do hereby certify, solely in my capacity as an officer of the Company and not in my individual capacity, on behalf of the Company [, as general partner of the Partnership,] [, as the managing member of the Limited Liability Company,] that:

1.      [Name of Person making above certifications] is the duly elected and qualified [Chairman/Chief Executive Officer/President/Vice-President] of the Company and the signature above is such person's genuine signature.

2.      The certifications made by [name of Person making above certifications] on behalf of the Company in Items 2, 3, 4, 5, 6, [7], [7][12] and [8] [13] above are true and correct.

IN WITNESS WHEREOF, I have hereunto set my hand this __ day of _____, ____.

[NAME OF CREDIT PARTY]

By:_____
    Name:
    Title:

EXHIBIT G
STB Draft 12/02/11

<u>SUBSIDIARIES GUARANTY</u>

SUBSIDIARIES GUARANTY (as amended, modified, restated and/or supplemented from time to time, this "<u>Guaranty</u>"), dated as of [_____], made by and among each of the undersigned guarantors (each, a "<u>Guarantor</u>" and, together with any other entity that becomes a guarantor hereunder pursuant to Section 22 hereof, collectively, the "<u>Guarantors</u>") in favor of Deutsche Bank Trust Company Americas, as Administrative Agent (together with any successor administrative agent, the "<u>Administrative Agent</u>"), for the benefit of the Secured Creditors (as defined below).  Except as otherwise defined herein, all capitalized terms used herein and defined in the Credit Agreement (as defined below) shall be used herein as therein defined.

<u>W I T N E S S E T H</u> :

WHEREAS, Lee Enterprises, Incorporated (the "<u>Borrower</u>"), the lenders from time to time party thereto (the "<u>Lenders</u>"), Deutsche Bank Securities Inc. and Goldman Sachs Lending Partners LLC, as Joint Lead Arrangers and Joint Book Running Managers, and Deutsche Bank Trust Company Americas, as Administrative Agent (the "<u>Administrative Agent</u>") and Collateral Agent  have entered into an Exit Credit Agreement, dated as of [____] (as amended, modified, restated and/or supplemented from time to time, the "<u>Credit Agreement</u>"), providing for the making and continuation of Loans to, and the issuance and maintenance of, and participation in, Letters of Credit for the account of, the Borrower, all as contemplated therein (the Lenders, each Issuing Lender, the Administrative Agent, the Collateral Agent and each other Agent are herein called the "<u>Lender Creditors</u>");

WHEREAS, the Borrower and/or one or more of its Qualified Wholly-Owned Domestic Subsidiaries have heretofore entered into, and/or may at any time and from time to time after the date hereof enter into, one or more Interest Rate Protection Agreements and/or Other Hedging Agreements with one or more Lenders or any affiliate thereof (each such Lender or affiliate, even if the respective Lender subsequently ceases to be a Lender under the Credit Agreement for any reason, together with such Lender's or affiliate's successors and assigns, if any, collectively, the "<u>Other Creditors</u>" and, together with the Lender Creditors, the "<u>Secured Creditors</u>"; and with each such Interest Rate Protection Agreement and/or Other Hedging Agreement with an Other Creditor being herein called a "<u>Secured Hedging Agreement</u>");

WHEREAS, each Guarantor is a direct or indirect Subsidiary of the Borrower;

WHEREAS, it is a condition precedent to the making and continuation of Loans to the Borrower and the issuance and maintenance of, and participation in, Letters of Credit for the account of the Borrower under the Credit Agreement and to the Other Creditors entering into and maintaining Secured Hedging Agreements that each Guarantor shall have executed and delivered to the Administrative Agent this Guaranty; and

WHEREAS, each Guarantor will obtain benefits from the incurrence and continuation of Loans by the Borrower and the issuance and maintenance of, and participation in, Letters of Credit for the account of the Borrower under the Credit Agreement and the entering into and maintaining by the Borrower and/or one or more of its Qualified Wholly-Owned Domestic Subsidiaries of Secured Hedging Agreements and, accordingly, desires to execute this Guaranty in order to satisfy the condition described in the preceding paragraph and to induce the Lenders to make (or be deemed to have made) and continue Loans to the Borrower and issue, maintain, and/or participate in, Letters of Credit for the account of the Borrower and the Other Creditors to maintain and/or enter into Secured Hedging Agreements with the Borrower and/or one or more of its Qualified Wholly-Owned Domestic Subsidiaries;

NOW, THEREFORE, in consideration of the foregoing and other benefits accruing to each Guarantor, the receipt and sufficiency of which are hereby acknowledged, each Guarantor hereby makes the following representations and warranties to the Administrative Agent for the benefit of the Secured Creditors and hereby covenants and agrees with each other Guarantor and the Administrative Agent for the benefit of the Secured Creditors as follows:

1. GUARANTY.    (a)    Each Guarantor, jointly and severally, irrevocably, absolutely and unconditionally guarantees as a primary obligor and not merely as surety:

(i)    to the Lender Creditors the full and prompt payment when due (whether at the stated maturity, by required prepayment, declaration, acceleration, demand or otherwise), subject to any applicable grace periods set forth in the Credit Documents, of (x) the principal of, premium, if any, and interest on the Notes issued by, and the Loans made to, the Borrower under the Credit Agreement, and all reimbursement obligations and Unpaid Drawings with respect to Letters of Credit and (y) all other obligations (including, without limitation, obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due), liabilities and indebtedness owing by the Borrower to the Lender Creditors under each Credit Document to which the Borrower is a party (including, without limitation, indemnities, Fees and interest thereon (including, without limitation, any interest accruing after the commencement of any bankruptcy, insolvency, receivership or similar proceeding at the rate provided for in the Credit Agreement, whether or not such interest is an allowed claim in any such proceeding)), whether now existing or hereafter incurred under, arising out of or in connection with each such Credit Document and the due performance and compliance by the Borrower with all of the terms, conditions, covenants and agreements contained in all such Credit Documents (all such principal, premium, interest, liabilities, indebtedness and obligations under this clause (i), except to the extent consisting of obligations or liabil-ities with respect to Secured Hedging Agreements, being herein collectively called the "Credit Document Obligations"); and

(ii)    to each Other Creditor the full and prompt payment when due (whether at the stated maturity, by required prepayment, declaration, acceleration, demand or otherwise) of all obligations (including, without limitation, obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due), liabilities and indebtedness (including, without limitation, any interest accruing after the commencement of any bankruptcy, insolvency, receivership or similar proceeding at the

rate provided for in the respective Secured Hedging Agreements, whether or not such interest is an allowed claim in any such proceeding) owing by the Borrower and each other Guaranteed Party (as defined below) under each Secured Hedging Agreement to which it is a party, whether now in existence or hereafter arising, and the due performance and compliance by the Borrower and each such other Guaranteed Party with all of the terms, conditions, covenants and agreements contained therein (all such obligations, liabilities and indebtedness being herein collectively called the "Other Obligations" and, together with the Credit Document Obligations are herein collectively called the "Guaranteed Obligations").

As used herein, the term "Guaranteed Party" shall mean the Borrower and each Qualified Wholly-Owned Domestic Subsidiary of the Borrower party to any Secured Hedging Agreement. Each Guarantor understands, agrees and confirms that the Secured Creditors may enforce this Guaranty up to the full amount of the Guaranteed Obligations against such Guarantor without proceeding against any other Guarantor, the Borrower or any other Guaranteed Party, or against any security for the Guaranteed Obligations, or under any other guaranty covering all or a portion of the Guaranteed Obligations. This Guaranty is a guaranty of prompt payment and performance and not of collection.

(b)    Additionally, each Guarantor, jointly and severally, unconditionally, absolutely and irrevocably, guarantees the payment of any and all Guaranteed Obligations whether or not due or payable by the Borrower or any other Guaranteed Party upon the occurrence in respect of the Borrower or any other Guaranteed Party of any of the events specified in Section 11.05 of the Credit Agreement, and unconditionally, absolutely and irrevocably, jointly and severally, promises to pay such Guaranteed Obligations to the Secured Creditors, or order, on demand.

2. LIABILITY OF GUARANTORS ABSOLUTE.    The liability of each Guarantor hereunder is primary, absolute, joint and several, and unconditional and is exclusive and independent of any security for or other guaranty of the indebtedness of the Borrower or any other Guaranteed Party whether executed by such Guarantor, any other Guarantor, any other guarantor or by any other party, and the liability of each Guarantor hereunder shall not be affected or impaired by any circumstance or occurrence whatsoever, including, without limitation: (a) any direction as to application of payment by the Borrower, any other Guaranteed Party or any other party, (b) any other continuing or other guaranty, undertaking or maximum liability of a Guarantor or of any other party as to the Guaranteed Obligations, (c) any payment on or in reduction of any such other guaranty or undertaking, (d) any dissolution, termination or increase, decrease or change in personnel by the Borrower or any other Guaranteed Party, (e) the failure of the Guarantor to receive any benefit from or as a result of its execution, delivery and performance of this Guaranty, (f) any payment made to any Secured Creditor on the indebtedness which any Secured Creditor repays the Borrower or any other Guaranteed Party pursuant to court order in any bankruptcy, reorganization, arrangement, moratorium or other debtor relief proceeding, and each Guarantor waives any right to the deferral or modification of its obligations hereunder by reason of any such proceeding, (g) any action or inaction by the Secured Creditors as contemplated in Section 5 hereof or (h) any invalidity, rescission, irregularity or unenforceability of all or any part of the Guaranteed Obligations or of any security therefor.

3. <u>OBLIGATIONS OF GUARANTORS INDEPENDENT</u>.  The obligations of each Guarantor hereunder are independent of the obligations of any other Guarantor, any other guarantor, the Borrower or any other Guaranteed Party, and a separate action or actions may be brought and prosecuted against each Guarantor whether or not action is brought against any other Guarantor, any other guarantor, the Borrower or any other Guaranteed Party and whether or not any other Guarantor, any other guarantor, the Borrower or any other Guaranteed Party be joined in any such action or actions.  Each Guarantor waives (to the fullest extent permitted by applicable law) the benefits of any statute of limitations affecting its liability hereunder or the enforcement thereof.  Any payment by the Borrower or any other Guaranteed Party or other circumstance which operates to toll any statute of limitations as to the Borrower or such other Guaranteed Party shall operate to toll the statute of limitations as to each Guarantor.

4. <u>WAIVERS BY GUARANTORS</u>.  (a)  Each Guarantor hereby waives (to the fullest extent permitted by applicable law) notice of acceptance of this Guaranty and notice of the existence, creation or incurrence of any new or additional liability to which it may apply, and waives promptness, diligence, presentment, demand of payment, demand for performance, protest, notice of dishonor or nonpayment of any such liabilities, suit or taking of other action by the Administrative Agent or any other Secured Creditor against, and any other notice to, any party liable thereon (including such Guarantor, any other Guarantor, any other guarantor, the Borrower or any other Guaranteed Party) and each Guarantor further hereby waives any and all notice of the creation, renewal, extension or accrual of any of the Guaranteed Obligations and notice or proof of reliance by any Secured Creditor upon this Guaranty, and the Guaranteed Obligations shall conclusively be deemed to have been created, contracted or incurred, or renewed, extended, amended, modified, supplemented or waived, in reliance upon this Guaranty.

(b)    Each Guarantor waives any right to require the Secured Creditors to:  (i) proceed against the Borrower, any other Guaranteed Party, any other Guarantor, any other guarantor of the Guaranteed Obligations or any other party; (ii) proceed against or exhaust any security held from the Borrower, any other Guaranteed Party, any other Guarantor, any other guarantor of the Guaranteed Obligations or any other party; or (iii) pursue any other remedy in the Secured Creditors' power whatsoever.  Each Guarantor waives any defense based on or arising out of any defense of the Borrower, any other Guaranteed Party, any other Guarantor, any other guarantor of the Guaranteed Obligations or any other party other than payment in full in cash of the Guaranteed Obligations, including, without limitation, any defense based on or arising out of the disability of the Borrower, any other Guaranteed Party, any other Guarantor, any other guarantor of the Guaranteed Obligations or any other party, or the unenforceability of the Guaranteed Obligations or any part thereof from any cause, or the cessation from any cause of the liability of the Borrower or any other Guaranteed Party other than payment in full in cash of the Guaranteed Obligations.  The Secured Creditors may, at their election, foreclose on any collateral serving as security held by the Administrative Agent, the Collateral Agent or the other Secured Creditors by one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable (to the extent such sale is permitted by applicable law), or exercise any other right or remedy the Secured Creditors may have against the Borrower, any other Guaranteed Party or any other party, or any security, without affecting or impairing in any way the liability of any Guarantor hereunder except to the extent the Guaranteed Obligations have been paid in full in cash.  Each Guarantor waives any defense arising out of any such

election by the Secured Creditors, even though such election operates to impair or extinguish any right of reimbursement, contribution, indemnification or subrogation or other right or remedy of such Guarantor against the Borrower, any other Guaranteed Party, any other guarantor of the Guaranteed Obligations or any other party or any security.

(c)      Each Guarantor has knowledge and assumes all responsibility for being and keeping itself informed of the Borrower's, each other Guaranteed Party's and each other Guarantor's financial condition, affairs and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks which such Guarantor assumes and incurs hereunder, and has adequate means to obtain from the Borrower, each other Guaranteed Party and each other Guarantor on an ongoing basis information relating thereto and the Borrower's, each other Guaranteed Party's and each other Guarantor's ability to pay and perform its respective Guaranteed Obligations, and agrees to assume the responsibility for keeping, and to keep, so informed for so long as this Guaranty is in effect. Each Guarantor acknowledges and agrees that (x) the Secured Creditors shall have no obligation to investigate the financial condition or affairs of the Borrower, any other Guaranteed Party or any other Guarantor for the benefit of such Guarantor nor to advise such Guarantor of any fact respecting, or any change in, the financial condition, assets or affairs of the Borrower, any other Guaranteed Party or any other Guarantor that might become known to any Secured Creditor at any time, whether or not such Secured Creditor knows or believes or has reason to know or believe that any such fact or change is unknown to such Guarantor, or might (or does) increase the risk of such Guarantor as guarantor hereunder, or might (or would) affect the willingness of such Guarantor to continue as a guarantor of the Guaranteed Obligations hereunder and (y) the Secured Creditors shall have no duty to advise any Guarantor of information known to them regarding any of the aforementioned circumstances or risks.

(d)      Each Guarantor hereby acknowledges and agrees that no Secured Creditor nor any other Person shall be under any obligation (a) to marshal any assets in favor of such Guarantor or in payment of any or all of the liabilities of any Guaranteed Party under the Credit Documents or the obligation of such Guarantor hereunder or (b) to pursue any other remedy that such Guarantor may or may not be able to pursue itself any right to which such Guarantor hereby waives.

(e)      Each Guarantor warrants and agrees that each of the waivers set forth in Section 3 and in this Section 4 is made with full knowledge of its significance and consequences and that if any of such waivers are determined to be contrary to any applicable law or public policy, such waivers shall be effective only to the maximum extent permitted by applicable law.

5.      <u>RIGHTS OF SECURED CREDITORS</u>.  Subject to Sections 4 and 13 hereof, any Secured Creditor may (except as shall be required by applicable statute and cannot be waived) at any time and from time to time without the consent of, or notice to, any Guarantor, without incurring responsibility to such Guarantor, without impairing or releasing the obligations or liabilities of such Guarantor hereunder, upon or without any terms or conditions and in whole or in part:

(a)      change the manner, place or terms of payment of, and/or change, increase or extend the time of payment of, renew, increase, accelerate or alter, any of the Guaranteed

Obligations (including, without limitation, any increase or decrease in the rate of interest thereon or the principal amount thereof), any security therefor, or any liability incurred directly or indirectly in respect thereof, and the guaranty herein made shall apply to the Guaranteed Obligations as so changed, extended, increased, accelerated, renewed or altered;

(b)    take and hold security for the payment of the Guaranteed Obligations and sell, exchange, release, surrender, impair, realize upon or otherwise deal with in any manner and in any order any property or other collateral by whomsoever at any time pledged or mortgaged to secure, or howsoever securing, the Guaranteed Obligations or any liabilities (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and/or any offset thereagainst;

(c)    exercise or refrain from exercising any rights against the Borrower, any other Guaranteed Party, any other Credit Party, any Subsidiary thereof, any other guarantor of the Borrower or others or otherwise act or refrain from acting;

(d)    release or substitute any one or more endorsers, Guarantors, other guarantors, the Borrower, any other Guaranteed Party or other obligors;

(e)    settle or compromise any of the Guaranteed Obligations, any security therefor or any liability (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and may subordinate the payment of all or any part thereof to the payment of any liability (whether due or not) of the Borrower or any other Guaranteed Party to creditors of the Borrower or such other Guaranteed Party other than the Secured Creditors;

(f)    apply any sums by whomsoever paid or howsoever realized to any liability or liabilities of the Borrower or any other Guaranteed Party to the Secured Creditors regardless of what liabilities of the Borrower or such other Guaranteed Party remain unpaid;

(g)    consent to or waive any breach of, or any act, omission or default under, any of the Secured Hedging Agreements, the Credit Documents or any of the instruments or agreements referred to therein, or otherwise amend, modify or supplement any of the Secured Hedging Agreements, the Credit Documents or any of such other instruments or agreements;

(h)    act or fail to act in any manner which may deprive such Guarantor of its right to subrogation against the Borrower or any other Guaranteed Party to recover full indemnity for any payments made pursuant to this Guaranty; and/or

(i)    take any other action or omit to take any other action which would, under otherwise applicable principles of common law, give rise to a legal or equitable discharge of such Guarantor from its liabilities under this Guaranty (including, without limitation, any action or omission whatsoever that might otherwise vary the risk of such Guarantor or constitute a legal or equitable defense to or discharge of the liabilities of a guarantor or surety or that might otherwise limit recourse against such Guarantor).

No invalidity, illegality, irregularity or unenforceability of all or any part of the Guaranteed Obligations, the Credit Documents or any other agreement or instrument relating to the

Guaranteed Obligations or of any security or guarantee therefor shall affect, impair or be a defense to this Guaranty, and this Guaranty shall be primary, absolute and unconditional notwithstanding the occurrence of any event or the existence of any other circumstances which might constitute a legal or equitable discharge of a surety or guarantor except payment in full in cash of the Guaranteed Obligations.

6. <u>CONTINUING GUARANTY</u>.  This Guaranty is a continuing one and all liabilities to which it applies or may apply under the terms hereof shall be conclusively presumed to have been created in reliance hereon.  No failure or delay on the part of any Secured Creditor in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein expressly specified are cumulative and not exclusive of any rights or remedies which any Secured Creditor would otherwise have.  No notice to or demand on any Guarantor in any case shall entitle such Guarantor to any other further notice or demand in similar or other circumstances or constitute a waiver of the rights of any Secured Creditor to any other or further action in any circumstances without notice or demand.  It is not necessary for any Secured Creditor to inquire into the capacity or powers of the Borrower or any other Guaranteed Party or the officers, directors, partners or agents acting or purporting to act on its or their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder.

7. <u>SUBORDINATION OF INDEBTEDNESS HELD BY GUARANTORS</u>.  Any indebtedness of the Borrower or any other Guaranteed Party now or hereafter held by any Guarantor is hereby subordinated to the indebtedness of the Borrower or such other Guaranteed Party to the Secured Creditors; and such indebtedness of the Borrower or such other Guaranteed Party to any Guarantor, if the Administrative Agent or the Collateral Agent, after an Event of Default has occurred and is continuing, so requests, shall be collected, enforced and received by such Guarantor as trustee for the Secured Creditors and be paid over to the Secured Creditors on account of the indebtedness of the Borrower or such other Guaranteed Party to the Secured Creditors, but without affecting or impairing in any manner the liability of such Guarantor under the other provisions of this Guaranty.  Prior to the transfer by any Guarantor of any note or negotiable instrument evidencing any indebtedness of the Borrower or any other Guaranteed Party to such Guarantor, such Guarantor shall mark such note or negotiable instrument with a legend that the same is subject to this subordination.  Without limiting the generality of the foregoing, each Guarantor hereby agrees with the Secured Creditors that it will not exercise any right of subrogation which it may at any time otherwise have as a result of this Guaranty (whether contractual, under Section 509 of the Bankruptcy Code or otherwise) until all Guaranteed Obligations have been irrevocably paid in full in cash; <u>provided</u>, that if any amount shall be paid to such Guarantor on account of such subrogation rights at any time prior to the irrevocable payment in full in cash of all the Guaranteed Obligations, such amount shall be held in trust for the benefit of the Secured Creditors and shall forthwith be paid to the Secured Creditors to be credited and applied upon the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms of the Credit Documents or, if the Credit Documents do not provide for the application of such amount, to be held by the Secured Creditors as collateral security for any Guaranteed Obligations thereafter existing.

8. <u>GUARANTY ENFORCEABLE BY ADMINISTRATIVE AGENT OR COLLATERAL AGENT</u>.  Notwithstanding anything to the contrary contained elsewhere in this Guaranty, the Secured Creditors agree (by their acceptance of the benefits of this Guaranty) that this Guaranty may be enforced only by the action of the Administrative Agent or the Collateral Agent, in each case acting upon the instructions of the Required Lenders (or, after the date on which all Credit Document Obligations have been paid in full, the holders of at least a majority of the outstanding Other Obligations) and that no other Secured Creditor shall have any right individually to seek to enforce or to enforce this Guaranty or to realize upon the security to be granted by the Security Documents, it being understood and agreed that such rights and remedies may be exercised by the Administrative Agent or the Collateral Agent or, after all the Credit Document Obligations have been paid in full, by the holders of at least a majority of the outstanding Other Obligations, as the case may be, for the benefit of the Secured Creditors upon the terms of this Guaranty and the Security Documents.  The Secured Creditors further agree that this Guaranty may not be enforced against any director, officer, employee, partner, member or stockholder of any Guarantor (except to the extent such partner, member or stockholder is also a Guarantor hereunder).  It is understood and agreed that the agreement in this Section 8 is among and solely for the benefit of the Secured Creditors and that, if the Required Lenders (or, after the date on which all Credit Document Obligations have been paid in full, the holders of at least a majority of the outstanding Other Obligations) so agree (without requiring the consent of any Guarantor), this Guaranty may be directly enforced by any Secured Creditor.

9. <u>REPRESENTATIONS, WARRANTIES AND COVENANTS OF GUARANTORS</u>.  In order to induce the Lenders to make Loans to, and issue Letters of Credit for the account of, the Borrower pursuant to the Credit Agreement, and in order to induce the Other Creditors to execute, deliver and perform the Secured Hedging Agreements to which they are a party, each Guarantor represents, warrants and covenants that:

(a)     such Guarantor (i) is a duly organized and validly existing Company in good standing under the laws of the jurisdiction of its organization, (ii) has the Company power and authority to own its property and assets and to transact the business in which it is engaged and presently proposes to engage and (iii) is duly qualified and is authorized to do business and is in good standing in each jurisdiction where the nature of its business requires such qualification, except for failures to be so qualified which, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect;

(b)     such Guarantor has the Company power and authority to execute, deliver and perform the terms and provisions of this Guaranty and each other Document (such term, for purposes of this Guaranty, to mean each Credit Document (as defined in the Credit Agreement) and each Secured Hedging Agreement) to which it is a party and has taken all necessary Company action to authorize the execution, delivery and performance by it of this Guaranty and each such other Document;

(c)     such Guarantor has duly executed and delivered this Guaranty and each other Document to which it is a party, and this Guaranty and each such other Document constitutes the legal, valid and binding obligation of such Guarantor enforceable in accordance with its terms, except to the extent that the enforceability hereof or thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally

affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law);

        (d)    neither the execution, delivery or performance by such Guarantor of this Guaranty or any other Document to which it is a party, nor compliance by it with the terms and provisions hereof and thereof, will (i) contravene any provision of any applicable law, statute, rule or regulation or any applicable order, writ, injunction or decree of any court or governmental instrumentality, (ii) conflict with or result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien (except pursuant to the Security Documents) upon any of the property or assets of such Guarantor or any of its Subsidiaries pursuant to the terms of any material indenture, mortgage, deed of trust, loan agreement, credit agreement, notes agreement, guaranty agreement, or any other material agreement, contract or instrument to which such Guarantor or any of its Subsidiaries is a party or by which it or any of its property or assets is bound or to which it may be subject or (iii) violate any provision of the certificate or articles of incorporation, by-laws, partnership agreement or limited liability company agreement (or equivalent organizational documents), as the case may be, of such Guarantor or any of its Subsidiaries;

        (e)    no order, consent, approval, license, authorization or validation of, or filing, recording or registration with (except as have been obtained or made prior to the date when required and which remain in full force and effect), or exemption by, any governmental or public body or authority, or any subdivision thereof, is required to authorize, or is required in connection with, (i) the execution, delivery and performance of this Guaranty by such Guarantor or any other Document to which such Guarantor is a party or (ii) the legality, validity, binding effect or enforceability of this Guaranty or any other Document to which such Guarantor is a party;

        (f)    there are no actions, suits or proceedings pending or, to such Guarantor's knowledge, threatened (i) with respect to this Guaranty or any other Document to which such Guarantor is a party or (ii) with respect to such Guarantor or any of its Subsidiaries that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect;

        (g)    until the termination of the Total Commitment and all Secured Hedging Agreements and until such time as no Note or Letter of Credit remains outstanding and all Guaranteed Obligations have been paid in full (other than indemnities described in Section 13.01 of the Credit Agreement and analogous provisions in the Pledge Agreement which are not then due and payable), such Guarantor will comply, and will cause each of its Subsidiaries to comply, with all of the applicable provisions, covenants and agreements contained in Sections 9 and 10 of the Credit Agreement, and will take, or will refrain from taking, as the case may be, all actions that are necessary to be taken or not taken so that no violation of any provision, covenant or agreement contained in Sections 9 and 10 of the Credit Agreement, and so that no Default or Event of Default, is caused by the actions of such Guarantor or any of its Subsidiaries; and

        (h)    an executed (or conformed) copy of each of the Credit Documents, the Secured Hedging Agreements has been made available to a senior officer of such Guarantor and such officer is familiar with the contents thereof.

10. <u>EXPENSES</u>.  The Guarantors hereby jointly and severally agree to pay all reasonable out-of-pocket costs and expenses of the Collateral Agent, the Administrative Agent and each other Secured Creditor in connection with the enforcement of this Guaranty and the protection of the Secured Creditors' rights hereunder and any amendment, waiver or consent relating hereto (including, in each case, without limitation, the reasonable fees and disbursements of counsel (including in-house counsel) employed by the Collateral Agent, the Administrative Agent and each other Secured Creditor).

11. <u>BENEFIT AND BINDING EFFECT</u>.  This Guaranty shall be binding upon each Guarantor and its successors and assigns and shall inure to the benefit of the Secured Creditors and their successors and assigns.

12. <u>AMENDMENTS; WAIVERS</u>.   Neither this Guaranty nor any provision hereof may be changed, waived, discharged or terminated except with the written consent of each Guarantor directly affected thereby (it being understood that the addition or release of any Guarantor hereunder shall not constitute a change, waiver, discharge or termination affecting any Guarantor other than the Guarantor so added or released) and with the written consent of either (x) the Required Lenders (or, to the extent required by Section 13.12 of the Credit Agreement, with the written consent of each Lender) at all times prior to the time at which all Credit Document Obligations have been paid in full or (y) the holders of at least a majority of the outstanding Other Obligations at all times after the time at which all Credit Document Obligations have been paid in full; <u>provided</u>, that any change, waiver, modification or variance affecting the rights and benefits of a single Class (as defined below) of Secured Creditors (and not all Secured Creditors in a like or similar manner) shall also require the written consent of the Requisite Creditors (as defined below) of such Class of Secured Creditors.  For the purpose of this Guaranty, the term "<u>Class</u>" shall mean each class of Secured Creditors, <u>i.e.</u>, whether (x) the Lender Creditors as holders of the Credit Document Obligations or (y) the Other Creditors as the holders of the Other Obligations.  For the purpose of this Guaranty, the term "<u>Requisite Creditors</u>" of any Class shall mean (x) with respect to the Credit Document Obligations, the Required Lenders (or, to the extent required by Section 13.12 of the Credit Agreement, each Lender) and (y) with respect to the Other Obligations, the holders of at least a majority of all Other Obligations outstanding from time to time under the Secured Hedging Agreements.

13. <u>SET OFF</u>.  In addition to any rights now or hereafter granted under applicable law (including, without limitation, Section 151 of the New York Debtor and Creditor Law) and not by way of limitation of any such rights, upon the occurrence and during the continuance of an Event of Default (such term to mean and include any "Event of Default" as defined in the Credit Agreement and any payment default under any Secured Hedging Agreement continuing after any applicable grace period), each Secured Creditor is hereby authorized, at any time or from time to time, without notice to any Guarantor or to any other Person, any such notice being expressly waived, to set off and to appropriate and apply any and all deposits (general or special) and any other indebtedness at any time held or owing by such Secured Creditor to or for the credit or the account of such Guarantor, against and on account of the obligations and liabilities of such Guarantor to such Secured Creditor under this Guaranty, irrespective of whether or not such Secured Creditor shall have made any demand hereunder and although said obligations, liabilities, deposits or claims, or any of them, shall be contingent or unmatured.  Each Secured Creditor (by its acceptance of the benefits hereof) acknowledges and agrees that the provisions of

this Section 13 are subject to the sharing provisions set forth in Section 13.06 of the Credit Agreement.

14. <u>NOTICE</u>.    Except as otherwise specified herein, all notices, requests, demands or other communications to or upon the respective parties hereto shall be sent or delivered by mail, telegraph, telex, telecopy, cable or courier service and all such notices and communications shall, when mailed, telegraphed, telexed, telecopied, or cabled or sent by courier, be effective when deposited in the mails, delivered to the telegraph company, cable company or overnight courier, as the case may be, or sent by telex or telecopier, except that notices and communications to the Administrative Agent or any Guarantor shall not be effective until received by the Administrative Agent or such Guarantor, as the case may be.  All notices and other communications shall be in writing and addressed to such party (i) in the case of any Lender Creditor, as provided in the Credit Agreement, (ii) in the case of any Guarantor, at its address set forth opposite its signature below, and (iii) in the case of any Other Creditor, at such address as such Other Creditor shall have specified in writing to the Guarantors; or in any case at such other address as any of the Persons listed above may hereafter notify the others in writing.

15. <u>REINSTATEMENT</u>.  If any claim is ever made upon any Secured Creditor for repayment or recovery of any amount or amounts received in payment or on account of any of the Guaranteed Obligations and any of the aforesaid payees repays all or part of said amount by reason of (i) any judgment, decree or order of any court or administrative body having jurisdiction over such payee or any of its property or (ii) any settlement or compromise of any such claim effected by such payee with any such claimant (including, without limitation, the Borrower or any other Guaranteed Party), then and in such event each Guarantor agrees that any such judgment, decree, order, settlement or compromise shall be binding upon such Guarantor, notwithstanding any revocation hereof or the cancellation of any Note, any Secured Hedging Agreement or any other instrument evidencing any liability of the Borrower or any other Guaranteed Party, and such Guarantor shall be and remain liable to the aforesaid payees hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by any such payee.

16. <u>CONSENT TO JURISDICTION; SERVICE OF PROCESS; AND WAIVER OF TRIAL BY JURY</u>.  (a)    THIS GUARANTY AND THE RIGHTS AND OBLIGATIONS OF THE SECURED CREDITORS AND OF THE UNDERSIGNED HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK.  Any legal action or proceeding with respect to this Guaranty or any other Credit Document to which any Guarantor is a party may be brought in the courts of the State of New York or of the United States of America for the Southern District of New York, in each case located within the County of New York, and, by execution and delivery of this Guaranty, each Guarantor hereby irrevocably accepts for itself and in respect of its property, generally and unconditionally, the personal jurisdiction of the aforesaid courts.  Each Guarantor hereby further irrevocably waives any claim that any such courts lack personal jurisdiction over such Guarantor, and agrees not to plead or claim, in any legal action or proceeding with respect to this Guaranty or any other Credit Document to which such Guarantor is a party brought in any of the aforesaid courts, that any such court lacks personal jurisdiction over such Guarantor.  Each Guarantor further irrevocably consents to the service of process out of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail,

postage prepaid, to each Guarantor at its address set forth opposite its signature below, such service to become effective 30 days after such mailing. Each Guarantor hereby irrevocably waives any objection to such service of process and further irrevocably waives and agrees not to plead or claim in any action or proceeding commenced hereunder or under any other Credit Document to which such Guarantor is a party that such service of process was in any way invalid or ineffective. Nothing herein shall affect the right of any of the Secured Creditors to serve process in any other manner permitted by law or to commence legal proceedings or otherwise proceed against each Guarantor in any other jurisdiction.

(b)    Each Guarantor hereby irrevocably waives (to the fullest extent permitted by applicable law) any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Guaranty or any other Credit Document to which such Guarantor is a party brought in the courts referred to in clause (a) above and hereby further irrevocably waives and agrees not to plead or claim in any such court that such action or proceeding brought in any such court has been brought in an inconvenient forum.

(c)    EACH GUARANTOR AND EACH SECURED CREDITOR (BY ITS ACCEPTANCE OF THE BENEFITS OF THIS GUARANTY) HEREBY IRREVOCABLY WAIVES ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS GUARANTY, THE OTHER CREDIT DOCUMENTS TO WHICH SUCH GUARANTOR IS A PARTY OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

17.    <u>RELEASE OF GUARANTORS</u>.  (a)  In the event that all of the Equity Interests of one or more Guarantors is sold or otherwise disposed of or liquidated in compliance with the requirements of Section 10.02 of the Credit Agreement (or such sale, other disposition or liquidation has been approved in writing by the Required Lenders (or all the Lenders if required by Section 13.12 of the Credit Agreement)) and the proceeds of such sale, disposition or liquidation are applied in accordance with the provisions of the Credit Agreement, to the extent applicable, such Guarantor shall, upon consummation of such sale or other disposition (except to the extent that such sale or disposition is to the Borrower or another Subsidiary thereof), be released from this Guaranty automatically and without further action and this Guaranty shall, as to each Guarantor, terminate, and have no further force or effect (it being understood and agreed that the sale of one or more Persons that own, directly or indirectly, all of the Equity Interests of any Guarantor shall be deemed to be a sale of such Guarantor for the purposes of this Section 17(a)).

(b)    Upon the payment in full of all Guaranteed Obligations and the termination of the Credit Agreement, Total Commitments and Letters of Credit (or, in the case of Letters of Credit, such Letters of Credit are cash collateralized or made subject to backstop letters of credit pursuant to documentation acceptable to the Collateral Agent and the Issuing Lender), the Guarantors shall be released from this Guaranty automatically and without further action and this Guaranty shall, as to each Guarantor, terminate, and have no further force or effect.

18. <u>CONTRIBUTION</u>.   At any time a payment in respect of the Guaranteed Obligations is made under this Guaranty, the right of contribution of each Guarantor against each other Guarantor shall be determined as provided in the immediately following sentence, with the right of contribution of each Guarantor to be revised and restated as of each date on which a payment (a "<u>Relevant Payment</u>") is made on the Guaranteed Obligations under this Guaranty. At any time that a Relevant Payment is made by a Guarantor that results in the aggregate payments made by such Guarantor in respect of the Guaranteed Obligations to and including the date of the Relevant Payment exceeding such Guarantor's Contribution Percentage (as defined below) of the aggregate payments made by all Guarantors in respect of the Guaranteed Obligations to and including the date of the Relevant Payment (such excess, the "<u>Aggregate Excess Amount</u>"), each such Guarantor shall have a right of contribution against each other Guarantor who has made payments in respect of the Guaranteed Obligations to and including the date of the Relevant Payment in an aggregate amount less than such other Guarantor's Contribution Percentage of the aggregate payments made to and including the date of the Relevant Payment by all Guarantors in respect of the Guaranteed Obligations (the aggregate amount of such deficit, the "<u>Aggregate Deficit Amount</u>") in an amount equal to (x) a fraction the numerator of which is the Aggregate Excess Amount of such Guarantor and the denominator of which is the Aggregate Excess Amount of all Guarantors multiplied by (y) the Aggregate Deficit Amount of such other Guarantor.  A Guarantor's right of contribution pursuant to the preceding sentences shall arise at the time of each computation, subject to adjustment to the time of each computation; <u>provided</u> that no Guarantor may take any action to enforce such right until the Guaranteed Obligations have been irrevocably paid in full in cash and the Total Commitment, all Secured Hedging Agreements and all Letters of Credit have been terminated, it being expressly recognized and agreed by all parties hereto that any Guarantor's right of contribution arising pursuant to this Section 18 against any other Guarantor shall be expressly junior and subordinate to such other Guarantor's obligations and liabilities in respect of the Guaranteed Obligations and any other obligations owing under this Guaranty.  As used in this Section 18:  (i) each Guarantor's "<u>Contribution Percentage</u>" shall mean the percentage obtained by dividing (x) the Adjusted Net Worth (as defined below) of such Guarantor by (y) the aggregate Adjusted Net Worth of all Guarantors; (ii) the "<u>Adjusted Net Worth</u>" of each Guarantor shall mean the greater of (x) the Net Worth (as defined below) of such Guarantor and (y) zero; and (iii) the "<u>Net Worth</u>" of each Guarantor shall mean the amount by which the fair saleable value of such Guarantor's assets on the date of any Relevant Payment exceeds its existing debts and other liabilities (including contingent liabilities, but without giving effect to any Guaranteed Obligations arising under this Guaranty on such date).  Notwithstanding anything to the contrary contained above, any Guarantor that is released from this Guaranty pursuant to Section 17 hereof shall thereafter have no contribution obligations, or rights, pursuant to this Section 18, and at the time of any such release, if the released Guarantor had an Aggregate Excess Amount or an Aggregate Deficit Amount, same shall be deemed reduced to $0, and the contribution rights and obligations of the remaining Guarantors shall be recalculated on the respective date of release (as otherwise provided above) based on the payments made hereunder by the remaining Guarantors. All parties hereto recognize and agree that, except for any right of contribution arising pursuant to this Section 18, each Guarantor who makes any payment in respect of the Guaranteed Obligations shall have no right of contribution or subrogation against any other Guarantor in respect of such payment until all of the Guaranteed Obligations have been irrevocably paid in full in cash.  Each of the Guarantors recognizes and acknowledges that the rights to contribution

arising hereunder shall constitute an asset in favor of the party entitled to such contribution.  In this connection, each Guarantor has the right to waive its contribution right against any Guarantor to the extent that after giving effect to such waiver such Guarantor would remain solvent, in the determination of the Required Lenders.

19.  <u>LIMITATION ON GUARANTEED OBLIGATIONS</u>.  Each Guarantor and each Secured Creditor (by its acceptance of the benefits of this Guaranty) hereby confirms that it is its intention that this Guaranty not constitute a fraudulent transfer or conveyance for purposes of the Bankruptcy Code, the Uniform Fraudulent Conveyance Act of any similar Federal or state law.  To effectuate the foregoing intention, each Guarantor and each Secured Creditor (by its acceptance of the benefits of this Guaranty) hereby irrevocably agrees that the Guaranteed Obligations guaranteed by such Guarantor shall be limited to such amount as will, after giving effect to such maximum amount and all other (contingent or otherwise) liabilities of such Guarantor that are relevant under such laws and after giving effect to any rights to contribution pursuant to any agreement providing for an equitable contribution among such Guarantor and the other Guarantors, result in the Guaranteed Obligations of such Guarantor in respect of such maximum amount not constituting a fraudulent transfer or conveyance.

20.  <u>COUNTERPARTS</u>.  This Guaranty may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.  A set of counterparts executed by all the parties hereto shall be lodged with the Borrower and the Administrative Agent.

21.  <u>PAYMENTS</u>.  All payments made by any Guarantor hereunder will be made without setoff, counterclaim or other defense and on the same basis as payments are made by the Borrower under Sections 5.03 and 5.04 of the Credit Agreement.

22.  <u>ADDITIONAL GUARANTORS</u>.  It is understood and agreed that any Subsidiary of the Borrower that is required to execute a counterpart of this Guaranty after the date hereof pursuant to the Credit Agreement shall become a Guarantor hereunder by (x) executing and delivering a counterpart hereof to the Administrative Agent or executing a joinder agreement and delivering same to the Administrative Agent, in each case as may be requested by (and in form and substance satisfactory to) the Administrative Agent and (y) taking all actions as specified in this Guaranty as would have been taken by such Guarantor had it been an original party to this Guaranty, in each case with all documents required above to be delivered to the Administrative Agent with all documents and actions required to be taken above to be taken to the reasonable satisfaction of the Administrative Agent.

23.  <u>HEADINGS DESCRIPTIVE</u>.  The headings of the several Sections of this Guaranty are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Guaranty.

IN WITNESS WHEREOF, each Guarantor has caused this Guaranty to be executed and delivered as of the date first above written.

Address:

| | |
|---|---|
| c/o Lee Enterprises, Incorporated<br>201 North Harrison Street, Suite 600<br>Davenport, Iowa 52801<br>Attention:  Chief Financial Officer<br>Tel:  (563) 383-2179<br>Fax:  (563) 327-2600 | ACCUDATA, INC.,<br>    as a Guarantor<br><br><br>By:_____<br>    Title: |
| c/o Lee Enterprises, Incorporated<br>201 North Harrison Street, Suite 600<br>Davenport, Iowa 52801<br>Attention:  Chief Financial Officer<br>Tel:  (563) 383-2179<br>Fax:  (563) 327-2600 | INN PARTNERS, L.C.,<br>    as a Guarantor<br><br><br>By:_____<br>    Title: |
| c/o Lee Enterprises, Incorporated<br>201 North Harrison Street, Suite 600<br>Davenport, Iowa 52801<br>Attention:  Chief Financial Officer<br>Tel:  (563) 383-2179<br>Fax:  (563) 327-2600 | JOURNAL – STAR PRINTING CO.,<br>    as a Guarantor<br><br><br>By:_____<br>    Title: |
| c/o Lee Enterprises, Incorporated<br>201 North Harrison Street, Suite 600<br>Davenport, Iowa 52801<br>Attention:  Chief Financial Officer<br>Tel:  (563) 383-2179<br>Fax:  (563) 327-2600 | K. FALLS BASIN PUBLISHING, INC.,<br>    as a Guarantor<br><br><br>By:_____<br>    Title: |
| c/o Lee Enterprises, Incorporated<br>201 North Harrison Street, Suite 600<br>Davenport, Iowa 52801<br>Attention:  Chief Financial Officer<br>Tel:  (563) 383-2179<br>Fax:  (563) 327-2600 | LEE CONSOLIDATED HOLDINGS CO.,<br>    as a Guarantor<br><br><br>By:_____<br>    Title: |
| c/o Lee Enterprises, Incorporated<br>201 North Harrison Street, Suite 600<br>Davenport, Iowa 52801<br>Attention:  Chief Financial Officer<br>Tel:  (563) 383-2179<br>Fax:  (563) 327-2600 | LEE PUBLICATIONS, INC.,<br>    as a Guarantor<br><br><br>By:_____<br>    Title: |

c/o Lee Enterprises, Incorporated
201 North Harrison Street, Suite 600
Davenport, Iowa 52801
Attention:  Chief Financial Officer
Tel:  (563) 383-2179
Fax:  (563) 327-2600

LEE PROCUREMENT SOLUTIONS CO.,
   as a Guarantor


By:_____
   Title:

c/o Lee Enterprises, Incorporated
201 North Harrison Street, Suite 600
Davenport, Iowa 52801
Attention:  Chief Financial Officer
Tel:  (563) 383-2179
Fax:  (563) 327-2600

SIOUX CITY NEWSPAPERS, INC.,
   as a Guarantor


By:_____
   Title:


Accepted and Agreed to:

DEUTSCHE BANK TRUST COMPANY AMERICAS,
as Administrative Agent


By:_____
   Title:

By:_____
   Title:

## FORM OF INTERCOMPANY SUBORDINATION AGREEMENT

THIS INTERCOMPANY SUBORDINATION AGREEMENT (as amended, restated, modified and/or supplemented from time to time, this "Agreement"), dated as of [____], made by each of the undersigned (each, a "Party" and, together with any entity that becomes a party to this Agreement pursuant to Section 9 hereof, the "Parties") and Deutsche Bank Trust Company Americas, as collateral agent (in such capacity, together with any successor collateral agent, the "Collateral Agent"), for the benefit of the Senior Creditors (as defined below). Unless otherwise defined herein, all capitalized terms used herein shall have the meanings ascribed to them in the Credit Agreement referred to below.

## W I T N E S S E T H:

WHEREAS, Lee Enterprises, Incorporated (the "Borrower"), the lenders from time to time party thereto (the "Lenders"), Deutsche Bank Securities Inc. and Goldman Sachs Lending Partners LLC, as Joint Lead Arrangers and Joint Book Running Managers, and Deutsche Bank Trust Company Americas, as Administrative Agent and Collateral Agent (together with any successor administrative agent, the "Administrative Agent"), have entered into an Exit Credit Agreement, dated as of [____], providing for the making (or deemed making) and continuation of Loans to the Borrower and the issuance and maintenance of, and participation in, Letters of Credit for the account of the Borrower, all as contemplated therein (with the Lenders, each Issuing Lender, the Administrative Agent, the Collateral Agent and each other Agent being herein called the "Lender Creditors") (as used herein, the term "Credit Agreement" means the Exit Credit Agreement described above in this paragraph, as the same may be amended, restated, modified, supplemented, extended, renewed, refinanced, replaced, or refunded from time to time, and including any agreement extending the maturity of, or refinancing or restructuring (including, but not limited to, the inclusion of additional borrowers or guarantors thereunder or any increase in the amount borrowed) all or any portion of, the indebtedness under such agreement or any successor agreement, whether or not with the same agent, trustee, representative, lenders or holders; provided that, with respect to any subsequent agreement providing for the refinancing or replacement of indebtedness under the Credit Agreement, such agreement shall only be treated as, or as part of, the Credit Agreement hereunder if (i) either (A) all obligations under the Credit Agreement being refinanced or replaced shall be paid in full at the time of such refinancing or replacement, and all Commitments and Letters of Credit issued pursuant to the refinanced or replaced Credit Agreement shall have terminated in accordance with their terms or (B) the Required Lenders shall have consented in writing to the refinancing or replacement indebtedness being treated as indebtedness pursuant to the Credit Agreement, and (ii) a notice to the effect that the refinancing or replacement indebtedness shall be treated as issued under the Credit Agreement shall be delivered by the Borrower to the Collateral Agent);

WHEREAS, the Borrower and/or one or more of its Qualified Wholly-Owned Domestic Subsidiaries have heretofore entered into, and/or may at any time and from time to time after the date hereof enter into, one or more Interest Rate Protection Agreements or Other Hedging Agreements with one or more Lenders or any affiliate thereof (each such Lender or affiliate, even if the respective Lender subsequently ceases to be a Lender under the Credit Agreement for any reason, together with such Lender's or affiliate's successors and assigns, if

any, collectively, the "Hedging Creditors"; and with each such Interest Rate Protection Agreement and/or Other Hedging Agreement with a Hedging Creditor being herein called a "Secured Hedging Agreement");

WHEREAS, pursuant to the Subsidiaries Guaranty, each Subsidiary Guarantor has jointly and severally guaranteed to the Guaranteed Creditors the payment when due of all Guaranteed Obligations (as defined in the Subsidiaries Guaranty);

WHEREAS, it is a condition precedent to the extensions of credit under the Credit Agreement that this Agreement be executed and delivered by the original Parties hereto;

WHEREAS, additional Parties may from time to time become parties hereto in order to allow for certain extensions of credit in accordance with the requirements of the Credit Agreement; and

WHEREAS, each of the Parties desires to execute this Agreement to satisfy the conditions described in the immediately preceding paragraphs.

NOW, THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties hereto, the Parties and the Collateral Agent (for the benefit of the Senior Creditors) hereby agree as follows:

1.    The Subordinated Debt (as defined in Section 7 hereof) and all payments of principal, interest and all other amounts thereunder are hereby, and shall continue to be, subject and subordinate in right of payment to the prior payment in full, in cash, of all Senior Indebtedness to the extent, and in the manner, set forth herein.  The foregoing shall apply notwithstanding the availability of collateral to the Senior Creditors or the holders of Subordinated Debt or the actual date and time of execution, delivery, recordation, filing or perfection of any security interests granted with respect to the Senior Indebtedness or the Subordinated Debt, or the lien or priority of payment thereof, and in any instance wherein the Senior Indebtedness or any claim for the Senior Indebtedness (as defined in Section 7 hereof) is subordinated, avoided or disallowed, in whole or in part, under the Bankruptcy Code or other applicable federal, foreign, state or local law.  In the event of a proceeding, whether voluntary or involuntary, for insolvency, liquidation, reorganization, dissolution, bankruptcy or other similar proceeding pursuant to the Bankruptcy Code or other applicable federal, foreign, state or local law (each, a "Bankruptcy Proceeding"), the Senior Indebtedness shall include all interest accrued on the Senior Indebtedness, in accordance with and at the rates specified in the Senior Indebtedness, both for periods before and for periods after the commencement of any of such proceedings, even if the claim for such interest is not allowed pursuant to the Bankruptcy Code or other applicable law.

2.    Each Party (as a lender of any Subordinated Debt) hereby agrees that until all Senior Indebtedness has been repaid in full in cash:

(a)    Such Party shall not, without the prior written consent of the Required Senior Creditors (as defined in Section 7 hereof), which consent may be withheld or conditioned

in the Required Senior Creditors' sole discretion, commence, or join or participate in, any Enforcement Action (as defined in Section 7 hereof).

(b)    In the event that (i) all or any portion of any Senior Indebtedness remaining unpaid after it becomes due (whether at stated maturity, by acceleration or otherwise), (ii) any Event of Default under the Credit Agreement or any event of default under, and as defined in, any other Senior Indebtedness (or the documentation governing the same), then exists or would result from such payment on the Subordinated Debt (including, without limitation, pursuant to Section 11.10 of the Credit Agreement), (iii) such Party receives any payment or prepayment of principal, interest or any other amount, in whole or in part, of (or with respect to) the Subordinated Debt in violation of the terms of the Credit Agreement or any other Senior Indebtedness (or the documentation governing the same) or (iv) any distribution, division or application, partial or complete, voluntary or involuntary, by operation of law or otherwise, is made of all or any part of the property, assets or business of the Borrower or any of its Subsidiaries or the proceeds thereof, in whatever form, to any creditor or creditors of the Borrower or any of its Subsidiaries or to any holder of indebtedness of the Borrower or any of its Subsidiaries or by reason of any liquidation, dissolution or other winding up of the Borrower, any of its Subsidiaries or their respective businesses, or of any receivership or custodianship for the Borrower or any of its Subsidiaries or of all or substantially all of their respective property, or of any insolvency or bankruptcy proceedings or assignment for the benefit of creditors or any proceeding by or against the Borrower or any of its Subsidiaries for any relief under any bankruptcy, reorganization or insolvency law or laws, federal, foreign, state or local, or any law, federal, foreign, state or local relating to the relief of debtors, readjustment of indebtedness, reorganization, composition or extension, then, and in any such event, any payment or distribution of any kind or character, whether in cash, property or securities, which shall be payable or deliverable with respect to any or all of the Subordinated Debt or which has been received by any Party shall be held in trust by such Party for the benefit of the Senior Creditors and shall forthwith be paid or delivered directly to the Senior Creditors for application to the payment of the Senior Indebtedness (after giving effect to the relative priorities of such Senior Indebtedness) to the extent necessary to make payment in full in cash of all sums due under the Senior Indebtedness remaining unpaid after giving effect to any concurrent payment or distribution to the Senior Creditors.  In any such event, the Senior Creditors may, but shall not be obligated to, demand, claim and collect any such payment or distribution that would, but for these subordination provisions, be payable or deliverable with respect to the Subordinated Debt. In the event of the occurrence of any event referred to in subclauses (i), (ii), (iii) or (iv) of the second preceding sentence of this clause (b) and until the Senior Indebtedness shall have been fully paid in cash and satisfied and all of the obligations of the Borrower or any of its Subsidiaries to the Senior Creditors have been performed in full, no payment of any kind or character (whether in cash, property, securities or otherwise) shall be made to or accepted by any Party in respect of the Subordinated Debt.  Notwithstanding anything to the contrary contained above, if one or more of the events referred to in subclauses (i) through (iv) of the first sentence of this clause (b) is in existence, the Required Senior Creditors may agree in writing that payments may be made with respect to the Subordinated Debt which would otherwise be prohibited pursuant to the provisions contained above, <u>provided</u> that any such waiver shall be specifically limited to the respective payment or payments which the Required Senior Creditors agree may be so paid to any Party in respect of the Subordinated Debt.

(c)     If such Party shall acquire by indemnification, subrogation or otherwise, any lien, estate, right or other interest in any of the assets or properties of the Borrower or any of its Subsidiaries, that lien, estate, right or other interest shall be subordinate in right of payment to the Senior Indebtedness and the lien of the Senior Indebtedness as provided herein, and such Party hereby waives any and all rights it may acquire by subrogation or otherwise to any lien of the Senior Indebtedness or any portion thereof until such time as all Senior Indebtedness has been repaid in full in cash.

(d)     Such Party shall not pledge, assign, hypothecate, transfer, convey or sell any Subordinated Debt or any interest in any Subordinated Debt to any entity (other than under the relevant Security Documents (as hereinafter defined) or in accordance with the relevant requirements of the Credit Agreement to a Credit Party which is a Party hereto) without the prior written consent of the Administrative Agent (with the prior written consent of the Required Senior Creditors).

(e)     After request by the Administrative Agent or the Required Senior Creditors, such Party shall within ten (10) days furnish the Senior Creditors with a statement, duly acknowledged and certified setting forth the original principal amount of the notes evidencing the indebtedness of the Subordinated Debt, the unpaid principal balance, all accrued interest but unpaid interest and any other sums due and owing thereunder, the rate of interest, the monthly payments and that, to the best knowledge of such Party, there exists no defaults under the Subordinated Debt, or if any such defaults exist, specifying the defaults and the nature thereof.

(f)     In any case commenced by or against the Borrower or any of its Subsidiaries under the Bankruptcy Code or any similar federal, foreign, state or local statute (a "Reorganization Proceeding"), to the extent permitted by applicable law, the Required Senior Creditors shall have the exclusive right to exercise any voting rights in respect of the claims of such Party against the Borrower or any of its Subsidiaries.

(g)     If, at any time, all or part of any payment with respect to Senior Indebtedness theretofore made (whether by the Borrower, any other Credit Party or any other Person or enforcement of any right of setoff or otherwise) is rescinded or must otherwise be returned by the holders of Senior Indebtedness for any reason whatsoever (including, without limitation, the insolvency, bankruptcy or reorganization of the Borrower, any other Credit Party or such other Persons), the subordination provisions set forth herein shall continue to be effective or be reinstated, as the case may be, all as though such payment had not been made.

(h)     Such Party shall not object to the entry of any order or orders approving any cash collateral stipulations, adequate protection stipulations or similar stipulations executed by the Senior Creditors in any Reorganization Proceeding or any other proceeding under the Bankruptcy Code.

(i)     Such Party waives any marshalling rights with respect to the Senior Creditors in any Reorganization Proceeding or any other proceeding under the Bankruptcy Code.

3.     Each Party hereby represents, warrants and covenants as follows:

(a)    each Party will deliver a schedule setting forth all Intercompany Debt to the Administrative Agent within 10 days after any request by the Administrative Agent or the Required Senior Creditors (although any failure to deliver such a supplement shall have no effect whatsoever on the subordination provisions contained herein, which shall apply to all Subordinated Debt whether or not listed on said schedule); and

(b)    each Party will not lend, hold or permit to exist any Intercompany Debt owed by it or to it (in accordance with the definition thereof contained herein) unless each obligee or obligor, as the case may be, with respect to such Intercompany Debt is (or concurrently with such extension becomes) a Party to this Agreement.

4.    Any payments made to, or received by, any Party in respect of any guaranty or security in support of the Subordinated Debt shall be subject to the terms of this Agreement and applied on the same basis as payments made directly by the obligor under such Subordinated Debt.  To the extent that the Borrower or any of its Subsidiaries (other than the respective obligor or obligors which are already Parties hereto) provides a guaranty or any security in support of any Subordinated Debt, the Party which is the lender of the respective Subordinated Debt will cause each such Person to become a Party hereto (if such Person is not already a Party hereto) not later than the date of the execution and delivery of the respective guarantee or security documentation, <u>provided</u> that any failure to comply with the foregoing requirements of this Section 4 will have no effect whatsoever on the subordination provisions contained herein (which shall apply to all payments received with respect to any guarantee or security for any Subordinated Debt, whether or not the Person furnishing such guarantee or security is a Party hereto).

5.    Each Party hereby acknowledges and agrees that no payments will be accepted by it in respect of the Subordinated Debt (unless promptly turned over to the holders of Senior Indebtedness as contemplated by Section 2 above) to the extent such payments would be prohibited under any Senior Indebtedness (or the documentation governing the same).

6.    In addition to the foregoing agreements, each Party hereby acknowledges and agrees that, with respect to all Intercompany Debt (whether or not same constitutes Subordinated Debt), that (x) such Intercompany Debt (and any promissory notes or other instruments evidencing same) may be pledged, and delivered for pledge, by the Borrower or any of its Subsidiaries pursuant to any Security Document (as used herein, the term "<u>Security Documents</u>" shall mean the Pledge Agreement (as defined in the Credit Agreement) and also shall include any other security documentation executed and delivered in connection with, or pursuant to, the Credit Agreement) to which the Borrower or the respective such Subsidiary is, or at any time in the future becomes, a party and (y) with respect to all Intercompany Debt so pledged, the Collateral Agent shall be entitled to exercise all rights and remedies with respect to such Intercompany Debt to the maximum extent provided in the various Security Documents (in accordance with the terms thereof and subject to the requirements of applicable law).  Further-more, with respect to all Intercompany Debt at any time owed to the Borrower or any of its Subsidiaries which is a Credit Party, and notwithstanding anything to the contrary contained in the terms of such Intercompany Debt, each obligor (including any guarantor) and obligee with respect to such Intercompany Debt hereby agrees, for the benefit of the holders from time to time of the Senior Indebtedness, that the Administrative Agent or the Collateral Agent may at any time, and from time to time, acting on its own or at the request of the Required Senior Creditors,

accelerate the maturity of such Intercompany Debt if (x) any obligor (including any guarantor) of such Intercompany Debt is subject to any Bankruptcy Proceeding or (y) any event of default under the Credit Agreement shall have occurred and be continuing.  Any such acceleration of the maturity of any Intercompany Debt shall be made by written notice by the Administrative Agent or Collateral Agent to the obligor on the respective Intercompany Debt; <u>provided</u> that no such notice shall be required (and the acceleration shall automatically occur) either upon the occurrence of a Bankruptcy Proceeding with respect to the respective obligor (or any guarantor) of the respective Intercompany Debt or upon (or following) any acceleration of the maturity of any Loans pursuant to the Credit Agreement.

       7.    <u>Definitions</u>.  As and in this Agreement, the terms set forth below shall have the respective meanings provided below:

      "<u>Credit Document Obligations Termination Date</u>" shall mean the first date after the Conversion Date upon which all Commitments and Letters of Credit under the Credit Agreement have terminated and all Credit Document Obligations have been paid in full in cash.

      "<u>Enforcement Action</u>" shall mean any acceleration of all or any part of the Subordinated Debt, any foreclosure proceeding, the exercise of any power of sale, the obtaining of a receiver, the seeking of default interest, the suing on, or otherwise taking action to enforce the obligation of the Borrower or any of its Subsidiaries to pay any amounts relating to any Subordinated Debt, the exercising of any banker's lien or rights of set-off or recoupment, the institution of a Bankruptcy Proceeding against the Borrower or any of its Subsidiaries, or the taking of any other enforcement action against any asset or Property of the Borrower or its Subsidiaries.

      "<u>Intercompany Debt</u>" shall mean any Indebtedness, payables or other obligations, whether now existing or hereafter incurred, owed by the Borrower or any Subsidiary Guarantor to the Borrower or any Subsidiary of the Borrower, <u>provided</u> that no such payables or other obligations incurred by any Credit Party after the Conversion Date and owing to Pulitzer or any of its Subsidiaries shall constitute Intercompany Debt. For the avoidance of doubt, all such Intercompany Debt outstanding on the Conversion Date and owed to Pulitzer or any of its Subsidiaries shall continue to be subordinated on, and subject to, the terms of this Agreement.

      "<u>Obligation</u>" shall mean any principal, interest, premium, penalties, fees, indemnities and other liabilities and obligations payable under the documentation governing any indebtedness (including, without limitation, all interest accruing after the commencement of any bankruptcy, insolvency, receivership or similar proceeding at the rate provided in the governing documentation, whether or not such interest is an allowed claim in such proceeding).

      "<u>Required Senior Creditors</u>" shall mean (i) the Required Lenders (or, to the extent required by Section 13.12 of the Credit Agreement, each of the Lenders) at all times prior to the Credit Document Obligations Termination Date, and (ii) the holders of at least a majority of the other outstanding Senior Indebtedness at all times after the Credit Document Obligations Termination Date.

      "<u>Secured Hedging Agreements</u>" shall have the meaning provided in the recitals to this Agreement.

"Senior Creditors" shall mean all holders from time to time of any Senior Indebtedness and shall include, without limitation, the Lender Creditors and the Hedging Creditors.

"Senior Indebtedness" shall mean:

(i)  all Obligations (including Obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due) and liabilities (including, without limitation, indemnities, Fees and interest thereon) of each Credit Party (whether as obligor, guarantor or otherwise) to the Lender Creditors, whether now existing or hereafter incurred under, arising out of or in connection with each Credit Document to which it is at any time a party (including, without limitation, all such obligations and liabilities of each Credit Party under the Credit Agreement (if a party thereto) and under the Subsidiaries Guaranty (if a party thereto) or under any other guarantee by it of obligations pursuant to the Credit Agreement) and the due performance and compliance by each Credit Party with the terms of each such Credit Document (all such obligations and liabilities under this clause (i), except to the extent consisting of obligations or indebtedness with respect to Secured Hedging Agreements, being herein collectively called the "Credit Document Obligations"); and

(ii) all Obligations (including Obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due) and liabilities of each Credit Party to the Hedging Creditors, whether now existing or hereafter incurred under, arising out of or in connection with any Secured Hedging Agreement (including, without limitation, all such obligations and liabilities of such Credit Party under the Subsidiaries Guaranty (if a party thereto) with respect thereto or under any other guarantee by it of obligations pursuant to any Secured Hedging Agreement) and the due performance and compliance by each Credit Party with the terms of each such Secured Hedging Agreement (all such obligations and liabilities under this clause (ii) being herein collectively called the "Hedging Obligations").

"Subordinated Debt" shall mean the principal of, interest on, and all other amounts owing from time to time in respect of, all Intercompany Debt (including, without limitation, pursuant to guarantees thereof or security therefor and intercompany payables not evidenced by a note) at any time outstanding.

8.    Each Party agrees to be fully bound by all terms and provisions contained in this Agreement, both with respect to any Subordinated Debt (including any guarantees thereof and security therefor) owed to it, and with respect to all Subordinated Debt (including all guarantees thereof and security therefor) owing by it.

9.    It is understood and agreed that any Subsidiary of the Borrower that is required to execute a counterpart of this Agreement after the date hereof pursuant to the requirements of the Credit Agreement or any other Senior Indebtedness shall become a Party hereunder by executing a counterpart hereof (or a joinder agreement in form and substance reasonably satisfactory to the Administrative Agent) and delivering same to the Collateral Agent.

10.     No failure or delay on the part of any party hereto or any holder of Senior Indebtedness in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy hereunder.

11.     Each Party hereto acknowledges that to the extent that no adequate remedy at law exists for breach of its obligations under this Agreement, in the event any Party fails to comply with its obligations hereunder, the Collateral Agent, the Administrative Agent or the holders of Senior Indebtedness shall have the right to obtain specific performance of the obligations of such defaulting Party, injunctive relief or such other equitable relief as may be available.

12.     Any notice to be given under this Agreement shall be in writing and shall be sent in accordance with the provisions of the Credit Agreement.

13.     In the event of any conflict between the provisions of this Agreement and the provisions of the Subordinated Debt, the provisions of this Agreement shall prevail.

14.     No Person other than the parties hereto, the Senior Creditors from time to time and their successors and assigns as holders of the Senior Indebtedness and the Subordinated Debt shall have any rights under this Agreement.

15.     This Agreement may be executed in any number of counterparts each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

16.     No amendment, supplement, modification, waiver or termination of this Agreement shall be effective against a party against whom the enforcement of such amendment, supplement, modification, waiver or termination would be asserted, unless such amendment, supplement, modification, waiver or termination was made in a writing signed by such party, provided that amendments hereto shall be effective as against the Senior Creditors only if executed and delivered by the Collateral Agent (with the written consent of the Required Senior Creditors at such time).

17.     In case any one or more of the provisions confined in this Agreement, or any application thereof, shall be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein, and any other application thereof, shall not in any way be affected or impaired thereby.

**18.     (a)     THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.**

(b)     Any legal action or proceeding with respect to this Agreement may be brought in the courts of the State of New York or of the United States of America for the Southern District of New York in each case which are located in the County of New York, and, by execution and delivery of this Agreement, each Party hereby irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts.

Each Party hereby further irrevocably waives any claim that any such court lacks personal jurisdiction over such Party, and agrees not to plead or claim in any legal action or proceeding with respect to this Agreement or any other Credit Document to which such Party is a party brought in any of the aforesaid courts that any such court lacks personal jurisdiction over such Party. Each Party further irrevocably consents to the service of process out of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to such Party at its address set forth opposite is signature below, such service to become effective 30 days after such mailing. Each Party hereby irrevocably waives any objection to such service of process and further irrevocably waives and agrees not to plead or claim in any action or proceeding commenced hereunder or under any other Credit Document to which such Party is a party that such service of process was in any way invalid or ineffective. Nothing herein shall affect the right of any of the Senior Creditors to serve process in any other manner permitted by law or to commence legal proceedings or otherwise proceed against each Party in any other jurisdiction.

(c)   **EACH PARTY HEREBY IRREVOCABLY WAIVES ANY OBJEC- TION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (b) ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.**

(d)   **EACH PARTY HEREBY IRREVOCABLY WAIVES ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.**

19.   This Agreement shall bind and inure to the benefit of the Administrative Agent, the Collateral Agent, the other Senior Creditors and each Party and their respective successors, permitted transferees and assigns.

*     *     *

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized officers to execute and deliver this Agreement as of the date first above written.

LEE ENTERPRISES, INCORPORATED

By:_____
    Title:

ACCUDATA, INC.

By:_____
    Title:

INN PARTNERS, L.C.

By:_____
    Title:

JOURNAL – STAR PRINTING CO.

By:_____
    Title:

K. FALLS BASIN PUBLISHING, INC.

By:_____
    Title:

LEE CONSOLIDATED HOLDINGS CO.

By:_____
    Title:

LEE PUBLICATIONS, INC.

By:_____
    Title:

LEE PROCUREMENT SOLUTIONS CO.


By:_____
   Title:

SIOUX CITY NEWSPAPERS, INC.


By:_____
   Title:



DEUTSCHE BANK TRUST COMPANY
AMERICAS, as Collateral Agent

By:_____
   Title:

By:_____
   Title:

### FORM OF PLEDGE AGREEMENT[1]

PLEDGE AGREEMENT (as amended, modified, restated and/or supplemented from time to time, this "Agreement"), dated as of [_____], made by each of the undersigned pledgors (each, a "Pledgor" and, together with any other entity that becomes a pledgor hereunder pursuant to Section 30 hereof, the "Pledgors") in favor of Deutsche Bank Trust Company Americas, as collateral agent (together with any successor collateral agent, the "Pledgee"), for the benefit of the Secured Creditors (as defined below).  Except as otherwise defined herein, all capitalized terms used herein and defined in the Credit Agreement (as defined below) shall be used herein as therein defined.

### W I T N E S S E T H :

WHEREAS, Lee Enterprises, Incorporated (the "Borrower"), the lenders from time to time party thereto (the "Lenders"), Deutsche Bank Securities Inc. and Goldman Sachs Lending Partners LLC, as Joint Lead Arrangers and Joint Book Running Managers, and Deutsche Bank Trust Company Americas, as Administrative Agent (together with any successor administrative agent, the "Administrative Agent") and Collateral Agent, have entered into an Exit Credit Agreement, dated as of [_____], (as amended, modified, restated and/or supplemented from time to time, the "Credit Agreement"), providing for the making and continuation of Loans to, and the issuance and maintenance of, and participation in, Letters of Credit for the account of, the Borrower, all as contemplated therein (the Lenders, each Issuing Lender, the Administrative Agent, the Pledgee and each other Agent are herein called the "Lender Creditors");

WHEREAS, the Borrower and/or one or more of its Qualified Wholly-Owned Domestic Subsidiaries have heretofore entered into, and/or may at any time and from time to time after the date hereof enter into, one or more Interest Rate Protection Agreements or Other Hedging Agreements with one or more Lenders or any affiliate thereof (each such Lender or affiliate, even if the respective Lender subsequently ceases to be a Lender under the Credit Agreement for any reason, together with such Lender's or affiliate's successors and assigns, if any, collectively, the "Other Creditors" and, together with the Lender Creditors, the "Secured Creditors"; and with each such Interest Rate Protection Agreement and/or Other Hedging Agreement with an Other Creditor being herein called a "Secured Hedging Agreement");

---

[1]    The Pledgors (i) acknowledge that no disclosure schedules or similar information contemplated by this Agreement have been provided as of the date of this draft and (ii) agree that, to the extent that the information set forth in such disclosure schedules or other information differs in any respect from the information provided to the Lenders prior to the Effective Date (as defined in the Support Agreement), the Lenders reserve the right in their reasonable discretion to make appropriate changes to this Agreement.

Exhibit I
Page 2

WHEREAS, pursuant to the Subsidiaries Guaranty, each Subsidiary Guarantor has jointly and severally guaranteed to the Secured Creditors the payment when due of all Guaranteed Obligations as described therein;

WHEREAS, it is a condition precedent to the making (or deemed making) and continuation of Loans to the Borrower and the issuance and maintenance of, and participation in, Letters of Credit for the account of the Borrower under the Credit Agreement and to the Other Creditors entering into and maintaining Secured Hedging Agreements that each Pledgor shall have executed and delivered to the Pledgee this Agreement; and

WHEREAS, each Pledgor desires to execute this Agreement to satisfy the conditions described in the preceding paragraph;

WHEREAS, each Pledgor will obtain benefits from the incurrence (or deemed incurrence) and continuation of Loans by the Borrower and the issuance and maintenance of, and participation in, Letters of Credit for the account of the Borrower under the Credit Agreement and the entering into and maintaining by the Borrower and/or one or more of its Qualified Wholly-Owned Domestic Subsidiaries of Secured Hedging Agreements and, accordingly, desires to execute this Agreement in order to satisfy the condition described in the preceding paragraph and to induce the Lenders to make (or deemed to have made) and continue Loans to the Borrower and issue, maintain, and/or participate in, Letters of Credit for the account of the Borrower and the Other Creditors to maintain and/or enter into Secured Hedging Agreements with the Borrower and/or one or more of its Qualified Wholly-Owned Domestic Subsidiaries;

NOW, THEREFORE, in consideration of the foregoing and other benefits accru-ing to each Pledgor, the receipt and sufficiency of which are hereby acknowledged, each Pledgor hereby makes the following representations and warranties to the Pledgee for the benefit of the Secured Creditors and hereby covenants and agrees with the Pledgee for the benefit of the Secured Creditors as follows:

1. SECURITY FOR OBLIGATIONS.  This Agreement is made by each Pledgor for the benefit of the Secured Creditors to secure:

(i)    the full and prompt payment when due (whether at stated maturity, by acceleration or otherwise) of all obligations, liabilities and indebtedness (including, without limitation, principal, premium, interest (including, without limitation, all interest that accrues on or after the commencement of any case, proceeding or other action relating to the bankruptcy, insolvency, reorganization or similar proceeding of any Pledgor or any Subsidiary thereof at the rate provided for in the respective documentation, whether or not a claim for post-petition interest is allowed in any such proceeding), reimbursement obligations under Letters of Credit, fees, costs and indemnities) of such Pledgor owing to the Lender Creditors, whether now existing or hereafter incurred under, arising out of, or in connection with, each Credit Document to which such Pledgor is a party (including, in the case of each Pledgor that is a Subsidiary Guarantor, all such obligations, liabilities and indebtedness of such Pledgor under the Subsidiaries Guaranties) and the due performance and compliance by such Pledgor with all of the terms, conditions and agreements contained in each such Credit Document (all

such obligations, liabilities and indebtedness under this clause (i), except to the extent consisting of obligations, liabilities or indebtedness with respect to the Secured Hedging Agreements being herein collectively called the "Credit Document Obligations");

(ii)    the full and prompt payment when due (whether at stated maturity, by acceleration or otherwise) of all obligations, liabilities and indebtedness (including, without limitation, all interest that accrues on or after the commencement of any case, proceeding or other action relating to the bankruptcy, insolvency, reorganization or similar proceeding of any Pledgor or any Subsidiary thereof at the rate provided for in the respective documentation, whether or not a claim for post-petition interest is allowed in any such proceeding) owing by such Pledgor to the Other Creditors now existing or hereafter incurred under, arising out of or in connection with each Secured Hedging Agreement, whether such Secured Hedging Agreement is now in existence or hereinafter arising (including, in the case of a Pledgor that is a Subsidiary Guarantor, all obligations, liabilities and indebtedness of such Pledgor under the Subsidiaries Guaranty in respect of each Secured Hedging Agreements), and the due performance and compliance by such Pledgor with all of the terms, conditions and agreements contained in each Secured Hedging Agreement (all such obligations, liabilities and indebtedness under this clause (ii) being herein collectively called the "Other Obligations");

(iii)   any and all sums advanced by the Pledgee in order to preserve the Collateral (as hereinafter defined) or preserve its security interest in the Collateral;

(iv)   in the event of any proceeding for the collection or enforcement of any indebtedness, obligations or liabilities of such Pledgor referred to in clauses (i) and (ii) above, after an Event of Default shall have occurred and be continuing, the reasonable expenses of retaking, holding, preparing for sale or lease, selling or otherwise disposing of or realizing on the Collateral, or of any exercise by the Pledgee of its rights hereunder, together with reasonable attorneys' fees and court costs;

(v)    all amounts paid by any Indemnitee as to which such Indemnitee has the right to reimbursement under Section 11 of this Agreement;

(vi)   all amounts owing to any Agent or any of its affiliates pursuant to any of the Credit Documents in its capacity as such; and

(vii)  any and all other debts, liabilities and reimbursement obligations, indemnity obligations and other obligations for monetary amounts, fees, expenses, costs or other sums (including reasonable attorneys' fees and costs) chargeable to any Credit Party under or pursuant to any of the Credit Documents.

all such obligations, liabilities, indebtedness, sums and expenses set forth in clauses (i) through (vii) of this Section 1 being herein collectively called the "Obligations", it being acknowledged and agreed that the "Obligations" shall include extensions of credit of the types described above, whether outstanding on the date of this Agreement or extended from time to time after the date of this Agreement.

2.  DEFINITIONS.  (a)  Unless otherwise defined herein, all capitalized terms used herein and defined in the Credit Agreement shall be used herein as therein defined. Reference to singular terms shall include the plural and vice versa.

(b) The following capitalized terms used herein shall have the definitions specified below:

"<u>Administrative Agent</u>" shall have the meaning set forth in the recitals hereto.

"<u>Adverse Claim</u>" shall have the meaning given such term in Section 8-102(a)(1) of the UCC.

"<u>Agreement</u>" shall have the meaning set forth in the first paragraph hereof.

"<u>Borrower</u>" shall have the meaning set forth in the recitals hereto.

"<u>Certificated Security</u>" shall have the meaning given such term in Section 8-102(a)(4) of the UCC.

"<u>Class</u>" shall have the meaning provided in Section 22 hereof.

"<u>Clearing Corporation</u>" shall have the meaning given such term in Section 8-102(a)(5) of the UCC.

"<u>Collateral</u>" shall have the meaning set forth in Section 3.1 hereof.

"<u>Credit Agreement</u>" shall have the meaning set forth in the recitals hereto.

"<u>Credit Document Obligations</u>" shall have the meaning set forth in Section 1(i) hereof.

"<u>Domestic Corporation</u>" shall have the meaning set forth in the definition of "Stock."

"<u>Event of Default</u>" shall mean any Event of Default under, and as defined in, the Credit Agreement and shall in any event include, without limitation, any payment default on any of the Obligations after the expiration of any applicable grace period.

"<u>Exempted Foreign Entity</u>" shall mean any Foreign Corporation and any limited liability company organized under the laws of a jurisdiction other than the United States or any State thereof or the District of Columbia that, in any such case, is treated as a corporation or an association taxable as a corporation for U.S. federal income tax purposes.

"<u>Foreign Corporation</u>" shall have the meaning set forth in the definition of "Stock".

"<u>Indemnitees</u>" shall have the meaning set forth in Section 11 hereof.

"<u>Investment Property</u>" shall have the meaning given such term in Section 9-102(a)(49) of the UCC.

"<u>Lender Creditors</u>" shall have the meaning set forth in the recitals hereto.

"<u>Lenders</u>" shall have the meaning set forth in the recitals hereto.

"<u>Limited Liability Company Assets</u>" shall mean all assets, whether tangible or intangible and whether real, personal or mixed (including, without limitation, all limited liability company capital and interest in other limited liability companies), at any time owned by any Pledgor or represented by any Limited Liability Company Interest.

"<u>Limited Liability Company Interests</u>" shall mean the entire limited liability company membership interest at any time owned by any Pledgor in any limited liability company that is a Subsidiary of such Pledgor.

"<u>Location</u>" of any Pledgor has the meaning given such term in Section 9-307 of the UCC.

"<u>Non-Voting Equity Interests</u>" shall mean all Equity Interests of any Person which are not Voting Equity Interests.

"<u>Obligations</u>" shall have the meaning set forth in Section 1 hereof.

"<u>Other Creditors</u>" shall have the meaning set forth in the recitals hereto.

"<u>Other Obligations</u>" shall have the meaning set forth in Section 1(ii) hereof.

"<u>Partnership Assets</u>" shall mean all assets, whether tangible or intangible and whether real, personal or mixed (including, without limitation, all partnership capital and interest in other partnerships), at any time owned by any Pledgor or represented by any Partnership Interest.

"<u>Partnership Interest</u>" shall mean the entire general partnership interest or limited partnership interest at any time owned by any Pledgor in any general partnership or limited partnership that is a Subsidiary of such Pledgor.

"<u>Pledgee</u>" shall have the meaning set forth in the first paragraph hereof.

"<u>Pledgor</u>" shall have the meaning set forth in the first paragraph hereof.

"<u>Primary Obligations</u>" shall mean (i) in the case of the Credit Document Obligations, all principal of, premium, fees and interest on, all Loans, all Unpaid Drawings, the Stated Amount of all outstanding Letters of Credit and all Fees and (ii) in the case of the Other Obligations, all amounts due under each Secured Hedging Agreement (other than indemnities, fees (including, without limitation, attorneys' fees) and similar obligations and liabilities).

"<u>Proceeds</u>" shall have the meaning given such term in Section 9-102(a)(64) of the UCC.

"<u>Registered Organization</u>" shall have the meaning given such term in Section 9-102(a)(70) of the UCC.

"<u>Representative</u>" shall have the meaning provided in Section 9(b) hereof.

"<u>Required Secured Creditors</u>" shall mean (i) at any time when any Credit Document Obligations or Letters of Credit are outstanding (and, in the case of Letters of Credit, such Letters of Credit have not been cash collateralized or made subject to backstop letters of credit pursuant to documentation acceptable to the Collateral Agent and the Issuing Lender) or any Commitments under the Credit Agreement exist, the Required Lenders (or, to the extent provided in Section 13.12 of the Credit Agreement, each of the Lenders) and (ii) at any time after all of the Credit Document Obligations have been paid in full and all Commitments and Letters of Credit under the Credit Agreement have been terminated (or, in the case of Letters of Credit, cash collateralized or made subject to backstop letters of credit pursuant to documentation acceptable to the Collateral Agent and the Issuing Lender) and no further Commitments and Letters of Credit may be provided thereunder, the holders of a majority of the Other Obligations.

"<u>Requisite Creditors</u>" shall have the meaning provided in Section 22 hereof.

"<u>Secondary Obligations</u>" shall mean all Obligations other than Primary Obligations.

"<u>Secured Creditors</u>" shall have the meaning set forth in the recitals hereto.

"<u>Secured Debt Agreements</u>" shall mean and includes (x) this Agreement, (y) the other Credit Documents and (z) the Secured Hedging Agreements.

"<u>Secured Hedging Agreements</u>" shall have the meaning set forth in the recitals hereto.

"<u>Securities Account</u>" shall have the meaning given such term in Section 8-501(a) of the UCC.

"<u>Securities Act</u>" shall mean the Securities Act of 1933, as amended, as in effect from time to time.

"<u>Securities Intermediary</u>" shall have the meaning given such term in Section 8-102(14) of the UCC.

"<u>Security</u>" and "<u>Securities</u>" shall have the meaning given such term in Section 8-102(a)(15) of the UCC and shall in any event also include all Stock.

"<u>Security Entitlement</u>" shall have the meaning given such term in Section 8-102(a)(17) of the UCC.

"Stock" shall mean (x) with respect to corporations incorporated under the laws of the United States or any State thereof or the District of Columbia (each, a "Domestic Corporation"), all of the issued and outstanding shares of capital stock at anytime owned by any Pledgor of any Domestic Corporation that is a Subsidiary of such Pledgor and (y) with respect to corporations not Domestic Corporations (each, a "Foreign Corporation"), all of the issued and outstanding shares of capital stock at any time owned by any Pledgor of any Foreign Corporation that is a Subsidiary of such Pledgor.

"Termination Date" shall have the meaning set forth in Section 20 hereof.

"Transmitting Utility" has the meaning given such term in Section 9-102(a)(80) of the UCC.

"UCC" shall mean the Uniform Commercial Code as in effect in the State of New York from time to time; provided that all references herein to specific Sections or subsections of the UCC are references to such Sections or subsections, as the case may be, of the Uniform Commercial Code as in effect in the State of New York on the date hereof.

"Uncertificated Security" shall have the meaning given such term in Section 8-102(a)(18) of the UCC.

"Voting Equity Interests" of any Person shall mean all classes of Equity Interests of such Person entitled to vote.

3.  PLEDGE OF SECURITIES, ETC.

3.1  Pledge.  To secure the Obligations now or hereafter owed or to be performed by such Pledgor, each Pledgor does hereby grant, pledge and assign to the Pledgee for the benefit of the Secured Creditors, and does hereby create a continuing security interest in favor of the Pledgee for the benefit of the Secured Creditors in, all of its right, title and interest in and to the following, whether now existing or hereafter from time to time acquired (collectively, the "Collateral"):

(a) all Stock owned or held by such Pledgor from time to time and all options and warrants owned by such Pledgor from time to time to purchase Stock;

(b) all Limited Liability Company Interests owned by such Pledgor from time to time and all of its right, title and interest in each limited liability company to which each such Limited Liability Company Interest relates, whether now existing or hereafter acquired, including, without limitation, to the fullest extent permitted under the terms and provisions of the documents and agreements governing such Limited Liability Company Interests and applicable law:

(A)  all its capital therein and its interest in all profits, income, surpluses, losses, Limited Liability Company Assets and other distributions to which such Pledgor shall at any time be entitled in respect of such Limited Liability Company Interests;

(B)    all other payments due or to become due to such Pledgor in respect of Limited Liability Company Interests, whether under any limited liability company agreement or otherwise, whether as contractual obligations, damages, insurance proceeds or otherwise;

(C)    all of its claims, rights, powers, privileges, authority, options, security interests, liens and remedies, if any, under any limited liability company agreement or operating agreement, or at law or otherwise in respect of such Limited Liability Company Interests;

(D)    all present and future claims, if any, of such Pledgor against any such limited liability company for monies loaned or advanced, for services rendered or otherwise;

(E)    all of such Pledgor's rights under any limited liability company agreement or operating agreement or at law to exercise and enforce every right, power, remedy, authority, option and privilege of such Pledgor relating to such Limited Liability Company Interests, including any power to terminate, cancel or modify any such limited liability company agreement or operating agreement, to execute any instruments and to take any and all other action on behalf of and in the name of any of such Pledgor in respect of such Limited Liability Company Interests and any such limited liability company, to make determinations, to exercise any election (including, but not limited to, election of remedies) or option or to give or receive any notice, consent, amendment, waiver or approval, together with full power and authority to demand, receive, enforce, collect or receipt for any of the foregoing or for any Limited Liability Company Asset, to enforce or execute any checks, or other instruments or orders, to file any claims and to take any action in connection with any of the foregoing; and

(F)    all other property hereafter delivered in substitution for or in addition to any of the foregoing, all certificates and instruments representing or evidencing such other property and all cash, securities, interest, dividends, rights and other property at any time and from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all thereof;

(c) all Partnership Interests owned by such Pledgor from time to time and all of its right, title and interest in each partnership to which each such Partnership Interest relates, whether now existing or hereafter acquired, including, without limitation, to the fullest extent permitted under the terms and provisions of the documents and agreements governing such Partnership Interests and applicable law:

(A)    all its capital therein and its interest in all profits, income, surpluses, losses, Partnership Assets and other distributions to which such Pledgor shall at any time be entitled in respect of such Partnership Interests;

(B)    all other payments due or to become due to such Pledgor in respect of Partnership Interests, whether under any partnership agreement or otherwise, whether as contractual obligations, damages, insurance proceeds or otherwise;

(C)    all of its claims, rights, powers, privileges, authority, options, security interests, liens and remedies, if any, under any partnership agreement or operating agreement, or at law or otherwise in respect of such Partnership Interests;

(D)    all present and future claims, if any, of such Pledgor against any such partnership for monies loaned or advanced, for services rendered or otherwise;

(E)    all of such Pledgor's rights under any partnership agreement or operating agreement or at law to exercise and enforce every right, power, remedy, authority, option and privilege of such Pledgor relating to such Partnership Interests, including any power to terminate, cancel or modify any partnership agreement or operating agreement, to execute any instruments and to take any and all other action on behalf of and in the name of such Pledgor in respect of such Partnership Interests and any such partnership, to make determinations, to exercise any election (including, but not limited to, election of remedies) or option or to give or receive any notice, consent, amendment, waiver or approval, together with full power and authority to demand, receive, enforce, collect or receipt for any of the foregoing or for any Partnership Asset, to enforce or execute any checks, or other instruments or orders, to file any claims and to take any action in connection with any of the foregoing; and

(F)    all other property hereafter delivered in substitution for or in addition to any of the foregoing, all certificates and instruments representing or evidencing such other property and all cash, securities, interest, dividends, rights and other property at any time and from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all thereof;

(d) all other Investment Property that constitutes Equity Interests of a Person that is a Subsidiary of a Pledgor; and

(e) all Proceeds, rents, issues, profits, returns, income, allocations and of and from any and all of the foregoing;

provided that (x) except in the circumstances and to the extent provided by Section 9.14 of the Credit Agreement (in which case this clause (x) shall no longer be applicable), no Pledgor shall be required at any time to pledge hereunder more than 66-⅔% of the total combined voting power of all classes of Voting Equity Interests of any Exempted Foreign Entity, (y) each Pledgor shall be required to pledge hereunder 100% of the Non-Voting Equity Interests of each Exempted Foreign Entity at any time and from time to time acquired by such Pledgor, which Non-Voting Equity Interests shall not be subject to the limitations described in preceding clause

(x) and (z) no Pledgor shall be required at any time to pledge hereunder any Excluded TNI Assets.

3.2 <u>Procedures</u>.  (a)  To the extent that any Pledgor at any time or from time to time owns, acquires or obtains any right, title or interest in any Collateral, such Collateral shall automatically (and without the taking of any action by such Pledgor) be pledged pursuant to Section 3.1 of this Agreement and, in addition thereto, such Pledgor shall (to the extent provided below) take the following actions as set forth below (as promptly as practicable and, in any event, within 10 days after it obtains such Collateral) for the benefit of the Pledgee and the other Secured Creditors:

(i)    with respect to a Certificated Security (other than a Certificated Security credited on the books of a Clearing Corporation or Securities Intermediary), such Pledgor shall physically deliver such Certificated Security to the Pledgee, endorsed to the Pledgee or endorsed in blank;

(ii)    with respect to an Uncertificated Security (other than an Uncertificated Security credited on the books of a Clearing Corporation or Securities Intermediary), such Pledgor shall cause the issuer of such Uncertificated Security to duly authorize, execute, and deliver to the Pledgee, an agreement for the benefit of the Pledgee and the other Secured Creditors substantially in the form of Annex G hereto (appropriately completed to the satisfaction of the Pledgee and with such modifications, if any, as shall be satisfactory to the Pledgee) pursuant to which such issuer agrees to comply with any and all instructions originated by the Pledgee without further consent by the registered owner and not to comply with instructions regarding such Uncertificated Security (and any Partnership Interests and Limited Liability Company Interests issued by such issuer) originated by any other Person other than a court of competent jurisdiction;

(iii)    with respect to a Certificated Security, Uncertificated Security, Partnership Interest or Limited Liability Company Interest credited on the books of a Clearing Corporation or Securities Intermediary (including a Federal Reserve Bank, Participants Trust Company or The Depository Trust Company), such Pledgor shall promptly notify the Pledgee thereof and shall promptly take (x) all actions required (i) to comply with the applicable rules of such Clearing Corporation or Securities Intermediary and (ii) to perfect the security interest of the Pledgee under applicable law (including, in any event, under Sections 9-314(a), (b) and (c), 9-106 and 8-106(d) of the UCC) and (y) such other actions as the Pledgee deems necessary or desirable to effect the foregoing;

(iv)    with respect to a Partnership Interest or a Limited Liability Company Interest (other than a Partnership Interest or Limited Liability Company Interest credited on the books of a Clearing Corporation or Securities Intermediary), (1) if such Partnership Interest or Limited Liability Company Interest is represented by a certificate and is a Security for purposes of the UCC, such Pledgor shall follow the procedure set forth in Section 3.2(a)(i) hereof, and (2) if such Partnership Interest or Limited Liability Company Interest is not represented by a certificate or is not a Security for purposes of the UCC, such Pledgor shall follow the procedure set forth in Section 3.2(a)(ii) hereof; and

(v)    with respect to cash proceeds from any of the Collateral, (i) establishment by the Pledgee of a cash account in the name of such Pledgor over which the Pledgee shall have "control" within the meaning of the UCC and at any time any Default or Event of Default is in existence no withdrawals or transfers may be made therefrom by any Person except with the prior written consent of the Pledgee and (ii) deposit of such cash in such cash account.

(b)    In addition to the actions required to be taken pursuant to Section 3.2(a) hereof, each Pledgor shall take the following additional actions with respect to the Collateral:

(i)    with respect to all Collateral of such Pledgor whereby or with respect to which the Pledgee may obtain "control" thereof within the meaning of Section 8-106 of the UCC (or under any provision of the UCC as same may be amended or supplemented from time to time, or under the laws of any relevant State other than the State of New York), such Pledgor shall take all actions as may be requested from time to time by the Pledgee so that "control" of such Collateral is obtained and at all times held by the Pledgee; and

(ii)    each Pledgor shall from time to time cause appropriate financing statements (on appropriate forms) under the Uniform Commercial Code as in effect in the various relevant States, covering all Collateral hereunder (with the form of such financing statements to be satisfactory to the Pledgee), to be filed in the relevant filing offices so that at all times the Pledgee's security interest in all Investment Property and other Collateral which can be perfected by the filing of such financing statements (in each case to the maximum extent perfection by filing may be obtained under the laws of the relevant States, including, without limitation, Section 9-312(a) of the UCC) is so perfected.

3.3    Subsequently Acquired Collateral.  If any Pledgor shall acquire (by purchase, stock dividend, distribution or otherwise) any additional Collateral at any time or from time to time after the date hereof, (i) such Collateral shall automatically (and without any further action being required to be taken) be subject to the pledge and security interests created pursuant to Section 3.1 hereof and, furthermore, such Pledgor will thereafter take (or cause to be taken) all action (as promptly as practicable and, in any event, within 10 days after it obtains such Collateral) with respect to such Collateral in accordance with the procedures set forth in Section 3.2 hereof, and will promptly thereafter deliver to the Pledgee (i) a certificate executed by an authorized officer of such Pledgor describing such Collateral and certifying that the same has been duly pledged in favor of the Pledgee (for the benefit of the Secured Creditors) hereunder and (ii) supplements to Annexes A through F hereto as are necessary to cause such Annexes to be complete and accurate at such time.  Without limiting the foregoing, each Pledgor shall be required to pledge hereunder the Equity Interests of any Exempted Foreign Entity at any time and from time to time after the date hereof acquired by such Pledgor, provided that (x) except in the circumstances and to the extent provided by Section 9.14 of the Credit Agreement (in which case this clause (x) shall no longer be applicable), no Pledgor shall be required at any time to pledge hereunder more than 66-⅔% of the total combined voting power of all classes of Voting Equity Interests of any Exempted Foreign Entity, (y) each Pledgor shall be required to pledge hereunder 100% of the Non-Voting Equity Interests of each Exempted Foreign Entity at any time

and from time to time acquired by such Pledgor and (z) no Pledgor shall be required at any time to pledge hereunder any Excluded TNI Assets.

3.4 <u>Transfer Taxes</u>.  Each pledge of Collateral under Section 3.1 or Section 3.3 hereof shall be accompanied by any transfer tax stamps required in connection with the pledge of such Collateral.

3.5 <u>Certain Representations and Warranties Regarding the Collateral</u>.  Each Pledgor represents and warrants that on the date hereof: (i) each Subsidiary of such Pledgor, and the direct ownership thereof, is listed in Annex B hereto; (ii) the Stock (and any warrants or options to purchase Stock) held by such Pledgor consists of the number and type of shares of the stock (or warrants or options to purchase any stock) of the corporations as described in Annex C hereto; (iii) such Stock referenced in clause (ii) of this sentence constitutes that percentage of the issued and outstanding capital stock of the issuing corporation as is set forth in Annex C hereto; (iv) the Limited Liability Company Interests held by such Pledgor consist of the number and type of interests of the Persons described in Annex D hereto; (v) each such Limited Liability Company Interest referenced in clause (iv) of this paragraph constitutes that percentage of the issued and outstanding equity interest of the issuing Person as set forth in Annex D hereto; (vi) the Partnership Interests held by such Pledgor consist of the number and type of interests of the Persons described in Annex E hereto; (vii) each such Partnership Interest referenced in clause (vi) of this paragraph constitutes that percentage or portion of the entire Partnership Interest of the relevant partnership as set forth in Annex E hereto; (viii) the exact address of the chief executive office of such Pledgor is listed on Annex F hereto; (ix) such Pledgor has complied with the respective procedure set forth in Section 3.2(a) hereof with respect to each item of Collateral described in Annexes C through E hereto for such Pledgor; and (x) on the date hereof, such Pledgor owns no other Stock, Limited Liability Company Interests or Partnership Interests.

4.  APPOINTMENT OF SUB-AGENTS; ENDORSEMENTS, ETC.  The Pledgee shall have the right to appoint one or more sub-agents for the purpose of retaining physical possession of the Collateral, which may be held (in the discretion of the Pledgee) in the name of the relevant Pledgor, endorsed or assigned in blank or in favor of the Pledgee or any nominee or nominees of the Pledgee or a sub-agent appointed by the Pledgee.

5.  VOTING, ETC., WHILE NO EVENT OF DEFAULT.  Unless and until there shall have occurred and be continuing an Event of Default and the Pledgee shall instruct the Pledgors otherwise (in writing), each Pledgor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Collateral owned by it, and to give consents, waivers or ratifications in respect thereof; <u>provided</u> that, in each case, no vote shall be cast or any consent, waiver or ratification given or any action taken or omitted to be taken which would violate, result in a breach of any covenant contained in, or be inconsistent with any of the terms of any Secured Debt Agreement, or which could reasonably be expected to have the effect of impairing the value of the Collateral or any part thereof or the position or interests of the Pledgee or any other Secured Creditor in the Collateral, unless expressly permitted by the terms of the Secured Debt Agreements.  All such rights of each Pledgor to vote and to give consents, waivers and ratifications shall cease in case an Event of Default has occurred and is continuing and the Pledgee has notified the Pledgors (in writing) that such rights have ceased, and Section 7 hereof shall become applicable.

6.  DIVIDENDS AND OTHER DISTRIBUTIONS.  Unless and until there shall have occurred and be continuing an Event of Default, all cash dividends, cash distributions, cash Proceeds and other cash amounts payable in respect of the Collateral shall be paid to the respective Pledgor.  The Pledgee shall be entitled to receive directly, and to retain as part of the Collateral:

> (i)      all other or additional stock, notes, certificates, limited liability company interests, partnership interests, instruments or other securities or property (including, but not limited to, cash dividends other than as set forth above) paid or distributed by way of dividend or otherwise in respect of the Collateral;

> (ii)      all other or additional stock, notes, certificates, limited liability company interests, partnership interests, instruments or other securities or property (including, but not limited to, cash (although such cash may be paid directly to the respective Pledgor so long as no Event of Default then exists)) paid or distributed in respect of the Collateral by way of stock-split, spin-off, split-up, reclassification, combination of shares or similar rearrangement; and

> (iii)      all other or additional stock, notes, certificates, limited liability company interests, partnership interests, instruments or other securities or property (including, but not limited to, cash) which may be paid in respect of the Collateral by reason of any consolidation, merger, exchange of stock, conveyance of assets, liquidation or similar corporate or other reorganization.

Nothing contained in this Section 6 shall limit or restrict in any way the Pledgee's right to receive the proceeds of the Collateral in any form in accordance with Section 3 of this Agreement.  All dividends, distributions or other payments which are received by any Pledgor contrary to the provisions of this Section 6 or Section 7 hereof shall be received in trust for the benefit of the Pledgee, shall be segregated from other property or funds of such Pledgor and shall be forthwith paid over to the Pledgee as Collateral in the same form as so received (with any necessary endorsement).

7.  REMEDIES IN CASE OF AN EVENT OF DEFAULT.  If there shall have occurred and be continuing an Event of Default, then and in every such case, the Pledgee shall be entitled to exercise all of the rights, powers and remedies (whether vested in it by this Agreement, any other Secured Debt Agreement or by law) for the protection and enforcement of its rights in respect of the Collateral, and the Pledgee shall be entitled to exercise all the rights and remedies of a secured party under the UCC as in effect in any relevant jurisdiction and also shall be entitled, without limitation, to exercise the following rights, which each Pledgor hereby agrees to be commercially reasonable:

> (i)      to receive all amounts payable in respect of the Collateral otherwise payable under Section 6 hereof to the respective Pledgor;

> (ii)      to transfer all or any part of the Collateral into the Pledgee's name or the name of its nominee or nominees;

Exhibit I
Page 14

(iii)    to vote (and exercise all rights and powers in respect of voting) all or any part of the Collateral (whether or not transferred into the name of the Pledgee) and give all consents, waivers and ratifications in respect of the Collateral and otherwise act with respect thereto as though it were the outright owner thereof (each Pledgor hereby irrevocably constituting and appointing the Pledgee the proxy and attorney-in-fact of such Pledgor, with full power of substitution to do so);

(iv)    at any time and from time to time to sell, assign and deliver, or grant options to purchase, all or any part of the Collateral, or any interest therein, at any public or private sale, without demand of performance, advertisement or, notice of intention to sell or of the time or place of sale or adjournment thereof or to redeem or otherwise purchase or dispose (all of which are hereby waived by each Pledgor), for cash, on credit or for other property, for immediate or future delivery without any assumption of credit risk, and for such price or prices and on such terms as the Pledgee in its absolute discretion may determine, provided at least 10 days' written notice of the time and place of any such sale shall be given to the respective Pledgor. The Pledgee shall not be obligated to make any such sale of Collateral regardless of whether any such notice of sale has theretofore been given. Each Pledgor hereby waives and releases to the fullest extent permitted by law any right or equity of redemption with respect to the Collateral, whether before or after sale hereunder, and all rights, if any, of marshalling the Collateral and any other security or the Obligations or otherwise. At any such sale, unless prohibited by applicable law, the Pledgee on behalf of the Secured Creditors may bid for and purchase all or any part of the Collateral so sold free from any such right or equity of redemption. Neither the Pledgee nor any other Secured Creditor shall be liable for failure to collect or realize upon any or all of the Collateral or for any delay in so doing nor shall any of them be under any obligation to take any action whatsoever with regard thereto; and

(v)    to set off any and all Collateral against any and all Obligations, and to withdraw any and all cash or other Collateral from any and all accounts described in Section 3.2(a)(v) hereof and to apply such cash and other Collateral to the payment of any and all Obligations.

8.    REMEDIES, CUMULATIVE, ETC.  Each and every right, power and remedy of the Pledgee provided for in this Agreement or in any other Secured Debt Agreement, or now or hereafter existing at law or in equity or by statute shall be cumulative and concurrent and shall be in addition to every other such right, power or remedy. The exercise or beginning of the exercise by the Pledgee or any other Secured Creditor of any one or more of the rights, powers or remedies provided for in this Agreement or any other Secured Debt Agreement or now or hereafter existing at law or in equity or by statute or otherwise shall not preclude the simultaneous or later exercise by the Pledgee or any other Secured Creditor of all such other rights, powers or remedies, and no failure or delay on the part of the Pledgee or any other Secured Creditor to exercise any such right, power or remedy shall operate as a waiver thereof.  No notice to or demand on any Pledgor in any case shall entitle it to any other or further notice or demand in similar or other circumstances or constitute a waiver of any of the rights of the Pledgee or any other Secured Creditor to any other or further action in any circumstances without notice or demand.  The Secured Creditors agree that this Agreement may be enforced only by the action of

the Pledgee, in each case, acting upon the instructions of the Required Secured Creditors, and that no other Secured Creditor shall have any right individually to seek to enforce or to enforce this Agreement or to realize upon the security to be granted hereby, it being understood and agreed that such rights and remedies may be exercised by the Pledgee for the benefit of the Secured Creditors upon the terms of this Agreement.

9. APPLICATION OF PROCEEDS. (a)  All monies collected by the Pledgee pursuant to the terms of this Agreement upon any sale or other disposition of Collateral, together with all other monies received by the Pledgee hereunder, shall be applied as provided in Section 13.17 of the Credit Agreement.

(b) All payments required to be made under Section 13.17 of the Credit Agreement shall be made (x) if to the Lender Creditors, to the Administrative Agent for the account of the Lender Creditors and (y) if to the Other Creditors, to the trustee, paying agent or other similar representative (each, a "Representative") for the Other Creditors or, in the absence of such a Representative, directly to the Other Creditors.

(c) For purposes of applying payments received in accordance with this Section 9, the Pledgee shall be entitled to rely upon (i) the Administrative Agent and (ii) the Representative or, in the absence of such a Representative, upon the Other Creditors for a determination (which the Administrative Agent, each Representative and the Other Creditors agree (or shall agree) to provide upon request of the Pledgee) of the outstanding Primary Obligations and Secondary Obligations owed to the Lender Creditors or the Other Creditors, as the case may be. Unless it has received written notice from a Lender Creditor or an Other Creditor to the contrary, the Administrative Agent and each Representative, in furnishing information pursuant to the preceding sentence, and the Pledgee, in acting hereunder, shall be entitled to assume that no Secondary Obligations are outstanding. Unless it has written notice from an Other Creditor to the contrary, the Pledgee, in acting hereunder, shall be entitled to assume that no Secured Hedging Agreements are in existence.

(d) It is understood and agreed that each Pledgor shall remain jointly and severally liable with respect to its Obligations to the extent of any deficiency between the amount of the proceeds of the Collateral pledged by it hereunder and the aggregate amount of such Obligations.

10. PURCHASERS OF COLLATERAL. Upon any sale of the Collateral by the Pledgee hereunder (whether by virtue of the power of sale herein granted, pursuant to judicial process or otherwise), the receipt of the Pledgee or the officer making such sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold, and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to the Pledgee or such officer or be answerable in any way for the misapplication or nonapplication thereof.

11. INDEMNITY. Each Pledgor jointly and severally agrees (i) to indemnify, reimburse and hold harmless the Pledgee and each other Secured Creditor and their respective successors, assigns, employees, agents and affiliates (individually an "Indemnitee", and collectively, the "Indemnitees") from and against any and all obligations, damages, injuries,

penalties, claims, demands, losses, judgments and liabilities (including, without limitation, liabilities for penalties) of whatsoever kind or nature, and (ii) to reimburse each Indemnitee for all reasonable costs, expenses and disbursements, including reasonable attorneys' fees and expenses, in each case arising out of or resulting from this Agreement or the exercise by any Indemnitee of any right or remedy granted to it hereunder or under any other Secured Debt Agreement (but excluding any obligations, damages, injuries, penalties, claims, demands, losses, judgments and liabilities (including, without limitation, liabilities for penalties) or expenses of whatsoever kind or nature to the extent incurred or arising by reason of gross negligence or willful misconduct of such Indemnitee (as determined by a court of competent jurisdiction in a final and non-appealable decision)).  In no event shall the Pledgee hereunder be liable, in the absence of gross negligence or willful misconduct on its part (as determined by a court of competent jurisdiction in a final and non-appealable decision), for any matter or thing in connection with this Agreement other than to account for monies or other property actually received by it in accordance with the terms hereof.  If and to the extent that the obligations of any Pledgor under this Section 11 are unenforceable for any reason, such Pledgor hereby agrees to make the maximum contribution to the payment and satisfaction of such obligations which is permissible under applicable law. The indemnity obligations of each Pledgor contained in this Section 11 shall continue in full force and effect notwithstanding the full payment of all the Notes issued under the Credit Agreement, the termination of all Secured Hedging Agreements and Letters of Credit, and the payment of all other Obligations and notwithstanding the discharge thereof.

12. PLEDGEE NOT A PARTNER OR LIMITED LIABILITY COMPANY MEMBER.  (a)  Nothing herein shall be construed to make the Pledgee or any other Secured Creditor liable as a member of any limited liability company or as a partner of any partnership and neither the Pledgee nor any other Secured Creditor by virtue of this Agreement or otherwise (except as referred to in the following sentence) shall have any of the duties, obligations or liabilities of a member of any limited liability company or as a partner in any partnership.  The parties hereto expressly agree that, unless the Pledgee shall become the absolute owner of Collateral consisting of a Limited Liability Company Interest or a Partnership Interest pursuant hereto, this Agreement shall not be construed as creating a partnership or joint venture among the Pledgee, any other Secured Creditor, any Pledgor and/or any other Person.

(b)        Except as provided in the last sentence of paragraph (a) of this Section 12, the Pledgee, by accepting this Agreement, did not intend to become a member of any limited liability company or a partner of any partnership or otherwise be deemed to be a co-venturer with respect to any Pledgor, any limited liability company, partnership and/or any other Person either before or after an Event of Default shall have occurred.  The Pledgee shall have only those powers set forth herein and the Secured Creditors shall assume none of the duties, obligations or liabilities of a member of any limited liability company or as a partner of any partnership or any Pledgor except as provided in the last sentence of paragraph (a) of this Section 12.

(c)        The Pledgee and the other Secured Creditors shall not be obligated to perform or discharge any obligation of any Pledgor as a result of the pledge hereby effected.

(d)        The acceptance by the Pledgee of this Agreement, with all the rights, powers, privileges and authority so created, shall not at any time or in any event obligate the

Pledgee or any other Secured Creditor to appear in or defend any action or proceeding relating to the Collateral to which it is not a party, or to take any action hereunder or thereunder, or to expend any money or incur any expenses or perform or discharge any obligation, duty or liability under the Collateral.

13. FURTHER ASSURANCES; POWER-OF-ATTORNEY. (a) Each Pledgor agrees that it will join with the Pledgee in executing and, at such Pledgor's own expense, file and refile under the UCC or other applicable law such financing statements, continuation statements and other documents, in form reasonably acceptable to the Pledgee, in such offices as the Pledgee (acting on its own or on the instructions of the Required Secured Creditors) may reasonably deem necessary or appropriate and wherever required or permitted by law in order to perfect and preserve the Pledgee's security interest in the Collateral hereunder and hereby authorizes the Pledgee to file financing statements and amendments thereto relative to all or any part of the Collateral (including, without limitation, (x) financing statements which list the Collateral specifically and/or "all assets" as collateral and (y) "in lieu of" financing statements) without the signature of such Pledgor where permitted by law, and agrees to do such further acts and things and to execute and deliver to the Pledgee such additional conveyances, assignments, agreements and instruments as the Pledgee may reasonably require or deem advisable to carry into effect the purposes of this Agreement or to further assure and confirm unto the Pledgee its rights, powers and remedies hereunder or thereunder.

(b) Each Pledgor hereby constitutes and appoints the Pledgee its true and lawful attorney-in-fact, irrevocably, with full authority in the place and stead of such Pledgor and in the name of such Pledgor or otherwise, from time to time after the occurrence and during the continuance of an Event of Default, in the Pledgee's discretion, to act, require, demand, receive and give acquittance for any and all monies and claims for monies due or to become due to such Pledgor under or arising out of the Collateral, to endorse any checks or other instruments or orders in connection therewith and to file any claims or take any action or institute any proceedings and to execute any instrument which the Pledgee may deem necessary or advisable to accomplish the purposes of this Agreement, which appointment as attorney is coupled with an interest.

14. THE PLEDGEE AS COLLATERAL AGENT. The Pledgee will hold in accordance with this Agreement all items of the Collateral at any time received under this Agreement. It is expressly understood, acknowledged and agreed by each Secured Creditor that by accepting the benefits of this Agreement each such Secured Creditor acknowledges and agrees that the obligations of the Pledgee as holder of the Collateral and interests therein and with respect to the disposition thereof, and otherwise under this Agreement, are only those expressly set forth in this Agreement and in Section 12 of the Credit Agreement. The Pledgee shall act hereunder on the terms and conditions set forth herein and in Section 12 of the Credit Agreement.

15. TRANSFER BY THE PLEDGORS. Except as permitted (i) prior to the date all Credit Document Obligations have been paid in full and all Commitments and Letters of Credit under the Credit Agreement have been terminated, pursuant to the Credit Agreement, and (ii) thereafter, pursuant to the other Secured Debt Agreements, no Pledgor will sell or otherwise

dispose of, grant any option with respect to, or mortgage, pledge or otherwise encumber any of the Collateral or any interest therein.

16. REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE PLEDGORS. (a) Each Pledgor represents, warrants and covenants as to itself and each of its Subsidiaries that:

(i)    it is the legal, beneficial and record owner of, and has good and marketable title to, all of its Collateral and that it has sufficient interest in all of its Collateral in which a security interest is purported to be created hereunder for such security interest to attach (subject, in each case, to no pledge, lien, mortgage, hypothe-cation, security interest, charge, option, Adverse Claim or other encumbrance whatsoever, except the liens and security interests created by this Agreement and any other Permitted Liens and Permitted Encumbrances granted pursuant to the Second Lien Loan Documents);

(ii)    it has full power, authority and legal right to pledge all the Collateral pledged by it pursuant to this Agreement;

(iii)    this Agreement has been duly authorized, executed and delivered by such Pledgor and constitutes a legal, valid and binding obligation of such Pledgor enforceable against such Pledgor in accordance with its terms, except to the extent that the enforce-ability hereof may be limited by applicable bankruptcy, insolvency, reorganization, mora-torium or other similar laws affecting creditors' rights generally and by general equitable principles (regardless of whether enforcement is sought in equity or at law);

(iv)    except to the extent already obtained or made, no consent of any other party (including, without limitation, any stockholder, partner, member or creditor of such Pledgor or any of its Subsidiaries) and no consent, license, permit, approval or authoriza-tion of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority is required to be obtained by such Pledgor in connection with (a) the execution, delivery or performance of this Agreement by such Pledgor, (b) the validity or enforceability of this Agreement against such Pledgor, (c) the perfection or enforceability of the Pledgee's security interest in such Pledgor's Collateral or (d) except for compliance with or as may be required by applicable securities laws, the exercise by the Pledgee of any of its rights or remedies provided herein;

(v)    neither the execution, delivery or performance by such Pledgor of this Agreement or any other Secured Debt Agreement to which it is a party, nor compliance by it with the terms and provisions hereof and thereof nor the consummation of the transactions contemplated therein:  (i) will contravene any provision of any applicable law, statute, rule or regulation, or any applicable order, writ, injunction or decree of any court, arbitrator or governmental instrumentality, domestic or foreign, applicable to such Pledgor; (ii) will conflict or be inconsistent with or result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien (except pursuant to this Agreement or any other Security Document) upon any of the properties or assets

of such Pledgor or any of its Subsidiaries pursuant to the terms of any indenture, lease, mortgage, deed of trust, credit agreement, loan agreement or any other material agreement, contract or other instrument to which such Pledgor or any of its Subsidiaries is a party or is otherwise bound, or by which it or any of its properties or assets is bound or to which it may be subject; or (iii) will violate any provision of the certificate of incorporation, by-laws, certificate of partnership, partnership agreement, certificate of formation or limited liability company agreement (or equivalent organizational documents), as the case may be, of such Pledgor or any of its Subsidiaries;

(vi)    all of such Pledgor's Collateral has been duly and validly issued, is fully paid and non-assessable and is subject to no options to purchase or similar rights;

(vii)    the pledge, collateral assignment and delivery to the Pledgee of such Pledgor's Collateral consisting of Certificated Securities pursuant to this Agreement creates a valid and perfected first priority security interest in such Certificated Securities, and the Proceeds thereof, subject to no prior Lien or encumbrance or to any agreement purporting to grant to any third party a Lien or encumbrance on the property or assets of such Pledgor (other than Permitted Liens and Permitted Encumbrances granted pursuant to the Second Lien Loan Documents) which would include the Securities and the Pledgee is entitled to all the rights, priorities and benefits afforded by the UCC or other relevant law as enacted in any relevant jurisdiction to perfect security interests in respect of such Collateral; and

(viii)    "control" (as defined in Section 8-106 of the UCC) has been obtained by the Pledgee over all of such Pledgor's Collateral consisting of Securities with respect to which such "control" may be obtained pursuant to Section 8-106 of the UCC, except to the extent that the obligation of the applicable Pledgor to provide the Pledgee with "control" of such Collateral has not yet arisen under this Agreement; provided that in the case of the Pledgee obtaining "control" over Collateral consisting of a Security Entitlement, such Pledgor shall have taken all steps in its control so that the Pledgee obtains "control" over such Security Entitlement.

(b)    Each Pledgor covenants and agrees that it will defend the Pledgee's right, title and security interest in and to such Pledgor's Collateral and the proceeds thereof against the claims and demands of all persons whomsoever; and each Pledgor covenants and agrees that it will have like title to and right to pledge any other property at any time hereafter pledged to the Pledgee by such Pledgor as Collateral hereunder and will likewise defend the right thereto and security interest therein of the Pledgee and the other Secured Creditors.

(c)    Each Pledgor covenants and agrees that it will take no action which would violate any of the terms of any Secured Debt Agreement.

17. LEGAL NAMES; TYPE OF ORGANIZATION (AND WHETHER A REGISTERED ORGANIZATION AND/OR A TRANSMITTING UTILITY); JURISDICTION OF ORGANIZATION; LOCATION; ORGANIZATIONAL IDENTIFICATION NUMBERS; CHANGES THERETO; ETC.  The exact legal name of each Pledgor, the type of organization of such Pledgor, whether or not such Pledgor is a Registered Organization, the jurisdiction of

organization of such Pledgor, such Pledgor's Location, the organizational identification number (if any) of each Pledgor, and whether or not such Pledgor is a Transmitting Utility, is listed on Annex A hereto for such Pledgor. No Pledgor shall change its legal name, its type of organization, its status as a Registered Organization (in the case of a Registered Organization), its status as a Transmitting Utility or as a Person which is not a Transmitting Utility, as the case may be, its jurisdiction of organization, its Location, or its organizational identification number (if any), except that any such changes shall be permitted (so long as not in violation of the applicable requirements of the Secured Debt Agreements and so long as same do not involve (x) a Registered Organization ceasing to constitute same or (y) any Pledgor changing its jurisdiction of organization or Location from the United States or a State thereof to a jurisdiction of organization or Location, as the case may be, outside the United States or a State thereof) if (i) it shall have given to the Collateral Agent not less than 15 days' prior written notice of each change to the information listed on Annex A (as adjusted for any subsequent changes thereto previously made in accordance with this sentence), together with a supplement to Annex A which shall correct all information contained therein for such Pledgor, and (ii) in connection with such change or changes, it shall have taken all action reasonably requested by the Pledgee to maintain the security interests of the Pledgee in the Collateral intended to be granted hereby at all times fully perfected and in full force and effect. In addition, to the extent that any Pledgor does not have an organizational identification number on the date hereof and later obtains one, such Pledgor shall promptly thereafter deliver a notification of the Collateral Agent of such organizational identification number and shall take all actions reasonably satisfactory to the Pledgee to the extent necessary to maintain the security interest of the Pledgee in the Collateral intended to be granted hereby fully perfected and in full force and effect.

18. PLEDGORS' OBLIGATIONS ABSOLUTE, ETC. The obligations of each Pledgor under this Agreement shall be absolute and unconditional and shall remain in full force and effect without regard to, and shall not be released, suspended, discharged, terminated or otherwise affected by, any circumstance or occurrence whatsoever (other than termination of this Agreement pursuant to Section 20 hereof), including, without limitation:

(i)     any renewal, extension, amendment or modification of, or addition or supplement to or deletion from any Secured Debt Agreement (other than this Agreement in accordance with its terms), or any other instrument or agreement referred to therein, or any assignment or transfer of any thereof;

(ii)    any waiver, consent, extension, indulgence or other action or inaction under or in respect of any such agreement or instrument including, without limitation, this Agreement (other than a waiver, consent or extension with respect to this Agreement in accordance with its terms);

(iii)   any furnishing of any additional security to the Pledgee or its assignee or any acceptance thereof or any release of any security by the Pledgee or its assignee;

(iv)    any limitation on any party's liability or obligations under any such instrument or agreement or any invalidity or unenforceability, in whole or in part, of any such instrument or agreement or any term thereof; or

(v)      any bankruptcy, insolvency, reorganization, composition, adjustment, dissolution, liquidation or other like proceeding relating to any Pledgor or any Subsidiary of any Pledgor, or any action taken with respect to this Agreement by any trustee or receiver, or by any court, in any such proceeding, whether or not such Pledgor shall have notice or knowledge of any of the foregoing.

19.  SALE OF COLLATERAL WITHOUT REGISTRATION.  (a)  If an Event of Default shall have occurred and be continuing and any Pledgor shall have received from the Pledgee a written request or requests that such Pledgor cause any registration, qualification or compliance under any federal or state securities law or laws to be effected with respect to all or any part of the Collateral, such Pledgor as soon as practicable and at its expense will use its best efforts to cause such registration to be effected (and be kept effective) and will use its best efforts to cause such qualification and compliance to be effected (and be kept effective) as may be so requested and as would permit or facilitate the sale and distribution of such Collateral, including, without limitation, registration under the Securities Act, as then in effect (or any similar statute then in effect), appropriate qualifications under applicable blue sky or other state securities laws and appropriate compliance with any other governmental requirements; provided, that the Pledgee shall furnish to such Pledgor such information regarding the Pledgee as such Pledgor may request in writing and as shall be required in connection with any such registration, qualification or compliance.  Each Pledgor will cause the Pledgee to be kept reasonably advised in writing as to the progress of each such registration, qualification or compliance and as to the completion thereof, will furnish to the Pledgee such number of prospectuses, offering circulars and other documents incident thereto as the Pledgee from time to time may reasonably request, and will indemnify, to the extent permitted by law, the Pledgee and all other Secured Creditors participating in the distribution of such Collateral against all claims, losses, damages and liabilities caused by any untrue statement (or alleged untrue statement) of a material fact contained therein (or in any related registration statement, notification or the like) or by any omission (or alleged omission) to state therein (or in any related registration statement, notification or the like) a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as the same may have been caused by an untrue statement or omission based upon information furnished in writing to such Pledgor by the Pledgee or such other Secured Creditor expressly for use therein.

(b)      If at any time when the Pledgee shall determine to exercise its right to sell all or any part of the Collateral pursuant to Section 7 hereof, and such Collateral or the part thereof to be sold shall not, for any reason whatsoever, be effectively registered under the Securities Act, as then in effect, the Pledgee may, in its sole and absolute discretion, sell such Collateral or part thereof by private sale in such manner and under such circumstances as the Pledgee may deem necessary or advisable in order that such sale may legally be effected without such registration.  Without limiting the generality of the foregoing, in any such event the Pledgee, in its sole and absolute discretion (i) may proceed to make such private sale notwithstanding that a registration statement for the purpose of registering such Collateral or part thereof shall have been filed under such Securities Act, (ii) may approach and negotiate with a single possible purchaser to effect such sale, and (iii) may restrict such sale to a purchaser who will represent and agree that such purchaser is purchasing for its own account, for investment, and not with a view to the distribution or sale of such Collateral or part thereof.  In the event of any such sale, the Pledgee shall incur no responsibility or liability for selling all or any part of

the Collateral at a price which the Pledgee, in its sole and absolute discretion, may in good faith deem reasonable under the circumstances, notwithstanding the possibility that a substantially higher price might be realized if the sale were deferred until the registration as aforesaid.

20.  TERMINATION; RELEASE.  (a)  On the Termination Date, this Agreement shall terminate (provided that all indemnities set forth herein including, without limitation, in Section 11 hereof shall survive any such termination) and the Pledgee, at the request and expense of such Pledgor, will execute and deliver to such Pledgor a proper instrument or instruments (including UCC termination statements) acknowledging the satisfaction and termination of this Agreement (including, without limitation, UCC termination statements and instruments of satisfaction, discharge and/or reconveyance), and will duly release from the security interest created hereby and assign, transfer and deliver to such Pledgor (without recourse and without any representation or warranty) such of the Collateral as may be in the possession of the Pledgee and as has not theretofore been sold or otherwise applied or released pursuant to this Agreement, together with any moneys at the time held by the Pledgee or any of its sub-agents hereunder and, with respect to any Collateral consisting of an Uncertificated Security, a Partnership Interest or a Limited Liability Company Interest (other than an Uncertificated Security, Partnership Interest or Limited Liability Company Interest credited on the books of a Clearing Corporation or Securities Intermediary), a termination of the agreement relating thereto executed and delivered by the issuer of such Uncertificated Security pursuant to Section 3.2(a)(ii) or by the respective partnership or limited liability company pursuant to Section 3.2(a)(iv)(2).  As used in this Agreement, "Termination Date" shall mean the date upon which the Commitments under the Credit Agreement have been terminated and all Secured Hedging Agreements entitled to the benefits of this Agreement have been terminated (or other arrangements satisfactory to the counterparties thereto have been completed), no Note (as defined in the Credit Agreement) is outstanding (and all Loans have been paid in full in cash), all Letters of Credit have been terminated (or cash collateralized or made subject to backstop letters of credit in the aggregate face amount of all outstanding Letters of Credit pursuant to documentation acceptable to the Collateral Agent and the Issuing Lender), and all other Obligations (other than indemnities described in Section 11 hereof and described in Section 13.01 of the Credit Agreement, in each case which are not then due and payable) then due and payable have been paid in full.

(b)     In the event that any part of the Collateral is sold or otherwise disposed of (to a Person other than a Credit Party) (I) (x) at any time prior to the time at which all Credit Document Obligations have been paid in full and all Commitments and Letters of Credit under the Credit Agreement have been terminated, in connection with a sale or disposition permitted by Section 10.02 of the Credit Agreement or is otherwise released at the direction of the Required Lenders (or all the Lenders if required by Section 13.12 of the Credit Agreement) or (y) at any time thereafter, to the extent permitted by the other Secured Debt Agreements, and in the case of clauses (x) and (y), the proceeds of such sale or disposition (or from such release) are applied in accordance with the terms of the Credit Agreement or such other Secured Debt Agreement, as the case may be, to the extent required to be so applied, or (II) pursuant to a Joint-Venture Transaction in accordance with the terms of the Credit Agreement, the Pledgee, at the request and expense of such Pledgor, will duly release from the security interest created hereby, or in the case of a Joint-Venture Transaction, the security interests created hereby shall be automatically released (and, in each case, will execute and deliver such documentation, including termination or partial release statements and the like in connection therewith) and assign, transfer and deliver

to such Pledgor (without recourse and without any representation or warranty) such of the Collateral as is then being (or has been) so sold or released and as may be in the possession of the Pledgee (or, in the case of Collateral held by any sub-agent designated pursuant to Section 4 hereto, such sub-agent) and has not theretofore been released pursuant to this Agreement.

(c)     At any time that any Pledgor desires that Collateral be released as provided in the foregoing Section 20(a) or (b), it shall deliver to the Pledgee (and the relevant sub-agent, if any, designated pursuant to Section 4 hereof) a certificate signed by an Authorized Officer of such Pledgor stating that the release of the respective Collateral is permitted pursuant to Section 20(a) or (b) hereof.  If reasonably requested by the Pledgee (although the Pledgee shall have no obligation to make any such request), the relevant Pledgor shall furnish appropriate legal opinions (from counsel, reasonably acceptable to the Pledgee) to the effect set forth in the immediately preceding sentence.

(d)     Upon the occurrence of the Termination Date, the Pledgors shall be automatically released from this Agreement and all security interests created hereunder shall be released automatically without further action on the part of the Pledgee and this Agreement shall, as to each Pledgor, terminate, and have no further force or effect (provided that all indemnitees set forth herein, including, without limitation, in Section 11 hereof shall survive any such termination).

(e)     The Pledgee shall have no liability whatsoever to any other Secured Creditor as the result of any release of Collateral by it in accordance with (or which the Collateral Agent in good faith believes to be in accordance with) this Section 20.

21. NOTICES, ETC.  Except as otherwise specified herein, all notices, requests, demands or other communications to or upon the respective parties hereto shall be sent or delivered by mail, telegraph, telex, telecopy, cable or courier service and all such notices and communications shall, when mailed, telegraphed, telexed, telecopied, or cabled or sent by courier, be effective when deposited in the mails, delivered to the telegraph company, cable company or overnight courier, as the case may be, or sent by telex or telecopier, except that notices and communications to the Pledgee or any Pledgor shall not be effective until received by the Pledgee or such Pledgor, as the case may be.  All notices and other communications shall be in writing and addressed as follows:

(a)     if to any Pledgor, at its address set forth opposite its signature below;

(b)     if to the Pledgee, at:

60 Wall Street
New York, New York 10005
Attention:  Stephen Cayer
Telephone No.:  (212) 250-3536
Telecopier No.:  (212) 797-5904

(c)     if to any Lender Creditor, either (x) to the Administrative Agent, at the address of the Administrative Agent specified in the Credit Agreement, or (y) at such address as such Lender Creditor shall have specified in the Credit Agreement;

Exhibit I
Page 24

(d)      if to any Other Creditor, at such address as such Other Creditor shall have specified in writing to the Pledgors and the Pledgee;

or at such other address or addressed to such other individual as shall have been furnished in writing by any Person described above to the party required to give notice hereunder.

22. WAIVER; AMENDMENT.   Except as provided in Sections 30 and 32 hereof, none of the terms and conditions of this Agreement may be changed, waived, modified or varied in any manner whatsoever unless in writing duly signed by each Pledgor directly affected thereby (it being understood that the addition or release of any Pledgor hereunder shall not constitute a change, waiver, discharge or termination affecting any Pledgor other than the Pledgor so added or released) and the Pledgee (with the written consent of the Required Secured Creditors); provided, however, that any change, waiver, modification or variance affecting the rights and benefits of a single Class of Secured Creditors (and not all Secured Creditors in a like or similar manner) also shall require the written consent of the Requisite Creditors of such affected Class.  For the purpose of this Agreement, the term "Class" shall mean each class of Secured Creditors, i.e., whether (x) the Lender Creditors as holders of the Credit Document Obligations or (y) the Other Creditors as the holders of the Other Obligations.  For the purpose of this Agreement, the term "Requisite Creditors" of any Class shall mean each of (x) with respect to the Credit Document Obligations, the Required Lenders (or, to the extent provided in Section 13.12 of the Credit Agreement, each of the Lenders), and (y) with respect to the Other Obligations, the holders of at least a majority of all Other Obligations outstanding from time to time.

23. SUCCESSORS AND ASSIGNS.  This Agreement shall create a continuing security interest in the Collateral and shall (i) remain in full force and effect, subject to release and/or termination as set forth in Section 20 hereof, (ii) be binding upon each Pledgor, its successors and assigns; provided, however, that no Pledgor shall assign any of its rights or obligations hereunder without the prior written consent of the Pledgee (with the prior written consent of the Required Secured Creditors), and (iii) inure, together with the rights and remedies of the Pledgee hereunder, to the benefit of the Pledgee, the other Secured Creditors and their respective successors, transferees and assigns.  All agreements, statements, representations and warranties made by each Pledgor herein or in any certificate or other instrument delivered by such Pledgor or on its behalf under this Agreement shall be considered to have been relied upon by the Secured Creditors and shall survive the execution and delivery of this Agreement and the other Secured Debt Agreements regardless of any investigation made by the Secured Creditors or on their behalf.

24. HEADINGS DESCRIPTIVE.  The headings of the several Sections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

25. GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF JURY TRIAL. (a)   THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE INTERNAL LAW OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.  ANY

Exhibit I
Page 25

LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, IN EACH CASE WHICH ARE LOCATED IN THE COUNTY OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PLEDGOR HEREBY IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE NON-EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS. EACH PLEDGOR HEREBY FURTHER IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH COURTS LACK PERSONAL JURISDICTION OVER SUCH PLEDGOR, AND AGREES NOT TO PLEAD OR CLAIM IN ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN ANY OF THE AFORESAID COURTS THAT ANY SUCH COURT LACKS PERSONAL JURISDICTION OVER SUCH PLEDGOR.  EACH PLEDGOR FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO ANY SUCH PLEDGOR AT ITS ADDRESS FOR NOTICES AS PROVIDED IN SECTION 21 ABOVE, SUCH SERVICE TO BECOME EFFECTIVE 30 DAYS AFTER SUCH MAILING.  EACH PLEDGOR HEREBY IRREVOCABLY WAIVES ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER OR UNDER ANY OTHER CREDIT DOCUMENT THAT SUCH SERVICE OF PROCESS WAS IN ANY WAY INVALID OR INEFFECTIVE. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE PLEDGEE UNDER THIS AGREEMENT, OR ANY SECURED CREDITOR, TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY PLEDGOR IN ANY OTHER JURISDICTION.

(b)     EACH PLEDGOR HEREBY IRREVOCABLY WAIVES ANY OBJEC-TION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (a) ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)     EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVO-CABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER CREDIT DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

26. PLEDGOR'S DUTIES.  It is expressly agreed, anything herein contained to the contrary notwithstanding, that each Pledgor shall remain liable to perform all of the obligations, if any, assumed by it with respect to the Collateral and the Pledgee shall not have

any obligations or liabilities with respect to any Collateral by reason of or arising out of this Agreement, except for the safekeeping of Collateral actually in Pledgor's possession, nor shall the Pledgee be required or obligated in any manner to perform or fulfill any of the obligations of any Pledgor under or with respect to any Collateral.

27.  COUNTERPARTS.  This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.  A set of counterparts executed by all the parties hereto shall be lodged with each Pledgor and the Pledgee.

28.  SEVERABILITY.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

29.  RECOURSE.  This Agreement is made with full recourse to each Pledgor and pursuant to and upon all the representations, warranties, covenants and agreements on the part of such Pledgor contained herein and in the other Secured Debt Agreements and otherwise in writing in connection herewith or therewith.

30.  ADDITIONAL PLEDGORS.  It is understood and agreed that any Subsidiary of the Borrower that is required to become a party to this Agreement after the date hereof pursuant to the requirements of the Credit Agreement or any other Secured Debt Agreement, shall become a Pledgor hereunder by (x) executing a counterpart hereof and delivering same to the Pledgee or executing a joinder agreement and delivering same to the Pledgee, in each case as may be required by (and in form and substance satisfactory to) the Pledgee, (y) delivering supplements to Annexes A through F, hereto as are necessary to cause such annexes to be complete and accurate with respect to such additional Pledgor on such date and (z) taking all actions as specified in this Agreement as would have been taken by such Pledgor had it been an original party to this Agreement, in each case with all documents required above to be delivered to the Pledgee and with all documents and actions required above to be taken to the reasonable satisfaction of the Pledgee.

31.  LIMITED OBLIGATIONS.  It is the desire and intent of each Pledgor and the Secured Creditors that this Agreement shall be enforced against each Pledgor to the fullest extent permissible under the laws applied in each jurisdiction in which enforcement is sought. Notwithstanding anything to the contrary contained herein, in furtherance of the foregoing, it is noted that the obligations of each Pledgor constituting a Subsidiary Guarantor have been limited as provided in the Subsidiaries Guaranty.

32.  RELEASE OF PLEDGORS.  If at any time all of the Equity Interests of any Pledgor owned by the Borrower or any of its Subsidiaries are sold (to a Person other than a Credit Party) in a transaction permitted pursuant to the Credit Agreement (and which does not violate the terms of any other Secured Debt Agreement then in effect), then, such Pledgor shall be released as a Pledgor pursuant to this Agreement without any further action hereunder (it

Exhibit I
Page 27

being understood that the sale of all of the Equity Interests in any Person that owns, directly or indirectly, all of the Equity Interests in any Pledgor shall be deemed to be a sale of all of the Equity Interests in such Pledgor for purposes of this Section), and the Pledgee is authorized and directed to execute and deliver such instruments of release as are reasonably satisfactory to it.  At any time that the Borrower desires that a Pledgor be released from this Agreement as provided in this Section 32, the Borrower shall deliver to the Pledgee a certificate signed by an Authorized Officer of the Borrower stating that the release of such Pledgor is permitted pursuant to this Section 32.  If requested by Pledgee (although the Pledgee shall have no obligation to make any such request), the Borrower shall furnish legal opinions (from counsel acceptable to the Pledgee) to the effect set forth in the immediately preceding sentence.  The Pledgee shall have no liability whatsoever to any other Secured Creditor as a result of the release of any Pledgor by it in accordance with, or which it believes in good faith to be in accordance with, this Section 32.

34.    INTERCREDITOR AGREEMENTS.    Notwithstanding anything herein to the contrary, the exercise of any right or remedy by the Pledgee hereunder shall be subject to the provisions of the Intercreditor Agreement.  In the event of any conflict between the terms of the Intercreditor Agreement and this Agreement, the terms of the Intercreditor Agreement shall govern and control.

* * * *

Exhibit I
Page 28

        IN  WITNESS  WHEREOF,  each  Pledgor  and  the  Pledgee  have  caused  this Agreement to be executed by their duly elected officers duly authorized as of the date first above written.

Address:

| | |
|---|---|
| 201 North Harrison Street, Suite 600<br>Davenport, Iowa 52801<br>Attention:  Chief Financial Officer<br>Tel:  (563) 383-2179<br>Fax:  (563) 327-2600 | LEE ENTERPRISES, INCORPORATED,<br>as a Pledgor<br><br>By:_____<br>    Title: |
| c/o Lee Enterprises, Incorporated<br>201 North Harrison Street, Suite 600<br>Davenport, Iowa 52801<br>Attention:  Chief Financial Officer<br>Tel:  (563) 383-2179<br>Fax:  (563) 327-2600 | ACCUDATA, INC.,<br>    as a Pledgor<br><br><br>By:_____<br>    Title: |
| c/o Lee Enterprises, Incorporated<br>201 North Harrison Street, Suite 600<br>Davenport, Iowa 52801<br>Attention:  Chief Financial Officer<br>Tel:  (563) 383-2179<br>Fax:  (563) 327-2600 | INN PARTNERS, L.C.,<br>    as a Pledgor<br><br><br>By:_____<br>    Title: |
| c/o Lee Enterprises, Incorporated<br>201 North Harrison Street, Suite 600<br>Davenport, Iowa 52801<br>Attention:  Chief Financial Officer<br>Tel:  (563) 383-2179<br>Fax:  (563) 327-2600 | JOURNAL – STAR PRINTING CO.,<br>    as a Pledgor<br><br><br>By:_____<br>    Title: |
| c/o Lee Enterprises, Incorporated<br>201 North Harrison Street, Suite 600<br>Davenport, Iowa 52801<br>Attention:  Chief Financial Officer<br>Tel:  (563) 383-2179<br>Fax:  (563) 327-2600 | K. FALLS BASIN PUBLISHING, INC.,<br>    as a Pledgor<br><br><br>By:_____<br>    Title: |
| c/o Lee Enterprises, Incorporated<br>201 North Harrison Street, Suite 600<br>Davenport, Iowa 52801<br>Attention:  Chief Financial Officer<br>Tel:  (563) 383-2179<br>Fax:  (563) 327-2600 | LEE CONSOLIDATED HOLDINGS CO.,<br>    as a Pledgor<br><br><br>By:_____<br>    Title: |

Exhibit I
Page 29

c/o Lee Enterprises, Incorporated
201 North Harrison Street, Suite 600
Davenport, Iowa 52801
Attention:  Chief Financial Officer
Tel:  (563) 383-2179
Fax:  (563) 327-2600

LEE PUBLICATIONS, INC.,
    as a Pledgor


By:_____
    Title:

c/o Lee Enterprises, Incorporated
201 North Harrison Street, Suite 600
Davenport, Iowa 52801
Attention:  Chief Financial Officer
Tel:  (563) 383-2179
Fax:  (563) 327-2600

LEE PROCUREMENT SOLUTIONS CO.,
    as a Pledgor


By:_____
    Title:

c/o Lee Enterprises, Incorporated
201 North Harrison Street, Suite 600
Davenport, Iowa 52801
Attention:  Chief Financial Officer
Tel:  (563) 383-2179
Fax:  (563) 327-2600

SIOUX CITY NEWSPAPERS, INC.,
    as a Pledgor


By:_____
    Title:

Accepted and Agreed to:

DEUTSCHE BANK TRUST COMPANY AMERICAS
    as Collateral Agent and Pledgee


By:_____
    Title:


By:_____
    Title:

ANNEX A
to
<u>PLEDGE AGREEMENT</u>

SCHEDULE OF LEGAL NAMES, TYPE OF ORGANIZATION
(AND WHETHER A REGISTERED ORGANIZATION AND/OR
A TRANSMITTING UTILITY), JURISDICTION OF ORGANIZATION,
<u>LOCATION AND ORGANIZATIONAL IDENTIFICATION NUMBERS</u>

| Exact Legal Name <u>of Each Pledgor</u> | Registered Organization? <u>(Yes/No)</u> | Jurisdiction of <u>Organization</u> | Pledgor's Location (for purposes of <u>NY UCC § 9-307)</u> | Pledgor's Organization Identification Number (or, if it has none, so <u>indicate)</u> | Transmitting Utility? <u>(Yes/No)</u> |
|---|---|---|---|---|---|
| | | | | | |

ANNEX B
to
PLEDGE AGREEMENT

SCHEDULE OF SUBSIDIARIES

| Entity | Ownership | Jurisdiction of Organization |
|--------|-----------|------------------------------|
|        |           |                              |

ANNEX C
to
<u>PLEDGE AGREEMENT</u>

<u>SCHEDULE OF STOCK</u>

1.    Lee Enterprises, Incorporated

| Name of Issuing <u>Corporation</u> | Type of <u>Shares</u> | Number of <u>Shares</u> | Certificate <u>No.</u> | Percentage <u>Owned</u> | Sub-clause of Section 3.2(a) of Pledge <u>Agreement</u> |
|---|---|---|---|---|---|
| | | | | | |

2.    Journal-Star Printing Co.

| Name of Issuing <u>Corporation</u> | Type of <u>Shares</u> | Number of <u>Shares</u> | Certificate <u>No.</u> | Percentage <u>Owned</u> | Sub-clause of Section 3.2(a) of Pledge <u>Agreement</u> |
|---|---|---|---|---|---|
| | | | | | |

3.     Accudata, Inc.

| Name of Issuing Corporation | Type of Shares | Number of Shares | Certificate No. | Percentage Owned | Sub-clause of Section 3.2(a) of Pledge Agreement |
|---|---|---|---|---|---|

4.     INN Partners, L.C.

| Name of Issuing Corporation | Type of Shares | Number of Shares | Certificate No. | Percentage Owned | Sub-clause of Section 3.2(a) of Pledge Agreement |
|---|---|---|---|---|---|

5.     K. Falls Basin Publishing, Inc.

| Name of Issuing Corporation | Type of Shares | Number of Shares | Certificate No. | Percentage Owned | Sub-clause of Section 3.2(a) of Pledge Agreement |
|---|---|---|---|---|---|

6.     Lee Consolidated Holdings Co.

| Name of Issuing Corporation | Type of Shares | Number of Shares | Certificate No. | Percentage Owned | Sub-clause of Section 3.2(a) of Pledge Agreement |
|---|---|---|---|---|---|

7.     Lee Publications, Inc.

| Name of Issuing Corporation | Type of Shares | Number of Shares | Certificate No. | Percentage Owned | Sub-clause of Section 3.2(a) of Pledge Agreement |
|---|---|---|---|---|---|

8.     Lee Procurement Solutions Co.

| Name of Issuing Corporation | Type of Shares | Number of Shares | Certificate No. | Percentage Owned | Sub-clause of Section 3.2(a) of Pledge Agreement |
|---|---|---|---|---|---|

9.     Sioux City Newspapers, Inc.

Annex C
page 3

| Name of Issuing Corporation | Type of Shares | Number of Shares | Certificate No. | Percentage Owned | Sub-clause of Section 3.2(a) of Pledge Agreement |
|---|---|---|---|---|---|

<div align="right">

ANNEX E

to

PLEDGE AGREEMENT

</div>

## SCHEDULE OF LIMITED LIABILITY COMPANY INTERESTS

[Pledgor]

| Name of<br>Issuing Limited<br>Liability Company | Type of<br>Interest | Percentage<br>Owned | Sub-clause of<br>Section 3.2(a)<br>of Pledge Agreement |
| --- | --- | --- | --- |

ANNEX F
to
PLEDGE AGREEMENT

SCHEDULE OF CHIEF EXECUTIVE OFFICES

Name of Pledgor                    Address of Chief Executive Office

ANNEX G
to
PLEDGE AGREEMENT

Form of Agreement Regarding Uncertificated Securities, Limited Liability
Company Interests and Partnership Interests

AGREEMENT (as amended, modified, restated and/or supplemented from time to time, this "Agreement"), dated as of [_____ __, 20__], among the undersigned pledgor (the "Pledgor"), Deutsche Bank Trust Company Americas, not in its individual capacity but solely as Collateral Agent (the "Pledgee"), and [_____], as the issuer of the Issuer Pledged Interests (as defined below) (the "Issuer").

W I T N E S S E T H :

WHEREAS, the Pledgor, certain of its affiliates and the Pledgee have entered into a Pledge Agreement, dated as of [_____], (as amended, modified, restated and/or supplemented from time to time, the "Pledge Agreement"), under which, among other things, in order to secure the payment of the Obligations (as defined in the Pledge Agreement), the Pledgor has or will pledge to the Pledgee for the benefit of the Secured Creditors (as defined in the Pledge Agreement), and grant a security interest in favor of the Pledgee for the benefit of the Secured Creditors in, all of the right, title and interest of the Pledgor in and to any and all ["uncertificated securities" (as defined in Section 8-102(a)(18) of the Uniform Commercial Code, as adopted in the State of New York) ("Uncertificated Securities")] [Partnership Interests (as defined in the Pledge Agreement)] [Limited Liability Company Interests (as defined in the Pledge Agreement)], from time to time issued by the Issuer, whether now existing or hereafter from time to time acquired by the Pledgor (with all of such [Uncertificated Securities] [Partnership Interests] [Limited Liability Company Interests] being herein collectively called the "Issuer Pledged Interests"); and

WHEREAS, the Pledgor desires the Issuer to enter into this Agreement in order to perfect the security interest of the Pledgee under the Pledge Agreement in the Issuer Pledged Interests, to vest in the Pledgee control of the Issuer Pledged Interests and to provide for the rights of the parties under this Agreement;

NOW THEREFORE, in consideration of the premises and the mutual promises and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.    The Pledgor hereby irrevocably authorizes and directs the Issuer, and the Issuer hereby agrees, to comply with any and all instructions and orders originated by the Pledgee (and its successors and assigns) regarding any and all of the Issuer Pledged Interests without the further consent by the registered owner (including the Pledgor), and, following its receipt of a notice from the Pledgee stating that the Pledgee is exercising exclusive control of the Issuer Pledged Interests, not to comply with any instructions or orders regarding any or all of the Issuer Pledged Interests originated by any person or entity other than the Pledgee (and its successors and assigns) or a court of competent jurisdiction.

2.   The Issuer hereby certifies that (i) no notice of any security interest, lien or other encumbrance or claim affecting the Issuer Pledged Interests (other than the security interest of the Pledgee) has been received by it, and (ii) the security interest of the Pledgee in the Issuer Pledged Interests has been registered in the books and records of the Issuer.

3.   The Issuer hereby represents and warrants that (i) the pledge by the Pledgor of, and the granting by the Pledgor of a security interest in, the Issuer Pledged Interests to the Pledgee, for the benefit of the Secured Creditors, does not violate the charter, by-laws, partnership agreement, membership agreement or any other agreement governing the Issuer or the Issuer Pledged Interests, and (ii) the Issuer Pledged Interests consisting of capital stock of a corporation are fully paid and nonassessable.

4.   All notices, statements of accounts, reports, prospectuses, financial statements and other communications to be sent to the Pledgor by the Issuer in respect of the Issuer will also be sent to the Pledgee at the following address:

> Deutsche Bank Trust Company Americas
> 60 Wall Street
> New York, New York  10005
> Attention: Stephen Cayer
> Telephone No.: (212) 250-3536
> Telecopier No.: (212) 797-5904

5.   Following its receipt of a notice from the Pledgee stating that the Pledgee is exercising exclusive control of the Issuer Pledged Interests and until the Pledgee shall have delivered written notice to the Issuer that all of the Obligations have been paid in full and this Agreement is terminated, the Issuer will send any and all redemptions, distributions, interest or other payments in respect of the Issuer Pledged Interests from the Issuer for the account of the Pledgee only by wire transfers to such account as the Pledgee shall instruct.

6.   Except as expressly provided otherwise in Sections 4 and 5 above, all notices, instructions, orders and communications hereunder shall be sent or delivered by mail, telegraph, telex, telecopy, cable or overnight courier service and all such notices and communications shall, when mailed, telexed, telecopied, cabled or sent by overnight courier, be effective when deposited in the mails or delivered to overnight courier, prepaid and properly addressed for delivery on such or the next Business Day, or sent by telex or telecopier, except that notices and communications to the Pledgee or the Issuer shall not be effective until received.  All notices and other communications shall be in writing and addressed as follows:

(a)    if to the Pledgor, at:

> _____
> _____
> _____
> _____
> Attention:  _____

Telephone No.:
Fax No.:

(b)     if to the Pledgee, at the address given in Section 4 hereof;

(c)     if to the Issuer, at:

_____

_____

_____

or at such other address as shall have been furnished in writing by any Person described above to the party required to give notice hereunder.  As used in this Section 6, "Business Day" means any day other than a Saturday, Sunday, or other day in which banks in New York are authorized to remain closed.

7.  This Agreement shall be binding upon the successors and assigns of the Pledgor and the Issuer and shall inure to the benefit of and be enforceable by the Pledgee and its successors and assigns.  This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which shall constitute one instrument.  In the event that any provision of this Agreement shall prove to be invalid or unenforceable, such provision shall be deemed to be severable from the other provisions of this Agreement which shall remain binding on all parties hereto.  None of the terms and conditions of this Agreement may be changed, waived, modified or varied in any manner whatsoever except in writing signed by the Pledgee, the Issuer and the Pledgor.

8.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to its principles of conflict of laws.

        IN WITNESS WHEREOF, the Pledgor, the Pledgee and the Issuer have caused this Agreement to be executed by their duly elected officers duly authorized as of the date first above written.

[_____],
    as Pledgor


By_____
    Name:
    Title:


DEUTSCHE    BANK    TRUST    COMPANY
AMERICAS,
    not in its individual capacity but solely as
    Collateral Agent and Pledgee


By_____
    Name:
    Title:


By_____
    Name:
    Title:


[_____],
    as the Issuer


By_____
    Name:
    Title:

SECURITY AGREEMENT[1]


among


LEE ENTERPRISES, INCORPORATED,

CERTAIN SUBSIDIARIES OF LEE ENTERPRISES, INCORPORATED


and


DEUTSCHE BANK TRUST COMPANY AMERICAS,
as COLLATERAL AGENT


_____

Dated as of [_____]
_____


_____

[1] The Assignors (i) acknowledge that no disclosure schedules or similar information contemplated by this Agreement have been provided as of the date of this draft and (ii) agree that, to the extent that the information set forth in such disclosure schedules or other information differs in any respect from the information provided to the Lenders prior to the Effective Date (as defined in the Support Agreement), the Lenders reserve the right in their reasonable discretion to make appropriate changes to this Agreement.

## SECURITY AGREEMENT

SECURITY AGREEMENT, dated as of [____], made by each of the undersigned assignors (each, an "Assignor" and, together with any other entity that becomes an assignor hereunder pursuant to Section 10.12 hereof, the "Assignors") in favor of Deutsche Bank Trust Company Americas, as Collateral Agent (together with any successor Collateral Agent, the "Collateral Agent"), for the benefit of the Secured Creditors (as defined below). Certain capitalized terms as used herein are defined in Article IX hereof. Except as otherwise defined herein, all capitalized terms used herein and defined in the Credit Agreement (as defined below) shall be used herein as therein defined.

## W I T N E S S E T H:

WHEREAS, Lee Enterprises, Incorporated (the "Borrower"), the lenders from time to time party thereto (the "Lenders"), Deutsche Bank Securities Inc. and Goldman Sachs Lending Partners LLC, as Joint Lead Arrangers and Joint Book Running Managers, and Deutsche Bank Trust Company Americas, as Administrative Agent (together with any successor administrative agent, the "Administrative Agent") and Collateral Agent, have entered into an Exit Credit Agreement, dated as of [____], (as amended, modified, restated and/or supplemented from time to time, the "Credit Agreement"), providing for the making and continuation of Loans to, and the issuance and maintenance of, and participation in, Letters of Credit for the account of, the Borrower, all as contemplated therein (the Lenders, each Issuing Lender, the Administrative Agent, the Collateral Agent and each other Agent are herein called the "Lender Creditors");

WHEREAS, the Borrower and/or one or more of its Qualified Wholly-Owned Domestic Subsidiaries have heretofore entered into, and/or may at any time and from time to time enter into, one or more Interest Rate Protection Agreements and/or Other Hedging Agreements with one or more Lenders or any affiliate thereof (each such Lender or affiliate, even if the respective Lender subsequently ceases to be a Lender under the Credit Agreement for any reason, together with such Lender's or affiliate's successors and assigns, if any, collectively, the "Other Creditors" and, together with the Lender Creditors, the "Secured Creditors"; and with each such Interest Rate Protection Agreement and/or Other Hedging Agreement with an Other Creditor being herein called a "Secured Hedging Agreement");

WHEREAS, pursuant to the Subsidiaries Guaranty, each Subsidiary Guarantor has jointly and severally guaranteed to the Secured Creditors the payment when due of all Guaranteed Obligations as described therein;

WHEREAS, it is a condition precedent to the making and continuation of Loans to the Borrower and the issuance and maintenance of, and participation in, Letters of Credit for the account of the Borrower under the Credit Agreement and to the Other Creditors entering into Secured Hedging Agreements that each Assignor shall have executed and delivered to the Collateral Agent this Agreement; and

WHEREAS, each Assignor will obtain benefits from the incurrence and continuation of Loans by the Borrower and the issuance and maintenance of, and participation in,

Letters of Credit for the account of the Borrower under the Credit Agreement and the entering into and maintaining by the Borrower and/or one or more of its Qualified Wholly-Owned Domestic Subsidiaries of Secured Hedging Agreements and, accordingly, desires to execute this Agreement in order to satisfy the condition described in the preceding paragraph and to induce the Lenders to make and continue Loans to the Borrower and issue, maintain, and/or participate in, Letters of Credit for the account of the Borrower and the Other Creditors to maintain and/or enter into Secured Hedging Agreements with the Borrower and/or one or more of its Qualified Wholly-Owned Domestic Subsidiaries;

NOW, THEREFORE, in consideration of the benefits accruing to each Assignor, the receipt and sufficiency of which are hereby acknowledged, each Assignor hereby makes the following representations and warranties to the Collateral Agent for the benefit of the Secured Creditors and hereby covenants and agrees with the Collateral Agent for the benefit of the Secured Creditors as follows:

ARTICLE I

SECURITY INTERESTS

1.1 <u>Grant of Security Interests</u>.  (a)  As security for the prompt and complete payment and performance when due of all of its Obligations, each Assignor does hereby assign and transfer unto the Collateral Agent, and does hereby pledge and grant to the Collateral Agent, for the benefit of the Secured Creditors, a continuing security interest in all of the right, title and interest of such Assignor in, to and under all of the following personal property and fixtures (and all rights therein) of such Assignor, or in which or to which such Assignor has any rights, in each case whether now existing or hereafter from time to time acquired:

(i)     each and every Account;

(ii)    all cash;

(iii)   the Cash Collateral Account and all monies, securities, Instruments and other investments deposited or required to be deposited in the Cash Collateral Account;

(iv)    all Chattel Paper (including, without limitation, all Tangible Chattel Paper and all Electronic Chattel Paper);

(v)     all Commercial Tort Claims;

(vi)    all computer programs of such Assignor and all intellectual property rights therein and all other proprietary information of such Assignor, including but not limited to Domain Names and Trade Secret Rights;

(vii)   all Contracts, together with all Contract Rights arising thereunder;

(viii)  all Copyrights;

(ix) all Equipment;

(x) all Deposit Accounts and all other demand, deposit, time, savings, cash management, passbook and similar accounts maintained by such Assignor with any Person and all monies, securities, Instruments and other investments deposited or required to be deposited in any of the foregoing;

(xi) all Documents;

(xii) all General Intangibles;

(xiii) all Goods;

(xiv) all Instruments;

(xv) all Inventory;

(xvi) all Financial Assets;

(xvii) all Joint Venture Investment Property;

(xviii) all Letter-of-Credit Rights (whether or not the respective letter of credit is evidenced by a writing);

(xix) all Marks, together with the registrations and right to all renewals thereof, the goodwill of the business of such Assignor symbolized by the Marks and all causes of action arising prior to or after the date hereof for infringement of any of the Marks or unfair competition regarding the same;

(xx) all Notes;

(xxi) all Patents, together with all causes of action arising prior to or after the date hereof for infringement of any of the Patents or unfair competition regarding the same;

(xxii) all Permits;

(xxiii) all Security Entitlements and other Investment Property (to the extent not already covered by another clause of this Section 1.1(a));

(xxiv) all Software and all Software licensing rights, all writings, plans, specifications and schematics, all engineering drawings, customer lists, goodwill and licenses, and all recorded data of any kind or nature, regardless of the medium of recording;

(xxv) all Supporting Obligations;

(xxvi)  all Fixtures;

(xxvii) all other goods and personal property, whether tangible or intangible; and

(xxvi)  all Proceeds and products of, and all accessions to, substitutions and replacements for, and rents, profits and products of, any and all of the foregoing (all of the above, the "Collateral").

Notwithstanding the foregoing, the term "Collateral" shall not include any Excluded Property or any Excluded TNI Assets.

(b)    The security interest of the Collateral Agent under this Agreement automatically (and without the taking of any action by any Assignor) extends to all Collateral which any Assignor may acquire, or with respect to which such Assignor may obtain rights, at any time during the term of this Agreement, and each Assignor shall (to the extent provided below) take the following actions as set forth below (as promptly as practicable and, in any event, within 10 days after it obtains such Collateral) for the benefit of the Collateral Agent and the other Secured Creditors:

(i)    with respect to a Certificated Security (other than a Certificated Security credited on the books of a Clearing Corporation or Securities Intermediary), such Assignor shall physically deliver such Certificated Security to the Collateral Agent, endorsed to the Collateral Agent or endorsed in blank;

(ii)    with respect to an Uncertificated Security (other than an Uncertificated Security credited on the books of a Clearing Corporation or Securities Intermediary), such Assignor shall cause the issuer of such Uncertificated Security to duly authorize, execute, and deliver to the Collateral Agent, an agreement for the benefit of the Collateral Agent and the other Secured Creditors substantially in the form of Annex S (appropriately completed to the satisfaction of the Collateral Agent and with such modifications, if any, as shall be satisfactory to the Collateral Agent) pursuant to which such issuer agrees to comply with any and all instructions originated by the Collateral Agent without further consent by the registered owner and not to comply with instructions regarding such Uncertificated Security (and any Partnership Interests and Limited Liability Company Interests issued by such issuer) originated by any other Person other than a court of competent jurisdiction;

(iii)    with respect to a Certificated Security, Uncertificated Security, Partnership Interest or Limited Liability Company Interest credited on the books of a Clearing Corporation or Securities Intermediary (including a Federal Reserve Bank, Participants Trust Company or The Depository Trust Company), such Assignor shall promptly notify the Collateral Agent thereof and shall promptly take (x) all actions required (i) to comply with the applicable rules of such Clearing Corporation or Securities Intermediary and (ii) to perfect the security interest of the Collateral Agent under applicable law (including, in any event, under Sections 9-314(a), (b) and (c), 9-106 and 8-106(d) of the UCC) and (y) such other actions as the Collateral Agent deems necessary or desirable to effect the foregoing;

(iv)    with respect to a Partnership Interest or a Limited Liability Company Interest (other than a Partnership Interest or Limited Liability Company Interest credited on the books of a Clearing Corporation or Securities Intermediary), (1) if such Partnership Interest or Limited Liability Company Interest is represented by a certificate and is a Security for purposes of the UCC, the procedure set forth in Section 1.1(b)(i) hereof, and (2) if such Partnership Interest or Limited Liability Company Interest is not represented by a certificate or is not a Security for purposes of the UCC, the procedure set forth in Section 1.1(b)(ii) hereof;

(v)    with respect to any Note, such Assignor shall physically deliver such Note to the Collateral Agent, endorsed in blank, or, at the request of the Collateral Agent, endorsed to the Collateral Agent in accordance with Section 3.6; and

(vi)    with respect to cash proceeds from any of the Collateral, at the reasonable request of the Collateral Agent or upon an occurrence of a Default or an Event of Default, (i) establishment by the Collateral Agent of a cash account in the name of such Assignor over which the Collateral Agent shall have "control" within the meaning of the UCC and at any time any Default or Event of Default is in existence no withdrawals or transfers may be made therefrom by any Person except with the prior written consent of the Collateral Agent and (ii) deposit of such cash in such cash account.

(c)    In addition to the actions required to be taken pursuant to Section 1.1(b) hereof, each Assignor shall take the following additional actions with respect to the Collateral:

(i)    with respect to all Collateral of such Assignor whereby or with respect to which the Collateral Agent may obtain "control" thereof within the meaning of Section 8-106 of the UCC (or under any provision of the UCC as same may be amended or supplemented from time to time, or under the laws of any relevant State other than the State of New York), such Assignor shall take all actions as may be reasonably requested from time to time by the Collateral Agent so that "control" of such Collateral is obtained and at all times held by the Collateral Agent; and

(ii)    each Assignor shall from time to time cause appropriate financing statements (on appropriate forms) under the Uniform Commercial Code as in effect in the various relevant States, covering all Collateral hereunder (with the form of such financing statements to be satisfactory to the Collateral Agent), to be filed in the relevant filing offices so that at all times the Collateral Agent's security interest in all Investment Property and other Collateral which can be perfected by the filing of such financing statements (in each case to the maximum extent perfection by filing may be obtained under the laws of the relevant States, including, without limitation, Section 9-312(a) of the UCC) is so perfected.

1.2 Power of Attorney.    Each Assignor hereby constitutes and appoints the Collateral Agent its true and lawful attorney, irrevocably, with full power after the occurrence of and during the continuance of an Event of Default (in the name of such Assignor or otherwise) to act, require, demand, receive, compound and give acquittance for any and all moneys and claims for moneys due or to become due to such Assignor under or arising out of the Collateral, to

endorse any checks or other instruments or orders in connection therewith and to file any claims or take any action or institute any proceedings which the Collateral Agent may deem to be reasonably necessary or advisable to protect the interests of the Secured Creditors, which appointment as attorney is coupled with an interest.

ARTICLE II

GENERAL REPRESENTATIONS, WARRANTIES AND COVENANTS

Each Assignor represents, warrants and covenants, which representations, warranties and covenants shall survive execution and delivery of this Agreement, as follows:

2.1 <u>Necessary Filings</u>.   All filings, registrations, recordings and other actions necessary or appropriate to create, preserve and perfect the security interest granted by such Assignor to the Collateral Agent hereby in respect of the Collateral have been accomplished and the security interest granted to the Collateral Agent pursuant to this Agreement in and to the Collateral creates a valid and, together with all such filings, registrations, recordings and other actions, a perfected security interest therein prior to the rights of all other Persons therein and subject to no other Liens (other than Permitted Liens) and is entitled to all the rights, priorities and benefits afforded by the Uniform Commercial Code or other relevant law as enacted in any relevant jurisdiction to perfected security interests, in each case to the extent that the Collateral consists of the type of property in which a security interest may be perfected by possession or control (within the meaning of the UCC as in effect on the date hereof in the State of New York), by filing a financing statement under the Uniform Commercial Code as enacted in any relevant jurisdiction or by a filing of a Grant of Security Interest in the respective form attached hereto in the United States Patent and Trademark Office or in the United States Copyright Office.

2.2 <u>No Liens</u>.   Such Assignor is, and as to all Collateral acquired by it from time to time after the date hereof such Assignor will be, the owner of all Collateral free from any Lien or other right, title or interest of any Person (other than Permitted Liens), and such Assignor shall defend the Collateral against all claims and demands of all Persons at any time claiming the same or any interest therein adverse to the Collateral Agent.

2.3 <u>Other Financing Statements</u>.   As of the date hereof, there is no financing statement (or similar statement or instrument of registration under the law of any jurisdiction) covering or purporting to cover any interest of any kind in the Collateral (other than financing statements filed in respect of Permitted Liens), and so long as the Termination Date has not occurred, such Assignor will not execute or authorize to be filed in any public office any financing statement (or similar statement or instrument of registration under the law of any jurisdiction) or statements relating to the Collateral, except financing statements filed or to be filed in respect of and covering the security interests granted hereby by such Assignor or in connection with Permitted Liens.

2.4 <u>Chief Executive Office, Record Locations</u>.   The chief executive office of such Assignor is, on the date of this Agreement, located at the address indicated on Annex A hereto for such Assignor.   During the period of the four calendar months preceding the date of this Agreement, the chief executive office of such Assignor has not been located at any address other

than that indicated on Annex A in accordance with the immediately preceding sentence, in each case unless each such other address is also indicated on Annex A hereto for such Assignor.

2.5    [RESERVED].

2.6    Legal Names; Type of Organization (and Whether a Registered Organization and/or a Transmitting Utility); Jurisdiction of Organization; Location; Organizational Identification Numbers; Federal Employer Identification Number; Changes Thereto; etc.

The exact legal name of each Assignor, the type of organization of such Assignor, whether or not such Assignor is a Registered Organization, the jurisdiction of organization of such Assignor, such Assignor's Location, the organizational identification number (if any) of such Assignor, the Federal Employer Identification Number (if any); and whether or not such Assignor is a Transmitting Utility, is listed on Annex C hereto for such Assignor.  Such Assignor shall not change its legal name, its type of organization, its status as a Registered Organization (in the case of a Registered Organization), its status as a Transmitting Utility or as a Person which is not a Transmitting Utility, as the case may be, its jurisdiction of organization, its Location, its organizational identification number (if any), or its Federal Employer Identification Number (if any) from that used on Annex C hereto, except that any such changes shall be permitted (so long as not in violation of the applicable requirements of the Secured Debt Agreements and so long as same do not involve (x) a Registered Organization ceasing to constitute same or (y) such Assignor changing its jurisdiction of organization or Location from the United States or a State thereof to a jurisdiction of organization or Location, as the case may be, outside the United States or a State thereof) if (i) it shall have given to the Collateral Agent  not less than 15 days' prior written notice of each change to the information listed on Annex C (as adjusted for any subsequent changes thereto previously made in accordance with this sentence), together with a supplement to Annex C which shall correct all information contained therein for such Assignor, and (ii) in connection with such change or changes, it shall have taken all action reasonably requested by the Collateral Agent to maintain the security interests of the Collateral Agent in the Collateral intended to be granted hereby at all times fully perfected and in full force and effect.  In addition, to the extent that such Assignor does not have an organizational identification number on the date hereof and later obtains one, such Assignor shall promptly thereafter notify the Collateral Agent of such organizational identification number and shall take all actions reasonably satisfactory to the Collateral Agent to the extent necessary to maintain the security interest of the Collateral Agent in the Collateral intended to be granted hereby fully perfected and in full force and effect.

2.7    [RESERVED].

2.8    Certain Significant Transactions.

During the one year period preceding the date of this Agreement, no Person shall have merged or consolidated with or into any Assignor, and no Person shall have liquidated into, or transferred all or substantially all of its assets to, any Assignor, in each case except as described in Annex E hereto.  With respect to any transactions so described in Annex E hereto, the respective Assignor shall have furnished such information with respect to the Person (and the assets of the Person and locations thereof) which merged with or into or consolidated with such

Assignor, or was liquidated into or transferred all or substantially all of its assets to such Assignor, and shall have furnished to the Collateral Agent such UCC lien searches as may have been requested with respect to such Person and its assets, to establish that no security interest (excluding Permitted Liens) continues perfected on the date hereof with respect to any Person described above (or the assets transferred to the respective Assignor by such Person), including without limitation pursuant to Section 9-316(a)(3) of the UCC.

2.9 Non-UCC Property. The aggregate fair market value (as determined by the Assignors in good faith) of all property of the Assignors of the types described in clauses (1), (2) and (3) of Section 9-311(a) (other than Copyrights, Marks and Patents which are the subject of a filing of a grant of security interest in the respective form attached hereto in the United States Patent and Trademark Office or in the United States Copyright Office) of the UCC does not exceed $5,000,000. If the aggregate value of all such property at any time owned by all Assignors exceeds $5,000,000, the Assignors shall provide prompt written notice thereof to the Collateral Agent and, upon the request of the Collateral Agent, the Assignors shall promptly (and in any event within 30 days) take such actions (at their own cost and expense) as may be required under the respective United States, State or other laws referenced in Section 9-311(a) of the UCC to perfect the security interests granted herein in any Collateral where the filing of a financing statement does not perfect the security interest in such property in accordance with the provisions of Section 9-311(a) of the UCC.

2.10 As-Extracted Collateral; Timber-to-be-Cut. On the date hereof, such Assignor does not own, or expect to acquire, any property which constitutes, or would constitute, As-Extracted Collateral or Timber-to-be-Cut. If at any time after the date of this Agreement such Assignor owns, acquires or obtains rights to any As-Extracted Collateral or Timber-to-be-Cut, such Assignor shall furnish the Collateral Agent with prompt written notice thereof (which notice shall describe in reasonable detail the As-Extracted Collateral and/or Timber-to-be-Cut and the locations thereof) and shall take all actions as may be deemed reasonably necessary or desirable by the Collateral Agent to perfect the security interest of the Collateral Agent therein.

2.11 Collateral in the Possession of a Bailee. If any material amounts of Inventory or other Goods (as to the Assignors taken as a whole) are at any time in the possession of a bailee, such Assignor shall promptly notify the Collateral Agent thereof and, if requested by the Collateral Agent, shall use its reasonable best efforts to promptly obtain an acknowledgment from such bailee, in form and substance reasonably satisfactory to the Collateral Agent, that the bailee holds such Collateral for the benefit of the Collateral Agent and shall act upon the instructions of the Collateral Agent, without the further consent of such Assignor. The Collateral Agent agrees with such Assignor that the Collateral Agent shall not give any such instructions unless an Event of Default has occurred and is continuing or would occur after taking into account any action by the respective Assignor with respect to any such bailee.

2.12 Recourse. This Agreement is made with full recourse to each Assignor and pursuant to and upon all the warranties, representations, covenants and agreements on the part of such Assignor contained herein, in the Secured Debt Agreements and otherwise in writing in connection herewith or therewith.

2.13 <u>Certain Representations and Warranties Regarding Certain Collateral</u>. Each Assignor represents and warrants that on the date hereof: (i) the Stock (and any warrants or options to purchase Stock) held by such Assignor consists of the number and type of shares of the stock (or warrants or options to purchase any stock) of the corporations as described in Annex O hereto; (ii) such Stock referenced in clause (i) of this paragraph constitutes that percentage of the issued and outstanding capital stock of the issuing corporation as is set forth in Annex O hereto; (iii) the Notes held by such Assignor consist of the promissory notes described in Annex P hereto where such Assignor is listed as the Lender; (iv) the Limited Liability Company Interests held by such Assignor consist of the number and type of interests of the Persons described in Annex Q hereto; (v) each such Limited Liability Company Interest referenced in clause (iv) of this paragraph constitutes that percentage of the issued and outstanding equity interest of the issuing Person as set forth in Annex Q hereto; (vi) the Partnership Interests held by such Assignor consist of the number and type of interests of the Persons described in Annex R hereto; (vii) each such Partnership Interest referenced in clause (vi) of this paragraph constitutes that percentage or portion of the entire partnership interest of the Partnership as set forth in Annex R hereto; (viii) such Assignor has complied with the respective procedure set forth in Section 1.1(b) hereof with respect to each item of Collateral described in Annexes O through R hereto for such Assignor; and (ix) on the date hereof, such Assignor owns no other Stock, Limited Liability Company Interests or Partnership Interests.

<div align="center">ARTICLE III</div>

<div align="center">SPECIAL PROVISIONS CONCERNING ACCOUNTS; CONTRACT RIGHTS;<br/>INSTRUMENTS; CHATTEL PAPER AND CERTAIN OTHER COLLATERAL</div>

3.1 <u>Additional Representations and Warranties</u>. As of the time when each of its Accounts arises, each Assignor shall be deemed to have represented and warranted that each such Account, and all records, papers and documents relating thereto (if any) are genuine and what they purport to be, and that all papers and documents (if any) relating thereto (i) will, to the knowledge of such Assignor, represent the genuine, legal, valid and binding obligation of the account debtor evidencing indebtedness unpaid and owed by the respective account debtor arising out of the performance of labor or services or the sale or lease and delivery of the merchandise listed therein, or both, (ii) will be the only original writings evidencing and embodying such obligation of the account debtor named therein (other than copies created for general accounting purposes), (iii) will, to the knowledge of such Assignor, evidence true and valid obligations, enforceable in accordance with their respective terms, and (iv) will be in compliance and will conform in all material respects with all applicable federal, state and local laws and applicable laws of any relevant foreign jurisdiction.

3.2 <u>Maintenance of Records</u>. Each Assignor will keep and maintain at its own cost and expense accurate records of its Accounts and Contracts pursuant to its historical customs and practices, including, but not limited to, originals of all documentation (including each Contract) with respect thereto, records of all payments received, all credits granted thereon, all merchandise returned and all other dealings therewith, and such Assignor will make the same available on any premise of any Assignor to the Collateral Agent for inspection, at such Assignor's own cost and expense, at any and all reasonable times upon prior notice to such Assignor and otherwise in accordance with the Credit Agreement. Upon the occurrence and

during the continuance of an Event of Default and at the request of the Collateral Agent, such Assignor shall, at its own cost and expense, deliver all tangible evidence of its Accounts and Contract Rights (including, without limitation, all documents evidencing the Accounts and all Contracts) and such books and records to the Collateral Agent or to its representatives (copies of which evidence and books and records may be retained by such Assignor). Upon the occurrence and during the continuance of an Event of Default and if the Collateral Agent so directs, such Assignor shall legend, in form and manner satisfactory to the Collateral Agent, the Accounts and the Contracts, as well as books, records and documents (if any) of such Assignor evidencing or pertaining to such Accounts and Contracts with an appropriate reference to the fact that such Accounts and Contracts have been assigned to the Collateral Agent and that the Collateral Agent has a security interest therein.

3.3  <u>Direction to Account Debtors; Contracting Parties; etc</u>.

Upon the occurrence and during the continuance of an Event of Default, if the Collateral Agent so directs any Assignor, such Assignor agrees (x) to cause all payments on account of the Accounts and Contracts to be made directly to the Cash Collateral Account, (y) that the Collateral Agent may, at its option, directly notify the obligors with respect to any Accounts and/or under any Contracts to make payments with respect thereto as provided in the preceding clause (x), and (z) that the Collateral Agent may enforce collection of any such Accounts and Contracts and may adjust, settle or compromise the amount of payment thereof, in the same manner and to the same extent as such Assignor. Without notice to or assent by any Assignor, the Collateral Agent may, upon the occurrence and during the continuance of an Event of Default, apply any or all amounts then in, or thereafter deposited in, the Cash Collateral Account toward the payment of the Obligations in the manner provided in Section 7.4 of this Agreement. The reasonable costs and expenses of collection (including reasonable attorneys' fees), whether incurred by an Assignor or the Collateral Agent, shall be borne by the relevant Assignor. The Collateral Agent shall deliver a copy of each notice referred to in the preceding clause (y) to the relevant Assignor, <u>provided</u> that (x) the failure by the Collateral Agent to so notify such Assignor shall not affect the effectiveness of such notice or the other rights of the Collateral Agent created by this Section 3.3 and (y) no such notice shall be required if an Event of Default of the type described in Section 11.05 of the Credit Agreement has occurred and is continuing.

3.4  <u>Modification of Terms; etc</u>.

Except in accordance with such Assignor's ordinary course of business and consistent with reasonable business judgment or as permitted by Section 3.5, no Assignor shall rescind or cancel any indebtedness evidenced by any Account or under any Contract, or modify any material term thereof or make any material adjustment with respect thereto, or extend or renew the same, or compromise or settle any material dispute, claim, suit or legal proceeding relating thereto, or sell any Account or Contract, or interest therein, without the prior written consent of the Collateral Agent.

3.5  <u>Collection</u>. Each Assignor shall endeavor in accordance with reasonable business practices to cause to be collected from the account debtor named in each of its Accounts or obligor under any Contract, as and when due (including, without limitation, amounts which

are delinquent, such amounts to be collected in accordance with generally accepted lawful collection procedures) any and all amounts owing under or on account of such Account or Contract, and apply forthwith upon receipt thereof all such amounts as are so collected to the outstanding balance of such Account or under such Contract.  Except as otherwise directed by the Collateral Agent after the occurrence and during the continuation of an Event of Default, any Assignor may allow in the ordinary course of business as adjustments to amounts owing under its Accounts and Contracts (i) an extension or renewal of the time or times of payment, or settlement for less than the total unpaid balance, which such Assignor finds appropriate in accordance with reasonable business judgment and (ii) a refund or credit due as a result of returned or damaged merchandise or improperly performed services or for other reasons which such Assignor finds appropriate in accordance with reasonable business judgment.  The reasonable costs and expenses (including, without limitation, reasonable attorneys' fees) of collection, whether incurred by an Assignor or the Collateral Agent, shall be borne by the relevant Assignor.

3.6  Instruments.  If any Assignor owns or acquires any Instrument in excess of $500,000 constituting Collateral (other than (x) checks and other payment instruments received and collected in the ordinary course of business and (y) any Intercompany Note, such Assignor will within 10 Business Days notify the Collateral Agent thereof, and upon request by the Collateral Agent will promptly deliver such Instrument to the Collateral Agent appropriately endorsed to the order of the Collateral Agent.

3.7  Assignors Remain Liable Under Accounts.  Anything herein to the contrary notwithstanding, the Assignors shall remain liable under each of the Accounts to observe and perform all of the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise to such Accounts.  Neither the Collateral Agent nor any other Secured Creditor shall have any obligation or liability under any Account (or any agreement giving rise thereto) by reason of or arising out of this Agreement or the receipt by the Collateral Agent or any other Secured Creditor of any payment relating to such Account pursuant hereto, nor shall the Collateral Agent or any other Secured Creditor be obligated in any manner to perform any of the obligations of any Assignor under or pursuant to any Account (or any agreement giving rise thereto), to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by them or as to the sufficiency of any performance by any party under any Account (or any agreement giving rise thereto), to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to them or to which they may be entitled at any time or times.

3.8  Assignors Remain Liable Under Contracts.  Anything herein to the contrary notwithstanding, the Assignors shall remain liable under each of the Contracts to observe and perform all of the conditions and obligations to be observed and performed by them thereunder, all in accordance with and pursuant to the terms and provisions of each Contract.  Neither the Collateral Agent nor any other Secured Creditor shall have any obligation or liability under any Contract by reason of or arising out of this Agreement or the receipt by the Collateral Agent or any other Secured Creditor of any payment relating to such Contract pursuant hereto, nor shall the Collateral Agent or any other Secured Creditor be obligated in any manner to perform any of the obligations of any Assignor under or pursuant to any Contract, to make any payment, to

make any inquiry as to the nature or the sufficiency of any performance by any party under any Contract, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to them or to which they may be entitled at any time or times.

3.9 Deposit Accounts; Etc.

(a) No Assignor maintains, or at any time after the date of this Agreement shall establish or maintain, any demand, time, savings, passbook or similar account, except for such accounts maintained with a bank (as defined in Section 9-102 of the UCC) whose jurisdiction (determined in accordance with Section 9-304 of the UCC) is within a State of the United States. Annex F hereto accurately sets forth, as of the date of this Agreement, for each Assignor, each Deposit Account maintained by such Assignor (including a description thereof and the respective account number), the name and address of the respective bank with which such Deposit Account is maintained, and the jurisdiction of the respective bank with respect to such Deposit Account, and indicates whether such Deposit Account constitutes an Excluded Account. For each Deposit Account (other than (i) the Cash Collateral Account or any other Deposit Account maintained with the Collateral Agent and (ii) any Excluded Account), the respective Assignor shall cause the bank with which the Deposit Account is maintained to execute and deliver to the Collateral Agent, on or before the date of this Agreement (or such later date as may be reasonably acceptable to the Collateral Agent in its sole discretion) or, if later, at the time of the establishment of the respective Deposit Account, a "control agreement" (A) in the form substantially consistent with the "control agreement" for such Deposit Account in effect with respect to the Prepetition Credit Agreement on the Petition Date, with such changes thereto to account for the lien of the collateral agent under the Second Lien Loan Agreement on such Deposit Account or, (B) if no such "control agreement" for a Deposit Account is in effect on the Petition Date, a "control agreement" in such other form as may be acceptable to the Collateral Agent. If any bank with which a Deposit Account (other than (i) the Cash Collateral Account or any other Deposit Account maintained with the Collateral Agent and (ii) any Excluded Account) is maintained refuses to, or does not, enter into such a "control agreement", then the respective Assignor shall promptly (and in any event within such period as may be reasonably acceptable to the Collateral Agent in its sole discretion close the respective Deposit Account and transfer all balances therein to the Cash Collateral Account or another Deposit Account meeting the requirements of this Section 3.9. If any bank with which a Deposit Account (other than (i) the Cash Collateral Account or any other Deposit Account maintained with the Collateral Agent and (ii) any Excluded Account) is maintained refuses to subordinate all its claims with respect to such Deposit Account to the Collateral Agent's security interest therein on terms satisfactory to the Collateral Agent, then the Collateral Agent, at its option, may (x) require that such Deposit Account be terminated in accordance with the immediately preceding sentence or (y) agree to a "control agreement" without such subordination, provided that in such event the Collateral Agent may at any time, at its option, subsequently require that such Deposit Account be terminated (within a reasonable period after notice from the Collateral Agent) in accordance with the requirements of the immediately preceding sentence. The Collateral Agent agrees that it will only give a "Notice of Exclusive Control" under a "control agreement" following the occurrence of an Event of Default.

(b)    After the date of this Agreement, no Assignor shall establish any new demand, time, savings, passbook or similar account, except for (i) Deposit Accounts established and maintained with banks and meeting the requirements of preceding clause (a) and (ii) Excluded Accounts.  At the time any such Deposit Account (other than an Excluded Account) is established, the appropriate "control agreement" shall be entered into in accordance with the requirements of preceding clause (a) and the respective Assignor shall furnish to the Collateral Agent a supplement to Annex F hereto containing the relevant information with respect to the respective Deposit Account and the bank with which same is established.

3.10  Letter-of-Credit Rights.  If any Assignor is at any time a beneficiary under a letter of credit with a stated amount of $500,000 or more, such Assignor shall promptly notify the Collateral Agent thereof and, at the request of the Collateral Agent, such Assignor shall, pursuant to an agreement in form and substance reasonably satisfactory to the Collateral Agent, use its reasonable best efforts to (i) arrange for the issuer and any confirmer of such letter of credit to consent to an assignment to the Collateral Agent of the proceeds of any drawing under such letter of credit or (ii) arrange for the Collateral Agent to become the transferee beneficiary of such letter of credit, with the Collateral Agent agreeing, in each case, that the proceeds of any drawing under the letter of credit are to be applied as provided in this Agreement after the occurrence and during the continuance of an Event of Default.

3.11  Commercial Tort Claims.  All Commercial Tort Claims of each Assignor in existence on the date of this Agreement in an amount (taking the greater of the aggregate claimed damages thereunder or the reasonably estimated value thereof) of $500,000 or more are described in Annex H hereto.  If any Assignor shall at any time after the date of this Agreement acquire a Commercial Tort Claim in an amount (taking the greater of the aggregate claimed damages thereunder or the reasonably estimated value thereof) of $500,000 or more, such Assignor shall promptly notify the Collateral Agent thereof in a writing signed by such Assignor and describing the details thereof and shall grant to the Collateral Agent in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance reasonably satisfactory to the Collateral Agent.

3.12  Chattel Paper.  Upon the request of the Collateral Agent made at any time or from time to time, each Assignor shall promptly furnish to the Collateral Agent a list of all Electronic Chattel Paper held or owned by such Assignor.  Furthermore, if requested by the Collateral Agent, each Assignor shall promptly take all actions which are reasonably practicable so that the Collateral Agent has "control" of all Electronic Chattel Paper in accordance with the requirements of Section 9-105 of the UCC.  Each Assignor will promptly (and in any event within 10 days) following any request by the Collateral Agent, deliver all of its Tangible Chattel Paper to the Collateral Agent.  At all times, each Assignor will mark Tangible Chattel Paper with a legend provided by the Collateral Agent indicating the security interest herein.

3.13  Further Actions.  Each Assignor will, at its own expense, make, execute, endorse, acknowledge, file and/or deliver to the Collateral Agent from time to time such vouchers, invoices, schedules, confirmatory assignments, conveyances, financing statements, transfer endorsements, certificates, reports and other assurances or instruments and take such further steps, including any and all actions as may be necessary or required under the Federal Assignment of Claims Act, relating to its Accounts, Contracts, Instruments and other property or

rights covered by the security interest hereby granted, as the Collateral Agent may reasonably require.

<div align="center">ARTICLE IV</div>

<div align="center">SPECIAL PROVISIONS CONCERNING TRADEMARKS AND DOMAIN NAMES</div>

4.1 <u>Additional Representations and Warranties</u>.  Each Assignor represents and warrants that it is the true and lawful owner of or otherwise has the right to use the registered Marks and Domain Names listed in Annex I hereto for such Assignor and that said listed Marks and Domain Names include all United States marks and applications for United States marks registered in the United States Patent and Trademark Office and all Domain Names that such Assignor owns or, except as described on Annex I, uses in connection with its business as of the date hereof.  Each Assignor represents and warrants that it owns, is licensed to use or otherwise has the right to use, all material Marks and material Domain Names that it uses.  Each Assignor further warrants that it has no knowledge of any third party claim received by it that any aspect of such Assignor's present or contemplated business operations infringes or will infringe any trademark, service mark or trade name of any other Person other than as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Each Assignor represents and warrants that it is the true and lawful owner of or otherwise has the right to use all U.S. trademark registrations and Domain Name registrations listed in Annex I hereto for such Assignor and that, to each Assignor's knowledge, said registrations are valid, subsisting, have not been canceled and that such Assignor is not aware of any third-party claim that any of said registrations is invalid or unenforceable, and is not aware that there is any reason that any of said applications for United States Marks will not mature into registrations, except to the extent the same, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  Each Assignor hereby grants to the Collateral Agent an absolute power of attorney to sign, upon the occurrence and during the continuance of an Event of Default, any document which may be required by the United States Patent and Trademark Office or similar registrar in order to effect an absolute assignment of all right, title and interest in each Mark and/or Domain Name, and record the same.

4.2 <u>Licenses and Assignments</u>.  Except as otherwise permitted by the Secured Debt Agreements, each Assignor hereby agrees not to divest itself of any right under any material Mark or Domain Name absent prior written approval of the Collateral Agent.

4.3 <u>Infringements</u>.  Each Assignor agrees, promptly upon learning thereof, to notify the Collateral Agent in writing of the name and address of, and to furnish such pertinent information that may be available with respect to, any party who such Assignor believes is, or may be, infringing or diluting or otherwise violating any of such Assignor's rights in and to any Mark or Domain Name in any manner that could reasonably be expected to have a Material Adverse Effect, or with respect to any party claiming that such Assignor's use of any Mark or Domain Name material to such Assignor's business violates in any material respect any property right of that party.  Each Assignor further agrees to prosecute diligently in accordance with reasonable business practices any Person infringing any Mark or Domain Name in any manner that could reasonably be expected to have a Material Adverse Effect.

4.4  <u>Preservation of Marks</u>.  Each Assignor agrees to take all such actions as are reasonably necessary to preserve its Marks as trademarks or service marks under the laws of the United States (other than any such Marks which are no longer used or useful in its business or operations).

4.5  <u>Maintenance of Registration</u>.  Each Assignor shall, at its own expense, diligently process all documents reasonably required to maintain all Mark and/or Domain Name registrations, including but not limited to affidavits of use and applications for renewals of registration in the United States Patent and Trademark Office for all of its material registered Marks, and shall pay all fees and disbursements in connection therewith and shall not abandon any such filing of affidavit of use or any such application of renewal prior to the exhaustion of all administrative and judicial remedies without prior written consent of the Collateral Agent (other than with respect to registrations and applications deemed by such Assignor in its reasonable business judgment to be no longer prudent to pursue).

4.6  <u>Future Registered Marks and Domain Names</u>.  If any Mark registration is issued hereafter to any Assignor as a result of any application now or hereafter pending before the United States Patent and Trademark Office or any Domain Name is registered by Assignor, within 30 days of receipt of such certificate or similar indicia of ownership, such Assignor shall deliver to the Collateral Agent a copy of such registration certificate or similar indicia of ownership, and a grant of a security interest in such Mark and/or Domain Name, to the Collateral Agent and at the expense of such Assignor, confirming the grant of a security interest in such Mark and/or Domain Name to the Collateral Agent hereunder, the form of such security to be substantially in the form of Annex L hereto or in such other form as may be reasonably satisfactory to the Collateral Agent.

4.7  <u>Remedies</u>.  If an Event of Default shall occur and be continuing, the Collateral Agent may, by written notice to the relevant Assignor, take any or all of the following actions:  (i) declare the entire right, title and interest of such Assignor in and to each of the Marks and Domain Names, together with all trademark rights and rights of protection to the same, vested in the Collateral Agent for the benefit of the Secured Creditors, in which event such rights, title and interest shall immediately vest, in the Collateral Agent for the benefit of the Secured Creditors, and the Collateral Agent shall be entitled to exercise the power of attorney referred to in Section 4.1 hereof to execute, cause to be acknowledged and notarized and record said absolute assignment with the applicable agency or registrar; (ii) take and use or sell the Marks or Domain Names and the goodwill of such Assignor's business symbolized by the Marks or Domain Names and the right to carry on the business and use the assets of such Assignor in connection with which the Marks or Domain Names have been used; and (iii) direct such Assignor to refrain, in which event such Assignor shall refrain, from using the Marks or Domain Names in any manner whatsoever, directly or indirectly, and such Assignor shall execute such further documents that the Collateral Agent may reasonably request to further confirm this and to transfer ownership of the Marks or Domain Names and registrations and any pending trademark applications in the United States Patent and Trademark Office or applicable Domain Name registrar to the Collateral Agent.

ARTICLE V

SPECIAL PROVISIONS CONCERNING PATENTS, COPYRIGHTS AND TRADE SECRETS

5.1 <u>Additional Representations and Warranties</u>.  Each Assignor represents and warrants that it is the true and lawful owner of all rights in (i) all material Trade Secret Rights, (ii) the Patents listed in Annex J hereto for such Assignor and that said Patents include all the United States patents and applications for United States patents that such Assignor owns as of the date hereof and (iii) the registered Copyrights listed in Annex K hereto for such Assignor and that, except as described on Annex K hereto, said Copyrights are all the United States copyrights registered with the United States Copyright Office and applications to United States copyrights that such Assignor owns as of the date hereof.  Each Assignor further warrants that it has no knowledge of any third party claim that any aspect of such Assignor's present or contemplated business operations infringes or will infringe any patent of any other Person or such Assignor has misappropriated any Trade Secret or proprietary information which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.  Each Assignor hereby grants to the Collateral Agent an absolute power of attorney to sign, upon the occurrence and during the continuance of any Event of Default, any document which may be required by the United States Patent and Trademark Office or the United States Copyright Office in order to effect an absolute assignment of all right, title and interest in each Patent or Copyright, and to record the same.

5.2 <u>Licenses and Assignments</u>.  Except as otherwise permitted by the Secured Debt Agreements, each Assignor hereby agrees not to divest itself of any right under any material Patent or Copyright absent prior written approval of the Collateral Agent.

5.3 <u>Infringements</u>.  Each Assignor agrees, promptly upon learning thereof, to furnish the Collateral Agent in writing with all pertinent information available to such Assignor with respect to any infringement, contributing infringement or active inducement to infringe or other violation of such Assignor's rights in any Patent or Copyright or to any claim that the practice of any Patent or use of any Copyright violates any property right of a third party, or with respect to any misappropriation of any Trade Secret Right or any claim that practice of any Trade Secret Right violates any property right of a third party, in each case, in any manner which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.  Each Assignor further agrees, absent direction of the Collateral Agent to the contrary, to diligently prosecute, in accordance with its reasonable business judgment, any Person infringing any Patent or Copyright or any Person misappropriating any Trade Secret Right, in each case to the extent that such infringement or misappropriation, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

5.4 <u>Maintenance of Patents or Copyrights</u>.  At its own expense, each Assignor shall make timely payment of all post-issuance fees required to maintain in force its rights under each material Patent or Copyright, absent prior written consent of the Collateral Agent.

5.5 <u>Prosecution of Patent or Copyright Applications</u>.  At its own expense, each Assignor shall diligently prosecute all material applications for (i) United States Patents listed in Annex J hereto and (ii) Copyrights listed on Annex K hereto, in each case for such Assignor and

shall not abandon any such application prior to exhaustion of all administrative and judicial remedies (other than applications that are deemed by such Assignor in its reasonable business judgment to no longer be necessary in the conduct of the Assignor's business), absent written consent of the Collateral Agent.

5.6 <u>Other Patents and Copyrights</u>.  Within 30 days of the acquisition or issuance of a United States Patent, registration of a Copyright, or acquisition of a registered Copyright, or of filing of an application for a United States Patent or Copyright, the relevant Assignor shall deliver to the Collateral Agent a copy of said Copyright or Patent, or certificate or registration of, or application therefor, as the case may be, with a grant of a security interest as to such Patent or Copyright, as the case may be, to the Collateral Agent and at the expense of such Assignor, confirming the grant of a security interest, the form of such grant of a security interest to be substantially in the form of Annex M or N hereto, as appropriate, or in such other form as may be reasonably satisfactory to the Collateral Agent.

5.7 <u>Remedies</u>.   If an Event of Default shall occur and be continuing, the Collateral Agent may, by written notice to the relevant Assignor, take any or all of the following actions:  (i) declare the entire right, title, and interest of such Assignor in each of the Patents and Copyrights vested in the Collateral Agent for the benefit of the Secured Creditors, in which event such right, title, and interest shall immediately vest in the Collateral Agent for the benefit of the Secured Creditors, in which case the Collateral Agent shall be entitled to exercise the power of attorney referred to in Section 5.1 hereof to execute, cause to be acknowledged and notarized and to record said absolute assignment with the applicable agency; (ii) take and practice or sell the Patents and Copyrights; and (iii) direct such Assignor to refrain, in which event such Assignor shall refrain, from practicing the Patents and using the Copyrights directly or indirectly, and such Assignor shall execute such further documents as the Collateral Agent may reasonably request further to confirm this and to transfer ownership of the Patents and Copyrights to the Collateral Agent for the benefit of the Secured Creditors.

ARTICLE VI

PROVISIONS CONCERNING ALL COLLATERAL

6.1 <u>Protection of Collateral Agent's Security</u>.  Except as otherwise permitted by the Secured Debt Agreements, each Assignor will do nothing to impair, in any material respect, the rights of the Collateral Agent in the Collateral.  Each Assignor will at all times maintain insurance, at such Assignor's own expense to the extent and in the manner provided in the Secured Debt Agreements.  Except to the extent otherwise permitted to be retained by such Assignor or applied by such Assignor pursuant to the terms of the Secured Debt Agreements, the Collateral Agent shall, at the time any proceeds of such insurance are distributed to the Secured Creditors, apply such proceeds in accordance with Section 7.4 hereof.  Each Assignor assumes all liability and responsibility in connection with the Collateral acquired by it and the liability of such Assignor to pay the Obligations shall in no way be affected or diminished by reason of the fact that such Collateral may be lost, destroyed, stolen, damaged or for any reason whatsoever unavailable to such Assignor.

6.2 <u>Warehouse Receipts Non-Negotiable</u>.    To the extent practicable, each Assignor agrees that if any warehouse receipt or receipt in the nature of a warehouse receipt is issued with respect to any of its Inventory, such Assignor shall request that such warehouse receipt or receipt in the nature thereof shall not be "negotiable" (as such term is used in Section 7-104 of the Uniform Commercial Code as in effect in any relevant jurisdiction or under other relevant law).

6.3 <u>Additional Information</u>.  Each Assignor will, at its own expense, from time to time upon the reasonable request of the Collateral Agent, promptly (and in any event within 10 days after its receipt of the respective request) furnish to the Collateral Agent such information with respect to the Collateral (including the identity of the Collateral or such components thereof as may have been requested by the Collateral Agent, and the estimated value and location of such Collateral).  Without limiting the forgoing, each Assignor agrees that it shall promptly (and in any event within 20 days after its receipt of the respective request) furnish to the Collateral Agent such updated Annexes hereto as may from time to time be reasonably requested by the Collateral Agent.

6.4 <u>Further Actions</u>.  Each Assignor will, at its own expense and upon the reasonable request of the Collateral Agent, make, execute, endorse, acknowledge, file and/or deliver to the Collateral Agent from time to time such lists, descriptions and designations of its Collateral, warehouse receipts, receipts in the nature of warehouse receipts, bills of lading, documents of title, vouchers, invoices, schedules, confirmatory assignments, conveyances, financing statements, transfer endorsements, certificates, reports and other assurances or instruments and take such further steps relating to the Collateral and other property or rights covered by the security interest hereby granted, which the Collateral Agent deems reasonably appropriate or advisable to perfect, preserve or protect its security interest in the Collateral consistent with the provisions of this Agreement.

6.5 <u>Financing Statements</u>.  Each Assignor agrees to execute and deliver to the Collateral Agent such financing statements, in form reasonably acceptable to the Collateral Agent, as the Collateral Agent may from time to time reasonably request or as are reasonably necessary or desirable in the opinion of the Collateral Agent to establish and maintain a valid, enforceable, perfected security interest in the Collateral as provided herein and the other rights and security contemplated hereby.  Each Assignor will pay any applicable filing fees, recordation taxes and related expenses relating to its Collateral.  Each Assignor hereby authorizes the Collateral Agent to file any such financing statements without the signature of such Assignor where permitted by law (and such authorization includes describing the Collateral as "all assets" of such Assignor with further reference to those assets specifically excluded from the grant of the security interest contained in this Agreement).

## ARTICLE VII

## REMEDIES UPON OCCURRENCE OF AN EVENT OF DEFAULT

7.1 <u>Remedies; Obtaining the Collateral Upon Default</u>.  Each Assignor agrees that, if any Event of Default shall have occurred and be continuing, then and in every such case, the Collateral Agent, in addition to any rights now or hereafter existing under applicable law and

under the other provisions of this Agreement, shall have all rights as a secured creditor under any UCC, and such additional rights and remedies to which a secured creditor is entitled under the laws in effect in all relevant jurisdictions and may:

(i)     personally, or by agents or attorneys, immediately take possession of the Collateral or any part thereof, from such Assignor or any other Person who then has possession of any part thereof with or without notice or process of law, and for that purpose may enter upon such Assignor's premises where any of the Collateral is located and remove the same and use in connection with such removal any and all services, supplies, aids and other facilities of such Assignor;

(ii)     instruct the obligor or obligors on any agreement, instrument or other obligation (including, without limitation, the Accounts and the Contracts) constituting the Collateral to make any payment required by the terms of such agreement, instrument or other obligation directly to the Collateral Agent and may exercise any and all remedies of such Assignor in respect of such Collateral;

(iii)     instruct all banks which have entered into a control agreement with the Collateral Agent to transfer all monies, securities and instruments held by such depositary bank to the Cash Collateral Account;

(iv)     sell, assign or otherwise liquidate any or all of the Collateral or any part thereof in accordance with Section 7.2 hereof, or direct such Assignor to sell, assign or otherwise liquidate any or all of the Collateral or any part thereof, and, in each case, take possession of the proceeds of any such sale or liquidation;

(v)     take possession of the Collateral or any part thereof, by directing such Assignor in writing to deliver the same to the Collateral Agent at any reasonable place or places designated by the Collateral Agent, in which event such Assignor shall at its own expense:

(x)     forthwith cause the same to be moved to the place or places so designated by the Collateral Agent and there delivered to the Collateral Agent;

(y)     store and keep any Collateral so delivered to the Collateral Agent at such place or places pending further action by the Collateral Agent as provided in Section 7.2 hereof; and

(z)     while the Collateral shall be so stored and kept, provide such security and maintenance services as shall be reasonably necessary to protect the same and to preserve and maintain it in good condition;

(vi)     license or sublicense, whether on an exclusive or nonexclusive basis, any Marks, Domain Names, Patents or Copyrights included in the Collateral for such term and on such conditions and in such manner as the Collateral Agent shall in its sole judgment determine;

(vii)    apply any monies constituting Collateral or proceeds thereof in accordance with the provisions of Section 7.4;

(viii)    accelerate any Note which may be accelerated in accordance with its terms, and take any other lawful action to collect upon any Note (including, without limitation, to make any demand for payment thereon);

(ix)    transfer all or any part of the Collateral into the Collateral Agent's name or the name of its nominee or nominees;

(x)    vote (and exercise all rights and powers in respect of voting) all or any part of the Collateral (whether or not transferred into the name of the Collateral Agent) and give all consents, waivers and ratifications in respect of the Collateral and otherwise act with respect thereto as though it were the outright owner thereof (each Assignor hereby irrevocably constituting and appointing the Collateral Agent the proxy and attorney-in-fact of such Assignor, with full power of substation to do so); and

(xi)    take any other action as specified in clauses (1) through (5), inclusive, of Section 9-607 of the UCC;

it being understood that each Assignor's obligation so to deliver the Collateral is of the essence of this Agreement and that, accordingly, upon application to a court of equity having jurisdiction, the Collateral Agent shall be entitled to a decree requiring specific performance by such Assignor of said obligation.  By accepting the benefits of this Agreement and each other Security Document, the Secured Creditors expressly acknowledge and agree that this Agreement and each other Security Document may be enforced only by the action of the Collateral Agent acting upon the instructions of the Required Secured Creditors and that no other Secured Creditor shall have any right individually to seek to enforce or to enforce this Agreement or to realize upon the security to be granted hereby, it being understood and agreed that such rights and remedies may be exercised by the Collateral Agent for the benefit of the Secured Creditors upon the terms of this Agreement and the other Security Documents.

7.2  Remedies; Disposition of the Collateral.  If any Event of Default shall have occurred and be continuing, then any Collateral repossessed by the Collateral Agent under or pursuant to Section 7.1 hereof and any other Collateral whether or not so repossessed by the Collateral Agent, may be sold, assigned, leased or otherwise disposed of under one or more con- tracts or as an entirety, and without the necessity of gathering at the place of sale the property to be sold, and in general in such manner, at such time or times, at such place or places and on such terms as the Collateral Agent may, in compliance with any mandatory requirements of applicable law, determine to be commercially reasonable.  Any of the Collateral may be sold, leased or otherwise disposed of, in the condition in which the same existed when taken by the Collateral Agent or after any overhaul or repair at the expense of the relevant Assignor which the Collateral Agent shall determine to be commercially reasonable.  Any such sale, lease or other disposition may be effected by means of a public disposition or private disposition, effected in accordance with the applicable requirements (in each case if and to the extent applicable) of Sections 9-610 through 9-613 of the UCC and/or such other mandatory requirements of applicable law as may apply to the respective disposition.  The Collateral Agent may, without notice or publication,

adjourn any public or private disposition or cause the same to be adjourned from time to time by announcement at the time and place fixed for the disposition, and such disposition may be made at any time or place to which the disposition may be so adjourned.  To the extent permitted by any such requirement of law, the Collateral Agent may bid for and become the purchaser (and may pay all or any portion of the purchase price by crediting Obligations against the purchase price) of the Collateral or any item thereof, offered for disposition in accordance with this Section 7.2 without accountability to the relevant Assignor.  If, under applicable law, the Collateral Agent shall be permitted to make disposition of the Collateral within a period of time which does not permit the giving of notice to the relevant Assignor as hereinabove specified, the Collateral Agent need give such Assignor only such notice of disposition as shall be required by such applicable law.  Each Assignor agrees to do or cause to be done all such other acts and things as may be reasonably necessary to make such disposition or dispositions of all or any portion of the Collateral valid and binding and in compliance with any and all applicable laws, regulations, orders, writs, injunctions, decrees or awards of any and all courts, arbitrators or governmental instrumentalities, domestic or foreign, having jurisdiction over any such sale or sales, all at such Assignor's expense.

7.3  Waiver of Claims.  Except as otherwise provided in this Agreement, EACH ASSIGNOR HEREBY WAIVES, TO THE EXTENT PERMITTED BY APPLICABLE LAW, NOTICE AND JUDICIAL HEARING IN CONNECTION WITH THE COLLATERAL AGENT'S TAKING POSSESSION OR THE COLLATERAL AGENT'S DISPOSITION OF ANY OF THE COLLATERAL, INCLUDING, WITHOUT LIMITATION, ANY AND ALL PRIOR NOTICE AND HEARING FOR ANY PREJUDGMENT REMEDY OR REMEDIES, and each Assignor hereby further waives, to the extent permitted by law:

(i)      all damages occasioned by such taking of possession or any such disposition except any damages which are the direct result of the Collateral Agent's gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision);

(ii)      all other requirements as to the time, place and terms of sale or other requirements with respect to the enforcement of the Collateral Agent's rights hereunder; and

(iii)      all rights of redemption, appraisement, valuation, stay, extension or moratorium now or hereafter in force under any applicable law in order to prevent or delay the enforcement of this Agreement or the absolute sale of the Collateral or any portion thereof, and each Assignor, for itself and all who may claim under it, insofar as it or they now or hereafter lawfully may, hereby waives the benefit of all such laws.

Any sale of, or the grant of options to purchase, or any other realization upon, any Collateral shall operate to divest all right, title, interest, claim and demand, either at law or in equity, of the relevant Assignor therein and thereto, and shall be a perpetual bar both at law and in equity against such Assignor and against any and all Persons claiming or attempting to claim the Collateral so sold, optioned or realized upon, or any part thereof, from, through and under such Assignor.

7.4 <u>Application of Proceeds</u>.  (a)  All moneys collected by the Collateral Agent (or, to the extent any Mortgage or any other Security Document requires proceeds of collateral under such other Security Document to be applied in accordance with the provisions of this Agreement, the Collateral Agent or other agent under such other Security Document) upon any sale or other disposition of the Collateral, together with all other moneys received by the Collateral Agent hereunder, shall be applied as provided in Section 13.17 of the Credit Agreement.

(b)    Each of the Secured Creditors, by their acceptance of the benefits hereof and of the other Security Documents, agrees and acknowledges that if the Lender Creditors receive a distribution on account of undrawn amounts with respect to Letters of Credit issued under the Credit Agreement (which shall only occur after all outstanding Revolving Loans under the Credit Agreement and Unpaid Drawings have been paid in full), such amounts shall be paid to the  Administrative Agent under the Credit Agreement and held by it, for the equal and ratable benefit of the Lender Creditors, as cash security for the repayment of Obligations owing to the Lender Creditors as such.  If any amounts are held as cash security pursuant to the immediately preceding sentence, then upon the termination of all outstanding Letters of Credit under the Credit Agreement, and after the application of all such cash security to the repayment of all Obligations owing to the Lender Creditors after giving effect to the termination of all such Letters of Credit, if there remains any excess cash, such excess cash shall be returned by the Administrative Agent to the Collateral Agent for distribution in accordance with Section 7.4(a) hereof.

(c)    All payments required to be made hereunder shall be made (x) if to the Lender Creditors, to the Administrative Agent for the account of the Lender Creditors and (y) if to the Other Creditors, to the trustee, paying agent or other similar representative (each, a "<u>Representative</u>") for the Other Creditors or, in the absence of such a Representative, directly to the Other Creditors.

(d)    For purposes of applying payments received in accordance with this Section 7.4, the Collateral Agent shall be entitled to rely upon (i) the Administrative Agent and (ii) the Representative or, in the absence of such a Representative, upon the Other Creditors for a determination (which the Administrative Agent, each Representative and the Other Creditors agree (or shall agree) to provide upon request of the Collateral Agent) of the outstanding Primary Obligations and Secondary Obligations owed to the Lender Creditors or the Other Creditors, as the case may be.  Unless it has received written notice from a Lender Creditor or an Other Creditor to the contrary, the Administrative Agent and each Representative, in furnishing information pursuant to the preceding sentence, and the Collateral Agent, in acting hereunder, shall be entitled to assume that no Secondary Obligations are outstanding. Unless it has written notice from an Other Creditor to the contrary, the Collateral Agent, in acting hereunder, shall be entitled to assume that no Secured Hedging Agreements are in existence.

(e)    It is understood that the Assignors shall remain jointly and severally liable to the extent of any deficiency between the amount of the proceeds of the Collateral and the aggregate amount of the Obligations.

7.5 <u>Remedies Cumulative</u>.  Each and every right, power and remedy hereby specifically given to the Collateral Agent shall be in addition to every other right, power and remedy specifically given to the Collateral Agent under this Agreement, the other Secured Debt Agreements or now or hereafter existing at law, in equity or by statute and each and every right, power and remedy whether specifically herein given or otherwise existing may be exercised from time to time or simultaneously and as often and in such order as may be deemed expedient by the Collateral Agent.  All such rights, powers and remedies shall be cumulative and the exercise or the beginning of the exercise of one shall not be deemed a waiver of the right to exercise any other or others.  No delay or omission of the Collateral Agent in the exercise of any such right, power or remedy and no renewal or extension of any of the Obligations shall impair any such right, power or remedy or shall be construed to be a waiver of any Default or Event of Default or an acquiescence thereof.  No notice to or demand on any Assignor in any case shall entitle it to any other or further notice or demand in similar or other circumstances or constitute a waiver of any of the rights of the Collateral Agent to any other or further action in any circumstances without notice or demand.  In the event that the Collateral Agent shall bring any suit to enforce any of its rights hereunder and shall be entitled to judgment, then in such suit the Collateral Agent may recover reasonable expenses, including reasonable attorneys' fees, and the amounts thereof shall be included in such judgment.

7.6 <u>Discontinuance of Proceedings</u>.  In case the Collateral Agent shall have instituted any proceeding to enforce any right, power or remedy under this Agreement by foreclosure, sale, entry or otherwise, and such proceeding shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Collateral Agent, then and in every such case the relevant Assignor, the Collateral Agent and each holder of any of the Obligations shall be restored to their former positions and rights hereunder with respect to the Collateral subject to the security interest created under this Agreement, and all rights, remedies and powers of the Collateral Agent shall continue as if no such proceeding had been instituted.

ARTICLE VIII

INDEMNITY

8.1 <u>Indemnity</u>.  (a) Each Assignor jointly and severally agrees to indemnify, reimburse and hold the Collateral Agent, each other Secured Creditor and their respective successors, assigns, employees, affiliates and agents (hereinafter in this Section 8.1 referred to individually as "<u>Indemnitee</u>," and collectively as "<u>Indemnitees</u>") harmless from any and all liabilities, obligations, damages, injuries, penalties, claims, demands, actions, suits, judgments and any and all costs, expenses or disbursements (including reasonable attorneys' fees and expenses) (for the purposes of this Section 8.1 the foregoing are collectively called "<u>expenses</u>") of whatsoever kind and nature imposed on, asserted against or incurred by any of the Indemnitees in any way relating to or arising out of this Agreement, any other Secured Debt Agreement or any other document executed in connection herewith or therewith or in any other way connected with the administration of the transactions contemplated hereby or thereby or the enforcement of any of the terms of, or the preservation of any rights under any thereof, or in any way relating to or arising out of the manufacture, ownership, ordering, purchase, delivery, control, acceptance, lease, financing, possession, operation, condition, sale, return or other disposition, or use of the Collateral (including, without limitation, latent or other defects,

whether or not discoverable), the violation of the laws of any country, state or other governmental body or unit, any tort (including, without limitation, claims arising or imposed under the doctrine of strict liability, or for or on account of injury to or the death of any Person (including any Indemnitee), or property damage), or contract claim; provided that no Indemnitee shall be indemnified pursuant to this Section 8.1(a) for losses, damages or liabilities to the extent caused by the gross negligence or willful misconduct of such Indemnitee (as determined by a court of competent jurisdiction in a final and non-appealable decision). Each Assignor agrees that upon written notice by any Indemnitee of the assertion of such a liability, obligation, damage, injury, penalty, claim, demand, action, suit or judgment, the relevant Assignor shall assume full responsibility for the defense thereof. Each Indemnitee agrees to use its best efforts to promptly notify the relevant Assignor of any such assertion of which such Indemnitee has knowledge.

(b)     Without limiting the application of Section 8.1(a) hereof, each Assignor agrees, jointly and severally, to pay or reimburse the Collateral Agent for any and all reasonable fees, costs and expenses of whatever kind or nature incurred in connection with the creation, preservation or protection of the Collateral Agent's Liens on, and security interest in, the Collateral, including, without limitation, all fees and taxes in connection with the recording or filing of instruments and documents in public offices, payment or discharge of any taxes or Liens upon or in respect of the Collateral, premiums for insurance with respect to the Collateral and all other fees, costs and expenses in connection with protecting, maintaining or preserving the Collateral and the Collateral Agent's interest therein, whether through judicial proceedings or otherwise, or in defending or prosecuting any actions, suits or proceedings arising out of or relating to the Collateral.

(c)     Without limiting the application of Section 8.1(a) or (b) hereof, each Assignor agrees, jointly and severally, to pay, indemnify and hold each Indemnitee harmless from and against any loss, costs, damages and expenses which such Indemnitee may suffer, expend or incur in consequence of or growing out of any misrepresentation by any Assignor in this Agreement, any other Secured Debt Agreement or in any writing contemplated by or made or delivered pursuant to or in connection with this Agreement or any other Secured Debt Agreement.

(d)     If and to the extent that the obligations of any Assignor under this Section 8.1 are unenforceable for any reason, such Assignor hereby agrees to make the maximum contribution to the payment and satisfaction of such obligations which is permissible under applicable law.

8.2  Indemnity Obligations Secured by Collateral; Survival.  Any amounts paid by any Indemnitee as to which such Indemnitee has the right to reimbursement shall constitute Obligations secured by the Collateral. The indemnity obligations of each Assignor contained in this Article VIII shall continue in full force and effect notwithstanding the full payment of all of the other Obligations and notwithstanding the full payment of all the Notes (as defined in the Credit Agreement) issued, and Loans made, under the Credit Agreement, the termination of all Letters of Credit issued under the Credit Agreement, the termination of all Secured Hedging Agreements and the payment of all other Obligations and notwithstanding the discharge thereof and the occurrence of the Termination Date.

ARTICLE IX

DEFINITIONS

The following terms shall have the meanings herein specified.  Such definitions shall be equally applicable to the singular and plural forms of the terms defined.

"Account" shall mean any "account" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York, and in any event shall include but shall not be limited to, all rights to payment of any monetary obligation, whether or not earned by performance, (i) for property that has been or is to be sold, leased, licensed, assigned or otherwise disposed of, (ii) for services rendered or to be rendered, (iii) for a policy of insurance issued or to be issued, (iv) for a secondary obligation incurred or to be incurred, (v) for energy provided or to be provided, (vi) for the use or hire of a vessel under a charter or other contract, (vii) arising out of the use of a credit or charge card or information contained on or for use with the card, or (viii) as winnings in a lottery or other game of chance operated or sponsored by a State, governmental unit of a State, or person licensed or authorized to operate the game by a State or governmental unit of a State.  Without limiting the foregoing, the term "account" shall include all Health-Care-Insurance Receivables.

"Administrative Agent" shall have the meaning provided in the recitals of this Agreement.

"Agreement" shall mean this Security Agreement, as the same may be amended, modified, restated and/or supplemented from time to time in accordance with its terms.

"As-Extracted Collateral" shall mean "as-extracted collateral" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Assignor" shall have the meaning provided in the first paragraph of this Agreement.

"Borrower" shall have the meaning provided in the recitals of this Agreement.

"Cash Collateral Account" shall mean a non-interest bearing cash collateral account maintained with, and in the sole dominion and control of, the Collateral Agent for the benefit of the Secured Creditors.

"Certificated Security" shall have the meaning given such term in Section 8-102(a)(4) of the UCC.

"Chattel Paper" shall mean "chattel paper" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.  Without limiting the foregoing, the term "Chattel Paper" shall in any event include all Tangible Chattel Paper and all Electronic Chattel Paper.

"Class" shall have the meaning provided in Section 10.2 of this Agreement.

"<u>Clearing Corporation</u>" shall have the meaning given such term in Section 8-102(a)(5) of the UCC.

"<u>Collateral</u>" shall have the meaning provided in Section 1.1(a) of this Agreement.

"<u>Collateral Agent</u>" shall have the meaning provided in the first paragraph of this Agreement.

"<u>Commercial Tort Claims</u>" shall mean "commercial tort claims" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"<u>Contract Rights</u>" shall mean all rights of any Assignor under each Contract, including, without limitation, (i) any and all rights to receive and demand payments under any or all Contracts, (ii) any and all rights to receive and compel performance under any or all Contracts and (iii) any and all other rights, interests and claims now existing or in the future arising in connection with any or all Contracts.

"<u>Contracts</u>" shall mean all contracts between any Assignor and one or more additional parties (including, without limitation, any Interest Rate Protection Agreements, Other Hedging Agreements, licensing agreements and any partnership agreements, joint venture agreements and limited liability company agreements).

"<u>Copyrights</u>" shall mean any United States or foreign copyright now or hereafter owned by any Assignor, including any registrations of any copyrights in the United States Copyright Office or any foreign equivalent office, as well as any application for a copyright registration now or hereafter made with the United States Copyright Office or any foreign equivalent office by any Assignor.

"<u>Credit Agreement</u>" shall have the meaning provided in the recitals of this Agreement.

"<u>Credit Document Obligations</u>" shall have the meaning provided in the definition of "Obligations" in this Article IX.

"<u>Deposit Accounts</u>" shall mean all "deposit accounts" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"<u>Documents</u>" shall mean "documents" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"<u>Domain Names</u>" shall mean all Internet domain names and associated URL addresses in or to which any Assignor now or hereafter has any right, title or interest.

"<u>Electronic Chattel Paper</u>" shall mean "electronic chattel paper" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Equipment" shall mean any "equipment" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York, and in any event, shall include, but shall not be limited to, all machinery, equipment, furnishings, fixtures and vehicles now or hereafter owned by any Assignor and any and all additions, substitutions and replacements of any of the foregoing and all accessions thereto, wherever located, together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto.

"Excluded Accounts" shall mean (i) any Deposit Account used solely for funding payroll, pension contributions or segregating payroll taxes and (ii) any petty cash Deposit Account that does not have a cash balance at any time exceeding $50,000 so long as the aggregate of all such petty cash Deposit Accounts that are not subject to a "control agreement" as provided in Section 3.9 hereof do not have cash balances at any time exceeding $500,000.

"Excluded Property" shall mean all ownership interests in (a) (i) Lee Enterprises, Incorporated Retirement Account Plan and related trust, (ii) Lee Enterprises, Incorporated Outside Directors Deferral Plan (effective January 1, 2005), (iii) Lee Enterprises, Incorporated Supplementary Benefit Plan and Trust for Non-Qualified Deferred Compensation Benefit Plans of Lee Enterprises (dated January 1, 2006), (iv) Lee Enterprises, Incorporated 1977 Employee Stock Purchase Plan (amended May 17, 2008), and (v) Lee Enterprises, Incorporated Supplemental Employee Stock Purchase Plan (amended February 20, 2007) (each as amended modified, restated and/or supplemented from time to time), in each case so long as such plans are solely for the benefit of officers, directors and/or employees of any Assignor or any Subsidiary thereof, (b) any Equity Interests held by any Assignor in Madison Newspapers, Inc., The Capital Times Company, or TNI Partners (each a "Specified Entity") so long as, in each case as to any Specified Entity, such Specified Entity is not a Subsidiary of the Borrower and (c) 33-1/3% of the voting power of all classes of Equity Interests of any Foreign Subsidiary owned by an Assignor (except in the circumstances and to the extent provided by Section 9.16 of the Credit Agreement (in which case this clause (c) shall no longer be applicable)).

"Excluded TNI Assets" shall mean all Equity Interests in TNI Partners, all real and personal property which is leased to or used in the operations or business of TNI Partners, and all proceeds of any of the foregoing.

"Event of Default" shall mean any Event of Default under, and as defined in, the Credit Agreement and shall in any event include, without limitation, any payment default on any of the Obligations after the expiration of any applicable grace period.

"Financial Assets" shall have the meaning given such term in Section 8-102(a)(9) of the UCC.

"Fixtures" shall mean "fixtures" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"General Intangibles" shall mean "general intangibles" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Goods" shall mean "goods" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Health-Care-Insurance Receivable" shall mean any "health-care-insurance receivable" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Indemnitee" shall have the meaning provided in Section 8.1(a) of this Agreement.

"Instrument" shall mean "instruments" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Inventory" shall mean merchandise, inventory and goods, and all additions, substitutions and replacements thereof and all accessions thereto, wherever located, together with all goods, supplies, incidentals, packaging materials, labels, materials and any other items used or usable in manufacturing, processing, packaging or shipping same, in all stages of production from raw materials through work in process to finished goods, and all products and proceeds of whatever sort and wherever located any portion thereof which may be returned, rejected, reclaimed or repossessed by the Collateral Agent from any Assignor's customers, and shall specifically include all "inventory" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Investment Property" shall mean "investment property" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Joint Venture Investment Property" shall mean all Limited Liability Company Interests, Partnership Interests and Stock.

"Lender Creditors" shall have the meaning provided in the recitals of this Agreement.

"Lenders" shall have the meaning provided in the recitals of this Agreement.

"Letter-of-Credit Rights" shall mean "letter-of-credit rights" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Limited Liability Company Interests" shall mean the entire limited liability company membership interest at any time owned by any Assignor in any limited liability company that is not a Subsidiary of such Assignor.

"Location" of any Assignor, shall mean such Assignor's "location" as determined pursuant to Section 9-307 of the UCC.

"Marks" shall mean all right, title and interest in and to any trademarks, service marks and trade names now held or hereafter acquired by any Assignor, including any registration or application for registration of any trademarks and service marks now held or

hereafter acquired by any Assignor, which are registered or filed in the United States Patent and Trademark Office or the equivalent thereof in any state of the United States or any equivalent foreign office or agency, as well as any unregistered trademarks and service marks used by an Assignor and any trade dress including logos, designs, fictitious business names and other business identifiers used by any Assignor.

"<u>Notes</u>" shall mean (x) all intercompany notes at any time issued to each Assignor and (y) all other promissory notes from time to time issued to, or held by, each Assignor.

"<u>Obligations</u>" shall mean and include, as to any Assignor, all of the following:

(i) the full and prompt payment when due (whether at stated maturity, by acceleration or otherwise) of all obligations, liabilities and indebtedness (including, without limitation, principal, premium, interest (including, without limitation, all interest that accrues after the commencement of any case, proceeding or other action relating to the bankruptcy, insolvency, reorganization or similar proceeding of any Assignor at the rate provided for in the respective documentation, whether or not a claim for post-petition interest is allowed in any such proceeding), reimbursement obligations under Letters of Credit, fees, costs and indemnities) of such Assignor to the Lender Creditors, whether now existing or hereafter incurred under, arising out of, or in connection with, each Credit Document to which such Assignor is a party (including, without limitation, in the event such Assignor is a Subsidiary Guarantor, all such obligations, liabilities and indebtedness of such Assignor under its Subsidiaries Guaranty) and the due performance and compliance by such Assignor with all of the terms, conditions and agreements contained in each such Credit Document (all such obligations, liabilities and indebtedness under this clause (i), except to the extent consisting of obligations or indebtedness with respect to Secured Hedging Agreements, being herein collectively called the "<u>Credit Document Obligations</u>");

(ii) the full and prompt payment when due (whether at stated maturity, by acceleration or otherwise) of all obligations, liabilities and indebtedness (including, without limitation, all interest that accrues after the commencement of any case, proceeding or other action relating to the bankruptcy, insolvency, reorganization or similar proceeding of any Assignor at the rate provided for in the respective documentation, whether or not a claim for post-petition interest is allowed in any such proceeding) owing by such Assignor to the Other Creditors, now existing or hereafter incurred under, arising out of or in connection with any Secured Hedging Agreement, whether such Secured Hedging Agreement is now in existence or hereinafter arising (including, without limitation, in the case of a Assignor that is a Guarantor, all obligations, liabilities and indebtedness of such Assignor under its Guaranty in respect of the Secured Hedging Agreements), and the due performance and compliance by such Assignor with all of the terms, conditions and agreements contained in each such Secured Hedging Agreement (all such obligations, liabilities and indebtedness under this clause (ii) being herein collectively called the "<u>Other Obligations</u>");

(iii) any and all sums advanced by the Collateral Agent in order to preserve the Collateral or preserve its security interest in the Collateral;

(iv) in the event of any proceeding for the collection or enforcement of any indebtedness, obligations, or liabilities of such Assignor referred to in clauses (i) and (ii) above, after an Event of Default shall have occurred and be continuing, the reasonable expenses of retaking, holding, preparing for sale or lease, selling or otherwise disposing of or realizing on the Collateral, or of any exercise by the Collateral Agent of its rights hereunder, together with reasonable attorneys' fees and court costs;

(v) all amounts paid by any Indemnitee as to which such Indemnitee has the right to reimbursement under Section 8.1 of this Agreement; and

(vi) all amounts owing to any Agent pursuant to any of the Credit Documents in its capacity as such;

it being acknowledged and agreed that the "Obligations" shall include extensions of credit of the types described above, whether outstanding on the date of this Agreement or extended from time to time after the date of this Agreement.

"Other Creditors" shall have the meaning provided in the recitals of this Agreement.

"Other Obligations" shall have the meaning provided in the definition of "Obligations" in this Article IX.

"Partnership Interest" shall mean the entire general partnership interest or limited partnership interest at any time owned by any Assignor in any general partnership or limited partnership that is not a Subsidiary of such Assignor.

"Patents" shall mean any patent in or to which any Assignor now or hereafter has any right, title or interest therein, and any divisions, continuations (including, but not limited to, continuations-in-parts) and improvements thereof, as well as any application for a patent now or hereafter made by any Assignor.

"Permits" shall mean, to the extent permitted to be assigned by the terms thereof or by applicable law, all licenses, permits, rights, orders, variances, franchises or authorizations of or from any governmental authority or agency.

"Primary Obligations" shall mean (i) in the case of the Credit Document Obligations, all principal of, premium, fees and interest on, all Loans, all Unpaid Drawings, the Stated Amount of all outstanding Letters of Credit and all Fees and (ii) in the case of the Other Obligations, all amounts due under each Secured Hedging Agreement (other than indemnities, fees (including, without limitation, attorneys' fees) and similar obligations and liabilities).

"Proceeds" shall mean all "proceeds" as such term is defined in the Uniform Commercial Code as in effect in the State of New York on the date hereof and, in any event, shall also include, but not be limited to, (i) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Collateral Agent or any Assignor from time to time with respect to any of the Collateral, (ii) any and all payments (in any form whatsoever) made or due and payable to any Assignor from time to time in connection with any requisition, confiscation,

condemnation, seizure or forfeiture of all or any part of the Collateral by any governmental authority (or any person acting under color of governmental authority) and (iii) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

"Registered Organization" shall have the meaning provided in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Representative" shall have the meaning provided in Section 7.4(c) of this Agreement.

"Required Secured Creditors" shall mean (i) at any time when any Credit Document Obligations or Letters of Credit are outstanding or any Commitments under the Credit Agreement exist, the Required Lenders (or, to the extent provided in Section 13.12 of the Credit Agreement, each of the Lenders) and (ii) at any time after all of the Credit Document Obligations have been paid in full and all Commitments under the Credit Agreement have been terminated and no further Commitments and Letters of Credit may be provided thereunder, the holders of a majority of the Other Obligations.

"Requisite Creditors" shall have the meaning provided in Section 10.2 of this Agreement.

"Secondary Obligations" shall mean all Obligations other than Primary Obligations.

"Secured Creditors" shall have the meaning provided in the recitals of this Agreement.

"Secured Debt Agreements" shall mean and include this Agreement, the other Credit Documents and each Secured Hedging Agreement.

"Secured Hedging Agreement" shall have the meaning provided in the recitals to this Agreement.

"Securities Entitlement" shall have the meaning given such term in Section 8-102(a)(17) of the UCC.

"Securities Intermediary" shall have the meaning given such term in Section 8-102(14) of the UCC.

"Software" shall mean "software" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Specified Entity" shall have the meaning provided in the definition of "Excluded Property" contained herein.

"Stock" shall mean (x) with respect to corporations incorporated under the laws of the United States or any State thereof or the District of Columbia (each, a "Domestic Corporation"), all of the issued and outstanding shares of stock owned by any Assignor of any

Domestic Corporation that is not a Subsidiary of such Assignor and (y) with respect to corporations not Domestic Corporations (each, a "Foreign Corporation"), all of the issued and outstanding shares of capital stock owned at any time by any Assignor of any Domestic Corporation that is not a Subsidiary of such Assignor.

"Supporting Obligations" shall mean any "supporting obligation" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York, now or hereafter owned by any Assignor, or in which any Assignor has any rights, and, in any event, shall include, but shall not be limited to all of such Assignor's rights in any Letter-of-Credit Right or secondary obligation that supports the payment or performance of, and all security for, any Account, Chattel Paper, Document, General Intangible, Instrument or Investment Property.

"Tangible Chattel Paper" shall mean "tangible chattel paper" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Termination Date" shall have the meaning provided in Section 10.8(a) of this Agreement.

"Timber-to-be-Cut" shall mean "timber-to-be-cut" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Trade Secrets" shall mean any secretly held existing engineering or other data, information, production procedures and other know-how relating to the design manufacture, assembly, installation, use, operation, marketing, sale and/or servicing of any products or business of an Assignor worldwide whether written or not.

"Trade Secret Rights" shall mean the rights of an Assignor in any Trade Secret it holds.

"Transmitting Utility" shall have the meaning given such term in Section 9-102(a)(80) of the UCC.

"UCC" shall mean the Uniform Commercial Code as in effect from time to time in the relevant jurisdiction.

"Uncertificated Security" shall have the meaning given such term in Section 8-102(a)(18) of the UCC.

## ARTICLE X

## MISCELLANEOUS

10.1 Notices.    Except as otherwise specified herein, all notices, requests, demands or other communications to or upon the respective parties hereto shall be sent or delivered by mail, telegraph, telex, telecopy, cable or courier service and all such notices and communications shall, when mailed, telegraphed, telexed, telecopied, or cabled or sent by

courier, be effective when deposited in the mails, delivered to the telegraph company, cable company or overnight courier, as the case may be, or sent by telex or telecopier, except that notices and communications to the Collateral Agent or any Assignor shall not be effective until received by the Collateral Agent or such Assignor, as the case may be.  All notices and other communications shall be in writing and addressed as follows:

(a)     if to any Assignor, c/o:

Lee Enterprises, Incorporated
201 North Harrison Street
Davenport, Iowa  52801
Attention:  Chief Financial Officer
Telephone No.:  (563) 383-2179
Telecopier No.:  (563) 327-2600

(b)     if to the Collateral Agent, at:

60 Wall Street
New York, New York 10005
Attention:  Susan Lefevre
Telephone No.:  (212) 250-6114
Telecopier No.:  (212) 797-5692

(c)     if to any Lender Creditor (other than the Collateral Agent), at such address as such Lender Creditor shall have specified in the Credit Agreement;

(d)     if to any Other Creditor, at such address as such Other Creditor shall have specified in writing to each Assignor and the Collateral Agent;

or at such other address or addressed to such other individual as shall have been furnished in writing by any Person described above to the party required to give notice hereunder.

10.2  Waiver; Amendment.  Except as provided in Sections 10.8 and 10.12 hereof, none of the terms and conditions of this Agreement may be changed, waived, modified or varied in any manner whatsoever unless in writing duly signed by each Assignor directly affected thereby (it being understood that the addition or release of any Assignor hereunder shall not constitute a change, waiver, discharge or termination affecting any Assignor other than the Assignor so added or released) and the Collateral Agent (with the written consent of the Required Secured Creditors); provided, however, that any change, waiver, modification or variance affecting the rights and benefits of a single Class of Secured Creditors (and not all Secured Creditors in a like or similar manner) also shall require the written consent of the Requisite Creditors of such affected Class.  For the purpose of this Agreement, the term "Class" shall mean each class of Secured Creditors, i.e., whether (x) the Lender Creditors as holders of the Credit Document Obligations or (y) the Other Creditors as the holders of the Other Obligations.  For the purpose of this Agreement, the term "Requisite Creditors" of any Class shall mean each of (x) with respect to the Credit Document Obligations, the Required Lenders (or, to the extent provided in Section 13.12 of the Credit Agreement, each of the Lenders), and

(y) with respect to the Other Obligations, the holders of at least a majority of all Other Obligations outstanding from time to time.

10.3 <u>Obligations Absolute</u>.  The obligations of each Assignor hereunder shall remain in full force and effect without regard to, and shall not be impaired by, (a) any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or the like of such Assignor; (b) any exercise or non-exercise, or any waiver of, any right, remedy, power or privilege under or in respect of this Agreement or any other Secured Debt Agreement; or (c) any amendment to or modification of any Secured Debt Agreement or any security for any of the Obligations; whether or not such Assignor shall have notice or knowledge of any of the foregoing.

10.4 <u>Successors and Assigns</u>.  This Agreement shall create a continuing security interest in the Collateral and shall (i) remain in full force and effect, subject to release and/or termination as set forth in Section 10.8 hereof, (ii) be binding upon each Assignor, its successors and assigns; <u>provided</u>, <u>however</u>, that no Assignor shall assign any of its rights or obligations hereunder without the prior written consent of the Collateral Agent (with the prior written consent of the Required Secured Creditors), and (iii) inure, together with the rights and remedies of the Collateral Agent hereunder, to the benefit of the Collateral Agent, the other Secured Creditors and their respective successors, transferees and assigns. All agreements, statements, representations and warranties made by each Assignor herein or in any certificate or other instrument delivered by such Assignor or on its behalf under this Agreement shall be considered to have been relied upon by the Secured Creditors and shall survive the execution and delivery of this Agreement and the other Secured Debt Agreements regardless of any investigation made by the Secured Creditors or on their behalf.

10.5 <u>Headings Descriptive</u>.  The headings of the several sections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

10.6 <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF JURY TRIAL</u>.  (a) THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE INTERNAL LAW OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.  ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH ASSIGNOR HEREBY IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE NON-EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS.  EACH ASSIGNOR HEREBY FURTHER IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH COURTS LACK JURISDICTION OVER SUCH ASSIGNOR, AND AGREES NOT TO PLEAD OR CLAIM IN ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN ANY OF THE AFORESAID COURTS THAT ANY SUCH COURT LACKS JURISDICTION OVER SUCH ASSIGNOR.  EACH

ASSIGNOR FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO ANY SUCH ASSIGNOR AT ITS ADDRESS FOR NOTICES AS PROVIDED IN SECTION 10.1 ABOVE, SUCH SERVICE TO BECOME EFFECTIVE 30 DAYS AFTER SUCH MAILING.    EACH ASSIGNOR HEREBY IRREVOCABLY WAIVES ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER OR UNDER ANY OTHER CREDIT DOCUMENT THAT SUCH SERVICE OF PROCESS WAS IN ANY WAY INVALID OR INEFFECTIVE. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE COLLATERAL AGENT UNDER THIS AGREEMENT, OR ANY SECURED CREDITOR, TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY ASSIGNOR IN ANY OTHER JURISDICTION.

(b)    EACH ASSIGNOR HEREBY IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (a) ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)    EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER CREDIT DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

10.7 _Assignor's Duties_.  It is expressly agreed, anything herein contained to the contrary notwithstanding, that each Assignor shall remain liable to perform all of the obligations, if any, assumed by it with respect to the Collateral and the Collateral Agent shall not have any obligations or liabilities with respect to any Collateral by reason of or arising out of this Agreement, nor shall the Collateral Agent be required or obligated in any manner to perform or fulfill any of the obligations of any Assignor under or with respect to any Collateral.

10.8 _Termination; Release_.  (a)  After the Termination Date, this Agreement shall terminate (_provided_ that all indemnities set forth herein including, without limitation in Section 8.1 hereof, shall survive such termination) and the Collateral Agent, at the request and expense of the respective Assignor, will promptly execute and deliver to such Assignor a proper instrument or instruments (including Uniform Commercial Code termination statements on form UCC-3) acknowledging the satisfaction and termination of this Agreement, and will duly assign, transfer and deliver to such Assignor (without recourse and without any representation or warranty) such of the Collateral as may be in the possession of the Collateral Agent and as has not theretofore been sold or otherwise applied or released pursuant to this Agreement.  As used

in this Agreement, "Termination Date" shall mean the date upon which the Total Commitment under the Credit Agreement has been terminated and all Secured Hedging Agreements have been terminated (or other arrangements satisfactory to the counterparties thereto have been completed), no Note under (and as defined in) the Credit Agreement is outstanding and all Loans thereunder have been repaid in full, all Letters of Credit issued under the Credit Agreement have been terminated (or cash collateralized or made subject to backstop letters of credit in the aggregate face amount of all outstanding Letters of Credit pursuant to documentation acceptable to the Collateral Agent and the Issuing Lender) and all Obligations then due and payable have been paid in full.

(b)    In the event that any part of the Collateral is sold or otherwise disposed of (to a Person other than a Credit Party) (I) (x) at any time prior to the time at which all Credit Document Obligations have been paid in full and all Commitments and Letters of Credit under the Credit Agreement have been terminated, in connection with a sale or disposition permitted by Section 10.02 of the Credit Agreement or is otherwise released at the direction of the Required Lenders (or all the Lenders if required by Section 13.12 of the Credit Agreement) or (y) at any time thereafter, to the extent permitted by the other Secured Debt Agreements, and in the case of clauses (x) and (y), the proceeds of such sale or disposition (or from such release) are applied in accordance with the terms of the Credit Agreement or such other Secured Debt Agreement, as the case may be, to the extent required to be so applied, or (II) pursuant to a Joint-Venture Transaction in accordance with the terms of the Credit Agreement, the Collateral Agent, at the request and expense of such Assignor, will duly release from the security interest created hereby, or in the case of a Joint-Venture Transaction, the security interests created hereby shall be automatically released, (and, in each case, will execute and deliver such documentation, including termination or partial release statements and the like in connection therewith) and assign, transfer and deliver to such Assignor (without recourse and without any representation or warranty) such of the Collateral as is then being (or has been) so sold or otherwise disposed of, or released, and as may be in the possession of the Collateral Agent and has not theretofore been released pursuant to this Agreement.  Furthermore, upon the release of any Subsidiary Guarantor from the Subsidiaries Guaranty in accordance with the provisions thereof, such Assignor (and the Collateral at such time assigned by the respective Assignor pursuant hereto) shall be released from this Agreement.

(c)    At any time that an Assignor desires that the Collateral Agent take any action to acknowledge or give effect to any release of Collateral pursuant to the foregoing Section 10.8(a) or (b), such Assignor shall deliver to the Collateral Agent a certificate signed by a principal executive officer of such Assignor stating that the release of the respective Collateral is permitted pursuant to such Section 10.8(a) or (b).  At any time that the Borrower or the respective Assignor desires that a Subsidiary of the Borrower which has been released from the Subsidiaries Guaranty be released hereunder as provided in the last sentence of Section 10.8(b) hereof, it shall deliver to the Collateral Agent a certificate signed by a principal executive officer of the Borrower and the respective Assignor stating that the release of the respective Assignor (and its Collateral) is permitted pursuant to such Section 10.8(b). If reasonably requested by the Collateral Agent (although the Collateral Agent shall have no obligation to make such request), the relevant Assignor shall furnish appropriate legal opinions (from counsel, reasonably acceptable to the Collateral Agent) to the effect set forth in this Section 10.8(c).

(d)    The Collateral Agent shall have no liability whatsoever to any other Secured Creditor as the result of any release of Collateral by it in accordance with (or which the Collateral Agent in good faith believes to be in accordance with) this Section 10.8.

10.9  Counterparts.  This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.  A set of counterparts executed by all the parties hereto shall be lodged with the Borrower and the Collateral Agent.

10.10  Severability.    Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

10.11  The Collateral Agent and the other Secured Creditors.    The Collateral Agent will hold in accordance with this Agreement all items of the Collateral at any time received under this Agreement.  It is expressly understood and agreed that the obligations of the Collateral Agent as holder of the Collateral and interests therein and with respect to the disposition thereof, and otherwise under this Agreement, are only those expressly set forth in this Agreement and in Section 12 of the Credit Agreement.  The Collateral Agent shall act hereunder on the terms and conditions set forth herein and in Section 12 of the Credit Agreement.

10.12  Additional Assignors.    It is understood and agreed that any Subsidiary Guarantor that desires to become an Assignor hereunder, or is required to execute a counterpart of this Agreement after the date hereof pursuant to the requirements of the Credit Agreement or any other Credit Document, shall become an Assignor hereunder by (x) executing a counterpart hereof and delivering same to the Collateral Agent or by executing a joinder agreement and delivering same to the Collateral Agent, in each case as may be requested by (and in form and substance satisfactory to) the Collateral Agent, (y) delivering supplements to Annexes A through F, inclusive, H through K, inclusive, and O through R, inclusive, hereto as are necessary to cause such Annexes to be complete and accurate with respect to such additional Assignor on such date and (z) taking all actions as specified in this Agreement as would have been taken by such Assignor had it been an original party to this Agreement, in each case with all documents required above to be delivered to the Collateral Agent and with all documents and actions required above to be taken to the reasonable satisfaction of the Collateral Agent.

10.13  Post-Signing Actions. Notwithstanding anything to the contrary contained in this Agreement or the other Credit Documents, the parties hereto acknowledge and agree that no Assignor shall be required to deliver completed Annexes to this Agreement upon its execution and delivery hereof, provided that completed Annexes to this Agreement shall be completed and delivered to the Collateral Agent (whereupon they shall be attached to, and become a part of, this Agreement as if they had been delivered concurrently upon the execution and deliver hereof by each Assignor) as promptly as practicable, and in any event not later than the Security Requirement Date. In furtherance of the foregoing, all representations, warranties and covenants contained in this Agreement and the other Credit Documents shall be deemed modified to the

extent necessary to effect the foregoing and no Default or Event of Default shall be deemed to occur as a result of the failure of the Assignors to deliver completed Annexes to this Agreement upon their execution and delivery hereof so long as completed Annexes are delivered to the Collateral Agent as promptly as practicable, and in any event not later than the Security Requirement Date.

        10.14   <u>Intercreditor Agreement</u>. Notwithstanding anything herein to the contrary, the exercise of any right or remedy by the Collateral Agent hereunder shall be subject to the provisions of the Intercreditor Agreement.  In the event of any conflict between the terms of the Intercreditor Agreement and this Agreement, the terms of the Intercreditor Agreement shall govern and control.

**[Remainder of this page intentionally left blank; signature page follows]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their duly authorized officers as of the date first above written.

LEE ENTERPRISES, INCORPORATED, as an Assignor

By: _____
    Name:
    Title:

ACCUDATA, INC., as an Assignor

By: _____
    Name:
    Title:

INN PARTNERS, L.C., as an Assignor

By: _____
    Name:
    Title:

JOURNAL-STAR PRINTING CO., as an Assignor

By: _____
    Name:
    Title:

K. FALLS BASIN PUBLISHING, INC., as an Assignor

By: _____
    Name:
    Title:

LEE CONSOLIDATED HOLDINGS CO., as an Assignor

By: _____
    Name:
    Title:

LEE PUBLICATIONS, INC., as an Assignor

By: _____
    Name:
    Title:

LEE PROCUREMENT SOLUTIONS CO., as an Assignor

By: _____
    Name:
    Title:

SIOUX CITY NEWSPAPERS, INC., as an Assignor

By: _____
    Name:
    Title:

Accepted and Agreed to:

DEUTSCHE BANK TRUST COMPANY
AMERICAS,
  as Collateral Agent


By: _____
      Name:
      Title:


By: _____
      Name:
      Title:

<div align="right">

ANNEX A

to

<u>SECURITY AGREEMENT</u>

</div>

<u>SCHEDULE OF CHIEF EXECUTIVE OFFICES</u>

<u>Name of Assignor</u>                    <u>Address(es) of Chief Executive Office</u>

ANNEX B
to
SECURITY AGREEMENT

[RESERVED]

ANNEX C
to
<u>SECURITY AGREEMENT</u>

SCHEDULE OF LEGAL NAMES, TYPE OF ORGANIZATION
(AND WHETHER A REGISTERED ORGANIZATION AND/OR
A TRANSMITTING UTILITY), JURISDICTION OF ORGANIZATION,
LOCATION, ORGANIZATIONAL IDENTIFICATION NUMBERS
<u>AND FEDERAL EMPLOYER IDENTIFICATION NUMBERS</u>

| Exact Legal Name of Each <u>Assignor</u> | Type of Organization (or, if the Assignor is an Individual, so <u>indicate)</u> | Registered Organization <u>(Yes/No)</u> | Jurisdiction of <u>Organization</u> | Assignor's Location (for purposes of NY <u>UCC § 9-307)</u> | Assignor's Organization Identification Number (or, if it has none, <u>so indicate)</u> | Assignor's Federal Employer Identification Number (or, if it has none, <u>so indicate)</u> | Transmitting Utility? <u>(Yes/No)</u> |
|---|---|---|---|---|---|---|---|

ANNEX D
to
SECURITY AGREEMENT

[RESERVED]

ANNEX E
to
SECURITY AGREEMENT

DESCRIPTION OF CERTAIN SIGNIFICANT TRANSACTIONS OCCURRING WITHIN
ONE YEAR PRIOR TO THE DATE OF THE SECURITY AGREEMENT

Name of Assignor

Description of any Transactions as required
by Section 2.8 of the Security Agreement

ANNEX F
to
<u>SECURITY AGREEMENT</u>

<u>Schedule of Deposit Accounts</u>

| <u>Name of Assignor</u> | Description <u>of Deposit Account</u> | <u>Account</u> <u>Number</u> | Name of Bank, Address <u>and Contact Information</u> | Jurisdiction of Bank (determined in accordance with <u>UCC § 9-304)</u> | <u>Excluded</u> <u>Accounts</u> <u>marked with</u> ** |
|---|---|---|---|---|---|

ANNEX G
to
<u>SECURITY AGREEMENT</u>


<u>Form of Control Agreement Regarding Deposit Accounts</u>


AGREEMENT (as amended, modified, restated and/or supplemented from time to time, this "Agreement"), dated as of _____  __,20[_], among the undersigned assignor (the "<u>Assignor</u>") DEUTSCHE BANK TRUST COMPANY AMERICAS, not in its individual capacity but solely as Collateral Agent (the "<u>Collateral Agent</u>"), and _____ (the "<u>Deposit Account Bank</u>"), as the "bank" (as defined in Section 9-102 of the UCC as in effect on the date hereof in the State of _____ (the "<u>UCC</u>")) with which one or more deposit accounts (as defined in Section 9-102 of the UCC) are maintained by the Assignor (with all such deposit accounts now or at any time in the future maintained by the Assignor with the Deposit Account Bank being herein called the "<u>Deposit Accounts</u>").

W I T N E S S E T H :


WHEREAS, the Assignor, various other assignors and the Collateral Agent have entered into a Security Agreement, dated as of [_____], (as amended, amended and restated, modified or supplemented from time to time, the "<u>Security Agreement</u>"), under which, among other things, in order to secure the payment of the Obligations (as defined in the Security Agreement), the Assignor has granted a security interest to the Collateral Agent for the benefit of the Secured Creditors (as defined in the Security Agreement) in all of the right, title and interest of the Assignor in and into any and all "deposit accounts" (as defined in Section 9-102 of the UCC) and in all monies, securities, instruments and other investments deposited therein from time to time (collectively, herein called the "<u>Collateral</u>"); and

WHEREAS, the Assignor desires that the Deposit Account Bank enter into this Agreement in order to establish "control" (as defined in Section 9-104 of the UCC) in each Deposit Account at any time or from time to time maintained with the Deposit Account Bank, and to provide for the rights of the parties under this Agreement with respect to such Deposit Accounts;

NOW THEREFORE, in consideration of the premises and the mutual promises and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.      <u>Assignor's Dealings with Deposit Accounts; Notice of Exclusive Control</u>. Until the Deposit Account Bank shall have received from the Collateral Agent a Notice of Exclusive Control (as defined below), the Assignor shall be entitled to present items drawn on and otherwise to withdraw or direct the disposition of funds from the Deposit Accounts and give instructions in respect of the Deposit Accounts; <u>provided</u>, <u>however</u>, that the Assignor may not, and the Deposit Account Bank agrees that it shall not permit the Assignor to, without the Collateral Agent's prior written consent, close any Deposit Account.  If the Collateral Agent

shall give to the Deposit Account Bank a notice of the Collateral Agent's exclusive control of the Deposit Accounts, which notice states that it is a "Notice of Exclusive Control" (a "Notice of Exclusive Control"), only the Collateral Agent shall be entitled to withdraw funds from the Deposit Accounts, to give any instructions in respect of the Deposit Accounts and any funds held therein or credited thereto or otherwise to deal with the Deposit Accounts.

2.    Collateral Agent's Right to Give Instructions as to Deposit Accounts. (a) Notwithstanding the foregoing or any separate agreement that the Assignor may have with the Deposit Account Bank, the Collateral Agent shall be entitled, for purposes of this Agreement, at any time to give the Deposit Account Bank instructions as to the withdrawal or disposition of any funds from time to time credited to any Deposit Account, or as to any other matters relating to any Deposit Account or any other Collateral, without further consent from the Assignor.  The Assignor hereby irrevocably authorizes and instructs the Deposit Account Bank, and the Deposit Account Bank hereby agrees, to comply with any such instructions from the Collateral Agent without any further consent from the Assignor.  Such instructions may include the giving of stop payment orders for any items being presented to any Deposit Account for payment.  The Deposit Account Bank shall be fully entitled to rely on, and shall comply with, such instructions from the Collateral Agent even if such instructions are contrary to any instructions or demands that the Assignor may give to the Deposit Account Bank.  In case of any conflict between instructions received by the Deposit Account Bank from the Collateral Agent and the Assignor, the instructions from the Collateral Agent shall prevail.

(b)    It is understood and agreed that the Deposit Account Bank's duty to comply with instructions from the Collateral Agent regarding the Deposit Accounts is absolute, and the Deposit Account Bank shall be under no duty or obligation, nor shall it have the authority, to inquire or determine whether or not such instructions are in accordance with the Security Agreement or any other Credit Document (as defined in the Credit Agreement referred to in the Security Agreement), nor seek confirmation thereof from the Assignor or any other Person.

3.    Assignor's Exculpation and Indemnification of Depository Bank.  The Assignor hereby irrevocably authorizes and instructs the Deposit Account Bank to follow instructions from the Collateral Agent regarding the Deposit Accounts even if the result of following such instructions from the Collateral Agent is that the Deposit Account Bank dishonors items presented for payment from any Deposit Account.  The Assignor further confirms that the Deposit Account Bank shall have no liability to the Assignor for wrongful dishonor of such items in following such instructions from the Collateral Agent.  The Deposit Account Bank shall have no duty to inquire or determine whether the Assignor's obligations to the Collateral Agent are in default or whether the Collateral Agent is entitled, under any separate agreement between the Assignor and the Collateral Agent, to give any such instructions.  The Assignor further agrees to be responsible for the Deposit Account Bank's customary charges and to indemnify the Deposit Account Bank from and to hold the Deposit Account Bank harmless against any loss, cost or expense that the Deposit Account Bank may sustain or incur in acting upon instructions which the Deposit Account Bank believes in good faith to be instructions from the Collateral Agent.

4.      Subordination of Security Interests; Deposit Account Bank's Recourse to Deposit Accounts.  The Deposit Account Bank hereby subordinates any claims and security interests it may have against, or with respect to, any Deposit Account at any time established or maintained with it by the Assignor (including any amounts, investments, instruments or other Collateral from time to time on deposit therein) to the security interests of the Collateral Agent (for the benefit of the Secured Creditors) therein, and agrees that no amounts shall be charged by it to, or withheld or set-off or otherwise recouped by it from, any Deposit Account of the Assignor or any amounts, investments, instruments or other Collateral from time to time on deposit therein; provided that the Deposit Account Bank may, however, from time to time debit the Deposit Accounts for any of its customary charges in maintaining the Deposit Accounts or for reimbursement for the reversal of any provisional credits granted by the Deposit Account Bank to any Deposit Account, to the extent, in each case, that the Assignor has not separately paid or reimbursed the Deposit Account Bank therefor.

5.      Representations, Warranties and Covenants of Deposit Account Bank. The Deposit Account Bank represents and warrants to the Collateral Agent that:

(a)      The Deposit Account Bank constitutes a "bank" (as defined in Section 9-102 of the UCC), that the jurisdiction (determined in accordance with Section 9-304 of the UCC) of the Deposit Account Bank for purposes of each Deposit Account maintained by the Assignor with the Deposit Account Bank shall be one or more States within the United States.

(b)      The Deposit Account Bank shall not permit any Assignor to establish any demand, time, savings, passbook or other account with it which does not constitute a "deposit account" (as defined in Section 9-102 of the UCC).

(c)      The account agreements between the Deposit Account Bank and the Assignor relating to the establishment and general operation of the Deposit Accounts provide, whether specifically or generally, that the laws of _____ govern secured transactions relating to the Deposit Accounts and that the Deposit Account Bank's "jurisdiction" for purposes of Section 9-304 of the UCC in respect of the Deposit Accounts is _____.  The Deposit Account Bank will not, without the Collateral Agent's prior written consent, amend any such account agreement so that the Deposit Account Bank's jurisdiction for purposes of Section 9-304 of the UCC is other than a jurisdiction permitted pursuant to preceding clause (a).  All account agreements in respect of each Deposit Account in existence on the date hereof are listed on Annex A hereto and copies of all such account agreements have been furnished to the Collateral Agent.  The Deposit Account Bank will promptly furnish to the Collateral Agent a copy of the account agreement for each Deposit Account hereafter established by the Deposit Account Bank for the Assignor.

(d)      The Deposit Account Bank has not entered and will not enter, into any agreement with any other Person by which the Deposit Account Bank is obligated to comply with instructions from such other Person as to the disposition of funds from any Deposit Account or other dealings with any Deposit Account or other of the Collateral.

(e)    On the date hereof the Deposit Account Bank maintains no Deposit Accounts for the Assignor other than the Deposit Accounts specifically identified in Annex A hereto.

(f)    Any items or funds received by the Deposit Account Bank for the Assignor's account will be credited to said Deposit Accounts specified in paragraph (e) above or to any other Deposit Accounts hereafter established by the Deposit Account Bank for the Assignor in accordance with this Agreement.

(g)    The Deposit Account Bank will promptly notify the Collateral Agent of each Deposit Account hereafter established by the Deposit Account Bank for the Assignor (which notice shall specify the account number of such Deposit Account and the location at which the Deposit Account is maintained), and each such new Deposit Account shall be subject to the terms of this Agreement in all respects.

6.    <u>Deposit Account Statements and Information</u>.  The Deposit Account Bank agrees, and is hereby authorized and instructed by the Assignor, to furnish to the Collateral Agent, at its address indicated below, copies of all account statements and other information relating to each Deposit Account that the Deposit Account Bank sends to the Assignor and to disclose to the Collateral Agent all information requested by the Collateral Agent regarding any Deposit Account.

7.    <u>Conflicting Agreements</u>.  This Agreement shall have control over any conflicting agreement between the Deposit Account Bank and the Assignor.

8.    <u>Merger or Consolidation of Deposit Account Bank</u>.  Without the execution or filing of any paper or any further act on the part of any of the parties hereto, any bank into which the Deposit Account Bank may be merged or with which it may be consolidated, or any bank resulting from any merger to which the Deposit Account Bank shall be a party, shall be the successor of the Deposit Account Bank hereunder and shall be bound by all provisions hereof which are binding upon the Deposit Account Bank and shall be deemed to affirm as to itself all representations and warranties of the Deposit Account Bank contained herein.

9.    <u>Notices</u>.  (a)  All notices and other communications provided for in this Agreement shall be in writing (including facsimile) and sent to the intended recipient at its address or telex or facsimile number set forth below:

<u>If to the Collateral Agent, at</u>:

60 Wall Street
New York, New York 10005
Attention:  Susan Lefevre
Telephone No.:  (212) 250-6114
Telecopier No.:  (212) 797-5692

<u>If to the Assignor, at</u>:

_____
_____
_____

If to the Deposit Account Bank, at:

_____
_____
_____

or, as to any party, to such other address or telex or facsimile number as such party may designate from time to time by notice to the other parties.

(b)    Except as otherwise provided herein, all notices and other communications hereunder shall be delivered by hand or by commercial overnight courier (delivery charges prepaid), or mailed, postage prepaid, or telexed or faxed, addressed as aforesaid, and shall be effective (i) three business days after being deposited in the mail (if mailed), (ii) when delivered (if delivered by hand or courier) and (iii) or when transmitted with receipt confirmed (if telexed or faxed); provided that notices to the Collateral Agent shall not be effective until actually received by it.

10.    Amendment.    This Agreement may not be amended, modified or supplemented except in writing executed and delivered by all the parties hereto.

11.    Binding Agreement.    This Agreement shall bind the parties hereto and their successors and assign and shall inure to the benefit of the parties hereto and their successors and assigns.    Without limiting the provisions of the immediately preceding sentence, the Collateral Agent at any time or from time to time may designate in writing to the Deposit Account Bank a successor Collateral Agent (at such time, if any, as such entity becomes the Collateral Agent under the Security Agreement, or at any time thereafter) who shall thereafter succeed to the rights of the existing Collateral Agent hereunder and shall be entitled to all of the rights and benefits provided hereunder.

12.    Continuing Obligations.    The rights and powers granted herein to the Collateral Agent have been granted in order to protect and further perfect its security interests in the Deposit Accounts and other Collateral and are powers coupled with an interest and will be affected neither by any purported revocation by the Assignor of this Agreement or the rights granted to the Collateral Agent hereunder or by the bankruptcy, insolvency, conservatorship or receivership of the Assignor or the Deposit Account Bank or by the lapse of time.    The rights of the Collateral Agent hereunder and in respect of the Deposit Accounts and the other Collateral, and the obligations of the Assignor and Deposit Account Bank hereunder, shall continue in effect until the security interests of Collateral Agent in the Deposit Accounts and such other Collateral have been terminated and the Collateral Agent has notified the Deposit Account Bank of such termination in writing.

13.    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

14.    <u>Counterparts</u>.    This Agreement may be executed in any number of counterparts, all of which shall constitute one and the same instrument, and any party hereto may execute this Agreement by signing and delivering one or more counterparts.

**[Remainder of this page intentionally left blank; signature page follows]**

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement as of the date first written above.

<u>Assignor</u>:


[NAME OF ASSIGNOR]


By:_____
   Name:
   Title:



<u>Collateral Agent</u>:


DEUTSCHE BANK TRUST COMPANY
   AMERICAS


By:_____
   Name:
   Title:


By:_____
   Name:
   Title:



<u>Deposit Account Bank</u>:


[NAME OF DEPOSIT ACCOUNT BANK]


By:_____
   Name:
   Title:

ANNEX H
to
SECURITY AGREEMENT

DESCRIPTION OF COMMERCIAL TORT CLAIMS

Name of Assignor                        Description of Commercial Tort Claims

ANNEX I
to
SECURITY AGREEMENT

SCHEDULE OF MARKS AND APPLICATIONS;
INTERNET DOMAIN NAME REGISTRATIONS

Marks


Applications

**The Assignors, in their reasonable business judgment, have deemed it no longer prudent to pursue or maintain the following registrations.  Notwithstanding such intentions, Assignors shall grant a security interest in these trademarks and their registrations.**

**2.       Internet Domain Name Registrations:**

**Assignors may use domain names and/or be the registrant of record for domain names that are beneficially owned by third parties that are not subject to or a part of this Agreement and therefore those domain names are not listed in this Annex I.**

**Assignors may own immaterial domain names that are not used and thus not included in this Annex.  Assignors may also have included immaterial domain names in this Annex that are not in use.   Domain names are set forth in this Annex under the subsidiaries who are their beneficial owners; however, such domain names may be formally registered to parties including: Lee Publications, Inc., Lee Procurement Solutions Co., Lee Enterprises, Lee Enterprises, Inc., INN Partners L.C., or Lee Consolidated Holdings Co.**

ANNEX J
to
<u>SECURITY AGREEMENT</u>

<u>SCHEDULE OF PATENTS</u>

ANNEX K
to
SECURITY AGREEMENT

### SCHEDULE OF COPYRIGHTS

In addition to those copyright registrations listed here, individual newspapers may have published books of local significance and may or may not have registered the copyright thereto. These copyrights are of immaterial value to the Assignors and their Subsidiaries taken as a whole.

Our search of the copyright office records includes only those documents available in the online search engine which only includes records created after January 1, 1978.

Our search of the copyright office database for copyrights owned by The Times returned nearly 1900 hits.  It is unknown if any of these documents are owned by the Munster, Indiana newspaper and this information is unascertainable without examining each of those records. These copyrights are of immaterial value to the Assignors and their Subsidiaries taken as a whole.

GRANT OF SECURITY INTEREST
IN UNITED STATES TRADEMARKS


FOR GOOD AND VALUABLE CONSIDERATION, receipt and sufficiency of which are hereby acknowledged, [Name of Grantor], a _____ _____ (the "Grantor") with principal offices at _____, hereby grants to Deutsche Bank Trust Company Americas, as Collateral Agent, with principal offices at 60 Wall Street, New York, New York 10005, (the "Grantee"), a continuing security interest in (i) all of the Grantor's right, title and interest in, to and under to the United States trademarks, trademark registrations and trademark applications (the "Marks") set forth on Schedule A attached hereto, (ii) all Proceeds (as such term is defined in the Security Agreement referred to below) and products of the Marks, (iii) the goodwill of the businesses with which the Marks are associated and (iv) all causes of action arising prior to or after the date hereof for infringement of any of the Marks or unfair competition regarding the same.

THIS GRANT is made to secure the satisfactory performance and payment of all the Obligations of the Grantor, as such term is defined in the Security Agreement among the Grantor, the other assignors from time to time party thereto and the Grantee, dated as of [____] (as amended, modified, restated and/or supplemented from time to time, the "Security Agreement"). Upon the occurrence of the Termination Date (as defined in the Security Agreement), the Grantee shall execute, acknowledge, and deliver to the Grantor an instrument in writing releasing the security interest in the Marks acquired under this Grant.

This Grant has been granted in conjunction with the security interest granted to the Grantee under the Security Agreement. The rights and remedies of the Grantee with respect to the security interest granted herein are as set forth in the Security Agreement, all terms and provisions of which are incorporated herein by reference. In the event that any provisions of this

Grant are deemed to conflict with the Security Agreement, the provisions of the Security Agreement shall govern.

**[Remainder of this page intentionally left blank; signature page follows]**

IN WITNESS WHEREOF, the undersigned have executed this Grant as of the _____ day of _____, _____.

[NAME OF GRANTOR], Grantor


By_____
  Name:
  Title:


DEUTSCHE BANK TRUST COMPANY
AMERICAS,
  as Collateral Agent and Grantee


By_____
  Name:
  Title:

By_____
  Name:
  Title:

STATE OF _____)
                        ) ss.:
COUNTY OF _____)


      On this _____ day of _____, ____, before me personally came _____ _____ who, being by me duly sworn, did state as follows:  that [s]he is _____ of [Name of Grantor], that [s]he is authorized to execute the foregoing Grant on behalf of said _____ and that [s]he did so by authority of the [Board of Directors] of said _____.

                                       _____
                                           Notary Public

STATE OF _____ )
                        ) ss:
COUNTY OF _____ )


      On this ____ day of _____, ____, before me personally came _____ _____ who, being by me duly sworn, did state as follows:  that [s]he is _____ of Deutsche Bank Trust Company Americas, that [s]he is authorized to execute the foregoing Grant on behalf of said _____ and that [s]he did so by authority of the Board of Directors of said _____.

_____
Notary Public

SCHEDULE A

| MARK | REG. NO. | REG. DATE |
|------|----------|-----------|

GRANT OF SECURITY INTEREST
IN UNITED STATES PATENTS


FOR GOOD AND VALUABLE CONSIDERATION, receipt and sufficiency of which are hereby acknowledged, [Name of Grantor], a _____ _____ (the "Grantor") with principal offices at _____, hereby grants to Deutsche Bank Trust Company Americas, as Collateral Agent, with principal offices at 60 Wall Street, New York, New York 10005, (the "Grantee"), a continuing security interest in (i) all of the Grantor's rights, title and interest in, to and under the United States patents (the "Patents") set forth on Schedule A attached hereto, in each case together with (ii) all Proceeds (as such term is defined in the Security Agreement referred to below) and products of the Patents, and (iii) all causes of action arising prior to or after the date hereof for infringement of any of the Patents or unfair competition regarding the same.


THIS GRANT is made to secure the satisfactory performance and payment of all the Obligations of the Grantor, as such term is defined in the Security Agreement among the Grantor, the other assignors from time to time party thereto and the Grantee, dated as of [_____] (as amended, modified, restated and/or supplemented from time to time, the "Security Agreement").   Upon the occurrence of the Termination Date (as defined in the Security Agreement), the Grantee shall execute, acknowledge, and deliver to the Grantor an instrument in writing releasing the security interest in the Patents acquired under this Grant.

This Grant has been granted in conjunction with the security interest granted to the Grantee under the Security Agreement.  The rights and remedies of the Grantee with respect to the security interest granted herein are as set forth in the Security Agreement, all terms and provisions of which are incorporated herein by reference.  In the event that any provisions of this Grant are deemed to conflict with the Security Agreement, the provisions of the Security Agreement shall govern.

**[Remainder of this page intentionally left blank; signature page follows]**

IN WITNESS WHEREOF, the undersigned have executed this Grant as of the ____ day of _____, ____.

[NAME OF GRANTOR], Grantor


By_____
  Name:
  Title:


DEUTSCHE BANK TRUST COMPANY
AMERICAS,
  as Collateral Agent and Grantee


By_____
  Name:
  Title:

By_____
  Name:
  Title:

STATE OF _____ )
                                         ) ss:
COUNTY OF_____)


       On this ____ day of _____, ____, before me personally came _____ _____ who, being by me duly sworn, did state as follows:  that [s]he is _____ of [Name of Grantor], that [s]he is authorized to execute the foregoing Grant on behalf of said _____ and that [s]he did so by authority of the Board of Directors of said _____.


                                                _____
                                                  Notary Public

STATE OF _____)
                                          ) ss:
COUNTY OF _____)


      On this ____ day of _____, ____, before me personally came _____ _____ who, being by me duly sworn, did state as follows:  that [s]he is _____ of Deutsche Bank Trust Company Americas, that [s]he is authorized to execute the foregoing Grant on behalf of said _____ and that [s]he did so by authority of the Board of Directors of said _____.

_____
Notary Public

SCHEDULE A

| PATENT | PATENT NO. | ISSUE DATE |
| --- | --- | --- |

ANNEX N
to
<u>SECURITY AGREEMENT</u>

GRANT OF SECURITY INTEREST
<u>IN UNITED STATES COPYRIGHTS</u>

WHEREAS, [Name of Grantor], a _____ _____ (the "<u>Grantor</u>"), having its chief executive office at _____, _____, is the owner of all right, title and interest in and to the United States copyrights and associated United States copyright registrations and applications for registration set forth in Schedule A attached hereto;

WHEREAS, DEUTSCHE BANK TRUST COMPANY AMERICAS, as Collateral Agent, with principal offices at 60 Wall Street, New York, New York 10005, (the "<u>Grantee</u>"), desires to acquire a security interest in said copyrights and copyright registrations and applications therefor; and

WHEREAS, the Grantor is willing to grant to the Grantee a security interest in and lien upon the copyrights and copyright registrations and applications therefor described above.

NOW, THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, and subject to the terms and conditions of the Security Agreement, dated as of [____], made by the Grantor, the other assignors from time to time party thereto and the Grantee (as amended, modified, restated and/or supplemented from time to time, the "<u>Security Agreement</u>"), the Grantor hereby assigns to the Grantee as collateral security, and grants to the Grantee a continuing security interest in, to and under the copyrights and copyright registrations and applications therefor set forth in Schedule A attached hereto.

Upon the occurrence of the Termination Date (as defined in the Security Agreement), the Grantee shall execute, acknowledge, and deliver to the Grantor an instrument in writing releasing the security interest in the Copyrights acquired under this Grant.

This Grant has been granted in conjunction with the security interest granted to the Grantee under the Security Agreement.  The rights and remedies of the Grantee with respect to the security interest granted herein are as set forth in the Security Agreement, all terms and provisions of which are incorporated herein by reference.  In the event that any provisions of this Grant are deemed to conflict with the Security Agreement, the provisions of the Security Agreement shall govern.

**[Remainder of this page intentionally left blank; signature page follows]**

IN WITNESS WHEREOF, the undersigned have executed this Grant as of the

_____ day of _____, _____.

[NAME OF GRANTOR], Grantor


By_____
   Name:
   Title:


DEUTSCHE BANK TRUST COMPANY
        AMERICAS,
   as Collateral Agent and Grantee


By_____
   Name:
   Title:

By_____
   Name:
   Title:

STATE OF                          )
                                  ) ss:
COUNTY OF                         )

On this __ day of _____, ____, before me personally came _____ _____, who being duly sworn, did depose and say that [s]he is _____ of [Name of Grantor], that [s]he is authorized to execute the foregoing Grant on behalf of said corporation and that [s]he did so by authority of the Board of Directors of said corporation.

_____
Notary Public

ANNEX O
to
SECURITY AGREEMENT

STATE OF _____ )

) ss.:

COUNTY OF_____ )


On this _____ day of _____, _____, before me personally came _____

_____ who, being by me duly sworn, did state as follows:   that [s]he is

_____ of Deutsche Bank Trust Company Americas, that [s]he is authorized to

execute the foregoing Grant on behalf of said _____ and that [s]he did so by authority of

the Board of Directors of said _____.


_____

Notary Public

ANNEX O
to
SECURITY AGREEMENT

SCHEDULE OF STOCK

1.    [Assignor]

| Name of Issuing Corporation | Type of Shares | Number of Shares | Certificate No. | Percentage Owned | Sub-clause of Section 1.1(b) of Security Agreement |
|---|---|---|---|---|---|

ANNEX P
to
<u>SECURITY AGREEMENT</u>

<u>SCHEDULE OF NOTES</u>

1.  [Assignor]

| <u>Amount</u>* | <u>Maturity Date</u> | <u>Obligor</u> | Sub-clause of<br>Section 1.1(b)<br><u>of Security Agreement</u> |
| --- | --- | --- | --- |

*Original principal amount.

ANNEX Q
to
<u>SECURITY AGREEMENT</u>

<u>SCHEDULE OF LIMITED LIABILITY COMPANY INTERESTS</u>

1. [Assignor]

| Name of<br>Issuing Limited<br><u>Liability Company</u> | Type of<br><u>Interest</u> | <u>Percentage<br>Owned</u> | Sub-clause of<br>Section 1.1(b)<br><u>of Security Agreement</u> |
|---|---|---|---|

SCHEDULE OF PARTNERSHIP INTERESTS

Form of Agreement Regarding Uncertificated Securities, Limited Liability
Company Interests and Partnership Interests

AGREEMENT (as amended, modified, restated and/or supplemented from time to time, this "Agreement"), dated as of [_____ __, 200_], among the undersigned pledgor (the "Pledgor"), Deutsche Bank Trust Company Americas, not in its individual capacity but solely as Collateral Agent (the "Pledgee"), and [_____], as the issuer of the Uncertificated Securities, Limited Liability Company Interests and/or Partnership Interests (each as defined below) (the "Issuer").

W I T N E S S E T H :

WHEREAS, the Pledgor, certain of its affiliates and the Pledgee have entered into a Security Agreement, dated as of [_____] (as amended, modified, restated and/or supplemented from time to time, the "Security Agreement"), under which, among other things, in order to secure the payment of the Obligations (as defined in the Security Agreement), the Pledgor has or will pledge to the Pledgee for the benefit of the Secured Creditors (as defined in the Security Agreement), and grant a security interest in favor of the Pledgee for the benefit of the Secured Creditors in, all of the right, title and interest of the Pledgor in and to any and all ["uncertificated securities" (as defined in Section 8-102(a)(18) of the Uniform Commercial Code, as adopted in the State of New York) ("Uncertificated Securities")] [Partnership Interests (as defined in the Security Agreement)] [Limited Liability Company Interests (as defined in the Security Agreement)], from time to time issued by the Issuer, whether now existing or hereafter from time to time acquired by the Pledgor (with all of such [Uncertificated Securities] [Partnership Interests] [Limited Liability Company Interests] being herein collectively called the "Issuer Pledged Interests"); and

WHEREAS, the Pledgor desires the Issuer to enter into this Agreement in order to perfect the security interest of the Pledgee under the Security Agreement in the Issuer Pledged Interests, to vest in the Pledgee control of the Issuer Pledged Interests and to provide for the rights of the parties under this Agreement;

NOW THEREFORE, in consideration of the premises and the mutual promises and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1. The Pledgor hereby irrevocably authorizes and directs the Issuer, and the Issuer hereby agrees, to comply with any and all instructions and orders originated by the

Pledgee (and its successors and assigns) regarding any and all of the Issuer Pledged Interests without the further consent by the registered owner (including the Pledgor), and, following its receipt of a notice from the Pledgee stating that the Pledgee is exercising exclusive control of the Issuer Pledged Interests, not to comply with any instructions or orders regarding any or all of the Issuer Pledged Interests originated by any person or entity other than the Pledgee (and its successors and assigns) or a court of competent jurisdiction.

2.    The Issuer hereby certifies that (i) no notice of any security interest, lien or other encumbrance or claim affecting the Issuer Pledged Interests (other than the security interest of the Pledgee) has been received by it, and (ii) the security interest of the Pledgee in the Issuer Pledged Interests has been registered in the books and records of the Issuer.

3.    The Issuer hereby represents and warrants that (i) the pledge by the Pledgor of, and the granting by the Pledgor of a security interest in, the Issuer Pledged Interests to the Pledgee, for the benefit of the Secured Creditors, does not violate the charter, by-laws, partnership agreement, membership agreement or any other agreement governing the Issuer or the Issuer Pledged Interests, and (ii) the Issuer Pledged Interests consisting of capital stock of a corporation are fully paid and nonassessable.

4.    All notices, statements of accounts, reports, prospectuses, financial statements and other communications to be sent to the Pledgor by the Issuer in respect of the Issuer will also be sent to the Pledgee at the following address:

> 60 Wall Street
> New York, New York 10005
> Attention:  Susan Lefevre
> Telephone No.:  (212) 250-6114
> Telecopier No.:  (212) 797-5692

5.    Following its receipt of a notice from the Pledgee stating that the Pledgee is exercising exclusive control of the Issuer Pledged Interests and until the Pledgee shall have delivered written notice to the Issuer that all of the Obligations have been paid in full and this Agreement is terminated, the Issuer will send any and all redemptions, distributions, interest or other payments in respect of the Issuer Pledged Interests from the Issuer for the account of the Pledgee only by wire transfers to such account as the Pledgee shall instruct.

6.    Except as expressly provided otherwise in Sections 4 and 5, all notices, instructions, orders and communications hereunder shall be sent or delivered by mail, telegraph, telex, telecopy, cable or overnight courier service and all such notices and communications shall, when mailed, telexed, telecopied, cabled or sent by overnight courier, be effective when deposited in the mails or delivered to overnight courier, prepaid and properly addressed for delivery on such or the next Business Day, or sent by telex or telecopier, except that notices and communications to the Pledgee or the Issuer shall not be effective until received.  All notices and other communications shall be in writing and addressed as follows:

(a)    if to the Pledgor, at:

c/o Lee Enterprises, Incorporated

                201 North Harrison Street
                Davenport, Iowa  52801
                Attention:  Chief Financial Officer
                Telephone No.:  (563) 383-2179
                Telecopier No.:  (563) 327-2600

(b)     if to the Pledgee, at the address given in Section 4 hereof;

©       if to the Issuer, at:

        _____
        _____
        _____

or at such other address as shall have been furnished in writing by any Person described above to the party required to give notice hereunder.  As used in this Section 6, "Business Day" means any day other than a Saturday, Sunday, or other day in which banks in New York are authorized to remain closed.

        7.   This Agreement shall be binding upon the successors and assigns of the Pledgor and the Issuer and shall inure to the benefit of and be enforceable by the Pledgee and its successors and assigns.  This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which shall constitute one instrument.  In the event that any provision of this Agreement shall prove to be invalid or unenforceable, such provision shall be deemed to be severable from the other provisions of this Agreement which shall remain binding on all parties hereto.  None of the terms and conditions of this Agreement may be changed, waived, modified or varied in any manner whatsoever except in writing signed by the Pledgee, the Issuer and the Pledgor.

        8.   This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to its principles of conflict of laws.

                        *       *       *

IN WITNESS WHEREOF, the Pledgor, the Pledgee and the Issuer have caused this Agreement to be executed by their duly elected officers duly authorized as of the date first above written.

[_____],
  as Pledgor


By_____
  Name:
  Title:


DEUTSCHE    BANK    TRUST    COMPANY AMERICAS,
  not in its individual capacity but solely as Collateral Agent and Pledgee


By_____
  Name:
  Title:


By_____
  Name:
  Title:


[_____],
  as the Issuer


By_____
  Name:
  Title:

# TABLE OF CONTENTS

**Page**

ARTICLE I SECURITY INTERESTS.................................................................................2

    1.1 Grant of Security Interests ................................................................................2
    1.2 Power of Attorney............................................................................................5

ARTICLE II GENERAL REPRESENTATIONS, WARRANTIES AND COVENANTS ...........6

    2.1 Necessary Filings............................................................................................6
    2.2 No Liens.........................................................................................................6
    2.3 Other Financing Statements.............................................................................6
    2.4 Chief Executive Office, Record Locations .......................................................6
    2.5 [RESERVED] ..................................................................................................7
    2.6 Legal Names; Type of Organization (and Whether a Registered Organization
        and/or a Transmitting Utility); Jurisdiction of Organization; Location;
        Organizational Identification Numbers; Federal Employer Identification
        Number; Changes Thereto; etc .............................................................7
    2.7 [RESERVED] ..................................................................................................7
    2.8 Certain Significant Transactions.......................................................................7
    2.9 Non-UCC Property .........................................................................................8
    2.10 As-Extracted Collateral; Timber-to-be-Cut ...................................................8
    2.11 Collateral in the Possession of a Bailee .........................................................8
    2.12 Recourse......................................................................................................8
    2.13 Certain Representations and Warranties Regarding Certain Collateral......................9

ARTICLE III SPECIAL PROVISIONS CONCERNING ACCOUNTS; CONTRACT
    RIGHTS; INSTRUMENTS; CHATTEL PAPER AND CERTAIN OTHER
    COLLATERAL .......................................................................................9

    3.1 Additional Representations and Warranties.......................................................9
    3.2 Maintenance of Records..................................................................................9
    3.3 Direction to Account Debtors; Contracting Parties; etc ...........................................10
    3.4 Modification of Terms; etc .............................................................................10
    3.5 Collection.....................................................................................................10
    3.6 Instruments...................................................................................................11
    3.7 Assignors Remain Liable Under Accounts.......................................................11
    3.8 Assignors Remain Liable Under Contracts.......................................................11
    3.9 Deposit Accounts; Etc....................................................................................12
    3.10 Letter-of-Credit Rights.................................................................................13
    3.11 Commercial Tort Claims...............................................................................13
    3.12 Chattel Paper...............................................................................................13
    3.13 Further Actions ...........................................................................................13

ARTICLE IV SPECIAL PROVISIONS CONCERNING TRADEMARKS AND
DOMAIN NAMES ...................................................................................................14

    4.1 Additional Representations and Warranties.................................................14
    4.2 Licenses and Assignments ........................................................................14
    4.3 Infringements ...........................................................................................14
    4.4 Preservation of Marks ..............................................................................15
    4.5 Maintenance of Registration .....................................................................15
    4.6 Future Registered Marks and Domain Names ...........................................15
    4.7 Remedies..................................................................................................15

ARTICLE V SPECIAL PROVISIONS CONCERNING PATENTS, COPYRIGHTS AND
TRADE SECRETS ..................................................................................................16

    5.1 Additional Representations and Warranties.................................................16
    5.2 Licenses and Assignments ........................................................................16
    5.3 Infringements ...........................................................................................16
    5.4 Maintenance of Patents or Copyrights.......................................................16
    5.5 Prosecution of Patent or Copyright Applications .......................................16
    5.6 Other Patents and Copyrights ...................................................................17
    5.7 Remedies..................................................................................................17

ARTICLE VI PROVISIONS CONCERNING ALL COLLATERAL.........................17

    6.1 Protection of Collateral Agent's Security ..................................................17
    6.2 Warehouse Receipts Non-Negotiable ........................................................18
    6.3 Additional Information ..............................................................................18
    6.4 Further Actions ........................................................................................18
    6.5 Financing Statements ................................................................................18

ARTICLE VII REMEDIES UPON OCCURRENCE OF AN EVENT OF DEFAULT ..............18

    7.1 Remedies; Obtaining the Collateral Upon Default .....................................18
    7.2 Remedies; Disposition of the Collateral ....................................................20
    7.3 Waiver of Claims .....................................................................................21
    7.4 Application of Proceeds.............................................................................22
    7.5 Remedies Cumulative ...............................................................................23
    7.6 Discontinuance of Proceedings..................................................................23

ARTICLE VIII INDEMNITY ..................................................................................23

    8.1 Indemnity .................................................................................................23
    8.2 Indemnity Obligations Secured by Collateral; Survival .............................24

ARTICLE IX DEFINITIONS....................................................................................25

ARTICLE X MISCELLANEOUS .............................................................................32

    10.1 Notices ..................................................................................................32
    10.2 Waiver; Amendment...............................................................................33
    10.3 Obligations Absolute .............................................................................34

10.4 Successors and Assigns...........................................................................34
10.5 Headings Descriptive ..............................................................................34
10.6 GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE;
        WAIVER OF JURY TRIAL.............................................................34
10.7 Assignor's Duties...................................................................................35
10.8 Termination; Release ............................................................................35
10.9 Counterparts ........................................................................................37
10.10 Severability ........................................................................................37
10.11 The Collateral Agent and the other Secured Creditors ..........................37
10.12 Additional Assignors ...........................................................................37

ANNEX A      Schedule of Chief Executive Offices Address(es) of Chief Executive Office
ANNEX B      [Reserved]
ANNEX C      Schedule of Legal Names, Type of Organization (and Whether a Registered Organization and/or a Transmitting Utility), Jurisdiction of Organization, Location, Organizational Identification Numbers and Federal Employer Identification Numbers
ANNEX D      [Reserved]
ANNEX E      Description of Certain Significant Transactions Occurring Within One Year Prior to the Date of the Security Agreement
ANNEX F      Schedule of Deposit Accounts
ANNEX G      Form of Control Agreement Regarding Deposit Accounts
ANNEX H      Schedule of Commercial Tort Claims
ANNEX I      Schedule of Marks and Applications; Internet Domain Name Registrations
ANNEX J      Schedule of Patents
ANNEX K      Schedule of Copyrights
ANNEX L      Grant of Security Interest in United States Trademarks
ANNEX M      Grant of Security Interest in United States Patents
ANNEX N      Grant of Security Interest in United States Copyrights
ANNEX O      Schedule of Stock
ANNEX P      Schedule of Notes
ANNEX Q      Schedule of Limited Liability Company Interests
ANNEX R      Schedule of Partnership Interests
ANNEX S      Form of Agreement Regarding Uncertificated Securities, Limited Liability Company Interests and Partnership Interests

**[Remainder of this page intentionally left blank]**

### FORM OF SOLVENCY CERTIFICATE

To the Administrative Agent and each of the Lenders
party to the Credit Agreement referred to below:

I, the undersigned, the Chief Financial Officer of Lee Enterprises, Incorporated, a Delaware corporation (the "Borrower"), in that capacity only and not in my individual capacity, do hereby certify as of the date hereof that:

1.     This Certificate is furnished to the Administrative Agent and the Lenders pursuant to Section 6.13 of the Exit Credit Agreement, dated as of [_____], among the Borrower, the lenders from time to time party thereto (each, a "Lender" and, collectively, the "Lenders"), Deutsche Bank Securities Inc. and Goldman Sachs Lending Partners LLC, as Joint Lead Arrangers and Joint Book Running Managers, and Deutsche Bank Trust Company Americas, as Administrative Agent (the "Administrative Agent") and Collateral Agent (the "Credit Agreement").  Unless otherwise defined herein, capitalized terms used in this Certificate shall have the meanings set forth in the Credit Agreement.

2.     For purposes of this Certificate, the terms below shall have the following definitions:

(a)     "does or do not have Unreasonably Small Capital"

For the period from the date hereof through the stated maturity of all New Financing, each of the Borrower (on a stand-alone basis) and the Borrower and its Subsidiaries (taken as a whole), as the case may be, after the incurrence, issuance or assumption of all Indebtedness (including the Loans) being incurred, issued or assumed (including the Loans and Letters of Credit) and Liens of such Person or of such group of Persons existing or created, as the case may be, on the Conversion Date, has or have sufficient capital with which to conduct its or their respective businesses.

(b)     "Fair Value"

The amount at which the assets (both tangible and intangible), in their entirety, of each of the Borrower (on a stand-alone basis) and the Borrower and its Subsidiaries (taken as a whole), as the case may be, would change hands between a willing buyer and a willing seller, within a commercially reasonable period of time, each having reasonable knowledge of the relevant facts, with neither being under any compulsion to act.

(c)     "Identified Contingent Liabilities"

The maximum estimated amount of liabilities reasonably likely to result from pending litigation, asserted claims and assessments, guaranties, uninsured risks and other contingent liabilities (other than such contingent

liabilities included within the term "Stated Liabilities") of each of the Borrower (on a stand-alone basis) and the Borrower and its Subsidiaries (taken as a whole), as the case may be, after giving effect to the transactions consummated on the Conversion Date (including all fees and expenses related thereto but exclusive of such contingent liabilities to the extent reflected in Stated Liabilities), as identified and explained in terms of their nature and estimated magnitude by responsible officers of the Borrower and its Subsidiaries or that have been identified as such by an officer of the Borrower or any of its Subsidiaries, determined in accordance with GAAP.

(d)    "<u>New Financing</u>"

All Indebtedness incurred or to be incurred by the Borrower and its Subsidiaries under the Credit Documents (assuming the full utilization by the Borrower of the Commitments under the Credit Agreement), the Second Lien Loan Documents and the Pulitzer Debt Documents, as applicable.

(e)    "<u>Present Fair Salable Value</u>"

The amount that could be obtained by an independent willing seller from an independent willing buyer if the assets of each of the Borrower (on a stand-alone basis) and the Borrower and its Subsidiaries (taken as a whole), as the case may be, are sold with reasonable promptness in an arm's-length transaction under present conditions for the sale of comparable business enterprises.

(f)    "<u>Stated Liabilities</u>"

The recorded liabilities (including contingent liabilities that would be recorded in accordance with GAAP) of each of the Borrower (on a stand-alone basis) and the Borrower and its Subsidiaries (taken as a whole), as the case may be, as of the date hereof after giving effect to the transactions consummated on the Conversion Date, determined in accordance with GAAP consistently applied, together with the amount of the New Financing.

(g)    "<u>will be able to pay its or their respective Stated Liabilities and Identified Contingent Liabilities as they mature or otherwise become payable</u>"

For the period from the date hereof through the stated maturity of all New Financing, each of the Borrower (on a stand-alone basis) and the Borrower and its Subsidiaries (taken as a whole), as the case may be, will have sufficient assets and cash flow to pay its or their respective Stated Liabilities and Identified Contingent Liabilities as those liabilities mature or otherwise become payable.

3.     For purposes of this Certificate, I, or officers of the Borrower and/or its Subsidiaries under my direction and supervision, have performed the following procedures as of and for the periods set forth below.

(a)     Reviewed the financial statements (including the <u>pro forma</u> financial statements) referred to in Section 8.05 of the Credit Agreement.

(b)     Made inquiries of certain officials of the Borrower and its Subsidiaries who have responsibility for financial and accounting matters regarding (i) the existence and amount of Identified Contingent Liabilities associated with the business of the Borrower and its Subsidiaries and (ii) whether the financial statements referred to in paragraph (a) above are in conformity with GAAP applied on a basis consistent with that of the Borrower's audited financial statements for the Borrower's fiscal year ended September 25, 2011.

(c)     Reviewed to my satisfaction the Credit Documents, the Second Lien Loan Documents and the Pulitzer Debt Documents and the respective Schedules, Annexes and Exhibits thereto.

(d)     With respect to Identified Contingent Liabilities:

1.     inquired of certain officials of the Borrower and/or its Subsidiaries who have responsibility for legal, financial and accounting matters as to the existence and estimated liability with respect to all contingent liabilities associated with the business of the Borrower and its Subsidiaries;

2.     confirmed with officers of the Borrower and/or its Subsidiaries that, to the best of such officers' knowledge, (i) all appropriate items were included in Stated Liabilities or Identified Contingent Liabilities and that (ii) the amounts relating thereto were the maximum estimated amount of liabilities reasonably likely to result therefrom as of the date hereof; and

3.     to the best of my knowledge, in making the certification set forth in paragraph 4 below, considered all material Identified Contingent Liabilities that may arise from any pending litigation, asserted claims and assessments, guarantees, uninsured risks and other Identified Contingent Liabilities of the Borrower and its Subsidiaries (exclusive of such Identified Contingent Liabilities to the extent reflected in Stated Liabilities) and with respect to each such Identified Contingent Liability the estimable maximum amount of liability with respect thereto was used in making such certification.

(e)     Made inquiries of certain officers of the Borrower and/or its Subsidiaries who have responsibility for financial reporting and accounting matters

regarding whether they were aware of any events or conditions that, as of the date hereof, would cause either Borrower (on a stand-alone basis) or the Borrower and its Subsidiaries (taken as a whole), as the case may be, after giving effect to the consummation of the financing transactions (including the incurrence of the New Financing), to (i) have assets with a Fair Value or Present Fair Salable Value that are less than the sum of its or their Stated Liabilities and Identified Contingent Liabilities; (ii) have Unreasonably Small Capital; or (iii) not be able to pay its or their respective Stated Liabilities and Identified Contingent Liabilities as they mature or otherwise become payable.

(f)     Had the Projections relating to the Borrower and/or its Subsidiaries which have been previously delivered to the Administrative Agent and the Lenders, prepared under my direction based on good faith estimates and assumptions, and have re-examined the Projections on the date hereof and considered the effect thereon of any changes since the date of the preparation thereof on the results projected therein.  After such review, I hereby certify that in my opinion the Projections are (and remain) reasonable and attainable (it being recognized by the Lenders that such projections of future events are not to be viewed as facts and that actual results during the period or periods covered by any such Projections may differ from the projected results contained therein) and the Projections support the conclusions contained in paragraph 4 below.

4.      Based on and subject to the foregoing, I hereby certify on behalf of the Borrower that, on and as of the date hereof and after giving effect to the consummation of the financing transactions (including the incurrence of the New Financing), it is my opinion that (i) the Fair Value and Present Fair Salable Value of the assets of each of the Borrower (on a stand-alone basis) and the Borrower and its Subsidiaries (taken as a whole), as the case may be, exceed its or their respective Stated Liabilities and Identified Contingent Liabilities; (ii) each of the Borrower (on a stand-alone basis) and the Borrower and its Subsidiaries (taken as a whole), as the case may be, do not have Unreasonably Small Capital; and (iii) each of the Borrower (on a stand-alone basis) and the Borrower and its Subsidiaries (taken as a whole), as the case may be, intends to and believes that it will be able to pay its or their respective Stated Liabilities and Identified Contingent Liabilities as they mature or otherwise become payable.

5.      The Borrower does not intend, in consummating the transactions contemplated by the New Financing, to delay, hinder, or defraud either present or future creditors.

IN WITNESS WHEREOF, the undersigned has set his hand this [__] day of [____], .

Exhibit J

LEE ENTERPRISES, INCORPORATED


By: _____
    Name:
    Title:

<div align="right">EXHIBIT K</div>

## FORM OF COMPLIANCE CERTIFICATE

This Compliance Certificate is delivered to you pursuant to Section 9.01(e) of the Exit Credit Agreement, dated as of [_____], (as amended, supplemented or modified from time to time, the "Credit Agreement"), among Lee Enterprises, Incorporated (the "Borrower"), the lenders from time to time party thereto, Deutsche Bank Securities Inc. and Goldman Sachs Lending Partners LLC, as Joint Lead Arrangers and Joint Book Running Managers, and Deutsche Bank Trust Company Americas, as Administrative Agent and Collateral Agent.  Terms defined in the Credit Agreement and not otherwise defined herein are used herein as therein defined.

1.    I am the duly elected, qualified and acting [insert Title of Authorized Officer] of the Borrower.

2.    I have reviewed and am familiar with the contents of this Compliance Certificate.  I am providing this Compliance Certificate solely in my capacity as an officer of the Borrower.  The matters set forth herein are true to the best of my knowledge after due inquiry.

3.    I have reviewed the terms of the Credit Agreement and the other Credit Documents and have made or caused to be made under my supervision a review in reasonable detail of the transactions and condition of the Borrower and its Subsidiaries during the accounting period covered by the financial statements attached hereto as ANNEX 1 (the "Financial Statements").  Such review did not disclose the existence during or at the end of the accounting period covered by the Financial Statements, and I have no knowledge of the existence, as of the date of this Compliance Certificate, of any condition or event which constitutes a Default or an Event of Default [, except as set forth below].

4.    Attached hereto as ANNEX 2 are the computations showing (in reasonable detail) compliance with the covenants specified therein.

5.    Attached hereto as ANNEX 3 is the information required by Section 9.01(e)(iii) of the Credit Agreement as of the date of this Compliance Certificate and the Borrower and its Subsidiaries have taken all actions required to be taken by them pursuant to the Security Documents in connection with the information set forth on ANNEX 3.

6.    Attached hereto as ANNEX 4 is the information required to establish compliance with Sections 5.02(d) and 5.02(f) of the Credit Agreement for the Test Period ended on _____ __, ___.

7.    Attached hereto as ANNEX 5 is the information required to establish compliance with Sections 10.02(iv) of the Credit Agreement for the Test Period ended on _____ __, ___.

IN WITNESS WHEREOF, I have executed this Compliance Certificate this _____ day of _____, _____.

LEE ENTERPRISES, INCORPORATED

By: _____
    Name:
    Title:

[Applicable Financial Statements To Be Attached]

The information described herein is as of _____ __, ____ (the "Computation Date") and pertains to (i) in the case of items I.A below, I.C below and I.D. below, the respective amounts outstanding as of the Computation Date, (ii) in the case of items I.B, I.D. (iv) and (vi) below and I.E.1 below, and II. below, the period from [the Initial Borrowing Date] [_____ __, ____][1] through the last day of the Test Period referred to in succeeding clause (iii) (the "Year-to-Date Period"), and (iii) in the case of items, I.E.2, and I.E.3, below, the period from _____ __, ____ to _____ __, ____ (the "Test Period").

I.    Negative and Financial Covenants

A.    Liens (Section 10.01)

| Section | | Amount |
|---|---|---|
| (i) | 10.01(x) | $_____ |
| (ii) | 10.01(xii) | $_____ |
| (iii) | 10.01(xvi) | $_____ |

B.    Dividends (Section 10.03)

| Section | | Amount |
|---|---|---|
| (i) | 10.03(iii) | $_____ |

C.    Indebtedness (Section 10.04)

| Section | | Amount |
|---|---|---|
| (i) | 10.04(iv) | $_____ |
| (ii) | 10.04(viii) | $_____ |
| (iii) | 10.04(xii) | $_____ |
| (v) | 10.04(viii) | $_____ |
| (vi) | 10.04(xiv) | $_____ |

D.    Investments (Section 10.05)

| Section | | Amount |
|---|---|---|
| (i) | 10.05(v) | $_____ |

_____

[1]    Insert the first day of the Borrower's fiscal year (beginning with the first day of its fiscal year commencing closest to [___]).

(ii)   10.05(viii)                                         $_____

(iii)  10.05(xiii)                                         $_____

(iv)   10.05(xiv)                                          $_____

(v)    10.05(xv)                                           $_____

(vi)   10.05(xvi)                                          $_____

(vii)  10.05(xvii)                                         $_____

(viii) 10.05(xviii)                                        $_____


E.    Financial Covenants

    1.    Capital Expenditures (Section 10.07)

       (a)    Capital Expenditures              Amount
           under Section 10.07(a)            $_____

       (b)    Capital Expenditures under
           Section 10.07(b)                  $_____

       (c)    Capital Expenditures under
           Section 10.07(c)                  $_____

    2.    Interest Expense Coverage
         Ratio (Section 10.08)

       a.    Lee EBITDA[2]
          for the Test Period               $_____

       b.    Lee Interest Expense[3]
          for the Test Period               $_____

       c.    Ratio of line a to line b         _____:1.00

    3.    Lee Leverage Ratio (Section 10.09)

       a.    Lee Indebtedness[4] for

---

[2]  Attach hereto in reasonable detail the calculations required to arrive at Lee EBITDA for purposes of the Interest Expense Coverage Ratio.

[3]  Attach hereto in reasonable detail the calculations required to arrive at Lee Interest Expense.

[4]  Attach hereto in reasonable detail the calculations required to arrive at Lee Indebtedness.

|  |  | for the Test Period | $_____ |
|---|---|---|---|
| b. | Lee EBITDA[5] for the Test Period |  | $_____ |
| c. | Ratio of line a to line b |  | _____:1.00 |

II.    Excess Cash Flow

The amount of Excess Cash Flow[6] for the Excess
Cash Flow Payment Period was                                          $_____.

---

[5]    Attach hereto in reasonable detail the calculations required to arrive at Lee EBITDA for purposes of the Total Leverage Ratio.

[6]    Attach hereto in reasonable detail the calculations required to establish Excess Cash Flow.

COMPLIANCE CERTIFICATE

[Specify in reasonable detail any changes to the Annexes of each of the Pledge Agreement and the Security Agreement, in each case since the Conversion Date or, if later, since the date of the most recent certificate delivered pursuant to Section 9.01(e) of the Credit Agreement, but only to the extent that such changes are required to be reported to the Collateral Agent pursuant to the terms of the Security Documents.]

[information required to establish compliance with Sections 5.02(d) and 5.02(f) of the Credit Agreement for the Test Period ended on _____ __, ___]

Asset Sales (Section 10.02)

| Section | Amount |
| --- | --- |
| 10.02(iv)(z) | |

(a) Consolidated EBITDA of the Borrower and its Subsidiaries generated by all assets sold during the covenant fiscal year of the Borrower

$_____

(b) Consolidated EBITDA of the Borrower and its Subsidiaries for the immediately preceding fiscal year of the Borrower

$_____

(c) Result of line (a) divided by line (b) (expressed as a percentage)

____%

EXHIBIT L

FORM OF ASSIGNMENT
AND
ASSUMPTION AGREEMENT[1]

This Assignment and Assumption Agreement (this "Assignment"), is dated as of the Effective Date set forth below and is entered into by and between [the][each] Assignor identified in item [1][2] below ([the] [each, an] "Assignor") and [the] [each] Assignee identified in item 2 below ([the] [each, an] "Assignee"). [It is understood and agreed that the rights and obligations of such [Assignees][and Assignors] hereunder are several and not joint.] Capitalized terms used herein but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as amended, restated, supplemented and/or otherwise modified from time to time, the "Credit Agreement"). The Standard Terms and Conditions for Assignment and Assumption Agreement set forth in Annex 1 hereto (the "Standard Terms and Conditions") are hereby agreed to and incorporated herein by reference and made a part of this Assignment as if set forth herein in full.

For an agreed consideration, [the][each] Assignor hereby irrevocably sells and assigns to [the] [each] Assignee, and [the] [each] Assignee hereby irrevocably purchases and assumes from [the][each] Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below, the interest in and to all of [the][each] Assignor's rights and obligations under the Credit Agreement and any other documents or instruments delivered pursuant thereto that represents the amount and percentage interest identified below of all of the [respective] Assignor's outstanding rights and obligations under the respective Tranches identified below (including, to the extent included in any such Tranches, Letters of Credit and Swingline Loans) ([the] [each, an] "Assigned Interest"). [Each] [Such] sale and assignment is without recourse to [the][any] Assignor and, except as expressly provided in this Assignment, without representation or warranty by [the][any] Assignor.

[1.    Assignor:    _____

2.    Assignee:    _____ ][2]

[1][3].  Credit Agreement:    Exit Credit Agreement, dated as of [_____], among Lee Enterprises, Incorporated (the "Borrower"), the lenders from time to time party thereto, Deutsche Bank Securities Inc. and Goldman Sachs Lending Partners LLC, as Joint Lead Arrangers and Joint Book Running Managers, and Deutsche Bank Trust Company Americas, as Administrative Agent and Collateral Agent.

[2.    Assigned Interest:[3]

---

[1]    This Form of Assignment and Assumption Agreement should be used by Lenders for an assignment to a single Assignee or to funds managed by the same or related investment managers.

[2]    If the form is used for a single Assignor and Assignee, items 1 and 2 should list the Assignor and the Assignee, respectively. In the case of an assignment to funds managed by the same or related investment managers, or an assignment by multiple Assignors, the Assignors and the Assignee(s) should be listed in the table under bracketed item 2 below.

Exhibit L
Page 2

| Assignor | Assignee | Tranche Assigned[4] | Aggregate Amount of Commitment/Loans under Relevant Tranche for all Lenders | Amount of Commitment/Loans under Relevant Tranche Assigned |
|---|---|---|---|---|
| [Name of Assignor] | [Name of Assignee] | | _____ | _____ |
| [Name of Assignor] | [Name of Assignee] | | _____ | _____ |

---

[3]    Insert this chart if this Form of Assignment and Assumption Agreement is being used for assignments to funds managed by the same or related investment managers or for an assignment by multiple Assignors. Insert additional rows as needed.

[4]    For complex multi-tranche assignments a separate chart for each tranche should be used for ease of reference.

Exhibit L
Page 3

[4.      Assigned Interest:[5]

| Tranche Assigned | Aggregate Amount of Commitment/Loans under Relevant Tranche for all Lenders | Amount of Commitment/Loans under Relevant Tranche Assigned |
|---|---|---|
| Term Loans | $_____ | $_____ |
| Revolving Loans | $_____ | $_____ |

Effective Date _____, ____, ____.


**Assignor[s] Information**

Payment Instructions:        _____

_____

_____

_____

Reference:_____

**Assignee[s] Information**

Payment Instructions:  _____

_____

_____

_____

Reference:_____

Notice Instructions:        _____

_____

_____

_____

Reference:_____

Notice Instructions:    _____

_____

_____

_____

Reference:_____

The terms set forth in this Assignment are hereby agreed to:


ASSIGNOR
[NAME OF ASSIGNOR]

ASSIGNEE
[NAME OF ASSIGNEE][6]


By:_____

Name:

Title:

By:_____

Name:

Title:

---

[5]    Insert this chart if this Form of Assignment and Assumption Agreement is being used by a single Assignor for an assignment to a single Assignee.

[6]    Add additional signature blocks, as needed, if this Form of Assignment and Assumption Agreement is being used by funds managed by the same or related investment managers.

Exhibit L
Page 4

[Consented to and][7] Accepted:

DEUTSCHE BANK TRUST COMPANY AMERICAS,
   as Administrative Agent


By:_____
   Name:
   Title:


By:_____
   Name:
   Title:


LEE ENTERPRISES, INCORPORATED


By:_____
   Name:
   Title:][8]

---

[7]   Insert only if assignment is being made to an Eligible Transferee pursuant to Section 13.04(b)(y) of the Credit Agreement.  Consent of the Administrative Agent shall not be unreasonably withheld or delayed.

[8]   Insert only if (i) no Default or Event of Default is then in existence and (ii) the assignment is being made to an Eligible Transferee pursuant to 13.04(b)(y) of the Credit Agreement.  Consent of the Borrower shall not be unreasonably withheld or delayed.

LEE ENTERPRISES, INCORPORATED

CREDIT AGREEMENT

STANDARD TERMS AND CONDITIONS FOR ASSIGNMENT
AND ASSUMPTION AGREEMENT

1.    Representations and Warranties.

1.1.    Assignor.  [The] [Each] Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of [the] [its] Assigned Interest, (ii) [the] [its] Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with any Credit Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement, any other Credit Document or any other instrument or document delivered pursuant thereto (other than this Assignment) or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or affiliates or any other Person obligated in respect of any Credit Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or affiliates or any other Person of any of their respective obligations under any Credit Document.

1.2.    Assignee.  [The] [Each] Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) confirms that it is (A) a Lender, (B) a parent company and/or an affiliate of [the][each] Assignor which is at least 50% owned by [the][each] Assignor or its parent company, (C) an affiliate of any other Lender which is at least 50% owned by such other Lender or its parent company (provided that any fund that invests in loans and is managed or advised by the same investment advisor of another fund which is a Lender (or by an Affiliate of such investment advisor) shall be treated as an affiliate of such other Lender for the purposes of this clause), (D) a fund that invests in loans and is managed or advised by the same investment advisor of any Lender or by an Affiliate of such investment advisor or (E) an Eligible Transferee under Section 13.04(b) of the Credit Agreement; (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement and, to the extent of [the][its] Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered pursuant to Section 9.01 thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and to purchase [the][its] Assigned Interest on the basis of which it has made such analysis and decision and (v) if it is organized under the laws of a jurisdiction outside the United States, it has attached to this Assignment any tax documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by it; (b) agrees that it will, independently and without reliance upon the Administrative Agent, [the][each] Assignor, or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Agreement; (c) appoints and authorizes each of the Administrative Agent and the Collateral Agent, and to take such action as agent on its behalf and to exercise such powers under the

Credit Agreement and the other Credit Documents as are delegated to or otherwise conferred upon the Administrative Agent and/or the Collateral Agent, as the case may be, by the terms thereof, together with such powers as are reasonably incidental thereto; and (d) agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Credit Documents are required to be performed by it as a Lender.

2.      <u>Payment</u>.  From and after the Effective Date, the Administrative Agent shall make all payments in respect [the] [each] Assigned Interest (including payments of principal, interest, fees, commissions and other amounts) to [the][each] Assignor for amounts which have accrued to but excluding the Effective Date and to [the] [each] Assignee for amounts which have accrued from and after the Effective Date.

3.      <u>Effect of Assignment</u>.  Upon the delivery of a fully executed original hereof to the Administrative Agent, as of the Effective Date, (i) [the][each] Assignee shall be a party to the Credit Agreement and, to the extent provided in this Assignment, have the rights and obligations of a Lender thereunder and under the other Credit Documents and (ii) [the][each] Assignor shall, to the extent provided in this Assignment, relinquish its rights and be released from its obligations under the Credit Agreement and the other Credit Documents.

4.      <u>General Provisions</u>.  This Assignment shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment by telecopy shall be effective as delivery of a manually executed counterpart of the Assignment.   THIS ASSIGNMENT SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK (INCLUDING, WITHOUT LIMITATION, SECTION 5.1401 OF THE GENERAL OBLIGATIONS LAW).

*      *      *

<div align="right">Exhibit M</div>

## FORM OF INTERCOMPANY NOTE

<div align="right">

New York, New York

_____ __, ____

</div>

FOR VALUE RECEIVED, _____, a [_____ [corporation]] (the "Payor"), hereby promises to pay [on demand] [on [DATE]] to the order of _____, or its assigns (the "Payee"), in lawful money of the United States of America in immediately available funds, at such location in the United States of America as the Payee shall from time to time designate, the unpaid principal amount of all loans and advances made by the Payee to the Payor.

The Payor also promises to pay interest on the unpaid principal amount hereof in like money at said location from the date hereof until paid at such rate per annum as shall be agreed upon from time to time by the Payor and the Payee.

Upon the earlier to occur of (x) the commencement of any bankruptcy, reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar proceeding of any jurisdiction relating to the Payor or (y) any exercise of remedies pursuant to (i) Section 11 of the Credit Agreement referred to below (including the termination of the Total Commitment), (ii) Section 11 of the Second Lien Loan Agreement referred to below or (iii) Section [_] of the Pulitzer Debt Agreement referred to below, the unpaid principal amount hereof shall become immediately due and payable without presentment, demand, protest or notice of any kind in connection with this Note.

This Note is one of the Intercompany Notes referred to in (i) the Exit Credit Agreement, dated as of [____], among Lee Enterprises, Incorporated, the lenders from time to time party thereto, Deutsche Bank Securities Inc. and Goldman Sachs Lending Partners LLC, as Joint Lead Arrangers and Joint Book Running Managers, and Deutsche Bank Trust Company Americas, as Administrative Agent and Collateral Agent (as amended, restated, modified and/or supplemented from time to time, the "Credit Agreement"), (ii) the Second Lien Loan Agreement, dated as of [___], 2012, among Lee Enterprises, Incorporated, Wilmington Trust, National Association, as Administrative Agent and the other lenders party thereto (as amended, restated, modified and/or supplemented from time to time, the "Second Lien Loan Agreement") and (iii) the Note Agreement, dated as of [____], among St. Louis Post-Dispatch LLC and the purchasers party thereto (as amended, restated, modified and/or supplemented from time to time, the "Pulitzer Debt Agreement"), and is subject to the terms thereof.

The Payee is hereby authorized (but shall not be required) to record all loans and advances made by it to the Payor (all of which shall be evidenced by this Note), and all repayments or prepayments thereof, in its books and records, such books and records constituting *prima facie* evidence of the accuracy of the information contained therein.

This Note, and all of obligations of the Payor hereunder, shall be subordinate and junior in right of payment to all Senior Indebtedness (as defined in the Intercompany Subordination Agreements referred to in each of the Credit Agreement, the Second Lien Loan Agreement and the Pulitzer Debt Agreement) as, and to the extent required by, such Intercompany Subordination Agreements.

All payments under this Note shall be made without offset, counterclaim or deduction of any kind.

The Payor hereby waives presentment, demand, protest or notice of any kind in connection with this Note.

**THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK.**

[NAME OF PAYOR]

By:_____
    Name:
    Title:

Pay to the order of

_____

[NAME OF PAYEE]

By:_____
    Name:
    Title:

# INTERCREDITOR AGREEMENT

Intercreditor Agreement (this "**Agreement**"), dated as of [_____], among DEUTSCHE BANK TRUST COMPANY AMERICAS, as Collateral Agent (in such capacity, with its successors and assigns, and as more specifically defined below, the "**First Priority Representative**") for the First Priority Secured Parties (as defined below), WILMINGTON TRUST, NATIONAL ASSOCIATION, as Collateral Agent (in such capacity, with its successors and assigns, and as more specifically defined below, the "**Second Priority Representative**") for the Second Priority Secured Parties (as defined below), LEE ENTERPRISES, INCORPORATED (the "**Borrower**") and each of the other Loan Parties (as defined below) from time to time party hereto.

WHEREAS, the Borrower, the First Priority Representative and certain financial institutions and other entities are parties to the Exit Credit Agreement, dated as of the date hereof (as amended, supplemented, amended and restated or otherwise modified from time to time, the "**Existing First Priority Agreement**"), pursuant to which such financial institutions and other entities have agreed to make loans (or be deemed to have made) and extend other financial accommodations to the Borrower;

WHEREAS, the Borrower, the Second Priority Representative and certain financial institutions and other entities are parties to the Second Lien Loan Agreement, dated as of the date hereof (as amended, supplemented, amended and restated or otherwise modified from time to time, the "**Existing Second Priority Agreement**"), pursuant to which such financial institutions and other entities have agreed to make (or be deemed to have made) loans to the Borrower;

WHEREAS, pursuant to that certain Subsidiaries Guaranty, dated as of the date hereof (as amended, supplemented, amended and restated or otherwise modified from time to time, the "**First Priority Guaranty Agreement**") the Loan Parties have guaranteed the obligations under the Existing First Priority Agreement, and pursuant to the First Priority Security Documents the Borrower and the other Loan Parties have granted to the First Priority Representative security interests in the Common Collateral as security for payment and performance of the First Priority Obligations;

WHEREAS, pursuant to that certain Subsidiaries Guaranty, dated as of the date hereof (as amended, supplemented, amended and restated or otherwise modified from time to time, the "**Second Priority Guaranty Agreement**") the Loan Parties (and certain other subsidiaries of the Borrower which are not Loan Parties and are not subject to the arrangements hereunder) have guaranteed the obligations under the Existing Second Priority Agreement, and pursuant to the Second Priority Security Documents the Borrower and the other Loan Parties have granted to the Second Priority Representative junior security interests in the Common Collateral as security for payment and performance of the Second Priority Obligations; and

WHEREAS, the First Priority Creditors under the Existing First Priority Agreement have agreed to permit the grant of such junior security interests in the Common Collateral on the terms and conditions of this Agreement.

NOW THEREFORE, in consideration of the foregoing and the mutual covenants herein contained and other good and valuable consideration, the existence and sufficiency of which are expressly recognized by all of the parties hereto, the parties agree as follows:

## SECTION 1. *Definitions.*

1.1.    <u>Defined Terms</u>.  The following terms, as used herein, have the following meanings:

"**Agreement**" has the meaning set forth in the introductory paragraph hereof.

"**Bankruptcy Code**" means the United States Bankruptcy Code (11 U.S.C. §101 et seq.), as amended from time to time.

"**Borrower**" has the meaning set forth in the introductory paragraph hereof.

"**Cash Collateral**" has the meaning set forth in Section 3.6(c).

"**Common Collateral**" means all assets that are both First Priority Collateral and Second Priority Collateral.

"**Comparable Second Priority Security Document**" means, in relation to any Common Collateral subject to any First Priority Security Document, that Second Priority Security Document that creates a security interest in the same Common Collateral, granted by the same Loan Party, as applicable.

"**DIP Financing**" has the meaning set forth in Section 5.2.

"**Enforcement Action**" means, with respect to the First Priority Obligations or the Second Priority Obligations the exercise of any rights and remedies with respect to any Common Collateral securing such obligations or the commencement or prosecution of enforcement of any of the rights and remedies with respect to the Common Collateral under, as applicable, the First Priority Documents or the Second Priority Documents, or applicable law, including without limitation (a) the exercise of any rights of set-off or recoupment, (b) the exercise of any rights or remedies of a secured creditor under the Uniform Commercial Code of any applicable jurisdiction or under the Bankruptcy Code, and (c) the commencement of any judicial or nonjudicial foreclosure proceedings with respect to, attempting any action to take possession of, any Common Collateral, or exercising any right, remedy or power with respect to, or otherwise taking any action to enforce their interest in or realize upon, the Common Collateral.

"**Enforcement Notice**" has the meaning set forth in Section 3.6(a).

"**Existing First Priority Agreement**" has the meaning set forth in the recitals to this Agreement.

"**Existing Second Priority Agreement**" has the meaning set forth in the recitals to this Agreement.

"**First Priority Agreement**" means the collective reference to (a) the Existing First Priority Agreement and (b) any other credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement or instrument evidencing or governing the terms of any indebtedness (or guarantee thereof) or other financial accommodation that has been incurred to extend, increase, renew, refund, replace (whether upon or after termination or otherwise) or refinance (including by means of sales of debt securities to institutional investors) in whole or in part from time to time the indebtedness and other obligations outstanding (contingent or otherwise) under the Existing First Priority Agreement or any other agreement or instrument referred to in this clause (b) unless such agreement or instrument expressly provides that it is not intended to be and is not a First Priority Agreement hereunder (a "**Replacement First Priority Agreement**").  Any reference to the First Priority Agreement hereunder shall be deemed a reference to any First Priority Agreement then extant.

"**First Priority Collateral**" means all assets, whether now owned or hereafter acquired by the Borrower or any other Loan Party, in which a Lien is granted or purported to be granted to any First Priority Secured Party as security for any First Priority Obligation.

"**First Priority Creditors**" means the "Secured Creditors" as defined in the Existing First Priority Agreement, the "Lenders" as defined in each other First Priority Agreement or any Persons that are designated under the First Priority Agreement as the "First Priority Creditors" for purposes of this Agreement.

"**First Priority Documents**" means the First Priority Agreement, each First Priority Security Document and each First Priority Guaranty.

"**First Priority Guaranty**" means any guarantee by any Loan Party of any or all of the First Priority Obligations, including, without limitation, pursuant to the First Priority Guaranty Agreement.

"**First Priority Guaranty Agreement**" has the meaning set forth in the recitals to this Agreement.

"**First Priority Lien**" means any Lien created by the First Priority Security Documents, solely to the extent in respect of any asset of any Loan Party.

"**First Priority Obligations**" means (a) with respect to the Existing First Priority Agreement, all "Obligations" of each Loan Party as defined in the First Priority Security Documents and (b) with respect to each other First Priority Agreement, (i) all principal of, and interest (including without limitation any Post-Petition Interest) and premium (if any) on, all loans made or other indebtedness (contingent or otherwise) of any Loan Party issued or incurred pursuant to the First Priority Agreement, (ii) all reimbursement obligations (if any) and interest thereon (including without limitation any Post-Petition Interest) with respect to any letter of credit or similar instruments issued pursuant to the First Priority Agreement, (iii) all Hedging Obligations and (iv) all guarantee obligations of, or fees, expenses and other amounts payable by any Loan Party from time to time pursuant to the First Priority Documents, in each case whether or not allowed or allowable in an Insolvency Proceeding. To the extent any payment with respect to any First Priority Obligation (whether by or on behalf of any Loan Party, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any Second Priority Secured Party, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of this Agreement and the rights and obligations of the First Priority Secured Parties and the Second Priority Secured Parties, be deemed to be reinstated and outstanding as if such payment had not occurred.

Notwithstanding the foregoing contained in this defined term of First Priority Obligations, if the sum of (1) the principal amount outstanding under the Existing First Priority Agreement and each other First Priority Agreement, plus (2) the aggregate undrawn face amount of any outstanding letters of credit under the Existing First Priority Agreement and each other First Priority Agreement and any unreimbursed drawings of any letters of credit issued under the Existing First Priority Agreement and each other First Priority Agreement (such sum, the "**First Priority Outstanding Amount**") exceeds the Maximum First Priority Amount, then only that portion of the First Priority Outstanding Amount equal to the Maximum First Priority Amount shall be included in First Priority Obligations and interest and reimbursement obligations with respect to the First Priority Outstanding Amount shall only constitute First Priority Obligations to the extent related to the First Priority Outstanding Amount.

"**First Priority Obligations Payment Date**" means the first date on which (a) the First Priority Obligations (other than those that constitute Unasserted Contingent Obligations) have been paid in cash in full (or cash collateralized or defeased in accordance with the terms of the First Priority Documents), (b) all commitments to extend credit under the First Priority Documents have been terminated or expired, (c) there are no outstanding letters of credit or similar instruments issued under the First Priority Documents (other than such as have been cash collateralized or defeased in accordance with the terms of the First Priority Documents, but in no event greater than 105% of the aggregate undrawn face amount thereof) and (d) the First Priority Representative shall have either (x) delivered  written notice to the Second Priority Representative or any other Second Priority Secured Party of the occurrence of the events described in clauses (a), (b) and (c) hereinabove or (y) failed to timely comply with its notice obligation under Section 3.9 hereof.

"**First Priority Outstanding Amount**" has the meaning set forth in the definition of "First Priority Obligations".

"**First Priority Representative**" has the meaning set forth in the introductory paragraph hereof. In the case of any Replacement First Priority Agreement, the First Priority Representative shall be the Person identified as such in such Agreement.

"**First Priority Secured Parties**" means the First Priority Representative, the First Priority Creditors and any other holders of the First Priority Obligations.

"**First Priority Security Documents**" means the "Security Documents" as defined in the First Priority Agreement, and any other documents that are designated under the First Priority Agreement as "First Priority Security Documents" for purposes of this Agreement.

"**Hedging Obligations**" means, with respect to any Loan Party, any monetary obligations of such Loan Party owed to any First Priority Creditor in respect of (i) any interest rate swap agreement, interest rate cap agreement, interest collar agreement, interest rate hedging agreement or other similar agreement or arrangement and (ii) any foreign exchange contracts, currency swap agreements, commodity agreements or other similar arrangements, or arrangements designed to protect against fluctuations in currency values or commodity prices, including, in each case, interest and Post-Petition Interest thereon.

"**Insolvency Proceeding**" means any proceeding in respect of bankruptcy, insolvency, winding up, receivership, dissolution or assignment for the benefit of creditors, in each of the foregoing events whether under the Bankruptcy Code or any similar federal, state or foreign bankruptcy, insolvency, reorganization, receivership or similar law, in each case to the extent in respect of any Loan Party.

"**Lien**" means any mortgage, pledge, hypothecation, assignment, encumbrance, lien (statutory or other), or other security interest or security agreement of any kind (including, without limitation, any conditional sale or other title retention agreement, any financing or similar statement or notice filed under the Uniform Commercial Code or any other similar recording or notice statute, and any lease having substantially the same effect as any of the foregoing) and any attachment or judgment lien contemplated in Section 3.3.

"**Loan Party**" means the Borrower and each direct or indirect subsidiary of the Borrower (other than any Pulitzer Entity), in each case to the extent, and during such time as, such person is a party to any First Priority Security Document or is a party to any Second Priority Security Document.  All references

in this Agreement to any Loan Party shall include such Loan Party as a debtor-in-possession and any receiver or trustee for such Loan Party in any Insolvency Proceeding.

"**Maximum First Priority Amount**" means the aggregate amount of revolving commitments and term loans outstanding on the date hereof (after giving effect to the transactions contemplated to occur on the date hereof) under the Existing First Priority Agreement (which amount, for the avoidance of doubt, is $750,000,000[1]) less the aggregate amount of all mandatory payments of the principal of the term loans and all permanent reductions of the Revolving Credit Commitments (as defined in the Existing First Priority Agreement) made pursuant to the Existing First Priority Agreement and each other First Priority Agreement, in each case resulting from any asset sales or recovery events of the Borrower or any other Loan Parties.

"**Person**" means any individual, partnership, joint venture, firm, corporation, association, trust or other enterprise or any government or political subdivision or any agency, department or instrumentality thereof.

"**Post-Petition Interest**" means any interest or entitlement to fees or expenses or other charges that accrues after the commencement of any Insolvency Proceeding, whether or not allowed or allowable in any such Insolvency Proceeding.

"**Pulitzer Entities**" means, collectively, Pulitzer, Inc. and each of its direct or indirect subsidiaries.

"**Purchase**" has the meaning set forth in Section 3.6.

"**Purchase Notice**" has the meaning set forth in Section 3.6.

"**Purchase Price**" has the meaning set forth in Section 3.6.

"**Purchaser**" has the meaning set forth in Section 3.6.

"**Purchasing Parties**" has the meaning set forth in Section 3.6.

"**Replacement First Priority Agreement**" has the meaning set forth in the definition of "First Priority Agreement."

"**Second Priority Agreement**" means the collective reference to (a) the Existing Second Priority Agreement and (b) any other credit agreement, loan agreement, note agreement, promissory note, indenture, or other agreement or instrument evidencing or governing the terms of any indebtedness (or guarantee thereof) or other financial accommodation that has been incurred to extend, increase, renew, refund, replace (whether upon or after termination or otherwise) or refinance (including by means of sales of debt securities to institutional investors) in whole or in part from time to time the indebtedness and other obligations outstanding (contingent or otherwise) under the Existing Second Priority Agreement or any other agreement or instrument referred to in this clause (b). Any reference to the Second Priority Agreement hereunder shall be deemed a reference to any Second Priority Agreement then extant.

---

[1] May be increased up to a maximum of $766,250,000 by increasing such amount to the extent the amount outstanding under the Second Priority Agreement as of the date hereof is less than $175,000,000.

"**Second Priority Collateral**" means all assets, whether now owned or hereafter acquired by the Borrower or any other Loan Party, in which a Lien is granted or purported to be granted to any Second Priority Secured Party as security for any Second Priority Obligation.

"**Second Priority Creditors**" means the "Secured Creditors" as defined in the Existing Second Priority Agreement, the "Lenders" as defined in each other Second Priority Agreement, or any Persons that are designated under the Second Priority Agreement as the "Second Priority Creditors" for purposes of this Agreement.

"**Second Priority Documents**" means each Second Priority Agreement, each Second Priority Security Document and each Second Priority Guaranty.

"**Second Priority Guaranty**" means any guarantee by any Loan Party of any or all of the Second Priority Obligations, including, without limitation, pursuant to the Second Priority Guaranty Agreement.

"**Second Priority Guaranty Agreement**" has the meaning set forth in the recitals to this Agreement.

"**Second Priority Lien**" means any Lien created by the Second Priority Security Documents solely to the extent in respect of any asset of any Loan Party.

"**Second Priority Obligations**" means (a) with respect to the Existing Second Priority Agreement, all "Obligations" of each Loan Party as defined in the Second Priority Security Documents and (b) with respect to each other Second Priority Agreement, (i) all principal of, and interest (including without limitation any Post-Petition Interest) and premium (if any) on, all indebtedness (contingent or otherwise) of any Loan Party under the Second Priority Agreement, and (ii) all guarantee obligations of, or fees, expenses and other amounts payable by, any Loan Party from time to time pursuant to the Second Priority Documents, in each case whether or not allowed or allowable in an Insolvency Proceeding.  To the extent any payment with respect to any Second Priority Obligation (whether by or on behalf of any Loan Party, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any First Priority Secured Party, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of this Agreement and the rights and obligations of the First Priority Secured Parties and the Second Priority Secured Parties, be deemed to be reinstated and outstanding as if such payment had not occurred.

"**Second Priority Representative**" has the meaning set forth in the introductory paragraph hereof, but shall also include any Person identified as a "Second Priority Representative" in any Second Priority Agreement other than the Existing Second Priority Agreement.

"**Second Priority Required Adequate Protection**" has the meaning set forth in Section 5.4.

"**Second Priority Secured Party**" means the Second Priority Representative, the Second Priority Creditors and any other holders of the Second Priority Obligations.

"**Second Priority Security Documents**" means the "Security Documents" as defined in the Second Priority Agreement and any documents that are designated under the Second Priority Agreement as "Second Priority Security Documents" for purposes of this Agreement.

"**Secured Parties**" means the First Priority Secured Parties and the Second Priority Secured Parties.

"**Standstill Period**" has the meaning set forth in Section 3.2.

"**Surviving Obligations**" has the meaning set forth in Section 3.6(b).

"**Unasserted Contingent Obligations**" shall mean, at any time, First Priority Obligations for taxes, costs, indemnifications, reimbursements, damages and other liabilities (excluding (a) the principal of, and interest and premium (if any) on, and fees and expenses relating to, any First Priority Obligation and (b) contingent reimbursement obligations in respect of amounts that may be drawn under outstanding letters of credit) in respect of which no assertion of liability (whether oral or written) and no claim or demand for payment (whether oral or written) has been made (and, in the case of First Priority Obligations for indemnification, no notice for indemnification has been issued by the indemnitee) at such time.

"**Uniform Commercial Code**" shall mean the Uniform Commercial Code as in effect from time to time in the applicable jurisdiction.

1.2    Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (i) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (to the extent applicable, in accordance with Section 6), (ii) any reference herein to any Person shall be construed to include such Person's successors or permitted assigns, (iii) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Sections shall be construed to refer to Sections of this Agreement and (v) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

**SECTION 2**.  Lien Priorities.

2.1    Subordination of Liens.  (a)  Any and all Liens on assets of any Loan Party now existing or hereafter created or arising in favor of any Second Priority Secured Party securing the Second Priority Obligations, regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise are expressly junior in priority, operation and effect to any and all Liens on assets of any Loan Party now existing or hereafter created or arising in favor of the First Priority Secured Parties securing the First Priority Obligations, notwithstanding (i) anything to the contrary contained in any agreement or filing to which any Second Priority Secured Party may now or hereafter be a party, and regardless of the time, order or method of grant, attachment, recording or perfection of any financing statements or other security interests, assignments, pledges, deeds, mortgages and other liens, charges or encumbrances or any defect or deficiency or alleged defect or deficiency in any of the foregoing, (ii) any provision of the Uniform Commercial Code or any applicable law or any First Priority Document or Second Priority Document or any other circumstance whatsoever and (iii) the fact that any such Liens on assets of any Loan Party in favor of any First Priority Secured Party securing any of the First Priority Obligations are

(x) subordinated to any Lien securing any obligation of any Loan Party other than the Second Priority Obligations or (y) otherwise subordinated, voided, avoided, invalidated or lapsed.

(b)  The First Priority Representative, on behalf of itself and the other First Priority Secured Parties, acknowledges and agrees that the Second Priority Representative on behalf of itself and the other Second Priority Secured Parties, has been granted Liens upon all of the Common Collateral, and the First Priority Representative, on behalf of itself and the other First Priority Secured Parties, hereby consents thereto.  The subordination of its Liens on assets of the Loan Parties by the Second Priority Representative in favor of the First Priority Liens on such assets shall not be deemed to subordinate any Liens of the Second Priority Representative (or any Second Priority Secured Party) to any Liens other than (x) the First Priority Liens on such assets securing the First Priority Obligations and (y) Liens that are permitted under the First Priority Documents and the Second Priority Documents to be senior to the First Priority Liens and the Second Priority Liens.

2.2    Nature of First Priority Obligations.  The Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties, acknowledges that a portion of the First Priority Obligations represents debt that is revolving in nature and that the amount thereof that may be outstanding at any time or from time to time may be increased or reduced and subsequently reborrowed, and that the terms of the First Priority Obligations may be modified, extended or amended from time to time, and that the aggregate amount of the First Priority Obligations may be increased, replaced or refinanced, in each event, without notice to or consent by the Second Priority Secured Parties and without affecting the provisions hereof but only so long as any such obligations are permitted to be incurred pursuant to the terms hereof or of the Second Priority Documents as in effect on the date of this Agreement.  The lien priorities provided in Section 2.1 shall not be altered or otherwise affected by any such amendment, modification, supplement, extension, repayment, reborrowing, increase, replacement, renewal, restatement or refinancing of either the First Priority Obligations or the Second Priority Obligations, or any portion thereof.

2.3    Agreements Regarding Actions to Perfect Liens.  (a)  The Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties, agrees that each patent, trademark or copyright filing or other filings or recordings (other than Uniform Commercial Code financing statements) filed or recorded by or on behalf of the Second Priority Representative in respect of applicable Common Collateral shall, to the extent reasonably practicable, contain the following notation: "The lien created hereby on the property described herein is junior and subordinate to the lien on such property created by any agreement, filing or recording now or hereafter granted to Deutsche Bank Trust Company Americas, as Collateral Agent (under the First Priority Documents), and its successors and assigns, in such property, in accordance with the provisions of the Intercreditor Agreement dated as of [_____], among DEUTSCHE BANK TRUST COMPANY AMERICAS, as First Priority Representative, WILMINGTON TRUST, NATIONAL ASSOCIATION, as Second Priority Representative, LEE ENTERPRISES, INCORPORATED, as Borrower, and the other Loan Parties referred to therein, as amended from time to time."

(b) The Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties, agrees that all mortgages, deeds of trust, deeds and similar instruments now or hereafter filed against real property comprising Common Collateral in favor of or for the benefit of the Second Priority Representative and the other Second Priority Secured Parties shall contain the following notation:  "The lien created by this mortgage on the property described herein is junior and subordinate to the lien on such property created by any mortgage, deed of trust or similar instrument now or hereafter granted to DEUTSCHE BANK TRUST COMPANY AMERICAS, as Collateral Agent (under the First Priority

Documents), and its successors and assigns, in such property, in accordance with the provisions of the Intercreditor Agreement dated as of [_____], among DEUTSCHE BANK TRUST COMPANY AMERICAS, as First Priority Representative, WILMINGTON TRUST, NATIONAL ASSOCIATION, as Second Priority Representative, LEE ENTERPRISES, INCORPORATED, as Borrower, and the other Loan Parties referred to therein, as amended from time to time."

(c)    The First Priority Representative hereby acknowledges and agrees that, to the extent that it holds, or a third party holds on its behalf, physical possession of or "control" (as defined in the Uniform Commercial Code) over Common Collateral pursuant to the First Priority Security Documents, such possession or control is also for the benefit of, and the First Priority Representative or such third party holds such possession or control as bailee and agent for, the Second Priority Representative and the other Second Priority Secured Parties solely to the extent required to perfect their security interest in such Common Collateral (such bailment and agency for perfection being intended, among other things, to satisfy the requirements of sections 8-301(a)(2) and 9-313(c) of the Uniform Commercial Code).  Nothing in the preceding sentence shall be construed to impose any duty on the First Priority Representative (or any third party acting on its behalf) with respect to such Common Collateral or provide the Second Priority Representative or any other Second Priority Secured Party with any rights with respect to such Common Collateral beyond those specified in this Agreement and the Second Priority Security Documents, provided that as soon as practicable after the occurrence of the events described in clauses (a), (b) and (c) of the definition of the First Priority Obligations Payment Date, the First Priority Representative shall (i) deliver, at the Borrower's sole cost and expense, the Common Collateral in its possession or control together with any necessary endorsements (x) first, to the Second Priority Representative to the extent any Second Priority Obligations remain outstanding and (y) second, to the Borrower to the extent no First Priority Obligations or Second Priority Obligations remain outstanding, or (ii) direct and deliver such Common Collateral as a court of competent jurisdiction otherwise directs, and provided, further, that the provisions of this Agreement are intended solely to govern the respective Lien priorities as between the First Priority Secured Parties and the Second Priority Secured Parties and shall not impose on the First Priority Secured Parties any obligations in respect of the disposition of any Common Collateral (or any proceeds thereof) that would conflict with prior perfected Liens or any claims thereon in favor of any other Person that is not a Secured Party.

(d)      To the extent that any deposit account or securities account of any Loan Party is subject to a control agreement in favor of the First Priority Representative, the First Priority Representative will act as bailee and agent for the Second Priority Representative solely to the extent required to perfect the Liens of the Second Priority Secured Parties in such deposit accounts and securities accounts and the cash and other assets therein.  Nothing in the preceding sentence shall be construed to impose any duty on the First Priority Representative (or any third party acting on its behalf) with respect to such Common Collateral or provide the Second Priority Representative or any other Second Priority Secured Party with any rights with respect to such Common Collateral beyond those specified in this Agreement and the Second Priority Security Documents.  Unless the Second Priority Liens on such First Priority Collateral shall have been or concurrently are released, after the First Priority Obligations Payment Date, the First Priority Representative shall cooperate with the Loan Parties and the Second Priority Representative (at the expense of the Loan Parties) in permitting control of any deposit accounts and securities accounts to be transferred to the Second Priority Representative (or for other arrangements with respect to each such deposit account and securities account reasonably satisfactory to the Second Priority Representative and in accordance with the Second Priority Documents to be made).

2.4    No New Liens.  So long as the First Priority Obligations Payment Date has not occurred, whether or not an Insolvency Proceeding has been commenced by or against any Loan Party the parties hereto agree that (a) there shall be no Lien, and no Loan Party shall have any right to create any Lien, on any assets of any Loan Party securing any Second Priority Obligation if these same assets are not subject to, and do not become subject to, a Lien securing the First Priority Obligations and (b) there shall be no Lien, and no Loan Party shall have any right to create any Lien, on any assets of any Loan Party securing any First Priority Obligation if these same assets are not subject to, and do not become subject to, a Lien securing the Second Priority Obligations.  To the extent that the foregoing provisions are not complied with for any reason, without limiting any other rights and remedies available to the First Priority Secured Parties, the Second Priority Representative and the other Second Priority Secured Parties agree that any amounts received by or distributed to any of them pursuant to or as a result of Liens granted in contravention of this Section 2.4 shall be subject to Section 4.1.

2.5    Prohibition on Contesting Liens.  Each of the Second Priority Representative, for itself and on behalf of each of the Second Priority Secured Parties, and the First Priority Representative, for itself and on behalf of each of the First Priority Secured Parties, agrees that it will not (and hereby waives any right to) object to or contest or support any other Person in objecting to or contesting, in any proceeding (including without limitation, any Insolvency Proceeding), the validity, extent, perfection, priority or enforceability of a Lien held by or on behalf of any of the First Priority Secured Parties in the First Priority Collateral or by or on behalf of any of the Second Priority Secured Parties in the Second Priority Collateral, as the case may be, or the provisions of this Agreement; provided, that nothing in this Agreement shall be construed to prevent or impair the rights of the First Priority Representative, any First Priority Secured Party, the Second Priority Representative or any Second Priority Secured Party to enforce this Agreement, including the provisions of this Agreement relating to the priority of the Liens securing the First Priority Obligations as provided in Sections 2.1 and 3.1.  Notwithstanding any failure by any First Priority Secured Party or Second Priority Secured Party to perfect its security interests in the Common Collateral or any avoidance, invalidation or subordination by any third party or court of competent jurisdiction of the security interests in the Common Collateral granted to the First Priority Secured Parties or the Second Priority Secured Parties, the priority and rights as between the First Priority Secured Parties and the Second Priority Secured Parties with respect to the Common Collateral shall be as set forth herein.

**SECTION 3**.  *Enforcement Rights.*

3.1    Exclusive Enforcement. Until the First Priority Obligations Payment Date has occurred, whether or not an Insolvency Proceeding has been commenced by or against any Loan Party, the First Priority Secured Parties shall have the exclusive right to take and continue any Enforcement Action with respect to the Common Collateral, without any consultation with or consent of any Second Priority Secured Party, but subject to the provisos set forth in Sections 3.2 and 5.1.  Upon the occurrence and during the continuance of a default or an event of default under the First Priority Documents, the First Priority Representative and the other First Priority Secured Parties may take and continue any Enforcement Action with respect to the First Priority Obligations and the Common Collateral in such order and manner as they may determine in their sole discretion.

3.2    Standstill and Waivers.  The Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties, agrees that, until the First Priority Obligations Payment Date has occurred, subject to the proviso set forth in Section 5.1:

(a)  they will not take or cause to be taken any Enforcement Action;

(b)  they will not take or cause to be taken any action, the purpose or effect of which is to make any Lien in respect of any Second Priority Obligation pari passu with or senior to, or to give any Second Priority Secured Party any preference or priority relative to, the Liens with respect to the First Priority Obligations or the First Priority Secured Parties with respect to any of the Common Collateral;

(c)  they will not contest, oppose, object to, interfere with, hinder or delay, in any manner, whether by judicial proceedings (including without limitation the filing of an Insolvency Proceeding in respect of any Loan Party) or otherwise, any foreclosure, sale, lease, exchange, transfer or other disposition of the Common Collateral by any First Priority Secured Party or any other Enforcement Action taken (or any forbearance from taking any Enforcement Action) by or on behalf of any First Priority Secured Party;

(d)  they have no right to (i) direct either the First Priority Representative or any other First Priority Secured Party to exercise any right, remedy or power with respect to the Common Collateral or pursuant to the First Priority Security Documents or (ii) consent or object to the exercise by the First Priority Representative or any other First Priority Secured Party of any right, remedy or power with respect to the Common Collateral or pursuant to the First Priority Security Documents or to the timing or manner in which any such right is exercised or not exercised (or, to the extent they may have any such right described in this clause (d), whether as a junior lien creditor or otherwise, they hereby irrevocably waive such right);

(e)  they will not institute any suit or other proceeding or assert in any suit, Insolvency Proceeding or other proceeding any claim against any First Priority Secured Party seeking damages from or other relief by way of specific performance, injunction or otherwise, with respect to, and no First Priority Secured Party shall be liable for, any action taken or omitted to be taken by any First Priority Secured Party with respect to the Common Collateral or pursuant to the First Priority Documents; and

(f)  they will not seek, and hereby waive any right, to have the Common Collateral or any part thereof marshaled upon any foreclosure or other disposition of the Common Collateral.

provided that, notwithstanding the foregoing, any Second Priority Secured Party may exercise its rights and remedies in respect of Common Collateral under the Second Priority Security Documents or applicable law after the passage of a period of 150 days (the "**Standstill Period**") from the first date of delivery of a notice in writing to the First Priority Representative and the Borrower of any Second Priority Secured Party's intention to exercise such rights and remedies in respect of Common Collateral, which notice may only be delivered following the occurrence of and during the continuance of an "Event of Default" under and as defined in the Second Priority Agreement; provided, further, however, that, notwithstanding the foregoing, in no event shall any Second Priority Secured Party exercise or continue to exercise any such rights or remedies if, notwithstanding the expiration of the Standstill Period, (i) any First Priority Secured Party shall have commenced and be diligently pursuing in good faith the exercise of any of its rights and remedies with respect to all or any material portion of the Common Collateral or (ii) an Insolvency Proceeding in respect of any Loan Party shall have been commenced; and provided, further, that in any Insolvency Proceeding commenced by or against any Loan Party, the Second Priority Representative and the Second Priority Secured Parties may take any action expressly permitted by Section 5.

Notwithstanding the foregoing contained in this Section 3.2, the Second Priority Representative and the Second Priority Secured Parties may:

(1)     take any action (not adverse to the priority status of the Liens on the Common Collateral, or the rights of any First Priority Representative or the First Priority Secured Parties to exercise remedies in respect thereof or the agreements set forth in Section 2) in order to create, perfect, preserve or protect its Lien on the Common Collateral;

(2)     file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any Person objecting to or otherwise seeking the disallowance of the claims of the Second Priority Secured Parties, including any claims secured by the Common Collateral, if any, in each case in a manner that is not inconsistent with, or in contravention of, the express terms of this Agreement;

(3)     file any pleadings, objections, motions or agreements or take any positions that assert rights or interests available to unsecured creditors of the Loan Parties arising under either any Insolvency Proceeding or applicable non-bankruptcy law, in each case in a manner that is not inconsistent with, or in contravention of, the express terms of this Agreement;

(4)     vote on any plan of reorganization, file any proof of claim or statement of interest, make other filings and make any arguments and motions that are, in each case, in a manner that is not inconsistent with, or in contravention of, the express terms of this Agreement, with respect to the Second Priority Obligations and the Common Collateral;

(5)     exercise any of its rights or remedies with respect to the Common Collateral after the termination of the Standstill Period to the extent permitted by this Section 3.2;

(6)     present a cash or credit bid (in the case of any such credit bid, so long as such bid provides for payment in full of the First Priority Obligations and the occurrence of the events described in clauses (a), (b) and (c) of the definition of the First Priority Obligations Payment Date) at any section 363 hearing or with respect to any other Common Collateral disposition; and

(7)     bid for or purchase Common Collateral at any private or judicial foreclosure upon such Common Collateral initiated by the First Priority Representative or any of the First Priority Secured Parties.

3.3     <u>Judgment Creditors</u>.  In the event that any Second Priority Secured Party becomes a judgment lien creditor as a result of its enforcement of its rights as an unsecured creditor, such judgment lien shall be subject to the terms of this Agreement for all purposes (including in relation to the First Priority Liens and the First Priority Obligations) to the same extent as all other Liens securing the Second Priority Obligations are subject to the terms of this Agreement.

3.4     <u>No Additional Rights For the Loan Parties Hereunder</u>.  Except as provided in Section 3.5, if any First Priority Secured Party or Second Priority Secured Party shall enforce its rights or remedies in violation of the terms of this Agreement, no Loan Party shall be entitled to use such violation as a defense to any action by any First Priority Secured Party or Second Priority Secured Party, nor to assert such violation as a counterclaim or basis for set off or recoupment against any First Priority Secured Party or Second Priority Secured Party.

      3.5    <u>Actions Upon Breach</u>.  (a)  If any Second Priority Secured Party, contrary to this Agreement, commences or participates in any action or proceeding against any Loan Party or the Common Collateral, such Loan Party, with the prior written consent of the First Priority Representative, may interpose as a defense or dilatory plea the making of this Agreement, and any First Priority Secured Party may intervene and interpose such defense or plea in its or their name or in the name of such Loan Party.

      (b)  Should any Second Priority Secured Party, contrary to this Agreement, in any way take, attempt to or threaten to take any action with respect to the Common Collateral (including, without limitation, any attempt to realize upon or enforce any remedy with respect to this Agreement), or fail to take any action required by this Agreement, any First Priority Secured Party (in its own name or in the name of the relevant Loan Party) or the relevant Loan Party may obtain relief against such Second Priority Secured Party by injunction, specific performance and/or other appropriate equitable relief, it being understood and agreed by the Second Priority Representative on behalf of each Second Priority Secured Party that (i) the First Priority Secured Parties' damages from its actions may at that time be difficult to ascertain and may be irreparable, and (ii) each Second Priority Secured Party waives any defense that the Loan Parties and/or the First Priority Secured Parties cannot demonstrate damage and/or be made whole by the awarding of damages.

      3.6    <u>Option to Purchase</u>.  (a)  The First Priority Representative agrees that it will give the Second Priority Representative written notice (the "**Enforcement Notice**") within five business days after commencing any Enforcement Action with respect to Common Collateral or the institution of any Insolvency Proceeding (which notice shall be effective for all Enforcement Actions taken after the date of such notice so long as the First Priority Representative is diligently pursuing in good faith the exercise of its default or enforcement rights or remedies against, or diligently attempting in good faith to vacate any stay of enforcement rights of its senior Liens on a material portion of the Common Collateral, including, without limitation, all Enforcement Actions identified in such notice).  Following the commencement of an Enforcement Action or the institution of any Insolvency Proceeding by the First Priority Representative or any other First Priority Secured Party, any Second Priority Secured Party shall have the option, by irrevocable written notice (the "**Purchase Notice**") delivered by the Second Priority Representative to the First Priority Representative no later than five business days after receipt by the Second Priority Representative of the Enforcement Notice, to purchase all of the First Priority Obligations from the First Priority Secured Parties.  If the Second Priority Representative so delivers the Purchase Notice, the First Priority Representative shall terminate any existing Enforcement Actions, and shall not take any further Enforcement Actions, <u>provided</u>, that the Purchase (as defined below) shall have been consummated on the date specified in the Purchase Notice in accordance with this Section 3.6.

      (b)    On the date specified by the Second Priority Representative in the Purchase Notice (which shall be a business day not less than five business days, nor more than ten business days, after receipt by the First Priority Representative of the Purchase Notice), the First Priority Secured Parties shall, subject to any required approval of any court or other governmental authority then in effect, sell to the Second Priority Secured Parties electing to purchase pursuant to Section 3.6(a) (the "**Purchasing Parties**"), and the Purchasing Parties shall purchase (the "**Purchase**") from the First Priority Secured Parties, the First Priority Obligations; <u>provided</u>, that the First Priority Obligations purchased shall not include any rights of First Priority Secured Parties with respect to indemnification and other obligations of the Loan Parties under the First Priority Documents that are expressly stated to survive the termination of the First Priority Documents (the "**Surviving Obligations**").

(c)    Without limiting the obligations of the Loan Parties under the First Priority Documents to the First Priority Secured Parties with respect to the Surviving Obligations (which shall not be transferred in connection with the Purchase), on the date of the Purchase, the Purchasing Parties shall (i) pay to the First Priority Secured Parties as the purchase price (the "**Purchase Price**") therefor the full amount of all First Priority Obligations then outstanding and unpaid (including principal, interest (including, to the extent applicable, interest at the default rate), Post-Petition Interest, fees, breakage costs, attorneys' fees and expenses, and, in the case of any Hedging Obligations, the amount that would be payable by the relevant Loan Party thereunder if it were to terminate such Hedging Obligations on the date of the Purchase or, if not terminated, an amount determined by the relevant First Priority Secured Party to be necessary to collateralize its credit risk arising out of such Hedging Obligations), (ii) furnish cash collateral (the "**Cash Collateral**") to the First Priority Secured Parties in such amounts as the relevant First Priority Secured Parties determine is reasonably necessary to secure such First Priority Secured Parties in connection with any outstanding letters of credit (not to exceed 105% of the aggregate undrawn face amount of such letters of credit), (iii) agree to reimburse the First Priority Secured Parties for any loss, cost, damage or expense (including attorneys' fees and expenses) in connection with any fees, costs or expenses related to any checks or other payments provisionally credited to the First Priority Obligations and/or as to which the First Priority Secured Parties have not yet received final payment and (iv) agree, after written request from the First Priority Representative, to reimburse the First Priority Secured Parties in respect of indemnification obligations of the Loan Parties under the First Priority Documents as to matters or circumstances known to the Purchasing Parties at the time of the Purchase which could reasonably be expected to result in any loss, cost, damage or expense to any of the First Priority Secured Parties, <u>provided</u> that, in no event shall any Purchasing Party have any liability for such amounts in excess of proceeds of Common Collateral received by the Purchasing Parties.

(d)    The Purchase Price and Cash Collateral shall be remitted by wire transfer in immediately available funds to such account of the First Priority Representative as it shall designate to the Purchasing Parties.  The First Priority Representative shall, promptly following its receipt thereof, distribute the amounts received by it in respect of the Purchase Price to the First Priority Secured Parties in accordance with the First Priority Agreement.  Interest shall be calculated to but excluding the day on which the Purchase occurs if the amounts so paid by the Purchasing Parties to the account designated by the First Priority Representative are received in such account prior to 12:00 Noon, New York City time, and interest shall be calculated to and including such day if the amounts so paid by the Purchasing Parties to the account designated by the First Priority Representative are received in such account later than 12:00 Noon, New York City time.

(e)    The Purchase shall be made without representation or warranty of any kind by the First Priority Secured Parties as to the First Priority Obligations, the Common Collateral or otherwise and without recourse to the First Priority Secured Parties, except that the First Priority Secured Parties shall represent and warrant:  (i) the amount of the First Priority Obligations being purchased, (ii) that the First Priority Secured Parties own the First Priority Obligations free and clear of any liens or encumbrances and (iii) that the First Priority Secured Parties have the right to assign the First Priority Obligations and the assignment is duly authorized.

3.7    <u>Rights as Unsecured Creditors</u>.  The Second Priority Representative and the Second Priority Secured Parties may exercise rights and remedies available to unsecured creditors against the Loan Parties that have granted Liens to secure the Second Priority Obligations in accordance with the terms of the Second Priority Documents and applicable law to the extent that such exercise is not inconsistent with, or in contravention of, the express terms of this Agreement; <u>provided</u> that in the event that any Second Priority Secured Party becomes an attachment or a judgment Lien creditor in respect of

the Common Collateral as a result of its enforcement of its rights as an unsecured creditor with respect to the Second Priority Obligations, such attachment or judgment Lien shall be subject to the terms of this Agreement for all purposes (including in relation to the First Priority Obligations) as the other Liens on Common Collateral securing the Second Priority Obligations are subject to this Agreement.

3.8     Second Priority Interest, Principal, Etc.  Nothing in this Agreement shall prohibit the receipt by the Second Priority Representative or any Second Priority Secured Parties of payments (including in cash) of interest, principal and other amounts owed in respect of the Second Priority Obligations unless such receipt is (x) the direct or indirect result of the exercise by the Second Priority Representative or any Second Priority Secured Parties of rights or remedies with respect to, or enforcement of, any Lien on Common Collateral held by any of them, which exercise or enforcement is inconsistent with, or in contravention of, the express terms of this Agreement or (y) from the proceeds of an Enforcement Action required to be applied in accordance with Section 4.1 below.  Nothing in this Agreement impairs or otherwise adversely affects any rights or remedies the First Priority Representative or the First Priority Secured Parties may have with respect to the Common Collateral.

3.9     Notice By First Priority Representative.  The First Priority Representative shall render to Second Priority Representative written notice of the occurrence of the events described in clauses (a), (b) and (c) of the definition of "First Priority Obligations Payment Date" as soon as practicable (and in any event within two business days) following the occurrence thereof, provided that such notice shall not be required in connection with the consummation of a Replacement First Priority Agreement.

**SECTION 4**. *Application Of Proceeds Of Common Collateral; Dispositions And Releases Of Common Collateral; Inspection and Insurance.*

4.1     Application of Proceeds; Turnover Provisions.  All proceeds of Common Collateral (including without limitation any interest earned thereon) resulting from the sale, collection or other disposition of Common Collateral in connection with an Enforcement Action or the exercise by any First Priority Secured Party or any Second Priority Secured Party of any of its respective rights and remedies with respect to Common Collateral, whether or not pursuant to an Insolvency Proceeding, shall be distributed as follows: first to the First Priority Representative for application to the First Priority Obligations in accordance with the terms of the First Priority Documents, until the First Priority Obligations Payment Date has occurred and thereafter, to the Second Priority Representative for application in accordance with the Second Priority Documents.  Until the occurrence of the First Priority Obligations Payment Date, any Common Collateral, including without limitation any such Common Collateral constituting proceeds, that may be received by any Second Priority Secured Party in violation of this Agreement shall be segregated and held in trust and promptly paid over to the First Priority Representative, for the benefit of the First Priority Secured Parties, in the same form as received, with any necessary endorsements, and each Second Priority Secured Party hereby authorizes the First Priority Representative to make any such endorsements as agent for the Second Priority Representative (which authorization, being coupled with an interest, is irrevocable).

4.2     Releases of Second Priority Lien.  (a) Upon any release, sale or disposition of Common Collateral (other than in connection with the occurrence of the First Priority Obligations Payment Date) permitted pursuant to the terms of the First Priority Documents that results in the release of the First Priority Lien on any Common Collateral (excluding any sale or other disposition that is not permitted by the Second Priority Documents unless such sale or disposition is consummated in connection with an Enforcement Action or consummated after the institution of an Insolvency Proceeding in respect of any Loan Party), the Second Priority Lien on such Common Collateral (excluding any portion of the proceeds

of such Common Collateral remaining after the First Priority Obligations Payment Date occurs) shall be automatically and unconditionally released with no further consent or action of any Person.

(b)  The Second Priority Representative shall promptly execute and deliver such release documents and instruments and shall take such further actions as the First Priority Representative shall request to evidence any release of the Second Priority Lien described in paragraph (a).  The Second Priority Representative hereby appoints the First Priority Representative and any officer or duly authorized person of the First Priority Representative, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power of attorney in the place and stead of the Second Priority Representative and in the name of the Second Priority Representative or in the First Priority Representative's own name, from time to time, in the First Priority Representative's sole discretion, for the purposes of carrying out the terms of this Section 4.2, to take any and all appropriate action and to execute and deliver any and all documents and instruments as may be necessary or desirable to accomplish the purposes of this Section 4.2, including, without limitation, any financing statements, endorsements, assignments, releases or other documents or instruments of transfer (which appointment, being coupled with an interest, is irrevocable).

4.3     Inspection Rights and Insurance.  (a)  Any First Priority Secured Party and its representatives and invitees may at any time inspect, repossess, remove and otherwise deal with the Common Collateral in accordance with the terms of the First Priority Documents, and the First Priority Representative may advertise and conduct public auctions or private sales of the Common Collateral, in each case without notice to, the involvement of or interference by any Second Priority Secured Party or liability to any Second Priority Secured Party; provided that the First Priority Representative shall provide the Second Priority Representative with notice of any sales.

(b)  Until the First Priority Obligations Payment Date has occurred, the First Priority Representative will have the sole and exclusive right (i) to be named as additional insured and loss payee under any insurance policies maintained from time to time by any Loan Party (except that the Second Priority Representative shall have the right to be named as additional insured and loss payee so long as its second lien status is identified in a manner satisfactory to the First Priority Representative); (ii) to adjust or settle any insurance policy or claim covering the Common Collateral in the event of any loss thereunder in accordance with the terms of the First Priority Documents; (iii) to approve any award granted in any condemnation or similar proceeding affecting the Common Collateral in accordance with the terms of the First Priority Documents; and (iv) to apply the proceeds of any insurance or condemnation award to the First Priority Obligations in accordance with the terms of the First Priority Documents.

4.4     Subrogation.  With respect to the value of any payments or distributions in cash, property or other assets that any Second Priority Secured Party pays over to the First Priority Secured Parties under the terms of this Agreement, the Second Priority Secured Parties shall be subrogated to the rights of the First Priority Secured Parties; provided that, the Second Priority Representative, on behalf of itself and the Second Priority Creditors, hereby agrees not to assert or enforce all such rights of subrogation it may acquire as a result of any payment hereunder until the First Priority Obligations Payment Date has occurred.  Each Loan Party acknowledges and agrees that the value of any payments or distributions in cash, property or other assets received by any Second Priority Secured Party that are paid over to the First Priority Secured Parties pursuant to this Agreement shall not reduce any of the Second Priority Obligations.

**SECTION 5**. *Insolvency Proceedings.*

5.1     Filing of Motions.  Until the First Priority Obligations Payment Date has occurred, the Second Priority Representative agrees on behalf of itself and the other Second Priority Secured Parties that no Second Priority Secured Party shall, in or in connection with any Insolvency Proceeding in respect of any Loan Party, file any pleadings or motions, take any position at any hearing or proceeding of any nature, or otherwise take any action whatsoever, in each case that (a) violates, or is prohibited by, this Agreement, (b) asserts any right, benefit or privilege that arises in favor of the Second Priority Representative or Second Priority Secured Parties in their capacity as secured creditors solely as a result of their interest in the Common Collateral or in the Second Priority Lien (unless the assertion of such right is expressly permitted by this Agreement) or (c) challenges the validity, priority, enforceability or voidability of any Liens or claims held by the First Priority Representative or any other First Priority Secured Party, or the extent to which the First Priority Obligations constitute secured claims under section 506(a) of the Bankruptcy Code or otherwise; provided that the Second Priority Representative may take the actions specifically set forth in Section 3.2.

The First Priority Representative agrees on behalf of itself and the other First Priority Secured Parties that no First Priority Secured Party shall, in or in connection with any Insolvency Proceeding, file any pleadings or motions, take any position at any hearing or proceeding of any nature, or otherwise take any action whatsoever, in each case that challenges the validity, priority, enforceability or voidability of any Liens or claims held by the Second Priority Representative or any other Second Priority Secured Party, or the extent to which the Second Priority Obligations constitute secured claims under section 506(a) of the Bankruptcy Code or otherwise, except that the foregoing shall not limit the ability of any First Priority Secured Party to enforce the terms of this Agreement.

5.2     Financing Matters.  Until the First Priority Obligations Payment Date has occurred, if any Loan Party becomes subject to any Insolvency Proceeding, and if the First Priority Representative or the other First Priority Secured Parties consent to the use of cash collateral under the Bankruptcy Code or provide financing to any Loan Party under the Bankruptcy Code or consent to the provision of such financing to any Loan Party by any third party that (w) is in an aggregate principal amount (including any undrawn portion of the revolving commitments thereunder and the face amount of any letters of credit issued and not reimbursed thereunder) of no more than the sum of (i) the amount by which the Maximum First Priority Amount then exceeds the First Priority Outstanding Amount plus (ii) $35,000,000, the proceeds of which are used solely by, and for the benefit of, the Loan Parties (and not, for the avoidance of doubt, any Pulitzer Entity) (x) provides that the Second Priority Secured Parties retain the right to object to any ancillary agreements or arrangements regarding the cash collateral use or the financing that are materially adverse to the Second Priority Secured Parties, (y) provides the Second Priority Secured Parties with the Second Priority Required Adequate Protection, and (z) does not compel the Loan Parties to pursue any specific plan or to conduct a sale or other liquidation of the Common Collateral (any such financing that complies with such clauses (w)-(z) (a "**DIP Financing**"), then the Second Priority Representative agrees, on behalf of itself and the other Second Priority Secured Parties, that each Second Priority Secured Party (a) will raise no objection to, nor support any other Person objecting to, the use of such cash collateral or to such DIP Financing, (b) will not request or accept adequate protection or any other relief in connection with the use of such cash collateral or such DIP Financing except as set forth in Section 5.4 below and (c) to the extent the Liens securing the First Priority Obligations are subordinated to or pari passu with such DIP Financing will subordinate (and will be deemed hereunder to have subordinated) the Second Priority Liens (i) to such DIP Financing on the same terms as the First Priority Liens are subordinated thereto (and such subordination will not alter in any manner the terms of this Agreement), (ii) to any adequate protection provided to the First Priority Secured Parties and (iii) to any

"carve-out" agreed to by the First Priority Representative or the other First Priority Secured Parties in an amount not to exceed $5,000,000, and (d) agrees that notice received two calendar days prior to the entry of an interim order approving such usage of cash collateral or approving such financing and fifteen days prior to the entry of a final order approving such usage of cash collateral or approving such financing shall be adequate notice.

       5.3    <u>Relief From the Automatic Stay</u>. The Second Priority Representative agrees, on behalf of itself and the other Second Priority Secured Parties, that none of them will seek relief from the automatic stay (or any analogous stay) in any Insolvency Proceeding in respect of a Loan Party or take any action in derogation thereof, in each case in respect of any Common Collateral, without the prior written consent of the First Priority Representative unless the First Priority Representative or any of the First Priority Secured Parties have concurrently sought relief from the automatic stay (or from any analogous stay) in any Insolvency Proceeding and the Second Priority Representative and/or the other Second Priority Secured Parties are not seeking relief from the automatic stay (or from any analogous stay) in any Insolvency Proceeding in order to take any Enforcement Action in any manner in violation of or otherwise inconsistent with the provisions of this Agreement.

       5.4    <u>Adequate Protection</u>. The Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties, agrees that none of them shall object, contest, or support any other Person objecting to or contesting, in respect of any Insolvency Proceeding of a Loan Party, (a) any request by the First Priority Representative or the other First Priority Secured Parties for adequate protection or any adequate protection provided to the First Priority Representative or the other First Priority Secured Parties or (b) any objection by the First Priority Representative or any other First Priority Secured Parties to any motion, relief, action or proceeding based on a claim of a lack of adequate protection or (c) the payment of interest, fees, expenses or other amounts to the First Priority Representative or any other First Priority Secured Party under section 506(b) or 506(c) of the Bankruptcy Code or otherwise. In any Insolvency Proceeding of a Loan Party, (i) if the First Priority Secured Parties (or any subset thereof) are granted adequate protection consisting of additional collateral (with replacement liens on such additional collateral) and superpriority claims in connection with any DIP Financing or use of cash collateral, then in connection with any such DIP Financing or use of cash collateral, the Second Priority Representative, on behalf of itself and any of the Second Priority Secured Parties, may seek or accept adequate protection consisting solely of (w) a replacement Lien on the same additional collateral, subordinated to the Liens securing the First Priority Obligations and such DIP Financing on the same basis as the other Liens securing the Second Priority Obligations are so subordinated to the First Priority Obligations under this Agreement, (x) superpriority claims junior in all respects to the superpriority claims granted to the First Priority Secured Parties, (y) payment of the fees and expenses of the Second Priority Representative and the Second Priority Secured Parties, to the extent permitted in the Second Priority Documents (the adequate protection for the Second Priority Secured Parties described in clauses (w), (x), and (y), collectively, the "**Second Priority Required Adequate Protection**") and (z) subject to the right of the First Priority Secured Parties to object thereto, the payment of post-petition interest at the pre-default rate (<u>provided</u>, that in the case of this clause (z), that the First Priority Secured Parties have been granted adequate protection in the form of post-petition interest at a rate no lower than the pre-default rate), <u>provided</u>, <u>however</u>, that the Second Priority Representative shall have irrevocably agreed, pursuant to section 1129(a)(9) of the Bankruptcy Code, on behalf of itself and the Second Priority Secured Parties, in any stipulation and/or order granting such adequate protection, that such junior superpriority claims in excess of $3,000,000 may with the consent of two-thirds in amount of the Second Priority Obligations be paid under any plan of reorganization in any combination of cash, debt, equity or other property having a value on the effective date of such plan equal to the allowed amount of such claims and (ii) in the event the Second Priority Representative, on behalf of itself and the

Second Priority Secured Parties, seeks or accepts adequate protection in respect of Loan Party in accordance with clause (i) above and such adequate protection is granted in the form of additional collateral comprising assets of a Loan Party, then the Second Priority Representative, on behalf of itself or any of the Second Priority Secured Parties, agrees that the First Priority Representative shall also be granted a senior Lien on such additional collateral as security for the First Priority Obligations and any such DIP Financing and that any Lien on such additional collateral securing the Second Priority Obligations shall be subordinated to the Liens on such collateral securing the First Priority Obligations and any such DIP Financing (and all Obligations relating thereto) and any other Liens granted to the First Priority Secured Parties as adequate protection, with such subordination to be on the same terms that the other Liens securing the Second Priority Obligations are subordinated to such First Priority Obligations under this Agreement.  The Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties, agrees that except as expressly set forth in this Section none of them shall seek or accept adequate protection in respect of a Loan Party without the prior written consent of the First Priority Representative.

5.5     Avoidance Issues.  If any First Priority Secured Party is required in any Insolvency Proceeding or otherwise to disgorge, turn over or otherwise pay to the estate of any Loan Party, because such amount was avoided or ordered to be paid or disgorged for any reason, including without limitation because it was found to be a constructively fraudulent or preferential transfer, any amount (a "**Recovery**"), whether received as proceeds of security, enforcement of any right of set-off or otherwise, then the First Priority Obligations shall be reinstated to the extent of such Recovery and deemed to be outstanding as if such payment had not occurred and the First Priority Obligations Payment Date shall be deemed not to have occurred.  If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto.  The Second Priority Secured Parties agree that none of them shall be entitled to benefit from any avoidance action affecting or otherwise relating to the First Priority Liens or the Second Priority Liens, it being understood and agreed that the benefit of such avoidance action otherwise allocable to them shall instead be allocated and turned over for application in accordance with the priorities set forth in this Agreement.

5.6     Asset Dispositions in an Insolvency Proceeding.  In an Insolvency Proceeding or otherwise, neither the Second Priority Representative nor any other Second Priority Secured Party shall oppose any sale or disposition of any assets of any Loan Party that is supported by the First Priority Secured Parties (or any right of the First Priority Secured Party to credit bid the First Priority Obligations in any such sale or disposition), and the Second Priority Representative and each other Second Priority Secured Party will be deemed to have consented under section 363 of the Bankruptcy Code (and otherwise) to any sale (and related matters) supported by the First Priority Secured Parties and to have released their Liens on such assets provided that their Liens attach to the proceeds of such assets (subject to the priorities set forth in this Agreement) and that the proceeds remaining after payment of related transaction costs and expenses are applied as a permanent reduction of the First Priority Obligations (with a corresponding reduction in the Maximum First Priority Amount).  In an Insolvency Proceeding or otherwise, neither the First Priority Representative nor any other First Priority Secured Party shall oppose any right of any Second Priority Secured Party to credit bid the Second Priority Obligations in any sale or disposition, provided that such bid provides for the payment in full of the First Priority Obligations and the occurrence of the events described in clauses (a), (b) and (c) of the definition of First Priority Obligations Payment Date.

5.7     Separate Grants of Security and Separate Classification.  Each Secured Party and Loan Party acknowledges and agrees that (a) the grants of Liens on the assets of each Loan Party pursuant to

the First Priority Security Documents and the Second Priority Security Documents constitute two separate and distinct grants of Liens and (b) because of, among other things, their differing rights in the Common Collateral, the First Priority Obligations and the Second Priority Obligations are fundamentally different from each other and must be separately classified in any plan of reorganization proposed or adopted in an Insolvency Proceeding.  To further effectuate the intent of the parties as provided in the immediately preceding sentence, if it is held that the claims of the First Priority Secured Parties and Second Priority Secured Parties in respect of the Common Collateral constitute only one secured claim (rather than separate classes of senior and junior secured claims), then the Second Priority Secured Parties hereby acknowledge and agree that all distributions shall be made as if there were separate classes of senior and junior secured claims against the Loan Parties in respect of the Common Collateral, with the effect being that, to the extent that the aggregate value of the Common Collateral is sufficient (for this purpose ignoring all claims held by the Second Priority Secured Parties), the First Priority Secured Parties shall be entitled to receive, in addition to amounts distributed to them in respect of principal, pre-petition interest and other claims, all amounts owing in respect of Post-Petition Interest before any distribution is made in respect of the claims held by the Second Priority Secured Parties.  The Second Priority Secured Parties hereby acknowledge and agree to turn over to the First Priority Secured Parties amounts otherwise received or receivable by them to the extent necessary to effectuate the intent of the preceding sentence, even if such turnover has the effect of reducing the claim or recovery of the Second Priority Secured Parties.

5.8    No Waivers of Rights.  Nothing contained herein shall prohibit or in any way limit the First Priority Representative, the Second Priority Representative, any First Priority Secured Party, or any Second Priority Secured Party from objecting, in any Insolvency Proceeding or otherwise, to any action taken by any party not permitted hereunder.

5.9    Plans of Reorganization.  Nothing in this Agreement shall impair the rights of any Second Priority Secured Party to propose, support, or vote in favor of or against any plan of reorganization or similar plan or scheme in any Insolvency Proceeding, so long as such plan or scheme is not inconsistent with, or in contravention of, the express terms of this Agreement, provided that in the case of proposing such plan of reorganization or similar plan or scheme it shall, unless otherwise approved by the First Priority Representative, provide for payment in full of the First Priority Obligations and the occurrence of the events described in clauses (a), (b) and (c) of the definition of the First Priority Obligations Payment Date.

5.10    Effectiveness in Insolvency Proceedings.  This Agreement, which the parties hereto expressly acknowledge is a "subordination agreement" under section 510(a) of the Bankruptcy Code, shall be effective before, during and after the commencement of an Insolvency Proceeding.

**SECTION 6**.  *Security Documents.*

(a)  Each Loan Party and the Second Priority Representative, on behalf of itself and the Second Priority Secured Parties, agrees that it shall not at any time execute or deliver any amendment or other modification to any of the Second Priority Documents that is inconsistent with or in violation of this Agreement.

(b)  Each Loan Party and the First Priority Representative, on behalf of itself and the First Priority Secured Parties, agrees that it shall not at any time execute or deliver any amendment or other modification to any of the First Priority Documents that is inconsistent with or in violation of this Agreement.

(c)  In the event the First Priority Representative enters into any amendment, waiver or consent in respect of any of the First Priority Security Documents for the purpose of adding to, or deleting from, or waiving or consenting to any departures from any provisions of, any First Priority Security Document or changing in any manner the rights of any parties thereunder, then such amendment, waiver or consent shall apply automatically to any comparable provision of the Comparable Second Priority Security Document to the extent applicable to any Loan Party and Common Collateral without the consent of or action by any Second Priority Secured Party (with all such amendments, waivers and modifications subject to the terms hereof); provided that (other than with respect to amendments, modifications or waivers that secure additional extensions of credit and add additional secured creditors and do not violate the express provisions of the Second Priority Agreements), (i) no such amendment, waiver or consent shall have the effect of removing assets subject to the Lien of any Second Priority Security Document, except to the extent that a release of such Lien is permitted by Section 4.2, (ii) any such amendment, waiver or consent that materially and adversely affects the rights of the Second Priority Secured Parties and does not affect the First Priority Secured Parties in a like or similar manner shall not apply to the Second Priority Security Documents without the prior written consent of the Second Priority Representative, (iii) no such amendment, waiver or consent with respect to any provision applicable to the Second Priority Representative under the Second Priority Documents shall be made without the prior written consent of the Second Priority Representative and (iv) notice of such amendment, waiver or consent shall be given to the Second Priority Representative no later than 15 days after its effectiveness, provided that the failure to give such notice shall not affect the effectiveness and validity thereof.

**SECTION 7**.  *Reliance; Waivers; etc.*

7.1    Reliance.  The First Priority Documents are deemed to have been executed and delivered, and all extensions of credit thereunder are deemed to have been made or incurred, in reliance upon this Agreement.  The Second Priority Representative, on behalf of itself and the Second Priority Secured Parties, expressly waives all notice of the acceptance of and reliance on this Agreement by the First Priority Secured Parties.  The Second Priority Documents are deemed to have been executed and delivered and all extensions of credit related thereto are deemed to have been made or incurred, in reliance upon this Agreement.  The First Priority Representative expressly waives all notices of the acceptance of and reliance by the Second Priority Representative and the Second Priority Secured Parties.

7.2    No Warranties or Liability.  The Second Priority Representative and the First Priority Representative acknowledge and agree that neither has made any representation or warranty with respect to the execution, validity, legality, completeness, collectibility or enforceability of any First Priority Document or any Second Priority Document.  Except as otherwise provided in this Agreement, the Second Priority Representative and the First Priority Representative will be entitled to manage and supervise their respective extensions of credit to any Loan Party in accordance with law and their usual practices, modified from time to time as they deem appropriate.

7.3    No Waivers.  No right or benefit of any party hereunder shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of such party or any other party hereto or by any noncompliance by any Loan Party with the terms and conditions of any of the First Priority Documents or the Second Priority Documents.

**SECTION 8**.  *Obligations Unconditional.*

8.1    First Priority Obligations Unconditional.  All rights and interests of the First Priority Secured Parties hereunder, and all agreements and obligations of the Second Priority Secured Parties

(and, to the extent applicable, the Loan Parties) hereunder, shall remain in full force and effect irrespective of:

(a) any lack of validity or enforceability of any First Priority Document;

(b) any change in the time, place or manner of payment of, or in any other term of, all or any portion of the First Priority Obligations, or any amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of any First Priority Document;

(c) prior to the First Priority Obligations Payment Date, any exchange, release, voiding, avoidance or non-perfection of any security interest in any Common Collateral or any other collateral, or any release, amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of all or any portion of the First Priority Obligations or any guarantee or guaranty thereof; or

(d) any other circumstances that otherwise might constitute a defense available to, or a discharge of, any Loan Party in respect of the First Priority Obligations, or of the Second Priority Representative, or any Loan Party, to the extent applicable, in respect of this Agreement.

8.2     Second Priority Obligations Unconditional.  All rights and interests of the Second Priority Secured Parties hereunder, and all agreements and obligations of the First Priority Secured Parties (and, to the extent applicable, the Loan Parties) hereunder, shall remain in full force and effect irrespective of:

(a) any lack of validity or enforceability of any Second Priority Document;

(b) any change in the time, place or manner of payment of, or in any other term of, all or any portion of the Second  Priority Obligations, or any amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of any Second Priority Document;

(c) any exchange, release, voiding, avoidance or non-perfection of any security interest in any Common Collateral or any other collateral, or any release, amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of all or any portion of the Second Priority Obligations or any guarantee or guaranty thereof; or

(d) any other circumstances that otherwise might constitute a defense available to, or a discharge of, any Loan Party in respect of the Second  Priority Obligations or any First Priority Secured Party in respect of this Agreement.

**SECTION 9**.  Miscellaneous.

9.1     In the event of any conflict between the provisions of this Agreement and the provisions of any First Priority Document or any Second Priority Document, the provisions of this Agreement shall govern.  Notwithstanding the foregoing, the parties hereto acknowledge that the terms of this Agreement are not intended to and shall not, as between the Loan Parties and the Secured Parties, negate, waive or cancel any rights granted to, or carry liability or obligation of, any Loan Party in the First Priority

Documents and the Second Priority Documents or impose any additional obligations on the Loan Parties (other than as expressly set forth herein).

9.2     <u>Continuing Nature of Provisions.</u>  This Agreement shall continue to be effective, and shall not be revocable by any party hereto, until the First Priority Obligation Payment Date shall have occurred.  This is a continuing agreement and the First Priority Secured Parties and the Second Priority Secured Parties may continue, at any time and without notice to the other parties hereto, to extend credit and other financial accommodations, lend monies and provide indebtedness to, or for the benefit of, Borrower or any other Loan Party on the faith hereof.

9.3     <u>Amendments; Waivers</u>.  (a)  No amendment or modification of any of the provisions of this Agreement shall be effective unless the same shall be in writing and signed by the First Priority Representative (with the consent of the Required Lenders under and as defined in the First Priority Agreement) and the Second Priority Representative (with the consent of the Required Lenders under and as defined in the Second Priority Agreement), and, in the case of amendments or modifications of Sections 3.5, 3.6, 9.3, 9.5 or 9.6 that directly affect the rights or duties of any Loan Party, such Loan Party, and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time.  Anything herein to the contrary notwithstanding, no consent of any Loan Party shall be required for amendments, modifications or waivers of any other provisions of this Agreement other than those that directly affect any obligation or right of the Loan Parties hereunder or under the First Priority Documents or the Second Priority Documents or that would impose any additional obligations on the Loan Parties.

(b)  It is understood that the First Priority Representative and the Second Priority Representative, without the consent of any other First Priority Secured Party or Second Priority Secured Party, may in their discretion determine that a supplemental agreement (which make take the form of an amendment and restatement of this Agreement) is necessary or appropriate to facilitate having additional indebtedness or other obligations ("**Additional Debt**") of any of the Loan Parties become First Priority Obligations or Second Priority Obligations, as the case may be, under this Agreement, which supplemental agreement shall specify whether such Additional Debt constitutes First Priority Obligations or Second Priority Obligations, <u>provided</u>, that such Additional Debt is permitted to be incurred by the First Priority Agreement and Second Priority Agreement then extant, and is permitted by said Agreements to be subject to the provisions of this Agreement as First Priority Obligations or Second Priority Obligations, as applicable.

9.4     <u>Information Concerning Financial Condition of the Borrower and the other Loan Parties.</u> Each of the Second Priority Representative and the First Priority Representative hereby assume responsibility for keeping itself informed of the financial condition of the Borrower and each of the other Loan Parties and all other circumstances bearing upon the risk of nonpayment of the First Priority Obligations or the Second Priority Obligations.  The Second Priority Representative and the First Priority Representative hereby agree that no party shall have any duty to advise any other party of information known to it regarding such condition or any such circumstances.  In the event the Second Priority Representative or the First Priority Representative, in its sole discretion, undertakes at any time or from time to time to provide any information to any other party to this Agreement, it shall be under no obligation (a) to provide any such information to such other party or any other party on any subsequent occasion, (b) to undertake any investigation not a part of its regular business routine, or (c) to disclose any other information.

9.5     Governing Law.  This Agreement shall be construed in accordance with and governed by the law of the State of New York, except as otherwise required by mandatory provisions of law and except to the extent that remedies provided by the laws of any jurisdiction other than the State of New York are governed by the laws of such jurisdiction.

9.6     Submission to Jurisdiction.  (a)  Each First Priority Secured Party, each Second Priority Secured Party and each Loan Party hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each such party hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court.  Each such party agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that any First Priority Secured Party or any Second Priority Secured Party may otherwise have to bring any action or proceeding against any Loan Party or its properties in the courts of any jurisdiction.

(b)  Each First Priority Secured Party, each Second Priority Secured Party and each Loan Party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so (i) any objection it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in paragraph (a) of this Section and (ii) the defense of an inconvenient forum to the maintenance of such action or proceeding.

(c)  Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.7.  Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

9.7     Notices.  Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given shall be in writing and may be personally served, telecopied, or sent by overnight express courier service or United States mail and shall be deemed to have been given when delivered in person or by courier service, upon receipt of a telecopy or five days after deposit in the United States mail (certified, with postage prepaid and properly addressed).  For the purposes hereof, the addresses of the parties hereto (until notice of a change thereof is delivered as provided in this Section) shall be as set forth below each party's name on the signature pages hereof, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

9.8     Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of each of the parties hereto and each of the First Priority Secured Parties and Second Priority Secured Parties and their respective successors and permitted assigns, and nothing herein is intended, or shall be construed to give, any other Person any right, remedy or claim under, to or in respect of this Agreement or any Common Collateral.

9.9     Headings.  Section headings used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

9.10    <u>Severability</u>.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

9.11    <u>Counterparts; Integration; Effectiveness</u>.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this Agreement by email or telecopy shall be effective as delivery of a manually executed counterpart of this Agreement. This Agreement shall become effective when it shall have been executed by each party hereto.

9.12    **WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AND FOR ANY COUNTERCLAIM THEREIN.**

9.13    <u>Additional Loan Parties</u>.  Each Person that becomes a Loan Party after the date hereof shall become a party to this Agreement upon execution and delivery by such Person of a joinder agreement as provided in section 10.12 of the Security Agreement referred to in the First Priority Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

DEUTSCHE BANK TRUST COMPANY AMERICAS, as First Priority Representative for and on behalf of the First Priority Secured Parties

By:_____
Name:
Title:

Address for Notices:

Attention:
Telecopy No.:

WILMINGTON TRUST, NATIONAL ASSOCIATION, as Second Priority Representative for and on behalf of the Second Priority Secured Parties

By:_____
Name:
Title:

Address for Notices:
Wilmington Trust, N.A.
50 South Sixth Street, Suite 1290
Minneapolis, MN 55402

Attention:  Josh James
Telecopy No.:  (612) 217-5651
Tel.:  (612) 217-5637
Email:  jjames@WilmingtonTrust.com

[LOAN PARTIES]

By:_____
Name:
Title:

Address for Notices:

Attention:
Telecopy No.:

# **Exhibit 1.79**

*New Lee Intercreditor Agreement*

STB Draft 11/21/11

## INTERCREDITOR AGREEMENT

Intercreditor Agreement (this "**Agreement**"), dated as of [_____], among DEUTSCHE BANK TRUST COMPANY AMERICAS, as Collateral Agent (in such capacity, with its successors and assigns, and as more specifically defined below, the "**First Priority Representative**") for the First Priority Secured Parties (as defined below), WILMINGTON TRUST, NATIONAL ASSOCIATION, as Collateral Agent (in such capacity, with its successors and assigns, and as more specifically defined below, the "**Second Priority Representative**") for the Second Priority Secured Parties (as defined below), LEE ENTERPRISES, INCORPORATED (the "**Borrower**") and each of the other Loan Parties (as defined below) from time to time party hereto.

WHEREAS, the Borrower, the First Priority Representative and certain financial institutions and other entities are parties to the Exit Credit Agreement, dated as of the date hereof (as amended, supplemented, amended and restated or otherwise modified from time to time, the "**Existing First Priority Agreement**"), pursuant to which such financial institutions and other entities have agreed to make loans (or be deemed to have made) and extend other financial accommodations to the Borrower;

WHEREAS, the Borrower, the Second Priority Representative and certain financial institutions and other entities are parties to the Second Lien Loan Agreement, dated as of the date hereof (as amended, supplemented, amended and restated or otherwise modified from time to time, the "**Existing Second Priority Agreement**"), pursuant to which such financial institutions and other entities have agreed to make (or be deemed to have made) loans to the Borrower;

WHEREAS, pursuant to that certain Subsidiaries Guaranty, dated as of the date hereof (as amended, supplemented, amended and restated or otherwise modified from time to time, the "**First Priority Guaranty Agreement**") the Loan Parties have guaranteed the obligations under the Existing First Priority Agreement, and pursuant to the First Priority Security Documents the Borrower and the other Loan Parties have granted to the First Priority Representative security interests in the Common Collateral as security for payment and performance of the First Priority Obligations;

WHEREAS, pursuant to that certain Subsidiaries Guaranty, dated as of the date hereof (as amended, supplemented, amended and restated or otherwise modified from time to time, the "**Second Priority Guaranty Agreement**") the Loan Parties (and certain other subsidiaries of the Borrower which are not Loan Parties and are not subject to the arrangements hereunder) have guaranteed the obligations under the Existing Second Priority Agreement, and pursuant to the Second Priority Security Documents the Borrower and the other Loan Parties have granted to the Second Priority Representative junior security interests in the Common Collateral as security for payment and performance of the Second Priority Obligations; and

WHEREAS, the First Priority Creditors under the Existing First Priority Agreement have agreed to permit the grant of such junior security interests in the Common Collateral on the terms and conditions of this Agreement.

NOW THEREFORE, in consideration of the foregoing and the mutual covenants herein contained and other good and valuable consideration, the existence and sufficiency of which are expressly recognized by all of the parties hereto, the parties agree as follows:

## SECTION 1. *Definitions.*

1.1.    <u>Defined Terms</u>.  The following terms, as used herein, have the following meanings:

"**Agreement**" has the meaning set forth in the introductory paragraph hereof.

"**Bankruptcy Code**" means the United States Bankruptcy Code (11 U.S.C. §101 et seq.), as amended from time to time.

"**Borrower**" has the meaning set forth in the introductory paragraph hereof.

"**Cash Collateral**" has the meaning set forth in Section 3.6(c).

"**Common Collateral**" means all assets that are both First Priority Collateral and Second Priority Collateral.

"**Comparable Second Priority Security Document**" means, in relation to any Common Collateral subject to any First Priority Security Document, that Second Priority Security Document that creates a security interest in the same Common Collateral, granted by the same Loan Party, as applicable.

"**DIP Financing**" has the meaning set forth in Section 5.2.

"**Enforcement Action**" means, with respect to the First Priority Obligations or the Second Priority Obligations the exercise of any rights and remedies with respect to any Common Collateral securing such obligations or the commencement or prosecution of enforcement of any of the rights and remedies with respect to the Common Collateral under, as applicable, the First Priority Documents or the Second Priority Documents, or applicable law, including without limitation (a) the exercise of any rights of set-off or recoupment, (b) the exercise of any rights or remedies of a secured creditor under the Uniform Commercial Code of any applicable jurisdiction or under the Bankruptcy Code, and (c) the commencement of any judicial or nonjudicial foreclosure proceedings with respect to, attempting any action to take possession of, any Common Collateral, or exercising any right, remedy or power with respect to, or otherwise taking any action to enforce their interest in or realize upon, the Common Collateral.

"**Enforcement Notice**" has the meaning set forth in Section 3.6(a).

"**Existing First Priority Agreement**" has the meaning set forth in the recitals to this Agreement.

"**Existing Second Priority Agreement**" has the meaning set forth in the recitals to this Agreement.

"**First Priority Agreement**" means the collective reference to (a) the Existing First Priority Agreement and (b) any other credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement or instrument evidencing or governing the terms of any indebtedness (or guarantee thereof) or other financial accommodation that has been incurred to extend, increase, renew, refund, replace (whether upon or after termination or otherwise) or refinance (including by means of sales of debt securities to institutional investors) in whole or in part from time to time the indebtedness and other obligations outstanding (contingent or otherwise) under the Existing First Priority Agreement or any other agreement or instrument referred to in this clause (b) unless such agreement or instrument expressly provides that it is not intended to be and is not a First Priority Agreement hereunder (a "**Replacement First Priority Agreement**").  Any reference to the First Priority Agreement hereunder shall be deemed a reference to any First Priority Agreement then extant.

"**First Priority Collateral**" means all assets, whether now owned or hereafter acquired by the Borrower or any other Loan Party, in which a Lien is granted or purported to be granted to any First Priority Secured Party as security for any First Priority Obligation.

"**First Priority Creditors**" means the "Secured Creditors" as defined in the Existing First Priority Agreement, the "Lenders" as defined in each other First Priority Agreement or any Persons that are designated under the First Priority Agreement as the "First Priority Creditors" for purposes of this Agreement.

"**First Priority Documents**" means the First Priority Agreement, each First Priority Security Document and each First Priority Guaranty.

"**First Priority Guaranty**" means any guarantee by any Loan Party of any or all of the First Priority Obligations, including, without limitation, pursuant to the First Priority Guaranty Agreement.

"**First Priority Guaranty Agreement**" has the meaning set forth in the recitals to this Agreement.

"**First Priority Lien**" means any Lien created by the First Priority Security Documents, solely to the extent in respect of any asset of any Loan Party.

"**First Priority Obligations**" means (a) with respect to the Existing First Priority Agreement, all "Obligations" of each Loan Party as defined in the First Priority Security Documents and (b) with respect to each other First Priority Agreement, (i) all principal of, and interest (including without limitation any Post-Petition Interest) and premium (if any) on, all loans made or other indebtedness (contingent or otherwise) of any Loan Party issued or incurred pursuant to the First Priority Agreement, (ii) all reimbursement obligations (if any) and interest thereon (including without limitation any Post-Petition Interest) with respect to any letter of credit or similar instruments issued pursuant to the First Priority Agreement, (iii) all Hedging Obligations and (iv) all guarantee obligations of, or fees, expenses and other amounts payable by any Loan Party from time to time pursuant to the First Priority Documents, in each case whether or not allowed or allowable in an Insolvency Proceeding. To the extent any payment with respect to any First Priority Obligation (whether by or on behalf of any Loan Party, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any Second Priority Secured Party, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of this Agreement and the rights and obligations of the First Priority Secured Parties and the Second Priority Secured Parties, be deemed to be reinstated and outstanding as if such payment had not occurred.

Notwithstanding the foregoing contained in this defined term of First Priority Obligations, if the sum of (1) the principal amount outstanding under the Existing First Priority Agreement and each other First Priority Agreement, plus (2) the aggregate undrawn face amount of any outstanding letters of credit under the Existing First Priority Agreement and each other First Priority Agreement and any unreimbursed drawings of any letters of credit issued under the Existing First Priority Agreement and each other First Priority Agreement (such sum, the "**First Priority Outstanding Amount**") exceeds  the Maximum First Priority Amount, then only that portion of the First Priority Outstanding Amount equal to the Maximum First Priority Amount shall be included in First Priority Obligations and interest and reimbursement obligations with respect to the First Priority Outstanding Amount shall only constitute First Priority Obligations to the extent related to the First Priority Outstanding Amount.

"**First Priority Obligations Payment Date**" means the first date on which (a) the First Priority Obligations (other than those that constitute Unasserted Contingent Obligations) have been paid in cash in full (or cash collateralized or defeased in accordance with the terms of the First Priority Documents), (b) all commitments to extend credit under the First Priority Documents have been terminated or expired, (c) there are no outstanding letters of credit or similar instruments issued under the First Priority Documents (other than such as have been cash collateralized or defeased in accordance with the terms of the First Priority Documents, but in no event greater than 105% of the aggregate undrawn face amount thereof) and (d) the First Priority Representative shall have either (x) delivered  written notice to the Second Priority Representative or any other Second Priority Secured Party of the occurrence of the events described in clauses (a), (b) and (c) hereinabove or (y) failed to timely comply with its notice obligation under Section 3.9 hereof.

"**First Priority Outstanding Amount**" has the meaning set forth in the definition of "First Priority Obligations".

"**First Priority Representative**" has the meaning set forth in the introductory paragraph hereof. In the case of any Replacement First Priority Agreement, the First Priority Representative shall be the Person identified as such in such Agreement.

"**First Priority Secured Parties**" means the First Priority Representative, the First Priority Creditors and any other holders of the First Priority Obligations.

"**First Priority Security Documents**" means the "Security Documents" as defined in the First Priority Agreement, and any other documents that are designated under the First Priority Agreement as "First Priority Security Documents" for purposes of this Agreement.

"**Hedging Obligations**" means, with respect to any Loan Party, any monetary obligations of such Loan Party owed to any First Priority Creditor in respect of (i) any interest rate swap agreement, interest rate cap agreement, interest collar agreement, interest rate hedging agreement or other similar agreement or arrangement and (ii) any foreign exchange contracts, currency swap agreements, commodity agreements or other similar arrangements, or arrangements designed to protect against fluctuations in currency values or commodity prices, including, in each case, interest and Post-Petition Interest thereon.

"**Insolvency Proceeding**" means any proceeding in respect of bankruptcy, insolvency, winding up, receivership, dissolution or assignment for the benefit of creditors, in each of the foregoing events whether under the Bankruptcy Code or any similar federal, state or foreign bankruptcy, insolvency, reorganization, receivership or similar law, in each case to the extent in respect of any Loan Party.

"**Lien**" means any mortgage, pledge, hypothecation, assignment, encumbrance, lien (statutory or other), or other security interest or security agreement of any kind (including, without limitation, any conditional sale or other title retention agreement, any financing or similar statement or notice filed under the Uniform Commercial Code or any other similar recording or notice statute, and any lease having substantially the same effect as any of the foregoing) and any attachment or judgment lien contemplated in Section 3.3.

"**Loan Party**" means the Borrower and each direct or indirect subsidiary of the Borrower (other than any Pulitzer Entity), in each case to the extent, and during such time as, such person is a party to any First Priority Security Document or is a party to any Second Priority Security Document.  All references

in this Agreement to any Loan Party shall include such Loan Party as a debtor-in-possession and any receiver or trustee for such Loan Party in any Insolvency Proceeding.

"**Maximum First Priority Amount**" means the aggregate amount of revolving commitments and term loans outstanding on the date hereof (after giving effect to the transactions contemplated to occur on the date hereof) under the Existing First Priority Agreement (which amount, for the avoidance of doubt, is $750,000,000[1]) less the aggregate amount of all mandatory payments of the principal of the term loans and all permanent reductions of the Revolving Credit Commitments (as defined in the Existing First Priority Agreement) made pursuant to the Existing First Priority Agreement and each other First Priority Agreement, in each case resulting from any asset sales or recovery events of the Borrower or any other Loan Parties.

"**Person**" means any individual, partnership, joint venture, firm, corporation, association, trust or other enterprise or any government or political subdivision or any agency, department or instrumentality thereof.

"**Post-Petition Interest**" means any interest or entitlement to fees or expenses or other charges that accrues after the commencement of any Insolvency Proceeding, whether or not allowed or allowable in any such Insolvency Proceeding.

"**Pulitzer Entities**" means, collectively, Pulitzer, Inc. and each of its direct or indirect subsidiaries.

"**Purchase**" has the meaning set forth in Section 3.6.

"**Purchase Notice**" has the meaning set forth in Section 3.6.

"**Purchase Price**" has the meaning set forth in Section 3.6.

"**Purchaser**" has the meaning set forth in Section 3.6.

"**Purchasing Parties**" has the meaning set forth in Section 3.6.

"**Replacement First Priority Agreement**" has the meaning set forth in the definition of "First Priority Agreement."

"**Second Priority Agreement**" means the collective reference to (a) the Existing Second Priority Agreement and (b) any other credit agreement, loan agreement, note agreement, promissory note, indenture, or other agreement or instrument evidencing or governing the terms of any indebtedness (or guarantee thereof) or other financial accommodation that has been incurred to extend, increase, renew, refund, replace (whether upon or after termination or otherwise) or refinance (including by means of sales of debt securities to institutional investors) in whole or in part from time to time the indebtedness and other obligations outstanding (contingent or otherwise) under the Existing Second Priority Agreement or any other agreement or instrument referred to in this clause (b).  Any reference to the Second Priority Agreement hereunder shall be deemed a reference to any Second Priority Agreement then extant.

---

[1] May be increased up to a maximum of $766,250,000 by increasing such amount to the extent the amount outstanding under the Second Priority Agreement as of the date hereof is less than $175,000,000.

"**Second Priority Collateral**" means all assets, whether now owned or hereafter acquired by the Borrower or any other Loan Party, in which a Lien is granted or purported to be granted to any Second Priority Secured Party as security for any Second Priority Obligation.

"**Second Priority Creditors**" means the "Secured Creditors" as defined in the Existing Second Priority Agreement, the "Lenders" as defined in each other Second Priority Agreement, or any Persons that are designated under the Second Priority Agreement as the "Second Priority Creditors" for purposes of this Agreement.

"**Second Priority Documents**" means each Second Priority Agreement, each Second Priority Security Document and each Second Priority Guaranty.

"**Second Priority Guaranty**" means any guarantee by any Loan Party of any or all of the Second Priority Obligations, including, without limitation, pursuant to the Second Priority Guaranty Agreement.

"**Second Priority Guaranty Agreement**" has the meaning set forth in the recitals to this Agreement.

"**Second Priority Lien**" means any Lien created by the Second Priority Security Documents solely to the extent in respect of any asset of any Loan Party.

"**Second Priority Obligations**" means (a) with respect to the Existing Second Priority Agreement, all "Obligations" of each Loan Party as defined in the Second Priority Security Documents and (b) with respect to each other Second Priority Agreement, (i) all principal of, and interest (including without limitation any Post-Petition Interest) and premium (if any) on, all indebtedness (contingent or otherwise) of any Loan Party under the Second Priority Agreement, and (ii) all guarantee obligations of, or fees, expenses and other amounts payable by, any Loan Party from time to time pursuant to the Second Priority Documents, in each case whether or not allowed or allowable in an Insolvency Proceeding.  To the extent any payment with respect to any Second Priority Obligation (whether by or on behalf of any Loan Party, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any First Priority Secured Party, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of this Agreement and the rights and obligations of the First Priority Secured Parties and the Second Priority Secured Parties, be deemed to be reinstated and outstanding as if such payment had not occurred.

"**Second Priority Representative**" has the meaning set forth in the introductory paragraph hereof, but shall also include any Person identified as a "Second Priority Representative" in any Second Priority Agreement other than the Existing Second Priority Agreement.

"**Second Priority Required Adequate Protection**" has the meaning set forth in Section 5.4.

"**Second Priority Secured Party**" means the Second Priority Representative, the Second Priority Creditors and any other holders of the Second Priority Obligations.

"**Second Priority Security Documents**" means the "Security Documents" as defined in the Second Priority Agreement and any documents that are designated under the Second Priority Agreement as "Second Priority Security Documents" for purposes of this Agreement.

"**Secured Parties**" means the First Priority Secured Parties and the Second Priority Secured Parties.

"**Standstill Period**" has the meaning set forth in Section 3.2.

"**Surviving Obligations**" has the meaning set forth in Section 3.6(b).

"**Unasserted Contingent Obligations**" shall mean, at any time, First Priority Obligations for taxes, costs, indemnifications, reimbursements, damages and other liabilities (excluding (a) the principal of, and interest and premium (if any) on, and fees and expenses relating to, any First Priority Obligation and (b) contingent reimbursement obligations in respect of amounts that may be drawn under outstanding letters of credit) in respect of which no assertion of liability (whether oral or written) and no claim or demand for payment (whether oral or written) has been made (and, in the case of First Priority Obligations for indemnification, no notice for indemnification has been issued by the indemnitee) at such time.

"**Uniform Commercial Code**" shall mean the Uniform Commercial Code as in effect from time to time in the applicable jurisdiction.

1.2    <u>Terms Generally</u>.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (i) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (to the extent applicable, in accordance with Section 6), (ii) any reference herein to any Person shall be construed to include such Person's successors or permitted assigns, (iii) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Sections shall be construed to refer to Sections of this Agreement and (v) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

**SECTION 2**.  Lien Priorities.

2.1    <u>Subordination of Liens</u>.  (a)  Any and all Liens on assets of any Loan Party now existing or hereafter created or arising in favor of any Second Priority Secured Party securing the Second Priority Obligations, regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise are expressly junior in priority, operation and effect to any and all Liens on assets of any Loan Party now existing or hereafter created or arising in favor of the First Priority Secured Parties securing the First Priority Obligations, notwithstanding (i) anything to the contrary contained in any agreement or filing to which any Second Priority Secured Party may now or hereafter be a party, and regardless of the time, order or method of grant, attachment, recording or perfection of any financing statements or other security interests, assignments, pledges, deeds, mortgages and other liens, charges or encumbrances or any defect or deficiency or alleged defect or deficiency in any of the foregoing, (ii) any provision of the Uniform Commercial Code or any applicable law or any First Priority Document or Second Priority Document or any other circumstance whatsoever and (iii) the fact that any such Liens on assets of any Loan Party in favor of any First Priority Secured Party securing any of the First Priority Obligations are

(x) subordinated to any Lien securing any obligation of any Loan Party other than the Second Priority Obligations or (y) otherwise subordinated, voided, avoided, invalidated or lapsed.

(b)  The First Priority Representative, on behalf of itself and the other First Priority Secured Parties, acknowledges and agrees that the Second Priority Representative on behalf of itself and the other Second Priority Secured Parties, has been granted Liens upon all of the Common Collateral, and the First Priority Representative, on behalf of itself and the other First Priority Secured Parties, hereby consents thereto.  The subordination of its Liens on assets of the Loan Parties by the Second Priority Representative in favor of the First Priority Liens on such assets shall not be deemed to subordinate any Liens of the Second Priority Representative (or any Second Priority Secured Party) to any Liens other than (x) the First Priority Liens on such assets securing the First Priority Obligations and (y) Liens that are permitted under the First Priority Documents and the Second Priority Documents to be senior to the First Priority Liens and the Second Priority Liens.

2.2    Nature of First Priority Obligations.  The Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties, acknowledges that a portion of the First Priority Obligations represents debt that is revolving in nature and that the amount thereof that may be outstanding at any time or from time to time may be increased or reduced and subsequently reborrowed, and that the terms of the First Priority Obligations may be modified, extended or amended from time to time, and that the aggregate amount of the First Priority Obligations may be increased, replaced or refinanced, in each event, without notice to or consent by the Second Priority Secured Parties and without affecting the provisions hereof but only so long as any such obligations are permitted to be incurred pursuant to the terms hereof or of the Second Priority Documents as in effect on the date of this Agreement.  The lien priorities provided in Section 2.1 shall not be altered or otherwise affected by any such amendment, modification, supplement, extension, repayment, reborrowing, increase, replacement, renewal, restatement or refinancing of either the First Priority Obligations or the Second Priority Obligations, or any portion thereof.

2.3    Agreements Regarding Actions to Perfect Liens.  (a)  The Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties, agrees that each patent, trademark or copyright filing or other filings or recordings (other than Uniform Commercial Code financing statements) filed or recorded by or on behalf of the Second Priority Representative in respect of applicable Common Collateral shall, to the extent reasonably practicable, contain the following notation: "The lien created hereby on the property described herein is junior and subordinate to the lien on such property created by any agreement, filing or recording now or hereafter granted to Deutsche Bank Trust Company Americas, as Collateral Agent (under the First Priority Documents), and its successors and assigns, in such property, in accordance with the provisions of the Intercreditor Agreement dated as of [_____], among DEUTSCHE BANK TRUST COMPANY AMERICAS, as First Priority Representative, WILMINGTON TRUST, NATIONAL ASSOCIATION, as Second Priority Representative, LEE ENTERPRISES, INCORPORATED, as Borrower, and the other Loan Parties referred to therein, as amended from time to time."

(b) The Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties, agrees that all mortgages, deeds of trust, deeds and similar instruments now or hereafter filed against real property comprising Common Collateral in favor of or for the benefit of the Second Priority Representative and the other Second Priority Secured Parties shall contain the following notation:  "The lien created by this mortgage on the property described herein is junior and subordinate to the lien on such property created by any mortgage, deed of trust or similar instrument now or hereafter granted to DEUTSCHE BANK TRUST COMPANY AMERICAS, as Collateral Agent (under the First Priority

Documents), and its successors and assigns, in such property, in accordance with the provisions of the Intercreditor Agreement dated as of [_____], among DEUTSCHE BANK TRUST COMPANY AMERICAS, as First Priority Representative, WILMINGTON TRUST, NATIONAL ASSOCIATION, as Second Priority Representative, LEE ENTERPRISES, INCORPORATED, as Borrower, and the other Loan Parties referred to therein, as amended from time to time."

(c)    The First Priority Representative hereby acknowledges and agrees that, to the extent that it holds, or a third party holds on its behalf, physical possession of or "control" (as defined in the Uniform Commercial Code) over Common Collateral pursuant to the First Priority Security Documents, such possession or control is also for the benefit of, and the First Priority Representative or such third party holds such possession or control as bailee and agent for, the Second Priority Representative and the other Second Priority Secured Parties solely to the extent required to perfect their security interest in such Common Collateral (such bailment and agency for perfection being intended, among other things, to satisfy the requirements of sections 8-301(a)(2) and 9-313(c) of the Uniform Commercial Code).  Nothing in the preceding sentence shall be construed to impose any duty on the First Priority Representative (or any third party acting on its behalf) with respect to such Common Collateral or provide the Second Priority Representative or any other Second Priority Secured Party with any rights with respect to such Common Collateral beyond those specified in this Agreement and the Second Priority Security Documents, underlined provided that as soon as practicable after the occurrence of the events described in clauses (a), (b) and (c) of the definition of the First Priority Obligations Payment Date, the First Priority Representative shall (i) deliver, at the Borrower's sole cost and expense, the Common Collateral in its possession or control together with any necessary endorsements (x) *first*, to the Second Priority Representative to the extent any Second Priority Obligations remain outstanding and (y) *second*, to the Borrower to the extent no First Priority Obligations or Second Priority Obligations remain outstanding, or (ii) direct and deliver such Common Collateral as a court of competent jurisdiction otherwise directs, and provided, further, that the provisions of this Agreement are intended solely to govern the respective Lien priorities as between the First Priority Secured Parties and the Second Priority Secured Parties and shall not impose on the First Priority Secured Parties any obligations in respect of the disposition of any Common Collateral (or any proceeds thereof) that would conflict with prior perfected Liens or any claims thereon in favor of any other Person that is not a Secured Party.

(d)    To the extent that any deposit account or securities account of any Loan Party is subject to a control agreement in favor of the First Priority Representative, the First Priority Representative will act as bailee and agent for the Second Priority Representative solely to the extent required to perfect the Liens of the Second Priority Secured Parties in such deposit accounts and securities accounts and the cash and other assets therein.  Nothing in the preceding sentence shall be construed to impose any duty on the First Priority Representative (or any third party acting on its behalf) with respect to such Common Collateral or provide the Second Priority Representative or any other Second Priority Secured Party with any rights with respect to such Common Collateral beyond those specified in this Agreement and the Second Priority Security Documents.  Unless the Second Priority Liens on such First Priority Collateral shall have been or concurrently are released, after the First Priority Obligations Payment Date, the First Priority Representative shall cooperate with the Loan Parties and the Second Priority Representative (at the expense of the Loan Parties) in permitting control of any deposit accounts and securities accounts to be transferred to the Second Priority Representative (or for other arrangements with respect to each such deposit account and securities account reasonably satisfactory to the Second Priority Representative and in accordance with the Second Priority Documents to be made).

2.4    No New Liens.  So long as the First Priority Obligations Payment Date has not occurred, whether or not an Insolvency Proceeding has been commenced by or against any Loan Party the parties hereto agree that (a) there shall be no Lien, and no Loan Party shall have any right to create any Lien, on any assets of any Loan Party securing any Second Priority Obligation if these same assets are not subject to, and do not become subject to, a Lien securing the First Priority Obligations and (b) there shall be no Lien, and no Loan Party shall have any right to create any Lien, on any assets of any Loan Party securing any First Priority Obligation if these same assets are not subject to, and do not become subject to, a Lien securing the Second Priority Obligations.  To the extent that the foregoing provisions are not complied with for any reason, without limiting any other rights and remedies available to the First Priority Secured Parties, the Second Priority Representative and the other Second Priority Secured Parties agree that any amounts received by or distributed to any of them pursuant to or as a result of Liens granted in contravention of this Section 2.4 shall be subject to Section 4.1.

2.5    Prohibition on Contesting Liens.  Each of the Second Priority Representative, for itself and on behalf of each of the Second Priority Secured Parties, and the First Priority Representative, for itself and on behalf of each of the First Priority Secured Parties, agrees that it will not (and hereby waives any right to) object to or contest or support any other Person in objecting to or contesting, in any proceeding (including without limitation, any Insolvency Proceeding), the validity, extent, perfection, priority or enforceability of a Lien held by or on behalf of any of the First Priority Secured Parties in the First Priority Collateral or by or on behalf of any of the Second Priority Secured Parties in the Second Priority Collateral, as the case may be, or the provisions of this Agreement; provided, that nothing in this Agreement shall be construed to prevent or impair the rights of the First Priority Representative, any First Priority Secured Party, the Second Priority Representative or any Second Priority Secured Party to enforce this Agreement, including the provisions of this Agreement relating to the priority of the Liens securing the First Priority Obligations as provided in Sections 2.1 and 3.1.  Notwithstanding any failure by any First Priority Secured Party or Second Priority Secured Party to perfect its security interests in the Common Collateral or any avoidance, invalidation or subordination by any third party or court of competent jurisdiction of the security interests in the Common Collateral granted to the First Priority Secured Parties or the Second Priority Secured Parties, the priority and rights as between the First Priority Secured Parties and the Second Priority Secured Parties with respect to the Common Collateral shall be as set forth herein.

**SECTION 3**.  *Enforcement Rights.*

3.1    Exclusive Enforcement. Until the First Priority Obligations Payment Date has occurred, whether or not an Insolvency Proceeding has been commenced by or against any Loan Party, the First Priority Secured Parties shall have the exclusive right to take and continue any Enforcement Action with respect to the Common Collateral, without any consultation with or consent of any Second Priority Secured Party, but subject to the provisos set forth in Sections 3.2 and 5.1.  Upon the occurrence and during the continuance of a default or an event of default under the First Priority Documents, the First Priority Representative and the other First Priority Secured Parties may take and continue any Enforcement Action with respect to the First Priority Obligations and the Common Collateral in such order and manner as they may determine in their sole discretion.

3.2    Standstill and Waivers.  The Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties, agrees that, until the First Priority Obligations Payment Date has occurred, subject to the proviso set forth in Section 5.1:

(a)  they will not take or cause to be taken any Enforcement Action;

(b)  they will not take or cause to be taken any action, the purpose or effect of which is to make any Lien in respect of any Second Priority Obligation pari passu with or senior to, or to give any Second Priority Secured Party any preference or priority relative to, the Liens with respect to the First Priority Obligations or the First Priority Secured Parties with respect to any of the Common Collateral;

(c)  they will not contest, oppose, object to, interfere with, hinder or delay, in any manner, whether by judicial proceedings (including without limitation the filing of an Insolvency Proceeding in respect of any Loan Party) or otherwise, any foreclosure, sale, lease, exchange, transfer or other disposition of the Common Collateral by any First Priority Secured Party or any other Enforcement Action taken (or any forbearance from taking any Enforcement Action) by or on behalf of any First Priority Secured Party;

(d)  they have no right to (i) direct either the First Priority Representative or any other First Priority Secured Party to exercise any right, remedy or power with respect to the Common Collateral or pursuant to the First Priority Security Documents or (ii) consent or object to the exercise by the First Priority Representative or any other First Priority Secured Party of any right, remedy or power with respect to the Common Collateral or pursuant to the First Priority Security Documents or to the timing or manner in which any such right is exercised or not exercised (or, to the extent they may have any such right described in this clause (d), whether as a junior lien creditor or otherwise, they hereby irrevocably waive such right);

(e)  they will not institute any suit or other proceeding or assert in any suit, Insolvency Proceeding or other proceeding any claim against any First Priority Secured Party seeking damages from or other relief by way of specific performance, injunction or otherwise, with respect to, and no First Priority Secured Party shall be liable for, any action taken or omitted to be taken by any First Priority Secured Party with respect to the Common Collateral or pursuant to the First Priority Documents; and

(f)  they will not seek, and hereby waive any right, to have the Common Collateral or any part thereof marshaled upon any foreclosure or other disposition of the Common Collateral.

provided that, notwithstanding the foregoing, any Second Priority Secured Party may exercise its rights and remedies in respect of Common Collateral under the Second Priority Security Documents or applicable law after the passage of a period of 150 days (the "**Standstill Period**") from the first date of delivery of a notice in writing to the First Priority Representative and the Borrower of any Second Priority Secured Party's intention to exercise such rights and remedies in respect of Common Collateral, which notice may only be delivered following the occurrence of and during the continuance of an "Event of Default" under and as defined in the Second Priority Agreement; provided, further, however, that, notwithstanding the foregoing, in no event shall any Second Priority Secured Party exercise or continue to exercise any such rights or remedies if, notwithstanding the expiration of the Standstill Period, (i) any First Priority Secured Party shall have commenced and be diligently pursuing in good faith the exercise of any of its rights and remedies with respect to all or any material portion of the Common Collateral or (ii) an Insolvency Proceeding in respect of any Loan Party shall have been commenced; and provided, further, that in any Insolvency Proceeding commenced by or against any Loan Party, the Second Priority Representative and the Second Priority Secured Parties may take any action expressly permitted by Section 5.

Notwithstanding the foregoing contained in this Section 3.2, the Second Priority Representative and the Second Priority Secured Parties may:

(1)    take any action (not adverse to the priority status of the Liens on the Common Collateral, or the rights of any First Priority Representative or the First Priority Secured Parties to exercise remedies in respect thereof or the agreements set forth in Section 2) in order to create, perfect, preserve or protect its Lien on the Common Collateral;

(2)    file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any Person objecting to or otherwise seeking the disallowance of the claims of the Second Priority Secured Parties, including any claims secured by the Common Collateral, if any, in each case in a manner that is not inconsistent with, or in contravention of, the express terms of this Agreement;

(3)    file any pleadings, objections, motions or agreements or take any positions that assert rights or interests available to unsecured creditors of the Loan Parties arising under either any Insolvency Proceeding or applicable non-bankruptcy law, in each case in a manner that is not inconsistent with, or in contravention of, the express terms of this Agreement;

(4)    vote on any plan of reorganization, file any proof of claim or statement of interest, make other filings and make any arguments and motions that are, in each case, in a manner that is not inconsistent with, or in contravention of, the express terms of this Agreement, with respect to the Second Priority Obligations and the Common Collateral;

(5)    exercise any of its rights or remedies with respect to the Common Collateral after the termination of the Standstill Period to the extent permitted by this Section 3.2;

(6)    present a cash or credit bid (in the case of any such credit bid, so long as such bid provides for payment in full of the First Priority Obligations and the occurrence of the events described in clauses (a), (b) and (c) of the definition of the First Priority Obligations Payment Date) at any section 363 hearing or with respect to any other Common Collateral disposition; and

(7)    bid for or purchase Common Collateral at any private or judicial foreclosure upon such Common Collateral initiated by the First Priority Representative or any of the First Priority Secured Parties.

3.3    <u>Judgment Creditors</u>.  In the event that any Second Priority Secured Party becomes a judgment lien creditor as a result of its enforcement of its rights as an unsecured creditor, such judgment lien shall be subject to the terms of this Agreement for all purposes (including in relation to the First Priority Liens and the First Priority Obligations) to the same extent as all other Liens securing the Second Priority Obligations are subject to the terms of this Agreement.

3.4    <u>No Additional Rights For the Loan Parties Hereunder</u>.  Except as provided in Section 3.5, if any First Priority Secured Party or Second Priority Secured Party shall enforce its rights or remedies in violation of the terms of this Agreement, no Loan Party shall be entitled to use such violation as a defense to any action by any First Priority Secured Party or Second Priority Secured Party, nor to assert such violation as a counterclaim or basis for set off or recoupment against any First Priority Secured Party or Second Priority Secured Party.

3.5    <u>Actions Upon Breach</u>.  (a)  If any Second Priority Secured Party, contrary to this Agreement, commences or participates in any action or proceeding against any Loan Party or the Common Collateral, such Loan Party, with the prior written consent of the First Priority Representative, may interpose as a defense or dilatory plea the making of this Agreement, and any First Priority Secured Party may intervene and interpose such defense or plea in its or their name or in the name of such Loan Party.

(b)  Should any Second Priority Secured Party, contrary to this Agreement, in any way take, attempt to or threaten to take any action with respect to the Common Collateral (including, without limitation, any attempt to realize upon or enforce any remedy with respect to this Agreement), or fail to take any action required by this Agreement, any First Priority Secured Party (in its own name or in the name of the relevant Loan Party) or the relevant Loan Party may obtain relief against such Second Priority Secured Party by injunction, specific performance and/or other appropriate equitable relief, it being understood and agreed by the Second Priority Representative on behalf of each Second Priority Secured Party that (i) the First Priority Secured Parties' damages from its actions may at that time be difficult to ascertain and may be irreparable, and (ii) each Second Priority Secured Party waives any defense that the Loan Parties and/or the First Priority Secured Parties cannot demonstrate damage and/or be made whole by the awarding of damages.

3.6    <u>Option to Purchase</u>.  (a)  The First Priority Representative agrees that it will give the Second Priority Representative written notice (the "**Enforcement Notice**") within five business days after commencing any Enforcement Action with respect to Common Collateral or the institution of any Insolvency Proceeding (which notice shall be effective for all Enforcement Actions taken after the date of such notice so long as the First Priority Representative is diligently pursuing in good faith the exercise of its default or enforcement rights or remedies against, or diligently attempting in good faith to vacate any stay of enforcement rights of its senior Liens on a material portion of the Common Collateral, including, without limitation, all Enforcement Actions identified in such notice).  Following the commencement of an Enforcement Action or the institution of any Insolvency Proceeding by the First Priority Representative or any other First Priority Secured Party, any Second Priority Secured Party shall have the option, by irrevocable written notice (the "**Purchase Notice**") delivered by the Second Priority Representative to the First Priority Representative no later than five business days after receipt by the Second Priority Representative of the Enforcement Notice, to purchase all of the First Priority Obligations from the First Priority Secured Parties.  If the Second Priority Representative so delivers the Purchase Notice, the First Priority Representative shall terminate any existing Enforcement Actions, and shall not take any further Enforcement Actions, <u>provided</u>, that the Purchase (as defined below) shall have been consummated on the date specified in the Purchase Notice in accordance with this Section 3.6.

(b)    On the date specified by the Second Priority Representative in the Purchase Notice (which shall be a business day not less than five business days, nor more than ten business days, after receipt by the First Priority Representative of the Purchase Notice), the First Priority Secured Parties shall, subject to any required approval of any court or other governmental authority then in effect, sell to the Second Priority Secured Parties electing to purchase pursuant to Section 3.6(a) (the "**Purchasing Parties**"), and the Purchasing Parties shall purchase (the "**Purchase**") from the First Priority Secured Parties, the First Priority Obligations; <u>provided</u>, that the First Priority Obligations purchased shall not include any rights of First Priority Secured Parties with respect to indemnification and other obligations of the Loan Parties under the First Priority Documents that are expressly stated to survive the termination of the First Priority Documents (the "**Surviving Obligations**").

(c)      Without limiting the obligations of the Loan Parties under the First Priority Documents to the First Priority Secured Parties with respect to the Surviving Obligations (which shall not be transferred in connection with the Purchase), on the date of the Purchase, the Purchasing Parties shall (i) pay to the First Priority Secured Parties as the purchase price (the "**Purchase Price**") therefor the full amount of all First Priority Obligations then outstanding and unpaid (including principal, interest (including, to the extent applicable, interest at the default rate), Post-Petition Interest, fees, breakage costs, attorneys' fees and expenses, and, in the case of any Hedging Obligations, the amount that would be payable by the relevant Loan Party thereunder if it were to terminate such Hedging Obligations on the date of the Purchase or, if not terminated, an amount determined by the relevant First Priority Secured Party to be necessary to collateralize its credit risk arising out of such Hedging Obligations), (ii) furnish cash collateral (the "**Cash Collateral**") to the First Priority Secured Parties in such amounts as the relevant First Priority Secured Parties determine is reasonably necessary to secure such First Priority Secured Parties in connection with any outstanding letters of credit (not to exceed 105% of the aggregate undrawn face amount of such letters of credit), (iii) agree to reimburse the First Priority Secured Parties for any loss, cost, damage or expense (including attorneys' fees and expenses) in connection with any fees, costs or expenses related to any checks or other payments provisionally credited to the First Priority Obligations and/or as to which the First Priority Secured Parties have not yet received final payment and (iv) agree, after written request from the First Priority Representative, to reimburse the First Priority Secured Parties in respect of indemnification obligations of the Loan Parties under the First Priority Documents as to matters or circumstances known to the Purchasing Parties at the time of the Purchase which could reasonably be expected to result in any loss, cost, damage or expense to any of the First Priority Secured Parties, provided that, in no event shall any Purchasing Party have any liability for such amounts in excess of proceeds of Common Collateral received by the Purchasing Parties.

(d)      The Purchase Price and Cash Collateral shall be remitted by wire transfer in immediately available funds to such account of the First Priority Representative as it shall designate to the Purchasing Parties.  The First Priority Representative shall, promptly following its receipt thereof, distribute the amounts received by it in respect of the Purchase Price to the First Priority Secured Parties in accordance with the First Priority Agreement.  Interest shall be calculated to but excluding the day on which the Purchase occurs if the amounts so paid by the Purchasing Parties to the account designated by the First Priority Representative are received in such account prior to 12:00 Noon, New York City time, and interest shall be calculated to and including such day if the amounts so paid by the Purchasing Parties to the account designated by the First Priority Representative are received in such account later than 12:00 Noon, New York City time.

(e)      The Purchase shall be made without representation or warranty of any kind by the First Priority Secured Parties as to the First Priority Obligations, the Common Collateral or otherwise and without recourse to the First Priority Secured Parties, except that the First Priority Secured Parties shall represent and warrant:  (i) the amount of the First Priority Obligations being purchased, (ii) that the First Priority Secured Parties own the First Priority Obligations free and clear of any liens or encumbrances and (iii) that the First Priority Secured Parties have the right to assign the First Priority Obligations and the assignment is duly authorized.

3.7      Rights as Unsecured Creditors.  The Second Priority Representative and the Second Priority Secured Parties may exercise rights and remedies available to unsecured creditors against the Loan Parties that have granted Liens to secure the Second Priority Obligations in accordance with the terms of the Second Priority Documents and applicable law to the extent that such exercise is not inconsistent with, or in contravention of, the express terms of this Agreement; provided that in the event that any Second Priority Secured Party becomes an attachment or a judgment Lien creditor in respect of

the Common Collateral as a result of its enforcement of its rights as an unsecured creditor with respect to the Second Priority Obligations, such attachment or judgment Lien shall be subject to the terms of this Agreement for all purposes (including in relation to the First Priority Obligations) as the other Liens on Common Collateral securing the Second Priority Obligations are subject to this Agreement.

3.8     Second Priority Interest, Principal, Etc.  Nothing in this Agreement shall prohibit the receipt by the Second Priority Representative or any Second Priority Secured Parties of payments (including in cash) of interest, principal and other amounts owed in respect of the Second Priority Obligations unless such receipt is (x) the direct or indirect result of the exercise by the Second Priority Representative or any Second Priority Secured Parties of rights or remedies with respect to, or enforcement of, any Lien on Common Collateral held by any of them, which exercise or enforcement is inconsistent with, or in contravention of, the express terms of this Agreement or (y) from the proceeds of an Enforcement Action required to be applied in accordance with Section 4.1 below.  Nothing in this Agreement impairs or otherwise adversely affects any rights or remedies the First Priority Representative or the First Priority Secured Parties may have with respect to the Common Collateral.

3.9     Notice By First Priority Representative.  The First Priority Representative shall render to Second Priority Representative written notice of the occurrence of the events described in clauses (a), (b) and (c) of the definition of "First Priority Obligations Payment Date" as soon as practicable (and in any event within two business days) following the occurrence thereof, provided that such notice shall not be required in connection with the consummation of a Replacement First Priority Agreement.

**SECTION 4**.  *Application Of Proceeds Of Common Collateral; Dispositions And Releases Of Common Collateral; Inspection and Insurance.*

4.1     Application of Proceeds; Turnover Provisions.  All proceeds of Common Collateral (including without limitation any interest earned thereon) resulting from the sale, collection or other disposition of Common Collateral in connection with an Enforcement Action or the exercise by any First Priority Secured Party or any Second Priority Secured Party of any of its respective rights and remedies with respect to Common Collateral, whether or not pursuant to an Insolvency Proceeding, shall be distributed as follows: first to the First Priority Representative for application to the First Priority Obligations in accordance with the terms of the First Priority Documents, until the First Priority Obligations Payment Date has occurred and thereafter, to the Second Priority Representative for application in accordance with the Second Priority Documents.  Until the occurrence of the First Priority Obligations Payment Date, any Common Collateral, including without limitation any such Common Collateral constituting proceeds, that may be received by any Second Priority Secured Party in violation of this Agreement shall be segregated and held in trust and promptly paid over to the First Priority Representative, for the benefit of the First Priority Secured Parties, in the same form as received, with any necessary endorsements, and each Second Priority Secured Party hereby authorizes the First Priority Representative to make any such endorsements as agent for the Second Priority Representative (which authorization, being coupled with an interest, is irrevocable).

4.2     Releases of Second Priority Lien.  (a) Upon any release, sale or disposition of Common Collateral (other than in connection with the occurrence of the First Priority Obligations Payment Date) permitted pursuant to the terms of the First Priority Documents that results in the release of the First Priority Lien on any Common Collateral (excluding any sale or other disposition that is not permitted by the Second Priority Documents unless such sale or disposition is consummated in connection with an Enforcement Action or consummated after the institution of an Insolvency Proceeding in respect of any Loan Party), the Second Priority Lien on such Common Collateral (excluding any portion of the proceeds

of such Common Collateral remaining after the First Priority Obligations Payment Date occurs) shall be automatically and unconditionally released with no further consent or action of any Person.

(b)  The Second Priority Representative shall promptly execute and deliver such release documents and instruments and shall take such further actions as the First Priority Representative shall request to evidence any release of the Second Priority Lien described in paragraph (a).  The Second Priority Representative hereby appoints the First Priority Representative and any officer or duly authorized person of the First Priority Representative, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power of attorney in the place and stead of the Second Priority Representative and in the name of the Second Priority Representative or in the First Priority Representative's own name, from time to time, in the First Priority Representative's sole discretion, for the purposes of carrying out the terms of this Section 4.2, to take any and all appropriate action and to execute and deliver any and all documents and instruments as may be necessary or desirable to accomplish the purposes of this Section 4.2, including, without limitation, any financing statements, endorsements, assignments, releases or other documents or instruments of transfer (which appointment, being coupled with an interest, is irrevocable).

4.3    Inspection Rights and Insurance.  (a)  Any First Priority Secured Party and its representatives and invitees may at any time inspect, repossess, remove and otherwise deal with the Common Collateral in accordance with the terms of the First Priority Documents, and the First Priority Representative may advertise and conduct public auctions or private sales of the Common Collateral, in each case without notice to, the involvement of or interference by any Second Priority Secured Party or liability to any Second Priority Secured Party; provided that the First Priority Representative shall provide the Second Priority Representative with notice of any sales.

(b)  Until the First Priority Obligations Payment Date has occurred, the First Priority Representative will have the sole and exclusive right (i) to be named as additional insured and loss payee under any insurance policies maintained from time to time by any Loan Party (except that the Second Priority Representative shall have the right to be named as additional insured and loss payee so long as its second lien status is identified in a manner satisfactory to the First Priority Representative); (ii) to adjust or settle any insurance policy or claim covering the Common Collateral in the event of any loss thereunder in accordance with the terms of the First Priority Documents; (iii) to approve any award granted in any condemnation or similar proceeding affecting the Common Collateral in accordance with the terms of the First Priority Documents; and (iv) to apply the proceeds of any insurance or condemnation award to the First Priority Obligations in accordance with the terms of the First Priority Documents.

4.4    Subrogation.  With respect to the value of any payments or distributions in cash, property or other assets that any Second Priority Secured Party pays over to the First Priority Secured Parties under the terms of this Agreement, the Second Priority Secured Parties shall be subrogated to the rights of the First Priority Secured Parties; provided that, the Second Priority Representative, on behalf of itself and the Second Priority Creditors, hereby agrees not to assert or enforce all such rights of subrogation it may acquire as a result of any payment hereunder until the First Priority Obligations Payment Date has occurred.  Each Loan Party acknowledges and agrees that the value of any payments or distributions in cash, property or other assets received by any Second Priority Secured Party that are paid over to the First Priority Secured Parties pursuant to this Agreement shall not reduce any of the Second Priority Obligations.

**SECTION 5**. *Insolvency Proceedings.*

5.1    Filing of Motions.  Until the First Priority Obligations Payment Date has occurred, the Second Priority Representative agrees on behalf of itself and the other Second Priority Secured Parties that no Second Priority Secured Party shall, in or in connection with any Insolvency Proceeding in respect of any Loan Party, file any pleadings or motions, take any position at any hearing or proceeding of any nature, or otherwise take any action whatsoever, in each case that (a) violates, or is prohibited by, this Agreement, (b) asserts any right, benefit or privilege that arises in favor of the Second Priority Representative or Second Priority Secured Parties in their capacity as secured creditors solely as a result of their interest in the Common Collateral or in the Second Priority Lien (unless the assertion of such right is expressly permitted by this Agreement) or (c) challenges the validity, priority, enforceability or voidability of any Liens or claims held by the First Priority Representative or any other First Priority Secured Party, or the extent to which the First Priority Obligations constitute secured claims under section 506(a) of the Bankruptcy Code or otherwise; provided that the Second Priority Representative may take the actions specifically set forth in Section 3.2.

The First Priority Representative agrees on behalf of itself and the other First Priority Secured Parties that no First Priority Secured Party shall, in or in connection with any Insolvency Proceeding, file any pleadings or motions, take any position at any hearing or proceeding of any nature, or otherwise take any action whatsoever, in each case that challenges the validity, priority, enforceability or voidability of any Liens or claims held by the Second Priority Representative or any other Second Priority Secured Party, or the extent to which the Second Priority Obligations constitute secured claims under section 506(a) of the Bankruptcy Code or otherwise, except that the foregoing shall not limit the ability of any First Priority Secured Party to enforce the terms of this Agreement.

5.2    Financing Matters.  Until the First Priority Obligations Payment Date has occurred, if any Loan Party becomes subject to any Insolvency Proceeding, and if the First Priority Representative or the other First Priority Secured Parties consent to the use of cash collateral under the Bankruptcy Code or provide financing to any Loan Party under the Bankruptcy Code or consent to the provision of such financing to any Loan Party by any third party that (w) is in an aggregate principal amount (including any undrawn portion of the revolving commitments thereunder and the face amount of any letters of credit issued and not reimbursed thereunder) of no more than the sum of (i) the amount by which the Maximum First Priority Amount then exceeds the First Priority Outstanding Amount plus (ii) $35,000,000, the proceeds of which are used solely by, and for the benefit of, the Loan Parties (and not, for the avoidance of doubt, any Pulitzer Entity) (x) provides that the Second Priority Secured Parties retain the right to object to any ancillary agreements or arrangements regarding the cash collateral use or the financing that are materially adverse to the Second Priority Secured Parties, (y) provides the Second Priority Secured Parties with the Second Priority Required Adequate Protection, and (z) does not compel the Loan Parties to pursue any specific plan or to conduct a sale or other liquidation of the Common Collateral (any such financing that complies with such clauses (w)-(z) (a "**DIP Financing**"), then the Second Priority Representative agrees, on behalf of itself and the other Second Priority Secured Parties, that each Second Priority Secured Party (a) will raise no objection to, nor support any other Person objecting to, the use of such cash collateral or to such DIP Financing, (b) will not request or accept adequate protection or any other relief in connection with the use of such cash collateral or such DIP Financing except as set forth in Section 5.4 below and (c) to the extent the Liens securing the First Priority Obligations are subordinated to or pari passu with such DIP Financing will subordinate (and will be deemed hereunder to have subordinated) the Second Priority Liens (i) to such DIP Financing on the same terms as the First Priority Liens are subordinated thereto (and such subordination will not alter in any manner the terms of this Agreement), (ii) to any adequate protection provided to the First Priority Secured Parties and (iii) to any

"carve-out" agreed to by the First Priority Representative or the other First Priority Secured Parties in an amount not to exceed $5,000,000, and (d) agrees that notice received two calendar days prior to the entry of an interim order approving such usage of cash collateral or approving such financing and fifteen days prior to the entry of a final order approving such usage of cash collateral or approving such financing shall be adequate notice.

 5.3 <u>Relief From the Automatic Stay</u>. The Second Priority Representative agrees, on behalf of itself and the other Second Priority Secured Parties, that none of them will seek relief from the automatic stay (or any analogous stay) in any Insolvency Proceeding in respect of a Loan Party or take any action in derogation thereof, in each case in respect of any Common Collateral, without the prior written consent of the First Priority Representative unless the First Priority Representative or any of the First Priority Secured Parties have concurrently sought relief from the automatic stay (or from any analogous stay) in any Insolvency Proceeding and the Second Priority Representative and/or the other Second Priority Secured Parties are not seeking relief from the automatic stay (or from any analogous stay) in any Insolvency Proceeding in order to take any Enforcement Action in any manner in violation of or otherwise inconsistent with the provisions of this Agreement.

 5.4 <u>Adequate Protection</u>. The Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties, agrees that none of them shall object, contest, or support any other Person objecting to or contesting, in respect of any Insolvency Proceeding of a Loan Party, (a) any request by the First Priority Representative or the other First Priority Secured Parties for adequate protection or any adequate protection provided to the First Priority Representative or the other First Priority Secured Parties or (b) any objection by the First Priority Representative or any other First Priority Secured Parties to any motion, relief, action or proceeding based on a claim of a lack of adequate protection or (c) the payment of interest, fees, expenses or other amounts to the First Priority Representative or any other First Priority Secured Party under section 506(b) or 506(c) of the Bankruptcy Code or otherwise. In any Insolvency Proceeding of a Loan Party, (i) if the First Priority Secured Parties (or any subset thereof) are granted adequate protection consisting of additional collateral (with replacement liens on such additional collateral) and superpriority claims in connection with any DIP Financing or use of cash collateral, then in connection with any such DIP Financing or use of cash collateral, the Second Priority Representative, on behalf of itself and any of the Second Priority Secured Parties, may seek or accept adequate protection consisting solely of (w) a replacement Lien on the same additional collateral, subordinated to the Liens securing the First Priority Obligations and such DIP Financing on the same basis as the other Liens securing the Second Priority Obligations are so subordinated to the First Priority Obligations under this Agreement, (x) superpriority claims junior in all respects to the superpriority claims granted to the First Priority Secured Parties, (y) payment of the fees and expenses of the Second Priority Representative and the Second Priority Secured Parties, to the extent permitted in the Second Priority Documents (the adequate protection for the Second Priority Secured Parties described in clauses (w), (x), and (y), collectively, the "**Second Priority Required Adequate Protection**") and (z) subject to the right of the First Priority Secured Parties to object thereto, the payment of post-petition interest at the pre-default rate (<u>provided</u>, that in the case of this clause (z), that the First Priority Secured Parties have been granted adequate protection in the form of post-petition interest at a rate no lower than the pre-default rate), <u>provided</u>, <u>however</u>, that the Second Priority Representative shall have irrevocably agreed, pursuant to section 1129(a)(9) of the Bankruptcy Code, on behalf of itself and the Second Priority Secured Parties, in any stipulation and/or order granting such adequate protection, that such junior superpriority claims in excess of $3,000,000 may with the consent of two-thirds in amount of the Second Priority Obligations be paid under any plan of reorganization in any combination of cash, debt, equity or other property having a value on the effective date of such plan equal to the allowed amount of such claims and (ii) in the event the Second Priority Representative, on behalf of itself and the

Second Priority Secured Parties, seeks or accepts adequate protection in respect of Loan Party in accordance with clause (i) above and such adequate protection is granted in the form of additional collateral comprising assets of a Loan Party, then the Second Priority Representative, on behalf of itself or any of the Second Priority Secured Parties, agrees that the First Priority Representative shall also be granted a senior Lien on such additional collateral as security for the First Priority Obligations and any such DIP Financing and that any Lien on such additional collateral securing the Second Priority Obligations shall be subordinated to the Liens on such collateral securing the First Priority Obligations and any such DIP Financing (and all Obligations relating thereto) and any other Liens granted to the First Priority Secured Parties as adequate protection, with such subordination to be on the same terms that the other Liens securing the Second Priority Obligations are subordinated to such First Priority Obligations under this Agreement.  The Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties, agrees that except as expressly set forth in this Section none of them shall seek or accept adequate protection in respect of a Loan Party without the prior written consent of the First Priority Representative.

5.5    Avoidance Issues.  If any First Priority Secured Party is required in any Insolvency Proceeding or otherwise to disgorge, turn over or otherwise pay to the estate of any Loan Party, because such amount was avoided or ordered to be paid or disgorged for any reason, including without limitation because it was found to be a constructively fraudulent or preferential transfer, any amount (a "**Recovery**"), whether received as proceeds of security, enforcement of any right of set-off or otherwise, then the First Priority Obligations shall be reinstated to the extent of such Recovery and deemed to be outstanding as if such payment had not occurred and the First Priority Obligations Payment Date shall be deemed not to have occurred.  If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto.  The Second Priority Secured Parties agree that none of them shall be entitled to benefit from any avoidance action affecting or otherwise relating to the First Priority Liens or the Second Priority Liens, it being understood and agreed that the benefit of such avoidance action otherwise allocable to them shall instead be allocated and turned over for application in accordance with the priorities set forth in this Agreement.

5.6    Asset Dispositions in an Insolvency Proceeding.  In an Insolvency Proceeding or otherwise, neither the Second Priority Representative nor any other Second Priority Secured Party shall oppose any sale or disposition of any assets of any Loan Party that is supported by the First Priority Secured Parties (or any right of the First Priority Secured Party to credit bid the First Priority Obligations in any such sale or disposition), and the Second Priority Representative and each other Second Priority Secured Party will be deemed to have consented under section 363 of the Bankruptcy Code (and otherwise) to any sale (and related matters) supported by the First Priority Secured Parties and to have released their Liens on such assets provided that their Liens attach to the proceeds of such assets (subject to the priorities set forth in this Agreement) and that the proceeds remaining after payment of related transaction costs and expenses are applied as a permanent reduction of the First Priority Obligations (with a corresponding reduction in the Maximum First Priority Amount).  In an Insolvency Proceeding or otherwise, neither the First Priority Representative nor any other First Priority Secured Party shall oppose any right of any Second Priority Secured Party to credit bid the Second Priority Obligations in any sale or disposition, provided that such bid provides for the payment in full of the First Priority Obligations and the occurrence of the events described in clauses (a), (b) and (c) of the definition of First Priority Obligations Payment Date.

5.7    Separate Grants of Security and Separate Classification.  Each Secured Party and Loan Party acknowledges and agrees that (a) the grants of Liens on the assets of each Loan Party pursuant to

the First Priority Security Documents and the Second Priority Security Documents constitute two separate and distinct grants of Liens and (b) because of, among other things, their differing rights in the Common Collateral, the First Priority Obligations and the Second Priority Obligations are fundamentally different from each other and must be separately classified in any plan of reorganization proposed or adopted in an Insolvency Proceeding.  To further effectuate the intent of the parties as provided in the immediately preceding sentence, if it is held that the claims of the First Priority Secured Parties and Second Priority Secured Parties in respect of the Common Collateral constitute only one secured claim (rather than separate classes of senior and junior secured claims), then the Second Priority Secured Parties hereby acknowledge and agree that all distributions shall be made as if there were separate classes of senior and junior secured claims against the Loan Parties in respect of the Common Collateral, with the effect being that, to the extent that the aggregate value of the Common Collateral is sufficient (for this purpose ignoring all claims held by the Second Priority Secured Parties), the First Priority Secured Parties shall be entitled to receive, in addition to amounts distributed to them in respect of principal, pre-petition interest and other claims, all amounts owing in respect of Post-Petition Interest before any distribution is made in respect of the claims held by the Second Priority Secured Parties.  The Second Priority Secured Parties hereby acknowledge and agree to turn over to the First Priority Secured Parties amounts otherwise received or receivable by them to the extent necessary to effectuate the intent of the preceding sentence, even if such turnover has the effect of reducing the claim or recovery of the Second Priority Secured Parties.

5.8    No Waivers of Rights.  Nothing contained herein shall prohibit or in any way limit the First Priority Representative, the Second Priority Representative, any First Priority Secured Party, or any Second Priority Secured Party from objecting, in any Insolvency Proceeding or otherwise, to any action taken by any party not permitted hereunder.

5.9    Plans of Reorganization.  Nothing in this Agreement shall impair the rights of any Second Priority Secured Party to propose, support, or vote in favor of or against any plan of reorganization or similar plan or scheme in any Insolvency Proceeding, so long as such plan or scheme is not inconsistent with, or in contravention of, the express terms of this Agreement, provided that in the case of proposing such plan of reorganization or similar plan or scheme it shall, unless otherwise approved by the First Priority Representative, provide for payment in full of the First Priority Obligations and the occurrence of the events described in clauses (a), (b) and (c) of the definition of the First Priority Obligations Payment Date.

5.10    Effectiveness in Insolvency Proceedings.  This Agreement, which the parties hereto expressly acknowledge is a "subordination agreement" under section 510(a) of the Bankruptcy Code, shall be effective before, during and after the commencement of an Insolvency Proceeding.

**SECTION 6**.  *Security Documents.*

(a)  Each Loan Party and the Second Priority Representative, on behalf of itself and the Second Priority Secured Parties, agrees that it shall not at any time execute or deliver any amendment or other modification to any of the Second Priority Documents that is inconsistent with or in violation of this Agreement.

(b)  Each Loan Party and the First Priority Representative, on behalf of itself and the First Priority Secured Parties, agrees that it shall not at any time execute or deliver any amendment or other modification to any of the First Priority Documents that is inconsistent with or in violation of this Agreement.

(c)  In the event the First Priority Representative enters into any amendment, waiver or consent in respect of any of the First Priority Security Documents for the purpose of adding to, or deleting from, or waiving or consenting to any departures from any provisions of, any First Priority Security Document or changing in any manner the rights of any parties thereunder, then such amendment, waiver or consent shall apply automatically to any comparable provision of the Comparable Second Priority Security Document to the extent applicable to any Loan Party and Common Collateral without the consent of or action by any Second Priority Secured Party (with all such amendments, waivers and modifications subject to the terms hereof); provided that (other than with respect to amendments, modifications or waivers that secure additional extensions of credit and add additional secured creditors and do not violate the express provisions of the Second Priority Agreements), (i) no such amendment, waiver or consent shall have the effect of removing assets subject to the Lien of any Second Priority Security Document, except to the extent that a release of such Lien is permitted by Section 4.2, (ii) any such amendment, waiver or consent that materially and adversely affects the rights of the Second Priority Secured Parties and does not affect the First Priority Secured Parties in a like or similar manner shall not apply to the Second Priority Security Documents without the prior written consent of the Second Priority Representative, (iii) no such amendment, waiver or consent with respect to any provision applicable to the Second Priority Representative under the Second Priority Documents shall be made without the prior written consent of the Second Priority Representative and (iv) notice of such amendment, waiver or consent shall be given to the Second Priority Representative no later than 15 days after its effectiveness, provided that the failure to give such notice shall not affect the effectiveness and validity thereof.

**SECTION 7**. *Reliance; Waivers; etc.*

7.1     Reliance.  The First Priority Documents are deemed to have been executed and delivered, and all extensions of credit thereunder are deemed to have been made or incurred, in reliance upon this Agreement.  The Second Priority Representative, on behalf of itself and the Second Priority Secured Parties, expressly waives all notice of the acceptance of and reliance on this Agreement by the First Priority Secured Parties.  The Second Priority Documents are deemed to have been executed and delivered and all extensions of credit related thereto are deemed to have been made or incurred, in reliance upon this Agreement.  The First Priority Representative expressly waives all notices of the acceptance of and reliance by the Second Priority Representative and the Second Priority Secured Parties.

7.2     No Warranties or Liability.  The Second Priority Representative and the First Priority Representative acknowledge and agree that neither has made any representation or warranty with respect to the execution, validity, legality, completeness, collectibility or enforceability of any First Priority Document or any Second Priority Document.  Except as otherwise provided in this Agreement, the Second Priority Representative and the First Priority Representative will be entitled to manage and supervise their respective extensions of credit to any Loan Party in accordance with law and their usual practices, modified from time to time as they deem appropriate.

7.3     No Waivers.  No right or benefit of any party hereunder shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of such party or any other party hereto or by any noncompliance by any Loan Party with the terms and conditions of any of the First Priority Documents or the Second Priority Documents.

**SECTION 8**. *Obligations Unconditional.*

8.1     First Priority Obligations Unconditional.  All rights and interests of the First Priority Secured Parties hereunder, and all agreements and obligations of the Second Priority Secured Parties

(and, to the extent applicable, the Loan Parties) hereunder, shall remain in full force and effect irrespective of:

(a)  any lack of validity or enforceability of any First Priority Document;

(b)  any change in the time, place or manner of payment of, or in any other term of, all or any portion of the First Priority Obligations, or any amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of any First Priority Document;

(c)  prior to the First Priority Obligations Payment Date, any exchange, release, voiding, avoidance or non-perfection of any security interest in any Common Collateral or any other collateral, or any release, amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of all or any portion of the First Priority Obligations or any guarantee or guaranty thereof; or

(d)  any other circumstances that otherwise might constitute a defense available to, or a discharge of, any Loan Party in respect of the First Priority Obligations, or of the Second Priority Representative, or any Loan Party, to the extent applicable, in respect of this Agreement.

8.2     Second Priority Obligations Unconditional.  All rights and interests of the Second Priority Secured Parties hereunder, and all agreements and obligations of the First Priority Secured Parties (and, to the extent applicable, the Loan Parties) hereunder, shall remain in full force and effect irrespective of:

(a)  any lack of validity or enforceability of any Second Priority Document;

(b)  any change in the time, place or manner of payment of, or in any other term of, all or any portion of the Second  Priority Obligations, or any amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of any Second Priority Document;

(c)  any exchange, release, voiding, avoidance or non-perfection of any security interest in any Common Collateral or any other collateral, or any release, amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of all or any portion of the Second Priority Obligations or any guarantee or guaranty thereof; or

(d)  any other circumstances that otherwise might constitute a defense available to, or a discharge of, any Loan Party in respect of the Second  Priority Obligations or any First Priority Secured Party in respect of this Agreement.

**SECTION 9**.  Miscellaneous.

9.1     In the event of any conflict between the provisions of this Agreement and the provisions of any First Priority Document or any Second Priority Document, the provisions of this Agreement shall govern.  Notwithstanding the foregoing, the parties hereto acknowledge that the terms of this Agreement are not intended to and shall not, as between the Loan Parties and the Secured Parties, negate, waive or cancel any rights granted to, or carry liability or obligation of, any Loan Party in the First Priority

Documents and the Second Priority Documents or impose any additional obligations on the Loan Parties (other than as expressly set forth herein).

9.2     <u>Continuing Nature of Provisions.</u>  This Agreement shall continue to be effective, and shall not be revocable by any party hereto, until the First Priority Obligation Payment Date shall have occurred.  This is a continuing agreement and the First Priority Secured Parties and the Second Priority Secured Parties may continue, at any time and without notice to the other parties hereto, to extend credit and other financial accommodations, lend monies and provide indebtedness to, or for the benefit of, Borrower or any other Loan Party on the faith hereof.

9.3     <u>Amendments; Waivers.</u>  (a)  No amendment or modification of any of the provisions of this Agreement shall be effective unless the same shall be in writing and signed by the First Priority Representative (with the consent of the Required Lenders under and as defined in the First Priority Agreement) and the Second Priority Representative (with the consent of the Required Lenders under and as defined in the Second Priority Agreement), and, in the case of amendments or modifications of Sections 3.5, 3.6, 9.3, 9.5 or 9.6 that directly affect the rights or duties of any Loan Party, such Loan Party, and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time.  Anything herein to the contrary notwithstanding, no consent of any Loan Party shall be required for amendments, modifications or waivers of any other provisions of this Agreement other than those that directly affect any obligation or right of the Loan Parties hereunder or under the First Priority Documents or the Second Priority Documents or that would impose any additional obligations on the Loan Parties.

(b)  It is understood that the First Priority Representative and the Second Priority Representative, without the consent of any other First Priority Secured Party or Second Priority Secured Party, may in their discretion determine that a supplemental agreement (which make take the form of an amendment and restatement of this Agreement) is necessary or appropriate to facilitate having additional indebtedness or other obligations ("**Additional Debt**") of any of the Loan Parties become First Priority Obligations or Second Priority Obligations, as the case may be, under this Agreement, which supplemental agreement shall specify whether such Additional Debt constitutes First Priority Obligations or Second Priority Obligations, <u>provided</u>, that such Additional Debt is permitted to be incurred by the First Priority Agreement and Second Priority Agreement then extant, and is permitted by said Agreements to be subject to the provisions of this Agreement as First Priority Obligations or Second Priority Obligations, as applicable.

9.4     <u>Information Concerning Financial Condition of the Borrower and the other Loan Parties.</u>  Each of the Second Priority Representative and the First Priority Representative hereby assume responsibility for keeping itself informed of the financial condition of the Borrower and each of the other Loan Parties and all other circumstances bearing upon the risk of nonpayment of the First Priority Obligations or the Second Priority Obligations.  The Second Priority Representative and the First Priority Representative hereby agree that no party shall have any duty to advise any other party of information known to it regarding such condition or any such circumstances.  In the event the Second Priority Representative or the First Priority Representative, in its sole discretion, undertakes at any time or from time to time to provide any information to any other party to this Agreement, it shall be under no obligation (a) to provide any such information to such other party or any other party on any subsequent occasion, (b) to undertake any investigation not a part of its regular business routine, or (c) to disclose any other information.

9.5     Governing Law.  This Agreement shall be construed in accordance with and governed by the law of the State of New York, except as otherwise required by mandatory provisions of law and except to the extent that remedies provided by the laws of any jurisdiction other than the State of New York are governed by the laws of such jurisdiction.

9.6     Submission to Jurisdiction.  (a)  Each First Priority Secured Party, each Second Priority Secured Party and each Loan Party hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each such party hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court.  Each such party agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that any First Priority Secured Party or any Second Priority Secured Party may otherwise have to bring any action or proceeding against any Loan Party or its properties in the courts of any jurisdiction.

(b)  Each First Priority Secured Party, each Second Priority Secured Party and each Loan Party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so (i) any objection it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in paragraph (a) of this Section and (ii) the defense of an inconvenient forum to the maintenance of such action or proceeding.

(c)  Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.7.  Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

9.7     Notices.  Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given shall be in writing and may be personally served, telecopied, or sent by overnight express courier service or United States mail and shall be deemed to have been given when delivered in person or by courier service, upon receipt of a telecopy or five days after deposit in the United States mail (certified, with postage prepaid and properly addressed).  For the purposes hereof, the addresses of the parties hereto (until notice of a change thereof is delivered as provided in this Section) shall be as set forth below each party's name on the signature pages hereof, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

9.8     Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of each of the parties hereto and each of the First Priority Secured Parties and Second Priority Secured Parties and their respective successors and permitted assigns, and nothing herein is intended, or shall be construed to give, any other Person any right, remedy or claim under, to or in respect of this Agreement or any Common Collateral.

9.9     Headings.  Section headings used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

9.10    Severability.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

9.11    Counterparts; Integration; Effectiveness.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this Agreement by email or telecopy shall be effective as delivery of a manually executed counterpart of this Agreement. This Agreement shall become effective when it shall have been executed by each party hereto.

9.12    **WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AND FOR ANY COUNTERCLAIM THEREIN.**

9.13    Additional Loan Parties.  Each Person that becomes a Loan Party after the date hereof shall become a party to this Agreement upon execution and delivery by such Person of a joinder agreement as provided in section 10.12 of the Security Agreement referred to in the First Priority Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

DEUTSCHE BANK TRUST COMPANY AMERICAS, as First Priority Representative for and on behalf of the First Priority Secured Parties

By:_____
Name:
Title:

Address for Notices:

Attention:
Telecopy No.:

WILMINGTON TRUST, NATIONAL ASSOCIATION, as Second Priority Representative for and on behalf of the Second Priority Secured Parties

By:_____
Name:
Title:

Address for Notices:
Wilmington Trust, N.A.
50 South Sixth Street, Suite 1290
Minneapolis, MN 55402

Attention:  Josh James
Telecopy No.:  (612) 217-5651
Tel.:  (612) 217-5637
Email:  jjames@WilmingtonTrust.com

[LOAN PARTIES]

By:_____
Name:
Title:

Address for Notices:

Attention:
Telecopy No.:

# Exhibit 1.80

*New PD LLC Intercreditor Agreement*

DRAFT 11/30/2011

## INTERCREDITOR AGREEMENT

Intercreditor Agreement (this "**Agreement**"), dated as of [_____], 2012, among THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., as Collateral Agent (in such capacity, with its successors and assigns, and as more specifically defined below, the "**First Priority Representative**") for the First Priority Secured Parties (as defined below), WILMINGTON TRUST, NATIONAL ASSOCIATION, as Collateral Agent (in such capacity, with its successors and assigns, and as more specifically defined below, the "**Second Priority Representative**") for the Second Priority Secured Parties (as defined below), ST. LOUIS POST-DISPATCH LLC (the "**Borrower**") and each of the other Loan Parties (as defined below) party hereto.

WHEREAS, the Borrower and certain financial institutions and other entities are parties to that certain Note Agreement dated as of May 1, 2000, as amended by (i) Amendment No. 1 to Note Agreement dated as of November 23, 2004, (ii) Amendment No. 2 to Note Agreement dated as of February 1, 2006, (iii) Amendment No. 3 to Note Agreement dated as of November 19, 2008, (iv) the Limited Waiver to Note Agreement and Guaranty Agreement (as amended), dated as of December 26, 2008, (v) Amendment No. 4 and First Amendment to Limited Waiver to Note Agreement and Guaranty Agreement, dated as of January 16, 2009, (vi) that certain Limited Waiver and Amendment No. 5 to Note Agreement dated as of February 18, 2009, (vii) Amendment No. 6 to Note Agreement dated as of April 6, 2011, and (viii) Amendment No. 7 to Note Agreement dated as of November 7, 2011, pursuant to which the Borrower issued and sold adjustable rate senior notes (collectively, the "**Exchanged Notes**");

WHEREAS, the Borrower and each of the holders of the Exchanged Notes are entering into that certain Note Agreement, dated as of the date hereof (as amended, supplemented, amended and restated or otherwise modified from time to time except as expressly prohibited hereby, the "**Existing First Priority Agreement**"), pursuant to which the Exchanged Notes are being exchanged for new adjustable rate senior notes of the Borrower (as amended, supplemented, amended and restated or otherwise modified from time to time, the "**Notes**");

WHEREAS, Lee Enterprises, Incorporated (the indirect parent of the Borrower, "**Lee**"), the Second Priority Representative and certain financial institutions and other entities are parties to the Second Lien Loan Agreement, dated as of the date hereof (as amended, supplemented, amended and restated or otherwise modified from time to time, the "**Second Priority Term Loan Agreement**"), pursuant to which such financial institutions and other entities have agreed to make (or be deemed to have made) loans to Lee;

WHEREAS, the Borrower is the obligor, and Pulitzer Inc. ("**Pulitzer**") and the other Loan Parties are the guarantors, of the First Priority Obligations and the Loan Parties have granted to the First Priority Representative security interests in the Common Collateral as security for payment and performance of the First Priority Obligations;

WHEREAS, pursuant to that certain Subsidiaries Guaranty, dated as of the date hereof (as amended, supplemented, amended and restated or otherwise modified from time to time except as expressly prohibited hereby, the "**Second Priority Guaranty Agreement**"), the Loan Parties (and certain other subsidiaries of Lee which are not Loan Parties and are not subject to the arrangements hereunder) have guaranteed the obligations under the Second Priority Term Loan Agreement and pursuant to the Second Priority Security Documents the Loan Parties have granted to the Second Priority Representative junior security interests in the Common Collateral as security for payment and performance of the Second Priority Obligations; and

WHEREAS, the First Priority Creditors under the Existing First Priority Agreement have agreed to permit the grant of such junior security interests in the Common Collateral on the terms and conditions of this Agreement.

NOW THEREFORE, in consideration of the foregoing and the mutual covenants herein contained and other good and valuable consideration, the existence and sufficiency of which are expressly recognized by all of the parties hereto, the parties agree as follows:

**SECTION 1**. *Definitions.*

1.1.    <u>Defined Terms</u>.  The following terms, as used herein, have the following meanings:

"**Agreement**" has the meaning set forth in the introductory paragraph hereof.

"**Bankruptcy Code**" means the United States Bankruptcy Code (11 U.S.C. §101 et seq.), as amended from time to time.

"**Borrower**" has the meaning set forth in the introductory paragraph hereof.

"**Common Collateral**" means all assets that are both First Priority Collateral and Second Priority Collateral.

"**Comparable Second Priority Security Document**" means, in relation to any Common Collateral subject to any First Priority Security Document, that Second Priority Security Document that creates a security interest in the same Common Collateral, granted by the same Loan Party, as applicable.

"**DIP Financing**" has the meaning set forth in Section 5.2.

"**Enforcement Action**" means, with respect to the First Priority Obligations or the Second Priority Obligations the exercise of any rights and remedies with respect to any Common Collateral securing such obligations or the commencement or prosecution of enforcement of any of the rights and remedies with respect to the Common Collateral under, as applicable, the First Priority Documents or the Second Priority Documents, or applicable law, including without limitation (a) the exercise of any rights of set-off or recoupment, (b) the exercise of any rights or remedies of a secured creditor under the Uniform Commercial Code of any applicable jurisdiction or under the Bankruptcy Code, and (c) the commencement of any judicial or nonjudicial foreclosure proceedings with respect to, attempting any action to take possession of any Common Collateral, exercising any right, remedy or power with respect to, or otherwise taking any action to enforce their interest in or realize upon, the Common Collateral.

"**Exchanged Notes**" has the meaning set forth in the recitals to this Agreement.

"**Existing First Priority Agreement**" has the meaning set forth in the recitals to this Agreement.

"**First Priority Agreement**" means the collective reference to (a) the Existing First Priority Agreement, (b) any other credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement or instrument evidencing or governing the terms of any indebtedness or other financial accommodation that has been incurred to extend, increase, renew, refund, replace (whether upon or after termination or otherwise) or refinance (including by means of sales of debt securities to institutional investors) in whole or in part from time to time the indebtedness and other obligations outstanding under

the Existing First Priority Agreement, the Notes or any other agreement or instrument referred to in this clause (b) unless such agreement or instrument expressly provides that it is not intended to be and is not a First Priority Agreement hereunder (a "**Replacement First Priority Agreement**").  Any reference to the First Priority Agreement hereunder shall be deemed a reference to any First Priority Agreement then extant.

"**First Priority Collateral**" means all assets, whether now owned or hereafter acquired by the Borrower or any other Loan Party, in which a Lien is granted or purported to be granted to any First Priority Secured Party as security for any First Priority Obligation.

"**First Priority Creditors**" means the holders of the Notes or any other First Priority Obligations under the First Priority Documents.

"**First Priority Documents**" means the First Priority Agreement, the Notes, each First Priority Security Document and each First Priority Guaranty.

"**First Priority Guaranty**" means any guaranty by any Loan Party of any or all of the First Priority Obligations.

"**First Priority Lien**" means any Lien created by the First Priority Security Documents.

"**First Priority Obligations**" means (a) with respect to the Existing First Priority Agreement, all "Secured Obligations" of each Loan Party as defined in the First Priority Security Documents and (b) with respect to each other First Priority Document, (i) all principal of, and interest (including without limitation any Post-Petition Interest), yield-maintenance amounts (if any) and premium (if any) on, all loans made or other indebtedness issued or incurred pursuant to the First Priority Agreement, (ii) all reimbursement obligations (if any) and interest thereon (including without limitation any Post-Petition Interest) with respect to any letter of credit or similar instruments issued pursuant to the First Priority Agreement, (iii) all Hedging Obligations and (iv) all guarantee obligations of, or fees, expenses and other amounts payable by any Loan Party, from time to time pursuant to the First Priority Documents, in each case whether or not allowed or allowable in an Insolvency Proceeding.  To the extent any payment with respect to any First Priority Obligation (whether by or on behalf of any Loan Party, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any Second Priority Secured Party, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of this Agreement and the rights and obligations of the First Priority Secured Parties and the Second Priority Secured Parties, be deemed to be reinstated and outstanding as if such payment had not occurred.

Notwithstanding the foregoing contained in this defined term of First Priority Obligations, if the sum of (1) the principal amount outstanding under the Existing First Priority Agreement and each other First Priority Agreement, plus (2) the aggregate undrawn face amount of any outstanding letters of credit under the Existing First Priority Agreement and each other First Priority Agreement and any unreimbursed drawings of any letters of credit issued under the Existing First Priority Agreement and each other First Priority Agreement (such sum, the "**First Priority Outstanding Amount**") exceeds  the Maximum First Priority Amount, then only that portion of the First Priority Outstanding Amount equal to the Maximum First Priority Amount shall be included in First Priority Obligations and interest, yield-maintenance amounts and reimbursement obligations with respect to the First Priority Outstanding

Amount shall only constitute First Priority Obligations to the extent related to the First Priority Outstanding Amount.

"**First Priority Obligations Payment Date**" means the first date on which (a) the First Priority Obligations (other than those that constitute Unasserted Contingent Obligations) have been paid in cash in full (or cash collateralized or defeased in accordance with the terms of the First Priority Documents), (b) all commitments to extend credit under the First Priority Documents have been terminated or expired, (c) there are no outstanding letters of credit or similar instruments issued under the First Priority Documents (other than such as have been cash collateralized or defeased in accordance with the terms of the First Priority Documents, but in no event greater than 105% of the aggregate undrawn face amount thereof) and (d) the First Priority Representative shall have either (x) delivered  written notice to the Second Priority Representative or any other Second Priority Secured Party of the occurrence of the events described in clauses (a), (b) and (c) hereinabove or (y) failed to timely comply with its notice obligation under Section 3.9 hereof.

"**First Priority Outstanding Amount**" has the meaning set forth in the definition of "First Priority Obligations".

"**First Priority Representative**" has the meaning set forth in the introductory paragraph hereof. In the case of any Replacement First Priority Agreement, the First Priority Representative shall be the Person identified as such in such Agreement.

"**First Priority Secured Parties**" means the First Priority Representative, the First Priority Creditors and any other holders of the First Priority Obligations.

"**First Priority Security Documents**" means the "Collateral Documents" as defined in the Existing First Priority Agreement (as in effect on the date hereof), and all other documents, instruments and agreements to which any Loan Party is a party from time to time which grant Liens in favor of the First Priority Representative to secure the First Priority Obligations.

"**Hedging Obligations**" means, with respect to any Loan Party, any monetary obligations of such Loan Party owed to any First Priority Creditor in respect of (i) any interest rate swap agreement, interest rate cap agreement, interest collar agreement, interest rate hedging agreement or other similar agreement or arrangement and (ii) any foreign exchange contracts, currency swap agreements, commodity agreements or other similar arrangements, or arrangements designed to protect against fluctuations in currency values or commodity prices, including, in each case, interest and Post-Petition Interest.

"**Insolvency Proceeding**" means any proceeding in respect of bankruptcy, insolvency, winding up, receivership, dissolution or assignment for the benefit of creditors, in each of the foregoing events whether under the Bankruptcy Code or any similar federal, state or foreign bankruptcy, insolvency, reorganization, receivership or similar law, in each case solely to the extent in respect of any Loan Party.

"**Lee**" has the meaning set forth in the recitals to this Agreement.

"**Lien**" means any mortgage, pledge, hypothecation, assignment, encumbrance, lien (statutory or other), or security interest or other security agreement of any kind (including, without limitation, any conditional sale or other title retention agreement, any financing or similar statement or notice filed under the Uniform Commercial Code or any other similar recording or notice statute, and any lease having

substantially the same effect as any of the foregoing), and any attachment or judgment lien contemplated in Section 3.3, in each case solely to the extent in respect of any asset of any Loan Party.

"**Loan Party**" means the Borrower, Pulitzer and each of their respective direct or indirect subsidiaries, in each case to the extent, and during such time as, such person is a party to any First Priority Security Document and any Second Priority Security Document.  All references in this Agreement to any Loan Party shall include such Loan Party as a debtor-in-possession and any receiver or trustee for such Loan Party in any Insolvency Proceeding.

"**Maximum First Priority Amount**" means (i) the aggregate principal amount of the Notes outstanding on the date hereof (after giving effect to the transactions contemplated to occur on the date hereof) under the Existing First Priority Agreement (which amount, for the avoidance of doubt, is $[_____]) or (ii) at any time following the repayment in full in cash of all outstanding obligations under the Existing First Priority Agreement and related First Priority Documents with the proceeds of Permitted Pulitzer Debt Refinancing Indebtedness (as defined in the Second Priority Term Loan Agreement), $150,000,000 minus, in each case of (i) and (ii), the aggregate amount of all payments of principal of (x) the Notes pursuant to the Existing First Priority Agreement and each other First Priority Agreement (including all such payments made on the date hereof), and (y) such Permitted Pulitzer Debt Refinancing Indebtedness.  For the avoidance of doubt, the amount of any DIP Financing shall not be included for purposes of determining the "Maximum First Priority Amount."

"**Notes**" has the meaning set forth in the recitals to this Agreement.

"**Person**" means any individual, partnership, joint venture, firm, corporation, association, trust or other enterprise or any government or political subdivision or any agency, department or instrumentality thereof.

"**Post-Petition Interest**" means any interest or entitlement to fees or expenses or other charges that accrues after the commencement of any Insolvency Proceeding, whether or not allowed or allowable in any such Insolvency Proceeding.

"**Pulitzer**" has the meaning set forth in the recitals to this Agreement.

"**Purchase**" has the meaning set forth in Section 3.6.

"**Purchase Notice**" has the meaning set forth in Section 3.6.

"**Purchase Price**" has the meaning set forth in Section 3.6.

"**Purchaser**" has the meaning set forth in Section 3.6.

"**Purchasing Parties**" has the meaning set forth in Section 3.6.

"**Replacement First Priority Agreement**" has the meaning set forth in the definition of "First Priority Agreement."

"**Second Priority Agreement**" means the collective reference to (a) the Second Priority Guaranty Agreement and (b) any guaranty to which any Loan Party is a party with respect to any other credit agreement, loan agreement, note agreement, promissory note, indenture, or other agreement or instrument

evidencing or governing the terms of any indebtedness (or guarantee thereof) or other financial accommodation that has been incurred to extend, increase, renew, refund, replace (whether upon or after termination or otherwise) or refinance (including by means of sales of debt securities to institutional investors) in whole or in part from time to time the indebtedness and other obligations outstanding (contingent or otherwise) under the Second Priority Term Loan Agreement or any other agreement or instrument referred to in this clause (b), provided that (i) the terms of any of the foregoing in this clause (b) are no less favorable to the Loan Parties than those set forth in the Second Priority Term Loan Agreement and (ii) the maximum aggregate principal amount of indebtedness (for the avoidance of doubt, not including interest, premium, yield-maintenance amounts, fees or reimbursement obligations (including expenses) payable in respect thereof, in each case including, without limitation, amounts capitalized in accordance with the First Priority Agreement and the Second Priority Agreement) which is guaranteed by any Loan Party as referenced in clauses (a) or (b) shall not exceed $175,000,000 or such greater amount as may then be expressly permitted by the First Priority Agreement.  Any reference to the Second Priority Agreement hereunder shall be deemed a reference to any Second Priority Agreement then extant.

"**Second Priority Collateral**" means all assets (whether now owned or hereafter acquired) of the Borrower or any other Loan Party in which a Lien is granted or purported to be granted to any Second Priority Secured Party as security for any Second Priority Obligation.

"**Second Priority Creditors**" means the "Secured Creditors" as defined in the Second Priority Security Documents, the "Lenders" as defined in each other Second Priority Agreement, or any Persons that are designated under the Second Priority Agreement as the "Second Priority Creditors" for purposes of this Agreement.

"**Second Priority Documents**" means the Second Priority Agreement and the Second Priority Security Documents.

"**Second Priority Guaranty Agreement**" has the meaning set forth in the recitals to this Agreement.

"**Second Priority Lien**" means any Lien created by the Second Priority Security Documents in respect of any assets of a Loan Party.

"**Second Priority Obligations**" means (a) with respect to the Second Priority Guaranty Agreement, all "Obligations" of each Loan Party as defined in the Second Priority Security Documents and (b) with respect to each other Second Priority Agreement, (i) all principal of, and interest (including without limitation any Post-Petition Interest), yield-maintenance amounts (if any) and premium (if any) on, all indebtedness (contingent or otherwise) of any Loan Party under the Second Priority Agreement, and (ii) all guarantee obligations of, or fees, expenses and other amounts payable by, any Loan Party from time to time pursuant to the Second Priority Documents, in each case whether or not allowed or allowable in an Insolvency Proceeding.  To the extent any payment with respect to any Second Priority Obligation (whether by or on behalf of any Loan Party, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any First Priority Secured Party, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of this Agreement and the rights and obligations of the First Priority Secured Parties and the Second Priority Secured Parties, be deemed to be reinstated and outstanding as if such payment had not occurred.

"**Second Priority Representative**" has the meaning set forth in the introductory paragraph hereof, but shall also include any Person identified as a "Second Priority Representative" in any Second Priority Agreement other than the Second Priority Term Loan Agreement.

"**Second Priority Required Adequate Protection**" has the meaning set forth in Section 5.4.

"**Second Priority Secured Party**" means the Second Priority Representative, the Second Priority Creditors and any other holders of the Second Priority Obligations.

"**Second Priority Security Documents**" means the "Security Documents" (as defined in the Second Priority Term Loan Agreement as in effect on the date hereof) to which any Loan Party is party and all other documents, instruments and agreements to which any Loan Party is a party from time to time which grant Liens in favor of the Second Priority Representative to secure the Second Priority Obligations.

"**Second Priority Term Loan Agreement**" has the meaning set forth in the recitals to this Agreement.

"**Secured Parties**" means the First Priority Secured Parties and the Second Priority Secured Parties.

"**Standstill Period**" has the meaning set forth in Section 3.2.

"**Surviving Obligations**" has the meaning set forth in Section 3.6(b).

"**Unasserted Contingent Obligations**" shall mean, at any time, First Priority Obligations for taxes, costs, indemnifications, reimbursements, damages and other liabilities (excluding (a) the principal of, and interest, yield-maintenance amount and premium (if any) on, and fees and expenses relating to, any First Priority Obligation and (b) contingent reimbursement obligations in respect of amounts that may be drawn under outstanding letters of credit) in respect of which no assertion of liability (whether oral or written) and no claim or demand for payment (whether oral or written) has been made (and, in the case of First Priority Obligations for indemnification, no notice for indemnification has been issued by the indemnitee) at such time.

"**Uniform Commercial Code**" shall mean the Uniform Commercial Code as in effect from time to time in the applicable jurisdiction.

1.2    Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (i) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (to the extent applicable, in accordance with Section 6 hereof), (ii) any reference herein to any Person shall be construed to include such Person's successors or permitted assigns, (iii) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Sections shall be construed to refer to Sections of this Agreement and (v) the words

"asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

**SECTION 2**. *Lien Priorities*.

2.1    <u>Subordination of Liens</u>.  (a)  Any and all Liens on assets of any Loan Party now existing or hereafter created or arising in favor of any Second Priority Secured Party securing the Second Priority Obligations, regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise are expressly junior in priority, operation and effect to any and all Liens on assets of any Loan Party now existing or hereafter created or arising in favor of the First Priority Secured Parties securing the First Priority Obligations, notwithstanding (i) anything to the contrary contained in any agreement or filing to which any Second Priority Secured Party may now or hereafter be a party, and regardless of the time, order or method of grant, attachment, recording or perfection of any financing statements or other security interests, assignments, pledges, deeds, mortgages and other liens, charges or encumbrances or any defect or deficiency or alleged defect or deficiency in any of the foregoing, (ii) any provision of the Uniform Commercial Code or any applicable law or any First Priority Document or Second Priority Document or any other circumstance whatsoever and (iii) the fact that any such Liens in favor of any First Priority Secured Party securing any of the First Priority Obligations are (x) subordinated to any Lien securing any obligation of any Loan Party other than the Second Priority Obligations or (y) otherwise subordinated, voided, avoided, invalidated or lapsed.

(b)  The First Priority Representative, on behalf of itself and the other First Priority Secured Parties, acknowledges and agrees that the Second Priority Representative on behalf of itself and the other Second Priority Secured Parties, has been granted Liens upon all of the Common Collateral, and the First Priority Representative, on behalf of itself and the other First Priority Secured Parties, hereby consents thereto.  The subordination of Liens on assets of any Loan Party by the Second Priority Representative in favor of the First Priority Representative shall not be deemed to subordinate such Liens of the Second Priority Representative (or any Second Priority Secured Party) to any Liens other than (x) the Liens of the First Priority Secured Parties securing the First Priority Obligations and (y) Liens that are permitted under the First Priority Documents to be senior to the First Priority Liens, and (z) Liens permitted pursuant to Section 5 hereof.

2.2    <u>Nature of First Priority Obligations</u>.  The Second Priority Representative on behalf of itself and the other Second Priority Secured Parties acknowledges that in the event the First Priority Obligations include debt that is revolving in nature the amount of First Priority Obligations that may be outstanding at any time or from time to time may be increased or reduced and subsequently reborrowed, and that the terms of the First Priority Obligations may be modified, extended or amended from time to time, and that the aggregate amount of the First Priority Obligations may be increased, replaced or refinanced, in each event, without notice to or consent by the Second Priority Secured Parties and without affecting the provisions hereof but only so long as any such obligations are permitted to be incurred pursuant to the terms hereof or of the Second Priority Documents as in effect on the date of this Agreement.  The lien priorities provided in Section 2.1 shall not be altered or otherwise affected by any such amendment, modification, supplement, extension, repayment, reborrowing, increase, replacement, renewal, restatement or refinancing of either the First Priority Obligations or the Second Priority Obligations, or any portion thereof.

2.3    <u>Agreements Regarding Actions to Perfect Liens</u>.  (a)  The Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties, agrees that each patent, trademark or copyright filing or other filings or recordings (other than Uniform Commercial Code

financing statements) filed or recorded by or on behalf of the Second Priority Representative in respect of applicable Common Collateral shall, to the extent reasonably practicable, contain the following notation: "The lien created hereby on the property described herein is junior and subordinate to the lien on such property created by any agreement, filing or recording now or hereafter granted to The Bank of New York Mellon Trust Company, N.A., as Collateral Agent (under the First Priority Documents), and its successors and assigns, in such property, in accordance with the provisions of the Intercreditor Agreement dated as of [_____], among THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A. as First Priority Representative, WILMINGTON TRUST, NATIONAL ASSOCIATION, as Second Priority Representative, ST. LOUIS POST-DISPATCH LLC, as Borrower, and the other Loan Parties referred to therein, as amended from time to time."

(b) The Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties, agrees that all mortgages, deeds of trust, deeds and similar instruments now or hereafter filed against real property comprising Common Collateral in favor of or for the benefit of the Second Priority Representative and the other Second Priority Secured Parties shall contain the following notation: "The lien created by this mortgage on the property described herein is junior and subordinate to the lien on such property created by any mortgage, deed of trust or similar instrument now or hereafter granted to The Bank of New York Mellon Trust Company, N.A., as Collateral Agent (under the First Priority Documents), and its successors and assigns, in such property, in accordance with the provisions of the Intercreditor Agreement dated as of [_____], among THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A. as First Priority Representative, WILMINGTON TRUST, NATIONAL ASSOCIATION, as Second Priority Representative, ST. LOUIS POST-DISPATCH LLC, and the other Loan Parties referred to therein, as amended from time to time."

(c)  The First Priority Representative hereby acknowledges and agrees that, to the extent that it holds, or a third party holds on its behalf, physical possession of or "control" (as defined in the Uniform Commercial Code) over Common Collateral pursuant to the First Priority Security Documents, such possession or control is also for the benefit of, and the First Priority Representative or such third party holds such possession or control as bailee and agent for, the Second Priority Representative and the other Second Priority Secured Parties solely to the extent required to perfect their security interest in such Common Collateral (such bailment and agency for perfection being intended, among other things, to satisfy the requirements of Sections 8-301(a)(2) and 9-313(c) of the Uniform Commercial Code). Nothing in the preceding sentence shall be construed to impose any duty on the First Priority Representative (or any third party acting on its behalf) with respect to such Common Collateral or provide the Second Priority Representative or any other Second Priority Secured Party with any rights with respect to such Common Collateral beyond those specified in this Agreement and the Second Priority Security Documents, provided that as soon as practicable after the occurrence of the events described in clauses (a), (b) and (c) of the definition of the First Priority Obligations Payment Date, the First Priority Representative shall (i) deliver, at the Borrower's sole cost and expense, the Common Collateral in its possession or control together with any necessary endorsements (x) *first*, to the Second Priority Representative to the extent any Second Priority Obligations remain outstanding and (y) *second*, to the Borrower to the extent no First Priority Obligations or Second Priority Obligations remain outstanding, or (ii) direct and deliver such Common Collateral as a court of competent jurisdiction otherwise directs, and provided, further, that the provisions of this Agreement are intended solely to govern the respective Lien priorities as between the First Priority Secured Parties and the Second Priority Secured Parties and shall not impose on the First Priority Secured Parties any obligations in respect of the disposition of any Common Collateral (or any proceeds thereof) that would conflict with prior perfected Liens or any claims thereon in favor of any other Person that is not a Secured Party.

(d)  To the extent that any deposit account or securities account of any Loan Party is subject to a control agreement in favor of the First Priority Representative, the First Priority Representative will act as bailee and agent for the Second Priority Representative solely to the extent required to perfect the Liens of the Second Priority Secured Parties in such deposit accounts and securities accounts and the cash and other assets therein.  Nothing in the preceding sentence shall be construed to impose any duty on the First Priority Representative (or any third party acting on its behalf) with respect to such Common Collateral or provide the Second Priority Representative or any other Second Priority Secured Party with any rights with respect to such Common Collateral beyond those specified in this Agreement and the Second Priority Security Documents.  Unless the Second Priority Liens on such First Priority Collateral shall have been or concurrently are released, after the First Priority Obligations Payment Date, the First Priority Representative shall cooperate with the Loan Parties and the Second Priority Representative (at the expense of the Loan Parties) in permitting control of any deposit accounts and securities accounts to be transferred to the Second Priority Representative (or for other arrangements with respect to each such deposit account and securities account reasonably satisfactory to the Second Priority Representative and in accordance with the Second Priority Documents to be made).

2.4    No New Liens.  So long as the First Priority Obligations Payment Date has not occurred, whether or not an Insolvency Proceeding has been commenced by or against any Loan Party the parties hereto agree that (a) there shall be no Lien, and no Loan Party shall have any right to create any Lien, on any assets of any Loan Party securing any Second Priority Obligation if these same assets are not subject to, and do not become subject to, a Lien securing the First Priority Obligations and (b) there shall be no Lien, and no Loan Party shall have any right to create any Lien, on any assets of any Loan Party securing any First Priority Obligation if these same assets are not subject to, and do not become subject to, a Lien securing the Second Priority Obligations.  To the extent that the foregoing provisions are not complied with for any reason, without limiting any other rights and remedies available to the First Priority Secured Parties, the Second Priority Representative and the other Second Priority Secured Parties agree that any amounts received by or distributed to any of them pursuant to or as a result of Liens granted in contravention of this Section 2.4 shall be subject to Section 4.1.

2.5    Prohibition on Contesting Liens.  Each of the Second Priority Representative, for itself and on behalf of each of the Second Priority Secured Parties, and the First Priority Representative, for itself and on behalf of each of the First Priority Secured Parties, agrees that it will not (and hereby waives any right to) object to or contest or support any other Person in objecting to or contesting, in any proceeding (including without limitation, any Insolvency Proceeding), the validity, extent, perfection, priority or enforceability of a Lien held by or on behalf of any of the First Priority Secured Parties in the First Priority Collateral or by or on behalf of any of the Second Priority Secured Parties in the Second Priority Collateral, as the case may be, or the provisions of this Agreement; provided, that nothing in this Agreement shall be construed to prevent or impair the rights of the First Priority Representative, any First Priority Secured Party, the Second Priority Representative or any Second Priority Secured Party to enforce this Agreement, including the provisions of this Agreement relating to the priority of the Liens securing the First Priority Obligations as provided in Sections 2.1 and 3.1.  Notwithstanding any failure by any First Priority Secured Party or Second Priority Secured Party to perfect its security interests in the Common Collateral or any avoidance, invalidation or subordination by any third party or court of competent jurisdiction of the security interests in the Common Collateral granted to the First Priority Secured Parties or the Second Priority Secured Parties, the priority and rights as between the First Priority Secured Parties and the Second Priority Secured Parties with respect to the Common Collateral shall be as set forth herein.

**SECTION 3**.  *Enforcement Rights.*

3.1    <u>Exclusive Enforcement</u>.  Until the First Priority Obligations Payment Date has occurred, whether or not an Insolvency Proceeding has been commenced by or against any Loan Party, the First Priority Secured Parties shall have the exclusive right to take and continue any Enforcement Action with respect to the Common Collateral, without any consultation with or consent of any Second Priority Secured Party, but subject to the provisos set forth in Sections 3.2 and 5.1.  Upon the occurrence and during the continuance of a default or an event of default under the First Priority Documents, the First Priority Representative and the other First Priority Secured Parties may take and continue any Enforcement Action with respect to the First Priority Obligations and the Common Collateral in such order and manner as they may determine in their sole discretion.

3.2    <u>Standstill and Waivers</u>.  The Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties, agrees that, until the First Priority Obligations Payment Date has occurred, subject to the proviso set forth in Section 5.1:

(a)  they will not take or cause to be taken any Enforcement Action;

(b)  they will not take or cause to be taken any action, the purpose or effect of which is to make any Lien in respect of any Second Priority Obligation pari passu with or senior to, or to give any Second Priority Secured Party any preference or priority relative to, the Liens with respect to the First Priority Obligations or the First Priority Secured Parties with respect to any of the Common Collateral;

(c)  they will not contest, oppose, object to, interfere with, hinder or delay, in any manner, whether by judicial proceedings (including without limitation the filing of an Insolvency Proceeding in respect of any Loan Party) or otherwise, any foreclosure, sale, lease, exchange, transfer or other disposition of the Common Collateral by any First Priority Secured Party or any other Enforcement Action taken (or any forbearance from taking any Enforcement Action) by or on behalf of any First Priority Secured Party;

(d)  they have no right to (i) direct either the First Priority Representative or any other First Priority Secured Party to exercise any right, remedy or power with respect to the Common Collateral or pursuant to the First Priority Security Documents or (ii) consent or object to the exercise by the First Priority Representative or any other First Priority Secured Party of any right, remedy or power with respect to the Common Collateral or pursuant to the First Priority Security Documents or to the timing or manner in which any such right is exercised or not exercised (or, to the extent they may have any such right described in this clause (d), whether as a junior lien creditor or otherwise, they hereby irrevocably waive such right);

(e)  they will not institute any suit or other proceeding or assert in any suit, Insolvency Proceeding or other proceeding any claim against any First Priority Secured Party seeking damages from or other relief by way of specific performance, injunction or otherwise, with respect to, and no First Priority Secured Party shall be liable for, any action taken or omitted to be taken by any First Priority Secured Party with respect to the Common Collateral or pursuant to the First Priority Documents; and

(f)  they will not seek, and hereby waive any right, to have the Common Collateral or any part thereof marshaled upon any foreclosure or other disposition of the Common Collateral.

provided that, notwithstanding the foregoing, any Second Priority Secured Party may exercise its rights and remedies in respect of Common Collateral under the Second Priority Security Documents or applicable law after the passage of a period of 150 days (the "**Standstill Period**") from the first date of delivery of a notice in writing to the First Priority Representative and the Borrower of any Second Priority Secured Party's intention to exercise such rights and remedies in respect of Common Collateral, which notice may only be delivered following the occurrence of and during the continuance of an "Event of Default" under and as defined in the Second Priority Agreement; provided, further, however, that, notwithstanding the foregoing, in no event shall any Second Priority Secured Party exercise or continue to exercise any such rights or remedies if, notwithstanding the expiration of the Standstill Period, (i) the First Priority Representative or any First Priority Secured Parties to the extent constituting the Required Holders (as defined in the Existing First Priority Agreement as of the date hereof) shall have commenced and be diligently pursuing in good faith the exercise of any of its rights and remedies with respect to all or any material portion of the Common Collateral or (ii) an Insolvency Proceeding in respect of any Loan Party shall have been commenced; and provided, further, that in any Insolvency Proceeding commenced by or against any Loan Party, the Second Priority Representative and the Second Priority Secured Parties may take any action expressly permitted by Section 5.

Notwithstanding the foregoing contained in this Section 3.2, the Second Priority Representative and the Second Priority Secured Parties may:

(1)    take any action (not adverse to the priority status of the Liens on the Common Collateral, or the rights of any First Priority Representative or the First Priority Secured Parties to exercise remedies in respect thereof or the agreements set forth in Section 2) in order to create, perfect, preserve or protect its Lien on the Common Collateral;

(2)    file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any Person objecting to or otherwise seeking the disallowance of the claims of the Second Priority Secured Parties, including any claims secured by the Common Collateral, if any, in each case in a manner that is not inconsistent with, or in contravention of, the express terms of this Agreement;

(3)    file any pleadings, objections, motions or agreements or take any positions that assert rights or interests available to unsecured creditors of the Loan Parties arising under either any Insolvency Proceeding or applicable non-bankruptcy law, in each case in a manner that is not inconsistent with, or in contravention of, the express terms of this Agreement;

(4)    vote on any plan of reorganization, file any proof of claim or statement of interest, make other filings and make any arguments and motions that are, in each case, in a manner that is not inconsistent with, or in contravention of, the express terms of this Agreement, with respect to the Second Priority Obligations and the Common Collateral;

(5)    exercise any of its rights or remedies with respect to the Common Collateral after the termination of the Standstill Period to the extent permitted by this Section 3.2;

(6)    present a cash or credit bid (in the case of any such credit bid, so long as such bid provides for payment in full of the First Priority Obligations and the occurrence of the events described in clauses (a), (b) and (c) of the definition of the First Priority Obligations Payment Date) at any Section 363 hearing or with respect to any other Common Collateral disposition; and

(7)      bid for or purchase Common Collateral at any private or judicial foreclosure upon such Common Collateral initiated by the First Priority Representative or any of the First Priority Secured Parties.

3.3      Judgment Creditors.  In the event that any Second Priority Secured Party becomes a judgment lien creditor as a result of its enforcement of its rights as an unsecured creditor, such judgment lien shall be subject to the terms of this Agreement for all purposes (including in relation to the First Priority Liens and the First Priority Obligations) to the same extent as all other Liens securing the Second Priority Obligations are subject to the terms of this Agreement.

3.4      No Additional Rights For the Loan Parties Hereunder.  Except as provided in Section 3.5, if any First Priority Secured Party or Second Priority Secured Party shall enforce its rights or remedies in violation of the terms of this Agreement, no Loan Party shall be entitled to use such violation as a defense to any action by any First Priority Secured Party or Second Priority Secured Party, nor to assert such violation as a counterclaim or basis for set off or recoupment against any First Priority Secured Party or Second Priority Secured Party.

3.5      Actions Upon Breach.  (a)  If any Second Priority Secured Party, contrary to this Agreement, commences or participates in any action or proceeding against any Loan Party or the Common Collateral, such Loan Party, with the prior written consent of the First Priority Representative, may interpose as a defense or dilatory plea the making of this Agreement, and any First Priority Secured Party may intervene and interpose such defense or plea in its or their name or in the name of such Loan Party.

(b)  Should any Second Priority Secured Party, contrary to this Agreement, in any way take, attempt to or threaten to take any action with respect to the Common Collateral (including, without limitation, any attempt to realize upon or enforce any remedy with respect to this Agreement), or fail to take any action required by this Agreement, any First Priority Secured Party (in its own name or in the name of the relevant Loan Party) or the relevant Loan Party may obtain relief against such Second Priority Secured Party by injunction, specific performance and/or other appropriate equitable relief, it being understood and agreed by the Second Priority Representative on behalf of each Second Priority Secured Party that (i) the First Priority Secured Parties' damages from its actions may at that time be difficult to ascertain and may be irreparable, and (ii) each Second Priority Secured Party waives any defense that the Loan Parties and/or the First Priority Secured Parties cannot demonstrate damage and/or be made whole by the awarding of damages.

3.6      Option to Purchase.  (a)  The First Priority Representative agrees that it will give the Second Priority Representative written notice (the "**Enforcement Notice**") within five business days after commencing any Enforcement Action with respect to Common Collateral or the institution of any Insolvency Proceeding (which notice shall be effective for all Enforcement Actions taken after the date of such notice so long as the First Priority Representative is diligently pursuing in good faith the exercise of its default or enforcement rights or remedies against, or diligently attempting in good faith to vacate any stay of enforcement rights of its senior Liens on a material portion of the Common Collateral, including, without limitation, all Enforcement Actions identified in such notice).  Following the commencement of an Enforcement Action or the institution of any Insolvency Proceeding by the First Priority Representative or any other First Priority Secured Party, any Second Priority Secured Party shall have the option, by irrevocable written notice (the "**Purchase Notice**") delivered by the Second Priority Representative to the First Priority Representative at any time, to purchase all of the First Priority Obligations from the First Priority Secured Parties.  If the Second Priority Representative so delivers the

Purchase Notice, the First Priority Representative shall terminate any existing Enforcement Actions, and shall not take any further Enforcement Actions, <u>provided</u>, that the Purchase (as defined below) shall have been consummated on the date specified in the Purchase Notice in accordance with this Section 3.6. For the avoidance of doubt, if the Purchase is not consummated on or before the date specified in the Purchase Notice for any reason, the First Priority Secured Parties shall be entitled to recommence taking Enforcement Actions. In addition, following any such failure the Second Priority Secured Parties shall not be entitled to exercise any right pursuant to this Section 3.6 to Purchase the First Priority Obligations at any time thereafter, unless agreed to by the First Priority Secured Parties.

(b)     On the date specified by the Second Priority Representative in the Purchase Notice (which shall be a business day not less than five business days, nor more than ten business days, after receipt by the First Priority Representative of the Purchase Notice), the First Priority Secured Parties shall, subject to any required approval of any court or other governmental authority then in effect, sell to the Second Priority Secured Parties electing to purchase pursuant to Section 3.6(a) (the "**Purchasing Parties**"), and the Purchasing Parties shall purchase (the "**Purchase**") from the First Priority Secured Parties, the First Priority Obligations; <u>provided</u>, that the First Priority Obligations purchased shall not include any rights of First Priority Secured Parties with respect to indemnification and other obligations of the Loan Parties under the First Priority Documents that are expressly stated to survive the termination of the First Priority Documents (the "**Surviving Obligations**").

(c)     Without limiting the obligations of the Loan Parties under the First Priority Documents to the First Priority Secured Parties with respect to the Surviving Obligations (which shall not be transferred in connection with the Purchase), on the date of the Purchase, the Purchasing Parties shall (i) pay to the First Priority Secured Parties as the purchase price (the "**Purchase Price**") therefor the full amount of all First Priority Obligations then outstanding and unpaid (including principal, interest (including, to the extent applicable, interest at the default rate), Post-Petition Interest, fees, yield-maintenance amounts (if any), breakage costs, attorneys' fees and expenses, and, in the case of any Hedging Obligations, the amount that would be payable by the relevant Loan Party thereunder if it were to terminate such Hedging Obligations on the date of the Purchase or, if not terminated, an amount determined by the relevant First Priority Secured Party to be necessary to collateralize its credit risk arising out of such Hedging Obligations), (ii) furnish cash collateral (the "**Cash Collateral**") to the First Priority Secured Parties in such amounts as the relevant First Priority Secured Parties determine is reasonably necessary to secure such First Priority Secured Parties in connection with any outstanding letters of credit (not to exceed 105% of the aggregate undrawn face amount of such letters of credit), (iii) agree to reimburse the First Priority Secured Parties for any loss, cost, damage or expense (including attorneys' fees and expenses) in connection with any fees, costs or expenses related to any checks or other payments provisionally credited to the First Priority Obligations and/or as to which the First Priority Secured Parties have not yet received final payment and (iv) agree, after written request from the First Priority Representative, to reimburse the First Priority Secured Parties in respect of indemnification obligations of the Loan Parties under the First Priority Documents as to matters or circumstances known to the Purchasing Parties at the time of the Purchase which could reasonably be expected to result in any loss, cost, damage or expense to any of the First Priority Secured Parties, <u>provided</u> that, in no event shall any Purchasing Party have any liability for such amounts in excess of proceeds of Common Collateral received by the Purchasing Parties.

(d)     The Purchase Price and Cash Collateral shall be remitted by wire transfer in immediately available funds to such account of the First Priority Representative as it shall designate to the Purchasing Parties. The First Priority Representative shall, promptly following its receipt thereof, distribute the amounts received by it in respect of the Purchase Price to the First Priority Secured Parties in accordance

with the First Priority Documents.  Interest shall be calculated to but excluding the day on which the Purchase occurs if the amounts so paid by the Purchasing Parties to the account designated by the First Priority Representative are received in such account prior to 12:00 Noon, New York City time, and interest shall be calculated to and including such day if the amounts so paid by the Purchasing Parties to the account designated by the First Priority Representative are received in such account later than 12:00 Noon, New York City time.

(e)    The Purchase shall be made without representation or warranty of any kind by the First Priority Secured Parties as to the First Priority Obligations, the Common Collateral or otherwise and without recourse to the First Priority Secured Parties, except that each First Priority Secured Party shall severally represent and warrant:  (i) the amount of the First Priority Obligations being purchased from such First Priority Secured Party, (ii) that such First Priority Secured Party owns the First Priority Obligations held by it free and clear of any liens or encumbrances and (iii) that such First Priority Secured Party has the right to assign the First Priority Obligations held by it and the assignment is duly authorized.

3.7    <u>Rights as Unsecured Creditors</u>.  The Second Priority Representative and the Second Priority Secured Parties may exercise rights and remedies available to unsecured creditors against the Loan Parties that have granted Liens to secure the Second Priority Obligations in accordance with the terms of the Second Priority Documents and applicable law to the extent that such exercise is not inconsistent with, or in contravention of, the express terms of this Agreement; <u>provided</u> that in the event that any Second Priority Secured Party becomes an attachment or a judgment Lien creditor in respect of the Common Collateral as a result of its enforcement of its rights as an unsecured creditor with respect to the Second Priority Obligations, such attachment or judgment Lien shall be subject to the terms of this Agreement for all purposes (including in relation to the First Priority Obligations) as the other Liens on Common Collateral securing the Second Priority Obligations are subject to this Agreement.

3.8    <u>Second Priority Interest, Principal, Etc</u>.  Nothing in this Agreement shall prohibit the receipt by the Second Priority Representative or any Second Priority Secured Parties of payments (including in cash) of interest, principal and other amounts owed in respect of the Second Priority Obligations unless such receipt is (x) the direct or indirect result of the exercise by the Second Priority Representative or any Second Priority Secured Parties of rights or remedies with respect to, or enforcement of, any Lien on Common Collateral held by any of them, which exercise or enforcement is inconsistent with, or in contravention of, the express terms of this Agreement or (y) from the proceeds of an Enforcement Action required to be applied in accordance with Section 4.1 below.  Nothing in this Agreement impairs or otherwise adversely affects any rights or remedies the First Priority Representative or the First Priority Secured Parties may have with respect to the Common Collateral.

3.9    <u>Notice By First Priority Representative</u>.  The First Priority Representative shall render to Second Priority Representative written notice of the occurrence of the events described in clauses (a), (b) and (c) of the definition of "First Priority Obligations Payment Date" as soon as practicable (and in any event within two business days) following the occurrence thereof, <u>provided</u> that such notice shall not be required in connection with the consummation of a Replacement First Priority Agreement.

**SECTION 4**.  *Application Of Proceeds Of Common Collateral; Dispositions And Releases Of Common Collateral; Inspection and Insurance.*

4.1    <u>Application of Proceeds; Turnover Provisions</u>.  All proceeds of Common Collateral (including without limitation any interest earned thereon) resulting from the sale, collection or other disposition of Common Collateral in connection with an Enforcement Action or the exercise by any First

Priority Secured Party or any Second Priority Secured Party of any of its respective rights and remedies with respect to Common Collateral, whether or not pursuant to an Insolvency Proceeding, shall be distributed as follows:  <u>first</u> to the First Priority Representative for application to the First Priority Obligations in accordance with the terms of the First Priority Documents, until the First Priority Obligations Payment Date has occurred and <u>thereafter</u>, to the Second Priority Representative for application in accordance with the Second Priority Documents.  Until the occurrence of the First Priority Obligations Payment Date, any Common Collateral, including without limitation any such Common Collateral constituting proceeds, that may be received by any Second Priority Secured Party in violation of this Agreement shall be segregated and held in trust and promptly paid over to the First Priority Representative, for the benefit of the First Priority Secured Parties, in the same form as received, with any necessary endorsements, and each Second Priority Secured Party hereby authorizes the First Priority Representative to make any such endorsements as agent for the Second Priority Representative (which authorization, being coupled with an interest, is irrevocable).

4.2    <u>Releases of Second Priority Lien</u>.  (a) Upon any release, sale or disposition of Common Collateral (other than in connection with the occurrence of the First Priority Obligations Payment Date) permitted pursuant to the terms of the First Priority Documents that results in the release of the First Priority Lien on any Common Collateral (excluding any sale or other disposition that is not permitted by the Second Priority Documents unless such sale or disposition is consummated in connection with an Enforcement Action or consummated after the institution of an Insolvency Proceeding in respect of any Loan Party), the Second Priority Lien on such Common Collateral (excluding any portion of the proceeds of such Common Collateral remaining after the First Priority Obligations Payment Date occurs) shall be automatically and unconditionally released with no further consent or action of any Person.

(b)  The Second Priority Representative shall promptly execute and deliver such release documents and instruments and shall take such further actions as the First Priority Representative shall request to evidence any release of the Second Priority Lien described in paragraph (a).  The Second Priority Representative hereby appoints the First Priority Representative and any officer or duly authorized person of the First Priority Representative, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power of attorney in the place and stead of the Second Priority Representative and in the name of the Second Priority Representative or in the First Priority Representative's own name, from time to time, in the First Priority Representative's sole discretion, for the purposes of carrying out the terms of this Section 4.2, to take any and all appropriate action and to execute and deliver any and all documents and instruments as may be necessary or desirable to accomplish the purposes of this Section 4.2, including, without limitation, any financing statements, endorsements, assignments, releases or other documents or instruments of transfer (which appointment, being coupled with an interest, is irrevocable).

4.3    <u>Inspection Rights and Insurance</u>.  (a) Any First Priority Secured Party and its representatives and invitees may at any time inspect, repossess, remove and otherwise deal with the Common Collateral in accordance with the terms of the First Priority Documents, and the First Priority Representative may advertise and conduct public auctions or private sales of the Common Collateral, in each case without notice to, the involvement of or interference by any Second Priority Secured Party or liability to any Second Priority Secured Party; <u>provided</u> that the First Priority Representative shall provide the Second Priority Representative with notice of any sales.

(b)  Until the First Priority Obligations Payment Date has occurred, the First Priority Representative will have the sole and exclusive right (i) to be named as additional insured and loss payee under any insurance policies maintained from time to time by any Loan Party (except that the Second

Priority Representative shall have the right to be named as additional insured and loss payee so long as its second lien status is identified in a manner satisfactory to the First Priority Representative); (ii) to adjust or settle any insurance policy or claim covering the Common Collateral in the event of any loss thereunder in accordance with the terms of the First Priority Documents; (iii) to approve any award granted in any condemnation or similar proceeding affecting the Common Collateral in accordance with the terms of the First Priority Documents; and (iv) to apply the proceeds of any insurance or condemnation award to the First Priority Obligations in accordance with the terms of the First Priority Documents.

4.4    <u>Subrogation</u>.  With respect to the value of any payments or distributions in cash, property or other assets that any Second Priority Secured Party pays over to the First Priority Secured Parties under the terms of this Agreement, the Second Priority Secured Parties shall be subrogated to the rights of the First Priority Secured Parties; <u>provided</u> that, the Second Priority Representative, on behalf of itself and the Second Priority Creditors, hereby agrees not to assert or enforce all such rights of subrogation it may acquire as a result of any payment hereunder until the First Priority Obligations Payment Date has occurred.  Each Loan Party acknowledges and agrees that the value of any payments or distributions in cash, property or other assets received by any Second Priority Secured Party that are paid over to the First Priority Secured Parties pursuant to this Agreement shall not reduce any of the Second Priority Obligations.

**SECTION 5**.  *Insolvency Proceedings.*

5.1    <u>Filing of Motions</u>.  Until the First Priority Obligations Payment Date has occurred, the Second Priority Representative agrees on behalf of itself and the other Second Priority Secured Parties that no Second Priority Secured Party shall, in or in connection with any Insolvency Proceeding in respect of any Loan Party, file any pleadings or motions, take any position at any hearing or proceeding of any nature, or otherwise take any action whatsoever, in each case that (a) violates, or is prohibited by, this Agreement, (b) asserts any right, benefit or privilege that arises in favor of the Second Priority Representative or Second Priority Secured Parties in their capacity as secured creditors solely as a result of their interest in the Common Collateral or in the Second Priority Lien (unless the assertion of such right is expressly permitted by this Agreement) or (c) challenges the validity, priority, enforceability or voidability of any Liens or claims held by the First Priority Representative or any other First Priority Secured Party, or the extent to which the First Priority Obligations constitute secured claims under Section 506(a) of the Bankruptcy Code or otherwise; <u>provided</u>, that the Second Priority Representative may take the actions specifically set forth in Section 3.2.

The First Priority Representative agrees on behalf of itself and the other First Priority Secured Parties that no First Priority Secured Party shall, in or in connection with any Insolvency Proceeding, file any pleadings or motions, take any position at any hearing or proceeding of any nature, or otherwise take any action whatsoever, in each case that challenges the validity, priority, enforceability or voidability of any Liens or claims held by the Second Priority Representative or any other Second Priority Secured Party, or the extent to which the Second Priority Obligations constitute secured claims under Section 506(a) of the Bankruptcy Code or otherwise, except that the foregoing shall not limit the ability of any First Priority Secured Party to enforce the terms of this Agreement.

5.2    <u>Financing Matters</u>.  Until the First Priority Obligations Payment Date has occurred, if any Loan Party becomes subject to any Insolvency Proceeding, and if the First Priority Representative or the other First Priority Secured Parties consent to the use of cash collateral under the Bankruptcy Code or provide financing to any Loan Party under the Bankruptcy Code or consent to the provision of such

financing to any Loan Party by any third party that (w) is in an aggregate principal amount (including any undrawn portion of the revolving commitments thereunder and the face amount of any letters of credit issued and not reimbursed thereunder) of no more than $10,000,000, the proceeds of which are used solely by the Loan Parties (and not by, or for the benefit of, any Loan Party's affiliate which is not a Loan Party), (x) provides that the Second Priority Secured Parties retain the right to object to any ancillary agreements or arrangements regarding the cash collateral use or the financing that are materially adverse to the Second Priority Secured Parties, (y) provides the Second Priority Secured Parties with the Second Priority Required Adequate Protection, and (z) does not compel the Loan Parties to pursue any specific plan or to conduct a sale or other liquidation of the Common Collateral (any such financing that complies with such clauses (w)-(z), a "**DIP Financing**"), then the Second Priority Representative agrees, on behalf of itself and the other Second Priority Secured Parties, that each Second Priority Secured Party (a) will raise no objection to, nor support any other Person objecting to, the use of such cash collateral or to such DIP Financing, (b) will not request or accept adequate protection or any other relief in connection with the use of such cash collateral or such DIP Financing except as set forth in Section 5.4 below and (c) to the extent the Liens securing the First Priority Obligations are subordinated to or pari passu with such DIP Financing will subordinate (and will be deemed hereunder to have subordinated) the Second Priority Liens (i) to such DIP Financing on the same terms as the First Priority Liens are subordinated thereto (and such subordination will not alter in any manner the terms of this Agreement), (ii) to any adequate protection provided to the First Priority Secured Parties and (iii) to any "carve-out" agreed to by the First Priority Representative or the other First Priority Secured Parties in an amount not to exceed $2,500,000, and (d) agrees that notice received two calendar days prior to the entry of an interim order approving such usage of cash collateral or approving such financing and fifteen  days prior to the entry of a final order approving such usage of cash collateral or approving such financing shall be adequate notice.

5.3     Relief From the Automatic Stay.  The Second Priority Representative agrees, on behalf of itself and the other Second Priority Secured Parties, that none of them will seek relief from the automatic stay (or any analogous stay) in any Insolvency Proceeding in respect of a Loan Party or take any action in derogation thereof, in each case in respect of any Common Collateral, without the prior written consent of the First Priority Representative unless the First Priority Representative or any of the First Priority Secured Parties have concurrently sought relief from the automatic stay (or from any analogous stay) in any Insolvency Proceeding and the Second Priority Representative and/or the other Second Priority Secured Parties are not seeking relief from the automatic stay (or from any analogous stay) in any Insolvency Proceeding in order to take any Enforcement Action in any manner in violation of or otherwise inconsistent with the provisions of this Agreement.

5.4     Adequate Protection.  The Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties, agrees that none of them shall object, contest, or support any other Person objecting to or contesting, in respect of any Insolvency Proceeding of a Loan Party, (a) any request by the First Priority Representative or the other First Priority Secured Parties for adequate protection or any adequate protection provided to the First Priority Representative or the other First Priority Secured Parties or (b) any objection by the First Priority Representative or any other First Priority Secured Parties to any motion, relief, action or proceeding based on a claim of a lack of adequate protection or (c) the payment of interest, fees, expenses or other amounts to the First Priority Representative or any other First Priority Secured Party under Section 506(b) or 506(c) of the Bankruptcy Code or otherwise.  In any Insolvency Proceeding of a Loan Party, (i) if the First Priority Secured Parties (or any subset thereof) are granted adequate protection consisting of additional collateral (with replacement liens on such additional collateral) and superpriority claims in connection with any DIP Financing or use of cash collateral, then in connection with any such DIP Financing or use of cash collateral, the Second Priority Representative, on behalf of itself and any of the Second Priority Secured

Parties, may seek or accept adequate protection consisting solely of (w) a replacement Lien on the same additional collateral, subordinated to the Liens securing the First Priority Obligations and such DIP Financing on the same basis as the other Liens securing the Second Priority Obligations are so subordinated to the First Priority Obligations under this Agreement, (x) superpriority claims junior in all respects to the superpriority claims granted to the First Priority Secured Parties, (y) payment of the fees and expenses of the Second Priority Representative and the Second Priority Secured Parties, to the extent permitted in the Second Priority Documents (the adequate protection for the Second Priority Secured Parties described in clauses (w), (x), and (y), collectively, the "**Second Priority Required Adequate Protection**") and (z) subject to the right of the First Priority Secured Parties to object thereto, the payment of post-petition interest at the pre-default rate (provided, that in the case of this clause (z), that the First Priority Secured Parties have been granted adequate protection in the form of post-petition interest at a rate no lower than the pre-default rate), provided, however, that the Second Priority Representative shall have irrevocably agreed, pursuant to Section 1129(a)(9) of the Bankruptcy Code, on behalf of itself and the Second Priority Secured Parties, in any stipulation and/or order granting such adequate protection, that such junior superpriority claims in excess of $3,000,000 may with the consent of two-thirds in amount of the Second Priority Obligations be paid under any plan of reorganization in any combination of cash, debt, equity or other property having a value on the effective date of such plan equal to the allowed amount of such claims and (ii) in the event the Second Priority Representative, on behalf of itself and the Second Priority Secured Parties, seeks or accepts adequate protection consisting of additional collateral (with replacement liens on such additional collateral) and superpriority claims in connection with any DIP Financing or use of cash collateral with respect to an Insolvency Proceeding, and such adequate protection is granted in the form of additional collateral comprising assets of Pulitzer or any of its subsidiaries, then the Second Priority Representative, on behalf of itself or any of the Second Priority Secured Parties, agrees that the First Priority Representative shall also be granted a senior Lien on such additional collateral as security for the First Priority Obligations and any such DIP Financing and that any Lien on such additional collateral securing the Second Priority Obligations shall be subordinated to the Liens on such collateral securing the First Priority Obligations and any such DIP Financing (and all Obligations relating thereto) and any other Liens granted to the First Priority Secured Parties as adequate protection, with such subordination to be on the same terms that the other Liens securing the Second Priority Obligations are subordinated to such First Priority Obligations under this Agreement.  The Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties, agrees that except as expressly set forth in this Section none of them shall seek or accept adequate protection in respect of a Loan Party without the prior written consent of the First Priority Representative.

       5.5    <u>Avoidance Issues.</u>  If any First Priority Secured Party is required in any Insolvency Proceeding or otherwise to disgorge, turn over or otherwise pay to the estate of any Loan Party, because such amount was avoided or ordered to be paid or disgorged for any reason, including without limitation because it was found to be a constructively fraudulent or preferential transfer, any amount (a "**Recovery**"), whether received as proceeds of security, enforcement of any right of set-off or otherwise, then the First Priority Obligations shall be reinstated to the extent of such Recovery and deemed to be outstanding as if such payment had not occurred and the First Priority Obligations Payment Date shall be deemed not to have occurred.  If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto.  The Second Priority Secured Parties agree that none of them shall be entitled to benefit from any avoidance action affecting or otherwise relating to the First Priority Liens or the Second Priority Liens, it being understood and agreed that the benefit of such avoidance action otherwise allocable to them shall instead be allocated and turned over for application in accordance with the priorities set forth in this Agreement.

5.6     Asset Dispositions in an Insolvency Proceeding.  In an Insolvency Proceeding or otherwise, neither the Second Priority Representative nor any other Second Priority Secured Party shall oppose any sale or disposition of any assets of any Loan Party that is supported by the First Priority Secured Parties (or any right of the First Priority Secured Party to credit bid the First Priority Obligations in any such sale or disposition), and the Second Priority Representative and each other Second Priority Secured Party will be deemed to have consented under Section 363 of the Bankruptcy Code (and otherwise) to any sale (and related matters) supported by the First Priority Secured Parties and to have released their Liens on such assets provided that their Liens attach to the proceeds of such assets (subject to the priorities set forth in this Agreement) and that the proceeds remaining after payment of related transaction costs and expenses are applied as a permanent reduction of the First Priority Obligations (with a corresponding reduction in the Maximum First Priority Amount).  In an Insolvency Proceeding or otherwise, neither the First Priority Representative nor any other First Priority Secured Party shall oppose any right of any Second Priority Secured Party to credit bid the Second Priority Obligations in any sale or disposition, provided that such bid provides for the payment in full of the First Priority Obligations and the occurrence of the events described in clauses (a), (b) and (c) of the definition of First Priority Obligations Payment Date.

5.7     Separate Grants of Security and Separate Classification.  Each of the Secured Parties and the Loan Parties acknowledges and agrees that (a) the grants of Liens on the assets of each Loan Party pursuant to the First Priority Security Documents and the Second Priority Security Documents constitute two separate and distinct grants of Liens and (b) because of, among other things, their differing rights in the Common Collateral, the First Priority Obligations and the Second Priority Obligations are fundamentally different from each other and must be separately classified in any plan of reorganization proposed or adopted in an Insolvency Proceeding.  To further effectuate the intent of the parties as provided in the immediately preceding sentence, if it is held that the claims of the First Priority Secured Parties and Second Priority Secured Parties in respect of the Common Collateral constitute only one secured claim (rather than separate classes of senior and junior secured claims), then the Second Priority Secured Parties hereby acknowledge and agree that all distributions shall be made as if there were separate classes of senior and junior secured claims against the Loan Parties in respect of the Common Collateral, with the effect being that, to the extent that the aggregate value of the Common Collateral is sufficient (for this purpose ignoring all claims held by the Second Priority Secured Parties), the First Priority Secured Parties shall be entitled to receive, in addition to amounts distributed to them in respect of principal, pre-petition interest and other claims, all amounts owing in respect of Post-Petition Interest before any distribution is made in respect of the claims held by the Second Priority Secured Parties.  The Second Priority Secured Parties hereby acknowledge and agree to turn over to the First Priority Secured Parties amounts otherwise received or receivable by them to the extent necessary to effectuate the intent of the preceding sentence, even if such turnover has the effect of reducing the claim or recovery of the Second Priority Secured Parties.

5.8     No Waivers of Rights.  Nothing contained herein shall prohibit or in any way limit the First Priority Representative, the Second Priority Representative, any First Priority Secured Party, or any Second Priority Secured Party from objecting, in any Insolvency Proceeding or otherwise, to any action taken by any party not permitted hereunder.

5.9     Plans of Reorganization.  Nothing in this Agreement shall impair the rights of any Second Priority Secured Party to propose, support, or vote in favor of or against any plan of reorganization or similar plan or scheme in any Insolvency Proceeding, so long as such plan or scheme is not inconsistent with, or in contravention of, the express terms of this Agreement, provided that in the case of proposing such plan of reorganization or similar plan or scheme it shall, unless otherwise

approved by the First Priority Representative, provide for payment in full of the First Priority Obligations and the occurrence of the events described in clauses (a), (b) and (c) of the definition of the First Priority Obligations Payment Date.

5.10    <u>Effectiveness in Insolvency Proceedings</u>.  This Agreement, which the parties hereto expressly acknowledge is a "subordination agreement" under section 510(a) of the Bankruptcy Code, shall be effective before, during and after the commencement of an Insolvency Proceeding.

**SECTION 6**.  *Security Documents.*

(a)  Each Loan Party and the Second Priority Representative, on behalf of itself and the Second Priority Secured Parties, agrees that it shall not at any time execute or deliver any amendment or other modification to any of the Second Priority Documents that (x) applies with respect to any Loan Party or any Common Collateral and (y) is inconsistent with or in violation of this Agreement.

(b)  Each Loan Party and the First Priority Representative, on behalf of itself and the First Priority Secured Parties, agrees that it shall not at any time execute or deliver any amendment or other modification to any of the First Priority Documents inconsistent with or in violation of this Agreement.

(c)  In the event the First Priority Representative enters into any amendment, waiver or consent in respect of any of the First Priority Security Documents for the purpose of adding to, or deleting from, or waiving or consenting to any departures from any provisions of, any First Priority Security Document or changing in any manner the rights of any parties thereunder, then such amendment, waiver or consent shall apply automatically to any comparable provision of the Comparable Second Priority Security Document to the extent applicable to any Loan Party and Common Collateral without the consent of or action by any Second Priority Secured Party (with all such amendments, waivers and modifications subject to the terms hereof); <u>provided</u>, that (i) no such amendment, waiver or consent shall have the effect of removing assets subject to the Lien of any Second Priority Security Document, except to the extent that a release of such Lien is permitted by Section 4.2, (ii) any such amendment, waiver or consent that materially and adversely affects the rights of the Second Priority Secured Parties and does not affect the First Priority Secured Parties in a like or similar manner shall not apply to the Second Priority Security Documents without the prior written consent of the Second Priority Representative, (iii) no such amendment, waiver or consent with respect to any provision applicable to the Second Priority Representative under the Second Priority Documents shall be made without the prior written consent of the Second Priority Representative and (iv) notice of such amendment, waiver or consent shall be given to the Second Priority Representative no later than 15 days after its effectiveness, provided that the failure to give such notice shall not affect the effectiveness and validity thereof.

**SECTION 7**.  *Reliance; Waivers; etc.*

7.1    <u>Reliance</u>.  The First Priority Documents are deemed to have been executed and delivered, and all extensions of credit thereunder are deemed to have been made or incurred, in reliance upon this Agreement.  The Second Priority Representative, on behalf of itself and the Second Priority Secured Parties, expressly waives all notice of the acceptance of and reliance on this Agreement by the First Priority Secured Parties.  The Second Priority Documents are deemed to have been executed and delivered and all extensions of credit related thereto are deemed to have been made or incurred, in reliance upon this Agreement.  The First Priority Representative expressly waives all notices of the acceptance of and reliance by the Second Priority Representative and the Second Priority Secured Parties.

7.2    <u>No Warranties or Liability.</u>  The Second Priority Representative and the First Priority Representative acknowledge and agree that neither has made any representation or warranty with respect to the execution, validity, legality, completeness, collectibility or enforceability of any First Priority Document or any Second Priority Document.  Except as otherwise provided in this Agreement, the Second Priority Representative and the First Priority Representative will be entitled to manage and supervise their respective extensions of credit to any Loan Party in accordance with law and their usual practices, modified from time to time as they deem appropriate.

7.3    <u>No Waivers.</u>  No right or benefit of any party hereunder shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of such party or any other party hereto or by any noncompliance by any Loan Party with the terms and conditions of any of the First Priority Documents or the Second Priority Documents.

**SECTION 8**.  *Obligations Unconditional.*

8.1    <u>First Priority Obligations Unconditional.</u>  All rights and interests of the First Priority Secured Parties hereunder, and all agreements and obligations of the Second Priority Secured Parties (and, to the extent applicable, the Loan Parties) hereunder, shall remain in full force and effect irrespective of:

(a)  any lack of validity or enforceability of any First Priority Document;

(b)  any change in the time, place or manner of payment of, or in any other term of, all or any portion of the First Priority Obligations, or any amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of any First Priority Document;

(c)  prior to the First Priority Obligations Payment Date, any exchange, release, voiding, avoidance or non-perfection of any security interest in any Common Collateral or any other collateral, or any release, amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of all or any portion of the First Priority Obligations or any guarantee or guaranty thereof; or

(d)  any other circumstances that otherwise might constitute a defense available to, or a discharge of, any Loan Party in respect of the First Priority Obligations, or of any of the Second Priority Secured Parties, or any Loan Party, to the extent applicable, in respect of this Agreement.

8.2    <u>Second Priority Obligations Unconditional.</u>  All rights and interests of the Second Priority Secured Parties hereunder, and all agreements and obligations of the First Priority Secured Parties (and, to the extent applicable, the Loan Parties) hereunder, shall remain in full force and effect irrespective of:

(a)  any lack of validity or enforceability of any Second Priority Document;

(b)  any change in the time, place or manner of payment of, or in any other term of, all or any portion of the Second  Priority Obligations, or any amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of any Second Priority Document;

(c)  any exchange, release, voiding, avoidance or non-perfection of any security interest in any Common Collateral or any other collateral, or any release, amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of all or any portion of the Second Priority Obligations or any guarantee or guaranty thereof; or

(d)  any other circumstances that otherwise might constitute a defense available to, or a discharge of, any Loan Party in respect of the Second  Priority Obligations or any First Priority Secured Parties or any Loan Party, to the extent applicable, in respect of this Agreement.

**SECTION 9**.  Miscellaneous.

9.1      In the event of any conflict between the provisions of this Agreement and the provisions of any First Priority Document or any Second Priority Document (to the extent applicable to any Loan Party or any Common Collateral), the provisions of this Agreement shall govern.  Notwithstanding the foregoing, the parties hereto acknowledge that the terms of this Agreement are not intended to and shall not, as between the Loan Parties and the Secured Parties, negate, waive or cancel any rights granted to, or carry liability or obligation of, any Loan Party in the First Priority Documents and the Second Priority Documents or impose any additional obligations on the Loan Parties (other than as expressly set forth herein).

9.2      <u>Continuing Nature of Provisions.</u>  This Agreement shall continue to be effective, and shall not be revocable by any party hereto, until the First Priority Obligation Payment Date shall have occurred.  This is a continuing agreement and the First Priority Secured Parties and the Second Priority Secured Parties may continue, at any time and without notice to the other parties hereto, to extend credit and other financial accommodations, lend monies and provide indebtedness to, or for the benefit of, Borrower or any other Loan Party on the faith hereof.

9.3      <u>Amendments; Waivers.</u>  No amendment or modification of any of the provisions of this Agreement shall be effective unless the same shall be in writing and signed by the First Priority Representative (with the consent of the Required Holders under and as defined in the First Priority Agreement) and the Second Priority Representative (with the consent of the Required Lenders under and as defined in the Second Priority Term Loan Agreement or other then extant Second Priority Agreement), and, in the case of amendments or modifications of Sections 3.5, 3.6, 9.3, 9.5 or 9.6 that directly affect the rights or duties of any Loan Party, such Loan Party, and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time. Anything herein to the contrary notwithstanding, no consent of any Loan Party shall be required for amendments, modifications or waivers of any other provisions of this Agreement other than those that directly affect any obligation or right of the Loan Parties hereunder or under the First Priority Documents or the Second Priority Documents or that would impose any additional obligations on the Loan Parties.

9.4      <u>Information Concerning Financial Condition of the Borrower and the other Loan Parties.</u>  Each of the Second Priority Representative and the First Priority Representative hereby assume responsibility for keeping itself informed of the financial condition of the Borrower and each of the other Loan Parties and all other circumstances bearing upon the risk of nonpayment of the First Priority Obligations or the Second Priority Obligations.  The Second Priority Representative and the First Priority Representative hereby agree that no party shall have any duty to advise any other party of information known to it regarding such condition or any such circumstances.  In the event the Second Priority

Representative or the First Priority Representative, in its sole discretion, undertakes at any time or from time to time to provide any information to any other party to this Agreement, it shall be under no obligation (a) to provide any such information to such other party or any other party on any subsequent occasion, (b) to undertake any investigation not a part of its regular business routine, or (c) to disclose any other information.

9.5     Governing Law.  This Agreement shall be construed in accordance with and governed by the law of the State of New York, except as otherwise required by mandatory provisions of law and except to the extent that remedies provided by the laws of any jurisdiction other than the State of New York are governed by the laws of such jurisdiction.

9.6     Submission to Jurisdiction.  (a)  Each First Priority Secured Party, each Second Priority Secured Party and each Loan Party hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each such party hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court.  Each such party agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that any First Priority Secured Party or Second Priority Secured Party may otherwise have to bring any action or proceeding against any Loan Party or its properties in the courts of any jurisdiction.

(b)  Each First Priority Secured Party, each Second Priority Secured Party and each Loan Party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so (i) any objection it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in paragraph (a) of this Section and (ii) the defense of an inconvenient forum to the maintenance of such action or proceeding.

(c)  Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.7.  Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

9.7     Notices.  Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given shall be in writing and may be personally served, telecopied, or sent by overnight express courier service or United States mail and shall be deemed to have been given when delivered in person or by courier service, upon receipt of a telecopy or five days after deposit in the United States mail (certified, with postage prepaid and properly addressed).  For the purposes hereof, the addresses of the parties hereto (until notice of a change thereof is delivered as provided in this Section) shall be as set forth below each party's name on the signature pages hereof, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

9.8     Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of each of the parties hereto and each of the First Priority Secured Parties and Second Priority Secured Parties and their respective successors and permitted assigns, and nothing herein is intended, or shall be

construed to give, any other Person any right, remedy or claim under, to or in respect of this Agreement or any Common Collateral.

9.9     Headings.  Section headings used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

9.10    Severability.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

9.11    Counterparts; Integration; Effectiveness.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this Agreement by email or telecopy shall be effective as delivery of a manually executed counterpart of this Agreement.  This Agreement shall become effective when it shall have been executed by each party hereto.

9.12    **WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AND FOR ANY COUNTERCLAIM THEREIN.**

9.13    Additional Loan Parties.  Each Person that becomes a Loan Party after the date hereof shall promptly become a party to this Agreement by execution and delivery by such Person of a joinder agreement in form and substance reasonably satisfactory to the First Priority Representative and the Second Priority Representative

9.14    Incorporation by Reference.  In connection with their execution and acting hereunder, the Company Parties acknowledge that (i) the First Priority Representative is entitled to all rights, privileges, benefits, immunities, protections and indemnities provided to it as Collateral Agent under (and as defined in) the First Priority Documents, and (ii) the Second Priority Representative is entitled to all rights, privileges, benefits, immunities, protections and indemnities provided to it as Collateral Agent under (and as defined in) the Second Priority Documents.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.**, as First Priority Representative for and on behalf of the First Priority Secured Parties

By:_____
Name:
Title:

Address for Notices:
The Bank of New York Mellon Trust Company, N.A.
10161 Centurion Parkway, N.
Jacksonville, FL 32256
Attention:  Geraldine Creswell, Asst. Treasurer
Telecopy No.:  (904) 645-1921
Email: geri.creswell@bnymellon.com

**WILMINGTON TRUST, NATIONAL ASSOCIATION**, as Second Priority Representative for and on behalf of the Second Priority Secured Parties

By:_____
Name:
Title:

Address for Notices:
Wilmington Trust, N.A.
50 South Sixth Street, Suite 1290
Minneapolis, MN 55402
Attention:  Josh James
Telecopy No.:  (612) 217-5651
Tel.:  (612) 217-5637
Email:  jjames@WilmingtonTrust.com

**[LOAN PARTIES]**

By:_____
Name:
Title:

Address for Notices:
Attention:
Telecopy No.:

# **Exhibit 1.83**

*New PD LLC Notes Agreement (inclusive of all exhibits thereto)*

**ST. LOUIS POST-DISPATCH LLC**

**$126,355,000**

**ADJUSTABLE RATE SENIOR NOTES DUE DECEMBER 31, 2015**

_____

**NOTE AGREEMENT**
_____

**Dated as of [_____]**

# TABLE OF CONTENTS

### (Not Part of Agreement)

Page

**PARAGRAPH 1.    BACKGROUND** ........................................................................... 1

**PARAGRAPH 2.    AUTHORIZATION AND ISSUANCE OF NOTES** ........................... 2

    2A.    Authorization of Notes ............................................................. 2
    2B.    Issuance of Notes ..................................................................... 2

**PARAGRAPH 3.    RESTRUCTURING CLOSING DATE** ................................................ 2

**PARAGRAPH 4.    CONDITIONS OF CLOSING** ....................................................... 3

    4A.    Representations and Warranties ............................................... 3
    4B.    No Default ................................................................................ 3
    4C.    Compliance Certificates ........................................................... 3
    4D.    Opinions of Counsel ................................................................ 3
    4E.    Transactions Permitted by Applicable Laws ............................ 4
    4F.    Consents and Approvals ........................................................... 4
    4G.    Notes ........................................................................................ 4
    4H.    Guaranty Agreement ................................................................ 4
    4I.    Subsidiary Guaranty ................................................................ 4
    4J.    Credit Agreement ..................................................................... 4
    4K.    Second Lien Loan Agreement and Other Second Lien Debt Documents ............ 4
    4L.    Intercreditor Agreement ........................................................... 5
    4M.    Collateral Documents .............................................................. 5
    4N.    Lien Searches/Evidence of First Priority Liens ...................... 6
    4O.    Private Placement Number ....................................................... 6
    4P.    [Reserved] ................................................................................ 6
    4Q.    Consent Fees ............................................................................ 6
    4R.    Evidence of Termination of Certain Accounts and Transfer of Funds ................. 6
    4S.    Lee Prepayment ....................................................................... 7
    4T.    Tax Sharing Agreement ........................................................... 7
    4U.    Star Intercompany Obligations ............................................... 7
    4V.    Confirmation Order .................................................................. 7
    4W.    Payment of Fees and Expenses ............................................... 7
    4X.    Herald Redemption Agreement ............................................... 7
    4Y.    Proceedings and Documents .................................................... 7

**PARAGRAPH 5.    PREPAYMENTS** ........................................................................ 8

    5A.    Mandatory Scheduled Prepayments ........................................ 8
    5B.    Excess Cash Flow Sweep ......................................................... 8
    5C.    Optional Prepayments ............................................................. 9
    5D.    Asset Sale Prepayments ........................................................... 9
    5E.    Prepayment Upon Change of Control ...................................... 9
    5F.    Application of Certain Prepayments ...................................... 10
    5G.    Partial Payments Pro Rata ..................................................... 10

i

TABLE OF CONTENTS
(continued)

| | | |
|---|---|---|
| 5H. | Retirement of Notes | 10 |
| 5I. | Use of Debt to Make Prepayment | 10 |
| 5J. | Prepayment of Interest upon Payment in Full of Notes | 10 |
| **PARAGRAPH 6.** | **AFFIRMATIVE COVENANTS** | **10** |
| 6A. | Financial Statements | 10 |
| 6B. | Inspection of Properties | 13 |
| 6C. | Covenant to Secure Notes Equally | 14 |
| 6D. | Compliance with Laws and Regulations | 14 |
| 6E. | Patents, Trade Marks and Trade Names | 14 |
| 6F. | Information Required by Rule 144A | 14 |
| 6G. | Payment of Taxes and Other Claims | 15 |
| 6H. | ERISA Compliance | 15 |
| 6I. | Insurance | 15 |
| 6J. | Maintenance of Properties | 15 |
| 6K. | Corporate Existence, Etc. | 16 |
| 6L. | Books and Records | 16 |
| 6M. | [Delivery of Deeds of Trust | 16 |
| **PARAGRAPH 7.** | **NEGATIVE COVENANTS** | **16** |
| 7A. | Change of Business | 16 |
| 7B. | Limitation on Distributions | 16 |
| 7C. | Lien, Debt and Other Restrictions | 16 |
| 7D. | Limitation on Certain Restrictive Agreements | 22 |
| 7E. | Terrorism Sanctions Regulations | 22 |
| **PARAGRAPH 8.** | **EVENTS OF DEFAULT** | **22** |
| 8A. | Acceleration | 22 |
| 8B. | Rescission of Acceleration | 27 |
| 8C. | Notice of Acceleration or Rescission | 27 |
| 8D. | Other Remedies | 27 |
| **PARAGRAPH 9.** | **REPRESENTATIONS, COVENANTS AND WARRANTIES** | **28** |
| 9A. | Organization and Qualification; Due Authorization | 28 |
| 9B. | Material Adverse Change | 28 |
| 9C. | Litigation; Observance of Agreements, Statutes and Orders | 28 |
| 9D. | Outstanding Debt | 29 |
| 9E. | Title to Properties | 29 |
| 9F. | Conflicting Agreements and Other Matters | 29 |
| 9G. | Margin Stock | 30 |
| 9H. | ERISA | 30 |
| 9I. | Governmental Authorizations, Etc. | 31 |
| 9J. | Disclosure | 31 |

A/74565634.14

## TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| 9K. | Foreign Assets Control Regulations, Etc | 32 |
| 9L. | Solvency | 32 |
| 9M. | Organization and Ownership of Shares of Subsidiaries; Affiliates | 33 |
| 9N. | Compliance with Laws, Other Instruments, Etc | 33 |
| 9O. | Licenses, Permits, Etc | 34 |
| 9P. | [Reserved] | 34 |
| 9Q. | Environmental Matters | 34 |

**PARAGRAPH 10.    REPRESENTATIONS OF THE PURCHASERS** .............................. 35

| | | |
|---|---|---|
| 10A. | Nature of Purchase | 35 |
| 10B. | Source of Funds | 35 |
| 10C. | Independent Investigation | 36 |

**PARAGRAPH 11.    DEFINITIONS; ACCOUNTING MATTERS** .................................. 37

| | | |
|---|---|---|
| 11A. | Yield-Maintenance Terms | 37 |
| 11B. | Other Terms | 38 |
| 11C. | Accounting and Legal Principles, Terms and Determinations | 52 |

**PARAGRAPH 12.    MISCELLANEOUS** ............................................................... 52

| | | |
|---|---|---|
| 12A. | Note Payments | 52 |
| 12B. | Expenses | 52 |
| 12C. | Consent to Amendments | 53 |
| 12D. | Form, Registration, Transfer and Exchange of Notes; Lost Notes | 54 |
| 12E. | Persons Deemed Owners; Participations | 54 |
| 12F. | Survival of Representations and Warranties; Entire Agreement | 54 |
| 12G. | Successors and Assigns | 55 |
| 12H. | Notices | 55 |
| 12I. | Payments due on Non-Business Days | 55 |
| 12J. | Satisfaction Requirement | 55 |
| 12K. | Governing Law | 55 |
| 12L. | Severability | 55 |
| 12M. | Descriptive Headings | 56 |
| 12N. | Counterparts | 56 |
| 12O. | Independence of Covenants | 56 |
| 12P. | Severalty of Obligations | 56 |
| 12Q. | Consent to Jurisdiction; Waiver of Immunities | 56 |
| 12R. | Waiver of Jury Trial | 56 |
| 12S. | Confidential Information | 57 |

iii

# SCHEDULES AND EXHIBITS[1]

SCHEDULE A         --        Purchaser Schedule
SCHEDULE 9C        --        Litigation
SCHEDULE 9D        --        Outstanding Debt
SCHEDULE 9F        --        Agreements Restricting Incurrence of Debt
SCHEDULE 9H        --        ERISA
SCHEDULE 9M        --        Subsidiaries of the Company and Ownership of Subsidiary
                             Stock

EXHIBIT A          --        Form of Note
EXHIBIT B          --        Form of Guaranty Agreement
EXHIBIT C          --        Form of Subsidiary Guaranty Agreement
EXHIBIT D          --        Form of Pledge Agreement
EXHIBIT E          --        Form of Security Agreement
EXHIBIT F          --        Form of Deeds of Trust
EXHIBIT G          --        Form of Trademark Security Agreements
EXHIBIT H          --        Form of Copyright Security Agreements
EXHIBIT I          --        Form of Compliance Certificate

---

[1] All schedules to the Transaction Documents are subject to the satisfactory review of the Purchasers.

A/74565634.14

**ST. LOUIS POST-DISPATCH LLC**
**North Tucker Boulevard**
**St. Louis, Missouri  63101**

As of [_____]

TO EACH OF THE PURCHASERS
NAMED ON <u>SCHEDULE A</u> HERETO

$126,355,000 Adjustable Rate Senior Notes

Ladies and Gentlemen:

The undersigned, ST. LOUIS POST-DISPATCH LLC, a Delaware limited liability company (the "**Company**"), hereby agrees with each Purchaser as follows:

**PARAGRAPH 1.    BACKGROUND**.

The Company entered into a certain Note Agreement, dated as of May 1, 2000, by and among the Company and each of the holders of notes issued thereunder, as amended by (a) that certain Amendment No. 1 to Note Agreement, dated as of November 23, 2004, (b) that certain Amendment No. 2 to Note Agreement, dated as of February 1, 2006, (c) that certain Amendment No. 3 to Note Agreement, dated as of November 19, 2008, (d) that certain Amendment No. 4 and First Amendment to Limited Waiver to Note Agreement and Guaranty Agreement, dated as of January 16, 2009, (e) that certain Limited Waiver and Amendment No. 5 to Note Agreement, dated as of February 18, 2009, (f) that certain Amendment No. 6 to Note Agreement, dated as of April 6, 2011 and (g) that certain Amendment No. 7 to Note Agreement, dated as of November 7, 2011 (as so amended and in effect immediately prior to the Petition Date (as defined below), the "**Prepetition Note Agreement**"), pursuant to which, among other things, the Company issued $306,000,000 in original principal amount of its Adjustable Rate Senior Notes due April 28, 2012 (as in effect immediately prior to the Petition Date (as defined below), the "**Prepetition Notes**").

On [_____], 2011 (the "**Petition Date**"), Lee and certain of its Subsidiaries including the Company (collectively, the "**Debtors**") filed voluntary petitions for relief under Chapter 11 of Title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") and continued in the possession of their property and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

On [_____], 2012, the Bankruptcy Court entered an order confirming the Joint Prepackaged Plan of Reorganization for the Debtors, dated [_____], 2011 (as in effect on the date of confirmation thereof pursuant to the Confirmation Order of the Bankruptcy Court and as

it thereafter may be amended in accordance with the Pulitzer Support Agreement, the "**Plan of Reorganization**").

In connection with the implementation of the Plan of Reorganization, and in full and complete satisfaction, settlement, release and discharge of any PD LLC Notes Claims, the Purchasers (as holders of all of the PD LLC Notes Claims) have agreed to become, or shall be deemed to become, parties to this Agreement on the terms and conditions set forth herein, on the Restructuring Closing Date.

Certain capitalized terms used in this Agreement are defined in paragraph 11; references to a "Schedule" or an "Exhibit" are, unless otherwise specified, to a Schedule or an Exhibit attached to this Agreement.

**PARAGRAPH 2.    AUTHORIZATION AND ISSUANCE OF NOTES**.

**2A.    Authorization of Notes**.  Subject to paragraph 2B below, the Company will authorize the issue of its senior guaranteed promissory notes in the aggregate principal amount of $131,355,000, to be dated the date of issue thereof, to mature December 31, 2015, to bear interest on the unpaid balance thereof from the date thereof until the principal thereof shall have become due and payable at the adjustable rate specified therein and on overdue payments at the rate specified therein, and to be substantially in the form of Exhibit A attached hereto (the "**Notes**").  The term "**Notes**" as used herein shall include each Note delivered pursuant to any provision of this Agreement and each Note delivered in substitution or exchange for any other Note pursuant to any such provision.

**2B.    Issuance of Notes**.  Subject to the terms and conditions hereof and to give effect to the Plan of Reorganization and provide for the full and complete satisfaction, settlement, release and discharge of the PD LLC Notes Claims, the Company will issue to each Purchaser, at the closing provided for in paragraph 3, Notes in the principal amount specified opposite such Purchaser's name in Schedule A, in an aggregate principal amount of $126,355,000, provided, that such aggregate amount reflects the application of a prepayment of the Notes to be made substantially concurrently with the issuance of the Notes in accordance with paragraph 5C hereof in an aggregate principal amount equal to $5,000,000 with the funds paid to the Purchasers as contemplated by paragraph 4S hereof (the "**Lee Prepayment**").  For administrative convenience, the principal amount of the Notes identified on the cover page and on page 1 hereof, the principal amount of each of the Notes specified on Schedule A and the principal amount of each of the Notes issued to the Purchasers on the Restructuring Closing Date shall, in each case, be net of the portion of the Lee Prepayment allocable to each such Note, provided, that, if for any reason the Lee Prepayment is not made substantially concurrently with the issuance of the Notes, the aggregate amount of the Notes shall be $131,355,000.

**PARAGRAPH 3.    RESTRUCTURING CLOSING DATE**.

This Agreement shall become effective, and the issuance of Notes provided for in paragraph 2B shall occur, on or before [February 10, 2012] at the office of Bingham McCutchen LLP, 399 Park Avenue, New York, New York 10022, so long as all of the conditions set forth in paragraph 4 hereof are fulfilled to the satisfaction of the Purchasers on or prior to such date (the

date, if any, on or prior to [February 10, 2012] that such conditions are so satisfied being referred to herein as the "**Restructuring Closing Date**").

## PARAGRAPH 4.    CONDITIONS OF CLOSING.

The effectiveness of this Agreement is subject to the fulfillment to each Purchaser's satisfaction of the following conditions (with each of the documents referred to below being in form, scope and substance reasonably satisfactory to the Purchasers; it is understood that a requirement to deliver any document to a Purchaser may be satisfied by delivering such document to the Purchasers' counsel):

**4A.    Representations and Warranties**.  The representations and warranties of the Company and the other Credit Parties in this Agreement and the other Transaction Documents to which each such Person is a party shall be correct when made and at the time of the Closing.

**4B.    No Default**.  Both immediately before and after giving effect to the issuance of the Notes, no Default or Event of Default shall have occurred and be continuing.

**4C.    Compliance Certificates**.

**4C(1). Officer's Certificates**.  Each of the Company and the Guarantor shall have delivered to each Purchaser an Officer's Certificate, dated the Restructuring Closing Date, certifying, among other things, that the conditions specified in paragraphs 4A and 4B have been fulfilled.

**4C(2). Secretary's Certificates**.  Each Credit Party shall have delivered to each Purchaser a certificate of its Secretary or an Assistant Secretary or a Director or other appropriate Person, dated the Restructuring Closing Date, certifying as to (i) such Person's organizational documents attached thereto, (ii) the resolutions attached thereto relating to the authorization, execution, delivery and performance by such Person of the Transaction Documents to which it is a party, and (iii) specimen signatures of the persons authorized to execute such documents on such Person's behalf.

**4D.    Opinions of Counsel**.  Each Purchaser shall have received opinions, dated the Restructuring Closing Date (a) (i) from Sidley Austin LLP, as special counsel for the Guarantor and its Subsidiaries, and (ii) from Lane & Waterman LLP, general counsel for the Guarantor and its Subsidiaries, each covering such matters incident to the transactions contemplated hereby as such Purchaser or its counsel may reasonably request (and the Company hereby instructs its counsel to deliver such opinions to the Purchasers), (b) (i) Brownstein Hyatt Farber Schreck, LLP, special Nevada counsel for Santa Maria Times, Inc., (ii) Davis Wright Tremaine LLP, special Washington counsel for Flagstaff Publishing Co., Hanford Sentinel Inc. and Napa Valley Publishing Co., and special Oregon counsel to Southwestern Oregon Publishing Co., and (iii) Parsons Behle & Latimer, special Utah counsel for Homechoice, LLC, each covering such matters incident to the transactions contemplated hereby as such Purchaser or its counsel may reasonably request, and (c) (i) from Bingham McCutchen LLP, the Purchasers' special counsel, and (ii) Bryan Cave LLP, the Purchasers' special Missouri counsel, each in connection with such transactions, covering such matters incident to such transactions as such Purchaser may reasonably request.

3

**4E.    Transactions Permitted by Applicable Laws**.  On the Restructuring Closing Date, the issuance of the Notes and the consummation of the other transactions contemplated hereby shall not (a) violate any applicable law or governmental regulation (including, without limitation, Section 5 of the Securities Act or Regulation T, U or X of the Board of Governors of the Federal Reserve System) and (b) subject any Purchaser to any tax, penalty or liability or other onerous condition under or pursuant to any applicable law or governmental regulation.  If requested by any Purchaser, such Purchaser shall have received an Officer's Certificate from the Company certifying as to such matters of fact as such Purchaser may reasonably specify to enable such Purchaser to determine compliance with this condition.

**4F.    Consents and Approvals**.  All necessary corporate, governmental and third party approvals and consents in connection with the transactions contemplated by this Agreement shall have been obtained.

**4G.    Notes**.  Each Purchaser shall have received an original Note or Notes executed by the Company in favor of such Purchaser (as more particularly set forth in Schedule A).

**4H.    Guaranty Agreement**.  Each Purchaser shall have received a fully executed copy of the Guaranty Agreement substantially in the form of Exhibit B hereto, dated as of the Restructuring Closing Date, made by the Guarantor in favor of the holders from time to time of the Notes (as amended, restated, supplemented or otherwise modified from time to time, the "**Guaranty Agreement**").

**4I.    Subsidiary Guaranty**.  Each Purchaser shall have received a fully executed copy of the Subsidiary Guaranty Agreement, substantially in the form of Exhibit C hereto dated as of the Restructuring Closing Date, made by each Subsidiary Guarantor in favor of the holders from time to time of the Notes (as amended, restated, supplemented or otherwise modified from time to time, the "**Subsidiary Guaranty Agreement**").

**4J.    Credit Agreement**.  Each Purchaser shall have received a fully executed copy, certified by a Responsible Officer of the Company as true and complete, of the Exit Credit Agreement, among Lee, various lenders from time to time party thereto and Deutsche Bank Trust Company Americas, as administrative agent and collateral agent, dated as of the Restructuring Closing Date (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "**Credit Agreement**").  Each Purchaser shall have received evidence reasonably satisfactory to it that the conditions precedent to the effectiveness of the Credit Agreement have been satisfied and/or waived and that the Credit Agreement is in full force and effect.

**4K.    Second Lien Loan Agreement and Other Second Lien Debt Documents**.  Each Purchaser shall have received (i) a fully executed copy of the Second Lien Loan Agreement, dated as of the Restructuring Closing Date (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, except as otherwise specified herein, the "**Second Lien Loan Agreement**"), by and among Lee, Wilmington Trust, National Association, as administrative agent, and the lenders from time to time party thereto, and (ii) fully executed copies of all other Second Lien Debt Documents. Each Purchaser shall have received evidence reasonably satisfactory to it that the conditions precedent

4

to the effectiveness of the Second Lien Loan Agreement have been satisfied and/or waived and that the Second Lien Loan Agreement is in full force and effect.

4L.    **Intercreditor Agreement**.  Each Purchaser shall have received a fully executed copy of the Intercreditor Agreement, dated as of the Restructuring Closing Date (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "**Intercreditor Agreement**"), by and among the Purchasers, the lenders that are parties to the Second Lien Loan Agreement, the Collateral Agent, Wilmington Trust, National Association, as administrative agent for the lenders under the Second Lien Loan Agreement, and the Credit Parties.

4M.    **Collateral Documents**.  Subject to paragraph 6M, each Purchaser shall have received fully executed copies of each of the following Collateral Documents, each dated as of the Restructuring Closing Date:

4M(1).  **Pledge Agreement**.  A Pledge Agreement substantially in the form of Exhibit D attached hereto, duly executed by the Guarantor and certain Subsidiaries of the Guarantor in favor of the Collateral Agent for the benefit of the holders from time to time of the Notes (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "**Pledge Agreement**");

4M(2).  **Security Agreement**.  A Security Agreement substantially in the form of Exhibit E attached hereto, duly executed by the Guarantor, the Company and each of the other Subsidiaries of the Guarantor except for TNI Partners in favor of the Collateral Agent for the benefit of the holders from time to time of the Notes (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "**Security Agreement**");

4M(3).  **Deeds of Trust**.  (i) A Deed of Trust substantially in the form set forth as Exhibit F attached hereto (with such changes thereto as may be necessary under applicable state law), duly executed by the Company in favor of the Collateral Agent for the benefit of the holders from time to time of the Notes with respect to the property located at 11790 Dunlap Industrial Boulevard f/k/a 11790 Dunlap Industrial Boulevard, including 11631 Fairgrove Industrial Boulevard, 11675 Fairgrove Industrial Boulevard and 11695 Fairgrove Industrial Boulevard, Maryland Heights, St. Louis County, Missouri, and (ii) a Deed of Trust substantially in the form set forth as Exhibit F attached hereto, duly executed by the Company and STL Distribution Services LLC in favor of the Collateral Agent for the benefit of the holders from time to time of the Notes with respect to the property located at 900 N. Tucker Boulevard, St. Louis, Missouri (as such Deeds of Trust may be amended, restated, supplemented or otherwise modified from time to time, collectively, the "**Deeds of Trust**");

4M(4).  **Trademark Security Agreements**.    Trademark Security Agreements substantially in the form of Exhibit G attached hereto, duly executed by any Obligor holding one or more trademarks (as the same may be amended, restated, supplemented or otherwise modified from time to time, collectively, the "**Trademark Security Agreements**");

4M(5).  **Copyright Security Agreements**.  Copyright Security Agreements substantially in the form of Exhibit H attached hereto, duly executed by any Obligor holding one or more

copyrights (as the same may be amended, restated, supplemented or otherwise modified from time to time, collectively, the "**Copyright Security Agreements**");

**4M(6).  Account Control Agreement**.  A deposit account control agreement in form and substance reasonably satisfactory to the Purchasers, duly executed by the Guarantor, with respect to the operating deposit account of the Guarantor maintained at U.S. Bank National Association (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "**Account Control Agreement**");

**4M(7).  Collateral Agency Agreement.**  A Collateral Agency Agreement in form and substance reasonably satisfactory to the Purchasers, duly executed by the Collateral Agent and the other Purchasers, together with evidence reasonably satisfactory to such Purchaser that all fees thereunder required to be paid to the Collateral Agent on the Restructuring Closing Date have been paid; and

**4M(8).  Other Documents**.  Such other documents, instruments and agreements as any of the Purchasers may reasonably request to grant to the Collateral Agent first priority perfected Liens on the Collateral.

**4N.    Lien Searches/Evidence of First Priority Liens**.  Each Purchaser shall have received from the Company such Lien searches as it has reasonably requested and evidence reasonably satisfactory to the Required Holders of the creation and perfection of valid, first priority Liens on the Collateral in favor of the Collateral Agent securing the Secured Obligations pursuant to the Collateral Documents, free and clear of all other Liens (other than Permitted Liens).

**4O.    Private Placement Number.**  A Private Placement Number issued by Standard & Poor's CUSIP Service Bureau (in cooperation with the SVO) shall have been obtained for the Notes.

**4P.    [Reserved].**

**4Q.    Consent Fees**.

(i)    On or prior to one Business Day after the Plan Support Effective Date, the Company shall have paid in cash a fee to each Consenting Noteholder in an amount equal to .50% of the outstanding principal amount of such Consenting Noteholder's Prepetition Notes as of December 2, 2011 (before giving effect to any prepayment of the Notes made, or required to be made, on or after such date).

(ii)    On the Restructuring Closing Date, the Company shall pay a fee in an amount equal to 1.00% of the outstanding principal amount of each Consenting Noteholder's Prepetition Notes as of December 2, 2011 (before giving effect to any prepayment of the Notes made, or required to be made, on or after such date).

**4R.    Evidence of Termination of Certain Accounts and Transfer of Funds**.  Each Purchaser shall have received from the Company reasonably satisfactory evidence that the Restricted Cash Reserve Account and the Excess Cash Flow Reserve Account (collectively, the

A/74565634.14

"**Accounts**") shall have been terminated and the outstanding balance on deposit in the Asset Sale Proceeds Reserve Account shall have been reduced to zero.

     **4S.    Lee Prepayment.**  On or prior to the Restructuring Closing Date, the Company shall have paid to the Purchasers an amount equal to $5,000,000 using only funds provided by Lee to the Company on or prior to such date, and such amount shall be applied as a prepayment of the Notes substantially concurrent with the issuance thereof in accordance with paragraph 2B hereof.

     **4T.    Tax Sharing Agreement**.  Each Purchaser shall have received (i) a copy of a tax sharing agreement among the Pulitzer Entities and Lee, dated the date hereof, in form and substance reasonably satisfactory to such Purchaser (the "**Tax Sharing Agreement**") and (ii) reasonably satisfactory evidence that the Tax Sharing Agreement is in full force and effect.

     **4U.    Star Intercompany Obligations**.  Each Purchaser shall have received evidence reasonably satisfactory to it that the Star Intercompany Notes have been canceled and no liability remains outstanding in respect thereof.

     **4V.    Confirmation Order.**  The Confirmation Order shall be in form and substance reasonably satisfactory to the Required Consenting Noteholders (as such term is defined in the Pulitzer Support Agreement) and shall have been entered, shall not be subject to any stay or injunction, and the conditions precedent to the effectiveness of the Plan of Reorganization shall have been satisfied (or waived) to the reasonable satisfaction of the Required Consenting Noteholders.  The Company shall have delivered an Officer's Certificate to the Purchasers certifying and attesting that, as of the Restructuring Closing Date, the Confirmation Order has not been stayed in any manner.

     **4W.    Payment of Fees and Expenses.**  Without limiting the provisions of paragraph 12B, the Company shall have paid, on or before the Restructuring Closing Date, all outstanding fees and expenses of (a) Bingham McCutchen LLP, the Purchasers' special counsel, (b) special local counsel to the Purchasers, and (c) Conway, Del Genio, Gries & Co., LLC, as financial advisor to the Purchasers, in each case to the extent reflected in a statement delivered to the Company at least one Business Day prior to the Restructuring Closing Date.

     **4X.    Herald Redemption Agreement.**  Each Purchaser shall have received a copy of a Redemption Agreement, dated as of the Restructuring Closing Date, duly executed by the Company, STL Distribution Services LLC, a Delaware limited liability company, The Herald Publishing Company, LLC, a New York limited liability company, the Guarantor and Pulitzer Technologies, Inc., a Delaware corporation, substantially in the form of the Redemption Agreement entered into by such Persons as of February 18, 2009.

     **4Y.    Proceedings and Documents.**  All corporate and other proceedings in connection with the transactions contemplated by this Agreement and all documents and instruments incident to such transactions shall be reasonably satisfactory to each Purchaser and its special counsel, and such Purchaser and its special counsel shall have received all such counterpart originals or certified or other copies of such documents as such Purchaser or such special counsel may reasonably request.

**PARAGRAPH 5.    PREPAYMENTS**.

 **5A.    Mandatory Scheduled Prepayments**.  On March 20, 2012 and on the 20th day of each June, September, December and March thereafter to and including December 20, 2015, the Company will prepay the Notes at par and without payment of the Yield-Maintenance Amount or any premium in accordance with the following schedule:

| Dates | Mandatory Scheduled Prepayment Amounts |
|---|---|
| December 20th in each Fiscal Year of the Company | $800,000 minus the Reduction Amount for the Fiscal Year in which such date falls (but not, in any event, less than zero) |
| March 20th in each Fiscal Year of the Company | $2,400,000 minus the Reduction Amount for the Fiscal Year in which such date falls (but not, in any event, less than zero) |
| June 20th in each Fiscal Year of the Company | $4,400,000 minus the Reduction Amount for the Fiscal Year in which such date falls (but not, in any event, less than zero) |
| September 20th in each Fiscal Year of the Company | $6,400,000 minus the Reduction Amount for the Fiscal Year in which such date falls (but not, in any event, less than zero) |

The Company shall pay the entire remaining outstanding principal amount of the Notes on December 31, 2015.

 **5B.    Excess Cash Flow Sweep.**  On or prior to the 45th day after the last day of each fiscal quarter of the Guarantor (commencing with the first fiscal quarter ending closest to March 31, 2012 through and including the last day of the fiscal quarter ending closest to September 30, 2015), the Company will prepay a principal amount of Notes (an "**Excess Cash Flow Sweep Prepayment**") equal to the greater of (a) zero and (b) an amount equal to (i) 75% of Available Excess Cash Flow for such fiscal quarter (rounded down to the nearest $10,000 increment), plus (ii) if, after giving effect to a pro forma reduction of Unrestricted Cash as a result of any prepayment required to be made with respect to such fiscal quarter pursuant to the foregoing clause (i), the aggregate amount of Unrestricted Cash held by the Guarantor and its Subsidiaries as at the last day of such fiscal quarter exceeds $20,000,000, an amount equal to 100% of such excess amount (rounded down to the nearest $10,000 increment).  The Excess Cash Flow Sweep Prepayment shall be made at par and without payment of the Yield-Maintenance Amount or any premium.  Simultaneously with each prepayment made pursuant to this paragraph 5B, the Company shall deliver to each holder of Notes the calculation, in reasonable detail, of the amount of the Excess Cash Flow Sweep Prepayment as of such prepayment date.

A/74565634.14

**5C.**     **Optional Prepayments**.

(i)     Notwithstanding anything herein to the contrary, the Notes shall be subject to prepayment, in whole at any time or from time to time in part (in a minimum principal amount of $250,000 and integral multiples of $100,000 above that amount) at the option of the Company, at 100% of the principal amount so prepaid, but without payment of the Yield-Maintenance Amount or any premium.

(ii)     The Company shall give the holder of each Note notice (which may be by telephone or e-mail) of any prepayment pursuant to paragraph 5C(i) not less than 3 Business Days prior to the prepayment date (which shall be a Business Day), specifying such prepayment date and the principal amount of the Notes, and of the Notes held by such holder, to be prepaid on such date and stating that such prepayment is to be made pursuant to paragraph 5C(i).  Notice of prepayment having been given as aforesaid, the principal amount of the Notes specified in such notice (but without the Yield-Maintenance Amount or any premium) shall become due and payable on such prepayment date unless such notice of prepayment shall be rescinded by the Company on or before such prepayment date.

**5D.**     **Asset Sale Prepayments**.  Within 5 Business Days of each date on or after the Restructuring Closing Date upon which the Guarantor or any of its Subsidiaries receives any Asset Sale Proceeds, the Company will prepay a principal amount of Notes (an "**Asset Sale Prepayment**") in an amount equal to 100% of the Asset Sale Proceeds (rounded down to the nearest $10,000 increment) received on such date in accordance with the requirements of paragraphs 5F and 5G.  The Company agrees that, on any Business Day on which the Guarantor or any of its Subsidiaries receives any Asset Sale Proceeds, it will cause such Asset Sale Proceeds to be deposited into the Asset Sale Proceeds Reserve Account, unless it makes the prepayment contemplated by the preceding sentence on such Business Day.

**5E.**     **Prepayment Upon Change of Control.**  Promptly and in any event within 5 Business Days after the occurrence of a Change of Control, the Company will give written notice thereof (a "**Change of Control Notice**") to the holders of all outstanding Notes, which Change of Control Notice shall (i) refer specifically to this paragraph 5E, (ii) describe the Change of Control in reasonable detail and specify the Change of Control Prepayment Date and the Response Date (as respectively defined below) in respect thereof and (iii) offer to prepay all outstanding Notes at the price specified below on the date therein specified (the "**Change of Control Prepayment Date**"), which shall be a Business Day not more than 15 days after the date of such Change of Control Notice.  Each holder of a Note will notify the Company of such holder's acceptance or rejection of such offer by giving written notice of such acceptance or rejection to the Company on or before the date specified in such Change of Control Notice (the "**Response Date**"), which specified date shall be a Business Day not less than 7 days nor more than 12 days after the date of such Change of Control Notice.  The Company shall prepay on the Change of Control Prepayment Date all of the outstanding Notes held by the holders as to which such offer has been so accepted (it being understood that failure of any holder to accept such offer on or before the Response Date shall be deemed to constitute acceptance by such holder), at the principal amount of each such Note, together with interest accrued thereon to the Change of Control Prepayment Date but without payment of the Yield-Maintenance Amount or any

premium.  If any holder shall reject such offer on or before the Response Date, such holder shall be deemed to have waived its rights under this paragraph 5E to require prepayment of all Notes held by such holder in respect of such Change of Control but not in respect of any subsequent Change of Control.  For purposes of this paragraph 5E, any holder of more than one Note may act separately with respect to each Note so held (with the effect that a holder of more than one Note may accept such offer with respect to one or more Notes so held and reject such offer with respect to one or more other Notes so held).

**5F.    Application of Certain Prepayments.**  Any prepayment of the Notes pursuant to any provision hereof (other than paragraph 5E hereof) shall be applied to reduce the minimum cumulative principal prepayments required by paragraph 5A in the order of maturity of such prepayments under paragraph 5A, provided that, for the avoidance of doubt, the foregoing portion of this sentence shall not apply to any prepayment that is made pursuant to paragraph 5A or that is part of the Reduction Amount to the extent applied to reduce such minimum cumulative principal prepayments.  Any prepayment of the Notes pursuant to paragraph 5E shall be applied ratably to reduce the minimum cumulative principal prepayments required by paragraph 5B (including, without limitation, the payment due on the maturity date of the Notes).

**5G.    Partial Payments Pro Rata.**  Upon any partial prepayment of the Notes pursuant to any provision hereof (other than paragraph 5E), the principal amount so prepaid shall be allocated to all Notes at the time outstanding in proportion to the respective outstanding principal amounts thereof.

**5H.    Retirement of Notes.**  The Company shall not, and shall not permit any of its Subsidiaries or any Company Affiliate to, prepay or otherwise retire in whole or in part prior to their stated final maturity (other than by prepayment pursuant to this paragraph 5 or upon acceleration of such final maturity pursuant to paragraph 8A), or purchase or otherwise acquire, directly or indirectly, Notes held by any holder.

**5I.    Use of Debt to Make Prepayment.**  No prepayment of less than the entire outstanding principal amount of the Notes will be made with the proceeds of any Debt incurred by the Guarantor, the Company or any of the Guarantor's other Subsidiaries, except unsecured Debt subordinated to payment of the Notes on terms and conditions satisfactory to the Required Holders.

**5J.    Prepayment of Interest upon Payment in Full of Notes.**  Any payment or prepayment of any Notes pursuant to this paragraph 5 which results in the payment or prepayment of the entire outstanding principal amount of such Notes shall be made together with all accrued and unpaid interest thereon as of the date of such payment or prepayment.  No interest shall otherwise be paid together with any such payment or prepayment unless such payment or prepayment is made on a date when interest is scheduled to be paid.

**PARAGRAPH 6.    AFFIRMATIVE COVENANTS.**

So long as any Note shall remain unpaid, the Company covenants as follows:

**6A.    Financial Statements.**  The Company will deliver or cause the Guarantor to deliver to each holder of a Note in duplicate or in electronic format (it being understood that the

10

Company need not duplicate delivery by the Guarantor of the financial statements or other items required to be delivered under Section 4.1 of the Guaranty Agreement):

(i)        as soon as practicable and in any event within 45 days after the end of each quarterly period (other than the last quarterly period) of Lee in each fiscal year, a consolidating and consolidated statement of income and a consolidated statement of cash flows of the Guarantor and its Subsidiaries (including the Company) for such quarterly period and for the period from the beginning of the current fiscal year to the end of such quarterly period, and a consolidating and consolidated balance sheet of the Guarantor and its Subsidiaries (including the Company) as at the end of such quarterly period, setting forth in each case in comparative form figures for the corresponding period in the preceding fiscal year (if applicable, in the case of the Company and its Subsidiaries), all in reasonable detail and certified by an authorized financial officer of Lee, subject to changes resulting from year-end adjustments;

(ii)       as soon as practicable and in any event within 90 days after the end of each fiscal year of Lee, a consolidating and consolidated statement of income and a consolidating and consolidated balance sheet of the Guarantor and its Subsidiaries (including the Company) as at the end of such year and consolidated statements of cash flows and stockholders' equity of the Guarantor and its Subsidiaries (including the Company) for such year, setting forth in each case in comparative form corresponding consolidated figures from the preceding annual audit, all in reasonable detail and satisfactory in scope to the Required Holder(s) and, as to the consolidated statements, audited by independent public accountants of recognized standing selected by the Guarantor whose opinion shall be in scope and substance satisfactory to the Required Holder(s) and shall not in any event include any scope limitation or any going concern or other material qualification (except that such opinion for the Guarantor's fiscal year ending in September 2015 may include a going concern limitation related to the refinancing of the Notes and/or the Debt outstanding under the Credit Agreement or the Second Lien Loan Agreement) and, as to the consolidating statements, certified by an authorized financial officer of Lee;

(iii)      promptly upon transmission thereof, copies of all such financial statements, proxy statements, notices and reports as the Guarantor shall send to its stockholders and copies of all registration statements (without exhibits) and all reports (other than reports as to which the Guarantor shall receive confidential treatment) which the Guarantor or any Subsidiary (including the Company) files with the Securities and Exchange Commission (or any governmental body or agency succeeding to the functions of the Securities and Exchange Commission);

(iv)      promptly upon receipt thereof, a copy of each other report submitted to the Guarantor or any Subsidiary (including the Company) by independent accountants in connection with any annual, interim or special audit made by them of the books of the Guarantor or any Subsidiary (including the Company);

(v)       within 30 days after the end of each fiscal month of Lee, the consolidated balance sheet of Lee and its Subsidiaries as at the end of such fiscal month and the related

consolidated statements of income and, to the extent prepared, statements of cash flows for such fiscal month and for the elapsed portion of the fiscal year ended with the last day of such fiscal month, in each case setting forth comparative figures for the corresponding fiscal month in the prior fiscal year;

(vi)    to the extent prepared by the Company or the Guarantor, within 30 days after the end of each fiscal month of the Guarantor, consolidated and consolidating balance sheets of the Guarantor and its Subsidiaries as at the end of such fiscal month and the related consolidated and consolidating statements of income and cash flows for such fiscal month and for the elapsed portion of the Fiscal Year ended with the last day of such fiscal month, in each case setting forth comparative figures for the corresponding fiscal month in the prior Fiscal Year;

(vii)    no later than the first Business Day of every other week (beginning on the first Monday after the Restructuring Closing Date), a forecast for the succeeding 13-week period of the projected consolidated cash flows of (x) Lee and its Subsidiaries, and (y) the Guarantor and its Subsidiaries, each taken as a whole (such forecast to contain the same level of detail used in such forecasts delivered to the holders of the Prepetition Notes commencing in October, 2011), together with a variance report of actual cash flow for the immediately preceding period for which a forecast was delivered against the then current forecast for such preceding period;

(viii)    promptly, and in any event within 45 days following the end of each fiscal quarter in each fiscal year of Lee, a written report of a Responsible Officer, in form and scope reasonably satisfactory to the Required Holders (such satisfaction to be presumed in the absence of an objection delivered to the Company within 30 days after the receipt of such report), setting forth a summary in reasonable detail of all Restricted Intercompany Charges, including cash and non-cash activities, organized by category of intercompany activity, by and among (x) Lee and its Subsidiaries (other than the Pulitzer Entities), on one hand, and the Pulitzer Entities, on the other hand, and (y) the Pulitzer Entities and Star Publishing, and a reconciliation of intercompany balances with respect to each of (x) and (y);

(ix)    promptly, and in any event within 90 days following the end of each Fiscal Year (or following such shorter intervals as the same may be prepared), an update, in a directly comparable format, of the financial model delivered to the Purchasers on the Restructuring Closing Date, setting forth the projected financial performance of the Guarantor and its Subsidiaries for the current Fiscal Year (prepared on a month-by-month basis) and for each of the next four (4) Fiscal Years (prepared on an annual basis);

(x)    promptly, and in any event within 45 days following the end of each Fiscal Year (or following such shorter intervals as the same may be prepared), a pension valuation/status report, in form and scope reasonably satisfactory to the Required Holders (such satisfaction to be presumed in the absence of an objection delivered to the Company within 30 days after the receipt of such update), setting forth in reasonable detail the extent to which the pension obligations of the Guarantor and its Subsidiaries are

A/74565634.14

funded, together with revised projections of future cash payments in respect of such pension obligations;

(xi)     promptly, and in any event within 30 days following the end of each fiscal month of Lee, a management report describing the financial performance and operations of Lee and its subsidiaries in a form consistent with, and containing the same level of detail as, reports made available to the holders of the Prepetition Notes commencing in October, 2011; and

(xii)    with reasonable promptness, such other information and documents as any holder may reasonably request.

Together with each delivery of financial statements required by clauses (i) and (ii) above, the Company will deliver to each holder a Compliance Certificate, substantially in the form of Exhibit I attached hereto, executed on behalf of the Company and demonstrating (with computations in reasonable detail) compliance by the Company and its Subsidiaries with the provisions of paragraphs 7B, 7C(2), 7C(3) and 7C(4) of this Agreement and stating that there exists no Event of Default or Default, or, if any Event of Default or Default exists, specifying the nature and period of existence thereof and what action the Company proposes to take with respect thereto.   Together with each delivery of financial statements required by clause (ii) above, the Company will use reasonable efforts to deliver or cause to be delivered to each holder a certificate of such accountants stating that, in making the audit necessary for their report on such financial statements, they have obtained no knowledge of any Event of Default or Default or, if they have obtained knowledge of any Event of Default or Default, specifying the nature and period of existence thereof.   Such accountants, however, shall not be liable to anyone by reason of their failure to obtain knowledge of any Event of Default or Default which would not be disclosed in the course of an audit conducted in accordance with generally accepted auditing standards.   Together with all financial statements of the Guarantor and its Subsidiaries required to be delivered pursuant to this paragraph 6A, the Company will deliver or cause to be delivered a reconciliation reflecting the changes that would be required to such financial statements had they been prepared in accordance with the GAAP and policies used to prepare the audited financial statements of the Guarantor for the Guarantor's fiscal year ended September 25, 2011. The Company also covenants that immediately after any Responsible Officer obtains knowledge of an Event of Default or Default, it will deliver to each holder an Officer's Certificate specifying the nature and period of existence thereof and what action the Company has taken, is taking or proposes to take with respect thereto.   Each holder is hereby authorized to deliver a copy of any financial statement delivered to such holder pursuant to this paragraph 6A to any regulatory body having jurisdiction over such holder.   Nothing herein shall require, or be deemed to require, the Company to deliver any audited financial statements, or a certificate of accountants related to any Event of Default or Default, for the Company.

**6B.     Inspection of Properties.**  The Company will permit any Person designated by any holder in writing, at such holder's expense if no Event of Default then exists and at the Company's expense if an Event of Default then exists, to visit and inspect any of the properties of the Company and its Subsidiaries, to examine the limited liability company or corporate books and financial records of the Company and its Subsidiaries and make copies thereof or extracts therefrom and to discuss the affairs, finances and accounts of any of such limited liability

13

companies or corporations with the principal officers of the Company and its independent public accountants, all at such reasonable times and as often as such holder may reasonably request; provided, however, that, so long as no Event of Default shall have occurred, no holder of Notes shall exercise rights pursuant to this paragraph 6B without the written approval of the Required Holders (to be given or withheld in their sole discretion) and (ii) no more than two such inspections shall be conducted in any calendar year.

**6C.    Covenant to Secure Notes Equally.**  The Company will, if it or any Subsidiary shall create or assume any Lien upon any of its property or assets, whether now owned or hereafter acquired, other than Liens permitted by the provisions of paragraph 7C(l) (unless prior written consent to the creation or assumption thereof shall have been obtained pursuant to paragraph 12C), make or cause to be made effective provision whereby the Notes will be secured by such Lien equally and ratably with any and all other Debt thereby secured, so long as any such other Debt shall be so secured; provided that the creation and maintenance of such equal and ratable Lien shall not in any way limit or modify the right of the holders of the Notes to enforce the provisions of paragraph 7C(1).

**6D.    Compliance with Laws and Regulations.**  The Company will, and will cause each Subsidiary to, be in material compliance with all laws, ordinances or governmental rules or regulations to which each of them is subject (including, without limitation, the laws and regulations that are referred to in paragraph 9K, and those relating to equal employment opportunity and employee health and safety) which are now in effect or may be legally imposed in the future in any jurisdiction in which the Company and any Subsidiary is doing business other than those laws and regulations which the Company or such Subsidiary is contesting in good faith by appropriate proceedings; provided, however, (i) the Company or such Subsidiary continues to operate any affected business free of any requirement to escrow or sequester any material amount of such business' profits or revenues pending resolution of such proceedings, or (ii) any non-compliance with any law or regulation could not reasonably be expected to have a Material Adverse Effect.

**6E.    Patents, Trade Marks and Trade Names.**  The Company will and will cause each Subsidiary to continue to own, or hold and maintain in effect, all licenses, certificates, permits, franchises and other governmental authorizations necessary to the ownership of their respective properties or to the use of, all copyrights, franchises, licenses, marketing rights, patents, service marks, trade marks, trade names, and rights in any of the foregoing, as in the aggregate are necessary for the conduct of its business in the manner in which such business is being conducted as of the date hereof except where failure to continue to own or hold such licenses could not reasonably be expected to have a Material Adverse Effect.

**6F.    Information Required by Rule 144A.**  The Company will, upon the request of the holder of any Note, provide such holder, and any qualified institutional buyer designated by such holder, such financial and other information as such holder may reasonably determine to be necessary in order to permit compliance with the information requirements of Rule 144A under the Securities Act in connection with the resale of Notes, except at such times as the Company is subject to the reporting requirements of section 13 or 15(d) of the Exchange Act.  For the purpose of this paragraph 6F, the term "qualified institutional buyer" shall have the meaning specified in Rule 144A under the Securities Act.

14

**6G.      Payment of Taxes and Other Claims**.  The Company will, and will cause each of its Subsidiaries to, file all income tax or similar tax returns required to be filed in any jurisdiction and to pay and discharge all taxes shown to be due and payable by the Company or its Subsidiaries on such returns and all other taxes, assessments, governmental charges, levies, trade accounts payable and claims for work, labor or materials (all the foregoing being referred to collectively as "**Claims**") payable by any of them, to the extent such Claims have become due and payable and before they have become delinquent (including, without limitation, Claims for which sums have become due and payable that have or might become a Lien on properties or assets of the Company or any Subsidiary); <u>provided</u>, that neither the Company nor any Subsidiary need pay any Claim if (i) the amount, applicability or validity thereof is contested by the Company or such Subsidiary on a timely basis in good faith and in appropriate proceedings, and the Company or such Subsidiary has established adequate reserves therefor in accordance with GAAP on its books or (ii) the nonpayment of all such Claims in the aggregate could not reasonably be expected to have a Material Adverse Effect.

**6H.      ERISA Compliance**.  The Company will, and will cause each ERISA Affiliate controlled by the Company to, at all times:

> (i)      with respect to each Plan, make timely payments of contributions required to meet the minimum funding standard set forth in ERISA or the Code with respect thereto and, with respect to any Multiemployer Plan, make timely payment of contributions required to be paid thereto as provided by Section 515 of ERISA, and

> (ii)      comply with all other provisions of ERISA,

except for such failures to make contributions and failures to comply as could not reasonably be expected to have a Material Adverse Effect.

**6I.      Insurance**.  The Company will, and will cause each of its Subsidiaries to, maintain, with financially sound and reputable insurers, (i) insurance with respect to their respective properties and businesses against such casualties and contingencies, of such types, on such terms and in such amounts (including deductibles, co-insurance and self-insurance, if adequate reserves are maintained with respect thereto) as is customary in the case of entities of established reputations engaged in the same or a similar business and similarly situated and (ii) such other insurance coverages as may be required under the terms of the Collateral Documents.

**6J.      Maintenance of Properties**.  The Company will, and will cause each of its Subsidiaries to, maintain and keep, or cause to be maintained and kept, their respective properties in good repair, working order and condition (other than ordinary wear and tear), so that the business carried on in connection therewith may be properly conducted at all times, *provided* that this paragraph shall not (i) prevent the Company or any Subsidiary from discontinuing the operation and the maintenance of any of its properties if such discontinuance is desirable in the conduct of its business and the Company has concluded that such discontinuance could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or (ii) be interpreted to require the Company to make Capital Expenditures in respect of maintenance in excess of the amounts permitted to be spent on Capital Expenditures under the Guaranty Agreement.

**6K.    Corporate Existence, Etc.**  Subject to paragraph 7C(6), the Company will at all times preserve and keep its corporate existence in full force and effect.  Subject to paragraphs 7C(4) and 7C(6), the Company will at all times preserve and keep in full force and effect the corporate existence of each of its Subsidiaries (unless merged into the Company or a Subsidiary) and all rights and franchises of the Company and its Subsidiaries unless, in the good faith judgment of the Company, the termination of or failure to preserve and keep in full force and effect such corporate existence, right or franchise could not, individually or in the aggregate, have a Material Adverse Effect.

**6L.    Books and Records**.  The Company will, and will cause each of its Subsidiaries to, maintain proper books of record and account in conformity with GAAP and all applicable requirements of any Governmental Authority having legal or regulatory jurisdiction over the Company or such Subsidiary, as the case may be.

**6M.    Delivery of Deeds of Trust**.  To the extent that the Company is unable to satisfy the condition set forth in paragraph 4M(3) hereto on or prior to the Restructuring Closing Date, the Company will deliver to the Purchasers the Deeds of Trust, as referenced in such paragraph, as soon as commercially reasonable but no later than 30 calendar days after the Restructuring Closing Date or by such later date to which the Required Holders may agree.

## PARAGRAPH 7.    NEGATIVE COVENANTS.

So long as any Note shall remain unpaid, the Company covenants as follows:

**7A.    Change of Business.**  The Company will not change, and will not permit any Material Subsidiary to change, in any material respect the purpose of its business or operations from that of owning and operating the *St. Louis Post-Dispatch* and other businesses directly or indirectly related thereto.

**7B.    Limitation on Distributions.**  Neither the Company nor any Subsidiary will declare or make, or incur any liability to declare or make, any distributions or payments in respect of its Equity Interests, except distributions or payments to the Guarantor, the Company or any Subsidiary of the Company.

**7C.    Lien, Debt and Other Restrictions.**  The Company will not, and will not permit any Subsidiary to:

**7C(1). Liens**.  Directly or indirectly, create, assume or suffer to exist (upon the happening of a contingency or otherwise) any Lien on or with respect to any of its property or assets, whether now owned or hereafter acquired, or any income or profits therefrom, or assign or otherwise convey the right to receive income or profits (whether or not provision is made for the equal and ratable securing of the Notes in accordance with the provisions of paragraph 6C), except:

(i)    mechanics', workmen's, repairmen's, warehousemen's, carriers' or other like Liens arising or incurred in the ordinary course of business for amounts which are not delinquent or are being actively contested in good faith by appropriate proceedings;

16

(ii)    with respect to real property, (a) easements, quasi-easements, licenses, covenants, rights-of-way and other similar restrictions, including any other agreements, conditions, restrictions or other matters which would be shown by a current title report or other similar report or listing, (b) any conditions that would be shown by a current survey or physical inspection and (c) zoning, building and other similar restrictions;

(iii)    Liens for taxes or assessments or other governmental charges or levies not yet due or which are being actively contested in good faith by appropriate proceedings if adequate reserves with respect thereto are maintained on the books of the Company or its Subsidiaries, as the case may be, in accordance with GAAP;

(iv)    Liens on property or assets of a Subsidiary to secure obligations of such Subsidiary to the Company or another Subsidiary;

(v)    to the extent the Debt secured thereby is permitted under clause (vi) of paragraph 7C(2), (a) Liens securing Capitalized Lease Obligations of the Company or its Subsidiaries, (b) Liens securing other Debt of the Company or its Subsidiaries to finance the purchase price or cost of property acquired, constructed or improved by the Company or any Subsidiary after the Restructuring Closing Date (including, without limitation, pursuant to purchase price conditional sales contracts) or (c) Liens existing on any property of any Person at the time it becomes a Subsidiary, or existing prior to the time of acquisition upon any property acquired by the Company or any Subsidiary through purchase, merger, or consolidation or otherwise, whether or not assumed by the Company or such Subsidiary, provided that any such Lien shall not encumber any other property of the Company or such Subsidiary;

(vi)    any Liens renewing, extending or refunding any Lien permitted by clause (v) above, provided that the principal amount secured is not increased and the Lien is not extended to other property;

(vii)    Liens consisting of financing statements filed under the Uniform Commercial Code of any jurisdiction solely for precautionary or notice purposes with respect to equipment leases;

(viii)    other Liens which were not incurred in connection with the borrowing of money or the obtaining of advances or credit, and which do not in the aggregate materially impair the use of such property and assets in the operation of the business of the Company and its Subsidiaries, or materially detract from the value of such property or assets for the purpose of the business of the Company and its Subsidiaries, taken as a whole;

(ix)    Liens in favor of the Collateral Agent to secure the Secured Obligations; and

(x)    Liens (other than Liens on the Excluded TNI Assets) securing Debt permitted by paragraph 7C(2)(iii) hereof, provided that such Liens are subject to the terms of the Intercreditor Agreement.

**7C(2). Debt.**  Create, incur, assume, guarantee or in any way become liable for any Debt except:

(i)      Debt represented by the Transaction Documents;

(ii)      Debt or indebtedness of the Company owing to the Guarantor or any of its Subsidiaries that are Credit Parties or Debt or indebtedness owing by any Credit Party to another Credit Party; provided that such Debt is unsecured;

(iii)      Debt in respect of any guarantee by the Credit Parties of Debt of Lee under and in respect of the Second Lien Loan Agreement (or any Permitted Refinancing Debt in respect of the Second Lien Loan Agreement), so long as (a) the Intercreditor Agreement is in full force and effect, and (ii) the aggregate principal amount of the Debt which is guaranteed by any Credit Party in respect of the Second Lien Loan Agreement (or any Permitted Refinancing Debt in respect thereof) shall not exceed [$175,000,000];

(iv)      Debt or indebtedness of the Company or any of its Subsidiaries permitted under paragraph 7C(3);

(v)      Debt of the Company and its Subsidiaries consisting of trade payables incurred in the ordinary course of business;

(vi)      (a) Debt of the Company and its Subsidiaries constituting Capitalized Lease Obligations, (b) other Debt of the Company or its Subsidiaries to finance the purchase price or cost of property acquired, constructed or improved by the Company or any Subsidiary after the Restructuring Closing Date, or (c) Debt secured by Liens existing on any property of any Person at the time it becomes a Subsidiary, or existing prior to the time of acquisition upon any property acquired by the Company or any Subsidiary through purchase, merger, or consolidation or otherwise, and assumed by the Company or such Subsidiary, in each case to the extent such Liens are permitted under clause (v) of paragraph 7C(1), provided that the aggregate principal amount of all such Debt described in subclauses (a), (b) and (c) of this clause (vi) at any time outstanding shall not exceed $5,000,000;

(vii)      Debt or indebtedness secured by Liens permitted under clauses (iv) and (vi) of paragraph 7C(1) (provided, in the case of Liens permitted under clause (vi) of paragraph 7C(1) that renew, extend or refund any Lien permitted under clause (v) of paragraph 7C(1), that such Liens shall be permitted only to the extent the Debt or indebtedness secured thereby is permitted under clause (vi) of this paragraph 7C(2));

(viii)      unsecured Debt in respect of the reimbursement obligations of letters of credit issued or in respect of worker's compensation arrangements not to exceed $5,000,000 outstanding at any time; and

(ix)      unsecured Debt (other than the Debt permitted by paragraph 7C(2)(iii) hereof) which is subordinated to the Secured Obligations on terms and conditions satisfactory to the Required Holders.

18

**7C(3). Loans, Advances and Investments.**  Make, or permit to remain outstanding, any loan or advance to, or own, purchase or acquire any stock, obligations or securities of, or any interest in, or make any capital contribution to, any Person, except that the Company or any Subsidiary may:

(i)    [reserved];

(ii)    make or permit to remain outstanding any loans, advances or capital contributions from any Credit Party to another Credit Party;

(iii)    own, purchase or acquire stock, obligations or securities of or other equity interests in a Subsidiary or a Person which immediately after such purchase or acquisition will be a Subsidiary;

(iv)    make and permit to remain outstanding investments in notes receivable or other consideration to the extent permitted by paragraph 7C(4) but only to the extent that the aggregate uncollected amount of all such notes receivable and other consideration, together with all such notes receivable and other consideration of the Guarantor and its Subsidiaries, would be permitted under clause (iv) of Section 5.4 of the Guaranty Agreement;

(v)    make and permit to remain outstanding loans, advances and other investments received in settlement of debts (created in the ordinary course of business) owing to the Company or any Subsidiary;

(vi)    own, purchase or acquire commercial paper issued by any corporation or bankers' acceptances issued by any member bank of the Federal Reserve System, in either case, maturing within one year of the date of purchase and rated, by at least two of S&P, Moody's and Fitch Investors Service, Inc., "A-1", "P-1" and "F-1", respectively, and payable in the United States in United States dollars;

(vii)    own, purchase or acquire certificates of deposit in any member bank of the Federal Reserve System having, or which is the principal banking subsidiary of a bank holding company having, a long-term unsecured debt rating of at least "A" or the equivalent thereof from S&P or "A2" or the equivalent thereof from Moody's, all due within one year from the date of original issue thereof and payable in the United States in United States dollars;

(viii)    own, purchase or acquire repurchase agreements of any member bank of the Federal Reserve System having, or which is the principal banking subsidiary of a bank holding company having, a long-term unsecured debt rating of at least "A" or the equivalent thereof from S&P or "A2" or the equivalent thereof from Moody's, for terms of less than one year in respect of commercial paper and certificates of deposit referred to in the foregoing clauses (vi) and (vii) and obligations referred to in clause (ix) and (x) below;

(ix)    own, purchase or acquire obligations of the United States government or any agency thereof;

19

(x)    own, purchase or acquire obligations guaranteed by the United States government or any agency thereof;

(xi)    own, purchase or acquire investments in stocks of investment companies registered under the Investment Company Act of 1940 which invest primarily in obligations of the type described in clauses (vi), (vii), (viii), (ix) or (x) above, provided that any such investment company shall have an aggregate net asset value of not less than $500,000,000;

(xii)    own, purchase or acquire investments in money market funds that are classified as current assets in accordance with GAAP, and that are rated "AAAm" or the equivalent by S&P, Moody's or Fitch Investors Service, Inc., which funds are managed by either (a) Persons having capital and surplus, or net worth, in excess of $500,000,000 or (b) any Person that is a direct or indirect subsidiary of a Person described in the foregoing clause (a);

(xiii)    own, purchase or acquire (a) asset-backed securities, mortgage-backed securities and collateralized mortgage obligations issued by any entity and rated at least Aa3 by Moody's or AA- by S&P and (b) notes and bonds issued by any domestic corporate issuer and rated at least A3 by Moody's or A- by S&P;

(xiv)    endorse negotiable instruments for collection in the ordinary course of business;

(xv)    make or permit to remain outstanding travel and other like advances to officers and employees in the ordinary course of business;

(xvi)    make or permit to remain outstanding investments in demand deposit accounts maintained by the Company or any Subsidiary in the ordinary course of its business;

(xvii)    make or permit to remain outstanding investments consisting of Eurodollar time deposits, maturing within three months after the making thereof, with any branch of a United States commercial bank having capital and surplus of not less than $1 billion in the aggregate;

(xviii)    make or permit to remain outstanding investments in municipal obligations having a rating of "Aaa" by Moody's, or "AAA" by S&P;

(xix)    own, purchase or acquire investments in commingled funds/portfolios that invest primarily in U.S. dollar denominated obligations, with a weighted average portfolio maturity of 120 days or less, and rated "AAA" or the equivalent, by at least two of S&P, Moody's and Fitch Investors Service, Inc., which funds are managed by either (a) Persons having capital and surplus, or net worth, in excess of $500,000,000 or (b) any Person that is a direct or indirect subsidiary of a Person described in the foregoing clause (a);

20

(xx)    make or permit to be made payments in connection with the redemption by the Company of the "phantom equity interests" held by Herald referred to in clause (iii) of the definition of "Change of Control" with common stock of Lee or cash contributed by Lee to the Company for purposes of making such payment (it being understood that any such cash contributed by Lee shall reduce the Lee Payable (as defined in the Guaranty Agreement) by an amount equal to such cash contribution); and

(xxi)    make or permit to remain outstanding any other loan or advance to, or own, purchase or acquire any other stock, obligations or securities of, or any other interest in, or make any other capital contribution to any Person, provided that the aggregate amount thereof, together with the aggregate amount of all such loans, advances and investments of the Guarantor and its Subsidiaries, would be permitted under Section 5.4 of the Guaranty Agreement.

**7C(4). Asset Sales.**  Engage in any Asset Sale (i) if the aggregate amount of Asset Sale Proceeds in respect of any one transaction or series of related transactions would be equal to or less than $1,000,000 unless at least 75% of such Asset Sale Proceeds consist of cash or (ii) if the aggregate amount of Asset Sale Proceeds in respect of any one transaction or series of related transactions would be more than $1,000,000 unless such Asset Sale Proceeds consist only of cash and the Required Holders have given their prior written consent thereto; *provided, however,* that notwithstanding the foregoing, no Asset Sale shall involve the sale of any Equity Interests in Star Publishing or the Equity Interests of TNI Partners held by Star Publishing.

**7C(5). Sale and Lease-Back.**  Enter into any arrangement with any lender or investor or under which such lender or investor is a party, providing for the leasing or other similar arrangement by the Company or any Subsidiary of real or personal property used by the Company or any Subsidiary in the operations of the Company or any Subsidiary, which has been or is sold or transferred by the Company or any Subsidiary to such lender or investor or to any Person to whom funds have been or are to be advanced by such lender or investor on the security of such rental obligations of the Company or such Subsidiary.

**7C(6). Merger.**  Merge or consolidate with any other Person, except that any Subsidiary may merge or consolidate with the Company (provided that the Company shall be the continuing or surviving Person) or any one or more other Subsidiaries; provided that nothing in this paragraph 7C(6) shall restrict the ability of any Subsidiary which is not a Material Subsidiary to merge or consolidate with any Person (so long as in connection with any such merger with a Person which is not the Company, the Guarantor or another Subsidiary, the Company or a Subsidiary shall have received only cash consideration for such merger).

**7C(7). Transactions With Affiliates.**  Directly or indirectly enter into or be a party to any transaction or arrangement, including, without limitation, the purchase, sale, exchange or use of any property or asset, or any interest therein, whether real, personal or mixed, or tangible or intangible, or the rendering of any service, with any Company Affiliate, except (i) transactions in the ordinary course of and pursuant to the reasonable requirements of the Company's and each Subsidiary's business, as the case may be, and upon fair and reasonable terms that are no less favorable to the Company and its Subsidiaries, as the case may be, than those which might be obtained in an arm's length transaction with a Person not a Company Affiliate, (ii) transactions

specifically permitted by Section 5.8(ii) of the Guaranty Agreement, (iii) transactions involving the allocation of costs and expenses among the Guarantor and its Subsidiaries (including the Company and its Subsidiaries) in respect of insurance, technical support, compensation and benefits, overhead allocation and other similar administrative costs and expenses, and (iv) payment by the Company of its Allocable Share of the Lee/Pulitzer Restructuring Costs.  For avoidance of doubt, the reference in this paragraph 7C(7) to transactions with "any Company Affiliate" shall be understood to exclude both (i) transactions between the Company and any Subsidiary and (ii) transactions between a Subsidiary of the Company and any other Subsidiary of the Company.

**7C(8).  Issuance or Sale of Stock of Subsidiaries.**  Issue, sell or otherwise dispose of, or part with control of, any shares of stock of or other equity interests in any Subsidiary (other than a Subsidiary which is not a Material Subsidiary), <u>except</u> to the Company or another Subsidiary.

**7C(9).  Sale or Discount of Receivables**.  Sell with recourse, discount (other than to the extent of finance and interest charges included therein) or otherwise sell for less than face value thereof, any of its notes or accounts receivable, except notes or accounts receivable of the Company or its Subsidiaries the collection of which is doubtful in accordance with GAAP.

**7D.    Limitation on Certain Restrictive Agreements.**  The Company will not and will not permit any of its Subsidiaries to enter into or suffer to exist any contractual obligation, other than this Agreement, which in any way restricts the ability of the Company or any of its Subsidiaries to (a) create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, (b) make any payments in respect of the Notes required under this Agreement, (c) make any dividends or distributions or (d) transfer any of its property or assets to the Company or a Subsidiary of the Company except for any such restrictions set forth in the Credit Agreement and the Second Lien Loan Agreement or in any documents, instruments or agreements evidencing any Permitted Refinancing Debt thereof, as applicable, in each case, as in effect on the date hereof, or, with respect to any Permitted Refinancing Debt, on the date of the incurrence or issuance thereof.

**7E.    Terrorism Sanctions Regulations**.  The Company will not and will not permit any Controlled Entity to (a) become a Blocked Person or (b) have any investments in or engage in any dealings or transactions with any Blocked Person if such investments, dealings or transactions would cause any holder of a Note to be in violation of any laws or regulations that are applicable to such holder.

## PARAGRAPH 8.    EVENTS OF DEFAULT.

**8A.    Acceleration.**  If any of the following events shall occur and be continuing for any reason whatsoever (and whether such occurrence shall be voluntary or involuntary or come about or be effected by operation of law or otherwise):

(i)    the Company defaults in the payment of any principal of or Yield-Maintenance Amount payable with respect to any Note when the same shall become due, either by the terms thereof or otherwise as herein provided; or

A/74565634.14

(ii)    the Company defaults in the payment of any interest on any Note or any other amounts due under the Transaction Documents for more than 5 Business Days after the date due; or

(iii)    any representation or warranty made by the Company in any of the Transaction Documents or in any writing furnished in connection with or pursuant to any of the Transaction Documents shall be false in any material respect on the date as of which made; or

(iv)    the Company fails to perform or observe any covenant or agreement contained in paragraph 7; or

(v)    the Company fails to perform or observe any other agreement, term or condition contained herein (other than those referred to in clauses (i), (ii) or (iv)) and such failure shall not be remedied within 30 days after any Responsible Officer of the Company obtains actual knowledge thereof; or

(vi)    the Company or any Material Subsidiary makes an assignment for the benefit of creditors or is generally not able to pay its debts as such debts become due; or

(vii)    any decree, judgment, or order for relief in respect of the Company or any Material Subsidiary is entered under any bankruptcy, reorganization, compromise, arrangement, insolvency, readjustment of debt, dissolution or liquidation or similar law, whether now or hereafter in effect (herein called the "**Bankruptcy Law**"), of any jurisdiction; or

(viii)    the Company or any Material Subsidiary petitions or applies to any tribunal for, or consents to, the appointment of, or taking possession by, a trustee, receiver, custodian, liquidator or similar official of the Company or any Material Subsidiary, or of any substantial part of the assets of the Company or any Material Subsidiary, or commences a voluntary case under the Bankruptcy Law of the United States or any proceedings (other than proceedings for the voluntary liquidation and dissolution of a Material Subsidiary) relating to the Company or any Material Subsidiary under the Bankruptcy Law of any other jurisdiction; or

(ix)    any such petition or application is filed, or any such proceedings are commenced, against the Company or any Material Subsidiary and the Company or such Material Subsidiary by any act indicates its approval thereof, consent thereto or acquiescence therein, or an order, judgment or decree is entered appointing any such trustee, receiver, custodian, liquidator or similar official, or approving the petition in any such proceedings, and such order, judgment or decree remains unstayed and in effect for more than 60 days; or

(x)    any order, judgment or decree is entered in any proceedings against the Company or any Material Subsidiary decreeing the dissolution of the Company or such Material Subsidiary and such order, judgment or decree remains unstayed and in effect for more than 60 days; or

(xi)    one or more final judgments in an aggregate amount in excess of $10,000,000 is rendered against the Guarantor, the Company or any of their respective Subsidiaries and, within 60 days after entry thereof, any such judgment is not discharged or execution thereof stayed pending appeal, or within 60 days after the expiration of any such stay, such judgment is not discharged; or

(xii)    (a) any Plan shall fail to satisfy the minimum funding standards of ERISA or the Code for any plan year or part thereof or a waiver of such standards or extension of any amortization period is requested or granted under section 412 of the Code, (b) a notice of intent to terminate any Plan in a distress termination (within the meaning of ERISA section 4041(c)) shall have been or is reasonably expected to be filed with the PBGC or the PBGC shall have instituted proceedings under ERISA section 4042 to terminate or appoint a trustee to administer any Plan or the PBGC shall have notified the Company or any ERISA Affiliate that a Plan may become a subject of such proceedings, (c) the aggregate "amount of unfunded benefit liabilities" (within the meaning of section 4001(a)(18) of ERISA) under all Plans, determined in accordance with Title IV of ERISA, shall exceed $76,000,000, (d) the Company or any ERISA Affiliate shall have incurred or is reasonably expected to incur any liability pursuant to Title I or IV of ERISA or the penalty or excise tax provisions of the Code relating to employee benefit plans, (e) the Company or any ERISA Affiliate is assessed liability for a partial or complete withdrawal from any Multiemployer Plan, or (f) the Company or any Subsidiary establishes or amends any employee welfare benefit plan that provides post-employment welfare benefits in a manner that would increase the liability of the Company or any Subsidiary thereunder; and any such event or events described in clauses (a) through (f) above, either individually or together with any other such event or events, could reasonably be expected to have a Material Adverse Effect; or

(xiii)    any provision of the Guaranty Agreement shall for any reason cease to be valid and binding on the Guarantor or the Guarantor shall so assert in writing or any of the Transaction Documents shall cease for any reason to be in full force and effect, or any party thereto shall purport to disavow its obligations thereunder, claim that it does not have any further obligation thereunder or contest the validity or enforceability thereof; or

(xiv)    a Guaranty Event of Default shall have occurred and be continuing (it being understood that no Guaranty Event of Default shall exist or arise as a result of non-compliance with Section 5.1(i) or Section 5.1(iii) of the Guaranty Agreement prior to the occurrence of the earlier of (a) an election of the Guarantor pursuant to the first sentence after clause (iii) of Section 5.1 and (b) the expiration of the 45 day period referred to in such sentence, so long as an election as to the maximum amount permissible under such first sentence would be sufficient to cure such non-compliance); or

(xv)    any Collateral Document shall cease for any reason (other than pursuant to the terms thereof) to create a valid Lien in the collateral purported to be covered thereby or such Lien shall for any reason cease to be a perfected and first priority Lien (subject only to Liens permitted by paragraph 7C(1)), and, in the case of any failure of the validity, perfection or priority of any such Lien which results from the actions or inaction of the Collateral Agent, such failure shall continue for a period of 30 days from the

24

earlier of (i) the date on which written notice of such failure is provided to the Company from any Purchaser or the Collateral Agent or (ii) actual knowledge of such failure by any Credit Party; or

(xvi)    (a) Lee or any of its Subsidiaries shall (1) default in any payment of any Debt (other than the Note Obligations) beyond the period of grace, if any, provided in an instrument or agreement under which such Debt was created or (2) default in the observance or performance of any agreement or condition relating to any Debt (other than the Note Obligations) or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Debt (or a trustee or agent on behalf of such holder or holders) to cause (determined without regard to whether any notice is required), any such Debt to become due (and/or, in the case of an Interest Rate Protection Agreement or Other Hedging Agreement, to be terminated) prior to its stated maturity, or (b) any Debt (other than the Note Obligations) of Lee or any of its Subsidiaries shall be declared to be (or shall become) due and payable (and/or, in the case of an Interest Rate Protection Agreement or Other Hedging Agreement, to be terminated), or required to be prepaid (and/or terminated, as the case may be) other than by a regularly scheduled required prepayment, prior to the stated maturity thereof, provided that it shall not be a Default or an Event of Default under this clause (xvi) unless the aggregate principal amount of all Debt as described in the preceding clauses (a) and (b) is at least $10,750,000 or unless such Debt is in respect of the Credit Agreement or the Second Lien Loan Agreement or any Permitted Refinancing Debt or any Additional Permitted Indebtedness (as defined in the Second Lien Loan Agreement); provided, however, that with respect to any breach or default under Sections 10.08 or 10.09 of the Credit Agreement (as in effect on the date hereof) or Section [__] of the Second Lien Loan Agreement (as in effect on the date hereof) (or any successor provisions or analogous financial covenants in any documentation relating to any Permitted Refinancing Debt), such breach or default shall only constitute an Event of Default under this clause (xvi) if such breach or default occurs and is not cured or waived within 30 days after the occurrence of such breach or default; or

(xvii)    Lee or any Material Lee Subsidiary shall commence a voluntary case concerning itself under any Bankruptcy Law; or an involuntary case is commenced against Lee or any Material Lee Subsidiary, and the petition is not controverted within 15 days, or is not dismissed within 60 days after the filing thereof; or a custodian (as defined under Title 11 of the United States Code) is appointed for, or takes charge of, all or substantially all of the property of Lee or any Material Lee Subsidiary, to operate all or any substantial portion of the business of Lee or any Material Lee Subsidiary; or Lee or any Material Lee Subsidiary commences any other proceeding under any Bankruptcy Law relating to Lee or any Material Lee Subsidiary, or there is commenced against Lee or any Material Lee Subsidiary any such proceeding which remains undismissed for a period of 60 days after the filing thereof; or Lee or any Material Lee Subsidiary is adjudicated insolvent or bankrupt; or any order for relief or other order approving any such case or proceeding is entered; or Lee or any Material Lee Subsidiary makes a general assignment for the benefit of creditors; or any action is taken by Lee or any Material Lee Subsidiary for the purpose of effecting any of the foregoing; or

25

(xviii)  any Credit Party shall fail to perform or observe any other agreement, term or condition contained in any Transaction Document to which it is a party (other than this Agreement, the Notes or the Guaranty Agreement) and such failure shall not be remedied within thirty (30) days after any Responsible Officer obtains knowledge thereof; or

(xix)   any Lee Company shall be a party to any agreement that restricts the Guarantor or any of its Subsidiaries from compliance in full with all provisions of all Transaction Documents; or

(xx)    with respect to any Fiscal Year ending after September 25, 2011, the Lee Companies shall fail to contribute to any qualified or non-qualified pension, retirement or similar employee compensation plans of the Guarantor and its Subsidiaries (including, without limitation, split-dollar insurance policies) an amount equal to the lesser of (a) $2,000,000 or (b) that amount necessary to meet minimum funding requirements of the Guarantor and its Subsidiaries with respect to any such plan for such Fiscal Year in accordance with applicable laws and regulations and consistent with the Guarantor's past practices; or

(xxi)   Lee or any of its Subsidiaries shall enter into an amendment or modification to (a) the Credit Agreement, any guaranty, security agreement or other document relating thereto or any indenture, purchase agreement, loan agreement, security agreement or other agreement or instrument relating to any Permitted Refinancing Debt in respect of the Credit Agreement, or (b) any Second Lien Debt Document or any indenture, purchase agreement, loan agreement, security agreement or other agreement or instrument relating to any Permitted Refinancing Debt in respect of the Second Lien Loan Agreement, in each case without the prior written consent of the Required Holders except, an amendment or modification which could not reasonably be expected to be adverse to the holders of Notes in any material respect; or

(xxii)  (a) any payment or demand for payment (satisfying the requirements for the making of such demand for payment) is made under any guarantee executed by any Credit Party in respect of the Second Lien Loan Agreement or any indenture, purchase agreement, loan agreement, security agreement or other agreement or instrument relating to any Permitted Refinancing Debt in respect of the Second Lien Loan Agreement, or (b) the Liens securing Debt under or in respect of the Second Lien Debt Documents (or any Permitted Refinancing Debt in respect thereof) shall cease, for any reason, to be validly subordinated to the Liens securing the Note Obligations as provided in the Intercreditor Agreement or the Intercreditor Agreement or any provision thereof shall cease to be in full force or effect, or the Guarantor, any Subsidiary of the Company or any Person acting for or on behalf of the Guarantor or any Subsidiary of the Guarantor shall deny or disaffirm the Guarantor's or such Subsidiary's obligations under the Intercreditor Agreement or the Guarantor or any of its Subsidiaries shall default in the due performance or observance of any material term, covenant or agreement on its part to be performed or observed pursuant to the Intercreditor Agreement.

then (A) if such event is an Event of Default specified in clause (i) or (ii) of this paragraph 8A, the holder of any Note (other than the Company or any of its Subsidiaries or any Company

26

Affiliate) may at its option during the continuance of such Event of Default, by notice in writing to the Company, declare such Note to be, and such Note shall thereupon be and become, immediately due and payable at par, together with interest accrued thereon and together with any Yield-Maintenance Amount with respect thereto and any other fees or amounts owing to such holder under the Transaction Documents, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Company, (B) if such event is an Event of Default specified in clause (vii), (viii) or (ix) of this paragraph 8A with respect to the Company, all of the Notes at the time outstanding shall automatically become immediately due and payable, together with interest accrued thereon and the Yield-Maintenance Amount, if any, with respect to each Note and any other fees or amounts then owing under the Transaction Documents, without presentment, demand, protest or notice of any kind, all of which are hereby waived by the Company, and (C) with respect to any event constituting an Event of Default (including an event described in clause (A) above), the holder or holders of at least 66 2/3% of the aggregate principal amount of Notes then outstanding may at its or their option, by notice in writing to the Company, declare all of the Notes to be, and all of the Notes shall thereupon be and become, immediately due and payable together with interest accrued thereon and together with the Yield-Maintenance Amount, if any, with respect to each Note and any other fees or amounts then owing under the Transaction Documents, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Company.

The Company acknowledges, and the parties hereto agree, that each holder of a Note has the right to maintain its investment in the Notes free from repayment by the Company (except as herein specifically provided for) and that the provision for payment of the Yield-Maintenance Amount by the Company in the event that the Notes are prepaid or are accelerated as a result of an Event of Default, is intended to provide compensation for the deprivation of such right under such circumstances.

**8B.     Rescission of Acceleration.**  At any time after any or all of the Notes shall have been declared immediately due and payable pursuant to paragraph 8A, the holder or holders of at least 66 2/3% of the aggregate principal amount of Notes then outstanding may, by notice in writing to the Company, rescind and annul such declaration and its consequences if (i) the Company shall have paid all overdue interest on the Notes, the principal of the Notes which has become due otherwise than by reason of such declaration, and interest on such overdue interest and overdue principal at the rate specified in the Notes, (ii) the Company shall not have paid any amounts which have become due solely by reason of such declaration, (iii) all Events of Default and Defaults, other than non-payment of amounts which have become due solely by reason of such declaration, shall have been cured or waived pursuant to paragraph 12C, and (iv) no judgment or decree shall have been entered for the payment of any amounts due pursuant to the Notes or this Agreement.  No such rescission or annulment shall extend to or affect any subsequent Event of Default or Default or impair any right arising therefrom.

**8C.     Notice of Acceleration or Rescission.**  Whenever any Note shall be declared immediately due and payable pursuant to paragraph 8A or any such declaration shall be rescinded and annulled pursuant to paragraph 8B, the Company shall forthwith give written notice thereof to the holder of each Note at the time outstanding.

27

**8D.    Other Remedies.**  If any Event of Default or Default shall occur and be continuing, the holder of any Note may proceed to protect and enforce its rights (or instruct the Collateral Agent to act, as the case may be) under this Agreement, such Note and the other Transaction Documents by exercising such remedies as are available to such holder in respect thereof under applicable law, either by suit in equity or by action at law, or both, whether for specific performance of any covenant or other agreement contained in this Agreement or in any other Transaction Document or in aid of the exercise of any power granted in this Agreement or in any other Transaction Document.  No remedy conferred in this Agreement or in any other Transaction Document upon the holder of any Note is intended to be exclusive of any other remedy, and each and every such remedy shall be cumulative and shall be in addition to every other remedy conferred herein or now or hereafter existing at law or in equity or by statute or otherwise.

**PARAGRAPH 9.    REPRESENTATIONS, COVENANTS AND WARRANTIES**.

The Company represents, covenants and warrants to each Purchaser as follows:

**9A.    Organization and Qualification; Due Authorization.**  The Company is a limited liability company duly organized and existing in good standing under the laws of the State of Delaware.  Each Material Subsidiary is duly organized and existing in good standing under the laws of the jurisdiction in which it is incorporated or otherwise organized.  The Company has and each Material Subsidiary has the limited liability company or corporate power, as applicable, to own its respective property and to carry on its respective business as now being conducted, and the Company is and each Material Subsidiary is duly qualified as a foreign limited liability company or foreign corporation, as applicable, to do business and in good standing in every jurisdiction in which the nature of the respective business conducted or property owned by it makes such qualification necessary, except where the failure to so qualify would not have a Material Adverse Effect.  Each of the Company and the Subsidiaries has the limited liability company power and authority to execute and deliver this Agreement, the Notes and each of the other Transaction Documents to which it is a party and to perform the provisions hereof and thereof.  The execution, delivery and performance by the Company of this Agreement and the Notes have been duly authorized by all necessary limited liability company action, and this Agreement constitutes, and upon execution and delivery thereof, each Note and each other Transaction Document to which any Credit Party is a party will constitute, a legal, valid and binding obligation of such Credit Party enforceable against such Credit Party in accordance with its terms, except as such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

**9B.    Material Adverse Change.**  Since September 25, 2011, nothing has occurred that has had, or could reasonably be expected to have, a Material Adverse Effect (it being understood that the filing of the voluntary petitions by the Debtors under Chapter 11 of the Bankruptcy Code on the Petition Date shall not, in and of itself, be deemed to have had or, reasonably be expected to have, a Material Adverse Effect).

**9C.    Litigation; Observance of Agreements, Statutes and Orders**.

(i)     Except as set forth in Schedule 9C (it being understood that disclosure on Schedule 9C is not a representation that the matter to which the disclosure relates is expected to have a Material Adverse Effect), there are no actions, suits, investigations or proceedings pending or, to the knowledge of the Company, threatened against or affecting the Company or any Subsidiary or any property of the Company or any Subsidiary in any court or before any arbitrator of any kind or before or by any Governmental Authority that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(ii)    Neither the Company nor any Subsidiary is (a) in default under any term of any agreement or instrument to which it is a party or by which it is bound, (b) in violation of any order, judgment, decree or ruling of any court, arbitrator or Governmental Authority or (c) in violation of any applicable law, ordinance, rule or regulation of any Governmental Authority (including, without limitation, Environmental Laws, the USA Patriot Act or any of the other laws and regulations that are referred to in paragraph 9K), which default or violation, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**9D.     Outstanding Debt**.

(i)     Except as described therein, Schedule 9D sets forth a complete and correct list of all outstanding Debt of the Company and its Subsidiaries as of [_____] (including a description of the obligors and obligees, principal amount outstanding and collateral therefor, if any, and guaranty thereof, if any), since which date there has been no material change in the amounts, interest rates, sinking funds, installment payments or maturities of the Debt of the Company or its Subsidiaries.  Neither the Company nor any Subsidiary is in default and no waiver of default is currently in effect, in the payment of any principal or interest on any Debt of the Company or such Subsidiary and no event or condition exists with respect to any Debt of the Company or any Subsidiary that would permit (or that with notice or the lapse of time, or both, would permit) one or more Persons to cause such Debt to become due and payable before its stated maturity or before its regularly scheduled dates of payment.

(ii)    Except as disclosed in Schedule 9D, neither the Company nor any Subsidiary has agreed or consented to cause or permit in the future (upon the happening of a contingency or otherwise) any of its property, whether now owned or hereafter acquired, to be subject to a Lien not permitted by paragraph 7C(1).

**9E.     Title to Properties**.  The Company has and each of its Material Subsidiaries has good and marketable title to its respective real properties (other than properties which it leases) and good title to all of its other respective properties and assets, subject to no Lien of any kind except Liens permitted by paragraph 7C(l).  All leases necessary in any material respect for the conduct of the respective businesses of the Company and its Subsidiaries are valid and subsisting and are in full force and effect.

**9F.     Conflicting Agreements and Other Matters**.  Neither the Company nor any of its Subsidiaries is a party to any contract or agreement or subject to any charter or other limited

29

liability company or corporate restriction which materially and adversely affects the business, property or assets, or financial condition of the Company and its Subsidiaries, taken as a whole. Neither the execution nor delivery of this Agreement or the Notes, nor the issuance of the Notes, nor fulfillment of nor compliance with the terms and provisions hereof and of the Notes and the other Transaction Documents will conflict with, or result in a breach of the terms, conditions or provisions of, or constitute a default under, or result in any violation of, or result in the creation of any Lien upon any of the properties or assets of the Company or any of its Subsidiaries pursuant to, the limited liability company agreement, charter, by-laws or other organizational documents of the Company or any of its Subsidiaries, any award of any arbitrator or any agreement (including any agreement with members or stockholders), instrument, order, judgment, decree, statute, law, rule or regulation to which the Company or any of its Subsidiaries is subject, except to the extent any such conflict, breach, defaults, violation or creation of a Lien could not reasonably be expected to have a Material Adverse Effect.  Except as set forth in the Limited Liability Company Agreement (as in effect on the date hereof) and as set forth on Schedule 9F, neither the Company nor  any of its Subsidiaries is a party to, or otherwise subject to any provision contained in, any instrument evidencing indebtedness of the Company or such Subsidiary, any agreement relating thereto or any other contract or agreement (including its limited liability company agreement, charter or other organizational documents) which limits the amount of, or otherwise imposes restrictions on the incurring of, Debt of the Company of the type evidenced by the Notes.

**9G.    Margin Stock.**  Neither the Company nor any Subsidiary owns or has any present intention of acquiring any "margin stock" as defined in Regulation U (12 CFR Part 221) of the Board of Governors of the Federal Reserve System ("**margin stock**").  Neither the Company nor any agent acting on its behalf has taken or will take any action which might cause this Agreement or the Notes to violate Regulation U, Regulation T or any other regulation of the Board of Governors of the Federal Reserve System or to violate the Exchange Act, in each case as in effect now or as the same may hereafter be in effect.

**9H.    ERISA**.  Except as stated in Schedule 9H (it being understood that disclosure on Schedule 9H is not a representation that the matter to which the disclosure relates is expected to have a Material Adverse Effect),

(i)    the Company and each ERISA Affiliate have operated and administered each Plan in compliance with all applicable laws except for such instances of noncom-pliance as have not resulted in and could not reasonably be expected to result in a Material Adverse Effect.  Neither the Company nor any ERISA Affiliate has incurred any liability (including actual or contingent withdrawal liability under section 4201 or 4204 of ERISA in respect of Multiemployer Plans) pursuant to Title I or IV of ERISA or the penalty or excise tax provisions of the Code relating to employee benefit plans (as defined in section 3 of ERISA), and no event, transaction or condition has occurred or exists that could reasonably be expected to result in the incurrence of any such liability by the Company or any ERISA Affiliate, or in the imposition of any Lien on any of the rights, properties or assets of the Company or any ERISA Affiliate, in either case pursuant to Title I or IV of ERISA or to section 430(k) of the Code or to any such penalty or excise tax provisions under the Code or Federal law or section 4068 of ERISA or by

30

the granting of a security interest in connection with the amendment of a Plan, other than such liabilities or Liens as would not be individually or in the aggregate material.

(ii)     The present value of the aggregate benefit liabilities under each of the Plans (other than Multiemployer Plans), determined as of the end of such Plan's most recently ended plan year on the basis of the actuarial assumptions specified for funding purposes in such Plan's most recent actuarial valuation report, did not exceed the aggregate current value of the assets of such Plan allocable to such benefit liabilities by more than $[_____] in the case of any single Plan and by more than $[_____] in the aggregate for all Plans.  The term "**benefit liabilities**" has the meaning specified in section 4001 of ERISA and the terms "**current value**" and "**present value**" have the meaning specified in section 3 of ERISA.

(iii)    The expected postretirement benefit obligation (determined as of the last day of the Company's most recently ended Fiscal Year in accordance with Financial Accounting Standards Board Accounting Standards Codification 715-60, without regard to liabilities attributable to continuation coverage mandated by section 4980B of the Code) of the Company and its Subsidiaries is not material.

(iv)    The execution and delivery of this Agreement and the issuance of the Notes hereunder will not involve any transaction that is subject to the prohibitions of section 406 of ERISA or in connection with which a tax could be imposed pursuant to section 4975(c)(1)(A)-(D) of the Code.  The representation by the Company to each Purchaser in the first sentence of this clause (v) of paragraph 9H is made in reliance upon and subject to the accuracy of such Purchaser's representation in paragraph 10B as to the sources of the funds used to acquire the Prepetition Notes held by such Purchaser on the Petition Date.

**9I.**    **Governmental Authorizations, Etc.**  No consent, approval or authorization of, or registration, filing or declaration with, any Governmental Authority is required in connection with the execution, delivery or performance by the Credit Parties of this Agreement, the Notes or any other Transaction Document which has not been obtained or made on or prior to the Restructuring Closing Date.

**9J.**    **Disclosure**.  All factual information (taken as a whole) theretofore furnished by or on behalf of Lee and its Subsidiaries in writing to the Purchasers (including, without limitation, all information contained in the Transaction Documents, the Plan of Reorganization and the Disclosure Statement) for purposes of or in connection with this Agreement, the other Transaction Documents or any transaction contemplated herein or therein is true and accurate in all material respects on the date as of which such information is dated or certified and not incomplete by omitting to state any fact necessary to make such information (taken as a whole) not misleading in any material respect at such time in light of the circumstances under which such information was provided, it being understood and agreed that for purposes of this paragraph 9J, such factual information shall not include any projections or any *pro forma* financial information.  There is no fact peculiar to the Company or any of its Subsidiaries which materially adversely affects or in the future may (so far as the Company can now foresee) materially adversely affect the business, property or assets, or financial condition of the

31

Company and its Subsidiaries taken as a whole and which has not been set forth in this Agreement or in the other documents, certificates and statements furnished to you by or on behalf of the Company on or prior to the date hereof in connection with the transactions contemplated hereby.

**9K.     Foreign Assets Control Regulations, Etc.**

(i)     Neither the Company nor any Controlled Entity is (i) a Person whose name appears on the list of Specially Designated Nationals and Blocked Persons published by the Office of Foreign Assets Control, U.S. Department of Treasury ("**OFAC**") (an "**OFAC Listed Person**") or (ii) a department, agency or instrumentality of, or is otherwise controlled by or acting on behalf of, directly or indirectly, (x) any OFAC Listed Person or (y) any Person, entity, organization, foreign country or regime that is subject to any OFAC Sanctions Program (each OFAC Listed Person and each other Person, entity, organization and government of a country described in clause (ii), a "**Blocked Person**").

(ii)     Neither the Company nor any Controlled Entity has any investments in, or engages in any dealings or transactions with, any Person where such investments, dealings or transactions would cause the purchase, holding, or receipt of any payment or exercise of any rights in respect of, any Note by the holder thereof to be in violation of any of the laws or regulations identified in this paragraph 9K.

(iii)     To the Company's actual knowledge after making due inquiry, neither the Company nor any Controlled Entity (i) is under investigation by any Governmental Authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist-related activities or other money laundering predicate crimes under any applicable law (collectively, "**Anti-Money Laundering Laws**"), (ii) has been assessed civil penalties under any Anti-Money Laundering Laws or (iii) has had any of its funds seized or forfeited in an action under any Anti-Money Laundering Laws. The Company has taken reasonable measures appropriate to the circumstances (in any event as required by applicable law) to ensure that the Company and each Controlled Entity is and will continue to be in compliance with all applicable current and future Anti-Money Laundering Laws.

(iv)     The Company has taken reasonable measures appropriate to the circumstances (in any event as required by applicable law) to ensure that the Company and each Controlled Entity is and will continue to be in compliance with all applicable current and future anti-corruption laws and regulations.

**9L.     Solvency**.  On and as of the Restructuring Closing Date, and after giving effect to all debt being incurred or assumed and Liens created by the Credit Parties in connection with this Agreement, the Notes and the other Transaction Documents, (i) the sum of the assets, at a fair valuation, of the Company (on a stand-alone basis) and of the Guarantor and its Subsidiaries (taken as a whole) will exceed its or their respective debts, (ii) the Company (on a stand-alone basis) and the Guarantor and its Subsidiaries (taken as a whole) has or have not incurred and does or do not intend to incur, and does or do not believe that it or they will incur, debts beyond

its or their respective ability to pay such debts as such debts mature, and (iii) the Company (on a stand-alone basis) and the Guarantor and its Subsidiaries (taken as a whole) will have sufficient capital with which to conduct its or their respective businesses.  For purposes of this paragraph 9L, "debt" means any liability on a claim, and "claim" means (a) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured or (b) right to an equitable remedy for breach of performance if such breach gives rise to a payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.  The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

**9M.     Organization and Ownership of Shares of Subsidiaries; Affiliates**.

(i)     Schedule 9M contains (except as noted therein) a complete and correct list of the Company's Subsidiaries, showing, as to each Subsidiary, the correct name thereof, the jurisdiction of its organization, and the percentage of shares of each class of its capital stock or similar equity interests outstanding owned by the Company and each other Subsidiary.

(ii)     All of the outstanding shares of capital stock or similar Equity Interests of each Subsidiary shown in Schedule 9M as being owned by the Company and its Subsidiaries have been validly issued, are fully paid and nonassessable and are owned by the Company or another Subsidiary free and clear of any Lien (except as otherwise disclosed in Schedule 9M).

(iii)     Each Subsidiary is a corporation or other legal entity duly organized, validly existing and, where applicable, in good standing under the laws of its jurisdiction of organization, and is duly qualified as a foreign corporation or other legal entity and, where applicable, is in good standing in each jurisdiction in which such qualification is required by law, other than those jurisdictions as to which the failure to be so qualified or in good standing could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Each such Subsidiary has the corporate or other power and authority to own or hold under lease the properties it purports to own or hold under lease and to transact the business it transacts and proposes to transact.

(iv)     No Subsidiary is a party to, or otherwise subject to any legal, regulatory, contractual or other restriction (other than this Agreement, the agreements listed on Schedule 9M and customary limitations imposed by corporate law or similar statutes) restricting the ability of such Subsidiary to pay dividends out of profits or make any other similar distributions of profits to the Company or any of its Subsidiaries that owns outstanding shares of capital stock or similar equity interests of such Subsidiary.

**9N.     Compliance with Laws, Other Instruments, Etc.**  The execution, delivery and performance by each Credit Party of the Tax Sharing Agreement, or this Agreement, the Notes, the Guaranty Agreement, the Subsidiary Guaranty Agreement, the Security Agreement, the

Pledge Agreement, the Deeds of Trust, the Account Control Agreement, the Trademark Security Agreements, the Copyright Security Agreements, or any other Transaction Document to which such Credit Party is a party, does not (i) contravene, result in any breach of, or constitute a default under, or result in the creation of any Lien in respect of any property of the Company or any Subsidiary under, any indenture, mortgage, deed of trust, loan, purchase or credit agreement, lease, corporate charter or by-laws, or any other agreement or instrument to which the Company or any Subsidiary is bound or by which the Company or any Subsidiary or any of their respective properties may be bound or affected, (ii) conflict with or result in a breach of any of the terms, conditions or provisions of any order, judgment, decree, or ruling of any court, arbitrator or Governmental Authority applicable to the Company or any Subsidiary or (iii) violate any provision of any statute or other rule or regulation of any Governmental Authority applicable to the Company or any Subsidiary, except, in the case of the other Transaction Documents not specifically enumerated above, to the extent such contravention, conflict, breach or violation, individually or in the aggregate, could not reasonably be expected to cause a Material Adverse Effect.

**9O.    Licenses, Permits, Etc.**  The Company and each of its Subsidiaries owns or has the right to use all the patents, trademarks, permits, domain names, service marks, trade names, copyrights, licenses, franchises, inventions, trade secrets, proprietary information and know-how of any type, whether or not written (including, but not limited to, rights in computer programs and databases) and formulas, or rights with respect to the foregoing, and has obtained assignments of all leases, licenses and other rights of whatever nature, necessary for the present conduct of its business, without any known conflict with the rights of others which, or the failure to own or have which, as the case may be, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**9P.    [Reserved].**

**9Q.    Environmental Matters.**

(i)    Neither the Company nor any Subsidiary has knowledge of any claim or has received any notice of any claim, and no proceeding has been instituted raising any claim against the Company or any of its Subsidiaries or any of their respective real properties now or formerly owned, leased or operated by any of them or other assets, alleging any damage to the environment or violation of any Environmental Laws, except, in each case, such as could not reasonably be expected to result in a Material Adverse Effect.

(ii)    Neither the Company nor any Subsidiary has knowledge of any facts which would give rise to any claim, public or private, of violation of Environmental Laws or damage to the environment emanating from, occurring on or in any way related to real properties now or formerly owned, leased or operated by any of them or to other assets or their use, except, in each case, such as could not reasonably be expected to result in a Material Adverse Effect.

(iii)    Neither the Company nor any Subsidiary has stored any Hazardous Materials on real properties now or formerly owned, leased or operated by any of them

A/74565634.14

and has not disposed of any Hazardous Materials in a manner contrary to any Environmental Laws in each case in any manner that could reasonably be expected to result in a Material Adverse Effect.

(iv)    All buildings on all real properties now owned, leased or operated by the Company or any Subsidiary are in compliance with applicable Environmental Laws, except where failure to comply could not reasonably be expected to result in a Material Adverse Effect.

**PARAGRAPH 10.    REPRESENTATIONS OF THE PURCHASERS.**

**10A.    Nature of Purchase.**  Each Purchaser severally represents that it is acquiring the Notes for its own account or for one or more separate accounts maintained by such Purchaser or for the account of one or more pension or trust funds and not with a view to the distribution thereof, provided that the disposition of the property of such Purchaser or trust funds shall at all times be within such Purchaser's or funds' control.

**10B.    Source of Funds.**  Each Purchaser severally represents that at least one of the following statements is an accurate representation as to each source of funds (a "**Source**") used by such Purchaser to acquire the Prepetition Notes held by it immediately prior to the Petition Date:

(i)    the Source was an "insurance company general account" (as the term is defined in the United States Department of Labor's Prohibited Transaction Exemption ("**PTE**") 95-60 (issued July 12, 1995)) in respect of which the reserves and liabilities (as defined by the annual statement for life insurance companies approved by the National Association of Insurance Commissioners (the "**NAIC Annual Statement**")) for the general account contract(s) held by or on behalf of any employee benefit plan together with the amount of the reserves and liabilities for the general account contract(s) held by or on behalf of any other employee benefit plans maintained by the same employer (or affiliate thereof as defined in PTE 95-60) or by the same employee organization in the general account do not exceed 10% of the total reserves and liabilities of the general account (exclusive of separate account liabilities) plus surplus as set forth in the NAIC Annual Statement filed with such Purchaser's state of domicile; or

(ii)    the Source was a separate account that is maintained solely in connection with such Purchaser's fixed contractual obligations under which the amounts payable, or credited, to any employee benefit plan (or its related trust) that has any interest in such separate account (or to any participant or beneficiary of such plan (including any annuitant)) are not affected in any manner by the investment performance of the separate account; or

(iii)    the Source was either (a) an insurance company pooled separate account, within the meaning of PTE 90-1 or (b) a bank collective investment fund, within the meaning of the PTE 91-38 and, except as disclosed by such Purchaser to the Company in writing pursuant to this clause (iii), no employee benefit plan or group of plans maintained by the same employer or employee organization beneficially owns more than

35

10% of all assets allocated to such pooled separate account or collective investment fund; or

      (iv)    the Source constituted assets of an "investment fund" (within the meaning of Part V of PTE 84-14 (the "**QPAM Exemption**")) managed by a "qualified professional asset manager" or "QPAM" (within the meaning of Part V of the QPAM Exemption), no employee benefit plan's assets that were included in such investment fund, when combined with the assets of all other employee benefit plans established or maintained by the same employer or by an affiliate (within the meaning of Section V(c)(1) of the QPAM Exemption) of such employer or by the same employee organization and managed by such QPAM, exceeded 20% of the total client assets managed by such QPAM, the conditions of Part I(c) and (g) of the QPAM Exemption were satisfied, as of the last day of its most recent calendar quarter ended prior to July 31, 2006, the QPAM did not own a 10% or more interest in the Company and no person controlling or controlled by the QPAM (applying the definition of "control" in Section V(e) of the QPAM Exemption) owned 20% or more interest in the Company (or less than 20% but greater than 10%, if such person exercised control over the management or policies of the Company by reason of its ownership interest) and (a) the identity of such QPAM and (b) the names of all employee benefit plans whose assets were included in such investment fund have been disclosed to the Company in writing pursuant to this clause (iv); or

      (v)    the Source constituted assets of a "plan(s)" (within the meaning of Section IV of PTE 96-23 (the "**INHAM Exemption**")) managed by an "in-house asset manager" or "INHAM" (within the meaning of Part IV of the INHAM exemption), the conditions of Part I(a), (g) and (h) of the INHAM Exemption were satisfied, neither the INHAM nor a person controlling or controlled by the INHAM (applying the definition of "control" in Section IV(d) of the INHAM Exemption) owned 5% or more interest in the Company and (a) the identity of such INHAM and (b) the name(s) of the employee benefit plan(s) whose assets constitute the Source were disclosed to the Company in writing pursuant to this clause (v); or

      (vi)    the Source was a governmental plan; or

      (vii)    the Source was one or more employee benefit plans, or a separate account or trust fund comprised of one or more employee benefit plans, each of which was identified to the Company in writing pursuant to this clause (vii); or

      (viii)    the Source did not include assets of any employee benefit plan, other than a plan exempt from the coverage of ERISA.

As used in this paragraph 10B, the terms "employee benefit plan," "governmental plan," and "separate account" shall have the respective meanings assigned to such terms in section 3 of ERISA.

    **10C.  Independent Investigation.**    Each Purchaser made its own independent investigation of the condition (financial and otherwise), prospects and affairs of the Guarantor,

the Company and their respective Subsidiaries in connection with its acquisition of the Notes and has made and shall continue to make its own appraisal of the creditworthiness of the Company and the Guarantor. No holder of Notes shall have any duty or responsibility to any other holder of Notes, either initially or on a continuing basis, to make any such investigation or appraisal or to provide any credit or other information with respect thereto. No holder of Notes is acting as agent or in any other fiduciary capacity on behalf of any other holder of Notes.

## PARAGRAPH 11.    DEFINITIONS; ACCOUNTING MATTERS.

For the purpose of this Agreement, the terms defined in paragraphs 11A and 11B (or within the text of any other paragraph) shall have the respective meanings specified therein and all accounting matters shall be subject to determination as provided in paragraph 11C.

### 11A.    Yield-Maintenance Terms.

"**Business Day**" shall mean any day on which banks are open for business in New York City (other than a Saturday, a Sunday or a legal holiday in the States of New York or New Jersey).

"**Called Principal**" shall mean, with respect to any Note, the principal of such Note that has become or is declared to be immediately due and payable pursuant to paragraph 8A.

"**Discounted Value**" shall mean, with respect to the Called Principal of any Note, the amount obtained by discounting all Remaining Scheduled Payments with respect to such Called Principal from their respective scheduled due dates to the Settlement Date with respect to such Called Principal, in accordance with accepted financial practice and at a discount factor (as converted to reflect the periodic basis on which interest on the Notes is payable, if interest is payable other than on a semi-annual basis) equal to the Reinvestment Yield with respect to such Called Principal.

"**Reinvestment Yield**" shall mean, with respect to the Called Principal of any Note, 0.50% over the yield to maturity implied by the yield(s) reported as of 10:00 a.m. (New York City time) on the second Business Day preceding the Settlement Date with respect to such Called Principal, on the display designated as "Page PX1" (or such other display as may replace Page PX1) on Bloomberg Financial Markets for the most recently issued actively traded on-the-run U.S. Treasury securities ("**Reported**") having a maturity equal to the Remaining Average Life of such Called Principal as of such Settlement Date. If there are no such U.S. Treasury securities Reported having a maturity equal to such Remaining Average Life, then such implied yield to maturity will be determined by (a) converting U.S. Treasury bill quotations to bond equivalent yields in accordance with accepted financial practice and (b) interpolating linearly between the yields Reported for the applicable most recently issued actively traded on-the-run U.S. Treasury securities with the maturities (1) closest to and greater than such Remaining Average Life and (2) closest to and less than such Remaining Average Life. The Reinvestment Yield shall be rounded to the number of decimal places as appears in the interest rate of the applicable Note.

If such yields are not Reported or the yields Reported as of such time are not ascertainable (including by way of interpolation), then "**Reinvestment Yield**" means, with respect to the Called Principal of any Note, 0.50% over the yield to maturity implied by the U.S.

Treasury constant maturity yields reported, for the latest day for which such yields have been so reported as of the second Business Day preceding the Settlement Date with respect to such Called Principal, in Federal Reserve Statistical Release H.15 (or any comparable successor publication) for the U.S. Treasury constant maturity having a term equal to the Remaining Average Life of such Called Principal as of such Settlement Date.  If there is no such U.S. Treasury constant maturity having a term equal to such Remaining Average Life, such implied yield to maturity will be determined by interpolating linearly between (1) the U.S. Treasury constant maturity so reported with the term closest to and greater than such Remaining Average Life and (2) the U.S. Treasury constant maturity so reported with the term closest to and less than such Remaining Average Life.  The Reinvestment Yield shall be rounded to the number of decimal places as appears in the interest rate of the applicable Note.

"**Remaining Average Life**" shall mean, with respect to any Called Principal, the number of years obtained by dividing (i) such Called Principal into (ii) the sum of the products obtained by multiplying (a) the principal component of each Remaining Scheduled Payment with respect to such Called Principal by (b) the number of years, computed on the basis of a 360-day year composed of twelve 30-day months, that will elapse between the Settlement Date with respect to such Called Principal and the scheduled due date of such Remaining Scheduled Payment.

"**Remaining Scheduled Payments**" shall mean, with respect to the Called Principal of any Note, all payments of such Called Principal and interest thereon that would be due on or after the Settlement Date with respect to such Called Principal if no payment of such Called Principal were made prior to its scheduled due date.

"**Settlement Date**" shall mean, with respect to the Called Principal of any Note, the date on which such Called Principal has become or is declared to be immediately due and payable pursuant to paragraph 8A.

"**Yield-Maintenance Amount**" shall mean, with respect to any Note, an amount equal to the excess, if any, of the Discounted Value of the Called Principal of such Note over the sum of (i) such Called Principal plus (ii) interest accrued thereon as of (including interest due on) the Settlement Date with respect to such Called Principal.  The Yield-Maintenance Amount shall in no event be less than zero.

**11B.    Other Terms**.

"**Account Control Agreement**" shall have the meaning specified in paragraph 4M(6).

"**Accounts**" shall have the meaning specified in paragraph 4R.

"**Accumulated Cash Flow Deficit**" shall mean, for any fiscal quarter ending after the Restructuring Closing Date, the greater of (i) zero and (ii) an amount equal to (a) the Accumulated Cash Flow Deficit for the prior fiscal quarter (for the avoidance of doubt, after giving effect to any reduction thereof as the result of the application thereto of Excess Cash Flow for such prior fiscal quarter), provided that, for the first fiscal quarter ending after the Restructuring Closing Date, the amount under this clause (a) shall be equal to zero, plus (b) the Cash Flow Deficit (for this purpose, calculated without reference to the $10,000,000 floor

referenced in clauses (i)(b)(B) and (ii)(b)(B) of the definition thereof) for such fiscal quarter, minus (c) the Excess Cash Flow for such fiscal quarter.

"**Affiliate**" shall mean any Person directly or indirectly controlling, controlled by, or under direct or indirect common control with, another Person.  A Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" shall have the meaning specified in paragraph 12C.

"**Allocable Share of the Lee/Pulitzer Restructuring Costs**" shall mean that amount of the aggregate amount of fees and expenses payable to counsel for, and financial advisers to, Lee and its Subsidiaries (including the Credit Parties) in connection with the issuance of the Notes as contemplated hereby and each of the other transactions contemplated under this Agreement, the Pulitzer Support Agreement, the Plan of Reorganization and the Support Agreement dated as of August 11, 2011, by and among Lee, certain subsidiaries of Lee and the lenders party thereto from time to time, as shall be allocated to the Company for payment by the Company, with the approval of the Required Holders in their reasonable business judgment.

"**Anti-Money Laundering Laws**" shall have the meaning specified in paragraph 9K(iii).

"**Asset Sale**" shall have the meaning specified in the Guaranty Agreement.

"**Asset Sale Prepayment**" shall have the meaning specified in paragraph 5D.

"**Asset Sale Proceeds**" shall have the meaning specified in the Guaranty Agreement.

"**Asset Sale Proceeds Reserve Account**" shall have the meaning set forth in the Prepetition Security Agreement.

"**Available Excess Cash Flow**" shall mean, for any fiscal quarter ending after the Restructuring Closing Date, the Excess Cash Flow for such fiscal quarter, minus the Accumulated Cash Flow Deficit as of the last day of the immediately preceding fiscal quarter.

"**Bankruptcy Court**" shall have the meaning specified in paragraph 1.

"**Bankruptcy Law**" shall have the meaning specified in clause (vii) of paragraph 8A.

"**Blocked Person**" shall have the meaning specified in paragraph 9K(i).

"**Capitalized Lease Obligations**" shall mean, with respect to any Person, all rental obligations of such Person which, under GAAP, are or will be required to be capitalized on the books of such Person, in each case taken at the amount thereof accounted for as indebtedness in accordance with such principles.

"**Carryforward Amount**" shall mean, in determining the Reduction Amount applicable to any Fiscal Year, an amount equal to the lesser of (i) $2,400,000 and (ii) to the extent in excess

of $16,000,000, the aggregate amount of all prepayments of principal of the Notes made in the immediately preceding Fiscal Year pursuant to paragraphs 5B and 5C and all other prepayments; *provided that*, notwithstanding the foregoing, the Carryforward Amount shall be equal to zero for purposes of determining the Reduction Amount applicable to any date occurring during the Fiscal Year ending in September, 2012.

"**Cash Equivalents**" shall mean, as to any Person, (i) securities issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof (<u>provided</u> that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than twelve months from the date of acquisition, (ii) marketable direct obligations issued by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within twelve months from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either S&P or Moody's, (iii) dollar denominated time deposits, certificates of deposit and bankers acceptances of any commercial bank having, or which is the principal banking subsidiary of a bank holding company having, a long-term unsecured debt rating of at least "A" or the equivalent thereof from S&P or "A2" or the equivalent thereof from Moody's with maturities of not more than twelve months from the date of acquisition by such Person, (iv) repurchase obligations with a term of not more than seven days for underlying securities of the types described in clause (i) above entered into with any bank meeting the qualifications specified in clause (iii) above, (v) commercial paper issued by any Person incorporated in the United States rated at least A-1 or the equivalent thereof by S&P or at least P-1 or the equivalent thereof by Moody's and in each case maturing not more than twelve months after the date of acquisition by such Person, and (vi) investments in money market funds substantially all of whose assets are comprised of securities of the types described in clauses (i) through (v) above.

"**Cash Flow Deficit**" shall mean (i) for the fiscal quarter ending March 25, 2012, the amount by which (A) the aggregate amount of all Unrestricted Cash held by the Guarantor and its Subsidiaries on a consolidated basis as at the close of business on the Restructuring Closing Date (immediately prior to giving effect to the issuance of the Notes as contemplated by paragraph 2B) exceeded (B) the aggregate amount of all Unrestricted Cash and Cash Equivalents held by the Guarantor and its Subsidiaries on a consolidated basis as at the close of business on March 25, 2012, and (ii) for each fiscal quarter of the Guarantor ending thereafter, an amount equal to (A) the amount by which (1) the aggregate amount of all Unrestricted Cash held by the Guarantor and its Subsidiaries on a consolidated basis as at the close of business on the last day of the immediately preceding fiscal quarter exceeded (2) the aggregate amount of all Unrestricted Cash and Cash Equivalents held by the Guarantor and its Subsidiaries on a consolidated basis as at the close of business on the last day of the fiscal quarter then ending.

"**Change of Control**" shall mean (i) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act as in effect on the Restructuring Closing Date) (A) is or shall become the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act as in effect on the Restructuring Closing Date), directly or indirectly, of 50% or more on a fully diluted basis of the Voting Equity Interests of Lee or (B) shall have obtained the power (whether or not exercised) to elect a majority of Lee's directors, (ii) the board of directors of Lee shall cease to consist of a majority of Continuing Directors (as defined in the Credit Agreement), (iii) the failure of Lee to directly or indirectly hold 100% of the Equity Interests of

the Company (it being understood that the "phantom equity interests" to be held by Herald, as contemplated by the Redemption Agreement (as in effect on the Restructuring Closing Date), shall be deemed not to be an Equity Interest for purposes of this definition) or (iv) a "change of control" or similar event shall occur as provided in the Credit Agreement, the Second Lien Loan Agreement, any Permitted Refinancing Debt (or any documentation governing the same) or any other agreement evidencing Debt of Lee or any Subsidiary of Lee with an aggregate outstanding principal amount of at least $25,000,000.

"**Change of Control Notice**" shall have the meaning specified in paragraph 5E.

"**Change of Control Prepayment Date**" shall have the meaning specified in paragraph 5E.

"**Claims**" shall have the meaning specified in paragraph 6G.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended.

"**Collateral Agent**" shall mean The Bank of New York Mellon Trust Company, N.A. in its capacity as collateral agent for the holders from time to time of the Notes, together with its successors and assigns in such capacity.

"**Collateral Documents**" shall mean the Security Agreement, the Pledge Agreement, the Deeds of Trust, the Trademark Security Agreements, the Copyright Security Agreements, the Account Control Agreement and each of the other security agreements, pledge agreements, trademark security agreements, copyright security agreements, deeds of trust, mortgages, leasehold mortgages or other agreements or instruments from time to time executed and delivered pursuant to the terms hereof or thereof which grants a Lien in favor of the Collateral Agent securing the obligations of the Credit Parties under any of the Notes and the other Transaction Documents, as each may be amended, restated, supplemented or otherwise modified from time to time, together with all financing statements or comparable documents filed with respect thereto under the Uniform Commercial Code of any jurisdiction or comparable law.

"**Company**" shall have the meaning specified in the introductory paragraph of this Agreement.

"**Company Affiliate**" shall mean any Affiliate of the Company, except a Subsidiary.

"**Confirmation Order**" shall have the meaning provided to such term in the Plan of Reorganization.

"**Consenting Noteholders**" shall mean each holder of Notes that executed the Pulitzer Support Agreement on or before the date it became effective in accordance with its terms.

"**Controlled Entity**" means any of the Subsidiaries of the Company and any of their or the Company's respective Controlled Company Affiliates. As used in this definition, "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Copyright Security Agreements**" shall have the meaning specified in paragraph 4M(5).

"**Credit Agreement**" shall have the meaning specified in paragraph 4J.

"**Credit Party**" shall mean the Guarantor, the Company and the Subsidiary Guarantors.

"**Debt**" shall mean and include without duplication:

(i)    all obligations for borrowed money or obligations represented by notes payable and drafts accepted representing extensions of credit, all obligations evidenced by bonds, debentures, notes or other similar instruments and all obligations upon which interest charges are customarily paid;

(ii)    Capitalized Lease Obligations;

(iii)    indebtedness secured by any Lien existing on property owned by the Company or any Subsidiary subject to such Lien, whether or not the indebtedness secured thereby shall have been assumed by the Company or any Subsidiary;

(iv)    guarantees, endorsements (other than endorsements of negotiable instruments for collection in the ordinary course of business) and other contingent liabilities (whether direct or indirect) in connection with the obligations, stock or dividends of any Person;

(v)    obligations under any contract providing for the making of loans, advances or capital contributions to any Person, or for the purchase of any property from any Person, in each case in order to enable such Person primarily to maintain working capital, net worth or any other balance sheet condition or to pay debt, dividends or expenses;

(vi)    obligations under any contract for the purchase of materials, supplies or other property from any Person if such contract (or any related document) requires that payment for such materials, supplies or other property shall be made regardless of whether or not delivery of such materials, supplies or other property is ever made or tendered;

(vii)    obligations under any contract to rent or lease (as lessee) any real or personal property if such contract (or any related document) provides that the obligation to make payments thereunder is absolute and unconditional under conditions not customarily found in commercial leases then in general use or requires that the lessee purchase or otherwise acquire securities or obligations of the lessor;

(viii)    obligations under any contract for the sale or use of materials, supplies or other property, or the rendering of services, if such contract (or any related document) requires that payment for such materials, supplies or other property, or the use thereof, or payment for such services, shall be subordinated to any indebtedness (of the purchaser or

42

user of such materials, supplies or other property or the Person entitled to the benefit of such services) owed or to be owed to any Person;

(ix)    obligations under any other contract which, in economic effect, is substantially equivalent to a guarantee;

(x)    all Off-Balance Sheet Liabilities; and

(xi)    all Swaps;

provided, however, that Debt shall not include (a) loans, advances and capital contributions by any Credit Party to any other Credit Party, (b) the guaranty of the obligations of the Company or a Subsidiary under an executory contract to purchase or sell a business, or (c) the obligation to redeem the phantom equity interests referred to in clause (iii) of the definition of "Change of Control".

"**Debtors**" shall have the meaning specified in paragraph 1.

"**Deeds of Trust**" shall have the meaning specified in paragraph 4M(3).

"**Default**" shall mean any of the events specified in paragraph 8A, whether or not any requirement for such event to become an Event of Default has been satisfied.

"**Disclosure Statement**" shall mean the disclosure statement relating to the Plan of Reorganization in the form approved by the Bankruptcy Court on [_____], 2012.

"**Environmental Laws**" shall mean any and all Federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution and the protection of the environment or the release of any materials into the environment, including but not limited to those related to Hazardous Materials.

"**Equity Interests**" of any Person shall mean any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated) equity of such Person, including any common stock, any preferred stock, any limited or general partnership interest and any limited liability company membership interest.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" shall mean any Person which is a member of the same controlled group of Persons as the Company within the meaning of section 414(b) of the Code, or any trade or business which is under common control with the Company within the meaning of section 414(c) of the Code.

"**Event of Default**" shall mean any of the events specified in paragraph 8A, provided that there has been satisfied any requirement in connection with such event for the giving of notice, or the lapse of time, or the happening of any further condition, event or act.

43

"**Excess Cash Flow**" shall mean an amount, if positive, equal to (i) for the fiscal quarter ending March 25, 2012, (a) the aggregate amount of all Unrestricted Cash held by the Guarantor and its Subsidiaries on a consolidated basis as at the close of business on March 25, 2012, minus (b) the greater of (A) the aggregate amount of all Unrestricted Cash held by the Guarantor and its Subsidiaries on a consolidated basis as at the close of business on the Restructuring Closing Date and (B) $10,000,000 and (ii) for each fiscal quarter of the Guarantor ending thereafter, (a) the aggregate amount of all Unrestricted Cash held by the Guarantor and its Subsidiaries on a consolidated basis as at the close of business on the last day of the fiscal quarter then ending, minus (b) the greater of (A) the aggregate amount of all Unrestricted Cash held by the Guarantor and its Subsidiaries on a consolidated basis as at the close of business on the last day of the immediately preceding fiscal quarter and (B) $10,000,000.

"**Excess Cash Flow Reserve Account**" shall have the meaning set forth in the Prepetition Security Agreement.

"**Excess Cash Flow Sweep Prepayment**" shall have the meaning specified in paragraph 5B.

"**Exchange Act**" shall mean the Securities Exchange Act of 1934, as amended, or any successor federal statute, and the rules and regulations of the United States Securities and Exchange Commission promulgated thereunder, all as the same shall be in effect from time to time.

"**Excluded TNI Assets**" shall mean all Equity Interests in TNI Partners, all real and personal property which is leased to or used in the operations or business of TNI Partners, and all proceeds of any of the foregoing.

"**Fiscal Year**" shall mean the fiscal year of the Company ending on the last Sunday of September of each calendar year.

"**Foreign Subsidiary**" of any Person shall mean any Subsidiary of such Person not incorporated or organized in the United States or any State thereof or the District of Columbia.

"**GAAP**" means generally accepted accounting principles in the United States, as in effect from time to time.

"**Governmental Authority**" shall mean

    (a)    the government of

        (i)    the United States of America and any state or other political subdivision thereof; or

        (ii)    any other jurisdiction in which the Guarantor or a Subsidiary of the Guarantor conducts all or any part of its business, or that properly asserts any jurisdiction over the conduct of the affairs of or the property of the Guarantor or any of its Subsidiaries; and

(b)    any entity exercising executive, legislative, judicial, regulatory or administrative functions of, or pertaining to, any such government.

"**Guarantor**" shall mean Pulitzer Inc., a Delaware corporation.

"**Guaranty Agreement**" shall have the meaning specified in paragraph 4H.

"**Guaranty Event of Default**" shall mean an "Event of Default" under the Guaranty Agreement (as such term is defined therein).

"**Hazardous Materials**" shall mean any and all pollutants, toxic or hazardous wastes or other substances that pose a hazard to health and safety, the removal of which may be required or the generation, manufacture, refining, production, processing, treatment, storage, handling, transportation, transfer, use, disposal, release, discharge, spillage, seepage or filtration of which is or shall be restricted, prohibited or penalized by any applicable law, including, without limitation, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, petroleum, petroleum products, lead based paint, radon gas or similar restricted, prohibited or penalized substances.

"**Herald**" shall mean The Herald Company, LLC, a New York limited liability company and the successor to The Herald Company, Inc., a New York corporation.

"**including**" shall mean, unless the context clearly requires otherwise, "including without limitation".

"**INHAM Exemption**" shall have the meaning specified in paragraph 10B(v).

"**Institutional Investor**" means (a) any Purchaser, (b) any holder of a Note holding (together with one or more of its affiliates) more than 3% of the aggregate principal amount of the Notes then outstanding, (c) any bank, trust company, savings and loan association or other financial institution, any pension plan, any investment company, any insurance company, any broker or dealer, or any other similar financial institution or entity, regardless of legal form, and (d) any Related Fund of any holder of any Note.

"**Intercompany Debt**" shall mean any Debt, payables or other obligations, whether now existing or hereafter incurred, owed by Lee or any Subsidiary Guarantor (as defined in the Second Lien Loan Agreement) to the Company or any of its Subsidiaries.

"**Intercreditor Agreement**" shall have the meaning specified in paragraph 4L.

"**Interest Rate Protection Agreement**" shall mean any interest rate swap agreement, interest rate cap agreement, interest collar agreement, interest rate hedging agreement or other similar agreement or arrangement.

"**Lee**" shall mean Lee Enterprises, Incorporated, a Delaware corporation.

45

"**Lee Company**" shall mean any Person (other than the Guarantor or any of its Subsidiaries) a majority of the outstanding equity interests of which are owned directly or indirectly by Lee.

"**Lee Prepayment**" shall have the meaning specified in paragraph 2B.

"**Lien**" shall mean any mortgage, pledge, security interest, encumbrance, lien or charge of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, any lease in the nature thereof, and the filing of or agreement to give any financing statement under the Uniform Commercial Code of any jurisdiction) or any other type of preferential arrangement for the purpose, or having the effect, of protecting a creditor against loss or securing the payment or performance of an obligation, provided, that in no event shall the term "Lien" include any right, title or interest of a lessor with respect to any lease of real or personal property under which the lessee's obligations are not Capitalized Lease Obligations.

"**Limited Liability Company Agreement**" shall mean the [Operating Agreement of the Company, dated as of May 1, 2000,] entered into by and among the Guarantor, Pulitzer Technologies, Inc. and Herald, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Material Adverse Effect**" shall mean a material adverse effect on (a) the business, financial condition, assets or properties of the Guarantor and its Subsidiaries taken as a whole, or (b) the ability of the Company, the Guarantor or the Credit Parties (taken as a whole) to perform its or their obligations under this Agreement, the Notes or any other Transaction Document, or (c) the validity or enforceability of this Agreement, the Notes or any other Transaction Document.

"**Material Lee Subsidiary**" shall mean Lee Procurement Solutions Co., Lee Publications, Inc. and each other Subsidiary of Lee whose revenues represent 25% of consolidated revenues of Lee or whose assets represent 25% of consolidated assets of Lee, in each case as determined on a consolidated basis in accordance with GAAP.

"**Material Subsidiary**" shall mean (i) postnet.com LLC, (ii) SCR Associates LLC and (iii) any other Subsidiary of the Company (whether now existing or hereafter acquired or organized) which has gross assets of more than $10,000,000 or has contributed more than 5% of the consolidated revenues of the Company and its Subsidiaries (in each case as reflected in the consolidated and consolidating financial statements of the Guarantor and its Subsidiaries as of the end of the most recently concluded Fiscal Year).

"**Moody's**" shall mean Moody's Investors Service, Inc.

"**Multiemployer Plan**" shall mean any employee pension benefit plan which is a "multiemployer plan" (as such term is defined in section 4001(a)(3) of ERISA).

"**NAIC**" means the National Association of Insurance Commissioners or any successor thereto.

"**NAIC Annual Statement**" shall have the meaning specified in paragraph 10B(i).

"**Note Obligations**" shall mean all amounts owing to any holder of Notes pursuant to the terms of this Agreement and each other Transaction Document, including, without limitation, all amounts in respect of any principal, premium, interest (including any interest, fees and/or expenses accruing subsequent to the filing of a petition in bankruptcy, reorganization or similar proceeding, whether or not such interest, fees and/or expenses are an allowed claim under any such proceeding or under applicable state, federal or foreign law), penalties, fees, expenses, indemnifications, reimbursements, damages and other liabilities, and guarantees of the foregoing amounts.

"**Notes**" shall have the meaning specified in paragraph 2A and shall include each Note delivered pursuant to any provision of this Agreement, as each such Note may be amended, restated or otherwise modified from time to time.

"**OFAC**" shall have the meaning specified in paragraph 9K(i).

"**OFAC Listed Person**" shall have the meaning specified in paragraph 9K(i).

"**OFAC Sanctions Program**" shall mean any economic or trade sanction that OFAC is responsible for administering and enforcing.  A list of OFAC Sanctions Programs may be found at http://www.ustreas.gov/offices/enforcement/ofac/programs/.

"**Off-Balance Sheet Liabilities**" of any Person shall mean (i) any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person, (ii) any liability of such Person under any sale and leaseback transactions that do not create a liability on the balance sheet of such Person, (iii) any obligation under a Synthetic Lease or (iv) any obligation arising with respect to any other transaction which is the functional equivalent of or takes the place of borrowing but which does not constitute a liability on the balance sheet of such Person.

"**Officer's Certificate**" shall mean a certificate signed in the name of the Company or the Guarantor, as applicable, by its President, one of its Vice Presidents or its Treasurer.

"**Other Hedging Agreements**" shall mean any foreign exchange contracts, currency swap agreements, commodity agreements or other similar arrangements, or arrangements designed to protect against fluctuations in currency values or commodity prices.

"**PBGC**" shall mean the Pension Benefit Guaranty Corporation, or any successor or replacement entity thereto under ERISA.

"**PD LLC Notes Claims**" shall have the meaning assigned to such term in the Plan of Reorganization.

"**Permitted Refinancing Debt**" shall mean Debt solely of the Lee Companies so long as (i) the proceeds of such Debt are used solely to refinance in full the Debt outstanding under the Credit Agreement or the Second Lien Loan Agreement at such time and to pay reasonable fees and expenses incurred in connection with obtaining such Debt, (ii) such Debt does not have any

amortization, redemption, sinking fund, maturity or similar requirement prior to the maturity date of the Debt under the Credit Agreement or the Second Lien Loan Agreement (as applicable) as in effect on, and after giving effect to, the Restructuring Closing Date or as thereafter amended or modified in accordance with the terms thereof and hereof, other than for amortization payments or prepayments prior to final maturity on terms, in the aggregate, no more restrictive than those set forth in the Credit Agreement or the Second Lien Loan Agreement as in effect on, and after giving effect to, the Restructuring Closing Date or as thereafter amended or modified in accordance with the terms thereof and hereof, (iii) in the case of any refinancing of the Second Lien Loan Agreement, the aggregate principal amount of such Permitted Refinancing Debt shall not be more than $[175,000,000], (iv) the terms thereof are no less favorable to, and no more burdensome on, the Credit Parties than those set forth in the Credit Agreement or the Second Lien Loan Agreement (as applicable) in any material respect, in each case than the terms of such agreements as in effect on, and after giving effect to, the Restructuring Closing Date or as thereafter amended or modified in accordance with the terms thereof and hereof, and (v) all of the other terms and conditions thereof (and the documentation with respect thereto) are in form and substance reasonably satisfactory to the Required Holders.

"**Person**" shall mean and include an individual, a partnership, a joint venture, a firm, a corporation, an association, a limited liability company, a trust or other enterprise or any government or political subdivision or any department, agency or instrumentality thereof.

"**Petition Date**" shall have the meaning specified in paragraph 1.

"**Plan**" shall mean any "employee pension benefit plan" (as such term is defined in section 3 of ERISA) which is or has been established or maintained, or to which contributions are or have been made, by the Company or any ERISA Affiliate, other than a Multiemployer Plan.

"**Plan of Reorganization**" shall have the meaning specified in paragraph 1.

"**Plan Support Effective Date**" shall mean the "Effective Date" as such term is defined in the Pulitzer Support Agreement.

"**Pledge Agreement**" shall have the meaning specified in paragraph 4M(1).

"**Prepetition Note Agreement**" shall have the meaning specified in paragraph 1.

"**Prepetition Notes**" shall have the meaning specified in paragraph 1.

"**Prepetition Security Agreement**" shall mean that certain Security Agreement, dated February 18, 2009, made by the Guarantor, the Company and each of the other Subsidiaries of the Guarantor (except for Star Publishing) in favor of the Collateral Agent for the benefit of the holders from time to time of the Notes.

"**Prohibited Transaction**" shall have the meaning assigned to such term in Section 4975 of the Code and Section 406 of ERISA.

"**PTE**" shall have the meaning specified in paragraph 10B(i).

48

"**Pulitzer Entities**" shall mean all Credit Parties with the exception of Star Publishing.

"**Pulitzer Support Agreement**" shall mean that certain Support Agreement dated as of November [__], 2011, by and among the Credit Parties and the Consenting Noteholders.

"**QPAM Exemption**" shall have the meaning specified in paragraph 10B(iv).

"**Redemption Agreement**" means the Redemption Agreement, dated as of February 18, 2009, among the Company, STL Distribution Services LLC, a Delaware limited liability company, The Herald Publishing Company, LLC,  a New York limited liability company, the Guarantor and Pulitzer Technologies, Inc. a Delaware corporation.

"**Reduction Amount**" shall mean, as of any date, the sum of each of the following (without duplication):

> (i)     all prepayments of principal theretofore paid pursuant to paragraph 5A in the Fiscal Year in which such date falls;

> (ii)    all Excess Cash Flow Sweep Prepayments theretofore paid in the Fiscal Year in which such date falls;

> (iii)   any Carryforward Amount calculated for the Fiscal Year immediately preceding the Fiscal Year in which such date falls; and

> (iv)    all other prepayments in respect of the Notes (and, to the extent applicable, the Prepetition Notes) theretofore paid in the Fiscal Year in which such date falls, other than (a) the Lee Prepayment and (b) the prepayment in respect of the Prepetition Notes in the amount of not less than $5,145,000 made not later than one Business Day following the Plan Support Effective Date by applying all amounts in the Accounts and the Asset Sale Proceeds Reserve Account, if any, to such prepayment (rounded down to the nearest $10,000 increment) and, to the extent of any shortfall in such amounts, by applying other funds available to the Company to such prepayment of the Prepetition Notes.

"**Related Fund**" means, with respect to any holder of any Note, any fund or entity that (i) invests in securities or bank loans, and (ii) is advised or managed by such holder, the same investment advisor as such holder or by an affiliate of such holder or such investment advisor.

"**Required Holders**" shall mean, (i) at any time that there are more than two non-affiliated holders of Notes, the holders of at least 60% of the aggregate principal amount of the Notes from time to time outstanding, so long as at least two of such holders are not affiliates and (ii) otherwise, the holders of 51% of the aggregate principal amount of the Notes.

"**Response Date**" shall have the meaning specified in paragraph 5E.

"**Responsible Officer**" shall mean the chief executive officer, chief operating officer, chief administrative officer or chief financial officer of any Credit Party or any other officer of such Credit Party involved principally in its financial administration or its controllership function.

"**Restricted Cash Reserve Account**" shall have the meaning set forth in the Prepetition Security Agreement.

"**Restructuring Closing Date**" shall have the meaning specified in paragraph 3.

"**S&P**" shall mean Standard & Poor's Ratings Services, a division of McGraw-Hill, Inc.

"**Sandler V Assets**" means all of the assets of Sandler Capital Partners V, L.P., a Delaware limited partnership, held by such limited partnership on November 30, 2011, together with any subsequent additions to such assets (whether by earnings, contributions or otherwise).

"**Second Lien Debt Documents**" shall have the meaning set forth by the term "Credit Documents" in the Second Lien Loan Agreement (as in effect on the date hereof).

"**Second Lien Loan Agreement**" shall have the meaning specified in paragraph 4K.

"**Secured Obligations**" shall have the meaning specified in the Security Agreement.

"**Securities Act**" shall mean the Securities Act of 1933, as amended.

"**Security Agreement**" shall have the meaning specified in paragraph 4M(2).

"**Source**" shall have the meaning specified in paragraph 10B.

"**Star Intercompany Notes**" shall mean, collectively, (i) the intercompany note issued by the Guarantor in favor of Star Publishing, dated as of January 11, 2000, in the original principal amount of $180,000,000, (ii) the intercompany note issued by the Guarantor in favor of Star Publishing, dated as of June 12, 2000, in the original principal amount of $15,000,000, (iii) the intercompany note issued by the Guarantor in favor of Star Publishing, dated as of August 10, 2000, in the original principal amount of $175,000,000, and (iv) the intercompany note issued by the Guarantor in favor of Star Publishing, dated as of August 25, 2000, in the original principal amount of $20,000,000.

"**Star Publishing**" shall mean Star Publishing Company, an Arizona corporation.

"**Subsidiary**" shall mean, as to the Company (or any other Person), any other corporation, limited liability company, association or other business entity organized under the laws of any state of the United States of America, Canada or any province of Canada which conducts the major portion of its business in and makes the major portion of its sales to Persons located in the United States of America or Canada, and all of the stock of every class of which (except directors' qualifying shares) or other equity interests in which shall, at the time as of which any determination is being made, be owned by the Company (or such other Person), either directly or through Subsidiaries. Unless the context otherwise clearly requires, any reference to a "Subsidiary" is a reference to a Subsidiary of the Company.

"**Subsidiary Guarantors**" shall mean all Subsidiaries of the Guarantor (other than TNI Partners) that are parties to the Subsidiary Guaranty Agreement.

"**Subsidiary Guaranty Agreement**" shall have the meaning specified in paragraph 4I.

"**SVO**" means the Securities Valuation Office of the NAIC or any successor to such Office.

"**Swap**" shall mean, with respect to any Person, payment obligations with respect to interest rate swaps, currency swaps and similar obligations obligating such Person to make payments, whether periodically or upon the happening of a contingency.

"**Synthetic Lease**" shall mean a lease transaction under which the parties intend that (i) the lease will be treated as an "operating lease" by the lessee and (ii) the lessee will be entitled to various tax and other benefits ordinarily available to owners (as opposed to lessees) of like property.

"**Tax Sharing Agreement**" shall have the meaning specified in paragraph 4T.

"**TNI Agreement**" shall mean that certain Amended and Restated Partnership Agreement, dated as of November 30, 2009, by and among Star Publishing and Citizen Publishing Company.

"**TNI Partners**" shall mean TNI Partners, a general partnership formed under the laws of the State of Arizona pursuant to the terms of the TNI Agreement.

"**Trademark Security Agreements**" shall have the meaning specified in paragraph 4M(4).

"**Transaction Documents**" shall mean this Agreement, the Notes, the Guaranty Agreement, the Subsidiary Guaranty Agreement, the Collateral Documents and any and all other agreements and certificates from time to time executed and delivered by or on behalf of any Credit Party related thereto.

"**Transferee**" shall mean any institutional investor that is a direct or indirect transferee of all or any part of any Note issued under this Agreement.

"**Unrestricted Cash**" means the aggregate amount of all cash and Cash Equivalents held by the Guarantor and its Subsidiaries that are not (i) subject to an escrow arrangement in favor of one or more Persons (other than a Credit Party) whose consent is necessary for the release of such cash and/or Cash Equivalents from such escrow, or (ii) required to be maintained by the Guarantor or its Subsidiaries by reason of applicable corporate law requirements as to capital maintenance, solvency or related matters.

"**USA Patriot Act**" means United States Public Law 107-56, Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, as amended from time to time, and the rules and regulations promulgated thereunder from time to time in effect.

"**Voting Equity Interests**" shall mean, as to any Person, any class or classes of outstanding Equity Interests of such Person pursuant to which the holders thereof have the

general voting power under ordinary circumstances to elect at least a majority of the board of directors of such Person.

**11C.    Accounting and Legal Principles, Terms and Determinations.**  All accounting terms used herein which are not expressly defined in this Agreement have the meanings respectively given to them in accordance with GAAP.  Except as otherwise specifically provided herein, (i) all computations made pursuant to this Agreement shall be made in accordance with GAAP, and (ii) all financial statements shall be prepared in accordance with GAAP; provided that, except as otherwise specifically provided herein, all computations of "Excess Cash Flow" and all computations and definitions used in determining compliance with financial covenants shall utilize GAAP and policies in conformity with those used to prepare the audited financial statements of the Guarantor for the Guarantor's fiscal year ended September 25, 2011.  For purposes of determining compliance with the financial covenants contained in this Agreement, any election by the Company or the Guarantor to measure any financial liability using fair value (as permitted by Accounting Standard Codification Topic No. 825-10-25 – *Fair Value Option* or any similar accounting standard) shall be disregarded and such determination shall be made as if such election had not been made.

## PARAGRAPH 12.    MISCELLANEOUS

**12A.    Note Payments.**  So long as any Purchaser or its nominee shall be the holder of any Note, the Company will make payments of principal of, interest on and any Yield-Maintenance Amount payable with respect to such Note, which comply with the terms of this Agreement, by wire transfer of immediately available funds for credit (not later than 1:00 p.m., New York City time, on the date due) to such Purchaser's account or accounts as specified in Schedule A attached hereto, or such other account or accounts in the United States as such Purchaser may designate in writing, notwithstanding any contrary provision herein or in any Note with respect to the place of payment. Each Purchaser agrees that, before disposing of any Note, it will make a notation thereon (or on a schedule attached thereto) of all principal payments previously made thereon and of the date to which interest thereon has been paid. The Company agrees to afford the benefits of this paragraph 12A to any Transferee which shall have made the same agreement as the Purchasers have made in this paragraph 12A.  No holder shall be required to present or surrender any Note or make any notation thereon, except that upon written request of the Company made concurrently with or reasonably promptly after payment or prepayment in full of any Note, the applicable holder shall surrender such Note for cancellation, reasonably promptly after any such request, to the Company at its principal executive office.

**12B.    Expenses.**  Whether or not the transactions contemplated hereby shall be consummated, the Company shall pay, and save each Purchaser and any Transferee harmless against liability for the payment of, all out-of-pocket expenses arising in connection with such transactions, including:

(i)    (a) all stamp and documentary taxes and similar charges and (b) costs of obtaining a private placement number for the Notes;

(ii)    document production and duplication charges and the fees and expenses of any special counsel engaged by such Purchaser or such Transferee in connection with (a)

A/74565634.14

this Agreement and the transactions contemplated hereby and (b) any subsequent proposed waiver, amendment or modification of, or proposed consent under, this Agreement, whether or not such the proposed action shall be effected or granted; and

(iii)    the costs and expenses, including attorneys' fees, incurred by such Purchaser or such Transferee in enforcing (or determining whether or how to enforce) any rights under this Agreement, the Guaranty Agreement or the Notes or in responding to any subpoena or other legal process served upon such Person in connection with this Agreement or the transactions contemplated hereby or by reason of such Purchaser or such Transferee having acquired any Note, including without limitation costs and expenses incurred in any workout, restructuring or renegotiation proceeding or bankruptcy case.

The obligations of the Company under this paragraph 12B shall survive the transfer of any Note or portion thereof or interest therein by any Purchaser or Transferee and the payment of any Note.

12C.    **Consent to Amendments.**    This Agreement (or any amendment hereto) may be amended or any provision hereof (or of any amendment) may be waived, and the Company may take any action herein prohibited, or omit to perform any act herein required to be performed by it, if the Company shall obtain the written consent to such amendment, waiver, action or omission to act, of the Required Holder(s) except that, without the written consent of the holder or holders of all Notes at the time outstanding, no amendment to this Agreement shall change the maturity of any Note, or change the principal of, or the rate, method of computation or time of payment of interest on or any Yield-Maintenance Amount payable with respect to any Note, or affect the time, amount or allocation of any prepayments, or change the proportion of the principal amount of the Notes required with respect to any consent, amendment, waiver or declaration.  For the avoidance of doubt, neither a waiver of the Company's failure to make a principal payment required by paragraph 5A (or any other provision of paragraph 5), nor any amendment of such paragraph (or any other provision of paragraph 5) (to the extent such amendment would affect the timing, amount or allocation of any prepayments), shall be effective without the consent of the holders of all Notes then outstanding and any such failure, if not waived, would constitute an Event of Default having the effect, *inter alia*, of prohibiting the making of the senior unsecured loans and advances referred to in Section 5.4(xxiv) of the Guaranty Agreement.  Each holder of any Note at the time or thereafter outstanding shall be bound by any consent authorized by this paragraph 12C, whether or not such Note shall have been marked to indicate such consent, but any Notes issued thereafter may bear a notation referring to any such consent.  No course of dealing between the Company and the holder of any Note nor any delay in exercising any rights hereunder or under any Note shall operate as a waiver of any rights of any holder of such Note.  The Company will not directly or indirectly pay or cause to be paid any remuneration, whether by way of supplemental or additional interest, fee or otherwise, or grant any security, to any holder of Notes as consideration for or as an inducement to the entering into by any holder of Notes or any waiver or amendment of any of the terms and provisions hereof (or any amendment hereto) unless such remuneration is concurrently paid, or security is concurrently granted, on the same terms, ratably to each holder of Notes then outstanding even if such holder did not consent to such waiver or amendment.  To the extent that any fees paid to any Consenting Noteholder pursuant to paragraph 4Q are determined by a court

of competent jurisdiction, pursuant to a final judgment not subject to appeal, to be subject to the preceding sentence and, in connection therewith, any Consenting Noteholder is required to disgorge all or any part of such fees, the Company shall pay to such Consenting Noteholder such additional amount so that, after taking into account such additional amount and such disgorgement, such Consenting Noteholder shall have received and retained the full amount of the fees payable pursuant to such paragraph.  As used herein and in the Notes, the term "**this Agreement**" and references thereto shall mean this Agreement as it may from time to time be amended or supplemented.

**12D.    Form, Registration, Transfer and Exchange of Notes; Lost Notes.**  The Notes are issuable as registered notes without coupons in denominations of at least $100,000, except as may be necessary to (i) reflect any principal amount not evenly divisible by $100,000 or (ii) enable the registration of transfer by a holder of its entire holding of Notes.  The Company shall keep at its principal office a register in which the Company shall provide for the registration of Notes and of transfers of Notes.  Upon surrender for registration of transfer of any Note at the principal office of the Company, the Company shall, at its expense, execute and deliver one or more new Notes of like tenor and of a like aggregate principal amount, registered in the name of such transferee or transferees.  At the option of the holder of any Note, such Note may be exchanged for other Notes of like tenor and of any authorized denominations, of a like aggregate principal amount, upon surrender of the Note to be exchanged at the principal office of the Company.  Whenever any Notes are so surrendered for exchange, the Company shall, at its expense, execute and deliver the Notes which the holder making the exchange is entitled to receive.  Every Note surrendered for registration of transfer or exchange shall be duly endorsed, or be accompanied by a written instrument of transfer duly executed, by the holder of such Note or such holder's attorney duly authorized in writing.  Any Note or Notes issued in exchange for any Note or upon transfer thereof shall carry the rights to unpaid interest and interest to accrue which were carried by the Note so exchanged or transferred, so that neither gain nor loss of interest shall result from any such transfer or exchange.  Upon receipt of written notice from the holder of any Note of the loss, theft, destruction or mutilation of such Note and, in the case of any such loss, theft or destruction, upon receipt of such holder's unsecured indemnity agreement, or in the case of any such mutilation upon surrender and cancellation of such Note, the Company will make and deliver a new Note, of like tenor, in lieu of the lost, stolen, destroyed or mutilated Note.

**12E.    Persons Deemed Owners; Participations.**    Prior to due presentment for registration of transfer, the Company may treat the Person in whose name any Note is registered as the owner and holder of such Note for the purpose of receiving payment of principal of, interest on and any Yield-Maintenance Amount payable with respect to such Note and for all other purposes whatsoever, whether or not such Note shall be overdue, and the Company shall not be affected by notice to the contrary.  Subject to the preceding sentence, the holder of any Note may from time to time grant participations in such Note to any Person on such terms and conditions as may be determined by such holder in its sole and absolute discretion, provided that any such participation shall be in an amount of at least $100,000, <u>provided</u> that no such granting of a participation shall increase or otherwise affect the obligations of the Company hereunder.

**12F.    Survival of Representations and Warranties; Entire Agreement.**    All representations and warranties contained herein or made in writing by or on behalf of the

A/74565634.14

Company in connection herewith shall survive the execution and delivery of this Agreement and the Notes, the transfer by a Purchaser of any Note or portion thereof or interest therein and the payment of any Note, and may be relied upon by any Transferee, regardless of any investigation made at any time by or on behalf of any Purchaser or any Transferee. Subject to the preceding sentence, this Agreement, the Notes and the Transaction Documents embody the entire agreement and understanding between the Purchasers and the Company and supersede all prior agreements and understandings relating to the subject matter hereof.

**12G.  Successors and Assigns.**  All covenants and other agreements in this Agreement contained by or on behalf of either of the parties hereto shall bind and inure to the benefit of the respective successors and assigns of the parties hereto (including, without limitation, any Transferee) whether so expressed or not.

**12H.  Notices.**  All written communications provided for hereunder shall be sent by first class mail or nationwide overnight delivery service (with charges prepaid) and (i) if to a Purchaser, addressed to it at the address specified for such communications in Schedule A attached hereto, or at such other address as such Purchaser shall have specified to the Company in writing, (ii) if to any other holder of any Note, addressed to such other holder at such address as such other holder shall have specified to the Company in writing or, if any such other holder shall not have so specified an address to the Company, then addressed to such other holder in care of the last holder of such Note which shall have so specified an address to the Company, and (iii) if to the Company, addressed to it at 900 North Tucker Boulevard, St. Louis, Missouri 63101, Attention: Senior Vice President-Finance, or at such other address as the Company shall have specified to the holder of each Note in writing.

**12I.  Payments due on Non-Business Days.**  Anything in this Agreement or the Notes to the contrary notwithstanding, any payment of principal of or interest on any Note that is due on a date other than a Business Day shall be made on the next succeeding Business Day. If the date for any payment is extended to the next succeeding Business Day by reason of the preceding sentence, the period of such extension shall not be included in the computation of the interest payable on such Business Day.

**12J.  Satisfaction Requirement.**  If any agreement, certificate or other writing, or any action taken or to be taken, is by the terms of this Agreement required to be satisfactory to any holder of Notes or to the Required Holder(s), the determination of such satisfaction shall be made by such holder of Notes or the Required Holder(s), as the case may be, in the sole and exclusive judgment (exercised in good faith) of the Person or Persons making such determination.

**12K.  Governing Law**.  This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York excluding choice-of-law principles of the law of such State that would permit the application of the laws of a jurisdiction other than such State.

**12L.  Severability.**  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any

such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**12M.   Descriptive Headings.**  The descriptive headings of the several paragraphs of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

**12N.   Counterparts.**  This Agreement may be executed in any number of counterparts (or counterpart signature pages), each of which shall be an original but all of which together shall constitute one instrument.

**12O.   Independence of Covenants.**   All covenants hereunder shall be given independent effect so that if a particular action or condition is prohibited by any one of such covenants, the fact that it would be permitted by an exception to, or otherwise be in compliance within the limitations of, another covenant shall not (i) avoid the occurrence of an Event of Default or Default if such action is taken or such condition exists or (ii) in any way prejudice an attempt by the holders to prohibit (through equitable action or otherwise) the taking of any action by the Company or a Subsidiary which would result in an Event of Default or Default.

**12P.   Severalty of Obligations.**   The obligations of the Purchasers under this Agreement are several obligations.  No failure by any Purchaser to perform its obligations under this Agreement shall relieve any other Purchaser or the Company of any of its obligations hereunder, and no Purchaser shall be responsible for the obligations of, or any action taken or omitted by, any other Purchaser hereunder.

**12Q.   Consent to Jurisdiction; Waiver of Immunities.**   The Company hereby irrevocably submits to the jurisdiction of any New York state or Federal court sitting in New York in any action or proceeding arising out of or relating to this Agreement, and the Company hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in New York state or Federal court.  The Company hereby irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding.  The Company agrees and irrevocably consents to the service of any and all process in any such action or proceeding by the mailing, by registered or certified U.S. mail, or by any other means or mail that requires a signed receipt, of copies of such process to the Company at its address set forth in paragraph 12H, and hereby appoints such Person as its agent to receive such service of process.  The Company agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this paragraph 12Q shall affect the right of any holder of the Notes to serve legal process in any other manner permitted by law or affect the right of any holder of the Notes to bring any action or proceeding against the Company or its property in the courts of any other jurisdiction.  To the extent that the Company has or hereafter may acquire immunity from jurisdiction of any court or from any legal process (whether through service of notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) with respect to itself or its property, the Company hereby irrevocably waives such immunity in respect of its obligations under this Agreement.

**12R.   Waiver of Jury Trial.**  The Company and the holders of the Notes agree to waive their respective rights to a jury trial of any claim or cause of action based upon or arising out of

this Agreement, the Notes, or any dealings between them relating to the subject matter of this transaction and the lender/borrower relationship that is being established. The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this transaction, including without limitation, contract claims, tort claims, breach of duty claims, and all other common law and statutory claims. The holders of the Notes and the Company each acknowledge that this waiver is a material inducement to enter into this business relationship, that each has already relied on the waiver in entering into this Agreement, and that each will continue to rely on the waiver in their related future dealings. The holders of the Notes and the Company further warrant and represent that each has reviewed this waiver with its legal counsel, and that each knowingly and voluntarily waives its jury trial rights following consultation with legal counsel. In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

**12S.    Confidential Information**. For the purposes of this paragraph 12S, "Confidential Information" means information delivered, whether to any holder or to any financial advisor retained by special counsel to the holders, by or on behalf of the Company, any Subsidiary, the Guarantor or Lee in connection with the transactions contemplated by or otherwise pursuant to this Agreement that is proprietary in nature and that was clearly marked or labeled or otherwise adequately identified when received by such holder or financial advisor as being confidential information of the Company, such Subsidiary, the Guarantor or Lee, provided that such term does not include information that (a) was publicly known or otherwise known to such holder prior to the time of such disclosure, (b) subsequently becomes publicly known through no act or omission by such holder or any person acting on such holder's behalf, (c) otherwise becomes known to such holder other than through disclosure by any such financial advisor or by the Company, any Subsidiary, the Guarantor or Lee or (d) constitutes financial statements that are otherwise publicly available. Each holder will maintain the confidentiality of such Confidential Information delivered to it in accordance with procedures adopted by such holder in good faith to protect confidential information of third parties delivered to such holder, provided that such holder may deliver or disclose Confidential Information described in clause (x) above following the termination of the engagement of such financial advisor and may deliver or disclose Confidential Information described in clause (x) or (y) above to (i) its directors, officers, employees, agents, attorneys, trustees and affiliates (to the extent such disclosure reasonably relates to the administration of the investment represented by its Notes), (ii) its financial advisors and other professional advisors who agree to hold confidential the Confidential Information substantially in accordance with the terms of this paragraph 12S, (iii) any other holder of any Note, (iv) any Institutional Investor to which it sells or offers to sell such Note or any part thereof or any participation therein (if such Person has agreed in writing prior to its receipt of such Confidential Information to be bound by the provisions of this paragraph 12S), (v) any Person from which it offers to purchase any security of the Company, the Guarantor or Lee (if such Person has agreed in writing prior to its receipt of such Confidential Information to be bound by the provisions of this paragraph 12S), (vi) any federal or state regulatory authority having jurisdiction over such holder, (vii) the NAIC or the SVO or, in each case, any similar organization, or any nationally recognized rating agency that requires access to information about such holder's investment portfolio, or (viii) any other Person to which such delivery or disclosure may be necessary or appropriate (w) to effect compliance with any law, rule, regulation or order applicable to such holder, (x) in response to any subpoena or other legal process, (y) in connection with any litigation to which such holder is a party or (z) if an Event of

Default has occurred and is continuing, to the extent such holder may reasonably determine such delivery and disclosure to be necessary or appropriate in the enforcement or for the protection of the rights and remedies under such holder's Notes, this Agreement, the Guaranty Agreement or any other Transaction Document or any document relating hereto or thereto.  Each holder of a Note, by its acceptance of a Note, will be deemed to have agreed to be bound by and to be entitled to the benefits of this paragraph 12S as though it were a party to this Agreement.  On reasonable request by the Company in connection with the delivery to any holder of a Note of information required to be delivered to such holder under this Agreement or requested by such holder (other than a holder that is a party to this Agreement or its nominees), such holder will enter into an agreement with the Company embodying the provisions of this paragraph 12S.

*[Remainder of Page Intentionally Left Blank; Signature Pages Follow]*

A/74565634.14

Please sign the form of acceptance on the enclosed counterpart of this letter and return the same to the Company, whereupon this letter shall become a binding agreement between the Company and each Purchaser.

Very truly yours,

**ST. LOUIS POST-DISPATCH LLC**
By:    Pulitzer Inc., Managing Member

By:_____
Name: Carl G. Schmidt
Title:   Treasurer

The foregoing Agreement is
hereby accepted as of the
date first above written.

**THE PRUDENTIAL INSURANCE COMPANY**
   **OF AMERICA**


By:_____
Name:
Title:    Vice President


**PRUCO LIFE INSURANCE COMPANY**


By:_____
Name:
Title:    Assistant Vice President


**PRUDENTIAL ANNUITIES LIFE ASSURANCE**
   **CORPORATION**

By:    Prudential Investment Management, Inc.,
       as investment manager


       By:_____
       Name:
       Title:   Vice President


**FERRY STREET I LLC**

By:    Prudential Investment Management, Inc.,
       as collateral manager


       By:_____
       Name:
       Title:   Vice President

**PACIFIC LIFE INSURANCE COMPANY**


By:_____
Name:
Title:


By:_____
Name:
Title:

**TCM MPS SERIES FUND LP – Partners Series**
By:      Troob Capital Management LLC, as general partner


By:_____
Name:
Title:


**TCM MPS LTD SPC – Partners Segregated Portfolio**


By:_____
Name:
Title:


**ARCHVIEW INVESTMENT GROUP L.P.**
on behalf of, and acting solely in its capacity as
investment manager to, **ARCHVIEW FUND L.P.** and
**ARCHVIEW MASTER FUND LTD.**


By:_____
Name:
Title:

**MARBLEGATE SPECIAL OPPORTUNITIES
MASTER FUND LP**

By:     Marblegate Asset Management LLC,
        its Investment Manager


        By: _____
        Name: Andrew Milgram
        Title:   Managing Partner


**DEUTSCHE BANK SECURITIES INC.**


By:_____
Name:
Title:


**MONARCH MASTER FUNDING LTD**

By:     Monarch Alternative Capital LP
Its:    Advisor


        By:_____
        Name:
        Title:

## SCHEDULE A

## PURCHASER SCHEDULE

|  | Aggregate Principal Amount of Notes to be Purchased | Note Registration Number(s); Note Denomination(s) |
|---|---|---|
| **THE PRUDENTIAL INSURANCE COMPANY OF AMERICA** | $[_____] | R-[_]; $[_____] |

(1)   All payments on account of Notes held by such purchaser shall be made by wire transfer of immediately available funds for credit to:

JPMorgan Chase Bank
New York, NY
ABA No.:  021-000-021
Account Name:  Prudential Managed Portfolio
Account No.:  P86188 (please do not include spaces)

Each such wire transfer shall set forth the name of the Company, a reference to "Adjustable Rate Senior Notes Due December 31, 2015, Security No. INV 07057, PPN 85229* AC0" and the due date and application (as among principal, interest and Yield-Maintenance Amount) of the payment being made.

(2)   Address for all notices relating to payments:

The Prudential Insurance Company of America
c/o Investment Operations Group
Gateway Center Two, 10th Floor
100 Mulberry Street
Newark, New Jersey 07102-4077
Facsimile:         888-889-3837
Attention:         Manager, Billings and Collections

(3)   Address for all other communications and notices:

The Prudential Insurance Company of America
c/o Prudential Capital Group
2200 Ross Avenue, Suite 4200E
Dallas, Texas 75201
Telephone:  214-720-6200
Facsimile:  214-720-6299
Email:  pcg.dallas@prudential.com
Attention:         Managing Director, Energy and Corporate
                          Finance

(4)   Recipient of telephonic prepayment notices:

Telephone:         973-367-3141

Schedule A-1

Facsimile:        888-889-3832
Attention:        Manager, Trade Management Group

(5)    Instructions re: delivery of Notes:

Send physical security by nationwide overnight delivery service
to:

Prudential Capital Group – Law Department
2200 Ross Avenue, Suite 4200E
Dallas, Texas 75201

Attention:        William H. Bulmer,
                  Vice President & Corporate Counsel
Telephone:        214-720-6204

(6)    Tax Identification No.:  22-1211670

(7)    Signature Block:

THE PRUDENTIAL INSURANCE COMPANY
 OF AMERICA


By: _____
Name:
Title:    Vice President

Schedule A-2

| | Aggregate Principal Amount of Notes to be Purchased | Note Registration Number(s); Note Denomination(s) |
|---|---|---|
| **THE PRUDENTIAL INSURANCE COMPANY OF AMERICA** | $[_____] | R-[_]; $[_____] |

(1) All payments on account of Notes held by such purchaser shall be made by wire transfer of immediately available funds for credit to:

JPMorgan Chase Bank
New York, NY
ABA No.:  021-000-021
Account Name:  Privest Plus
Account No.:  P86288 (please do not include spaces)

Each such wire transfer shall set forth the name of the Company, a reference to "Adjustable Rate Senior Notes Due December 31, 2015, Security No. INV 07057, PPN 85229* AC0" and the due date and application (as among principal, interest and Yield-Maintenance Amount) of the payment being made.

(2) Address for all notices relating to payments:

The Prudential Insurance Company of America
c/o Investment Operations Group
Gateway Center Two, 10th Floor
100 Mulberry Street
Newark, New Jersey 07102-4077
Facsimile:        888-889-3837
Attention:        Manager, Billings and Collections

(3) Address for all other communications and notices:

The Prudential Insurance Company of America
c/o Prudential Capital Group
2200 Ross Avenue, Suite 4200E
Dallas, Texas 75201
Telephone:  214-720-6200
Facsimile:  214-720-6299
Email:  pcg.dallas@prudential.com
Attention:        Managing Director, Energy and Corporate
                       Finance

(4) Recipient of telephonic prepayment notices:

Telephone:        973-367-3141
Facsimile:        888-889-3832
Attention:        Manager, Trade Management Group

Schedule A-3

(5)    Instructions re: delivery of Notes:

Send physical security by nationwide overnight delivery service
to:

Prudential Capital Group – Law Department
2200 Ross Avenue, Suite 4200E
Dallas, Texas 75201

Attention:        William H. Bulmer,
                  Vice President & Corporate Counsel
Telephone:        214-720-6204

(6)    Tax Identification No.:  22-1211670

(7)    Signature Block:

THE PRUDENTIAL INSURANCE COMPANY
 OF AMERICA


By: _____
Name:
Title:     Vice President

Schedule A-4

|  | Aggregate Principal Amount of Notes to be Purchased | Note Registration Number(s); Note Denomination(s) |
|---|---|---|
| **PRUCO LIFE INSURANCE COMPANY** | $[_____] | R-[_]; $[_____] |

(1) All payments on account of Notes held by such purchaser shall be made by wire transfer of immediately available funds for credit to:

JPMorgan Chase Bank
New York, NY
ABA No.: 021-000-021
Account Name:  Pruco Life Private Placement
Account No.: P86192 (please do not include spaces)

Each such wire transfer shall set forth the name of the Company, a reference to "Adjustable Rate Senior Notes Due December 31, 2015, Security No. INV 07057 PPN 85229* AC0" and the due date and application (as among principal, interest and Yield-Maintenance Amount) of the payment being made.

(2) Address for all notices relating to payments:

Pruco Life Insurance Company
c/o The Prudential Insurance Company of America
c/o Investment Operations Group
Gateway Center Two, 10th Floor
100 Mulberry Street
Newark, New Jersey 07102-4077
Facsimile:        888-889-3837
Attention:        Manager, Billings and Collections

(3) Address for all other communications and notices:

Pruco Life Insurance Company
c/o Prudential Capital Group
2200 Ross Avenue, Suite 4200E
Dallas, Texas 75201
Telephone:  214-720-6200
Facsimile:   214-720-6299
Email:  pcg.dallas@prudential.com
Attention:        Managing Director, Energy and Corporate
                         Finance

(4) Recipient of telephonic prepayment notices:

Telephone:        973-367-3141
Facsimile:        888-889-3832
Attention:        Manager, Trade Management Group

Schedule A-5

(5)    Instructions re: delivery of Notes:

Send physical security by nationwide overnight delivery service
to:

Prudential Capital Group – Law Department
2200 Ross Avenue, Suite 4200E
Dallas, Texas 75201

Attention:        William H. Bulmer,
                  Vice President & Corporate Counsel
Telephone:        214-720-6204

(6)    Tax Identification No.:  22-1944557

(7)    Signature Block:

PRUCO LIFE INSURANCE COMPANY


By: _____
Name:
Title:    Assistant Vice President

Schedule A-6

|  | Aggregate Principal Amount of Notes to be Purchased | Note Registration Number(s); Note Denomination(s) |
|---|---|---|
| **PRUDENTIAL ANNUITIES LIFE ASSURANCE CORPORATION** | $[_____] | R-[_]; $[_____] |

(1)    All payments on account of Notes held by such purchaser shall be made by wire transfer of immediately available funds for credit to:

JPMorgan Chase Bank
New York, NY
ABA No.:  021-000-021
Account Name:  Prudential Annuities Life Assurance Corporation
Account No.:  P01309 (please do not include spaces)

Each such wire transfer shall set forth the name of the Company, a reference to "Adjustable Rate Senior Notes Due December 31, 2015, Security No. INV 07057 PPN 85229* AC0" and the due date and application (as among principal, interest and Yield-Maintenance Amount) of the payment being made.

(2)    Address for all notices relating to payments:

Prudential Annuities Life Assurance Corporation
c/o The Prudential Insurance Company of America
c/o Investment Operations Group
Gateway Center Two, 10th Floor
100 Mulberry Street
Newark, New Jersey 07102-4077
Facsimile:         888-889-3837
Attention:  Manager, Billings and Collections

(3)    Address for all other communications and notices:

Prudential Annuities Life Assurance Corporation
c/o Prudential Capital Group
2200 Ross Avenue, Suite 4200E
Dallas, Texas 75201
Telephone:  214-720-6200
Facsimile:  214-720-6299
Email:  pcg.dallas@prudential.com
Attention:         Managing Director, Energy and Corporate
                         Finance

(4)    Recipient of telephonic prepayment notices:

Telephone:         973-367-3141
Facsimile:         888-889-3832

Schedule A-7

Attention:          Manager, Trade Management Group

(5)    Instructions re: delivery of Notes:

Send physical security by nationwide overnight delivery service to:

Prudential Capital Group – Law Department
2200 Ross Avenue, Suite 4200E
Dallas, Texas 75201

Attention:          William H. Bulmer,
                    Vice President & Corporate Counsel
Telephone:          214-720-6204

(6)    Tax Identification No.:  06-1241288

(7)    Signature Block:

PRUDENTIAL ANNUITIES LIFE ASSURANCE
  CORPORATION

By:    Prudential Investment Management, Inc.,
       as investment manager

       By: _____
       Name:
       Title:      Vice President

Schedule A-8

|  | Aggregate Principal Amount of Notes to be Purchased | Note Registration Number(s); Note Denomination(s) |
|---|---|---|
| **FERRY STREET I LLC** | $[_____] | R-[_]; $[_____] |

(1) All payments on account of Notes held by such purchaser shall be made by wire transfer of immediately available funds for credit to:

The Bank of New York Mellon
New York, NY
ABA No.: 021-000-018
Account Name:  Ferry Street I LLC
Account No.:  211551
For further credit to Account No.:  TAS153667

Each such wire transfer shall set forth the name of the Company, a reference to "Adjustable Rate Senior Notes Due December 31, 2015, Security No. INV 07057 PPN 85229* AC0" and the due date and application (as among principal, interest and Yield-Maintenance Amount) of the payment being made.

(2) Address for all notices relating to payments:

Ferry Street I LLC
c/o The Bank of New York Mellon
One Wall Street
3rd Floor, Window A
New York, New York 10286
Attention:  Anthony V. Saviano / Ada Casiano
Telephone:  (212) 635-6764 / (212) 635-1921

With copy to:

Ferry Street I LLC
c/o Prudential Investment Management, Inc.
c/o Private Investment Operations - Private Accounting
Gateway Center Two, 10th Floor
100 Mulberry Street
Newark, New Jersey 07102-4077
Facsimile:         888-889-3837
Attention:         Manager

(3) Address for all other communications and notices:

Ferry Street I LLC
c/o Prudential Investment Management, Inc.
c/o Prudential Capital Group
2200 Ross Avenue, Suite 4200E
Dallas, Texas 75201

Schedule A-9

Telephone:  214-720-6200
Facsimile:  214-720-6299
Email:  pcg.dallas@prudential.com
Attention:        Managing Director, Energy and Corporate
                  Finance

(4)    Instructions re: delivery of Notes:

Send physical security by nationwide overnight delivery service
to:

(a)    The Bank of New York Mellon
       One Wall Street
       3rd Floor, Window A
       New York, New York 10286

       Attention:  Anthony V. Saviano / Ada Casiano
       Telephone:  (212) 635-6764 / (212) 635-1921
       Account Name:  Ferry Street I LLC
       TAS Account:  153672
       Registration 10 / DNC

(b)    Send copy by nationwide overnight delivery service to:

       Prudential Financial, Inc.
       Trade Management
       Gateway Center 4, 7th Floor
       100 Mulberry Street
       Newark, New Jersey 07102

       Attention:  Manager
       Telephone:  (973) 367-3141

       and

       Prudential Capital Group – Law Department
       2200 Ross Avenue, Suite 4200E
       Dallas, Texas 75201

       Attention:        William H. Bulmer,
                         Vice President & Corporate Counsel
       Telephone:        214-720-6204

(5)    Tax Identification No.: 32-0295275

(6)    Signature Block:

FERRY STREET I LLC

By:    Prudential Investment Management, Inc.,
       as collateral manager

       By: _____
       Name:
       Title:      Vice President

<div align="center">Schedule A-10</div>

|  | **Aggregate Principal Amount of Notes to be Purchased** | **Note Registration Number(s); Note Denomination(s)** |
|---|---|---|
| **MARBLEGATE SPECIAL OPPORTUNITIES MASTER FUND LP** | $[_____] | R-[_]; $[_____] |

(1)   All payments on account of Notes held by such purchaser shall be made by wire transfer of immediately available funds for credit to:

JPMorgan Chase
383 Madison Avenue New York, NY 10179
ABA No.:  021000021
Account Name:  JPMCC
Account No.:  066001633
F/F/C: Marblegate Special Opportunities Master Fund LP
Account No.: 10238972

Each such wire transfer shall set forth the name of the Company, a reference to "Adjustable Rate Senior Notes Due December 31, 2015, PPN 85229* AC0" and the due date and application (as among principal, interest and Yield-Maintenance Amount) of the payment being made.

(2)   Address for all notices relating to payments:

Mark Zoldan
Marblegate Asset Management LLC
80 Field Point Road, Suite 101
Greenwich, CT 06830
Telephone:          203-413-6902
Facsimile:          203-413-6938
Email:   mark@marblegate.com
Attention:          Mark Zoldan

(3)   Address for all other communications and notices:

Jared Golub
Marblegate Asset Management LLC
80 Field Point Road, Suite 101
Greenwich, CT 06830
Telephone:          203-413-6903
Facsimile:          203-413-6938
Email:   jared@marblegate.com
Attention:          Jared Golub

(4)   Recipient of telephonic prepayment notices:

Telephone:          203-413-6902
Facsimile:          203-413-6938

Schedule A-11

Attention:     Mark Zoldan

(5)    Instructions re: delivery of Notes:

Send physical security by nationwide overnight delivery service to:

Mark Zoldan
Marblegate Asset Management LLC
80 Field Point Road, Suite 101
Greenwich, CT 06830
Telephone:     203-413-6902
Facsimile:     203-413-6938
Email:  mark@marblegate.com
Attention:     Mark Zoldan

(6)    Tax Identification No.:  98-0600195

(7)    Signature Block:

MARBLEGATE SPECIAL OPPORTUNITIES MASTER
  FUND LP
By:    Marblegate Asset Management LLC,
       its Investment Manager

By: _____
Name:    Andrew Milgram
Title:    Managing Partner

Schedule A-12

|  | Aggregate Principal Amount of Notes to be Purchased | Note Registration Number(s); Note Denomination(s) |
|---|---|---|
| **PACIFIC LIFE INSURANCE COMPANY** | $[_____] | R-[_];<br>$[_____] |

**Name in which to register Notes:  MAC & CO., as nominee for PACIFIC LIFE INSURANCE COMPANY**

(1) All payments on account of Notes held by such purchaser shall be made by wire transfer of immediately available funds for credit to:

Mellon Trust of New England
ABA#:  011001234
DDA:  0000125261
Attn:  MBS Income CC:  1253
A/C Name:  General Account/PLCF18101302

Each such wire transfer shall set forth the name of the Company, a reference to "Adjustable Rate Senior Notes Due December 31, 2015, PPN 85229* AC0" and the due date and application (as among principal, interest and Yield-Maintenance Amount) of the payment being made.

(2) Address for all notices relating to payments and written confirmations of such wire transfers:

Mellon Trust
Attn:  Pacific Life Accounting Team
One Mellon Bank Center
Room 0930
Pittsburgh, PA  15259

and

Pacific Life Insurance Company
Attn:  IM – Cash Team
700 Newport Center Drive
Newport Beach, CA  92660-6397
Facsimile:          949-718-5845

(3) Address for all other communications and notices:

Pacific Life Insurance Company
Attn:  IM – Credit Analysis
700 Newport Center Drive
Newport Beach, CA  92660-6397
Facsimile:          949-219-5406

(4) Recipient of telephonic prepayment notices:

Schedule A-13

Telephone:     949-219-3334
Facsimile:     949-718-5845
Attention:     Karen Carnemolla

(5)    Instructions re: delivery of Notes:

Send physical security by nationwide overnight delivery service to:

Mellon Securities Trust Company
One Wall Street
3rd Floor-Receive Window C
New York, NY 10286
A/C Name:  General Account
A/C#:  PLCF18101302
Attention:     Robert Ferraro
Telephone:     212-635-1299

(6)    Tax Identification No.:  95-1079000

(7)    Signature Block:

PACIFIC LIFE INSURANCE COMPANY

By:_____
Name:
Title:

By:_____
Name:
Title:

Schedule A-14

|  | Aggregate Principal Amount of Notes to be Purchased | Note Registration Number(s); Note Denomination(s) |
|---|---|---|
| **ARCHVIEW FUND L.P.** | $[_____] | R-[_]; $[_____] |

**Name in which to register Notes:  GOLDMAN SACHS & CO.**

(1)    All payments on account of Notes held by such purchaser shall be made by wire transfer of immediately available funds for credit to:

JPMorgan Chase Bank, New York
ABA # 021000021
Goldman Sachs and Company, New York
Account # 9301011483
Attn: Fixed Income Asset Servicing
For St. Louis-Post Dispatch LLC Notes

Each such wire transfer shall set forth the name of the Company, a reference to "Adjustable Rate Senior Notes Due December 31, 2015, PPN 85229* AC0" and the due date and application (as among principal, interest and Yield-Maintenance Amount) of the payment being made.

(2)    Address for all notices relating to payments:

Michael Triolo
Director of Operations
Archview Investment Group
70 East 55th Street, 14th Floor
New York, NY 10022
Telephone:      212-728-2550
Facsimile:      212-728-2599
Email:   notices@archviewlp.com
Attention:       Michael Triolo

(3)    Address for all other communications and notices:

Michael Triolo
Director of Operations
Archview Investment Group
70 East 55th Street, 14th Floor
New York, NY 10022
Telephone:      212-728-2550
Facsimile:      212-728-2599
Email:   notices@archviewlp.com
Attention:       Michael Triolo

(4)    Recipient of telephonic prepayment notices:

Schedule A-15

Telephone:       212-728-2550
Facsimile:        212-728-2599
Attention:        Michael Triolo

(5)     Instructions re: delivery of Notes:

Send physical security by nationwide overnight delivery service
to:

Goldman Sachs & Co. – Prime Brokerage
200 West Street, 3rd Floor
New York, NY 10282
Attention:        Michael Arciero
Telephone:       212-357-8826

(6)     Tax Identification No.:  26-4033511

(7)     Signature Block:

ARCHVIEW INVESTMENT GROUP L.P.
on behalf of, and acting solely in its capacity as
investment manager to, ARCHVIEW FUND L.P. and
ARCHVIEW MASTER FUND LTD.


By:_____
Name:
Title:

Schedule A-16

| | Aggregate Principal Amount of Notes to be Purchased | Note Registration Number(s); Note Denomination(s) |
|---|---|---|
| **ARCHVIEW MASTER FUND LTD.** | $[_____] | R-[\_]; $[_____] |

**Name in which to register Notes:  GOLDMAN SACHS & CO.**

(1)    All payments on account of Notes held by such purchaser shall be made by wire transfer of immediately available funds for credit to:

JPMorgan Chase Bank, New York
ABA # 021000021
Goldman Sachs and Company, New York
Account # 9301011483
Attn: Fixed Income Asset Servicing
For St. Louis-Post Dispatch LLC Notes

Each such wire transfer shall set forth the name of the Company, a reference to "Adjustable Rate Senior Notes Due December 31, 2015, PPN 85229* AC0" and the due date and application (as among principal, interest and Yield-Maintenance Amount) of the payment being made.

(2)    Address for all notices relating to payments:

Michael Triolo
Director of Operations
Archview Investment Group
70 East 55th Street, 14th Floor
New York, NY 10022
Telephone:        212-728-2550
Facsimile:        212-728-2599
Email:    notices@archviewlp.com
Attention:        Michael Triolo

(3)    Address for all other communications and notices:

Michael Triolo
Director of Operations
Archview Investment Group
70 East 55th Street, 14th Floor
New York, NY 10022
Telephone:        212-728-2550
Facsimile:        212-728-2599
Email:    notices@archviewlp.com
Attention:        Michael Triolo

(4)    Recipient of telephonic prepayment notices:

Schedule A-17

Telephone:      212-728-2550
Facsimile:       212-728-2599
Attention:       Michael Triolo

(5)     Instructions re: delivery of Notes:

Send physical security by nationwide overnight delivery service to:

Goldman Sachs & Co. – Prime Brokerage
200 West Street, 3rd Floor
New York, NY 10282
Attention:      Michael Arciero
Telephone:     212-357-8826

(6)     Tax Identification No.: 98-0607838

(7)     Signature Block:

ARCHVIEW INVESTMENT GROUP L.P.
on behalf of, and acting solely in its capacity as
investment manager to, ARCHVIEW FUND L.P. and
ARCHVIEW MASTER FUND LTD.


By:_____
Name:
Title:

|  | **Aggregate Principal Amount of Notes to be Purchased** | **Note Registration Number(s); Note Denomination(s)** |
|---|---|---|
| **TCM MPS SERIES FUND LP – Partners Series** | $[_____] | R-[_]; $[_____] |

(1) All payments on account of Notes held by such purchaser shall be made by wire transfer of immediately available funds for credit to:

JP Morgan Chase
New York, NY
ABA No.: 021000021
Account Name: JPMCC
Account No.: 066001633
FFC: TCM MPS Series Fund LP – Partners Series
FFC Account No.: 102-36342-21

Each such wire transfer shall set forth the name of the Company, a reference to "Adjustable Rate Senior Notes Due December 31, 2015, PPN 85229* AC0" and the due date and application (as among principal, interest and Yield-Maintenance Amount) of the payment being made.

(2) Address for all notices relating to payments:

Troob Capital Management LLC
777 Westchester Avenue, Suite 203
White Plains, NY 10604
Telephone: 914-694-5777
Facsimile: 914-694-5775
Email: Spahrmann@Troobcapital.com
Attention: Anita Spahrmann
Email: Wolford@Troobcapital.com
Attention: Shane Wolford

(3) Address for all other communications and notices:

Troob Capital Management LLC
777 Westchester Avenue, Suite 203
White Plains, NY 10604
Telephone: 914-694-5777
Facsimile: 914-694-5775
Email: Spahrmann@Troobcapital.com
Attention: Anita Spahrmann
Email: Wolford@Troobcapital.com
Attention: Shane Wolford

(4) Recipient of telephonic prepayment notices:

Schedule A-19

Telephone: 914-694-5777
Facsimile: 914-694-5775
Attention: Anita Spahrmann

(5)    Instructions re: delivery of Notes:

Send physical security by nationwide overnight delivery service to:

Troob Capital Management LLC
777 Westchester Avenue, Suite 203
White Plains, NY  10604
Attention: Anita Spahrmann
Telephone: 914-694-5777

(6)    Tax Identification No.:  20-5535986

(7)    Signature Block:

TCM MPS SERIES FUND LP – Partners Series
By:      Troob Capital Management LLC, as general partner


By:_____
Name:
Title:

Schedule A-20

|  | Aggregate Principal Amount of Notes to be Purchased | Note Registration Number(s); Note Denomination(s) |
|---|---|---|
| **TCM MPS LTD SPC –Partners Segregated Portfolio** | $[_____] | R-[_]; $[_____] |

(1)    All payments on account of Notes held by such purchaser shall be made by wire transfer of immediately available funds for credit to:

JP Morgan Chase
New York, NY
ABA No.: 021000021
Account Name: JPMCC
Account No.: 066001633
FFC: TCM MPS Ltd SPC – Partners Segregated Portfolio
FFC Account No.: 102-31685-27

Each such wire transfer shall set forth the name of the Company, a reference to "Adjustable Rate Senior Notes Due December 31, 2015, PPN 85229* AC0" and the due date and application (as among principal, interest and Yield-Maintenance Amount) of the payment being made.

(2)    Address for all notices relating to payments:

Troob Capital Management LLC
777 Westchester Avenue, Suite 203
White Plains, NY  10604
Telephone: 914-694-5777
Facsimile: 914-694-5775
Email: Spahrmann@Troobcapital.com
Attention: Anita Spahrmann
Email: Wolford@Troobcapital.com
Attention: Shane Wolford

(3)    Address for all other communications and notices:

Troob Capital Management LLC
777 Westchester Avenue, Suite 203
White Plains, NY  10604
Telephone: 914-694-5777
Facsimile: 914-694-5775
Email: Spahrmann@Troobcapital.com
Attention: Anita Spahrmann
Email: Wolford@Troobcapital.com
Attention: Shane Wolford

(4)    Recipient of telephonic prepayment notices:

Telephone: 914-694-5777

Schedule A-21

A/74565634.14

Facsimile: 914-694-5775
Attention: Anita Spahrmann

(5)     Instructions re: delivery of Notes:

Send physical security by nationwide overnight delivery service
to:

Troob Capital Management LLC
777 Westchester Avenue, Suite 203
White Plains, NY  10604
Attention: Anita Spahrmann
Telephone: 914-694-5777

(6)     Tax Identification No.:  Offshore Fund/No Tax ID number

(7)     Signature Block:

TCM MPS LTD SPC – Partners Segregated Portfolio


By:_____
Name:
Title:

Schedule A-22

|  | **Aggregate Principal Amount of Notes to be Purchased** | **Note Registration Number(s); Note Denomination(s)** |
|---|---|---|
| **[DEUTSCHE BANK SECURITIES INC.]** | $[_____] | R-[_]; $[_____] |

(1)     All payments on account of Notes held by such purchaser shall be made by wire transfer of immediately available funds for credit to:

[Bank Name]
[Bank Address]
ABA No.: [_____]
Account Name: [_____]
Account No.: [_____]

Each such wire transfer shall set forth the name of the Company, a reference to "Adjustable Rate Senior Notes Due December 31, 2015, PPN 85229* AC0" and the due date and application (as among principal, interest and Yield-Maintenance Amount) of the payment being made.

(2)     Address for all notices relating to payments:

[_____]
[_____]
Telephone:        [_____]
Facsimile:        [_____]
Email:   [_____]
Attention:        [_____]

(3)     Address for all other communications and notices:

[_____]
[_____]
Telephone:        [_____]
Facsimile:        [_____]
Email:   [_____]
Attention:        [_____]

(4)     Recipient of telephonic prepayment notices:

Telephone:        [_____]
Facsimile:        [_____]
Attention:        [_____]

Schedule A-23

(5)    Instructions re: delivery of Notes:

Send physical security by nationwide overnight delivery service
to:

[_____]
[_____]

Attention:          [_____]
Telephone:         [_____]

(6)    Tax Identification No.:  [_____]

(7)    Signature Block:

DEUTSCHE BANK SECURITIES INC.

By:_____
Name:
Title:

Schedule A-24

|  | **Aggregate Principal Amount of Notes to be Purchased** | **Note Registration Number(s); Note Denomination(s)** |
|---|---|---|
| **MONARCH MASTER FUNDING LTD** | $[_____] | R-[_];<br>$[_____] |

(1)  All payments on account of Notes held by such purchaser shall be made by wire transfer of immediately available funds for credit to:

Chase Manhattan Bank, N.Y.
ABA# 021-000-021
A/C Name: Monarch Master Funding Ltd
A/C# 739-152-610
Ref: St. Louis Post-Dispatch LLC

Each such wire transfer shall set forth the name of the Company, a reference to "Adjustable Rate Senior Notes Due December 31, 2015, PPN 85229* AC0" and the due date and application (as among principal, interest and Yield-Maintenance Amount) of the payment being made.

(2)  Address for all notices relating to payments:

Monarch Master Funding Ltd
c/o Monarch Alternative Capital LP
535 Madison Avenue 26th Floor
New York, NY 10022
Telephone:       (212) 554-1743
Facsimile:       (866) 741-3564
Email:   michael.gillin@monarchlp.com;
fundops@monarchlp.com
Attention:       Michael Gillin

(3)  Address for all other communications and notices:

Monarch Master Funding Ltd
c/o Monarch Alternative Capital LP
535 Madison Avenue 26th Floor
New York, NY 10022
Telephone:       (212) 554-1743
Facsimile:       (866) 741-3564
Email:   michael.gillin@monarchlp.com;
fundops@monarchlp.com
Attention:       Michael Gillin

(4)  Recipient of telephonic prepayment notices:

Telephone:       (212) 554-1743
Facsimile:       (866) 741-3564
Attention:       Michael Gillin

Schedule A-25

(5)    Instructions re: delivery of Notes:

Send physical security by nationwide overnight delivery service to:

Monarch Master Funding Ltd
c/o Monarch Alternative Capital LP
535 Madison Avenue 26th Floor
New York, NY 10022
Attention:        Michael Gillin
Telephone:       (212) 554-1743

(6)    Tax Identification No.:  20-0192628

(7)    Signature Block:

MONARCH MASTER FUNDING LTD
By:      Monarch Alternative Capital LP
Its:      Advisor

By:_____
Name:
Title:

Schedule A-26

**SCHEDULE 9C**

**LITIGATION**

A/74565634.14

**SCHEDULE 9D**

**OUTSTANDING DEBT**

A/74565634.14

# SCHEDULE 9F

# AGREEMENTS RESTRICTING INCURRENCE OF DEBT

# SCHEDULE 9H

# ERISA

# SCHEDULE 9M

## SUBSIDIARIES OF THE COMPANY AND
## OWNERSHIP OF SUBSIDIARY STOCK

A/74565634.14

<u>EXHIBIT A</u>

[FORM OF NOTE]

## ST. LOUIS POST-DISPATCH LLC

ADJUSTABLE RATE SENIOR NOTE DUE DECEMBER 31, 2015

No. _____                                                    **[Date]**
$_____                                                     PPN 85229* AC0

        FOR VALUE RECEIVED, the undersigned, ST. LOUIS POST-DISPATCH LLC (the "**Company**"), a limited liability company organized and existing under the laws of the State of Delaware, hereby promises to pay to _____, or registered assigns, the principal sum of _____ DOLLARS on December 31, 2015, with interest (computed on the basis of a 360-day year of 30 day months) (a) on the unpaid balance hereof (i) at the rate of 10.55% per annum on and after the date hereof to, but not including, January 1, 2013, (ii) at the rate of 11.30% per annum on and after January 1, 2013 to, but not including, January 1, 2014, (iii) at the rate of 12.05% per annum on and after January 1, 2014 to, but not including, January 1, 2015 and (iv) at the rate of 12.80% per annum at all times thereafter, such interest to accrue from the date hereof and to be payable quarterly on the 20th day of March, June, September and December in each year, commencing with the March, June, September or December next succeeding the date hereof, until the principal hereof shall have become due and payable, and (b) to the extent permitted by law, on any overdue payment of interest and, during the continuance of an Event of Default (as defined in the Note Agreement referred to below), on such unpaid balance and on any overdue payment of any Yield-Maintenance Amount (as defined in the Note Agreement referred to below), payable quarterly as aforesaid (or, at the option of the registered holder hereof, on demand), at a rate per annum from time to time equal to the greater of (i) 2.0% above the interest rate otherwise in effect at such time pursuant to the foregoing clause (a) or (ii) 2.0% over the rate of interest publicly announced by The Bank of New York Mellon Corporation from time to time in New York City as its prime rate.

        Payments of principal of, interest on and any Yield-Maintenance Amount payable with respect to this Note are to be made at the main office of The Bank of New York Mellon Corporation in New York City or at such other place as the holder hereof shall designate to the Company in writing, in lawful money of the United States of America.

        This Note is one of a series of Senior Notes (the "**Notes**") issued pursuant to a Note Agreement, dated as of [_____] (the "**Agreement**"), among the Company and the holders of the Notes named in Schedule A attached thereto and is entitled to the benefits thereof and to the benefits of the Guaranty Agreement (as defined in the Agreement). Each holder of this Note will be deemed, by its acceptance hereof, to have made the representation set forth in paragraph 10B

Exhibit A-1

of the Agreement on the date of its purchase of this Note with respect to the source of the funds used by it to purchase this Note.

Payment of the principal of, and interest and any Yield-Maintenance Amount on, this Note has been guaranteed by Pulitzer Inc. pursuant to the Guaranty Agreement and by certain Subsidiaries of the Company pursuant to the Subsidiary Guaranty Agreement. This Note is secured by, and entitled to the benefits of, the Collateral Documents.

This Note is a registered Note and, as provided in the Agreement, upon surrender of this Note for registration of transfer, duly endorsed, or accompanied by a written instrument of transfer duly executed, by the registered holder hereof or such holder's attorney duly authorized in writing, a new Note for a like principal amount will be issued to, and registered in the name of, the transferee. Prior to due presentment for registration of transfer, the Company may treat the person in whose name this Note is registered as the owner hereof for the purpose of receiving payment and for all other purposes, and the Company shall not be affected by any notice to the contrary.

This Note is subject to optional prepayment, in whole or from time to time in part, on the terms specified in the Agreement.

In case an Event of Default, as defined in the Agreement, shall occur and be continuing, the principal of this Note may be declared or otherwise become due and payable in the manner and with the effect provided in the Agreement.

THIS NOTE IS INTENDED TO BE PERFORMED IN THE STATE OF NEW YORK AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAW OF SUCH STATE.

**ST. LOUIS POST-DISPATCH LLC**
By:     Pulitzer Inc., Managing Member


By:_____
Name: Carl G. Schmidt
Title:   Treasurer

A/74565634.14

EXHIBIT B

[FORM OF GUARANTY AGREEMENT]

Exhibit B

Bingham Draft
12/1/11

**PULITZER INC.**

—————————

**GUARANTY AGREEMENT**

—————————

**Dated as of [_____]**

## TABLE OF CONTENTS

Page

1.  **DEFINED TERMS; ACCOUNTING MATTERS** ...................................................... 2
    1.1.  Defined Terms ................................................................................. 2
    1.2.  Accounting and Legal Principles, Terms and Determinations ............................ 9

2.  **GUARANTY** ................................................................................. 9
    2.1.  Guaranty .................................................................................. 9
    2.2.  Guaranty of Payment and Performance ....................................................... 10
    2.3.  General Provisions Relating to the Guaranty ............................................... 10

3.  **REPRESENTATIONS AND WARRANTIES** ............................................................ 15
    3.1.   Organization and Qualification; Due Authorization ........................................ 15
    3.2.   Material Adverse Change ................................................................. 15
    3.3.   Litigation; Observance of Agreements, Statutes and Orders ............................... 15
    3.4.   Outstanding Debt ........................................................................ 16
    3.5.   Title to Properties ..................................................................... 16
    3.6.   Taxes ................................................................................... 16
    3.7.   Conflicting Agreements and Other Matters ................................................ 17
    3.8.   ERISA ................................................................................... 17
    3.9.   Governmental Authorizations, Etc. ....................................................... 18
    3.10.  Disclosure .............................................................................. 18
    3.11.  Solvency ................................................................................ 19
    3.12.  Foreign Assets Control Regulations, Etc ................................................. 19
    3.13.  Organization and Ownership of Shares of Subsidiaries; Affiliates ........................ 20
    3.14.  Compliance with Laws, Other Instruments, Etc ............................................ 20
    3.15.  Licenses, Permits, Etc .................................................................. 21
    3.16.  [Reserved] .............................................................................. 21
    3.17.  Environmental Matters ................................................................... 21

4.  **AFFIRMATIVE COVENANTS** ..................................................................... 22
    4.1.   Financial Statements .................................................................... 22
    4.2.   Inspection of Properties ................................................................ 25
    4.3.   Covenant to Secure Notes Equally ........................................................ 25
    4.4.   Business ................................................................................ 25
    4.5.   Compliance with Laws and Regulations .................................................... 25
    4.6.   Patents, Trade Marks and Trade Names .................................................... 25
    4.7.   Payment of Taxes and Other Claims ....................................................... 26
    4.8.   ERISA Compliance ........................................................................ 26
    4.9.   Execution and Delivery of Subsidiary Guaranty Agreement and Other
           Collateral Documents .................................................................... 26
    4.10.  Insurance ............................................................................... 27
    4.11.  Maintenance of Properties ............................................................... 27
    4.12.  Corporate Existence, Etc. ............................................................... 27
    4.13.  Books and Records ....................................................................... 28

i

TABLE OF CONTENTS
(continued)

|  | 4.14. | Lee/Pulitzer Contribution Transaction | 28 |
| **5.** | | **NEGATIVE COVENANTS** | **28** |
|  | 5.1. | Financial Covenants | 28 |
|  | 5.2. | Liens | 29 |
|  | 5.3. | Priority Debt | 30 |
|  | 5.4. | Loans, Advances and Investments | 31 |
|  | 5.5. | Sale or Disposition of Assets | 33 |
|  | 5.6. | Sale and Lease-Back | 34 |
|  | 5.7. | Merger | 34 |
|  | 5.8. | Transactions With Affiliates; Lee Company Transactions | 34 |
|  | 5.9. | Sale of Stock and Debt of Subsidiaries | 35 |
|  | 5.10. | Issuance of Stock by Subsidiaries | 36 |
|  | 5.11. | Limitation on Certain Restrictive Agreements | 36 |
|  | 5.12. | Capital Expenditures | 36 |
|  | 5.13. | Restricted Payments | 36 |
|  | 5.14. | Terrorism Sanctions Regulations | 37 |
|  | 5.15. | Debt | 37 |
| **6.** | | **EVENTS OF DEFAULT; REMEDIES** | **38** |
|  | 6.1. | Events of Default | 38 |
|  | 6.2. | Remedies | 40 |
| **7.** | | **MISCELLANEOUS** | **41** |
|  | 7.1. | Survival of Representations and Warranties; Entire Agreement | 41 |
|  | 7.2. | Consent to Amendments | 41 |
|  | 7.3. | Binding Effect, etc | 41 |
|  | 7.4. | Notices | 41 |
|  | 7.5. | Severability | 42 |
|  | 7.6. | Successors and Assigns | 42 |
|  | 7.7. | Independence of Covenants | 42 |
|  | 7.8. | Satisfaction Requirement | 42 |
|  | 7.9. | Counterparts | 42 |
|  | 7.10. | Governing Law | 42 |
|  | 7.11. | Consent to Jurisdiction; Waiver of Immunities | 42 |
|  | 7.12. | Waiver of Jury Trial | 43 |

SCHEDULE 3.3      -      LITIGATION

SCHEDULE 3.4      –      OUTSTANDING DEBT

SCHEDULE 3.7      –      AGREEMENTS RESTRICTING INCURRENCE OF DEBT

SCHEDULE 3.8      –      ERISA

SCHEDULE 3.13     –      SUBSIDIARIES OF THE GUARANTOR AND OWNERSHIP
                         OF SUBSIDIARY STOCK

SCHEDULE 5.4      –      EXISTING INVESTMENTS

EXHIBIT A         –      [FORM OF COMPLIANCE CERTIFICATE][1]

---

[1] To be updated

## GUARANTY AGREEMENT

THIS GUARANTY AGREEMENT (as amended, restated, supplemented or otherwise modified from time to time, this "**Guaranty**") is made as of [_____] by PULITZER INC., a Delaware corporation (the "**Guarantor**"), in favor of the holders from time to time of the Notes issued under the below-described Note Agreement.

## <u>Recitals</u>

A.      St. Louis Post-Dispatch LLC, a Delaware limited liability company (the "**Company**"), entered into that certain Note Agreement dated as of May 1, 2000, as amended by (i) that certain Amendment No. 1 to Note Agreement, dated as of November 23, 2004, (ii) that certain Amendment No. 2 to Note Agreement, dated as of February 1, 2006, (iii) that certain Amendment No. 3 to Note Agreement, dated as of November 19, 2008, (iv) that certain Amendment No. 4 and First Amendment to Limited Waiver to Note Agreement and Guaranty Agreement, dated as of January 16, 2009, (v) that certain Limited Waiver and Amendment No. 5 to Note Agreement, dated as of February 18, 2009, (vi) that certain Amendment No. 6 to Note Agreement, dated as of April 6, 2011, and (vii) that certain Amendment No. 7 to Note Agreement, dated as of November 7, 2011 (as so amended and in effect immediately prior to the Petition Date (as defined below), the "**Prepetition Note Agreement**"), with the several Purchasers listed in the Purchaser Schedule attached thereto, pursuant to which, among other things, the Company issued and sold $306,000,000 in original principal amount of its Adjustable Rate Senior Notes due April 28, 2009 (as in effect immediately prior to the Petition Date (as defined below), the "**Prepetition Notes**").

B.      In connection with the Prepetition Note Agreement, the Guarantor executed and delivered to the holders of Prepetition Notes a Guaranty Agreement, dated as of May 1, 2000, as amended by (i) that certain Amendment No. 1 to Guaranty Agreement, dated as of August 7, 2000, (ii) that certain Amendment No. 2 to Guaranty Agreement, dated as of November 23, 2004, (iii) that certain Amendment No. 3 to Guaranty Agreement, dated as of June 3, 2005, (iv) that certain Amendment No. 4 to Guaranty Agreement, dated as of February 1, 2006, and (v) that certain Limited Waiver and Amendment No. 5 to Guaranty Agreement, dated as of February 18, 2009 (as so amended and in effect immediately prior to the Petition Date (as defined below), the "**Prepetition Guaranty Agreement**"), pursuant to which the Guarantor, among other things, agreed to guaranty the payment and performance by the Company of all of its obligations and liabilities under and in respect of the Prepetition Note Agreement and the Prepetition Notes.

C.      On [_____], 2011 (the "**Petition Date**"), Lee and certain of its Subsidiaries including the Company and the Guarantor (collectively, the "**Debtors**") filed voluntary petitions for relief under Chapter 11 of Title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") and continued in the possession of their property and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code (the "**Bankruptcy Proceeding**").

D.      On [_____], 2012, the Bankruptcy Court entered an order confirming the Joint Prepackaged Plan of Reorganization for the Debtors, dated [_____], 2011 (as in effect on the

date of confirmation thereof pursuant to the Confirmation Order of the Bankruptcy Court and as it thereafter may be amended in accordance with Pulitzer Support Agreement, the "**Plan of Reorganization**").

E.     In connection with the implementation of the Plan of Reorganization, the Purchasers have agreed to become, or shall be deemed to become, parties to a new Note Agreement, dated as of the date hereof (as may be amended, restated, supplemented or otherwise modified from time to time, the "**Note Agreement**"), pursuant to which, among other things, the Company will issue new adjustable rate senior guaranteed promissory notes of the Company in the aggregate principal amount (after giving effect to the Lee Prepayment) of $126,355,000, each substantially in the form of Exhibit A to the Note Agreement (together with any notes issued in substitution or exchange therefor, each as amended, restated or otherwise modified from time to time, each, individually, a "**Note**" and, collectively, the "**Notes**").

F.     To induce each Purchaser to enter into the Note Agreement and acquire the Notes, the Guarantor is required, pursuant to the Note Agreement, to (i) execute a guaranty agreement in substantially the form hereof, and (ii) guaranty all obligations of the Company under and in respect of the Notes, the Note Agreement and the other Transaction Documents pursuant to the terms and provisions hereof.

G.     The Board of Directors of the Guarantor has determined that the Guarantor's execution, delivery and performance of this Guaranty may reasonably be expected to benefit the Guarantor, directly or indirectly, and to be in the best interests of the Guarantor.

NOW THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Guarantor hereby covenants and agrees with, and represents and warrants to each holder of Notes, as follows:

1.     **DEFINED TERMS; ACCOUNTING MATTERS**

1.1.     **Defined Terms.**  All capitalized terms used herein, unless specifically otherwise defined, shall have the meanings ascribed to them in the Note Agreement.  In addition, the following terms shall have the meanings specified with respect thereto below (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"**Affiliate**" shall mean any Person directly or indirectly controlling, controlled by, or under direct or indirect common control with, another Person.  A reference to an Affiliate shall mean an Affiliate of the Guarantor unless the context otherwise requires.  A Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise.

"**Anti-Money Laundering**" shall have the meaning specified in clause (iii) of Section 3.12 of this Guaranty.

"**Asset Sale**" shall mean any sale, transfer or other disposition of any assets of the Guarantor or any of its Subsidiaries other than (i) the sale of inventory sold in the ordinary

2

course of business, (ii) grants of licenses, sublicenses, leases or subleases to other Persons not materially interfering with the conduct of the business of the Guarantor or its Subsidiaries and so long as any such grant does not prevent foreclosure on the affected asset if it is subject to any of the Liens created by the Collateral Documents and may be revoked upon such foreclosure, (iii) any such transaction between the Guarantor and any one of its Subsidiaries or between Subsidiaries of the Guarantor, (iv) any transaction permitted by paragraph 7C(6) of the Note Agreement to the extent such transaction involves only the Guarantor and its Subsidiaries, (v) the sale or other disposition of cash and Cash Equivalents in the ordinary course of business, in each case for cash at Fair Market Value, and (vi) the Contribution.

"**Asset Sale Proceeds**" shall mean, with respect to any Asset Sale, the amount of cash proceeds received (directly or indirectly, including, subject to the proviso hereto, insurance and condemnation proceeds) by or on behalf of the Guarantor or any Subsidiary in connection therewith (including, without limitation, cash payments in respect of non-cash consideration to the extent permitted by paragraph 7C(3)(iv) of the Note Agreement and Section 5.5, as and when such cash payments are received), after deducting therefrom only (i) the amount of any Debt secured by any Lien permitted by paragraph 7C(1) of the Note Agreement (other than (A) the Notes and (B) Debt assumed by the purchaser of such asset) which is required to be, and is, repaid in connection with such Asset Sale and (ii) all direct costs and reasonable fees, commissions, expenses and taxes related thereto to the extent paid or payable to a Person that is not an Affiliate or a Subsidiary, provided that Asset Sale Proceeds shall not include, so long as no Event of Default has occurred and is continuing, (1) the proceeds of the any Asset Sale effected pursuant to paragraph 7C(4)(i) of the Note Agreement to the extent such proceeds are applied to replace the assets subject to such Asset Sale with assets of like kind and purposes or (2) insurance and condemnation proceeds from any single occurrence of less than $10,000,000 to the extent such proceeds are applied to repair or replace the assets subject to the casualty or condemnation giving rise to the payment of such proceeds.

"**Bankruptcy Court**" shall have the meaning specified in Recital C of this Guaranty.

"**Bankruptcy Law**" shall have the meaning specified in clause (vi) of Section 6.1 of this Guaranty.

"**Blocked Person**" shall have the meaning specified in clause (i) of Section 3.12 of this Guaranty.

"**Bankruptcy Proceeding**" shall have the meaning specified in Recital C of this Guaranty.

"**Capital Expenditures**" shall mean, with respect to any Person, all expenditures by such Person which should be capitalized in accordance with GAAP and, without duplication, the amount of all Capitalized Lease Obligations incurred by such Person.

"**Capitalized Lease Obligation**" shall mean, with respect to any Person, all rental obligations of such Person which, under GAAP, are or will be required to be capitalized on the books of such Person, taken at the amount thereof accounted for as indebtedness in accordance with such principles.

3

"**Claims**" shall have the meaning specified in Section 4.7 of this Guaranty.

"**Company**" shall have the meaning specified in Recital A of this Guaranty.

"**Consolidated Debt**" shall mean, with respect to the Guarantor and its Subsidiaries on any date of determination, (i) total Debt of the Guarantor and its Subsidiaries, determined on a consolidated basis in accordance with GAAP, *minus* (ii) the aggregate amount of all Debt permitted by Section 5.3(iv) hereof.

"**Consolidated EBITDA**" shall mean, for any period, Consolidated Net Income for such period, *plus*, all amounts deducted or excluded in the computation thereof on account of (without duplication) (a) Consolidated Interest Expense, (b) depreciation and amortization expense, (c) income and profits taxes, (d) Intercompany Charges to Pulitzer permitted under Section 5.8(i) but not paid or settled in cash and properly allocable to such period in accordance with GAAP, (e) commencing with the fiscal quarter ending on or about June [26], 2011, (i) the Allocable Share of the Lee/Pulitzer Restructuring Costs properly allocable to such period in accordance with GAAP, and (ii) all fees and expenses of legal counsel and financial advisors on behalf of the Purchasers paid by the Guarantor and its Subsidiaries during such period in connection with the transactions contemplated by the Transaction Documents, the Plan of Reorganization and the Bankruptcy Proceeding, (f) any curtailment charges relating to the reduction or elimination of benefits under any Plan maintained by the Guarantor or its Subsidiaries, and (g) the fees paid pursuant to paragraph 4Q of the Note Agreement to the extent not capitalized or otherwise deferred and amortized *minus*, to the extent included in Consolidated Net Income for such period (without duplication), (x) cash interest income for such period and (y) for the avoidance of doubt, any curtailment gains relating to any reduction or elimination of benefits under any Plan.

"**Consolidated Interest Expense**" shall mean, for any period, for the Guarantor and its Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, the sum of all amounts which would be deducted in computing Consolidated Net Income on account of interest on Debt (including (whether or not so deducted) (i) imputed interest in respect of Capitalized Lease Obligations, (ii) the "deemed interest expense" (i.e., the interest expense which would have been applicable if the respective obligations were structured as on-balance sheet financing arrangements) with respect to all Debt of the Guarantor and its Subsidiaries of the type described in clause (x) of the definition of "Debt" in the Note Agreement (to the extent same does not arise from a financing arrangement constituting an operating lease), and (iii) all commissions, discounts and other regularly accruing commitment, letter of credit and other banking fees and charges, but excluding (x) amortization of debt discount and expense and (y) other non-cash interest expense.

"**Consolidated Net Income**" shall mean, for any period, the net income (or loss) of the Guarantor and its Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP, excluding:

      (a)     any gains arising from (i) the sale or other disposition of any assets (other than current assets) to the extent that the aggregate amount of the gains during such period exceeds the aggregate amount of the losses during such period from the sale, abandonment or other disposition of assets (other than current assets), (ii) any write-up of

4

assets or (iii) the acquisition of outstanding securities of the Guarantor or any of its Subsidiaries;

(b)    any losses arising from the sale or other disposition of any assets (other than current assets) to the extent the aggregate amount of losses during such period exceeds the aggregate amount of gains during such period from such sale;

(c)    any amount representing any interest in the undistributed earnings of (i) any other Person that is not a Subsidiary of the Guarantor, (ii) TNI Partners and (iii) any other Subsidiary of the Guarantor that is accounted for by the Guarantor by the equity method of accounting;

(d)    any earnings, prior to the date of acquisition, of any Person acquired in any manner, and any earnings of any Subsidiary of the Guarantor acquired prior to its becoming a Subsidiary of the Guarantor;

(e)    any earnings of a successor to or transferee of the assets of the Guarantor prior to its becoming such successor or transferee;

(f)    any deferred credit (or amortization of a deferred credit) arising from the acquisition of any Person;

(g)    any extraordinary gains or extraordinary losses not covered by clause (a) or (b) above;

(h)    any non-cash charges related to goodwill and asset write-offs and write-downs;

(i)    any other non-cash gains or losses; and

(j)    amortization of debt discounts and expenses for such period.

"**Contribution**" shall have the meaning specified in Section 4.14 of this Guaranty.

"**Controlled Entity**" means any of the Subsidiaries of the Guarantor and any of their or the Guarantor's respective Controlled Affiliates.  As used in this definition, "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Debtors**" shall have the meaning specified in Recital C of this Guaranty.

"**Default**" shall mean any of the events specified in Section 6.1, whether or not any requirement for such event to become an Event of Default has been satisfied.

"**Distribution**" shall mean, in respect of any corporation, association or other business entity:

(a)  dividends or other distributions or payments on capital stock or other equity interest of such corporation, association or other business entity (except distributions in such stock or other equity interest); and

(b)  the redemption or acquisition of such stock or other equity interests or of warrants, rights or other options to purchase such stock or other equity interests (except when solely in exchange for such stock or other equity interests) unless made, contemporaneously, from the net proceeds of a sale of such stock or other equity interests.

"**ERISA Affiliate**" shall mean any Person which is a member of the same controlled group of Persons as the Guarantor within the meaning of section 414(b) of the Code, or any trade or business which is under common control with the Guarantor within the meaning of section 414(c) of the Code.

"**Event of Default**" shall mean any of the events specified in Section 6.1, provided that there has been satisfied any requirement in connection with such event for the giving of notice, or the lapse of time, or the happening of any further condition, event or act.

"**Excluded TNI Assets**" shall mean all Equity Interests in TNI Partners, all real and personal property which is leased to or used in the operations or business of TNI Partners, and all proceeds of any of the foregoing.

"**Fair Market Value**" shall mean, at any time and with respect to any property, the sale value of such property that would be realized in an arm's-length sale at such time between an informed and willing buyer and an informed and willing seller (neither being under a compulsion to buy or sell).

"**Guaranteed Obligations**" shall have the meaning specified in Section 2.1 of this Guaranty.

"**Guarantor**" shall have the meaning specified in the introductory paragraph hereof.

"**Guaranty**" shall have the meaning specified in the introductory paragraph hereof.

"**Lee**" shall mean Lee Enterprises, Incorporated, a Delaware corporation.

"**Lee Company**" shall mean any Person (other than the Guarantor or any of its Subsidiaries) a majority of the outstanding equity interests of which are owned directly or indirectly by Lee.

"**Lee Payable**" shall mean, at any time, the aggregate amount owing to the Guarantor by Lee Publications.

"**Lee Procurement**" shall mean Lee Procurement Solutions Co., an Iowa corporation.

"**Lee Publications**" shall mean Lee Publications, Inc., a Delaware corporation.

"**LIBOR**" means the rate per annum (rounded upwards, if necessary, to the next higher one hundred-thousandth of a percentage point) for deposits in US Dollars for a 90-day period which appears on the Telerate page 3750 (or if such page is not available, the Reuters Screen LIBO page) as of 11:00 a.m. (London, England time) on the date two (2) Business Days before the commencement of the applicable interest period. "Reuters Screen LIBO Page" means the display designated as the "LIBO" page on the Reuters Monitory Money Rates Service (or such other page as may replace the LIBO page on the service or such other service as may be nominated by the British Bankers' Association as the information vendor for the purpose of displaying British Banker's Association Interest Settlement Rates for Dollar deposits).

"**Note Agreement**" shall have the meaning specified in Recital E of this Guaranty.

"**Notes**" shall have the meaning specified in Recital E of this Guaranty.

"**OFAC**" shall have the meaning specified in clause (i) of Section 3.12 of this Guaranty.

"**OFAC Listed Person**" shall have the meaning specified in clause (i) of Section 3.12 of this Guaranty.

"**Petition Date**" shall have the meaning specified in Recital C of this Guaranty.

"**Plan of Reorganization**" shall have the meaning specified in Recital D of this Guaranty.

"**Prepetition Guaranty Agreement**" shall have the meaning specified in Recital B of this Guaranty.

"**Prepetition Note Agreement**" shall have the meaning specified in Recital A of this Guaranty.

"**Prepetition Notes**" shall have the meaning specified in Recital A of this Guaranty.

"**Priority Debt**" shall mean, with respect to the Guarantor and its Subsidiaries on any date of determination, the aggregate amount of all Debt of the Guarantor secured by a Lien plus all secured and unsecured Debt of all Subsidiaries (excluding Debt represented by the Notes and the Subsidiary Guaranty Agreement).

"**Purchasers**" shall have the meaning specified in the Note Agreement.

"**Replacement Covenant Notice Date**" shall mean the date (which shall in no event be more than 45 days after the end of any fiscal quarter of the Guarantor) on which the Guarantor shall have delivered written notice to all holders of the Notes (i) certifying that the ratio of (a) Consolidated Debt as of the last day of the most recently ended fiscal quarter of the Guarantor to (b) Consolidated EBITDA for the four consecutive fiscal quarters ended as of such last day is less than or equal to 2.25 to 1.00, and attaching evidence thereof satisfactory to such holders (including computations in reasonable detail), and (ii) electing to replace the covenant set forth in Section 5.1(i) hereof with the covenant set forth in Section 5.1(ii) hereof. Upon delivery of such notice, the covenant set forth in Section 5.1(ii) hereof shall become effective as of the date

of the delivery of such notice and, for the avoidance of doubt, shall be deemed to replace irrevocably the covenant set forth in Section 5.1(i) in its entirety and in all respects and the Guarantor shall not be required to comply with the covenant set forth in Section 5.1(i) with respect to any fiscal quarter ending thereafter.

"**Restricted Intercompany Charges**" shall mean charges by any Lee Company to the Guarantor or any of its Subsidiaries for (i) the provision by any Lee Company of goods and services for the benefit of the Guarantor or any of its Subsidiaries to the extent arising from cost-savings measures adopted in accordance with Section 5.8(i)(e)(2) hereof, including, but not limited to transactions related to the integrated operations of Bloomington, IL and Decatur, IL and regional design centers, (ii) procurement services furnished by Lee Procurement  in connection with obtaining newsprint from third parties for the benefit of the Guarantor or any of its Subsidiaries, (iii) the corporate overhead of the Lee Companies (including, without limitation, management, administration, financial services, legal, human resources, building services, editorial support, and Lee Lodge facilities), (iv) fees for (a) Lee corporate sales and marketing, (b) Lee information technology services, (c) digital service/online fees, and (d) audit and consulting fees, (v) compensation of publishers, (vi) fees for Lee regional call centers and regional finance center services and (vii) compensation of outside directors, in the case of the foregoing subclauses (iv) (a) to (d), (v), (vi) and (vii) inclusive, only to the extent actually paid by any Lee Company.  The nature, allocation and payment method of the charges referred to in the foregoing clauses (ii) to (v), inclusive, shall be consistent with practices used in the period from the fiscal quarter of the Guarantor ending in March, 2009 through the fiscal quarter of the Guarantor ending in September, 2011; provided, that, for the avoidance of doubt, the charges referred to in the foregoing clause (iii) shall be paid by a reduction in the Lee Payable and not in cash.

"**Restricted Payment**" shall mean

(a)    any Distribution in respect of the Guarantor or any Subsidiary of the Guarantor (other than (i) on account of capital stock or other equity interests of a Subsidiary of the Guarantor owned legally and beneficially by the Guarantor or another Subsidiary of the Guarantor or (ii) a Distribution payable in stock or other equity interests of the Guarantor), including, without limitation, any Distribution resulting in the acquisition by the Guarantor of securities which would constitute treasury stock, and

(b)    any payment, repayment, redemption, retirement, repurchase or other acquisition, direct or indirect, by the Guarantor or any Subsidiary of, on account of, or in respect of, the principal of any Subordinated Debt (or any installment thereof) prior to the regularly scheduled maturity date thereof (as in effect on the date such Subordinated Debt was originally incurred).

For purposes of this Agreement, the amount of any Restricted Payment made in property shall be the greater of (x) the Fair Market Value of such property (as determined in good faith by the board of directors (or equivalent governing body) of the Person making such Restricted Payment) and (y) the net book value thereof on the books of such Person, in each case determined as of the date on which such Restricted Payment is made.

A/74565836.10

"**Subordinated Debt**" shall mean any Debt that is in any manner subordinated in right of payment or security in any respect to Debt evidenced by the Notes.

"**Subsidiary**" shall mean, as to the Guarantor, the Company and any other corporation, limited liability company, association or other business entity organized under the laws of any state of the United States of America, Canada or any province of Canada which conducts the major portion of its business in and makes the major portion of its sales to Persons located in the United States of America or Canada, and all of the stock of every class of which (except directors' qualifying shares) or other equity interests in which shall, at the time as of which any determination is being made, be owned by the Guarantor either directly or through Subsidiaries.

"**Unrestricted Intercompany Transactions**" shall mean transactions between any Lee Company and the Guarantor or any of its Subsidiaries for (i) passing through to the Guarantor or any of its Subsidiaries revenue received by any Lee Company for services rendered by the Guarantor or any of its Subsidiaries for arm's length transactions with third parties; (ii) payment or reimbursement of costs incurred by Pulitzer and its Subsidiaries for and on behalf of any Lee Company; (iii) passing through to the Guarantor or any of its Subsidiaries of costs incurred by any Lee Company for arm's length transactions with third parties to the extent the portion of such transactions passing through to the Guarantor or any of its Subsidiaries are for the sole benefit of the Guarantor or any of its Subsidiaries and such costs are specifically identified as such on invoices from third parties, or in the absence of such invoices, are properly allocable to the Guarantor or any of its Subsidiaries on a basis consistent with past practices; (iv) reimbursing any Lee Company for payments made by Lee for payroll or other employee benefit costs incurred directly by (or for the account of) the Guarantor or any of its Subsidiaries, (v) income tax expense or income tax benefits in accordance with the Tax Sharing Agreement, (vi) pension payments from Lee to the Guarantor, and (vii) interest income on the Lee Payable.

1.2.    **Accounting and Legal Principles, Terms and Determinations.**  All accounting terms used herein which are not expressly defined in this Guaranty have the meanings respectively given to them in accordance with GAAP.  Except as otherwise specifically provided herein, (i) all computations made pursuant to this Guaranty shall be made in accordance with GAAP, and (ii) all financial statements shall be prepared in accordance with GAAP; provided that, except as otherwise specifically provided herein, all computations and definitions used in determining compliance with financial covenants shall utilize GAAP and policies in conformity with those used to prepare the audited financial statements of the Guarantor for the Guarantor's fiscal year ended September 25, 2011.  For purposes of determining compliance with the financial covenants contained in this Guaranty, any election by the Guarantor to measure any financial liability using fair value (as permitted by Accounting Standard Codification Topic No. 825-10-25 – *Fair Value Option* or any similar accounting standard) shall be disregarded and such determination shall be made as if such election had not been made.

2.    **GUARANTY**

2.1.    **Guaranty**.  The Guarantor hereby irrevocably, absolutely and unconditionally guarantees unto each holder of Notes (i) the full and prompt payment of the principal of, Yield-Maintenance Amount, if any, interest and all other amounts due with respect to the Notes from time to time outstanding, as and when such amounts shall become due and payable, whether by

lapse of time, upon redemption, prepayment or purchase, by extension or by acceleration or declaration or otherwise (including (to the extent legally enforceable) interest due on overdue payments of principal, Yield-Maintenance Amount, if any, or interest at the rate set forth in the Notes or any other amounts due thereunder) in coin or currency of the United States of America which at the time of payment or demand therefor shall be legal tender for the payment of public and private debts, (ii) the full and prompt payment, performance and observance by the Company of all other obligations, covenants, conditions and agreements contained in the Note Agreement or any other instrument or agreement entered into in connection therewith or otherwise relating thereto, and (iii) the full and prompt payment, upon demand by any holder of Notes, of all costs and expenses (including reasonable attorneys' fees), if any, as shall have been expended or incurred in the analysis, protection or enforcement of any right or privilege under the Notes, the Note Agreement or any other instrument or agreement entered into in connection therewith or relating thereto or in the protection or enforcement of any rights, privileges or liabilities under this Guaranty or in any consultation or action in connection therewith or herewith (all such obligations, covenants, conditions and agreements described in the foregoing clauses (i), (ii) and (iii) being hereinafter collectively referred to as the "**Guaranteed Obligations**").

The Guarantor hereby acknowledges and agrees that its liability hereunder is joint and several with any other Person(s) who may guarantee the obligations and indebtedness under and in respect of the Notes, the Note Agreement and the other Transaction Documents.

**2.2.    Guaranty of Payment and Performance**.  This is a guaranty of payment and performance and not a guaranty of collection, and the Guarantor hereby waives any right to require that any action on or in respect of any Note, the Note Agreement or any instrument or agreement relating to the Guaranteed Obligations be brought against the Company or any other Person or that resort be had to any direct or indirect security for the Notes or for this Guaranty or any other remedy.  Any holder of Notes may, at its option, proceed hereunder against the Guarantor in the first instance to collect monies when due, the payment of which is guaranteed hereby, without first proceeding against the Company or any other Person and without first resorting to any direct or indirect security for the Notes, or for this Guaranty or any other remedy.  The liability of the Guarantor hereunder shall in no way be affected or impaired by any acceptance by any holder of Notes of any direct or indirect security for, or other guaranties of, the Guaranteed Obligations or by any failure, delay, neglect or omission by any holder of Notes to realize upon or protect any of the Guaranteed Obligations or any Notes or other instruments evidencing the same or any direct or indirect security therefor or by any approval, consent, waiver, or other action taken or omitted to be taken by any such holder.  The Guarantor (i) acknowledges that certain obligations of the Company under the Note Agreement will survive the payment or transfer of any Note and the termination of the Note Agreement, and (ii) agrees that the obligations of the Guarantor hereunder with respect to such surviving obligations shall also survive the payment or transfer of any Note and the termination of the Note Agreement.

**2.3.    General Provisions Relating to the Guaranty**.

(i)    The Guarantor hereby consents and agrees that any holder or holders of Notes from time to time, with or without any further notice to or assent from the Guarantor may, without in any manner affecting the liability of the Guarantor under

10

this Guaranty, and upon such terms and conditions as any such holder or holders may deem advisable:

>    (a)    extend in whole or in part (by renewal or otherwise), modify, change, compromise, release or extend the duration of the time for the payment or performance of any of the Guaranteed Obligations, or waive any default with respect thereto, or waive, modify, amend or change any provision of the Note Agreement, the Notes or any other instrument or agreement entered into in connection therewith or otherwise relating thereto;

>    (b)    sell, release, surrender, modify, impair, exchange or substitute any and all property, of any nature and from whomsoever received, held by, or for the benefit of, any such holder as direct or indirect security for the payment or performance of any of the Guaranteed Obligations; or

>    (c)    settle, adjust or compromise any claim of the Company against any other Person secondarily or otherwise liable for any of the Guaranteed Obligations.

The Guarantor hereby ratifies and confirms any such extension, renewal, change, sale, release, waiver, surrender, exchange, modification, amendment, impairment, substitution, settlement, adjustment or compromise and that the same shall be binding upon it, and hereby waives any and all defenses, counterclaims or offsets which it might or could have by reason thereof, it being understood that the Guarantor shall at all times be bound by this Guaranty and remain liable hereunder.

>    (ii)    The Guarantor hereby waives: (a) notice of acceptance of this Guaranty by the holders of Notes or of the creation, renewal or accrual of any liability of the Company, present or future, or of the reliance of such holders upon this Guaranty (it being understood that all Guaranteed Obligations shall conclusively be presumed to have been created, contracted or incurred in reliance upon the execution of this Guaranty); (b) demand of payment by any holder of Notes from the Company or any other Person indebted in any manner on or for any of the Guaranteed Obligations hereby guaranteed; and (c) presentment for the payment by any holder of Notes or any other Person of the Notes or any other instrument, protest thereof and notice of its dishonor to any party thereto and to the Guarantor.  The obligations of the Guarantor under this Guaranty and the rights of any holder of Notes to enforce such obligations by any proceedings, whether by action at law, suit in equity or otherwise, shall not be subject to any reduction, limitation, impairment or termination, whether by reason of any claim of any character whatsoever or otherwise and shall not be subject to any defense, setoff, counterclaim, recoupment or termination whatsoever.

>    (iii)    The obligations of the Guarantor hereunder shall be binding upon the Guarantor and its successors and assigns, and shall remain in full force and effect irrespective of:

A/74565836.10

(a)    the genuineness, validity, regularity or enforceability of the Notes, the Note Agreement or this Guaranty or any other instrument or agreement entered into in connection therewith or otherwise relating thereto, or any of the terms of any thereof, the continuance of any obligation on the part of the Company or any other Person on the Notes or under the Note Agreement or any such other instrument or agreement, or the power or authority or the lack of power or authority of the Company to execute and deliver the Note Agreement, the Notes or any such other instrument or agreement, or to perform any of its obligations thereunder or the existence or continuance of the Company or any other Person as a legal entity;

(b)    any default, failure or delay, willful or otherwise, in the performance by the Company or any other Person of any obligations of any kind or character whatsoever of the Company or any other Person (including, without limitation, the Guaranteed Obligations);

(c)    any creditors' rights, bankruptcy, receivership or other insolvency proceeding of the Company or any other Person or in respect of the property of the Company or any other Person or any merger, consolidation, reorganization, dissolution, liquidation, sale of all or substantially all of the assets, or winding up, of the Company or any other Person;

(d)    impossibility or illegality of performance on the part of the Company or any other Person of its obligations under the Notes, the Note Agreement or this Guaranty or any other instrument or agreement entered into in connection therewith or otherwise relating thereto;

(e)    in respect of the Company or any other Person, any change of circumstances, whether or  not foreseen or foreseeable, whether or not imputable to the Company or any other Person, or impossibility of performance through fire, explosion, accident, labor disturbance, floods, droughts, embargoes, wars (whether or not declared), civil commotion, acts of God or the public enemy, delays or failure of suppliers or carriers, inability to obtain materials, action of any Federal or state regulatory body or agency, change of law or any other causes affecting performance, or any other *force majeure,* whether or not beyond the control of the Company or any other Person and whether or not of the kind hereinbefore specified;

(f)    any attachment, claim, demand, charge, lien, order, process, encumbrance or any other happening or event or reason, similar or dissimilar to the foregoing, or any withholding or diminution at the source, by reason of any taxes, assessments, expenses, indebtedness, obligations or liabilities of any character, foreseen or unforeseen, and whether or not valid, incurred by or against any Person, or any claims, demands, charges or liens of any nature, foreseen or unforeseen, incurred by any Person, or against any sums payable under this Guaranty, so that such sums would be rendered inadequate or would be unavailable to make the payments herein provided;

12

(g)    any order, judgment, decree, ruling or regulation (whether or not valid) of any court of any nation or of any political subdivision thereof or any body, agency, department, official or administrative or regulatory agency of any thereof or any other action, happening, event or reason whatsoever which shall delay, interfere with, hinder or prevent, or in any way adversely affect, the payment or performance by any party of any of the Guaranteed Obligations;

(h)    any failure or lack of diligence in collection or protection, failure in presentment or demand for payment, protest, notice of protest, notice of default and of nonpayment, any failure to give notice to the Guarantor of failure of Company or any other Person to keep and perform any of the Guaranteed Obligations, or failure to resort for payment to the Company or to any other Person or to any other guaranty or to any property, security, Liens or other rights or remedies;

(i)    the acceptance of any additional security or other guaranty, the advance of additional money to the Company or any other Person, the renewal or extension of the Notes or amendments, modifications, consents or waivers with respect to the Notes, the Note Agreement or any other instrument or agreement entered into in connection therewith or otherwise relating thereto, or the sale, release, substitution or exchange of any security for the Notes;

(j)    any defense whatsoever that the Company or any other Person might have to the payment of the Notes (principal, Yield-Maintenance Amount, if any, or interest or any other amounts due thereunder), other than payment in cash thereof, or to the payment, performance or observance of any of the other Guaranteed Obligations, whether through the satisfaction or purported satisfaction by the Company or any other Person of its debts due to any cause such as bankruptcy, insolvency, receivership, merger, consolidation, reorganization, dissolution, liquidation, winding up or otherwise;

(k)    any act or failure to act with regard to the Notes, the Note Agreement, this Guaranty or any other instrument or agreement entered into in connection therewith or otherwise relating thereto, or anything which might vary the risk of the Guarantor; or

(l)    any other circumstance (other than payment and performance in full of the Guaranteed Obligations) which might otherwise constitute a defense available to, or a discharge of, the Guarantor in respect of its obligations under this Guaranty;

provided, that the specific enumeration of the above-mentioned acts, failures or omissions shall not be deemed to exclude any other acts, failures or omissions, though not specifically mentioned above, it being the purpose and intent of this Guaranty that the obligations of the Guarantor shall be absolute and unconditional and shall not be discharged, impaired or varied except by the full and prompt payment and performance of all of the Guaranteed Obligations.  Without limiting the foregoing, it is understood that

13

repeated and successive demands may be made and recoveries may be had hereunder as and when, from time to time, the Company or any other Person shall default under the terms of the Notes, the Note Agreement or any other instrument or agreement entered into in connection therewith or otherwise relating thereto and that notwithstanding recovery hereunder for or in respect of any given default or defaults by the Company or any other Person under the Notes, the Note Agreement or any such other instrument or agreement, this Guaranty shall remain in full force and effect and shall apply to each and every subsequent default.

(iv)    All rights of any holder of Notes may be transferred or assigned at any time and shall be considered to be transferred or assigned at any time or from time to time upon the transfer of such Note whether with or without the consent of or notice to the Guarantor under this Guaranty or to the Company.

(v)    The Guarantor hereby subordinates to the rights of the holders of Notes under the Note Agreement, the Notes or any other instrument or agreement entered into in connection therewith or otherwise relating thereto, and agrees to defer any assertion of, until such time as the Guaranteed Obligations have been indefeasibly paid and performed in full, any claim or other rights that it may now or hereafter acquire against the Company or any other Person that arise from the existence, payment, performance or enforcement of the Guarantor's obligations under this Guaranty, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of any holder or holders of Notes against the Company or any other Person, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from the Company or any other Person, directly or indirectly, in cash or other property or by setoff or in any other manner, payment or security on account of such claim, remedy or right.  If any amount shall be paid to the Guarantor in violation of the preceding sentence at any time prior to the payment and performance in full of all the Guaranteed Obligations, such amount shall be held in trust for the benefit of the holders of Notes and shall forthwith be paid to such holders to be credited and applied to the Guaranteed Obligations, whether matured or unmatured.

(vi)    The Guarantor agrees that to the extent the Company or any other Person makes any payment on any Note or in respect of any of the other Guaranteed Obligations, which payment or any part thereof is subsequently invalidated, voided, declared to be fraudulent or preferential, set aside, recovered, rescinded or is required to be retained by or repaid to a trustee, receiver, or any other Person under any bankruptcy code, common law, or equitable cause, then and to the extent of such payment, the obligation or the part thereof intended to be satisfied shall be revived and continued in full force and effect with respect to the Guarantor's obligations hereunder, as if said payment had not been made.  The liability of the Guarantor hereunder shall not be reduced or discharged, in whole or in part, by any payment to any holder of Notes from any source that is thereafter paid, returned or refunded in whole or in part by reason of the assertion of a claim of any kind

14

relating thereto, including, but not limited to, any claim for breach of contract, breach of warranty, preference, illegality, invalidity, or fraud asserted by any account debtor or by any other Person.

(vii)    The holders of Notes shall have no obligation to (a) to marshal any assets in favor of the Guarantor or in payment of any or all of the Guaranteed Obligations or (b) pursue any other remedy that the Guarantor may or may not be able to pursue itself and that may lighten the Guarantor's burden, any right to which the Guarantor hereby expressly waives.

## 3.    REPRESENTATIONS AND WARRANTIES

The Guarantor represents, covenants and warrants as follows:

**3.1.    Organization and Qualification; Due Authorization**.    The Guarantor is a corporation duly organized and existing in good standing under the laws of the State of Delaware.  The Company and each other Subsidiary (other than a Subsidiary of the Company that is not a Material Subsidiary) is duly organized and existing in good standing under the laws of the jurisdiction in which it is incorporated or otherwise organized.  The Guarantor, the Company and each other Subsidiary (other than a Subsidiary of the Company that is not a Material Subsidiary) has the corporate or limited liability company power, as applicable, to own its respective property and to carry on its respective business as now being conducted, and the Guarantor, the Company and each other Subsidiary (other than a Subsidiary of the Company that is not a Material Subsidiary) is duly qualified as a foreign corporation or limited liability company, as applicable, to do business and in good standing in every jurisdiction in which the nature of the respective business conducted or property owned by it makes such qualification necessary, except where the failure to so qualify would not have a Material Adverse Effect.  The Guarantor has the corporate power and authority to execute and deliver this Guaranty and to perform the provisions hereof.  The execution, delivery and performance by the Guarantor of this Guaranty has been duly authorized by all necessary corporate action, and this Guaranty constitutes a legal, valid and binding obligation of the Guarantor enforceable against the Guarantor in accordance with its terms, except as such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

**3.2.    Material Adverse Change.**  Since September 25, 2011, nothing has occurred that has had, or could reasonably be expected to have, a Material Adverse Effect (it being understood that the filing of the voluntary petitions by the Debtors under Chapter 11 of the Bankruptcy Code on the Petition Date shall not, in and of itself, be deemed to have had or, reasonably be expected to have, a Material Adverse Effect).

**3.3.    Litigation; Observance of Agreements, Statutes and Orders**.

(i)    Except as set forth in Schedule 3.3 (it being understood that disclosure on Schedule 3.3 is not a representation that the matter to which the disclosure relates is expected to have a Material Adverse Effect), there are no

A/74565836.10

actions, suits, investigations or proceedings pending or, to the knowledge of the Guarantor, threatened against or affecting the Guarantor or any Subsidiary or any property of the Guarantor or any Subsidiary in any court or before any arbitrator of any kind or before or by any Governmental Authority that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(ii)     Neither the Guarantor nor any Subsidiary is (a) in default under any term of any agreement or instrument to which it is a party or by which it is bound, (b) in violation of any order, judgment, decree or ruling of any court, arbitrator or Governmental Authority or (c) in violation of any applicable law, ordinance, rule or regulation of any Governmental Authority (including, without limitation, Environmental Laws, the USA Patriot Act or any of the other laws and regulations that are referred to in Section 3.12), which default or violation, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**3.4.    Outstanding Debt**.

(i)     Except as described therein, Schedule 3.4 sets forth a complete and correct list of all outstanding Debt of the Guarantor and its Subsidiaries as of [_____] (including a description of the obligors and obligees, principal amount outstanding and collateral therefor, if any, and guaranty thereof, if any), since which date there has been no material change in the amounts, interest rates, sinking funds, installment payments or maturities of the Debt of the Guarantor or its Subsidiaries. Neither the Guarantor nor any Subsidiary is in default and no waiver of default is currently in effect, in the payment of any principal or interest on any Debt of the Guarantor or such Subsidiary and no event or condition exists with respect to any Debt of the Guarantor or any Subsidiary that would permit (or that with notice or the lapse of time, or both, would permit) one or more Persons to cause such Debt to become due and payable before its stated maturity or before its regularly scheduled dates of payment.

(ii)     Except as disclosed in Schedule 3.4, neither the Guarantor nor any Subsidiary has agreed or consented to cause or permit in the future (upon the happening of a contingency or otherwise) any of its property, whether now owned or hereafter acquired, to be subject to a Lien not permitted by Section 5.2.

**3.5.    Title to Properties**. The Guarantor has and each of its Subsidiaries has good and marketable title to its respective real properties (other than properties which it leases) and good title to all of its other respective properties and assets, subject to no Lien of any kind except Liens permitted by Section 5.2.  All leases necessary in any material respect for the conduct of the respective businesses of the Guarantor and its Subsidiaries are valid and subsisting and are in full force and effect, subject to Liens permitted by Section 5.2.

**3.6.    Taxes**. The Guarantor has and each of its Subsidiaries has filed all Federal, state and other income tax returns which, to the best knowledge of the officers of the Guarantor, are required to be filed and each has paid all taxes as shown on such returns and on all assessments received by it to the extent that such taxes have become due, except such taxes as are being

contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP. Federal income tax returns of the Guarantor and its Subsidiaries have been examined and reported on by the taxing authorities or closed by applicable statutes and satisfied for all fiscal years prior to and including the fiscal year ended September 26, 2010.

**3.7.    Conflicting Agreements and Other Matters**.  Neither the Guarantor nor any of its Subsidiaries is a party to any contract or agreement or subject to any charter or other limited liability company or corporate restriction which materially and adversely affects the business, property or assets, or financial condition of the Guarantor and its Subsidiaries, taken as a whole. Neither the execution nor delivery of this Guaranty, the Note Agreement, the Notes or any other Transaction Document, nor the issuance of the Notes, nor fulfillment of nor compliance with the terms and provisions hereof and of the Note Agreement, the Notes or any other Transaction Document will conflict with, or result in a breach of the terms, conditions or provisions of, or constitute a default under, or result in any violation of, or result in the creation of any Lien upon any of the properties or assets of the Guarantor or any of its Subsidiaries pursuant to, the charter, by-laws, limited liability company agreement or other organizational documents of the Guarantor or any of its Subsidiaries, any award of any arbitrator or any agreement (including any agreement with members or stockholders), instrument, order, judgment, decree, statute, law, rule or regulation to which the Guarantor or any of its Subsidiaries is subject, except to the extent any such conflict, breach, defaults, violation or creation of a Lien could not reasonably be expected to have a Material Adverse Effect.  Except as set forth in the Limited Liability Company Agreement (as in effect on the date hereof) and as set forth in Schedule 3.7, neither the Guarantor nor any of its Subsidiaries is a party to, or otherwise subject to any provision contained in, any instrument evidencing indebtedness of the Guarantor or such Subsidiary, any agreement relating thereto or any other contract or agreement (including its limited liability company agreement, charter or other organizational documents) which limits the amount of, or otherwise imposes restrictions on the incurring of, Debt of the Guarantor represented by this Guaranty or Debt of the Company of the type evidenced by the Notes.

**3.8.    ERISA**.  Except as set forth on Schedule 3.8 (it being understood that disclosure on Schedule 3.8 is not a representation that the matter to which the disclosure relates is expected to have a Material Adverse Effect),

    (i)    the Guarantor and each ERISA Affiliate have operated and administered each Plan in compliance with all applicable laws except for such instances of noncompliance as have not resulted in and could not reasonably be expected to result in a Material Adverse Effect.  Neither the Guarantor nor any ERISA Affiliate has incurred any liability (including actual or contingent withdrawal liability under section 4201 or 4204 of ERISA in respect of Multiemployer Plans) pursuant to Title I or IV of ERISA or the penalty or excise tax provisions of the Code relating to employee benefit plans (as defined in section 3 of ERISA), and no event, transaction or condition has occurred or exists that could reasonably be expected to result in the incurrence of any such liability by the Guarantor or any ERISA Affiliate, or in the imposition of any Lien on any of the rights, properties or assets of the Guarantor or any ERISA Affiliate, in either case pursuant to Title I or IV of ERISA or to section 430(k) of the Code or to any such

penalty or excise tax provisions under the Code or Federal law or section 4068 of ERISA or by the granting of a security interest in connection with the amendment of a Plan, other than such liabilities or Liens as would not be individually or in the aggregate material.

(ii)     The present value of the aggregate benefit liabilities under each of the Plans (other than Multiemployer Plans), determined as of the end of such Plan's most recently ended plan year on the basis of the actuarial assumptions specified for funding purposes in such Plan's most recent actuarial valuation report, did not exceed the aggregate current value of the assets of such Plan allocable to such benefit liabilities by more than $[_____] in the case of any single Plan and by more than $[_____] in the aggregate for all Plans.    The term "**benefit liabilities**" has the meaning specified in section 4001 of ERISA and the terms "**current value**" and "**present value**" have the meaning specified in section 3 of ERISA.

(iii)     The expected postretirement benefit obligation (determined as of the last day of the Guarantor's most recently ended fiscal year in accordance with Financial Accounting Standards Board Accounting Standards Codification 715-60, without regard to liabilities attributable to continuation coverage mandated by section 4980B of the Code) of the Guarantor and its Subsidiaries is not material.

(iv)     The execution and delivery of this Guaranty will not involve any transaction that is subject to the prohibitions of section 406 of ERISA or in connection with which a tax could be imposed pursuant to section 4975(c)(1)(A)-(D) of the Code.

**3.9.     Governmental Authorizations, Etc**.  No consent, approval or authorization of, or registration, filing or declaration with, any Governmental Authority is required in connection with the execution, delivery or performance by the Guarantor of this Guaranty which has not already been obtained.

**3.10.     Disclosure**.  All factual information (taken as a whole) theretofore furnished by or on behalf of Lee and its Subsidiaries in writing to the Purchasers (including, without limitation, all information contained in the Transaction Documents, the Plan of Reorganization and the Disclosure Statement) for purposes of or in connection with this Guaranty, the other Transaction Documents or any transaction contemplated herein or therein is true and accurate in all material respects on the date as of which such information is dated or certified and not incomplete by omitting to state any fact necessary to make such information (taken as a whole) not misleading in any material respect at such time in light of the circumstances under which such information was provided, it being understood and agreed that for purposes of this Section 3.10, such factual information shall not include any projections or any *pro forma* financial information.  There is no fact peculiar to the Guarantor or any of its Subsidiaries which materially adversely affects or in the future may (so far as the Guarantor can now foresee) materially adversely affect the business, property or assets, or financial condition of the Guarantor and its Subsidiaries taken as a whole and which has not been set forth in this Guaranty or in the other documents, certificates and

18

statements furnished to the holders of Notes by or on behalf of the Guarantor on or prior to the date hereof in connection with the transactions contemplated hereby.

**3.11.    Solvency**.  On and as of the Restructuring Closing Date, and after giving effect to all debt being incurred or assumed and Liens created by the Credit Parties in connection with this Agreement, the Notes and the other Transaction Documents, (i) the sum of the assets, at a fair valuation, of the Company (on a stand-alone basis) and of the Guarantor and its Subsidiaries (taken as a whole) will exceed its or their respective debts, (ii) the Company (on a stand-alone basis) and the Guarantor and its Subsidiaries (taken as a whole) has or have not incurred and does or do not intend to incur, and does or do not believe that it or they will incur, debts beyond its or their respective ability to pay such debts as such debts mature, and (iii) the Company (on a stand-alone basis) and the Guarantor and its Subsidiaries (taken as a whole) will have sufficient capital with which to conduct its or their respective businesses.  For purposes of this Section 3.11, "debt" means any liability on a claim, and "claim" means (a) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured or (b) right to an equitable remedy for breach of performance if such breach gives rise to a payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.  The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

**3.12.    Foreign Assets Control Regulations, Etc.**

(i)    Neither the Guarantor nor any Controlled Entity is (i) a Person whose name appears on the list of Specially Designated Nationals and Blocked Persons published by the Office of Foreign Assets Control, U.S. Department of Treasury ("**OFAC**") (an "**OFAC Listed Person**") or (ii) a department, agency or instrumentality of, or is otherwise controlled by or acting on behalf of, directly or indirectly, (x) any OFAC Listed Person or (y) any Person, entity, organization, foreign country or regime that is subject to any OFAC Sanctions Program (each OFAC Listed Person and each other Person, entity, organization and government of a country described in clause (ii), a "**Blocked Person**").

(ii)    Neither the Guarantor nor any Controlled Entity has any investments in, or engages in any dealings or transactions with, any Person where such investments, dealings or transactions would cause the receipt of any payment or exercise of any rights in respect of, this Guaranty by any holder of Notes to be in violation of any of the laws or regulations identified in this Section 3.12.

(iii)    To the Guarantor's actual knowledge after making due inquiry, neither the Guarantor nor any Controlled Entity (i) is under investigation by any Governmental Authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist-related activities or other money laundering predicate crimes under any applicable law (collectively, "**Anti-Money Laundering Laws**"), (ii) has been assessed civil penalties under any Anti-Money Laundering

Laws or (iii) has had any of its funds seized or forfeited in an action under any Anti-Money Laundering Laws. The Guarantor has taken reasonable measures appropriate to the circumstances (in any event as required by applicable law) to ensure that the Guarantor and each Controlled Entity is and will continue to be in compliance with all applicable current and future Anti-Money Laundering Laws.

(iv)    The Guarantor has taken reasonable measures appropriate to the circumstances (in any event as required by applicable law) to ensure that the Guarantor and each Controlled Entity is and will continue to be in compliance with all applicable current and future anti-corruption laws and regulations.

**3.13.    Organization and Ownership of Shares of Subsidiaries; Affiliates**.

(i)    Schedule 3.13 contains (except as noted therein) a complete and correct list of the Guarantor's Subsidiaries, showing, as to each Subsidiary, the correct name thereof, the jurisdiction of its organization, and the percentage of shares of each class of its capital stock or similar equity interests outstanding owned by the Guarantor and each other Subsidiary.

(ii)    All of the outstanding shares of capital stock or similar Equity Interests of each Subsidiary shown in Schedule 3.13 as being owned by the Guarantor and its Subsidiaries have been validly issued, are fully paid and nonassessable and are owned by the Guarantor or another Subsidiary free and clear of any Lien (except as otherwise disclosed in Schedule 3.13).

(iii)    Each Subsidiary is a corporation or other legal entity duly organized, validly existing and, where applicable, in good standing under the laws of its jurisdiction of organization, and is duly qualified as a foreign corporation or other legal entity and, where applicable, is in good standing in each jurisdiction in which such qualification is required by law, other than those jurisdictions as to which the failure to be so qualified or in good standing could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Each such Subsidiary has the corporate or other power and authority to own or hold under lease the properties it purports to own or hold under lease and to transact the business it transacts and proposes to transact.

(iv)    No Subsidiary is a party to, or otherwise subject to any legal, regulatory, contractual or other restriction (other than this Guaranty, the agreements listed on Schedule 3.13 and customary limitations imposed by corporate law or similar statutes) restricting the ability of such Subsidiary to pay dividends out of profits or make any other similar distributions of profits to the Guarantor or any of its Subsidiaries that owns outstanding shares of capital stock or similar equity interests of such Subsidiary.

**3.14.    Compliance with Laws, Other Instruments, Etc.**  The execution, delivery and performance by each Credit Party of this Guaranty or any other Transaction Document to which such Credit Party is a party does not and, with respect to any of the documents or other matters

referred to below as in effect on the date hereof, will not (i) contravene, result in any breach of, or constitute a default under, or result in the creation of any Lien in respect of any property of the Guarantor or any Subsidiary under, any indenture, mortgage, deed of trust, loan, purchase or credit agreement, lease, corporate charter or by-laws, or any other agreement or instrument to which the Guarantor or any Subsidiary is bound or by which the Guarantor or any Subsidiary or any of their respective properties may be bound or affected, (ii) conflict with or result in a breach of any of the terms, conditions or provisions of any order, judgment, decree, or ruling of any court, arbitrator or Governmental Authority applicable to the Guarantor or any Subsidiary or (iii) violate any provision of any statute or other rule or regulation of any Governmental Authority applicable to the Guarantor or any Subsidiary.

**3.15.    Licenses, Permits, Etc.**  The Guarantor and each of its Subsidiaries owns or has the right to use all the patents, trademarks, permits, domain names, service marks, trade names, copyrights, licenses, franchises, inventions, trade secrets, proprietary information and know-how of any type, whether or not written (including, but not limited to, rights in computer programs and databases) and formulas, or rights with respect to the foregoing, and has obtained assignments of all leases, licenses and other rights of whatever nature, necessary for the present conduct of its business, without any known conflict with the rights of others which, or the failure to own or have which, as the case may be, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**3.16.    [Reserved].**

**3.17.    Environmental Matters**.

(i)    Neither the Guarantor nor any Subsidiary has knowledge of any claim or has received any notice of any claim, and no proceeding has been instituted raising any claim against the Guarantor or any of its Subsidiaries or any of their respective real properties now or formerly owned, leased or operated by any of them or other assets, alleging any damage to the environment or violation of any Environmental Laws, except, in each case, such as could not reasonably be expected to result in a Material Adverse Effect.

(ii)    Neither the Guarantor nor any Subsidiary has knowledge of any facts which would give rise to any claim, public or private, of violation of Environmental Laws or damage to the environment emanating from, occurring on or in any way related to real properties now or formerly owned, leased or operated by any of them or to other assets or their use, except, in each case, such as could not reasonably be expected to result in a Material Adverse Effect.

(iii)    Neither the Guarantor nor any Subsidiary has stored any Hazardous Materials on real properties now or formerly owned, leased or operated by any of them and has not disposed of any Hazardous Materials in a manner contrary to any Environmental Laws in each case in any manner that could reasonably be expected to result in a Material Adverse Effect.

A/74565836.10

(iv)    All buildings on all real properties now owned, leased or operated by the Guarantor or any Subsidiary are in compliance with applicable Environmental Laws, except where failure to comply could not reasonably be expected to result in a Material Adverse Effect.

## 4.    AFFIRMATIVE COVENANTS

So long as any Note shall remain unpaid, the Guarantor covenants as follows:

**4.1.    Financial Statements**.  The Guarantor will deliver to each holder of Notes in duplicate or in electronic format (it being understood that the Guarantor need not duplicate delivery by the Company of the financial statements or other items required to be delivered under paragraph 5A of the Note Agreement):

(i)    as soon as practicable and in any event within 45 days after the end of each quarterly period (other than the last quarterly period) in each fiscal year of Lee, a consolidating and consolidated statement of income and a consolidated statement of cash flows of the Guarantor and its Subsidiaries for such quarterly period and for the period from the beginning of the current fiscal year to the end of such quarterly period, and a consolidating and consolidated balance sheet of the Guarantor and its Subsidiaries as at the end of such quarterly period, setting forth in each case in comparative form figures for the corresponding period in the preceding fiscal year (if applicable, in the case of the Company and its Subsidiaries), all in reasonable detail and certified by an authorized financial officer of Lee, subject to changes resulting from year-end adjustments;

(ii)    as soon as practicable and in any event within 90 days after the end of each fiscal year of Lee, a consolidating and consolidated statement of income and a consolidating and consolidated balance sheet of the Guarantor and its Subsidiaries as at the end of such year and consolidated statements of cash flows and stockholders' equity of the Guarantor and its Subsidiaries for such year, setting forth in each case in comparative form corresponding consolidated figures from the preceding annual audit, all in reasonable detail and satisfactory in scope to the Required Holder(s) and, as to the consolidated statements, audited by independent public accountants of recognized standing selected by the Guarantor whose opinion shall be in scope and substance satisfactory to the Required Holder(s) which audit reports shall not include any scope limitation or any going concern or other material qualification (except that such opinion for the Guarantor's fiscal year ending in September 2015 may include a going concern limitation related to the refinancing of the Notes and/or the Debt outstanding under the Credit Agreement, the Second Lien Loan Agreement or this Guaranty) and, as to the consolidating statements, certified by an authorized financial officer of Lee;

(iii)    promptly upon transmission thereof, copies of all such financial statements, proxy statements, notices and reports as the Guarantor shall send to its stockholders and copies of all registration statements (without exhibits) and all reports (other than reports as to which the Guarantor shall receive confidential

A/74565836.10

treatment) which the Guarantor or any Subsidiary (including the Company) files with the Securities and Exchange Commission (or any governmental body or agency succeeding to the functions of the Securities and Exchange Commission);

(iv)    promptly upon receipt thereof, a copy of each other report submitted to the Guarantor or any Subsidiary by independent accountants in connection with any annual, interim or special audit made by them of the books of the Guarantor or any Subsidiary;

(v)    within 30 days after the end of each fiscal month of Lee, the consolidated balance sheet of Lee and its Subsidiaries as at the end of such fiscal month and the related consolidated statements of income and, to the extent prepared, statements of cash flows for such fiscal month and for the elapsed portion of the fiscal year ended with the last day of such fiscal month, in each case setting forth comparative figures for the corresponding fiscal month in the prior fiscal year;

(vi)    to the extent prepared by the Guarantor or the Company, within 30 days after the end of each fiscal month of the Guarantor, consolidated and consolidating balance sheets of the Guarantor and its Subsidiaries as at the end of such fiscal month and the related consolidated and consolidating statements of income and cash flows for such fiscal month and for the elapsed portion of the Fiscal Year ended with the last day of such fiscal month, in each case setting forth comparative figures for the corresponding fiscal month and period in the prior fiscal year;

(vii)    no later than the first Business Day of every other week (beginning on the first Monday after the Restructuring Closing Date), a forecast for the succeeding 13-week period of the projected consolidated cash flows of (x) Lee and its Subsidiaries, and (y) the Guarantor and its Subsidiaries, each taken as a whole (such forecast to contain the same level of detail used in such forecasts delivered to the holders of the Prepetition Notes commencing in October, 2011), together with a variance report of actual cash flow for the immediately preceding period for which a forecast was delivered against the then current forecast for such preceding period;

(viii)    promptly, and in any event within 45 days following the end of each fiscal quarter in each fiscal year of Lee, a written report of a Responsible Officer, in form and scope reasonably satisfactory to the Required Holders (such satisfaction to be presumed in the absence of an objection delivered to the Company within 30 days after the receipt of such report), setting forth a summary in reasonable detail of all Restricted Intercompany Charges, including cash and non-cash activities, organized by category of intercompany activity, by and among (x) Lee and its Subsidiaries (other than the Pulitzer Entities), on the one hand, and the Pulitzer Entities, on the other hand, and (y) the Pulitzer Entities and Star Publishing, and a reconciliation of intercompany balances with respect to each of (x) and (y);

(ix)    promptly, and in any event within 90 days following the end of each fiscal year (or following such shorter intervals as the same may be prepared), an

update, in a directly comparable format, of the financial model delivered to the Purchasers on the Restructuring Closing Date, setting forth the projected financial performance of the Guarantor and its Subsidiaries for the current fiscal year (prepared on a month-by-month basis) and for each of the next four (4) fiscal years (prepared on an annual basis);

(x)    promptly, and in any event within 45 days following the end of each fiscal year  (or following such shorter intervals as the same may be prepared), a pension valuation/status report, in form and scope reasonably satisfactory to the Required Holders (such satisfaction to be presumed in the absence of an objection delivered to the Company within 30 days after the receipt of such update), setting forth in reasonable detail the extent to which the pension obligations of the Guarantor and its Subsidiaries are funded, together with revised projections of future cash payments in respect of such pension obligations;

(xi)    promptly, and in any event within 30 days following the end of each fiscal month of Lee, a management report describing the financial performance and operations of Lee and its subsidiaries in a form consistent with, and containing the same level of detail as, reports made available to the holders of the Prepetition Notes commencing in October, 2011; and

(xii)    with reasonable promptness, such other information and documents as any holder of Notes may reasonably request.

Together with each delivery of financial statements required by clauses (i) and (ii) above, the Guarantor will deliver to each holder of Notes an Officer's Certificate, substantially in the form of Exhibit A attached hereto, executed on behalf of the Guarantor and demonstrating (with computations in reasonable detail) compliance by the Guarantor and its Subsidiaries (including the Company) with the provisions of Sections 5.1, 5.5, 5.8 and 5.12 of this Guaranty and stating that there exists no Event of Default or Default, or, if any Event of Default or Default exists, specifying the nature and period of existence thereof and what action the Guarantor proposes to take with respect thereto.  Together with each delivery of financial statements required by clause (ii) above, the Guarantor will use reasonable efforts to deliver or cause to be delivered to each holder a certificate of such accountants stating that, in making the audit necessary for their report on such financial statements, they have obtained no knowledge of any Event of Default or Default or, if they have obtained knowledge of any Event of Default or Default, specifying the nature and period of existence thereof.  Such accountants, however, shall not be liable to anyone by reason of their failure to obtain knowledge of any Event of Default or Default which would not be disclosed in the course of an audit conducted in accordance with generally accepted auditing standards.  Together with all financial statements of the Guarantor and its Subsidiaries required to be delivered pursuant to this paragraph 6A, the Guarantor will deliver or cause to be delivered a reconciliation reflecting the changes that would be required to such financial statements had they been prepared in accordance with the GAAP and policies used to prepare the audited financial statements of the Guarantor for the Guarantor's fiscal year ended September 25, 2011.  The Guarantor also covenants that immediately after any Responsible Officer obtains knowledge of an Event of Default or Default, it will deliver to each holder an Officer's Certificate specifying the nature and period of existence thereof and what action the Guarantor

A/74565836.10

has taken, is taking or proposes to take with respect thereto.  Each holder of Notes is hereby authorized to deliver a copy of any financial statement delivered to such holder pursuant to this Section 4.1 to any regulatory body having jurisdiction over such holder.

**4.2.    Inspection of Properties**.  The Guarantor will permit any Person designated by any holder in writing, at such holder's expense if no Event of Default then exists and at the Company's expense if an Event of Default then exists, to visit and inspect any of the properties of the Guarantor and its Subsidiaries, to examine the corporate or limited liability company books and financial records of the Guarantor and its Subsidiaries and make copies thereof or extracts therefrom and to discuss the affairs, finances and accounts of any of such limited liability companies or corporations with the principal officers of the Guarantor and its independent public accountants, all at such reasonable times and as often as such holder may reasonably request; provided, however, that, so long as no Event of Default shall have occurred, no holder of Notes shall exercise rights pursuant to this Section 4.2 without the written approval of the Required Holders (to be given or withheld in their sole discretion) and (ii) no more than two such inspections shall be conducted in any calendar year.

**4.3.    Covenant to Secure Notes Equally**.  The Guarantor will, if it or any Subsidiary shall create or assume any Lien upon any of its property or assets, whether now owned or hereafter acquired, other than Liens permitted by the provisions of Section 5.2 (unless prior written consent to the creation or assumption thereof shall have been obtained pursuant to Section 7.2), make or cause to be made effective provision whereby the Guaranteed Obligations will be secured by such Lien equally and ratably with any and all other Debt thereby secured, so long as any such other Debt shall be so secured; provided that the creation and maintenance of such equal and ratable Lien shall not in any way limit or modify the right of the holders of the Notes to enforce the provisions of Section 5.2.

**4.4.    Business**.  Except as otherwise provided in Section 5.4, the Guarantor and its Subsidiaries taken as a whole will continue to engage in business in substantially the same fields of enterprise as conducted on the date hereof.

**4.5.    Compliance with Laws and Regulations**.  The Guarantor will, and will cause each Subsidiary to, be in material compliance with all laws, ordinances or governmental rules or regulations to which each of them is subject (including, without limitation, the laws and regulations that are referred to in Section 3.12, and those relating to equal employment opportunity and employee health and safety) which are now in effect or may be legally imposed in the future in any jurisdiction in which the Guarantor and any Subsidiary is doing business other than those laws and regulations which the Guarantor or such Subsidiary is contesting in good faith by appropriate proceedings; provided, however, (i) the Guarantor or such Subsidiary continues to operate any affected business free of any requirement to escrow or sequester any material amount of such business' profits or revenues pending resolution of such proceedings, or (ii) any non-compliance with any law or regulation could not reasonably be expected to have a Material Adverse Effect.

**4.6.    Patents, Trade Marks and Trade Names**.  The Guarantor will, and will cause each Subsidiary to, continue to own, or hold and maintain in effect, all licenses, certificates, permits, franchises and other governmental authorizations necessary to the ownership of their

A/74565836.10

respective properties or to the use of, all copyrights, franchises, licenses, marketing rights, patents, service marks, trade marks, trade names, and rights in any of the foregoing, as in the aggregate are necessary for the conduct of its business in the manner in which such business is being conducted as of the date hereof except where failure to continue to own or hold such licenses could not reasonably be expected to have a Material Adverse Effect.

4.7.    **Payment of Taxes and Other Claims**.  The Guarantor will, and will cause each of its Subsidiaries to, file all income tax or similar tax returns required to be filed in any jurisdiction and to pay and discharge all taxes shown to be due and payable on such returns and all other taxes, assessments, governmental charges, levies, trade accounts payable and claims for work, labor or materials (all the foregoing being referred to collectively as "**Claims**") payable by any of them, to the extent such Claims have become due and payable and before they have become delinquent (including, without limitation, Claims for which sums have become due and payable that have or might become a Lien on properties or assets of the Guarantor or any Subsidiary); provided, that neither the Guarantor nor any Subsidiary need pay any Claim if (i) the amount, applicability or validity thereof is contested by the Guarantor or such Subsidiary on a timely basis in good faith and in appropriate proceedings, and the Guarantor or such Subsidiary has established adequate reserves therefor in accordance with GAAP on its books or (ii) the nonpayment of all such Claims in the aggregate could not reasonably be expected to have a Material Adverse Effect.

4.8.    **ERISA Compliance**.  The Guarantor will, and will cause each ERISA Affiliate to, at all times:

> (i)    with respect to each Plan, make timely payments of contributions required to meet the minimum funding standard set forth in ERISA or the Code with respect thereto and, with respect to any Multiemployer Plan, make timely payment of contributions required to be paid thereto as provided by Section 515 of ERISA, and

> (ii)    comply with all other provisions of ERISA,

except for such failures to make contributions and failures to comply as could not reasonably be expected to have a Material Adverse Effect.

4.9.    **Execution and Delivery of Subsidiary Guaranty Agreement and Other Collateral Documents.**  Within ten (10) Business Days after any Credit Party's acquisition or formation of a Person that becomes a Subsidiary:

> (i)    the Guarantor will cause such Subsidiary to execute and deliver to each holder of Notes (a) the Subsidiary Guaranty Agreement, or a joinder thereto, (b) an appropriate joinder to the Security Agreement and (c) such other documents necessary to grant a first priority Lien in such Subsidiary's assets (other than, in the case of Star Publishing, the Excluded TNI Assets) in favor of the Collateral Agent for the benefit of the holders of the Notes;

> (ii)    the Guarantor (if such Subsidiary is a direct subsidiary of the Guarantor) will pledge or will cause the direct parent of such Subsidiary (if such

Subsidiary is not a direct subsidiary of the Guarantor) to pledge the equity interests of such Subsidiary pursuant to a pledge agreement substantially similar in form to the Pledge Agreement; and

(iii)    the Guarantor will deliver (or cause to be delivered) such certificates accompanying authorizing resolutions and corporate or similar constitutive documents and other agreements, instruments, opinions and other documents as the Required Holders may reasonably request, each of the foregoing to be in form and substance reasonably satisfactory to the Required Holders.

In addition to the foregoing, the Guarantor will, and will cause each Subsidiary to, within thirty (30) days after such Person shall have obtained title (whether in fee or, if requested by the Required Holders with respect to any leasehold interest of the Guarantor or any Subsidiary, a leasehold interest) to any real property with a Fair Market Value, individually, of more than $3,000,000, take such action as shall be reasonably necessary to grant a first priority Lien in favor of the Collateral Agent to secure the Notes with such Person's interest in such real property and to obtain title insurance in an amount reasonably required by the Required Holders. Such Lien shall be documented and recorded to the reasonable satisfaction of the Required Holders.

**4.10.    Insurance**.    The Guarantor will, and will cause each of its Subsidiaries to, maintain, with financially sound and reputable insurers, (i) insurance with respect to their respective properties and businesses against such casualties and contingencies, of such types, on such terms and in such amounts (including deductibles, co-insurance and self-insurance, if adequate reserves are maintained with respect thereto) as is customary in the case of entities of established reputations engaged in the same or a similar business and similarly situated and (ii) such other insurance coverages as may be required under the terms of the Collateral Documents.

**4.11.    Maintenance of Properties**.    The Guarantor will, and will cause each of its Subsidiaries to, maintain and keep, or cause to be maintained and kept, their respective properties in good repair, working order and condition (other than ordinary wear and tear), so that the business carried on in connection therewith may be properly conducted at all times, *provided* that this Section shall not (i) prevent the Guarantor or any Subsidiary from discontinuing the operation and the maintenance of any of its properties if such discontinuance is desirable in the conduct of its business and the Guarantor has concluded that such discontinuance could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or (ii) be interpreted to require the Guarantor to make Capital Expenditures in respect of maintenance in excess of the amounts permitted to be spent on Capital Expenditures under this Guaranty.

**4.12.    Corporate Existence, Etc.**    Subject to Section 5.7, the Guarantor will at all times preserve and keep its corporate existence in full force and effect.  Subject to Sections 5.5 and 5.7, the Guarantor will at all times preserve and keep in full force and effect the corporate existence of each of its Subsidiaries (unless merged into the Guarantor or a Wholly-Owned Subsidiary) and all rights and franchises of the Guarantor and its Subsidiaries unless, in the good faith judgment of the Guarantor, the termination of or failure to preserve and keep in full force and effect such corporate existence, right or franchise could not, individually or in the aggregate, have a Material Adverse Effect.

**4.13.    Books and Records**.  The Guarantor will, and will cause each of its Subsidiaries to, maintain proper books of record and account in conformity with GAAP and all applicable requirements of any Governmental Authority having legal or regulatory jurisdiction over the Guarantor or such Subsidiary, as the case may be.

**4.14.    Lee/Pulitzer Contribution Transaction**.    (i) The Guarantor will use commercially reasonable efforts to obtain the necessary consents and approvals to permit its contribution of the Sandler V Assets to the pension plans of the Guarantor and its Subsidiaries (the "**Contribution**") and, (ii) to the extent such consents and approvals are obtained, the Guarantor will (a) promptly (and in any event within 3 Business Days of receipt thereof) notify all holders of the Notes of the receipt of such consents and approvals and any terms, conditions or qualifications relating thereto, and (b) upon a determination in the Guarantor's reasonable commercial judgment that the terms and conditions set forth in such consent or approval with respect to the Contribution are acceptable, make the Contribution within 60 calendar days thereafter.

## 5.    NEGATIVE COVENANTS

So long as any Note shall remain unpaid, the Guarantor covenants as follows:

**5.1.    Financial Covenants.**

(i)    Minimum Consolidated EBITDA.  With respect to any fiscal quarter ending prior to the Replacement Covenant Notice Date, the Guarantor will not permit Consolidated EBITDA for the period of four (4) consecutive fiscal quarters ended as of the last day of each fiscal quarter set forth below, to be less than the amount set forth below opposite such date:

| Fiscal Quarter Ending in | Consolidated EBITDA |
| --- | --- |
| March, 2012 | $26,700,000 |
| June, 2012 | $28,400,000 |
| September, 2012 | $25,600,000 |
| December, 2012 | $25,400,000 |
| March, 2013 | $25,300,000 |
| June, 2013 | $25,200,000 |
| September, 2013 | $25,100,000 |
| December, 2013 | $24,800,000 |
| March, 2014 | $24,700,000 |
| June, 2014 | $24,600,000 |
| September, 2014 | $24,500,000 |
| December, 2014 | $24,200,000 |

| | |
|---|---|
| March, 2015 | $24,200,000 |
| June, 2015 | $24,000,000 |
| September, 2015 | $23,900,000 |

(ii)    Consolidated Debt to Consolidated EBITDA.  With respect to any fiscal quarter ending after the Replacement Covenant Notice Date, the Guarantor will not permit the ratio of (a) Consolidated Debt as of the last day of such fiscal quarter to (b) Consolidated EBITDA for the four consecutive fiscal quarters ended as of such last day to be greater than 2.25 to 1.00.

5.2.    **Liens**.  The Guarantor will not, and will not permit any Subsidiary to, directly or indirectly, create, assume or suffer to exist (upon the happening of a contingency or otherwise) any Lien on or with respect to any of its property or assets, whether now owned or hereafter acquired, or any income or profits therefrom, or assign or otherwise convey the right to receive income or profits (whether or not provision is made for the equal and ratable securing of the Guaranteed Obligations in accordance with the provisions of Section 4.3), except:

(i)    mechanics', workmen's, repairmen's, warehousemen's, carriers' or other like Liens arising or incurred in the ordinary course of business for amounts which are not delinquent or are being actively contested in good faith by appropriate proceedings;

(ii)    with respect to real property, (a) easements, quasi-easements, licenses, covenants, rights-of-way and other similar restrictions, including any other agreements, conditions, restrictions or other matters which would be shown by a current title report or other similar report or listing, (b) any conditions that would be shown by a current survey or physical inspection and (c) zoning, building and other similar restrictions;

(iii)    Liens for taxes or assessments or other governmental charges or levies not yet due or which are being actively contested in good faith by appropriate proceedings if adequate reserves with respect thereto are maintained on the books of the Guarantor or its Subsidiaries, as the case may be, in accordance with GAAP;

(iv)    other Liens which were not incurred in connection with the borrowing of money or the obtaining of advances or credit, and which do not in the aggregate materially impair the use of such property and assets in the operation of the business of the Guarantor and its Subsidiaries, or materially detract from the value of such property or assets for the purpose of the business of the Guarantor and its Subsidiaries, taken as a whole;

(v)    Liens on property or assets of a Subsidiary (other than the Company and its Subsidiaries) to secure obligations of such Subsidiary (other than the Company and its Subsidiaries) to the Guarantor or another Subsidiary that is a Credit Party;

(vi)     any Lien existing on any property of any Person at the time it becomes a Subsidiary, or existing prior to the time of acquisition upon any property acquired by the Guarantor or any Subsidiary through purchase, merger, or consolidation or otherwise, whether or not assumed by the Guarantor or such Subsidiary, or placed upon property at the time of acquisition, construction or improvement by the Guarantor or any Subsidiary to secure all or a portion of (or to secure Debt (including any Capitalized Lease Obligation) incurred to pay all or a portion of) the purchase price or cost thereof or placed after acquisition upon property acquired, constructed or improved by the Guarantor or any Subsidiary after the Date of Closing, underlined provided that any such Lien shall not encumber any other property of the Guarantor or such Subsidiary and any Debt secured by any such Lien shall be permitted by Section 5.3;

(vii)     Liens on property owned or leased by the Guarantor or a Subsidiary (other than the Company) in favor of the United States of America or any state thereof, or any department, agency or instrumentality or political subdivision of the United States of America or any state thereof, or any political subdivision thereof, or in favor of holders of securities issued by any such entity, pursuant to any contract or statute (including, without limitation, mortgages to secure pollution control industrial revenue bonds) to secure any indebtedness incurred for the purpose of financing all or any part of the purchase price or the cost of construction of the property subject to such Liens, provided that any Debt secured thereby shall be permitted by Section 5.3;

(viii)    any Liens renewing, extending or refunding any Lien permitted by clauses (vi) and (vii) above, provided that the principal amount secured is not increased and the Lien is not extended to other property;

(ix)     any Liens permitted under paragraph 7C(1) of the Note Agreement;

(x)     Liens in favor of the Collateral Agent to secure the Secured Obligations; and

(xi)     Liens (other than Liens on the Excluded TNI Assets) securing Debt permitted by Section 5.3(iv) hereof, provided that such Liens are subject to the terms of the Intercreditor Agreement.

**5.3.    Priority Debt**. The Guarantor will not at any time permit any Priority Debt to exist except (i) Debt (including, without limitation, Capitalized Lease Obligations) secured by Liens permitted by clauses (vi) and (vii) of Section 5.2 provided that the aggregate principal amount of all such Debt shall not at any time exceed $1,000,000, (ii) unsecured Debt in respect of the reimbursement obligations of letters of credit issued or in respect of worker's compensation arrangements not to exceed $5,000,000 outstanding at any time, (iii) unsecured Debt subordinated to the Secured Obligations on terms and conditions satisfactory to the Required Holders, and (iv) Debt of the Credit Parties under any guarantee of the Debt under or in respect of the Second Lien Loan Agreement (or any Permitted Refinancing Debt in respect thereof), so long as (a) the Intercreditor Agreement is in full force and effect, and (b) the

aggregate principal amount of the Debt which is guaranteed by any Credit Party in respect of the Second Lien Loan Agreement (or any Permitted Refinancing Debt in respect thereof) does not exceed $175,000,000 at any time.

**5.4.** **Loans, Advances and Investments**. The Guarantor will not, and will not permit any Subsidiary to, make or permit to remain outstanding any loan or advance to, or own, purchase or acquire any stock, obligations or securities of, or any interest in, or make any capital contribution to, any other Person, except that the Guarantor or any Subsidiary may:

(i)     [reserved];

(ii)     make or permit to remain outstanding any loans, advances or capital contributions from any Credit Party to another Credit Party;

(iii)     own, purchase or acquire stock, obligations or securities of or other equity interests in a Subsidiary or a Person which immediately after such purchase or acquisition will be a Subsidiary;

(iv)     permit to remain outstanding loans, advances and other investments existing on the Effective Date (as set forth on Schedule 5.4 hereto) in any business principally engaged in publishing (print or electronic) or related media activity;

(v)     make and permit to remain outstanding loans, advances and other investments received in settlement of debts (created in the ordinary course of business) owing to the Guarantor or any Subsidiary;

(vi)     own, purchase or acquire commercial paper issued by any corporation or bankers' acceptances issued by any member bank of the Federal Reserve System, in either case, maturing within one year of the date of purchase and rated, by at least two of S&P, Moody's and Fitch Investors Service, Inc., "A-1", "P-1" and "F-1", respectively, and payable in the United States in United States dollars;

(vii)     own, purchase or acquire certificates of deposit in any member bank of the Federal Reserve System having, or which is the principal banking subsidiary of a bank holding company having, a long-term unsecured debt rating of at least "A" or the equivalent thereof from S&P or "A2" or the equivalent thereof from Moody's, all due within one year from the date of original issue thereof and payable in the United States in United States dollars;

(viii)     own, purchase or acquire repurchase agreements of any member bank of the Federal Reserve System having, or which is the principal banking subsidiary of a bank holding company having, a long-term unsecured debt rating of at least "A" or the equivalent thereof from S&P or "A2" or the equivalent thereof from Moody's, for terms of less than one year in respect of commercial paper and certificates of deposit referred to in the foregoing clauses (vi) and (vii) and obligations referred to in clauses (ix) and (x) below;

31

(ix)    own, purchase or acquire obligations of the United States government or any agency thereof;

(x)    own, purchase or acquire obligations guaranteed by the United States government or any agency thereof;

(xi)    own, purchase or acquire investments in stocks of investment companies registered under the Investment Company Act of 1940 which invest primarily in obligations of the type described in clauses (vi), (vii), (viii), (ix) or (x) above, provided that any such investment company shall have an aggregate net asset value of not less than $500,000,000;

(xii)    own, purchase or acquire investments in money market funds that are classified as current assets in accordance with GAAP, and that are rated "AAAm" or the equivalent by S&P, Moody's or Fitch Investors Service, Inc., which funds are managed by either (a) Persons having capital and surplus, or net worth, in excess of $500,000,000 or (b) any Person that is a direct or indirect subsidiary of a Person described in the foregoing clause (a);

(xiii)    endorse negotiable instruments for collection in the ordinary course of business;

(xiv)    make or permit to remain outstanding travel and other like advances to officers and employees in the ordinary course of business;

(xv)    make or permit to remain outstanding investments in demand deposit accounts maintained by the Guarantor or any Subsidiary in the ordinary course of its business;

(xvi)    make or permit to remain outstanding investments consisting of Eurodollar time deposits, maturing within three months after the making thereof, with any branch of a United States commercial bank having capital and surplus of not less than $1 billion in the aggregate;

(xvii)    make or permit to remain outstanding investments in municipal obligations having a rating of "Aaa" by Moody's or "AAA" by S&P;

(xviii)    permit to remain outstanding investments of the Guarantor and its Subsidiaries set forth on Schedule 5.4;

(xix)    own, purchase or acquire notes and bonds issued by any domestic corporate issuer and rated at least A3 by Moody's or A- by S&P;

(xx)    own, purchase or acquire investments in commingled funds/portfolios that invest primarily in U.S. dollar denominated obligations, with a weighted average portfolio maturity of 120 days or less, and rated "AAA" or the equivalent, by at least two of S&P, Moody's and Fitch Investors Service, Inc., which funds are managed by either (a) Persons having capital and surplus, or net worth, in excess of

32

$500,000,000 or (b) any Person that is a direct or indirect subsidiary of a Person described in the foregoing clause (a);

(xxi)   permit the Lee Payable to remain outstanding so long as it shall bear interest (on a pay-in-kind basis) at a rate per annum equal to LIBOR plus 0.75% (75 basis points);

(xxii)  make or permit to remain outstanding loans and advances permitted by Section 5.8(i);

(xxiii) in the case of the Guarantor, own, purchase or acquire investments in the Associated Press Digital Rights Agency or any successor thereto or any Affiliate thereof for Fair Market Value (as determined in good faith by the Board of Directors of the Guarantor at the time of such purchase or acquisition) in an aggregate amount not to exceed $750,000 at any time outstanding; provided that (a) the Guarantor shall be entitled to receive its ratable share (based on the aggregate amount of investments made by Lee and each of its Subsidiaries (other than the Guarantor), on the one hand, and the Guarantor, on the other hand) of any Equity Interests of such Person issued in consideration for, or on account of, the aggregate investments made in such Person by Lee and its Subsidiaries, (b) any such Equity Interests received by the Guarantor shall be pledged in favor of the Collateral Agent to secure the Secured Obligations in accordance with the Collateral Documents, and (c) the Guarantor shall, and shall cause its Subsidiaries to, vote or otherwise give their consent in respect of all such Equity Interests of such Person beneficially owned by the Guarantor or its Subsidiaries for the election to the board of directors (or other similar governing body) of such Person of Mary Junck or her designee (or any person acceptable to the Required Holders), provided further that the foregoing proviso shall not apply to the issuance of fractional Equity Interests to the extent that the issuance thereof is prohibited by the organization documents of Associated Press Digital Rights Agency as in effect on the date hereof; and

(xxiv) deliver or permit to be delivered consideration in connection with the redemption of the "phantom equity interests" held by Herald as contemplated by the Redemption Agreement (as in effect on the Restructuring Closing Date) consisting solely of common stock of Lee or cash contributed by Lee for purposes of making such delivery (it being understood that any such cash contributed by Lee shall reduce the Lee Payable by an amount equal to such cash contribution);

provided that, notwithstanding the foregoing, the Guarantor will not permit Star Publishing to make, or permit to remain outstanding, any loan or advance to, or own, purchase or acquire any stock, obligations or securities of, all or substantially all of the assets of, or any interest in, or make any capital contribution to, any Person or purchase or acquire the assets comprising any line of business or business unit or division thereof, except to the extent required under the terms of the TNI Agreement.

**5.5.    Sale or Disposition of Assets**.  The Guarantor will not, and will not permit any Subsidiary to, engage in any Asset Sale (i) if the aggregate amount of Asset Sale Proceeds in

respect of any one transaction or series of related transactions would be equal to or less than $1,000,000 unless at least 75% of such Asset Sale Proceeds consist of cash or (ii) if the aggregate amount of Asset Sale Proceeds in respect of any one transaction or series of related transactions would be more than $1,000,000 unless such Asset Sale Proceeds consist only of cash and the Required Holders have given their prior written consent thereto; *provided, however,* that notwithstanding the foregoing, no Asset Sale shall involve the sale of any Equity Interests in Star Publishing or the Equity Interests of TNI Partners held by Star Publishing.

**5.6.    Sale and Lease-Back**.  The Guarantor will not, and will not permit any Subsidiary to, enter into any arrangement with any lender or investor or under which such lender or investor is a party, providing for the leasing or other similar arrangement by the Guarantor or any Subsidiary of real or personal property used by the Guarantor or any Subsidiary in the operations of the Guarantor or any Subsidiary, which has been or is sold or transferred by the Guarantor or any Subsidiary to such lender or investor or to any Person to whom funds have been or are to be advanced by such lender or investor on the security of such rental obligations of the Guarantor or such Subsidiary, except that the Guarantor or any Subsidiary (other than the Company and its Subsidiaries) may enter into sale and lease-back transactions involving newspaper equipment or facilities acquired after the Effective Date if (i) such arrangement shall be for a period of less than three years by the end of which the use of such property by the lessee will be discontinued, (ii) the Guarantor or such Subsidiary complies with Section 5.5 with respect to such transaction and (iii) the property immediately prior to such sale could have been subjected to a Lien securing Debt in an amount equal to such net proceeds and which Lien would be permitted by clause (vi) of Section 5.2.

**5.7.    Merger**.  The Guarantor will not, and will not permit any Subsidiary to, merge or consolidate with any other Person except that any Subsidiary may merge or consolidate with the Guarantor (provided that the Guarantor shall be the continuing or surviving Person) or any one or more other Subsidiaries that is a Credit Party; provided that nothing in this Section 5.7 shall restrict any such transaction which, if structured as an Asset Sale, would be permitted under Section 5.5.

**5.8.    Transactions With Affiliates; Lee Company Transactions.**

(i)    Subject to clause (ii) of this Section 5.8, the Guarantor will not, and will not permit any Subsidiary to, directly or indirectly enter into or be a party to any transaction or arrangement, including, without limitation, the purchase, sale, exchange or use of any property or asset, or any interest therein, whether real, personal or mixed, or tangible or intangible, or the rendering of any service, with any Affiliate, except (a) for any such transaction by and among the Credit Parties only, (b) for the transaction contemplated by Section 5.4(xxiv), (c) for the payment of the Allocable Share of the Lee/Pulitzer Restructuring Costs, (d) for any Unrestricted Intercompany Transaction and (e) the Guarantor may make Restricted Intercompany Charges if either (1) (x) such Restricted Intercompany Charges are consistent in nature and manner of computation with the types of Restricted Intercompany Charges incurred during the period from March [__], 2009 through and including September [__], 2011 and (y) any such Restricted Intercompany Charges which are to be paid in cash do not exceed an aggregate amount of

$5,500,000 in any fiscal year of the Guarantor, or (2) such Restricted Intercompany Charges arise from reasonably expected and identifiable cost-saving measures relating to goods and services provided to the Guarantor and its Subsidiaries which are implemented after the Restructuring Closing Date as set forth in an Officer's Certificate delivered to the holders of the Notes by the chief financial officer of the Guarantor, so long as (A) with respect to any goods and services proposed to be provided by any Lee Company as part of the implementation of any such cost-savings measures, the Restricted Intercompany Charges to be charged by any Lee Company to provide such goods and services to the Guarantor during the four successive fiscal quarters following such implementation (and for each successive period of four consecutive fiscal quarters ending thereafter) are reasonably expected to be no greater than the cost for the same goods and services previously paid in cash by the Guarantor for the period of four consecutive fiscal quarters of the Guarantor then most recently ended immediately prior to the implementation of such cost-saving measures, and (B) the aggregate amount paid in cash by the Guarantor in respect of such Restricted Intercompany Charges as set forth in this clause (2) does not exceed $2,000,000 in any fiscal year of the Guarantor.

(ii)    All payments in respect of Restricted Intercompany Charges or Unrestricted Intercompany Transactions pursuant to Section 5.8(i) above shall meet the following requirements: (a) any such transaction is in the ordinary course of, and pursuant to the reasonable requirements of, the Guarantor's and each Subsidiary's business, as the case may be, (b) any such transaction is upon fair and reasonable terms that are no less favorable to the Guarantor and/or any of its Subsidiaries, as the case may be, than those which might be obtained in an arm's length transaction with a Person who is not an Affiliate and (c) any payment required to be made in cash is made by the Guarantor not more than 3 days prior to delivery of such goods, the rendering of such services or the making of such payments by any Lee Company to a third party.

**5.9.    Sale of Stock and Debt of Subsidiaries**.  Other than pursuant to the Collateral Documents, the Guarantor will not, and will not permit any Subsidiary to, sell or otherwise dispose of, or part with control of, any shares of stock of (or other equity interests in) or Debt of any Subsidiary, _except_ that shares of stock of (or other equity interests in) or Debt of any Subsidiary (other than the Company or its Subsidiaries) may be sold or otherwise disposed of to the Guarantor or another Subsidiary that is a Credit Party, and except that all shares of stock of (or other equity interests in) and Debt of any Subsidiary (other than the Company or its Subsidiaries) at the time owned by or owed to the Guarantor or any Subsidiary may be sold as an entirety for a cash consideration which represents the Fair Market Value (as determined in good faith by the Board of Directors of the Guarantor) at the time of sale of the shares of stock or other equity interests and Debt so sold, _provided_ that the Guarantor or such Subsidiary complies with Section 5.5 with respect to such sale, and _further provided_ that, in any event, at the time of such sale, such Subsidiary shall not own, directly or indirectly, any shares of stock of (or other equity interests in) or Debt of any other Subsidiary (unless all of the shares of stock of (or other equity interests in) and Debt of such other Subsidiary owned, directly or indirectly, by the Guarantor and all Subsidiaries are simultaneously being sold as permitted by Section 5.5 and this Section 5.9).

35

**5.10.    Issuance of Stock by Subsidiaries**.    The Guarantor will not permit any Subsidiary to issue, sell or otherwise dispose of, any shares of its stock (of any class) or any other equity interests except to the Guarantor or another Subsidiary which is a Credit Party.

**5.11.    Limitation on Certain Restrictive Agreements**.    The Guarantor will not permit any Subsidiary to enter into or suffer to exist any contractual obligation which in any way restricts the ability of such Subsidiary to (i) make any Distributions to the Guarantor or any other Subsidiary or (ii) transfer any of its property or assets to the Guarantor or any other Subsidiary, [except for any such restrictions set forth in the Credit Agreement and the Second Lien Loan Agreement or in any documents, instruments or agreements evidencing any Permitted Refinancing Debt thereof, as applicable, in each case, as in effect on the date hereof, or, with respect to any Permitted Refinancing Debt, on the date of the incurrence or issuance thereof].

**5.12.    Capital Expenditures**.

(i)    The Guarantor will not, and will not permit any of its Subsidiaries to, make Capital Expenditures in any of the following fiscal years of the Guarantor in an aggregate amount for all such Persons in excess of the amount set forth below opposite such fiscal year:

| Fiscal Year Ending | Aggregate Amount of Capital Expenditures |
|---|---|
| 2012 | $5,600,000 |
| 2013 | $4,000,000 |
| 2014 | $4,000,000 |
| 2015 | $4,000,000 |

(ii)    In the event that the amount of Capital Expenditures permitted to be made by the Guarantor and its Subsidiaries during any fiscal year of the Guarantor is greater than the amount of Capital Expenditures actually made by the Guarantor and its Subsidiaries during such fiscal year, 100% of such excess for such fiscal year may be carried forward and utilized to make Capital Expenditures in any succeeding fiscal year.

**5.13.    Restricted Payments.**    The Guarantor will not, and will not permit any Subsidiary to, make any Restricted Payments at any time except for Restricted Payments made to another Subsidiary or the Guarantor.    The Guarantor shall cause Star Publishing to pay to the Guarantor as a dividend (i) promptly and in any event within 5 Business Days of the receipt thereof, all cash and other distributions it receives from TNI or otherwise pursuant to the TNI Agreement or otherwise and (ii) within 5 Business Days after the end of each calendar month, all cash and Cash Equivalents it holds as of the end of such calendar month (other than cash to be paid pursuant to the foregoing clause (i)).

36

**5.14.   Terrorism Sanctions Regulations**.  The Guarantor will not and will not permit any Controlled Entity to (a) become a Blocked Person or (b) have any investments in or engage in any dealings or transactions with any Blocked Person if such investments, dealings or transactions would cause any holder of a Note to be in violation of any laws or regulations that are applicable to such holder.

**5.15.   Debt.**[2]   The Guarantor will not, and will not permit any Subsidiary to, create, incur, assume, guarantee or in any way become liable for any Debt except:

(i)     Debt represented by the Transaction Documents;

(ii)     Debt or indebtedness of the Guarantor owing to any of its Subsidiaries that are Credit Parties or Debt or indebtedness owing by any Credit Party to another Credit Party; provided that such Debt or indebtedness is unsecured;

(iii)     Debt in respect of any guarantee by the Credit Parties of Debt of Lee under and in respect of the Second Lien Loan Agreement (or any Permitted Refinancing Debt in respect of the Second Lien Loan Agreement), so long as (a) the Intercreditor Agreement is in full force and effect, and (ii) the aggregate principal amount of the Debt which is guaranteed by any Credit Party in respect of the Second Lien Loan Agreement (or any Permitted Refinancing Debt in respect thereof) shall not exceed $175,000,000;

(iv)     Debt or indebtedness of the Guarantor or any of its Subsidiaries permitted under Sections 5.3, 5.4 or 5.8;

(v)     Debt of the Guarantor and its Subsidiaries consisting of trade payables incurred in the ordinary course of business;

(vi)     (a) Debt of the Guarantor and its Subsidiaries constituting Capitalized Lease Obligations, (b) other Debt of the Guarantor or its Subsidiaries to finance the purchase price or cost of property acquired, constructed or improved by the Guarantor or any Subsidiary after the Restructuring Closing Date, or (c) Debt secured by Liens existing on any property of any Person at the time it becomes a Subsidiary, or existing prior to the time of acquisition upon any property acquired by the Guarantor or any Subsidiary through purchase, merger, or consolidation or otherwise, and assumed by the Guarantor or such Subsidiary, in each case to the extent such Liens are permitted under Section 5.2(vi), provided that the aggregate principal amount of all such Debt described in subclauses (a), (b) and (c) of this clause (vi) at any time outstanding shall not exceed $5,000,000;

(vii)     Debt or indebtedness secured by Liens permitted under clauses (v) and (viii) of Section 5.2 (provided, in the case of Liens permitted under clause (viii) of Section 5.2 that renew, extend or refund any Lien permitted under clause (vi) of Section

---

[2] Debt covenant inserted since, with the elimination of the leverage ratio, there is no unsecured debt test applicable to the Guarantor.  This provision tracks the debt covenant in the Note Agreement (and does duplicate to some extent, the permissions in Section 5.3).

5.2, that such Liens shall be permitted only to the extent the Debt or indebtedness secured thereby is permitted under clause (vi) of this Section 5.15;

(viii)    unsecured Debt in respect of the reimbursement obligations of letters of credit issued or in respect of worker's compensation arrangements not to exceed $5,000,000 outstanding at any time; and

(ix)    unsecured Debt (other than the Debt permitted by Section 5.15(iii)) which is subordinated to the Secured Obligations on terms and conditions satisfactory to the Required Holders.

## 6.    EVENTS OF DEFAULT; REMEDIES

**6.1.    Events of Default**.  The occurrence of an "Event of Default" under and as defined in the Note Agreement or the occurrence of any of the following events shall constitute an "**Event of Default**" under this Guaranty:

(i)    (a) Lee or any of its Subsidiaries shall (1) default in any payment of any Debt (other than the Note Obligations) beyond the period of grace, if any, provided in an instrument or agreement under which such Debt was created or (2) default in the observance or performance of any agreement or condition relating to any Debt (other than the Note Obligations) or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Debt (or a trustee or agent on behalf of such holder or holders) to cause (determined without regard to whether any notice is required), any such Debt to become due (and/or, in the case of an Interest Rate Protection Agreement or Other Hedging Agreement, to be terminated) prior to its stated maturity, or (b) any Debt (other than the Note Obligations) of Lee or any of its Subsidiaries shall be declared to be (or shall become) due and payable (and/or, in the case of an Interest Rate Protection Agreement or Other Hedging Agreement, to be terminated), or required to be prepaid (and/or terminated, as the case may be) other than by a regularly scheduled required prepayment, prior to the stated maturity thereof, provided that it shall not be a Default or an Event of Default under this clause (xvi) unless the aggregate principal amount of all Debt as described in the preceding clauses (a) and (b) is at least $10,750,000 or unless such Debt is in respect of the Credit Agreement or the Second Lien Loan Agreement or any Permitted Refinancing Debt or any Additional Permitted Indebtedness (as defined in the Second Lien Loan Agreement); provided, however, that with respect to any breach or default under Sections [10.08 or 10.09] of the Credit Agreement (as in effect on the date hereof) or Section [__] of the Second Lien Loan Agreement (as in effect on the date hereof) (or any successor provisions or analogous financial covenants in any documentation relating to any Permitted Refinancing Debt), such breach or default shall only constitute an Event of Default under this clause (xvi) if such breach or default occurs and is not cured or waived within 30 days after the occurrence of such breach or default; or

38

(ii)    any representation or warranty made by the Guarantor herein or in any other Transaction Document or in any writing furnished in connection with or pursuant to this Guaranty or any other Transaction Document, shall be false in any material respect on the date as of which made; or

(iii)    the Guarantor fails to perform or observe any term, covenant or agreement contained in Sections 2 or 5 of this Guaranty; or

(iv)    the Guarantor fails to perform or observe any other agreement, term or condition contained herein (other than those referred to in clause (iii)) and such failure shall not be remedied within 30 days after any Responsible Officer of the Guarantor obtains actual knowledge thereof; or

(v)    the Guarantor or any Subsidiary (other than a Subsidiary of the Company that is not a Material Subsidiary) makes an assignment for the benefit of creditors or is generally not able to pay its debts as such debts become due; or

(vi)    any decree, judgment, or order for relief in respect of the Guarantor or any Subsidiary (other than a Subsidiary of the Company that is not a Material Subsidiary) is entered under any bankruptcy, reorganization, compromise, arrangement, insolvency, readjustment of debt, dissolution or liquidation or similar law, whether now or hereafter in effect (herein called the "**Bankruptcy Law**"), of any jurisdiction; or

(vii)    the Guarantor or any Subsidiary (other than a Subsidiary of the Company that is not a Material Subsidiary) petitions or applies to any tribunal for, or consents to, the appointment of, or taking possession by, a trustee, receiver, custodian, liquidator or similar official of the Guarantor or any such Subsidiary, or of any substantial part of the assets of the Guarantor or any such Subsidiary, or commences a voluntary case under the Bankruptcy Law of the United States or any proceedings (other than proceedings for the voluntary liquidation and dissolution of any such Subsidiary) relating to the Guarantor or any such Subsidiary under the Bankruptcy Law of any other jurisdiction; or

(viii)    any such petition or application is filed, or any such proceedings are commenced, against the Guarantor or any Subsidiary (other than a Subsidiary of the Company that is not a Material Subsidiary) and the Guarantor or such Subsidiary by any act indicates its approval thereof, consent thereto or acquiescence therein, or an order, judgment or decree is entered appointing any such trustee, receiver, custodian, liquidator or similar official, or approving the petition in any such proceedings, and such order, judgment or decree remains unstayed and in effect for more than 60 days; or

(ix)    any order, judgment or decree is entered in any proceedings against the Guarantor or any Subsidiary (other than a Subsidiary of the Company that is not a Material Subsidiary) decreeing the dissolution of the Guarantor or such Subsidiary

and such order, judgment or decree remains unstayed and in effect for more than 60 days; or

(x)    one or more final judgments in an aggregate amount in excess of $10,000,000 is rendered against the Guarantor or any of its Subsidiaries and, within 60 days after entry thereof, any such judgment is not discharged or execution thereof stayed pending appeal, or within 60 days after the expiration of any such stay, such judgment is not discharged; or

(xi)    (a) any Plan shall fail to satisfy the minimum funding standards of ERISA or the Code for any plan year or part thereof or a waiver of such standards or extension of any amortization period is requested or granted under section 412 of the Code, (b) a notice of intent to terminate any Plan in a distress termination (within the meaning of ERISA section 4041(c)) shall have been or is reasonably expected to be filed with the PBGC or the PBGC shall have instituted proceedings under ERISA section 4042 to terminate or appoint a trustee to administer any Plan or the PBGC shall have notified the Guarantor or any ERISA Affiliate that a Plan may become a subject of such proceedings, (c) the aggregate "amount of unfunded benefit liabilities" (within the meaning of section 4001(a)(18) of ERISA) under all Plans, determined in accordance with Title IV of ERISA, shall exceed $76,000,000, (d) the Guarantor or any ERISA Affiliate shall have incurred or is reasonably expected to incur any liability pursuant to Title I or IV of ERISA or the penalty or excise tax provisions of the Code relating to employee benefit plans, (e) the Guarantor or any ERISA Affiliate is assessed liability for a partial or complete withdrawal from any Multiemployer Plan, or (f) the Guarantor or any Subsidiary establishes or amends any employee welfare benefit plan that provides post-employment welfare benefits in a manner that would increase the liability of the Guarantor or any Subsidiary thereunder; and any such event or events described in clauses (a) through (f) above, either individually or together with any other such event or events, could reasonably be expected to have a Material Adverse Effect; or

(xii)    any Collateral Document shall cease for any reason (other than pursuant to the terms thereof) to create a valid Lien in the collateral purported to be covered thereby or such Lien shall for any reason cease to be a perfected and first priority Lien (subject only to Liens permitted by Section 5.2) and, in the case of any failure of the validity, perfection or priority of any such Lien which results from the actions or inaction of the Collateral Agent, such failure shall continue for a period of 30 days from the earlier of (i) the date on which written notice of such failure is provided to the Guarantor from any Purchaser or the Collateral Agent or (ii) actual knowledge of such failure by any Credit Party; or

(xiii)    any provision of the Tax Sharing Agreement shall be amended, waived or otherwise modified without the consent of the Required Holders or Pulitzer shall fail diligently to enforce its rights thereunder in any material respect.

**6.2.    Remedies**.  Upon the occurrence of an Event of Default under this Guaranty, the Required Holders may, at its or their option, make demand hereunder for payment of the

Guaranteed Obligations and exercise any and all remedies available to it or them, whether under the Note Agreement or any other instrument or agreement entered into in connection therewith or relating thereto or otherwise at law or in equity.

## 7.    MISCELLANEOUS

**7.1.    Survival of Representations and Warranties; Entire Agreement**.    All representations and warranties contained herein or made in writing by or on behalf of the Guarantor in connection herewith shall survive the execution and delivery of this Guaranty, the purchase or transfer of any Note or portion thereof or interest therein and the payment of any Note, and may be relied upon by any subsequent holder of Notes, regardless of any investigation made at any time by or on behalf of any other holder of Notes.   All statements contained in the Transaction Documents to which the Guarantor is a party or any certificate or other instrument delivered by or on behalf of the Guarantor pursuant to or in connection with this Guaranty shall be deemed representations and warranties of the Guarantor under this Guaranty.   Subject to the preceding sentence, this Guaranty and the Transaction Documents to which the Guarantor is a party embody the entire agreement and understanding between the Guarantor and the holders of the Notes and supersede all prior agreements and understandings relating to the subject matter hereof.

**7.2.    Consent to Amendments**.   This Guaranty (or any amendment hereto) may be amended or any provision hereof may be waived, and the Guarantor may take any action herein prohibited, or omit to perform any act herein required to be performed by it, if the Guarantor shall obtain the written consent to such amendment, waiver, action or omission to act, of the Required Holder(s), except that that (i) no amendment or waiver of any of the provisions of Section 2 hereof or any defined term (as it is used therein) and (ii) no termination of this Guaranty in its entirety or release of the Guarantor herefrom will be effective unless consented to in writing by the holder or holders of all Notes at the time outstanding.   The Guarantor will not directly or indirectly pay or cause to be paid any remuneration, whether by way of supplemental or additional interest, fee or otherwise, or grant any security, to any holder of Notes as consideration for or as an inducement to the entering into by any holder of Notes or any waiver or amendment of any of the terms and provisions hereof (or any amendment hereto) unless such remuneration is concurrently paid, or security is concurrently granted, on the same terms, ratably to each holder of Notes then outstanding even if such holder did not consent to such waiver or amendment.

**7.3.    Binding Effect, etc.**   Any amendment or waiver consented to as provided in Section 7.2 hereof applies equally to all holders of Notes and is binding upon them and upon each future holder of any Note and the Guarantor without regard to whether such Note has been marked to indicate such amendment or waiver.   No such amendment or waiver will extend to or affect any obligation, covenant, agreement or Event of Default not expressly amended or waived or impair any right consequent thereon.   No course of dealing between the Guarantor and any holder of Notes nor any delay in exercising any rights hereunder or under any Note shall operate as a waiver of any rights of any holder of such Note.

**7.4.    Notices**.   All written communications provided for hereunder shall be sent by first class mail or nationwide overnight delivery service (with charges prepaid) and (i) if to any holder

of Notes, addressed to it at the address specified for such communications in Schedule A to the Note Agreement, or at such other address as such holder of Notes shall have specified to the Guarantor or the Company in writing or, if any such other holder shall not have so specified an address to the Guarantor or the Company, then addressed to such holder in care of the last holder of such Note which shall have so specified an address to the Guarantor or the Company, and (ii) if to the Guarantor, addressed to it at 900 North Tucker Boulevard, St. Louis, Missouri 63101, Attention: Senior Vice President-Finance, or at such other address as the Guarantor shall have specified to the holder of each Note in writing.

7.5.    **Severability**.    Any provision of this Guaranty which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

7.6.    **Successors and Assigns**.    All covenants and other agreements in this Guaranty shall bind the successors and assigns of the Guarantor and shall inure to the benefit of the successors and assigns of the holders of Notes (including, without limitation, any Transferee) whether so expressed or not.

7.7.    **Independence of Covenants**.    All covenants hereunder shall be given independent effect so that if a particular action or condition is prohibited by any one of such covenants, the fact that it would be permitted by an exception to, or otherwise be in compliance within the limitations of, another covenant shall not (i) avoid the occurrence of an Event of Default or Default if such action is taken or such condition exists or (ii) in any way prejudice an attempt by the holders of Notes to prohibit (through equitable action or otherwise) the taking of any action by the Guarantor or a Subsidiary which would result in an Event of Default or Default.

7.8.    **Satisfaction Requirement**.    If any agreement, certificate or other writing, or any action taken or to be taken, is by the terms of this Guaranty required to be satisfactory to any holder of Notes or to the Required Holder(s), the determination of such satisfaction shall be made by such holder or the Required Holder(s), as the case may be, in the sole and exclusive judgment (exercised in good faith) of the Person or Persons making such determination.

7.9.    **Counterparts**.    This Guaranty may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one instrument.

7.10.    **Governing Law**.    This Guaranty shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York.

7.11.    **Consent to Jurisdiction; Waiver of Immunities.**    The Guarantor hereby irrevocably submits to the jurisdiction of any New York state or Federal court sitting in New York in any action or proceeding arising out of or relating to this Guaranty, and the Guarantor hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in New York state or Federal court. The Guarantor hereby irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the

maintenance of such action or proceeding.  The Guarantor agrees and irrevocably consents to the service of any and all process in any such action or proceeding by the mailing, by registered or certified U.S. mail, or by any other means or mail that requires a signed receipt, of copies of such process to the Guarantor at its address set forth in section 7.4.  The Guarantor agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Section 7.11 shall affect the right of any holder of the Notes to serve legal process in any other manner permitted by law or affect the right of any holder of the Notes to bring any action or proceeding against the Guarantor or its property in the courts of any other jurisdiction.  To the extent that the Guarantor has or hereafter may acquire immunity from jurisdiction of any court or from any legal process (whether through service of notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) with respect to itself or its property, the Guarantor hereby irrevocably waives such immunity in respect of its obligations under this Guaranty.

    **7.12.   Waiver of Jury Trial.**  THE GUARANTOR AND THE HOLDERS OF THE NOTES AGREE TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS GUARANTY, THE NOTE AGREEMENT, THE NOTES, OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS TRANSACTION AND THE LENDER/GUARANTOR RELATIONSHIP THAT IS BEING ESTABLISHED.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.  THE HOLDERS OF THE NOTES AND THE GUARANTOR EACH ACKNOWLEDGE THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO THIS BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THE WAIVER IN THEIR RELATED FUTURE DEALINGS.  THE HOLDERS OF THE NOTES AND THE GUARANTOR FURTHER WARRANT AND REPRESENT THAT EACH HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  IN THE EVENT OF LITIGATION, THIS GUARANTY MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

A/74565836.10

IN WITNESS WHEREOF, the undersigned has caused this Guaranty to be executed and delivered by its duly authorized officer as of the date first above written to become effective as of such date.

PULITZER INC.


By:_____
Name:
Title:

**Schedule 3.3 to**
**Guaranty Agreement**

**<u>Litigation</u>**

**Schedule 3.4**
**to Guaranty Agreement**

## Outstanding Debt

Schedule 3.4

A/74565836.10

**Schedule 3.7**
**to Guaranty Agreement**

<u>**Agreements Restricting Incurrence of Debt**</u>

A/74565836.10

**Schedule 3.8**
**to Guaranty Agreement**

**<u>ERISA</u>**

A/74565836.10

**Schedule 3.13**
**to Guaranty Agreement**

**<u>Subsidiaries of the Guarantor and Ownership of Subsidiary Stock</u>**

A/74565836.10

**Schedule 5.4**
**to Guaranty Agreement**

**Existing Investments**

Schedule 5.4

A/74565836.10

<u>EXHIBIT C</u>

[FORM OF SUBSIDIARY GUARANTY AGREEMENT]

Exhibit C

A/74565634.14

Bingham Draft
11/30/11

## SUBSIDIARY GUARANTY AGREEMENT

This **SUBSIDIARY GUARANTY AGREEMENT** (this "**Subsidiary Guaranty Agreement**"), dated as of [_____], is made jointly and severally by the Persons listed on the signature pages hereof as Subsidiary Guarantors and each of the other Persons that from time to time becomes an Additional Subsidiary Guarantor pursuant to the terms of Section 11 hereof (each a "**Subsidiary Guarantor**" and collectively the "**Subsidiary Guarantors**"), in favor of each of the holders from time to time of the Notes issued under the Note Agreement referred to below (each a "**Beneficiary**", and collectively, the "**Beneficiaries**"). Capitalized terms used but not defined herein shall have the meanings given to them in the Note Agreement referred to below.

### RECITALS

**A.** Reference is made to that certain Note Agreement, dated as of [_____] (as amended, restated, supplemented or otherwise modified from time to time, the "**Note Agreement**"), by and among St. Louis Post-Dispatch LLC, a Delaware limited liability company (together with its successors and assigns, the "**Company**"), and the Beneficiaries, pursuant to which, subject to the terms and conditions set forth therein, the Company issued to such Beneficiaries the Notes.

**B.** Reference is also made to that certain Guaranty Agreement, dated as of [_____] (as amended, restated, supplemented or otherwise modified from time to time, the "**Guaranty Agreement**"), made by Pulitzer Inc., a Delaware corporation (together with its successors and assigns, the "**Parent**") in favor of the Beneficiaries, pursuant to which, subject to the terms and conditions set forth therein, the Parent guaranteed the full, complete and final payment and performance of the "Guaranteed Obligations" (as defined in the Guaranty Agreement).

**C.** On [_____], 2011, Lee and certain of its Subsidiaries including the Company (collectively, the "**Debtors**") filed voluntary petitions for relief under Chapter 11 of Title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") and continued in the possession of their property and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

**D.** On [_____], 2012, the Bankruptcy Court entered an order confirming the Joint Prepackaged Plan of Reorganization for the Debtors, dated [_____], 2011 (as in effect on the date of confirmation thereof pursuant to the Confirmation Order of the Bankruptcy Court and as it thereafter may be amended in accordance with Pulitzer Support Agreement, the "**Plan of Reorganization**").

**E.** In connection with the implementation of the Plan of Reorganization, the Beneficiaries are willing to enter into the Note Agreement and otherwise make, extend and maintain certain financial accommodations to the Company and the Parent as provided in the Note Agreement, the Notes and the Guaranty Agreement and the other Transaction Documents,

but only upon the condition, among others, that the Subsidiary Guarantors shall have executed and delivered this Subsidiary Guaranty Agreement.

<div align="center">GUARANTY</div>

**NOW, THEREFORE**, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each Subsidiary Guarantor hereby agrees as follows:

## 1.  GUARANTY.

**1.1    Guaranty.**  Each Subsidiary Guarantor hereby irrevocably, absolutely and unconditionally jointly and severally guarantees unto each Beneficiary (i) the full and prompt payment of the principal of, Yield-Maintenance Amount, if any, interest and all other amounts due with respect to the Notes from time to time outstanding, as and when such amounts shall become due and payable, whether by lapse of time, upon redemption, prepayment or purchase, by extension or by acceleration or declaration or otherwise (including (to the extent legally enforceable) interest due on overdue payments of principal, Yield-Maintenance Amount, if any, or interest at the rate set forth in the Notes or any other amounts due thereunder) in coin or currency of the United States of America which at the time of payment or demand therefor shall be legal tender for the payment of public and private debts, (ii) the full and prompt payment, performance and observance by the Company of all other obligations, covenants, conditions and agreements contained in the Note Agreement or any other instrument or agreement entered into in connection therewith or otherwise relating thereto, (iii) the full and prompt payment, performance and observance by the Parent of the "Guaranteed Obligations" (as defined in the Guaranty Agreement) and all other obligations, covenants, conditions and agreements of the Parent contained in the Guaranty Agreement or any other instrument or agreement entered into in connection therewith or otherwise relating thereto, and (iv) the full and prompt payment, upon demand by any Beneficiary, of all costs and expenses (including reasonable attorneys' fees), if any, as shall have been expended or incurred in the protection or enforcement of any right or privilege under the Note Agreement, the Notes, the Guaranty Agreement or any other instrument or agreement entered into in connection therewith or relating thereto or in the protection or enforcement of any rights, privileges or liabilities under this Subsidiary Guaranty Agreement or in any consultation or action in connection therewith or herewith (all such obligations, covenants, conditions and agreements described in the foregoing clauses (i), (ii), (iii) and (iv) being hereinafter collectively referred to as the "**Guaranteed Obligations**").

Each Subsidiary Guarantor hereby acknowledges and agrees that its liability hereunder is joint and several with any other Person(s) who may guarantee the obligations and indebtedness under and in respect of the Notes, the Note Agreement and the other Transaction Documents.

**1.2    Guaranty of Payment and Performance.**  This is a guaranty of payment and performance and not a guaranty of collection, and each Subsidiary Guarantor hereby waives any right to require that any action on or in respect of the Note Agreement, the Notes, the Guaranty Agreement or any instrument or agreement relating to the Guaranteed Obligations be brought against the Company, the Parent, any other Subsidiary Guarantor or any other Person or that resort be had to any direct or indirect security for the Notes, for the Guaranty Agreement or for

<div align="center">2</div>

this Subsidiary Guaranty Agreement or any other remedy.  Any Beneficiary may, at its option, proceed hereunder against any Subsidiary Guarantor in the first instance to collect monies when due, the payment of which is guaranteed hereby, without first proceeding against the Company, the Parent, any other Subsidiary Guarantor or any other Person and without first resorting to any direct or indirect security for the Notes, for the Guaranty Agreement or for this Subsidiary Guaranty Agreement or any other remedy.  The liability of each Subsidiary Guarantor hereunder shall in no way be affected or impaired by any acceptance by any Beneficiary of any direct or indirect security for, or other guaranties of, the Guaranteed Obligations or by any failure, delay, neglect or omission by any Beneficiary to realize upon or protect any of the Guaranteed Obligations or any Notes or other instruments evidencing the same or any direct or indirect security therefor or by any approval, consent, waiver, or other action taken or omitted to be taken by any such Beneficiary.  Each Subsidiary Guarantor (i) acknowledges that certain obligations of the Company under the Note Agreement will survive the payment or transfer of any Note and the termination of the Note Agreement, (ii) acknowledges that certain obligations of the Parent under the Guaranty Agreement will survive the payment or transfer of any Note and the termination of the Guaranty Agreement, and (iii) agrees that the obligations of each Subsidiary Guarantor hereunder with respect to such surviving obligations shall also survive the payment or transfer of any Note and the termination of the Note Agreement and the Guaranty Agreement.

**1.3    General Provisions Relating to the Subsidiary Guaranty Agreement.**

**(a)**    Each Subsidiary Guarantor hereby consents and agrees that any Beneficiary, with or without any further notice to or assent from any Subsidiary Guarantor, may, without in any manner affecting the liability of any Subsidiary Guarantor under this Subsidiary Guaranty Agreement, and upon such terms and conditions as any Beneficiary may deem advisable:

**(i)**    extend in whole or in part (by renewal or otherwise), modify, change, compromise, release or extend the duration of the time for the payment or performance of any of the Guaranteed Obligations, or waive any default with respect thereto, or waive, modify, amend or change any provision of the Note Agreement, the Notes, the Guaranty Agreement or any other instrument or agreement entered into in connection therewith or otherwise relating thereto;

**(ii)**    sell, release, surrender, modify, impair, exchange or substitute any and all property, of any nature and from whomsoever received, held by, or for the benefit of, any such Beneficiary as direct or indirect security for the payment or performance of any of the Guaranteed Obligations; or

**(iii)**    settle, adjust or compromise any claim of the Company, the Parent or any other Subsidiary Guarantor against any other Person secondarily or otherwise liable for any of the Guaranteed Obligations.

Each Subsidiary Guarantor hereby ratifies and confirms any such extension, renewal, change, sale, release, waiver, surrender, exchange, modification, amendment, impairment, substitution, settlement, adjustment or compromise and that the same shall

be binding upon it, and hereby waives any and all defenses, counterclaims or offsets which it might or could have by reason thereof, it being understood that each Subsidiary Guarantor shall at all times be bound by this Subsidiary Guaranty Agreement and remain liable hereunder.

(b)     Each Subsidiary Guarantor hereby waives: (i) notice of acceptance of this Subsidiary Guaranty Agreement by the Beneficiaries or of the creation, renewal or accrual of any liability of the Company, the Parent or any other Subsidiary Guarantor, present or future, or of the reliance of such Beneficiaries upon this Subsidiary Guaranty Agreement (it being understood that all Guaranteed Obligations shall conclusively be presumed to have been created, contracted or incurred in reliance upon the execution of this Subsidiary Guaranty Agreement); (ii) demand of payment by any Beneficiary from the Company, the Parent, any other Subsidiary Guarantor or any other Person indebted in any manner on or for any of the Guaranteed Obligations hereby guaranteed; and (iii) presentment for the payment by any Beneficiary or any other Person of the Notes or any other instrument, protest thereof and notice of its dishonor to any party thereto and to the Subsidiary Guarantors.    The obligations of each Subsidiary Guarantor under this Subsidiary Guaranty Agreement and the rights of each Beneficiary to enforce such obligations by any proceedings, whether by action at law, suit in equity or otherwise, shall not be subject to any reduction, limitation, impairment or termination, whether by reason of any claim of any character whatsoever or otherwise and shall not be subject to any defense, setoff, counterclaim, recoupment or termination whatsoever.

(c)     The obligations of each Subsidiary Guarantor hereunder shall be binding upon each Subsidiary Guarantor and its successors and assigns, and shall remain in full force and effect irrespective of:

(i)     (A) the genuineness, validity, regularity or enforceability of the Note Agreement, the Notes, the Guaranty Agreement, this Subsidiary Guaranty Agreement or any other instrument or agreement entered into in connection therewith or otherwise relating thereto, or any of the terms of any thereof, (B) the continuance of any obligation on the part of the Company, the Parent, any other Subsidiary Guarantor or any other Person on the Notes or under the Note Agreement, the Guaranty Agreement, this Subsidiary Guaranty Agreement or any such other instrument or agreement, (C) the power or authority or the lack of power or authority of (x) the Company to execute and deliver the Note Agreement and the Notes or any such other instrument or agreement, or to perform any of its obligations thereunder , (y) the Parent to execute and deliver the Guaranty Agreement or any such other instrument or agreement, or to perform any of its obligations thereunder, or (z) any other Subsidiary Guarantor to execute and deliver this Subsidiary Guaranty Agreement or any such other instrument or agreement, or to perform any of its obligations thereunder, or (D) the existence or continuance of the Company, the Parent, any other Subsidiary Guarantor  or any other Person as a legal entity;

(ii)    any default, failure or delay, willful or otherwise, in the performance by the Company, the Parent, any other Subsidiary Guarantor or any other Person of any obligations of any kind or character whatsoever of the Company, the Parent, any other Subsidiary Guarantor or any other Person (including, without limitation, the Guaranteed Obligations);

(iii)    any creditors' rights, bankruptcy, receivership or other insolvency proceeding of the Company, the Parent, any other Subsidiary Guarantor or any other Person or in respect of the property of the Company, the Parent, any other Subsidiary Guarantor or any other Person or any merger, consolidation, reorganization, dissolution, liquidation, the sale of all or substantially all of the assets of or winding up of the Company, the Parent, any other Subsidiary Guarantor or any other Person;

(iv)    impossibility or illegality of performance on the part of the Company, the Parent, any other Subsidiary Guarantor or any other Person of its obligations under the Note Agreement, the Notes, the Guaranty Agreement, this Subsidiary Guaranty Agreement or any other instrument or agreement entered into in connection therewith or otherwise relating thereto;

(v)    in respect of the Company, the Parent, any other Subsidiary Guarantor or any other Person, any change of circumstances, whether or not foreseen or foreseeable, whether or not imputable to the Company, the Parent, any other Subsidiary Guarantor or any other Person, or impossibility of performance through fire, explosion, accident, labor disturbance, floods, droughts, embargoes, wars (whether or not declared), civil commotion, acts of God or the public enemy, delays or failure of suppliers or carriers, inability to obtain materials, action of any Federal or state regulatory body or agency, change of law or any other causes affecting performance, or any other *force majeure,* whether or not beyond the control of the Company, the Parent, any other Subsidiary Guarantor or any other Person and whether or not of the kind hereinbefore specified;

(vi)    any attachment, claim, demand, charge, lien, order, process, encumbrance or any other happening or event or reason, similar or dissimilar to the foregoing, or any withholding or diminution at the source, by reason of any taxes, assessments, expenses, indebtedness, obligations or liabilities of any character, foreseen or unforeseen, and whether or not valid, incurred by or against any Person, or any claims, demands, charges or liens of any nature, foreseen or unforeseen, incurred by any Person, or against any sums payable under this Subsidiary Guaranty Agreement, so that such sums would be rendered inadequate or would be unavailable to make the payments herein provided;

(vii)    any order, judgment, decree, ruling or regulation (whether or not valid) of any court of any nation or of any political subdivision thereof or any body, agency, department, official or administrative or regulatory agency of any thereof or any other action, happening, event or reason whatsoever which shall

delay, interfere with, hinder or prevent, or in any way adversely affect, the payment or performance by any party of any of the Guaranteed Obligations;

(viii)    any failure or lack of diligence in collection or protection, failure in presentment or demand for payment, protest, notice of protest, notice of default and of nonpayment, any failure to give notice to any Subsidiary Guarantor of failure of the Company, the Parent, any other Subsidiary Guarantor or any other Person to keep and perform any of the Guaranteed Obligations, or failure to resort for payment to the Company, the Parent, any other Subsidiary Guarantor or to any other Person or to any other guaranty or to any property, security, Liens or other rights or remedies;

(ix)    the acceptance of any additional security or other guaranty, the advance of additional money to the Company, the Parent, any other Subsidiary Guarantor or any other Person, the renewal or extension of the Notes or amendments, modifications, consents or waivers with respect to the Note Agreement, the Notes, the Guaranty Agreement or any other instrument or agreement entered into in connection therewith or otherwise relating thereto, or the sale, release, substitution or exchange of any security for the Notes;

(x)    any defense whatsoever that the Company, the Parent, any other Subsidiary Guarantor or any other Person might have to the payment of the Notes (principal, Yield-Maintenance Amount, if any, or interest or any other amounts due thereunder), other than payment in cash thereof, or to the payment, performance or observance of any of the other Guaranteed Obligations, whether through the satisfaction or purported satisfaction by the Company, the Parent, any other Subsidiary Guarantor or any other Person of its debts due to any cause such as bankruptcy, insolvency, receivership, merger, consolidation, reorganization, dissolution, liquidation, winding up or otherwise;

(xi)    any act or failure to act with regard to the Note Agreement, the Notes, the Guaranty Agreement, this Subsidiary Guaranty Agreement or any other instrument or agreement entered into in connection therewith or otherwise relating thereto, or anything which might vary the risk of the Subsidiary Guarantors; or

(xii)    any other circumstance (other than payment and performance in full of the Guaranteed Obligations (subject to Section 4 below)) which might otherwise constitute a defense available to, or a discharge of, each Subsidiary Guarantor in respect of its obligations under this Subsidiary Guaranty Agreement;

provided, that the specific enumeration of the above-mentioned acts, failures or omissions shall not be deemed to exclude any other acts, failures or omissions, though not specifically mentioned above, it being the purpose and intent of this Subsidiary Guaranty Agreement that the obligations of each Subsidiary Guarantor shall be absolute and unconditional and shall not be discharged, impaired or varied except by the full and prompt payment and performance of all of the Guaranteed Obligations.  Without limiting

the foregoing, it is understood that repeated and successive demands may be made and recoveries may be had hereunder as and when, from time to time, the Company, the Parent or any other Person shall default under the terms of the Note Agreement, the Notes, the Guaranty Agreement or any other instrument or agreement entered into in connection therewith or otherwise relating thereto and that notwithstanding recovery hereunder for or in respect of any given default or defaults by the Company, the Parent or any other Person under the Note Agreement, the Notes, the Guaranty Agreement or any such other instrument or agreement, this Subsidiary Guaranty Agreement shall remain in full force and effect and shall apply to each and every subsequent default.

(d)    All rights of any Beneficiary may be transferred or assigned at any time and shall be considered to be transferred or assigned at any time or from time to time upon the transfer of such Note whether with or without the consent of or notice to the Subsidiary Guarantors under this Subsidiary Guaranty Agreement or to the Company or the Parent.

(e)    Each Subsidiary Guarantor hereby subordinates to the rights of the Beneficiaries under the Note Agreement, the Notes, the Guaranty Agreement or any other instrument or agreement entered into in connection therewith or otherwise relating thereto, and agrees to defer any assertion, until such time as the Guaranteed Obligations have been indefeasibly paid and performed in full (subject to Section 4 below), of any claim or other rights that it may now or hereafter acquire against the Company, the Parent, any other Subsidiary Guarantor or any other Person that arise from the existence, payment, performance or enforcement of each Subsidiary Guarantor's obligations under this Subsidiary Guaranty Agreement, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of any Beneficiary against the Company, the Parent, any other Subsidiary Guarantor or any other Person, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from the Company, the Parent, any other Subsidiary Guarantor or any other Person, directly or indirectly, in cash or other property or by setoff or in any other manner, payment or security on account of such claim, remedy or right.  If any amount shall be paid to any Subsidiary Guarantor in violation of the preceding sentence at any time prior to the payment and performance in full of all the Guaranteed Obligations, such amount shall be held in trust for the benefit of the Beneficiaries and shall forthwith be paid to the Beneficiaries to be credited and applied to the Guaranteed Obligations, whether matured or unmatured.

(f)    Each Subsidiary Guarantor agrees that, to the extent the Company, the Parent, any other Subsidiary Guarantor or any other Person makes any payment on any Note or in respect of any of the other Guaranteed Obligations, which payment or any part thereof is subsequently invalidated, voided, declared to be fraudulent or preferential, set aside, recovered, rescinded or is required to be retained by or repaid to a trustee, receiver, or any other Person under any bankruptcy code, common law, or equitable cause, then and to the extent of such payment, the obligation or the part thereof intended to be satisfied shall be revived and continued in full force and effect with respect to each

Subsidiary Guarantor's obligations hereunder, as if said payment had not been made. The liability of each Subsidiary Guarantor hereunder shall not be reduced or discharged, in whole or in part, by any payment to any Beneficiary from any source that is thereafter paid, returned or refunded in whole or in part by reason of the assertion of a claim of any kind relating thereto, including, but not limited to, any claim for breach of contract, breach of warranty, preference, illegality, invalidity, or fraud asserted by any account debtor or by any other Person.

(g)     The Beneficiaries shall have no obligation to (a) marshal any assets in favor of any Subsidiary Guarantor or in payment of any or all of the Guaranteed Obligations or (b) pursue any other remedy that any Subsidiary Guarantor may or may not be able to pursue itself and that may lighten such Subsidiary Guarantor's burden, any right to which each Subsidiary Guarantor hereby expressly waives.

## 2.  DUTY OF SUBSIDIARY GUARANTORS TO STAY INFORMED.

Each of the Subsidiary Guarantors hereby agrees that it has complete and absolute responsibility for keeping itself informed of the business, operations, properties, assets, condition (financial or otherwise) of the Company, the Parent, any other Subsidiary Guarantors, any and all endorsers and any and all guarantors of the Guaranteed Obligations and of all other circumstances bearing upon the risk of nonpayment of the obligations evidenced by the Notes or the Guaranteed Obligations, and each of the Subsidiary Guarantors further agrees that the Beneficiaries shall have no duty, obligation or responsibility to advise it of any such facts or other information, whether now known or hereafter ascertained, and each Subsidiary Guarantor hereby waives any such duty, obligation or responsibility on the part of the Beneficiaries to disclose such facts or other information to any Subsidiary Guarantor.

## 3.  REPRESENTATIONS AND WARRANTIES.

Each Subsidiary Guarantor hereby represents and warrants to each of the Beneficiaries that, as of the date such Person becomes a party hereto:

(a)     Such Subsidiary Guarantor, if it is a corporation, limited partnership or limited liability company:  (i) is an entity duly organized, validly existing and in good standing under the laws of the state of its formation; (ii) is duly registered or qualified to do business and is in good standing in every jurisdiction where the nature of its business requires it to be so registered or qualified (except where the failure to so register or qualify could not be reasonably likely to have a material adverse effect on such Subsidiary Guarantor's business, property or assets, condition (financial or otherwise), operations or prospects or on such Subsidiary Guarantor's ability to pay or perform the Guaranteed Obligations); (iii) has all requisite organizational power and authority to own its properties and to carry on its business as currently conducted and as proposed to be conducted, and to execute and deliver this Subsidiary Guaranty Agreement and to perform its obligations hereunder; and (iv) is in compliance in all material respects with all applicable laws, rules, regulations and orders;

(b)    Such Subsidiary Guarantor, if it is a general partnership:  (i) has all requisite partnership power and authority to conduct its business, to own and lease its property or assets, to execute and deliver this Subsidiary Guaranty Agreement and to perform its obligations hereunder; and (ii) is in compliance in all material respects with all applicable laws, rules, regulations and orders;

(c)    The execution, delivery and performance by such Subsidiary Guarantor of this Subsidiary Guaranty Agreement (i) have been duly authorized by all necessary corporate, limited liability company or partnership action and (ii) do not contravene such Subsidiary Guarantor's charter documents, bylaws, partnership agreement, operating agreement or any similar agreement;

(d)    The execution and delivery of this Subsidiary Guaranty Agreement will not conflict with, or result in a breach of the terms, conditions or provisions of, or constitute a default under, or result in any violation of, or result in the creation of any Lien upon any of the properties or assets of any Subsidiary Guarantor pursuant to the organizational documents of any such Person, any award of any arbitrator or any agreement (including any agreement with equityholders of such Persons), instrument, order, judgment, decree, statute, law, rule or regulation to which such Person is subject;

(e)    Neither the nature of any Subsidiary Guarantor nor any of their respective businesses or properties, nor any relationship between any Subsidiary Guarantors or any Subsidiary or Affiliate and any other Person, nor any circumstance in connection with this Subsidiary Guaranty Agreement, require any material authorization, consent, approval, exemption or other action by, or notice to, or filing with, any court or administrative or governmental body (other than routine filings with respect to this Subsidiary Guaranty Agreement and any consents which have been obtained) in connection with the execution and delivery of this Subsidiary Guaranty Agreement or the fulfillment of or compliance with the terms and provisions hereof or of any other instrument or agreement relating hereto;

(f)    This Subsidiary Guaranty Agreement constitutes a valid and binding obligation of such Subsidiary Guarantor, enforceable against such Subsidiary Guarantor in accordance with its terms, except as the enforceability thereof may be subject to, or limited by, bankruptcy, insolvency, reorganization, arrangement, moratorium or other similar laws relating to or affecting the rights of creditors generally, and general principles of equity, regardless of whether such enforceability is considered in a proceeding at law or in equity;

(g)    There is no action, suit, investigation or proceeding pending or, to the knowledge of such Subsidiary Guarantor, threatened which questions the validity or legality of, or seeks damages in connection with, this Subsidiary Guaranty Agreement, the Note Agreement, the Notes, the Guaranty Agreement or any other instrument or agreement relating hereto or thereto or any action taken or to be taken pursuant to this Subsidiary Guaranty Agreement, the Guaranty Agreement, the Note Agreement or the Notes.  There is no action, suit, investigation or proceeding pending or, to the knowledge of such Subsidiary Guarantor, threatened against such Subsidiary Guarantor or any of its

Subsidiaries or any properties or rights of any of the foregoing, by or before any court, arbitrator or administrative or governmental body which, individually or collectively, could reasonably be expected to have a material adverse effect;

(h)     The Guaranteed Obligations are not subject to any offset or defense of any kind against any Beneficiary, the Parent or the Company;

(i)     After giving effect to this Subsidiary Guaranty Agreement, such Subsidiary Guarantor will be "**Solvent**," (taking into account any and all rights of contribution) meaning:  (a) the fair saleable value of such Subsidiary Guarantor's assets will be in excess of the amount that will be required to be paid on or in respect of its existing debts and other liabilities (including contingent liabilities) as they mature; (b) such Subsidiary Guarantor will not have unreasonably small capital to carry on its business as conducted or as proposed to be conducted; (c) such Subsidiary Guarantor does not intend to or believe that it will incur debts beyond its ability to generally pay such debts as they mature (taking into account the timing and amounts of cash to be received by it and the amounts to be payable on or in respect of its obligations); and (d) such Subsidiary Guarantor does not intend to hinder, delay or defraud either present or future creditors.  In addition, such Subsidiary Guarantor will have received fair consideration and reasonably equivalent value in exchange for incurring its Debt under this Subsidiary Guaranty Agreement.

(j)     Such Subsidiary Guarantor has made its appraisal of and investigation into the business, prospects, operations, property or assets, condition (financial or otherwise) and creditworthiness of the Company, the Parent and any other Subsidiary Guarantors and has made its decision to enter into this Subsidiary Guaranty Agreement independently based on such documents and information as it has deemed appropriate and without reliance upon any of the Beneficiaries or any of their partners, directors, trustees, members, officers, agents, designees or employees, and such Subsidiary Guarantor has established adequate means of obtaining from the Company, the Parent and any other Subsidiary Guarantors, on a continuing basis, financial or other information pertaining to the business, prospects, operations, property, assets, condition (financial or otherwise) of the Company, the Parent and any other Subsidiary Guarantors; and

(k)     Neither such Subsidiary Guarantor nor its properties or assets have any immunity from jurisdiction of any court or from any legal process (whether through service of process or notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) under applicable law.

## 4.  TERMINATION; REINSTATEMENT.

This Subsidiary Guaranty Agreement shall remain in full force and effect until all Guaranteed Obligations shall have been satisfied by payment in full in cash, upon the occurrence of which this Subsidiary Guaranty Agreement shall, subject to the immediately succeeding sentence, terminate.  This Subsidiary Guaranty Agreement shall continue to be effective, or be reinstated, as the case may be, if at any time the payment, or any part thereof, of any of the Guaranteed Obligations is rescinded or otherwise must be restored or returned by any

Beneficiary in connection with the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Company, the Parent or any other Subsidiary Guarantor or in connection with the application of applicable fraudulent conveyance or fraudulent transfer law, all as though such payments had not been made.

## 5.  PAYMENTS.

Each Subsidiary Guarantor hereby agrees that, upon the occurrence and during the continuance of any Event of Default, upon demand, the Guaranteed Obligations will be paid to each of the Beneficiaries without setoff or counterclaim in U.S. dollars in immediately available funds at the location specified by such Beneficiary pursuant to the Note Agreement.

## 6.  SEVERABILITY.

Whenever possible, each provision of this Subsidiary Guaranty Agreement shall be interpreted in such manner as to be effective and valid under all applicable laws and regulations. If, however, any provision of this Subsidiary Guaranty Agreement shall be prohibited by or invalid under any such law or regulation, it shall be deemed modified to conform to the minimum requirements of such law or regulation, or, if for any reason it is not deemed so modified, it shall be ineffective and invalid only to the extent of such prohibition or invalidity without the remainder thereof or any of the remaining provisions of this Subsidiary Guaranty Agreement being prohibited or invalid.

## 7.  HEADINGS.

Section headings in this Subsidiary Guaranty Agreement are included herein for convenience of reference only and shall not constitute a part of this Subsidiary Guaranty Agreement for any other purpose or be given any substantive effect.

## 8.  APPLICABLE LAW.

**THIS SUBSIDIARY GUARANTY AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK, EXCLUDING CHOICE-OF-LAW PRINCIPLES OF THE LAW OF SUCH STATE THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF A JURISDICTION OTHER THAN SUCH STATE.**

## 9.  ENTIRE AGREEMENT.

This Subsidiary Guaranty Agreement constitutes the entire agreement among the parties hereto relating to the subject matter hereof and supersedes any and all prior or contemporaneous commitments, agreements, representations, and understandings, whether written or oral, relating to the subject matter hereof and may not be contradicted or varied by evidence of prior, contemporaneous, or subsequent oral agreements or discussions of the Subsidiary Guarantors, on the one hand, and the Beneficiaries, on the other hand.  There are no oral agreements between the Subsidiary Guarantors, on the one hand, and the Beneficiaries, on the other hand.

## 10. CONSTRUCTION.

Each of the Subsidiary Guarantors and the Beneficiaries acknowledges that it has had the benefit of legal counsel of its own choice and has been afforded an opportunity to review this Subsidiary Guaranty Agreement with such legal counsel.

## 11. ADDITIONAL SUBSIDIARY GUARANTORS.

The Initial Subsidiary Guarantors hereunder shall be (i) Fairgrove, LLC; (ii) Flagstaff Publishing Co.; (iii) Hanford Sentinel, Inc.; (iv) Homechoice, LLC; (v) HSTAR LLC; (vi) Kauai Publishing Co.; (vii) Napa Valley Publishing Co.; (viii) NIPC, Inc.; (ix) NLPC LLC; (x) Northern Lakes Publishing Co.; (xi) NVPC LLC; (xii) Pantagraph Publishing Co.; (xiii) Pulitzer Missouri Newspapers, Inc.; (xiv) Pulitzer Network Systems LLC; (xv) Pulitzer Newspapers, Inc.; (xvi) Pulitzer Technologies Inc.; (xvii) Pulitzer Utah Newspapers, Inc.; (xviii) Santa Maria Times, Inc.; (xix) SHTP LLC; (xx) SOPC LLC; (xxi) Southwestern Oregon Publishing Co.; (xxii) STL Distribution Services LLC; (xxiii) Suburban Journals of Greater St. Louis LLC; (xxiv) Ynez Corporation; and (xxv) Star Publishing Company.  From time to time subsequent to the date hereof, additional Subsidiaries and/or Affiliates of the Company may become parties hereto, as additional Subsidiary Guarantors (each, an "**Additional Subsidiary Guarantor**"), by executing a Joinder Agreement substantially in the form of *Exhibit A* attached hereto (each, a "**Joinder Agreement**").  Upon the delivery of a Joinder Agreement to the Beneficiaries, such Additional Subsidiary Guarantor shall be a Subsidiary Guarantor and shall be as fully a party hereto as if such Additional Subsidiary Guarantor were an original signatory hereof.

## 12. COUNTERPARTS; EFFECTIVENESS.

This Subsidiary Guaranty Agreement and any amendments, waivers, consents, or supplements hereto may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all of which counterparts together shall constitute but one and the same instrument.

This Subsidiary Guaranty Agreement shall become effective as to each Subsidiary Guarantor upon the execution and delivery of a counterpart hereof by such Subsidiary Guarantor (whether or not a counterpart hereof shall have been executed by any other Person) and receipt of written or telephonic notification of such execution and authorization of delivery thereof.

Delivery of an executed counterpart hereof by any Subsidiary Guarantor by facsimile or electronic pdf shall be as effective as delivery of a manually executed counterpart hereof and shall be considered a representation that an original executed counterpart hereof will be delivered.

## 13. WAIVERS AND AMENDMENTS; SUCCESSORS AND ASSIGNS.

No amendment or waiver of any term or provision of this Subsidiary Guaranty Agreement or consent to any departure by any Subsidiary Guarantor therefrom shall in any event be effective unless the same is in writing and signed by the Required Holders; *provided, however*, that no such amendment reducing any payment obligations under this Subsidiary

Guaranty Agreement shall be effective unless signed by each Beneficiary.  This Subsidiary Guaranty Agreement is a joint and several continuing guaranty and shall be binding upon each Subsidiary Guarantor and its successors and assigns; *provided, however,* that no Subsidiary Guarantor shall assign this Subsidiary Guaranty Agreement or any of the rights or obligations of such Subsidiary Guarantor hereunder without the prior written consent of the Required Holders.  This Subsidiary Guaranty Agreement shall inure to the benefit of each of the Beneficiaries and its successors, assigns and transferees.

### 14. ADDRESS FOR NOTICES.

All notices and communications provided for hereunder shall be in writing and sent by first class mail or nationwide overnight delivery service (with charges prepaid) and (i) if to any Purchaser or its nominee, addressed as specified for such communications in the Purchaser Schedule attached to the Note Agreement, or at such other address as such Purchaser or its nominee shall have specified to the Company, on behalf of each of the Subsidiary Guarantors, in writing, (ii) if to any other Beneficiary, addressed to such Person at such address as it shall have specified in writing to the Company or, if any such Person shall not have so specified an address, then addressed to such Person in care of the last holder of Notes held by such Person which shall have so specified an address to the Company, and (iii) if to any Subsidiary Guarantor, addressed to such Subsidiary Guarantor care of the Parent at the Parent's address set forth in the Guaranty Agreement, or at such other address as such Subsidiary Guarantor shall have specified to each of the Beneficiaries in writing.

### 15. FAILURE OR INDULGENCE NOT WAIVER; REMEDIES CUMULATIVE.

No failure or delay on the part of any Beneficiary in the exercise of any power, right or privilege hereunder shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.  All rights and remedies existing under this Subsidiary Guaranty Agreement are cumulative to, and not exclusive of, any rights or remedies otherwise available.

### 16. PERSONAL JURISDICTION.

Each Subsidiary Guarantor irrevocably agrees that any legal action or proceeding with respect to this Subsidiary Guaranty Agreement, the Guaranty Agreement, the Note Agreement, the Notes or any of the agreements, documents or instruments delivered in connection herewith or therewith shall be brought in the courts of the State of New York or the United States of America for the Southern District of New York as the Required Holders may elect, and, by execution and delivery hereof, each Subsidiary Guarantor accepts and consents to, for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts and agrees that such jurisdiction shall be exclusive, unless waived by the Required Holders in writing, with respect to any action or proceeding brought by such Subsidiary Guarantor against any Beneficiary.  Each Subsidiary Guarantor hereby waives, to the full extent permitted by law, any right to stay or to dismiss any action or proceeding brought before said courts on the basis of *forum non conveniens*.

### 17. WAIVER OF JURY TRIAL.

THE PARTIES HERETO AGREE TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS SUBSIDIARY GUARANTY AGREEMENT, THE GUARANTY AGREEMENT, THE NOTE AGREEMENT, THE NOTES, OR ANY OTHER AGREEMENT OR INSTRUMENT RELATED HERETO OR THERETO, OR ANY DEALINGS BETWEEN OR AMONG THEM RELATING TO THE SUBJECT MATTER OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY AND THE LENDER/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH OF THE PARTIES HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO THIS BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THE WAIVER IN ENTERING INTO THIS SUBSIDIARY GUARANTY AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THE WAIVER IN THEIR RELATED FUTURE DEALINGS. EACH OF THE PARTIES HERETO FURTHER WARRANTS AND REPRESENTS THAT EACH HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, THIS SUBSIDIARY GUARANTY AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

**IN WITNESS WHEREOF,** each of the undersigned has caused this Subsidiary Guaranty Agreement to be duly executed as of the date first above written.

<div align="center">

**SUBSIDIARY GUARANTORS:**

</div>

**FAIRGROVE LLC**
**FLAGSTAFF PUBLISHING CO.**
**HANFORD SENTINEL INC.**
**HOMECHOICE, LLC**
**HSTAR LLC**
**KAUAI PUBLISHING CO.**
**NAPA VALLEY PUBLISHING CO**
**NIPC, INC.**
**NLPC LLC**
**NORTHERN LAKES PUBLISHING CO.**
**NVPC LLC**
**PANTAGRAPH PUBLISHING CO.**
**PULITZER MISSOURI NEWSPAPERS, INC.**
**PULITZER NETWORK SYSTEMS LLC**
**PULITZER NEWSPAPERS, INC.**
**PULITZER TECHNOLOGIES, INC.**
**PULITZER UTAH NEWSPAPERS, INC.**
**SANTA MARIA TIMES, INC.**
**SHTP LLC**
**SOPC LLC**
**SOUTHWESTERN OREGON PUBLISHING
  CO.**
**STAR PUBLISHING COMPANY**
**STL DISTRIBUTION SERVICES LLC**
**SUBURBAN JOURNALS OF GREATER ST.
  LOUIS LLC**
**YNEZ CORPORATION**


By:_____
Name: C.D. Waterman III
Title:   Secretary

EXHIBIT A

**FORM OF JOINDER AGREEMENT**

**JOINDER AGREEMENT**
**TO**
**SUBSIDIARY GUARANTY AGREEMENT**

**ADDITIONAL SUBSIDIARY GUARANTOR:**  Reference is made to that certain Subsidiary Guaranty Agreement, dated as of [_____] (as the same may from time to time be amended, restated, supplemented or otherwise modified, the "**Subsidiary Guaranty Agreement**"), entered into by certain Affiliates and Subsidiaries of St. Louis Post-Dispatch LLC (the "**Company**") (the "**Subsidiary Guarantors**"), in favor of the Beneficiaries identified therein.  Capitalized terms not defined in this Joinder Agreement shall have the meanings given to them in the Subsidiary Guaranty Agreement.  The undersigned acknowledges and agrees it is (or, concurrently with the execution and delivery of this Joinder Agreement, will become) a Subsidiary Guarantor and that, by its execution and delivery of this Joinder Agreement to the Beneficiaries, it hereby joins and for all purposes becomes a Subsidiary Guarantor under, and a party to, the Subsidiary Guaranty Agreement, and does hereby unconditionally, absolutely and irrevocably guarantee to each of the Beneficiaries the complete payment when due (whether at stated maturity, by acceleration or otherwise) and due performance of all Guaranteed Obligations, and does hereby fully assume and undertake to perform all rights, benefits, burdens, obligations and liabilities of a Subsidiary Guarantor under the Subsidiary Guaranty Agreement.  Capitalized terms used but not defined in this Joinder Agreement shall have the meanings given to them in the Subsidiary Guaranty Agreement.

_____, a  _____

By:  _____

Printed Name:  _____

Title:  _____

Exhibit A-2

<u>EXHIBIT D</u>

[FORM OF PLEDGE AGREEMENT]

Exhibit D

Bingham Draft
12/1/11

# PLEDGE AGREEMENT[1]

This **PLEDGE AGREEMENT** (together with all exhibits and schedules hereto, as amended, supplemented or otherwise modified from time to time, this "**Agreement**"), dated as of [_____], is made by **PULITZER INC.**, a Delaware corporation (together with its successors and assigns, the "**Company**"), **ST. LOUIS POST-DISPATCH LLC**, a Delaware limited liability company (together with its successors and assigns, the "**Borrower**"), and each Subsidiary of the Company on the signature pages hereto (each a "**Subsidiary Pledgor**" and collectively, the "**Subsidiary Pledgors**") (the Company, the Borrower and the Subsidiary Pledgors, together with any other entity subsequently added as a pledgor hereunder pursuant to Section 7.12 hereof, each, a "**Pledgor**" and collectively, the "**Pledgors**"), in favor of the Collateral Agent on behalf and for the benefit of the Secured Parties (as such terms are defined below).

## RECITALS

**A**.     Reference is made to that certain Note Agreement, dated as of [_____] (as the same from time to time hereafter may be amended, restated, supplemented or otherwise modified, the "**Note Agreement**"), by and among the Borrower and the Purchasers named therein, pursuant to which, subject to the terms and conditions set forth therein, the Borrower issued the Notes (as defined below) to such Purchasers.

**B**.     Reference is also made to that certain Guaranty Agreement, dated as of [_____] (as the same from time to time hereafter may be amended, restated, supplemented or otherwise modified, the "**Guaranty Agreement**"), made by the Company in favor of the Purchasers, pursuant to which, subject to the terms and conditions set forth therein, the Company has guaranteed the full, complete and final payment and performance of the "Guaranteed Obligations" (as defined in the Guaranty Agreement).

**C**.     Reference is also made to that certain Subsidiary Guaranty Agreement, dated as of [_____] (as the same from time to time hereafter may be amended, restated, supplemented or otherwise modified, the "**Subsidiary Guaranty Agreement**") made by each Subsidiary Pledgor, and each additional Person that hereinafter executes a joinder thereto, in favor of the Purchasers, pursuant to which such Persons have, among other things, agreed to guarantee the full, complete and final payment and performance of the "Guaranteed Obligations" (as defined in the Subsidiary Guaranty Agreement).

**D**.     The Pledgors are the record and beneficial owners of the equity interests shown on ***Exhibit A*** attached hereto to be owned by such Pledgor (the "**Pledged Equity**"), which

---

[1] The Pledgors (i) acknowledge that no disclosure schedules or similar information contemplated by this Agreement have been provided as of the date of this draft and (ii) agree that, to the extent that the information set forth in such disclosure schedules or other information differs in any respect from the information provided to the Noteholders (as defined in the Pulitzer Support Agreement) prior to the Plan Support Effective Date, without prejudice to any other rights of any Noteholder, the Noteholders reserve the right, in their reasonable discretion. to make appropriate changes to this Agreement.

exhibit is incorporated herein by this reference and may be amended or supplemented pursuant to the terms of this Pledge Agreement.

**E.** On [_____], 2011, Lee and certain of its Subsidiaries including the Company (collectively, the "**Debtors**") filed voluntary petitions for relief under Chapter 11 of Title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") and continued in the possession of their property and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

**F.** On [_____], 2012, the Bankruptcy Court entered an order confirming the Joint Prepackaged Plan of Reorganization for the Debtors, dated [_____], 2011 (as in effect on the date of confirmation thereof pursuant to the Confirmation Order of the Bankruptcy Court and as it thereafter may be amended in accordance with the Pulitzer Support Agreement, the "**Plan of Reorganization**").

**G.** In connection with the implementation of the Plan of Reorganization, the Purchasers are willing to enter into the Note Agreement and otherwise make, extend and maintain certain financial accommodations to the Borrower and the Company as provided in the Note Agreement, the Notes (as defined below) and the Guaranty Agreement, but only upon the condition, among others, that the Pledgors, which own the Pledged Equity, shall have executed this Agreement, and delivered this Agreement and the Pledged Collateral (as defined below) to the Collateral Agent (defined below), on behalf and for the benefit of the Secured Parties (defined below).

### AGREEMENT

**NOW, THEREFORE**, in consideration of the foregoing Recitals and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and intending to be legally bound, each Pledgor hereby represents, warrants, covenants and agrees as follows:

## ARTICLE I

### DEFINITIONS

**1.1 Definitions**. Capitalized terms not defined herein shall have the meanings given to them in the Note Agreement. The following capitalized terms shall have the following meanings (such meanings being equally applicable to both the singular and plural forms of the terms defined):

"**Act**" has the meaning set forth in **Section 6.2(c)**, below.

"**Agreement**" has the meaning specified for such term in the introductory paragraph hereto.

"**Additional Pledgor**" has the meaning set forth in **Section 7.12**, below.

"**Bankruptcy Code**" means the provisions of Title 11 of the United States Code, 11 U.S.C. §§101 *et seq.*, as now and hereafter in effect, any successors to such statute and any other applicable bankruptcy, insolvency or other similar law of any jurisdiction including, without limitation, any law of any jurisdiction relating to the reorganization, readjustment, liquidation, dissolution, release or other relief of debtors, or providing for the appointment of a receiver, trustee, custodian or conservator or other similar official for all or any substantial part of such debtor's assets, or for the making of an assignment for the benefit of creditors of a debtor.

"**Borrower**" has the meaning specified for such term in the introductory paragraph hereto.

"**Charter Documents**" means, collectively, the certificate or articles of incorporation, organization or formation (including any certificates of designation), the bylaws, the operating agreement, the partnership agreement and/or any other similar constituent documents, as applicable, of the Pledged Entities.

"**Collateral Agency Agreement**" means that certain Collateral Agency Agreement, dated as of [_____], duly executed by the Collateral Agent and the Purchasers.

"**Collateral Agent**" means The Bank of New York Mellon Trust Company, N.A. in its capacity as collateral agent for the Secured Parties, together with its successors and assigns in such capacity.

"**Collateral Documents**" has the meaning specified for such term in the Note Agreement.

"**Company**" has the meaning specified for such term in the introductory paragraph hereto.

"**Credit Parties**" means the Company, the Borrower and each Subsidiary Guarantor.

"**Event of Default**" has the meaning set forth in **Section 6.1**, below.

"**Guaranty Agreement**" has the meaning specified for such term in the Recitals hereto.

"**Indemnified Persons**" has the meaning set forth in **Section 6.5**, below.

"**Lien**" has the meaning specified for such term in the Note Agreement.

"**Note Agreement**" has the meaning specified for such term in the Recitals hereto.

"**Note Documents**" means the Note Agreement and Guaranty Agreement.

"**Notes**" shall have the meaning specified in the Note Agreement.

"**Pledged Collateral**" has the meaning set forth in **Section 2.1**, below.

"**Pledged Entities**" means each of (a) the Borrower and (b) each other entity identified from time to time as a "Pledged Entity" on *Exhibit A* hereto.

"**Pledged Equity**" has the meaning specified for such term in the Recitals hereto.

"**Pledgors**" has the meaning specified for such term in the introductory paragraph hereto.

"**Required Holders**" has the meaning specified for such term in the Note Agreement.

"**Secured Obligations**" means (a) all obligations of the Borrower for the payment of the principal amount of the Notes, accrued interest thereon, Yield-Maintenance Amount, non-usage fees and all other fees and amounts due to the holders of Notes pursuant to the terms of the Note Agreement and the other Transaction Documents, (b) the "Guaranteed Obligations" as such term is defined in the Guaranty Agreement, (c) the "Guaranteed Obligations" as such term is defined in the Subsidiary Guaranty Agreement and (d) any and all other debts, liabilities and reimbursement obligations, indemnity obligations and other obligations for monetary amounts, fees, expenses, costs or other sums (including reasonable attorneys' fees and costs) chargeable to any Credit Party under or pursuant to any of the Transaction Documents.

"**Secured Parties**" means the holders from time to time of the Notes.

"**Security Agreement**" means that certain Security Agreement dated the date hereof entered into by the Company, the Borrower and each of the other Grantors (as defined therein) from time to time party thereto in favor of the Collateral Agent for the benefit of the Secured Parties.

"**Subsidiary Guarantors**" has the meaning specified for such term in the Note Agreement.

"**Subsidiary Pledgors**" has the meaning specified for such term in the introductory paragraph hereto.

"**Subsidiary Guaranty Agreement**" has the meaning specified for such term in the Recitals hereto.

"**TNI Agreement**" means that certain Amended and Restated Partnership Agreement, dated as of November 30, 2009, by and among Star Publishing Company and Citizen Publishing Company.

"**TNI Partners**" means TNI Partners, a general partnership formed under the laws of the State of Arizona pursuant to the terms of the TNI Agreement.

"**Transaction Documents**" has the meaning specified for such term in the Note Agreement.

"**UCC**" means the Uniform Commercial Code as the same may, from time to time, be in effect in the State of New York; *provided, however*, in the event that, by reason of mandatory

provisions of law, any or all of the attachment, perfection or priority of the Collateral Agent's security interest in any collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, the term "**UCC**" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection of priority and for purposes of definitions related to such provisions.

**1.2 UCC Definitions**.    Unless otherwise defined herein or the context otherwise requires, terms for which meanings are provided in the UCC are used in this Agreement, including its preamble and recitals, with such meanings.

**1.3 Interpretive Provisions.**    The definitions in this Article 1 shall apply equally to both the singular and plural forms of the terms defined.    Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.    The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."    All references herein to Articles and Sections shall be deemed references to Articles and Sections of this Agreement unless the context shall otherwise require.

## ARTICLE II

### PLEDGE

**2.1 Grant Of Security Interest**.    As security for the full, prompt and complete payment when due (whether at stated maturity, by demand, acceleration or otherwise) of the Secured Obligations, each Pledgor hereby pledges, hypothecates, assigns, charges, mortgages, delivers, and transfers to the Collateral Agent, and hereby grants to the Collateral Agent, on behalf and for the benefit of the Secured Parties, a continuing security interest in, and delivers to the Collateral Agent all right, title and interest of such Pledgor, in and to all of the following, whether now or hereafter existing or acquired (collectively, the "**Pledged Collateral**"):

(**a**)    All right, title and interest of such Pledgor, whether now existing or hereafter arising or acquired, in, to and under the Charter Documents and the Pledged Equity and the certificates, if any, representing such Pledged Equity, and all dividends, cash, instruments, and other property or proceeds from time to time received, receivable, or otherwise distributed in respect of or in exchange for any or all of such Pledged Equity, including, without limitation:

(**i**)    All voting trust certificates held by such Pledgor evidencing its beneficial interest in any Pledged Equity subject to any voting trust;

(**ii**)    All additional shares of capital stock, membership interests, partnership interests or other equity interests, as the case may be, of the Pledged Entities, and voting trust certificates from time to time acquired by such Pledgor in any manner (which additional interests shall be deemed to be part of the Pledged Equity), and the certificates representing such shares of capital stock, membership interests, partnership interests or other equity interests, and all dividends, cash, instruments, and other property or proceeds from time to time received, receivable, or otherwise distributed in respect of or in exchange for any or all

of such shares of capital stock, membership interests, partnership interests or other equity interests; and

   **(iii)** In the case of a limited liability company or limited partnership, (a) all payments or distributions, whether in cash, property or otherwise, at any time owing or payable to such Pledgor on account of its interest as a member or partner, as the case may be, in any of the Pledged Entities or in the nature of a management, investment banking or other fee paid or payable by any of the Pledged Entities to such Pledgor, (b) all of such Pledgor's rights and interests under each of the partnership agreements or operating agreements, as applicable, including all voting and management rights and all rights to grant or withhold consents or approvals, (c) all rights of access and inspection to and use of all books and records, including computer software and computer software programs, of each of the Pledged Entities, (d) all other rights, interests, property or claims to which such Pledgor may be entitled in its capacity as a partner or the sole member of any Pledged Entity of such Pledgor, and (e) all proceeds, income from, increases in and products of any of the foregoing; and

   **(b)** The rents, issues, profits, returns, income, allocations, distributions and proceeds of and from any and all of the foregoing;

*provided, however*, that, notwithstanding the foregoing, the Pledged Collateral shall not include any Excluded TNI Assets.

Each of the Pledgors hereby instructs the applicable Pledged Entities to register the pledge of the Pledged Collateral under this **Section 2.1** pursuant to the UCC.

  **2.2 Continuing Security Interest**.  This Agreement shall create a continuing security interest in the Pledged Collateral and shall:

   **(a)** remain in full force and effect until the full and complete and final payment and performance of all of the Secured Obligations;

   **(b)** be binding upon each Pledgor and its successors, transferees and assigns; and

   **(c)** inure, together with the rights and remedies of the Collateral Agent and the Secured Parties hereunder, to the benefit of the Collateral Agent and the Secured Parties.

  **2.3 Termination of Security Interest.**  Upon the complete, full and final payment and performance of the Secured Obligations, the security interest granted in **Section 2.1** shall terminate and all rights to the Pledged Collateral shall revert to the Pledgors.  Upon any such termination, the Collateral Agent then shall, at each Pledgor's sole expense, deliver to such Pledgor, without any representations, warranties or recourse of any kind whatsoever, any and all certificates and instruments representing or evidencing such Pledgor's interest in the applicable Pledged Entity that had been previously delivered by such Pledgor to the Collateral Agent, together with all other Pledged Collateral held by the Collateral Agent hereunder, and execute and deliver to each Pledgor, at such Pledgor's sole expense, such documents and take such other actions as such Pledgor shall reasonably request to evidence such termination.

**2.4 No Assumption**.  This Agreement is executed and delivered to the Collateral Agent, for the benefit of itself and the Secured Parties, for collateral security purposes only. Notwithstanding anything herein to the contrary:

(a)    each Pledgor shall remain liable under the contracts and agreements included in the Pledged Collateral to the extent set forth therein, and shall perform all of its duties and obligations under such contracts and agreements to the same extent as if this Agreement had not been executed;

(b)    the exercise by the Collateral Agent or any Secured Party of any of its rights hereunder shall not release any Pledgor from any of its duties or obligations under any such contracts or agreements included in the Pledged Collateral; and

(c)    the Collateral Agent and the Secured Parties shall not have any obligation or liability under any such contracts or agreements included in the Pledged Collateral by reason of this Agreement, nor shall the Collateral Agent or any Secured Party be obligated to perform any of the obligations or duties of any Pledgor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder, and the Collateral Agent and the Secured Parties shall not hereunder or otherwise (i) assume any obligation or liability under or in connection with the Charter Documents or the certificates representing the Pledged Equity to any Person, and any such assumption is hereby expressly disclaimed, or (ii) be deemed to have or be vested with the duties, responsibilities or powers of the management of any of the Pledged Entities.

**2.5 Waiver of Certain Partnership Agreement and Operating Agreement Provisions.**  Each Pledgor irrevocably waives any and all provisions of the partnership agreements and operating agreements of each Pledged Entity (as applicable) that (a) prohibit, restrict, condition or otherwise affect the grant hereunder of any Lien on any of the Pledged Collateral or any enforcement action which may be taken in respect of any such Lien or the transfer of the Pledged Collateral by the Collateral Agent or any of its transferees, (b) would operate to limit or restrict the ability of the Collateral Agent or any of its transferees from becoming a full voting member of the partnership or limited liability company, as the case may be, or (c) otherwise conflict with the terms of this Agreement.

## ARTICLE III

### REPRESENTATIONS, WARRANTIES AND COVENANTS

**3.1 Representations, Warranties And Covenants**.  Each Pledgor hereby represents and warrants to the Collateral Agent, for its benefit and for the benefit of the Secured Parties, (i) as of the date such Pledgor becomes a party hereto and (ii) as of the date of each pledge and delivery hereunder by such Pledgor to the Collateral Agent of any Pledged Collateral, that:

(a)    **Organization.**  Such Pledgor is duly formed and validly existing under the laws of the state of its organization and has all requisite organizational power and authority to enter into and perform its obligations under this Agreement.

       **(b)**     **Due Authorization; Non-Contravention.**  The execution, delivery and performance by such Pledgor of this Agreement and each of the other Transaction Documents to which such Pledgor is a party have been duly authorized by all requisite action.  Such Transaction Documents do not contravene such Pledgor's organizational documents and do not conflict with, or result in a breach of the terms, conditions or provisions of, or constitute a default under, or result in any violation of, or result in the creation of any Lien upon any of the properties or assets of such Pledgor pursuant to its organizational documents, any award of any arbitrator or any agreement (including any agreement with equityholders of Pledgor), instrument, order, judgment, decree, statute, law, rule or regulation to which Pledgor is subject.

       **(c)**     **Binding Obligations.**  This Agreement constitutes, and each other Transaction Document executed by such Pledgor will, on the due execution and delivery thereof, constitute, the legal, valid and binding obligations of such Pledgor, enforceable against such Pledgor in accordance with their respective terms, except as such enforceability may be limited by (i) bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

       **(d)**     **Filing.**  No presently effective UCC financing statement covering any of the Pledged Collateral is on file in any public office, except for UCC financing statements in favor of the Collateral Agent.

       **(e)**     **Ownership; No Liens.**  Such Pledgor is the legal and beneficial owner of, and has good and merchantable title to (and has full right and authority to pledge and assign), all Pledged Collateral pledged by such Pledgor hereunder, free and clear of all Liens, except the Lien granted herein to the Collateral Agent.  None of the Pledged Collateral has been transferred in violation of the securities registration, securities disclosure or similar laws of any jurisdiction to which such transfer may be subject.

       **(f)**     **Charter Documents.**  Such Pledgor has furnished to the Collateral Agent a true and correct copy of the Charter Documents and all amendments thereto, which Charter Documents have not been further amended or modified and remain in full force and effect.

       **(g)**     **Equity Interests.**  The class, certificate numbers, number of shares, membership interests or other equity interests, and percentage ownership of the Pledged Equity are set forth on ***Exhibit A***.  In the event any Pledgor shall acquire any additional securities or equity interests of any Pledged Entity, or any securities or equity interests exchangeable for, or convertible into, securities or equity interests of any class of any Pledged Entity, by purchase, stock dividend, stock split or otherwise, then such securities or equity interests shall be subject to the pledge, collateral assignment and security interest granted to the Collateral Agent under this Agreement and such Pledgor shall forthwith deliver to the Collateral Agent any certificates therefor, accompanied by stock powers or other appropriate instruments of assignment duly executed by such Pledgor in blank.  In addition, if any Pledgor shall acquire any additional securities or equity interests of any newly-created or acquired Subsidiary or any other corporation, partnership, limited liability company or other entity, or any securities exchangeable for, or convertible into, securities or equity interests of any class of any such Subsidiary or other entity, by purchase, stock dividend, stock split or otherwise, in each case

other than Excluded TNI Assets, then such securities or equity interests shall be subject to the pledge, collateral assignment and security interest granted to the Collateral Agent under this Agreement and such Pledgor shall forthwith deliver to the Collateral Agent any certificates therefor, accompanied by stock powers or other appropriate instruments of assignment duly executed by such Pledgor in blank. Each Pledgor agrees that the Collateral Agent may from time to time attach as **Exhibit A** hereto an updated list of the securities or equity interests at the time pledged with the Collateral Agent hereunder.

(**h**)    **Certificate.**  No interest of such Pledgor in the applicable Pledged Entities is represented by a certificate or other similar instrument, except such certificates or instruments (together with all necessary instruments of transfer or assignment, duly executed in blank) as have been delivered to the Collateral Agent and are held in its possession (and such Pledgor covenants and agrees that any such certificates or instruments hereafter received by such Pledgor with respect to any of the Pledged Collateral (together with all necessary instruments of transfer or assignment, duly executed in blank) will be promptly delivered to the Collateral Agent).

(**i**)    **Compliance With Securities Laws.**  The offering and sale of all the Pledged Equity has been conducted, in all material respects, in compliance with all applicable state and federal securities laws and regulations and, without limiting the generality of the foregoing, no offering document furnished to any Person in connection therewith contained any misstatement of a material fact or omitted to state any fact necessary to make such document not materially misleading.

(**j**)    **Information.**  All information with respect to the Pledged Collateral set forth in any schedule, certificate or other writing at any time furnished by such Pledgor to the Collateral Agent or any Secured Party, and all other written information ay any time furnished by such Pledgor to the Collateral Agent or any Secured Party, is and shall be true and correct in all material respects as of the date furnished.

(**k**)    **Records.**  The address of the location of the records of such Pledgor concerning the Pledged Collateral and the address of such Pledgor's principal place of business and chief executive office (or residence, if Pledgor is an individual) is set forth in *Schedule I* to this Agreement.

(**l**)    **Authorization; Approval.**  No authorization, approval, or other action by, and no notice to or filing with, any governmental authority, or any other Person is required either:

(**i**)    for the pledge by such Pledgor of any Pledged Collateral pursuant to this Agreement or for the execution, delivery, and performance of this Agreement by such Pledgor; or

(**ii**)    for the exercise by the Collateral Agent or any Secured Party of (a) the voting or other rights provided for in this Agreement, or (b) the remedies in respect of the Pledged Collateral pursuant to this Agreement, except, in the case of this **clause (ii)(b)**, as may be required in connection with a disposition of any shares of capital stock, membership

interests, partnership interests or other equity interests, as the case may be, by laws affecting the offering and sale of securities generally, or as may be required under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 and regulations issued relating thereto.

(m)     **First Priority Lien.**  The pledge and grant of a security interest in, and delivery of the Pledged Collateral pursuant to this Pledge Agreement, will create a valid first priority perfected Lien on and in the Pledged Collateral pledged by such Pledgor, and the proceeds thereof, securing the payment of the Secured Obligations, subject to no prior Lien, assuming continued possession of the original certificates evidencing the Pledged Equity constituting Pledged Collateral by the Collateral Agent.  Separately, the Lien on and in the Pledged Collateral will become a valid first priority Lien upon the due filing of a UCC financing statement describing the Pledged Collateral in the applicable filing offices in the State in which such Pledgor was formed.

(n)     **Certificated Security.**

(i)     The securities described in **Section 2.1** which are certificated securities are governed by Article 8 of the Uniform Commercial Code of the jurisdiction in which each respective Pledged Entity is organized, and without the prior written consent of the Collateral Agent, the Pledgor will not cause or permit any of such securities to be or become uncertificated or to constitute a security not governed by Article 8 of the Uniform Commercial Code of the jurisdiction in which the applicable issuer is organized.

(ii)     The securities described in **Section 2.1** which are uncertificated securities are not governed by Article 8 of the Uniform Commercial Code of the jurisdiction in which each respective Pledged Entity is organized, and without the prior written consent of the Collateral Agent, the Pledgor will not cause or permit any of such securities to be or become certificated or to constitute a security governed by Article 8 of the Uniform Commercial Code of the jurisdiction in which the applicable issuer is organized.

## ARTICLE IV

### COVENANTS

**4.1 Protect Pledged Collateral; Further Assurances**.  No Pledgor shall sell, assign, transfer, pledge or otherwise encumber the Pledged Collateral in any manner (except for the pledge granted herein to the Collateral Agent), except to the extent permitted by the Note Documents.  Each Pledgor shall warrant and defend the right and title granted by this Agreement to the Collateral Agent in and to the Pledged Collateral (and all right, title and interest represented by the Pledged Collateral) against the claims and demands of all Persons whomsoever, but nothing contained herein shall prevent the Pledged Entities from issuing additional equity interests if otherwise permitted by the Note Documents.  Each Pledgor agrees, at any time, and from time to time, at the expense of such Pledgor, that such Pledgor shall promptly execute and deliver all further instruments, and take all further action that may be necessary, or that the Collateral Agent may reasonably request, in order to perfect and protect any security interest granted or purported to be granted hereby or to enable the Collateral Agent

or any Secured Party to exercise and enforce its rights and remedies hereunder with respect to any of the Pledged Collateral as set forth in **Article VI** hereof.

**4.2 Voting Rights; Dividends**.  Each Pledgor agrees:

      **(a)**     that the Collateral Agent may exercise (to the exclusion of such Pledgor) the voting power and all other incidental rights of ownership with respect to the Pledged Collateral and such Pledgor hereby grants the Collateral Agent, from the date hereof until the complete, full and final payment and performance of the Secured Obligations, an irrevocable proxy, coupled with an interest exercisable under such circumstances, to vote such Pledged Collateral; and

      **(b)**     promptly to deliver to the Collateral Agent such additional proxies and other documents as may be necessary to allow the Collateral Agent to exercise such voting power.

Unless an Event of Default shall have occurred and be continuing and the Collateral Agent shall have given the notice referred to in this **Section 4.2**, the Pledgors shall have the exclusive voting power with respect to the Pledged Collateral and the Collateral Agent shall, upon the written request of any Pledgor, promptly deliver such proxies and other documents, if any, as shall be reasonably requested by such Pledgor which are necessary to allow such Pledgor to exercise voting power with respect to the Pledged Collateral; *provided, however*, that no vote shall be cast, or consent, waiver or ratification given, or action taken, by any Pledgor that would impair any Pledged Collateral or be inconsistent with, or violate any provision of, any of the Transaction Documents (including this Agreement) without the prior written consent of the Collateral Agent and the Secured Parties.

So long as no Event of Default shall have occurred and be continuing, each Pledgor shall be entitled to receive all dividends and distributions made in accordance with the Guaranty Agreement in respect of the Pledged Equity.  All such rights of such Pledgor to receive dividends shall cease in case an Event of Default shall have occurred and be continuing and form such time all dividends or distributions in respect of the Pledged Equity shall be paid to the Collateral Agent.  All payments and proceeds which may at any time, and from time to time, be held by any of the Pledgors, but which such Pledgor is obligated to deliver to the Collateral Agent on behalf of itself and the Secured Parties, shall be held by such Pledgor separate and apart from its other property in trust for the Collateral Agent and the other Secured Parties.

**4.3 Filings; Recordings.**  Each Pledgor shall authorize the filing of UCC-1 financing statements (and any amendment thereto) and execute, or authorizing the filings of, other documents (and pay the cost of filing or recording the same in all public offices deemed appropriate by the Collateral Agent or any Secured Party), and do such other acts and things, all as the Collateral Agent or any Secured Party may from time to time reasonably request to establish and maintain a valid, perfected pledge of, and security interest in, the Pledged Collateral in favor of the Collateral Agent.

**4.4 Maintenance Of Records.**  Subject to the provisions of **Section 4.5**, each Pledgor shall keep at its address indicated on *Schedule I* all its records concerning the Pledged Collateral.

**4.5 Notice Of Change Of Address.**  Each Pledgor shall furnish to the Collateral Agent at least thirty (30) days' prior written notice of any change in the address of such Pledgor's principal place of business or chief executive office (as described on *Schedule I*), the name of such Pledgor, or its state of formation.

**4.6 Information.**  Each Pledgor shall promptly furnish the Collateral Agent and any Secured Party such information concerning the Pledged Collateral as such Person may from time to time reasonably request.  Additionally, each Pledgor shall permit the Collateral Agent and the Secured Parties such rights of inspection and audit of the Pledged Collateral as provided in the Transaction Documents.

**4.7 Notice Of Dissolution.**  Each Pledgor shall promptly notify the Collateral Agent in writing upon learning of the occurrence of any event which would reasonably be expected to cause termination and/or dissolution of any of the Pledged Entities.

## ARTICLE V

### THE COLLATERAL AGENT

**5.1 The Collateral Agent Appointed Attorney-in-Fact**.  Each Pledgor hereby irrevocably appoints the Collateral Agent, and any officer, co-agent or sub-agent thereof, to be such Pledgor's attorney-in-fact, with full authority in the place and stead of such Pledgor and in the name of such Pledgor or otherwise, from time to time in the Collateral Agent's discretion after the occurrence and during the continuance of an Event of Default, to take any action and to execute any instrument which the Collateral Agent may reasonably deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation:

  **(a)** to ask, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Pledged Collateral;

  **(b)** to receive, endorse, and collect any drafts or other instruments, documents and chattel paper, in connection with clause (a) above; and

  **(c)** to file any claims or take any action or institute any proceedings which the Collateral Agent may deem desirable for the collection of any of the Pledged Collateral or otherwise to enforce the rights of the Collateral Agent with respect to any of the Pledged Collateral.

Each Pledgor hereby acknowledges, consents and agrees that the power of attorney granted pursuant to this **Section 5.1** is irrevocable and coupled with an interest.

**5.2 The Collateral Agent May Perform**.  If any Pledgor fails to perform any agreement contained herein, the Collateral Agent may itself perform, or cause performance of, such

agreement for the benefit of the Secured Parties and itself and not for such Pledgor, and the expenses of the Collateral Agent incurred in connection therewith shall be payable by the Pledgors pursuant to **Section 6.5**.

**5.3 The Collateral Agent Has No Duty.**  The powers conferred on the Collateral Agent hereunder are solely to protect its interest in the Pledged Collateral and shall not impose any duty on it to exercise any such powers.  The Collateral Agent shall have no duty as to any Pledged Collateral or responsibility for (a) ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relative to any Pledged Collateral, whether or not the Collateral Agent has or is deemed to have knowledge of such matters, or (b) taking any necessary steps to preserve rights against prior parties or any other rights pertaining to any Pledged Collateral.  Without limiting the generality of the preceding sentence, the Collateral Agent shall be deemed to have exercised reasonable care in the custody and preservation of any of the Pledged Collateral if it takes such action for that purpose as any Pledgor reasonably requests in writing at times other than upon the occurrence and during the continuance of any Event of Default.  Failure of the Collateral Agent to comply with any such request at any time shall not in itself be deemed a failure to exercise reasonable care.

**5.4 Notice Of This Agreement.**  Each Pledgor shall notify the applicable Pledged Entities of the existence of this Agreement by sending to such Pledged Entities a notice in substantially the form attached hereto as ***Exhibit B*** within three (3) Business Days of the date hereof, or if a Pledged Entity has not been formed by the date hereof, within three (3) Business Days of the formation of such Pledged Entity.

## ARTICLE VI

### DEFAULTS AND REMEDIES

**6.1 Events Of Default**.  It shall be an "**Event of Default**" hereunder if any Event of Default (as defined in the Note Agreement or the Guaranty Agreement) shall occur.

**6.2 Certain Remedies**.  If any Event of Default shall have occurred and be continuing:

**(a)**    The Collateral Agent may exercise in respect of the Pledged Collateral, in addition to other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party under the UCC (whether or not the UCC applies to the affected Pledged Collateral) and also may, without notice except as specified below, sell the Pledged Collateral or any part thereof in one or more parcels at public or private sale, at any of the Collateral Agent's offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as the Collateral Agent may deem commercially reasonable.  Each Pledgor agrees that, to the extent notice of sale shall be required by law, at least ten (10) days' prior notice to such Pledgor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification.  The Collateral Agent shall not be obligated to make any sale of Pledged Collateral regardless of notice of sale having been given.  The Collateral Agent may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

(b)    The Collateral Agent may:

(i)    transfer all or any part of the Pledged Collateral into the name of the Collateral Agent or its nominee, with or without disclosing that such Pledged Collateral is subject to the Lien hereunder;

(ii)    notify the parties obligated on any of the Pledged Collateral to make payment to the Collateral Agent of any amount due or to become due thereunder;

(iii)    enforce collection of any of the Pledged Collateral by suit or otherwise, and surrender, release or exchange all or any part thereof, or compromise or extend or renew for any period (whether or not longer than the original period) any obligations of any nature of any party with respect thereto;

(iv)    endorse any checks, drafts, or other writings in any Pledgor's name to allow collection of the Pledged Collateral;

(v)    take control of any proceeds of the Pledged Collateral; and

(vi)    execute (in the name, place and stead of any Pledgor) endorsements, assignments and other instruments of conveyance or transfer with respect to all or any of the Pledged Collateral.

(c)    If, at any time when the Collateral Agent shall determine to exercise its right to sell the whole or any part of the Pledged Collateral hereunder, such Pledged Collateral or the part thereof to be sold shall not, for any reason whatsoever, be effectively registered under the Securities Act of 1933, as amended (as so amended, the "**Act**"), the Collateral Agent may, in its discretion (subject only to applicable requirements of law), sell such Pledged Collateral or part thereof by private sale in such manner and under such circumstances as the Collateral Agent may deem desirable, but subject to the other requirements of this **Section 6.2(c)**, and shall not be required to effect such registration or cause the same to be effected.  Without limiting the generality of the foregoing, in any such event the Collateral Agent may, in its sole discretion: (i) in accordance with applicable securities laws, proceed to make such private sale notwithstanding that a registration statement for the purpose of registering such Pledged Collateral or part thereof could be or shall have been filed under the Act; (ii) approach and negotiate with a single possible purchaser to effect such sale; and (iii) restrict such sale to a purchaser who will represent and agree that such purchaser is purchasing for its own account, for investment, and not with a view to the distribution or sale of such Pledged Collateral or part thereof.  In addition to a private sale as provided above in this **Section 6.2(c)**, if any of the Pledged Collateral shall not be freely distributable to the public without registration under the Act at the time of any proposed sale hereunder, then the Collateral Agent shall not be required to effect such registration or cause the same to be effected but may, in its sole discretion (subject only to applicable requirements of law), require that any sale hereunder (including a sale at auction) be conducted subject to such restrictions as the Collateral Agent may, in its sole discretion, deem desirable in order that such sale (notwithstanding any failure so to register) may be effected in compliance with the Bankruptcy

Code and other laws affecting the enforcement of creditors' rights and the Act and all applicable state securities laws.

(d)      Each Pledgor agrees that a breach of any covenants contained in this **Article VI** with the effect of denying the Collateral Agent the realization of the practical benefits to be provided by this Agreement will cause irreparable injury to the Collateral Agent, on behalf of itself and the Secured Parties, that in such event the Collateral Agent and the Secured Parties would have no adequate remedy at law in respect of such breach and, as a consequence, agrees that in such event each and every covenant contained in this **Article VI** shall be specifically enforceable against such Pledgor, and such Pledgor hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants except for a defense that the Secured Obligations are not then due and payable.

**6.3 Compliance With Restrictions**.  Each Pledgor agrees that in any sale of any of the Pledged Collateral, whether at a foreclosure sale or otherwise, the Collateral Agent is hereby authorized to comply with any limitation or restriction in connection with such sale as it may be advised by counsel is necessary in order to avoid any violation of applicable law (including compliance with such procedures as may restrict the number of prospective bidders and purchasers, require that such prospective bidders and purchasers have certain qualifications and restrict such prospective bidders and purchasers to persons who will represent and agree that they are purchasing for their own account for investment and not with a view to the distribution or resale of such Pledged Collateral), or in order to obtain any required approval of the sale or of the purchaser by any governmental authority, and such Pledgor further agrees that such compliance shall not result in such sale being considered or deemed not to have been made in a commercially reasonable manner, nor shall the Collateral Agent nor any of the Secured Parties be liable nor accountable to such Pledgor for any discount allowed by the reason of the fact that such Pledged Collateral is sold in compliance with any such limitation or restriction.

**6.4 Application Of Proceeds**.  All cash proceeds received by the Collateral Agent in respect of any sale of, collection from, or other realization upon, all or any part of the Pledged Collateral shall be applied:  <u>first</u>, to the payment of all reasonable costs and expenses of holding and selling the Pledged Collateral, including, without limitation, reasonable attorneys' fees and expenses, fees of any accountants and court costs; <u>second</u>, to the full and complete payment of all of the Secured Obligations; and <u>third</u>, to, after payment in full of all of the Secured Obligations, the Pledgors as required by law.

**6.5 Indemnity And Expenses**.  Each Pledgor hereby indemnifies and holds harmless the Collateral Agent, each Secured Party, and each of their respective officers, directors, employees, agents, advisors and representatives (collectively, the "**Indemnified Persons**") from and against any and all claims, losses, and liabilities arising out of or resulting from this Agreement (including enforcement of this Agreement), except claims, losses, or liabilities resulting from the gross negligence or willful misconduct of any Indemnified Person.  Upon demand, the Pledgors shall pay to the Collateral Agent or such Secured Party the amount of any and all reasonable expenses, including the reasonable fees and disbursements of its counsel and of any experts and agents (including reasonable attorneys' fees and costs, whether related to a suit or action or any reviews of or appeals from a judgment or decree therein or in connection with non-judicial action) which the Collateral Agent or such Secured Party may incur in

connection with this Agreement, including, but not limited to, (a) the custody, preservation, use, or operation of, or the sale of, collection from, or other realization upon, any of the Pledged Collateral, (b) the exercise or enforcement of any of the rights of the Collateral Agent or the Secured Parties hereunder, or (c) the failure by the Pledgor to perform or observe any of the provisions hereof.

## ARTICLE VII

### MISCELLANEOUS PROVISIONS

**7.1 Transaction Document.**  This Agreement is one of the Transaction Documents executed pursuant to the Note Agreement and the Guaranty Agreement and shall (unless otherwise expressly indicated herein) be construed, administered and applied in accordance with the terms and provisions thereof.

**7.2 Reinstatement**.  This Agreement shall remain in full force and effect and continue to be effective if at any time payment of the Secured Obligations, or any part thereof, is, pursuant to applicable law, avoided, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Secured Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made.  In the event that any payment, or any part thereof, is avoided, rescinded, reduced, restored, or returned, the Secured Obligations, shall be reinstated and deemed reduced only by such amount paid and not so avoided, rescinded, reduced, restored, or returned.

**7.3 Amendments; Waivers**.  No amendment to, or waiver of, any provision of this Agreement, nor consent to any departure by any Pledgor from any provision in this Agreement shall in any event be effective unless the same shall have been in writing and given by the Collateral Agent.

**7.4 Protection Of Pledged Collateral**.  The Collateral Agent may from time to time, at its option, perform any act which any Pledgor agrees hereunder to perform and which such Pledgor shall fail to perform after being requested in writing so to perform (it being understood that no such request need be given after the occurrence and during the continuance of any Event of Default) and the Collateral Agent may, but shall not be required to, from time to time, take any other action which the Collateral Agent reasonably deems necessary for the maintenance, preservation or protection of any of the Pledged Collateral or of its security interest therein, all such actions being for the express benefit of the Secured Parties and the Collateral Agent and not any of the Pledgors.

**7.5 Addresses For Notices**.  Any notice or other communication hereunder shall be addressed and delivered (i) to the Company by delivering such notice in accordance with Section 7.4 of the Guaranty Agreement, (ii) to the Borrower by delivering such notice in accordance with Section 12H of the Note Agreement, (iii) to the Subsidiary Guarantors, pursuant to Section 14 of the Subsidiary Guaranty Agreement, and (iv) to the Collateral Agent at the address and telefacsimile number set forth under the Collateral Agent's signature block of this Agreement.

**7.6 Section Captions.**  Section captions used in this Agreement are for convenience of reference only, and shall not affect the construction of this Agreement.

**7.7 Severability**.   Wherever possible each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**7.8 Counterparts**.  This Agreement may be executed in any number of counterparts, (including those transmitted by electronic transmission (including, without limitation, facsimile and e-mail)), each of which when so delivered shall be deemed an original, but all such counterparts shall constitute but one and the same instrument.  Delivery of this Agreement may be made by facsimile transmission of a duly executed counterpart copy hereof.

**7.9 Governing Law; Entire Agreement**.   THIS AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, AND THE RIGHTS OF THE PARTIES SHALL BE GOVERNED BY, THE INTERNAL LAW OF THE STATE OF NEW YORK, EXCLUDING CHOICE-OF-LAW PRINCIPLES OF THE LAW OF SUCH STATE THAT WOULD PERMIT THE APPLICATION OF THE LAWS OF A JURISDICTION OTHER THAN SUCH STATE.

**7.10    Waiver of Jury Trial.**  THE PARTIES HERETO AGREE TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, ANY OTHER TRANSACTION DOCUMENT OR ANY DEALINGS BETWEEN OR AMONG THE COLLATERAL AGENT, ANY OF THE SECURED PARTIES AND ANY OF THE PLEDGORS RELATING TO THE SUBJECT MATTER OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY AND THE SECURED PARTY/PLEDGOR RELATIONSHIP THAT IS BEING ESTABLISHED.   THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH OF THE PARTIES HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO THIS BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS, AND THAT EACH WILL CONTINUE TO RELY ON THE WAIVER IN THEIR RELATED FUTURE DEALINGS.   EACH OF THE PARTIES HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.   IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

**7.11    Jurisdiction; Venue**. Each Pledgor irrevocably agrees that any legal action or proceeding with respect to this Agreement, the other Transaction Documents or any of the agreements, documents or instruments delivered in connection herewith shall be brought in the courts of the State of New York, or the United States of America for the Southern District of New York as the Collateral Agent or any Secured Party may elect, and, by execution and delivery hereof, each Pledgor accepts and consents to, for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts and agrees that such jurisdiction shall be exclusive, unless waived by the Required Holders in writing, with respect to any action or proceeding brought by such Pledgor against the Collateral Agent or any other Secured Party.  Nothing herein shall limit the right that the Collateral Agent or any Secured Party may have to bring proceedings against any Pledgor in the courts of any appropriate jurisdiction or to enforce in any lawful manner a judgment obtained in one jurisdiction in any other jurisdiction.  Each Pledgor hereby waives, to the full extent permitted by law, any right to stay or to dismiss any action or proceeding brought before said courts on the basis of *forum non conveniens*.

**7.12    Additional Pledgors**.   From time to time subsequent to the date hereof, additional Subsidiaries and/or Affiliates of the Company may become parties hereto, as additional Pledgors (each, an "**Additional Pledgor**"), by executing a Joinder Agreement.  Upon the delivery of the Joinder Agreement to the Collateral Agent, such Additional Pledgor shall be a Pledgor and shall be as fully a party hereto as if such Additional Pledgor were an original signatory hereof.

**7.13    Incorporation by Reference**.   In connection with its execution and acting hereunder, the Collateral Agent is entitled to all rights, privileges, benefits, protections, immunities and indemnities provided to it (i) under the Collateral Documents to which any Credit Party is party and (ii) under the Collateral Agency Agreement as between the Secured Parties and the Collateral Agent.

[Remainder of Page Intentionally Blank]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and delivered by their respective duly authorized officers as of the day and year first above written.

**PLEDGORS:**

COMPANY:

**PULIZTER INC.,**
a Delaware corporation

By: _____
Name:
Title:

BORROWER:

**ST. LOUIS POST-DISPATCH LLC**,
a Delaware limited liability company
By:      Pulitzer Inc., Managing Member

By: _____
Name:
Title:

A/74598684.3

SUBSIDIARY PLEDGORS:

**PULITZER NEWSPAPERS, INC.**
**PULITZER TECHNOLOGIES, INC.**
**NAPA VALLEY PUBLISHING CO.**
**NORTHERN LAKES PUBLISHING CO.**
**PANTAGRAPH PUBLISHING CO.**
**SOUTHWESTERN OREGON PUBLISHING**
**CO.**


By:_____
Name:
Title:


Acknowledged, accepted and agreed:

**THE BANK OF NEW YORK MELLON**
**TRUST COMPANY, N.A.**


By:_____
Name:
Title:

Address:

The Bank of New York Mellon Trust Company, N.A.
Attn: Geraldine Creswell, Asst. Treasurer
10161 Centurion Parkway, N.
Jacksonville, Florida 32256
Fax: 904-645-1921
Email: geri.creswell@bnymellon.com

SCHEDULE I

**LOCATION OF EACH PLEDGOR'S CHIEF EXECUTIVE
OFFICE, PRINCIPAL PLACE OF BUSINESS
AND RECORDS PERTAINING TO COLLATERAL**

**PLEDGOR**                    **LOCATION**

EXHIBIT A

PLEDGED EQUITY

| PLEDGOR | PLEDGED ENTITY | CLASS | CERTIFICATE NUMBER | NUMBER OF SHARES, UNITS, INTERESTS | PERCENTAGE OWNERSHIP |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |

A-1.

**EXHIBIT B**

**NOTICE OF PLEDGE AGREEMENT**

**TO:**    **[NAME OF PLEDGED ENTITY] (the "Pledged Company")**

Reference is made to a Pledge Agreement (an unexecuted copy of which is attached hereto) dated as of [_____] (as the same from time to time hereafter may be amended, restated, supplemented or otherwise modified, the "**Pledge Agreement**"), made by the undersigned "Pledgor" and each other "Pledgor" identified therein (each, a "**Pledgor**" and collectively, the "**Pledgors**"), in favor of The Bank of New York Mellon Trust Company, N.A., not in its individual capacity, but solely in its capacity as the collateral agent (in such capacity, together with its successors and assigns in such capacity, the "**Collateral Agent**") for the benefit and on behalf of the Secured Parties (as defined therein).  Capitalized terms used but not defined herein shall have the meanings given to them in the Pledge Agreement.

Pursuant to the Pledge Agreement, the undersigned Pledgor hereby gives you notice that it has pledged and assigned to the Collateral Agent, on behalf and for the benefit of the Secured Parties, and granted to the Collateral Agent, on behalf and for the benefit of the Secured Parties, a continuing security interest in and to all right, title and interest of such Pledgor, whether now existing or hereafter arising or acquired, in, to and under the Pledged Equity, as set forth in *Exhibit A* of the Pledge Agreement, in respect of any and all of the following:

(a)    The Pledged Equity owned or held by such Pledgor and the certificates representing the Pledged Equity, if any, and all dividends, cash, instruments, and other property or proceeds from time to time received, receivable, or otherwise distributed in respect of or in exchange for any or all of such Pledged Equity;

(b)    All voting trust certificates held by such Pledgor evidencing its beneficial interest in any Pledged Equity subject to any voting trust;

(c)    All additional shares of capital stock, membership interest, partnership interests or other equity interests, as the case may be, of the Pledged Company and voting trust certificates from time to time acquired by the Pledgor in any manner (which additional interests shall be deemed to be part of the Pledged Equity), and the certificates representing such additional shares of capital stock, membership interests, partnership interests or other equity interests, if any, and all dividends, cash, instruments, and other property or proceeds from time to time received, receivable, or otherwise distributed in respect of or in exchange for any or all of such shares of capital stock, membership interests, partnership interests or other equity interests; and

(d)    The rents, issues, profits, returns, income, allocations, distributions and proceeds of and from any and all of the foregoing.

Pursuant to the Pledge Agreement, the Pledged Company is hereby authorized and directed (i) to register on its books the undersigned Pledgor's pledge of the Pledged Collateral to the Collateral Agent, (ii) to make direct payment to the Collateral Agent, on behalf and for the benefit of itself and the Secured Parties, of any amounts due or to become due such Pledgor, if so

notified by the Collateral Agent or such Pledgor, and (iii) to otherwise comply with instructions, including, without limitation, any vote or consent originated by the Collateral Agent without further consent of such Pledgor.

The undersigned Pledgor hereby requests that the Pledged Company indicate its acceptance of this notice of and consent to Pledge Agreement and confirm its terms and provisions by signing a copy hereof where indicated on the attached page and returning the same to the Collateral Agent.

[Signature page follows]

B-2

Dated:  [_____]

**PLEDGOR:**

**[NAME OF PLEDGOR]**


By:_____
Name:
Title:

# ACKNOWLEDGMENT

**[NAME OF PLEDGED ENTITY],** a [_____] (the "**Issuer**"*)*, hereby acknowledges and consents to the assignment by **[Name of Pledgor]** (the "**Pledgor**"), of all its right, title and interest in, to and under the Pledged Equity, and the other Pledged Collateral pursuant to the terms of and as described and defined in the Pledge Agreement, dated as of [_____] (as the same from time to time hereafter may be amended, restated, supplemented or otherwise modified, the "**Pledge Agreement**"), made by the Pledgor and each other "Pledgor" identified therein in favor of The Bank of New York Mellon Trust Company, N.A., not in its individual capacity, but solely in its capacity as the collateral agent (in such capacity, together with its successors and assigns in such capacity, the "**Collateral Agent**") for the benefit and on behalf of the Secured Parties (as defined therein). Capitalized terms used but not defined herein shall have the meanings given to them in the Pledge Agreement.

The Issuer further confirms that it has reviewed the Pledge Agreement and this notice of assignment and has not found the terms thereof or the transactions described therein to be objectionable, has registered the Pledgor's pledge to the Collateral Agent, on behalf and for the benefit of the Secured Parties of the Pledged Equity and the other Pledged Collateral on its books, and upon notice from the Collateral Agent or the Pledgor, Issuer agrees to make direct payment to the Collateral Agent of any amounts due or to become due the Pledgor in connection with the Pledged Equity or the Pledged Collateral and agrees that it will otherwise comply with instructions (including, without limitation, any vote or consent) originated by the Collateral Agent without further consent by the Pledgor.

[Signature page follows]

Dated: [_____]

**ISSUER:**

**[NAME OF ISSUER],**
a[n] [_____]


By: _____

Printed Name: _____

Title: _____

**[Attach hereto an unexecuted copy of the
Pledge Agreement
between the Pledgor and the Collateral Agent]**

B-6

**EXHIBIT C**

**FORM OF JOINDER AGREEMENT**

C-1

# JOINDER AGREEMENT
## TO
## PLEDGE AGREEMENT

**ADDITIONAL PLEDGOR:**  Reference is made to that certain Pledge Agreement, dated as of [_____] (as the same may from time to time be amended, restated, supplemented or otherwise modified, the "**Pledge Agreement**"), made by Pulitzer Inc. (the "**Company**"), St. Louis Post-Dispatch LLC (the "**Borrower**") and certain other Affiliates and Subsidiaries of the Company, each identified as Pledgors therein, in favor of the Collateral Agent identified therein, on behalf and for the benefit of the Secured Parties identified therein.  Capitalized terms not defined in this Joinder Agreement shall have the meanings given to them in the Pledge Agreement.  The undersigned acknowledges and agrees it is (or, concurrently with the execution and delivery of this Joinder Agreement, will become) a Pledgor and that, by its execution and delivery of this Joinder Agreement to the Collateral Agent, it hereby joins and for all purposes becomes a Pledgor under and a party to the Pledge Agreement, and does hereby pledge, hypothecate, assign, charge, mortgage, deliver and transfer to the Collateral Agent, on behalf and for the benefit of the Secured Parties, and does hereby grant and deliver to the Collateral Agent, on behalf and for the benefit of the Secured Parties, a security interest in and to all of such Pledgor's respective right, title and interest in, to and under the Collateral, whether now existing or hereafter arising or acquired, and does hereby fully assume and undertake to perform, all rights, benefits, burdens, obligations and liabilities of a Pledgor under the Pledge Agreement.

_____, a _____

By:    _____

Printed Name:  _____

Title:  _____

<u>EXHIBIT E</u>

[FORM OF SECURITY AGREEMENT]

Bingham Draft
12/1/11

# SECURITY AGREEMENT[1]

This **SECURITY AGREEMENT** (together with all exhibits and schedules hereto, as amended, supplemented or otherwise modified from time to time, this "**Agreement**"), dated as of [_____], is made by **PULITZER INC.**, a Delaware corporation (together with its successors and assigns, the "**Company**"), **ST. LOUIS POST-DISPATCH LLC**, a Delaware limited liability company (together with its successors and assigns, the "**Borrower**"), and each Subsidiary of the Company on the signature pages hereto (collectively, the "**Initial Subsidiary Grantors**") and each of the other Persons (as defined below) that from time to time becomes an "Additional Grantor" pursuant to Section 12(m) of this Agreement (each, a "**Grantor**" and, collectively, the "**Grantors**") in favor of the Collateral Agent, on behalf and for the benefit of the Secured Parties (as each such term is defined below).

## RECITALS

A.    Reference is made to that certain Note Agreement, dated as of [_____] (as the same from time to time hereafter may be amended, restated, supplemented or otherwise modified, the "**Note Agreement**"), by and among St. Louis Post-Dispatch LLC, a Delaware limited liability company (together with its successors and assigns, the "**Borrower**"), and the Purchasers named therein, pursuant to which, subject to the terms and conditions set forth therein, the Borrower issued the Notes (as defined below) to such Purchasers.

B.    Reference is also made to that certain Guaranty Agreement, dated as of [_____] (as the same from time to time hereafter may be amended, restated, supplemented or otherwise modified, the "**Guaranty Agreement**"), made by the Company in favor of the Purchasers, pursuant to which, subject to the terms and conditions set forth therein, the Company guaranteed the full, complete and final payment and performance of the "Guaranteed Obligations" (as defined in the Guaranty Agreement).

C.    Reference is also made to that certain Subsidiary Guaranty Agreement, dated as of [_____] (as the same from time to time hereafter may be amended, restated, supplemented or otherwise modified, the "**Subsidiary Guaranty Agreement**") made by each Initial Subsidiary Grantor, and each additional Person that hereinafter executes a joinder thereto, in favor of the Purchasers, pursuant to which such Persons have, among other things, agreed to guarantee the full, complete and final payment and performance of the "Guaranteed Obligations" (as defined in the Subsidiary Guaranty Agreement).

D.    On [_____], 2011, Lee and certain of its Subsidiaries including the Company (collectively, the "**Debtors**") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the

---

[1] The Grantors (i) acknowledge that no disclosure schedules or similar information contemplated by this Agreement have been provided as of the date of this draft and (ii) agree that, to the extent that the information set forth in such disclosure schedules or other information differs in any respect from the information provided to the Noteholders (as defined in the Pulitzer Support Agreement) prior to the Plan Support Effective Date, without prejudice to any other rights of any Noteholder, the Noteholders reserve the right in their reasonable discretion to make appropriate changes to this Agreement.

"**Bankruptcy Court**") and continued in the possession of their property and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

E.      On [_____], 2012, the Bankruptcy Court entered an order confirming the Joint Prepackaged Plan of Reorganization for the Debtors, dated [_____], 2011 (as in effect on the date of confirmation thereof pursuant to the Confirmation Order of the Bankruptcy Court and as it thereafter may be amended in accordance with the Pulitzer Support Agreement, the "**Plan of Reorganization**").

F.      In connection with the implementation of the Plan of Reorganization, the Purchasers are willing to enter into the Note Agreement and otherwise make, extend and maintain certain financial accommodations to the Borrower and Company as provided in the Note Agreement, the Notes (as defined below) and the Guaranty Agreement, but only upon the condition, among others, that the Company, the Borrower and the Initial Subsidiary Grantors shall have executed and delivered this Agreement to the Collateral Agent, on behalf and for the benefit of the Secured Parties.

<div align="center">

**AGREEMENT**

</div>

NOW, THEREFORE, in order to induce the Purchasers to enter into the Note Agreement and to otherwise make, extend and maintain financial accommodations to or for the benefit of the Credit Parties on the terms and subject to the conditions set forth therein, and for other good and valuable consideration, and intending to be legally bound, each Grantor, jointly and severally, hereby represents, warrants, covenants and agrees as follows:

**SECTION 1. Defined Terms.**   Capitalized terms not defined herein shall have the meanings given to them in the Note Agreement.  The following capitalized terms shall have the following meanings (such meanings being equally applicable to both the singular and plural forms of the terms defined):

"**Account**" means and includes any "*account,*" as such term is defined in Article 9 of the UCC, now owned or hereafter acquired or received by any Grantor or in which any Grantor now holds or hereafter acquires or receives any right or interest.

"**Account Debtor**" means a Person obligated on an Account, Chattel Paper or General Intangible, but does not include a Person obligated to pay on or under an Instrument, even if such Instrument constitutes a part of Chattel Paper.

"**Additional Grantor**" has the meaning specified for such term in **Section 12(m)** of this Agreement.

"**Affiliate**" has the meaning specified for such term in the Note Agreement.

"**Agreement**" has the meaning specified for such term in the introductory paragraph hereto.

"**Bankruptcy Code**" means the provisions of Title 11 of the United States Code, 11 U.S.C. §§101 *et seq*., as now and hereafter in effect, any successors to such statute and any other

applicable bankruptcy, insolvency or other similar law of any jurisdiction including, without limitation, any law of any jurisdiction relating to the reorganization, readjustment, liquidation, dissolution, release or other relief of debtors, or providing for the appointment of a receiver, trustee, custodian or conservator or other similar official for all or any substantial part of such debtor's assets, or for the making of an assignment for the benefit of creditors of a debtor.

"**Borrower**" has the meaning specified for such term in the introductory paragraph hereto.

"**Certificate of Title**" means all certificates of title (or similar ownership documents) with respect to which applicable law provides for a security interest to be identified on such certificate as a condition for the perfection or priority of a security interest over the rights of a lien creditor or other persons with respect thereto.

"**Chattel Paper**" means and includes any "*chattel paper,*" as such term is defined in Article 9 of the UCC, now owned or hereafter acquired or received by Grantor or in which any Grantor now holds or hereafter acquires or receives any right or interest.

"**Collateral**" means all of each Grantor's: (i) Accounts; (ii) Chattel Paper; (ii) Commercial Tort Claims; (iii) Contracts; (iv) Deposit Accounts; (v) Documents; (vi) Equipment; (vii) Fixtures; (viii) General Intangibles; (ix) Instruments; (x) Inventory; (xi) Investment Property; (xii) Letter-of-Credit Rights; (xiii) Supporting Obligations; (xiv) other goods and personal property of such Grantor whether tangible or intangible and whether now or hereafter owned or existing, leased, consigned by or to, or acquired by, such Grantor and wherever located; and (xv) to the extent not otherwise included, all Proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of each of the foregoing.  Notwithstanding the foregoing, the term "Collateral" shall <u>not</u> include (a) the Excluded TNI Assets, or (b) "intent-to-use" trademarks at all times prior to the first use thereof, whether by the actual use thereof in commerce, the recording of a statement of use with the United States Patent and Trademark Office or otherwise.

"**Collateral Agency Agreement**" means that certain Collateral Agency Agreement, dated as of [_____], duly executed by the Collateral Agent and the Purchasers.

"**Collateral Agent**" means The Bank of New York Mellon Trust Company, N.A. in its capacity as collateral agent for the Secured Parties, together with its successors and assigns in such capacity.

"**Collateral Documents**" has the meaning specified for such term in the Note Agreement.

"**Commercial Tort Claims**" means any claim arising in tort now or hereafter owned or acquired or received by any Grantor or in which any Grantor now holds or hereafter acquires or receives any right or interest, including, without limitation, those from time to time listed on *Schedule VI* hereto.

"**Commodity Account**" means and includes any *"commodity account,"* as such term is defined in Article 9 of the UCC, now owned or hereafter acquired or received by any Grantor or in which any Grantor now holds or hereafter acquires or receives any right or interest.

"**Company**" has the meaning specified for such term in the introductory paragraph hereto.

"**Contract**" means any contract (including any customer, vendor, supplier, service or maintenance contract), lease, license (including any License), undertaking, purchase order, permit, franchise agreement or other agreement (other than any right evidenced by Chattel Paper, Documents or Instruments), whether in written or electronic form, in or under which any Grantor may now hold or hereafter acquires or receives any right or interest, including with respect to an Account, any agreement relating to the terms of payment or the terms of performance thereof.

"**Copyright**" means any of the following now owned or hereafter acquired or created (as a work for hire for the benefit of such Grantor) by any Grantor or in which any Grantor now holds or hereafter acquires or receives any right or interest, in whole or in part:    (a) any copyright, whether registered or unregistered, held pursuant to the laws of the United States of America or of any other country or foreign jurisdiction; (b) registration, application or recording in the United States Copyright Office or in any similar office or agency of the United States of America or any other country or foreign jurisdiction; (c) any continuation, renewal or extension thereof; and (d) any registration to be issued in any pending application, and shall include any right or interest in and to work protectable by any of the foregoing which are presently or in the future owned, created or authorized (as a work for hire for the benefit of such Grantor) or acquired by such Grantor, in whole or in part.

"**Copyright License**" means any agreement, whether in written or electronic form, now owned or hereafter acquired or received by any Grantor or in which any Grantor now holds or hereafter acquires or receives any right or interest granting any right to use or right not to be sued with respect to the use of any Copyright or any work protectable by Copyright.

"**Credit Party**" means the Company, the Borrower and each Initial Subsidiary Grantor.

"**Deposit Account**" means and includes any "*deposit account*" as such term is defined in Article 9 of the UCC.

"**Documents**" means and includes any "*documents,*" as such term is defined in Article 9 of the UCC, now owned or hereafter acquired or received by any Grantor or in which any Grantor now holds or hereafter acquires or receives any right or interest.

"**Equipment**" means and includes any "*equipment,*" as such term is defined in Article 9 of the UCC, now or hereafter owned or acquired or received by any Grantor or in which any Grantor now holds or hereafter acquires or receives any right or interest.

"**Event of Default**" has the meaning specified for such term in Section 8 hereof.

"**Excluded TNI Assets**" means all Equity Interests in TNI Partners, all real and personal property which is leased to, or used in the operations or business of, TNI Partners, and all proceeds of any of the foregoing.

"**Fixtures**" means and includes any "*fixtures,*" as such term is defined in Article 9 of the UCC, now or hereafter owned or acquired or received by any Grantor or in which any Grantor now holds or hereafter acquires or receives any right or interest.

"**GAAP**" means generally accepted accounting principles (including International Financial Reporting Standards, as applicable) as in effect from time to time.

"**General Intangible**" means and includes any "*general intangible,*" as such term is defined in Article 9 of the UCC, now owned or hereafter acquired or received by any Grantor or in which any Grantor now holds or hereafter acquires or receives any right or interest.

"**Grantors**" has the meaning specified for such term in the Preamble hereto.

"**Guaranty Agreement**" has the meaning specified for such term in the Recitals hereto.

"**Indemnified Persons**" has the meaning specified for such term in **Section 5(c)** of this Agreement.

"**Initial Subsidiary Grantors**" has the meaning specified for such term in the Preamble hereto.

"**Instrument**" means and includes any "*instrument,*" as such term is defined in Article 9 of the UCC, now or hereafter owned or acquired or received by any Grantor or in which any Grantor now holds or hereafter acquires or receives any right or interest.

"**Intellectual Property**" means any intellectual property, in any medium, of any kind or nature whatsoever, now or hereafter owned or acquired or received by any Grantor or in which any Grantor now holds or hereafter acquires or receives any right or interest, and shall include, in any event, any Copyright, Trademark, Patent, trade secret, customer list, Internet domain name (including any right related to the registration thereof), proprietary or confidential information, mask work, source, object or other programming code, invention (whether or not patented or patentable), technical information, procedure, design, knowledge, know-how, software, data base, data, skill, expertise, recipe, experience, process, model, drawing, material or record.

"**Inventory**" means and includes any "*inventory,*" as such term is defined in Article 9 of the UCC, wherever located, now or hereafter owned or acquired or received by any Grantor or in which any Grantor now holds or hereafter acquires or receives any right or interest.

"**Investment Property**" means and includes any "*investment property,*" as such term is defined in Article 9 of the UCC, now or hereafter owned or acquired or received by any Grantor or in which any Grantor now holds or hereafter acquires or receives any right or interest.

"**Joinder Agreement**" means a Joinder Agreement substantially in the form of *Exhibit A* attached hereto.

"**Letter-of-Credit Right**" means any right now owned or hereafter acquired or received by any Grantor or in which any Grantor now holds or hereafter acquires or receives any right or interest, in each case to payment or performance under a letter of credit (as such term is defined in Article 5 of the UCC), whether or not the beneficiary has demanded or is at the time entitled to demand payment or performance.

"**Lien**" has the meaning specified for such term in the Note Agreement.

"**License**" means any Copyright License, Patent License, Trademark License or other license of rights or interests, whether in-bound or out-bound, whether in written or electronic form, now or hereafter owned or acquired or received by any Grantor or in which any Grantor now holds or hereafter acquires or receives any right or interest, and shall include any renewals or extensions of any of the foregoing thereof.

"**Material Adverse Effect**" means a material adverse effect on (i) the business, financial condition, assets or properties of the Company and its Subsidiaries taken as a whole, or (ii) the ability of any Credit Party to perform its obligations under any of the Transaction Documents, or (iii) the validity or enforceability of any of the Transaction Documents.

"**Note Agreement**" has the meaning specified for such term in the Recitals hereto.

"**Note Documents**" means the Note Agreement and Guaranty Agreement.

"**Notes**" has the meaning specified for such term in the Note Agreement.

"**Patent**" means any of the following now hereafter owned or acquired or received by any Grantor or in which any Grantor now holds or hereafter acquires or receives any right or interest: (a) letters patent and right corresponding thereto, of the United States of America or any other country or other foreign jurisdiction, any registration and recording thereof, and any application for letters patent, and rights corresponding thereto, of the United States of America or any other country or other foreign jurisdiction, including, without limitation, registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States of America, any State thereof or any other country or other foreign jurisdiction; (b) any reissue, continuation, continuation-in-part or extension thereof; (c) any petty patent, divisional, and patent of addition; and (d) any patent to issue in any such application.

"**Patent License**" means any agreement, whether in written or electronic form, now hereafter owned or acquired or received by any Grantor or in which any Grantor now holds or hereafter acquires or receives any right or interest granting any right to use or right not to be sued with respect to any Patent or any invention on which a Patent is in existence.

"**Person**" has the meaning specified for such term in the Note Agreement.

"**Pledge Agreement**" means that certain Pledge Agreement dated the date hereof entered into by the Company in favor of the Collateral Agent for the benefit of the Secured Parties.

"**Proceeds**" means and includes any "*proceeds,*" as such term is defined in Article 9 of the UCC, now or hereafter owned or acquired or received by any Grantor or in which any Grantor now holds or hereafter acquires or receives any right or interest.

"**Purchasers**" means the original Purchasers of the Notes pursuant to the Note Agreement, each of whom is listed on Schedule A thereto.

"**Requirement of Law**" means, as to any Person, any law, treaty, rule, regulation, guideline or determination of an arbitrator, a court or other governmental authority, in each case applicable to or binding upon the Person or any of its property or to which the Person or any of its property is subject.

"**Required Holders**" has the meaning specified for such term in the Note Agreement.

"**Secured Obligations**" means (a) all obligations of the Borrower for the payment of the principal amount of the Notes, accrued interest thereon, Yield-Maintenance Amount, non-usage fees and all other fees and amounts due to the holders of Notes pursuant to the terms of the Note Agreement and the other Transaction Documents, (b) the "Guaranteed Obligations" as such term is defined in the Guaranty Agreement, (c) the "Guaranteed Obligations" as such term is defined in the Subsidiary Guaranty Agreement and (d) any and all other debts, liabilities and reimbursement obligations, indemnity obligations and other obligations for monetary amounts, fees, expenses, costs or other sums (including reasonable attorneys' fees and costs) chargeable to any Credit Party under or pursuant to any of the Transaction Documents.

"**Secured Parties**" means the holders from time to time of the Notes.

"**Securities Account**" means and includes any "*securities account,*" as such term is defined in Article 9 of the UCC, now or hereafter owned or acquired or received by any Grantor or in which any Grantor now holds or hereafter acquires or receives any right or interest.

"**Subsidiary**" has the meaning specified for such term in the Note Agreement.

"**Subsidiary Guaranty Agreement**" has the meaning specified for such term in the Recitals hereto.

"**Supporting Obligations**" means and includes any "*supporting obligations,*" as such term is defined in Article 9 of the UCC, now or hereafter owned or acquired or received by any Grantor or in which any Grantor now holds or hereafter acquires or receives any right or interest.

"**TNI Agreement**" means that certain Amended and Restated Partnership Agreement, dated as of November 30, 2009, by and among Star Publishing Company and Citizen Publishing Company.

"**TNI Partners**" means TNI Partners, a general partnership formed under the laws of the State of Arizona pursuant to the terms of the TNI Agreement.

"**Trademark License**" means any agreement, whether in written or electronic form, now or hereafter owned or acquired or received by any Grantor or in which any Grantor now holds or

hereafter acquires or receives any right or interest granting any right to use or right not to be sued for the use of any Trademark or Trademark registration.

"**Trademarks**" means any of the following now or hereafter owned or acquired or received by any Grantor or in which any Grantor now holds or hereafter acquires or receives any right or interest: (a) any trademark, service mark, trade name, corporate name, business name, trade style, logo, other source or business identifier, print or label on which any of the foregoing have appeared or appear, design or other general intangibles of like nature, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and any applications in connection therewith, including registration, recording and application in the United States Patent and Trademark Office or in any similar office or agency of the United States of America, any State thereof or any other country or other foreign jurisdiction; and (b) any reissue, extension or renewal of any of the foregoing.

"**Transaction Documents**" has the meaning specified for such term in the Note Agreement.

"**UCC**" means the Uniform Commercial Code as the same may from time to time be in effect in the State of New York (and each reference in this Agreement to an Article thereof shall refer to that Article as from time to time in effect; *provided, however,* in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of the Collateral Agent's security interest in any collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, the term "*UCC*" shall mean the Uniform Commercial Code (including the Articles, Divisions, Parts, Chapters, Sections and the like, as applicable, thereof) as in effect at such time in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection or priority and for purposes of definitions related to such provisions.

**SECTION 2.  Grant of Security Interest.**  As security for the full, complete and final payment and performance when due (whether at stated maturity, by acceleration or otherwise) of all the Secured Obligations and in order to induce the Purchasers to enter into the Note Agreement, and make, extend and maintain financial accommodations to and for the benefit of the Credit Parties upon the terms and subject to the conditions of the Transaction Documents, each Grantor hereby mortgages, pledges and hypothecates to the Collateral Agent, on behalf and for the benefit of the Secured Parties, and hereby grants to the Collateral Agent, on behalf and for the benefit of the Secured Parties, a security interest in and to all of such Grantor's respective right, title and interest in, to and under the Collateral, whether now existing or hereafter arising or acquired.

**SECTION 3.  Assignment of Contracts; Rights of the Collateral Agent; Collection of Accounts**.

**(a)**  In furtherance of Section 2 and the purposes of this Agreement, each Grantor hereby mortgages, pledges and hypothecates to the Collateral Agent, on behalf and for the benefit of the Secured Parties, and hereby grants to the Collateral Agent, on behalf and for the benefit of the Secured Parties, a security interest in and to, all right, title and interest of such Grantor in and to, and all benefits accruing to such Grantor pursuant to, each of the Contracts,

Instruments, Chattel Paper and Investment Property (other than any Contracts, Instruments, Chattel Paper and Investment Property constituting Excluded TNI Assets), provided, however, that, unless an Event of Default shall have occurred and be continuing, such Grantor shall have the right to exercise any of its rights under any such Contracts, Instruments, Chattel Paper or Investment Property to which it is a party or by which it is bound (including the right to enter into possession of and use any and all property leased or licensed to such Grantor, as lessee or licensee, the right to use any or all of the facilities made available to such Grantor and the right to make all waivers and agreements, to give all notices, consents and releases, to take all action upon the happening of any default giving rise to a right in favor of such Grantor, under any of such Contracts, Instruments, Chattel Paper or Investment Property to which it is a party or by which it is bound, and to do any and all other things whatsoever which such Grantor is or may become entitled to do under any of such Contracts, Instruments, Chattel Paper or Investment Property to which it is a party or by which it is bound); and provided, further, that during the continuance of any Event of Default, the Collateral Agent shall have the right (but not the obligation) to exercise any and all rights under any such Contracts, Instruments, Chattel Paper and Investment Property (including all rights set forth in the parenthetical in the immediately preceding proviso and in Section 3(d)).

(b)    Notwithstanding anything contained in this Agreement to the contrary, each Grantor expressly agrees that it shall not default under any of its Contracts, Instruments, Chattel Paper or Investment Property, it shall observe and perform all the conditions and obligations to be observed and performed by it thereunder and that it shall perform all of its duties and obligations thereunder, all in accordance with and pursuant to the terms and provisions of each such Contract, Instrument, Chattel Paper or Investment Property unless and to the extent such default(s) or other failure(s) could not, individually or in the aggregate, with reasonable likelihood, be expected to have a Material Adverse Effect; provided, however, that Grantor may suspend performance of its obligations under any such Contract, Instrument, Chattel Paper or Investment Property in the event of a material breach of such Contract, Instrument, Chattel Paper or Investment Property by a third party.  Neither the Collateral Agent nor any Secured Party shall have any obligation or liability under any Contract, Instrument, Chattel Paper or Investment Property by reason of or arising out of this Agreement or the granting to the Collateral Agent of a security interest therein or the receipt by the Collateral Agent or any Secured Party of any payment relating to any Contract, Instrument, Chattel Paper or Investment Property pursuant hereto, nor shall the Collateral Agent or any Secured Party be required or obligated in any manner to perform or fulfill any of the obligations of any Grantor under or pursuant to any Contract, Instrument, Chattel Paper or Investment Property, or to make any payment, or to make any inquiry as to the nature or the sufficiency of any payment received by it or the sufficiency of any performance by any party under any Contract, Instrument, Chattel Paper or Investment Property, or to present or file any claim, or to take any action to collect or enforce any performance or the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

(c)    The Collateral Agent authorizes each Grantor to collect its Accounts; provided that the Collateral Agent may, upon the occurrence and during the continuation of any Event of Default and without notice, limit or terminate said authority at any time.  If required by the Collateral Agent at any time during the continuation of any Event of Default, any Proceeds, when first collected by any Grantor, received in payment of any such Account or in payment for

any of its Inventory or on account of any of its Contracts shall be promptly deposited by such Grantor in precisely the form received (with all necessary endorsements) in a special bank account maintained by the Collateral Agent subject to withdrawal by the Collateral Agent only, as hereinafter provided, and until so turned over shall be deemed to be held in trust by such Grantor for and as the Collateral Agent's property, on behalf and for the benefit of the Secured Parties, and shall not be commingled with such Grantor's other funds or properties.  Such Proceeds, when deposited, shall continue to be collateral security for all of such Grantor's Secured Obligations and shall not constitute payment thereof until applied as hereinafter provided.  Upon the occurrence and during the continuation of any Event of Default, the Collateral Agent may, in its sole discretion, after consultation with the Required Holders, apply all or a part of the funds on deposit in said special account to the principal of or interest on, or both, in respect of any of the Secured Obligations in accordance with the provisions of **Section 8(h)**, and any part of such funds which the Collateral Agent elects not so to apply and deem not required as collateral security for the Secured Obligations shall be paid over from time to time by the Collateral Agent to the appropriate Grantor.  If an Event of Default has occurred and is continuing, at the request of the Collateral Agent, each Grantor shall deliver to the Collateral Agent all original and other documents evidencing, and relating to, the sale (or other disposition) and delivery of such Inventory and such Grantor shall deliver all original and other documents evidencing and relating to, the performance of labor or service which created such Accounts, including, without limitation, all original orders, invoices and shipping receipts.

(d)  The Collateral Agent may, at any time, upon the occurrence and during the continuation of any Event of Default, notify Account Debtors of such Grantor, parties to the Contracts of such Grantor, or obligors in respect of Instruments, Chattel Paper and Investment Property of such Grantor that the Accounts and the right, title and interest of such Grantor in and under such Contracts, Instruments, Chattel Paper and Investment Property have been assigned as collateral security to the Collateral Agent, on behalf and for the benefit of the Secured Parties, and that payments shall be made directly to the Collateral Agent pursuant to its written instructions.  Upon the request of the Collateral Agent, such Grantor shall so notify such Account Debtors, parties to such Contracts and obligors in respect of such Instruments, Chattel Paper and Investment Property.  Upon the occurrence and during the continuation of an Event of Default, the Collateral Agent may, in its name, or in the name of others, communicate with such Account Debtors, parties to such Contracts and Licenses and obligors in respect of such Instruments, Chattel Paper and Investment Property to verify with such parties, to the Collateral Agent's satisfaction, the existence, amount and terms of any such Accounts, Contracts, Licenses, Instruments, Chattel Paper or Investment Property.

**SECTION 4.  Representations and Warranties.**  Each of the Grantors represents and warrants to the Collateral Agent as of the date such Grantor becomes a party hereto that:

(a)  Such Grantor is the sole legal and equitable owner of, or, as to Intellectual Property licensed from other Persons, licensee of, each item of the Collateral in which it purports to grant a security interest hereunder, and such Grantor has good, merchantable and insurable title or rights thereto free and clear of any and all Liens, except for the Liens permitted under the Note Documents.

**(b)** No effective security agreement, collateral control agreement, financing statement, equivalent security or lien instrument or continuation statement covering all or any part of the Collateral exists, except such as may have been filed by such Grantor in favor of the Collateral Agent pursuant to this Agreement or such as relate to the Liens expressly permitted under the Note Documents.

**(c)** The security interest in the Collateral created hereunder in favor of the Collateral Agent, on behalf and for the benefit of the Secured Parties, constitutes a valid security interest in the Collateral securing the payment of the Secured Obligations.  Upon (i) the due filing of UCC financing statements naming the applicable Grantor as "debtor", naming the Collateral Agent as "secured party" and describing the Collateral in the filing offices set forth on *Schedule IA*, and (ii) in the case of the Collateral comprising Trademarks, Patents or Copyrights, in addition, the due recordation of a "*Notice of Grant of Security Interest in Intellectual Property*," substantially in the form of *Exhibit B*, with respect to such Trademarks or Patents, with the United States Patent and Trademark Office, and with respect to Copyrights, with the United States Copyright Office, then the security interest in the Collateral granted to the Collateral Agent, on behalf and for the benefit of the Secured Parties, will, to the extent a security interest in the Collateral may be perfected by filing UCC financing statements and, in the case of the Collateral comprising Intellectual Property, in addition to the filing of such UCC financing statements, by the recordation of the "*Notice of Grant of Security Interest in Intellectual Property*" with the United States Patent and Trademark Office and the United States Copyright Office, as applicable, constitute perfected security interests therein prior to all other Liens (except for Liens expressly permitted under the Guaranty Agreement that have priority by operation of law); *provided, however,* additional actions, filings, recordings or registrations in the United States Patent and Trademark Office and the United States Copyright Office may be required with respect to the perfection of the Collateral Agent's security interest in Intellectual Property acquired by any Grantor after the date hereof.

**(d)** Such Grantor's taxpayer and organizational identification numbers are, and chief executive office, principal place of business, and the place where such Grantor maintains its records concerning the Collateral are presently located at the address(es), set forth on *Schedule IB*.  If such Grantor is a corporation, limited liability company, limited partnership, corporate trust or other registered organization, the state (or if not a state, the other jurisdiction) under whose law such registered organization was organized is set forth on *Schedule IC*.  The Collateral of such Grantor, other than Deposit Accounts, Securities Accounts and Commodity Accounts, is presently located, within the meaning of the UCC, at the address(es) further set forth for such Grantor on *Schedule ID*.  Such Grantor shall not change its taxpayer identification number or such chief executive office, principal place of business or remove or cause to be removed, the records concerning the Collateral from those premises without at least thirty (30) days prior written notice to the Collateral Agent.  In the event that any Grantor shall change its chief executive office or principal place of business (provided that the new location is leased to the Grantor), then, concurrently with entering into the lease for the new location, such Grantor shall furnish to the Collateral Agent, an executed and delivered access agreement in favor of the Collateral Agent with respect to the new location, in form and substance reasonably satisfactory to the Collateral Agent.  Such Grantor shall not change its jurisdiction of organization without the prior written consent of the Collateral Agent.

(e) All Collateral of such Grantor comprising Chattel Paper, Instruments (in an outstanding or stated principal amount in excess of $25,000) or Investment Property comprising certificated securities is set forth for such Grantor on **Schedule II**. All action necessary or desirable to protect and perfect such security interest in each item set forth on **Schedule II**, including the delivery of all originals thereof, duly indorsed in favor of the Collateral Agent, to the Collateral Agent, has been duly taken. The security interest of the Collateral Agent in each Grantor's Collateral listed on **Schedule II** is prior in right and interest to all other Liens (other than Liens expressly permitted under the Guaranty Agreement that have priority by operation of law) and is enforceable as such against creditors of and purchasers from such Grantor.

(f) All federally registered Copyrights, Copyright Licenses, Patents, and Trademarks owned, held or in which such Grantor otherwise has acquired or received any rights or interest are listed on **Schedule III**. Such Grantor shall promptly amend **Schedule III** from time to time to reflect any material additions to or deletions from this list. Except as set forth on **Schedule III**, none of the Patents, Trademarks or Copyrights has been licensed to any third party except in the ordinary course of publishing newspapers and related products.

(g) The name and address of each depository institution at which such Grantor maintains any Deposit Account and the account number and account name of each such Deposit Account is listed on **Schedule IV-A**. The name and address of each securities intermediary or commodity intermediary at which such Grantor maintains any Securities Account or Commodity Account and the account number and account name is listed on **Schedule IV-A**. Such Grantor agrees to amend **Schedule IV-A** from time to time within five (5) Business Days after opening any additional Deposit Account, Securities Account or Commodity Account, or closing or changing the account name or number on any existing Deposit Account, Securities Account, or Commodity Account.

(h) All motor vehicles and other Equipment subject to a Certificate of Title owned, held or in which such Grantor otherwise has acquired or received any rights or interest are listed on **Schedule V**. Such Grantor shall promptly amend **Schedule V** from time to time to reflect any additions to or deletions from this list.

(i) **Such Grantor has no Commercial Tort Claims with a stated or potential claim in excess of $100,000 other than those set forth on Schedule VI hereto**. Such Grantor shall promptly amend **Schedule VI** from time to time to reflect any additions to or deletions from this list.

(j) There are no Accounts or Chattel Paper of such Grantor which arise out of a contract or contracts with the United States of America or any department, agency, or instrumentality thereof, except for those listed on **Schedule VII** hereto. Such Grantor shall promptly amend **Schedule VII** from time to time (and, in any event, in accordance with **Section 5(n)** hereof) to reflect any additions to or deletions from this list.

(k) Such Grantor is the sole holder of record and the sole beneficial owner of all certificated securities and uncertificated securities pledged to the Collateral Agent by such Grantor under Section 2 of this Agreement, free and clear of any adverse claim, as defined in

Section 8102(a)(1) of the UCC, except for Liens created in favor of the Collateral Agent by this Agreement or as expressly permitted under the Note Documents.

(l) None of the Investment Property of such Grantor has been transferred in violation of the securities registration, securities disclosure or similar laws of any jurisdiction to which such transfer may be subject.

**SECTION 5.  Covenants.**  Each Grantor covenants and agrees with the Collateral Agent that so long as any of the Secured Obligations shall remain unpaid:

(a) **Further Assurances; Pledge of Instruments.**  At any time and from time to time, upon the written request of the Collateral Agent, and at the sole expense of such Grantor, such Grantor shall promptly and duly execute and deliver any and all such further instruments and documents and take such further action with respect to the Collateral as the Collateral Agent may reasonably deem necessary or desirable to obtain the full benefits of this Agreement and of the rights and powers herein granted, including (i) using its best efforts to secure all consents and approvals necessary or appropriate for the grant of a security interest to the Collateral Agent in any Contract held by such Grantor or in which such Grantor has any right or interest not heretofore assigned, (ii) executing, delivering and causing to be filed any financing or continuation statements under the UCC with respect to the security interests granted hereby, (iii) filing or cooperating with the Collateral Agent in filing any forms or other documents required to be recorded with the United States Patent and Trademark Office, United States Copyright Office, or any actions, filings, recordings or registrations in any foreign jurisdiction or under any international treaty, required to secured or protect the Collateral Agent's security interest in such Grantor's Collateral, (iv) transferring such Grantor's Collateral to the Collateral Agent's possession (if a security interest in such Collateral can be perfected by possession), (v) executing and delivering and causing the applicable depository institution, securities intermediary, commodity intermediary or issuer or nominated party under a letter of credit to execute and deliver a collateral control agreement in form and substance reasonably acceptable to the Collateral Agent with respect to each Deposit Account; *provided however*, a collateral control agreement shall not be required for any individual Deposit Account with an amount less than $15,000 at all times; notwithstanding the foregoing, in no event shall the aggregate amount in all Deposit Accounts not subject to collateral control agreement exceed $100,000 at any time), Securities Account, Commodity Account or Letter-of-Credit Right in or to which such Grantor has any right or interest in order to perfect the security interest created hereunder in favor of the Collateral Agent (including giving the Collateral Agent "control" over such Collateral within the meaning of the applicable provisions of Article 8 and Article 9 of the UCC), but excluding the Deposit Accounts and Securities Accounts identified on ***Schedule IV-B***, which are used exclusively for employee payroll or employee trust accounts, (vi) executing and delivering or causing to be delivered written notice to insurers of the Collateral Agent's security interest in, or claim in or under, any policy of insurance (including unearned premiums), (vii) using its best efforts to obtain acknowledgments from bailees having possession of any Collateral and waivers of liens from landlords and mortgagees of any location where any of the Collateral in an aggregate amount in excess of $250,000 may from time to time be stored or located, and (viii) placing the interest of the Collateral Agent as lienholder (or other similar designation) on the Certificate of Title of any motor vehicles or other Equipment constituting Collateral owned by such Grantor which is covered by a Certificate of Title and delivering the original thereof to the

Collateral Agent or its designated agent), it being understood that the Grantors shall not be required to comply with the foregoing requirements of this clause (viii) prior to an Event of Default unless the aggregate book value of  motor vehicles and such Equipment exceeds $750,000 (in which case, and in the case of an Event of Default, all Certificates of Title will be required to be delivered with the Collateral Agent's Lien properly noted thereon).  Such Grantor also hereby authorizes the Collateral Agent and each Secured Party to file any such financing or continuation statement, and any amendments thereto, all without the signature of such Grantor. A carbon, photographic or other reproduction of this Agreement or any financing statement covering the Collateral or any part thereof shall be sufficient as a financing statement where permitted by law, and without limiting the generality of the foregoing, the Collateral Agent is expressly authorized to use a collateral description that encompasses "all assets" or "all personal property" or words of similar import in any such financing statement.  If any amount payable under or in connection with any of the Collateral is or shall become evidenced by any Instrument, such Instrument, other than checks and notes received in the ordinary course of business and any Instrument in the outstanding or stated amount of less than $25,000, shall be duly endorsed in a manner reasonably satisfactory to the Collateral Agent and delivered to the Collateral Agent promptly and in any event within five (5) Business Days of such Grantor's receipt thereof.  If at any time any Grantor shall hold any Investment Property (other than Excluded TNI Assets) comprised of certificated or uncertificated securities, such Grantor shall promptly, and in any event within five (5) Business Days of such Grantor's acquisition or receipt thereof, pledge such Investment Property to the Collateral Agent, for the benefit of the Secured Parties, pursuant to the terms of a pledge agreement in form and substance satisfactory to the Collateral Agent.

(b)  **Maintenance of Records.**  Such Grantor shall keep and maintain, at its own cost and expense, satisfactory and complete records of its Collateral, including a record of all payments received and all credits granted with respect to such Collateral and all other dealings with such Collateral.

(c)  **Indemnification**.  In any suit, proceeding or action brought by the Collateral Agent or any Secured Party relating to any of such Grantor's Accounts, Chattel Papers, Deposit Accounts, General Intangibles (including any Contracts), Instruments, Letter-of-Credit Rights or Investment Properties for any sum owing thereunder, or to enforce any provision of any of such Grantor's Accounts, Chattel Papers, Deposit Accounts, General Intangibles (including any Contracts), Instruments, Letter-of-Credit Rights or Investment Properties, such Grantor shall save, indemnify and keep the Collateral Agent, each Secured Party, and each of their respective officers, directors, employees, agents, advisors, and representatives (collectively, the "**Indemnified Persons**") harmless from and against any and all liabilities, expenses, losses or damages suffered by reason of any defense, setoff, counterclaim, recoupment or reduction of liability whatsoever of the obligor thereunder arising out of a breach by such Grantor of any obligation thereunder or arising out of any other agreement, indebtedness or liability at any time owing to, or in favor of, such obligor or its successors from such Grantor, and all such obligations of such Grantor shall be and remain enforceable against and only against such Grantor and shall not be enforceable against any Indemnified Person.  Each Grantor hereby further shall save, indemnify and keep each Indemnified Person harmless from, any and all claims, liabilities, expenses, losses or damages arising out of, resulting from, or otherwise related to the subject matter of this Agreement, including but not limited to any claims, liabilities,

expenses, losses or damages arising out of or resulting from (a) the failure by such Grantor to perform any obligations or undertakings required to be performed by such Grantor under or in connection with the Collateral (including the failure of any warranty or representation (express or implied) in respect of the sale of any Inventory), (b) any failure by such Grantor, in connection with any of the Collateral, to comply with any applicable Requirement of Law, or (c) any bodily injury, death or property damage occurring in connection with the use, sale or other disposition of the Collateral; *provided* that such Grantor shall not be liable to any Indemnified Person pursuant to this **Section 5(c)** solely to the extent any such liability, expense, loss or damage is determined to have been caused by such Indemnified Person's own gross negligence or willful misconduct. The benefits of this Section 5(c) shall survive the termination of this Agreement.

        **(d) Limitation on Liens on Collateral.** Such Grantor shall not create, permit or suffer to exist, and shall defend its Collateral against and take such other action as is necessary to remove, any Lien on such Collateral, except for Liens expressly permitted under the Note Documents. Such Grantor shall further defend the right, title and interest of the Collateral Agent in and to any of such Grantor's rights under the Collateral and in and to the Proceeds thereof against the claims and demands of all Persons whomsoever.

        **(e) Limitations on Modifications of Accounts, Etc.** Upon the occurrence and during the continuation of any Event of Default, such Grantor shall not, without the Collateral Agent's prior written consent, acting pursuant to the direction of the Required Holders, grant any extension of the time of payment of any Account, Chattel Paper or Instrument or amounts due under any Contract, Deposit Account, Letter-of-Credit Right or Investment Property, in each case constituting Collateral, compromise, compound or settle the same for less than the full amount thereof, release, wholly or partly, any Person liable for the payment thereof, or allow any credit or discount whatsoever thereon other than trade discounts granted in the ordinary course of business of such Grantor.

        **(f) Maintenance of Insurance.** Such Grantor shall maintain, with financially sound and reputable companies, insurance with respect to their respective properties and businesses against such casualties and contingencies, of such types, on such terms and in such amounts (including deductibles, co-insurance and self-insurance, if adequate reserves are maintained with respect thereto) as is customary in the case of entities of established reputations engaged in the same or a similar business and similarly situated. In addition, such Grantor shall maintain, with financially sound and reputable companies, insurance policies insuring (a) its Equipment, Fixtures and Inventory against loss by fire, explosion, theft and such other casualties as are usually insured against by companies engaged in the same or similar businesses, and reasonably satisfactory to the Required Holders, and (b) against liability for personal injury and property damage relating to such Equipment, Fixtures and Inventory, and reasonably satisfactory to the Required Holders. The Grantor, at its expense, shall obtain a loss payable endorsement to each policy of property insurance in favor of the Collateral Agent for the benefit of the Secured Parties and each policy of liability insurance shall name the Collateral Agent for the benefit of the Secured Parties as an additional insured. Each Grantor shall, if so requested by the Collateral Agent, acting pursuant to the direction of the Required Holders, deliver to the Collateral Agent, as often as the Collateral Agent may reasonably request pursuant to such direction, a report of a reputable insurance broker reasonably satisfactory to the Required Holders with respect to the

insurance on its Equipment, Fixtures and Inventory.  Within 60 days of the date hereof, all policies of insurance required to be maintained pursuant to this **Section 5(f)** shall (i) contain a clause which provides that the Collateral Agent's and the Secured Parties' interests under the policy shall not be invalidated by any act or omission to act of, or any breach of warranty by, the insured, or by any change in the title, ownership or possession of the insured property, or by the use of the property for purposes more hazardous than is permitted in the policy; and (ii) provide that, as to the interests of the Collateral Agent under such policies, no cancellation, reduction in amount or change in coverage thereof shall be effective until at least 30 days after receipt by the Collateral Agent of written notice thereof.

(g)  **[Reserved.]**

(h)  **Limitations on Disposition.**  Such Grantor shall not sell, lease, license, transfer or otherwise dispose of any of such Collateral, or attempt or contract to do so, except as permitted by the Note Documents.

(i)  **Further Identification of Collateral.**  Such Grantor shall, if so requested by the Collateral Agent, furnish to the Collateral Agent, as often as the Collateral Agent shall reasonably request, statements and schedules further identifying and describing its Collateral and such other reports in connection with such Collateral as the Collateral Agent may reasonably request, all in reasonable detail.

(j)  **Notices.**  Such Grantor shall advise the Collateral Agent promptly upon obtaining knowledge thereof, in reasonable detail, of (a) any material Lien, other than Liens expressly permitted under the Note Documents, attaching to or asserted against any of its Collateral, (b) the occurrence of any other event which could have a Material Adverse Effect with respect to the Collateral or on the security interest created hereunder, and (c) the acquisition of any Commercial Tort Claim and grant to the Collateral Agent, for the benefit of the Secured Parties, of a security interest therein and in the proceeds thereof.

(k)  **Right of Inspection and Audit.**  Such Grantor shall permit the Collateral Agent and the Secured Parties such rights of visitation, inspection and audit of the Collateral as provided in the Note Documents or any other Transaction Document.

(l)  **Maintenance of Properties.**  Such Grantor shall, and shall cause each of its Subsidiaries to, (i) maintain and keep, or cause to be maintained and kept, their respective properties, assets and facilities, including its Equipment and Fixtures in good repair, working order and condition (other than ordinary wear and tear), so that the business carried on in connection therewith may be properly conducted at all times, and (ii) maintain and preserve all material rights, privileges and franchises that such Grantor or its Subsidiaries now have, in each case, except to the extent that the failure to do so would not reasonably be expected to have a Material Adverse Effect.

(m)  **Covenants Regarding Intellectual Property**.

(i)    Such Grantor shall notify the Collateral Agent promptly if (A) it knows or has reason to know that any application or registration relating to any Patent or Trademark of such Grantor which is material to the conduct of such Grantor's business may

become abandoned, (B) if a terminal disclaimer is filed with respect to any Patent in the United States Patent and Trademark Office, or (C) of any other adverse determination or development (including the institution of, or any such determination or development in, any proceeding in the United States Patent and Trademark Office, the United States Copyright Office, or any court) regarding such Grantor's ownership or license of any Copyright, Patent or Trademark which is material to the conduct of such Grantor's business, its right to register the same, or to keep and maintain the same.

       **(ii)**    Such Grantor shall take all commercially reasonable steps necessary (if any be required) to prevent any misuse, infringement, invalidation, misappropriation, unauthorized use or abandonment of its Copyrights, Patents, Trademarks or other Intellectual Property, whether owned or licensed.  Such Grantor's efforts pursuant to this **Section 5(m)** shall include, but not be limited to: (A) establishing prudent security measures and procedures governing access to, and use of, property protected by such Copyrights, Trademarks or Patents or of such Intellectual Property owned or licensed by such Grantor or developed by any Person on behalf of such Grantor; (B) establishing and maintaining in force any agreements with employees and consultants or any written terms of employment, as are customarily used in such Grantor's industry for the protection of such Intellectual Property; and (C) vigorous enforcement of such Grantor's rights in any such Intellectual Property.

       **(iii)**    In no event shall such Grantor, either itself or through any agent, employee, licensee or designee, file an application for the registration of any Patent or Trademark with the United States Patent and Trademark Office, any Copyright with the United States Copyright Office, or any similar office or agency in any other country or any political subdivision thereof unless it promptly informs the Collateral Agent and, upon request of the Collateral Agent, executes and delivers any and all agreements, instruments, documents, and papers as may be reasonably necessary to evidence the Collateral Agent's security interest in such Copyright, Patent or Trademark, including, with respect to Trademarks, the goodwill of such Grantor, relating thereto or represented thereby.

       **(iv)**    Such Grantor shall take all reasonable and necessary action to maintain and pursue each application (and to obtain the relevant registration) and to maintain the registration of each of the Copyrights, Patents and Trademarks of such Grantor which is material to the conduct of such Grantor's business, including the filing of applications for renewal, affidavits of use, affidavits of noncontestability and opposition and interference and cancellation proceedings.

       **(v)**    In the event that any Copyright, Patent or Trademark of such Grantor is infringed, misappropriated or diluted by a third party, such Grantor shall notify the Collateral Agent promptly after such Grantor learns thereof and shall, unless such Grantor shall reasonably determine that such Copyright, Patent or Trademark is not material to the conduct of such Grantor's business, promptly sue for infringement, misappropriation or dilution and to recover any and all damages for such infringement, misappropriation or dilution or take such other actions as such Grantor shall reasonably deem appropriate under the circumstances to protect such Copyright, Patent or Trademark.

(vi)    Such Grantor covenants and agrees that in the event any Patent is or becomes subject to a terminal disclaimer, the security interest granted in this Agreement shall extend to the Patent necessitating the disclaimer and such Patent shall not be sold, transferred or otherwise alienated without the prior written consent of the Collateral Agent.

(n)  **Covenants Regarding Federal Government Contracts.**  If any Account or Chattel Paper of any Grantor arises out of a contract or contracts with the United States of America or any department, agency, or instrumentality thereof, such Grantor shall (i) promptly notify the Collateral Agent thereof in writing, and execute and deliver in connection therewith (A) a collateral assignment of claims in favor of the Collateral Agent, and (B) a notice of collateral assignment of claims directed to the appropriate federal government agencies and agents thereof as required under applicable law, each in form and substance reasonably satisfactory to the Collateral Agent, (ii) promptly take any other steps reasonably required by the Collateral Agent in order to ensure that all moneys due or to become due under such contract or contracts shall be collaterally assigned to the Collateral Agent, for the benefit of the Secured Parties, and notice thereof given under the Assignment of Claims Act of 1940, as amended (31 U.S.C. 3727; 41 U.S.C. 15), or other applicable law, and (iii) promptly update *Schedule VII* hereto and deliver a copy of such revised schedule to the Collateral Agent, together with copies of all related contracts evidencing such Accounts and/or Chattel Paper. Notwithstanding the foregoing, the Grantors shall not be required to comply with the foregoing in connection with purchase orders for the publication of notices so long as the aggregate amount owing under all of such purchase orders does not at any time exceed $100,000.

**SECTION 6.  [Reserved.]**

**SECTION 7.  The Collateral Agent's Appointment as Attorney-in-Fact**.

(a)  Subject to **Section 7(b)** below, each Grantor hereby irrevocably constitutes and appoints the Collateral Agent and any officer, co-agent or sub-agent thereof with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Grantor and in the name of such Grantor or in its own name, from time to time at the Collateral Agent's discretion, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute and deliver any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this Agreement and, without limiting the generality of the foregoing, hereby gives the Collateral Agent the power and right (but not the obligation), on behalf of such Grantor, without notice to or assent by such Grantor to do the following:

(i)    to ask, demand, collect, receive and give acquittances and receipts for any and all monies due or to become due under any of such Grantor's Collateral and, in the name of such Grantor in its own name or otherwise to take possession of, endorse and collect any checks, drafts, notes, acceptances or other Instruments for the payment of monies due under any such Collateral and to file any claim or to take or commence any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Collateral Agent for the purpose of collecting any and all such monies due under any such Collateral whenever payable;

(ii)      to pay or discharge any Liens, including any tax lien, levied or placed on or threatened against such Collateral, to effect any repairs or any insurance called for by the terms of this Agreement and to pay all or any part of the premiums therefor and the costs thereof, which actions shall be on behalf and for the benefit of the Secured Parties and the Collateral Agent and not such Grantor; and

(iii)      to (A) direct any Person liable for any payment under or in respect of any of such Collateral to make payment of any and all monies due or to become due thereunder directly to the Collateral Agent or as the Collateral Agent shall direct, (B) receive payment of any and all monies, claims and other amounts due or to become due at any time arising out of or in respect of any such Collateral, (C) sign and endorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications and notices in connection with Accounts and other Instruments and Documents constituting or relating to such Collateral, (D) commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect such Collateral or any part thereof and to enforce any other right in respect of any such Collateral, (E) defend any suit, action or proceeding brought against such Grantor with respect to any such Collateral, (F) settle, compromise or adjust any suit, action or proceeding described above and, in connection therewith, give such discharges or releases as the Collateral Agent may deem appropriate, (G) license or, to the extent permitted by an applicable license, sublicense, whether general, special or otherwise, and whether on an exclusive or non-exclusive basis, any Patent, Copyright, Trademark or other Intellectual Property throughout the world for such term or terms, on such conditions and in such manner as the Collateral Agent shall in its sole discretion determine, and (H) sell, transfer, pledge, make any agreement with respect to, or otherwise deal with, any of such Collateral as fully and completely as though the Collateral Agent were the absolute owner thereof for all purposes, and to do, at the Collateral Agent's option and such Grantor's expense, at any time, or from time to time, all acts and things which the Collateral Agent may reasonably deem necessary to protect, preserve or realize upon such Collateral and the Collateral Agent's security interest therein in order to effect the intent of this Agreement, all as fully and effectively as such Grantor might do.

(b)  The Collateral Agent agrees that, except upon the occurrence and during the continuation of an Event of Default, it shall not exercise the power of attorney or any rights granted to the Collateral Agent, on behalf and for the benefit of the Secured Parties, pursuant to this **Section 7**.  Each Grantor hereby ratifies, to the extent permitted by law, all that said attorney shall lawfully do or cause to be done by virtue hereof.  The power of attorney granted pursuant to this **Section 7** is a power coupled with an interest and shall be irrevocable until the Secured Obligations are finally and completely paid and performed in full; *provided* that the foregoing power of attorney shall terminate upon the full, complete and final payment and performance of the Secured Obligations and the termination of all commitments and obligations of the Secured Parties under the Transaction Documents.

(c)  The powers conferred on the Collateral Agent hereunder are solely to protect the Collateral Agent's and each Secured Party's interests in the Collateral and shall not impose any duty upon the Collateral Agent to exercise any such powers.  The Collateral Agent shall have no duty as to any Collateral, including any responsibility for (i) taking any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral, or

(ii) ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relative to any Investment Property, whether or not the Collateral Agent has or is deemed to have knowledge of such matters. Without limiting the generality of the preceding sentence, the Collateral Agent shall be deemed to have exercised reasonable care in the custody and preservation of any of the Collateral if it takes such action for that purpose as the applicable Grantor reasonably requests in writing at times other than upon the occurrence and during the continuance of any Event of Default. Failure of the Collateral Agent to comply with any such request at any time shall not in itself be deemed a failure to exercise reasonable care. No failure of the Collateral Agent to do any act not so requested shall be deemed a failure to act reasonably. The Collateral Agent shall be accountable only for amounts that it actually receives as a result of the exercise of such powers and neither it nor any of its officers, directors, employees, agents or representatives shall be responsible to any Grantor for any act or failure to act.

(d) Each Grantor also authorizes the Collateral Agent, on behalf of itself and the Secured Parties, at any time, and from time to time, upon the occurrence and during the continuation of any Event of Default, to (i) communicate in its own name with any party to any Contract of such Grantor with regard to the assignment of the right, title and interest of such Grantor in and under the Contracts hereunder and other matters relating thereto, and (ii) execute, in connection with the sale of such Grantor's Collateral provided for in **Section 7**, any endorsements, assignments or other instruments of conveyance or transfer with respect to such Collateral.

(e) If any Grantor fails to perform or comply with any of its agreements contained herein and the Collateral Agent or any Secured Party, as provided for by the terms of this Agreement, shall perform or comply, or otherwise cause performance or compliance, with such agreement, the reasonable expenses, including reasonable attorneys' fees and expenses, of the Collateral Agent or such Secured Party, shall be payable by such Grantor to the Collateral Agent within (3) three days of written demand and shall constitute Secured Obligations secured hereby.

**SECTION 8. Rights and Remedies Upon Default.** It shall be an "**Event of Default**" hereunder if any Event of Default (as defined in the Note Agreement or the Guaranty Agreement) shall occur. If any Event of Default shall have occurred and be continuing, the Collateral Agent shall have the following rights and remedies as set forth in this **Section 8**:

(a) The Collateral Agent may exercise, in addition to all other rights and remedies granted to it under this Agreement, the Note Agreement, the Guaranty Agreement, the Subsidiary Guaranty Agreement, the other Transaction Documents and under any other instrument or agreement securing, evidencing or relating to the Secured Obligations, all rights and remedies of a secured party under the UCC and other applicable law. Without limiting the generality of the foregoing, each Grantor expressly agrees that in any such event, the Collateral Agent, without demand of performance or other demand, advertisement or notice of any kind (except the notice specified below of time and place of public or private sale) to or upon such Grantor or any other Person (all and each of which demands, advertisements and notices are hereby expressly waived to the maximum extent permitted by the UCC and other applicable law), may (i) reclaim, take possession, recover, store, maintain, finish, repair, prepare for sale or lease, shop, advertise for sale or lease and sell or lease (in the manner provided herein) the

Collateral, and in connection with the liquidation of the Collateral and collection of the accounts receivable pledged as Collateral, use any Trademark, Copyright, or process used or owned by such Grantor, and (ii) forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and may forthwith sell, lease, assign, give an option or options to purchase or sell or otherwise dispose of and deliver said Collateral (or contract to do so), or any part thereof, in one or more parcels at public or private sale or sales, at any exchange or broker's board or at any of the Collateral Agent's offices or elsewhere at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk.  To the extent any Grantor has the right to do so, such Grantor authorizes the Collateral Agent, on the terms set forth in this **Section 8**, to enter the premises where the Collateral is located, to take possession of the Collateral, or any part of it, and to pay, purchase, contact, or compromise any encumbrance, charge, or lien which, in the opinion of the Collateral Agent, appears to be prior or superior to its security interest.  The Collateral Agent or any Secured Party shall have the right, upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of said Collateral so sold, free of any right or equity of redemption, which equity of redemption each Grantor hereby releases.  Each Grantor further agrees, at the Collateral Agent's request, to assemble its Collateral and make it available to the Collateral Agent at places which the Collateral Agent shall reasonably select, whether at such Grantor's premises or elsewhere.  The Collateral Agent and the Secured Parties shall apply the net proceeds of any such collection, recovery, receipt, appropriation, realization or sale as provided in **Section 8(h)**, below, with each Grantor remaining jointly and severally liable for any deficiency remaining unpaid after such application, and only after so paying over such net proceeds and after the payment by the Collateral Agent of any other amount required by any provision of law, need the Collateral Agent account for the surplus, if any, to any Grantor.  To the maximum extent permitted by applicable law, each Grantor waives all claims, damages, and demands against the Collateral Agent or any Secured Party arising out of the repossession, retention or sale of the Collateral.  Each Grantor agrees that the Collateral Agent need not give more than ten (10) days' notice (which notification shall be deemed given if sent in accordance with **Section 12(a)**) of the time and place of any public sale or of the time after which a private sale may take place and that such notice is reasonable notification of such matters.  Each Grantor shall remain liable for any deficiency if the proceeds of any sale or disposition of its Collateral are insufficient to pay all amounts to which the Collateral Agent and the Secured Parties are entitled from such Grantor, such Grantor also being liable for the attorneys' fees and expenses of any attorneys employed by the Collateral Agent or any Secured Party to collect such deficiency.

**(b)** As to any Collateral constituting certificated securities or uncertificated securities, if, at any time when the Collateral Agent shall determine to exercise its right to sell the whole or any part of such Collateral hereunder, such Collateral or the part thereof to be sold shall not, for any reason whatsoever, be effectively registered under the Securities Act of 1933, as amended (as so amended the "**Act**"), the Collateral Agent may, in its discretion (subject only to applicable Requirements of Law), sell such Collateral or any part thereof by private sale in such manner and under such circumstances as the Collateral Agent may deem desirable, but subject to the other requirements of this **Section 8(b)**, and shall not be required to effect such registration or cause the same to be effected.  Without limiting the generality of the foregoing, in any such event, the Collateral Agent may, in its sole discretion: (i) in accordance with applicable securities laws, proceed to make such private sale notwithstanding that a registration statement for the purpose of registering such Collateral or part thereof could be or shall have been filed

under the Act; (ii) approach and negotiate with a single possible purchaser to effect such sale; and (iii) restrict such sale to a purchaser who will represent and agree that such purchaser is purchasing for its own account, for investment, and not with a view to the distribution or sale of such Collateral or part thereof.  In addition to a private sale as provided above in this **Section 8(b)**, if any of such Collateral shall not be freely distributable to the public without registration under the Act at the time of any proposed sale hereunder, then the Collateral Agent shall not be required to effect such registration or cause the same to be effected but may, in its sole discretion (subject only to applicable requirements of law), require that any sale hereunder (including a sale at auction) be conducted subject to such restrictions as the Collateral Agent may, in its sole discretion, deem desirable in order that such sale (notwithstanding any failure so to register) may be effected in compliance with the Bankruptcy Code and other laws affecting the enforcement of creditors' rights and the Act and all applicable state securities laws.

(c)  Each Grantor agrees that in any sale of any of such Collateral, whether at a foreclosure sale or otherwise, the Collateral Agent is hereby authorized to comply with any limitation or restriction in connection with such sale as it may be advised by counsel is necessary in order to avoid any violation of applicable law (including compliance with such procedures as may restrict the number of prospective bidders and purchasers, require that such prospective bidders and purchasers have certain qualifications and restrict such prospective bidders and purchasers to Persons who will represent and agree that they are purchasing for their own account for investment and not with a view to the distribution or resale of such Collateral), or in order to obtain any required approval of the sale or of the purchaser by any governmental authority, and each Grantor further agrees that such compliance shall not result in such sale being considered or deemed not to have been made in a commercially reasonable manner, nor shall the Collateral Agent nor any Secured Party be liable nor accountable to such Grantor for any discount allowed by reason of the fact that such Collateral is sold in compliance with any such limitation or restriction.

(d)  Each Grantor also agrees to pay all fees, costs, and reasonable expenses of the Collateral Agent or any of the Secured Parties, including reasonable attorneys' fees and expenses, incurred in connection with the enforcement of any of its rights and remedies hereunder.

(e)  Upon the Collateral Agent's request, each Grantor agrees that it will promptly execute assignments of its entire right, title and interest in and to each its Patents, Trademarks, Copyrights, and Licenses.  Such assignments shall be in form and content which is recordable in the United States Patent and Trademark Office or Copyright Office, or any similar office or agency in any other country or any political subdivision thereof, as applicable, and otherwise reasonably acceptable to the Collateral Agent.

(f)  Except as otherwise expressly permitted herein, each Grantor hereby waives presentment, demand, protest or any notice (to the maximum extent permitted by applicable law) of any kind in connection with this Agreement or any Collateral.

(g)  Each Grantor agrees that a breach of any covenants contained in this **Section 8** will cause irreparable injury to the Collateral Agent, on behalf of itself and the Secured Parties, that in such event the Collateral Agent and the Secured Parties would have no adequate remedy

at law in respect of such breach and, as a consequence, agrees that in such event each and every covenant contained in this **Section 8** shall be specifically enforceable against such Grantor, and each Grantor hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants except for a defense that the Secured Obligations are not then due and payable.

(h)  The Proceeds of any sale, disposition or other realization upon all or any part of the Collateral shall be distributed by the Collateral Agent in the following order of priorities:

**First**, to the Collateral Agent in an amount sufficient to pay in full the costs payable hereunder of the Collateral Agent in connection with such sale, disposition or other realization, including all fees, costs, expenses, liabilities and advances incurred or made by the Collateral Agent in connection therewith, including reasonable attorneys' fees and expenses;

**Second**, to the Secured Parties in an amount sufficient to pay in full the reasonable costs of the Secured Parties in connection with such sale, disposition or other realization, including all fees, costs, expenses, liabilities and advances incurred or made by the Secured Parties in connection therewith, including reasonable attorneys' fees and expenses;

**Third**, to the Secured Parties in an amount equal to the then unpaid principal of and accrued interest, Yield-Maintenance Amount, non-usage and all other fees and charges payable on the Secured Obligations;

**Fourth**, to the Secured Parties in an amount equal to any other Secured Obligations under any of the Transaction Documents which are then unpaid; and

**Finally**, upon payment in full of all of the Secured Obligations, to the Grantors or their representatives according to their interests or as a court of competent jurisdiction may direct.

**SECTION 9.  Grant of License to Intellectual Property.**  For the purpose of enabling the Collateral Agent to exercise its rights and remedies under **Section 8**, at such time as the Collateral Agent shall be lawfully entitled to exercise such rights and remedies, each Grantor hereby grants to the Collateral Agent an irrevocable, non-exclusive license (exercisable without payment of royalty or other compensation to such Grantor) to use, license or sublicense any Copyright, Patent or Trademark, and to exercise any rights held by such Grantor under any License, now owned or hereafter acquired by such Grantor or in which such Grantor now holds or hereafter acquires any interest, and wherever the same may be located, and including in such license reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer and automatic machinery software and programs used for the compilation or printout thereof, subject to any applicable restrictions or limitations contained in such License.

**SECTION 10.  Limitation on the Collateral Agent's Duty in Respect of Collateral.**  Beyond the exercise of reasonable care in the custody thereof and the duty to account for monies actually received by it, the Collateral Agent shall have no duty as to any Collateral in its

possession or control or in the possession or control of any agent or bailee as may be selected by the Collateral Agent with reasonable care or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto and the Collateral Agent shall not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or maintaining the perfection of any security interest in the Collateral.  The Collateral Agent shall be deemed to have exercised reasonable care in the custody of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which it accords its own property and shall not be liable or responsible for any loss or diminution in the value of any of the Collateral, by reason of the act or omission of any carrier, forwarding agency or other agent or bailee as may be selected by the Collateral Agent with reasonable care.  The Collateral Agent shall not be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the Liens in any of the Collateral, whether impaired by operation of law or by reason of any of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence, bad faith or willful misconduct on the part of the Collateral Agent, for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title of the Company to the Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral.

Additionally, in no event shall the Collateral Agent be responsible or liable for (i) special, indirect, or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Collateral Agent has been advised of the likelihood of such loss or damage and regardless of the form of action, or (ii) any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Collateral Agent shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

**SECTION 11.  Reinstatement.**  This Agreement shall remain in full force and effect and continue to be effective against each Grantor should any petition be filed by or against such Grantor for liquidation or reorganization, should such Grantor become insolvent or make an assignment for the benefit of creditors or should a receiver or trustee be appointed for all or any significant part of such Grantor's property and assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment or performance of the Secured Obligations, or any part thereof, is, pursuant to applicable law, avoided, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Secured Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made.  In the event that any payment, or any part thereof, is avoided, rescinded, reduced, restored or returned, the Secured Obligations shall be reinstated and deemed reduced only by such amount paid and not so avoided, rescinded, reduced, restored or returned.

**SECTION 12.  Miscellaneous**.

**(a) Notices.**   Any notice or other communication hereunder shall be addressed and delivered (i) to the Company by delivering such notice in accordance with Section 7.4 of the Guaranty Agreement, (ii) to the Borrower by delivering such notice in accordance with Section 12H of the Note Agreement, (iii) to the Initial Subsidiary Grantors, pursuant to Section 14 of the Subsidiary Guaranty Agreement, and (iv) to the Collateral Agent at the address and telefacsimile number set forth under the Collateral Agent's signature block of this Agreement.

**(b) Severability.**   Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**(c) Headings.**   The various headings in this Agreement are inserted for convenience only and shall not affect the meaning or interpretation of this agreement or any provisions hereof.

**(d) No Waiver; Cumulative Remedies**.

**(i)**   The Collateral Agent and each Secured Party shall not by any act, delay, omission or otherwise be deemed to have waived any of their respective rights or remedies hereunder, nor shall any single or partial exercise of any right or remedy hereunder on any one occasion preclude the further exercise thereof or the exercise of any other right or remedy.

**(ii)**   The rights and remedies hereunder provided are cumulative and may be exercised singly or concurrently, and are not exclusive of any rights and remedies provided by law.

**(iii)**   None of the terms or provisions of this Agreement may be waived, altered, modified or amended except by an instrument in writing, duly executed by each of the Grantors and the Collateral Agent.

**(e) Time is of the Essence.**   Time is of the essence for the performance of each of the terms and provisions of this Agreement.

**(f) Termination of this Agreement.**   Subject to **Section 11**, this Agreement shall terminate upon the full, complete and final payment and performance of the Secured Obligations.

**(g) Release of Collateral**.   Upon any sale or other disposition of title in or to any assets of any Grantor constituting Collateral permitted to be sold or disposed of under the Note Documents, the Collateral Agent, at the reasonable request and at the expense of the applicable Grantor, will execute and deliver to such Grantor such instruments provided to it (including UCC partial release statements) acknowledging the release of the Collateral Agent's security interest in such Collateral so sold or otherwise disposed of, *provided* that such security interest shall continue to attach to and be perfected in the Proceeds of such Collateral, and will record such instruments with the United States Patent and Trademark Office and the United States Copyright Office as may be necessary to evidence the release of the Collateral Agent's security interest in such Collateral.

(h) **Successor and Assigns.**  This Agreement and all obligations of each of the Grantors hereunder shall be binding upon the successors and assigns of each such Grantor, and shall, together with the rights and remedies of the Collateral Agent and the Secured Parties hereunder, inure to the benefit of such Collateral Agent and the Secured Parties, and their respective successors and assigns.  No sales of participations, other sales, assignments, transfers or other dispositions of any agreement governing or instrument evidencing the Secured Obligations or any portion thereof or interest therein shall in any manner affect the security interest created herein and granted to the Collateral Agent hereunder.

(i) **Governing Law.**  THIS AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, AND THE RIGHTS OF THE PARTIES SHALL BE GOVERNED BY, THE INTERNAL LAW OF THE STATE OF NEW YORK, EXCLUDING CHOICE-OF-LAW PRINCIPLES OF THE LAW OF SUCH STATE THAT WOULD PERMIT THE APPLICATION OF THE LAWS OF A JURISDICTION OTHER THAN SUCH STATE.

(j) **Waiver of Jury Trial.**  THE PARTIES HERETO AGREE TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, ANY OTHER TRANSACTION DOCUMENT, OR ANY DEALINGS BETWEEN OR AMONG THEM RELATING TO THE SUBJECT MATTER OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY AND THE SECURED PARTY/GRANTOR RELATIONSHIP THAT IS BEING ESTABLISHED.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH OF THE PARTIES HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO THIS BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS, AND THAT EACH WILL CONTINUE TO RELY ON THE WAIVER IN THEIR RELATED FUTURE DEALINGS.  EACH OF THE PARTIES HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(k) **Jurisdiction; Venue.**  Each Grantor irrevocably agrees that any legal action or proceeding with respect to this Agreement, the other Transaction Documents or any of the agreements, documents or instruments delivered in connection herewith shall be brought in the courts of the State of New York, or the United States of America for the Southern District of New York as the Collateral Agent or any Secured Party may elect, and, by execution and delivery hereof, each Grantor accepts and consents to, for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts and agrees that such jurisdiction shall be exclusive, unless waived by the Required Holders in writing, with respect to any action or proceeding brought by such Grantor against the Collateral Agent or any other

Secured Party.  Nothing herein shall limit the right that the Collateral Agent or any Secured Party may have to bring proceedings against any Grantor in the courts of any appropriate jurisdiction or to enforce in any lawful manner a judgment obtained in one jurisdiction in any other jurisdiction.  Each Grantor hereby waives, to the full extent permitted by law, any right to stay or to dismiss any action or proceeding brought before said courts on the basis of *forum non conveniens*.

(l) **Counterparts.**   This Agreement may be executed in any number of counterparts (including those transmitted by electronic transmission (including, without limitation, facsimile and e-mail)), each of which when so delivered shall be deemed an original, but all such counterparts shall constitute but one and the same instrument.  Delivery of this Agreement may be made by facsimile transmission of a duly executed counterpart copy hereof.

(m) **Additional Grantors.**   From time to time subsequent to the date hereof, additional Subsidiaries and/or Affiliates of the Company may become parties hereto, as additional Grantors (each, an "**Additional Grantor**"), by executing a Joinder Agreement.  Upon the delivery of the Joinder Agreement to the Collateral Agent, such Additional Grantor shall be a Grantor and shall be as fully a party hereto as if such Additional Grantor were an original signatory hereof.

(n) **Incorporation by Reference.**   In connection with its execution and acting hereunder, the Collateral Agent is entitled to all rights, privileges, benefits, protections, immunities and indemnities provided to it (i) under the Collateral Documents to which any Credit Party is party and (ii) under the Collateral Agency Agreement as between the Secured Parties and the Collateral Agent.

**[The remainder of this page is intentionally left blank.]**

**IN WITNESS WHEREOF**, each of the parties hereto has caused this Agreement to be executed and delivered by its duly authorized signatory on the date first set forth above.

**GRANTORS:**

**PULITZER INC.**

By:_____
Name: Carl G. Schmidt
Title:   Treasurer

**ST. LOUIS POST-DISPATCH LLC**,
By:      Pulitzer Inc., Managing Member

By:_____
Name: Carl G. Schmidt
Title:   Treasurer

**FAIRGROVE LLC**
**FLAGSTAFF PUBLISHING CO.**
**HANFORD SENTINEL INC.**
**HOMECHOICE, LLC**
**HSTAR LLC**
**KAUAI PUBLISHING CO.**
**NAPA VALLEY PUBLISHING CO**
**NIPC, INC.**
**NLPC LLC**
**NORTHERN LAKES PUBLISHING CO.**
**NVPC LLC**
**PANTAGRAPH PUBLISHING CO.**
**PULITZER MISSOURI NEWSPAPERS, INC.**
**PULITZER NETWORK SYSTEMS LLC**
**PULITZER NEWSPAPERS, INC.**
**PULITZER TECHNOLOGIES, INC.**
**PULITZER UTAH NEWSPAPERS, INC.**
**SANTA MARIA TIMES, INC.**
**SHTP LLC**
**SOPC LLC**
**SOUTHWESTERN OREGON PUBLISHING CO.**

**STAR PUBLISHING COMPANY**
**STL DISTRIBUTION SERVICES LLC**
**SUBURBAN JOURNALS OF GREATER ST.**
**LOUIS LLC**
**YNEZ CORPORATION**


By:_____
Name:  C.D. Waterman III
Title:    Secretary

*Accepted and acknowledged by:*

**THE BANK OF NEW YORK MELLON TRUST
COMPANY, N.A.**, as Collateral Agent


By:_____
Name:
Title:

Address for Notices:

The Bank of New York Mellon Trust Company, N.A.
Attn: Geraldine Creswell, Asst. Treasurer
10161 Centurion Parkway, N.
Jacksonville, Florida 32256
Fax: 904-645-1921
Email: geri.creswell@bnymellon.com

SCHEDULE IA

**FILING OFFICES FOR UCC FINANCING STATEMENTS**

GRANTOR                          FILING OFFICE

**Company:**                     _____

                                 _____

SCHEDULE IB

CHIEF EXECUTIVE OFFICE

| GRANTOR | TAXPAYER ID NUMBER | ORGANIZATIONAL ID NUMBER | LOCATION OF GRANTOR'S CHIEF EXECUTIVE OFFICE, PRINCIPAL PLACE OF BUSINESS AND RECORDS PERTAINING TO ITS COLLATERAL |
|---|---|---|---|
| Company: | _____ | _____ | _____ |
| | _____ | _____ | _____ |

SCHEDULE IC

## JURISDICTION OF ORGANIZATION

GRANTOR                          JURISDICTION

**Company:**

_____

_____

### SCHEDULE ID

## LOCATIONS OF COLLATERAL

**GRANTOR**                          **LOCATION(S)**

**Company:**

_____

_____

SCHEDULE II

**LIST OF CHATTEL PAPER, INVESTMENTS
AND INVESTMENT PROPERTY**

GRANTOR                          COLLATERAL

**Company:**

_____

_____

## SCHEDULE III

## PATENTS, PATENT LICENSES, TRADEMARKS, TRADEMARK LICENSES, COPYRIGHTS AND COPYRIGHT LICENSES OF THE GRANTORS

<u>Patents</u>:

<u>Trademarks</u>:

<u>Copyrights</u>:

SCHEDULE IV-A

**DEPOSIT ACCOUNTS, SECURITIES ACCOUNTS, AND COMMODITY ACCOUNTS**
**(Including Grantor, Type of Account, Account Name, Account Number,**
**and Name of Institution/Intermediary)**

| Name and Address of Depository Institution | Type and Account No. | Account-Holder |
| --- | --- | --- |

SCHEDULE IV-B

## DEPOSIT ACCOUNTS AND SECURITIES ACCOUNTS
## USED EXCLUSIVELY FOR PAYROLL OR EMPLOYEE TRUST ACCOUNTS
### (Including Grantor, Type of Account, Account Name, Account Number,
### and Name of Institution/Intermediary)

| Name and Address of Depository Institution | Type and Account No. | Account-Holder |
|---|---|---|

SCHEDULE V

**COLLATERAL SUBJECT TO CERTIFICATES OF TITLE**

SCHEDULE VI

COMMERICAL TORT CLAIMS

SCHEDULE VII

**FEDERAL GOVERNMENT CONTRACTS**

**EXHIBIT A**

**FORM OF JOINDER AGREEMENT**

## JOINDER AGREEMENT
## TO
## SECURITY AGREEMENT

**Additional Grantor:**  Reference is made to that certain Security Agreement, dated as of [_____] (as the same may from time to time be amended, restated, supplemented or otherwise modified, the "**Security Agreement**"), made by Pulitzer Inc. (the "**Company**"), St. Louis Post-Dispatch LLC (the "**Borrower**") and certain other Affiliates and Subsidiaries of the Company, each identified as Grantors therein, in favor of the Collateral Agent identified therein, on behalf and for the benefit of the Secured Parties identified therein.  Capitalized terms not defined in this Joinder Agreement shall have the meanings given to them in the Security Agreement.  The undersigned acknowledges and agrees it is (or, concurrently with the execution and delivery of this Joinder Agreement, will become) a Subsidiary Guarantor and that, by its execution and delivery of this Joinder Agreement to the Collateral Agent, it hereby joins, and for all purposes becomes, a Grantor under, and a party to, the Security Agreement, and does hereby, mortgage, pledge and hypothecate to the Collateral Agent, on behalf and for the benefit of the Secured Parties, and does hereby grant to the Collateral Agent, on behalf and for the benefit of the Secured Parties, a security interest in and to all of such Grantor's respective right, title and interest in, to and under the Collateral, whether now existing or hereafter arising or acquired, and does hereby fully assume and undertake to perform, all rights, benefits, burdens, obligations and liabilities of a Grantor under the Security Agreement.

_____, a _____

By:  _____

Printed Name:  _____

Title:  _____

EXHIBIT B

**FORM OF NOTICE OF GRANT OF SECURITY INTEREST
IN INTELLECTUAL PROPERTY**

## NOTICE OF GRANT OF SECURITY INTEREST
## IN INTELLECTUAL PROPERTY

[United States Patent and Trademark Office]
[United States Copyright Office]

Ladies and Gentlemen:

Please be advised that pursuant to the Security Agreement, dated as of [_____] (as amended, restated, supplemented or otherwise modified from time to time, the "**Security Agreement**"), made by Pulitzer Inc. (the "**Company**"), St. Louis Post-Dispatch LLC (the "**Borrower**") and each of the other affiliates and subsidiaries of the Company identified as Grantors therein in favor of The Bank of New York Mellon Trust Company, in its capacity as collateral agent on behalf and for the benefit of the Secured Parties identified therein (together with its successors and assigns in such capacity, the "**Collateral Agent**"), the undersigned has granted a continuing security interest in, and continuing lien upon, the trademarks, trademark applications, patents, patent applications, copyrights and copyright applications, each of which is described on *Schedule I* attached hereto, in favor of the Collateral Agent.

The undersigned hereby acknowledges and agrees that the security interest in the foregoing intellectual property (i) may only be terminated in accordance with the terms of the Security Agreement, and (ii) is not to be construed as an assignment of any intellectual property.

Very truly yours,

**GRANTOR:**

[_____],
[_____]

By:_____
Name:
Title:

## SCHEDULE I

I.    **Trademarks:**

| Mark | Application/ Registration No. | Application/ Registration Date |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

II.    **Patents:**

| Patent | Application/ Registration No. | Application/ Registration Date |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

III.    **Copyrights:**

| Copyright | Application/ Registration No. | Application/ Registration Date |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

<u>EXHIBIT F</u>

[FORM OF DEEDS OF TRUST]

A/74565634.14

Bingham Draft
11/23/11

_____

**SPACE ABOVE LINE RESERVED FOR OFFICIAL RECORDER'S USE**

| | | |
|---|---|---|
| **1.** | **Title of Document:** | Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing |
| **2.** | **Date of Document:** | [_____] |
| **3.** | **Grantor:** | [St. Louis Post-Dispatch LLC, a Delaware limited liability company] |
| **4.** | **Grantee/Beneficiary:** | The Bank of New York Mellon Trust Company, N.A. a national banking association |
| **5.** | **Statutory Mailing Addresses** | **Grantor:** [St. Louis Post-Dispatch LLC 900 N. Tucker Avenue St. Louis, Missouri, 63101]<br><br>**Grantee/Beneficiary:** The Bank of New York Mellon Trust Company, N.A. 10161 Centurion Parkway, N. Jacksonville, Florida 32256 |
| **6.** | **Legal Description:** | See Exhibit A attached to the document, page [__]. |
| **7.** | **Reference to Book and Page:** | N/A |

*Recording requested by, and when recorded mail to:*
*Bingham McCutchen LLP*
*One State Street*
*Hartford, Connecticut 06103*
*Attn: [_____], Esq.*

A/74604193.1

THIS DEED OF TRUST, SECURITY AGREEMENT AND FIXTURE FILING SECURES FUTURE ADVANCES AND FUTURE OBLIGATIONS AND SHALL BE GOVERNED BY SECTION 443.055 R.S.MO., AS AMENDED FROM TIME TO TIME.  THE TOTAL FACE AMOUNT OF THE PRESENT AND FUTURE ADVANCES AND OBLIGATIONS WHICH MAY BE SECURED HEREBY IS $[_____], PLUS ANY ADDITIONAL AMOUNTS WHICH MAY BE SECURED HEREBY UNDER THE PROVISIONS OF SECTION 443.055 R.S.MO., AS AMENDED.

## DEED OF TRUST, ASSIGNMENT OF RENTS AND LEASES, SECURITY AGREEMENT AND FIXTURE FILING

This Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing (as amended, extended, renewed, consolidated, spread or otherwise modified from time to time, this "**Deed of Trust**"), dated as of [_____], is executed by [_____] ("**Grantor**"), whose address is [_____], in favor of [_____], an individual ("**Trustee**"), whose address is [_____], as Trustee, for the benefit of **THE BANK OF NEW YORK MELLON TRUST COMPANY**, **N.A.,** a national banking association, as Collateral Agent (in such capacity, "**Beneficiary**"), for the benefit of certain holders of Notes (as defined below), as the same may be from time to time (each a "**Noteholder**", and collectively the "**Noteholders**") that are parties to the Note Agreement (as defined below), the Beneficiary's address being 10161 Centurion Parkway, N., Jacksonville, Florida 32256.

## RECITALS:

**WHEREAS**, Grantor is the fee owner of the real property and improvements described in **Exhibit A** attached hereto;

**WHEREAS**, Grantor and the Noteholders have entered into that certain Note Agreement dated as of [_____] (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "**Note Agreement**"), whereby the [Grantor] has agreed to issue to the Noteholders the [Grantor's] adjustable rate senior guaranteed promissory notes due December 31, 2015 the aggregate maximum principal amount of which is currently outstanding is [_____] Dollars ($[_____]) (as amended, extended, renewed, consolidated, spread or otherwise modified from time to time, the "**Notes**", such term to include any such notes issued in substitution or exchange therefor pursuant to the Note Agreement);

**WHEREAS**, the Beneficiary and the Noteholders have entered into that certain Collateral Agency Agreement, dated as of even date herewith (the "**Collateral Agency Agreement**"), as acknowledged by and consented to by Grantor and certain of its affiliates, pursuant to which the Noteholders requested that the Beneficiary act as the Collateral Agent for and on behalf of the Noteholders with respect to the Collateral, and pursuant to which the Beneficiary has agreed to this request;

**WHEREAS**, Grantor, pursuant to the Note Agreement, has agreed to execute and deliver this Deed of Trust to Trustee, for the benefit of Beneficiary, as Collateral Agent for the Noteholders, as security for the aggregate indebtedness and other obligations from time to time owing by Grantor under or in respect of the Notes, the Note Agreement and the other documents, certificates and agreements executed in connection therewith prior to, on or after the date hereof,

whether now existing or hereafter arising and whether consisting of principal, interest, late charges, fees, reimbursements, costs, expenses, indemnities, premium, yield-maintenance amounts or any other amounts whatsoever (including, without limitation, all payments made by the Grantor pursuant to the Collateral Agency Agreement (including all interest payable in respect of such payments)), however said indebtedness or other obligation may be amended, extended, renewed, consolidated, increased in amount or otherwise modified from time to time (said aggregate present and future indebtedness and other obligations hereinafter referred to as the "**Indebtedness**"), and as security for the keeping, performance and observance of, and compliance with, all covenants, agreements, conditions and other provisions required to be kept, performed, observed and complied with by Grantor from time to time pursuant to or in connection with the Note Agreement; and

**WHEREAS**, Grantor is receiving a good and valuable benefit, the sufficiency and receipt of which is hereby acknowledged, from the Noteholders entering into the Note Agreement with Grantor.  Capitalized terms used herein and not otherwise defined shall have the meaning given to them in the Note Agreement.  The provisions set forth below are subject to the provisions set forth in Appendix I attached hereto.

**1.**     **Assignment in Trust with Power of Sale**.

For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Grantor does hereby irrevocably GRANT, BARGAIN AND SELL, CONVEY AND CONFIRM to Trustee, IN TRUST, WITH POWER OF SALE, AND WITH RIGHT OF ENTRY AND POSSESSION, for the benefit of Beneficiary for the benefit of the Noteholders, as security for the obligations described below, all of Grantor's right, title and interest, whether now existing or hereafter acquired, in and to all of the following (collectively, the "**Property**"):

**1.1.**     That certain real property (the "**Land**") in the County of [_____], State of [_____], described in **Exhibit A** attached hereto and incorporated herein by this reference.

**1.2.**     All buildings, landscaping and other improvements now or hereafter located on, acquired or appurtenant to the Land, including without limitation the Fixtures (as defined below) (collectively, the "**Improvements**").

**1.3.**     All easements, rights-of-way, licenses and other rights now or hereafter used in connection with the Property or as a means of access thereto, including without limitation:  water and water rights, and shares of stock evidencing the same; trackage agreement rights; rights to use common drive entries; rights relating to land within the right-of-way of adjoining streets; rights in or to sidewalks, alleys and strips and gores of land adjoining or used in connection with the Property; air rights; development rights and credits; and tenements, hereditaments and other appurtenances of and to the Property.

**1.4.**     All fixtures and goods that are or are to become fixtures now or hereafter located on, attached to, installed in or used in connection with the Property (collectively, the "**Fixtures**"), including without limitation all partitions, generators, screens, awnings, boilers, furnaces, pipes, plumbing, elevators, cleaning, call and sprinkler systems, fire

extinguishing machinery and equipment, water tanks, heating, ventilating, air conditioning and air cooling machinery and equipment, gas and electric machinery and equipment and other appliances, machinery and equipment and other fixtures of every nature.

1.5.    All oil, gas and other mineral rights relating to the Property, and all royalty, leasehold and other rights pertaining thereto.

1.6.    All of Grantor's right, title and interest as landlord or tenant in and to all leases and subleases relating to any portion of the Property, including without limitation all advance rentals, security deposits and any other deposits (but not including the Rents, as defined and separately assigned in Section 3.1 hereof).

1.7.    All deposits made with and other security given to utility companies by Grantor in connection with the Property, and all reserves, escrow and impounds, and all claims in law and equity that relate to the Property.

1.8.    All greater right, title and interest hereafter acquired by Grantor in or to the Property, and all options relating to such property (whether Grantor is optionor or optionee).

1.9.    All rights to proceeds of property, liability, rent abatement, business interruption and other insurance relating to the ownership or operation of the Property, and all awards made for the taking by eminent domain (or by any proceeding in lieu thereof) of any portion of the Property, including awards relating to changes in grade of streets or for severance damages ("**Condemnation Awards**").

1.10.    All other agreements, such as construction contracts, architects' agreements, engineers' contracts, utility contracts, maintenance agreements, management agreements, service contracts, listing agreements, guaranties, warranties, permits, licenses, certificates and entitlements in any way relating to the construction, use, occupancy, operation, maintenance, enjoyment or ownership of the Property (the "**Property Agreements**").

1.11.    All rights, privileges, tenements, hereditaments, rights-of-way, easements, appendages and appurtenances appertaining to the foregoing.

1.12.    All property tax refunds, utility refunds and rebates, earned or received at any time, relating to the Property (the "**Tax Refunds**").

1.13.    All insurance policies, unearned premiums therefor and proceeds from such policies covering any of the above property now or hereafter acquired by Grantor (the "**Insurance**").

1.14.    All of Grantor's rights to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Grantor in the Property.

**1.15.**    All additions and accretions to any of the foregoing.

**2.**    **Obligations Secured**.

This Deed of Trust secures the performance of each of the following obligations (collectively, the "**Secured Obligations**"):

**2.1.**    the payment of all Indebtedness;

**2.2.**    each of Grantor's obligations hereunder and all other existing and future obligations to Beneficiary and the Noteholders under the Note Agreement, the Notes and all other documents, certificates and agreements executed in connection therewith prior to, on or after the date hereof;

**2.3.**    any and all amendments, renewals, extensions and other modifications of any of the foregoing; and

**2.4.**    reimbursement of all amounts advanced by or on behalf of Beneficiary or any Noteholder to protect Beneficiary's and the Noteholders' interests under this Deed of Trust.

**3.**    **Assignment of Rents and Profits**.

**3.1.**    Absolute Assignment

Grantor hereby absolutely and irrevocably assigns to Beneficiary for the benefit of the Noteholders all of its right, title and interest in and to all rents, issues, profits, royalties, income and other proceeds and similar benefits derived from the Property (collectively, the "**Rents**"), and hereby irrevocably appoints Beneficiary its true and lawful attorney-in-fact, at Beneficiary's option at any time, to demand, receive and enforce payment, to give receipts, releases and satisfactions, and to sue, either in Grantor's name, the Noteholders' names or in Beneficiary's name, for all Rents.

**3.2.**    License to Collect

Notwithstanding the foregoing assignment of the Rents, so long as no Event of Default (as defined below) has occurred and is continuing, Grantor shall have a license to collect all Rents (but no more than one month in advance), and to retain and enjoy the same.

**3.3.**    Collection and Application of Rents by Beneficiary

While any Event of Default remains uncured, (a) Grantor's license to collect the Rents shall automatically terminate, without notice, (b) Beneficiary may at any time, without notice, in person, by agent or by court-appointed receiver, and without regard to the adequacy of any security for the Secured Obligations, enter upon any portion of the Property and/or, with or without taking possession thereof, in its own name or the Noteholders' names sue for or otherwise collect the Rents (including past due amounts), and (c) promptly following demand by Beneficiary therefor, Grantor shall deliver to Beneficiary, for the benefit of the Noteholders, all

-4-

prepaid Rents, deposits relating to Rents, and all other Rents then held by or thereafter collected by Grantor.  All Rents collected by or delivered to Beneficiary may only be applied by Beneficiary against the Secured Obligations, in such order as Beneficiary shall determine in its absolute discretion.  No application of Rents against any Secured Obligations or other action taken by Beneficiary or any Noteholder under this Section 3 shall be deemed to cure or waive any Event of Default, or to invalidate any other action taken in response to such Event of Default, or to make Beneficiary or the Noteholders a mortgagee-in-possession of the Property.

### 3.4.    Further Assignments

Upon demand by Beneficiary from time to time, Grantor shall promptly execute and deliver to Beneficiary, for the benefit of the Noteholders, in form and substance reasonably satisfactory to Beneficiary, recordable assignments of Grantor's interest in any leases, subleases, contracts, licenses, permits and other documents and agreements to which Rents relate; provided however, that no such assignment shall be construed to impose upon Beneficiary or any Noteholder any obligation with respect thereto.

### 3.5.    Termination

The assignment of the Rents to Beneficiary hereunder shall terminate and be of no further force and effect following the satisfaction in full of all Secured Obligations.

### 3.6.    Assigned Leases

Except as otherwise agreed in writing by Beneficiary from time to time, the following shall apply to each lease and sublease of any portion of the Property (collectively, the "**Assigned Leases**") with respect to which any portion of the landlord's interest is assigned to Beneficiary under this Deed of Trust:

(a)    Grantor shall promptly perform all of its obligations as landlord under each Assigned Lease, and shall immediately notify Beneficiary in writing of any notice of default received by Grantor from the tenant thereunder.

(b)    Grantor shall diligently enforce the performance of all of the obligations of the tenant under each Assigned Lease and shall not waive any default or waive, release or discharge any such tenant of or from any such obligation.

(c)    Grantor shall not collect the Rents (or any other amounts) due under any Assigned Lease more than one month in advance of the date due.

(d)    Grantor hereby irrevocably authorizes and directs the tenants under all Assigned Leases to pay all amounts owing to Grantor thereunder to Beneficiary, for the benefit of the Noteholders, following receipt of any written notice from Beneficiary which states that an Event of Default remains uncured and that all such amounts are to be paid to Beneficiary.  Grantor further authorizes and directs all such tenants to pay all such amounts to Beneficiary, for the benefit of the Noteholders, without any right or obligation to inquire as to the validity of

Beneficiary's notice and regardless of the fact that Grantor has notified any such tenants that Beneficiary's notice is invalid or has then directed any such tenants not to pay such amounts to Beneficiary.

(e)    Upon the foreclosure of this Deed of Trust, no Assigned Lease shall be destroyed or terminated by application of the doctrine of merger or as a matter of law unless Beneficiary, any Noteholder or any purchaser at such foreclosure sale so elects.  No act by or on behalf of Beneficiary or any such purchaser shall constitute a termination of any Assigned Lease unless Beneficiary or such purchaser gives written notice thereof to the applicable tenant or subtenant.

(f)    Grantor hereby represents and warrants to Beneficiary and the Noteholders, with respect to each Assigned Lease that is presently in effect (collectively, the "**Current Assigned Leases**"), (i) that Grantor has delivered to Beneficiary a true and complete copy of each Current Assigned Lease, together with all modifications and a rent roll with respect to all Current Assigned Leases; (ii) that Grantor has not accepted any payment of rent (or other charge except any tenant security deposits and advances or prepaid rents in accordance with the provisions of any of the Assigned Leases) under any Current Assigned Lease more than thirty (30) days prior to the due date of such payment; and (iii) that, to the best of Grantor's knowledge, no material default by Grantor or any other person under any Current Assigned Lease remains uncured.

**3.7.**    Perfection Upon Recordation

Grantor acknowledges that Beneficiary and Trustee have taken all actions necessary to obtain, and that upon recordation of this Deed of Trust Beneficiary and Trustee shall have, to the extent permitted under applicable law, a valid and fully perfected, first priority, present assignment of the Rents arising out of the Assigned Leases and all security for such Assigned Leases.  Grantor acknowledges and agrees that upon recordation of this Deed of Trust, Trustee's and Beneficiary's interest in the Rents shall be deemed to be fully perfected, "choate" and enforced as to Grantor and all third parties, including, without limitation, any subsequently appointed trustee in any case under Title 11 of the United States Code (the "**Bankruptcy Code**"), without the necessity of commencing a foreclosure action with respect to this Deed of Trust, making formal demand for the Rents, exercising Beneficiary's rights under the assignment of Rents provided in this Section 3 in favor of Beneficiary and the Noteholders pursuant to this Deed of Trust, obtaining the appointment of a receiver or taking any other affirmative action.

**3.8.**    Bankruptcy Provisions

Without limitation of the absolute nature of the assignment of the Rents hereunder, Grantor, Trustee and Beneficiary agree that (a) this Deed of Trust shall constitute a "security agreement" for purposes of Section 552(b) of the Bankruptcy Code, (b) the security interest created by this Deed of Trust extends to property of Grantor acquired before the commencement of a case in bankruptcy and to all amounts paid as Rents and (c) such security interest shall

-6-

extend to all Rents acquired by the debtor's estate after the commencement of any case in bankruptcy.

### 3.9. No Merger of Estates

So long as part of the Secured Obligations secured hereby remains unpaid and undischarged, the fee and leasehold estates to the Property shall not merge, but shall remain separate and distinct, notwithstanding the union of such estates either in Grantor, Beneficiary, any tenant or any third party by purchase or otherwise.

### 4. Security Agreement

#### 4.1. Security Interest

This Deed of Trust constitutes a "security agreement" with respect to the Fixtures, Assigned Leases, Rents, Property Agreements, Tax Refunds, Proceeds, Insurance and Condemnation Awards (the "**Collateral**").  To this end, Grantor grants to Beneficiary a first and prior security interest in the Collateral and further affirms its grant of all other Property which is personal property ("**Personal Property**") pursuant to that certain Security Agreement of even date herewith, to secure the payment and performance of the Secured Obligations, and agrees that Beneficiary shall have all the rights and remedies of a secured party under the UCC with respect to such property.  Any notice of sale, disposition or other intended action by Beneficiary with respect to Collateral sent to Grantor at least ten (10) days prior to any action under the UCC shall constitute reasonable notice to Grantor.

#### 4.2. Financing Statements

Grantor shall execute and deliver to Beneficiary, in form and substance satisfactory to Beneficiary, such financing statements and such further assurances as Beneficiary may, from time to time, reasonably consider necessary to create, perfect and preserve Beneficiary's security interest hereunder and Beneficiary may cause such statements and assurances to be recorded and filed, at such times and places as may be required or permitted by law to so create, perfect and preserve such security interest.  Grantor's state of organization is the State of Delaware.

#### 4.3. Fixture Filing

This Deed of Trust shall also constitute a "fixture filing" for the purposes of the UCC against all of the Property constituting goods that are or are to become fixtures. The name of the debtor is [St. Louis Post-Dispatch LLC] and the name of the secured party is The Bank of New York Mellon Trust Company, N.A., as Collateral Agent.  The address of Grantor set forth in the initial paragraph of this Deed of Trust is a mailing address for the debtor, and the address of Beneficiary set forth in the initial paragraph of this Deed of Trust is a mailing address for the secured party. The debtor is an organization, the type of organization for the debtor is a [limited liability company], the jurisdiction for the debtor is the State of [Delaware], and the organizational identification number for the debtor is [3211374].  This Deed of Trust covers goods that are or are to become fixtures related to the Property. Grantor is the record owner of the Property.

## 5.    Maintenance, Operation, Preservation and Repair of Property

Grantor shall maintain the Property (and all abutting grounds, sidewalks, roads, parking and landscape areas) in good condition and repair (other than ordinary wear and tear), shall operate the Property in a businesslike manner, shall use its best efforts to preserve and protect both its own and Beneficiary's and the Noteholders' interests in connection with the Property, shall not commit or permit any waste or deterioration of the Property, shall not abandon any portion of the Property, and shall not otherwise act, or fail to act, in such a way as to unreasonably increase the risk of any damage to the Property or of any other impairment of Beneficiary's or the Noteholders' interests hereunder.  Without limiting the generality of the foregoing, and except as otherwise agreed by Beneficiary in writing from time to time, Grantor shall promptly and faithfully perform and observe each of the following provisions:

### 5.1.    Alterations and Repair

Grantor shall not remove, demolish or materially alter any Improvement, except to make non-structural repairs that preserve or increase the Property's value.  Grantor shall promptly restore, in a good and workmanlike manner, any Improvement (or other aspect of the Property) that is damaged or destroyed from any cause, and shall diligently complete, in a good and workmanlike manner, any Improvement constructed by Grantor from time to time.

### 5.2.    Compliance with Laws

Grantor shall comply with all applicable federal, state and local laws, rules, regulations, codes and administrative and judicial decisions applicable to the Property, shall not permit any act on or with respect to the Property in violation of any of the foregoing, and shall obtain and maintain in effect all licenses, permits, exemptions, approvals and other authorizations required by law in connection with the ownership and operation of the Property.

### 5.3.    Compliance with Rights of Third Parties

Grantor shall comply with all covenants, conditions, restrictions, easements and rights of way, and all other contract and other rights of third parties relating to the Property, including without limitation all leases and subleases under which Grantor is a landlord or tenant.

### 5.4.    Changes in Property Restrictions

Grantor shall not initiate, join in or consent to any change in any applicable zoning ordinance, general plan or similar law, or to any private restrictive covenant or any similar public or private restriction or obligation with respect to the Property without Beneficiary's consent.

### 5.5.    Taxes and Impositions

Grantor shall pay, prior to delinquency, all of the following (collectively, the "**Impositions**"):  (i) all general and special real property taxes and assessments imposed on the Property; (ii) all other taxes and assessments of every kind that are assessed upon the Property (or upon the owner and/or operator of the Property) and that create or may create a lien upon the Property (or upon any personal property or fixture used in connection with the Property),

-8-

including without limitation non-governmental levies and assessments imposed in connection with covenants, conditions or restrictions; (iii) all taxes and assessments imposed on the Property following Grantor's execution hereof in lieu of or in addition to any of the foregoing Impositions; and (iv) all license fees, taxes and assessments imposed on Beneficiary or any Noteholder (other than income and franchise taxes) and measured by or based upon (in whole or in part) the Secured Obligations. If permitted by law, Grantor may pay any Imposition in installments; provided, however, all such installment payments shall be made on a timely basis so as to avoid any and all late fees, penalties, interest and similar charges.

(a)     Grantor shall not be required to pay any Imposition so long as (i) its validity is being actively contested in good faith and by appropriate proceedings and (ii) Grantor has demonstrated to Beneficiary's reasonable satisfaction that leaving such Imposition unpaid pending the outcome of such proceedings could not result in the sale of the Property to satisfy such Imposition or otherwise impair Beneficiary's or the Noteholders' interests hereunder; provided that, if reasonable under the circumstances, Beneficiary may require Grantor to furnish Beneficiary, for the benefit of the Noteholders, with a bond or other security reasonably satisfactory to Beneficiary in an amount not less than 150% of the applicable claim.

(b)     Upon demand by Beneficiary from time to time, Grantor shall deliver to Beneficiary, within thirty (30) days following the due date of any Imposition, but subject to the provisions of Section 5.5(a) above, evidence of payment reasonably satisfactory to Beneficiary.

**5.6.**    Utility Charges

Grantor shall promptly pay all utility charges incurred for the benefit of the Property or which may become a lien upon the Property, and all assessments and other charges of a similar nature, public or private, relating to the Property, regardless of whether any such charge is or may become a lien thereon.

**5.7.**    Liens

Grantor shall perform, on or before the date due, all obligations secured by any lien or encumbrance upon any portion of the Property. Notwithstanding the foregoing, Grantor shall not be required to perform any such secured obligation so long as (a) its validity is being actively contested in good faith and by appropriate proceedings and (b) Grantor has demonstrated to Beneficiary's reasonable satisfaction that leaving such obligation unpaid or unperformed pending the outcome of such proceedings could not result in the sale of the Property to satisfy such obligation or otherwise impair Beneficiary's or the Noteholders' interests hereunder; provided that, if reasonable under the circumstances, Beneficiary may require Grantor to furnish Beneficiary, for the benefit of the Noteholders, with a bond or other security reasonably satisfactory to Beneficiary in an amount not less than 150% of the applicable claim. If Grantor fails to fulfill its obligations under this Section with respect to any lien or encumbrance, Beneficiary may, subject to Section 8.5 hereof, discharge the same by paying the amount due or by providing a bond or other security therefor, without inquiring into the validity of such lien or

encumbrance and without regard for any claimed defense or offset, and Grantor shall, within three (3) business days following receipt of written demand, reimburse Beneficiary for all costs incurred by Beneficiary or the Noteholders in connection therewith.

### 5.8.    Books and Records

Grantor shall maintain complete books of account and other records relating to the ownership and operation of the Property, including contributions of equity investment capital, in accordance with accounting principles reasonably acceptable to Beneficiary and applied on a consistent basis.

### 5.9.    Hazardous Materials

Without limiting the generality of Section 5.2, Grantor shall not cause or permit the substantial or material violation of any law relating to industrial hygiene or environmental conditions in connection with the Property, including soil and ground water conditions, or use, generate, manufacture, store or dispose of on, under or about the Property, or transport to or from the Property, any flammable explosives, radioactive materials, hazardous wastes, toxic substances and similar substances and materials, including, without limitation, all Hazardous Materials (as hereinafter defined) and Mold.  "Mold", as used herein, shall mean any fungi that reproduces through the release of spores or the splitting of cells or other means, including, but not limited to, mold, mildew, fungi, fungal spores, fragments and metabolites such as mycotoxins and microbial volatile organic compounds. Without prior written notice to Beneficiary (except in the case of emergency), Grantor shall take no remedial action with respect to any Hazardous Materials on, under or about the Property, and shall not enter into any settlement agreement, consent decree or other compromise or agreement relating to any such Hazardous Materials.

### 5.10.    Title to Property and Lien of this Deed of Trust

Grantor (i) has good and indefeasible title to the Property, in fee simple (to the extent that the Property constitutes real property), free and clear of any liens, claims or interests, except the liens, if any, set forth on **Exhibit B** attached hereto and made a part hereof (the "**Permitted Liens**"), and (ii) has full power and lawful authority to encumber the Property in the manner and form set forth in this Deed of Trust.  This Deed of Trust creates first priority liens and security interests against the Property.  Grantor further hereby covenants and agrees that within thirty (30) days of the date hereof, Grantor shall deliver a full paid Lenders Policy (or Policies) of Title Insurance insuring the lien of this Deed of Trust as senior to all other deeds of trust, liens, and encumbrances except as may be expressly provided herein.

### 5.11.    First Lien Status

Grantor shall preserve and protect the first lien status of this Deed of Trust.  If any lien or security interest other than the Permitted Liens is asserted against the Property, Grantor shall promptly, and at its expense, (a) give Beneficiary a detailed written notice of such lien or security interest (including origin, amount and other terms), and (b) pay the underlying claim in full or take such other action so as to cause it to be released.

**5.12.** Payment and Performance

Grantor shall pay the Indebtedness when due under the Notes, this Deed of Trust, the Note Agreement or any related documents, and shall perform or cause the relevant Obligor to perform the Secured Obligations in full when and how they are required to be performed.

**5.13.** Other Covenants

All of the covenants of the Grantor in the Note Agreement are incorporated herein by reference and, together with covenants in this Article 5, shall, to the extent applicable, be covenants running with the land.

**5.14.** Environmental Matters

(a) Definitions. As used herein, "**Environmental Laws**" shall mean all existing or future federal, state and local statutes, ordinances, regulations, rules, executive orders, standards and requirements, including the requirements imposed by common law, concerning or relating to industrial hygiene and the protection of health and the environment including but not limited to: (a) those relating to the generation, manufacture, storage, transportation, disposal, release, emission or discharge of Hazardous Substances (as hereinafter defined); (b) those in connection with the construction, fuel supply, power generation and transmission, waste disposal or any other operations or processes relating to the Property; and (c) those relating to the atmosphere, soil, surface and ground water, wetlands, stream sediments and vegetation on, under, in or about the Property. Any terms mentioned herein which are defined in any Environmental Law shall have the meanings ascribed to such terms in said laws; provided, however, that if any of such laws are amended so as to broaden any term defined therein, such broader meaning shall apply subsequent to the effective date of such amendment.

(b) **Representations, Warranties and Covenants**. Grantor represents, warrants, covenants and agrees as follows:

(i) To Grantor's knowledge, neither Grantor nor the Property or any occupant thereof, except as disclosed in the Environmental Reports described in **Exhibit C** attached hereto and made a part hereof (the "**Environmental Reports**"), is in violation of or subject to any existing, pending or threatened investigation or inquiry by any governmental authority pertaining to any Environmental Law. Grantor shall not cause or permit the Property to be in violation of, or do anything which would subject the Property to any remedial obligations under, any Environmental Law, and shall promptly notify Beneficiary in writing of any existing, pending or to Grantor's knowledge, threatened investigation or inquiry by any governmental authority in connection with any Environmental Law. In addition, Grantor shall provide Beneficiary with copies of any and all material written communications with any governmental authority in

connection with any Environmental Law, concurrently with Grantor's giving or receiving of same.

(ii)    To Grantor's knowledge, there has been no release, spill, discharge, leak, disposal or emission (individually a "**Release**" and collectively, "**Releases**") of any Hazardous Material, Hazardous Substance or Hazardous Waste, including gasoline, petroleum products, explosives, toxic substances, solid wastes and radioactive materials (collectively, "**Hazardous Substances**") or Mold (as defined herein) at, upon, under or within the Property.  The use which Grantor or any other occupant of the Property makes or intends to make of the Property will not result in Release of any Hazardous Substances on or to the Property.

(iii)    Except as disclosed in the Environmental Reports, the Property has never been used by the present or previous owners and/or operators nor will be used in the future to refine, produce, store, handle, transfer, process, transport, generate, manufacture, heat, treat, recycle or dispose of Hazardous Substances.

(iv)    The Property: (i) is being and, except as disclosed in the Environmental Reports, has been operated in compliance with all Environmental Laws, and all permits required thereunder have been obtained and complied with in all respects; and (ii) except as disclosed in the Environmental Reports, does not have any Hazardous Substances present excepting small quantities of petroleum and chemical products, in proper storage containers, that are necessary for the construction or operation of the commercial business of Grantor and its tenants, and the usual waste products therefrom ("**Permitted Substances**").

(v)    Grantor will and will cause its tenants to operate the Property in compliance with all Environmental Laws and, other than Permitted Substances, will not place or permit to be placed any Hazardous Substances on the Property.

(vi)    No lien has been attached to or threatened to be imposed upon the Property, and except as disclosed in the Environmental Reports, there is no basis for the imposition of any such lien based on any governmental action under Environmental Laws.  Except as disclosed in the Environmental Reports, neither Grantor nor any other person has been, is or will be involved in operations at the Property which could lead to the imposition of environmental liability on Grantor, or, to the best of Grantor's knowledge, on any subsequent or former owner of the Property, or the creation of an environmental lien on the Property.  In the event that any such lien is filed, Grantor shall, within (30) days from the date that the Grantor is given notice of such lien (or within such shorter period of time as is appropriate in the event that steps have commenced to have the Property sold), either: (i) pay the claim and remove the lien from the

-12-

Property; or (ii) furnish a cash deposit, bond or other security satisfactory in form and substance to Beneficiary in an amount sufficient to discharge the claim out of which the lien arises.

(c)    **Right to Inspect and Cure**.  Beneficiary shall have the right to conduct or have conducted by its agents or contractors such environmental inspections, audits and tests as Beneficiary shall deem necessary or advisable from time to time at the sole cost and expense of Grantor; provided, however, that Grantor shall not be obligated to bear the expense of such environmental inspections, audits and tests so long as (a) no Event of Default exists, and (b) Beneficiary has no cause to believe (other than as a result of matters disclosed in the Environmental Reports) in its sole reasonable judgment that there has been a Release or threatened Release of Hazardous Substances at the Property or that Grantor or the Property is in violation of any Environmental Law.  The cost of such inspections, audits and tests, if chargeable to Grantor as aforesaid, shall be added to the Liabilities and shall be secured by this Deed of Trust.  Grantor shall, and shall cause each tenant of the Property to, cooperate with such inspection efforts; such cooperation shall include, without limitation, supplying all information requested concerning the operations conducted and Hazardous Substances located at the Property.  In the event that Grantor fails to comply with any Environmental Law, Beneficiary may, in addition to any of its other remedies under this Deed of Trust, cause the Property to be in compliance with such laws and the cost of such compliance shall be added to the sums secured by this Deed of Trust in accordance with the provisions of Section 2.2 hereof.

(d)    **Indemnification**.  The Grantor covenants and agrees, at Grantor's sole cost and expense, to indemnify, defend (at trial and appellate levels and with attorneys, consultants and experts acceptable to Beneficiary) and hold Beneficiary, the Noteholders, and each of their respective successors and assigns (each an "**Indemnified Party**" and collectively the "**Indemnified Parties**") harmless against and from any and all liens, damages, losses, liabilities, obligations, settlement payments, penalties, assessments, citations, directives, claims, litigation, demands, defenses, judgments, suits, proceedings, costs, disbursements or expenses of any kind or of any nature whatsoever (including, without limitation, attorneys', consultants' and experts' fees and disbursements incurred in investigating, defending against, settling or prosecuting any claim, litigation or proceeding) which may at any time be imposed upon, incurred by or asserted or awarded against such Indemnified Party or the Property and arising directly or indirectly from or out of: (a) the Release or threat of Release of any Hazardous Materials on, in, under or affecting all or any portion of the Property or any surrounding areas (i) caused by or attributable to the Grantor or (ii) originating or emanating from the Property regardless of whether or not caused by or within the control of the Grantor (b) the violation of any Environmental Laws relating to or affecting the Property, whether or not caused by or within the control of the Grantor; (c) the failure of the Grantor to comply fully with the terms and conditions of this Section 5.14; (d) the violation of any Environmental Laws in connection with other real property of the Grantor which gives or may

-13-

give rise to any liens or other rights of any party with respect to the Property by virtue of any Environmental Laws; or (e) the enforcement of this Deed of Trust, including, without limitation, (i) the reasonable costs of assessment, containment and/or removal of any and all Hazardous Materials from all or any portion of the Property or any surrounding areas, (ii) the reasonable costs of any necessary actions taken in response to a Release or threat of Release of any Hazardous Materials on, in, under or affecting all or any portion of the Property or any surrounding areas to prevent or minimize such Release or threat of Release so that it does not migrate or otherwise cause or threaten danger to present or future public health, safety, welfare or the environment, and (iii) costs incurred to comply with the Environmental Laws in connection with all or any portion of the Property or any surrounding areas. Beneficiary's and the other Indemnified Parties' rights under this Section 5.14 shall be in addition to all rights of Beneficiary under the Note Agreement and under any other documents, certificates or instruments evidencing, securing or relating to the Notes, and payments by the Grantor under this Section 5.14 shall not reduce the Grantor's obligations and liabilities under any of the other documents, certificates or instruments evidencing, securing or relating to the Notes. Notwithstanding the foregoing, the Grantors shall not be obligated to indemnify the Indemnified Parties against any losses or liabilities arising out of the gross negligence or willful misconduct of the Indemnified Parties.

## 6. Insurance

### 6.1. Policies Required

Grantor shall at all times maintain at Grantor's sole expense, with insurers reasonably approved by Beneficiary, the following policies of insurance in form and substance reasonably satisfactory to Beneficiary:

    (a)    all insurance required by law from time to time with respect to the ownership or operation of the Property, including without limitation workers' compensation and employer's liability insurance;

    (b)    fire and hazard "all risk" insurance covering 100% of the replacement cost of the Improvements in the event of fire, lightning, windstorm, earthquake, vandalism, malicious mischief and all other risks normally covered by "all risk" coverage policies in the area where the Property is located (including loss by flood if the Property is in an area designated as subject to the danger of flood);

    (c)    commercial general liability insurance in amounts reasonably required by Beneficiary from time to time; and

    (d)    all other insurance reasonably required by Beneficiary from time to time.

-14-

All such insurance shall provide that it may not be cancelled or materially modified without thirty (30) days' prior written notice to Beneficiary.  The policies required under this Section shall include a Standard Mortgagee Clause, a Lender's Loss Payable Clause and Additional Insured endorsements in form and substance satisfactory to Beneficiary, assuring Beneficiary that all proceeds, to the extent of the outstanding balance of the Secured Obligations, shall be paid to Beneficiary, on behalf of the Noteholders, as the secured party.  Beneficiary, for the benefit of the Noteholders, shall be an additional named insured on the liability insurance policies.  Certificates of insurance (on an Acord 27 form, if applicable) evidencing such insurance for the above coverages (and/or original policies, if required by Beneficiary) shall be delivered to Beneficiary from time to time upon demand.  All policies insuring against damage to the Improvements shall contain an agreed value clause sufficient to eliminate any risk of co-insurance.  No less than thirty (30) days prior to the expiration of each policy, Grantor shall deliver to Beneficiary evidence of renewal or replacement of such policy reasonably satisfactory to Beneficiary.

### 6.2.    Claims

Grantor shall give Beneficiary immediate notice of any casualty to any portion of the Property, whether or not covered by insurance.  If covered, and if there is an Event of Default, Grantor hereby authorizes Beneficiary, if Beneficiary so elects, to make proof of loss, to appear in and prosecute any action arising from any applicable policy and, while any Event of Default remains uncured, to settle, adjust or compromise any claim under any such policy, and Grantor hereby irrevocably appoints Beneficiary its true and lawful attorney-in-fact for all such purposes. Grantor shall not settle, adjust or compromise any such claim without the reasonable prior written approval of Beneficiary.  Nothing in this Section is intended to prohibit Grantor from participating if Beneficiary elects to pursue any such claim.

### 6.3.    Delivery of Proceeds to Beneficiary

In the event that, notwithstanding the Lender's Loss Payable Clause requirement set forth above, the proceeds of any casualty insurance policy described herein are paid to Grantor, Grantor shall deliver such proceeds, to the extent of the outstanding balance of the Secured Obligations, to Beneficiary, for the benefit of the Noteholders, immediately upon receipt.

### 6.4.    Application of Casualty Insurance Proceeds

Any proceeds collected (the "**Proceeds**") under any casualty insurance policy described in this Deed of Trust shall be disbursed to Grantor as provided below, but only upon fulfillment of each of the following conditions (the "**Restoration Conditions**") within ninety (90) days following the occurrence of the damage for which the Proceeds are collected:

(a)    Grantor shall demonstrate to Beneficiary's reasonable satisfaction that the Proceeds (together with amounts delivered by Grantor pursuant to subsection (b) immediately below) will be adequate to repair the Improvements and to restore the fair market value of the Property, within a time period reasonably acceptable to Beneficiary, to at least the value it had immediately prior to sustaining the damage.  Such demonstration shall include delivery to

-15-

Beneficiary of plans and specifications reasonably satisfactory to Beneficiary and a construction contract in form and content, and with a contractor, reasonably satisfactory to Beneficiary.

(b)     To the extent that the Proceeds are insufficient to accomplish the restoration required above, Grantor shall deliver to Beneficiary funds (the "**Shortfall Funds**") in the amount of such shortfall, which funds shall be assigned to Beneficiary, for the benefit of the Noteholders, as security for Grantor's Secured Obligations hereunder and held and disbursed in the same manner as the Proceeds.

(c)     Grantor shall execute such documents as Beneficiary reasonably requires to evidence and secure Grantor's obligation to use all amounts disbursed for the diligent restoration of the Property.

(d)     No Event of Default (other than defaults relating to the casualty) shall remain uncured.

Any Proceeds and Shortfall Funds to be disbursed to Grantor shall be held by Beneficiary, for the benefit of the Noteholders, and disbursed in accordance with customary construction lending practices.  Any amounts remaining undisbursed following completion of such restoration shall be returned to Grantor up to the amount of any Shortfall Funds deposited by Grantor, and any other amounts remaining shall either be paid to Grantor or applied by Beneficiary against the Secured Obligations, as Beneficiary elects in its absolute discretion.

In the event that Grantor fails to fulfill the Restoration Conditions within ninety (90) days following the date on which the damage occurs, Beneficiary may, in its sole discretion, choose to apply the Proceeds against the Secured Obligations, and the selection of which Secured Obligations to apply the Proceeds against, and the order of such application, shall be made by Beneficiary in its absolute discretion.

**6.5.**     Restoration

Nothing in this Section 6 shall be construed to excuse Grantor from repairing and restoring all damage to the Property, regardless of whether insurance proceeds are available or sufficient.

**6.6.**     Assignment of Policies Upon Foreclosure

In the event of foreclosure of this Deed of Trust or other assignment of the Property in extinguishment of any Secured Obligations, all policies of insurance required hereunder and any related unearned premiums shall, without further action, be assigned to the successor-in-interest to Grantor with respect to the Property, and Grantor hereby irrevocably appoints Beneficiary as its true and lawful attorney-in-fact to execute all documents necessary to effect any such transfer.

**6.7.**     Waiver of Subrogation

A/74604193.1

Grantor hereby waives all right to recover against Beneficiary or any Noteholder (or any officer, employee, agent or representative of Beneficiary or any Noteholder) for any loss incurred by Grantor from any cause insured against; provided however, that this waiver of subrogation shall not be effective with respect to any insurance policy if the coverage thereunder would be materially reduced or impaired as a result. Grantor shall use its best efforts to obtain only policies which permit the foregoing waiver of subrogation.

### 6.8.    Limitation.

Notwithstanding anything to the contrary contained herein, the parties hereto acknowledge and agree that should any action required under this Section 6 conflict with any provisions contained in the Note Agreement, the Note Agreement shall control.

### 7.    Condemnation

### 7.1.    Proceedings

Upon learning of the institution or threatened institution of any proceeding for the condemnation or other taking for public or quasi-public use of any portion of the Property, Grantor shall immediately notify Beneficiary in writing, together with copies of all applicable documents. Grantor shall take all action reasonably required by Beneficiary in connection therewith to protect the interests of Grantor, the Noteholders and/or Beneficiary, and Beneficiary, for the benefit of the Noteholders, shall be entitled (without regard to the adequacy of its security) to participate in any such proceeding and be represented therein by counsel of its choice.

### 7.2.    Compensation

Grantor hereby assigns to Beneficiary, for the benefit of the Noteholders, as security for the Secured Obligations and to the extent of the outstanding balance of the Secured Obligations, all amounts payable to Grantor in connection with any taking of any portion of the Property for public or quasi-public use, and any proceeds of any related settlement regardless of whether eminent domain proceedings are instituted in connection therewith (collectively, "**Compensation**"). Grantor shall deliver all Compensation to Beneficiary, for the benefit of the Noteholders, immediately upon receipt. In the event Beneficiary chooses, in its absolute discretion, to waive any Event of Default resulting from any such taking, any Compensation received by Beneficiary shall be (a) disbursed to Grantor for repairs and reconstruction and/or (b) paid to Grantor and/or (c) applied by Beneficiary against the Secured Obligations in accordance with the rights, procedures and other provisions set forth in this Deed of Trust for the application of Proceeds (including requirements with respect to Grantor's deposit of Shortfall Funds).

### 8.    Additional Duties and Powers

### 8.1.    Actions by Beneficiary to Protect Its and Noteholders' Interests

If Grantor fails to perform any Secured Obligation, either Beneficiary or Trustee or both may, without releasing Grantor from such obligation, perform such obligation to the extent reasonably necessary to protect its interests hereunder.  Without limiting the generality of the foregoing, Beneficiary and Trustee are each hereby specifically authorized to do any or all of the following:

> (a)    enter upon and/or take possession of the Property;

> (b)    make alterations, repairs and other improvements reasonably necessary to maintain the Property in good condition and repair;

> (c)    participate and appear in any action or proceeding which may affect Beneficiary's or the Noteholders' interests hereunder;

> (d)    pay, purchase, contest and/or compromise any encumbrance, lien or other claim which may affect Beneficiary's or the Noteholders' interests hereunder; and/or

> (e)    pay all expenses reasonably incurred in protecting Beneficiary's or the Noteholders' interests hereunder, including fees and costs of attorneys and other consultants.

### 8.2.    Inspections

Beneficiary, the Noteholders and their representatives may from time to time, at reasonable times and following reasonable notice (except in emergencies), conduct inspections of the Property, and inspect and/or copy any and all books and records relating thereto, for the purpose of monitoring Grantor's compliance with its Secured Obligations under this Deed of Trust and any other document secured hereby.

### 8.3.    Defense of Actions

Grantor shall, at its sole expense, appear in and defend any action or proceeding which may affect Beneficiary's or the Noteholders' interests hereunder, or under the Note Agreement, the Notes, the Secured Obligations or any related document.

### 8.4.    Indemnity of Beneficiary, Noteholders and Trustee

Grantor shall defend, indemnify and hold Beneficiary, the Noteholders and Trustee harmless from and against:

> (a)    all claims, demands and causes of action asserted against Beneficiary, any Noteholder or Trustee by any person (except to the extent that it results from the gross negligence or willful misconduct of Beneficiary, such Noteholder or Trustee, as applicable) which directly or indirectly relate to (i) a claim, demand or cause of action that such person has or asserts against Grantor (or any other obligor or guarantor with respect to any Secured Obligation), (ii) any lease or other contract assigned to Beneficiary hereunder, (iii) acts or

-18-

omissions of Grantor, or other rights of third parties, relating to the Property, (iv) the ownership, occupancy or use of the Property, or (v) the presence, release, handling, transport or remediation of any Hazardous Substance on, under or in the Property caused by Grantor, or the presence, release, handling, transport or remediation of any Hazardous Substance on any neighboring properties caused by Grantor or any violations by Grantor of any Environmental Laws; and

(b)    all liabilities, losses and other costs (including court costs and attorneys' fees) reasonably incurred by Beneficiary, any Noteholder or Trustee as the result of any claim, demand or cause of action described in subsection (a) immediately above.

Grantor's indemnity obligations hereunder shall survive the reconveyance of this Deed of Trust.

### 8.5.    Reimbursement of Beneficiary

Grantor shall reimburse Beneficiary immediately upon written demand for all costs reasonably incurred by Beneficiary or any Noteholder (including fees and expenses of attorneys and other consultants) in the exercise of Beneficiary's or the Noteholders' rights hereunder and the enforcement of Grantor's Secured Obligations hereunder, including without limitation the following:

(a)    costs incurred under Section 5.7(a), Section 8.1, or under similar provisions of this Deed of Trust, to protect Beneficiary's or the Noteholders' interests hereunder;

(b)    costs incurred in connection with claims, demands, causes of action, liabilities, losses and other costs against which Beneficiary or the Noteholders are indemnified hereunder; and

(c)    all liabilities, losses and other costs incurred by Beneficiary or any Noteholder as a direct or indirect result of any Event of Default, including the cost of a Trustee's Sale Guarantee, Trustee's fees and expenses, and receiver's fees and expenses.

Grantor's reimbursement obligations under this Deed of Trust shall be Secured Obligations, shall bear interest at any default rate set forth in the Notes or the Note Agreement following written demand, and shall survive the reconveyance of this Deed of Trust.

### 8.6.    Notice of Certain Matters

Grantor shall give notice to Beneficiary, within five (5) business days of Grantor's learning thereof, of each of the following:

(a)    any litigation or claim affecting or relating to the Property;

-19-

(b)    any dispute between Grantor and any governmental agency relating to the Property, the adverse determination of which might materially affect the Property; and

(c)    the presence of any Hazardous Materials on, under or about the Property;

(d)    the enforcement, clean-up, removal or other action or requirement of any governmental agency relating to any such Hazardous Materials; and

(e)    the existence of any occurrence or condition on any property in the vicinity of the Property that could cause the Property to be subject to any restrictions relating to Hazardous Materials.

Notice shall be given pursuant to and in accordance with the Note Agreement.

**8.7.**    Further Assurances

Grantor shall execute and deliver to Beneficiary, for the benefit of the Noteholders, all documents, and take all actions, reasonably required by Beneficiary from time to time to confirm the rights created or now or hereafter intended to be created hereunder, to protect and further the validity, priority and enforceability hereof, to subject to the lien hereof any property intended to be encumbered hereby, or otherwise to carry out the purposes hereof.  Without limiting the generality of the foregoing, Grantor shall, upon request of Beneficiary, promptly correct any defect, error or omission which may be discovered in the contents hereof or in the execution or acknowledgment hereof.

**8.8.**    Impounds

(a)    While any Event of Default remains uncured, if requested by Beneficiary, Grantor shall deposit with Beneficiary, for the benefit of the Noteholders, in monthly installments, an amount equal to one-twelfth of the estimated aggregate annual Impositions on the Property.  In such event, Grantor shall cause all bills and other documents relating to Impositions to be sent directly to Beneficiary and, upon receipt of the same, and provided Grantor has deposited sufficient funds with Beneficiary, Beneficiary shall pay the amounts due out of the funds so deposited.  If at any time and for any reason the funds so deposited are or will be insufficient to pay such amounts as may then or subsequently be due, Beneficiary shall notify Grantor and Grantor shall immediately deposit an amount equal to such deficiency with Beneficiary.    Notwithstanding the foregoing, nothing contained herein shall cause Beneficiary or any Noteholder to be deemed a trustee of such funds or obligate Beneficiary or any Noteholder to pay any amounts in excess of the deposited funds.  Beneficiary may commingle such funds with its own funds and Grantor shall not be entitled to interest thereon.

(b)    While any Event of Default remains uncured, if requested by Beneficiary, Grantor shall deposit with Beneficiary, for the benefit of the Noteholders, in monthly installments, an amount equal to one-twelfth of the

-20-

estimated aggregate annual premiums on all policies of insurance required by this Deed of Trust.  In such event, Grantor shall cause all bills and other documents relating to such insurance premiums to be sent directly to Beneficiary and, upon receipt of the same, and provided Grantor has deposited sufficient funds with Beneficiary, Beneficiary shall pay the amounts due out of the funds so deposited. If at any time and for any reason the funds so deposited are or will be insufficient to pay such amounts as may then or subsequently be due, Beneficiary shall notify Grantor and Grantor shall immediately deposit an amount equal to such deficiency with Beneficiary.  Notwithstanding the foregoing, nothing contained herein shall cause Beneficiary or any Noteholder to be deemed a trustee of such funds or obligate Beneficiary or any Noteholder to pay any amounts in excess of the deposited funds, nor shall anything contained herein modify the obligation of Grantor to maintain such insurance in force at all times.  Beneficiary may commingle such funds with its own funds and Grantor shall not be entitled to interest thereon.

## 9.    Sale or Lease of Property

Except as otherwise permitted in this Deed of Trust, Grantor shall not sell, lease, ground lease, pledge, encumber, create a security interest in or otherwise transfer any interest in the Property without the prior written consent of Beneficiary, which consent may be withheld in Beneficiary's absolute discretion.  The consent by Beneficiary to any sale, lease, ground lease, pledge, encumbrance, creation of a security interest in, or other transfer of any portion of the Property shall not be deemed to constitute a novation or a consent to any further sale, lease, ground lease, pledge, encumbrance, creation of a security interest in or other transfer, or to waive the right of Beneficiary, at its option, to declare the Secured Obligations secured hereby immediately due and payable, without notice to Grantor or any other person or entity, upon any such sale, lease, ground lease, pledge encumbrance, creation of a security interest in or other transfer to which Beneficiary shall not have consented.  In connection with the foregoing consent requirements, Grantor acknowledges that Beneficiary and the Noteholders relied upon Grantor's particular expertise in entering into the transaction to which this Deed of Trust relates and continues to rely on such expertise to ensure the satisfactory operation of the Property and repayment of the Secured Obligations.

### 9.1.    Transfers

Transfers requiring Beneficiary's prior written consent shall include, without limitation, the following:

> (a)    involuntary transfers and transfers by operation of law; and

> (b)    liens and assignments as security for obligations, whether voluntary or involuntary.

### 9.2.    Continuing Liability of Grantor

No sale, lease or other transfer shall relieve Grantor from primary liability for any Secured Obligation or relieve Grantor from any such obligation from any liability under the Note

A/74604193.1

Agreement, the Notes or any other documents, certificates, or agreements executed in connection therewith or relieve any guarantor of any such obligation from any liability under its guaranty, and Grantor shall deliver to Beneficiary, for the benefit of the Noteholders, all documents reasonably required by Beneficiary to evidence its continuing liability.

**9.3.**    Limitation

The foregoing provision notwithstanding, the parties hereto acknowledge and agree that in the event of any conflict between this Section 9 and any provisions set forth in the Note Agreement with respect to the release or other disposition of the Property, the Note Agreement shall control.

**10.    Other Waivers, Rights and Obligations**

**10.1.**    Authority to Modify Obligations

Beneficiary may from time to time, without notice, and without affecting the lien of this Deed of Trust or the liability of any other person or entity for any Secured Obligation, (a) release any person from any Secured Obligation, (b) extend the maturity or otherwise alter the terms of any Secured Obligation, (c) grant other indulgences, (d) release or reconvey any portion of the Property, (e) take or release any other security for any Secured Obligation, and/or (f) make compositions and other arrangements with debtors relating to any Secured Obligation.

**10.2.**    Additional Security

No other collateral held as security for any Secured Obligation shall be affected by the execution of this Deed of Trust, and all such collateral shall be cumulative.  Neither the taking of additional security nor the release or partial release of any security for any Secured Obligation shall affect the lien hereof or the liability of any obligor, endorser, guarantor or other surety in connection therewith.  Beneficiary may, in its absolute discretion, and in accordance with applicable law, enforce the sale of (or otherwise realize on) any other security for any Secured Obligation before, after, or concurrently with, any exercise of its remedies hereunder.

**10.3.**    Survival of Warranties

Any representations and warranties set forth herein or otherwise made by Grantor in connection herewith shall survive the delivery and recording hereof and continue so long as any Secured Obligation remains outstanding.

**10.4.**    Other Waivers By Grantor

Grantor waives, to the extent permitted by law (a) the benefit of all present and future laws providing for any appraisement before sale of any portion of the Property, (b) whether now existing or hereafter created, all rights of redemption, valuation, appraisement, stay of execution, and marshalling, in the event of any foreclosure hereunder, (c) the right to plead or assert any statute of limitations as a defense to the enforcement of any Secured Obligation or this Deed of Trust, and (d) all rights which Grantor may now or hereafter have by reason of laws of the States of New York and/or Missouri pertaining to sureties.

-22-

**10.5.**    Subrogation to Lienholder Rights

To the extent that proceeds of the Secured Obligations and/or the Notes are used to pay any outstanding lien, charge or encumbrance against the Property, Beneficiary and the Noteholders shall be subrogated to all rights and liens held by the owner or holder of such lien, charge or encumbrance, regardless of whether such lien, charge or encumbrance is released.

**10.6.**    Nonliability of Beneficiary

Except as otherwise expressly provided herein, no assignment to Beneficiary hereunder of any lease, sublease or other document shall be construed to impose any obligation or liability upon Beneficiary or any Noteholder in connection therewith.

**10.7.**    Partial Invalidity of Lien

If the lien of this Deed of Trust is invalid or unenforceable as to any part of the Secured Obligations or any part of the Property, the unsecured or partially secured portion of such obligations shall be completely paid prior to the payment of the remaining secured or partially secured portion of such obligations, and all payments made on the Secured Obligations, whether voluntary or under foreclosure or other enforcement action or procedure, shall be first applied against that portion of such obligations which is not secured or fully secured by the lien of this Deed of Trust.

**10.8.**    Performance of Secured Obligations

Grantor shall pay and perform when due each of the Secured Obligations which constitutes an obligation of Grantor.

**11.    Events of Default**

The occurrence of any of the following, whatever the reason therefor, shall constitute an "Event of Default" hereunder:

**11.1.**    the occurrence of any Event of Default as defined in the Note Agreement, the Guaranty Agreement (as defined in the Note Agreement) or any other document executed in connection therewith, or under any other Secured Obligation or related document;

**11.2.**    a default under any other document or agreement secured hereby;

**11.3.**    if any representation made herein or in the Note Agreement or in any other document executed in connection therewith (including any certificate delivered in connection with any of the foregoing), or otherwise made by or on behalf of Grantor or any guarantor of the Secured Obligations in connection with the transactions contemplated under the Note Agreement, shall be false or misleading in any material respect when made; or

**11.4.**    a default or breach by Grantor in any obligation made or contained herein.

-23-

### 12.    Foreclosure and Other Remedies

**12.1.**    Acceleration Upon Default; Additional Remedies

Upon the occurrence of any Event of Default, Beneficiary may declare all Secured Obligations immediately due and payable and, whether or not Beneficiary exercises such option, Beneficiary, on behalf of the Noteholders, may do any or all of the following:

(a)    In person or by agent or court-appointed receiver, and without regard to the adequacy of its security:  enter upon and take possession of the Property, or any part thereof, in its own name, in the names of the Noteholders or in the name of Trustee; take any action which it reasonably deems necessary to preserve the value, marketability or rentability of the Property, increase the income therefrom or protect the security hereof; and, with or without taking possession of the Property, sue for or otherwise collect the Rents, including those past due and unpaid, and apply the same, less costs of operation and collection, against any Secured Obligation, all in such order as Beneficiary determines in its absolute discretion.

(b)    Commence an action to foreclose this Deed of Trust as a mortgage, appoint a receiver, or specifically enforce any of the covenants hereof.

(c)    Deliver to Trustee a written declaration of default and demand for sale, and a written notice of default and election to cause Grantor's interest in the Property to be sold, which notice the Trustee or Beneficiary shall cause to be duly filed for record in the Official Records of the County in which the Property is located.

(d)    Exercise all other rights and remedies provided herein, in the Note Agreement, or in any related document or other document secured hereby, or in any document that secures all or any portion of the Secured Obligations, or provided by law.

**12.2.**    Foreclosure By Power of Sale

(a)    Should Beneficiary elect to foreclose by exercise of the power of sale contained herein, Beneficiary shall notify Trustee  (a "**Notice of Default**") and deposit with Trustee this Deed of Trust and such evidence of expenditures made and secured hereby as Trustee may reasonably require.

(b)    Upon receipt of any such notice from Beneficiary, Trustee shall cause to be recorded, published and delivered to Grantor and all other entitled parties such Notice of Default and Election to Sell as is then required by law and by this Deed of Trust.  Trustee shall, without demand on Grantor, after lapse of such time as is then required by law after recordation of such Notice of Default and after Notice of Sale has been given as required by law, sell the Property at the time and place of sale fixed in such Notice of Sale, either as a whole or in separate lots, parcels or items and in such order as Beneficiary elects, at public auction to

-24-

the highest bidder for cash in lawful money of the United States payable at the time of sale. Trustee shall deliver to such purchaser(s) good and sufficient deed(s) conveying the property so sold, but without any warranty, express or implied. Any person, including Grantor, Trustee, any Noteholder or Beneficiary, may purchase at any such sale.

(c)     After deducting all fees and costs of Beneficiary, the Noteholders and Trustee, including costs of evidence of title in connection with any such sale, Beneficiary shall apply the proceeds of sale to payment of (i) first, all amounts expended under the terms hereof and not then repaid, with accrued interest; (ii) second, all other amounts then secured hereby; and (iii) the remainder, if any, to the person(s) legally entitled thereto.

(d)     To the extent permitted by applicable law, Trustee may postpone the sale of all or any portion of the Property by public announcement at the time and place of sale, and from time to time thereafter may again postpone such sale by public announcement or subsequently noticed sale.

(e)     A sale of less than all of the Property or any defective or irregular sale made hereunder shall not exhaust the power of sale provided for herein, and subsequent sales may be made hereunder until all Secured Obligations have been satisfied or the entire Property has been sold without defect or irregularity.

(f)     The right of Beneficiary to collect and receive the Rents from the Property or to take possession of the Property or to exercise any of the rights or powers herein granted to Beneficiary shall, to the extent not prohibited by law, also extend to the period from and after the filing of any suit or the taking of other actions to foreclose the lien of this Deed of Trust, including any period allowed by law for the redemption of the Property after any foreclosure sale.

### 12.3.    Separate Sales

The Property may be sold in one or more parcels and in such manner and order as Trustee in its sole discretion may elect; the right of sale arising out of any Event of Default shall not be exhausted by any one or more sales.

### 12.4.    Appointment of Receiver

While any Event of Default remains uncured, Beneficiary may, in accordance with applicable law and without regard to the value of the Property, apply to any court having jurisdiction to appoint a receiver or receivers of the Property, and Grantor hereby irrevocably consents to such appointment. Any such receiver shall have the usual powers and duties of receivers in similar cases, and all the powers and duties of Beneficiary in case of entry as provided herein, until the date of confirmation of sale of the Property (unless such receivership is sooner terminated).

### 12.5.    Application of Funds

-25-

Except as otherwise provided herein, while any Event of Default remains uncured, Beneficiary may, at any time without notice, apply any amounts received by Beneficiary or any Noteholder from or on account of Grantor or the Property (including amounts received as Rents, as insurance or condemnation proceeds, and/or as impounds with respect to insurance premiums or Impositions) against any Secured Obligation, in such order as Beneficiary elects, regardless of whether any such obligation is yet due. The receipt, use or application of any such amount shall not be construed to affect the maturity of any Secured Obligation, any rights of Beneficiary, the Noteholders or Trustee under the Note Agreement, the Notes, the other Secured Obligations or any related documents, or any obligations of Grantor under the Note Agreement, other Secured Obligation or any related documents; or to cure or waive any default under the Note Agreement, the Notes, the other Secured Obligations or any related documents; or to invalidate any act of Trustee, any Noteholder or Beneficiary.

**12.6.** Cumulative Remedies; No Waiver

Trustee and Beneficiary, for the benefit of the Noteholders, shall each be entitled to enforce the performance of any Secured Obligation and to exercise all rights under this Deed of Trust, the Note Agreement, the other Secured Obligations or other agreement or any law now or hereafter in force, regardless of whether some or all of the Secured Obligations are otherwise secured, whether by guaranty, deed of trust, lien, assignment or otherwise. Neither the acceptance or enforcement of this Deed of Trust, whether by court action or pursuant to the power of sale or other powers contained herein, shall prejudice Trustee's, any Noteholder's or Beneficiary's right to realize upon any other security held by Trustee, any Noteholder or Beneficiary, it being agreed that Trustee and Beneficiary, for the benefit of the Noteholders, shall each be entitled to enforce this Deed of Trust and any such other security in such order as they determine in their absolute discretion in accordance with applicable law. Trustee's, the Noteholders' and Beneficiary's rights and remedies hereunder are cumulative and in addition to all rights and remedies provided by law or otherwise from time to time. Every right or remedy given by the Note Agreement, the other Secured Obligations or any related documents to Trustee, any Noteholder or Beneficiary or to which any of them is otherwise entitled may be exercised, concurrently or independently, from time to time and as often as is deemed expedient by Trustee or Beneficiary, and either of them may pursue inconsistent remedies. No waiver of any default shall be implied from any omission by Beneficiary or any Noteholder to take action on account of such default if such default persists or is repeated. No waiver of any default shall affect any default other than the default expressly waived, and any such waiver shall be operative only for the time and to the extent stated. No waiver of any provision of the Note Agreement, the other Secured Obligations or any related documents shall be construed as a waiver of any subsequent breach of the same provision. Beneficiary's consent to or approval of any act by Grantor requiring further consent or approval shall not be deemed to waive or render unnecessary Beneficiary's consent to or approval of any subsequent act. Beneficiary's or any Noteholder's acceptance of the late performance of any Secured Obligation shall not constitute a waiver by Beneficiary or the Noteholders of the right to require prompt performance of all further Secured Obligations; Beneficiary's or any Noteholder's acceptance of any performance following the filing of a notice of default hereunder shall not constitute a waiver of Beneficiary's or the Noteholders' right to proceed with the exercise of any remedies for any unfulfilled obligations; and Beneficiary's or any Noteholder's acceptance of any partial performance shall

-26-

not constitute a waiver of any rights relating to the unfulfilled portion of the applicable obligation.

### 12.7.   Request for Notice

Grantor hereby requests that a copy of any notice of default and a copy of any notice of sale hereunder be mailed to it at the address set forth in the first paragraph of this Deed of Trust.

### 13.   Miscellaneous Provisions

### 13.1.   Execution of Reconveyances and Other Instruments by Trustee

Upon written request of Beneficiary from time to time and upon payment of Trustee's fees and costs in connection therewith and, if reasonably required by Trustee, upon presentation of this Deed of Trust for endorsement, Trustee shall, without affecting the personal liability of any person with respect to any Secured Obligation or the lien of this Deed of Trust upon the remainder of the Property, (a) reconvey to the person(s) legally entitled thereto, without warranty, any portion of the Property then held hereunder, (b) consent in writing to the making of any map or plat thereof, (c) join in granting any easement thereon, or (d) join in any extension agreement, agreement subordinating the lien or charge hereof, or other agreement or document relating hereto or to the Property.

### 13.2.   Appointment of Successor Trustee

Trustee or any successor acting hereunder may resign and thereupon be discharged of the trusts hereunder upon thirty (30) days' prior written notice to Beneficiary.  Regardless of whether such resignation occurs, Beneficiary may from time to time substitute a successor or successors to any Trustee.  If permitted by law, Beneficiary may substitute such successor or successors by recording a document executed by Beneficiary and containing the name of the original Grantor and Beneficiary hereunder, the book and page where this Deed of Trust is recorded (and/or instrument number, as applicable) and the name of the new Trustee, in which event such successor Trustee or Trustees shall, without conveyance from the predecessor Trustee, succeed to all its estate, rights and duties hereunder.

### 13.3.   Trust Irrevocable; Acceptance by Trustee

The trust created hereby is irrevocable by Grantor.  Trustee accepts this trust when this Deed of Trust is made a public record as provided by law.

### 13.4.   Statements by Grantor

Grantor shall, within ten (10) days following Beneficiary's demand from time to time, deliver to Beneficiary, for the benefit of the Noteholders, a written statement setting forth all outstanding amounts secured by this Deed of Trust and stating whether any offset or defense exists against such amounts.

### 13.5.   Beneficiary Statements

For any statement or accounting requested by Grantor or any other entitled person pursuant to any provision of applicable law, or for any other document furnished to Grantor by Beneficiary or any Noteholder, Beneficiary and the Noteholders may charge the maximum amount then permitted by law or, if no such maximum, then in accordance with Beneficiary's and the Noteholders' reasonable and customary charges therefor or the actual cost reasonably incurred by Beneficiary and the Noteholders, whichever is greater.

    **13.6.**   Notices

All notices, demands, approvals and other communications provided for herein shall be in writing and be sent or delivered to the appropriate party at the address set forth below or as set forth in the first paragraph of this Deed of Trust.  Addresses for notice may be changed from time to time by written notice to all other parties.  All communications shall be effective when actually received; <u>provided</u> <u>however</u>, that nonreceipt of any communication as the result of a change of address of which the sending party was not notified or as the result of a refusal to accept delivery shall be deemed receipt of such communication.

    [St. Louis Post-Dispatch LLC
    900 N. Tucker Boulevard
    St. Louis, MO 63101
    Attn: Senior Vice President - Finance]

    <u>With a copy to</u>:

    C. Dana Waterman III
    Lane & Waterman LLP
    220 North Main Street, Suite 600
    Davenport, Iowa 52801-1987

    The Bank of New York Mellon Trust Company, N.A.
    10161 Centurion Parkway, N.
    Jacksonville, Florida 32256
    Attn: Geraldine Creswell, Asst. Treasurer

    With a copy to:

    [_____], Esq.
    Bingham McCutchen LLP
    One State Street
    Hartford, CT 06103

    [Trustee Name and Address]

    **13.7.**   Amendments

A/74604193.1

This Deed of Trust cannot be modified except by an instrument in writing signed by the party against whom enforcement of any waiver or other modification is sought.  A copy of any such document shall be sent by such party to all other parties.

### 13.8.   Headings

Section headings are included in this Deed of Trust for convenience of reference only and shall not be used in construing this Deed of Trust.

### 13.9.   Severability of Provisions

Every provision of this Deed of Trust is intended to be severable.  In the event that any provision hereof is declared to be invalid or unenforceable for any reason by a court of competent jurisdiction, such invalidity or unenforceability shall not affect the remaining provisions hereof.

### 13.10.   Governing Law

This Deed of Trust shall be, and the Note Agreement provides that they are to be, governed by, and construed and enforced in accordance with, the laws of the State of New York, excluding choice-of-law principles of the law of such State that would permit the application of the laws of a jurisdiction other than such State.  Notwithstanding such provisions, however, (i) matters respecting title to the Property and the creation, perfection, priority and foreclosure of liens on, and security interests in, the Property shall be governed by, and construed and enforced in accordance with, the internal law of Missouri without giving effect to the conflicts-of-law rules and principles of such state; (ii) Grantor agrees that whether or not deficiency judgments are available under the laws of Missouri after a foreclosure (judicial or nonjudicial) of the Property, or any portion thereof, or any other realization thereon by Beneficiary or any Noteholder or their respective successors and assigns, Beneficiary, Noteholders and their respective successors and assigns shall have the right to seek such a deficiency judgment against Grantor in other states or foreign jurisdictions; and (iii) Grantor agrees that, to the extent Beneficiary, any Noteholder or any of their respective successors and assigns obtains a deficiency judgment in any other state or foreign jurisdiction then such party shall have the right to enforce such judgment in Missouri, as well as in other states or foreign jurisdictions.

### 13.11.   Joint and Several Obligations

Should this Deed of Trust be signed by more than one party, all obligations contained herein shall be deemed to be the joint and several obligations of each such party.  Any married person signing this Deed of Trust agrees that recourse may be had against community assets and against his or her separate property for the satisfaction of all obligations contained herein.

### 13.12.   Interpretation

In this Deed of Trust the singular shall include the plural and the masculine shall include the feminine and neuter and vice versa, if the context so requires.  Any reference to the Note Agreement, the Notes, any other documents, certificates, or agreements executed in connection therewith prior to, on or after the date hereof, the other Secured Obligations or other related

A/74604193.1

document shall include such document both as originally executed and as it may from time to time be modified.  References herein to Sections and Exhibits shall be construed as references to this Deed of Trust unless a different document is named, and references to subsections shall be construed as references to the same Section in which the reference appears.   The term "document" is used in its broadest sense and encompasses agreements, certificates, opinions, consents, instruments and other written material of every kind.   The terms "including" and "include" mean "including (include) without limitation."   The term "any," as a modifier to any noun, shall be construed to mean "any and/or all" preceding the same noun in the plural.   The term "agreement" includes both written and oral agreements.   The terms "modify" and "modification," when used with reference to any document or obligation, include amendments, supplements, renewals, extensions, waivers, terminations and other modifications of every kind. The terms "law" and "laws," unless otherwise modified, mean, collectively, all federal, state and local laws, rules, regulations, codes and administrative and judicial precedents.   The word "person" includes corporations, partnerships, limited liability companies and other forms of association.   The terms "herein," "hereunder" and other similar compounds of the word "here" refer to this entire Deed of Trust and not to any particular provision or Section hereof.  As stated in the last recital, capitalized terms used and not otherwise defined shall have the meaning given to them in the Note Agreement.

### 13.13.  Counterparts

This Deed of Trust may be executed in counterparts and any party may execute any counterpart, each of which shall be deemed to be an original and all of which, taken together, shall be deemed to be one and the same document.

### 13.14.  Successors and Assigns

This Deed of Trust shall bind, and shall inure to the benefit of, Grantor, Trustee, Beneficiary, the Noteholders and their respective heirs, legatees, devisees, administrators, executors and other successors and assigns.

### 13.15.  Beneficiary as Collateral Agent

(a)      Beneficiary has been appointed to act as Beneficiary hereunder by the Noteholders.   Beneficiary shall be obligated, and shall have the right hereunder, to make demands, to give notices, to exercise or refrain from exercising any rights, and to take or refrain from taking any action (including, without limitation, the release or substitution of Property), solely in accordance with this Deed of Trust, the Note Agreement and the Collateral Agency Agreement.

(b)      Beneficiary hereunder shall at all times be the same person or entity that is the Collateral Agent under the Note Agreement and the Collateral Agency Agreement.   Written notice of resignation by the Collateral Agent pursuant to the Collateral Agency Agreement shall also constitute notice of resignation as Beneficiary under this Deed of Trust; and appointment of a successor Collateral Agent pursuant to the Collateral Agency Agreement shall

-30-

also constitute appointment of a successor Beneficiary under this Deed of Trust. Upon the acceptance of any appointment as the Collateral Agent under the Collateral Agency Agreement by a successor Collateral Agent, that successor Collateral Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Beneficiary under this Deed of Trust, and the retiring Beneficiary under this Deed of Trust shall promptly (i) transfer to such successor Beneficiary all sums, securities and other items of Property held hereunder, together with all records and other documents necessary or appropriate in connection with the performance of the duties of the successor Beneficiary under this Deed of Trust, and (ii) execute and deliver to such successor Beneficiary such amendments to financing statements, and take such other actions, as may be necessary or appropriate in connection with the assignment to such successor Beneficiary of the liens and security interests created hereunder, whereupon such retiring Beneficiary shall be discharged from its duties and obligations under this Deed of Trust. After any retiring Beneficiary's resignation hereunder as Beneficiary, the provisions of this Deed of Trust shall inure to its benefit as to any actions taken or omitted to be taken by it under this Deed of Trust while it was Beneficiary hereunder.

**13.16.** Resolution of Conflicts

The parties hereto acknowledge and agree that with respect to the validity and enforceability of this Deed of Trust, the terms and conditions of this Deed of Trust shall control; provided, however, that in the event of any conflict between this Deed of Trust and the Note Agreement with respect to all other terms and conditions, the Note Agreement shall control.

**13.17.** Business Purpose.

Grantor warrants that it is engaging in this transaction exclusively for business, commercial or investment purposes.

**13.18.** State Specific Provisions.

This Deed of Trust is governed by the further provisions set forth in <u>Appendix I</u> attached hereto and made a part hereof, which are incorporated herein as if fully set forth herein. In the event of any inconsistencies between the terms and conditions set forth in <u>Appendix I</u> and the other provisions of this Deed of Trust, the terms and conditions set forth in <u>Appendix I</u> shall control and be binding.

*[Remainder of page intentionally left blank. Next page is signature page.]*

**IN WITNESS WHEREOF**, Grantor has caused this Deed of Trust to be duly executed as of the date first written above.

<div align="center">

**GRANTOR(S):**

**[Insert Signature Blocks]**

</div>

STATE OF  [_____]                    )
                                     ) ss.
COUNTY OF  SCOTT                     )

On this _____ day of [_____], [____], before me, the undersigned, a Notary Public in and for the State of [_____], duly commissioned and sworn, personally appeared [_____], to me personally known to be the person who signed as [_____] of [_____], a [_____], who executed the within and foregoing instrument, and acknowledged said instrument to be the free and voluntary act and deed of said [_____] for the uses and purposes therein mentioned, and on oath stated that he was duly elected, qualified and acting as said officer of the company, that he was authorized to execute said instrument and that the seal affixed, if any, is the seal of said company.

**IN WITNESS WHEREOF** I have hereunto set my hand and my official seal in the County and State aforesaid on the day and year first above written.

Name(print):_____
                              Notary Public

| My Commission Expires: |
| --- |
| |
| |
| |
| |
| PLEASE AFFIX SEAL FIRMLY AND CLEARLY IN THIS BOX. |

<div align="center">

*[Signature and Acknowledgement Page to Deed of Trust (Dunlap)]*

</div>

A/74604193.1

**EXHIBIT A**

**DESCRIPTION OF THE LAND**

A/74604193.1

**EXHIBIT B**

**PERMITTED LIENS**

**EXHIBIT C**

**ENVIRONMENTAL REPORTS**

**[\*\*For Properties Located in Missouri\*\*]**

## APPENDIX I

## STATE SPECIFIC PROVISIONS

**Section 1.1.**    **[Interpretation; Conflicts**.    In the event of any inconsistencies between the terms and conditions of this Appendix I and the other provisions of this instrument, the terms and conditions of this Appendix shall control and be binding.

**Section 1.2.**    **Future Advances**.    THIS DEED OF TRUST, SECURITY AGREEMENT AND FIXTURE FILING SECURES FUTURE ADVANCES AND FUTURE OBLIGATIONS AND SHALL BE GOVERNED BY SECTION 443.055 R.S.MO., AS AMENDED FROM TIME TO TIME.   THE TOTAL FACE AMOUNT OF THE PRESENT AND FUTURE ADVANCES AND OBLIGATIONS WHICH MAY BE SECURED HEREBY IS  $[_____], PLUS ANY ADDITIONAL AMOUNTS WHICH MAY BE SECURED HEREBY UNDER THE PROVISIONS OF SECTION 443.055 R.S.MO., AS AMENDED.

**Section 1.3.**    **Insurance**.

(a)    Pursuant to Section 427.120 R.S.Mo., Grantor acknowledges receipt of the following notice: "Unless you provide evidence of the insurance coverage required by your agreement with us, we may purchase insurance at your expense to protect our interests in your collateral.   This insurance may, but need not, protect your interests.   The coverage that we purchase may not pay any claim that you make or any claim that is made against you in connection with the collateral.   You may later cancel any insurance purchased by us, but only after providing evidence that you have obtained insurance as required by our agreement.   If we purchase insurance for the collateral, you will be responsible for the costs of that insurance, including the insurance premium, interest and any other charges we may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance.   The costs of the insurance may be added to your total outstanding balance or obligation.   The costs of the insurance may be more than the cost of insurance you may be able to obtain on your own."

(b)    If Grantor fails to maintain any insurance required hereunder or under the other Loan Documents or fails to provide evidence of such insurance as required hereunder or under the other Loan Documents, Beneficiary may, but shall not be obligated to, purchase such required insurance at Grantor's expense to protect its interests in the Property.   This insurance may, but need not, protect the Grantor's interests in the Property.   The coverage that Beneficiary purchases shall not be required to pay any claim that the Grantor makes or any claim that is made against the Grantor in connection with the Property.   The Grantor may later cancel any insurance purchased by Beneficiary, but only after providing evidence that the Grantor has obtained the insurance required hereunder and under any other Loan Document.   If Beneficiary purchases insurance for the Property, Grantor will be responsible for the costs of the insurance, including the insurance premium, interest thereon from the date of each such payment or expenditure at the then applicable rate under the Note and any other charges Beneficiary may impose in connection

with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. All sums so paid or expended by Beneficiary, the interest thereon and the other charges in connection therewith shall be added to the Indebtedness and shall be secured by the lien of this Deed of Trust. The costs of the insurance obtained by the Beneficiary may be more than the cost of insurance Grantor may be able to obtain on its own. Unless Beneficiary otherwise agrees in writing, the Grantor shall pay to Beneficiary the full costs of such insurance, together with the accrued interest thereon and the other charges in connection therewith, within thirty (30) days after "Notice of Placement of Insurance" as required by Section 427.125 R.S.Mo.

Section 1.4. **Oral Agreements**. The following notice is provided pursuant to Section 432.047 R.S.Mo.: **ORAL AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING PAYMENT OF A DEBT INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT ARE NOT ENFORCEABLE, REGARDLESS OF THE LEGAL THEORY UPON WHICH IT IS BASED THAT IS IN ANY WAY RELATED TO THIS AGREEMENT. TO PROTECT BOTH GRANTOR AND BENEFICIARY FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS WE REACH COVERING SUCH MATTERS ARE CONTAINED IN THE LOAN DOCUMENTS, WHICH REPRESENTS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN US, EXCEPT AS WE MAY LATER AGREE IN WRITING TO MODIFY IT.**

Section 1.5. **UCC Remedies**. Beneficiary shall, upon an Event of Default, at its option and without notice or demand, be entitled to enter upon the Property to take immediate possession of the Fixtures and Personal Property. Beneficiary may thereafter sell all or any portion of the Personal Property and the Fixtures at public or private sale in accordance with the Uniform Commercial Code as adopted in Missouri or in accordance with the foreclosure advertisement and sale provisions under this Deed of Trust. Grantor agrees that a commercially reasonable manner of disposition of the Personal Property and the Fixtures upon a default shall include, without limitation and at the option of Beneficiary, the sale of Personal Property and the Fixtures, in whole or in part, concurrently with a foreclosure sale of the Property in accordance with the provisions of this Deed of Trust. In the further event Beneficiary shall dispose of any or all of the Personal Property and the Fixtures after default, the proceeds of disposition shall be applied in the following order: (i) to the expenses of retaking, holding, preparing for sale, selling and the like; (ii) to the reasonable attorneys' fees and legal expenses incurred by Beneficiary; and (iii) to the satisfaction of the indebtedness secured hereby. Grantor hereby waives any right of redeeming the Personal Property and the Fixtures whether foreclosure with regard thereto is coterminous with or separate from foreclosure of the Property.

Section 1.6. **Special Provisions Concerning Trustee's Power of Sale**

(a) If an Event of Default shall occur, Trustee is authorized and empowered to proceed to sell the Property as one parcel in its entirety or any part thereof, either in mass or in parcels, at the absolute discretion of Trustee, at public vendue, to the highest bidder for cash at the door of the Court House or other location then customarily employed for that purpose in the county (or city) where the Property is located, first giving notice of the time and place of sale, and a description of the property to be sold, by advertisement published and as is provided by the laws of the State of Missouri then in effect, and upon sale shall execute and deliver a deed of conveyance of the property sold to the purchaser or purchasers thereof, and any statement or

recital of fact in such deed, in relation to the non-payment of the money hereby secured to be paid, existence of the indebtedness so secured, notice of advertisement, sale and receipt of the proceeds of sale, shall be presumptive evidence of the truth of such statements or recital, and Trustee shall receive the proceeds of such sale out of which Trustee shall dispose of the proceeds: FIRST, to discharge the expenses of executing this Deed of Trust, including a reasonable commission to Trustee, and all proper costs, charges and expenses of the sale and reasonable attorney's fees in connection with the sale; SECOND, to discharge all taxes, levies and assessments with costs and interest thereon from the date of advance to the date of sale at an interest rate equal to the default rate set forth in the Notes or the Note Agreement, including all monies previously advanced for taxes, levies and assessments and the due pro rata portion thereof for the current year; THIRD, to discharge in the order of their priority, if any, the remaining debts and obligations secured by this Deed of Trust, and liens of record other than Permitted Liens inferior thereon, it being agreed that the Loan shall, upon such sale being made before the maturity date of the Loan, be and become immediately due and payable; less the expense, if any, of obtaining possession upon the delivery and surrender to the purchaser of possession of the Property; and FOURTH, the residue of the proceeds shall be paid to Grantor and its assigns, provided, however, that as to such residue Trustee shall not be bound by an inheritance, devise, conveyance, assignment or lien upon Grantor's equity, without actual notice prior to distribution. Beneficiary may bid and become purchaser at any sale under this Deed of Trust. The power of sale hereunder shall not be exhausted by any one or more such sales (or attempts to sell) as to all or any portion of the Property remaining unsold, but shall continue unimpaired until all of the Property has been sold or all indebtedness of Grantor to Beneficiary secured hereby shall have been paid in full.

(b)     Trustee may sell and convey the Property under the power aforesaid, although Trustee has been, may now be or may hereafter be attorney or agent of Beneficiary in respect to the loan made by Beneficiary evidenced by the Loan Documents or this Deed of Trust or in respect to any matter of business whatsoever.

(c)     Trustee hereby lets the Property to Grantor until a sale be had under the foregoing provisions, upon the following terms and conditions, such letting being to-wit: Grantor and every and all persons claiming or possessing the Property, or any part thereof, by, through or under Grantor shall pay rent therefor during said term at the rate of one cent per month, payable monthly upon demand, and shall surrender immediate peaceable possession of the Property, to the purchaser thereof, under such sale, without notice or demand therefor. Should possession not be surrendered as provided for herein the purchaser shall be entitled to institute proceedings for possession as aforesaid.

(d)     In the event any foreclosure advertisement is running or has run at the time of such appointment of a successor trustee, the successor trustee may consummate the advertised sale without the necessity of republishing such advertisement. The making of oath or giving of bond by Trustee or any successor trustee is expressly waived.]

A/74604193.1

<u>EXHIBIT G</u>

[FORM OF TRADEMARK SECURITY AGREEMENTS]

Exhibit G

Bingham Draft
11/23/11

# GRANT OF SECURITY INTEREST
## (TRADEMARKS, SERVICE MARKS AND TRADE NAMES)

THIS GRANT OF SECURITY INTEREST (TRADEMARKS, SERVICE MARKS AND TRADE NAMES) is dated as of [_____], between **NAME OF ASSIGNOR**, a [State] [Type of Organization] having its chief executive office at [Address] (the "**Assignor**"), and THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A. having a representative office at [Address], in its capacity as the Collateral Agent on behalf and for the benefit of the Secured Parties (in such capacity, the "**Assignee**").  Capitalized terms used, but not otherwise defined herein, shall have the meanings given to such terms in the Security Agreement (as defined below).

WHEREAS, reference is made to that certain Note Agreement, dated as of [_____] (as the same from time to time hereafter may be amended, restated, supplemented or otherwise modified, the "**Note Agreement**") by and among [the Assignor][the Borrower] and the Purchasers named therein, pursuant to which, subject to the terms and conditions set forth therein, [the Assignor][the Borrower] issued the Notes to such Purchasers.

WHEREAS, reference is also made to that certain Guaranty Agreement, dated as of [_____] (as the same from time to time hereafter may be amended, restated, supplemented or otherwise modified, the "**Guaranty Agreement**") made by [the Assignor][the Company] in favor of the Secured Parties, pursuant to which, subject to the terms and conditions set forth therein, [the Assignor][the Company] guaranteed the full, complete and final payment and performance of the "Guaranteed Obligations" as defined in the Guaranty Agreement.

WHEREAS, reference is also made to that certain Subsidiary Guaranty Agreement, dated as of [_____] (as the same from time to time hereafter may be amended, restated, supplemented or otherwise modified, the "**Subsidiary Guaranty Agreement**") made by each Initial Subsidiary Grantor in favor of the Secured Parties, pursuant to which, subject to the terms and conditions set forth therein, [the Assignor and] such [other] Persons have, among other things, guaranteed the full, complete and final payment and performance of the "Guaranteed Obligations" as defined in the Subsidiary Guaranty Agreement.

WHEREAS, pursuant to the terms of a Security Agreement, dated as of [_____] (as the same from time to time hereafter may be amended, restated, supplemented or otherwise modified, the "**Security Agreement**"), in favor of the Assignee on behalf of and for the benefit of the Secured Parties, the Assignor has granted to the Assignee a security interest in all of the Assignor's right, title and interest, whether presently existing or hereafter arising or acquired, in, to and under all of the Collateral.

WHEREAS, the Secured Parties are willing to enter into the Note Agreement and the other Transaction Documents and otherwise make, extend and maintain certain financial accommodations to and for the benefit of the Assignor, but only upon the condition, among others, that the Assignor shall grant a security interest in and assign for security purposes (and

1

not as an absolute assignment) in favor of and to the Assignee, on behalf of and for the benefit of the Secured Parties, in and to, all of Assignor's right, title and interest in and to all Trademarks (as described below) to secure its payment and performance of the Secured Obligations.

NOW, THEREFORE, for good and valuable consideration, receipt of which is hereby acknowledged, as collateral security for the prompt and complete payment and performance when due of the Secured Obligations, the Assignor hereby represents, warrants, covenants and agrees as follows:

As security for the full, complete and final payment and performance when due (whether at stated maturity, by acceleration or otherwise) of all the Secured Obligations and in order to induce the Assignee and the Secured Parties to enter into the Transaction Documents and to make, extend and maintain the credit to and for the benefit of the Assignor upon the terms and subject to the conditions thereof, Assignor hereby mortgages, pledges and hypothecates to the Assignee, on behalf of and for the benefit of the Secured Parties, and hereby grants to the Assignee, on behalf of and for the benefit of the Secured Parties, a security interest in and to all of Assignor's respective right, title and interest in, to and under each of the following:

> (a)    all Trademarks, including, without limitation, each registered trademark, trade name and service mark and each trademark, trade name and service mark application for registration listed on **Schedules A** and **B** hereto, including, without limitation, all proceeds thereof (such as, by way of example but not by way of limitation, license royalties and proceeds of infringement suits), the right to sue for past, present and future infringements, all rights corresponding thereto throughout the world and all reissues, continuations, continuations-in-part and renewals thereof; and

> (b)    the goodwill of the business connected with the use of, and symbolized by, each Trademark.

The Assignee does hereby further acknowledge and affirm that the rights and remedies of the Assignee with respect to the assignment of, and security interest in, the Collateral made and granted hereby are more fully set forth in the Security Agreement, the terms and provisions of which are hereby incorporated herein by reference.

Following the termination of the Security Agreement in accordance with its terms, the security interest in the Trademarks, the goodwill thereof and any and all financing statements filed on behalf of the Assignee will be automatically terminated, released, and/or reassigned to the Assignor, and, on the terms and conditions set forth in the Security Agreement, the Assignee will execute, acknowledge and deliver to each Assignor such instruments as may be reasonably requested to evidence such termination, release, and/or reassignment.

In the event of a conflict between the terms of this Grant of Security Interest (Trademarks, Service Marks and Trade Names) and the terms of the Security Agreement, the terms of the Security Agreement shall prevail.

2

**IN WITNESS WHEREOF**, each of the parties has caused this Grant of Security Interest (Trademarks, Service Marks and Trade Names) to be duly executed by its officer(s) thereunto duly authorized as of the date first written above.

**ASSIGNOR:**

**[NAME OF ASSIGNOR],** a [State][Type of Organization]

By: _____

Name:

Title:

**ASSIGNEE:**

**THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.,** as the Assignee

By: _____

Name:

Title:   Vice President

3

## SCHEDULE A

## U.S. TRADEMARKS

| REGISTRATION NO. | MARK | REGISTRATION DATE |
|---|---|---|
| | | |
| | | |
| | | |

A/74602441.1

**SCHEDULE B**

**PENDING U.S. TRADEMARKS**

| APPLICATION NO. | MARK | APPLICATION DATE |
|---|---|---|
| | | |
| | | |
| | | |

<u>EXHIBIT H</u>

[FORM OF COPYRIGHT SECURITY AGREEMENTS]

Bingham Draft
11/23/11

# GRANT OF SECURITY INTEREST
## (COPYRIGHTS)

THIS GRANT OF SECURITY INTEREST (COPYRIGHTS) is dated as of [_____], between [ASSIGNOR'S NAME], a [State] [Type of Organization] having its chief executive office at [Address] (the "**Assignor**"), and THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., having a representative office at [Address], in its capacity as the Collateral Agent on behalf and for the benefit of the Secured Parties (in such capacity, the "**Assignee**").  Capitalized terms used, but not otherwise defined herein, shall have the meanings given to such terms in the Security Agreement (as defined below).

WHEREAS, reference is made to that certain Note Agreement, dated as of [_____] (as the same from time to time hereafter may be amended, restated, supplemented or otherwise modified, the "**Note Agreement**") by and among [the Assignor][the Borrower] and the Purchasers named therein, pursuant to which, subject to the terms and conditions set forth therein, [the Assignor][the Borrower] issued the Notes to such Purchasers.

WHEREAS, reference is also made to that certain Guaranty Agreement, dated as of [_____] (as the same from time to time hereafter may be amended, restated, supplemented or otherwise modified, the "**Guaranty Agreement**") made by [the Assignor][the Company] in favor of the Secured Parties, pursuant to which, subject to the terms and conditions set forth therein, [the Assignor][the Company] guaranteed the full, complete and final payment and performance of the "Guaranteed Obligations" as defined in the Guaranty Agreement.

WHEREAS, reference is also made to that certain Subsidiary Guaranty Agreement, dated as of [_____] (as the same from time to time hereafter may be amended, restated, supplemented or otherwise modified, the "**Subsidiary Guaranty Agreement**") made by each Initial Subsidiary Grantor in favor of the Secured Parties, pursuant to which, subject to the terms and conditions set forth therein, [the Assignor and] such [other] Persons have, among other things, guaranteed the full, complete and final payment and performance of the "Guaranteed Obligations" as defined in the Subsidiary Guaranty Agreement.

WHEREAS, pursuant to the terms of a Security Agreement, dated as of [_____] (as the same from time to time hereafter may be amended, restated, supplemented or otherwise modified, the "**Security Agreement**"), in favor of the Assignee on behalf of and for the benefit of the Secured Parties, the Assignor has granted to the Assignee a security interest in all of the Assignor's right, title and interest, whether presently existing or hereafter arising or acquired, in, to and under all of the Collateral.

WHEREAS, the Secured Parties are willing to enter into the Note Agreement and the other Transaction Documents and otherwise make, extend and maintain certain financial accommodations to and for the benefit of the Assignor, but only upon the condition, among others, that the Assignor shall grant a security interest in and assign for security purposes (and not as an absolute assignment) in favor of and to the Assignee, on behalf of and for the benefit of

the Secured Parties, in and to, all of Assignor's right, title and interest in and to all Copyrights (as described below) to secure its payment and performance of the Secured Obligations.

NOW, THEREFORE, for good and valuable consideration, receipt of which is hereby acknowledged, as collateral security for the prompt and complete payment and performance when due of the Secured Obligations, the Assignor hereby represents, warrants, covenants and agrees as follows:

As security for the full, complete and final payment and performance when due (whether at stated maturity, by acceleration or otherwise) of all the Secured Obligations and in order to induce the Assignee and the Secured Parties to enter into the Transaction Documents and to make, extend and maintain the credit to and for the benefit of the Assignor upon the terms and subject to the conditions thereof, Assignor hereby mortgages, pledges and hypothecates to the Assignee, on behalf of and for the benefit of the Secured Parties, and hereby grants to the Assignee, on behalf of and for the benefit of the Secured Parties, a security interest in and to all of Assignor's respective right, title and interest in, to and under all Copyrights, including, without limitation, each registered and unregistered copyright, and each application for registration of any Copyright listed on *Schedules A* and *B* hereto, including, without limitation, all proceeds thereof (such as, by way of example but not by way of limitation, license royalties and proceeds of infringement suits), the right to sue for past, present and future infringements, all rights corresponding thereto throughout the world and all continuations, renewals and extensions thereof.

The Assignee does hereby further acknowledge and affirm that the rights and remedies of the Assignee with respect to the assignment of, and security interest in, the Collateral made and granted hereby are more fully set forth in the Security Agreement, the terms and provisions of which are hereby incorporated herein by reference.

Following the termination of the Security Agreement in accordance with its terms, the security interest in the Copyrights and any and all financing statements filed on behalf of the Assignee will be automatically terminated, released, and/or reassigned to the Assignor, and, on the terms and conditions set forth in the Security Agreement, the Assignee will execute, acknowledge and deliver to each Assignor such instruments as may be reasonably requested to evidence such termination, release, and/or reassignment.

In the event of a conflict between the terms of this Grant of Security Interest (Copyrights) and the terms of the Security Agreement, the terms of the Security Agreement shall prevail.

**IN WITNESS WHEREOF**, each of the parties has caused this Grant of Security Interest (Copyrights) to be duly executed by its officer(s) thereunto duly authorized as of the date first written above.

**ASSIGNOR:**

**[ASSIGNOR'S NAME],** a [State] [Type of Organization]

By: _____

Name: _____

Title: _____

**ASSIGNEE:**

**THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.**, as the Assignee

By: _____

Name: _____

Title:  Vice President

## SCHEDULE A

### U.S. COPYRIGHTS

| REGISTRATION NO. | COPYRIGHT | REGISTRATION DATE |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**SCHEDULE B**

**PENDING U.S. COPYRIGHTS**

| APPLICATION NO. | COPYRIGHT | APPLICATION DATE |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

<u>EXHIBIT I</u>

[FORM OF COMPLIANCE CERTIFICATE]

Exhibit I

# Exhibit 1.85

*New PD LLC Notes Subsidiary Guaranty Agreement*

Bingham Draft
11/30/11

## SUBSIDIARY GUARANTY AGREEMENT

This **SUBSIDIARY GUARANTY AGREEMENT** (this "**Subsidiary Guaranty Agreement**"), dated as of [_____], is made jointly and severally by the Persons listed on the signature pages hereof as Subsidiary Guarantors and each of the other Persons that from time to time becomes an Additional Subsidiary Guarantor pursuant to the terms of Section 11 hereof (each a "**Subsidiary Guarantor**" and collectively the "**Subsidiary Guarantors**"), in favor of each of the holders from time to time of the Notes issued under the Note Agreement referred to below (each a "**Beneficiary**", and collectively, the "**Beneficiaries**").  Capitalized terms used but not defined herein shall have the meanings given to them in the Note Agreement referred to below.

## RECITALS

**A.**     Reference is made to that certain Note Agreement, dated as of [_____] (as amended, restated, supplemented or otherwise modified from time to time, the "**Note Agreement**"), by and among St. Louis Post-Dispatch LLC, a Delaware limited liability company (together with its successors and assigns, the "**Company**"), and the Beneficiaries, pursuant to which, subject to the terms and conditions set forth therein, the Company issued to such Beneficiaries the Notes.

**B.**     Reference is also made to that certain Guaranty Agreement, dated as of [_____] (as amended, restated, supplemented or otherwise modified from time to time, the "**Guaranty Agreement**"), made by Pulitzer Inc., a Delaware corporation (together with its successors and assigns, the "**Parent**") in favor of the Beneficiaries, pursuant to which, subject to the terms and conditions set forth therein, the Parent guaranteed the full, complete and final payment and performance of the "Guaranteed Obligations" (as defined in the Guaranty Agreement).

**C.**     On [_____], 2011, Lee and certain of its Subsidiaries including the Company (collectively, the "**Debtors**") filed voluntary petitions for relief under Chapter 11 of Title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") and continued in the possession of their property and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

**D.**     On [_____], 2012, the Bankruptcy Court entered an order confirming the Joint Prepackaged Plan of Reorganization for the Debtors, dated [_____], 2011 (as in effect on the date of confirmation thereof pursuant to the Confirmation Order of the Bankruptcy Court and as it thereafter may be amended in accordance with Pulitzer Support Agreement, the "**Plan of Reorganization**").

**E.**     In connection with the implementation of the Plan of Reorganization, the Beneficiaries are willing to enter into the Note Agreement and otherwise make, extend and maintain certain financial accommodations to the Company and the Parent as provided in the Note Agreement, the Notes and the Guaranty Agreement and the other Transaction Documents,

but only upon the condition, among others, that the Subsidiary Guarantors shall have executed and delivered this Subsidiary Guaranty Agreement.

<div align="center">GUARANTY</div>

**NOW, THEREFORE**, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each Subsidiary Guarantor hereby agrees as follows:

## 1. GUARANTY.

**1.1    Guaranty.**    Each Subsidiary Guarantor hereby irrevocably, absolutely and unconditionally jointly and severally guarantees unto each Beneficiary (i) the full and prompt payment of the principal of, Yield-Maintenance Amount, if any, interest and all other amounts due with respect to the Notes from time to time outstanding, as and when such amounts shall become due and payable, whether by lapse of time, upon redemption, prepayment or purchase, by extension or by acceleration or declaration or otherwise (including (to the extent legally enforceable) interest due on overdue payments of principal, Yield-Maintenance Amount, if any, or interest at the rate set forth in the Notes or any other amounts due thereunder) in coin or currency of the United States of America which at the time of payment or demand therefor shall be legal tender for the payment of public and private debts, (ii) the full and prompt payment, performance and observance by the Company of all other obligations, covenants, conditions and agreements contained in the Note Agreement or any other instrument or agreement entered into in connection therewith or otherwise relating thereto, (iii) the full and prompt payment, performance and observance by the Parent of the "Guaranteed Obligations" (as defined in the Guaranty Agreement) and all other obligations, covenants, conditions and agreements of the Parent contained in the Guaranty Agreement or any other instrument or agreement entered into in connection therewith or otherwise relating thereto, and (iv) the full and prompt payment, upon demand by any Beneficiary, of all costs and expenses (including reasonable attorneys' fees), if any, as shall have been expended or incurred in the protection or enforcement of any right or privilege under the Note Agreement, the Notes, the Guaranty Agreement or any other instrument or agreement entered into in connection therewith or relating thereto or in the protection or enforcement of any rights, privileges or liabilities under this Subsidiary Guaranty Agreement or in any consultation or action in connection therewith or herewith (all such obligations, covenants, conditions and agreements described in the foregoing clauses (i), (ii), (iii) and (iv) being hereinafter collectively referred to as the "**Guaranteed Obligations**").

Each Subsidiary Guarantor hereby acknowledges and agrees that its liability hereunder is joint and several with any other Person(s) who may guarantee the obligations and indebtedness under and in respect of the Notes, the Note Agreement and the other Transaction Documents.

**1.2    Guaranty of Payment and Performance.**    This is a guaranty of payment and performance and not a guaranty of collection, and each Subsidiary Guarantor hereby waives any right to require that any action on or in respect of the Note Agreement, the Notes, the Guaranty Agreement or any instrument or agreement relating to the Guaranteed Obligations be brought against the Company, the Parent, any other Subsidiary Guarantor or any other Person or that resort be had to any direct or indirect security for the Notes, for the Guaranty Agreement or for

this Subsidiary Guaranty Agreement or any other remedy.  Any Beneficiary may, at its option, proceed hereunder against any Subsidiary Guarantor in the first instance to collect monies when due, the payment of which is guaranteed hereby, without first proceeding against the Company, the Parent, any other Subsidiary Guarantor or any other Person and without first resorting to any direct or indirect security for the Notes, for the Guaranty Agreement or for this Subsidiary Guaranty Agreement or any other remedy.  The liability of each Subsidiary Guarantor hereunder shall in no way be affected or impaired by any acceptance by any Beneficiary of any direct or indirect security for, or other guaranties of, the Guaranteed Obligations or by any failure, delay, neglect or omission by any Beneficiary to realize upon or protect any of the Guaranteed Obligations or any Notes or other instruments evidencing the same or any direct or indirect security therefor or by any approval, consent, waiver, or other action taken or omitted to be taken by any such Beneficiary.  Each Subsidiary Guarantor (i) acknowledges that certain obligations of the Company under the Note Agreement will survive the payment or transfer of any Note and the termination of the Note Agreement, (ii) acknowledges that certain obligations of the Parent under the Guaranty Agreement will survive the payment or transfer of any Note and the termination of the Guaranty Agreement, and (iii) agrees that the obligations of each Subsidiary Guarantor hereunder with respect to such surviving obligations shall also survive the payment or transfer of any Note and the termination of the Note Agreement and the Guaranty Agreement.

### 1.3    General Provisions Relating to the Subsidiary Guaranty Agreement.

(a)    Each Subsidiary Guarantor hereby consents and agrees that any Beneficiary, with or without any further notice to or assent from any Subsidiary Guarantor, may, without in any manner affecting the liability of any Subsidiary Guarantor under this Subsidiary Guaranty Agreement, and upon such terms and conditions as any Beneficiary may deem advisable:

(i)    extend in whole or in part (by renewal or otherwise), modify, change, compromise, release or extend the duration of the time for the payment or performance of any of the Guaranteed Obligations, or waive any default with respect thereto, or waive, modify, amend or change any provision of the Note Agreement, the Notes, the Guaranty Agreement or any other instrument or agreement entered into in connection therewith or otherwise relating thereto;

(ii)    sell, release, surrender, modify, impair, exchange or substitute any and all property, of any nature and from whomsoever received, held by, or for the benefit of, any such Beneficiary as direct or indirect security for the payment or performance of any of the Guaranteed Obligations; or

(iii)    settle, adjust or compromise any claim of the Company, the Parent or any other Subsidiary Guarantor against any other Person secondarily or otherwise liable for any of the Guaranteed Obligations.

Each Subsidiary Guarantor hereby ratifies and confirms any such extension, renewal, change, sale, release, waiver, surrender, exchange, modification, amendment, impairment, substitution, settlement, adjustment or compromise and that the same shall

be binding upon it, and hereby waives any and all defenses, counterclaims or offsets which it might or could have by reason thereof, it being understood that each Subsidiary Guarantor shall at all times be bound by this Subsidiary Guaranty Agreement and remain liable hereunder.

(b)    Each Subsidiary Guarantor hereby waives: (i) notice of acceptance of this Subsidiary Guaranty Agreement by the Beneficiaries or of the creation, renewal or accrual of any liability of the Company, the Parent or any other Subsidiary Guarantor, present or future, or of the reliance of such Beneficiaries upon this Subsidiary Guaranty Agreement (it being understood that all Guaranteed Obligations shall conclusively be presumed to have been created, contracted or incurred in reliance upon the execution of this Subsidiary Guaranty Agreement); (ii) demand of payment by any Beneficiary from the Company, the Parent, any other Subsidiary Guarantor or any other Person indebted in any manner on or for any of the Guaranteed Obligations hereby guaranteed; and (iii) presentment for the payment by any Beneficiary or any other Person of the Notes or any other instrument, protest thereof and notice of its dishonor to any party thereto and to the Subsidiary Guarantors.   The obligations of each Subsidiary Guarantor under this Subsidiary Guaranty Agreement and the rights of each Beneficiary to enforce such obligations by any proceedings, whether by action at law, suit in equity or otherwise, shall not be subject to any reduction, limitation, impairment or termination, whether by reason of any claim of any character whatsoever or otherwise and shall not be subject to any defense, setoff, counterclaim, recoupment or termination whatsoever.

(c)    The obligations of each Subsidiary Guarantor hereunder shall be binding upon each Subsidiary Guarantor and its successors and assigns, and shall remain in full force and effect irrespective of:

(i)    (A) the genuineness, validity, regularity or enforceability of the Note Agreement, the Notes, the Guaranty Agreement, this Subsidiary Guaranty Agreement or any other instrument or agreement entered into in connection therewith or otherwise relating thereto, or any of the terms of any thereof, (B) the continuance of any obligation on the part of the Company, the Parent, any other Subsidiary Guarantor or any other Person on the Notes or under the Note Agreement, the Guaranty Agreement, this Subsidiary Guaranty Agreement or any such other instrument or agreement, (C) the power or authority or the lack of power or authority of (x) the Company to execute and deliver the Note Agreement and the Notes or any such other instrument or agreement, or to perform any of its obligations thereunder , (y) the Parent to execute and deliver the Guaranty Agreement or any such other instrument or agreement, or to perform any of its obligations thereunder, or (z) any other Subsidiary Guarantor to execute and deliver this Subsidiary Guaranty Agreement or any such other instrument or agreement, or to perform any of its obligations thereunder, or (D) the existence or continuance of the Company, the Parent, any other Subsidiary Guarantor  or any other Person as a legal entity;

(ii)    any default, failure or delay, willful or otherwise, in the performance by the Company, the Parent, any other Subsidiary Guarantor or any other Person of any obligations of any kind or character whatsoever of the Company, the Parent, any other Subsidiary Guarantor or any other Person (including, without limitation, the Guaranteed Obligations);

(iii)    any creditors' rights, bankruptcy, receivership or other insolvency proceeding of the Company, the Parent, any other Subsidiary Guarantor or any other Person or in respect of the property of the Company, the Parent, any other Subsidiary Guarantor or any other Person or any merger, consolidation, reorganization, dissolution, liquidation, the sale of all or substantially all of the assets of or winding up of the Company, the Parent, any other Subsidiary Guarantor or any other Person;

(iv)    impossibility or illegality of performance on the part of the Company, the Parent, any other Subsidiary Guarantor or any other Person of its obligations under the Note Agreement, the Notes, the Guaranty Agreement, this Subsidiary Guaranty Agreement or any other instrument or agreement entered into in connection therewith or otherwise relating thereto;

(v)    in respect of the Company, the Parent, any other Subsidiary Guarantor or any other Person, any change of circumstances, whether or not foreseen or foreseeable, whether or not imputable to the Company, the Parent, any other Subsidiary Guarantor or any other Person, or impossibility of performance through fire, explosion, accident, labor disturbance, floods, droughts, embargoes, wars (whether or not declared), civil commotion, acts of God or the public enemy, delays or failure of suppliers or carriers, inability to obtain materials, action of any Federal or state regulatory body or agency, change of law or any other causes affecting performance, or any other *force majeure,* whether or not beyond the control of the Company, the Parent, any other Subsidiary Guarantor or any other Person and whether or not of the kind hereinbefore specified;

(vi)    any attachment, claim, demand, charge, lien, order, process, encumbrance or any other happening or event or reason, similar or dissimilar to the foregoing, or any withholding or diminution at the source, by reason of any taxes, assessments, expenses, indebtedness, obligations or liabilities of any character, foreseen or unforeseen, and whether or not valid, incurred by or against any Person, or any claims, demands, charges or liens of any nature, foreseen or unforeseen, incurred by any Person, or against any sums payable under this Subsidiary Guaranty Agreement, so that such sums would be rendered inadequate or would be unavailable to make the payments herein provided;

(vii)    any order, judgment, decree, ruling or regulation (whether or not valid) of any court of any nation or of any political subdivision thereof or any body, agency, department, official or administrative or regulatory agency of any thereof or any other action, happening, event or reason whatsoever which shall

delay, interfere with, hinder or prevent, or in any way adversely affect, the payment or performance by any party of any of the Guaranteed Obligations;

(viii)    any failure or lack of diligence in collection or protection, failure in presentment or demand for payment, protest, notice of protest, notice of default and of nonpayment, any failure to give notice to any Subsidiary Guarantor of failure of the Company, the Parent, any other Subsidiary Guarantor or any other Person to keep and perform any of the Guaranteed Obligations, or failure to resort for payment to the Company, the Parent, any other Subsidiary Guarantor or to any other Person or to any other guaranty or to any property, security, Liens or other rights or remedies;

(ix)    the acceptance of any additional security or other guaranty, the advance of additional money to the Company, the Parent, any other Subsidiary Guarantor or any other Person, the renewal or extension of the Notes or amendments, modifications, consents or waivers with respect to the Note Agreement, the Notes, the Guaranty Agreement or any other instrument or agreement entered into in connection therewith or otherwise relating thereto, or the sale, release, substitution or exchange of any security for the Notes;

(x)    any defense whatsoever that the Company, the Parent, any other Subsidiary Guarantor or any other Person might have to the payment of the Notes (principal, Yield-Maintenance Amount, if any, or interest or any other amounts due thereunder), other than payment in cash thereof, or to the payment, performance or observance of any of the other Guaranteed Obligations, whether through the satisfaction or purported satisfaction by the Company, the Parent, any other Subsidiary Guarantor or any other Person of its debts due to any cause such as bankruptcy, insolvency, receivership, merger, consolidation, reorganization, dissolution, liquidation, winding up or otherwise;

(xi)    any act or failure to act with regard to the Note Agreement, the Notes, the Guaranty Agreement, this Subsidiary Guaranty Agreement or any other instrument or agreement entered into in connection therewith or otherwise relating thereto, or anything which might vary the risk of the Subsidiary Guarantors; or

(xii)    any other circumstance (other than payment and performance in full of the Guaranteed Obligations (subject to Section 4 below)) which might otherwise constitute a defense available to, or a discharge of, each Subsidiary Guarantor in respect of its obligations under this Subsidiary Guaranty Agreement;

provided, that the specific enumeration of the above-mentioned acts, failures or omissions shall not be deemed to exclude any other acts, failures or omissions, though not specifically mentioned above, it being the purpose and intent of this Subsidiary Guaranty Agreement that the obligations of each Subsidiary Guarantor shall be absolute and unconditional and shall not be discharged, impaired or varied except by the full and prompt payment and performance of all of the Guaranteed Obligations.  Without limiting

the foregoing, it is understood that repeated and successive demands may be made and recoveries may be had hereunder as and when, from time to time, the Company, the Parent or any other Person shall default under the terms of the Note Agreement, the Notes, the Guaranty Agreement or any other instrument or agreement entered into in connection therewith or otherwise relating thereto and that notwithstanding recovery hereunder for or in respect of any given default or defaults by the Company, the Parent or any other Person under the Note Agreement, the Notes, the Guaranty Agreement or any such other instrument or agreement, this Subsidiary Guaranty Agreement shall remain in full force and effect and shall apply to each and every subsequent default.

(d)     All rights of any Beneficiary may be transferred or assigned at any time and shall be considered to be transferred or assigned at any time or from time to time upon the transfer of such Note whether with or without the consent of or notice to the Subsidiary Guarantors under this Subsidiary Guaranty Agreement or to the Company or the Parent.

(e)     Each Subsidiary Guarantor hereby subordinates to the rights of the Beneficiaries under the Note Agreement, the Notes, the Guaranty Agreement or any other instrument or agreement entered into in connection therewith or otherwise relating thereto, and agrees to defer any assertion, until such time as the Guaranteed Obligations have been indefeasibly paid and performed in full (subject to Section 4 below), of any claim or other rights that it may now or hereafter acquire against the Company, the Parent, any other Subsidiary Guarantor or any other Person that arise from the existence, payment, performance or enforcement of each Subsidiary Guarantor's obligations under this Subsidiary Guaranty Agreement, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of any Beneficiary against the Company, the Parent, any other Subsidiary Guarantor or any other Person, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from the Company, the Parent, any other Subsidiary Guarantor or any other Person, directly or indirectly, in cash or other property or by setoff or in any other manner, payment or security on account of such claim, remedy or right.  If any amount shall be paid to any Subsidiary Guarantor in violation of the preceding sentence at any time prior to the payment and performance in full of all the Guaranteed Obligations, such amount shall be held in trust for the benefit of the Beneficiaries and shall forthwith be paid to the Beneficiaries to be credited and applied to the Guaranteed Obligations, whether matured or unmatured.

(f)     Each Subsidiary Guarantor agrees that, to the extent the Company, the Parent, any other Subsidiary Guarantor or any other Person makes any payment on any Note or in respect of any of the other Guaranteed Obligations, which payment or any part thereof is subsequently invalidated, voided, declared to be fraudulent or preferential, set aside, recovered, rescinded or is required to be retained by or repaid to a trustee, receiver, or any other Person under any bankruptcy code, common law, or equitable cause, then and to the extent of such payment, the obligation or the part thereof intended to be satisfied shall be revived and continued in full force and effect with respect to each

Subsidiary Guarantor's obligations hereunder, as if said payment had not been made. The liability of each Subsidiary Guarantor hereunder shall not be reduced or discharged, in whole or in part, by any payment to any Beneficiary from any source that is thereafter paid, returned or refunded in whole or in part by reason of the assertion of a claim of any kind relating thereto, including, but not limited to, any claim for breach of contract, breach of warranty, preference, illegality, invalidity, or fraud asserted by any account debtor or by any other Person.

(g)    The Beneficiaries shall have no obligation to (a) marshal any assets in favor of any Subsidiary Guarantor or in payment of any or all of the Guaranteed Obligations or (b) pursue any other remedy that any Subsidiary Guarantor may or may not be able to pursue itself and that may lighten such Subsidiary Guarantor's burden, any right to which each Subsidiary Guarantor hereby expressly waives.

## 2.  DUTY OF SUBSIDIARY GUARANTORS TO STAY INFORMED.

Each of the Subsidiary Guarantors hereby agrees that it has complete and absolute responsibility for keeping itself informed of the business, operations, properties, assets, condition (financial or otherwise) of the Company, the Parent, any other Subsidiary Guarantors, any and all endorsers and any and all guarantors of the Guaranteed Obligations and of all other circumstances bearing upon the risk of nonpayment of the obligations evidenced by the Notes or the Guaranteed Obligations, and each of the Subsidiary Guarantors further agrees that the Beneficiaries shall have no duty, obligation or responsibility to advise it of any such facts or other information, whether now known or hereafter ascertained, and each Subsidiary Guarantor hereby waives any such duty, obligation or responsibility on the part of the Beneficiaries to disclose such facts or other information to any Subsidiary Guarantor.

## 3.  REPRESENTATIONS AND WARRANTIES.

Each Subsidiary Guarantor hereby represents and warrants to each of the Beneficiaries that, as of the date such Person becomes a party hereto:

(a)    Such Subsidiary Guarantor, if it is a corporation, limited partnership or limited liability company:  (i) is an entity duly organized, validly existing and in good standing under the laws of the state of its formation; (ii) is duly registered or qualified to do business and is in good standing in every jurisdiction where the nature of its business requires it to be so registered or qualified (except where the failure to so register or qualify could not be reasonably likely to have a material adverse effect on such Subsidiary Guarantor's business, property or assets, condition (financial or otherwise), operations or prospects or on such Subsidiary Guarantor's ability to pay or perform the Guaranteed Obligations); (iii) has all requisite organizational power and authority to own its properties and to carry on its business as currently conducted and as proposed to be conducted, and to execute and deliver this Subsidiary Guaranty Agreement and to perform its obligations hereunder; and (iv) is in compliance in all material respects with all applicable laws, rules, regulations and orders;

(b)    Such Subsidiary Guarantor, if it is a general partnership: (i) has all requisite partnership power and authority to conduct its business, to own and lease its property or assets, to execute and deliver this Subsidiary Guaranty Agreement and to perform its obligations hereunder; and (ii) is in compliance in all material respects with all applicable laws, rules, regulations and orders;

(c)    The execution, delivery and performance by such Subsidiary Guarantor of this Subsidiary Guaranty Agreement (i) have been duly authorized by all necessary corporate, limited liability company or partnership action and (ii) do not contravene such Subsidiary Guarantor's charter documents, bylaws, partnership agreement, operating agreement or any similar agreement;

(d)    The execution and delivery of this Subsidiary Guaranty Agreement will not conflict with, or result in a breach of the terms, conditions or provisions of, or constitute a default under, or result in any violation of, or result in the creation of any Lien upon any of the properties or assets of any Subsidiary Guarantor pursuant to the organizational documents of any such Person, any award of any arbitrator or any agreement (including any agreement with equityholders of such Persons), instrument, order, judgment, decree, statute, law, rule or regulation to which such Person is subject;

(e)    Neither the nature of any Subsidiary Guarantor nor any of their respective businesses or properties, nor any relationship between any Subsidiary Guarantors or any Subsidiary or Affiliate and any other Person, nor any circumstance in connection with this Subsidiary Guaranty Agreement, require any material authorization, consent, approval, exemption or other action by, or notice to, or filing with, any court or administrative or governmental body (other than routine filings with respect to this Subsidiary Guaranty Agreement and any consents which have been obtained) in connection with the execution and delivery of this Subsidiary Guaranty Agreement or the fulfillment of or compliance with the terms and provisions hereof or of any other instrument or agreement relating hereto;

(f)    This Subsidiary Guaranty Agreement constitutes a valid and binding obligation of such Subsidiary Guarantor, enforceable against such Subsidiary Guarantor in accordance with its terms, except as the enforceability thereof may be subject to, or limited by, bankruptcy, insolvency, reorganization, arrangement, moratorium or other similar laws relating to or affecting the rights of creditors generally, and general principles of equity, regardless of whether such enforceability is considered in a proceeding at law or in equity;

(g)    There is no action, suit, investigation or proceeding pending or, to the knowledge of such Subsidiary Guarantor, threatened which questions the validity or legality of, or seeks damages in connection with, this Subsidiary Guaranty Agreement, the Note Agreement, the Notes, the Guaranty Agreement or any other instrument or agreement relating hereto or thereto or any action taken or to be taken pursuant to this Subsidiary Guaranty Agreement, the Guaranty Agreement, the Note Agreement or the Notes. There is no action, suit, investigation or proceeding pending or, to the knowledge of such Subsidiary Guarantor, threatened against such Subsidiary Guarantor or any of its

Subsidiaries or any properties or rights of any of the foregoing, by or before any court, arbitrator or administrative or governmental body which, individually or collectively, could reasonably be expected to have a material adverse effect;

(h)    The Guaranteed Obligations are not subject to any offset or defense of any kind against any Beneficiary, the Parent or the Company;

(i)    After giving effect to this Subsidiary Guaranty Agreement, such Subsidiary Guarantor will be "**Solvent**," (taking into account any and all rights of contribution) meaning:  (a) the fair saleable value of such Subsidiary Guarantor's assets will be in excess of the amount that will be required to be paid on or in respect of its existing debts and other liabilities (including contingent liabilities) as they mature; (b) such Subsidiary Guarantor will not have unreasonably small capital to carry on its business as conducted or as proposed to be conducted; (c) such Subsidiary Guarantor does not intend to or believe that it will incur debts beyond its ability to generally pay such debts as they mature (taking into account the timing and amounts of cash to be received by it and the amounts to be payable on or in respect of its obligations); and (d) such Subsidiary Guarantor does not intend to hinder, delay or defraud either present or future creditors.   In addition, such Subsidiary Guarantor will have received fair consideration and reasonably equivalent value in exchange for incurring its Debt under this Subsidiary Guaranty Agreement.

(j)    Such Subsidiary Guarantor has made its appraisal of and investigation into the business, prospects, operations, property or assets, condition (financial or otherwise) and creditworthiness of the Company, the Parent and any other Subsidiary Guarantors and has made its decision to enter into this Subsidiary Guaranty Agreement independently based on such documents and information as it has deemed appropriate and without reliance upon any of the Beneficiaries or any of their partners, directors, trustees, members, officers, agents, designees or employees, and such Subsidiary Guarantor has established adequate means of obtaining from the Company, the Parent and any other Subsidiary Guarantors, on a continuing basis, financial or other information pertaining to the business, prospects, operations, property, assets, condition (financial or otherwise) of the Company, the Parent and any other Subsidiary Guarantors; and

(k)    Neither such Subsidiary Guarantor nor its properties or assets have any immunity from jurisdiction of any court or from any legal process (whether through service of process or notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) under applicable law.

## 4.  TERMINATION; REINSTATEMENT.

This Subsidiary Guaranty Agreement shall remain in full force and effect until all Guaranteed Obligations shall have been satisfied by payment in full in cash, upon the occurrence of which this Subsidiary Guaranty Agreement shall, subject to the immediately succeeding sentence, terminate.  This Subsidiary Guaranty Agreement shall continue to be effective, or be reinstated, as the case may be, if at any time the payment, or any part thereof, of any of the Guaranteed Obligations is rescinded or otherwise must be restored or returned by any

Beneficiary in connection with the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Company, the Parent or any other Subsidiary Guarantor or in connection with the application of applicable fraudulent conveyance or fraudulent transfer law, all as though such payments had not been made.

### 5. PAYMENTS.

Each Subsidiary Guarantor hereby agrees that, upon the occurrence and during the continuance of any Event of Default, upon demand, the Guaranteed Obligations will be paid to each of the Beneficiaries without setoff or counterclaim in U.S. dollars in immediately available funds at the location specified by such Beneficiary pursuant to the Note Agreement.

### 6. SEVERABILITY.

Whenever possible, each provision of this Subsidiary Guaranty Agreement shall be interpreted in such manner as to be effective and valid under all applicable laws and regulations. If, however, any provision of this Subsidiary Guaranty Agreement shall be prohibited by or invalid under any such law or regulation, it shall be deemed modified to conform to the minimum requirements of such law or regulation, or, if for any reason it is not deemed so modified, it shall be ineffective and invalid only to the extent of such prohibition or invalidity without the remainder thereof or any of the remaining provisions of this Subsidiary Guaranty Agreement being prohibited or invalid.

### 7. HEADINGS.

Section headings in this Subsidiary Guaranty Agreement are included herein for convenience of reference only and shall not constitute a part of this Subsidiary Guaranty Agreement for any other purpose or be given any substantive effect.

### 8. APPLICABLE LAW.

**THIS SUBSIDIARY GUARANTY AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK, EXCLUDING CHOICE-OF-LAW PRINCIPLES OF THE LAW OF SUCH STATE THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF A JURISDICTION OTHER THAN SUCH STATE.**

### 9. ENTIRE AGREEMENT.

This Subsidiary Guaranty Agreement constitutes the entire agreement among the parties hereto relating to the subject matter hereof and supersedes any and all prior or contemporaneous commitments, agreements, representations, and understandings, whether written or oral, relating to the subject matter hereof and may not be contradicted or varied by evidence of prior, contemporaneous, or subsequent oral agreements or discussions of the Subsidiary Guarantors, on the one hand, and the Beneficiaries, on the other hand.  There are no oral agreements between the Subsidiary Guarantors, on the one hand, and the Beneficiaries, on the other hand.

## 10. CONSTRUCTION.

Each of the Subsidiary Guarantors and the Beneficiaries acknowledges that it has had the benefit of legal counsel of its own choice and has been afforded an opportunity to review this Subsidiary Guaranty Agreement with such legal counsel.

## 11. ADDITIONAL SUBSIDIARY GUARANTORS.

The Initial Subsidiary Guarantors hereunder shall be (i) Fairgrove, LLC; (ii) Flagstaff Publishing Co.; (iii) Hanford Sentinel, Inc.; (iv) Homechoice, LLC; (v) HSTAR LLC; (vi) Kauai Publishing Co.; (vii) Napa Valley Publishing Co.; (viii) NIPC, Inc.; (ix) NLPC LLC; (x) Northern Lakes Publishing Co.; (xi) NVPC LLC; (xii) Pantagraph Publishing Co.; (xiii) Pulitzer Missouri Newspapers, Inc.; (xiv) Pulitzer Network Systems LLC; (xv) Pulitzer Newspapers, Inc.; (xvi) Pulitzer Technologies Inc.; (xvii) Pulitzer Utah Newspapers, Inc.; (xviii) Santa Maria Times, Inc.; (xix) SHTP LLC; (xx) SOPC LLC; (xxi) Southwestern Oregon Publishing Co.; (xxii) STL Distribution Services LLC; (xxiii) Suburban Journals of Greater St. Louis LLC; (xxiv) Ynez Corporation; and (xxv) Star Publishing Company.  From time to time subsequent to the date hereof, additional Subsidiaries and/or Affiliates of the Company may become parties hereto, as additional Subsidiary Guarantors (each, an "**Additional Subsidiary Guarantor**"), by executing a Joinder Agreement substantially in the form of *Exhibit A* attached hereto (each, a "**Joinder Agreement**").  Upon the delivery of a Joinder Agreement to the Beneficiaries, such Additional Subsidiary Guarantor shall be a Subsidiary Guarantor and shall be as fully a party hereto as if such Additional Subsidiary Guarantor were an original signatory hereof.

## 12. COUNTERPARTS; EFFECTIVENESS.

This Subsidiary Guaranty Agreement and any amendments, waivers, consents, or supplements hereto may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all of which counterparts together shall constitute but one and the same instrument.

This Subsidiary Guaranty Agreement shall become effective as to each Subsidiary Guarantor upon the execution and delivery of a counterpart hereof by such Subsidiary Guarantor (whether or not a counterpart hereof shall have been executed by any other Person) and receipt of written or telephonic notification of such execution and authorization of delivery thereof.

Delivery of an executed counterpart hereof by any Subsidiary Guarantor by facsimile or electronic pdf shall be as effective as delivery of a manually executed counterpart hereof and shall be considered a representation that an original executed counterpart hereof will be delivered.

## 13. WAIVERS AND AMENDMENTS; SUCCESSORS AND ASSIGNS.

No amendment or waiver of any term or provision of this Subsidiary Guaranty Agreement or consent to any departure by any Subsidiary Guarantor therefrom shall in any event be effective unless the same is in writing and signed by the Required Holders; *provided, however*, that no such amendment reducing any payment obligations under this Subsidiary

Guaranty Agreement shall be effective unless signed by each Beneficiary.  This Subsidiary Guaranty Agreement is a joint and several continuing guaranty and shall be binding upon each Subsidiary Guarantor and its successors and assigns; *provided, however,* that no Subsidiary Guarantor shall assign this Subsidiary Guaranty Agreement or any of the rights or obligations of such Subsidiary Guarantor hereunder without the prior written consent of the Required Holders. This Subsidiary Guaranty Agreement shall inure to the benefit of each of the Beneficiaries and its successors, assigns and transferees.

### 14. ADDRESS FOR NOTICES.

All notices and communications provided for hereunder shall be in writing and sent by first class mail or nationwide overnight delivery service (with charges prepaid) and (i) if to any Purchaser or its nominee, addressed as specified for such communications in the Purchaser Schedule attached to the Note Agreement, or at such other address as such Purchaser or its nominee shall have specified to the Company, on behalf of each of the Subsidiary Guarantors, in writing, (ii) if to any other Beneficiary, addressed to such Person at such address as it shall have specified in writing to the Company or, if any such Person shall not have so specified an address, then addressed to such Person in care of the last holder of Notes held by such Person which shall have so specified an address to the Company, and (iii) if to any Subsidiary Guarantor, addressed to such Subsidiary Guarantor care of the Parent at the Parent's address set forth in the Guaranty Agreement, or at such other address as such Subsidiary Guarantor shall have specified to each of the Beneficiaries in writing.

### 15. FAILURE OR INDULGENCE NOT WAIVER; REMEDIES CUMULATIVE.

No failure or delay on the part of any Beneficiary in the exercise of any power, right or privilege hereunder shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.  All rights and remedies existing under this Subsidiary Guaranty Agreement are cumulative to, and not exclusive of, any rights or remedies otherwise available.

### 16. PERSONAL JURISDICTION.

Each Subsidiary Guarantor irrevocably agrees that any legal action or proceeding with respect to this Subsidiary Guaranty Agreement, the Guaranty Agreement, the Note Agreement, the Notes or any of the agreements, documents or instruments delivered in connection herewith or therewith shall be brought in the courts of the State of New York or the United States of America for the Southern District of New York as the Required Holders may elect, and, by execution and delivery hereof, each Subsidiary Guarantor accepts and consents to, for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts and agrees that such jurisdiction shall be exclusive, unless waived by the Required Holders in writing, with respect to any action or proceeding brought by such Subsidiary Guarantor against any Beneficiary.  Each Subsidiary Guarantor hereby waives, to the full extent permitted by law, any right to stay or to dismiss any action or proceeding brought before said courts on the basis of *forum non conveniens.*

### 17. WAIVER OF JURY TRIAL.

THE PARTIES HERETO AGREE TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS SUBSIDIARY GUARANTY AGREEMENT, THE GUARANTY AGREEMENT, THE NOTE AGREEMENT, THE NOTES, OR ANY OTHER AGREEMENT OR INSTRUMENT RELATED HERETO OR THERETO, OR ANY DEALINGS BETWEEN OR AMONG THEM RELATING TO THE SUBJECT MATTER OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY AND THE LENDER/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.  EACH OF THE PARTIES HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO THIS BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THE WAIVER IN ENTERING INTO THIS SUBSIDIARY GUARANTY AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THE WAIVER IN THEIR RELATED FUTURE DEALINGS.  EACH OF THE PARTIES HERETO FURTHER WARRANTS AND REPRESENTS THAT EACH HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  IN THE EVENT OF LITIGATION, THIS SUBSIDIARY GUARANTY AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

**IN  WITNESS  WHEREOF,** each  of  the  undersigned  has  caused  this  Subsidiary Guaranty Agreement to be duly executed as of the date first above written.

**SUBSIDIARY GUARANTORS:**

**FAIRGROVE LLC**
**FLAGSTAFF PUBLISHING CO.**
**HANFORD SENTINEL INC.**
**HOMECHOICE, LLC**
**HSTAR LLC**
**KAUAI PUBLISHING CO.**
**NAPA VALLEY PUBLISHING CO**
**NIPC, INC.**
**NLPC LLC**
**NORTHERN LAKES PUBLISHING CO.**
**NVPC LLC**
**PANTAGRAPH PUBLISHING CO.**
**PULITZER MISSOURI NEWSPAPERS, INC.**
**PULITZER NETWORK SYSTEMS LLC**
**PULITZER NEWSPAPERS, INC.**
**PULITZER TECHNOLOGIES, INC.**
**PULITZER UTAH NEWSPAPERS, INC.**
**SANTA MARIA TIMES, INC.**
**SHTP LLC**
**SOPC LLC**
**SOUTHWESTERN OREGON PUBLISHING CO.**
**STAR PUBLISHING COMPANY**
**STL DISTRIBUTION SERVICES LLC**
**SUBURBAN JOURNALS OF GREATER ST. LOUIS LLC**
**YNEZ CORPORATION**

By:_____
Name: C.D. Waterman III
Title:   Secretary

EXHIBIT A

**FORM OF JOINDER AGREEMENT**

**JOINDER AGREEMENT
TO
SUBSIDIARY GUARANTY AGREEMENT**

**ADDITIONAL SUBSIDIARY GUARANTOR:**  Reference is made to that certain Subsidiary Guaranty Agreement, dated as of [_____] (as the same may from time to time be amended, restated, supplemented or otherwise modified, the "**Subsidiary Guaranty Agreement**"), entered into by certain Affiliates and Subsidiaries of St. Louis Post-Dispatch LLC (the "**Company**") (the "**Subsidiary Guarantors**"), in favor of the Beneficiaries identified therein.  Capitalized terms not defined in this Joinder Agreement shall have the meanings given to them in the Subsidiary Guaranty Agreement.  The undersigned acknowledges and agrees it is (or, concurrently with the execution and delivery of this Joinder Agreement, will become) a Subsidiary Guarantor and that, by its execution and delivery of this Joinder Agreement to the Beneficiaries, it hereby joins and for all purposes becomes a Subsidiary Guarantor under, and a party to, the Subsidiary Guaranty Agreement, and does hereby unconditionally, absolutely and irrevocably guarantee to each of the Beneficiaries the complete payment when due (whether at stated maturity, by acceleration or otherwise) and due performance of all Guaranteed Obligations, and does hereby fully assume and undertake to perform all rights, benefits, burdens, obligations and liabilities of a Subsidiary Guarantor under the Subsidiary Guaranty Agreement.  Capitalized terms used but not defined in this Joinder Agreement shall have the meanings given to them in the Subsidiary Guaranty Agreement.

_____, a  _____

By:  _____

Printed Name:  _____

Title:  _____

# **Exhibit 1.86**

*New Pulitzer Guaranty Agreement*

Bingham Draft
12/1/11

**PULITZER INC.**

_____

**GUARANTY AGREEMENT**
_____

**Dated as of [_____]**

## TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| **1.** | **DEFINED TERMS; ACCOUNTING MATTERS** | **2** |
| | 1.1. Defined Terms | 2 |
| | 1.2. Accounting and Legal Principles, Terms and Determinations | 9 |
| **2.** | **GUARANTY** | **9** |
| | 2.1. Guaranty | 9 |
| | 2.2. Guaranty of Payment and Performance | 10 |
| | 2.3. General Provisions Relating to the Guaranty | 10 |
| **3.** | **REPRESENTATIONS AND WARRANTIES** | **15** |
| | 3.1. Organization and Qualification; Due Authorization | 15 |
| | 3.2. Material Adverse Change | 15 |
| | 3.3. Litigation; Observance of Agreements, Statutes and Orders | 15 |
| | 3.4. Outstanding Debt | 16 |
| | 3.5. Title to Properties | 16 |
| | 3.6. Taxes | 16 |
| | 3.7. Conflicting Agreements and Other Matters | 17 |
| | 3.8. ERISA | 17 |
| | 3.9. Governmental Authorizations, Etc. | 18 |
| | 3.10. Disclosure | 18 |
| | 3.11. Solvency | 19 |
| | 3.12. Foreign Assets Control Regulations, Etc | 19 |
| | 3.13. Organization and Ownership of Shares of Subsidiaries; Affiliates | 20 |
| | 3.14. Compliance with Laws, Other Instruments, Etc | 20 |
| | 3.15. Licenses, Permits, Etc | 21 |
| | 3.16. [Reserved] | 21 |
| | 3.17. Environmental Matters | 21 |
| **4.** | **AFFIRMATIVE COVENANTS** | **22** |
| | 4.1. Financial Statements | 22 |
| | 4.2. Inspection of Properties | 25 |
| | 4.3. Covenant to Secure Notes Equally | 25 |
| | 4.4. Business | 25 |
| | 4.5. Compliance with Laws and Regulations | 25 |
| | 4.6. Patents, Trade Marks and Trade Names | 25 |
| | 4.7. Payment of Taxes and Other Claims | 26 |
| | 4.8. ERISA Compliance | 26 |
| | 4.9. Execution and Delivery of Subsidiary Guaranty Agreement and Other Collateral Documents | 26 |
| | 4.10. Insurance | 27 |
| | 4.11. Maintenance of Properties | 27 |
| | 4.12. Corporate Existence, Etc. | 27 |
| | 4.13. Books and Records | 28 |

i

# TABLE OF CONTENTS
(continued)

|  | 4.14. | Lee/Pulitzer Contribution Transaction | 28 |
|---|---|---|---|
| **5.** | | **NEGATIVE COVENANTS** | **28** |
|  | 5.1. | Financial Covenants | 28 |
|  | 5.2. | Liens | 29 |
|  | 5.3. | Priority Debt | 30 |
|  | 5.4. | Loans, Advances and Investments | 31 |
|  | 5.5. | Sale or Disposition of Assets | 33 |
|  | 5.6. | Sale and Lease-Back | 34 |
|  | 5.7. | Merger | 34 |
|  | 5.8. | Transactions With Affiliates; Lee Company Transactions | 34 |
|  | 5.9. | Sale of Stock and Debt of Subsidiaries | 35 |
|  | 5.10. | Issuance of Stock by Subsidiaries | 36 |
|  | 5.11. | Limitation on Certain Restrictive Agreements | 36 |
|  | 5.12. | Capital Expenditures | 36 |
|  | 5.13. | Restricted Payments | 36 |
|  | 5.14. | Terrorism Sanctions Regulations | 37 |
|  | 5.15. | Debt | 37 |
| **6.** | | **EVENTS OF DEFAULT; REMEDIES** | **38** |
|  | 6.1. | Events of Default | 38 |
|  | 6.2. | Remedies | 40 |
| **7.** | | **MISCELLANEOUS** | **41** |
|  | 7.1. | Survival of Representations and Warranties; Entire Agreement | 41 |
|  | 7.2. | Consent to Amendments | 41 |
|  | 7.3. | Binding Effect, etc | 41 |
|  | 7.4. | Notices | 41 |
|  | 7.5. | Severability | 42 |
|  | 7.6. | Successors and Assigns | 42 |
|  | 7.7. | Independence of Covenants | 42 |
|  | 7.8. | Satisfaction Requirement | 42 |
|  | 7.9. | Counterparts | 42 |
|  | 7.10. | Governing Law | 42 |
|  | 7.11. | Consent to Jurisdiction; Waiver of Immunities | 42 |
|  | 7.12. | Waiver of Jury Trial | 43 |

SCHEDULE 3.3      -       LITIGATION

SCHEDULE 3.4      –       OUTSTANDING DEBT

SCHEDULE 3.7      –       AGREEMENTS RESTRICTING INCURRENCE OF DEBT

SCHEDULE 3.8      –       ERISA

SCHEDULE 3.13     –       SUBSIDIARIES OF THE GUARANTOR AND OWNERSHIP
                          OF SUBSIDIARY STOCK

SCHEDULE 5.4      –       EXISTING INVESTMENTS

EXHIBIT A         –       [FORM OF COMPLIANCE CERTIFICATE][1]

---

[1] To be updated

## GUARANTY AGREEMENT

THIS GUARANTY AGREEMENT (as amended, restated, supplemented or otherwise modified from time to time, this "**Guaranty**") is made as of [_____] by PULITZER INC., a Delaware corporation (the "**Guarantor**"), in favor of the holders from time to time of the Notes issued under the below-described Note Agreement.

### Recitals

A.       St. Louis Post-Dispatch LLC, a Delaware limited liability company (the "**Company**"), entered into that certain Note Agreement dated as of May 1, 2000, as amended by (i) that certain Amendment No. 1 to Note Agreement, dated as of November 23, 2004, (ii) that certain Amendment No. 2 to Note Agreement, dated as of February 1, 2006, (iii) that certain Amendment No. 3 to Note Agreement, dated as of November 19, 2008, (iv) that certain Amendment No. 4 and First Amendment to Limited Waiver to Note Agreement and Guaranty Agreement, dated as of January 16, 2009, (v) that certain Limited Waiver and Amendment No. 5 to Note Agreement, dated as of February 18, 2009, (vi) that certain Amendment No. 6 to Note Agreement, dated as of April 6, 2011, and (vii) that certain Amendment No. 7 to Note Agreement, dated as of November 7, 2011 (as so amended and in effect immediately prior to the Petition Date (as defined below), the "**Prepetition Note Agreement**"), with the several Purchasers listed in the Purchaser Schedule attached thereto, pursuant to which, among other things, the Company issued and sold $306,000,000 in original principal amount of its Adjustable Rate Senior Notes due April 28, 2009 (as in effect immediately prior to the Petition Date (as defined below), the "**Prepetition Notes**").

B.       In connection with the Prepetition Note Agreement, the Guarantor executed and delivered to the holders of Prepetition Notes a Guaranty Agreement, dated as of May 1, 2000, as amended by (i) that certain Amendment No. 1 to Guaranty Agreement, dated as of August 7, 2000, (ii) that certain Amendment No. 2 to Guaranty Agreement, dated as of November 23, 2004, (iii) that certain Amendment No. 3 to Guaranty Agreement, dated as of June 3, 2005, (iv) that certain Amendment No. 4 to Guaranty Agreement, dated as of February 1, 2006, and (v) that certain Limited Waiver and Amendment No. 5 to Guaranty Agreement, dated as of February 18, 2009 (as so amended and in effect immediately prior to the Petition Date (as defined below), the "**Prepetition Guaranty Agreement**"), pursuant to which the Guarantor, among other things, agreed to guaranty the payment and performance by the Company of all of its obligations and liabilities under and in respect of the Prepetition Note Agreement and the Prepetition Notes.

C.       On [_____], 2011 (the "**Petition Date**"), Lee and certain of its Subsidiaries including the Company and the Guarantor (collectively, the "**Debtors**") filed voluntary petitions for relief under Chapter 11 of Title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") and continued in the possession of their property and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code (the "**Bankruptcy Proceeding**").

D.       On [_____], 2012, the Bankruptcy Court entered an order confirming the Joint Prepackaged Plan of Reorganization for the Debtors, dated [_____], 2011 (as in effect on the

date of confirmation thereof pursuant to the Confirmation Order of the Bankruptcy Court and as it thereafter may be amended in accordance with Pulitzer Support Agreement, the "**Plan of Reorganization**").

E.     In connection with the implementation of the Plan of Reorganization, the Purchasers have agreed to become, or shall be deemed to become, parties to a new Note Agreement, dated as of the date hereof (as may be amended, restated, supplemented or otherwise modified from time to time, the "**Note Agreement**"), pursuant to which, among other things, the Company will issue new adjustable rate senior guaranteed promissory notes of the Company in the aggregate principal amount (after giving effect to the Lee Prepayment) of $126,355,000, each substantially in the form of Exhibit A to the Note Agreement (together with any notes issued in substitution or exchange therefor, each as amended, restated or otherwise modified from time to time, each, individually, a "**Note**" and, collectively, the "**Notes**").

F.     To induce each Purchaser to enter into the Note Agreement and acquire the Notes, the Guarantor is required, pursuant to the Note Agreement, to (i) execute a guaranty agreement in substantially the form hereof, and (ii) guaranty all obligations of the Company under and in respect of the Notes, the Note Agreement and the other Transaction Documents pursuant to the terms and provisions hereof.

G.     The Board of Directors of the Guarantor has determined that the Guarantor's execution, delivery and performance of this Guaranty may reasonably be expected to benefit the Guarantor, directly or indirectly, and to be in the best interests of the Guarantor.

NOW THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Guarantor hereby covenants and agrees with, and represents and warrants to each holder of Notes, as follows:

## 1.     DEFINED TERMS; ACCOUNTING MATTERS

**1.1.     Defined Terms.**  All capitalized terms used herein, unless specifically otherwise defined, shall have the meanings ascribed to them in the Note Agreement.  In addition, the following terms shall have the meanings specified with respect thereto below (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"**Affiliate**" shall mean any Person directly or indirectly controlling, controlled by, or under direct or indirect common control with, another Person.  A reference to an Affiliate shall mean an Affiliate of the Guarantor unless the context otherwise requires.  A Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise.

"**Anti-Money Laundering**" shall have the meaning specified in clause (iii) of Section 3.12 of this Guaranty.

"**Asset Sale**" shall mean any sale, transfer or other disposition of any assets of the Guarantor or any of its Subsidiaries other than (i) the sale of inventory sold in the ordinary

2

course of business, (ii) grants of licenses, sublicenses, leases or subleases to other Persons not materially interfering with the conduct of the business of the Guarantor or its Subsidiaries and so long as any such grant does not prevent foreclosure on the affected asset if it is subject to any of the Liens created by the Collateral Documents and may be revoked upon such foreclosure, (iii) any such transaction between the Guarantor and any one of its Subsidiaries or between Subsidiaries of the Guarantor, (iv) any transaction permitted by paragraph 7C(6) of the Note Agreement to the extent such transaction involves only the Guarantor and its Subsidiaries, (v) the sale or other disposition of cash and Cash Equivalents in the ordinary course of business, in each case for cash at Fair Market Value, and (vi) the Contribution.

"**Asset Sale Proceeds**" shall mean, with respect to any Asset Sale, the amount of cash proceeds received (directly or indirectly, including, subject to the proviso hereto, insurance and condemnation proceeds) by or on behalf of the Guarantor or any Subsidiary in connection therewith (including, without limitation, cash payments in respect of non-cash consideration to the extent permitted by paragraph 7C(3)(iv) of the Note Agreement and Section 5.5, as and when such cash payments are received), after deducting therefrom only (i) the amount of any Debt secured by any Lien permitted by paragraph 7C(1) of the Note Agreement (other than (A) the Notes and (B) Debt assumed by the purchaser of such asset) which is required to be, and is, repaid in connection with such Asset Sale and (ii) all direct costs and reasonable fees, commissions, expenses and taxes related thereto to the extent paid or payable to a Person that is not an Affiliate or a Subsidiary, provided that Asset Sale Proceeds shall not include, so long as no Event of Default has occurred and is continuing, (1) the proceeds of the any Asset Sale effected pursuant to paragraph 7C(4)(i) of the Note Agreement to the extent such proceeds are applied to replace the assets subject to such Asset Sale with assets of like kind and purposes or (2) insurance and condemnation proceeds from any single occurrence of less than $10,000,000 to the extent such proceeds are applied to repair or replace the assets subject to the casualty or condemnation giving rise to the payment of such proceeds.

"**Bankruptcy Court**" shall have the meaning specified in Recital C of this Guaranty.

"**Bankruptcy Law**" shall have the meaning specified in clause (vi) of Section 6.1 of this Guaranty.

"**Blocked Person**" shall have the meaning specified in clause (i) of Section 3.12 of this Guaranty.

"**Bankruptcy Proceeding**" shall have the meaning specified in Recital C of this Guaranty.

"**Capital Expenditures**" shall mean, with respect to any Person, all expenditures by such Person which should be capitalized in accordance with GAAP and, without duplication, the amount of all Capitalized Lease Obligations incurred by such Person.

"**Capitalized Lease Obligation**" shall mean, with respect to any Person, all rental obligations of such Person which, under GAAP, are or will be required to be capitalized on the books of such Person, taken at the amount thereof accounted for as indebtedness in accordance with such principles.

3

"**Claims**" shall have the meaning specified in Section 4.7 of this Guaranty.

"**Company**" shall have the meaning specified in Recital A of this Guaranty.

"**Consolidated Debt**" shall mean, with respect to the Guarantor and its Subsidiaries on any date of determination, (i) total Debt of the Guarantor and its Subsidiaries, determined on a consolidated basis in accordance with GAAP, *minus* (ii) the aggregate amount of all Debt permitted by Section 5.3(iv) hereof.

"**Consolidated EBITDA**" shall mean, for any period, Consolidated Net Income for such period, *plus*, all amounts deducted or excluded in the computation thereof on account of (without duplication) (a) Consolidated Interest Expense, (b) depreciation and amortization expense, (c) income and profits taxes, (d) Intercompany Charges to Pulitzer permitted under Section 5.8(i) but not paid or settled in cash and properly allocable to such period in accordance with GAAP, (e) commencing with the fiscal quarter ending on or about June [26], 2011, (i) the Allocable Share of the Lee/Pulitzer Restructuring Costs properly allocable to such period in accordance with GAAP, and (ii) all fees and expenses of legal counsel and financial advisors on behalf of the Purchasers paid by the Guarantor and its Subsidiaries during such period in connection with the transactions contemplated by the Transaction Documents, the Plan of Reorganization and the Bankruptcy Proceeding, (f) any curtailment charges relating to the reduction or elimination of benefits under any Plan maintained by the Guarantor or its Subsidiaries, and (g) the fees paid pursuant to paragraph 4Q of the Note Agreement to the extent not capitalized or otherwise deferred and amortized *minus*, to the extent included in Consolidated Net Income for such period (without duplication), (x) cash interest income for such period and (y) for the avoidance of doubt, any curtailment gains relating to any reduction or elimination of benefits under any Plan.

"**Consolidated Interest Expense**" shall mean, for any period, for the Guarantor and its Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, the sum of all amounts which would be deducted in computing Consolidated Net Income on account of interest on Debt (including (whether or not so deducted) (i) imputed interest in respect of Capitalized Lease Obligations, (ii) the "deemed interest expense" (i.e., the interest expense which would have been applicable if the respective obligations were structured as on-balance sheet financing arrangements) with respect to all Debt of the Guarantor and its Subsidiaries of the type described in clause (x) of the definition of "Debt" in the Note Agreement (to the extent same does not arise from a financing arrangement constituting an operating lease), and (iii) all commissions, discounts and other regularly accruing commitment, letter of credit and other banking fees and charges, but excluding (x) amortization of debt discount and expense and (y) other non-cash interest expense.

"**Consolidated Net Income**" shall mean, for any period, the net income (or loss) of the Guarantor and its Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP, excluding:

(a)    any gains arising from (i) the sale or other disposition of any assets (other than current assets) to the extent that the aggregate amount of the gains during such period exceeds the aggregate amount of the losses during such period from the sale, abandonment or other disposition of assets (other than current assets), (ii) any write-up of

assets or (iii) the acquisition of outstanding securities of the Guarantor or any of its Subsidiaries;

(b)　　any losses arising from the sale or other disposition of any assets (other than current assets) to the extent the aggregate amount of losses during such period exceeds the aggregate amount of gains during such period from such sale;

(c)　　any amount representing any interest in the undistributed earnings of (i) any other Person that is not a Subsidiary of the Guarantor, (ii) TNI Partners and (iii) any other Subsidiary of the Guarantor that is accounted for by the Guarantor by the equity method of accounting;

(d)　　any earnings, prior to the date of acquisition, of any Person acquired in any manner, and any earnings of any Subsidiary of the Guarantor acquired prior to its becoming a Subsidiary of the Guarantor;

(e)　　any earnings of a successor to or transferee of the assets of the Guarantor prior to its becoming such successor or transferee;

(f)　　any deferred credit (or amortization of a deferred credit) arising from the acquisition of any Person;

(g)　　any extraordinary gains or extraordinary losses not covered by clause (a) or (b) above;

(h)　　any non-cash charges related to goodwill and asset write-offs and write-downs;

(i)　　any other non-cash gains or losses; and

(j)　　amortization of debt discounts and expenses for such period.

"**Contribution**" shall have the meaning specified in Section 4.14 of this Guaranty.

"**Controlled Entity**" means any of the Subsidiaries of the Guarantor and any of their or the Guarantor's respective Controlled Affiliates.  As used in this definition, "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Debtors**" shall have the meaning specified in Recital C of this Guaranty.

"**Default**" shall mean any of the events specified in Section 6.1, whether or not any requirement for such event to become an Event of Default has been satisfied.

"**Distribution**" shall mean, in respect of any corporation, association or other business entity:

5

(a)      dividends or other distributions or payments on capital stock or other equity interest of such corporation, association or other business entity (except distributions in such stock or other equity interest); and

(b)      the redemption or acquisition of such stock or other equity interests or of warrants, rights or other options to purchase such stock or other equity interests (except when solely in exchange for such stock or other equity interests) unless made, contemporaneously, from the net proceeds of a sale of such stock or other equity interests.

"**ERISA Affiliate**" shall mean any Person which is a member of the same controlled group of Persons as the Guarantor within the meaning of section 414(b) of the Code, or any trade or business which is under common control with the Guarantor within the meaning of section 414(c) of the Code.

"**Event of Default**" shall mean any of the events specified in Section 6.1, provided that there has been satisfied any requirement in connection with such event for the giving of notice, or the lapse of time, or the happening of any further condition, event or act.

"**Excluded TNI Assets**" shall mean all Equity Interests in TNI Partners, all real and personal property which is leased to or used in the operations or business of TNI Partners, and all proceeds of any of the foregoing.

"**Fair Market Value**" shall mean, at any time and with respect to any property, the sale value of such property that would be realized in an arm's-length sale at such time between an informed and willing buyer and an informed and willing seller (neither being under a compulsion to buy or sell).

"**Guaranteed Obligations**" shall have the meaning specified in Section 2.1 of this Guaranty.

"**Guarantor**" shall have the meaning specified in the introductory paragraph hereof.

"**Guaranty**" shall have the meaning specified in the introductory paragraph hereof.

"**Lee**" shall mean Lee Enterprises, Incorporated, a Delaware corporation.

"**Lee Company**" shall mean any Person (other than the Guarantor or any of its Subsidiaries) a majority of the outstanding equity interests of which are owned directly or indirectly by Lee.

"**Lee Payable**" shall mean, at any time, the aggregate amount owing to the Guarantor by Lee Publications.

"**Lee Procurement**" shall mean Lee Procurement Solutions Co., an Iowa corporation.

"**Lee Publications**" shall mean Lee Publications, Inc., a Delaware corporation.

"**LIBOR**" means the rate per annum (rounded upwards, if necessary, to the next higher one hundred-thousandth of a percentage point) for deposits in US Dollars for a 90-day period which appears on the Telerate page 3750 (or if such page is not available, the Reuters Screen LIBO page) as of 11:00 a.m. (London, England time) on the date two (2) Business Days before the commencement of the applicable interest period. "Reuters Screen LIBO Page" means the display designated as the "LIBO" page on the Reuters Monitory Money Rates Service (or such other page as may replace the LIBO page on the service or such other service as may be nominated by the British Bankers' Association as the information vendor for the purpose of displaying British Banker's Association Interest Settlement Rates for Dollar deposits).

"**Note Agreement**" shall have the meaning specified in Recital E of this Guaranty.

"**Notes**" shall have the meaning specified in Recital E of this Guaranty.

"**OFAC**" shall have the meaning specified in clause (i) of Section 3.12 of this Guaranty.

"**OFAC Listed Person**" shall have the meaning specified in clause (i) of Section 3.12 of this Guaranty.

"**Petition Date**" shall have the meaning specified in Recital C of this Guaranty.

"**Plan of Reorganization**" shall have the meaning specified in Recital D of this Guaranty.

"**Prepetition Guaranty Agreement**" shall have the meaning specified in Recital B of this Guaranty.

"**Prepetition Note Agreement**" shall have the meaning specified in Recital A of this Guaranty.

"**Prepetition Notes**" shall have the meaning specified in Recital A of this Guaranty.

"**Priority Debt**" shall mean, with respect to the Guarantor and its Subsidiaries on any date of determination, the aggregate amount of all Debt of the Guarantor secured by a Lien plus all secured and unsecured Debt of all Subsidiaries (excluding Debt represented by the Notes and the Subsidiary Guaranty Agreement).

"**Purchasers**" shall have the meaning specified in the Note Agreement.

"**Replacement Covenant Notice Date**" shall mean the date (which shall in no event be more than 45 days after the end of any fiscal quarter of the Guarantor) on which the Guarantor shall have delivered written notice to all holders of the Notes (i) certifying that the ratio of (a) Consolidated Debt as of the last day of the most recently ended fiscal quarter of the Guarantor to (b) Consolidated EBITDA for the four consecutive fiscal quarters ended as of such last day is less than or equal to 2.25 to 1.00, and attaching evidence thereof satisfactory to such holders (including computations in reasonable detail), and (ii) electing to replace the covenant set forth in Section 5.1(i) hereof with the covenant set forth in Section 5.1(ii) hereof. Upon delivery of such notice, the covenant set forth in Section 5.1(ii) hereof shall become effective as of the date

7

of the delivery of such notice and, for the avoidance of doubt, shall be deemed to replace irrevocably the covenant set forth in Section 5.1(i) in its entirety and in all respects and the Guarantor shall not be required to comply with the covenant set forth in Section 5.1(i) with respect to any fiscal quarter ending thereafter.

"**Restricted Intercompany Charges**" shall mean charges by any Lee Company to the Guarantor or any of its Subsidiaries for (i) the provision by any Lee Company of goods and services for the benefit of the Guarantor or any of its Subsidiaries to the extent arising from cost-savings measures adopted in accordance with Section 5.8(i)(e)(2) hereof, including, but not limited to transactions related to the integrated operations of Bloomington, IL and Decatur, IL and regional design centers, (ii) procurement services furnished by Lee Procurement  in connection with obtaining newsprint from third parties for the benefit of the Guarantor or any of its Subsidiaries, (iii) the corporate overhead of the Lee Companies (including, without limitation, management, administration, financial services, legal, human resources, building services, editorial support, and Lee Lodge facilities), (iv) fees for (a) Lee corporate sales and marketing, (b) Lee information technology services, (c) digital service/online fees, and (d) audit and consulting fees, (v) compensation of publishers, (vi) fees for Lee regional call centers and regional finance center services and (vii) compensation of outside directors, in the case of the foregoing subclauses (iv) (a) to (d), (v), (vi) and (vii) inclusive, only to the extent actually paid by any Lee Company.  The nature, allocation and payment method of the charges referred to in the foregoing clauses (ii) to (v), inclusive, shall be consistent with practices used in the period from the fiscal quarter of the Guarantor ending in March, 2009 through the fiscal quarter of the Guarantor ending in September, 2011; provided, that, for the avoidance of doubt, the charges referred to in the foregoing clause (iii) shall be paid by a reduction in the Lee Payable and not in cash.

"**Restricted Payment**" shall mean

(a)     any Distribution in respect of the Guarantor or any Subsidiary of the Guarantor (other than (i) on account of capital stock or other equity interests of a Subsidiary of the Guarantor owned legally and beneficially by the Guarantor or another Subsidiary of the Guarantor or (ii) a Distribution payable in stock or other equity interests of the Guarantor), including, without limitation, any Distribution resulting in the acquisition by the Guarantor of securities which would constitute treasury stock, and

(b)     any payment, repayment, redemption, retirement, repurchase or other acquisition, direct or indirect, by the Guarantor or any Subsidiary of, on account of, or in respect of, the principal of any Subordinated Debt (or any installment thereof) prior to the regularly scheduled maturity date thereof (as in effect on the date such Subordinated Debt was originally incurred).

For purposes of this Agreement, the amount of any Restricted Payment made in property shall be the greater of (x) the Fair Market Value of such property (as determined in good faith by the board of directors (or equivalent governing body) of the Person making such Restricted Payment) and (y) the net book value thereof on the books of such Person, in each case determined as of the date on which such Restricted Payment is made.

"**Subordinated Debt**" shall mean any Debt that is in any manner subordinated in right of payment or security in any respect to Debt evidenced by the Notes.

"**Subsidiary**" shall mean, as to the Guarantor, the Company and any other corporation, limited liability company, association or other business entity organized under the laws of any state of the United States of America, Canada or any province of Canada which conducts the major portion of its business in and makes the major portion of its sales to Persons located in the United States of America or Canada, and all of the stock of every class of which (except directors' qualifying shares) or other equity interests in which shall, at the time as of which any determination is being made, be owned by the Guarantor either directly or through Subsidiaries.

"**Unrestricted Intercompany Transactions**" shall mean transactions between any Lee Company and the Guarantor or any of its Subsidiaries for (i) passing through to the Guarantor or any of its Subsidiaries revenue received by any Lee Company for services rendered by the Guarantor or any of its Subsidiaries for arm's length transactions with third parties; (ii) payment or reimbursement of costs incurred by Pulitzer and its Subsidiaries for and on behalf of any Lee Company; (iii) passing through to the Guarantor or any of its Subsidiaries of costs incurred by any Lee Company for arm's length transactions with third parties to the extent the portion of such transactions passing through to the Guarantor or any of its Subsidiaries are for the sole benefit of the Guarantor or any of its Subsidiaries and such costs are specifically identified as such on invoices from third parties, or in the absence of such invoices, are properly allocable to the Guarantor or any of its Subsidiaries on a basis consistent with past practices; (iv) reimbursing any Lee Company for payments made by Lee for payroll or other employee benefit costs incurred directly by (or for the account of) the Guarantor or any of its Subsidiaries, (v) income tax expense or income tax benefits in accordance with the Tax Sharing Agreement, (vi) pension payments from Lee to the Guarantor, and (vii) interest income on the Lee Payable.

    **1.2.**    **Accounting and Legal Principles, Terms and Determinations.**  All accounting terms used herein which are not expressly defined in this Guaranty have the meanings respectively given to them in accordance with GAAP.  Except as otherwise specifically provided herein, (i) all computations made pursuant to this Guaranty shall be made in accordance with GAAP, and (ii) all financial statements shall be prepared in accordance with GAAP; provided that, except as otherwise specifically provided herein, all computations and definitions used in determining compliance with financial covenants shall utilize GAAP and policies in conformity with those used to prepare the audited financial statements of the Guarantor for the Guarantor's fiscal year ended September 25, 2011.  For purposes of determining compliance with the financial covenants contained in this Guaranty, any election by the Guarantor to measure any financial liability using fair value (as permitted by Accounting Standard Codification Topic No. 825-10-25 – *Fair Value Option* or any similar accounting standard) shall be disregarded and such determination shall be made as if such election had not been made.

## 2.    GUARANTY

    **2.1.**    **Guaranty**.  The Guarantor hereby irrevocably, absolutely and unconditionally guarantees unto each holder of Notes (i) the full and prompt payment of the principal of, Yield-Maintenance Amount, if any, interest and all other amounts due with respect to the Notes from time to time outstanding, as and when such amounts shall become due and payable, whether by

9

lapse of time, upon redemption, prepayment or purchase, by extension or by acceleration or declaration or otherwise (including (to the extent legally enforceable) interest due on overdue payments of principal, Yield-Maintenance Amount, if any, or interest at the rate set forth in the Notes or any other amounts due thereunder) in coin or currency of the United States of America which at the time of payment or demand therefor shall be legal tender for the payment of public and private debts, (ii) the full and prompt payment, performance and observance by the Company of all other obligations, covenants, conditions and agreements contained in the Note Agreement or any other instrument or agreement entered into in connection therewith or otherwise relating thereto, and (iii) the full and prompt payment, upon demand by any holder of Notes, of all costs and expenses (including reasonable attorneys' fees), if any, as shall have been expended or incurred in the analysis, protection or enforcement of any right or privilege under the Notes, the Note Agreement or any other instrument or agreement entered into in connection therewith or relating thereto or in the protection or enforcement of any rights, privileges or liabilities under this Guaranty or in any consultation or action in connection therewith or herewith (all such obligations, covenants, conditions and agreements described in the foregoing clauses (i), (ii) and (iii) being hereinafter collectively referred to as the "**Guaranteed Obligations**").

The Guarantor hereby acknowledges and agrees that its liability hereunder is joint and several with any other Person(s) who may guarantee the obligations and indebtedness under and in respect of the Notes, the Note Agreement and the other Transaction Documents.

**2.2.    Guaranty of Payment and Performance**.    This is a guaranty of payment and performance and not a guaranty of collection, and the Guarantor hereby waives any right to require that any action on or in respect of any Note, the Note Agreement or any instrument or agreement relating to the Guaranteed Obligations be brought against the Company or any other Person or that resort be had to any direct or indirect security for the Notes or for this Guaranty or any other remedy.   Any holder of Notes may, at its option, proceed hereunder against the Guarantor in the first instance to collect monies when due, the payment of which is guaranteed hereby, without first proceeding against the Company or any other Person and without first resorting to any direct or indirect security for the Notes, or for this Guaranty or any other remedy.   The liability of the Guarantor hereunder shall in no way be affected or impaired by any acceptance by any holder of Notes of any direct or indirect security for, or other guaranties of, the Guaranteed Obligations or by any failure, delay, neglect or omission by any holder of Notes to realize upon or protect any of the Guaranteed Obligations or any Notes or other instruments evidencing the same or any direct or indirect security therefor or by any approval, consent, waiver, or other action taken or omitted to be taken by any such holder.   The Guarantor (i) acknowledges that certain obligations of the Company under the Note Agreement will survive the payment or transfer of any Note and the termination of the Note Agreement, and (ii) agrees that the obligations of the Guarantor hereunder with respect to such surviving obligations shall also survive the payment or transfer of any Note and the termination of the Note Agreement.

**2.3.    General Provisions Relating to the Guaranty**.

(i)    The Guarantor hereby consents and agrees that any holder or holders of Notes from time to time, with or without any further notice to or assent from the Guarantor may, without in any manner affecting the liability of the Guarantor under

A/74565836.10

this Guaranty, and upon such terms and conditions as any such holder or holders may deem advisable:

>     (a)    extend in whole or in part (by renewal or otherwise), modify, change, compromise, release or extend the duration of the time for the payment or performance of any of the Guaranteed Obligations, or waive any default with respect thereto, or waive, modify, amend or change any provision of the Note Agreement, the Notes or any other instrument or agreement entered into in connection therewith or otherwise relating thereto;

>     (b)    sell, release, surrender, modify, impair, exchange or substitute any and all property, of any nature and from whomsoever received, held by, or for the benefit of, any such holder as direct or indirect security for the payment or performance of any of the Guaranteed Obligations; or

>     (c)    settle, adjust or compromise any claim of the Company against any other Person secondarily or otherwise liable for any of the Guaranteed Obligations.

The Guarantor hereby ratifies and confirms any such extension, renewal, change, sale, release, waiver, surrender, exchange, modification, amendment, impairment, substitution, settlement, adjustment or compromise and that the same shall be binding upon it, and hereby waives any and all defenses, counterclaims or offsets which it might or could have by reason thereof, it being understood that the Guarantor shall at all times be bound by this Guaranty and remain liable hereunder.

>     (ii)    The Guarantor hereby waives: (a) notice of acceptance of this Guaranty by the holders of Notes or of the creation, renewal or accrual of any liability of the Company, present or future, or of the reliance of such holders upon this Guaranty (it being understood that all Guaranteed Obligations shall conclusively be presumed to have been created, contracted or incurred in reliance upon the execution of this Guaranty); (b) demand of payment by any holder of Notes from the Company or any other Person indebted in any manner on or for any of the Guaranteed Obligations hereby guaranteed; and (c) presentment for the payment by any holder of Notes or any other Person of the Notes or any other instrument, protest thereof and notice of its dishonor to any party thereto and to the Guarantor.  The obligations of the Guarantor under this Guaranty and the rights of any holder of Notes to enforce such obligations by any proceedings, whether by action at law, suit in equity or otherwise, shall not be subject to any reduction, limitation, impairment or termination, whether by reason of any claim of any character whatsoever or otherwise and shall not be subject to any defense, setoff, counterclaim, recoupment or termination whatsoever.

>     (iii)    The obligations of the Guarantor hereunder shall be binding upon the Guarantor and its successors and assigns, and shall remain in full force and effect irrespective of:

(a)      the genuineness, validity, regularity or enforceability of the Notes, the Note Agreement or this Guaranty or any other instrument or agreement entered into in connection therewith or otherwise relating thereto, or any of the terms of any thereof, the continuance of any obligation on the part of the Company or any other Person on the Notes or under the Note Agreement or any such other instrument or agreement, or the power or authority or the lack of power or authority of the Company to execute and deliver the Note Agreement, the Notes or any such other instrument or agreement, or to perform any of its obligations thereunder or the existence or continuance of the Company or any other Person as a legal entity;

(b)      any default, failure or delay, willful or otherwise, in the performance by the Company or any other Person of any obligations of any kind or character whatsoever of the Company or any other Person (including, without limitation, the Guaranteed Obligations);

(c)      any creditors' rights, bankruptcy, receivership or other insolvency proceeding of the Company or any other Person or in respect of the property of the Company or any other Person or any merger, consolidation, reorganization, dissolution, liquidation, sale of all or substantially all of the assets, or winding up, of the Company or any other Person;

(d)      impossibility or illegality of performance on the part of the Company or any other Person of its obligations under the Notes, the Note Agreement or this Guaranty or any other instrument or agreement entered into in connection therewith or otherwise relating thereto;

(e)      in respect of the Company or any other Person, any change of circumstances, whether or  not foreseen or foreseeable, whether or not imputable to the Company or any other Person, or impossibility of performance through fire, explosion, accident, labor disturbance, floods, droughts, embargoes, wars (whether or not declared), civil commotion, acts of God or the public enemy, delays or failure of suppliers or carriers, inability to obtain materials, action of any Federal or state regulatory body or agency, change of law or any other causes affecting performance, or any other *force majeure,* whether or not beyond the control of the Company or any other Person and whether or not of the kind hereinbefore specified;

(f)      any attachment, claim, demand, charge, lien, order, process, encumbrance or any other happening or event or reason, similar or dissimilar to the foregoing, or any withholding or diminution at the source, by reason of any taxes, assessments, expenses, indebtedness, obligations or liabilities of any character, foreseen or unforeseen, and whether or not valid, incurred by or against any Person, or any claims, demands, charges or liens of any nature, foreseen or unforeseen, incurred by any Person, or against any sums payable under this Guaranty, so that such sums would be rendered inadequate or would be unavailable to make the payments herein provided;

(g)    any order, judgment, decree, ruling or regulation (whether or not valid) of any court of any nation or of any political subdivision thereof or any body, agency, department, official or administrative or regulatory agency of any thereof or any other action, happening, event or reason whatsoever which shall delay, interfere with, hinder or prevent, or in any way adversely affect, the payment or performance by any party of any of the Guaranteed Obligations;

(h)    any failure or lack of diligence in collection or protection, failure in presentment or demand for payment, protest, notice of protest, notice of default and of nonpayment, any failure to give notice to the Guarantor of failure of Company or any other Person to keep and perform any of the Guaranteed Obligations, or failure to resort for payment to the Company or to any other Person or to any other guaranty or to any property, security, Liens or other rights or remedies;

(i)    the acceptance of any additional security or other guaranty, the advance of additional money to the Company or any other Person, the renewal or extension of the Notes or amendments, modifications, consents or waivers with respect to the Notes, the Note Agreement or any other instrument or agreement entered into in connection therewith or otherwise relating thereto, or the sale, release, substitution or exchange of any security for the Notes;

(j)    any defense whatsoever that the Company or any other Person might have to the payment of the Notes (principal, Yield-Maintenance Amount, if any, or interest or any other amounts due thereunder), other than payment in cash thereof, or to the payment, performance or observance of any of the other Guaranteed Obligations, whether through the satisfaction or purported satisfaction by the Company or any other Person of its debts due to any cause such as bankruptcy, insolvency, receivership, merger, consolidation, reorganization, dissolution, liquidation, winding up or otherwise;

(k)    any act or failure to act with regard to the Notes, the Note Agreement, this Guaranty or any other instrument or agreement entered into in connection therewith or otherwise relating thereto, or anything which might vary the risk of the Guarantor; or

(l)    any other circumstance (other than payment and performance in full of the Guaranteed Obligations) which might otherwise constitute a defense available to, or a discharge of, the Guarantor in respect of its obligations under this Guaranty;

provided, that the specific enumeration of the above-mentioned acts, failures or omissions shall not be deemed to exclude any other acts, failures or omissions, though not specifically mentioned above, it being the purpose and intent of this Guaranty that the obligations of the Guarantor shall be absolute and unconditional and shall not be discharged, impaired or varied except by the full and prompt payment and performance of all of the Guaranteed Obligations.  Without limiting the foregoing, it is understood that

13

repeated and successive demands may be made and recoveries may be had hereunder as and when, from time to time, the Company or any other Person shall default under the terms of the Notes, the Note Agreement or any other instrument or agreement entered into in connection therewith or otherwise relating thereto and that notwithstanding recovery hereunder for or in respect of any given default or defaults by the Company or any other Person under the Notes, the Note Agreement or any such other instrument or agreement, this Guaranty shall remain in full force and effect and shall apply to each and every subsequent default.

(iv)    All rights of any holder of Notes may be transferred or assigned at any time and shall be considered to be transferred or assigned at any time or from time to time upon the transfer of such Note whether with or without the consent of or notice to the Guarantor under this Guaranty or to the Company.

(v)    The Guarantor hereby subordinates to the rights of the holders of Notes under the Note Agreement, the Notes or any other instrument or agreement entered into in connection therewith or otherwise relating thereto, and agrees to defer any assertion of, until such time as the Guaranteed Obligations have been indefeasibly paid and performed in full, any claim or other rights that it may now or hereafter acquire against the Company or any other Person that arise from the existence, payment, performance or enforcement of the Guarantor's obligations under this Guaranty, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of any holder or holders of Notes against the Company or any other Person, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from the Company or any other Person, directly or indirectly, in cash or other property or by setoff or in any other manner, payment or security on account of such claim, remedy or right. If any amount shall be paid to the Guarantor in violation of the preceding sentence at any time prior to the payment and performance in full of all the Guaranteed Obligations, such amount shall be held in trust for the benefit of the holders of Notes and shall forthwith be paid to such holders to be credited and applied to the Guaranteed Obligations, whether matured or unmatured.

(vi)    The Guarantor agrees that to the extent the Company or any other Person makes any payment on any Note or in respect of any of the other Guaranteed Obligations, which payment or any part thereof is subsequently invalidated, voided, declared to be fraudulent or preferential, set aside, recovered, rescinded or is required to be retained by or repaid to a trustee, receiver, or any other Person under any bankruptcy code, common law, or equitable cause, then and to the extent of such payment, the obligation or the part thereof intended to be satisfied shall be revived and continued in full force and effect with respect to the Guarantor's obligations hereunder, as if said payment had not been made. The liability of the Guarantor hereunder shall not be reduced or discharged, in whole or in part, by any payment to any holder of Notes from any source that is thereafter paid, returned or refunded in whole or in part by reason of the assertion of a claim of any kind

relating thereto, including, but not limited to, any claim for breach of contract, breach of warranty, preference, illegality, invalidity, or fraud asserted by any account debtor or by any other Person.

(vii)    The holders of Notes shall have no obligation to (a) to marshal any assets in favor of the Guarantor or in payment of any or all of the Guaranteed Obligations or (b) pursue any other remedy that the Guarantor may or may not be able to pursue itself and that may lighten the Guarantor's burden, any right to which the Guarantor hereby expressly waives.

## 3.    REPRESENTATIONS AND WARRANTIES

The Guarantor represents, covenants and warrants as follows:

**3.1.    Organization and Qualification; Due Authorization**.    The Guarantor is a corporation duly organized and existing in good standing under the laws of the State of Delaware.  The Company and each other Subsidiary (other than a Subsidiary of the Company that is not a Material Subsidiary) is duly organized and existing in good standing under the laws of the jurisdiction in which it is incorporated or otherwise organized.  The Guarantor, the Company and each other Subsidiary (other than a Subsidiary of the Company that is not a Material Subsidiary) has the corporate or limited liability company power, as applicable, to own its respective property and to carry on its respective business as now being conducted, and the Guarantor, the Company and each other Subsidiary (other than a Subsidiary of the Company that is not a Material Subsidiary) is duly qualified as a foreign corporation or limited liability company, as applicable, to do business and in good standing in every jurisdiction in which the nature of the respective business conducted or property owned by it makes such qualification necessary, except where the failure to so qualify would not have a Material Adverse Effect.  The Guarantor has the corporate power and authority to execute and deliver this Guaranty and to perform the provisions hereof.  The execution, delivery and performance by the Guarantor of this Guaranty has been duly authorized by all necessary corporate action, and this Guaranty constitutes a legal, valid and binding obligation of the Guarantor enforceable against the Guarantor in accordance with its terms, except as such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

**3.2.    Material Adverse Change.**  Since September 25, 2011, nothing has occurred that has had, or could reasonably be expected to have, a Material Adverse Effect (it being understood that the filing of the voluntary petitions by the Debtors under Chapter 11 of the Bankruptcy Code on the Petition Date shall not, in and of itself, be deemed to have had or, reasonably be expected to have, a Material Adverse Effect).

**3.3.    Litigation; Observance of Agreements, Statutes and Orders**.

(i)    Except as set forth in Schedule 3.3 (it being understood that disclosure on Schedule 3.3 is not a representation that the matter to which the disclosure relates is expected to have a Material Adverse Effect), there are no

actions, suits, investigations or proceedings pending or, to the knowledge of the Guarantor, threatened against or affecting the Guarantor or any Subsidiary or any property of the Guarantor or any Subsidiary in any court or before any arbitrator of any kind or before or by any Governmental Authority that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(ii)    Neither the Guarantor nor any Subsidiary is (a) in default under any term of any agreement or instrument to which it is a party or by which it is bound, (b) in violation of any order, judgment, decree or ruling of any court, arbitrator or Governmental Authority or (c) in violation of any applicable law, ordinance, rule or regulation of any Governmental Authority (including, without limitation, Environmental Laws, the USA Patriot Act or any of the other laws and regulations that are referred to in Section 3.12), which default or violation, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**3.4.    Outstanding Debt**.

(i)    Except as described therein, Schedule 3.4 sets forth a complete and correct list of all outstanding Debt of the Guarantor and its Subsidiaries as of [_____] (including a description of the obligors and obligees, principal amount outstanding and collateral therefor, if any, and guaranty thereof, if any), since which date there has been no material change in the amounts, interest rates, sinking funds, installment payments or maturities of the Debt of the Guarantor or its Subsidiaries. Neither the Guarantor nor any Subsidiary is in default and no waiver of default is currently in effect, in the payment of any principal or interest on any Debt of the Guarantor or such Subsidiary and no event or condition exists with respect to any Debt of the Guarantor or any Subsidiary that would permit (or that with notice or the lapse of time, or both, would permit) one or more Persons to cause such Debt to become due and payable before its stated maturity or before its regularly scheduled dates of payment.

(ii)    Except as disclosed in Schedule 3.4, neither the Guarantor nor any Subsidiary has agreed or consented to cause or permit in the future (upon the happening of a contingency or otherwise) any of its property, whether now owned or hereafter acquired, to be subject to a Lien not permitted by Section 5.2.

**3.5.    Title to Properties**.  The Guarantor has and each of its Subsidiaries has good and marketable title to its respective real properties (other than properties which it leases) and good title to all of its other respective properties and assets, subject to no Lien of any kind except Liens permitted by Section 5.2.  All leases necessary in any material respect for the conduct of the respective businesses of the Guarantor and its Subsidiaries are valid and subsisting and are in full force and effect, subject to Liens permitted by Section 5.2.

**3.6.    Taxes**.  The Guarantor has and each of its Subsidiaries has filed all Federal, state and other income tax returns which, to the best knowledge of the officers of the Guarantor, are required to be filed and each has paid all taxes as shown on such returns and on all assessments received by it to the extent that such taxes have become due, except such taxes as are being

contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP. Federal income tax returns of the Guarantor and its Subsidiaries have been examined and reported on by the taxing authorities or closed by applicable statutes and satisfied for all fiscal years prior to and including the fiscal year ended September 26, 2010.

      **3.7.** **Conflicting Agreements and Other Matters**.  Neither the Guarantor nor any of its Subsidiaries is a party to any contract or agreement or subject to any charter or other limited liability company or corporate restriction which materially and adversely affects the business, property or assets, or financial condition of the Guarantor and its Subsidiaries, taken as a whole. Neither the execution nor delivery of this Guaranty, the Note Agreement, the Notes or any other Transaction Document, nor the issuance of the Notes, nor fulfillment of nor compliance with the terms and provisions hereof and of the Note Agreement, the Notes or any other Transaction Document will conflict with, or result in a breach of the terms, conditions or provisions of, or constitute a default under, or result in any violation of, or result in the creation of any Lien upon any of the properties or assets of the Guarantor or any of its Subsidiaries pursuant to, the charter, by-laws, limited liability company agreement or other organizational documents of the Guarantor or any of its Subsidiaries, any award of any arbitrator or any agreement (including any agreement with members or stockholders), instrument, order, judgment, decree, statute, law, rule or regulation to which the Guarantor or any of its Subsidiaries is subject, except to the extent any such conflict, breach, defaults, violation or creation of a Lien could not reasonably be expected to have a Material Adverse Effect.  Except as set forth in the Limited Liability Company Agreement (as in effect on the date hereof) and as set forth in Schedule 3.7, neither the Guarantor nor any of its Subsidiaries is a party to, or otherwise subject to any provision contained in, any instrument evidencing indebtedness of the Guarantor or such Subsidiary, any agreement relating thereto or any other contract or agreement (including its limited liability company agreement, charter or other organizational documents) which limits the amount of, or otherwise imposes restrictions on the incurring of, Debt of the Guarantor represented by this Guaranty or Debt of the Company of the type evidenced by the Notes.

      **3.8.** **ERISA**.  Except as set forth on Schedule 3.8 (it being understood that disclosure on Schedule 3.8 is not a representation that the matter to which the disclosure relates is expected to have a Material Adverse Effect),

          (i)   the Guarantor and each ERISA Affiliate have operated and administered each Plan in compliance with all applicable laws except for such instances of noncompliance as have not resulted in and could not reasonably be expected to result in a Material Adverse Effect.  Neither the Guarantor nor any ERISA Affiliate has incurred any liability (including actual or contingent withdrawal liability under section 4201 or 4204 of ERISA in respect of Multiemployer Plans) pursuant to Title I or IV of ERISA or the penalty or excise tax provisions of the Code relating to employee benefit plans (as defined in section 3 of ERISA), and no event, transaction or condition has occurred or exists that could reasonably be expected to result in the incurrence of any such liability by the Guarantor or any ERISA Affiliate, or in the imposition of any Lien on any of the rights, properties or assets of the Guarantor or any ERISA Affiliate, in either case pursuant to Title I or IV of ERISA or to section 430(k) of the Code or to any such

penalty or excise tax provisions under the Code or Federal law or section 4068 of ERISA or by the granting of a security interest in connection with the amendment of a Plan, other than such liabilities or Liens as would not be individually or in the aggregate material.

(ii)    The present value of the aggregate benefit liabilities under each of the Plans (other than Multiemployer Plans), determined as of the end of such Plan's most recently ended plan year on the basis of the actuarial assumptions specified for funding purposes in such Plan's most recent actuarial valuation report, did not exceed the aggregate current value of the assets of such Plan allocable to such benefit liabilities by more than $[_____] in the case of any single Plan and by more than $[_____] in the aggregate for all Plans.   The term "**benefit liabilities**" has the meaning specified in section 4001 of ERISA and the terms "**current value**" and "**present value**" have the meaning specified in section 3 of ERISA.

(iii)    The expected postretirement benefit obligation (determined as of the last day of the Guarantor's most recently ended fiscal year in accordance with Financial Accounting Standards Board Accounting Standards Codification 715-60, without regard to liabilities attributable to continuation coverage mandated by section 4980B of the Code) of the Guarantor and its Subsidiaries is not material.

(iv)    The execution and delivery of this Guaranty will not involve any transaction that is subject to the prohibitions of section 406 of ERISA or in connection with which a tax could be imposed pursuant to section 4975(c)(1)(A)-(D) of the Code.

**3.9.    Governmental Authorizations, Etc**.  No consent, approval or authorization of, or registration, filing or declaration with, any Governmental Authority is required in connection with the execution, delivery or performance by the Guarantor of this Guaranty which has not already been obtained.

**3.10.    Disclosure**.  All factual information (taken as a whole) theretofore furnished by or on behalf of Lee and its Subsidiaries in writing to the Purchasers (including, without limitation, all information contained in the Transaction Documents, the Plan of Reorganization and the Disclosure Statement) for purposes of or in connection with this Guaranty, the other Transaction Documents or any transaction contemplated herein or therein is true and accurate in all material respects on the date as of which such information is dated or certified and not incomplete by omitting to state any fact necessary to make such information (taken as a whole) not misleading in any material respect at such time in light of the circumstances under which such information was provided, it being understood and agreed that for purposes of this Section 3.10, such factual information shall not include any projections or any *pro forma* financial information.  There is no fact peculiar to the Guarantor or any of its Subsidiaries which materially adversely affects or in the future may (so far as the Guarantor can now foresee) materially adversely affect the business, property or assets, or financial condition of the Guarantor and its Subsidiaries taken as a whole and which has not been set forth in this Guaranty or in the other documents, certificates and

statements furnished to the holders of Notes by or on behalf of the Guarantor on or prior to the date hereof in connection with the transactions contemplated hereby.

**3.11.    Solvency**.  On and as of the Restructuring Closing Date, and after giving effect to all debt being incurred or assumed and Liens created by the Credit Parties in connection with this Agreement, the Notes and the other Transaction Documents, (i) the sum of the assets, at a fair valuation, of the Company (on a stand-alone basis) and of the Guarantor and its Subsidiaries (taken as a whole) will exceed its or their respective debts, (ii) the Company (on a stand-alone basis) and the Guarantor and its Subsidiaries (taken as a whole) has or have not incurred and does or do not intend to incur, and does or do not believe that it or they will incur, debts beyond its or their respective ability to pay such debts as such debts mature, and (iii) the Company (on a stand-alone basis) and the Guarantor and its Subsidiaries (taken as a whole) will have sufficient capital with which to conduct its or their respective businesses.  For purposes of this Section 3.11, "debt" means any liability on a claim, and "claim" means (a) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured or (b) right to an equitable remedy for breach of performance if such breach gives rise to a payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.  The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

**3.12.    Foreign Assets Control Regulations, Etc.**

(i)    Neither the Guarantor nor any Controlled Entity is (i) a Person whose name appears on the list of Specially Designated Nationals and Blocked Persons published by the Office of Foreign Assets Control, U.S. Department of Treasury ("**OFAC**") (an "**OFAC Listed Person**") or (ii) a department, agency or instrumentality of, or is otherwise controlled by or acting on behalf of, directly or indirectly, (x) any OFAC Listed Person or (y) any Person, entity, organization, foreign country or regime that is subject to any OFAC Sanctions Program (each OFAC Listed Person and each other Person, entity, organization and government of a country described in clause (ii), a "**Blocked Person**").

(ii)    Neither the Guarantor nor any Controlled Entity has any investments in, or engages in any dealings or transactions with, any Person where such investments, dealings or transactions would cause the receipt of any payment or exercise of any rights in respect of, this Guaranty by any holder of Notes to be in violation of any of the laws or regulations identified in this Section 3.12.

(iii)    To the Guarantor's actual knowledge after making due inquiry, neither the Guarantor nor any Controlled Entity (i) is under investigation by any Governmental Authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist-related activities or other money laundering predicate crimes under any applicable law (collectively, "**Anti-Money Laundering Laws**"), (ii) has been assessed civil penalties under any Anti-Money Laundering

Laws or (iii) has had any of its funds seized or forfeited in an action under any Anti-Money Laundering Laws. The Guarantor has taken reasonable measures appropriate to the circumstances (in any event as required by applicable law) to ensure that the Guarantor and each Controlled Entity is and will continue to be in compliance with all applicable current and future Anti-Money Laundering Laws.

(iv)    The Guarantor has taken reasonable measures appropriate to the circumstances (in any event as required by applicable law) to ensure that the Guarantor and each Controlled Entity is and will continue to be in compliance with all applicable current and future anti-corruption laws and regulations.

**3.13.    Organization and Ownership of Shares of Subsidiaries; Affiliates**.

(i)    Schedule 3.13 contains (except as noted therein) a complete and correct list of the Guarantor's Subsidiaries, showing, as to each Subsidiary, the correct name thereof, the jurisdiction of its organization, and the percentage of shares of each class of its capital stock or similar equity interests outstanding owned by the Guarantor and each other Subsidiary.

(ii)    All of the outstanding shares of capital stock or similar Equity Interests of each Subsidiary shown in Schedule 3.13 as being owned by the Guarantor and its Subsidiaries have been validly issued, are fully paid and nonassessable and are owned by the Guarantor or another Subsidiary free and clear of any Lien (except as otherwise disclosed in Schedule 3.13).

(iii)    Each Subsidiary is a corporation or other legal entity duly organized, validly existing and, where applicable, in good standing under the laws of its jurisdiction of organization, and is duly qualified as a foreign corporation or other legal entity and, where applicable, is in good standing in each jurisdiction in which such qualification is required by law, other than those jurisdictions as to which the failure to be so qualified or in good standing could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Each such Subsidiary has the corporate or other power and authority to own or hold under lease the properties it purports to own or hold under lease and to transact the business it transacts and proposes to transact.

(iv)    No Subsidiary is a party to, or otherwise subject to any legal, regulatory, contractual or other restriction (other than this Guaranty, the agreements listed on Schedule 3.13 and customary limitations imposed by corporate law or similar statutes) restricting the ability of such Subsidiary to pay dividends out of profits or make any other similar distributions of profits to the Guarantor or any of its Subsidiaries that owns outstanding shares of capital stock or similar equity interests of such Subsidiary.

**3.14.    Compliance with Laws, Other Instruments, Etc.**  The execution, delivery and performance by each Credit Party of this Guaranty or any other Transaction Document to which such Credit Party is a party does not and, with respect to any of the documents or other matters

20

referred to below as in effect on the date hereof, will not (i) contravene, result in any breach of, or constitute a default under, or result in the creation of any Lien in respect of any property of the Guarantor or any Subsidiary under, any indenture, mortgage, deed of trust, loan, purchase or credit agreement, lease, corporate charter or by-laws, or any other agreement or instrument to which the Guarantor or any Subsidiary is bound or by which the Guarantor or any Subsidiary or any of their respective properties may be bound or affected, (ii) conflict with or result in a breach of any of the terms, conditions or provisions of any order, judgment, decree, or ruling of any court, arbitrator or Governmental Authority applicable to the Guarantor or any Subsidiary or (iii) violate any provision of any statute or other rule or regulation of any Governmental Authority applicable to the Guarantor or any Subsidiary.

**3.15.   Licenses, Permits, Etc.**  The Guarantor and each of its Subsidiaries owns or has the right to use all the patents, trademarks, permits, domain names, service marks, trade names, copyrights, licenses, franchises, inventions, trade secrets, proprietary information and know-how of any type, whether or not written (including, but not limited to, rights in computer programs and databases) and formulas, or rights with respect to the foregoing, and has obtained assignments of all leases, licenses and other rights of whatever nature, necessary for the present conduct of its business, without any known conflict with the rights of others which, or the failure to own or have which, as the case may be, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**3.16.   [Reserved].**

**3.17.   Environmental Matters**.

(i)      Neither the Guarantor nor any Subsidiary has knowledge of any claim or has received any notice of any claim, and no proceeding has been instituted raising any claim against the Guarantor or any of its Subsidiaries or any of their respective real properties now or formerly owned, leased or operated by any of them or other assets, alleging any damage to the environment or violation of any Environmental Laws, except, in each case, such as could not reasonably be expected to result in a Material Adverse Effect.

(ii)      Neither the Guarantor nor any Subsidiary has knowledge of any facts which would give rise to any claim, public or private, of violation of Environmental Laws or damage to the environment emanating from, occurring on or in any way related to real properties now or formerly owned, leased or operated by any of them or to other assets or their use, except, in each case, such as could not reasonably be expected to result in a Material Adverse Effect.

(iii)      Neither the Guarantor nor any Subsidiary has stored any Hazardous Materials on real properties now or formerly owned, leased or operated by any of them and has not disposed of any Hazardous Materials in a manner contrary to any Environmental Laws in each case in any manner that could reasonably be expected to result in a Material Adverse Effect.

A/74565836.10

(iv)    All buildings on all real properties now owned, leased or operated by the Guarantor or any Subsidiary are in compliance with applicable Environmental Laws, except where failure to comply could not reasonably be expected to result in a Material Adverse Effect.

## 4.    AFFIRMATIVE COVENANTS

So long as any Note shall remain unpaid, the Guarantor covenants as follows:

**4.1.    Financial Statements**.  The Guarantor will deliver to each holder of Notes in duplicate or in electronic format (it being understood that the Guarantor need not duplicate delivery by the Company of the financial statements or other items required to be delivered under paragraph 5A of the Note Agreement):

(i)    as soon as practicable and in any event within 45 days after the end of each quarterly period (other than the last quarterly period) in each fiscal year of Lee, a consolidating and consolidated statement of income and a consolidated statement of cash flows of the Guarantor and its Subsidiaries for such quarterly period and for the period from the beginning of the current fiscal year to the end of such quarterly period, and a consolidating and consolidated balance sheet of the Guarantor and its Subsidiaries as at the end of such quarterly period, setting forth in each case in comparative form figures for the corresponding period in the preceding fiscal year (if applicable, in the case of the Company and its Subsidiaries), all in reasonable detail and certified by an authorized financial officer of Lee, subject to changes resulting from year-end adjustments;

(ii)    as soon as practicable and in any event within 90 days after the end of each fiscal year of Lee, a consolidating and consolidated statement of income and a consolidating and consolidated balance sheet of the Guarantor and its Subsidiaries as at the end of such year and consolidated statements of cash flows and stockholders' equity of the Guarantor and its Subsidiaries for such year, setting forth in each case in comparative form corresponding consolidated figures from the preceding annual audit, all in reasonable detail and satisfactory in scope to the Required Holder(s) and, as to the consolidated statements, audited by independent public accountants of recognized standing selected by the Guarantor whose opinion shall be in scope and substance satisfactory to the Required Holder(s) which audit reports shall not include any scope limitation or any going concern or other material qualification (except that such opinion for the Guarantor's fiscal year ending in September 2015 may include a going concern limitation related to the refinancing of the Notes and/or the Debt outstanding under the Credit Agreement, the Second Lien Loan Agreement or this Guaranty) and, as to the consolidating statements, certified by an authorized financial officer of Lee;

(iii)    promptly upon transmission thereof, copies of all such financial statements, proxy statements, notices and reports as the Guarantor shall send to its stockholders and copies of all registration statements (without exhibits) and all reports (other than reports as to which the Guarantor shall receive confidential

treatment) which the Guarantor or any Subsidiary (including the Company) files with the Securities and Exchange Commission (or any governmental body or agency succeeding to the functions of the Securities and Exchange Commission);

(iv)    promptly upon receipt thereof, a copy of each other report submitted to the Guarantor or any Subsidiary by independent accountants in connection with any annual, interim or special audit made by them of the books of the Guarantor or any Subsidiary;

(v)    within 30 days after the end of each fiscal month of Lee, the consolidated balance sheet of Lee and its Subsidiaries as at the end of such fiscal month and the related consolidated statements of income and, to the extent prepared, statements of cash flows for such fiscal month and for the elapsed portion of the fiscal year ended with the last day of such fiscal month, in each case setting forth comparative figures for the corresponding fiscal month in the prior fiscal year;

(vi)    to the extent prepared by the Guarantor or the Company, within 30 days after the end of each fiscal month of the Guarantor, consolidated and consolidating balance sheets of the Guarantor and its Subsidiaries as at the end of such fiscal month and the related consolidated and consolidating statements of income and cash flows for such fiscal month and for the elapsed portion of the Fiscal Year ended with the last day of such fiscal month, in each case setting forth comparative figures for the corresponding fiscal month and period in the prior fiscal year;

(vii)    no later than the first Business Day of every other week (beginning on the first Monday after the Restructuring Closing Date), a forecast for the succeeding 13-week period of the projected consolidated cash flows of (x) Lee and its Subsidiaries, and (y) the Guarantor and its Subsidiaries, each taken as a whole (such forecast to contain the same level of detail used in such forecasts delivered to the holders of the Prepetition Notes commencing in October, 2011), together with a variance report of actual cash flow for the immediately preceding period for which a forecast was delivered against the then current forecast for such preceding period;

(viii)    promptly, and in any event within 45 days following the end of each fiscal quarter in each fiscal year of Lee, a written report of a Responsible Officer, in form and scope reasonably satisfactory to the Required Holders (such satisfaction to be presumed in the absence of an objection delivered to the Company within 30 days after the receipt of such report), setting forth a summary in reasonable detail of all Restricted Intercompany Charges, including cash and non-cash activities, organized by category of intercompany activity, by and among (x) Lee and its Subsidiaries (other than the Pulitzer Entities), on the one hand, and the Pulitzer Entities, on the other hand, and (y) the Pulitzer Entities and Star Publishing, and a reconciliation of intercompany balances with respect to each of (x) and (y);

(ix)    promptly, and in any event within 90 days following the end of each fiscal year (or following such shorter intervals as the same may be prepared), an

A/74565836.10

update, in a directly comparable format, of the financial model delivered to the Purchasers on the Restructuring Closing Date, setting forth the projected financial performance of the Guarantor and its Subsidiaries for the current fiscal year (prepared on a month-by-month basis) and for each of the next four (4) fiscal years (prepared on an annual basis);

(x)     promptly, and in any event within 45 days following the end of each fiscal year  (or following such shorter intervals as the same may be prepared), a pension valuation/status report, in form and scope reasonably satisfactory to the Required Holders (such satisfaction to be presumed in the absence of an objection delivered to the Company within 30 days after the receipt of such update), setting forth in reasonable detail the extent to which the pension obligations of the Guarantor and its Subsidiaries are funded, together with revised projections of future cash payments in respect of such pension obligations;

(xi)     promptly, and in any event within 30 days following the end of each fiscal month of Lee, a management report describing the financial performance and operations of Lee and its subsidiaries in a form consistent with, and containing the same level of detail as, reports made available to the holders of the Prepetition Notes commencing in October, 2011; and

(xii)    with reasonable promptness, such other information and documents as any holder of Notes may reasonably request.

Together with each delivery of financial statements required by clauses (i) and (ii) above, the Guarantor will deliver to each holder of Notes an Officer's Certificate, substantially in the form of Exhibit A attached hereto, executed on behalf of the Guarantor and demonstrating (with computations in reasonable detail) compliance by the Guarantor and its Subsidiaries (including the Company) with the provisions of Sections 5.1, 5.5, 5.8 and 5.12 of this Guaranty and stating that there exists no Event of Default or Default, or, if any Event of Default or Default exists, specifying the nature and period of existence thereof and what action the Guarantor proposes to take with respect thereto.  Together with each delivery of financial statements required by clause (ii) above, the Guarantor will use reasonable efforts to deliver or cause to be delivered to each holder a certificate of such accountants stating that, in making the audit necessary for their report on such financial statements, they have obtained no knowledge of any Event of Default or Default or, if they have obtained knowledge of any Event of Default or Default, specifying the nature and period of existence thereof.  Such accountants, however, shall not be liable to anyone by reason of their failure to obtain knowledge of any Event of Default or Default which would not be disclosed in the course of an audit conducted in accordance with generally accepted auditing standards.  Together with all financial statements of the Guarantor and its Subsidiaries required to be delivered pursuant to this paragraph 6A, the Guarantor will deliver or cause to be delivered a reconciliation reflecting the changes that would be required to such financial statements had they been prepared in accordance with the GAAP and policies used to prepare the audited financial statements of the Guarantor for the Guarantor's fiscal year ended September 25, 2011.  The Guarantor also covenants that immediately after any Responsible Officer obtains knowledge of an Event of Default or Default, it will deliver to each holder an Officer's Certificate specifying the nature and period of existence thereof and what action the Guarantor

has taken, is taking or proposes to take with respect thereto. Each holder of Notes is hereby authorized to deliver a copy of any financial statement delivered to such holder pursuant to this Section 4.1 to any regulatory body having jurisdiction over such holder.

**4.2.** **Inspection of Properties**. The Guarantor will permit any Person designated by any holder in writing, at such holder's expense if no Event of Default then exists and at the Company's expense if an Event of Default then exists, to visit and inspect any of the properties of the Guarantor and its Subsidiaries, to examine the corporate or limited liability company books and financial records of the Guarantor and its Subsidiaries and make copies thereof or extracts therefrom and to discuss the affairs, finances and accounts of any of such limited liability companies or corporations with the principal officers of the Guarantor and its independent public accountants, all at such reasonable times and as often as such holder may reasonably request; provided, however, that, so long as no Event of Default shall have occurred, no holder of Notes shall exercise rights pursuant to this Section 4.2 without the written approval of the Required Holders (to be given or withheld in their sole discretion) and (ii) no more than two such inspections shall be conducted in any calendar year.

**4.3.** **Covenant to Secure Notes Equally**. The Guarantor will, if it or any Subsidiary shall create or assume any Lien upon any of its property or assets, whether now owned or hereafter acquired, other than Liens permitted by the provisions of Section 5.2 (unless prior written consent to the creation or assumption thereof shall have been obtained pursuant to Section 7.2), make or cause to be made effective provision whereby the Guaranteed Obligations will be secured by such Lien equally and ratably with any and all other Debt thereby secured, so long as any such other Debt shall be so secured; provided that the creation and maintenance of such equal and ratable Lien shall not in any way limit or modify the right of the holders of the Notes to enforce the provisions of Section 5.2.

**4.4.** **Business**. Except as otherwise provided in Section 5.4, the Guarantor and its Subsidiaries taken as a whole will continue to engage in business in substantially the same fields of enterprise as conducted on the date hereof.

**4.5.** **Compliance with Laws and Regulations**. The Guarantor will, and will cause each Subsidiary to, be in material compliance with all laws, ordinances or governmental rules or regulations to which each of them is subject (including, without limitation, the laws and regulations that are referred to in Section 3.12, and those relating to equal employment opportunity and employee health and safety) which are now in effect or may be legally imposed in the future in any jurisdiction in which the Guarantor and any Subsidiary is doing business other than those laws and regulations which the Guarantor or such Subsidiary is contesting in good faith by appropriate proceedings; provided, however, (i) the Guarantor or such Subsidiary continues to operate any affected business free of any requirement to escrow or sequester any material amount of such business' profits or revenues pending resolution of such proceedings, or (ii) any non-compliance with any law or regulation could not reasonably be expected to have a Material Adverse Effect.

**4.6.** **Patents, Trade Marks and Trade Names**. The Guarantor will, and will cause each Subsidiary to, continue to own, or hold and maintain in effect, all licenses, certificates, permits, franchises and other governmental authorizations necessary to the ownership of their

25

respective properties or to the use of, all copyrights, franchises, licenses, marketing rights, patents, service marks, trade marks, trade names, and rights in any of the foregoing, as in the aggregate are necessary for the conduct of its business in the manner in which such business is being conducted as of the date hereof except where failure to continue to own or hold such licenses could not reasonably be expected to have a Material Adverse Effect.

**4.7.    Payment of Taxes and Other Claims**.  The Guarantor will, and will cause each of its Subsidiaries to, file all income tax or similar tax returns required to be filed in any jurisdiction and to pay and discharge all taxes shown to be due and payable on such returns and all other taxes, assessments, governmental charges, levies, trade accounts payable and claims for work, labor or materials (all the foregoing being referred to collectively as "**Claims**") payable by any of them, to the extent such Claims have become due and payable and before they have become delinquent (including, without limitation, Claims for which sums have become due and payable that have or might become a Lien on properties or assets of the Guarantor or any Subsidiary); provided, that neither the Guarantor nor any Subsidiary need pay any Claim if (i) the amount, applicability or validity thereof is contested by the Guarantor or such Subsidiary on a timely basis in good faith and in appropriate proceedings, and the Guarantor or such Subsidiary has established adequate reserves therefor in accordance with GAAP on its books or (ii) the nonpayment of all such Claims in the aggregate could not reasonably be expected to have a Material Adverse Effect.

**4.8.    ERISA Compliance**.  The Guarantor will, and will cause each ERISA Affiliate to, at all times:

> (i)    with respect to each Plan, make timely payments of contributions required to meet the minimum funding standard set forth in ERISA or the Code with respect thereto and, with respect to any Multiemployer Plan, make timely payment of contributions required to be paid thereto as provided by Section 515 of ERISA, and

> (ii)    comply with all other provisions of ERISA,

except for such failures to make contributions and failures to comply as could not reasonably be expected to have a Material Adverse Effect.

**4.9.    Execution and Delivery of Subsidiary Guaranty Agreement and Other Collateral Documents.**  Within ten (10) Business Days after any Credit Party's acquisition or formation of a Person that becomes a Subsidiary:

> (i)    the Guarantor will cause such Subsidiary to execute and deliver to each holder of Notes (a) the Subsidiary Guaranty Agreement, or a joinder thereto, (b) an appropriate joinder to the Security Agreement and (c) such other documents necessary to grant a first priority Lien in such Subsidiary's assets (other than, in the case of Star Publishing, the Excluded TNI Assets) in favor of the Collateral Agent for the benefit of the holders of the Notes;

> (ii)    the Guarantor (if such Subsidiary is a direct subsidiary of the Guarantor) will pledge or will cause the direct parent of such Subsidiary (if such

26

Subsidiary is not a direct subsidiary of the Guarantor) to pledge the equity interests of such Subsidiary pursuant to a pledge agreement substantially similar in form to the Pledge Agreement; and

(iii)    the Guarantor will deliver (or cause to be delivered) such certificates accompanying authorizing resolutions and corporate or similar constitutive documents and other agreements, instruments, opinions and other documents as the Required Holders may reasonably request, each of the foregoing to be in form and substance reasonably satisfactory to the Required Holders.

In addition to the foregoing, the Guarantor will, and will cause each Subsidiary to, within thirty (30) days after such Person shall have obtained title (whether in fee or, if requested by the Required Holders with respect to any leasehold interest of the Guarantor or any Subsidiary, a leasehold interest) to any real property with a Fair Market Value, individually, of more than $3,000,000, take such action as shall be reasonably necessary to grant a first priority Lien in favor of the Collateral Agent to secure the Notes with such Person's interest in such real property and to obtain title insurance in an amount reasonably required by the Required Holders.  Such Lien shall be documented and recorded to the reasonable satisfaction of the Required Holders.

**4.10.   Insurance**.   The Guarantor will, and will cause each of its Subsidiaries to, maintain, with financially sound and reputable insurers, (i) insurance with respect to their respective properties and businesses against such casualties and contingencies, of such types, on such terms and in such amounts (including deductibles, co-insurance and self-insurance, if adequate reserves are maintained with respect thereto) as is customary in the case of entities of established reputations engaged in the same or a similar business and similarly situated and (ii) such other insurance coverages as may be required under the terms of the Collateral Documents.

**4.11.   Maintenance of Properties**.   The Guarantor will, and will cause each of its Subsidiaries to, maintain and keep, or cause to be maintained and kept, their respective properties in good repair, working order and condition (other than ordinary wear and tear), so that the business carried on in connection therewith may be properly conducted at all times, *provided* that this Section shall not (i) prevent the Guarantor or any Subsidiary from discontinuing the operation and the maintenance of any of its properties if such discontinuance is desirable in the conduct of its business and the Guarantor has concluded that such discontinuance could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or (ii) be interpreted to require the Guarantor to make Capital Expenditures in respect of maintenance in excess of the amounts permitted to be spent on Capital Expenditures under this Guaranty.

**4.12.   Corporate Existence, Etc.**  Subject to Section 5.7, the Guarantor will at all times preserve and keep its corporate existence in full force and effect.  Subject to Sections 5.5 and 5.7, the Guarantor will at all times preserve and keep in full force and effect the corporate existence of each of its Subsidiaries (unless merged into the Guarantor or a Wholly-Owned Subsidiary) and all rights and franchises of the Guarantor and its Subsidiaries unless, in the good faith judgment of the Guarantor, the termination of or failure to preserve and keep in full force and effect such corporate existence, right or franchise could not, individually or in the aggregate, have a Material Adverse Effect.

27

**4.13.  Books and Records**.  The Guarantor will, and will cause each of its Subsidiaries to, maintain proper books of record and account in conformity with GAAP and all applicable requirements of any Governmental Authority having legal or regulatory jurisdiction over the Guarantor or such Subsidiary, as the case may be.

**4.14.  Lee/Pulitzer Contribution Transaction**.    (i)  The Guarantor will use commercially reasonable efforts to obtain the necessary consents and approvals to permit its contribution of the Sandler V Assets to the pension plans of the Guarantor and its Subsidiaries (the "**Contribution**") and, (ii) to the extent such consents and approvals are obtained, the Guarantor will (a) promptly (and in any event within 3 Business Days of receipt thereof) notify all holders of the Notes of the receipt of such consents and approvals and any terms, conditions or qualifications relating thereto, and (b) upon a determination in the Guarantor's reasonable commercial judgment that the terms and conditions set forth in such consent or approval with respect to the Contribution are acceptable, make the Contribution within 60 calendar days thereafter.

## 5.    NEGATIVE COVENANTS

So long as any Note shall remain unpaid, the Guarantor covenants as follows:

**5.1.    Financial Covenants.**

(i)    <u>Minimum Consolidated EBITDA</u>.  With respect to any fiscal quarter ending prior to the Replacement Covenant Notice Date, the Guarantor will not permit Consolidated EBITDA for the period of four (4) consecutive fiscal quarters ended as of the last day of each fiscal quarter set forth below, to be less than the amount set forth below opposite such date:

| Fiscal Quarter Ending in | Consolidated EBITDA |
|---|---|
| March, 2012 | $26,700,000 |
| June, 2012 | $28,400,000 |
| September, 2012 | $25,600,000 |
| December, 2012 | $25,400,000 |
| March, 2013 | $25,300,000 |
| June, 2013 | $25,200,000 |
| September, 2013 | $25,100,000 |
| December, 2013 | $24,800,000 |
| March, 2014 | $24,700,000 |
| June, 2014 | $24,600,000 |
| September, 2014 | $24,500,000 |
| December, 2014 | $24,200,000 |

A/74565836.10

| | |
|---|---|
| March, 2015 | $24,200,000 |
| June, 2015 | $24,000,000 |
| September, 2015 | $23,900,000 |

(ii)    <u>Consolidated Debt to Consolidated EBITDA</u>.  With respect to any fiscal quarter ending after the Replacement Covenant Notice Date, the Guarantor will not permit the ratio of (a) Consolidated Debt as of the last day of such fiscal quarter to (b) Consolidated EBITDA for the four consecutive fiscal quarters ended as of such last day to be greater than 2.25 to 1.00.

**5.2.    Liens**.  The Guarantor will not, and will not permit any Subsidiary to, directly or indirectly, create, assume or suffer to exist (upon the happening of a contingency or otherwise) any Lien on or with respect to any of its property or assets, whether now owned or hereafter acquired, or any income or profits therefrom, or assign or otherwise convey the right to receive income or profits (whether or not provision is made for the equal and ratable securing of the Guaranteed Obligations in accordance with the provisions of Section 4.3), except:

(i)    mechanics', workmen's, repairmen's, warehousemen's, carriers' or other like Liens arising or incurred in the ordinary course of business for amounts which are not delinquent or are being actively contested in good faith by appropriate proceedings;

(ii)    with respect to real property, (a) easements, quasi-easements, licenses, covenants, rights-of-way and other similar restrictions, including any other agreements, conditions, restrictions or other matters which would be shown by a current title report or other similar report or listing, (b) any conditions that would be shown by a current survey or physical inspection and (c) zoning, building and other similar restrictions;

(iii)    Liens for taxes or assessments or other governmental charges or levies not yet due or which are being actively contested in good faith by appropriate proceedings if adequate reserves with respect thereto are maintained on the books of the Guarantor or its Subsidiaries, as the case may be, in accordance with GAAP;

(iv)    other Liens which were not incurred in connection with the borrowing of money or the obtaining of advances or credit, and which do not in the aggregate materially impair the use of such property and assets in the operation of the business of the Guarantor and its Subsidiaries, or materially detract from the value of such property or assets for the purpose of the business of the Guarantor and its Subsidiaries, taken as a whole;

(v)    Liens on property or assets of a Subsidiary (other than the Company and its Subsidiaries) to secure obligations of such Subsidiary (other than the Company and its Subsidiaries) to the Guarantor or another Subsidiary that is a Credit Party;

29

(vi)    any Lien existing on any property of any Person at the time it becomes a Subsidiary, or existing prior to the time of acquisition upon any property acquired by the Guarantor or any Subsidiary through purchase, merger, or consolidation or otherwise, whether or not assumed by the Guarantor or such Subsidiary, or placed upon property at the time of acquisition, construction or improvement by the Guarantor or any Subsidiary to secure all or a portion of (or to secure Debt (including any Capitalized Lease Obligation) incurred to pay all or a portion of) the purchase price or cost thereof or placed after acquisition upon property acquired, constructed or improved by the Guarantor or any Subsidiary after the Date of Closing, underlined provided that any such Lien shall not encumber any other property of the Guarantor or such Subsidiary and any Debt secured by any such Lien shall be permitted by Section 5.3;

(vii)    Liens on property owned or leased by the Guarantor or a Subsidiary (other than the Company) in favor of the United States of America or any state thereof, or any department, agency or instrumentality or political subdivision of the United States of America or any state thereof, or any political subdivision thereof, or in favor of holders of securities issued by any such entity, pursuant to any contract or statute (including, without limitation, mortgages to secure pollution control industrial revenue bonds) to secure any indebtedness incurred for the purpose of financing all or any part of the purchase price or the cost of construction of the property subject to such Liens, provided that any Debt secured thereby shall be permitted by Section 5.3;

(viii)    any Liens renewing, extending or refunding any Lien permitted by clauses (vi) and (vii) above, provided that the principal amount secured is not increased and the Lien is not extended to other property;

(ix)    any Liens permitted under paragraph 7C(1) of the Note Agreement;

(x)    Liens in favor of the Collateral Agent to secure the Secured Obligations; and

(xi)    Liens (other than Liens on the Excluded TNI Assets) securing Debt permitted by Section 5.3(iv) hereof, provided that such Liens are subject to the terms of the Intercreditor Agreement.

**5.3.    Priority Debt**.  The Guarantor will not at any time permit any Priority Debt to exist except (i) Debt (including, without limitation, Capitalized Lease Obligations) secured by Liens permitted by clauses (vi) and (vii) of Section 5.2 provided that the aggregate principal amount of all such Debt shall not at any time exceed $1,000,000, (ii) unsecured Debt in respect of the reimbursement obligations of letters of credit issued or in respect of worker's compensation arrangements not to exceed $5,000,000 outstanding at any time, (iii) unsecured Debt subordinated to the Secured Obligations on terms and conditions satisfactory to the Required Holders, and (iv) Debt of the Credit Parties under any guarantee of the Debt under or in respect of the Second Lien Loan Agreement (or any Permitted Refinancing Debt in respect thereof), so long as (a) the Intercreditor Agreement is in full force and effect, and (b) the

aggregate principal amount of the Debt which is guaranteed by any Credit Party in respect of the Second Lien Loan Agreement (or any Permitted Refinancing Debt in respect thereof) does not exceed $175,000,000 at any time.

**5.4.    Loans, Advances and Investments**.  The Guarantor will not, and will not permit any Subsidiary to, make or permit to remain outstanding any loan or advance to, or own, purchase or acquire any stock, obligations or securities of, or any interest in, or make any capital contribution to, any other Person, except that the Guarantor or any Subsidiary may:

(i)      [reserved];

(ii)      make or permit to remain outstanding any loans, advances or capital contributions from any Credit Party to another Credit Party;

(iii)      own, purchase or acquire stock, obligations or securities of or other equity interests in a Subsidiary or a Person which immediately after such purchase or acquisition will be a Subsidiary;

(iv)      permit to remain outstanding loans, advances and other investments existing on the Effective Date (as set forth on Schedule 5.4 hereto) in any business principally engaged in publishing (print or electronic) or related media activity;

(v)      make and permit to remain outstanding loans, advances and other investments received in settlement of debts (created in the ordinary course of business) owing to the Guarantor or any Subsidiary;

(vi)      own, purchase or acquire commercial paper issued by any corporation or bankers' acceptances issued by any member bank of the Federal Reserve System, in either case, maturing within one year of the date of purchase and rated, by at least two of S&P, Moody's and Fitch Investors Service, Inc., "A-1", "P-1" and "F-1", respectively, and payable in the United States in United States dollars;

(vii)      own, purchase or acquire certificates of deposit in any member bank of the Federal Reserve System having, or which is the principal banking subsidiary of a bank holding company having, a long-term unsecured debt rating of at least "A" or the equivalent thereof from S&P or "A2" or the equivalent thereof from Moody's, all due within one year from the date of original issue thereof and payable in the United States in United States dollars;

(viii)      own, purchase or acquire repurchase agreements of any member bank of the Federal Reserve System having, or which is the principal banking subsidiary of a bank holding company having, a long-term unsecured debt rating of at least "A" or the equivalent thereof from S&P or "A2" or the equivalent thereof from Moody's, for terms of less than one year in respect of commercial paper and certificates of deposit referred to in the foregoing clauses (vi) and (vii) and obligations referred to in clauses (ix) and (x) below;

(ix)     own, purchase or acquire obligations of the United States government or any agency thereof;

(x)     own, purchase or acquire obligations guaranteed by the United States government or any agency thereof;

(xi)     own, purchase or acquire investments in stocks of investment companies registered under the Investment Company Act of 1940 which invest primarily in obligations of the type described in clauses (vi), (vii), (viii), (ix) or (x) above, provided that any such investment company shall have an aggregate net asset value of not less than $500,000,000;

(xii)     own, purchase or acquire investments in money market funds that are classified as current assets in accordance with GAAP, and that are rated "AAAm" or the equivalent by S&P, Moody's or Fitch Investors Service, Inc., which funds are managed by either (a) Persons having capital and surplus, or net worth, in excess of $500,000,000 or (b) any Person that is a direct or indirect subsidiary of a Person described in the foregoing clause (a);

(xiii)     endorse negotiable instruments for collection in the ordinary course of business;

(xiv)     make or permit to remain outstanding travel and other like advances to officers and employees in the ordinary course of business;

(xv)     make or permit to remain outstanding investments in demand deposit accounts maintained by the Guarantor or any Subsidiary in the ordinary course of its business;

(xvi)     make or permit to remain outstanding investments consisting of Eurodollar time deposits, maturing within three months after the making thereof, with any branch of a United States commercial bank having capital and surplus of not less than $1 billion in the aggregate;

(xvii)     make or permit to remain outstanding investments in municipal obligations having a rating of "Aaa" by Moody's or "AAA" by S&P;

(xviii)     permit to remain outstanding investments of the Guarantor and its Subsidiaries set forth on Schedule 5.4;

(xix)     own, purchase or acquire notes and bonds issued by any domestic corporate issuer and rated at least A3 by Moody's or A- by S&P;

(xx)     own, purchase or acquire investments in commingled funds/portfolios that invest primarily in U.S. dollar denominated obligations, with a weighted average portfolio maturity of 120 days or less, and rated "AAA" or the equivalent, by at least two of S&P, Moody's and Fitch Investors Service, Inc., which funds are managed by either (a) Persons having capital and surplus, or net worth, in excess of

$500,000,000 or (b) any Person that is a direct or indirect subsidiary of a Person described in the foregoing clause (a);

(xxi)    permit the Lee Payable to remain outstanding so long as it shall bear interest (on a pay-in-kind basis) at a rate per annum equal to LIBOR plus 0.75% (75 basis points);

(xxii)  make or permit to remain outstanding loans and advances permitted by Section 5.8(i);

(xxiii)  in the case of the Guarantor, own, purchase or acquire investments in the Associated Press Digital Rights Agency or any successor thereto or any Affiliate thereof for Fair Market Value (as determined in good faith by the Board of Directors of the Guarantor at the time of such purchase or acquisition) in an aggregate amount not to exceed $750,000 at any time outstanding; provided that (a) the Guarantor shall be entitled to receive its ratable share (based on the aggregate amount of investments made by Lee and each of its Subsidiaries (other than the Guarantor), on the one hand, and the Guarantor, on the other hand) of any Equity Interests of such Person issued in consideration for, or on account of, the aggregate investments made in such Person by Lee and its Subsidiaries, (b) any such Equity Interests received by the Guarantor shall be pledged in favor of the Collateral Agent to secure the Secured Obligations in accordance with the Collateral Documents, and (c) the Guarantor shall, and shall cause its Subsidiaries to, vote or otherwise give their consent in respect of all such Equity Interests of such Person beneficially owned by the Guarantor or its Subsidiaries for the election to the board of directors (or other similar governing body) of such Person of Mary Junck or her designee (or any person acceptable to the Required Holders), provided further that the foregoing proviso shall not apply to the issuance of fractional Equity Interests to the extent that the issuance thereof is prohibited by the organization documents of Associated Press Digital Rights Agency as in effect on the date hereof; and

(xxiv)  deliver or permit to be delivered consideration in connection with the redemption of the "phantom equity interests" held by Herald as contemplated by the Redemption Agreement (as in effect on the Restructuring Closing Date) consisting solely of common stock of Lee or cash contributed by Lee for purposes of making such delivery (it being understood that any such cash contributed by Lee shall reduce the Lee Payable by an amount equal to such cash contribution);

provided that, notwithstanding the foregoing, the Guarantor will not permit Star Publishing to make, or permit to remain outstanding, any loan or advance to, or own, purchase or acquire any stock, obligations or securities of, all or substantially all of the assets of, or any interest in, or make any capital contribution to, any Person or purchase or acquire the assets comprising any line of business or business unit or division thereof, except to the extent required under the terms of the TNI Agreement.

**5.5.    Sale or Disposition of Assets**.  The Guarantor will not, and will not permit any Subsidiary to, engage in any Asset Sale (i) if the aggregate amount of Asset Sale Proceeds in

respect of any one transaction or series of related transactions would be equal to or less than $1,000,000 unless at least 75% of such Asset Sale Proceeds consist of cash or (ii) if the aggregate amount of Asset Sale Proceeds in respect of any one transaction or series of related transactions would be more than $1,000,000 unless such Asset Sale Proceeds consist only of cash and the Required Holders have given their prior written consent thereto; *provided, however,* that notwithstanding the foregoing, no Asset Sale shall involve the sale of any Equity Interests in Star Publishing or the Equity Interests of TNI Partners held by Star Publishing.

**5.6.    Sale and Lease-Back**.   The Guarantor will not, and will not permit any Subsidiary to, enter into any arrangement with any lender or investor or under which such lender or investor is a party, providing for the leasing or other similar arrangement by the Guarantor or any Subsidiary of real or personal property used by the Guarantor or any Subsidiary in the operations of the Guarantor or any Subsidiary, which has been or is sold or transferred by the Guarantor or any Subsidiary to such lender or investor or to any Person to whom funds have been or are to be advanced by such lender or investor on the security of such rental obligations of the Guarantor or such Subsidiary, except that the Guarantor or any Subsidiary (other than the Company and its Subsidiaries) may enter into sale and lease-back transactions involving newspaper equipment or facilities acquired after the Effective Date if (i) such arrangement shall be for a period of less than three years by the end of which the use of such property by the lessee will be discontinued, (ii) the Guarantor or such Subsidiary complies with Section 5.5 with respect to such transaction and (iii) the property immediately prior to such sale could have been subjected to a Lien securing Debt in an amount equal to such net proceeds and which Lien would be permitted by clause (vi) of Section 5.2.

**5.7.    Merger**.  The Guarantor will not, and will not permit any Subsidiary to, merge or consolidate with any other Person except that any Subsidiary may merge or consolidate with the Guarantor (provided that the Guarantor shall be the continuing or surviving Person) or any one or more other Subsidiaries that is a Credit Party; provided that nothing in this Section 5.7 shall restrict any such transaction which, if structured as an Asset Sale, would be permitted under Section 5.5.

**5.8.    Transactions With Affiliates; Lee Company Transactions.**

(i)    Subject to clause (ii) of this Section 5.8, the Guarantor will not, and will not permit any Subsidiary to, directly or indirectly enter into or be a party to any transaction or arrangement, including, without limitation, the purchase, sale, exchange or use of any property or asset, or any interest therein, whether real, personal or mixed, or tangible or intangible, or the rendering of any service, with any Affiliate, <u>except</u> (a) for any such transaction by and among the Credit Parties only, (b) for the transaction contemplated by Section 5.4(xxiv), (c) for the payment of the Allocable Share of the Lee/Pulitzer Restructuring Costs, (d) for any Unrestricted Intercompany Transaction and (e) the Guarantor may make Restricted Intercompany Charges if either (1) (x) such Restricted Intercompany Charges are consistent in nature and manner of computation with the types of Restricted Intercompany Charges incurred during the period from March [__], 2009 through and including September [__], 2011 and (y) any such Restricted Intercompany Charges which are to be paid in cash do not exceed an aggregate amount of

34

$5,500,000 in any fiscal year of the Guarantor, or (2) such Restricted Intercompany Charges arise from reasonably expected and identifiable cost-saving measures relating to goods and services provided to the Guarantor and its Subsidiaries which are implemented after the Restructuring Closing Date as set forth in an Officer's Certificate delivered to the holders of the Notes by the chief financial officer of the Guarantor, so long as (A) with respect to any goods and services proposed to be provided by any Lee Company as part of the implementation of any such cost-savings measures, the Restricted Intercompany Charges to be charged by any Lee Company to provide such goods and services to the Guarantor during the four successive fiscal quarters following such implementation (and for each successive period of four consecutive fiscal quarters ending thereafter) are reasonably expected to be no greater than the cost for the same goods and services previously paid in cash by the Guarantor for the period of four consecutive fiscal quarters of the Guarantor then most recently ended immediately prior to the implementation of such cost-saving measures, and (B) the aggregate amount paid in cash by the Guarantor in respect of such Restricted Intercompany Charges as set forth in this clause (2) does not exceed $2,000,000 in any fiscal year of the Guarantor.

(ii)    All payments in respect of Restricted Intercompany Charges or Unrestricted Intercompany Transactions pursuant to Section 5.8(i) above shall meet the following requirements: (a) any such transaction is in the ordinary course of, and pursuant to the reasonable requirements of, the Guarantor's and each Subsidiary's business, as the case may be, (b) any such transaction is upon fair and reasonable terms that are no less favorable to the Guarantor and/or any of its Subsidiaries, as the case may be, than those which might be obtained in an arm's length transaction with a Person who is not an Affiliate and (c) any payment required to be made in cash is made by the Guarantor not more than 3 days prior to delivery of such goods, the rendering of such services or the making of such payments by any Lee Company to a third party.

**5.9.    Sale of Stock and Debt of Subsidiaries**.  Other than pursuant to the Collateral Documents, the Guarantor will not, and will not permit any Subsidiary to, sell or otherwise dispose of, or part with control of, any shares of stock of (or other equity interests in) or Debt of any Subsidiary, <u>except</u> that shares of stock of (or other equity interests in) or Debt of any Subsidiary (other than the Company or its Subsidiaries) may be sold or otherwise disposed of to the Guarantor or another Subsidiary that is a Credit Party, and except that all shares of stock of (or other equity interests in) and Debt of any Subsidiary (other than the Company or its Subsidiaries) at the time owned by or owed to the Guarantor or any Subsidiary may be sold as an entirety for a cash consideration which represents the Fair Market Value (as determined in good faith by the Board of Directors of the Guarantor) at the time of sale of the shares of stock or other equity interests and Debt so sold, <u>provided</u> that the Guarantor or such Subsidiary complies with Section 5.5 with respect to such sale, and <u>further</u> <u>provided</u> that, in any event, at the time of such sale, such Subsidiary shall not own, directly or indirectly, any shares of stock of (or other equity interests in) or Debt of any other Subsidiary (unless all of the shares of stock of (or other equity interests in) and Debt of such other Subsidiary owned, directly or indirectly, by the Guarantor and all Subsidiaries are simultaneously being sold as permitted by Section 5.5 and this Section 5.9).

**5.10.    Issuance of Stock by Subsidiaries**.    The Guarantor will not permit any Subsidiary to issue, sell or otherwise dispose of, any shares of its stock (of any class) or any other equity interests except to the Guarantor or another Subsidiary which is a Credit Party.

**5.11.    Limitation on Certain Restrictive Agreements**.    The Guarantor will not permit any Subsidiary to enter into or suffer to exist any contractual obligation which in any way restricts the ability of such Subsidiary to (i) make any Distributions to the Guarantor or any other Subsidiary or (ii) transfer any of its property or assets to the Guarantor or any other Subsidiary, [except for any such restrictions set forth in the Credit Agreement and the Second Lien Loan Agreement or in any documents, instruments or agreements evidencing any Permitted Refinancing Debt thereof, as applicable, in each case, as in effect on the date hereof, or, with respect to any Permitted Refinancing Debt, on the date of the incurrence or issuance thereof].

**5.12.    Capital Expenditures**.

(i)    The Guarantor will not, and will not permit any of its Subsidiaries to, make Capital Expenditures in any of the following fiscal years of the Guarantor in an aggregate amount for all such Persons in excess of the amount set forth below opposite such fiscal year:

| Fiscal Year Ending | Aggregate Amount of Capital Expenditures |
|:---:|:---:|
| 2012 | $5,600,000 |
| 2013 | $4,000,000 |
| 2014 | $4,000,000 |
| 2015 | $4,000,000 |

(ii)    In the event that the amount of Capital Expenditures permitted to be made by the Guarantor and its Subsidiaries during any fiscal year of the Guarantor is greater than the amount of Capital Expenditures actually made by the Guarantor and its Subsidiaries during such fiscal year, 100% of such excess for such fiscal year may be carried forward and utilized to make Capital Expenditures in any succeeding fiscal year.

**5.13.    Restricted Payments.**    The Guarantor will not, and will not permit any Subsidiary to, make any Restricted Payments at any time except for Restricted Payments made to another Subsidiary or the Guarantor.    The Guarantor shall cause Star Publishing to pay to the Guarantor as a dividend (i) promptly and in any event within 5 Business Days of the receipt thereof, all cash and other distributions it receives from TNI or otherwise pursuant to the TNI Agreement or otherwise and (ii) within 5 Business Days after the end of each calendar month, all cash and Cash Equivalents it holds as of the end of such calendar month (other than cash to be paid pursuant to the foregoing clause (i)).

36

**5.14.    Terrorism Sanctions Regulations**.  The Guarantor will not and will not permit any Controlled Entity to (a) become a Blocked Person or (b) have any investments in or engage in any dealings or transactions with any Blocked Person if such investments, dealings or transactions would cause any holder of a Note to be in violation of any laws or regulations that are applicable to such holder.

**5.15.    Debt.**[2]  The Guarantor will not, and will not permit any Subsidiary to, create, incur, assume, guarantee or in any way become liable for any Debt except:

(i)    Debt represented by the Transaction Documents;

(ii)    Debt or indebtedness of the Guarantor owing to any of its Subsidiaries that are Credit Parties or Debt or indebtedness owing by any Credit Party to another Credit Party; <u>provided</u> that such Debt or indebtedness is unsecured;

(iii)    Debt in respect of any guarantee by the Credit Parties of Debt of Lee under and in respect of the Second Lien Loan Agreement (or any Permitted Refinancing Debt in respect of the Second Lien Loan Agreement), so long as (a) the Intercreditor Agreement is in full force and effect, and (ii) the aggregate principal amount of the Debt which is guaranteed by any Credit Party in respect of the Second Lien Loan Agreement (or any Permitted Refinancing Debt in respect thereof) shall not exceed $175,000,000;

(iv)    Debt or indebtedness of the Guarantor or any of its Subsidiaries permitted under Sections 5.3, 5.4 or 5.8;

(v)    Debt of the Guarantor and its Subsidiaries consisting of trade payables incurred in the ordinary course of business;

(vi)    (a) Debt of the Guarantor and its Subsidiaries constituting Capitalized Lease Obligations, (b) other Debt of the Guarantor or its Subsidiaries to finance the purchase price or cost of property acquired, constructed or improved by the Guarantor or any Subsidiary after the Restructuring Closing Date, or (c) Debt secured by Liens existing on any property of any Person at the time it becomes a Subsidiary, or existing prior to the time of acquisition upon any property acquired by the Guarantor or any Subsidiary through purchase, merger, or consolidation or otherwise, and assumed by the Guarantor or such Subsidiary, in each case to the extent such Liens are permitted under Section 5.2(vi), <u>provided</u> that the aggregate principal amount of all such Debt described in subclauses (a), (b) and (c) of this clause (vi) at any time outstanding shall not exceed $5,000,000;

(vii)    Debt or indebtedness secured by Liens permitted under clauses (v) and (viii) of Section 5.2 (<u>provided</u>, in the case of Liens permitted under clause (viii) of Section 5.2 that renew, extend or refund any Lien permitted under clause (vi) of Section

---

[2] Debt covenant inserted since, with the elimination of the leverage ratio, there is no unsecured debt test applicable to the Guarantor.  This provision tracks the debt covenant in the Note Agreement (and does duplicate to some extent, the permissions in Section 5.3).

5.2, that such Liens shall be permitted only to the extent the Debt or indebtedness secured thereby is permitted under clause (vi) of this Section 5.15;

(viii)    unsecured Debt in respect of the reimbursement obligations of letters of credit issued or in respect of worker's compensation arrangements not to exceed $5,000,000 outstanding at any time; and

(ix)    unsecured Debt (other than the Debt permitted by Section 5.15(iii)) which is subordinated to the Secured Obligations on terms and conditions satisfactory to the Required Holders.

## 6.    EVENTS OF DEFAULT; REMEDIES

**6.1.    Events of Default**.  The occurrence of an "Event of Default" under and as defined in the Note Agreement or the occurrence of any of the following events shall constitute an "**Event of Default**" under this Guaranty:

(i)    (a) Lee or any of its Subsidiaries shall (1) default in any payment of any Debt (other than the Note Obligations) beyond the period of grace, if any, provided in an instrument or agreement under which such Debt was created or (2) default in the observance or performance of any agreement or condition relating to any Debt (other than the Note Obligations) or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Debt (or a trustee or agent on behalf of such holder or holders) to cause (determined without regard to whether any notice is required), any such Debt to become due (and/or, in the case of an Interest Rate Protection Agreement or Other Hedging Agreement, to be terminated) prior to its stated maturity, or (b) any Debt (other than the Note Obligations) of Lee or any of its Subsidiaries shall be declared to be (or shall become) due and payable (and/or, in the case of an Interest Rate Protection Agreement or Other Hedging Agreement, to be terminated), or required to be prepaid (and/or terminated, as the case may be) other than by a regularly scheduled required prepayment, prior to the stated maturity thereof, provided that it shall not be a Default or an Event of Default under this clause (xvi) unless the aggregate principal amount of all Debt as described in the preceding clauses (a) and (b) is at least $10,750,000 or unless such Debt is in respect of the Credit Agreement or the Second Lien Loan Agreement or any Permitted Refinancing Debt or any Additional Permitted Indebtedness (as defined in the Second Lien Loan Agreement); provided, however, that with respect to any breach or default under Sections [10.08 or 10.09] of the Credit Agreement (as in effect on the date hereof) or Section [__] of the Second Lien Loan Agreement (as in effect on the date hereof) (or any successor provisions or analogous financial covenants in any documentation relating to any Permitted Refinancing Debt), such breach or default shall only constitute an Event of Default under this clause (xvi) if such breach or default occurs and is not cured or waived within 30 days after the occurrence of such breach or default; or

A/74565836.10

(ii)    any representation or warranty made by the Guarantor herein or in any other Transaction Document or in any writing furnished in connection with or pursuant to this Guaranty or any other Transaction Document, shall be false in any material respect on the date as of which made; or

(iii)    the Guarantor fails to perform or observe any term, covenant or agreement contained in Sections 2 or 5 of this Guaranty; or

(iv)    the Guarantor fails to perform or observe any other agreement, term or condition contained herein (other than those referred to in clause (iii)) and such failure shall not be remedied within 30 days after any Responsible Officer of the Guarantor obtains actual knowledge thereof; or

(v)    the Guarantor or any Subsidiary (other than a Subsidiary of the Company that is not a Material Subsidiary) makes an assignment for the benefit of creditors or is generally not able to pay its debts as such debts become due; or

(vi)    any decree, judgment, or order for relief in respect of the Guarantor or any Subsidiary (other than a Subsidiary of the Company that is not a Material Subsidiary) is entered under any bankruptcy, reorganization, compromise, arrangement, insolvency, readjustment of debt, dissolution or liquidation or similar law, whether now or hereafter in effect (herein called the "**Bankruptcy Law**"), of any jurisdiction; or

(vii)    the Guarantor or any Subsidiary (other than a Subsidiary of the Company that is not a Material Subsidiary) petitions or applies to any tribunal for, or consents to, the appointment of, or taking possession by, a trustee, receiver, custodian, liquidator or similar official of the Guarantor or any such Subsidiary, or of any substantial part of the assets of the Guarantor or any such Subsidiary, or commences a voluntary case under the Bankruptcy Law of the United States or any proceedings (other than proceedings for the voluntary liquidation and dissolution of any such Subsidiary) relating to the Guarantor or any such Subsidiary under the Bankruptcy Law of any other jurisdiction; or

(viii)    any such petition or application is filed, or any such proceedings are commenced, against the Guarantor or any Subsidiary (other than a Subsidiary of the Company that is not a Material Subsidiary) and the Guarantor or such Subsidiary by any act indicates its approval thereof, consent thereto or acquiescence therein, or an order, judgment or decree is entered appointing any such trustee, receiver, custodian, liquidator or similar official, or approving the petition in any such proceedings, and such order, judgment or decree remains unstayed and in effect for more than 60 days; or

(ix)    any order, judgment or decree is entered in any proceedings against the Guarantor or any Subsidiary (other than a Subsidiary of the Company that is not a Material Subsidiary) decreeing the dissolution of the Guarantor or such Subsidiary

and such order, judgment or decree remains unstayed and in effect for more than 60 days; or

(x)      one or more final judgments in an aggregate amount in excess of $10,000,000 is rendered against the Guarantor or any of its Subsidiaries and, within 60 days after entry thereof, any such judgment is not discharged or execution thereof stayed pending appeal, or within 60 days after the expiration of any such stay, such judgment is not discharged; or

(xi)      (a) any Plan shall fail to satisfy the minimum funding standards of ERISA or the Code for any plan year or part thereof or a waiver of such standards or extension of any amortization period is requested or granted under section 412 of the Code, (b) a notice of intent to terminate any Plan in a distress termination (within the meaning of ERISA section 4041(c)) shall have been or is reasonably expected to be filed with the PBGC or the PBGC shall have instituted proceedings under ERISA section 4042 to terminate or appoint a trustee to administer any Plan or the PBGC shall have notified the Guarantor or any ERISA Affiliate that a Plan may become a subject of such proceedings, (c) the aggregate "amount of unfunded benefit liabilities" (within the meaning of section 4001(a)(18) of ERISA) under all Plans, determined in accordance with Title IV of ERISA, shall exceed $76,000,000, (d) the Guarantor or any ERISA Affiliate shall have incurred or is reasonably expected to incur any liability pursuant to Title I or IV of ERISA or the penalty or excise tax provisions of the Code relating to employee benefit plans, (e) the Guarantor or any ERISA Affiliate is assessed liability for a partial or complete withdrawal from any Multiemployer Plan, or (f) the Guarantor or any Subsidiary establishes or amends any employee welfare benefit plan that provides post-employment welfare benefits in a manner that would increase the liability of the Guarantor or any Subsidiary thereunder; and any such event or events described in clauses (a) through (f) above, either individually or together with any other such event or events, could reasonably be expected to  have a Material Adverse Effect; or

(xii)      any Collateral Document shall cease for any reason (other than pursuant to the terms thereof) to create a valid Lien in the collateral purported to be covered thereby or such Lien shall for any reason cease to be a perfected and first priority Lien (subject only to Liens permitted by Section 5.2) and, in the case of any failure of the validity, perfection or priority of any such Lien which results from the actions or inaction of the Collateral Agent, such failure shall continue for a period of 30 days from the earlier of (i) the date on which written notice of such failure is provided to the Guarantor from any Purchaser or the Collateral Agent or (ii) actual knowledge of such failure by any Credit Party; or

(xiii)      any provision of the Tax Sharing Agreement shall be amended, waived or otherwise modified without the consent of the Required Holders or Pulitzer shall fail diligently to enforce its rights thereunder in any material respect.

**6.2.      Remedies**.  Upon the occurrence of an Event of Default under this Guaranty, the Required Holders may, at its or their option, make demand hereunder for payment of the

Guaranteed Obligations and exercise any and all remedies available to it or them, whether under the Note Agreement or any other instrument or agreement entered into in connection therewith or relating thereto or otherwise at law or in equity.

## 7.    MISCELLANEOUS

**7.1.    Survival of Representations and Warranties; Entire Agreement**.    All representations and warranties contained herein or made in writing by or on behalf of the Guarantor in connection herewith shall survive the execution and delivery of this Guaranty, the purchase or transfer of any Note or portion thereof or interest therein and the payment of any Note, and may be relied upon by any subsequent holder of Notes, regardless of any investigation made at any time by or on behalf of any other holder of Notes.    All statements contained in the Transaction Documents to which the Guarantor is a party or any certificate or other instrument delivered by or on behalf of the Guarantor pursuant to or in connection with this Guaranty shall be deemed representations and warranties of the Guarantor under this Guaranty.    Subject to the preceding sentence, this Guaranty and the Transaction Documents to which the Guarantor is a party embody the entire agreement and understanding between the Guarantor and the holders of the Notes and supersede all prior agreements and understandings relating to the subject matter hereof.

**7.2.    Consent to Amendments**.    This Guaranty (or any amendment hereto) may be amended or any provision hereof may be waived, and the Guarantor may take any action herein prohibited, or omit to perform any act herein required to be performed by it, if the Guarantor shall obtain the written consent to such amendment, waiver, action or omission to act, of the Required Holder(s), except that that (i) no amendment or waiver of any of the provisions of Section 2 hereof or any defined term (as it is used therein) and (ii) no termination of this Guaranty in its entirety or release of the Guarantor herefrom will be effective unless consented to in writing by the holder or holders of all Notes at the time outstanding.    The Guarantor will not directly or indirectly pay or cause to be paid any remuneration, whether by way of supplemental or additional interest, fee or otherwise, or grant any security, to any holder of Notes as consideration for or as an inducement to the entering into by any holder of Notes or any waiver or amendment of any of the terms and provisions hereof (or any amendment hereto) unless such remuneration is concurrently paid, or security is concurrently granted, on the same terms, ratably to each holder of Notes then outstanding even if such holder did not consent to such waiver or amendment.

**7.3.    Binding Effect, etc.**    Any amendment or waiver consented to as provided in Section 7.2 hereof applies equally to all holders of Notes and is binding upon them and upon each future holder of any Note and the Guarantor without regard to whether such Note has been marked to indicate such amendment or waiver.    No such amendment or waiver will extend to or affect any obligation, covenant, agreement or Event of Default not expressly amended or waived or impair any right consequent thereon.    No course of dealing between the Guarantor and any holder of Notes nor any delay in exercising any rights hereunder or under any Note shall operate as a waiver of any rights of any holder of such Note.

**7.4.    Notices**.    All written communications provided for hereunder shall be sent by first class mail or nationwide overnight delivery service (with charges prepaid) and (i) if to any holder

41

of Notes, addressed to it at the address specified for such communications in Schedule A to the Note Agreement, or at such other address as such holder of Notes shall have specified to the Guarantor or the Company in writing or, if any such other holder shall not have so specified an address to the Guarantor or the Company, then addressed to such holder in care of the last holder of such Note which shall have so specified an address to the Guarantor or the Company, and (ii) if to the Guarantor, addressed to it at 900 North Tucker Boulevard, St. Louis, Missouri 63101, Attention: Senior Vice President-Finance, or at such other address as the Guarantor shall have specified to the holder of each Note in writing.

7.5.    **Severability**.    Any provision of this Guaranty which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

7.6.    **Successors and Assigns**.    All covenants and other agreements in this Guaranty shall bind the successors and assigns of the Guarantor and shall inure to the benefit of the successors and assigns of the holders of Notes (including, without limitation, any Transferee) whether so expressed or not.

7.7.    **Independence of Covenants**.    All covenants hereunder shall be given independent effect so that if a particular action or condition is prohibited by any one of such covenants, the fact that it would be permitted by an exception to, or otherwise be in compliance within the limitations of, another covenant shall not (i) avoid the occurrence of an Event of Default or Default if such action is taken or such condition exists or (ii) in any way prejudice an attempt by the holders of Notes to prohibit (through equitable action or otherwise) the taking of any action by the Guarantor or a Subsidiary which would result in an Event of Default or Default.

7.8.    **Satisfaction Requirement**.    If any agreement, certificate or other writing, or any action taken or to be taken, is by the terms of this Guaranty required to be satisfactory to any holder of Notes or to the Required Holder(s), the determination of such satisfaction shall be made by such holder or the Required Holder(s), as the case may be, in the sole and exclusive judgment (exercised in good faith) of the Person or Persons making such determination.

7.9.    **Counterparts**.    This Guaranty may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one instrument.

7.10.    **Governing Law**.    This Guaranty shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York.

7.11.    **Consent to Jurisdiction; Waiver of Immunities.**    The Guarantor hereby irrevocably submits to the jurisdiction of any New York state or Federal court sitting in New York in any action or proceeding arising out of or relating to this Guaranty, and the Guarantor hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in New York state or Federal court. The Guarantor hereby irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the

42

maintenance of such action or proceeding.  The Guarantor agrees and irrevocably consents to the service of any and all process in any such action or proceeding by the mailing, by registered or certified U.S. mail, or by any other means or mail that requires a signed receipt, of copies of such process to the Guarantor at its address set forth in section 7.4.  The Guarantor agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Section 7.11 shall affect the right of any holder of the Notes to serve legal process in any other manner permitted by law or affect the right of any holder of the Notes to bring any action or proceeding against the Guarantor or its property in the courts of any other jurisdiction.  To the extent that the Guarantor has or hereafter may acquire immunity from jurisdiction of any court or from any legal process (whether through service of notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) with respect to itself or its property, the Guarantor hereby irrevocably waives such immunity in respect of its obligations under this Guaranty.

**7.12.    Waiver of Jury Trial.**  THE GUARANTOR AND THE HOLDERS OF THE NOTES AGREE TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS GUARANTY, THE NOTE AGREEMENT, THE NOTES, OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS TRANSACTION AND THE LENDER/GUARANTOR RELATIONSHIP THAT IS BEING ESTABLISHED.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.  THE HOLDERS OF THE NOTES AND THE GUARANTOR EACH ACKNOWLEDGE THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO THIS BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THE WAIVER IN THEIR RELATED FUTURE DEALINGS.  THE HOLDERS OF THE NOTES AND THE GUARANTOR FURTHER WARRANT AND REPRESENT THAT EACH HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  IN THE EVENT OF LITIGATION, THIS GUARANTY MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

A/74565836.10

IN WITNESS WHEREOF, the undersigned has caused this Guaranty to be executed and delivered by its duly authorized officer as of the date first above written to become effective as of such date.

PULITZER INC.


By:_____
Name:
Title:

**Schedule 3.3 to**
**Guaranty Agreement**

**<u>Litigation</u>**

**Schedule 3.4**
**to Guaranty Agreement**

**<u>Outstanding Debt</u>**

**Schedule 3.7**
**to Guaranty Agreement**

## Agreements Restricting Incurrence of Debt

**Schedule 3.8**
**to Guaranty Agreement**

## ERISA

**Schedule 3.13**
**to Guaranty Agreement**

### Subsidiaries of the Guarantor and Ownership of Subsidiary Stock

A/74565836.10

**Schedule 5.4**
**to Guaranty Agreement**

## Existing Investments

A/74565836.10

# **Exhibit 1.89**

*New Second Lien Term Loan Agreement (inclusive of all exhibits thereto)*

**MILBANK DRAFT**
**DEC. 2, 2011**

---

SECOND LIEN LOAN AGREEMENT[1]

among

LEE ENTERPRISES, INCORPORATED,

VARIOUS LENDERS

and

WILMINGTON TRUST, NATIONAL ASSOCIATION,

as ADMINISTRATIVE AGENT and COLLATERAL AGENT

_____

Dated as of [_____], 2012

_____

DEUTSCHE BANK SECURITIES INC.
and

GOLDMAN SACHS BANK USA
as JOINT LEAD ARRANGERS
and

as JOINT BOOK RUNNING MANAGERS

---

[1]    **The Credit Parties (i) acknowledge that no disclosure schedules or similar information contemplated by this Agreement or any other Credit Document have been provided as of the date of this draft, (ii) agree that, to the extent that the information set forth in such disclosure schedules or other information differs in any respect from the information provided to the Backstop Parties prior to the Effective Date (as defined in the Lee Support Agreement), without prejudice to any other rights of any Backstop Party under its Backstop Commitment Letter, the Lenders hereunder reserve the right in their reasonable discretion to make appropriate changes to this Agreement and (iii) agree that the Backstop Parties reserve the right, but have no obligation, to conform this Agreement or any other Credit Document in respect of any change made to any Pulitzer Debt Document or First Lien Credit Document made to the forms thereof agreed as of December 2, 2011 to be exhibited to the Plan.**

SECOND LIEN LOAN AGREEMENT, dated as of [_____], 2012, among LEE ENTERPRISES, INCORPORATED, a Delaware corporation (the "Borrower"), the Lenders party hereto from time to time, and WILMINGTON TRUST, NATIONAL ASSOCIATION, as Administrative Agent, DEUTSCHE BANK SECURITIES INC., and GOLDMAN SACHS BANK USA, as Joint Lead Arrangers and Joint Book Running Managers.  All capitalized terms used herein and defined in Section 1 are used herein as therein defined.

W I T N E S S E T H:

WHEREAS, on December [__], 2011 (the "Petition Date") the Borrower and certain of its Subsidiaries (collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of Title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and continued in the possession of their property and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, on [_____], 2012 the Bankruptcy Court entered an order confirming the Joint Prepackaged Plan of Reorganization for Lee Enterprises Incorporated and its Debtor Subsidiaries, dated [_____] (as in effect on the date of confirmation thereof pursuant to the Confirmation Order and as thereafter may be amended in accordance with the Lee Support Agreement, the "Plan of Reorganization");

WHEREAS, in connection with the confirmation and implementation of the Plan of Reorganization, in partial satisfaction of the Prepetition Credit Agreement Claims, certain holders of the Existing Loans have agreed to become parties to this Agreement on the Effective Date in accordance with the terms of the relevant Backstop Commitment Letters;

WHEREAS, the Borrower and the Lenders originally party hereto are parties to the Prepetition Credit Agreement and the relevant Backstop Commitment Letter and the Lee Support Agreement;

WHEREAS, the Lenders originally party hereto have agreed pursuant to (and in accordance with the terms of and subject to the conditions in) the Lee Support Agreement and the relevant Backstop Commitment Letter to convert the Existing Loans into Loans hereunder; and

WHEREAS, subject to and upon the terms and conditions set forth herein, the Lenders are willing to make available to the Borrower the credit facility provided for herein.

NOW, THEREFORE, IT IS AGREED as follows:

SECTION 1.    Definitions and Accounting Terms.

1.01    Defined Terms.  As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Additional Permitted Indebtedness" shall have the meaning provided in Section 10.04(xii).

"Additional Security Documents" shall have the meaning provided in Section 9.12(b).

"Administrative Agent" shall mean Wilmington Trust, National Association, in its capacity as Administrative Agent for the Lenders hereunder and under the other Credit Documents, and shall include any successor to the Administrative Agent appointed pursuant to Section 12.09.

"Affiliate" shall mean, with respect to any Person, any other Person directly or indirectly controlling (including, but not limited to, all directors and officers of such Person), controlled by, or under direct or indirect common control with, such Person. A Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power (i) to vote 5% or more of the securities having ordinary voting power for the election of directors (or equivalent governing body) of such Person or (ii) to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise; provided, however, that no Lender as of the Effective Date (nor any Affiliate thereof) shall be considered an Affiliate of the Borrower or any Subsidiary thereof.

"Agents"  shall mean and include each of the Administrative Agent, the Collateral Agent, the Joint Lead Arrangers and the Joint Book Running Managers.

"Agreement" shall mean this Second Lien Loan Agreement, as modified, supplemented, amended, restated (including any amendment and restatement hereof), extended or renewed from time to time.

"Allocable Share of the Lee/Pulitzer Restructuring Costs" shall mean that amount of the aggregate amount of fees and expenses payable to counsel for, and financial advisers to, the Borrower and its Subsidiaries (including the Pulitzer Entities) in connection with the issuance of the Notes as contemplated by (and as defined in) the Pulitzer Debt Agreement as of the Effective Date and each of the other transactions contemplated thereunder and under the Pulitzer Support Agreement and the Lee Support Agreement and under the Plan of Reorganization, as shall be allocated to PD LLC for payment by PD LLC, with the approval of the Required Lenders in their reasonable business judgment.

"Anti-Money Laundering Laws" shall have the meaning provided in Section 8.23(c).

"Applicable Interest Rate" shall mean 15.0% per annum.

"Asset Sale" shall mean any sale, transfer or other disposition by the Borrower or any of its Subsidiaries to any Person (including by way of redemption by such Person) other than (i) in the case of any Lee Entity, to the Borrower or a Wholly-Owned Subsidiary of the Borrower that is a Lee Entity or (ii) in the case of any Pulitzer Entity, to Pulitzer or any Wholly-Owned Subsidiary of Pulitzer, in each case of any asset (including, without limitation, any capital stock

or other securities of, or Equity Interests in, another Person), but excluding sales, transfers or other dispositions of assets pursuant to Sections 10.02(ii), (iii), (vi), (vii) (viii), (ix), (x) and (xi).

"<u>Assignment and Assumption Agreement</u>" shall mean an Assignment and Assumption Agreement substantially in the form of Exhibit L (appropriately completed).

"<u>Authorized Officer</u>" shall mean, with respect to (i) delivering the Notice of Borrowing, notices of any prepayments pursuant to Section 5.01 and similar notices, any person or persons that has or have been authorized by the board of directors of the Borrower to deliver such notices pursuant to this Agreement and that has or have appropriate signature cards on file with the Administrative Agent, (ii) delivering financial information and officer's certificates pursuant to this Agreement, the chief financial officer, the treasurer or the principal accounting officer of the Borrower, and (iii) any other matter in connection with this Agreement or any other Credit Document, any officer (or a person or persons so designated by any two officers) of the Borrower.

"<u>Backstop Commitment Letter</u>" shall mean (i) the Amended and Restated Backstop Commitment Letter, dated as of December 2, 2011, between the Borrower and GS Lending Partners, (ii) the Amended and Restated Backstop Commitment Letter, dated as of December 2 2011, between the Borrower and Monarch, (iii) the Amended and Restated Backstop Commitment Letter, dated as of December 2, 2011, between the Borrower and Mutual Quest, (iv) the Backstop Commitment Letter, dated as of December 2, 2011, between the Borrower and Mudrick Distressed Opportunity Fund Global, LP, and (v) the Backstop Commitment Letter, dated as of December 2, 2011, between the Borrower and Blackwell Partners, LLC.

"<u>Backstop Party</u>" shall mean each of GS Lending Partners, Monarch, Mutual Quest, Mudrick Distressed Opportunity Fund Global, LP, Blackwell Partners, LLC and each of their respective assignees under (and in accordance with) the applicable Backstop Commitment Letter.

"<u>Bankruptcy Code</u>" shall have the meaning provided in Section 11.05.

"<u>Bankruptcy Court</u>" shall have the meaning provided in the recitals hereto.

"<u>Blocked Person</u>" shall have the meaning provided in Section 8.23(a).

"<u>Borrower</u>" shall have the meaning provided in the first paragraph of this Agreement.

"<u>Borrowing</u>" shall mean the borrowing (or deemed borrowing) of the Loans.

"<u>Business Day</u>" shall mean any day except Saturday, Sunday and any day which shall be in New York, New York, a legal holiday or a day on which banking institutions are authorized or required by law or other government action to close.

"Capital Expenditures" shall mean, with respect to any Person, all expenditures by such Person which should be capitalized in accordance with GAAP and, without duplication, the amount of Capitalized Lease Obligations incurred by such Person.

"Capitalized Lease Obligations" shall mean, with respect to any Person, all rental obligations of such Person which, under GAAP, are or will be required to be capitalized on the books of such Person, in each case taken at the amount thereof accounted for as indebtedness in accordance with such principles.

"Cash Equivalents" shall mean, as to any Person, (i) securities issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof (provided that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than twelve months from the date of acquisition, (ii) marketable direct obligations issued by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within twelve months from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either S&P or Moody's, (iii) Dollar denominated time deposits, certificates of deposit and bankers acceptances of any Lender or any commercial bank having, or which is the principal banking subsidiary of a bank holding company having, a long-term unsecured debt rating of at least A or the equivalent thereof from S&P or A2 or the equivalent thereof from Moody's with maturities of not more than twelve months from the date of acquisition by such Person, (iv) repurchase obligations with a term of not more than seven days for underlying securities of the types described in clause (i) above entered into with any bank meeting the qualifications specified in clause (iii) above, (v) commercial paper issued by any Person incorporated in the United States rated at least A-1 or the equivalent thereof by S&P or at least P-1 or the equivalent thereof by Moody's and in each case maturing not more than twelve months after the date of acquisition by such Person, (vi) investments in money market funds substantially all of whose assets are comprised of securities of the types described in clauses (i) through (v) above, and (vii) in the case of any Foreign Subsidiary of the Borrower that is a Lee Entity only, direct obligations of the sovereign nation (or any agency thereof) in which such Foreign Subsidiary is organized and is conducting business or in obligations fully and unconditionally guaranteed by such sovereign nation (or any agency thereof) in each case having maturities of not more than twelve months from the date of acquisition thereof.

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as the same has been amended and may hereafter be amended from time to time, 42 U.S.C. § 9601 et seq.

"Change of Control" shall mean (i) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act as in effect on the Effective Date) (A) is or shall become the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act as in effect on the Effective Date), directly or indirectly, of 50% or more on a fully diluted basis of the Voting Equity Interests of the Borrower or (B) shall have obtained the power (whether or not exercised) to elect a majority of the Borrower's directors, (ii) the board of directors of the Borrower shall cease to consist of a majority of Continuing Directors or (iii) a "change of control" or similar event shall occur which results in a default or a mandatory prepayment or redemption of Indebtedness under any First Lien Credit Document, any Permitted

-4-

First Lien Refinancing Indebtedness (or any documentation governing the same), any Pulitzer Debt Document as in effect on the Effective Date as amended at any time thereafter, any Permitted Pulitzer Debt Refinancing Indebtedness (or any documentation governing the same), or any Additional Permitted Indebtedness (or any documentation governing the same), in each case with an aggregate outstanding principal amount of at least $25,000,000.

"Claims" shall have the meaning provided in the definition of "Environmental Claims" contained herein.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder.  Section references to the Code are to the Code, as in effect at the date of this Agreement and any subsequent provisions of the Code, amendatory thereof, supplemental thereto or substituted therefor.

"Collateral" shall mean all property (whether real or personal) with respect to which any security interests have been granted (or purported to be granted) pursuant to any Security Document, including, without limitation, all Pledge Agreement Collateral, all Security Agreement Collateral, all Mortgaged Properties and all cash and Cash Equivalents delivered as collateral pursuant to this Agreement and the other Credit Documents.

"Collateral Agent" shall mean the Administrative Agent acting as collateral agent for the Secured Creditors pursuant to the Security Documents.

"Company" shall mean any corporation, limited liability company, partnership or other business entity (or the adjectival form thereof, where appropriate).

"Company Affiliate" shall mean any Affiliate of the Borrower, except a Subsidiary.

"Confirmation Order" shall have the meaning provided to such term in the Plan of Reorganization.

"Consolidated EBITDA" shall mean, as to any Person, for any period, Consolidated Net Income for such period of such Person and its Subsidiaries (1) plus all amounts deducted in the computation of Consolidated Net Income on account of (without duplication) (a) Consolidated Interest Expense, (b) depreciation and amortization expense, (c) income and profits taxes, (d) any curtailment losses relating to any Plan maintained by such Person and its Subsidiaries and (e) in the case of the Borrower and its Subsidiaries only, in the case of any fiscal period (beginning with the fiscal period ending June 2011) (i) the fees and expenses incurred in connection with the restructuring pursuant to the First Lien Credit Documents, the Credit Documents  and the Pulitzer Debt (in each case, as in effect on, and after giving effect to, the Effective Date) and (ii) if applicable, all bankruptcy-related professional fees and expenses payable by the Borrower and its Subsidiaries and other Restructuring Charges actually recorded or accrued during such period and (2) minus to the extent included in the statement of such Consolidated Net Income for such period, any curtailment gains relating to any Plan maintained by such Person and its Subsidiaries.

"Consolidated Indebtedness" shall mean, as to any Person, at any time, the sum of (without duplication) (i) all Indebtedness of such Person and its Subsidiaries (on a consolidated basis) as would be required to be reflected as debt or Capitalized Lease Obligations on the liability side of a consolidated balance sheet of such Person and its Subsidiaries in accordance with GAAP, (ii) all Indebtedness of such Person and its Subsidiaries of the type described in clauses (ii), (vii) and (viii) of the definition of Indebtedness and (iii) all Contingent Obligations of such Person and its Subsidiaries in respect of Indebtedness of any third Person of the type referred to in preceding clauses (i) and (ii); provided that the amount of Indebtedness in respect of any Interest Rate Protection Agreements and Other Hedging Agreements shall be at any time (a) if any such Interest Rate Protection Agreements or Other Hedging Agreements have been closed out, the unamortized termination value thereof, and (b) in all other cases, the unrealized net loss position, if any, of such Person and/or its Subsidiaries thereunder on a marked-to-market basis determined no more than one month prior to such time.

"Consolidated Interest Expense" shall mean, as to any Person, for any period, the sum for such Person and its Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP, of all amounts which would be deducted in computing Consolidated Net Income for such Person and its Subsidiaries on account of interest on Indebtedness (including (whether or not so deducted) (i) imputed interest in respect of Capitalized Lease Obligations, (ii) the "deemed interest expense" (i.e., the interest expense which would have been applicable if the respective obligations were structured as on-balance sheet financing arrangements) with respect to all Indebtedness of such Person and its Subsidiaries of the type described in clause (viii) of the definition of "Indebtedness" contained herein (to the extent same does not arise from a financing arrangement constituting an operating lease), (iii) amortization of debt discount and expense, (iv) all commissions, discounts and other regularly accruing commitment, letter of credit and other banking fees and charges (including all Commitment Commissions, Letter of Credit Fees and Facing Fees (each as defined in the First Lien Credit Agreement), and (v) interest arising in connection with curtailment gains or losses relating to any Plan maintained by such Person and its Subsidiaries).

"Consolidated Net Income" shall mean, as to any Person (the "Reference Person"), for any period, the net income (or loss) of such Reference Person and its Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP (after deduction for minority interests), excluding:

(a)    any gains arising from (i) the sale or other disposition of any assets (other than current assets) to the extent that the aggregate amount of the gains during such period exceeds the aggregate amount of the losses during such period from the sale, abandonment or other disposition of assets (other than current assets), (ii) any write-up of assets or (iii) the acquisition of outstanding securities of the Reference Person or any of its Subsidiaries;

(b)    any losses arising from the sale or other disposition of any assets (other than current assets) to the extent the aggregate amount of losses during such period exceeds the aggregate amount of gains during such period from such sale;

(c)    any amount representing any interest in the undistributed earnings of (i) any other Person that is not a Subsidiary of the Reference Person, (ii) Madison Newspapers, Inc.,

(iii) TNI Partners and (iv) any other Subsidiary of the Reference Person that is accounted for by the Reference Person by the equity method of accounting;

(d)    except for determinations expressly required to be made on a *pro forma* basis, any earnings, prior to the date of acquisition, of any Person acquired in any manner, and any earnings of any Subsidiary of the Reference Person acquired prior to its becoming a Subsidiary of the Reference Person;

(e)    any earnings of a successor to or transferee of the assets of the Reference Person prior to its becoming such successor or transferee;

(f)    any deferred credit (or amortization of a deferred credit) arising from the acquisition of any other Person;

(g)    any extraordinary gains or extraordinary losses not covered by clause (a) or (b) above;

(h)    any non-cash charges related to goodwill and asset write-offs and write-downs; and

(i)    any other non-cash income or expenses, including non-cash interest income or expenses.

"Contingent Obligation" shall mean, as to any Person, any obligation of such Person as a result of such Person being a general partner of any other Person, unless the underlying obligation is expressly made non-recourse as to such general partner, and any obligation of such Person guaranteeing or intended to guarantee any Indebtedness, leases, dividends or other obligations ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (x) for the purchase or payment of any such primary obligation or (y) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; provided, however, that the term "Contingent Obligation" shall not include endorsements of instruments for deposit or collection in the ordinary course of business.  The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

"Continuing Directors" shall mean the directors of the Borrower on, and after giving effect to, the Effective Date and each other director if such director's nomination for election to the board of directors of the Borrower is recommended by a majority of the then Continuing Directors.

"<u>Controlled Entity</u>" shall mean any of the Subsidiaries of the Borrower and any of their or the Borrower's respective Controlled Company Affiliates. As used in this definition, "<u>Control</u>" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"<u>Credit Documents</u>" shall mean this Agreement, the Subsidiaries Guaranty, the Pledge Agreement, the Security Agreement, the Intercompany Subordination Agreement, the Lee Intercreditor Agreement, the Pulitzer Intercreditor Agreement, and, after the execution and delivery thereof pursuant to the terms of this Agreement, each Note and each other Security Document.

"<u>Credit Party</u>" shall mean the Borrower and each Subsidiary Guarantor.

"<u>Debtors</u>" shall have the meaning provided in the recitals hereto.

"<u>Default</u>" shall mean any event, act or condition which with notice or lapse of time, or both, would constitute an Event of Default.

"<u>Disclosure Statement</u>" shall mean the disclosure statement relating to the Plan of Reorganization in the form approved by the Bankruptcy Court on [____], 2012.

"<u>Dividend</u>" shall mean, with respect to any Person, that such Person has declared or paid a dividend or distribution or returned any equity capital to its stockholders, partners or members or authorized or made any other distribution, payment or delivery of property (other than common Equity Interests of such Person) or cash to its stockholders, partners or members in their capacity as such, or redeemed, retired, purchased or otherwise acquired, directly or indirectly, for a consideration any shares of any class of its capital stock or any other Equity Interests outstanding on or after the Effective Date (or any options or warrants issued by such Person with respect to its capital stock or other Equity Interests), or set aside any funds for any of the foregoing purposes, or shall have permitted any of its Subsidiaries to purchase or otherwise acquire for a consideration any shares of any class of the capital stock or any other Equity Interests of such Person outstanding on or after the Effective Date (or any options or warrants issued by such Person with respect to its capital stock or other Equity Interests). Without limiting the foregoing, "Dividends" with respect to any Person shall also include all payments made or required to be made by such Person with respect to any stock appreciation rights, plans, equity incentive or achievement plans or any similar plans or setting aside of any funds for the foregoing purposes.

"<u>Dollars</u>" and the sign "<u>$</u>" shall each mean freely transferable lawful money of the United States.

"<u>Domestic Subsidiary</u>" of any Person shall mean any Subsidiary of such Person incorporated or organized in the United States or any State thereof or the District of Columbia.

"<u>Effective Date</u>" shall have the meaning provided in Section 13.10.

"Eligible Transferee" shall mean and include a commercial bank, an insurance company, a finance company, a financial institution, any fund that invests in loans or any other "accredited investor" (as defined in Regulation D of the Securities Act), but in any event excluding the Borrower and its Subsidiaries.

"Environmental Claims" shall mean any and all administrative, regulatory or judicial actions, suits, demands, demand letters, directives, claims, liens, notices of noncompliance or violation, investigations or proceedings relating in any way to any Environmental Law or any permit issued, or any approval given, under any such Environmental Law (hereafter, "Claims"), including, without limitation, (a) any and all Claims by governmental or regulatory authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law, and (b) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief in connection with alleged injury or threat of injury to health, safety or the environment due to the presence of Hazardous Materials.

"Environmental Law" shall mean any federal, state, foreign or local statute, law, rule, regulation, ordinance, code, guideline, policy and rule of common law now or hereafter in effect and in each case as amended, and any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, relating to the environment, employee health and safety or Hazardous Materials, including, without limitation, CERCLA; the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; the Safe Drinking Water Act, 42 U.S.C. § 3803 et seq.; the Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq.; the Emergency Planning and the Community Right-to-Know Act of 1986, 42 U.S.C. § 11001 et seq.; the Hazardous Material Transportation Act, 49 U.S.C. § 1801 et seq.; the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq.; and any state and local or foreign counterparts or equivalents, in each case as amended from time to time.

"Equity Interests" of any Person shall mean any and all shares, interests, rights to purchase, warrants, options, participation or other equivalents of or interest in (however designated) equity of such Person, including any common stock, any preferred stock, any limited or general partnership interest and any limited liability company membership interest.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder. Section references to ERISA are to ERISA, as in effect at the date of this Agreement and any subsequent provisions of ERISA, amendatory thereof, supplemental thereto or substituted therefor.

"ERISA Affiliate" shall mean each person (as defined in Section 3(9) of ERISA) which together with the Borrower or a Subsidiary of the Borrower would be deemed to be a "single employer" (i) within the meaning of Section 414(b), (c), (m) or (o) of the Code or (ii) as a result of the Borrower or a Subsidiary of the Borrower being or having been a general partner of such person.

"Event of Default" shall have the meaning provided in Section 11.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Excluded Real Property" shall have the meaning provided in Section 9.12(b).

"Excluded TNI Assets" shall mean all Equity Interests in TNI Partners, all real and person property which is leased to or used in the operations or business of TNI Partners, and all proceeds of any of the foregoing.

"Existing Indebtedness" shall have the meaning provided in Section 8.21.

"Existing Indebtedness Agreements" shall have the meaning provided in Section 6.05.

"Existing Loans" shall mean the "Term Loans" and "Revolving Loans" (each as defined in the Prepetition Credit Agreement immediately prior to the Effective Date) owing to each Lender in its respective capacity as a "Lender" under the Prepetition Credit Agreement, with respect to each Lender in the aggregate outstanding principal amount set forth opposite its name on Schedule I hereto, and in the aggregate outstanding principal amount of $[_____].

"Fair Market Value" shall mean, with respect to any asset (including Equity Interests of any Person), the price at which a willing buyer, not an Affiliate of the seller, and a willing seller who does not have to sell, would agree to purchase and sell such asset, as determined in good faith by the board of directors or other governing body or, pursuant to a specific delegation of authority by such board of directors or governing body, a designated senior executive officer, of the Borrower, or the Subsidiary of the Borrower selling such asset.

"Fees" shall mean all amounts payable pursuant to or referred to in Section 4.01.

"First Lien Credit Agreement" shall mean (i) the Exit Credit Agreement, dated as of the Effective Date, among the Borrower, Deutsche Bank Trust Company Americas, as administrative agent and collateral agent, and the lenders from time to time party thereto, as in effect on the Effective Date, and (ii) any agreement evidencing Permitted First Lien Refinancing Indebtedness as in effect on the original date of incurrence of such Permitted First Lien Refinancing Indebtedness, in each case as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof and thereof.

"First Lien Credit Documents" shall mean the First Lien Credit Agreement and all other instruments, agreements and other documents (including, without limitation, the Credit Documents (as defined in the First Lien Credit Agreement)) executed and delivered with respect to the First Lien Credit Agreement, as in effect on the Effective Date (or, to the extent any entered into after the Effective Date in accordance with the terms of this Agreement, as in effect on the original date thereof) and as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof and thereof.

"Foreign Pension Plan" shall mean any plan, fund (including, without limitation, any superannuation fund) or other similar program established or maintained outside the United States by the Borrower or any one or more of its Subsidiaries primarily for the benefit of employees of the Borrower or such Subsidiaries residing outside the United States, which plan, fund or other similar program provides, or results in, retirement income, a deferral of income in contemplation of retirement or payments to be made upon termination of employment, and which plan is not subject to ERISA or the Code.

"Foreign Subsidiary" of any Person shall mean any Subsidiary of such Person that is not a Domestic Subsidiary.

"GAAP" shall mean generally accepted accounting principles in the United States as in effect from time to time; provided that determinations in accordance with GAAP for purposes of Section 10, including defined terms as used therein, are subject (to the extent provided therein) to Section 13.07(a).

"GS Lending Partners" shall mean Goldman Sachs Lending Partners LLC.

"Hazardous Materials" shall mean (a) any petroleum or petroleum products, radioactive materials, asbestos in any form that is or could become friable, urea formaldehyde foam insulation, dielectric fluid containing levels of polychlorinated biphenyls, and radon gas; (b) any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "hazardous waste," "hazardous materials," "extremely hazardous substances," "restricted hazardous waste," "toxic substances," "toxic pollutants," "contaminants," or "pollutants," or words of similar import, under any applicable Environmental Law; and (c) any other chemical, material or substance, the exposure to, or Release of which, is prohibited, limited or regulated by any governmental authority.

"Herald" shall mean The Herald Publishing Company, LLC, a New York limited liability company (and the successor to The Herald Company, Inc., a New York corporation).

"Indebtedness" shall mean, as to any Person, without duplication, (i) all indebtedness of such Person for borrowed money or for the deferred purchase price of property acquired by such Person or services, (ii) the maximum amount available to be drawn or paid under all letters of credit, bankers' acceptances, bank guaranties, surety and appeal bonds and similar obligations issued for the account of such Person and all unpaid drawings and unreimbursed payments in respect of such letters of credit, bankers' acceptances, bank guaranties, surety and appeal bonds and similar obligations, (iii) all indebtedness of the types described in clause (i), (ii), (iv), (v), (vi), (vii) or (viii) of this definition secured by any Lien on any property owned by such Person, whether or not such indebtedness has been assumed by such Person (provided that, if the Person has not assumed or otherwise become liable in respect of such indebtedness, such indebtedness shall be deemed to be in an amount equal to the lesser of the amount of such indebtedness and the Fair Market Value of the property to which such Lien relates), (iv) all Capitalized Lease Obligations of such Person, (v) all obligations of such Person to pay a specified purchase price for goods or services, whether or not delivered or accepted, i.e., take-or-pay and similar obligations, (vi) all Contingent Obligations of such Person, (vii) all obligations under any Interest Rate Protection Agreement, any Other Hedging Agreement or

-11-

under any similar type of agreement and (viii) all Off-Balance Sheet Liabilities of such Person. Notwithstanding the foregoing, Indebtedness shall not include trade payables, accrued expenses and deferred tax and other credits incurred by any Person in accordance with customary practices and in the ordinary course of business of such Person.

"Intercompany Debt" shall mean any Indebtedness, payables or other obligations, whether now existing or hereafter incurred, owed by the Borrower or any Subsidiary Guarantor to the Borrower or any Subsidiary of the Borrower.

"Intercompany Loans" shall have the meaning provided in Section 10.05(ix).

"Intercompany Notes" shall mean (i) a promissory note evidencing the Lee Intercompany Loans and (ii) a promissory note evidencing the Pulitzer Intercompany Loans, in each case duly executed and delivered substantially in the form of Exhibit M (or such other form as shall be satisfactory to the Administrative Agent), with blanks completed in conformity herewith.

"Intercompany Subordination Agreement" shall have the meaning provided in Section 6.09(b).

"Intercreditor Agreement" shall mean (i) the Lee Intercreditor Agreement and (ii) the Pulitzer Intercreditor Agreement.

"Interest Rate Protection Agreement" shall mean any interest rate swap agreement, interest rate cap agreement, interest collar agreement, interest rate hedging agreement or other similar agreement or arrangement.

"Investments" shall have the meaning provided in Section 10.05.

"Joint Book Running Managers" shall mean Deutsche Bank Securities Inc. and Goldman Sachs Bank USA in their capacity as joint book running managers in respect of the credit facilities provided for herein.

"Joint Lead Arrangers" shall mean Deutsche Bank Securities Inc. and Goldman Sachs Bank USA, in their capacity as joint lead arrangers in respect of the credit facilities provided for herein.

"Joint-Venture Transaction" shall mean up to two joint venture transactions, pursuant to each of which either (x) the Borrower or one or more of its Subsidiaries contributes, sells, leases or otherwise transfers assets (including, without limitation, Equity Interests) to a joint venture or (y) a Subsidiary of the Borrower issues Equity Interests to a Person other than the Borrower or its Subsidiaries for the purpose of forming a joint venture or similar arrangement.

"Leaseholds" of any Person shall mean all the right, title and interest of such Person as lessee or licensee in, to and under leases or licenses of land, improvements and/or fixtures.

"Lee Entities" shall mean the Borrower and its Subsidiaries, excluding the Pulitzer Entities.

"Lee Intercompany Loans" shall have the meaning provided in Section 10.05(viii).

"Lee Intercreditor Agreement" shall mean the Intercreditor Agreement, dated as of the Effective Date, originally by and among the Collateral Agent, the collateral agent under the First Lien Credit Documents, the Borrower and the other Lee Entities party thereto, substantially in the form of Exhibit N-1, as in effect on the Effective Date and as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof and thereof.

"Lee Support Agreement" shall mean the Support Agreement, dated as of August 11, 2011, by and among the Debtors and certain of the holders of claims against the Debtors arising under the Prepetition Credit Agreement (including the term sheets referred to therein, in each case as amended on December 2, 2011 and as further amended, restated, modified and/or supplemented in accordance with the terms thereof).

"Lender" shall mean each financial institution listed on Schedule I as of the Effective Date, subject to any Person that ceases to be or becomes a "Lender" hereunder pursuant to Section 2.13 or 13.04(b).

"Lien" shall mean any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), preference, priority or other security agreement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement, any financing or similar statement or notice filed under the UCC or any other similar recording or notice statute, and any lease having substantially the same effect as any of the foregoing) and any attachment or judgment lien.

"Loans" shall mean the loans made or deemed made by the Lenders to the Borrower pursuant to Section 2.01.

"Mandatory Resignation" shall have the meaning provided in Section 12.09(a).

"Margin Stock" shall have the meaning provided in Regulation U.

"Material Adverse Effect" shall mean (x) a material adverse effect on the business, operations, property, assets, liabilities or condition (financial or otherwise) of the Borrower or of the Borrower and its Subsidiaries taken as a whole or (y) a material adverse effect on (i) the rights or remedies of the Lenders, the Administrative Agent or the Collateral Agent hereunder or under any other Credit Document or (ii) the ability of any Credit Party to perform its obligations to the Lenders, the Administrative Agent or the Collateral Agent hereunder or under any other Credit Document.

"Maturity Date" shall mean the earlier of (i) April [__], 2017 and (ii) the date that all Loans shall become due and payable in full hereunder, whether by acceleration or otherwise.

"Monarch" shall mean Monarch Master Funding Ltd.

"Moody's" shall mean Moody's Investors Service, Inc.

"Mortgage" shall mean a mortgage, deed of trust, deed to secure debt or similar security instrument.

"Mortgage Policy" shall mean an American Land Title Association 2006 Form Lender's Fee and/or Leasehold Policy of title insurance, as applicable (or a binding marked commitment to issue such policy dated as of the Effective Date and to be re-dated the date of recording of the applicable Mortgage), in favor of the Collateral Agent for the benefit of the Lenders and subject to Permitted Encumbrances.

"Mortgaged Property" shall mean any Real Property owned by the Borrower or any other Credit Party which is encumbered (or required to be encumbered) by a Mortgage pursuant to the terms hereof.

"Mutual Quest" shall mean Mutual Quest Fund.

"NAIC" shall mean the National Association of Insurance Commissioners.

"Net Cash Proceeds" shall mean for any event resulting in a repayment of Loans pursuant to Section 10.04(xii) or in connection with which additional Capital Expenditures may be made in accordance with Section 10.07(c), as the case may be, the gross cash proceeds (including any cash received by way of deferred payment pursuant to a promissory note, receivable or otherwise, but only as and when received) received from such event, net of reasonable transaction costs (including, as applicable, any underwriting, brokerage or other customary commissions and reasonable legal, advisory and other fees and expenses associated therewith) paid in respect of any such event.

"Non-Public Information" shall mean material non-public information (within the meaning of United States federal, state or other applicable securities laws) with respect to the Borrower or its Affiliates or their respective securities.

"Non-Wholly Owned Subsidiary" shall mean, as to any Person, each Subsidiary of such Person which is not a Wholly-Owned Subsidiary of such Person.

"Note" shall have the meaning provided in Section 2.05(a).

"Notice of Borrowing" shall have the meaning provided in Section 2.03.

"Notice Office" shall mean (i) for credit notices, the office of the Administrative Agent located at 50 South Sixth Street, Suite 1290, Minneapolis, MN 55402, Attention: Josh James, Telephone No.: (612) 217-5637, and Telecopier No.: (612) 217-5651, and (ii) for operational notices, the office of the Administrative Agent located at 50 South Sixth Street, Suite 1290, Minneapolis, MN 55402, Attention: Wilmington Trust Loan Agency Group, Telephone No.: (612) 217-5649 and Email: loanagency@wilmingtontrust.com, or such other office or

-14-

person as the Administrative Agent may hereafter designate in writing as such to the other parties hereto.

"Obligations" shall mean all amounts owing to the Administrative Agent, the Collateral Agent or any Lender pursuant to the terms of this Agreement and each other Credit Document, including, without limitation, all amounts in respect of any principal, premium, interest (including any interest, fees and/or expenses accruing subsequent to the filing of a petition in bankruptcy, reorganization or similar proceeding at the rate provided for in this Agreement, whether or not such interest, fees and/or expenses are an allowed claim under any such proceeding or under applicable state, federal or foreign law), penalties, fees, expenses, indemnifications, reimbursements, damages and other liabilities, and guarantees of the foregoing amounts.

"OFAC" shall have the meaning provided in Section 8.23(a).

"OFAC Listed Person" shall have the meaning provided in Section 8.23(a).

"Off-Balance Sheet Liabilities" of any Person shall mean (i) any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person, (ii) any liability of such Person under any sale and leaseback transactions that do not create a liability on the balance sheet of such Person, (iii) any obligation under a Synthetic Lease or (iv) any obligation arising with respect to any other transaction which is the functional equivalent of or takes the place of borrowing but which does not constitute a liability on the balance sheet of such Person.

"Other Hedging Agreements" shall mean any foreign exchange contracts, currency swap agreements, commodity agreements or other similar arrangements, or arrangements designed to protect against fluctuations in currency values or commodity prices.

"Other Taxes" shall mean any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Credit Document, including any interest, additions to tax or penalties applicable thereto.

"Payment Office" shall mean the office of the Administrative Agent located at 50 South Sixth Street, Suite 1290, Minneapolis, MN 55402, Attention: Wilmington Trust Loan Agency Group, or such other office as the Administrative Agent may hereafter designate in writing as such to the other parties hereto.

"PBGC" shall mean the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto.

"PD LLC" shall mean St. Louis Post-Dispatch LLC, a Delaware limited liability company.

"PD LLC Indemnity Agreement" shall mean the Indemnity Agreement, dated as of May 1, 2000, between Herald and Pulitzer, as in effect on, and after giving effect to, the

-15-

Effective Date and as the same may be amended, modified and supplemented from time to time in accordance with the terms hereof and thereof.

"PD LLC Operating Agreement" shall mean the Operating Agreement of PD LLC, dated as of May 1, 2000, among Herald, Pulitzer, Pulitzer Technologies, Inc. and the other members of PD LLC from time to time party thereto, as in effect on, and after giving effect to, the Effective Date and as the same may be amended, modified or supplemented from time to time in accordance with the terms thereof and hereof.

"Permitted Encumbrance" shall mean:

(i)     First Priority Liens (as defined in each of the Lee Intercreditor Agreement and the Pulitzer Intercreditor Agreement) on Common Collateral (as defined in the Lee Intercreditor Agreement or the Pulitzer Intercreditor Agreement, as applicable); provided that such Liens are subject to the terms of the Lee Intercreditor Agreement or the Pulitzer Intercreditor Agreement, as applicable;

(ii)    inchoate Liens for taxes, assessments or governmental charges or levies not yet due or Liens for taxes, assessments or governmental charges or levies being contested in good faith and by appropriate proceedings for which adequate reserves have been established in accordance with GAAP;

(iii)   Liens in respect of property or assets of the Borrower or any of its Subsidiaries imposed by law, which were incurred in the ordinary course of business and do not secure Indebtedness for borrowed money, such as carriers', warehousemen's, materialmen's and mechanics' liens and other similar Liens arising in the ordinary course of business, which are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing the forfeiture or sale of the property or assets subject to any such Lien;

(iv)    easements, rights-of-way, restrictions, covenants, encroachments and other similar charges or encumbrances, including, without limitation, any encumbrances which would be reflected by an accurate survey of the property, and minor title deficiencies, in each case not securing Indebtedness and not materially interfering with the conduct of the business of the Borrower or any of its Subsidiaries; and

(v)     any exceptions to title as set forth in the Mortgage Policy, as reasonably approved by the Collateral Agent.

"Permitted First Lien Refinancing Indebtedness" shall mean Indebtedness solely of the Lee Entities so long as (i) the proceeds of such Indebtedness are used solely (x) to refinance in full all Obligations under (and as defined in) the First Lien Credit Agreement (or other Permitted First Lien Refinancing Indebtedness) outstanding at such time and to pay reasonable fees and expenses incurred in connection with obtaining such Indebtedness, (ii) such Indebtedness does not have any amortization, redemption, sinking fund, maturity or similar requirement prior to the maturity date of the Indebtedness under the First Lien Credit Agreement as in effect on, and after giving effect to, the Effective Date or as thereafter amended or modified in accordance with the terms thereof and hereof (including, without limitation, Section 10.10(viii)), other than for amortization payments or prepayments prior to final maturity on

-16-

terms, in the aggregate, no more restrictive than those set forth in the First Lien Credit Documents as in effect on, and after giving effect to, the Effective Date or as thereafter amended or modified in accordance with the terms thereof and hereof (including, without limitation, Section 10.10(viii)), (iii) such Indebtedness contains no restrictions, conditions or other limitations on any Credit Party's ability to make any required payment of principal or interest in respect of any Obligations pursuant to the terms of this Agreement or the other Credit Documents that are more restrictive in the aggregate than the First Lien Credit Agreement as in effect on, and after giving effect to, the Effective Date, (iv) the aggregate principal amount of such Indebtedness shall not be more than the Maximum First Priority Amount (as defined in the Lee Intercreditor Agreement), (v) the terms thereof, in the aggregate, shall be no more restrictive on, and no more burdensome to, the applicable Credit Parties in any material respect, in each case than the First Lien Credit Documents as in effect on, and after giving effect to, the Effective Date or as thereafter amended or modified in accordance with the terms thereof and hereof (including, without limitation, Section 10.10(viii)), (vi) such Indebtedness shall be subject to the Lee Intercreditor Agreement, and (vii) all of the other terms and conditions thereof (and the documentation with respect thereto) are in form and substance reasonably satisfactory to the Administrative Agent.

"Permitted Liens" shall have the meaning provided in Section 10.01.

"Permitted Pulitzer Debt Refinancing Indebtedness" shall mean Indebtedness solely of the Pulitzer Entities so long as (i) the proceeds of such Indebtedness are used solely to refinance in full the Pulitzer Debt (or other Permitted Pulitzer Debt Refinancing Indebtedness)[2] outstanding at such time, to pay reasonable fees and expenses incurred in connection with obtaining such Indebtedness and, in the case of any permitted surplus over the Pulitzer Debt refinanced, for other purposes permitted hereunder and thereunder, (ii) such Indebtedness does not have any amortization, redemption, sinking fund, maturity or similar requirement prior to the maturity date of the Pulitzer Debt under the Pulitzer Debt Agreement as in effect on, and after giving effect to, the Effective Date or as thereafter amended or modified in accordance with the terms thereof and hereof (including, without limitation, Section 10.10(v)), other than for amortization payments or prepayments prior to final maturity on terms, in the aggregate, no more restrictive than those set forth in the Pulitzer Debt Agreement as in effect on, and after giving effect to, the Effective Date or as thereafter amended or modified in accordance with the terms thereof and hereof (including, without limitation, Section 10.10(v)), (iii) such Indebtedness contains no restrictions, conditions or other limitations on any Credit Party's ability to make any required payment of principal or interest in respect of any Obligations pursuant to the terms of this Agreement or the other Credit Documents that are more restrictive in the aggregate than the Pulitzer Debt Agreement as in effect on, and after giving effect to, the Effective Date, (iv) the aggregate principal amount of such Indebtedness shall not be more than the Maximum First Priority Amount (as defined in the Pulitzer Intercreditor Agreement), (v) the terms thereof, in the aggregate, shall be no more restrictive on, and no more burdensome to, the applicable Credit Parties in any material respect, in each case than the Pulitzer Debt Documents as in effect on, and after giving effect to, the Effective Date or as thereafter amended or modified in accordance

_____
[2]  Inclusion of parenthetical subject to same in final First Lien Loan Agreement.

with the terms thereof and hereof (including, without limitation, Section 10.10(v)), (vi) such Indebtedness shall be subject to the Pulitzer Intercreditor Agreement, and (vii) all of the other terms and conditions thereof (and the documentation with respect thereto) are in form and substance reasonably satisfactory to the Administrative Agent.

"Person" shall mean any individual, partnership, joint venture, firm, corporation, association, limited liability company, trust or other enterprise or any government or political subdivision or any agency, department or instrumentality thereof.

"Petition Date" shall have the meaning provided in the recitals hereto.

"Plan" shall mean any pension plan as defined in Section 3(2) of ERISA, which is maintained or contributed to by (or to which there is an obligation to contribute of) the Borrower or a Subsidiary of the Borrower or an ERISA Affiliate, and each such plan for the five year period immediately following the latest date on which the Borrower, a Subsidiary of the Borrower or an ERISA Affiliate maintained, contributed to or had an obligation to contribute to such plan.

"Plan of Reorganization" shall have the meaning provided in the recitals hereto.

"Platform" shall have the meaning provided in Section 9.01(q).

"Pledge Agreement" shall have the meaning provided in Section 6.10.

"Pledge Agreement Collateral" shall mean all "Collateral" as defined in the Pledge Agreement.

"Pledgee" shall have the meaning provided in the Pledge Agreement.

"Preferred Equity," as applied to the Equity Interests of any Person, shall mean Equity Interests of such Person (other than common Equity Interests of such Person) of any class or classes (however designed) that ranks prior, as to the payment of dividends or as to the distribution of assets upon any voluntary or involuntary liquidation, dissolution or winding up of such Person, to shares of Equity Interests of any other class of such Person, and shall include any Qualified Preferred Stock of the Borrower.

"Prepetition Credit Agreement Claims" shall have the meaning provided to such term in the Plan of Reorganization.

"Prepetition Credit Agreement" shall mean the Amended and Restated Credit Agreement, dated as of December 21, 2005, among the Borrower, Deutsche Bank Trust Company Americas, as administrative agent, and the other agents and lenders from time to time party thereto, as amended, supplemented or otherwise modified as of the Petition Date.

"Prepetition Credit Agreement Claims" shall have the meaning provided to such term in the Plan of Reorganization.

-18-

"Projections" shall mean the five-year projections that were prepared by or on behalf of the Borrower in connection with the Disclosure Statement and attached thereto as Exhibit [__].

"Public Lenders" shall mean Lenders that do not wish to receive Non-Public Information with respect to the Borrower, its Subsidiaries or their respective securities.

"Pulitzer" shall mean Pulitzer Inc., a Delaware corporation.

"Pulitzer Debt" shall mean the debt arising and the notes issued under the Pulitzer Debt Agreement.

"Pulitzer Debt Agreement" shall mean the Note Agreement, dated as of [_____], 2012, entered into by and among PD LLC and the purchasers party thereto, as in effect on, and after giving effect to, the Effective Date in the form approved by the Backstop Parties on or before the Effective Date, and as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof and thereof.

"Pulitzer Debt Documents" shall mean the Pulitzer Debt, the Pulitzer Debt Agreement, the Pulitzer Debt Guaranties and all other instruments, agreements and other documents (including, without limitation, all Collateral Documents and Note Documents (each as defined in the Pulitzer Debt Agreement)) executed and delivered in connection with the Pulitzer Debt or the Pulitzer Debt Agreement, as in effect on, and after giving effect to, the Effective Date in the form approved by the Backstop Parties on or before the Effective Date, and as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof and thereof.

"Pulitzer Debt Guaranties" shall mean (i) the Pulitzer Debt Pulitzer Guaranty and (ii) the Pulitzer Debt Subsidiaries Guaranty.

"Pulitzer Debt Pulitzer Guaranty" shall mean that certain Guaranty Agreement, dated as of the Effective Date, made by Pulitzer in favor of the holders from time to time of the Pulitzer Debt, as in effect on, and after giving effect to, the Effective Date and as the same may be further amended, restated, modified and/or supplemented from time to time in accordance with the terms thereof and hereof.

"Pulitzer Debt Subsidiaries Guaranty" shall mean that certain Subsidiary Guaranty Agreement, dated as of the Effective Date, made by the Subsidiaries of Pulitzer in favor of the holders from time to time of the Pulitzer Debt, as in effect on, and after giving effect to, the Effective Date and as the same may be further amended, restated, modified and/or supplemented from time to time in accordance with the terms thereof and hereof.

"Pulitzer Entities" shall mean Pulitzer and its Subsidiaries.

"Pulitzer Indebtedness" shall mean, at any time, Consolidated Indebtedness of the Pulitzer Entities.

"Pulitzer Intercompany Charges" shall mean charges to the Pulitzer Entities in an

-19-

aggregate amount not to exceed $20,000,000 in any fiscal year of the Borrower for (i) fees for the procurement by the Lee Entities of goods and services from third parties for the benefit of the Pulitzer Entities (but, for the avoidance of doubt, excluding reimbursements to the Lee Entities for the actual cost of such goods and services except for those items identified in clause (iv) of this definition), (ii) the corporate overhead of the Lee Entities (including, without limitation, administration, financial services, legal, human resources, building services, editorial support, and Lee Lodge facilities), (iii) management, corporate sales and marketing, and information technology costs of the Lee Entities, (iv) (a) online fees, (b) allocated audit and consulting charges, (c) compensation of publishers, and (d) compensation of outside directors, in the case of the foregoing subclauses (a) to (d), inclusive, to the extent actually paid or deemed paid by, or credited to payment by, the Lee Entities and (v) interest on such charges (both cash and non-cash) and on intercompany loans to the extent in excess of intercompany loans owed by the applicable Pulitzer Entity to the applicable Lee Entity; the charges referred to in the foregoing clauses (i) to (v), inclusive, shall be allocated to the Pulitzer Entities in a manner consistent with past practices.

"<u>Pulitzer Intercompany Loans</u>" shall have the meaning provided in Section 10.05(ix).

"<u>Pulitzer Intercreditor Agreement</u>" shall mean the Intercreditor Agreement originally by and among the Collateral Agent, the collateral agent under the Pulitzer Debt Documents, PD LLC and the other Pulitzer Entities party thereto, substantially in the form of Exhibit N-2, as in effect on the Effective Date and as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof and thereof.

"<u>Pulitzer Lenders</u>" shall mean the purchasers party to the Pulitzer Debt Agreement.

"<u>Pulitzer Material Adverse Effect</u>" shall mean a material adverse effect on (i) the business, financial condition, assets or properties of the Pulitzer Entities taken as a whole, or (ii) the ability of PD LLC, Pulitzer or the Pulitzer Entities (taken as a whole) to perform its or their obligations under any Pulitzer Debt Document or any Credit Document, or (iii) the validity or enforceability of any Pulitzer Debt Document or any Credit Document.

"<u>Pulitzer Support Agreement</u>" shall mean the Support Agreement, dated as of December 2, 2011, among the Debtors, Star Publishing Company Pulitzer Entities, the noteholders party thereto and such other entities from time to time party thereto (including the term sheet referred to therein, in each case as amended, restated, modified and/or supplemented in accordance with its terms to the extent approved by each Backstop Party).

"<u>Qualified Preferred Stock</u>" shall mean any Preferred Equity of the Borrower so long as the terms of any such Preferred Equity (v) do not contain any mandatory put, redemption, repayment, sinking fund or other similar provision prior to April 28, 2018 (other than as a result of the conversion of such Preferred Equity into common stock of the Borrower without any cash payment), (w) do not require the cash payment of dividends or distributions not otherwise permitted at such time pursuant to this Agreement, (x) do not contain any covenants (other than periodic reporting covenants), (y) do not grant the holders thereof any voting rights except for

(I) voting rights required to be granted to such holders under applicable law and (II) limited customary voting rights on fundamental matters such as mergers, consolidations, sales of all or substantially all of the assets of the Borrower, or liquidations involving the Borrower, and (z) are otherwise reasonably satisfactory to the Administrative Agent.

"Quarterly Payment Date" shall mean the fifteenth calendar day (or, if such day is not a Business Day, the next succeeding Business Day) of each March, June, September and December occurring after the Effective Date.

"Real Property" of any Person shall mean all the right, title and interest of such Person in and to land, improvements and fixtures, including Leaseholds.

"Recovery Event" shall mean the receipt by the Borrower or any of its Subsidiaries of any cash insurance proceeds or condemnation awards payable (i) by reason of theft, loss, physical destruction, damage, taking or any other similar event with respect to any property or assets of the Borrower or any of its Subsidiaries and (ii) under any policy of insurance required to be maintained under Section 9.03 (other than business interruption insurance proceeds).

"Redemption Agreement" shall mean the Redemption Agreement, dated as of February 18, 2009, by PD LLC, STL Distribution Services LLC, Herald, Pulitzer and Pulitzer Technologies, Inc., as amended.

"Register" shall have the meaning provided in Section 13.15.

"Regulation D" shall mean Regulation D of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof establishing reserve requirements.

"Regulation T" shall mean Regulation T of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"Regulation U" shall mean Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"Regulation X" shall mean Regulation X of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"Release" shall mean actively or passively disposing, discharging, injecting, spilling, pumping, leaking, leaching, dumping, emitting, escaping, emptying, pouring, seeping, migrating or the like, into or upon any land or water or air, or otherwise entering into the environment.

"Replaced Lender" shall have the meaning provided in Section 2.13.

"Replacement Lender" shall have the meaning provided in Section 2.13.

"Reportable Event" shall mean an event described in Section 4043(c) of ERISA with respect to a Plan that is subject to Title IV of ERISA other than those events as to which the 30-day-notice period is waived under subsection .22, .23, .25, .27 or .28 of PBGC Regulation Section 4043.

"Required Lenders" shall mean, at any time, Lenders the sum of whose outstanding Loans at such time represents at least a majority of the sum of all outstanding Loans at such time.

"Restricted" shall mean, when referring to cash or Cash Equivalents of the Borrower or any of its Subsidiaries, that such cash or Cash Equivalents (i) appears (or would be required to appear) as "restricted" on a consolidated balance sheet of the Borrower or of any such Subsidiary (unless such appearance is related to the Credit Documents or Liens created thereunder), (ii) are subject to any Lien in favor of any Person other than the Collateral Agent for the benefit of the Secured Creditors or (iii) are not otherwise generally available for use by the Borrower or such Subsidiary.

"Restructuring Charges" shall mean non-recurring one-time restructuring charges incurred by the Borrower or any of its Subsidiaries during the twelve-month period immediately preceding the Effective Date which are approved by the Administrative Agent based upon reasonably satisfactory evidence thereof delivered by the Borrower to the Administrative Agent.

"Returns" shall have the meaning provided in Section 8.09.

"S&P" shall mean Standard & Poor's Ratings Services, a division of McGraw-Hill, Inc.

"SEC" shall have the meaning provided in Section 9.01(g).

"Section 5.04(b)(ii) Certificate" shall have the meaning provided in Section 5.04(b)(ii).

"Secured Creditors" shall have the meaning assigned that term in the respective Security Documents.

"Securities Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Security Agreement" shall have the meaning provided in Section 6.11.

"Security Agreement Collateral" shall mean all "Collateral" as defined in the Security Agreement.

"Security Document" shall mean and include each of the Security Agreement, the Pledge Agreement, each Mortgage and, after the execution and delivery thereof, each Additional Security Document.

"Shareholders' Agreements" shall have the meaning provided in Section 6.05.

-22-

"Subsidiaries Guaranty" shall have the meaning provided in Section 6.09(a).

"Subsidiary" shall mean, as to any Person, (i) any corporation more than 50% of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person and/or one or more Subsidiaries of such Person and (ii) any partnership, limited liability company, association, joint venture or other entity in which such Person and/or one or more Subsidiaries of such Person has more than a 50% equity interest at the time. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Subsidiary Guarantor" shall mean each Domestic Subsidiary of the Borrower and, to the extent required by Section 9.16, each Foreign Subsidiary of the Borrower (in each case, whether existing on the Effective Date or established, created or acquired after the Effective Date), unless and until such time as the respective Subsidiary is released from all of its obligations under the Subsidiaries Guaranty in accordance with the terms and provisions thereof.

"Synthetic Lease" shall mean a lease transaction under which the parties intend that (i) the lease will be treated as an "operating lease" by the lessee and (ii) the lessee will be entitled to various tax and other benefits ordinarily available to owners (as opposed to lessees) of like property.

"Tax Sharing Agreements" shall have the meaning provided in Section 6.05.

"Taxes" shall have the meaning provided in Section 5.04(a). "UCC" shall mean the Uniform Commercial Code as from time to time in effect in the relevant jurisdiction.

"TNI Partners" shall mean TNI Partners, a general partnership formed under the laws of the State of Arizona pursuant to the terms of the Amended and Restated Partnership Agreement, dated as of November 30, 2009, as amended, by and between Star Publishing Company and Citizen Publishing Company.

"Unfunded Current Liability" of any Plan subject to Title IV of ERISA (other than a multiemployer plan as defined under Title IV of ERISA) shall mean the amount, if any, by which the value of the accumulated plan benefits under the Plan determined on a plan termination basis in accordance with actuarial assumptions at such time consistent with those prescribed by the PBGC for purposes of Section 4044 of ERISA, exceeds the Fair Market Value of all plan assets allocable to such liabilities under Title IV of ERISA (excluding any accrued but unpaid contributions).

"United States" and "U.S." shall each mean the United States of America.

"Unrestricted" shall mean, when referring to cash or Cash Equivalents of the Borrower or any of its Subsidiaries, that such cash or Cash Equivalents are not Restricted.

"USA PATRIOT Act" shall have the meaning provided in Section 13.19.

"Voting Equity Interests" shall mean, as to any Person, any class or classes of outstanding Equity Interests of such Person pursuant to which the holders thereof have the general voting power under ordinary circumstances to elect at least a majority of the board of directors of such Person.

"Wholly-Owned Domestic Subsidiary" shall mean, as to any Person, any Wholly-Owned Subsidiary of such Person which is a Domestic Subsidiary.

"Wholly-Owned Foreign Subsidiary" shall mean, as to any Person, any Wholly-Owned Subsidiary of such Person which is a Foreign Subsidiary.

"Wholly-Owned Subsidiary" shall mean, as to any Person, (i) any corporation 100% of whose capital stock is at the time owned by such Person and/or one or more Wholly-Owned Subsidiaries of such Person and (ii) any partnership, association, joint venture or other entity in which such Person and/or one or more Wholly-Owned Subsidiaries of such Person has a 100% equity interest at such time (other than, in the case of a Foreign Subsidiary of the Borrower with respect to preceding clauses (i) and (ii), director's qualifying shares and/or other nominal amount of shares required to be held by Persons other than the Borrower and its Subsidiaries under applicable law).

SECTION 2.   Amount and Terms of Credit.

2.01   Loans.[3]   Each of the Borrower, each Credit Party, each Lender and the Administrative Agent hereby confirms and acknowledges that each Lender has heretofore made credit extensions to the Borrower pursuant to the Prepetition Credit Agreement, including without limitation, the Existing Loans in the amount for each Lender as set forth on Schedule I hereto, the aggregate outstanding principal amount of which Existing Loans of all Lenders on the Effective Date is $[_____].   The Borrower agrees, ratifies and confirms that the Existing Loans (and all other loans held by Lenders outstanding under the Prepetition Credit Agreement which are not converted into and exchanged for Loans hereunder but which shall remain outstanding under the First Lien Credit Agreement), together with all accrued and unpaid interest thereon, are due and owing to the Lenders (in their capacity as Lenders under (and as defined in) the Prepetition Credit Agreement) and are not subject to any offset, counterclaims or defenses of any kind or nature.   As of the Effective Date, subject to the terms and conditions hereof and to give effect to the Plan of Reorganization, the Existing Loans are hereby converted into, and exchanged for, Loans hereunder on a dollar-for-dollar basis in an aggregate principal amount (including the fees payable pursuant to Section 4.01(b)) of $[_____], which Loans shall be allocated to each Lender in the respective principal amount specified for such Lender on Schedule I.   Such Loans shall be denominated in Dollars.   Once repaid, Loans may not be reborrowed.

2.02   Intentionally Omitted.

---

[3]   Mechanics for Backstop Cash (as defined in each Backstop Commitment Letter) to be added if relevant.

2.03     Notice of Borrowing.  On the Effective Date the Borrower shall give the Administrative Agent at the Notice Office written notice of the Loans to be incurred (or deemed incurred) hereunder prior to 3:00 P.M. (New York time) on such day.  Such notice (the "Notice of Borrowing") shall be irrevocable and shall be in the form of Exhibit A, appropriately completed to specify:  (i) the aggregate principal amount of the Loans to be incurred pursuant to such Borrowing; and (ii) the date of such Borrowing (which shall be a Business Day).  The Administrative Agent shall promptly give each Lender which is required to make (or be deemed to make) Loans notice of such proposed Borrowing, of such Lender's proportionate share thereof and of the other matters required by the immediately preceding sentence to be specified in the Notice of Borrowing.

2.04     Intentionally Omitted.

2.05     Notes.  (a)  The Borrower's obligation to pay the principal of, and interest on, the Loans made by each Lender shall be evidenced in the Register maintained by the Administrative Agent pursuant to Section 13.15 and shall, if requested by such Lender, also be evidenced by a promissory note duly executed and delivered by the Borrower substantially in the form of Exhibit B, with blanks appropriately completed in conformity herewith (each, a "Note" and, collectively, the "Notes").

(b)     The Note issued to each Lender that has outstanding Loans shall (i) be executed by the Borrower, (ii) be payable to such Lender or its registered assigns and be dated the Effective Date (or, if issued after the Effective Date, be dated the date of issuance thereof), (iii) be in a stated principal amount equal to the Loans of such Lender as of the Effective Date (or, if issued after the Effective Date, be in a stated principal amount equal to the outstanding Loans of such Lender at such time) and be payable in the outstanding principal amount of Loans evidenced thereby from time to time, (iv) mature on the Maturity Date, (v) bear interest as provided in Section 2.08, (vi) be subject to voluntary prepayment as provided in Section 5.01 and (vii) be entitled to the benefits of this Agreement and the other Credit Documents.

(c)     Each Lender will note on its internal records the amount of each Loan made by it and each payment in respect thereof and prior to any transfer of any of its Notes will endorse on the reverse side thereof the outstanding principal amount of Loans evidenced thereby. Failure to make any such notation or any error in such notation shall not affect the Borrower's obligations in respect of such Notes or Loans.

(d)     Notwithstanding anything to the contrary contained above in this Section 2.05 or elsewhere in this Agreement, Notes shall only be delivered to Lenders which at any time specifically request the delivery of such Notes.  No failure of any Lender to request or obtain a Note evidencing its Loans shall affect or in any manner impair the obligations of the Borrower to pay the Loans (and all related Obligations) which would otherwise be evidenced thereby in accordance with the requirements of this Agreement, and shall not in any way affect the security or guaranties therefor provided pursuant to the various Credit Documents.  Any Lender which does not have a Note evidencing its outstanding Loans shall in no event be required to make the notations otherwise described in preceding clause (c).  At any time when any Lender requests the delivery of a Note to evidence any of its Loans, the Borrower shall

promptly execute and deliver to the respective Lender the requested Note in the appropriate amount or amounts to evidence such Loan(s).

2.06    <u>Intentionally Omitted</u>.

2.07    <u>Intentionally Omitted</u>.

2.08    <u>Interest</u>. (a)  The Borrower agrees to pay interest in respect of the unpaid principal amount of each Loan from the date of Borrowing thereof until the maturity thereof (whether by acceleration or otherwise) at the Applicable Interest Rate.

(b)    Notwithstanding anything to the contrary contained in this Agreement, the unpaid principal amount of each Loan shall bear interest at a rate per annum equal to the rate which is 2% in excess of the rate otherwise applicable to such Loan at all times that an Event of Default shall have occurred and be continuing.  In addition (but without duplication of any amounts payable pursuant to the immediately preceding sentence), overdue principal and, to the extent permitted by law, overdue interest in respect of each Loan shall, in each case, bear interest at a rate per annum equal to the rate which is 2% in excess of the rate then borne by Loans hereunder. Interest that accrues under this Section 2.08(b) shall be payable on demand.  Payment or acceptance of the increased rates of interest provided for in this Section 2.08(b) is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the Administrative Agent or any Lender.

(c)    Accrued (and theretofore unpaid) interest shall be payable in cash (x) quarterly in arrears on each Quarterly Payment Date, (y) on the date of any repayment or prepayment in full of all outstanding Loans, and (z) at maturity (whether by acceleration or otherwise) and, after such maturity, on demand.

2.09    <u>Intentionally Omitted</u>.

2.10    <u>Increased Costs, Illegality, etc.</u> (a)  If any Lender determines that after the Effective Date the introduction of or any change in any applicable law or governmental rule, regulation, order, guideline, directive or request (whether or not having the force of law) concerning capital adequacy, or any change in interpretation or administration thereof by the NAIC or any governmental authority, central bank or comparable agency, will have the effect of increasing the amount of capital required or expected to be maintained by such Lender or any corporation controlling such Lender based on the existence of such Lender's obligations hereunder, then the Borrower agrees to pay to such Lender, upon its written demand therefor, such additional amounts as shall be required to compensate such Lender or such other corporation for the increased cost to such Lender or such other corporation or the reduction in the rate of return to such Lender or such other corporation as a result of such increase of capital.  In determining such additional amounts, each Lender will act reasonably and in good faith and will use averaging and attribution methods which are reasonable, <u>provided</u> that such Lender's determination of compensation owing under this Section 2.10 shall, absent manifest error, be final and conclusive and binding on all the parties hereto.  Each Lender, upon determining that any additional amounts will be payable pursuant to this Section 2.10, will give prompt written

#4824-6878-8234v29

notice thereof to the Borrower, which notice shall show in reasonable detail the basis for calculation of such additional amounts.

(b)        Notwithstanding anything in this Agreement to the contrary, the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder, issued in connection therewith or in implementation thereof, and all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall be deemed to be a change after the Effective Date in a requirement of law or government rule, regulation or order, regardless of the date enacted, adopted, issued or implemented for purposes of this Section 2.10.

2.11    <u>Intentionally Omitted</u>.

2.12    <u>Change of Lending Office</u>.  Each Lender agrees that on the occurrence of any event giving rise to the operation of Section 2.10 or Section 5.04 with respect to such Lender, it will, if requested by the Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event, <u>provided</u> that such designation is made on such terms that such Lender and its lending office suffer no economic, legal or regulatory disadvantage, with the object of avoiding the consequence of the event giving rise to the operation of such Section.  Nothing in this Section 2.12 shall affect or postpone any of the obligations of the Borrower or the right of any Lender provided in Sections 2.10 and 5.04.

2.13    <u>Replacement of Lenders</u>.  (x) Upon the occurrence of any event giving rise to the operation of Section 2.10 or Section 5.04 with respect to any Lender which results in such Lender charging to the Borrower increased costs in excess of those being generally charged by the other Lenders or (y) in the case of a refusal by a Lender to consent to a proposed change, waiver, discharge or termination with respect to this Agreement which has been approved by the Required Lenders as (and to the extent) provided in Section 13.12(b), the Borrower shall have the right, in accordance with Section 13.04(b), if no Default or Event of Default then exists or would exist after giving effect to such replacement, to replace such Lender (the "<u>Replaced Lender</u>") with one or more other Eligible Transferees (collectively, the "<u>Replacement Lender</u>") and each of which shall be reasonably acceptable to the Administrative Agent or, in the case of a replacement as provided in Section 13.12(b) where the consent of the respective Lender is required with respect to less than all of its Loans, to replace outstanding Loans of such Lender where the consent of such Lender would otherwise be individually required, with identical Loans provided by the Replacement Lender; <u>provided</u> that:

(a)        at the time of any replacement pursuant to this Section 2.13, the Replacement Lender shall enter into one or more Assignment and Assumption Agreements pursuant to Section 13.04(b) (and with all fees payable pursuant to said Section 13.04(b) to be paid by the Replacement Lender) pursuant to which the Replacement Lender shall acquire all of the outstanding Loans of the respective Replaced Lender and, in connection therewith, shall pay to the Replaced Lender in respect thereof an amount equal to the sum of (A) an amount equal to the principal of, and all accrued

-27-

interest on, all outstanding Loans of the respective Replaced Lender with respect to which such Replaced Lender is being replaced, and (B) an amount equal to all accrued, but theretofore unpaid, Fees owing to the Replaced Lender pursuant to Section 4.01; and

       (b)     all obligations of the Borrower then owing to the Replaced Lender (other than those (i) specifically described in clause (a) above in respect of which the assignment purchase price has been, or is concurrently being, paid or (ii) relating to any Loans of the respective Replaced Lender which will remain outstanding after giving effect to the respective replacement) shall be paid in full to such Replaced Lender concurrently with such replacement.

Upon receipt by the Replaced Lender of all amounts required to be paid to it pursuant to this Section 2.13, the Administrative Agent shall be entitled (but not obligated) and authorized to execute an Assignment and Assumption Agreement on behalf of such Replaced Lender, and any such Assignment and Assumption Agreement so executed by the Administrative Agent and the Replacement Lender shall be effective for purposes of this Section 2.13 and Section 13.04. Upon the execution of the respective Assignment and Assumption Agreement, the payment of amounts referred to in clauses (a) and (b) above, recordation of the assignment on the Register by the Administrative Agent pursuant to Section 13.15 and, if so requested by the Replacement Lender, delivery to the Replacement Lender of the appropriate Note or Notes executed by the Borrower, the Replacement Lender shall become a Lender hereunder and, unless the respective Replaced Lender continues to have outstanding Loans hereunder, the Replaced Lender shall cease to constitute a Lender hereunder, except with respect to indemnification provisions under this Agreement (including, without limitation, Sections 2.10, 5.04, 12.06, 13.01 and 13.06), which shall survive as to such Replaced Lender.

       SECTION 3.   Intentionally Omitted.

       SECTION 4.   Fees; Call Protection.

       4.01   Fees.  (a) The Borrower agrees to pay to the Administrative Agent such fees as may be agreed to in writing from time to time by the Borrower or any of its Subsidiaries and the Administrative Agent.

       (b)     The Borrower agrees to pay on the Effective Date to each Lender party to this Agreement as a Lender on the Effective Date, as fee compensation for the deemed funding of such Lender's Loan in accordance with the conversion mechanics set forth in Section 2.01, a non-cash closing fee in an amount equal to 5.0% of the stated principal amount of such Lender's Loan, payable to such Lender as provided in Section 2.01 and added to the principal amount of its Loan as and when deemed funded on the Effective Date. Such closing fee will be in all respects fully earned, due and payable on the Effective Date and non-refundable and non-creditable thereafter.

       4.02   Call Protection.  In the event that all or any portion of the Loans are repaid or prepaid pursuant to Section 5.01(a) or by acceleration on or after the first anniversary of the Effective Date but prior to the third anniversary of the Effective Date, each such repayment or prepayment shall be made at (i) 102.0% of the principal amount so repaid or prepaid if such

repayment or prepayment occurs on or after the first anniversary of the Effective Date but prior to the second anniversary of the Effective Date and (ii) 101.0% of the principal amount so repaid or prepaid if such repayment or prepayment occurs on or after the second anniversary of the Effective Date but prior to the third anniversary of the Effective Date.

SECTION 5.    Prepayments; Payments; Taxes.

5.01    Voluntary Prepayments.  (a)  No voluntary prepayments of Loans shall be permitted prior to the first anniversary of the Effective Date.  Subject to Section 4.02, the Borrower shall have the right to prepay the Loans in whole or in part at any time and from time to time on or after the first anniversary of the Effective Date on the following terms and conditions:  (i) the Borrower shall give the Administrative Agent prior to 12:00 Noon (New York time) at the Notice Office at least one Business Day's prior written notice (or telephonic notice promptly confirmed in writing) of its intent to prepay Loans, which notice shall specify the amount of such prepayment, and which notice the Administrative Agent shall promptly transmit to each of the Lenders; and (ii) each partial prepayment of Loans pursuant to this Section 5.01(a) shall be in an aggregate principal amount of at least $5,000,000 (or such lesser amount as is acceptable to the Administrative Agent).

(b)    Without in any way limiting the obligation of the Borrower to confirm in writing any telephonic notice of any prepayment of Loans permitted hereunder, the Administrative Agent may act without liability upon the basis of telephonic notice of such prepayment believed by the Administrative Agent in good faith to be from an Authorized Officer of the Borrower, prior to receipt of written confirmation.  In each such case, the Borrower hereby waives the right to dispute the Administrative Agent's record of the terms of such telephonic notice of such prepayment absent manifest error.

(c)    In the event of certain refusals by a Lender to consent to certain proposed changes, waivers, discharges or terminations with respect to this Agreement which have been approved by the Required Lenders as (and to the extent) provided in Section 13.12(b), the Borrower may, upon five Business Days' prior written notice to the Administrative Agent at the Notice Office (which notice the Administrative Agent shall promptly transmit to each of the Lenders), repay all Loans of such Lender, together with accrued and unpaid interest, Fees, premiums and all other amounts then owing to such Lender in accordance with, and subject to the requirements of, said Section 13.12(b), so long as the consents, if any, required by Section 13.12(b) in connection with the repayment pursuant to this clause (c) shall have been obtained.

5.02    Mandatory Repayment.  The Borrower shall repay the entire principal amount of the outstanding Loans, together with all other amounts owed hereunder with respect thereto, in full on the Maturity Date.

5.03    Method and Place of Payment.  Except as otherwise specifically provided herein, all payments under this Agreement and under any Note shall be made to the Administrative Agent for the account of the Lender or Lenders entitled thereto not later than 12:00 Noon (New York time) on the date when due and shall be made in Dollars in immediately available funds at the Payment Office.  Whenever any payment to be made

-29-

hereunder or under any Note shall be stated to be due on a day which is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest shall be payable at the applicable rate during such extension.

        5.04   <u>Net Payments</u>.  (a)  All payments made by or on behalf of the Borrower hereunder and under any Note will be made without setoff, counterclaim or other defense. Except as provided in Section 5.04(b), all such payments will be made free and clear of, and without deduction or withholding for, any present or future taxes, levies, imposts, duties, fees, assessments or other charges of whatever nature now or hereafter imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein with respect to such payments (but excluding, (i) except as provided in the second succeeding sentence, any tax imposed on or measured by the net income or net profits of a Lender pursuant to the laws of the jurisdiction in which it is organized or the jurisdiction in which the principal office or applicable lending office of such Lender is located or any subdivision thereof or therein and (ii) any United States Federal withholding tax that would not have been imposed but for a failure by such recipient (or any financial institution through which any payment is made to such recipient) to comply with the applicable requirements of Sections 1471 through 1474 of the Code, as of the date of this Agreement, and any regulations or official interpretations thereof) and all interest, penalties or similar liabilities with respect to such non-excluded taxes, levies, imposts, duties, fees, assessments or other charges (all such non-excluded taxes, levies, imposts, duties, fees, assessments or other charges being referred to, collectively, as "<u>Taxes</u>").  If any Taxes are so levied or imposed, the Borrower agrees to pay the full amount of such Taxes, and such additional amounts as may be necessary so that every payment of all amounts due under this Agreement or under any Note, after withholding or deduction for or on account of any Taxes, will not be less than the amount provided for herein or in such Note as if such Taxes had not been levied or imposed.  If any amounts are payable in respect of Taxes pursuant to the preceding sentence, the Borrower agrees to reimburse each Lender, upon the written request of such Lender, for taxes imposed on or measured by the net income or net profits of such Lender pursuant to the laws of the jurisdiction in which such Lender is organized or in which the principal office or applicable lending office of such Lender is located or under the laws of any political subdivision or taxing authority of any such jurisdiction in which such Lender is organized or in which the principal office or applicable lending office of such Lender is located and for any withholding of taxes as such Lender shall determine are payable by, or withheld from, such Lender, in respect of such amounts so paid to or on behalf of such Lender pursuant to the preceding sentence and in respect of any amounts paid to or on behalf of such Lender pursuant to this sentence.  The Borrower will furnish to the Administrative Agent within 45 days after the date the payment of any Taxes is due pursuant to applicable law certified copies of tax receipts evidencing such payment by such Borrower.  The Borrower agrees to indemnify and hold harmless each Lender, and reimburse such Lender upon its written request, for the amount of any Taxes so levied or imposed and paid by such Lender (other than for any interest or penalties directly attributable to any failure of a Lender to file any returns or pay any Taxes directly attributable to this Agreement, to the extent such Lender was legally required to file such returns and/or pay such Taxes and was reasonably informed by the Borrower about such requirements and had all information necessary to file such returns and/or pay such Taxes).  For purposes of this Section 5.04(a), Taxes shall include Other Taxes.

(b)       Each Lender that is a "United States person" (as such term is defined in Section 7701(a)(30) of the Code) agrees to deliver to the Borrower and the Administrative Agent on or prior to the Effective Date or, in the case of a Lender that is an assignee, transferee or acquiror of an interest under this Agreement pursuant to Section 2.12, 2.13 or 13.04(b) (unless the respective Lender was already a Lender hereunder immediately prior to such assignment, transfer or acquisition), on the date of such assignment, transfer or acquisition to or by such Lender, two properly completed and duly signed copies of Internal Revenue Service Form W-9 (or any successor form) certifying that such Lender is exempt from U.S. Federal withholding tax. Each Lender that is not a United States person (as such term is defined in Section 7701(a)(30) of the Code) for U.S. Federal income tax purposes agrees to deliver to the Borrower and the Administrative Agent on or prior to the Effective Date or, in the case of a Lender that is an assignee, transferee or acquiror of an interest under this Agreement pursuant to Section 2.12, 2.13 or 13.04(b) (unless the respective Lender was already a Lender hereunder immediately prior to such assignment, transfer or acquisition), on the date of such assignment, transfer or acquisition to or by such Lender, (i) two accurate and complete original signed copies of Internal Revenue Service Form W-8ECI, Form W-8BEN (with respect to a complete exemption under an income tax treaty) or Form W-8IMY (together with any applicable underlying Internal Revenue Service forms) (or successor forms) certifying to such Lender's entitlement as of such date to a complete exemption from United States withholding tax with respect to payments to be made under this Agreement and under any Note, (ii) if the Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code and cannot deliver either Internal Revenue Service Form W-8ECI or Form W-8BEN (with respect to a complete exemption under an income tax treaty) or W-8IMY (or any successor forms) pursuant to clause (i) above, (x) a certificate substantially in the form of Exhibit D (any such certificate, a "Section 5.04(b)(ii) Certificate") and (y) two accurate and complete original signed copies of applicable Internal Revenue Service Form W-8 (with respect to the portfolio interest exemption) (or successor form) certifying to such Lender's entitlement as of such date to a complete exemption from United States withholding tax with respect to payments of interest to be made under this Agreement and under any Note, or  (iii) any other form prescribed by applicable requirements of U.S. Federal income tax law as a basis for claiming exemption from or a reduction in U.S. Federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable requirements of law to permit the Borrower and the Administrative Agent to determine the withholding or deduction required to be made.  In addition, each Lender agrees that from time to time after the Effective Date, when a lapse in time or change in circumstances renders the previous certification obsolete or inaccurate in any material respect and from time to time thereafter upon the request of the Borrower or the Administrative Agent, such Lender will deliver to the Borrower and the Administrative Agent two new accurate and complete original signed copies of Internal Revenue Service Form W-8ECI, Form W-8BEN (with respect to the benefits of any income tax treaty), Form W-8IMY (together with any applicable underlying Internal Revenue Service forms) or applicable Form W-8 (with respect to the portfolio interest exemption) and a Section 5.04(b)(ii) Certificate, as the case may be, and such other forms as may be required in order to confirm or establish the entitlement of such Lender to a continued exemption from or reduction in United States withholding tax with respect to payments under this Agreement and any Note, or such Lender shall immediately notify the Borrower and the Administrative Agent of its inability to deliver any such Form or Certificate, in which case such Lender shall not be required to deliver any such Form or Certificate pursuant to this

Section 5.04(b). Notwithstanding anything to the contrary contained in Section 5.04(a), but subject to Section 13.04(b) and the immediately succeeding sentence, (x) the Borrower shall be entitled, to the extent it is required to do so by law, to deduct or withhold income or similar taxes imposed by the United States (or any political subdivision or taxing authority thereof or therein) from interest, Fees or other amounts payable hereunder for the account of any Lender which is not a United States person (as such term is defined in Section 7701(a)(30) of the Code) for U.S. Federal income tax purposes to the extent that such Lender has not provided to the Borrower U.S. Internal Revenue Service Forms that establish a complete exemption from such deduction or withholding and (y) the Borrower shall not be obligated pursuant to Section 5.04(a) to gross-up payments to be made to a Lender in respect of income or similar taxes imposed by the United States if (I) such Lender has not provided to the Borrower the Internal Revenue Service Forms required to be provided to the Borrower pursuant to this Section 5.04(b) or (II) in the case of a payment, other than interest, to a Lender described in clause (ii) above, to the extent that such forms do not establish a complete exemption from withholding of such taxes. Notwithstanding anything to the contrary contained in the preceding sentence or elsewhere in this Section 5.04 and except as set forth in Section 13.04(b), the Borrower agrees to pay any additional amounts and to indemnify each Lender in the manner set forth in Section 5.04(a) (without regard to the identity of the jurisdiction requiring the deduction or withholding) in respect of any amounts deducted or withheld by it as described in the immediately preceding sentence as a result of any changes that are effective after the Effective Date in any applicable law, treaty, governmental rule, regulation, guideline or order, or in the interpretation thereof, relating to the deducting or withholding of such Taxes.

(c)     Each Lender shall indemnify the Administrative Agent for the full amount of any taxes, levies, imposts, duties, charges, fees, deductions, withholdings or similar charges imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein (but only to the extent that the Borrower has not already reimbursed the Administrative Agent for such taxes, levies, imposts, duties, charges, fees, deductions, withholdings or similar charges and without limiting the obligation of the Borrower to do so) that are attributable to such Lender and that are payable or paid by the Administrative Agent, together with all interest, penalties, reasonable costs and expenses arising therefrom or with respect thereto in connection with any Credit Document, as determined by the Administrative Agent in good faith. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.

SECTION 6.  Conditions Precedent to the Effective Date.  The occurrence of the Effective Date pursuant to Section 13.10 and the obligation of each Lender to make (or be deemed to have made) Loans on the Effective Date, are subject at the time of the occurrence of the Effective Date to the satisfaction of the following conditions (none of which may be waived without the prior written consent of each Backstop Party):

6.01     Execution of Agreement; Notes.  On or prior to the Effective Date, (i) this Agreement shall have been executed and delivered as provided in Section 13.10 and (ii) there shall have been delivered to the Administrative Agent for the account of each of the Lenders that has requested same an appropriate Note executed by the Borrower in the amount, maturity and as otherwise provided herein.

6.02   Officer's Certificate. On the Effective Date, the Administrative Agent shall have received a certificate, dated the Effective Date and signed on behalf of the Borrower by the chairman of the board, the chief executive officer, the president or any vice president of the Borrower, certifying on behalf of the Borrower that all of the conditions in Sections 6.07 through 6.08, inclusive, and 6.18 have been satisfied on such date.

6.03   Opinions of Counsel. On the Effective Date, the Administrative Agent shall have received (i) from Lane & Waterman LLP and from Sidley Austin LLP, special counsels to the Credit Parties, opinions (in form and substance reasonably satisfactory to the Backstop Parties and the Administrative Agent) addressed to the Administrative Agent, the Collateral Agent and each of the Lenders and dated the Effective Date covering such matters incident to the transactions contemplated herein as the Administrative Agent or the Backstop Parties (or counsel thereto) may reasonably request, (ii) opinions, dated the Effective Date, from [Brownstein Hyatt Farber Schreck, LLP], special Nevada counsel for Santa Maria Times, Inc., [Davis Wright Tremaine LLP], special Washington counsel for Flagstaff Publishing Co., Hanford Sentinel Inc. and Napa Valley Publishing Co., and special Oregon counsel to Southwestern Oregon Publishing Co., and [Parsons Behle & Latimer], special Utah counsel for Homechoice, LLC, each covering such matters incident to the transactions contemplated hereby as the Administrative Agent or the Backstop Parties (or their respective counsel) may reasonably request, and (iii) from local counsel in each state in which a Subsidiary Guarantor (other than K. Falls Basin Publishing, Inc., but only to the extent such entity is a non-operating entity and has no material assets or liabilities) is organized, an opinion in form and substance reasonably satisfactory to the Backstop Parties and the Administrative Agent addressed to the Administrative Agent, the Collateral Agent and each of the Lenders, dated the Effective Date and covering such matters incident to the transactions contemplated herein as the Administrative Agent may reasonably request.

6.04   Company Documents; Proceedings; etc. (a) On the Effective Date, the Administrative Agent shall have received a certificate from each Credit Party, dated the Effective Date, signed by the chairman of the board, the chief executive officer, the president or any vice president of such Credit Party, and attested to by the secretary or any assistant secretary of such Credit Party, in the form of Exhibit F with appropriate insertions, together with copies of the certificate or articles of incorporation and by-laws (or other equivalent organizational documents), as applicable, of such Credit Party and the resolutions of such Credit Party referred to in such certificate, and each of the foregoing shall be in form and substance reasonably acceptable to the Administrative Agent.

(b)   On the Effective Date, all Company and legal proceedings and all instruments and agreements in connection with the transactions contemplated by this Agreement and the other Credit Documents shall be reasonably satisfactory in form and substance to the Administrative Agent, and the Administrative Agent shall have received all information and copies of all documents and papers, including records of Company proceedings, governmental approvals, good standing certificates and bring-down telegrams or facsimiles, if any, which the Administrative Agent reasonably may have requested in connection therewith, such documents and papers where appropriate to be certified by proper Company or governmental authorities.

6.05    Shareholders' Agreements; Tax Sharing Agreements; Existing Indebtedness Agreements; Redemption Agreement.  On the Effective Date, the Administrative Agent shall have received a certificate from the Borrower in the form of Exhibit E, dated the Effective Date, attaching true and correct copies of the following documents, certified as such by an Authorized Officer of the Borrower:

(i)    all agreements entered into by the Borrower or any of its Subsidiaries governing the terms and relative rights of its Equity Interests and any agreements entered into by its shareholders relating to any such entity with respect to its Equity Interests (collectively, the "Shareholders' Agreements");

(ii)    all tax sharing, tax allocation and other similar agreements entered into (including on the Effective Date) by the Borrower or any of its Subsidiaries (collectively, the "Tax Sharing Agreements");

(iii)    all agreements evidencing or relating to Indebtedness of the Borrower or any of its Subsidiaries which is outstanding after giving effect to the Effective Date (collectively, the "Existing Indebtedness Agreements"), provided that the Borrower shall not be required to deliver a copy of any Existing Indebtedness Agreement to the extent that same relates to an item of Indebtedness (including unused commitments in respect thereof) of less than $5,000,000; and

(iv)    the Redemption Agreement.

6.06    Confirmation Order. (a) The Confirmation Order shall be in form and substance reasonably satisfactory to the Administrative Agent and each Backstop Party and shall have been entered, shall not be subject to any stay and the conditions precedent to the effectiveness of the Plan of Reorganization shall have been satisfied (or waived) to the reasonable satisfaction of the Administrative Agent and each Backstop Party.

(b)    The sum of (1) Unrestricted cash and Cash Equivalents of the Lee Entities and (2) unused availability under the Revolving Facility under (and as defined in) the First Lien Credit Agreement immediately after giving effect to the Effective Date shall not be less than $26,000,000, and the Borrower shall have delivered a certificate to the Administrative Agent to such effect on or before the Effective Date, based on the Borrower's good faith assumptions.

(c)    The Borrower shall be in compliance with all financial covenants set forth in Section 10.08 and 10.09 of the First Lien Credit Agreement on a *pro forma* basis after giving effect to the Effective Date.

(d)    No Default or Event of Default under (and as such terms are defined in) the DIP Credit Agreement (as defined in the First Lien Credit Agreement) shall exist or would exist immediately prior to or after giving effect to the occurrence of the Effective Date.

6.07    Adverse Change, Approvals. (a) Since September 25, 2011, nothing shall have occurred (and neither any Agent nor the Required Lenders shall have become aware of any facts or conditions not previously known) which any Agent or the Required Lenders shall

reasonably determine has had, or could reasonably be expected to have, a Material Adverse Effect.

(b)     On or prior to the Effective Date, all necessary governmental (domestic and foreign) and material third party approvals and/or consents in connection with this Agreement, the other transactions contemplated hereby and the granting of Liens under each of the Pledge Agreement, the Security Agreement, each Mortgage and each other applicable Security Document shall have been obtained and remain in effect, and all applicable waiting periods with respect thereto shall have expired without any action being taken by any competent authority which restrains, prevents or imposes materially adverse conditions upon the consummation of this Agreement or the other transactions contemplated hereby or otherwise referred to herein or therein.  On the Effective Date, there shall not exist any judgment, order, injunction or other restraint issued or filed or a hearing seeking injunctive relief or other restraint pending or notified prohibiting or imposing materially adverse conditions upon this Agreement or the other transactions contemplated hereby or otherwise referred to herein or therein.  On the Effective Date, the Collateral Agent shall have continuing, perfected liens in the Collateral as and to the extent required under the terms hereof and of the Security Documents.

6.08    Litigation. On the Effective Date, there shall be no actions, suits or proceedings pending or threatened with respect to this Agreement, any other Credit Document or otherwise which any Agent or the Required Lenders shall reasonably determine has had, or could reasonably be expected to have, a Material Adverse Effect.

6.09    Subsidiaries Guaranty; Intercompany Subordination Agreement. (a) On the Effective Date, each Subsidiary Guarantor shall have duly authorized, executed and delivered the Subsidiaries Guaranty in the form of Exhibit G (as further amended, modified or supplemented from time to time in accordance with the terms hereof and thereof, the "Subsidiaries Guaranty"), and the Subsidiaries Guaranty shall be in full force and effect.

(b)     On the Effective Date, each Credit Party and each other Subsidiary of the Borrower which is an obligee with respect to any Intercompany Debt shall have duly authorized, executed and delivered the Intercompany Subordination Agreement in the form of Exhibit H (as amended, modified, restated and/or supplemented from time to time in accordance with the terms hereof and thereof, the "Intercompany Subordination Agreement"), and the Intercompany Subordination Agreement shall be in full force and effect.

6.10    Pledge Agreement. On the Effective Date, each Credit Party shall have duly authorized, executed and delivered the pledge agreement in the form of Exhibit I-1 (as amended, modified, restated and/or supplemented from time to time in accordance with the terms hereof and thereof, the "Pledge Agreement") and shall have delivered (or shall have previously delivered) to the Collateral Agent, as Pledgee thereunder (or, to the extent such Pledge Agreement Collateral constitutes Common Collateral (as defined in the Lee Intercreditor Agreement or the Pulitzer Intercreditor Agreement, as applicable), to the First Priority Representative (as defined in the Lee Intercreditor Agreement or the Pulitzer Intercreditor Agreement, as applicable) in accordance with, and only to the extent subject to the provisions of, Section 2.3(c) of the Lee Intercreditor Agreement or Section 2.3(c) of the Pulitzer Intercreditor Agreement, as applicable, with copies thereof and of any related endorsements to the Collateral

Agent), all of the Pledge Agreement Collateral, if any, referred to therein and then owned by such Credit Party, together with executed and undated endorsements for transfer in the case of Equity Interests constituting certificated Pledge Agreement Collateral, along with evidence that all other actions necessary or, in the reasonable opinion of the Collateral Agent, desirable, to perfect the security interests purported to be created by the Pledge Agreement have been taken and the Pledge Agreement shall be in full force and effect.

6.11    <u>Security Agreement</u>.  On the Effective Date, each Credit Party shall have duly authorized, executed and delivered the security agreement in the form of Exhibit I-2 (as amended, modified, restated and/or supplemented from time to time in accordance with the terms hereof and thereof, the "<u>Security Agreement</u>") covering all of such Credit Party's Security Agreement Collateral, together with:

(i)    proper financing statements (Form UCC-1 or the equivalent) fully executed or authorized for filing under the UCC or other appropriate filing offices of each jurisdiction as may be necessary or, in the reasonable opinion of the Collateral Agent, desirable, to perfect the security interests purported to be created by the Security Agreement;

(ii)    certified copies of requests for information or copies (Form UCC-11), or equivalent reports as of a recent date, listing all effective financing statements that name the Borrower or any of the other Credit Parties as debtor and that are filed in the jurisdictions referred to in clause (i) above, together with copies of such other financing statements that name the Borrower or any other Credit Party as debtor (none of which shall cover any of the Collateral except (x) to the extent evidencing Permitted Liens or (y) those in respect of which the Collateral Agent shall have received termination statements (Form UCC-3) or such other termination statements as shall be required by local law fully executed for filing);

(iii)    evidence of the completion of all other recordings and filings of, or with respect to, the Security Agreement as may be necessary or, in the reasonable opinion of the Collateral Agent, desirable, to perfect the security interests intended to be created by the Security Agreement;

(iv)    evidence that all other actions necessary or, in the reasonable opinion of the Collateral Agent, desirable to perfect and protect the security interests purported to be created by the Security Agreement have been taken, and the Security Agreement shall be in full force and effect; and

(v)    from local counsel to each Credit Party, an opinion, in form and substance reasonably satisfactory to the Administrative Agent and each Backstop Party (and its counsel), addressed to the Administrative Agent, the Collateral Agent and each of the Lenders and dated the Effective Date covering such matters incident to the transactions contemplated herein as the Administrative Agent may reasonably request including, but not limited to, the perfection of the security interests created thereunder.

6.12    Real Property Collateral.  On the Effective Date, the Borrower shall have complied with all of the requirements as of such date set forth in Section 9.16.

6.13    Historical Financial Statements; Projections.  On or prior to the Effective Date, the Administrative Agent shall have received true and correct copies of the historical financial statements and the Projections referred to in Sections 8.05(a) and (d), which historical financial statements and Projections shall be in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders.

6.14    Solvency Certificate; Insurance Certificates, etc.  On the Effective Date, the Administrative Agent shall have received:

(i)    a solvency certificate from the chief financial officer of the Borrower in the form of Exhibit J; and

(ii)    certificates of insurance complying with the requirements of Section 9.03(c) for the business and properties of the Borrower and its Subsidiaries, in form and substance reasonably satisfactory to the Administrative Agent.

6.15    Fees, etc.  On or before the Effective Date, the Borrower shall have paid to each Agent and each Backstop Party (in each case and/or any of its respective relevant affiliates), as applicable, all reasonable costs, fees and expenses (including, without limitation, the invoiced and reasonable fees and disbursements of (x) Milbank, Tweed, Hadley & McCloy LLP as sole legal counsel (other than local counsel in any relevant jurisdiction) to GS Lending Partners and Monarch prior to the Effective Date and (y) Willkie Farr & Gallagher LLP as legal counsel to the Administrative Agent) of any type or nature described in clause (i) of Section 13.01 or otherwise constituting Transaction Expenses (as defined in each Backstop Commitment Letter) requested in writing (without application of Section 13.03) at least one Business Day prior to the Effective Date or required by any other provision of this Agreement or any Backstop Commitment Letter to be paid on or before the Effective Date, and all other compensation contemplated hereby, by any other Credit Document, by the Lee Support Agreement or by any of the Backstop Commitment Letters to be paid on or before the Effective Date.

6.16    Transaction Documents.  (a) On the Effective Date, the First Lien Credit Agreement, the Lee Intercreditor Agreement and the other First Lien Credit Documents shall have become (or concurrently with the Effective Date shall become) effective in accordance with the terms hereof, thereof and of the Lee Support Agreement, and the Administrative Agent shall have received true, correct and complete (including all exhibits, schedules and annexes thereto), fully executed copies thereof, certified as such by an Authorized Officer of the Borrower as required by Section 6.05.

(b)    On the Effective Date, the Pulitzer Debt Documents and the Pulitzer Intercreditor Agreement shall have become (or concurrently with the Effective Date shall become) effective in accordance with the terms hereof, thereof and of the Lee Support Agreement and of the Pulitzer Support Agreement, and the Administrative Agent shall have received true, correct and complete (including all exhibits, schedules and annexes thereto), fully

-37-

executed copies thereof, certified as such by an Authorized Officer of the Borrower as required by Section 6.05.

6.17    Backstop Commitment Letter Conditions; Newly Issued Equity.  On the Effective Date, (x) each Backstop Commitment letter shall be in full force and effect (and shall not have terminated or expired) and all of the Backstop Party Conditions (as defined in each Backstop Commitment Letter) and all other conditions to each Backstop Party's commitments under its respective Backstop Commitment Letter shall have been satisfied in full or waived in accordance with its terms and (y) each Lender shall have received a ratable portion of duly and validly issued, fully paid and non-assessable common stock of the Borrower in an aggregate amount equal to 15% of all issued and outstanding common shares of the Borrower on the Effective Date, immediately before giving effect to the closing of the transactions contemplated by the Lee Support Agreement, the First Lien Credit Documents and the Credit Documents to occur on the Effective Date, pursuant to and in accordance with the Plan of Reorganization.

6.18    No Default; Representations and Warranties.  On the Effective Date and immediately after giving effect thereto and the borrowing (or deemed borrowing) of the Loans (i) there shall exist (w) no Default or Event of Default, (x) no Default or Event of Default under (and each as defined in) the First Lien Credit Agreement, (y) no Default or Event of Default under (and each as defined in) either the Pulitzer Debt Agreement or the Pulitzer Debt Guaranties, and (z) no default or event of default under any other Indebtedness of any Credit Party the aggregate outstanding principal amount of which exceeds $5,000,000, and (ii) all representations and warranties contained herein, in the other Credit Documents, the First Lien Credit Documents, the Pulitzer Debt Documents, the Lee Support Agreement, the Pulitzer Support Agreement and each Backstop Commitment Letter shall be true and correct in all material respects with the same effect as though such representations and warranties had been made on the Effective Date (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date).

6.19    Star Intercompany Obligations.  On or prior to the Effective Date, the Administrative Agent shall have received evidence reasonably satisfactory to it and the Backstop Parties that all obligations of the Pulitzer Entities to Star Publishing (whether or not represented by promissory notes) have been irrevocably cancelled and no liability remains outstanding in respect thereof.

6.20    Notice of Borrowing.  Prior to the making (or deemed making) of the Loans, the Administrative Agent shall have received a Notice of Borrowing meeting the requirements of Section 2.03.

SECTION 7.    Intentionally Omitted.

SECTION 8.    Representations, Warranties and Agreements.  In order to induce the Lenders and the Agents to enter into this Agreement and to make (or be deemed to have made) the Loans, the Borrower makes the following representations, warranties and agreements, in each case after giving effect to the Effective Date, all of which shall survive the execution and delivery of this Agreement and the Notes and the making (or deemed making) of the Loans with

the occurrence of the Effective Date being deemed to constitute a representation and warranty that the matters specified in this Section 8 are true and correct in all material respects on and as of the Effective Date (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date):

8.01    Company Status.  Each of the Borrower and each of its Subsidiaries (i) is a duly organized and validly existing Company in good standing under the laws of the jurisdiction of its organization, (ii) has the Company power and authority to own its property and assets and to transact the business in which it is engaged and presently proposes to engage and (iii) is duly qualified and is authorized to do business and is in good standing in each jurisdiction where the ownership, leasing or operation of its property or the conduct of its business requires such qualifications except for failures to be so qualified or authorized which, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

8.02    Power and Authority.  Each Credit Party has the Company power and authority to execute, deliver and perform the terms and provisions of each of the Credit Documents to which it is party and has taken all necessary Company action to authorize the execution, delivery and performance by it of each of such Credit Documents.  Each Credit Party has duly executed and delivered each of the Credit Documents to which it is party, and each of such Credit Documents constitutes its legal, valid and binding obligation enforceable in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law).

8.03    No Violation.  Neither the execution, delivery or performance by any Credit Party of the Credit Documents, the Tax Sharing Agreements to which it is a party, nor compliance by it with the terms and provisions thereof, (i) contravenes any provision of any law, statute, rule or regulation or any order, writ, injunction or decree of any court or governmental instrumentality, (ii) conflicts with or results in any breach of any of the terms, covenants, conditions or provisions of, or constitutes a default under, or results in the creation or imposition of (or the obligation to create or impose) any Lien (except (x) pursuant to the Security Documents and (y) the Liens permitted under Sections 10.01(xviii) and 10.01(xix)) upon any of the property or assets of any Credit Party or any of its Subsidiaries pursuant to the terms of any material indenture, mortgage, deed of trust, credit agreement or loan agreement, or any other material agreement, contract or instrument, in each case to which any Credit Party or any of its Subsidiaries is a party or by which it or any its property or assets is bound or to which it may be subject, or (iii) violates any provision of the certificate or articles of incorporation, certificate of formation, limited liability company agreement or by-laws (or equivalent organizational documents), as applicable, of any Credit Party or any of its Subsidiaries, in each case, except solely with respect to the Pulitzer Entities, in the case of the Security Documents other than those specifically referred to in the definition of "Credit Documents" in Section 1.01, to the extent such contravention, conflict, breach or violation, individually or in the aggregate, could not reasonably be expected to cause a Pulitzer Material Adverse Effect.

8.04    <u>Approvals</u>.    All necessary governmental (domestic and foreign) and material third party approvals and/or consents in connection with this Agreement and the other transactions contemplated hereby and by the other Credit Documents shall have been obtained and remain in effect, and all applicable waiting periods with respect thereto shall have expired without any action being taken by any competent authority which restrains, prevents or imposes materially adverse conditions upon the consummation of this Agreement or the other transactions contemplated hereby and by the other Credit Documents or otherwise referred to herein or therein.    No order, consent, approval, license, authorization or validation of, or filing, recording or registration with (except for those that have otherwise been obtained or made on or prior to the Effective Date and which remain in full force and effect on the Effective Date and for the filings for perfection or recordation of the Liens under the Credit Documents set forth in Section 8.11), or exemption by, any governmental or public body or authority, or any subdivision thereof, is required to be obtained or made by, or on behalf of, any Credit Party to authorize, or is required to be obtained or made by, or on behalf of, any Credit Party in connection with, (i) the execution, delivery and performance of any Credit Document or (ii) the legality, validity, binding effect or enforceability of any such Credit Document.

8.05    <u>Financial Statements; Financial Condition; Undisclosed Liabilities; Projections</u>.    (a)    The consolidated balance sheets of the Borrower and its Subsidiaries at September 25, 2011 and September 26, 2010, and the related consolidated statements of income and cash flows and changes in shareholders' equity of the Borrower and its Subsidiaries for the Borrower's respective fiscal year ended on each such date, in each case furnished to the Lenders prior to the Effective Date, present fairly in all material respects the consolidated financial position of the Borrower and its Subsidiaries at the dates of said financial statements and the consolidated results of their operations for the periods covered thereby.    The consolidated balance sheets of Pulitzer and its Subsidiaries at September 25, 2011 and September 26, 2010 and the related consolidated statements of income and cash flows and changes in shareholders' equity of Pulitzer and its Subsidiaries for Pulitzer's fiscal year ended on each such date, furnished to the Lenders prior to the Effective Date, present fairly in all material respects the consolidated financial condition of Pulitzer and its Subsidiaries at the date of said financial statements and the consolidated results of their operations for the periods covered thereby.    All such financial statements have been prepared in accordance with GAAP consistently applied except to the extent provided in the notes to said financial statements and subject, in the case of the unaudited interim consolidated financial statements of the Borrower and Pulitzer, to normal year-end audit adjustments (all of which are of a recurring nature and none of which, individually or in the aggregate, would be material) and the absence of footnotes.

(b)    On and as of the Effective Date, and after giving effect to all Indebtedness (including the Loans) being incurred or assumed and Liens created by the Credit Parties in connection therewith, (i) the sum of the assets, at a fair valuation, of the Borrower (on a stand-alone basis) and of the Borrower and its Subsidiaries (taken as a whole), will exceed its or their respective debts, (ii) the Borrower (on a stand-alone basis) and the Borrower and its Subsidiaries (taken as a whole) has or have not incurred and does or do not intend to incur, and does or do not believe that it or they will incur, debts beyond its or their respective ability to pay such debts as such debts mature, and (iii) the Borrower (on a stand-alone basis) and the Borrower and its Subsidiaries (taken as a whole) will have sufficient capital with which to conduct its or their respective businesses.    For purposes of this Section 8.05(b), "<u>debt</u>" means any liability on a

claim, and "claim" means (A) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured or (B) right to an equitable remedy for breach of performance if such breach gives rise to a payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured. The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

(c)     Except as fully disclosed in the financial statements delivered pursuant to Section 8.05(a) and for the Indebtedness incurred under this Agreement, the Pulitzer Debt Documents and the First Lien Loan Documents, there were as of the Effective Date no liabilities or obligations with respect to the Borrower or any of its Subsidiaries of any nature whatsoever (whether absolute, accrued, contingent or otherwise and whether or not due) which, either individually or in the aggregate, could reasonably be expected to be material to the Borrower and its Subsidiaries taken as a whole. As of the Effective Date, the Borrower knows of no basis for the assertion against it or any of its Subsidiaries of any liability or obligation of any nature whatsoever that is not fully disclosed in the financial statements delivered pursuant to Section 8.05(a) or referred to in the immediately preceding sentence which, either individually or in the aggregate, could reasonably be expected to be material to the Borrower and its Subsidiaries taken as a whole.

(d)     The Projections delivered to the Administrative Agent and the Lenders prior to the Effective Date have been prepared in good faith and are based on reasonable assumptions, and there are no statements or conclusions in the Projections which are based upon or include information known to the Borrower to be misleading in any material respect or which fail to take into account material information known to the Borrower regarding the matters reported therein. On the Effective Date, the Borrower believes that the Projections are reasonable and attainable, it being recognized by the Lenders, however, that projections as to future events are not to be viewed as facts and that the actual results during the period or periods covered by the Projections may differ from the projected results.

(e)     Since September 25, 2011, nothing has occurred that has had, or could reasonably be expected to have, a Material Adverse Effect or a Pulitzer Material Adverse Effect (it being understood that the filing of the voluntary petitions under Chapter 11 of the Bankruptcy Code on the Petition Date shall not, in and of itself, be deemed to have had or, reasonably be expected to have, a Material Adverse Effect or a Pulitzer Material Adverse Effect).

8.06    Litigation. Except as set forth in Schedule XI[4] (it being understood that disclosure on Schedule XI is not a representation that a matter to which the disclosure relates is expected to have a Material Adverse Effect), there are no actions, suits, proceedings or governmental investigations pending or, to the knowledge of the Borrower, threatened with

---

[4]    This schedule and all other schedules to the Credit Documents are subject to the satisfactory review of the Lenders.

respect to any Credit Document or otherwise that have had, or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect (it being understood that the filing of the voluntary petitions under Chapter 11 of the Bankruptcy Code on the Petition Date shall not, in and of itself, be deemed to have had or, reasonably be expected to have, a Material Adverse Effect).

8.07   <u>True and Complete Disclosure</u>.  All factual information (taken as a whole) theretofore furnished by or on behalf of the Borrower in writing to the Administrative Agent or any Lender (including, without limitation, all information contained in the Credit Documents, the Plan of Reorganization and the Disclosure Statement) for purposes of or in connection with this Agreement, the other Credit Documents or any transaction contemplated herein or therein is true and accurate in all material respects on the date as of which such information is dated or certified and not incomplete by omitting to state any fact necessary to make such information (taken as a whole) not misleading in any material respect at such time in light of the circumstances under which such information was provided, it being understood and agreed that for purposes of this Section 8.07, such factual information shall not include the Projections or any *pro forma* financial information.

8.08   <u>Use of Proceeds; Margin Regulations</u>.  (a)  All proceeds of the Loans were used by the Borrower to restructure (by way of exchange) Existing Loans as contemplated by the Lee Support Agreement and the Backstop Commitment Letters.

(b)   No part of the Loans (or the proceeds thereof) will be used to purchase or carry any Margin Stock or to extend credit for the purpose of purchasing or carrying any Margin Stock.  Neither the making of any Loan nor the use of the proceeds thereof will violate or be inconsistent with the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System.

8.09   <u>Tax Returns and Payments</u>.  Each of the Borrower and each of its Subsidiaries has timely filed or caused to be timely filed (in each case giving effect to all applicable and permitted extensions) with the appropriate taxing authority all Federal and other material returns, statements, forms and reports for taxes (the "<u>Returns</u>") required to be filed by, or with respect to the income, properties or operations of, the Borrower and/or any of its Subsidiaries.  The Returns accurately reflect in all material respects all liability for taxes of the Borrower and its Subsidiaries, as applicable, for the periods covered thereby.  Each of the Borrower and each of its Subsidiaries has paid all taxes and assessments payable by it which have become due, other than those that are immaterial and those that are being contested in good faith and adequately disclosed and fully provided for on the financial statements of the Borrower and its Subsidiaries in accordance with GAAP.  There is no material action, suit, proceeding, investigation, audit or claim now pending or, to the knowledge of the Borrower, threatened by any authority regarding any material taxes relating to the Borrower or any of its Subsidiaries. Neither the Borrower nor any of its Subsidiaries has incurred, nor will any of them incur, any material tax liability in connection with transactions contemplated in this Agreement, the First Lien Credit Agreement or the Pulitzer Debt Agreement (it being understood that (x) the representation contained in this sentence does not cover any future tax liabilities of the Borrower or any of its Subsidiaries arising as a result of the operation of their businesses in the ordinary course of business and (y) the consummation of the Plan of Reorganization may result in tax

consequences to the Borrower, including an adjustment of asset values or tax basis as a result of cancellation of indebtedness resulting from the Plan of Reorganization).

        8.10   <u>Compliance with ERISA</u>.  (a)  Schedule IV sets forth each Plan as of the Effective Date.  Except as disclosed on Schedule IV or otherwise as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect (it being understood that disclosure on Schedule IV is not a representation that such item is expected to have a Material Adverse Effect):  each Plan (and each related trust, insurance contract or fund) is in compliance with its terms and with all applicable laws, including without limitation ERISA and the Code; each Plan (and each related trust, if any) which is intended to be qualified under Section 401(a) of the Code has received a determination letter from the Internal Revenue Service to the effect that it meets the requirements of Sections 401(a) and 501(a) of the Code, has applied for such a determination letter within the time period permitted by the Internal Revenue Service, or has time remaining within the time period permitted by the Internal Revenue Service in which to apply for such a determination letter; no Reportable Event has occurred; the Borrower has not been notified by any Plan which is a multiemployer plan (as defined in Section 4001(a)(3) of ERISA) that it is insolvent or in reorganization; no Plan has an Unfunded Current Liability; no Plan which is subject to Section 412 of the Code or Section 302 of ERISA has an accumulated funding deficiency or failure to meet applicable minimum funding standards, within the meaning of such sections of the Code or ERISA, or has applied for or received either a waiver of such standards or an extension of any amortization period (to the extent applicable), within the meaning of Section 412 of the Code or Section 302 of ERISA; all contributions required to be made with respect to a Plan have been timely made; neither the Borrower nor any ERISA Affiliate has incurred any liability (including any indirect, contingent or secondary liability to or on account of a Plan) pursuant to Sections 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or Sections 401(a)(29), 4971 or 4975 of the Code or expects to incur any liability under any of the foregoing sections with respect to any Plan; no condition exists which presents a risk to the Borrower or any ERISA Affiliate of incurring a liability to or on account of a Plan pursuant to the foregoing provisions of ERISA and the Code; no proceedings have been instituted to terminate or appoint a trustee to administer any Plan which is subject to Title IV of ERISA; no action, suit, proceeding, hearing, audit or investigation with respect to the administration, operation or the investment of assets of any Plan (other than routine audits and claims for benefits) is pending, expected or threatened; using actuarial assumptions and computation methods consistent with Part 1 of subtitle E of Title IV of ERISA, the aggregate liabilities of the Borrower and its ERISA Affiliates to all Plans which are multiemployer plans (as defined in Section 4001(a)(3) of ERISA) in the event of a complete withdrawal therefrom, as of the close of the most recent fiscal year of each such Plan ended prior to the Effective Date, would not exceed $10,000,000; each group health plan (as defined in Section 607(1) of ERISA or Section 4980B(g)(2) of the Code) which covers or has covered employees or former employees of the Borrower or any ERISA Affiliate has at all times been operated in compliance with the provisions of Part 6 of subtitle B of Title I of ERISA and Section 4980B of the Code; each group health plan (as defined in 45 Code of Federal Regulations Section 160.103) which covers or has covered employees or former employees of the Borrower or any ERISA Affiliate has at all times been operated in compliance with the provisions of the Health Insurance Portability and Accountability Act of 1996 and the regulations promulgated thereunder; no lien imposed under the Code or ERISA on the assets of the Borrower or any ERISA Affiliate exists or is likely to arise on account of any Plan; and the

Borrower and its ERISA Affiliates may cease contributions to or terminate any employee maintained by any of them without incurring any liability (other than any termination of employees which, individually or in the aggregate, may trigger a complete or partial withdrawal from a multiemployer pension fund).

(b)     Except as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect:  each Foreign Pension Plan has been maintained in compliance with its terms and with the requirements of any and all applicable laws, statutes, rules, regulations and orders and has been maintained, where required, in good standing with applicable regulatory authorities; all contributions required to be made with respect to a Foreign Pension Plan have been timely made; neither the Borrower nor any of its Subsidiaries has incurred any obligation in connection with the termination of, or withdrawal from, any Foreign Pension Plan; and the present value of the accrued benefit liabilities (whether or not vested) under each Foreign Pension Plan, determined as of the end of the Borrower's most recently ended fiscal year on the basis of actuarial assumptions, each of which is reasonable, did not exceed the current value of the assets of such Foreign Pension Plan allocable to such benefit liabilities.

8.11    <u>Security Documents</u>.  (a) The provisions of the Security Agreement are effective to create in favor of the Collateral Agent for the benefit of the Secured Creditors a legal, valid and enforceable security interest in all right, title and interest of the Credit Parties in the Security Agreement Collateral described therein, and the Collateral Agent, for the benefit of the Secured Creditors, has a fully perfected security interest in all right, title and interest in all of the Security Agreement Collateral described therein, subject to no other Liens other than Permitted Liens.  The recordation of (x) the Grant of Security Interest in U.S. Patents and (y) the Grant of Security Interest in U.S. Trademarks in the respective form attached to the Security Agreement, in each case in the United States Patent and Trademark Office, together with filings on Form UCC-1 made pursuant to the Security Agreement, creates, as may be perfected by such filings and recordation, a perfected security interest in the United States trademarks and patents covered by the Security Agreement, and the recordation of the Grant of Security Interest in U.S. Copyrights in the form attached to the Security Agreement with the United States Copyright Office, together with filings on Form UCC-1 made pursuant to the Security Agreement, creates, as may be perfected by such filings and recordation, a perfected security interest in the United States copyrights covered by the Security Agreement.

(b)     The security interests created under the Pledge Agreement in favor of the Collateral Agent, as Pledgee, for the benefit of the Secured Creditors, constitute perfected security interests in the Pledge Agreement Collateral described in the Pledge Agreement, subject to no security interests of any other Person other than Permitted Liens applicable thereto.

(c)     Upon the filing thereof, each Mortgage creates, as security for the obligations purported to be secured thereby, a valid and enforceable perfected security interest in and mortgage lien on the respective Mortgaged Property in favor of the Collateral Agent (or such other trustee as may be required or desired under local law) for the benefit of the Secured Creditors, superior and prior to the rights of all third Persons (except that the security interest and mortgage lien created on such Mortgaged Property may be subject to the Permitted

#4824-6878-8234v29

Encumbrances related thereto) and subject to no other Liens (other than Permitted Encumbrances related thereto).

8.12    Properties.  Each of the Borrower and each of its Subsidiaries has good and indefeasible title to all material properties (and to all buildings, fixtures and improvements located thereon) owned by it, including all material property reflected in the most recent historical balance sheets referred to in Section 8.05(a) (except as sold or otherwise disposed of since the date of such balance sheet in the ordinary course of business or as permitted by the terms of this Agreement), free and clear of all Liens, other than Permitted Liens.  Each of the Borrower and each of its Subsidiaries has a valid and indefeasible leasehold interest in the material properties leased by it free and clear of all Liens other than Permitted Liens.

8.13    Capitalization.  On, and after giving effect to, the Effective Date, the authorized capital stock of the Borrower consists of (a) 120,000,000 shares of common stock, $0.01 par value per share, (b) 30,000,000 shares of Class B common stock, $2.00 par value per share and (c) 500,000 shares of serial convertible preferred stock.  All outstanding shares of the capital stock of the Borrower have been duly and validly issued, are fully paid and non-assessable and have been issued free of preemptive rights.  The Borrower does not have outstanding any capital stock or other securities convertible into or exchangeable for its capital stock or any rights to subscribe for or to purchase, or any options for the purchase of, or any agreement providing for the issuance (contingent or otherwise) of, or any calls, commitments or claims of any character relating to, its capital stock or any stock appreciation or similar rights, except for (x) options, warrants and rights to purchase shares of the Borrower's common stock which may be issued from time to time and (y) shares of Qualified Preferred Stock of the Borrower which may be convertible into shares of the Borrower's common stock.

8.14    Subsidiaries.  On and as of the Effective Date, the Borrower has no Subsidiaries other than those Subsidiaries listed on Schedule V.  Schedule V sets forth, as of the Effective Date, (i) the percentage ownership (direct and indirect) of the Borrower in each class of capital stock or other Equity Interests of each of its Subsidiaries and also identifies the direct owner thereof, and (ii) the jurisdiction of organization of each such Subsidiary.  All outstanding shares of Equity Interests of each Subsidiary of the Borrower have been duly and validly issued, are fully paid and non-assessable and have been issued free of preemptive rights.  No Subsidiary of the Borrower has outstanding any securities convertible into or exchangeable for its Equity Interests or outstanding any right to subscribe for or to purchase, or any options or warrants for the purchase of, or any agreement providing for the issuance (contingent or otherwise) of or any calls, commitments or claims of any character relating to, its Equity Interests or any stock appreciation or similar rights.

8.15    Compliance with Statutes, etc.  Each of the Borrower and each of its Subsidiaries is in compliance with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all governmental bodies, domestic or foreign, in respect of the conduct of its business and the ownership of its property (including, without limitation, applicable statutes, regulations, orders and restrictions relating to environmental standards and controls), except such noncompliances as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

-45-

8.16   <u>Investment Company Act</u>.   Neither the Borrower nor any of its Subsidiaries is an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended.

8.17   <u>Solvency</u>.   On and as of the Effective Date, and after giving effect to all debt being incurred or assumed and Liens created by the Credit Parties in connection with this Agreement and the Pulitzer Debt Documents, (i) the sum of the assets, at a fair valuation, of PD LLC (on a stand-alone basis) and of the Pulitzer Entities (taken as a whole) will exceed its or their respective debts, (ii) PD LLC (on a stand-alone basis) and the Pulitzer Entities (taken as a whole) has or have not incurred and does or do not intend to incur, and does or do not believe that it or they will incur, debts beyond its or their respective ability to pay such debts as such debts mature, and (iii) PD LLC (on a stand-alone basis) and the Pulitzer Entities (taken as a whole) will have sufficient capital with which to conduct its or their respective businesses.  For purposes of this Section 8.17, "debt" means any liability on a claim, and "claim" means (a) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured or (b) right to an equitable remedy for breach of performance if such breach gives rise to a payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.  The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

8.18   <u>Environmental Matters</u>. (a) Each of the Borrower and each of its Subsidiaries is in compliance with all applicable Environmental Laws and the requirements of any permits issued under such Environmental Laws.  There are no pending or, to the knowledge of the Borrower, threatened Environmental Claims against the Borrower or any of its Subsidiaries or any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries (including any such claim arising out of the ownership, lease or operation by the Borrower or any of its Subsidiaries of any Real Property formerly owned, leased or operated by the Borrower or any of its Subsidiaries but no longer owned, leased or operated by the Borrower or any of its Subsidiaries).  There are no facts, circumstances, conditions or occurrences with respect to the business or operations of the Borrower or any of its Subsidiaries, or any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries (including any Real Property formerly owned, leased or operated by the Borrower or any of its Subsidiaries but no longer owned, leased or operated by the Borrower or any of its Subsidiaries) or, to the knowledge of the Borrower, any property adjoining or adjacent to any such Real Property that could be reasonably expected (i) to form the basis of an Environmental Claim against the Borrower or any of its Subsidiaries or any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries or (ii) to cause any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries to be subject to any restrictions on the ownership, lease, occupancy or transferability of such Real Property by the Borrower or any of its Subsidiaries under any applicable Environmental Law.

(b)   Hazardous Materials have not at any time been generated, used, treated or stored on, or transported to or from, or Released on or from, any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries or, to the knowledge of the Borrower, any

property adjoining or adjacent to any Real Property, where such generation, use, treatment, storage, transportation or Release has violated or could be reasonably expected to violate any applicable Environmental Law or give rise to an Environmental Claim.

(c)     Notwithstanding anything to the contrary in this Section 8.18, the representations and warranties made in this Section 8.18 shall be untrue only if the effect of any or all conditions, violations, claims, restrictions, failures and noncompliances of the types described above could, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, or, with respect to the Pulitzer Entities, a Pulitzer Material Adverse Effect.

8.19    Employment and Labor Relations.    Neither the Borrower nor any of its Subsidiaries is engaged in any unfair labor practice that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.  There is (i) no unfair labor practice complaint pending against the Borrower or any of its Subsidiaries or, to the knowledge of the Borrower, threatened against any of them, before the National Labor Relations Board, and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement is so pending against the Borrower or any of its Subsidiaries or, to the knowledge of the Borrower, threatened against any of them, (ii) no strike, labor dispute, slowdown or stoppage pending against the Borrower or any of its Subsidiaries or, to the knowledge of the Borrower, threatened against the Borrower or any of its Subsidiaries, (iii) no union representation question exists with respect to the employees of the Borrower or any of its Subsidiaries, (iv) no equal employment opportunity charges or other claims of employment discrimination are pending or, to the Borrower's knowledge, threatened against the Borrower or any of its Subsidiaries, and (v) no wage and hour department investigation has been made of the Borrower or any of its Subsidiaries, except (with respect to any matter specified in clauses (i) through (v) above, either individually or in the aggregate) such as could not reasonably be expected to have a Material Adverse Effect.

8.20    Intellectual Property, etc.    Each of the Borrower and each of its Subsidiaries owns or has the right to use all the patents, trademarks, permits, domain names, service marks, trade names, copyrights, licenses, franchises, inventions, trade secrets, proprietary information and know-how of any type, whether or not written (including, but not limited to, rights in computer programs and databases) and formulas, or rights with respect to the foregoing, and has obtained assignments of all leases, licenses and other rights of whatever nature, necessary for the present conduct of its business, without any known conflict with the rights of others which, or the failure to own or have which, as the case may be, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect (provided, that with respect to the Pulitzer Entities, such exception shall apply only to the extent such known conflict or failure to own could not, either individually or in the aggregate, reasonably be expected to have a Pulitzer Material Adverse Effect).

8.21    Indebtedness.    Schedule VI sets forth a list of all Indebtedness (including Contingent Obligations) of the Borrower and its Subsidiaries as of the Effective Date (excluding the Obligations, the Obligations (as defined under the First Lien Credit Agreement), the Pulitzer Debt, and the Pulitzer Debt Guaranties) (collectively, the "Existing Indebtedness"), in each case showing the aggregate principal amount thereof and the name of the respective borrower and any

Credit Party or any of its Subsidiaries which directly or indirectly guarantees any such Indebtedness.

8.22    Insurance.  Schedule VII sets forth a listing of all insurance maintained by the Borrower and its Subsidiaries as of the Effective Date, with the amounts insured (and any deductibles) set forth therein.

8.23    Foreign Assets Control Regulations, Etc.

(a)    Neither the Borrower nor any Controlled Entity is (i) a Person whose name appears on the list of Specially Designated Nationals and Blocked Persons published by the Office of Foreign Assets Control, U.S. Department of Treasury ("OFAC") (an "OFAC Listed Person") or (ii) a department, agency or instrumentality of, or is otherwise controlled by or acting on behalf of, directly or indirectly, (x) any OFAC Listed Person or (y) any Person, entity, organization, foreign country or regime that is subject to any OFAC Sanctions Program (each OFAC Listed Person and each other Person, entity, organization and government of a country described in clause (ii), a "Blocked Person").

(b)    Neither the Borrower nor any Controlled Entity has any investments in, or engages in any dealings or transactions with, any Person where such investments, dealings or transactions would cause the receipt of any payment or exercise of any rights in respect of, this Agreement by any holder of Notes to be in violation of any of the laws or regulations identified in this Section 3.12.

(c)    To the Borrower's actual knowledge after making due inquiry, neither the Borrower nor any Controlled Entity (i) is under investigation by any Governmental Authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist-related activities or other money laundering predicate crimes under any applicable law (collectively, "Anti-Money Laundering Laws"), (ii) has been assessed civil penalties under any Anti-Money Laundering Laws or (iii) has had any of its funds seized or forfeited in an action under any Anti-Money Laundering Laws. The Borrower has taken reasonable measures appropriate to the circumstances (in any event as required by applicable law) to ensure that the Borrower and each Controlled Entity is and will continue to be in compliance with all applicable current and future Anti-Money Laundering Laws.

(d)    The Borrower has taken reasonable measures appropriate to the circumstances (in any event as required by applicable law) to ensure that the Borrower and each Controlled Entity is and will continue to be in compliance with all applicable current and future anti-corruption laws and regulations.

8.24    Representations and Warranties in Other Documents.  All representations and warranties set forth in the other Credit Documents, the Lee Support Agreement, the First Lien Credit Documents, the Pulitzer Support Agreement, the Pulitzer Debt Documents and each Backstop Commitment Letter were true and correct in all material respects at the time as of which such representations and warranties were made (or deemed made) and shall be true and correct in all material respects as of the Effective Date as if such representations or warranties were made on and as of such date (it being understood and agreed that any such representation or

-48-

warranty which by its terms is made as of a specified date shall be true and correct in all material respects as of such specified date).

SECTION 9.    Affirmative Covenants.    The Borrower hereby covenants and agrees that on and after the Effective Date and until the Loans (together with interest thereon), Fees and all other Obligations (other than indemnities described in Section 13.13 which are not then due and payable) incurred hereunder and thereunder, are paid in full:

9.01    Information Covenants.    The Borrower will furnish to the Administrative Agent (which shall promptly furnish to each Lender in accordance with Section 9.01(q) (subject to the Borrower's compliance with the second sentence thereof)):

(a)    Quarterly Financial Statements.    Within 45 days after the close of each of the first three quarterly accounting periods in each fiscal year of the Borrower, (i) the consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such quarterly accounting period and the related consolidated statements of income and cash flows for such quarterly accounting period and for the elapsed portion of the fiscal year ended with the last day of such quarterly accounting period, in each case setting forth comparative figures for the corresponding quarterly accounting period in the prior fiscal year and comparable budgeted figures for such quarterly accounting period as set forth in the respective budget delivered pursuant to Section 9.01(d), all of which shall be certified by an Authorized Officer of the Borrower that they fairly present in all material respects in accordance with GAAP the financial condition of the Borrower and its Subsidiaries as of the dates indicated and the results of their operations for the periods indicated, subject to normal year-end audit adjustments and the absence of footnotes, (ii) the consolidating and consolidated balance sheets of Pulitzer and its Subsidiaries as at the end of such quarterly accounting period and the related consolidating and consolidated statements of income and consolidated statement of cash flows for such quarterly accounting period and for the elapsed portion of the fiscal year ended with the last day of such quarterly accounting period, in each case setting forth comparative figures for the corresponding quarterly accounting period in the prior fiscal year, all of which shall be certified by an Authorized Officer of the Borrower that they fairly present in all material respects in accordance with GAAP the financial condition of Pulitzer and its Subsidiaries as of the dates indicated and the results of their operations for the periods indicated, subject to normal year-end audit adjustments and the absence of footnotes, and (iii) management's discussion and analysis of the important operational and financial developments during such quarterly accounting period; provided that to the extent prepared to comply with SEC requirements and delivered to each Lender within the time requirement set forth above in this Section 9.01(a), a copy of the SEC Form 10-Q filed by the Borrower with the SEC for each such quarterly accounting period shall satisfy the requirements of clauses (i) and (iii) of this Section 9.01(a) except for any required comparison against budget as provided above (which comparison will still need to be delivered to each Lender separately pursuant to this Section 9.01(a)).

(b)    Annual Financial Statements.    Within 90 days after the close of each fiscal year of the Borrower: (i) the consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal year and the related consolidated statements of income and stockholders' equity and statement of cash flows for such fiscal year setting forth comparative figures for the preceding fiscal year and audited by KPMG LLP or other independent certified public

-49-

accountants of recognized national standing reasonably acceptable to the Administrative Agent (which audit shall be without a "going concern" or like qualification or exception and without any qualification or exception as to scope of audit; provided, however, that (1) the audit opinions in respect of the Borrower's fiscal year ended on or ending closest to (x) September 30, 2015 or (y) September 30, 2016 may contain a "going concern" qualification solely as a result of (A) in the case of such fiscal years ended on or ending closest to September 30, 2015, the existing Pulitzer Indebtedness being treated as current obligations on the Borrower's consolidated balance sheet and/or the financing arrangements under this Agreement, the First Lien Credit Documents and the Pulitzer Debt and (B) in the case of such fiscal year ended on or ending closest to September 30, 2016, the financing arrangements under this Agreement), and (2) such a qualification or exception shall not be deemed to exist as a result of any qualification or exception solely arising from Madison Newspapers, Inc. being separately audited by a different accounting firm); (ii) the consolidating and consolidated balance sheets of Pulitzer and its Subsidiaries as at the end of such fiscal year and the related consolidating and consolidated statements of income and consolidated statement of cash flows and stockholders' equity for such fiscal year, in each case setting forth comparative figures for the preceding fiscal year and (x) in the case of such consolidated financial statements, audited by KPMG LLP or other independent certified public accountants of recognized national standing reasonably acceptable to the Administrative Agent (which audit shall be without a "going concern" or like qualification or exception and without any qualification or exception as to scope of audit except as otherwise described in the proviso to clause (i) above) and (y) in the case of such consolidating financial statements, certified by an Authorized Officer of the Borrower that they fairly present in all material respects in accordance with GAAP the financial condition of Pulitzer and its Subsidiaries as of the dates indicated and the results of their operations for the periods indicated; and (iii) management's discussion and analysis of the important operational and financial developments during such fiscal year; provided that to the extent prepared to comply with SEC requirements and delivered to each Lender within the time requirement set forth above in this Section 9.01(b), a copy of the SEC Form 10-K filed by the Borrower with the SEC for such fiscal year shall satisfy the requirements of clauses (i) and (iii) of this Section 9.01(b).

(c)    Management Letters.    Promptly after the Borrower's or any of its Subsidiaries' receipt thereof, a copy of any "management letter" received from its certified public accountants and management's response thereto.

(d)    Budgets.    No later than 60 days following the first day of each fiscal year of the Borrower (commencing with the Borrower's fiscal year ending on or closest to September 30, 2012), a budget in form reasonably satisfactory to the Administrative Agent (including budgeted statements of income and sources and uses of cash for the Borrower and its Subsidiaries on a consolidated basis) for each of the four fiscal quarters of such fiscal year prepared in detail and setting forth, with appropriate discussion, the principal assumptions upon which such budget is based.

(e)    Officer's Certificates.    At the time of the delivery of the financial statements provided for in Sections 9.01(a) and (b), a compliance certificate from an Authorized Officer of the Borrower in the form of Exhibit K certifying on behalf of the Borrower that, to such officer's knowledge after due inquiry, no Default or Event of Default has occurred and is continuing or, if any Default or Event of Default has occurred and is continuing, specifying the

nature and extent thereof, which certificate shall (i) set forth in reasonable detail the calculations required to establish whether the Borrower and its Subsidiaries were in compliance with the provisions of Sections 10.01(x), 10.01(xii), 10.01(xvii), 10.02(iv), 10.03(iii), 10.04(iv), 10.04(viii), 10.04(x), 10.04(xiii), 10.05(v), 10.05(viii), 10.05(xiv), 10.05(xv), 10.05(xvi), 10.05(xvii), 10.05(xviii), 10.05(xix) and 10.07, at the end of such quarterly accounting period or fiscal year, as the case may be, and (ii) certify that there have been no changes to the Annexes of each of the Pledge Agreement and the Security Agreement, in each case since the Effective Date or, in either case, if later, since the date of the most recent certificate delivered pursuant to this Section 9.01(e), or if there have been any such changes, a list in reasonable detail of such changes (but, in each case with respect to this clause (ii), only to the extent that such changes are required to be reported to the Collateral Agent pursuant to the terms of the Security Documents) and whether the Borrower and the other Credit Parties have otherwise taken all actions required to be taken by them pursuant to the Security Documents in connection with any such changes.

(f)    Notice of Default, Litigation and Material Adverse Effect.  Promptly, and in any event within ten Business Days (or five Business Days in the case of succeeding sub-clause (i)) after any senior or executive officer of the Borrower or any of its Subsidiaries obtains knowledge thereof, notice of (i) the occurrence of any event which constitutes (A) a Default or an Event of Default or (B) a default or an event of default under any of the First Lien Credit Documents, any Permitted First Lien Refinancing Indebtedness (or any document governing the same), any of the Pulitzer Debt Documents or any Permitted Pulitzer Debt Refinancing Indebtedness (or any document governing the same), (ii) any litigation or governmental investigation or proceeding pending against the Borrower or any of its Subsidiaries (x) which, either individually or in the aggregate, has had, or could reasonably be expected to have, a Material Adverse Effect or (y) with respect to any Credit Document, or (iii) any other event, change or circumstance that has had, or could reasonably be expected to have, a Material Adverse Effect.

(g)    Other Reports and Filings.  Promptly after the filing or delivery thereof, copies of all financial information, proxy materials, compliance certificates and reports, if any, which the Borrower or any of its Subsidiaries shall publicly file with the Securities and Exchange Commission or any successor thereto (the "SEC") or deliver to holders (or any trustee, agent or other representative therefor) of its material Indebtedness (including, without limitation, the First Lien Credit Documents, any Permitted First Lien Refinancing Indebtedness, the Pulitzer Debt or any Permitted Pulitzer Debt Refinancing Indebtedness) pursuant to the terms of the documentation governing such Indebtedness.

(h)    Environmental Matters.  Promptly after any senior or executive officer of the Borrower or any of its Subsidiaries obtains knowledge thereof, notice of one or more of the following environmental matters to the extent that such environmental matters, either individually or when aggregated with all other such environmental matters, could reasonably be expected to have a Material Adverse Effect:

(i)    any pending or threatened Environmental Claim against the Borrower or any of its Subsidiaries or any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries;

(ii)    any condition or occurrence on or arising from any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries that (a) results in noncompliance by the Borrower or any of its Subsidiaries with any applicable Environmental Law or (b) could reasonably be expected to form the basis of an Environmental Claim against the Borrower or any of its Subsidiaries or any such Real Property;

(iii)    any condition or occurrence on any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries that could reasonably be expected to cause such Real Property to be subject to any restrictions on the ownership, lease, occupancy, use or transferability by the Borrower or any of its Subsidiaries of such Real Property under any Environmental Law; and

(iv)    the taking of any removal or remedial action in response to the actual or alleged presence of any Hazardous Material on any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries as required by any Environmental Law or any governmental or other administrative agency; provided that in any event the Borrower shall deliver to each Lender all notices received by the Borrower or any of its Subsidiaries from any government or governmental agency under, or pursuant to, CERCLA which identify the Borrower or any of its Subsidiaries as potentially responsible parties for remediation costs or which otherwise notify the Borrower or any of its Subsidiaries of potential liability under CERCLA.

All such notices shall describe in reasonable detail the nature of the claim, investigation, condition, occurrence or removal or remedial action and the Borrower's or such Subsidiary's response thereto.

(i)    Other Information.    From time to time, such other information or documents (financial or otherwise) with respect to the Borrower or any of its Subsidiaries as any Agent or any Lender (through the Administrative Agent) may reasonably request.

(j)    Monthly Reports.    Within 30 days after the end of each fiscal month of the Borrower, the consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal month and the related consolidated statements of income, and, to the extent prepared, statements of cash flows for such fiscal month and for the elapsed portion of the fiscal year ended with the last day of such fiscal month, in each case setting forth comparative figures for the corresponding fiscal month in the prior fiscal year.

(k)    Projected Cash Flows.    No later than the first Business Day of every other week (beginning on the first Monday after the Effective Date), a forecast for the succeeding 13-week period of the projected consolidated cash flows of (x) the Borrower and its Subsidiaries, and (y) the Pulitzer Entities, each taken as a whole (such forecast with respect to the Pulitzer Entities to contain the same level of detail used in such forecasts delivered to the holders of the Prepetition Notes (as defined in the Pulitzer Note Agreement) commencing in October, 2011),

-52-

together with a variance report of actual cash flow for the immediately preceding period for which a forecast was delivered against the then current forecast for such preceding period.

(l)    Officer's Report.  Promptly, and in any event within 45 days following the end of each fiscal quarter in each fiscal year of the Borrower, a written report of an Authorized Officer, in form and scope reasonably satisfactory to the Administrative Agent, setting forth a summary in reasonable detail of all Restricted Intercompany Charges (as defined in the Pulitzer Debt Pulitzer Guaranty), including cash and non-cash activities, organized by category of intercompany activity, by and among (x) Lee and its Subsidiaries (other than the Pulitzer Entities), on one hand, and the Pulitzer Entities, on the other hand, and (y) the Pulitzer Entities and Star Publishing, and a reconciliation of intercompany balances with respect to each of (x) and (y).

(m)    Financial Model.  Promptly, and in any event within 90 days following the end of each fiscal year of the Borrower (or following such shorter intervals as the same may be prepared), an update, in a directly comparable format, of the financial model delivered to the purchasers of the Pulitzer Debt on the Effective Date, setting forth the projected financial performance of the Pulitzer Entities for the current fiscal year of the Borrower (prepared on a month-by-month basis) and for each of the next four fiscal years (prepared on an annual basis).

(n)    Pension Valuation/Status Reports.  Promptly, and in any event within 45 days following the end of each fiscal year of the Borrower (or following such shorter intervals as the same may be prepared), a pension valuation/status report, in form and scope reasonably satisfactory to the Required Lenders (such satisfaction to be presumed in the absence of an objection delivered to PD LLC within 30 days after the receipt of such update), setting forth in reasonable detail the extent to which the pension obligations of the Pulitzer Entities are funded, together with revised projections of future cash payments in respect of such pension obligations.

(o)    Management Reports.  Promptly, and in any event within 30 days following the end of each fiscal month of the Borrower, a management report describing the financial performance and operations of the Borrower and its subsidiaries in a form consistent with, and containing the same level of detail as, reports made available to the holders of the Prepetition Notes (as defined in the Pulitzer Debt Agreement) commencing in October, 2011.

(p)    First Lien and Pulitzer Debt Information.  Concurrently with, or promptly after, delivery of any information, documents or certificates to any Lender or Agent under (and each as defined in) the First Lien Credit Agreement pursuant to Section 9.01 (or similar reporting provisions) of the First Lien Credit Agreement or Sections 6A (or similar reporting provisions) of the Pulitzer Debt Agreement or any corresponding or similar provision of any Pulitzer Debt Document (including, without limitation, Section 4.1 of the Pulitzer Debt Pulitzer Guaranty) or in respect of any Permitted First Lien Refinancing Indebtedness (or any documentation governing the same) or any Permitted Pulitzer Debt Refinancing Indebtedness (or any documentation governing the same), complete copies of all such information, documents and certificates, in each case other than such information, documents and certificates delivered pursuant to Section 9.01(i) of the First Lien Credit Agreement or any analogous reporting

provision of the Pulitzer Debt Agreement or the documentation governing any Permitted Pulitzer Debt Refinancing Indebtedness except to the extent any such information, document or certificate delivered pursuant to such Section 9.01(i) or analogous provision is provided to all Lenders (as defined in the First Lien Credit Agreement) or all Pulitzer Lenders, as the case may be, and relates to the financial (including, without limitation, accounting) or economic condition, results, developments or prospects of any Credit Party.

(q)    Certification of Public Information.    The Borrower and each Lender acknowledge that certain of the Lenders may be Public Lenders and, if documents or notices required to be delivered pursuant to this Section 9.01 or otherwise are being distributed through IntraLinks/IntraAgency, SyndTrak or another relevant website or other information platform (the "Platform"), any document or notice that the Borrower has indicated contains Non-Public Information shall not be posted on that portion of the Platform designated for such Public Lenders.    The Borrower agrees to clearly designate all information provided to the Administrative Agent or the Lenders by or on behalf of the Borrower which is suitable to make available to Public Lenders (provided that neither Borrower nor any other Credit Party shall have any obligation to ensure that Non-Public Information is not so posted on the portion of the Platform designated for Public Lenders).

9.02    Books, Records and Inspections; Quarterly Meetings. (a)    The Borrower will, and will cause each of its Subsidiaries to, keep proper books of record and accounts in which full, true and correct entries in conformity with GAAP and all requirements of law shall be made of all dealings and transactions in relation to its business and activities.    The Borrower will, and will cause each of its Subsidiaries to, permit officers and designated representatives of the Administrative Agent or any Lender to visit and inspect, under guidance of officers of the Borrower or such Subsidiary, any of the properties of the Borrower or such Subsidiary, and to examine the books of account of the Borrower or such Subsidiary and discuss the affairs, finances and accounts of the Borrower or such Subsidiary with, and be advised as to the same by, its and their officers and independent accountants, all upon reasonable prior notice and at such reasonable times and intervals and to such reasonable extent as the Administrative Agent or any such Lender may reasonably request; provided, however, so long as (x) no Default or Event of Default has occurred and is continuing, neither the Administrative Agent nor any Lender may exercise its rights under this Section 9.02(a) with respect to the Lee Entities more than once per calendar year or (y) no Event of Default has occurred and is continuing, neither the Administrative Agent nor any Lender may exercise its rights under this Section 9.02(a) with respect to the Pulitzer Entities without the written approval of the Required Lenders (to be given or withheld in their sole discretion) or more than twice per calendar year.

(b)    At a date to be mutually agreed upon between the Administrative Agent and the Borrower occurring on or prior to the 60th day after the close of each quarterly accounting period of the Borrower, the Borrower will, at the request of the Administrative Agent, hold a meeting (which may be done via a conference call or video conference) with all of the Lenders at which meeting will be reviewed the financial results of the Borrower and its Subsidiaries for the previous quarterly accounting period (and, in the case of the last quarterly accounting period of each fiscal year, for the previous fiscal year) and the budgets presented for the current fiscal year of the Borrower.

9.03    Maintenance of Property; Insurance.  (a)  The Borrower will, and will cause each of its Subsidiaries to, (i) keep all material property necessary to the business of the Borrower and its Subsidiaries in good working order and condition, ordinary wear and tear excepted and subject to the occurrence of casualty events, (ii) maintain with financially sound and reputable insurance companies, insurance (including self-insurance retentions on a basis consistent with past practice) on all such property and against all such risks as is consistent and in accordance with industry practice for companies similarly situated owning similar properties and engaged in similar businesses as the Borrower and its Subsidiaries, and (iii) furnish to the Administrative Agent, upon its request therefor, full information as to the insurance carried.

(b)    If the Borrower or any of its Subsidiaries shall fail to maintain insurance in accordance with this Section 9.03, the Administrative Agent shall have the right (but shall be under no obligation) to procure such insurance and the Borrower agrees to reimburse the Administrative Agent for all reasonable costs and expenses of procuring such insurance.

(c)    The Borrower will, and will cause each other Credit Party to, at all times keep its property insured in favor of the Collateral Agent, and all policies or certificates (or certified copies thereof) with respect to such insurance, (i) shall be endorsed to the Collateral Agent's satisfaction for the benefit of the Collateral Agent (including, without limitation, by naming the Collateral Agent as loss payee (in respect of property insurance) and/or additional insured (in respect of all insurance)), (ii) shall state that the respective insurer shall endeavor to provide at least 30 days' prior written notice to the Collateral Agent prior to the cancellation of any such insurance policy, and (iii) shall be deposited with the Collateral Agent, in each case subject to any applicable provisions of the Lee Intercreditor Agreement or the Pulitzer Intercreditor Agreement, as applicable.

9.04    Existence; Franchises.  The Borrower will, and will cause each of its Subsidiaries to, do or cause to be done, all things necessary to preserve and keep in full force and effect (x) its existence and (y) all rights, franchises, licenses, permits, certificates, copyrights, trademarks and patents as are in the aggregate necessary for the conduct of its business in the manner in which such business is being conducted as of the Effective Date; provided, however, that nothing in this Section 9.04 shall prevent (i) sales of assets and other transactions by the Borrower or any of its Subsidiaries in accordance with Section 10.02 or (ii) the withdrawal by the Borrower or any of its Subsidiaries of its qualification as a foreign Company in any jurisdiction if such withdrawal could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect (provided, that with respect to the Pulitzer Entities, any such withdrawal shall be permitted under this clause (ii) only to the extent it could not, either individually or in the aggregate, reasonably be expected to have a Pulitzer Material Adverse Effect).

9.05    Compliance with Statutes, etc.  (a)  The Borrower will, and will cause each of its Subsidiaries to, comply with all applicable statutes, ordinances or governmental rules, regulations and orders of, and all applicable restrictions imposed by, all governmental bodies, domestic or foreign, in respect of the conduct of its business and the ownership of its property (including applicable statutes, regulations, orders and restrictions relating to (i) environmental standards and controls and (ii) ERISA), except such noncompliances as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect

(provided, that with respect to the Pulitzer Entities, such exception shall apply only to the extent such noncompliances could not, either individually or in the aggregate, reasonably be expected to have a Pulitzer Material Adverse Effect).

(b)      Within five Business Days after the date on which the Borrower is required by applicable law, statute, rule or regulation (including any applicable extension of such date), the Borrower will file (or cause to be filed) with the SEC all reports, financial information and certifications required to be filed by the Borrower pursuant to any such applicable law, statute, rule or regulation.

9.06    Compliance with Environmental Laws. (a)  The Borrower will comply, and will cause each of its Subsidiaries to comply, with all Environmental Laws and permits applicable to, or required by, the ownership, lease or use of its Real Property now or hereafter owned, leased or operated by the Borrower or any of its Subsidiaries, except such noncompliances as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect (provided, that with respect to the Pulitzer Entities, such exception shall apply only to the extent such noncompliances could not, either individually or in the aggregate, reasonably be expected to have a Pulitzer Material Adverse Effect), and will promptly pay or cause to be paid all costs and expenses incurred in connection with such compliance, and will keep or cause to be kept all such Real Property free and clear of any Liens imposed pursuant to such Environmental Laws.  Neither the Borrower nor any of its Subsidiaries will generate, use, treat, store, Release or dispose of, or permit the generation, use, treatment, storage, Release or disposal of Hazardous Materials on any Real Property now or hereafter owned, leased or operated by the Borrower or any of its Subsidiaries, or transport or permit the transportation of Hazardous Materials to or from any such Real Property, except for Hazardous Materials generated, used, treated, stored, Released or disposed of at any such Real Properties in compliance in all material respects with all applicable Environmental Laws.

(b)      (i) After the receipt by the Administrative Agent or any Lender of any notice of the type described in Section 9.01(h), (ii) at any time that the Borrower or any of its Subsidiaries are not in compliance with Section 9.06(a) or (iii) in the event that the Administrative Agent or the Lenders have exercised any of the remedies pursuant to the last paragraph of Section 11, the Borrower will (in each case) provide, at the sole expense of the Borrower and at the request of the Administrative Agent, an environmental site assessment report concerning any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries, prepared by an environmental consulting firm reasonably approved by the Administrative Agent, indicating the presence or absence of Hazardous Materials and the potential cost of any removal or remedial action in connection with such Hazardous Materials on such Real Property.  If the Borrower fails to provide the same within 30 days after such request was made, the Administrative Agent may order the same, the cost of which shall be borne by the Borrower, and the Borrower shall grant and hereby grants to the Administrative Agent and the Lenders and their respective agents access to such Real Property and specifically grants the Administrative Agent and the Lenders an irrevocable non-exclusive license, subject to the rights of tenants, to undertake such an assessment at any reasonable time upon reasonable notice to the Borrower, all at the sole expense of the Borrower.

9.07    <u>ERISA</u>.    As soon as possible and, in any event, within fifteen (15) Business Days after the Borrower or any ERISA Affiliate knows or has reason to know of the occurrence of any of the following, the Borrower will deliver to each of the Lenders a certificate of an Authorized Officer of the Borrower setting forth the details as to such occurrence and the action, if any, that the Borrower or such ERISA Affiliate is required or proposes to take, together with any notices required or proposed to be given or filed by the Borrower, the Plan administrator or such ERISA Affiliate to or with the PBGC or any other government agency, or a Plan participant and any notices received by the Borrower or ERISA Affiliate from the PBGC or any other government agency, or a Plan participant with respect thereto:  that a Reportable Event has occurred (except to the extent that the Borrower has previously delivered to the Lenders a certificate and notices (if any) concerning such event pursuant to the next clause hereof); that a contributing sponsor (as defined in Section 4001(a)(13) of ERISA) of a Plan subject to Title IV of ERISA is subject to the advance reporting requirement of PBGC Regulation Section 4043.61 (without regard to subparagraph (b)(1) thereof), and an event described in subsection .62, .63, .64, .65, .66, .67 or .68 of PBGC Regulation Section 4043 is reasonably expected to occur with respect to such Plan within the following 30 days; that an accumulated funding deficiency or failure to meet minimum funding standards, each within the meaning of Section 412 of the Code or Section 302 of ERISA, has been incurred or an application has been made for a waiver or modification of the minimum funding standard (including any required installment payments) or an extension of any amortization period under Section 412 of the Code or Section 302 of ERISA with respect to a Plan; that any material contribution required to be made with respect to a Plan or Foreign Pension Plan has not been timely made; that a Plan has been or may be terminated, reorganized, partitioned or declared insolvent under Title IV of ERISA; that a Plan has an Unfunded Current Liability which, when added to the aggregate amount of Unfunded Current Liabilities with respect to all other Plans, exceeds the aggregate amount of such Unfunded Current Liabilities that existed on the Effective Date by $10,000,000; that proceedings may be or have been instituted to terminate or appoint a trustee to administer a Plan (other than a member of the board of trustees of a Plan which is a multiemployer plan (as defined in Section 4001(a)(3) of ERISA)) which is subject to Title IV of ERISA; that a proceeding has been instituted pursuant to Section 515 of ERISA to collect a delinquent contribution to a Plan; that the Borrower or any ERISA Affiliate has incurred any material liability (including any indirect, contingent, or secondary liability) to or on account of the termination of or withdrawal from a Plan under Sections 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or with respect to a Plan under Sections 401(a)(29), 4971, 4975 or 4980 of the Code or Sections 409, 502(i) or 502(l) of ERISA or with respect to a group health plan (as defined in Section 607(1) of ERISA or Section 4980B(g)(2) of the Code) under Section 4980B of the Code; or that the Borrower or any ERISA Affiliate of the Borrower has incurred (or is alleged in any proceeding to have incurred) any material liability pursuant to any employee welfare benefit plan (as defined in Section 3(1) of ERISA) that provides benefits to retired employees or other former employees (other than as required by Section 601 of ERISA) or any Plan or any Foreign Pension Plan.  The Borrower will deliver to each of the Lenders copies of any records, documents or other information that must be furnished to the PBGC with respect to any Plan pursuant to Section 4010 of ERISA.  The Borrower will also deliver to each Lender, to the extent requested by such Lender, a complete copy of the annual report (on Form 5500 series) of each Plan (including, to the extent required, any related financial and actuarial statements and opinions and other supporting statements, certifications, schedules and information) required to

be filed with the Internal Revenue Service.  In addition to any certificates or notices delivered to the Lenders pursuant to the first sentence hereof, copies of annual reports and any records, documents or other information required to be furnished to the PBGC or any other government agency, and any material notices received by the Borrower or any ERISA Affiliate with respect to any Plan or Foreign Pension Plan shall be delivered to each Lender, to the extent requested by such Lender, no later than fifteen (15) days after the date such annual report or such records, documents and/or information has been filed or furnished, as appropriate, to any appropriate and applicable government agency or such notice has been received by the Borrower or the ERISA Affiliate, as applicable.  The Borrower and each of its applicable Subsidiaries shall ensure that all Foreign Pension Plans administered by it or into which it makes payments obtains or retains (as applicable) registered status under and as required by applicable law and is administered in a timely manner in all respects in compliance with all applicable laws except where the failure to do any of the foregoing, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect (provided, that with respect to the Pulitzer Entities, such exception shall apply only to the extent any such failures could not, either individually or in the aggregate, reasonably be expected to have a Pulitzer Material Adverse Effect).

9.08    End of Fiscal Years.  The Borrower will, for financial reporting purposes, cause its fiscal years to end on the last Sunday of September of each calendar year.

9.09    Performance of Obligations.  The Borrower will, and will cause each of its Subsidiaries to, perform all of its obligations under the terms of each mortgage, indenture, security agreement, loan agreement or credit agreement and each other agreement, contract or instrument by which it is bound, except such non-performances as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

9.10    Payment of Taxes.  The Borrower will pay and discharge, and will cause each of its Subsidiaries to pay and discharge, all taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or upon any properties belonging to it, prior to the date on which penalties attach thereto, and all lawful claims which, if unpaid, might become a Lien or charge upon any properties of the Borrower or any of its Subsidiaries not otherwise permitted under Section 10.01(i); provided that neither the Borrower nor any of its Subsidiaries shall be required to pay any such tax, assessment, charge, levy or claim which is immaterial or which is being contested in good faith and by proper proceedings if it has maintained adequate reserves with respect thereto in accordance with GAAP.

9.11    Use of Proceeds.  The Borrower will use the proceeds of the Loans only as provided in Section 8.08.

9.12    Further Assurances; etc.  (a) The Borrower will cause each of its Domestic Subsidiaries created or acquired after the Effective Date to become party to the Subsidiaries Guaranty, the Security Agreement, the Pledge Agreement and each Intercreditor Agreement (to the extent applicable to such Domestic Subsidiary) in accordance with the terms of the Subsidiaries Guaranty, the Security Agreement, the Pledge Agreement and each such Intercreditor Agreement (provided that in no event will any Lien be granted or be required to be created as a result thereof on any Excluded TNI Assets).

(b)     The Borrower will, and will cause each other Credit Party to, grant to the Collateral Agent for the benefit of the Secured Creditors security interests and Mortgages in such assets and Real Property of the Borrower and such other Credit Party as are not covered by the Security Documents as in effect on the Effective Date (other than Real Property listed on Part B of Schedule X that is currently being held for sale and, Excluded TNI Assets and Excluded Real Property) and as may be reasonably requested from time to time by the Administrative Agent or the Required Lenders (collectively, the "Additional Security Documents").  All such security interests and Mortgages shall be granted pursuant to documentation reasonably satisfactory in form and substance to the Collateral Agent and shall constitute valid and enforceable perfected security interests, hypothecations and Mortgages superior to and prior to the rights of all third Persons and enforceable against third parties and subject to no other Liens except for Permitted Liens or, in the case of Real Property, the Permitted Encumbrances related thereto.  The Additional Security Documents or instruments related thereto shall have been duly recorded or filed in such manner and in such places as are required by law to establish, perfect, preserve and protect the Liens in favor of the Collateral Agent required to be granted pursuant to the Additional Security Documents and all taxes, fees and other charges payable in connection therewith shall have been paid in full.  Notwithstanding the foregoing, this Section 9.12(b) shall not apply to (and the Borrower and the other Credit Parties shall not be required to grant a Mortgage in) any Real Property the fair market value (as determined in good faith by the Borrower) of which individually is less than $3,000,000 (any such Real Property, "Excluded Real Property").

(c)     The Borrower will, and will cause each of the other Credit Parties to, at the expense of the Borrower, make, execute, endorse, acknowledge, file and/or deliver to the Collateral Agent from time to time such vouchers, invoices, schedules, confirmatory assignments, conveyances, financing statements, transfer endorsements, powers of attorney, certificates, copies of its most recent real property surveys, reports, landlord waivers, bailee agreements, control agreements and other assurances or instruments and take such further steps relating to the Collateral covered by any of the Security Documents (other than with respect to Excluded Real Property and excluding Excluded TNI Assets) as the Collateral Agent may reasonably require.  In addition, at the time that the actions required or requested to be taken pursuant to clause (a) above are taken, the Borrower will cause the respective Domestic Subsidiaries to execute and deliver, or cause to be executed and delivered, all relevant documentation (including, but not limited to, opinions of counsel and officers' certificates) of the type described in Section 6 as each such Domestic Subsidiary would have had to deliver if it were a Credit Party on the Effective Date.  Furthermore, the Borrower will, and will cause the other Credit Parties to, deliver to the Collateral Agent such opinions of counsel, officers' certificates, title insurance and other related documents as may be reasonably requested by the Administrative Agent to assure itself that this Section 9.12 has been complied with.

(d)     If the Administrative Agent or the Required Lenders reasonably determine that they are required by law or regulation to have appraisals prepared in respect of any Real Property of the Borrower and the other Credit Parties constituting Collateral, the Borrower will, at its own expense, provide to the Administrative Agent appraisals which satisfy the applicable requirements of the Real Estate Appraisal Reform Amendments of the Financial Institution Reform, Recovery and Enforcement Act of 1989, as amended, and which shall otherwise be in form and substance reasonably satisfactory to the Administrative Agent.

(e)      The Borrower agrees that each action required by clauses (a), (b) and (c) of this Section 9.12 shall be completed as soon as possible, but in no event later than 15 days (or, in the case of Mortgages, 60 days) after such action is required to be taken or requested to be taken by the Administrative Agent; provided that, in no event will the Borrower or any of its Subsidiaries be required to take any action, other than using its best efforts, to obtain consents from third parties with respect to its compliance with this Section 9.12.

(f)      The Borrower agrees that, to the extent that it is unable to deliver to the Collateral Agent on or prior to the Effective Date any of the documents described in Section 9.16, the Borrower shall and shall cause each of its Subsidiaries to deliver to the Collateral Agent such documents as soon as commercially reasonable and no later than 30 calendar days after the Effective Date or such other later date as the Collateral Agent and each Backstop Party may reasonably agree.

9.13      Ownership of Subsidiaries; etc.      Except as otherwise permitted by Section 10.05(iii) or (xiv), the Borrower will, and will cause each of its Subsidiaries to, own 100% of the Equity Interests of each of their Subsidiaries (other than, in the case of a Foreign Subsidiary, directors' qualifying shares and/or other nominal amounts of shares required to be held by local nationals in each case to the extent required by applicable law).

9.14      Compliance with Pulitzer Debt Documents.      Without limitation to any other provision of this Agreement, the Borrower will cause each of the Pulitzer Entities to perform all of their respective obligations under the terms of the Pulitzer Debt Documents as in effect on the date hereof, including, without limitation, the affirmative and negative covenants set forth in Paragraphs 6 and 7 of such Pulitzer Debt Agreement and Sections 4 and 5 (but excluding Section 5.1) of such Pulitzer Debt Pulitzer Guaranty; provided, that with respect to any such covenants set forth in such Pulitzer Debt Agreement or such Pulitzer Debt Pulitzer Guaranty, compliance therewith for purposes of this Section 9.14 shall be determined after giving effect to (x) a static cushion of 15.0% over any numerical- or amount-based exceptions or baskets set forth therein (as reasonably determined by the Administrative Agent) and (y) any period of grace or cure period applicable thereto under the Pulitzer Debt Agreement or Pulitzer Debt Pulitzer Guaranty, as applicable.

9.15      Foreign Subsidiaries Security.      If following a change in the relevant sections of the Code or the regulations, rules, rulings, notices or other official pronouncements issued or promulgated thereunder, counsel for the Borrower reasonably acceptable to the Administrative Agent does not within 30 days after a request from the Administrative Agent or the Required Lenders deliver evidence, in form and substance mutually satisfactory to the Administrative Agent and the Borrower, with respect to any Foreign Subsidiary of the Borrower which has not already had all of its Equity Interests pledged pursuant to the Pledge Agreement to secure all of the Obligations (as defined in the Pledge Agreement) that (i) a pledge of more than 66-2/3% of the total combined voting power of all classes of Equity Interests of such Foreign Subsidiary entitled to vote, (ii) the entering into by such Foreign Subsidiary of a pledge agreement in substantially the form of the Pledge Agreement, (iii) the entering into by such Foreign Subsidiary of a guaranty in substantially the form of the Subsidiaries Guaranty and (iv) the entering into by such Foreign Subsidiary of a security agreement in substantially the form of the Security Agreement, in any such case could reasonably be expected to cause the

-60-

undistributed earnings of such Foreign Subsidiary as determined for Federal income tax purposes to be treated as a deemed dividend to such Foreign Subsidiary's United States parent for Federal income tax purposes, then in the case of a failure to deliver the evidence described in clause (i) above, that portion of such Foreign Subsidiary's outstanding Equity Interests so issued by such Foreign Subsidiary, in each case not theretofore pledged pursuant to the Pledge Agreement to secure all of the Obligations (as defined in the Pledge Agreement), shall be pledged to the Collateral Agent for the benefit of the Secured Creditors pursuant to the Pledge Agreement (or another pledge agreement in substantially similar form, if needed), and in the case of a failure to deliver the evidence described in clause (ii) or (iv) above, such Foreign Subsidiary shall execute and deliver the Pledge Agreement (or another pledge agreement in substantially similar form, if needed) or the Security Agreement (or another security agreement in substantially similar form, if needed), as the case may be, granting to the Collateral Agent for the benefit of the Secured Creditors a security interest in all assets, promissory notes and Equity Interests owned by such Foreign Subsidiary and securing the obligations of the Borrower under the Credit Documents and under any Interest Rate Protection Agreement or Other Hedging Agreement and, in the event the Subsidiaries Guaranty shall have been executed by such Foreign Subsidiary, the obligations of such Foreign Subsidiary thereunder, and in the case of a failure to deliver the evidence described in clause (iii) above, such Foreign Subsidiary shall execute and deliver the Subsidiaries Guaranty (or another guaranty in substantially similar form, if needed), guaranteeing the obligations of the Borrower under the Credit Documents and under any Interest Rate Protection Agreement or Other Hedging Agreement, in each case to the extent that the entering into of such Security Agreements, the Pledge Agreement or the Subsidiaries Guaranty (or substantially similar document) is permitted by the laws of the respective foreign jurisdiction and with all documents delivered pursuant to this Section 9.15 to be in form and substance reasonably satisfactory to the Administrative Agent and/or the Collateral Agent.

9.16    <u>Mortgage; Title Insurance; Survey; Landlord Waivers; etc.</u>  The Borrower shall deliver, or cause the applicable other Credit Party to deliver, to the Collateral Agent (<u>provided</u> that such delivery requirement shall be subject to Section 9.12(f)):

(i)    fully executed counterparts of Mortgages and corresponding UCC Fixture Filings, in form and substance reasonably satisfactory to the Collateral Agent, which Mortgages and UCC Fixture Filings shall cover each Real Property owned by the Borrower or any other Credit Party as set forth on Part A of Schedule X (it being understood that this excludes Real Property listed on Part B of Schedule X that is currently being held for sale and Excluded Real Property), together with evidence that counterparts of such Mortgages and UCC Fixture Filings have been delivered to the title insurance company insuring the Lien of such Mortgage for recording;

(ii)    a Mortgage Policy relating to each Mortgage of the Mortgaged Property referred to above, issued by a title insurer reasonably satisfactory to the Collateral Agent, in an insured amount satisfactory to the Collateral Agent and insuring the Collateral Agent that the Mortgage on each such Mortgaged Property is a valid and enforceable mortgage lien on such Mortgaged Property, free and clear of all defects and encumbrances except Permitted Encumbrances, with each such Mortgage Policy to be in form and substance reasonably satisfactory to the Collateral Agent;

(iii)    to induce the title company to issue the Mortgage Policies referred to in subsection (ii) above, such affidavits, certificates, information and instruments of indemnification (including, without limitation, a so-called "gap" indemnification) as shall be required by such title company, together with payment by the Borrower of all Mortgage Policy premiums, search and examination charges, mortgage recording taxes, fees, charges, costs and expenses required for the recording of such Mortgages and issuance of such Mortgage Policies;

(iv)    to the extent requested by the Collateral Agent and otherwise reasonably available to the Borrower, a survey of each Mortgaged Property (and all improvements thereon) in form and substance reasonably satisfactory to the Collateral Agent or complete copies of all such surveys as most recently completed;

(v)    flood certificates covering each Mortgaged Property in form and substance acceptable to the Administrative Agent, certified to the Collateral Agent (in its capacity as such) and setting forth whether or not each such Mortgaged Property is located in a flood hazard area, as determined by designation of each such Mortgaged Property in a specified flood hazard zone by reference to the applicable FEMA map; and

(vi)    from local counsel in each state in which a Mortgaged Property is located, an opinion in form and substance reasonably satisfactory to the Collateral Agent addressed to the Collateral Agent (in its capacity as such) and each of the Lenders, covering such matters incident to the transactions contemplated herein as the Collateral Agent may reasonably request, including, but not limited to, the enforceability of each Mortgage.

9.17    <u>Terrorism Sanctions Regulations.</u>    The Borrower will not and will not permit any Controlled Entity to (a) become a Blocked Person or (b) have any investments in or engage in any dealings or transactions with any Blocked Person if such investments, dealings or transactions would cause any Lender to be in violation of any laws or regulations that are applicable to such Lender.

SECTION 10. <u>Negative Covenants.</u>  The Borrower hereby covenants and agrees that on and after the Effective Date and until the Loans (together with interest thereon), Fees and all other Obligations (other than indemnities described in Section 13.13 which are not then due and payable) incurred hereunder and thereunder, are paid in full:

10.01    <u>Liens.</u>  The Borrower will not, and will not permit any of its Subsidiaries to, create, incur, assume or suffer to exist any Lien upon or with respect to any property or assets (real or personal, tangible or intangible) of the Borrower or any of its Subsidiaries, whether now owned or hereafter acquired, or sell any such property or assets subject to an understanding or agreement, contingent or otherwise, to repurchase such property or assets (including sales of accounts receivable with recourse to the Borrower or any of its Subsidiaries), or assign any right to receive income or permit the filing of any financing statement under the UCC or any other similar notice of Lien under any similar recording or notice statute; <u>provided</u> that the provisions of this Section 10.01 shall not prevent the creation, incurrence, assumption or existence of the following (Liens described below are herein referred to as "<u>Permitted Liens</u>"):

(i)      inchoate Liens for taxes, assessments or governmental charges or levies not yet due or Liens for taxes, assessments or governmental charges or levies being contested in good faith and by appropriate proceedings for which adequate reserves have been established in accordance with GAAP;

(ii)      Liens in respect of property or assets of the Borrower or any of its Subsidiaries imposed by law, which were incurred in the ordinary course of business and do not secure Indebtedness for borrowed money, such as carriers', warehousemen's, materialmen's and mechanics' liens and other similar Liens arising in the ordinary course of business, and (x) which do not in the aggregate materially detract from the value of the Borrower's or such Subsidiary's property or assets or materially impair the use thereof in the operation of the business of the Borrower or such Subsidiary or (y) which are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing the forfeiture or sale of the property or assets subject to any such Lien;

(iii)      Liens in existence on the Petition Date which remain in effect on, and after giving effect to, the Effective Date and are listed, and the property subject thereto described, in Schedule VIII, but only to the respective date, if any, set forth in such Schedule VIII for the removal, replacement and termination of any such Liens, plus renewals, replacements and extensions of such Liens to the extent set forth on such Schedule VIII, provided that (x) the aggregate principal amount of the Indebtedness, if any, secured by such Liens does not increase from that amount outstanding at the time of any such renewal, replacement or extension and (y) any such renewal, replacement or extension does not encumber any additional assets or properties of the Borrower or any of its Subsidiaries;

(iv)      Liens created pursuant to the Credit Documents;

(v)      licenses, sublicenses, leases or subleases granted to other Persons not materially interfering with the conduct of the business of the Borrower or any of its Subsidiaries;

(vi)      Liens upon assets of the Borrower or any of its Subsidiaries subject to Capitalized Lease Obligations to the extent such Capitalized Lease Obligations are permitted by Section 10.04(iv), provided that (x) such Liens only serve to secure the payment of Indebtedness arising under such Capitalized Lease Obligation and (y) the Lien encumbering the asset giving rise to the Capitalized Lease Obligation does not encumber any other asset of the Borrower or any Subsidiary of the Borrower;

(vii)      Liens placed upon equipment or machinery used in the ordinary course of business of the Borrower or any of its Subsidiaries and placed at the time of the acquisition thereof by the Borrower or such Subsidiary or within 90 days thereafter to secure Indebtedness incurred to pay all or a portion of the purchase price thereof or to secure Indebtedness incurred solely for the purpose of financing the acquisition of any such equipment or machinery or extensions, renewals or replacements of any of the foregoing for the same or a lesser amount, provided that (x) the Indebtedness secured by such Liens is permitted by Section 10.04(iv) and (y) in all events, the Lien encumbering

-63-

the equipment or machinery so acquired does not encumber any other asset of the Borrower or such Subsidiary;

(viii)    easements, rights-of-way, restrictions, encroachments and other similar charges or encumbrances, and minor title deficiencies, in each case not securing Indebtedness and not materially interfering with the conduct of the business of the Borrower or any of its Subsidiaries;

(ix)    Liens arising from precautionary UCC financing statement filings regarding operating leases entered into in the ordinary course of business;

(x)    Liens arising out of the existence of judgments or awards in respect of which the Borrower or any of its Subsidiaries shall in good faith be prosecuting an appeal or proceedings for review and in respect of which there shall have been secured a subsisting stay of execution pending such appeal or proceedings, provided that the aggregate amount of all cash and the Fair Market Value of all other property subject to such Liens (other than any such Liens securing judgments or awards to the extent covered by a reputable and solvent insurance company and not otherwise giving rise to an Event of Default under Section 11.10) does not exceed $10,750,000 at any time outstanding;

(xi)    statutory and common law landlords' liens under leases to which the Borrower or any of its Subsidiaries is a party;

(xii)    Liens (other than Liens imposed under ERISA) incurred in the ordinary course of business in connection with workers compensation claims, unemployment insurance and social security benefits and Liens on cash deposits securing the performance of bids, tenders, leases and contracts in the ordinary course of business, statutory obligations, surety bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business and consistent with past practice (exclusive of obligations in respect of the payment for borrowed money), provided that the aggregate amount of all cash and the Fair Market Value of all other property subject to all Liens permitted by this clause (xii) shall not at any time exceed $10,750,000;

(xiii)    [Reserved];

(xiv)    Liens arising out of any conditional sale, title retention, consignment or other similar arrangements for the sale of goods entered into by the Borrower or any of its Subsidiaries in the ordinary course of business to the extent such Liens do not attach to any assets other than the goods subject to such arrangements;

(xv)    Liens (x) incurred in the ordinary course of business in connection with the purchase or shipping of goods or assets (or the related assets and proceeds thereof), which Liens are in favor of the seller or shipper of such goods or assets and only attach to such goods or assets, and (y) in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(xvi)   bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by the Borrower or any Subsidiary, in each case granted in the ordinary course of business in favor of the bank or banks with which such accounts are maintained, securing amounts owing to such bank or banks with respect to cash management and operating account arrangements;

(xvii)   additional Liens of the Borrower or any Subsidiary of the Borrower not otherwise permitted by this Section 10.01 that (v) were not incurred in connection with borrowed money, (w) do not encumber Collateral or Equity Interests of a Subsidiary of the Borrower, (x) do not encumber any other assets of the Borrower or any of its Subsidiaries the Fair Market Value of which exceeds the amount of the Indebtedness or other obligations secured by such assets, (y) do not materially impair the use of such assets in the operation of the business of the Borrower or such Subsidiary and (z) do not secure obligations in excess of $1,128,750 in the aggregate for all such Liens at any time;

(xviii) Liens solely on the assets of Pulitzer and its Subsidiaries (other than the Excluded TNI Assets) to secure their respective obligations in respect of the Pulitzer Debt Documents and any Permitted Pulitzer Debt Refinancing Indebtedness incurred in accordance with this Agreement (including any guaranty or pledge thereof by Pulitzer and/or one or more of its Subsidiaries); provided that such Liens are at all times subject to the terms of the Pulitzer Intercreditor Agreement;

(xix)   Liens solely on the assets of the Lee Entities created pursuant to the First Lien Credit Documents or securing Permitted First Lien Refinancing Indebtedness incurred in accordance with this Agreement; provided that such Liens are at all times subject to the terms of the Lee Intercreditor Agreement; and

(xx)   any other Permitted Encumbrance (provided that Liens described in clause (i) of the definition of "Permitted Encumbrances" in Section 1.01 shall be Permitted Liens only to the extent permitted under preceding clauses (xviii) or (xix), as applicable).

10.02  Consolidation, Merger, Purchase or Sale of Assets, etc.  The Borrower will not, and will not permit any of its Subsidiaries to, wind up, liquidate or dissolve its affairs or enter into any partnership, joint venture, or transaction of merger or consolidation, or convey, sell, lease or otherwise dispose of all or any part of its property or assets (other than sales of inventory in the ordinary course of business), or enter into any sale-leaseback transactions, or purchase or otherwise acquire (in one or a series of related transactions) any part of the property or assets (other than purchases or other acquisitions of inventory, materials and equipment in the ordinary course of business) of any Person (or agree to do any of the foregoing at any future time), except that:

(i)   Capital Expenditures by the Borrower and its Subsidiaries shall be permitted to the extent not in violation of Section 10.07;

(ii)   the Borrower and its Subsidiaries may sell, convey or otherwise dispose of obsolete or worn-out property in the ordinary course of business;

(iii)    Investments may be made to the extent permitted by Section 10.05 or 10.06(ix);

(iv)    the Borrower and its Subsidiaries may sell assets (other than the capital stock or other Equity Interests of any Wholly-Owned Subsidiary of the Borrower, unless all of the capital stock or other Equity Interests of such Wholly-Owned Subsidiary are sold in accordance with this clause (iv)), so long as (v) no Default or Event of Default then exists or would result therefrom, (w) each such sale is in an arm's-length transaction and the Borrower or the respective Subsidiary receives at least Fair Market Value, (x) the consideration received by the Borrower or such Subsidiary consists of at least 90% cash and is paid at the time of the closing of such sale, (y) the Net Sale Proceeds (as defined in the First Lien Credit Agreement) and the Asset Sale Proceeds (such term used in this clause (iv) as defined in the Pulitzer Debt Agreement or the documentation governing any Permitted Pulitzer Debt Refinancing Indebtedness, as applicable) therefrom are applied as (and to the extent) required by Section 5.02(d) of the First Lien Credit Agreement or Section 5D of the Pulitzer Debt Agreement or the documentation governing any Permitted Pulitzer Debt Refinancing Indebtedness, as applicable, and without giving effect to any waivers thereof, and (z) the assets sold pursuant to this clause (iv) shall not, in the aggregate, be comprised of assets that generated in any fiscal year of the Borrower more than 5.25% of Consolidated EBITDA of the Borrower and its Subsidiaries for the immediately preceding fiscal year of the Borrower; provided, that notwithstanding anything in this clause (iv) to the contrary, no Pulitzer Entity may engage in any Asset Sale (i) if the aggregate amount of Asset Sale Proceeds in respect of any one transaction or series of related transactions would be equal to or less than $1,075,000 unless at least 75% of such Asset Sale Proceeds consist of cash or (ii) if the aggregate amount of Asset Sale Proceeds in respect of any one transaction or series of related transactions would be more than $1,075,000 unless either (x) such Asset Sale Proceeds are applied to the payment of obligations under the Pulitzer Debt Documents or (y) such Asset Sale Proceeds consist only of cash and the Required Lenders have given their prior written consent thereto; provided, however, that notwithstanding the foregoing, no Asset Sale shall involve the sale of any Equity Interests in Star Publishing or the Equity Interests of TNI Partners held by Star Publishing; provided, further, that the contribution of equity interests in or assets of Sandler Capital Partners V, L.P. to one or more qualified or non-qualified pension, retirement or similar employee compensation plans of the Pulitzer Entities shall be permitted hereunder;

(v)    each of the Borrower and its Subsidiaries may lease (as lessee) or license (as licensee) real or personal property (so long as any such lease or license does not create a Capitalized Lease Obligation except to the extent permitted by Section 10.04(iv));

(vi)    each of the Borrower and its Subsidiaries may sell or discount, in each case without recourse and in the ordinary course of business, accounts receivable arising in the ordinary course of business, but only in connection with the compromise or collection thereof and not as part of any financing transaction;

(vii)     each of the Borrower and its Subsidiaries may grant licenses, sublicenses, leases or subleases to other Persons not materially interfering with the conduct of the business of the Borrower or any of its Subsidiaries, in each case so long as no such grant otherwise affects the Collateral Agent's security interest in the asset or property subject thereto;

(viii)    any Subsidiary of the Borrower that is (a) a Lee Entity may convey, lease, license, sell or otherwise transfer all or any part of its business, properties and assets to the Borrower or to any Wholly-Owned Domestic Subsidiary of the Borrower that is a Lee Entity and (b) a Pulitzer Entity may convey, lease, license, sell or otherwise transfer all or any part of its business, properties and assets to Pulitzer or any Wholly-Owned Domestic Subsidiary of Pulitzer, so long as, in each case, any security interests granted to the Collateral Agent for the benefit of the Secured Creditors pursuant to the Security Documents in the assets so transferred shall remain in full force and effect and perfected (to at least the same extent as in effect immediately prior to such transfer) and all actions required to maintain said perfected status have been taken;

(ix)      any Subsidiary of the Borrower that is (a) a Lee Entity may merge or consolidate with and into, or be dissolved or liquidated into, the Borrower or any Wholly-Owned Domestic Subsidiary of the Borrower that is a Lee Entity and (b) a Pulitzer Entity may merge or consolidate with and into, or be dissolved or liquidated into, Pulitzer or any Wholly-Owned Domestic Subsidiary of Pulitzer, so long as (x) in the case of any such merger, consolidation, dissolution or liquidation involving the Borrower, the Borrower is the surviving or continuing entity of any such merger, consolidation, dissolution or liquidation, (y) in all other cases, the respective Wholly-Owned Domestic Subsidiary is the surviving or continuing entity of any such merger, consolidation, dissolution or liquidation, and (z) any security interests granted to the Collateral Agent for the benefit of the Secured Creditors pursuant to the Security Documents in the assets of such Subsidiary shall remain in full force and effect and perfected (to at least the same extent as in effect immediately prior to such merger, consolidation, dissolution or liquidation) and all actions required to maintain said perfected status have been taken;

(x)       any Foreign Subsidiary of the Borrower that is (a) a Lee Entity may be merged, consolidated or amalgamated with and into, or be dissolved or liquidated into, or transfer any of its assets to, any Wholly-Owned Foreign Subsidiary of the Borrower that is a Lee Entity and (b) a Pulitzer Entity may be merged, consolidated or amalgamated with and into, or be dissolved or liquidated into, or transfer any of its assets to, any Wholly-Owned Foreign Subsidiary of Pulitzer, so long as, in each case, (x) such respective Wholly-Owned Foreign Subsidiary is the surviving or continuing entity of any such merger, consolidation, amalgamation, dissolution or liquidation and (y) any security interests granted to the Collateral Agent for the benefit of the Secured Creditors pursuant to the Security Documents in the Equity Interests of such respective Wholly-Owned Foreign Subsidiary and such respective Foreign Subsidiary shall remain in full force and effect and perfected and enforceable (to at least the same extent as in effect immediately prior to such merger, consolidation, amalgamation, dissolution, liquidation or transfer) and all actions required to maintain said perfected status have been taken; and

(xi)    the Borrower and its Subsidiaries may sell, convey or otherwise dispose of cash and Cash Equivalents in the ordinary course of business, in each case for cash at Fair Market Value.

To the extent the Required Lenders waive the provisions of this Section 10.02 with respect to the sale of any Collateral, or any Collateral is sold as permitted by this Section 10.02 (other than to the Borrower or a Subsidiary thereof), such Collateral shall be sold free and clear of the Liens created by the Security Documents, and the Administrative Agent and the Collateral Agent shall be authorized to take any actions deemed appropriate in the reasonable opinion of the Administrative Agent or the Collateral Agent in order to effect the foregoing.

10.03    Dividends.    The Borrower will not, and will not permit any of its Subsidiaries to, authorize, declare or pay any Dividends with respect to the Borrower or any of its Subsidiaries, except that:

(i)    any Subsidiary of the Borrower that is (a) a Lee Entity may pay cash Dividends to the Borrower or to any Wholly-Owned Domestic Subsidiary of the Borrower that is a Lee Entity and any Foreign Subsidiary of the Borrower that is a Lee Entity also may pay cash Dividends to any Wholly-Owned Foreign Subsidiary of the Borrower that is a Lee Entity and (b) a Pulitzer Entity may pay cash Dividends to (x) Pulitzer or any Wholly-Owned Domestic Subsidiary of Pulitzer and any Foreign Subsidiary of Pulitzer also may pay cash Dividends to any Wholly-Owned Foreign Subsidiary of Pulitzer and (y) the Borrower solely with excess proceeds of Permitted Pulitzer Debt Refinancing Indebtedness in an aggregate amount not to exceed $7,700,000 to the extent required to be paid by Section 10.04(xi) of the First Lien Credit Agreement;

(ii)    any Non-Wholly Owned Subsidiary of the Borrower (other than any Pulitzer Entity to the extent any recipient is a Lee Entity) may pay cash Dividends to its shareholders, members or partners generally, so long as the Borrower or its respective Subsidiary which owns the Equity Interest in the Subsidiary paying such Dividends receives at least its proportionate share thereof (based upon its relative holding of the Equity Interest in the Subsidiary paying such Dividends and taking into account the relative preferences, if any, of the various classes of Equity Interests of such Subsidiary);

(iii)    so long as no Default or Event of Default exists at the time of the respective Dividend or would exist immediately after giving effect thereto, the Borrower may redeem or repurchase Equity Interests of the Borrower from officers, employees and directors of the Borrower or its Subsidiaries (or their estates) after the death, disability, retirement or termination of employment or service as a director of any such Person, or otherwise in accordance with any stock option plan or any employee stock ownership plan that has been approved by the board of directors of the Borrower, provided that the aggregate amount of Dividends made by the Borrower pursuant to this clause (iii) shall not exceed $268,750 during any fiscal year of the Borrower;

(iv)    the Borrower may declare and pay regularly scheduled Dividends on its Qualified Preferred Stock pursuant to the terms thereof through the issuance of additional shares of such Qualified Preferred Stock rather than in cash, provided that in lieu of

-68-

issuing additional shares of such Qualified Preferred Stock as Dividends, the Borrower may increase the liquidation preference of the shares of Qualified Preferred Stock in respect of which such Dividends have accrued; and

(v)    the Borrower and its Subsidiaries may make the payments and deliveries contemplated in Section 10.04(xi) and Sections 10.05(xvi) and (xvii); and the Pulitzer Entities may make the payments and deliveries contemplated in Section 10.05(xvii).

10.04    <u>Indebtedness</u>.    The Borrower will not, and will not permit any of its Subsidiaries to, contract, create, incur, assume or suffer to exist any Indebtedness, except:

(i)    Indebtedness incurred pursuant to this Agreement and the other Credit Documents;

(ii)    Existing Indebtedness outstanding on the Petition Date (to the extent remaining outstanding on, and after giving effect to, the Effective Date) and listed on Schedule VI (as reduced by any repayments of principal thereof), without giving effect to any subsequent extension, renewal or refinancing thereof except to the extent set forth on Schedule VI, <u>provided</u> that the aggregate principal amount of the Indebtedness to be extended, renewed or refinanced does not increase from that amount outstanding at the time of any such extension, renewal or refinancing;

(iii)    Indebtedness of the Borrower under (x) Interest Rate Protection Agreements entered into with respect to other Indebtedness permitted under this Section 10.04 and (y) Other Hedging Agreements entered into in the ordinary course of business and providing protection to the Borrower and its Subsidiaries against fluctuations in currency values or commodity prices in connection with the Borrower's or any of its Subsidiaries' operations, in either case so long as the entering into of such Interest Rate Protection Agreements or Other Hedging Agreements are *bona fide* hedging activities and are not for speculative purposes;

(iv)    Indebtedness of the Borrower and its Subsidiaries evidenced by Capitalized Lease Obligations (to the extent permitted pursuant to Section 10.07) and purchase money Indebtedness described in Section 10.01(vii), <u>provided</u> that in no event shall the sum of the aggregate principal amount of all Capitalized Lease Obligations and purchase money Indebtedness permitted by this clause (iv) exceed (x) $32,250,000 with respect to the Borrower and its Subsidiaries or (y) $1,075,000 with respect to the Pulitzer Entities, in each case at any time outstanding;

(v)    Indebtedness constituting Intercompany Loans to the extent permitted by Section 10.05(viii) or (ix);

(vi)    Indebtedness consisting of guaranties by (i) the Borrower and the Wholly-Owned Domestic Subsidiaries that are Lee Entities of each other's Indebtedness and lease and other contractual obligations permitted under this Agreement and (ii) Pulitzer Entities of each other's Indebtedness permitted hereunder (other than any such Indebtedness owing to a Lee Entity) and lease and other contractual obligations permitted under this Agreement, in each case other than obligations (if any) in respect of the First Lien Credit

-69-

Documents, any Permitted First Lien Refinancing Indebtedness, the Pulitzer Debt, the Pulitzer Debt Guaranties and any Permitted Pulitzer Debt Refinancing Indebtedness;

(vii)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, so long as such Indebtedness is extinguished within four Business Days after its incurrence;

(viii)    Indebtedness of the Borrower and its Subsidiaries with respect to performance bonds, surety bonds, appeal bonds or customs bonds required in the ordinary course of business or in connection with the enforcement of rights or claims of the Borrower or any of its Subsidiaries or in connection with judgments that do not result in a Default or an Event of Default, provided that the aggregate outstanding amount of all such performance bonds, surety bonds, appeal bonds and customs bonds permitted by this clause (viii) shall not at any time exceed $10,750,000;

(ix)    Indebtedness of the Borrower or any of its Subsidiaries which may be deemed to exist in connection with agreements providing for indemnification, purchase price adjustments and similar obligations in connection with the acquisition or disposition of assets in accordance with the requirements of this Agreement, so long as any such obligations are those of the Person making the respective acquisition or sale, and are not guaranteed by any other Person except as permitted by Section 10.04(vi);

(x)    Indebtedness of PD LLC or Pulitzer under the Pulitzer Debt and the other Pulitzer Debt Documents and of Pulitzer and one or more of the Subsidiaries of Pulitzer under the Pulitzer Debt Guaranties and the other Pulitzer Debt Documents, in an aggregate principal amount (without duplication in the case of amounts owing by Pulitzer under the Pulitzer Debt Pulitzer Guaranty and Pulitzer's other Subsidiaries under the Pulitzer Debt Subsidiaries Guaranty) not to exceed the Maximum First Priority Amount (as defined in the Pulitzer Intercreditor Agreement);

(xi)    Indebtedness of PD LLC or Pulitzer incurred pursuant to the Permitted Pulitzer Debt Refinancing Indebtedness and one or more of the Subsidiaries of Pulitzer under a guaranty thereof complying with the requirements set forth in the definition of "Permitted Pulitzer Debt Refinancing Indebtedness" in Section 1.01; provided that the excess proceeds of any Permitted Pulitzer Debt Refinancing Indebtedness in an aggregate amount not to exceed $7,700,000 shall be applied to prepay principal amount outstanding under the First Lien Credit Agreement to the extent required by Section 10.04(xi) of the First Lien Credit Agreement;

(xii)    additional unsecured subordinated Indebtedness of the Borrower ("Additional Permitted Indebtedness"), so long as (i) no Default or Event of Default then exists or would result from the incurrence or issuance of any such Additional Permitted Indebtedness, (ii) the Borrower shall have given the Administrative Agent at least five Business Days prior written notice of the incurrence or issuance of any such Additional Permitted Indebtedness, (iii) such Additional Permitted Indebtedness (A) is not guaranteed by any Subsidiary of the Borrower that is not both a Lee Entity and a

Subsidiary Guarantor, (B) matures no earlier than 180 days after the Maturity Date, (C) requires no payment of principal (whether by way of scheduled amortization, mandatory redemption, mandatory prepayment, sinking fund or otherwise) prior to its maturity, except (x) upon the occurrence of a change of control (the definition of which shall be acceptable to the Required Lenders) so long as the terms thereof do not require any such redemption or other action unless (and until) all Obligations have been paid in full or the requisite consents under this Agreement have been obtained to permit such redemption or other action upon the occurrence of a change of control and (y) as a customary mandatory offer to repurchase following an asset sale, (D) does not require the Borrower or any of its Subsidiaries to maintain any specified financial condition (whether stated as a covenant, event of default or otherwise), and (E) contains subordination and other provisions that are reasonably satisfactory to the Required Lenders and (iv) 100% of the Net Cash Proceeds of the respective issuance or incurrence of such Additional Permitted Indebtedness are used solely and concurrently to either, at the option of the Borrower, (I) repay the Loans (provided that any such repayment shall be deemed a voluntary prepayment under Section 5.01(a) and shall be subject to the provisions of such Section (including, without limitation, the prohibition on such voluntary prepayments of Loans prior to the first anniversary of the Effective Date) and Section 4.02) or (II) repay Indebtedness under the First Lien Credit Documents or any Permitted First Lien Refinancing Indebtedness; and

(xiii)   Indebtedness of the Lee Entities under the First Priority Agreement (as defined in the Lee Intercreditor Agreement) in an aggregate principal amount not to exceed the Maximum First Priority Amount (as defined in the Lee Intercreditor Agreement).

10.05   <u>Advances, Investments and Loans</u>.  The Borrower will not, and will not permit any of its Subsidiaries to, directly or indirectly, lend money or credit or make advances to any Person, or purchase or acquire any stock, obligations or securities of, or any other Equity Interest in, or make any capital contribution to, any other Person, or purchase or own a futures contract or otherwise become liable for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract, or hold any cash or Cash Equivalents (each of the foregoing an "<u>Investment</u>" and, collectively, "<u>Investments</u>"), except that the following shall be permitted:

(i)      the Borrower and its Subsidiaries may acquire and hold accounts receivable owing to any of them, if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms of the Borrower or such Subsidiary;

(ii)     the Borrower and its Subsidiaries may acquire and hold cash and Cash Equivalents;

(iii)    the Borrower and its Subsidiaries may hold the Investments held by them on the Petition Date to the extent continued to be held by them on, and after giving effect to, the Effective Date and described on Schedule IX, <u>provided</u> that any additional

Investments made with respect thereto shall be permitted only if permitted under the other provisions of this Section 10.05;

(iv)    the Borrower and its Subsidiaries may acquire and own investments (including debt obligations) received in connection with the bankruptcy or reorganization of suppliers and customers and in good faith settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the ordinary course of business;

(v)    the Borrower and its Subsidiaries may make loans and advances to their respective officers and employees for moving, relocation and travel expenses and other similar expenditures, in each case in the ordinary course of business in an aggregate outstanding amount not to exceed $2,687,500 at any time (determined without regard to any write-downs or write-offs of such loans and advances);

(vi)    the Borrower may acquire and hold obligations of the officers and employees of the Borrower or any of its Subsidiaries in connection with such officers' and employees' acquisition of shares of common Equity Interests of the Borrower so long as no cash is actually advanced by the Borrower or any of its Subsidiaries in connection with the acquisition of such Equity Interests;

(vii)    the Borrower may enter into Interest Rate Protection Agreements and Other Hedging Agreements to the extent permitted by Section 10.04(iii);

(viii)    (I) the Borrower and its Wholly-Owned Domestic Subsidiaries that are Lee Entities may make intercompany loans and advances between and among one another, (II) Wholly-Owned Foreign Subsidiaries that are Lee Entities may make intercompany loans and advances between and among one another and to the Borrower and Wholly-Owned Domestic Subsidiaries that are Lee Entities and (III) the Borrower and Wholly-Owned Domestic Subsidiaries that are Lee Entities may make intercompany loans and advances to Wholly-Owned Domestic Subsidiaries that are Pulitzer Entities (1) to the extent made prior to and outstanding on the Effective Date (together with interest accruing thereon), (2) made for the purposes permitted pursuant to Section 10.05(xv), (xvii) and (xix), (3) reflecting Pulitzer Intercompany Charges not settled in cash in amounts consistent with past practices (provided that notwithstanding any other provision of this Agreement to the contrary, the Borrower agrees that no more than $5,912,500 of such Pulitzer Intercompany Charges in any fiscal year may be settled in cash), and (4) reflecting Pulitzer Intercompany Charges not settled in cash which arise from reasonably expected and identifiable cost-saving measures relating to goods and services (provided that notwithstanding any other provision of this Agreement to the contrary, the Borrower agrees that no more than $2,150,000 of such Pulitzer Intercompany Charges in any fiscal year may be settled in cash) (all such intercompany loans and advances pursuant to this clause (viii), collectively, the "Lee Intercompany Loans"), provided that (x) for the avoidance of doubt, intercompany loans made by the Borrower and the Wholly-Owned Domestic Subsidiaries that are Lee Entities to Wholly-Owned Domestic Subsidiaries that are Pulitzer Entities shall not be permitted except as provided in clause (III) above and (y) each Lee Intercompany Loan constituting Intercompany Debt shall be subject to the terms and conditions contained in the Intercompany Subordination Agreement;

(ix)    (I) Pulitzer and its Wholly-Owned Domestic Subsidiary Guarantors may make unsecured intercompany loans and advances between and among one another and (II) any existing unsecured intercompany loans and advances by Pulitzer and its Wholly-Owned Domestic Subsidiary Guarantors to the extent made prior to and outstanding on the Effective Date (together with interest accruing thereon) (all such intercompany loans and advances pursuant to this clause (ix), collectively, the "Pulitzer Intercompany Loans", and together with the Lee Intercompany Loans, the "Intercompany Loans");

(x)    (i) the Borrower and any Subsidiary Guarantor that is a Lee Entity may make capital contributions to any Wholly-Owned Domestic Subsidiary Guarantor that is a Lee Entity and (ii) any Subsidiary Guarantor that is a Pulitzer Entity may make capital contributions to any Wholly-Owned Domestic Subsidiary Guarantor that is a Pulitzer Entity;

(xi)    the Borrower and its Subsidiaries may own the Equity Interests of their respective Subsidiaries created or acquired in accordance with the terms of this Agreement (so long as all amounts invested in such Subsidiaries are independently justified under another provision of this Section 10.05);

(xii)    Contingent Obligations permitted by Section 10.04, to the extent constituting Investments;

(xiii)    the Borrower and its Subsidiaries may receive and hold promissory notes and other non-cash consideration received in connection with any Asset Sale permitted by Section 10.02(iv);

(xiv)    up to two Joint-Venture Transactions, provided that immediately after giving effect to each such Joint-Venture Transaction, (a) the aggregate book value of all such assets and Equity Interests contributed, sold, leased or otherwise transferred, and all Equity Interests issued, to Persons other than the Borrower or a Subsidiary of the Borrower pursuant to both such Joint-Venture Transactions subsequent to the Effective Date shall not exceed (x) $37,625,000 for one Joint-Venture Transaction and (y) $26,875,000 for the other Joint-Venture Transaction, (b) with respect to such Joint-Venture Transaction exceeding $26,875,000, such joint venture is a Subsidiary of the Borrower, (c) cash contributed to such joint ventures shall not exceed $268,750 in the aggregate for each such Joint-Venture Transaction and (d) the Equity Interests of the Borrower and its Subsidiaries in each such joint venture shall be pledged to secure the Obligations pursuant to Section 9.12;

(xv)    (A) Investments made in connection with the funding of contributions under qualified or non-qualified pension, retirement or similar employee compensation plan, including without limitation split-dollar insurance policies, in such amounts consistent with applicable law and the Borrower's and its Subsidiaries' past practices, provided that any such contributions by the Borrower and any Wholly-Owned Domestic Subsidiaries that are Lee Entities to Wholly-Owned Domestic Subsidiaries that are Pulitzer Entities shall not exceed $2,150,000 in any fiscal year of the Borrower (including, for the avoidance of doubt, any such Investments made after the Petition Date

and prior to the Effective Date), and (B) the contribution of equity interests in or assets of Sandler Capital Partners V, L.P. to one or more qualified or non-qualified pension, retirement or similar employee compensation plans of the Pulitzer Entities;

(xvi)   (A) Investments by the Lee Entities in the Associated Press Digital Rights Agency or any successor thereto or any Affiliate thereof in an aggregate amount not to exceed $1,612,500 at any time outstanding, and (B) the Pulitzer Entities may own, purchase or acquire Investments in the Associated Press Digital Rights Agency or any successor thereto or any Affiliate thereof for Fair Market Value (as defined in the Pulitzer Debt Agreement) (as determined in good faith by the Board of Directors of Pulitzer at the time of such purchase or acquisition) in an aggregate amount not to exceed $750,000 at any time outstanding; provided, further that (a) the Pulitzer Entities shall be entitled to receive their ratable share (based on the aggregate amount of investments made by the Lee Entities, on the one hand, and the Pulitzer Entities, on the other hand) of any Equity Interests of such Person issued in consideration for, or on account of, the aggregate investments made in such Person by the Lee Entities, (b) any such Equity Interests received by the Pulitzer Entities shall be pledged in favor of the Collateral Agent to secure the Obligations in accordance with the Security Documents, and (c) Pulitzer shall, and shall cause its Subsidiaries to, vote or otherwise give their consent in respect of all such Equity Interests of such Person beneficially owned by the Pulitzer Entities for the election to the board of directors (or other similar governing body) of such Person of Mary Junck or her designee (or any person acceptable to the Required Holders (as defined under the Pulitzer Debt Agreement)); provided further, however, that the immediately preceding proviso shall not apply to the issuance of fractional Equity Interests to the extent that the issuance thereof is prohibited by the organization documents of Associated Press Digital Rights Agency as in effect on the date hereof;

(xvii)   (A) payments or deliveries to be made by the Lee Entities to satisfy certain obligations owed to Herald as described in note 19 to the Borrower's Annual Report on Form 10-K for the fiscal year ended September 26, 2010; provided that any such payments or deliveries made to Pulitzer Entities for such purposes shall not exceed $3,762,500 in the aggregate, and (B) deliveries of consideration by the Pulitzer Entities in connection with the redemption of the "phantom equity interest" held by Herald (as contemplated by the Redemption Agreement (as in effect on the Effective Date)) consisting solely of common stock of the Borrower or cash contributed (to the extent permitted by clause (xvii)(A) above) by the Borrower for purposes of making such delivery (it being understood that any such cash contributed by the Borrower shall reduce the Pulitzer Intercompany Loan outstanding on the Effective Date in the aggregate principal amount of $[260,000,000] by an amount equal to such cash contribution);

(xviii)  Investments of (x) up to a $1,128,750 cash Investment in Metrix4 Media for up to 8% of the Equity Interests of such Person, (y) up to a $1,128,750 cash Investment in Kaango for up to 5% of the Equity Interests of such Person and (z) up to a $1,128,750 cash Investment in The Port for up to 9% of the Equity Interests of such Person; and

#4824-6878-8234v29

(xix)   in addition to Investments permitted by clauses (i) through (xviii) of this Section 10.05, the Borrower and its Subsidiaries may make additional loans, advances and other Investments to or in a Person in an aggregate amount for all loans, advances and other Investments (determined without regard to any write-downs or write-offs thereof), net of cash repayments of principal in the case of loans, sale proceeds in the case of Investments in the form of debt instruments and cash equity returns (whether as a distribution, dividend, redemption or sale) in the case of equity investments, not to exceed $2,150,000 in any fiscal year, provided that no such Investments may be used, directly or indirectly, to purchase, repurchase, redeem, defease or otherwise acquire or retire for value any (i) Additional Permitted Indebtedness, (ii) unsecured Indebtedness of the Borrower or a Subsidiary Guarantor, (iii) junior lien obligations of the Borrower or a Subsidiary Guarantor, or (iv) the Pulitzer Debt or any Permitted Pulitzer Debt Refinancing Indebtedness.

10.06   _Transactions with Affiliates_.  The Borrower will not, and will not permit any of its Subsidiaries to, enter into any transaction or series of related transactions with any Affiliate of the Borrower or any of its Subsidiaries, other than in the ordinary course of business and on terms and conditions substantially as favorable to the Borrower or such Subsidiary as would reasonably be obtained by the Borrower or such Subsidiary at that time in a comparable arm's-length transaction with a Person other than an Affiliate, except that the following in any event shall be permitted:

(i)      Dividends may be paid to the extent provided in Section 10.03;

(ii)     loans may be made and other transactions may be entered into by the Borrower and its Subsidiaries to the extent permitted by Sections 10.02, 10.04 and 10.05;

(iii)    customary fees may be paid to non-officer directors of the Borrower and its Subsidiaries;

(iv)     the Borrower may issue shares of its Equity Interests as otherwise permitted by this Agreement;

(v)      the Borrower and its Subsidiaries may enter into, and may make payments under, employment agreements, employee benefits plans, stock option plans, indemnification provisions and other similar compensatory arrangements with officers, employees and directors of the Borrower and its Subsidiaries in the ordinary course of business;

(vi)     Subsidiaries of the Borrower that are (a) Lee Entities may pay management fees, licensing fees and similar fees to the Borrower or to any of its Wholly-Owned Domestic Subsidiaries that are Lee Entities and (b) Pulitzer Entities may pay management fees, licensing fees and similar fees to Pulitzer or any of its Wholly-Owned Domestic Subsidiaries;

(vii)    the Credit Parties may enter into, and may exercise their respective rights and perform their respective obligations under and pursuant to, the Credit Documents, the First Lien Credit Documents, the Pulitzer Debt Documents, the documentation governing

-75-

any Permitted First Lien Refinancing Indebtedness and the documentation governing any Permitted Pulitzer Debt Refinancing Indebtedness, as applicable, in each case as in effect on, and after giving effect to, the Effective Date (or, if later, the original date thereof) and as thereafter amended or modified in accordance with the terms thereof and hereof;

(viii)   PD LLC may pay its Allocable Share of the Lee/Pulitzer Restructuring Costs;

(ix)    the Borrower may repay in cash, on the Effective Date, to the holders of the Pulitzer Debt, on behalf of PD LLC, outstanding principal under the Pulitzer Debt in an amount not to exceed $5,000,000 in the aggregate; provided that the principal amount of the Pulitzer Intercompany Loan outstanding on the Effective Date in the aggregate principal amount of $[260,000,000] shall automatically be reduced dollar-for-dollar by the amount so paid by the Borrower in respect of the Pulitzer Debt;

(x)     the Pulitzer Entities may pay or reimburse fees and expenses payable to counsel for, and financial advisers to, (x) the Borrower and its Subsidiaries (including the Pulitzer Entities), (y) the "Noteholders" under and as defined in the Pulitzer Debt Agreement, and (z) the other parties to the Pulitzer Debt Documents, in each case in connection with the issuance of the Notes as contemplated by (and as defined in) the Pulitzer Debt Agreement and each of the other transactions contemplated thereunder, under the Support Agreement and under the Plan of Reorganization; and

(xi)    [the Borrower and its Subsidiaries may engage in the activities described on Exhibit O][5].

Notwithstanding anything to the contrary contained in this Agreement, except to the extent expressly permitted by clauses (i) through (x) above, transactions between the Lee Entities on the one hand, and the Pulitzer Entities on the other hand, shall be limited to those activities described on Exhibit O.

10.07   Capital Expenditures.

(a)   The Borrower will not, and will not permit any of its Subsidiaries to, make any Capital Expenditures, except that the Borrower and its Subsidiaries may make Capital Expenditures during any fiscal year of the Borrower (taken as one accounting period) so long as the aggregate amount of such Capital Expenditures does not exceed $25,000,000 during such fiscal year (provided, that the aggregate amount of Capital Expenditures made by the Pulitzer Entities permitted hereunder shall not exceed (i) $6,020,000 during the 2012 fiscal year of the Borrower and (ii) $4,300,000 during each fiscal year thereafter).

(b)    In addition to the foregoing, in the event that the amount of Capital Expenditures permitted to be made by the Borrower and its Subsidiaries pursuant to clause (a)

---

[5]   Subject to review of and satisfaction with the content of Exhibit O, when delivered.

above in any fiscal year of the Borrower (before giving effect to any increase in such permitted Capital Expenditure amount pursuant to this clause (b)) is greater than the amount of Capital Expenditures actually made by the Borrower and its Subsidiaries during such fiscal year, the lesser of (x) such excess and (y) 50% (or, with respect to the Pulitzer Entities, 100%) of the applicable permitted scheduled Capital Expenditure amount as set forth in such clause (a) above for such fiscal year may be carried forward and utilized to make Capital Expenditures in the immediately succeeding fiscal year (or, with respect to the Pulitzer Entities, in any fiscal year thereafter), provided that (x) with respect to the Lee Entities only, no amounts once carried forward pursuant to this Section 10.07(b) may be carried forward to any fiscal year of the Borrower thereafter and (y) no amounts may be carried forward pursuant to this Section 10.07(b) in respect of any fiscal year of the Borrower ended prior to the Effective Date.

(c)　　In addition to the foregoing, the Borrower and its Subsidiaries may make additional Capital Expenditures (which Capital Expenditures will not be included in any determination under Section 10.07(a) or (b)) with the amount of Net Cash Proceeds received by the Borrower or any of its Subsidiaries from any Recovery Event so long as such Net Cash Proceeds are used to replace or restore any properties or assets in respect of which such Net Cash Proceeds were paid within 360 days following the date of receipt of such Net Cash Proceeds from such Recovery Event, but only to the extent that such Net Cash Proceeds are not otherwise required to be applied as a mandatory repayment and/or commitment reduction pursuant to Section 5.02 of the First Lien Credit Agreement or the corresponding provision of the Pulitzer Debt Documents or with respect to Permitted Pulitzer Debt Refinancing Indebtedness.

10.08　Intentionally Omitted.

10.09　Anti-Layering.　The Borrower will not, and will not permit any of its Subsidiaries to, create, incur, assume or suffer to exist any Lien that is junior to the Liens created pursuant to (i) the First Lien Credit Documents or any Permitted First Lien Refinancing Indebtedness (or any documentation governing the same) or (ii) the Pulitzer Debt Documents or any Permitted Pulitzer Debt Refinancing Indebtedness (or any documentation governing the same) unless such Lien is also junior to the Liens securing the Obligations.

10.10　Modifications of Pulitzer Debt Documents, First Lien Credit Documents, Certificate of Incorporation, By-Laws and Certain Other Agreements; Limitations on Voluntary Payments, etc.

The Borrower will not, and will not permit any of its Subsidiaries to:

(i)　　[Reserved];

(ii)　　amend, modify or change its certificate or articles of incorporation (including, without limitation, by the filing or modification of any certificate or articles of designation), certificate of formation, limited liability company agreement or by-laws (or the equivalent organizational documents), as applicable, or any agreement entered into by it with respect to its capital stock or other Equity Interests (including any Shareholders' Agreement) in any material respect, or enter into any new agreement with respect to its capital stock or other Equity Interests, unless such amendment, modification, change or

other action contemplated by this clause (ii) could not reasonably be expected to be adverse to the interests of the Lenders in any material respect;

(iii)    amend, modify or change any provision of any Tax Sharing Agreement or enter into any new tax sharing agreement, tax allocation agreement or similar agreement without the prior written consent of the Administrative Agent;

(iv)    make any payment or prepayment on or redemption, repurchase or acquisition for value of (including, without limitation, by way of depositing with the trustee with respect thereto or any other Person money or securities before due for the purpose of paying when due), or any prepayment or redemption as a result of any asset sale or similar event, of principal of the Pulitzer Debt, the Pulitzer Debt Guaranties or the Permitted Pulitzer Debt Refinancing Indebtedness, <u>provided</u> that (w) the Pulitzer Entities may make optional or voluntary payments or prepayments on or redemptions, repurchases or acquisitions for value of the Pulitzer Debt or any Permitted Pulitzer Debt Refinancing Indebtedness, (x) the Pulitzer Entities may make payments on the Pulitzer Debt or any Permitted Pulitzer Debt Refinancing Indebtedness at par (A) in connection with a Change of Control (as defined in the Pulitzer Debt Agreement or any documents evidencing Permitted Pulitzer Debt Refinancing Indebtedness) as required pursuant to the Pulitzer Debt Agreement as in effect on, and after giving effect to, the Effective Date (or subject to substantially the same terms in documents evidencing Permitted Pulitzer Debt Refinancing Indebtedness), (B) with proceeds of Asset Sales and/or Recovery Events to the extent representing proceeds from assets of Pulitzer and its Subsidiaries, or (C) to the extent permitted by Section 10.06(ix), (y) the Pulitzer Entities may make amortization payments of the Pulitzer Debt or any Permitted Pulitzer Debt Refinancing Indebtedness in an aggregate amount in any fiscal year not to exceed $6,400,000, and (z) the Pulitzer Entities may make periodic payments from excess cash flow as required pursuant to the Pulitzer Debt Agreement as in effect on, and after giving effect to, the Effective Date (or subject to the same terms in documents evidencing Permitted Pulitzer Debt Refinancing Indebtedness);

(v)    amend or modify, or permit the amendment or modification of, any provision of any Pulitzer Debt Document, the PD LLC Indemnity Agreement or any indenture, purchase agreement, loan agreement, security document or other agreement or instrument relating to the Permitted Pulitzer Debt Refinancing Indebtedness, in each case other than such amendments or modifications (i) with the prior written consent of the Administrative Agent or (ii) which could not reasonably be expected to be adverse to the Lenders in any material respect; <u>provided</u>, that any such amendment or modification the effect of which is to (w) increase or effectively increase the interest rates or yield (in each case whether payable in cash or in-kind) applicable to any Indebtedness thereunder from such rates or yield as in effect on, and after giving effect to, the Effective Date (or, in the case of Permitted Pulitzer Debt Refinancing Indebtedness, the date such Indebtedness is incurred in accordance with the terms of this Agreement), (x) subordinate the Lien securing any Indebtedness thereunder on all or any portion of the Collateral to any Lien securing any Indebtedness other than such Indebtedness thereunder or grant a Lien (other than a Permitted Lien) securing any Indebtedness thereunder on all or any portion of the Collateral which is not subject to the Pulitzer Intercreditor Agreement, (y) prohibit the

performance by the Credit Parties of their obligations under the Credit Documents or (z) make the terms thereof, in the aggregate, more burdensome to the applicable Credit Parties in any material respect than the terms thereof as in effect on, and after giving effect to, the Effective Date or as thereafter amended or modified in accordance with the terms thereof and hereof (including, without limitation, this Section 10.10(v)), shall, in each case described in preceding clauses (w), (x), (y) and (z), be deemed to be materially adverse to the Lenders;

(vi)    make (or give any notice in respect of) any voluntary or optional payment or prepayment on or redemption, repurchase or acquisition for value of, or any prepayment or redemption as a result of any asset sale, change of control or similar event of (including, in each case without limitation, by way of depositing with the trustee with respect thereto or any other Person money securities before due for the purpose of paying when due), any Additional Permitted Indebtedness; or

(vii)    after the execution and delivery thereof, amend or modify, or permit the amendment or modification of, any provision of any indenture, purchase agreement or other document, agreement or note relating to (or evidencing) any Additional Permitted Indebtedness (or any guaranty thereof); or

(viii)    amend or modify, or permit the amendment or modification of, any provision of any First Lien Credit Document or any Permitted First Lien Refinancing Indebtedness (or any documentation governing the same), other than any such amendments or modifications (i) with the prior written consent of the Administrative Agent or (ii) which could not reasonably be expected to be adverse to the Lenders in any material respect; provided, that any such amendment or modification the effect of which is to (w) increase or effectively increase the interest rates or yield (in each case whether payable in cash or in-kind) applicable to any Indebtedness under any First Lien Credit Document or to any Permitted First Lien Refinancing Indebtedness, in each case from such respective rates or yield as in effect on, and after giving effect to, the Effective Date or, in the case of any Permitted First Lien Refinancing Indebtedness, the original date of incurrence thereof, (x) subordinate the Lien securing the Obligations (as defined in the First Lien Credit Agreement) or any Permitted First Lien Refinancing Indebtedness on all or any portion of the Collateral to any Lien securing any Indebtedness not constituting Obligations (as defined in the First Lien Credit Agreement) or such Permitted First Lien Refinancing Indebtedness or grant a Lien (other than a Permitted Lien) securing any Indebtedness thereunder on all or any portion of the Collateral which is not subject to the Lee Intercreditor Agreement, (y) prohibit the performance by the Credit Parties of their obligations under the Credit Documents or (z) make the terms thereof, in the aggregate, more burdensome to the applicable Credit Parties in any material respect than the terms thereof as in effect on, and after giving effect to, the Effective Date or as thereafter amended or modified in accordance with the terms thereof and hereof (including, without limitation, this Section 10.10(viii)), shall, in each case described in preceding clauses (w), (x), (y) and (z), be deemed to be materially adverse to the Lenders.

Notwithstanding anything to the contrary contained herein or in any other Credit Document, in no event shall (1) (x) the Lee Entities be permitted to pay any fee to the holders of

any Pulitzer Debt (or any agent or advisor in respect thereof) in connection with any amendment, modification, change or waiver of, or forbearance with respect to, any term or provision of any Pulitzer Debt Document or Permitted Pulitzer Debt Refinancing Indebtedness or, except as otherwise permitted in Section 10.06, make any other payment on behalf of any of the Pulitzer Entities, (y) the Lee Entities be permitted to prepay or repay any amounts (including in respect of interest) owing to the Pulitzer Entities in respect of any Lee Intercompany Loans or other Intercompany Debt (other than as otherwise permitted in Section 10.06(ix) and other than the set-off and netting arrangements as, and to the extent, described on Exhibit O) or (z) the Borrower or any of its Subsidiaries be permitted to make any payments (whether in cash, property or securities) to Herald or any of its Affiliates in satisfaction of the obligations owed to Herald as described in note 19 to the Borrower's Annual Report on Form 10-K for the fiscal year ended September 26, 2010, except as otherwise permitted by Section 10.03(v) or Section 10.05(xvii) or (2) (x) the Pulitzer Entities be permitted to pay any fee to the holders of any Indebtedness under any First Lien Credit Document (or any agent or advisor in respect thereof) in connection with any amendment, modification, change or waiver of, or forbearance with respect to, any term or provision of any First Lien Credit Document or any Permitted First Lien Refinancing Indebtedness or, except as otherwise permitted in Section 10.06, make any other payment on behalf of any of the Lee Entities, or (y) the Pulitzer Entities be permitted to prepay or repay any amounts (including in respect of interest) owing to the Lee Entities in respect of any Pulitzer Intercompany Loans or other Intercompany Debt (other than the set-off and netting arrangements as, and to the extent, described on Exhibit O).

        10.11  <u>Limitation on Certain Restrictions on Subsidiaries</u>.  The Borrower will not, and will not permit any of its Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any encumbrance or restriction on the ability of any such Subsidiary to (a) pay dividends or make any other distributions on its capital stock or any other Equity Interest or participation in its profits owned by the Borrower or any of its Subsidiaries, or pay any Indebtedness owed to the Borrower or any of its Subsidiaries, (b) make loans or advances to the Borrower or any of its Subsidiaries or (c) transfer any of its properties or assets to the Borrower or any of its Subsidiaries, except for such encumbrances or restrictions existing under or by reason of (i) applicable law, (ii) this Agreement and the other Credit Documents, (iii) the Pulitzer Debt Documents as in effect on, and after giving effect to, the Effective Date and the Permitted Pulitzer Debt Refinancing Indebtedness (as in effect at the time of the issuance or incurrence thereof so long as such encumbrances or restrictions are no more restrictive in any material respect than those encumbrances or restrictions set forth in the Pulitzer Debt Documents as in effect on and after giving effect to, the Effective Date), in each case so long as such restrictions apply solely to Pulitzer and/or its applicable Subsidiaries, (iv) the First Lien Credit Documents (including Permitted First Lien Refinancing Indebtedness so long as such encumbrances or restrictions are no more restrictive in any material respect than those encumbrances or restrictions set forth in the First Lien Credit Documents as in effect on, and after giving effect to, the Effective Date), (v) customary provisions restricting subletting or assignment of any lease governing any leasehold interest of the Borrower or any of its Subsidiaries, (vi) customary provisions restricting assignment of any licensing agreement (in which the Borrower or any of its Subsidiaries is the licensee) or other contract entered into by the Borrower or any of its Subsidiaries in the ordinary course of business, (vii) restrictions on the transfer of any asset pending the close of the sale of such asset, and (viii) restrictions on the

transfer of any asset subject to a Lien permitted by Section 10.01(iii), (vi), (vii), (x), (xiv), (xv) or (xvii).

10.12  Limitation on Issuance of Equity Interests.  (a)  The Borrower will not, and will not permit any of its Subsidiaries to, issue (i) any Preferred Equity (other than Qualified Preferred Stock of the Borrower) or (ii) any redeemable common stock or other redeemable common Equity Interests other than common stock or other redeemable common Equity Interests that is or are redeemable at the sole option of the Borrower or such Subsidiary, as the case may be.

(b)  The Borrower will not permit any of its Subsidiaries to issue any capital stock or other Equity Interests (including by way of sales of treasury stock) or any options or warrants to purchase, or securities convertible into, capital stock or other Equity Interests, except (i) for transfers and replacements of then outstanding shares of capital stock or other Equity Interests, (ii) for stock splits, stock dividends and issuances which do not decrease the percentage ownership of the Borrower or any of its Subsidiaries in any class of the capital stock or other Equity Interests of such Subsidiary, (iii) in the case of Foreign Subsidiaries of the Borrower, to qualify directors and other nominal amounts held by local nationals in each case to the extent required by applicable law, or (iv) for issuances by Subsidiaries of the Borrower which are newly created or acquired in accordance with the terms of this Agreement.

10.13  Business; etc.  The Borrower will not, and will not permit any of its Subsidiaries to, engage directly or indirectly in any business other than the businesses engaged in by the Borrower and its Subsidiaries as of the Effective Date and with reasonable extensions thereof and business ancillary or complimentary thereto.

10.14  Limitation on Creation of Subsidiaries.  The Borrower will not, and will not permit any of its Subsidiaries to, establish, create or acquire after the Effective Date any Subsidiary, provided that (x) the Borrower and its Wholly-Owned Subsidiaries shall be permitted to establish and create and, to the extent permitted by this Agreement, acquire, Wholly-Owned Subsidiaries, and (y) the Borrower and its Subsidiaries shall be permitted to establish and create and acquire Non-Wholly Owned Subsidiaries to the extent permitted by Section 10.05(xix) so long as (i) at least 5 days' prior written notice thereof is given by the Borrower to the Administrative Agent (or such shorter period of time as is acceptable to the Administrative Agent in any given case), (ii) the capital stock or other Equity Interests of such new Subsidiary are promptly pledged pursuant to, and to the extent required by, this Agreement and the Pledge Agreement and the certificates, if any, representing such stock or other Equity Interests, together with stock or other appropriate powers duly executed in blank, are delivered to the Collateral Agent (or, to the extent such stock or Equity Interests constitute Common Collateral (as defined in the Lee Intercreditor Agreement or the Pulitzer Intercreditor Agreement, as applicable), to the First Priority Representative (as defined in the Lee Intercreditor Agreement or the Pulitzer Intercreditor Agreement, as applicable) in accordance with, and only to the extent subject to the provisions of, Section 2.3(c) of the Lee Intercreditor Agreement or the corresponding Section of the Pulitzer Intercreditor Agreement, as applicable, with copies thereof and of any related endorsements to the Collateral Agent), and (iii) each such new Domestic Subsidiary (and, to the extent required by Section 9.16, each such new Foreign Subsidiary) executes a counterpart of the Subsidiaries Guaranty, the Security Agreement, the Pledge Agreement and the Intercompany

Subordination Agreement.  In addition, each new Subsidiary that is required to execute any Credit Document shall execute and deliver, or cause to be executed and delivered, all other relevant documentation (including opinions of counsel) of the type described in Section 6 as such new Subsidiary would have had to deliver if such new Subsidiary were a Credit Party on the Effective Date.

SECTION 11. Events of Default.

Upon the occurrence of any of the following specified events (each, an "Event of Default"):

11.01   Payments.  The Borrower shall (i) default in the payment when due of any principal of any Loan or Note or (ii) default, and such default shall continue unremedied for three or more Business Days, in the payment when due of any interest on any Loan or Note or any Fees or any other amounts owing hereunder or under any other Credit Document; or

11.02   Representations, etc.  Any representation, warranty or statement made or deemed made by any Credit Party herein or in any other Credit Document or in any certificate delivered to the Administrative Agent or any Lender pursuant hereto or thereto shall prove to be untrue in any material respect on the date as of which made or deemed made; or

11.03   Covenants.  (i)(A) The Borrower or any of its Subsidiaries shall default in the due performance or observance by it of any term, covenant or agreement contained in Section 9.01(f)(i), 9.08, 9.11, 9.14 (subject to the lapse of any grace or cure period contemplated in clause (y) of the proviso thereto) or Section 10 or (B) the Borrower shall default in the due performance or observance by it of any term, covenant or agreement contained in Section 9.04 or (ii) the Borrower or any of its Subsidiaries shall default in the due performance or observance by it of any other term, covenant or agreement contained in this Agreement (other than those set forth in Sections 11.01 and 11.02) and such default shall continue unremedied for a period of 30 days after (x) with respect to the Lee Entities, written notice thereof to the defaulting party by the Administrative Agent or the Required Lenders or (y) with respect to the Pulitzer Entities, the chief executive officer, chief operating officer, chief administrative officer or chief financial officer of any Pulitzer Entity (or any other officer involved principally in its financial administration or its controllership function) obtains knowledge thereof; or

11.04   Default Under Other Agreements.  (i) The Borrower or any of its Subsidiaries shall (x) default in any payment of any Indebtedness (other than the Obligations) beyond the period of grace, if any, provided in an instrument or agreement under which such Indebtedness was created or (y) default in the observance or performance of any agreement or condition relating to any Indebtedness (other than the Obligations) or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause (determined without regard to whether any notice is required), any such Indebtedness to become due (and/or, in the case of an Interest Rate Protection Agreement or Other Hedging Agreement, to be terminated) prior to its stated maturity, or (ii) any Indebtedness (other than the Obligations) of the Borrower or any of its Subsidiaries shall be declared to be (or

shall become) due and payable (and/or, in the case of an Interest Rate Protection Agreement or Other Hedging Agreement, to be terminated), or required to be prepaid (and/or terminated, as the case may be) other than by a regularly scheduled required prepayment, prior to the stated maturity thereof, _provided_ that it shall not be a Default or an Event of Default under this Section 11.04 unless the aggregate principal amount of all Indebtedness as described in preceding clauses (i) and (ii) is at least $10,750,000 or unless such Indebtedness is in respect of any Obligations (as defined in the First Lien Credit Agreement), any Permitted First Lien Refinancing Indebtedness, any Pulitzer Debt, any Permitted Pulitzer Debt Refinancing Indebtedness or any Additional Permitted Indebtedness; _provided_, _however_, that with respect to any default under Sections 10.08 or 10.09 of the First Lien Credit Agreement or Section 5.1 of the Pulitzer Debt Pulitzer Guaranty (or any analogous financial maintenance covenants in the Pulitzer Debt Documents or with respect to Permitted Pulitzer Debt Refinancing Indebtedness), such default shall only constitute an Event of Default hereunder if such default occurs and is not cured or waived within 30 days after the occurrence of such default; or

      11.05  _Bankruptcy, etc._  The Borrower or any of its Subsidiaries shall commence a voluntary case concerning itself under Title 11 of the United States Code entitled "Bankruptcy," as now or hereafter in effect, or any successor thereto (the "_Bankruptcy Code_"); or an involuntary case is commenced against the Borrower or any of its Subsidiaries, and the petition is not controverted within 15 days, or is not dismissed within 60 days after the filing thereof; or a custodian (as defined in the Bankruptcy Code) is appointed for, or takes charge of, all or substantially all of the property of the Borrower or any of its Subsidiaries, to operate all or any substantial portion of the business of the Borrower or any of its Subsidiaries, or the Borrower or any of its Subsidiaries commences any other proceeding under any reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction whether now or hereafter in effect relating to the Borrower or any of its Subsidiaries, or there is commenced against the Borrower or any of its Subsidiaries any such proceeding which remains undismissed for a period of 60 days after the filing thereof, or the Borrower or any of its Subsidiaries is adjudicated insolvent or bankrupt; or any order of relief or other order approving any such case or proceeding is entered; or the Borrower or any of its Subsidiaries makes a general assignment for the benefit of creditors; or any Company action is taken by the Borrower or any of its Subsidiaries for the purpose of effecting any of the foregoing; or

      11.06  _ERISA._  (a)  Any Plan shall fail to satisfy the minimum funding standard required for any plan year or part thereof under Section 412 of the Code or Section 302 of ERISA or a waiver of such standard or extension of any amortization period is requested or granted under Section 412 of the Code or Section 302 of ERISA; a Reportable Event shall have occurred, a contributing sponsor (as defined in Section 4001(a)(13) of ERISA) of a Plan subject to Title IV of ERISA shall be subject to the advance reporting requirement of PBGC Regulation Section 4043.61 (without regard to subparagraph (b)(1) thereof) and an event described in subsection .62, .63, .64, .65, .66, .67 or .68 of PBGC Regulation Section 4043 shall be reasonably expected to occur with respect to such Plan within the following 30 days, any Plan which is subject to Title IV of ERISA shall have had or is likely to have a trustee (other than a member of the board of trustees of a Plan which is a multiemployer plan (as defined in Section 4001(a)(3) of ERISA)) appointed to administer such Plan; any Plan which is subject to Title IV of ERISA is or shall have been terminated or the subject of termination proceedings under

ERISA; any Plan shall have an Unfunded Current Liability which, when added to the aggregate amount of Unfunded Current Liabilities with respect to all other Plans, exceeds the aggregate amount of such Unfunded Current Liabilities that existed on the Effective Date by $10,000,000; a contribution required to be made with respect to a Plan or a Foreign Pension Plan has not been timely made, the Borrower or any ERISA Affiliate has incurred any liability to or on account of a Plan under Sections 409, 502(i), 502(l), 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or Sections 401(a)(29), 4971 or 4975 of the Code or on account of a group health plan (as defined in Section 607(1) of ERISA, Section 4980B(g)(2) of the Code or 45 Code of Federal Regulations Section 160.103) under Section 4980B of the Code and/or the Health Insurance Portability and Accountability Act of 1996; the Borrower or any ERISA Affiliate of the Borrower has incurred liabilities pursuant to one or more employee welfare benefit plans (as defined in Section 3(1) of ERISA) that provide benefits to retired employees or other former employees (other than as required by Section 601 of ERISA) or Plans or Foreign Pension Plans; or a "default," within the meaning of Section 4219(c)(5) of ERISA, has been determined by a multiemployer plan (as defined in Section 4001(a)(3) of ERISA) to have occurred with respect to any Plan; (b) there shall result from any such event or events the imposition of a lien, the granting of a security interest, or a liability or a material risk of incurring a liability; and (c) such lien, security interest or liability, either individually or in the aggregate, has had, or could reasonably be expected to have, a Material Adverse Effect (or, in the case of any Pulitzer Entity or in respect of a Plan of any Pulitzer Entity, a Pulitzer Material Adverse Effect); or

11.07  Security Documents.  Any of the Security Documents shall cease to be in full force and effect, or shall cease to give the Collateral Agent for the benefit of the Secured Creditors the Liens, rights, powers and privileges purported to be created thereby (including, without limitation, a perfected security interest in, and Lien on, all of the Collateral, in favor of the Collateral Agent, superior to and prior to the rights of all third Persons (except as permitted by Section 10.01), and subject to no other Liens (except as permitted by Section 10.01)), or any Credit Party shall default in the due performance or observance of any term, covenant or agreement on its part to be performed or observed pursuant to any such Security Document and such default shall continue beyond the period of grace, if any, specifically applicable thereto pursuant to the terms of such Security Document; and, in each case, in the case of any failure of the validity, perfection or priority of any such Lien on the assets of a Pulitzer Entity which results from the actions or inaction of the Collateral Agent, such failure shall continue for a period of 30 days from the earlier of (i) the date on which written notice of such failure is provided to the Borrower from the Administrative Agent, the Collateral Agent or any Lender or (ii) actual knowledge of such failure by any Credit Party; or

11.08  Subsidiaries Guaranty.  The Subsidiaries Guaranty or any provision thereof shall cease to be in full force or effect as to any Subsidiary Guarantor (except as a result of a release of any Subsidiary Guarantor in accordance with the terms of the Subsidiaries Guaranty), or any Subsidiary Guarantor or any Person acting for or on behalf of such Subsidiary Guarantor shall deny or disaffirm such Subsidiary Guarantor's obligations under the Subsidiaries Guaranty or any Subsidiary Guarantor shall default in the due performance or observance of any term, covenant or agreement on its part to be performed or observed pursuant to the Subsidiaries Guaranty; or

11.09 <u>Intercompany Subordination Agreement</u>.    The Intercompany Subordination Agreement or any provision thereof shall cease to be in full force or effect as to the Borrower or any Subsidiary of the Borrower party thereto (except as a result of a release of any such Person in accordance with the terms of the Intercompany Subordination Agreement), or the Borrower, any Subsidiary of the Borrower or any Person acting for or on behalf of the Borrower or any Subsidiary of the Borrower shall deny or disaffirm the Borrower's or such Subsidiary's obligations under the Intercompany Subordination Agreement or the Borrower or any of its Subsidiaries shall default in the due performance or observance of any term, covenant or agreement on its part to be performed or observed pursuant to the Intercompany Subordination Agreement; or

11.10 <u>Judgments</u>.  One or more judgments or decrees shall be entered against the Borrower or any Subsidiary of the Borrower involving in the aggregate for the Borrower and its Subsidiaries a liability (not paid or to the extent not covered by a reputable and solvent insurance company) and such judgments and decrees either shall be final and non-appealable or shall not be vacated, discharged or stayed or bonded pending appeal for any period of 30 consecutive days, and the aggregate amount of all such judgments equals or exceeds $10,750,000; or

11.11 <u>Change of Control</u>.  A Change of Control shall occur; or

11.12 <u>Intercreditor Agreement</u>.  Any Intercreditor Agreement or any provision thereof shall cease to be in full force or effect, or the Borrower, any Subsidiary of the Borrower or any Person acting for or on behalf of the Borrower or any Subsidiary of the Borrower shall deny or disaffirm the Borrower's or such Subsidiary's obligations under any Intercreditor Agreement or the Borrower or any of its Subsidiaries shall default in the due performance or observance of any term, covenant or agreement on its part to be performed or observed pursuant to any Intercreditor Agreement; or

11.13 <u>Tax Sharing Agreements</u>.  Any provision of any Tax Sharing Agreement to which a Pulitzer Entity is party shall be amended, waived or otherwise modified without the consent of the Required Lenders or Pulitzer shall fail diligently to enforce its rights thereunder in any material respect; or

11.14 <u>Minimum Pension Contribution</u>.  With respect to any fiscal year of the Borrower ending after September 25, 2011, the Lee Entities shall fail to contribute to any qualified or non-qualified pension, retirement or similar employee compensation plans of the Pulitzer Entities (including, without limitation, split-dollar insurance policies) an amount equal to the lesser of (a) $2,000,000 or (b) that amount necessary to meet minimum funding requirements of the Pulitzer Entities with respect to any such plan for such fiscal year in accordance with applicable laws and regulations and consistent with Pulitzer's past practices,

then, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, the Administrative Agent, upon the written request of the Required Lenders, shall by written notice to the Borrower, take any or all of the following actions, without prejudice to the rights of the Administrative Agent, any Lender or the holder of any Note to enforce its claims against any Credit Party (<u>provided</u> that, if an Event of Default specified in Section 11.05 shall occur with respect to the Borrower, the result which would occur upon the giving of written

notice by the Administrative Agent as specified in clause (i) below shall occur automatically without the giving of any such notice):  (i) declare the principal of and any accrued interest in respect of all Loans and the Notes and all Obligations owing hereunder and thereunder to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Credit Party; (ii) enforce, as Collateral Agent, all of the Liens and security interests created pursuant to the Security Documents; and (iii) apply any cash collateral held by the Administrative Agent to the repayment of the Obligations.

SECTION 12. The Administrative Agent.

12.01  Appointment.  The Lenders hereby irrevocably designate and appoint Wilmington Trust, National Association as Administrative Agent (for purposes of this Section 12 and Section 13.01, the term "Administrative Agent" also shall include Wilmington Trust, National Association in its capacity as Collateral Agent under the Security Documents) to act as specified herein and in the other Credit Documents and hereby instruct the Administrative Agent to enter into this Agreement and the other Credit Documents, as applicable.  Each Lender hereby irrevocably authorizes, and each holder of any Note by the acceptance of such Note shall be deemed irrevocably to authorize, the Administrative Agent to take such action on its behalf under the provisions of this Agreement, the other Credit Documents and any other instruments and agreements referred to herein or therein and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of the Administrative Agent by the terms hereof and thereof and such other powers as are reasonably incidental thereto.  The Administrative Agent may perform any of its respective duties hereunder by or through its officers, directors, agents, employees or affiliates.  Notwithstanding anything herein or in any other Credit Document to the contrary, the Administrative Agent shall not take any discretionary action (other than any such actions of a purely administrative or ministerial nature) or exercise any discretionary powers, including in each case any expressions of satisfaction, except such discretionary actions and powers exercised in the manner directed by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under Section 13.12(a)), and in the absence of any such direction shall refrain from taking any such discretionary actions or exercising any such discretionary powers.

12.02  Nature of Duties.  (a) The Administrative Agent shall not have any duties or responsibilities except those expressly set forth in this Agreement and in the other Credit Documents.  Neither the Administrative Agent nor any of its officers, directors, agents, employees or affiliates shall be liable for any action taken or omitted by it or them hereunder or under any other Credit Document or in connection herewith or therewith, unless caused by its or their gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).  The duties of the Administrative Agent shall be mechanical and administrative in nature; the Administrative Agent shall not have by reason of this Agreement or any other Credit Document a fiduciary relationship in respect of any Lender or the holder of any Note; and nothing in this Agreement or in any other Credit Document, expressed or implied, is intended to or shall be so construed as to impose upon the Administrative Agent any obligations in respect of this Agreement or any other Credit Document except as expressly set forth herein or therein.

-86-

(b)    Notwithstanding any other provision of this Agreement or any provision of any other Credit Document, the Joint Lead Arrangers and the Joint Book Running Managers and are named as such for recognition purposes only, and in their respective capacities as such shall have no powers, duties, responsibilities or liabilities with respect to this Agreement or the other Credit Documents or the transactions contemplated hereby and thereby; it being understood and agreed that the Joint Lead Arrangers and the Joint Book Running Managers shall each be entitled to all indemnification and reimbursement rights in favor of the Administrative Agent as, and to the extent, provided for under Sections 12.06 and 13.01.  Without limitation of the fore-going, none of the Joint Lead Arrangers or the Joint Book Running Managers shall, solely by reason of this Agreement or any other Credit Documents, have any fiduciary relationship in respect of any Lender or the holder of any Note.

12.03    Lack of Reliance on the Administrative Agent.  Independently and without reliance upon the Administrative Agent, each Lender and the holder of each Note, to the extent it deems appropriate, has made and shall continue to make (i) its own independent investigation of the financial condition and affairs of the Borrower and its Subsidiaries in connection with the making and the continuance of the Loans and the taking or not taking of any action in connection herewith and (ii) its own appraisal of the creditworthiness of the Borrower and its Subsidiaries and, except as expressly provided in this Agreement, the Administrative Agent shall not have any duty or responsibility, either initially or on a continuing basis, to provide any Lender or the holder of any Note with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter.  The Administrative Agent shall not be responsible to any Lender or the holder of any Note for any recitals, statements, information, representations or warranties herein or in any document, certificate or other writing delivered in connection herewith or for the execution, effectiveness, genuineness, validity, enforceability, perfection, collectibility, priority or sufficiency of this Agreement or any other Credit Document or the financial condition of the Borrower or any of its Subsidiaries or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement or any other Credit Document, or the financial condition of the Borrower or any of its Subsidiaries or the existence or possible existence of any Default or Event of Default.

12.04    Certain Rights of the Administrative Agent.  If the Administrative Agent requests instructions from the Required Lenders with respect to any act or action (including failure to act) in connection with this Agreement or any other Credit Document, the Administrative Agent shall be entitled to refrain from such act or taking such action unless and until the Administrative Agent shall have received instructions from the Required Lenders; and the Administrative Agent shall not incur liability to any Person by reason of so refraining. Without limiting the foregoing, neither any Lender nor the holder of any Note shall have any right of action whatsoever against the Administrative Agent as a result of the Administrative Agent acting or refraining from acting hereunder or under any other Credit Document in accordance with the instructions of the Required Lenders.

12.05    Reliance.  The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, telex, teletype or telecopier message, cablegram, radiogram, order or other document or telephone message signed, sent or made by any Person that the Administrative Agent reasonably believed

to be the proper Person, and, with respect to all legal matters pertaining to this Agreement and any other Credit Document and its duties hereunder and thereunder, upon advice of counsel selected by the Administrative Agent.

12.06    Indemnification.  To the extent the Administrative Agent (or any affiliate thereof) is not reimbursed and indemnified by the Borrower, the Lenders will reimburse and indemnify the Administrative Agent (and any affiliate thereof) in proportion to their respective "percentage" as used in determining the Required Lenders for and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, costs, expenses or disbursements of whatsoever kind or nature which may be imposed on, asserted against or incurred by the Administrative Agent (or any affiliate thereof) in performing its duties hereunder or under any other Credit Document or in any way relating to or arising out of this Agreement or any other Credit Document with respect to such duties or its role as Administrative Agent; provided that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, claims, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's (or such affiliate's) gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

12.07    The Administrative Agent in its Individual Capacity.  With respect to its obligation to make (or be deemed to have made) Loans under this Agreement, the Administrative Agent shall have the rights and powers specified herein for a "Lender" and may exercise the same rights and powers as though it were not performing the duties specified herein; and the term "Lender", "Required Lenders" or any similar terms shall, unless the context clearly indicates otherwise, include the Administrative Agent in its respective individual capacities.  The Administrative Agent and its affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, investment banking, trust or other business with, or provide debt financing, equity capital or other services (including financial advisory services) to any Credit Party or any Affiliate of any Credit Party (or any Person engaged in a similar business with any Credit Party or any Affiliate thereof) as if they were not performing the duties specified herein, and may accept fees and other consideration from any Credit Party or any Affiliate of any Credit Party for services in connection with this Agreement and otherwise without having to account for the same to the Lenders.

12.08    Holders.  The Administrative Agent may deem and treat the payee of any Note as the owner thereof for all purposes hereof unless and until a written notice of the assignment, transfer or endorsement thereof, as the case may be, shall have been filed with the Administrative Agent.  Any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is the holder of any Note shall be conclusive and binding on any subsequent holder, transferee, assignee or endorsee, as the case may be, of such Note or of any Note or Notes issued in exchange therefor.

12.09    Resignation by the Administrative Agent.  (a)  The Administrative Agent may (and must, if so directed by the Required Lenders, with or without cause (any such resignation, a "Mandatory Resignation")) resign from the performance of all its respective functions and duties hereunder and/or under the other Credit Documents (including, for the avoidance of doubt, in its capacity as Collateral Agent) at any time by giving 30 days' prior

written notice of any such resignation (other than a Mandatory Resignation) to the Lenders and, unless a Default or an Event of Default under Section 11.05 then exists, the Borrower.

(b)    Upon any such notice of resignation (or upon a Mandatory Resignation) by the Administrative Agent, the Required Lenders shall appoint a successor Administrative Agent who shall be a financial institution acceptable to the Required Lenders in their sole discretion; provided, that if no Event of Default then exists and such successor Administrative Agent's stated annual fees exceed $75,000 per year, such successor Administrative Agent shall also be reasonably acceptable to the Borrower, which acceptance shall not be unreasonably withheld, delayed or conditioned.

(c)    If a successor Administrative Agent shall not have been so appointed within such 30 day period, the Administrative Agent, with the consent of the Required Lenders (which consent shall not be unreasonably withheld or delayed), shall then appoint a successor Administrative Agent (provided, that if no Event of Default then exists and such successor Administrative Agent's stated annual fees exceed $75,000 per year, such successor Administrative Agent shall also be reasonably acceptable to the Borrower, which acceptance shall not be unreasonably withheld, delayed or conditioned) who shall serve as Administrative Agent until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided above.

(d)    If no successor Administrative Agent has been appointed pursuant to clause (b) or (c) above by the 35th day after the date any such notice of resignation was given by the Administrative Agent, the Administrative Agent's resignation shall become effective and the Required Lenders shall thereafter perform all the duties of the Administrative Agent hereunder and/or under any other Credit Document until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided above.

(e)    Upon a resignation of the Administrative Agent pursuant to this Section 12.09, such former Administrative Agent shall remain indemnified to the extent provided in this Agreement and the other Credit Documents and the provisions of this Section 12 (and the analogous provisions of the other Credit Documents) shall continue in effect for the benefit of such former Administrative Agent for all of its actions and inactions while serving as the Administrative Agent.

12.10    Collateral Matters.  (a) Each Lender authorizes and directs the Collateral Agent to enter into the Security Documents for the benefit of the Lenders and the other Secured Creditors.  Each Lender hereby agrees, and each holder of any Note by the acceptance thereof will be deemed to agree, that, except as otherwise set forth herein, any action taken by the Required Lenders (or all of the Lenders, to the extent required by Section 13.12) in accordance with the provisions of this Agreement or the Security Documents, and the exercise by the Required Lenders (or all of the Lenders, as the case may be) of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Lenders.  The Collateral Agent is hereby authorized on behalf of all of the Lenders, without the necessity of any notice to or further consent from any Lender, from time to time prior to an Event of Default, to take any action with respect to any Collateral or the

-89-

Security Documents which may be necessary to perfect and maintain perfected the security interest in and liens upon the Collateral granted pursuant to the Security Documents.

(b)      The Lenders hereby authorize the Collateral Agent, at its option and in its discretion, to release any Lien granted to or held by the Collateral Agent upon any Collateral (i) upon payment and satisfaction of all of the Obligations at any time arising under or in respect of this Agreement or the Credit Documents or the transactions contemplated hereby or thereby, (ii) constituting property being sold or otherwise disposed of (to Persons other than the Borrower and its Subsidiaries) upon the sale or other disposition thereof in compliance with Section 10.02, (iii) if approved, authorized or ratified in writing by the Required Lenders (or all of the Lenders hereunder, to the extent required by Section 13.12) or (iv) as otherwise may be expressly provided in this Agreement and/or the relevant Security Documents.  Upon request by the Administrative Agent at any time, the Lenders will confirm in writing the Collateral Agent's authority to release particular types or items of Collateral pursuant to this Section 12.10.

(c)      The Collateral Agent shall have no obligation whatsoever to the Lenders or to any other Person to assure that the Collateral exists or is owned by any Credit Party or is cared for, protected or insured or that the Liens granted to the Collateral Agent herein or pursuant hereto have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise or to continue exercising at all or in any manner or under any duty of care, disclosure or fidelity any of the rights, authorities and powers granted or available to the Collateral Agent in this Section 12.10 or in any of the Security Documents, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Collateral Agent may act in any manner it may deem appropriate, in its sole discretion and that the Collateral Agent shall have no duty or liability whatsoever to the Lenders, except for its gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

(d)      The Lenders hereby authorize and instruct the Collateral Agent to enter into each Intercreditor Agreement and to take all actions and execute all documents required or deemed advisable by it in accordance with the terms of each such Intercreditor Agreement.

12.11   Delivery of Information.  The Administrative Agent shall not be required to deliver to any Lender originals or copies of any documents, instruments, notices, communications or other information received by the Administrative Agent from any Credit Party, any Subsidiary, the Required Lenders, any Lender or any other Person under or in connection with this Agreement or any other Credit Document except (i) as specifically provided in this Agreement or any other Credit Document and (ii) as specifically requested from time to time in writing by any Lender with respect to a specific document, instrument, notice or other written communication received by and in the possession of the Administrative Agent at the time of receipt of such request and then only in accordance with such specific request.

SECTION 13. Miscellaneous.

13.01   Payment of Expenses, etc.  The Borrower hereby agrees to:  (i) whether or not the transactions herein contemplated are consummated, reimburse or pay, as the case may be, from time to time all reasonable out-of-pocket costs and expenses (including, without limitation,

the reasonable fees and disbursements of legal counsel (including, without limitation, Milbank, Tweed, Hadley & McCloy LLP and Willkie Farr & Gallagher LLP) and consultants) of each Agent (including, without limitation, any successor Agent contemplated by Section 12.09, including any such successor Agent appointed following a Mandatory Resignation) and each Backstop Party in connection with the preparation, execution, delivery and administration of this Agreement and the other Credit Documents and the documents and instruments referred to herein and therein and any amendment, waiver or consent relating hereto or thereto, and in connection with the enforcement of this Agreement and the other Credit Documents and the documents and instruments referred to herein and therein or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or pursuant to any insolvency or bankruptcy proceedings (including, in each case without limitation, the reasonable fees and disbursements of counsel and consultants for each Agent and, after the occurrence and during the continuance of an Event of Default, each of the Lenders); (ii) without duplication with Section 5.04(a), pay and hold each Agent and each of the Lenders harmless from and against any and all present and future stamp, excise and other similar documentary taxes with respect to the foregoing matters and save each Agent and each of the Lenders harmless from and against any and all liabilities with respect to or resulting from any delay or omission (other than to the extent attributable to such Agent or such Lender) to pay such taxes; and (iii) indemnify each Agent and each Lender, and each of their respective officers, directors, employees, representatives, agents, affiliates, trustees and investment advisors from and hold each of them harmless against any and all liabilities, obligations (including removal or remedial actions), losses, damages, penalties, claims, actions, judgments, suits, costs, expenses and disbursements (including reasonable attorneys' and consultants' fees and disbursements) of whatsoever kind or nature incurred by, imposed on or assessed against any of them as a result of, or arising out of, or in any way related to, or by reason of, (a) any investigation, litigation or other proceeding (whether or not any Agent or any Lender is a party thereto and whether or not such investigation, litigation or other proceeding is brought by or on behalf of any Credit Party) related to the entering into and/or performance of this Agreement or any other Credit Document or the use of the proceeds of any Loans hereunder or the consummation of any transactions contemplated herein or in any other Credit Document or the exercise of any of their rights or remedies provided herein or in the other Credit Documents or in any other way relating to or arising out of this Agreement or any other Credit Document, or (b) the actual or alleged presence of Hazardous Materials in the air, surface water or groundwater or on the surface or subsurface of any Real Property at any time owned, leased or operated by the Borrower or any of its Subsidiaries, the generation, storage, transportation, handling or disposal of Hazardous Materials by the Borrower or any of its Subsidiaries at any location, whether or not owned, leased or operated by the Borrower or any of its Subsidiaries, the non-compliance by the Borrower or any of its Subsidiaries with any Environmental Law (including applicable permits thereunder) applicable to any Real Property, or any Environmental Claim asserted against the Borrower, any of its Subsidiaries or any Real Property at any time owned, leased or operated by the Borrower or any of its Subsidiaries, including, in each case, without limitation, the reasonable fees and disbursements of counsel and other consultants incurred in connection with any such investigation, litigation or other proceeding (but excluding any losses, liabilities, claims, damages or expenses to the extent incurred by reason of the gross negligence or willful misconduct of the Person to be indemnified (as determined by a court of competent jurisdiction in a final and non-appealable decision)).  To the extent that the undertaking to indemnify, pay or

hold harmless any Agent or any Lender set forth in the preceding sentence may be unenforceable because it is violative of any law or public policy, the Borrower shall make the maximum contribution to the payment and satisfaction of each of the indemnified liabilities which is permissible under applicable law.

13.02  Right of Setoff.  (a) Subject to the terms of each Intercreditor Agreement and Section 13.06, in addition to any rights now or hereafter granted under applicable law or otherwise, and not by way of limitation of any such rights, upon the occurrence and during the continuance of an Event of Default, the Administrative Agent and each Lender is hereby authorized at any time or from time to time, without presentment, demand, protest or other notice of any kind to any Credit Party or to any other Person, any such notice being hereby expressly waived, to set off and to appropriate and apply any and all deposits (general or special) and any other Indebtedness at any time held or owing by the Administrative Agent or such Lender (including, without limitation, by branches and agencies of the Administrative Agent or such Lender wherever located) to or for the credit or the account of the Borrower or any other Credit Party against and on account of the Obligations and liabilities of the Credit Parties to the Administrative Agent or such Lender under this Agreement or under any of the other Credit Documents, including, without limitation, all interests in Obligations purchased by such Lender pursuant to Section 13.06(b), and all other claims of any nature or description arising out of or connected with this Agreement or any other Credit Document, irrespective of whether or not the Administrative Agent or such Lender shall have made any demand hereunder and although said Obligations, liabilities or claims, or any of them, shall be contingent or unmatured.

**(b)    NOTWITHSTANDING THE FOREGOING SUBSECTION (a), AT ANY TIME THAT THE LOANS OR ANY OTHER OBLIGATION SHALL BE SECURED BY REAL PROPERTY LOCATED IN CALIFORNIA, NO LENDER SHALL EXERCISE A RIGHT OF SETOFF, LIEN OR COUNTERCLAIM OR TAKE ANY COURT OR ADMINISTRATIVE ACTION OR INSTITUTE ANY PROCEEDING TO ENFORCE ANY PROVISION OF THIS AGREEMENT OR ANY NOTE UNLESS IT IS TAKEN WITH THE CONSENT OF THE REQUIRED LENDERS OR APPROVED IN WRITING BY THE ADMINISTRATIVE AGENT, IF SUCH SETOFF OR ACTION OR PROCEEDING WOULD OR MIGHT (PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 580a, 580b, 580d AND 726 OF THE CALIFORNIA CODE OF CIVIL PROCEDURE OR SECTION 2924 OF THE CALIFORNIA CIVIL CODE, IF APPLICABLE, OR OTHERWISE) AFFECT OR IMPAIR THE VALIDITY, PRIORITY OR ENFORCEABILITY OF THE LIENS GRANTED TO THE COLLATERAL AGENT PURSUANT TO THE SECURITY DOCUMENTS OR THE ENFORCEABILITY OF THE NOTES AND OTHER OBLIGATIONS HEREUNDER, AND ANY ATTEMPTED EXERCISE BY ANY LENDER OF ANY SUCH RIGHT WITHOUT OBTAINING SUCH CONSENT OF THE REQUIRED LENDERS OR THE ADMINISTRATIVE AGENT SHALL BE NULL AND VOID.  THIS SUBSECTION (b) SHALL BE SOLELY FOR THE BENEFIT OF EACH OF THE LENDERS AND THE ADMINISTRATIVE AGENT HEREUNDER.**

13.03  Notices.  Except as otherwise expressly provided herein, all notices and other communications provided for hereunder shall be in writing (including telegraphic, telex, telecopier or cable communication) and mailed, telegraphed, telexed, telecopied, cabled or

delivered:  if to any Credit Party, at the address specified opposite its signature below or in the other relevant Credit Documents; if to any Lender, at its address specified on Schedule II; and if to the Administrative Agent, at the Notice Office; or, as to any Credit Party or the Administrative Agent, at such other address as shall be designated by such party in a written notice to the other parties hereto and, as to each Lender, at such other address as shall be designated by such Lender in a written notice to the Borrower and the Administrative Agent.  All such notices and communications shall, when mailed, telegraphed, telexed, telecopied, or cabled or sent by overnight courier, be effective when deposited in the mails, delivered to the telegraph company, cable company or overnight courier, as the case may be, or sent by telex or telecopier, except that notices and communications to the Administrative Agent and the Borrower shall not be effective until received by the Administrative Agent or the Borrower, as the case may be.

        13.04  <u>Benefit of Agreement; Assignments; Participations</u>.  (a)  This Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto; <u>provided</u>, <u>however</u>, the Borrower may not assign or transfer any of its rights, obligations or interest hereunder without the prior written consent of each Lender and, <u>provided</u>, <u>further</u>, that, although any Lender may transfer, assign or grant participations in its rights hereunder, such Lender shall remain a "Lender" for all purposes hereunder and the transferee, assignee or participant, as the case may be, shall not constitute a "Lender" hereunder and, <u>provided</u>, <u>further</u>, that no Lender shall transfer or grant any participation under which the participant shall have rights to approve any amendment to or waiver of this Agreement or any other Credit Document except to the extent such amendment or waiver would (i) extend the final scheduled maturity of any Loan or Note in which such participant is participating, or reduce the rate or extend the time of payment of interest or Fees thereon (except in connection with a waiver of applicability of any post-default increase in interest rates) or reduce the principal amount thereof (it being understood that any amendment or modification to the financial definitions in this Agreement or to Section 13.07(a) shall not constitute a reduction in the rate of interest or Fees payable hereunder), or increase the amount of the participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default shall not constitute a change in the terms of such participation), (ii) consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement or (iii) release all or substantially all of the Collateral under all of Security Documents (except as expressly provided in the Credit Documents) supporting the Loans in which such participant is participating.  In the case of any such participation, the participant shall not have any rights under this Agreement or any of the other Credit Documents (including, without limitation, any rights of set-off) (the participant's rights against such Lender in respect of such participation to be those set forth in the agreement executed by such Lender in favor of the participant relating thereto) and all amounts payable by the Borrower hereunder shall be determined as if such Lender had not sold such participation.

        (b)     Notwithstanding the foregoing, any Lender (or any Lender together with one or more other Lenders) may (x) assign all or a portion of its outstanding Obligations hereunder to (i)(A) its parent company and/or any affiliate of such Lender which is at least 50% owned by such Lender or its parent company or (B) to one or more other Lenders or any affiliate of any such other Lender which is at least 50% owned by such other Lender or its parent company (<u>provided</u> that any fund that invests in loans and is managed or advised by the same investment advisor of another fund which is a Lender (or by an Affiliate of such investment

advisor) shall be treated as an affiliate of such other Lender for the purposes of this sub-clause (x)(i)(B)), or (ii) in the case of any Lender that is a fund that invests in loans, any other fund that invests in loans and is managed or advised by the same investment advisor of any Lender or by an Affiliate of such investment advisor or (y) assign all, or if less than all, a portion equal to at least $1,000,000 in the aggregate for the assigning Lender or assigning Lenders, of such outstanding Obligations hereunder to one or more Eligible Transferees (treating any fund that invests in loans and any other fund that invests in loans and is managed or advised by the same investment advisor of such fund or by an Affiliate of such investment advisor as a single Eligible Transferee), each of which assignees shall become a party to this Agreement as a Lender by execution of an Assignment and Assumption Agreement, <u>provided</u> that (i) at such time, Schedule I shall be deemed modified to reflect the outstanding Loans of such new Lender and of the existing Lenders, (ii) upon the surrender of the relevant Notes by the assigning Lender (or, upon such assigning Lender's indemnifying the Borrower for any lost Note pursuant to a customary indemnification agreement) new Notes will be issued, at the Borrower's expense, to such new Lender and to the assigning Lender upon the request of such new Lender or assigning Lender, such new Notes to be in conformity with the requirements of Section 2.05 (with appropriate modifications) to the extent needed to reflect the revised outstanding Loans, as the case may be, (iii) the consent of the Administrative Agent and, so long as no Default or Event of Default then exists, the Borrower shall be required in connection with any such assignment pursuant to clause (y) above (each of which consents shall not be unreasonably withheld or delayed), (iv) the Administrative Agent shall receive at the time of each such assignment, from the assigning or assignee Lender, the payment of a non-refundable assignment fee of $3,500, and (v) no such transfer or assignment will be effective until recorded by the Administrative Agent on the Register pursuant to Section 13.15.  To the extent of any assignment pursuant to this Section 13.04(b), the assigning Lender shall be relieved of its obligations hereunder with respect to its assigned outstanding Loans.  At the time of each assignment pursuant to this Section 13.04(b) to a Person which is not already a Lender hereunder, the respective assignee Lender shall, to the extent legally entitled to do so, provide to the Borrower the appropriate Internal Revenue Service Forms (and, if applicable, a Section 5.04(b)(ii) Certificate) described in Section 5.04(b).  To the extent that an assignment of all or any portion of a Lender's outstanding Obligations pursuant to Section 2.13 or this Section 13.04(b) would, at the time of such assignment, result in increased costs under Section 2.10 or 5.04 from those being charged by the respective assigning Lender prior to such assignment, then the Borrower shall not be obligated to pay such increased costs (although the Borrower, in accordance with and pursuant to the other provisions of this Agreement, shall be obligated to pay any other increased costs of the type described above resulting from changes after the date of the respective assignment).

(c)    Nothing in this Agreement shall prevent or prohibit any Lender from pledging its Loans and Notes hereunder to a Federal Reserve Bank in support of borrowings made by such Lender from such Federal Reserve Bank and, with prior notification to the Administrative Agent (but without the consent of the Administrative Agent or the Borrower), any Lender which is a fund may pledge all or any portion of its Loans and Notes to its trustee or to a collateral agent providing credit or credit support to such Lender in support of its obligations to such trustee, such collateral agent or a holder of such obligations, as the case may be.  No pledge pursuant to this clause (c) shall release the transferor Lender from any of its obligations hereunder.

13.05   No Waiver; Remedies Cumulative.  No failure or delay on the part of the Administrative Agent, the Collateral Agent or any Lender in exercising any right, power or privilege hereunder or under any other Credit Document and no course of dealing between the Borrower or any other Credit Party and the Administrative Agent, the Collateral Agent or any Lender shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or under any other Credit Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder or thereunder. The rights, powers and remedies herein or in any other Credit Document expressly provided are cumulative and not exclusive of any rights, powers or remedies which the Administrative Agent, the Collateral Agent or any Lender would otherwise have.  No notice to or demand on any Credit Party in any case shall entitle any Credit Party to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Administrative Agent, the Collateral Agent or any Lender to any other or further action in any circumstances without notice or demand.

13.06   Payments Pro Rata.  (a)  Except as otherwise provided in this Agreement, the Administrative Agent agrees that promptly after its receipt of each payment from or on behalf of the Borrower in respect of any Obligations hereunder, the Administrative Agent shall distribute such payment to the Lenders entitled thereto (other than any Lender that has consented in writing to waive its pro rata share of any such payment) pro rata based upon their respective shares, if any, of the Obligations with respect to which such payment was received.

(b)   Except as otherwise provided in this Agreement, each of the Lenders agrees that, if it should receive any amount hereunder (whether by voluntary payment, by realization upon security, by the exercise of the right of setoff or banker's lien, by counterclaim or cross action, by the enforcement of any right under the Credit Documents, or otherwise), which is applicable to the payment of the principal of, or interest on, the Loans, of a sum which with respect to the related sum or sums received by other Lenders is in a greater proportion than the total of such Obligation then owed and due to such Lender bears to the total of such Obligation then owed and due to all of the Lenders immediately prior to such receipt, then such Lender receiving such excess payment shall purchase for cash without recourse or warranty from the other Lenders an interest in the Obligations of the respective Credit Party to such Lenders in such amount as shall result in a proportional participation by all the Lenders in such amount; provided that if all or any portion of such excess amount is thereafter recovered from such Lenders, such purchase shall be rescinded and the purchase price restored to the extent of such recovery, but without interest.

13.07   Calculations; Computations.  (a)  The financial statements to be furnished to the Lenders pursuant hereto shall be made and prepared in accordance with GAAP consistently applied throughout the periods involved (except as set forth in the notes thereto or as otherwise disclosed in writing by the Borrower to the Lenders); provided that, (i) except as otherwise specifically provided herein, all computations and all definitions (including accounting terms) used in determining compliance with Section 10.07 shall utilize GAAP and policies in conformity with those used to prepare the audited financial statements of the Borrower referred to in Section 8.05(a) for the Borrower's fiscal year ended September 25, 2011 and (ii) to the extent expressly provided herein, certain calculations shall be made on a *pro forma* basis.

(b)      All computations of interest hereunder shall be made on the basis of a year of 365/366 days for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest is payable.

13.08  GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF JURY TRIAL.  (a) THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL, EXCEPT AS OTHERWISE PROVIDED IN ANY MORTGAGE, BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE INTERNAL LAW OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.  ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, IN EACH CASE WHICH ARE LOCATED IN THE COUNTY OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT THE BORROWER HEREBY IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE PERSONAL JURISDICTION OF THE AFORESAID COURTS.  THE BORROWER HEREBY FURTHER IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH COURTS LACK PERSONAL JURISDICTION OVER THE BORROWER, AND AGREES NOT TO PLEAD OR CLAIM, IN ANY LEGAL ACTION PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN ANY OF THE AFOREMENTIONED COURTS, THAT SUCH COURTS LACK PERSONAL JURISDICTION OVER THE BORROWER.  THE BORROWER FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE BORROWER AT ITS ADDRESS SET FORTH OPPOSITE ITS SIGNATURE BELOW, SUCH SERVICE TO BECOME EFFECTIVE 30 DAYS AFTER SUCH MAILING.  THE BORROWER HEREBY IRREVOCABLY WAIVES ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER OR UNDER ANY OTHER CREDIT DOCUMENT THAT SERVICE OF PROCESS WAS IN ANY WAY INVALID OR INEFFECTIVE.  NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE ADMINISTRATIVE AGENT, ANY LENDER OR THE HOLDER OF ANY NOTE TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST THE BORROWER IN ANY OTHER JURISDICTION.

(b)      THE BORROWER HEREBY IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (a) ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY

SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)    EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER CREDIT DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

13.09    <u>Counterparts</u>.    This Agreement may be executed in any number of counterparts (including by facsimile or other electronic transmission) and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.    A set of counterparts executed by all the parties hereto shall be lodged with the Borrower and the Administrative Agent.

13.10    <u>Effectiveness</u>.    This Agreement shall become effective on the date (the "<u>Effective Date</u>") on which (i) the Borrower, the Administrative Agent and each of the Lenders shall have signed a counterpart hereof (whether the same or different counterparts) and shall have delivered the same (including by facsimile or other electronic transmission) to the Administrative Agent at the Notice Office and (ii) each of the conditions precedent set forth in Section 6 shall have been satisfied (<u>provided</u>, that no such condition precedent shall be waived without the prior written consent of each Backstop Party).  The Administrative Agent will give the Borrower and each Lender prompt written notice of the occurrence of the Effective Date.

13.11    <u>Headings Descriptive</u>.    The headings of the several sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

13.12    <u>Amendment or Waiver; etc.</u>    (a)  Neither this Agreement nor any other Credit Document nor any terms hereof or thereof may be changed, waived, discharged or terminated unless such change, waiver, discharge or termination is in writing signed by the respective Credit Parties party hereto or thereto and the Required Lenders (although additional parties may be added to (and annexes may be modified to reflect such additions), and Subsidiaries of the Borrower may be released from, the Subsidiaries Guaranty and the Pledge Agreement in accordance with the provisions hereof and thereof without the consent of the other Credit Parties party thereto or the Required Lenders), <u>provided</u> that no such change, waiver, discharge or termination shall, without the consent of each Lender (with Obligations being directly affected in the case of following clause (i)), (i) extend the final scheduled maturity of any Loan or Note, or reduce the rate or extend the time of payment of interest, premium or Fees thereon (except in connection with the waiver of applicability of any post-default increase in interest rates), or reduce the principal amount thereof (it being understood that any amendment or modification to the financial definitions in this Agreement or to Section 13.07(a) shall not constitute a reduction in the rate of interest or Fees for the purposes of this clause (i)) or remove the non-call period in Section 5.01, or waive any condition in Section 6, (ii) release all or substantially all of the Collateral (except as expressly provided in the Credit Documents) under the Pledge Agreement or the Security Agreement, (iii) amend, modify or waive any provision of

this Section 13.12(a) (except for technical amendments with respect to additional extensions of credit pursuant to this Agreement which afford the protections to such additional extensions of credit of the type provided to the Loans on the Effective Date), (iv) reduce the percentage specified in the definition of Required Lenders (it being understood that, with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Required Lenders on substantially the same basis as the extensions of Loans are included on the Effective Date) or (v) consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement; provided further, that no such change, waiver, discharge or termination shall, (1) without the consent of the Administrative Agent, amend, modify or waive any provision of Section 12 or any other provision as same relates to the rights or obligations of the Administrative Agent, (2) without the consent of Collateral Agent, amend, modify or waive any provision relating to the rights or obligations of the Collateral Agent or (3) without the consent of each Backstop Party, amend, modify or waive any provision or clause of, or any condition set forth in, Section 6.

(b)    If, in connection with any proposed change, waiver, discharge or termination of or to any of the provisions of this Agreement as contemplated by clauses (i) through (v), inclusive, of the first proviso to Section 13.12(a), the consent of the Required Lenders is obtained but the consent of one or more of such other Lenders whose consent is required is not obtained, then the Borrower shall have the right, so long as all non-consenting Lenders whose individual consent is required are treated as described below, to replace each such non-consenting Lender or Lenders with one or more Replacement Lenders pursuant to Section 2.13 so long as at the time of such replacement, each such Replacement Lender consents to the proposed change, waiver, discharge or termination.

13.13    Survival.  All indemnities set forth herein including, without limitation, in Sections 2.10, 5.04, 12.06 and 13.01 shall survive the execution, delivery and termination of this Agreement and the Notes and the making and repayment of the Obligations.

13.14    Domicile of Loans.  Each Lender may transfer and carry its Loans at, to or for the account of any office, Subsidiary or affiliate of such Lender.  Notwithstanding anything to the contrary contained herein, to the extent that a transfer of Loans pursuant to this Section 13.14 would, at the time of such transfer, result in increased costs under Section 2.10 or 5.04 from those being charged by the respective Lender prior to such transfer, then the Borrower shall not be obligated to pay such increased costs (although the Borrower shall be obligated to pay any other increased costs of the type described above resulting from changes after the date of the respective transfer).

13.15    Register.  The Borrower hereby designates the Administrative Agent to serve as its agent, solely for purposes of this Section 13.15, to maintain a register (the "Register") on which it will record the Loans made by each of the Lenders and each repayment in respect of the principal amount of the Loans of each Lender.  Failure to make any such recordation, or any error in such recordation, shall not affect the Borrower's obligations in respect of such Loans.  The Register shall be available for inspection by Borrower, any Backstop Party or any Lender (with respect to any entry relating to such Lender's Loans) at any reasonable time and from time to time upon reasonable prior notice.  With respect to any Lender, the transfer of its rights to the principal of, and interest on, any Loan shall not be effective until such

transfer is recorded on the Register maintained by the Administrative Agent with respect to ownership of such Loan and prior to such recordation all amounts owing to the transferor with respect to such Loan shall remain owing to the transferor.  The registration of assignment or transfer of all or part of any Loans shall be recorded by the Administrative Agent on the Register only upon the acceptance by the Administrative Agent of a properly executed and delivered Assignment and Assumption Agreement pursuant to Section 13.04(b).  Coincident with the delivery of such an Assignment and Assumption Agreement to the Administrative Agent for acceptance and registration of assignment or transfer of all or part of a Loan, or as soon thereafter as practicable, the assigning or transferor Lender shall surrender the Note (if any) evidencing such Loan, and thereupon one or more new Notes in the same aggregate principal amount shall be issued to the assigning or transferor Lender and/or the new Lender at the request of any such Lender.  The Borrower agrees to indemnify the Administrative Agent from and against any and all losses, claims, damages and liabilities of whatsoever nature which may be imposed on, asserted against or incurred by the Administrative Agent in performing its duties under this Section 13.15.  Each Lender that sells a participation, acting solely for this purpose as an agent of the Borrower, shall maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Loans or other obligations under this Agreement (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any participant or any information relating to a participant's interest in any Loans or its other obligations under this Agreement) except to the extent that such disclosure is necessary to establish that such Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive, and such Lender, each Credit Party and the Administrative Agent shall treat each person whose name is recorded in the Participant Register pursuant to the terms hereof as the owner of such participation for all purposes of this Agreement, notwithstanding notice to the contrary.

13.16  Confidentiality.  (a)  Subject to the provisions of clause (b) of this Section 13.16, each Lender agrees that it will use its reasonable efforts not to disclose without the prior consent of the Borrower (other than to its employees, auditors, advisors or counsel or to another Lender if such Lender or such Lender's holding or parent company in its sole discretion determines that any such party should have access to such information, provided such Persons shall be subject to the provisions of this Section 13.16 to the same extent as such Lender) any non-public confidential information with respect to the Borrower or any of its Subsidiaries which is now or in the future furnished pursuant to this Agreement or any other Credit Document, provided that any Lender may disclose any such information (i) as has become generally available to the public other than by virtue of a breach of this Section 13.16(a) by the respective Lender or is or has become available to such Lender on a non-confidential basis, (ii) as may be required or appropriate in any report, statement or testimony submitted to any municipal, state or Federal regulatory body having or claiming to have jurisdiction over such Lender or to the Federal Reserve Board or the Federal Deposit Insurance Corporation or similar organizations (whether in the United States or elsewhere) or their successors, (iii) as may be required or appropriate in respect to any summons or subpoena or in connection with any litigation, (iv) in order to comply with any law, order, regulation or ruling applicable to such Lender, (v) to the Administrative Agent or the Collateral Agent, (vi) to any direct or indirect contractual counterparty in any swap, hedge or similar agreement (or to any such contractual counterparty's

professional advisor) or to any credit insurance provider relating to the Borrower and its obligations, so long as such contractual counterparty (or such professional advisor) or credit insurance provider agrees to be bound by the provisions of this Section 13.16 and (vii) to any prospective or actual transferee or participant in connection with any contemplated transfer or participation of any of the Notes or any interest therein by such Lender, provided that such prospective transferee agrees to be bound by the confidentiality provisions contained in this Section 13.16.

(b)    The Borrower hereby acknowledges and agrees that each Lender may share with any of its affiliates, and such affiliates may share with such Lender, any information related to the Borrower or any of its Subsidiaries (including, without limitation, any non-public customer information regarding the creditworthiness of the Borrower and its Subsidiaries), in each case only if such Lender or affiliate shall have determined in its sole discretion that the Lender or affiliate with whom the information is to be shared should have access to such information; provided that such Persons shall be subject to the provisions of this Section 13.16 to the same extent as such Lender.

13.17    Application of Proceeds.

(a)    After the exercise of remedies (including rights of setoff) provided for in Section 11 (or after the Loans and the Obligations owing hereunder have automatically become immediately due and payable as set forth in Section 11), any amounts received on account of the Obligations (whether as a result of a payment under the Subsidiaries Guaranty, any realization on the Collateral, any setoff rights, any distribution in connection with any proceedings or otherwise and whether received in cash or otherwise) shall be applied in the following order:

First, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including legal fees and expenses payable under the Security Documents) payable to the Collateral Agent in its capacity as such;

Second, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including legal fees and expenses payable under Section 13.01 and amounts payable under Sections 2.10 and 5.04) payable to the Administrative Agent in its capacity as such;

Third, to payment of that portion of the Obligations constituting Fees, indemnities and other fees and amounts (other than principal and interest) payable to the Lenders (including legal fees and expenses payable under Section 13.01 and amounts payable under Sections 2.10 and 5.04), ratably among them in proportion to the amounts described in this clause Third payable to them;

Fourth, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans, ratably among the Lenders in proportion to the respective amounts described in this clause Fourth payable to them;

*Fifth*, to payment of that portion of the Obligations constituting unpaid principal of the Loans, ratably among the applicable Secured Creditors in proportion to the respective amounts described in this clause *Fifth* held by them;

*Sixth*, to the payment of all other Obligations that are due and payable to the Administrative Agent and the other applicable Secured Creditors on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and the other applicable Secured Creditors on such date; and

*Last*, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Borrower or as otherwise required by law.

(b)     If any Secured Creditor collects or receives any amounts received on account of the Obligations to which it is not entitled under Section 13.17(a) hereof, such Secured Creditor shall hold the same in trust for the applicable Secured Creditors entitled thereto and shall forthwith deliver the same to the Administrative Agent, for the account of such Secured Creditors, to be applied in accordance with Section 13.17(a) hereof, in each case until the prior payment in full in cash of the applicable Obligations of such Secured Creditors.

13.18    <u>Certain Releases</u>.  In further consideration of the Lenders' execution of this Agreement, the Borrower, for itself and on behalf of each Credit Party, unconditionally and irrevocably acquits and fully forever releases and discharges each Lender, the Administrative Agent, the Collateral Agent and all affiliates, partners, subsidiaries, officers, employees, agents, attorneys, principals, directors and shareholders of such Persons, and their respective heirs, legal representatives, successors and assigns (collectively, the "<u>Releasees</u>") from any and all claims, demands, causes of action, obligations, remedies, suits, damages and liabilities of any nature whatsoever, whether now known, suspected or claimed, whether arising under common law, in equity or under statute, which such Credit Party ever had or now has against any of the Releasees and which may have arisen at any time prior to the Effective Date and which were in any manner related to this Agreement, any other Credit Document, any Backstop Commitment Letter, the Lee Support Agreement, the Pulitzer Support Agreement or any related document, instrument or agreement or the enforcement or attempted or threatened enforcement by any of the Releasees of any of their respective rights, remedies or recourse related thereto (collectively, the "<u>Released Claims</u>").  The Borrower, for itself and on behalf of each Credit Party, covenants and agrees never to commence, voluntarily aid in any way, prosecute or cause to be commenced or prosecuted against any of the Releasees any action or other proceeding based upon any of the Released Claims.

13.19    <u>The USA PATRIOT Act</u>.  Each Lender subject to the USA PATRIOT ACT (Title 111 of Pub. L. 107-56 (signed into law October 26, 2001)) (the "<u>USA PATRIOT Act</u>") hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies the Borrower and the other Credit Parties and other information that will allow such Lender to identify the Borrower and the other Credit Parties in accordance with the USA PATRIOT Act.

13.20    <u>OID</u>.  THE LOANS HAVE BEEN ISSUED WITH ORIGINAL ISSUE DISCOUNT FOR UNITED STATES FEDERAL INCOME TAX PURPOSES.  THE ISSUE

PRICE, AMOUNT OF SUCH ORIGINAL ISSUE DISCOUNT, ISSUE DATE AND YIELD TO MATURITY OF THESE LOANS MAY BE OBTAINED BY WRITING TO THE ADMINISTRATIVE AGENT AT THE NOTICE OFFICE.

*    *    *

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized officers to execute and deliver this Agreement as of the date first above written.

# TABLE OF CONTENTS

Page

SECTION 1.  Definitions and Accounting Terms. ........................................................1
1.01  Defined Terms ..............................................................................1

SECTION 2.  Amount and Terms of Credit ..............................................................24

2.01  Loans...................................................................................24
2.02  Intentionally Omitted ....................................................................24
2.03  Notice of Borrowing ......................................................................25
2.04  Intentionally Omitted ....................................................................25
2.05  Notes ....................................................................................25
2.06  Intentionally Omitted ....................................................................26
2.07  Intentionally Omitted ....................................................................26
2.08  Interest..................................................................................26
2.09  Intentionally Omitted ....................................................................26
2.10  Increased Costs, Illegality, etc. ........................................................26
2.11  Intentionally Omitted ....................................................................27
2.12  Change of Lending Office .................................................................27
2.13  Replacement of Lenders ...................................................................27

SECTION 3.  Intentionally Omitted ....................................................................28

SECTION 4.  Fees; Call Protection ....................................................................28

4.01  Fees .....................................................................................28
4.02  Call Protection ..........................................................................28

SECTION 5.  Prepayments; Payments; Taxes..............................................................29

5.01  Voluntary Prepayments ....................................................................29
5.02  Mandatory Repayment ......................................................................29
5.03  Method and Place of Payment ..............................................................29
5.04  Net Payments .............................................................................30

SECTION 6.  Conditions Precedent to the Effective Date ...............................................32

6.01  Execution of Agreement; Notes ............................................................32
6.02  Officer's Certificate ....................................................................33
6.03  Opinions of Counsel ......................................................................33
6.04  Company Documents; Proceedings; etc ......................................................33
6.05  Shareholders' Agreements; Tax Sharing Agreements; Existing Indebtedness Agreements; Redemption Agreement.........................................34
6.06  Confirmation Order........................................................................34
6.07  Adverse Change, Approvals ................................................................34
6.08  Litigation................................................................................35
6.09  Subsidiaries Guaranty; Intercompany Subordination Agreement ..............................35

<div align="right">Page</div>

| | | |
|---|---|---|
| 6.10 | Pledge Agreement | 35 |
| 6.11 | Security Agreement | 36 |
| 6.12 | Real Property Collateral | 37 |
| 6.13 | Historical Financial Statements; Projections | 37 |
| 6.14 | Solvency Certificate; Insurance Certificates, etc | 37 |
| 6.15 | Fees, etc. | 37 |
| 6.16 | Transaction Documents | 37 |
| 6.17 | Backstop Commitment Letter Conditions; Newly Issued Equity | 38 |
| 6.18 | No Default; Representations and Warranties | 38 |
| 6.19 | Star Intercompany Obligations | 38 |
| 6.20 | Notice of Borrowing | 38 |

| | | |
|---|---|---|
| SECTION 7. | Intentionally Omitted | 38 |

| | | |
|---|---|---|
| SECTION 8. | Representations, Warranties and Agreements | 38 |

| | | |
|---|---|---|
| 8.01 | Company Status | 39 |
| 8.02 | Power and Authority | 39 |
| 8.03 | No Violation | 39 |
| 8.04 | Approvals | 40 |
| 8.05 | Financial Statements; Financial Condition; Undisclosed Liabilities; Projections | 40 |
| 8.06 | Litigation | 41 |
| 8.07 | True and Complete Disclosure | 42 |
| 8.08 | Use of Proceeds; Margin Regulations | 42 |
| 8.09 | Tax Returns and Payments | 42 |
| 8.10 | Compliance with ERISA | 43 |
| 8.11 | Security Documents | 44 |
| 8.12 | Properties | 45 |
| 8.13 | Capitalization | 45 |
| 8.14 | Subsidiaries | 45 |
| 8.15 | Compliance with Statutes, etc. | 45 |
| 8.16 | Investment Company Act | 46 |
| 8.17 | Solvency | 46 |
| 8.18 | Environmental Matters | 46 |
| 8.19 | Employment and Labor Relations | 47 |
| 8.20 | Intellectual Property, etc. | 47 |
| 8.21 | Indebtedness | 47 |
| 8.22 | Insurance | 48 |
| 8.23 | Foreign Assets Control Regulations, Etc | 48 |
| 8.24 | Representations and Warranties in Other Documents | 48 |

| | | |
|---|---|---|
| SECTION 9. | Affirmative Covenants | 49 |

| | | |
|---|---|---|
| 9.01 | Information Covenants | 49 |
| 9.02 | Books, Records and Inspections; Quarterly Meetings | 54 |
| 9.03 | Maintenance of Property; Insurance | 55 |
| 9.04 | Existence; Franchises | 55 |

Page

9.05   Compliance with Statutes, etc..................................................................55
9.06   Compliance with Environmental Laws.......................................................56
9.07   ERISA ......................................................................................................57
9.08   End of Fiscal Years .................................................................................58
9.09   Performance of Obligations .....................................................................58
9.10   Payment of Taxes.....................................................................................58
9.11   Use of Proceeds........................................................................................58
9.12   Further Assurances; etc............................................................................58
9.13   Ownership of Subsidiaries; etc. ...............................................................60
9.14   Compliance with Pulitzer Debt Documents..............................................60
9.15   Foreign Subsidiaries Security...................................................................60
9.16   Mortgage; Title Insurance; Survey; Landlord Waivers; etc. ...................61
9.17   Terrorism Sanctions Regulations .............................................................62

SECTION 10. Negative Covenants ............................................................................62

10.01  Liens.........................................................................................................62
10.02  Consolidation, Merger, Purchase or Sale of Assets, etc. ........................65
10.03  Dividends .................................................................................................68
10.04  Indebtedness.............................................................................................69
10.05  Advances, Investments and Loans ...........................................................71
10.06  Transactions with Affiliates .....................................................................75
10.07  Capital Expenditures ................................................................................76
10.08  Intentionally Omitted ...............................................................................77
10.09  Anti-Layering............................................................................................77
10.10  Modifications of Pulitzer Debt Documents, First Lien Credit Documents,
       Certificate of Incorporation, By-Laws and Certain Other Agreements;
       Limitations on Voluntary Payments, etc...................................................77
10.11  Limitation on Certain Restrictions on Subsidiaries .................................80
10.12  Limitation on Issuance of Equity Interests ..............................................81
10.13  Business; etc.............................................................................................81
10.14  Limitation on Creation of Subsidiaries ....................................................81

SECTION 11. Events of Default ................................................................................82

11.01  Payments ..................................................................................................82
11.02  Representations, etc. .................................................................................82
11.03  Covenants..................................................................................................82
11.04  Default Under Other Agreements .............................................................82
11.05  Bankruptcy, etc. .......................................................................................83
11.06  ERISA ......................................................................................................83
11.07  Security Documents ..................................................................................84
11.08  Subsidiaries Guaranty ..............................................................................84
11.09  Intercompany Subordination Agreement ..................................................85
11.10  Judgments .................................................................................................85
11.11  Change of Control.....................................................................................85
11.12  Intercreditor Agreement ...........................................................................85
11.13  Tax Sharing Agreements...........................................................................85

Page

11.14   Minimum Pension Contribution ........................................................................85

SECTION 12. The Administrative Agent.........................................................................86

12.01   Appointment ......................................................................................................86
12.02   Nature of Duties................................................................................................86
12.03   Lack of Reliance on the Administrative Agent....................................................87
12.04   Certain Rights of the Administrative Agent ........................................................87
12.05   Reliance..............................................................................................................87
12.06   Indemnification ..................................................................................................88
12.07   The Administrative Agent in its Individual Capacity ..........................................88
12.08   Holders...............................................................................................................88
12.09   Resignation by the Administrative Agent............................................................88
12.10   Collateral Matters...............................................................................................89
12.11   Delivery of Information ......................................................................................90

SECTION 13. Miscellaneous ..........................................................................................90

13.01   Payment of Expenses, etc. ..................................................................................90
13.02   Right of Setoff....................................................................................................92
13.03   Notices ...............................................................................................................92
13.04   Benefit of Agreement; Assignments; Participations............................................93
13.05   No Waiver; Remedies Cumulative ......................................................................95
13.06   Payments Pro Rata .............................................................................................95
13.07   Calculations; Computations ...............................................................................95
13.08   GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE;
        WAIVER OF JURY TRIAL..............................................................................96
13.09   Counterparts .......................................................................................................97
13.10   Effectiveness.......................................................................................................97
13.11   Headings Descriptive ..........................................................................................97
13.12   Amendment or Waiver; etc..................................................................................97
13.13   Survival...............................................................................................................98
13.14   Domicile of Loans...............................................................................................98
13.15   Register ...............................................................................................................98
13.16   Confidentiality ....................................................................................................99
13.17   Application of Proceeds.....................................................................................100
13.18   Certain Releases ...............................................................................................101
13.19   The USA PATRIOT Act....................................................................................101
13.20   OID ...................................................................................................................101

SCHEDULE I          Lenders; Loans
SCHEDULE II         Lender Addresses
SCHEDULE III        [Intentionally Omitted]
SCHEDULE IV         Plans
SCHEDULE V          Subsidiaries
SCHEDULE VI         Existing Indebtedness
SCHEDULE VII        Insurance
SCHEDULE VIII       Existing Liens
SCHEDULE IX         Existing Investments
SCHEDULE X          Real Property
SCHEDULE XI         Litigation


EXHIBIT A           Form of Notice of Borrowing
EXHIBIT B           Form of Note
EXHIBIT C           [Intentionally Omitted]
EXHIBIT D           Form of Section 5.04(b)(ii) Certificate
EXHIBIT E           Form of Effective Date Certificate
EXHIBIT F           Form of Officers' Certificate
EXHIBIT G           Form of Subsidiaries Guaranty
EXHIBIT H           Form of Intercompany Subordination Agreement
EXHIBIT I-1         Form of Pledge Agreement
EXHIBIT I-2         Form of Security Agreement
EXHIBIT J           Form of Solvency Certificate
EXHIBIT K           Form of Compliance Certificate
EXHIBIT L           Form of Assignment and Assumption Agreement
EXHIBIT M           Form of Intercompany Note
EXHIBIT N-1         Form of Lee Intercreditor Agreement
EXHIBIT N-2         Form of Pulitzer Intercreditor Agreement
EXHIBIT O           Specified Affiliate Activities

<u>EXHIBIT A</u>
TO SECOND LIEN LOAN AGREEMENT

FORM OF

<u>NOTICE OF BORROWING</u>

*[DATE]*

Wilmington Trust, National Association, as
    Administrative Agent (the "<u>Administrative</u>
    <u>Agent</u>") for the Lenders party to the Loan
    Agreement referred to below
50 South Sixth Street, Suite 1290
Minneapolis, MN 55402
Phone: (612) 217-5637
Fax: (612) 217-5651
Email: jjames@WilmingtonTrust.com
Attn: Josh James

Ladies and Gentlemen:

    The undersigned, Lee Enterprises, Incorporated, a Delaware corporation (the "<u>Borrower</u>"), refers to the Second Lien Loan Agreement, dated as of on or about the date hereof (as amended, restated, modified and/or supplemented from time to time, the "<u>Loan Agreement</u>"; the capitalized terms defined therein being used herein as therein defined), among the Borrower, the lenders from time to time party thereto (each, a "<u>Lender</u>" and collectively, the "<u>Lenders</u>"), Deutsche Bank Securities Inc. and Goldman Sachs Lending Partners LLC, as Joint Lead Arrangers and Joint Book Running Managers, and you, as Administrative Agent for such Lenders, and hereby gives you notice, irrevocably, pursuant to Section 2.03 of the Loan Agreement, that the undersigned hereby requests the Borrowing under the Loan Agreement (herein, the "<u>Proposed Borrowing</u>"), and in that connection sets forth below the information required by Section 2.03 of the Loan Agreement:

    (i)      The Business Day of the Proposed Borrowing is [DATE].

    (ii)     The aggregate principal amount of the Proposed Borrowing is $[__].

    The undersigned hereby certifies that the following statements are true on the date hereof, and will be true on the date of the Proposed Borrowing:

    (A)    all of the conditions precedent to the Effective Date set forth in Section 6 of the Loan Agreement shall have been satisfied (or waived in accordance with the terms of the Loan Agreement, including with the prior written consent of each Backstop Party);

    (B)    the representations and warranties contained in the Loan Agreement and in the other Credit Documents are and will be true and correct in all material respects, both before and after giving effect to the Proposed Borrowing, as though made on such date,

unless stated to relate to a specific earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date; and

(C)     no Default or Event of Default has occurred and is continuing, or would result from such Proposed Borrowing.

<div style="margin-left:40%">

Very truly yours,

LEE ENTERPRISES, INCORPORATED


By:_____
    Name:
    Title:

</div>

<u>EXHIBIT B</u>
**TO SECOND LIEN LOAN AGREEMENT**

<u>FORM OF</u>

<u>NOTE</u>

$_____                                                    New York, New York
                                                           _____ __, ____

FOR VALUE RECEIVED, LEE ENTERPRISES, INCORPORATED, a Delaware corporation (the "<u>Borrower</u>"), hereby promises to pay to _____ or its registered assigns (the "<u>Lender</u>"), in lawful money of the United States of America in immediately available funds, at the Payment Office (such term and all other capitalized terms used herein shall have the meanings ascribed thereto in the Loan Agreement referred to below) initially located at 50 South Sixth Street, Suite 1290, Minneapolis, MN 55402, Attention: Wilmington Trust Loan Agency Group, on the Maturity Date the principal sum of _____ DOLLARS ($_____) or, if less, the unpaid principal amount of all Loans made by the Lender pursuant to the Loan Agreement, payable at such times and in such amounts as are specified in the Loan Agreement.

The Borrower also promises to pay interest on the unpaid principal amount of each Loan made by the Lender in like money at said office from the date hereof until paid at the rates and at the times provided in Section 2.08 of the Loan Agreement.

This Note is one of the Notes referred to in the Second Lien Loan Agreement, dated as of [_____], among the Borrower, the lenders from time to time party thereto (including the Lender), Deutsche Bank Securities Inc. and Goldman Sachs Lending Partners LLC, as Joint Lead Arrangers and Joint Book Running Managers, and Wilmington Trust, National Association, as Administrative Agent (as amended, restated, modified and/or supplemented from time to time, the "<u>Loan Agreement</u>"), and is entitled to the benefits thereof and of the other Credit Documents. This Note is secured by the Security Documents and is entitled to the benefits of the Subsidiaries Guaranty. As and to the extent provided in the Loan Agreement, this Note is subject to voluntary prepayment (in whole or in part) on or after the first anniversary of the Effective Date, subject to the provisions of Section 4.02 of the Loan Agreement.

In case an Event of Default shall occur and be continuing, the principal of and accrued interest on this Note may be declared to be due and payable in the manner and with the effect provided in the Loan Agreement.

The Borrower hereby waives presentment, demand, protest or notice of any kind in connection with this Note.

**THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK.**

LEE ENTERPRISES, INCORPORATED

By:_____
    Name:
    Title:

**EXHIBIT C**
**TO SECOND LIEN LOAN AGREEMENT**

[Intentionally Omitted]

FORM OF

SECTION 5.04(b)(ii) CERTIFICATE

(For Non-U.S. Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Second Lien Loan Agreement, dated as of [_____], among Lee Enterprises, Incorporated, the Lenders from time to time party thereto, Deutsche Bank Securities Inc. and Goldman Sachs Lending Partners LLC, as Joint Lead Arrangers and Joint Book Running Managers, and Wilmington Trust, National Association, as Administrative Agent (as amended, restated, modified and/or supplemented from time to time, the "Loan Agreement").  Unless otherwise defined herein, terms defined in the Loan Agreement and used herein shall have the meanings given to them in the Loan Agreement.

Pursuant to the provisions of Section 5.04(b)(ii) of the Loan Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code and (v) the interest payments in question are not effectively connected with the undersigned's conduct of a U.S. trade or business.

The undersigned has furnished the Administrative Agent and the Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF LENDER]

By:_____
    Name:
    Title:

Date: _____, _____

FORM OF

SECTION 5.04(b)(ii) CERTIFICATE

(For Non-U.S. Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Second Lien Loan Agreement, dated as of [_____], among Lee Enterprises, Incorporated, the Lenders from time to time party thereto, Deutsche Bank Securities Inc. and Goldman Sachs Lending Partners LLC, as Joint Lead Arrangers and Joint Book Running Managers, [_____] as [_____], and Wilmington Trust, National Association, as Administrative Agent (as amended, restated, modified and/or supplemented from time to time, the "Loan Agreement").  Unless otherwise defined herein, terms defined in the Loan Agreement and used herein shall have the meanings given to them in the Loan Agreement.

Pursuant to the provisions of Section 5.04(b)(ii) of the Loan Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this Loan Agreement, neither the undersigned nor any of its partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, (v) none of its partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code, and (vi) the interest payments in question are not effectively connected with the undersigned's or its partners/members' conduct of a U.S. trade or business.

The undersigned has furnished the Administrative Agent and the Borrower with IRS Form W-8IMY accompanied by an IRS Form W-8BEN from each of its partners/members claiming the portfolio interest exemption.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF LENDER]


By:_____
        Name:
        Title:

Date: _____, _____

FORM OF

EFFECTIVE DATE CERTIFICATE

[*DATE*]

This Effective Date Certificate (this "Certificate") is furnished pursuant to Section 6.05 of the Second Lien Loan Agreement, dated as of [_____], among [Lee Enterprises, Incorporated] [the Company], the lenders from time to time party thereto, Deutsche Bank Securities Inc. and Goldman Sachs Lending Partners LLC, as Joint Lead Arrangers and Joint Book Running Managers, and Wilmington Trust, National Association, as Administrative Agent (such Loan Agreement, as in effect on the date of this Certificate, being herein called the "Loan Agreement").  Unless otherwise defined herein, capitalized terms used in this Certificate shall have the meanings set forth in the Loan Agreement.

The undersigned hereby certifies, represents and warrants, for and on behalf of the Borrower, that, as of the Effective Date:

1.    Authority.  The undersigned is an Authorized Officer of the Borrower and, in such capacity, is authorized and empowered to execute this Certificate on behalf of the Borrower.

2.    Shareholders' Agreements.  Attached hereto as Annex I are true and correct copies of all Shareholders' Agreements of the Borrower and its Subsidiaries required to be delivered to the Administrative Agent pursuant to Section 6.05(i) of the Loan Agreement.

3.    Tax Sharing Agreements.  Attached hereto as Annex II are true and correct copies of all Tax Sharing Agreements of the Borrower and its Subsidiaries required to be delivered to the Administrative Agent pursuant to Section 6.05(ii) of the Loan Agreement.

4.    Existing Indebtedness Agreements.  Attached hereto as Annex III are true and correct copies of all Existing Indebtedness Agreements of the Borrower and its Subsidiaries required to be delivered to the Administrative Agent pursuant to Section 6.05(iii) of the Loan Agreement.

5.    Redemption Agreement.   Attached hereto as Annex IV is a true and correct copy of the Redemption Agreement.

6.        IN WITNESS WHEREOF, the undersigned has caused this Certificate to be executed and delivered, and the certifications, representations and warranties contained herein to be made, by its Authorized Officer as of the date hereof.

LEE ENTERPRISES, INCORPORATED


By:_____
    Name:
    Title:

FORM OF

OFFICER CERTIFICATE

I, the undersigned, [Chairman/Chief Executive Officer/President/Vice-President] of [Name of Credit Party], a [corporation] organized and existing under the laws of the State of [_____] (the "Company"), [which corporation constitutes the general partner of _____, a _____ [general] [limited] partnership (the "Partnership"),] [which corporation constitutes the managing member of _____, a _____ limited liability company (the "Limited Liability Company"),] do hereby certify, solely in my capacity as an Authorized Officer of the Company and not in my individual capacity, on behalf of the Company[, as the general partner of the Partnership] [, as the managing member of the Limited Liability Company], that:

1.     This Certificate is furnished pursuant to the Second Lien Loan Agreement, dated as of [_____], among [Lee Enterprises, Incorporated] [the Company], the lenders from time to time party thereto, Deutsche Bank Securities Inc. and Goldman Sachs Lending Partners LLC, as Joint Lead Arrangers and Joint Book Running Managers, and Wilmington Trust, National Association, as Administrative Agent (such Loan Agreement, as in effect on the date of this Certificate, being herein called the "Loan Agreement"). Unless otherwise defined herein, capitalized terms used in this Certificate shall have the meanings set forth in the Loan Agreement.

2.     The following named individuals are duly elected or appointed officers of the Company, and each holds the office of the Company set forth opposite such individual's name. The signature written opposite the name and title of each such officer is such officer's genuine signature.

| Name[1] | Office | Signature |
|---------|--------|-----------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

3.     Attached hereto as Exhibit A is a certified copy of the [Certificate of Incorporation of the Company][Certificate of Partnership of the Partnership] [Certificate of Formation of the Limited Liability Company], as filed in the [Office of the Secretary of State] of the State of [_____] on [_____ __, ____], together with all amendments thereto adopted through the date hereof.

---

[1]     Include name, office and signature of each officer who will sign any Credit Document on behalf of the Company, including the officer who will sign the certification at the end of this Certificate or related documentation.

4.      Attached hereto as Exhibit B is a [true and correct copy of the By-Laws of the Company which were duly adopted and are in full force and effect on the date hereof], [certified copy of the [Partnership Agreement of the Partnership] [Limited Liability Company Agreement of the Limited Liability Company] [, as filed in the office of the Secretary of State of the State of [_____] on [_____ __, _____]], together with all amendments thereto adopted through the date hereof.

5.      Attached hereto as Exhibit C is a true and correct copy of resolutions which were duly adopted on _____ __, _____ [by unanimous written consent of the Board of Directors of the Company] [by a meeting of the Board of Directors of the Company at which a quorum was present and acting throughout], and said resolutions have not been rescinded, amended or modified.  Except as attached hereto as Exhibit C, no resolutions have been adopted by the Board of Directors of the Company which deal with the execution, delivery or performance of any of the Credit Documents to which the Company[, as the general partner of the Partnership] [, as the managing member of the Limited Liability Company,] is a party or the transactions contemplated thereby.

6.      Attached hereto as Exhibit D is a true and complete copy of a "good standing" certificate (or equivalent) in respect of the Company issued as of a recent date by the Secretary of State or other appropriate governmental authority of the Company's jurisdiction of organization.

7.      On the date hereof, all of the conditions set forth in Sections 6.07, 6.08 and 6.18 of the Loan Agreement have been satisfied.

8.      On the date hereof, all representations and warranties of the Company or any of its Subsidiaries contained in the Loan Agreement, in the other Credit Documents, the First Lien Credit Documents, the Pulitzer Debt Documents, each Backstop Commitment Letter, the Lee Support Agreement and the Pulitzer Support Agreement are true and correct in all material respects with the same effect as though such representations and warranties had been made on the date hereof, both before and after giving effect to the transactions contemplated to occur on the Effective Date, unless stated to relate to a specific earlier date, in which case such representations and warranties were true and correct in all material respects as of such earlier date.

9.      On the date hereof, no Default or Event of Default has occurred and is continuing or would result from any Credit Event to occur on the date hereof.

10.      There is no pending proceeding for the dissolution or liquidation of [the Company] [and/or the [Partnership] [Limited Liability Company]] or, to the knowledge of the undersigned, threatening its existence.

IN WITNESS WHEREOF, I have hereunto set my hand this __ day of _____, _____.

[NAME OF CREDIT PARTY]

By:_____
    Name:
    Title:

I, the undersigned, [Secretary/Assistant Secretary] of the Company, do hereby certify, solely in my capacity as an officer of the Company and not in my individual capacity, on behalf of the Company [, as general partner of the Partnership,] [, as the managing member of the Limited Liability Company,] that:

1.       [Name of Person making above certifications] is the duly elected and qualified [Chairman/Chief Executive Officer/President/Vice-President] of the Company and the signature above is such person's genuine signature.

2.       The certifications made by [name of person making above certifications] on behalf of the Company in Items 2, 3, 4, 5 and 6 above are true and correct.

IN WITNESS WHEREOF, I have hereunto set my hand this __ day of _____, ____.

<div style="text-align:center">[NAME OF CREDIT PARTY]</div>

By:_____
    Name:
    Title:

FORM OF

SUBSIDIARIES GUARANTY

SUBSIDIARIES GUARANTY (as amended, modified, restated and/or supplemented from time to time, this "Guaranty"), dated as of [_____], made by and among each of the undersigned guarantors (each, a "Guarantor" and, together with any other entity that becomes a guarantor hereunder pursuant to Section 22 hereof, collectively, the "Guarantors") in favor of Wilmington Trust, National Association, as Administrative Agent (together with any successor administrative agent, the "Administrative Agent"), for the benefit of the Secured Creditors (as defined below).  Except as otherwise defined herein, all capitalized terms used herein and defined in the Loan Agreement (as defined below) shall be used herein as therein defined.

W I T N E S S E T H :

WHEREAS, Lee Enterprises, Incorporated (the "Borrower"), the lenders from time to time party thereto (the "Lenders"), Deutsche Bank Securities Inc. and Goldman Sachs Lending Partners LLC, as Joint Lead Arrangers and Joint Book Running Managers, and the Administrative Agent have entered into a Second Lien Loan Agreement, dated as of [_____], (as amended, modified, restated and/or supplemented from time to time, the "Loan Agreement"), providing for the making and continuation of Loans to the Borrower, as contemplated therein (the Lenders, the Administrative Agent and the Collateral Agent are herein called the "Secured Creditors");

WHEREAS, each Guarantor is a direct or indirect Subsidiary of the Borrower;

WHEREAS, it is a condition precedent to the making and continuation of Loans to the Borrower under the Loan Agreement that each Guarantor shall have executed and delivered to the Administrative Agent this Guaranty; and

WHEREAS, each Guarantor will obtain benefits from the incurrence and continuation of Loans by the Borrower under the Loan Agreement and, accordingly, desires to execute this Guaranty in order to satisfy the condition described in the preceding paragraph and to induce the Lenders to make (or be deemed to have made) and continue Loans to the Borrower.

NOW, THEREFORE, in consideration of the foregoing and other benefits accruing to each Guarantor, the receipt and sufficiency of which are hereby acknowledged, each Guarantor hereby makes the following representations and warranties to the Administrative Agent for the benefit of the Secured Creditors and hereby covenants and agrees with each other Guarantor and the Administrative Agent for the benefit of the Secured Creditors as follows:

1.    Guaranty.    (a)    Each Guarantor, jointly and severally, irrevocably, absolutely and unconditionally guarantees as a primary obligor and not merely as surety to the Secured Creditors the full and prompt payment when due (whether at the stated maturity, by required prepayment, declaration, acceleration, demand or otherwise), subject to any applicable grace periods set forth in the Credit Documents, of (x) the principal of, premium, if any, and

interest on the Notes issued by, and the Loans made to, the Borrower under the Loan Agreement, and (y) all other obligations (including, without limitation, obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due), liabilities and indebtedness owing by the Borrower to the Secured Creditors under each Credit Document to which the Borrower is a party (including, without limitation, indemnities, Fees and interest thereon (including, without limitation, any interest accruing after the commencement of any bankruptcy, insolvency, receivership or similar proceeding at the rate provided for in the Loan Agreement, whether or not such interest is an allowed claim in any such proceeding)), whether now existing or hereafter incurred under, arising out of or in connection with each such Credit Document and the due performance and compliance by the Borrower with all of the terms, conditions, covenants and agreements contained in all such Credit Documents (all such principal, premium, interest, liabilities, indebtedness and obligations under this clause being herein collectively called the "Guaranteed Obligations").

(b)     Each Guarantor understands, agrees and confirms that the Secured Creditors may enforce this Guaranty up to the full amount of the Guaranteed Obligations against such Guarantor without proceeding against any other Guarantor or the Borrower, or against any security for the Guaranteed Obligations, or under any other guaranty covering all or a portion of the Guaranteed Obligations.  This Guaranty is a guaranty of prompt payment and performance and not of collection.

Additionally, each Guarantor, jointly and severally, unconditionally, absolutely and irrevocably, guarantees the payment of any and all Guaranteed Obligations whether or not due or payable by the Borrower upon the occurrence in respect of the Borrower of any of the events specified in Section 11.05 of the Loan Agreement, and unconditionally, absolutely and irrevocably, jointly and severally, promises to pay such Guaranteed Obligations to the Secured Creditors, or order, on demand.

2.     Liability of Guarantors Absolute.   The liability of each Guarantor hereunder is primary, absolute, joint and several, and unconditional and is exclusive and independent of any security for or other guaranty of the indebtedness of the Borrower whether executed by such Guarantor, any other Guarantor, any other guarantor or by any other party, and the liability of each Guarantor hereunder shall not be affected or impaired by any circumstance or occurrence whatsoever, including, without limitation:  (a) any direction as to application of payment by the Borrower or any other party, (b) any other continuing or other guaranty, undertaking or maximum liability of a Guarantor or of any other party as to the Guaranteed Obligations, (c) any payment on or in reduction of any such other guaranty or undertaking, (d) any dissolution, termination or increase, decrease or change in personnel by the Borrower, (e) the failure of the Guarantor to receive any benefit from or as a result of its execution, delivery and performance of this Guaranty, (f) any payment made to any Secured Creditor on the indebtedness which any Secured Creditor repays the Borrower pursuant to court order in any bankruptcy, reorganization, arrangement, moratorium or other debtor relief proceeding, and each Guarantor waives any right to the deferral or modification of its obligations hereunder by reason of any such proceeding, (g) any action or inaction by the Secured Creditors as contemplated in Section 5 hereof or (h) any invalidity, rescission, irregularity or unenforceability of all or any part of the Guaranteed Obligations or of any security therefor.

3.     <u>Obligations of Guarantors Independent</u>.    The obligations of each Guarantor hereunder are independent of the obligations of any other Guarantor or the Borrower, and a separate action or actions may be brought and prosecuted against each Guarantor whether or not action is brought against any other Guarantor or the Borrower and whether or not any other Guarantor or the Borrower be joined in any such action or actions.  Each Guarantor waives (to the fullest extent permitted by applicable law) the benefits of any statute of limitations affecting its liability hereunder or the enforcement thereof.  Any payment by the Borrower or other circumstance which operates to toll any statute of limitations as to the Borrower shall operate to toll the statute of limitations as to each Guarantor.

4.     <u>Waivers by Guarantors</u>.  (a) Each Guarantor hereby waives (to the fullest extent permitted by applicable law) notice of acceptance of this Guaranty and notice of the existence, creation or incurrence of any new or additional liability to which it may apply, and waives promptness, diligence, presentment, demand of payment, demand for performance, protest, notice of dishonor or nonpayment of any such liabilities, suit or taking of other action by the Administrative Agent or any other Secured Creditor against, and any other notice to, any party liable thereon (including such Guarantor, any other Guarantor, any other guarantor or the Borrower) and each Guarantor further hereby waives any and all notice of the creation, renewal, extension or accrual of any of the Guaranteed Obligations and notice of proof of reliance by any Secured Creditor upon this Guaranty, and the Guaranteed Obligations shall conclusively be deemed to have been created, contracted or incurred, or renewed, extended, amended, modified, supplemented or waived, in reliance upon this Guaranty.

(b)     Each Guarantor waives any right to require the Secured Creditors to: (i) proceed against the Borrower, any other Guarantor, any other guarantor of the Guaranteed Obligations or any other party; (ii) proceed against or exhaust any security held from the Borrower, any other Guarantor, any other guarantor of the Guaranteed Obligations or any other party; or (iii) pursue any other remedy in the Secured Creditors' power whatsoever.  Each Guarantor waives any defense based on or arising out of any defense of the Borrower, any other Guarantor, any other guarantor of the Guaranteed Obligations or any other party other than payment in full in cash of the Guaranteed Obligations, including, without limitation, any defense based on or arising out of the disability of the Borrower, any other Guarantor, any other guarantor of the Guaranteed Obligations or any other party, or the unenforceability of the Guaranteed Obligations or any part thereof from any cause, or the cessation from any cause of the liability of the Borrower, other than payment in full in cash of the Guaranteed Obligations.  The Secured Creditors may, at their election and in accordance with the applicable Intercreditor Agreement, foreclose on any collateral serving as security held by the Administrative Agent, the Collateral Agent or the other Secured Creditors by one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable (to the extent such sale is permitted by applicable law), or exercise any other right or remedy the Secured Creditors may have against the Borrower or any other party or any security, without affecting or impairing in any way the liability of any Guarantor hereunder except to the extent the Guaranteed Obligations have been paid in full in cash.  Each Guarantor waives any defense arising out of any such election by the Secured Creditors, even though such election operates to impair or extinguish any right of reimbursement, contribution, indemnification or subrogation or other right or remedy of such Guarantor against the Borrower, any other guarantor of the Guaranteed Obligations or any other party or any security.

(c)     Each Guarantor has knowledge and assumes all responsibility for being and keeping itself informed of the Borrower's, and each other Guarantor's financial condition, affairs and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks which such Guarantor assumes and incurs hereunder, and has adequate means to obtain from the Borrower and each other Guarantor on an ongoing basis information relating thereto and the Borrower's and each other Guarantor's ability to pay and perform its respective Guaranteed Obligations, and agrees to assume the responsibility for keeping, and to keep, so informed for so long as this Guaranty is in effect.  Each Guarantor acknowledges and agrees that (x) the Secured Creditors shall have no obligation to investigate the financial condition or affairs of the Borrower or any other Guarantor for the benefit of such Guarantor nor to advise such Guarantor of any fact respecting, or any change in, the financial condition, assets or affairs of the Borrower or any other Guarantor that might become known to any Secured Creditor at any time, whether or not such Secured Creditor knows or believes or has reason to know or believe that any such fact or change is unknown to such Guarantor, or might (or does) increase the risk of such Guarantor as guarantor hereunder, or might (or would) affect the willingness of such Guarantor to continue as a guarantor of the Guaranteed Obligations hereunder and (y) the Secured Creditors shall have no duty to advise any Guarantor of information known to them regarding any of the aforementioned circumstances or risks.

(d)     Each Guarantor hereby acknowledges and agrees that no Secured Creditor nor any other Person shall be under any obligation (a) to marshal any assets in favor of such Guarantor or the obligation of such Guarantor hereunder or (b) to pursue any other remedy that such Guarantor may or may not be able to pursue itself any right to which such Guarantor hereby waives.

(e)     Each Guarantor warrants and agrees that each of the waivers set forth in Section 3 and in this Section 4 is made with full knowledge of its significance and consequences and that if any of such waivers are determined to be contrary to any applicable law or public policy, such waivers shall be effective only to the maximum extent permitted by applicable law.

5.     <u>Rights Of Secured Creditors</u>.  Subject to Sections 4 and 13 hereof, any Secured Creditor may (except as shall be required by applicable statute and cannot be waived) at any time and from time to time without the consent of, or notice to, any Guarantor, without incurring responsibility to such Guarantor, without impairing or releasing the obligations or liabilities of such Guarantor hereunder, upon or without any terms or conditions and in whole or in part:

(a)     change the manner, place or terms of payment of, and/or change, increase or extend the time of payment of, renew, increase, accelerate or alter, any of the Guaranteed Obligations (including, without limitation, any increase or decrease in the rate of interest thereon or the principal amount thereof), any security therefor, or any liability incurred directly or indirectly in respect thereof, and the guaranty herein made shall apply to the Guaranteed Obligations as so changed, extended, increased, accelerated, renewed or altered;

(b)     take and hold security for the payment of the Guaranteed Obligations and sell, exchange, release, surrender, impair, realize upon or otherwise deal with in any manner and

in any order any property or other collateral by whomsoever at any time pledged or mortgaged to secure, or howsoever securing, the Guaranteed Obligations or any liabilities (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and/or any offset thereagainst;

(c)     exercise or refrain from exercising any rights against the Borrower, any other Credit Party, any Subsidiary thereof, any other guarantor of the Borrower or others or otherwise act or refrain from acting;

(d)     release or substitute any one or more endorsers, Guarantors, other guarantors, the Borrower or other obligors;

(e)     settle or compromise any of the Guaranteed Obligations, any security therefor or any liability (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and may subordinate the payment of all or any part thereof to the payment of any liability (whether due or not) of the Borrower to creditors of the Borrower other than the Secured Creditors;

(f)     apply any sums by whomsoever paid or howsoever realized to any liability or liabilities of the Borrower to the Secured Creditors regardless of what liabilities of the Borrower remain unpaid;

(g)     consent to or waive any breach of, or any act, omission or default under, any of the Credit Documents or any of the instruments or agreements referred to therein, or otherwise amend, modify or supplement any of the Credit Documents or any of such other instruments or agreements;

(h)     act or fail to act in any manner which may deprive such Guarantor of its right to subrogation against the Borrower to recover full indemnity for any payments made pursuant to this Guaranty; and/or

(i)     take any other action or omit to take any other action which would, under otherwise applicable principles of common law, give rise to a legal or equitable discharge of such Guarantor from its liabilities under this Guaranty (including, without limitation, any action or omission whatsoever that might otherwise vary the risk of such Guarantor or constitute a legal or equitable defense to or discharge of the liabilities of a guarantor or surety or that might otherwise limit recourse against such Guarantor).

No invalidity, illegality, irregularity or unenforceability of all or any part of the Guaranteed Obligations, the Credit Documents or any other agreement or instrument relating to the Guaranteed Obligations or of any security or guarantee therefor shall affect, impair or be a defense to this Guaranty, and this Guaranty shall be primary, absolute and unconditional notwithstanding the occurrence of any event or the existence of any other circumstances which might constitute a legal or equitable discharge of a surety or guarantor except payment in full in cash of the Guaranteed Obligations.

6.     Continuing Guaranty. This Guaranty is a continuing one and all liabilities to which it applies or may apply under the terms hereof shall be conclusively presumed to have

been created in reliance hereon. No failure or delay on the part of any Secured Creditor in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein expressly specified are cumulative and not exclusive of any rights or remedies which any Secured Creditor would otherwise have. No notice to or demand on any Guarantor in any case shall entitle such Guarantor to any other further notice or demand in similar or other circumstances or constitute a waiver of the rights of any Secured Creditor to any other or further action in any circumstances without notice or demand. It is not necessary for any Secured Creditor to inquire into the capacity or powers of the Borrower or the officers, directors, partners or agents acting or purporting to act on its or their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder.

7.    Subordination of Indebtedness held by Guarantors. Any indebtedness of the Borrower now or hereafter held by any Guarantor is hereby subordinated to the indebtedness of the Borrower to the Secured Creditors; and such indebtedness of the Borrower to any Guarantor, if the Administrative Agent or the Collateral Agent, after an Event of Default has occurred and is continuing, so requests, shall be collected, enforced and received by such Guarantor as trustee for the Secured Creditors and be paid over to the Secured Creditors on account of the indebtedness of the Borrower to the Secured Creditors, but without affecting or impairing in any manner the liability of such Guarantor under the other provisions of this Guaranty. Prior to the transfer by any Guarantor of any note or negotiable instrument evidencing any indebtedness of the Borrower to such Guarantor, such Guarantor shall mark such note or negotiable instrument with a legend that the same is subject to this subordination. Without limiting the generality of the foregoing, each Guarantor hereby agrees with the Secured Creditors that it will not exercise any right of subrogation which it may at any time otherwise have as a result of this Guaranty (whether contractual, under Section 509 of the Bankruptcy Code or otherwise) until all Guaranteed Obligations have been irrevocably paid in full in cash; provided, that if any amount shall be paid to such Guarantor on account of such subrogation rights at any time prior to the irrevocable payment in full in cash of all the Guaranteed Obligations, such amount shall be held in trust for the benefit of the Secured Creditors and shall forthwith be paid to the Secured Creditors to be credited and applied upon the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms of the Credit Documents or, if the Credit Documents do not provide for the application of such amount, to be held by the Secured Creditors as collateral security for any Guaranteed Obligations thereafter existing.

8.    Guaranty Enforceable by Administrative Agent or Collateral Agent. Notwithstanding anything to the contrary contained elsewhere in this Guaranty, the Secured Creditors agree (by their acceptance of the benefits of this Guaranty) that this Guaranty may be enforced only by the action of the Administrative Agent or the Collateral Agent, in each case acting upon the instructions of the Required Lenders, and that no other Secured Creditor shall have any right individually to seek to enforce or to enforce this Guaranty or to realize upon the security to be granted by the Security Documents, it being understood and agreed that such rights and remedies may be exercised by the Administrative Agent or the Collateral Agent for the benefit of the Secured Creditors upon the terms of this Guaranty and the Security Documents. The Secured Creditors further agree that this Guaranty may not be enforced against any director, officer, employee, partner, member or stockholder of any Guarantor (except to the extent such

partner, member or stockholder is also a Guarantor hereunder).  It is understood and agreed that the agreement in this Section 8 is among and solely for the benefit of the Secured Creditors and that, if the Required Lenders agree (without requiring the consent of any Guarantor), this Guaranty may be directly enforced by any Secured Creditor.

9.    <u>Representations, Warranties and Covenants of Guarantors</u>.  In order to induce the Lenders to make (or be deemed to have made) loans to the Borrower pursuant to the Loan Agreement, each Guarantor (or, in the case of clause (i) below, each Guarantor that is a Pulitzer Entity) represents, warrants and covenants that:

(a)    such Guarantor (i) is a duly organized and validly existing Company in good standing under the laws of the jurisdiction of its organization, (ii) has the Company power and authority to own its property and assets and to transact the business in which it is engaged and presently proposes to engage and (iii) is duly qualified and is authorized to do business and is in good standing in each jurisdiction where the nature of its business requires such qualification, except for failures to be so qualified which, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect;

(b)    such Guarantor has the Company power and authority to execute, deliver and perform the terms and provisions of this Guaranty and each other Credit Document to which it is a party and has taken all necessary Company action to authorize the execution, delivery and performance by it of this Guaranty and each such other Credit Document;

(c)    such Guarantor has duly executed and delivered this Guaranty and each other Credit Document to which it is a party, and this Guaranty and each such other Credit Document constitutes the legal, valid and binding obligation of such Guarantor enforceable in accordance with its terms, except to the extent that the enforceability hereof or thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law);

(d)    neither the execution, delivery or performance by such Guarantor of this Guaranty or any other Credit Document to which it is a party, nor compliance by it with the terms and provisions hereof and thereof, will (i) contravene any provision of any applicable law, statute, rule or regulation or any applicable order, writ, injunction or decree of any court or governmental instrumentality, (ii) conflict with or result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien (except pursuant to the Security Documents) upon any of the property or assets of such Guarantor or any of its Subsidiaries pursuant to the terms of any material indenture, mortgage, deed of trust, loan agreement, credit agreement, notes agreement, guaranty agreement, or any other material agreement, contract or instrument to which such Guarantor or any of its Subsidiaries is a party or by which it or any of its property or assets is bound or to which it may be subject or (iii) violate any provision of the certificate or articles of incorporation, by-laws, partnership agreement or limited liability company agreement (or equivalent organizational documents), as the case may be, of such Guarantor or any of its Subsidiaries;

(e)    no order, consent, approval, license, authorization or validation of, or filing, recording or registration with (except as have been obtained or made prior to the date when required and which remain in full force and effect), or exemption by, any governmental or public body or authority, or any subdivision thereof, is required to authorize, or is required in connection with, (i) the execution, delivery and performance of this Guaranty by such Guarantor or any other Credit Document to which such Guarantor is a party or (ii) the legality, validity, binding effect or enforceability of this Guaranty or any other Credit Document to which such Guarantor is a party;

(f)    there are no actions, suits or proceedings pending or, to such Guarantor's knowledge, threatened (i) with respect to this Guaranty or any other Credit Document to which such Guarantor is a party or (ii) with respect to such Guarantor or any of its Subsidiaries that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect;

(g)    until such time as no Note remains outstanding and all Guaranteed Obligations have been paid in full (other than indemnities described in Section 13.01 of the Loan Agreement and analogous provisions in the Pledge Agreement or the Security Agreement which are not then due and payable), such Guarantor will comply, and will cause each of its Subsidiaries to comply, with all of the applicable provisions, covenants and agreements contained in Sections 9 and 10 of the Loan Agreement, and will take, or will refrain from taking, as the case may be, all actions that are necessary to be taken or not taken so that no violation of any provision, covenant or agreement contained in Sections 9 and 10 of the Loan Agreement, and so that no Default or Event of Default, is caused by the actions of such Guarantor or any of its Subsidiaries;

(h)    an executed (or conformed) copy of each of the Credit Documents has been made available to a senior officer and an authorized officer of each Guarantor and each such officer is familiar with the contents thereof; and

(i)    on the date hereof, all representations and warranties of the Pulitzer Entities contained in the Pulitzer Debt Documents are true and correct in all material respects with the same effect as though such representations and warranties had been made on the date hereof, both before and after giving effect to the transactions contemplated to occur on the Effective Date and the application of the proceeds of the Loans (unless stated to relate to a specific earlier date, in which case such representations and warranties were true and correct in all material respects as of such earlier date), and all such representations and warranties are hereby made to and in favor of the Secured Creditors as if the same were set out herein in full, *mutatis mutandis*.

10.    <u>Expenses</u>.  The Guarantors hereby jointly and severally agree to pay all reasonable out-of-pocket costs and expenses of the Collateral Agent, the Administrative Agent and each other Secured Creditor in connection with the enforcement of this Guaranty and the protection of the Secured Creditors' rights hereunder and any amendment, waiver or consent relating hereto (including, in each case, without limitation, the reasonable fees and disbursements of counsel (including in-house counsel) employed by the Collateral Agent, the Administrative Agent and each other Secured Creditor).

11.     <u>Benefit and binding effect</u>.  This Guaranty shall be binding upon each Guarantor and its successors and assigns and shall inure to the benefit of the Secured Creditors and their successors and assigns.

12.     <u>Amendments; Waivers</u>.  Neither this Guaranty nor any provision hereof may be changed, waived, discharged or terminated except with the written consent of each Guarantor directly affected thereby (it being understood that the addition or release of any Guarantor hereunder shall not constitute a change, waiver, discharge or termination affecting any Guarantor other than the Guarantor so added or released) and with the written consent of the Required Lenders (or such other Lenders (or number or percentage thereof) as shall be necessary under Section 13.12(a) of the Loan Agreement) at all times prior to the time at which all Guaranteed Obligations have been paid in full.

13.     <u>Set off</u>.  In addition to any rights now or hereafter granted under applicable law (including, without limitation, Section 151 of the New York Debtor and Creditor Law) and not by way of limitation of any such rights, upon the occurrence and during the continuance of an Event of Default, each Secured Creditor is hereby authorized, at any time or from time to time, without notice to any Guarantor or to any other person, any such notice being expressly waived, to set off and to appropriate and apply any and all deposits (general or special) and any other indebtedness at any time held or owing by such Secured Creditor to or for the credit or the account of such Guarantor, against and on account of the obligations and liabilities of such Guarantor to such Secured Creditor under this Guaranty, irrespective of whether or not such Secured Creditor shall have made any demand hereunder and although said obligations, liabilities, deposits or claims, or any of them, shall be contingent or unmatured.  Each Secured Creditor (by its acceptance of the benefits hereof) acknowledges and agrees that the provisions of this Section 13 are subject to the sharing provisions set forth in Section 13.06 of the Loan Agreement.

14.     <u>Notice</u>.  Except as otherwise specified herein, all notices, requests, demands or other communications to or upon the respective parties hereto shall be sent or delivered by mail, telegraph, telex, telecopy, cable or courier service and all such notices and communications shall, when mailed, telegraphed, telexed, telecopied, or cabled or sent by courier, be effective when deposited in the mails, delivered to the telegraph company, cable company or overnight courier, as the case may be, or sent by telex or telecopier, except that notices and communications to the Administrative Agent or any Guarantor shall not be effective until received by the Administrative Agent or such Guarantor, as the case may be.  All notices and other communications shall be in writing and addressed to such party (i) in the case of any Secured Creditor, as provided in the Loan Agreement, and (ii) in the case of any Guarantor, at its address set forth opposite its signature below.

15.     <u>Reinstatement</u>.  If any claim is ever made upon any Secured Creditor for repayment or recovery of any amount or amounts received in payment or on account of any of the Guaranteed Obligations and any of the aforesaid payees repays all or part of said amount by reason of (i) any judgment, decree or order of any court or administrative body having jurisdiction over such payee or any of its property or (ii) any settlement or compromise of any such claim effected by such payee with any such claimant (including, without limitation, the Borrower), then and in such event each Guarantor agrees that any such judgment, decree, order,

settlement or compromise shall be binding upon such Guarantor, notwithstanding any revocation hereof or the cancellation of any note or any other instrument evidencing any liability of the Borrower and such Guarantor shall be and remain liable to the aforesaid payees hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by any such payee.

16.    CONSENT TO JURISDICTION; SERVICE OF PROCESS; AND WAIVER OF TRIAL BY JURY.    (a) THIS GUARANTY AND THE RIGHTS AND OBLIGATIONS OF THE SECURED CREDITORS AND OF THE UNDERSIGNED HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.  Any legal action or proceeding with respect to this Guaranty or any other Credit Document to which any Guarantor is a party may be brought in the courts of the State of New York or of the United States of America for the Southern District of New York, in each case located within the County of New York, and, by execution and delivery of this Guaranty, each Guarantor hereby irrevocably accepts for itself and in respect of its property, generally and unconditionally, the personal jurisdiction of the aforesaid courts. Each Guarantor hereby further irrevocably waives any claim that any such courts lack personal jurisdiction over such Guarantor, and agrees not to plead or claim, in any legal action or proceeding with respect to this Guaranty or any other Credit Document to which such Guarantor is a party brought in any of the aforesaid courts, that any such court lacks personal jurisdiction over such Guarantor.  Each Guarantor further irrevocably consents to the service of process out of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to each Guarantor at its address set forth opposite its signature below, such service to become effective 30 days after such mailing.  Each Guarantor hereby irrevocably waives any objection to such service of process and further irrevocably waives and agrees not to plead or claim in any action or proceeding commenced hereunder or under any other Credit Document to which such Guarantor is a party that such service of process was in any way invalid or ineffective.  Nothing herein shall affect the right of any of the Secured Creditors to serve process in any other manner permitted by law or to commence legal proceedings or otherwise proceed against each Guarantor in any other jurisdiction.

(b)    Each Guarantor hereby irrevocably waives (to the fullest extent permitted by applicable law) any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Guaranty or any other Credit Document to which such Guarantor is a party brought in the courts referred to in clause (a) above and hereby further irrevocably waives and agrees not to plead or claim in any such court that such action or proceeding brought in any such court has been brought in an inconvenient forum.

(C)    EACH GUARANTOR AND EACH SECURED CREDITOR (BY ITS ACCEPTANCE OF THE BENEFITS OF THIS GUARANTY) HEREBY IRREVOCABLY WAIVES ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS GUARANTY, THE OTHER CREDIT DOCUMENTS TO WHICH SUCH GUARANTOR IS A PARTY OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

17.     Release of Guarantors.  (a)  In the event that all of the Equity Interests of one or more Guarantors is sold or otherwise disposed of or liquidated in compliance with the requirements of Section 10.02 of the Loan Agreement (or such sale, other disposition or liquidation has been approved in writing by the Required Lenders (or such other Lenders (or number or percentage thereof) as shall be necessary under Section 13.12(a) of the Loan Agreement) and the proceeds of such sale, disposition or liquidation are applied in accordance with the provisions of the Loan Agreement, to the extent applicable, such Guarantor shall, upon consummation of such sale or other disposition (except to the extent that such sale or disposition is to the Borrower or another Subsidiary thereof), be released from this Guaranty automatically and without further action and this Guaranty shall, as to each Guarantor, terminate, and have no further force or effect (it being understood and agreed that the sale of one or more Persons that own, directly or indirectly, all of the Equity Interests of any Guarantor shall be deemed to be a sale of such Guarantor for the purposes of this Section 17(a)).

(b)  Upon the payment in full of all Guaranteed Obligations and the termination of the Loan Agreement, the Guarantors shall be released from this Guaranty automatically and without further action and this Guaranty shall, as to each Guarantor, terminate, and have no further force or effect.

18.     Contribution.  At any time a payment in respect of the Guaranteed Obligations is made under this Guaranty, the right of contribution of each Guarantor against each other Guarantor shall be determined as provided in the immediately following sentence, with the right of contribution of each Guarantor to be revised and restated as of each date on which a payment (a "Relevant Payment") is made on the Guaranteed Obligations under this Guaranty. At any time that a Relevant Payment is made by a Guarantor that results in the aggregate payments made by such Guarantor in respect of the Guaranteed Obligations to and including the date of the Relevant Payment exceeding such Guarantor's Contribution Percentage (as defined below) of the aggregate payments made by all Guarantors in respect of the Guaranteed Obligations to and including the date of the Relevant Payment (such excess, the "Aggregate Excess Amount"), each such Guarantor shall have a right of contribution against each other Guarantor who has made payments in respect of the Guaranteed Obligations to and including the date of the Relevant Payment in an aggregate amount less than such other Guarantor's Contribution Percentage of the aggregate payments made to and including the date of the Relevant Payment by all Guarantors in respect of the Guaranteed Obligations (the aggregate amount of such deficit, the "Aggregate Deficit Amount") in an amount equal to (x) a fraction the numerator of which is the Aggregate Excess Amount of such Guarantor and the denominator of which is the Aggregate Excess Amount of all Guarantors multiplied by (y) the Aggregate Deficit Amount of such other Guarantor.  A Guarantor's right of contribution pursuant to the preceding sentences shall arise at the time of each computation, subject to adjustment to the time of each computation; provided that no Guarantor may take any action to enforce such right until the Guaranteed Obligations have been irrevocably paid in full in cash, it being expressly recognized and agreed by all parties hereto that any Guarantor's right of contribution arising pursuant to this Section 18 against any other Guarantor shall be expressly junior and subordinate to such other Guarantor's obligations and liabilities in respect of the Guaranteed Obligations.  As used in this Section 18:  (i) each Guarantor's "Contribution Percentage" shall mean the percentage obtained by dividing (x) the Adjusted Net Worth (as defined below) of such Guarantor by (y) the aggregate Adjusted Net Worth of all Guarantors; (ii) the "Adjusted Net Worth" of each

Guarantor shall mean the greater of (x) the Net Worth (as defined below) of such Guarantor and (y) zero; and (iii) the "Net Worth" of each Guarantor shall mean the amount by which the fair saleable value of such Guarantor's assets on the date of any Relevant Payment exceeds its existing debts and other liabilities (including contingent liabilities, but without giving effect to any Guaranteed Obligations arising under this Guaranty on such date).   Notwithstanding anything to the contrary contained above, any Guarantor that is released from this Guaranty pursuant to Section 17 hereof shall thereafter have no contribution obligations, or rights, pursuant to this Section 18, and at the time of any such release, if the released Guarantor had an Aggregate Excess Amount or an Aggregate Deficit Amount, same shall be deemed reduced to $0, and the contribution rights and obligations of the remaining Guarantors shall be recalculated on the respective date of release (as otherwise provided above) based on the payments made hereunder by the remaining Guarantors.   All parties hereto recognize and agree that, except for any right of contribution arising pursuant to this Section 18, each Guarantor who makes any payment in respect of the Guaranteed Obligations shall have no right of contribution or subrogation against any other Guarantor in respect of such payment until all of the Guaranteed Obligations have been irrevocably paid in full in cash.   Each of the Guarantors recognizes and acknowledges that the rights to contribution arising hereunder shall constitute an asset in favor of the party entitled to such contribution.   In this connection, each Guarantor has the right to waive its contribution right against any Guarantor to the extent that after giving effect to such waiver such Guarantor would remain solvent, in the determination of the Required Lenders.

19.    Limitation on Guaranteed Obligations.   Each Guarantor and each Secured Creditor (by its acceptance of the benefits of this Guaranty) hereby confirms that it is its intention that this Guaranty not constitute a fraudulent transfer or conveyance for purposes of the Bankruptcy Code, the Uniform Fraudulent Conveyance Act or any similar federal or state law. To effectuate the foregoing intention, each Guarantor and each Secured Creditor (by its acceptance of the benefits of this Guaranty) hereby irrevocably agrees that the Guaranteed Obligations guaranteed by such Guarantor shall be limited to such amount as will, after giving effect to such maximum amount and all other (contingent or otherwise) liabilities of such Guarantor that are relevant under such laws and after giving effect to any rights to contribution pursuant to any agreement providing for an equitable contribution among such Guarantor and the other Guarantors, result in the Guaranteed Obligations of such Guarantor in respect of such maximum amount not constituting a fraudulent transfer or conveyance.

20.    Counterparts.    This Guaranty may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.   A set of counterparts executed by all the parties hereto shall be lodged with the Borrower and the Administrative Agent.

21.    Payments.   All payments made by any Guarantor hereunder will be made without setoff, counterclaim or other defense and on the same basis as payments are made by the Borrower under Sections 5.03 and 5.04 of the Loan Agreement.

22.    Additional Guarantors.   It is understood and agreed that any Subsidiary of the Borrower that is required to execute a counterpart of this Guaranty after the date hereof pursuant to the Loan Agreement shall become a Guarantor hereunder by (x) executing and

delivering a counterpart hereof to the Administrative Agent or executing a joinder agreement and delivering same to the Administrative Agent, in each case as may be requested by (and in form and substance satisfactory to) the Administrative Agent and (y) taking all actions as specified in this Guaranty as would have been taken by such Guarantor had it been an original party to this Guaranty, in each case with all documents required above to be delivered to the Administrative Agent with all documents and actions required to be taken above to be taken to the reasonable satisfaction of the Administrative Agent.

23.    <u>Headings descriptive</u>.    The headings of the several sections of this Guaranty are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Guaranty.

IN WITNESS WHEREOF, each of the undersigned has caused this Guaranty to be executed and delivered as of the date first above written.

Address:

[c/o Lee Enterprises, Incorporated
201 North Harrison Street, Suite 600
Davenport, Iowa 52801
Attention:  Chief Financial Officer
Tel:  (563) 383-2179
Fax:  (563) 327-2600

[ACCUDATA, INC.,
    as a Guarantor


By: _____
     Title:

c/o Lee Enterprises, Incorporated
201 North Harrison Street, Suite 600
Davenport, Iowa 52801
Attention:  Chief Financial Officer
Tel:  (563) 383-2179
Fax:  (563) 327-2600

INN PARTNERS, L.C.,
    as a Guarantor


By: _____
     Title:

c/o Lee Enterprises, Incorporated
201 North Harrison Street, Suite 600
Davenport, Iowa 52801
Attention:  Chief Financial Officer
Tel:  (563) 383-2179
Fax:  (563) 327-2600

JOURNAL – STAR PRINTING CO.,
    as a Guarantor


By: _____
     Title:

c/o Lee Enterprises, Incorporated
201 North Harrison Street, Suite 600
Davenport, Iowa 52801
Attention:  Chief Financial Officer
Tel:  (563) 383-2179
Fax:  (563) 327-2600

K.  FALLS BASIN PUBLISHING, INC.,
    as a Guarantor


By: _____
     Title:

c/o Lee Enterprises, Incorporated
201 North Harrison Street, Suite 600
Davenport, Iowa 52801

LEE CONSOLIDATED HOLDINGS CO.,
    as a Guarantor

Attention:  Chief Financial Officer
Tel:  (563) 383-2179                                    By: _____
Fax:  (563) 327-2600                                        Title:

c/o Lee Enterprises, Incorporated              LEE PUBLICATIONS, INC.,
201 North Harrison Street, Suite 600               as a Guarantor
Davenport, Iowa 52801
Attention:  Chief Financial Officer
Tel:  (563) 383-2179                                    By: _____
Fax:  (563) 327-2600                                        Title:

c/o Lee Enterprises, Incorporated              LEE PROCUREMENT SOLUTIONS CO.,
201 North Harrison Street, Suite 600               as a Guarantor
Davenport, Iowa 52801
Attention:  Chief Financial Officer
Tel:  (563) 383-2179                                    By: _____
Fax:  (563) 327-2600                                        Title:

c/o Lee Enterprises, Incorporated              SIOUX CITY NEWSPAPERS, INC.,][2]
201 North Harrison Street, Suite 600               as a Guarantor
Davenport, Iowa 52801
Attention:  Chief Financial Officer
Tel:  (563) 383-2179                                    By: _____
Fax:  (563) 327-2600                                        Title:


## [TO INCLUDE SIGNATURE BLOCKS FOR THE PULITZER ENTITIES]


Accepted and Agreed to:

WILMINGTON TRUST, NATIONAL ASSOCIATION,
as Administrative Agent


By: _____
       Title:

_____

[2] All signatories to be confirmed.

<div align="right">

**EXHIBIT H**
**TO SECOND LIEN LOAN AGREEMENT**

</div>

FORM OF

INTERCOMPANY SUBORDINATION AGREEMENT

THIS INTERCOMPANY SUBORDINATION AGREEMENT (as amended, restated, modified and/or supplemented from time to time, this "Agreement"), dated as of [_____], made by each of the undersigned (each, a "Party" and, together with any entity that becomes a party to this Agreement pursuant to Section 9 hereof, the "Parties") and Wilmington Trust, National Association, as collateral agent (in such capacity, together with any successor collateral agent, the "Collateral Agent"), for the benefit of the Senior Creditors (as defined below). Unless otherwise defined herein, all capitalized terms used herein shall have the meanings ascribed to them in the Loan Agreement referred to below.

W I T N E S S E T H:

WHEREAS, Lee Enterprises, Incorporated (the "Borrower"), the lenders from time to time party thereto (the "Lenders"), Deutsche Bank Securities Inc. and Goldman Sachs Lending Partners LLC, as Joint Lead Arrangers and Joint Book Running Managers, and Wilmington Trust, National Association, as administrative agent (together with any successor administrative agent, the "Administrative Agent"), have entered into a Second Lien Loan Agreement, dated as of [___], providing for the making (or deemed making) and continuation of Loans to the Borrower, all as contemplated therein (with the Lenders, the Administrative Agent and the Collateral Agent being herein called the "Secured Creditors") (as used herein, the term "Loan Agreement" means the Second Lien Loan Agreement described above in this paragraph, as the same may be amended, restated, modified, supplemented, extended, renewed, refinanced, replaced, or refunded from time to time, and including any agreement extending the maturity of, or refinancing or restructuring (including, but not limited to, the inclusion of additional borrowers or guarantors thereunder or any increase in the amount borrowed) all or any portion of, the indebtedness under such agreement or any successor agreement, whether or not with the same agent, trustee, representative, lenders or holders; provided that, with respect to any subsequent agreement providing for the refinancing or replacement of indebtedness under the Loan Agreement, such agreement shall only be treated as, or as part of, the Loan Agreement hereunder if (i) either (A) all obligations under the Loan Agreement being refinanced or replaced shall be paid in full at the time of such refinancing or replacement or (B) the Required Lenders shall have consented in writing to the refinancing or replacement indebtedness being treated as indebtedness pursuant to the Loan Agreement, and (ii) a notice to the effect that the refinancing or replacement indebtedness shall be treated as issued under the Loan Agreement shall be delivered by the Borrower to the Collateral Agent);

WHEREAS, pursuant to the Subsidiaries Guaranty, each Subsidiary Guarantor has jointly and severally guaranteed to the Secured Creditors the payment when due of all Guaranteed Obligations (as defined in the Subsidiaries Guaranty);

WHEREAS, it is a condition precedent to the extensions of credit under the Loan Agreement that this Agreement be executed and delivered by the original Parties hereto;

WHEREAS, additional Parties may from time to time become parties hereto in order to allow for certain extensions of credit in accordance with the requirements of the Loan Agreement; and

WHEREAS, each of the original Parties desires to execute this Agreement to satisfy the conditions described in the immediately preceding paragraphs.

NOW, THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties hereto, the Parties and the Collateral Agent (for the benefit of the Senior Creditors) hereby agree as follows:

1.      The Subordinated Debt (as defined in Section 7 hereof) and all payments of principal, interest and all other amounts thereunder are hereby, and shall continue to be, subject and subordinate in right of payment to the prior payment in full, in cash, of all Senior Indebtedness to the extent, and in the manner, set forth herein.  The foregoing shall apply notwithstanding the availability of collateral to the Senior Creditors or the holders of Subordinated Debt or the actual date and time of execution, delivery, recordation, filing or perfection of any security interests granted with respect to the Senior Indebtedness or the Subordinated Debt, or the lien or priority of payment thereof, and in any instance wherein the Senior Indebtedness or any claim for the Senior Indebtedness (as defined in Section 7 hereof) is subordinated, avoided or disallowed, in whole or in part, under the Bankruptcy Code or other applicable federal, foreign, state or local law.  In the event of a proceeding, whether voluntary or involuntary, for insolvency, liquidation, reorganization, dissolution, bankruptcy or other similar proceeding pursuant to the Bankruptcy Code or other applicable federal, foreign, state or local law (each, a "Bankruptcy Proceeding"), the Senior Indebtedness shall include all interest accrued on the Senior Indebtedness, in accordance with and at the rates specified in the Senior Indebtedness, both for periods before and for periods after the commencement of any of such proceedings, even if the claim for such interest is not allowed pursuant to the Bankruptcy Code or other applicable law.

2.      Each Party (as a lender of any Subordinated Debt) hereby agrees that until the Senior Indebtedness Termination Date shall have occurred:

(a)      Such Party shall not, without the prior written consent of the Required Senior Creditors (as defined in Section 7 hereof), which consent may be withheld or conditioned in the Required Senior Creditors' sole discretion, commence, or join or participate in, any Enforcement Action (as defined in Section 7 hereof).

(b)      In the event that (i) all or any portion of any Senior Indebtedness remaining unpaid after it becomes due (whether at stated maturity, by acceleration or otherwise), (ii) any Event of Default under the Loan Agreement or any event of default under, and as defined in, any other Senior Indebtedness (or the documentation governing the same), then exists or would result from such payment on the Subordinated Debt (including, without limitation, pursuant to Section 11.09 of the Loan Agreement), (iii) such Party receives any payment or prepayment of principal, interest or any other amount, in whole or in part, of (or with respect to) the Subordinated Debt in violation of the terms of the Loan Agreement or any other Senior

Indebtedness (or the documentation governing the same) or (iv) any distribution, division or application, partial or complete, voluntary or involuntary, by operation of law or otherwise, is made of all or any part of the property, assets or business of the Borrower or any of its Subsidiaries or the proceeds thereof, in whatever form, to any creditor or creditors of the Borrower or any of its Subsidiaries or to any holder of indebtedness of the Borrower or any of its Subsidiaries or by reason of any liquidation, dissolution or other winding up of the Borrower, any of its Subsidiaries or their respective businesses, or of any receivership or custodianship for the Borrower or any of its Subsidiaries or of all or substantially all of their respective property, or of any insolvency or bankruptcy proceedings or assignment for the benefit of creditors or any proceeding by or against the Borrower or any of its Subsidiaries for any relief under any bankruptcy, reorganization or insolvency law or laws, federal, foreign, state or local, or any law, federal, foreign, state or local relating to the relief of debtors, readjustment of indebtedness, reorganization, composition or extension, then, and in any such event, any payment or distribution of any kind or character, whether in cash, property or securities, which shall be payable or deliverable with respect to any or all of the Subordinated Debt or which has been received by any Party shall be held in trust by such Party for the benefit of the Senior Creditors and shall forthwith be paid or delivered directly to the Senior Creditors for application to the payment of the Senior Indebtedness (after giving effect to the relative priorities of such Senior Indebtedness) to the extent necessary to make payment in full in cash of all sums due under the Senior Indebtedness remaining unpaid after giving effect to any concurrent payment or distribution to the Senior Creditors.  In any such event, the Senior Creditors may, but shall not be obligated to, demand, claim and collect any such payment or distribution that would, but for these subordination provisions, be payable or deliverable with respect to the Subordinated Debt. In the event of the occurrence of any event referred to in subclauses (i), (ii), (iii) or (iv) of the second preceding sentence of this clause (b) and until the Senior Indebtedness Termination Date shall have occurred and all of the obligations of the Borrower or any of its Subsidiaries to the Senior Creditors have been performed in full, no payment of any kind or character (whether in cash, property, securities or otherwise) shall be made to or accepted by any Party in respect of the Subordinated Debt.  Notwithstanding anything to the contrary contained above, if one or more of the events referred to in subclauses (i) through (iv) of the first sentence of this clause (b) is in existence, the Required Senior Creditors may agree in writing that payments may be made with respect to the Subordinated Debt which would otherwise be prohibited pursuant to the provisions contained above, provided that any such waiver shall be specifically limited to the respective payment or payments which the Required Senior Creditors agree may be so paid to any Party in respect of the Subordinated Debt.

(c)    If such Party shall acquire by indemnification, subrogation or otherwise, any lien, estate, right or other interest in any of the assets or properties of the Borrower or any of its Subsidiaries, that lien, estate, right or other interest shall be subordinate in right of payment to the Senior Indebtedness and the lien of the Senior Indebtedness as provided herein, and such Party hereby waives any and all rights it may acquire by subrogation or otherwise to any lien of the Senior Indebtedness or any portion thereof until such time as the Senior Indebtedness Termination Date shall have occurred.

(d)    Such Party shall not pledge, assign, hypothecate, transfer, convey or sell any Subordinated Debt or any interest in any Subordinated Debt to any entity (other than under the relevant Security Documents (as hereinafter defined) or in accordance with the relevant

requirements of the Loan Agreement to a Credit Party which is a Party hereto) without the prior written consent of the Administrative Agent (with the prior written consent of the Required Senior Creditors).

(e)      After request by the Administrative Agent or the Required Senior Creditors, such Party shall within ten (10) days furnish the Senior Creditors with a statement, duly acknowledged and certified setting forth the original principal amount of the notes evidencing the indebtedness of the Subordinated Debt, the unpaid principal balance, all accrued interest but unpaid interest and any other sums due and owing thereunder, the rate of interest, the monthly payments and that, to the best knowledge of such Party, there exists no defaults under the Subordinated Debt, or if any such defaults exist, specifying the defaults and the nature thereof.

(f)      In any case commenced by or against the Borrower or any of its Subsidiaries under the Bankruptcy Code or any similar federal, foreign, state or local statute (a "Reorganization Proceeding"), to the extent permitted by applicable law, the Required Senior Creditors shall have the exclusive right to exercise any voting rights in respect of the claims of such Party against the Borrower or any of its Subsidiaries.

(g)      If, at any time, all or part of any payment with respect to Senior Indebtedness theretofore made (whether by the Borrower, any other Credit Party or any other Person or enforcement of any right of setoff or otherwise) is rescinded or must otherwise be returned by the holders of Senior Indebtedness for any reason whatsoever (including, without limitation, the insolvency, bankruptcy or reorganization of the Borrower, any other Credit Party or such other Persons), the subordination provisions set forth herein shall continue to be effective or be reinstated, as the case may be, all as though such payment had not been made.

(h)      Such Party shall not object to the entry of any order or orders approving any cash collateral stipulations, adequate protection stipulations or similar stipulations executed by the Senior Creditors in any Reorganization Proceeding or any other proceeding under the Bankruptcy Code.

(i)      Such Party waives any marshalling rights with respect to the Senior Creditors in any Reorganization Proceeding or any other proceeding under the Bankruptcy Code.

(j)      Notwithstanding anything herein to the contrary, if any amount otherwise required to be held for or paid to the Senior Creditors is required to be held for or paid to any other Senior Creditors (as defined in the Lee Intercompany Subordination Agreement or the Pulitzer Intercompany Subordination Agreement, as applicable) pursuant to the Lee Intercompany Subordination Agreement or the Pulitzer Intercompany Subordination Agreement, the terms of the Lee Intercompany Subordination Agreement or the Pulitzer Intercompany Subordination Agreement, as applicable, shall supersede the terms hereof and such amounts may be held for or paid to such other Senior Creditors (as defined in the Lee Intercompany Subordination Agreement or the Pulitzer Intercompany Subordination Agreement, as applicable) pursuant to the Lee Intercompany Subordination Agreement or the Pulitzer Intercompany Subordination Agreement, as applicable, without resulting in any violation by such Party of this Agreement.

3.      Each Party hereby represents, warrants and covenants as follows:

(a)      each Party will deliver a schedule setting forth all Intercompany Debt to the Administrative Agent within 10 days after any request by the Administrative Agent or the Required Senior Creditors (although any failure to deliver such a supplement shall have no effect whatsoever on the subordination provisions contained herein, which shall apply to all Subordinated Debt whether or not listed on said schedule); and

(b)      each Party will not lend, hold or permit to exist any Intercompany Debt owed by it or to it (in accordance with the definition thereof contained herein) unless each obligee or obligor, as the case may be, with respect to such Intercompany Debt is (or concurrently with such extension becomes) a Party to this Agreement.

4.      Any payments made to, or received by, any Party in respect of any guaranty or security in support of the Subordinated Debt shall be subject to the terms of this Agreement and applied on the same basis as payments made directly by the obligor under such Subordinated Debt.  To the extent that the Borrower or any of its Subsidiaries (other than the respective obligor or obligors which are already Parties hereto) provides a guaranty or any security in support of any Subordinated Debt, the Party which is the lender of the respective Subordinated Debt will cause each such Person to become a Party hereto (if such Person is not already a Party hereto) not later than the date of the execution and delivery of the respective guarantee or security documentation, provided that any failure to comply with the foregoing requirements of this Section will have no effect whatsoever on the subordination provisions contained herein (which shall apply to all payments received with respect to any guarantee or security for any Subordinated Debt, whether or not the Person furnishing such guarantee or security is a Party hereto).

5.      Each Party hereby acknowledges and agrees that no payments will be accepted by it in respect of the Subordinated Debt (unless promptly turned over to the holders of Senior Indebtedness as contemplated by Section 2 above) to the extent such payments would be prohibited under any Senior Indebtedness (or the documentation governing the same).

6.      In addition to the foregoing agreements, each Party hereby acknowledges and agrees that, with respect to all Intercompany Debt (whether or not same constitutes Subordinated Debt), that (x) such Intercompany Debt (and any promissory notes or other instruments evidencing same) may be pledged, and delivered for pledge, by the Borrower or any of its Subsidiaries pursuant to any Security Document to which the Borrower or the respective such Subsidiary is, or at any time in the future becomes, a party and (y) with respect to all Intercompany Debt so pledged, the Collateral Agent shall be entitled to exercise all rights and remedies with respect to such Intercompany Debt to the maximum extent provided in the various Security Documents (in accordance with the terms thereof and subject to the requirements of applicable law).  Furthermore, with respect to all Intercompany Debt at any time owed to any Credit Party, and notwithstanding anything to the contrary contained in the terms of such Intercompany Debt, each obligor (including any guarantor) and obligee with respect to such Intercompany Debt hereby agrees, for the benefit of the holders from time to time of the Senior Indebtedness, that the Administrative Agent or the Collateral Agent may at any time, and from time to time, acting on its own or at the request of the Required Senior Creditors, accelerate the

maturity of such Intercompany Debt if (x) any obligor (including any guarantor) of such Intercompany Debt is subject to any Bankruptcy Proceeding or (y) any event of default under the Loan Agreement shall have occurred and be continuing.  Any such acceleration of the maturity of any Intercompany Debt shall be made by written notice by the Administrative Agent or Collateral Agent to the obligor on the respective Intercompany Debt; provided that no such notice shall be required (and the acceleration shall automatically occur) either upon the occurrence of a Bankruptcy Proceeding with respect to the respective obligor (or any guarantor) of the respective Intercompany Debt or upon (or following) any acceleration of the maturity of any Loans pursuant to the Loan Agreement.

7.    Definitions.  As and in this Agreement, the terms set forth below shall have the respective meanings provided below:

"Enforcement Action" shall mean any acceleration of all or any part of the Subordinated Debt, any foreclosure proceeding, the exercise of any power of sale, the obtaining of a receiver, the seeking of default interest, the suing on, or otherwise taking action to enforce the obligation of the Borrower or any of its Subsidiaries to pay any amounts relating to any Subordinated Debt, the exercising of any banker's lien or rights of set-off or recoupment, the institution of a Bankruptcy Proceeding against the Borrower or any of its Subsidiaries, or the taking of any other enforcement action against any asset or Property of the Borrower or its Subsidiaries.

"Intercompany Debt" shall mean any Indebtedness, payables or other obligations, whether now existing or hereinafter incurred, owed by any Credit Party to the Borrower or any Subsidiary of the Borrower.

"Lee Intercompany Subordination Agreement" shall mean the "Intercompany Subordination Agreement" referred to and defined in the First Lien Credit Agreement.

"Obligation" shall mean any principal, interest, premium, penalties, fees, indemnities and other liabilities and obligations payable under the documentation governing any indebtedness (including, without limitation, all interest accruing after the commencement of any bankruptcy, insolvency, receivership or similar proceeding at the rate provided in the governing documentation, whether or not such interest is an allowed claim in such proceeding).

"Pulitzer Intercompany Subordination Agreement" shall mean each "Subordinated Intercompany Note" referred to and defined in the Pulitzer Debt Agreement or the documentation governing any Permitted Pulitzer Debt Refinancing Indebtedness.

"Required Senior Creditors" shall mean (i) the Required Lenders (or such other Lenders (or number or percentage thereof) as shall be necessary under Section 13.12(a) of the Loan Agreement) at all times prior to the Senior Indebtedness Termination Date, and (ii) the holders of at least a majority of the other outstanding Senior Indebtedness at all times after the Senior Indebtedness Termination Date.

"Senior Creditors" shall mean all holders from time to time of any Senior Indebtedness and shall include, without limitation, the Secured Creditors.

"<u>Senior Indebtedness</u>" shall mean all Obligations (including Obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due) and liabilities (including, without limitation, indemnities, fees and interest thereon) of each Credit Party (whether as obligor, guarantor or otherwise) to the Secured Creditors, whether now existing or hereafter incurred under, arising out of or in connection with each Credit Document to which it is at any time a party (including, without limitation, all such obligations and liabilities of each Credit Party under the Loan Agreement (if a party thereto) and under the Subsidiaries Guaranty (if a party thereto) or under any other guarantee by it of obligations pursuant to the Loan Agreement) and the due performance and compliance by each Credit Party with the terms of each such Credit Document.

"<u>Senior Indebtedness Termination Date</u>" shall mean the first date after the Effective Date upon which all Senior Indebtedness have been indefeasibly paid in full in cash.

"<u>Subordinated Debt</u>" shall mean the principal of, interest on, and all other amounts owing from time to time in respect of, all Intercompany Debt (including, without limitation, pursuant to guarantees thereof or security therefor and intercompany payables not evidenced by a note) at any time outstanding.

8.      Each Party agrees to be fully bound by all terms and provisions contained in this Agreement, both with respect to any Subordinated Debt (including any guarantees thereof and security therefor) owed to it, and with respect to all Subordinated Debt (including all guarantees thereof and security therefor) owing by it.

9.      It is understood and agreed that any Subsidiary of the Borrower that is required to execute a counterpart of this Agreement after the date hereof pursuant to the requirements of the Loan Agreement or any other Senior Indebtedness shall become a Party hereunder by executing a counterpart hereof (or a joinder agreement in form and substance reasonably satisfactory to the Administrative Agent) and delivering same to the Collateral Agent.

10.     No failure or delay on the part of any party hereto or any holder of Senior Indebtedness in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy hereunder.

11.     Each Party hereto acknowledges that to the extent that no adequate remedy at law exists for breach of its obligations under this Agreement, in the event any Party fails to comply with its obligations hereunder, the Collateral Agent, the Administrative Agent or the holders of Senior Indebtedness shall have the right to obtain specific performance of the obligations of such defaulting Party, injunctive relief or such other equitable relief as may be available.

12.     Any notice to be given under this Agreement shall be in writing and shall be sent in accordance with the provisions of the Loan Agreement.

13.     In the event of any conflict between the provisions of this Agreement and the provisions of the Subordinated Debt, the provisions of this Agreement shall prevail.

14.     No Person other than the parties hereto, the Senior Creditors from time to time and their successors and assigns as holders of the Senior Indebtedness and the Subordinated Debt shall have any rights under this Agreement.

15.     This Agreement may be executed in any number of counterparts each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

16.     No amendment, supplement, modification, waiver or termination of this Agreement shall be effective against a party against whom the enforcement of such amendment, supplement, modification, waiver or termination would be asserted, unless such amendment, supplement, modification, waiver or termination was made in a writing signed by such party, provided that amendments hereto shall be effective as against the Senior Creditors only if executed and delivered by the Collateral Agent (with the written consent of the Required Senior Creditors at such time).

17.     In case any one or more of the provisions confined in this Agreement, or any application thereof, shall be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein, and any other application thereof, shall not in any way be affected or impaired thereby.

18.     (a)     **THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE INTERNAL LAW OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.**

(b)     Any legal action or proceeding with respect to this Agreement may be brought in the courts of the State of New York or of the United States of America for the Southern District of New York in each case which are located in the County of New York, and, by execution and delivery of this Agreement, each Party hereby irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts. Each Party hereby further irrevocably waives any claim that any such court lacks personal jurisdiction over such Party, and agrees not to plead or claim in any legal action or proceeding with respect to this Agreement or any other Credit Document to which such Party is a party brought in any of the aforesaid courts that any such court lacks personal jurisdiction over such Party.  Each Party further irrevocably consents to the service of process out of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to such Party at its address set forth opposite is signature below, such service to become effective 30 days after such mailing. Each Party hereby irrevocably waives any objection to such service of process and further irrevocably waives and agrees not to plead or claim in any action or proceeding commenced hereunder or under any other Credit Document to which such Party is a party that such service of process was in any way invalid or ineffective.  Nothing herein shall affect the right of any of the Senior Creditors to serve process in any other manner permitted by law or to commence legal proceedings or otherwise proceed against each Party in any other jurisdiction.

(c)     **EACH PARTY HEREBY IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF**

**VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (b) ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.**

        (d)    **EACH PARTY HEREBY IRREVOCABLY WAIVES ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.**

        19.    This Agreement shall bind and inure to the benefit of the Administrative Agent, the Collateral Agent, the other Senior Creditors and each Party and their respective successors, permitted transferees and assigns.

<div align="center">*    *    *</div>

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized officers to execute and deliver this Agreement as of the date first above written.

LEE ENTERPRISES, INCORPORATED

By: _____
     Title:


[ADDITIONAL PARTIES:]

By: _____
     Title:]

WILMINGTON TRUST, NATIONAL
ASSOCIATION, as Collateral Agent


By: _____
    Title:

MILBANK DRAFT 12/02/11

## EXHIBIT I-1
## TO SECOND LIEN LOAN AGREEMENT

FORM OF

PLEDGE AGREEMENT[1]

PLEDGE AGREEMENT, dated as of [____] (as amended, modified, restated and/or supplemented from time to time, this "Agreement"), made by each of the undersigned pledgors (each, a "Pledgor" and, together with any other entity that becomes a pledgor hereunder pursuant to Section 30 hereof, the "Pledgors") in favor of Wilmington Trust, National Association, as Collateral Agent (together with any successor Collateral Agent, the "Pledgee"), for the benefit of the Secured Creditors (as defined below).  Except as otherwise defined herein, all capitalized terms used herein and defined in the Loan Agreement (as defined below) shall be used herein as therein defined.

W I T N E S S E T H :

WHEREAS, Lee Enterprises, Incorporated (the "Borrower"), the lenders from time to time party thereto (the "Lenders"), Deutsche Bank Securities Inc. and Goldman Sachs Lending Partners LLC, as Joint Lead Arrangers and Joint Book Running Managers, and Wilmington Trust, National Association, as administrative agent (together with any successor administrative agent, the "Administrative Agent") for the Lenders, have entered into a Second Lien Loan Agreement, dated as of the date hereof (as amended, modified, restated and/or supplemented from time to time, the "Loan Agreement"), providing for the making and continuation of Loans to the Borrower, all as contemplated therein (the Lenders, the Administrative Agent and the Pledgee are herein called the "Secured Creditors");

WHEREAS, pursuant to the Subsidiaries Guaranty, each Subsidiary Guarantor has jointly and severally guaranteed to the Secured Creditors the payment when due of all Guaranteed Obligations as described therein;

WHEREAS, it is a condition precedent to the making (or deemed making) and continuation of Loans to the Borrower under the Loan Agreement that each Pledgor shall have executed and delivered to the Pledgee this Agreement;

---

[1]    The Pledgors (i) acknowledge that no disclosure schedules or similar information contemplated by this Agreement have been provided as of the date of this draft and (ii) agree that, to the extent that the information set forth in such disclosure schedules or other information differs in any respect from the information provided to the Backstop Parties prior to the Effective Date (as defined in the Lee Support Agreement), without prejudice to any other rights of any Backstop Party under its Backstop Commitment Letter, the Backstop Parties reserve the right in their reasonable discretion to make appropriate changes to this Agreement.

Exhibit I

WHEREAS, each Pledgor desires to execute this Agreement to satisfy the conditions described in the preceding paragraph; and

WHEREAS, each Pledgor will obtain benefits from the incurrence (or deemed incurrence) and continuation of Loans by the Borrower under the Loan Agreement and, accordingly, desires to execute this Agreement in order to satisfy the condition described in the preceding paragraph and to induce the Lenders to make (or be deemed to have made) and continue Loans to the Borrower.

NOW, THEREFORE, in consideration of the foregoing and other benefits accruing to each Pledgor, the receipt and sufficiency of which are hereby acknowledged, each Pledgor hereby makes the following representations and warranties to the Pledgee for the benefit of the Secured Creditors and hereby covenants and agrees with the Pledgee for the benefit of the Secured Creditors as follows:

1. SECURITY FOR OBLIGATIONS.  This Agreement is made by each Pledgor for the benefit of the Secured Creditors to secure:

(i)    the full, prompt and complete payment when due (whether at stated maturity, by acceleration or otherwise) of all obligations, liabilities and indebtedness (including, without limitation, principal, premium, interest (including, without limitation, all interest that accrues on or after the commencement of any case, proceeding or other action relating to the bankruptcy, insolvency, reorganization or similar proceeding of any Pledgor or any Subsidiary thereof at the rate provided for in the respective documentation, whether or not a claim for post-petition interest is allowed in any such proceeding), fees, costs and indemnities) of such Pledgor owing to the Secured Creditors, whether now existing or hereafter incurred under, arising out of, or in connection with, each Credit Document to which such Pledgor is a party (including, in the case of each Pledgor that is a Subsidiary Guarantor, all such obligations, liabilities and indebtedness of such Pledgor under the Subsidiaries Guaranties) and the due performance and compliance by such Pledgor with all of the terms, conditions and agreements contained in each such Credit Document;

(ii)    any and all sums advanced by the Pledgee in order to preserve the Collateral (as hereinafter defined) or preserve its security interest in the Collateral;

(iii)    in the event of any proceeding for the collection or enforcement of any indebtedness, obligations or liabilities of such Pledgor referred to in clause (i) above, after an Event of Default shall have occurred and be continuing, the reasonable expenses of retaking, holding, preparing for sale or lease, selling or otherwise disposing of or realizing on the Collateral, or of any exercise by the Pledgee of its rights hereunder, together with reasonable attorneys' fees and court costs;

(iv)    all amounts paid by any Indemnitee as to which such Indemnitee has the right to reimbursement under Section 11 of this Agreement;

(v)    all amounts owing to any Agent or any of its affiliates pursuant to any of the Credit Documents in its capacity as such; and

Exhibit I

(vi)    any and all other debts, liabilities and reimbursement obligations, indemnity obligations and other obligations for monetary amounts, fees, expenses, costs or other sums (including reasonable attorneys' fees and costs) chargeable to any Credit Party under or pursuant to any of the Credit Documents.

all such obligations, liabilities, indebtedness, sums and expenses set forth in clauses (i) through (vi) of this Section 1 being herein collectively called the "Obligations", it being acknowledged and agreed that the "Obligations" shall include extensions of credit of the types described above, whether outstanding on the date of this Agreement or extended from time to time after the date of this Agreement.

2.    DEFINITIONS; INTERPRETATION.    (a)    Unless otherwise defined herein, all capitalized terms used herein and defined in the Loan Agreement shall be used herein as therein defined.    Reference to singular terms shall include the plural and vice versa.

(b) The following capitalized terms used herein shall have the definitions specified below:

"Administrative Agent" shall have the meaning set forth in the recitals hereto.

"Adverse Claim" shall have the meaning given such term in Section 8-102(a)(1) of the UCC.

"Agreement" shall have the meaning set forth in the first paragraph hereof.

"Borrower" shall have the meaning set forth in the recitals hereto.

"Certificated Security" shall have the meaning given such term in Section 8-102(a)(4) of the UCC.

"Clearing Corporation" shall have the meaning given such term in Section 8-102(a)(5) of the UCC.

"Collateral" shall have the meaning set forth in Section 3.1 hereof.

"Domestic Corporation" shall have the meaning set forth in the definition of "Stock."

"Event of Default" shall mean any Event of Default under, and as defined in, the Loan Agreement and shall in any event include, without limitation, any payment default on any of the Obligations after the expiration of any applicable grace period.

"Exempted Foreign Entity" shall mean any Foreign Corporation and any limited liability company organized under the laws of a jurisdiction other than the United States or any State thereof or the District of Columbia that, in any such case, is treated as a corporation or an association taxable as a corporation for U.S. federal income tax purposes.

"First Priority Representative" shall have the meaning given such term in the Lee Intercreditor Agreement or the Pulitzer Intercreditor Agreement, as applicable.

"Foreign Corporation" shall have the meaning set forth in the definition of "Stock".

"Indemnitees" shall have the meaning set forth in Section 11 hereof.

"Investment Property" shall have the meaning given such term in Section 9-102(a)(49) of the UCC.

"Lenders" shall have the meaning set forth in the recitals hereto.

"Limited Liability Company Assets" shall mean all assets, whether tangible or intangible and whether real, personal or mixed (including, without limitation, all limited liability company capital and interest in other limited liability companies), at any time owned by any Pledgor or represented by any Limited Liability Company Interest.

"Limited Liability Company Interests" shall mean the entire limited liability company membership interest at any time owned by any Pledgor in any limited liability company that is a Subsidiary of such Pledgor.

"Loan Agreement" shall have the meaning set forth in the recitals hereto.

"Location" of any Pledgor has the meaning given such term in Section 9-307 of the UCC.

"Non-Voting Equity Interests" shall mean all Equity Interests of any Person which are not Voting Equity Interests.

"Obligations" shall have the meaning set forth in Section 1 hereof.

"Partnership Assets" shall mean all assets, whether tangible or intangible and whether real, personal or mixed (including, without limitation, all partnership capital and interest in other partnerships), at any time owned by any Pledgor or represented by any Partnership Interest.

"Partnership Interest" shall mean the entire general partnership interest or limited partnership interest at any time owned by any Pledgor in any general partnership or limited partnership that is a Subsidiary of such Pledgor.

"Pledgee" shall have the meaning set forth in the first paragraph hereof.

"Pledgor" shall have the meaning set forth in the first paragraph hereof.

"Proceeds" shall have the meaning given such term in Section 9-102(a)(64) of the UCC.

"Pulitzer Pledgor" shall mean any Pledgor that is a Pulitzer Entity.

Exhibit I

"Registered Organization" shall have the meaning given such term in Section 9-102(a)(70) of the UCC.

"Required Secured Creditors" shall mean the Required Lenders (or such other Lenders (or number or percentage thereof) as shall be necessary under Section 13.12(a) of the Loan Agreement).

"Secured Creditors" shall have the meaning set forth in the recitals hereto.

"Securities Account" shall have the meaning given such term in Section 8-501(a) of the UCC.

"Secured Debt Agreements" shall mean and includes (x) this Agreement and (y) the other Credit Documents.

"Securities Act" shall mean the Securities Act of 1933, as amended, as in effect from time to time.

"Securities Intermediary" shall have the meaning given such term in Section 8-102(14) of the UCC.

"Security" and "Securities" shall have the meaning given such term in Section 8-102(a)(15) of the UCC and shall in any event also include all Stock.

"Security Entitlement" shall have the meaning given such term in Section 8-102(a)(17) of the UCC.

"Stock" shall mean (x) with respect to corporations incorporated under the laws of the United States or any State thereof or the District of Columbia (each, a "Domestic Corporation"), all of the issued and outstanding shares of capital stock at anytime owned by any Pledgor of any Domestic Corporation that is a Subsidiary of such Pledgor and (y) with respect to corporations not Domestic Corporations (each, a "Foreign Corporation"), all of the issued and outstanding shares of capital stock at any time owned by any Pledgor of any Foreign Corporation that is a Subsidiary of such Pledgor.

"Termination Date" shall have the meaning set forth in Section 20 hereof.

"Transmitting Utility" has the meaning given such term in Section 9-102(a)(80) of the UCC.

"UCC" shall mean the Uniform Commercial Code as in effect in the State of New York from time to time; provided that all references herein to specific Sections or subsections of the UCC are references to such Sections or subsections, as the case may be, of the Uniform Commercial Code as in effect in the State of New York on the date hereof.

"Uncertificated Security" shall have the meaning given such term in Section 8-102(a)(18) of the UCC.

Exhibit I

"Voting Equity Interests" of any Person shall mean all classes of Equity Interests of such Person entitled to vote.

### 3. PLEDGE OF SECURITIES, ETC.

3.1 Pledge. To secure the Obligations now or hereafter owed or to be performed by such Pledgor, each Pledgor does hereby grant, pledge and assign to the Pledgee for the benefit of the Secured Creditors, and does hereby create a continuing security interest in favor of the Pledgee for the benefit of the Secured Creditors in, all of its right, title and interest in and to the following, whether now existing or hereafter from time to time acquired (collectively, the "Collateral"):

(a) all Stock owned or held by such Pledgor from time to time and all options and warrants owned by such Pledgor from time to time to purchase Stock;

(b) all Limited Liability Company Interests owned by such Pledgor from time to time and all of its right, title and interest in each limited liability company to which each such Limited Liability Company Interest relates, whether now existing or hereafter acquired, including, without limitation, to the fullest extent permitted under the terms and provisions of the documents and agreements governing such Limited Liability Company Interests and applicable law:

(A) all its capital therein and its interest in all profits, income, surpluses, losses, Limited Liability Company Assets and other distributions to which such Pledgor shall at any time be entitled in respect of such Limited Liability Company Interests;

(B) all other payments due or to become due to such Pledgor in respect of Limited Liability Company Interests, whether under any limited liability company agreement or otherwise, whether as contractual obligations, damages, insurance proceeds or otherwise;

(C) all of its claims, rights, powers, privileges, authority, options, security interests, liens and remedies, if any, under any limited liability company agreement or operating agreement, or at law or otherwise in respect of such Limited Liability Company Interests;

(D) all present and future claims, if any, of such Pledgor against any such limited liability company for monies loaned or advanced, for services rendered or otherwise;

(E) all of such Pledgor's rights under any limited liability company agreement or operating agreement or at law to exercise and enforce every right, power, remedy, authority, option and privilege of such Pledgor relating to such Limited Liability Company Interests, including any power to terminate, cancel or modify any such limited liability company agreement or operating agreement, to execute any instruments and to take any and all other action on behalf of and in the name of any of such Pledgor in respect of such Limited Liability Company

Exhibit I

Interests and any such limited liability company, to make determinations, to exercise any election (including, but not limited to, election of remedies) or option or to give or receive any notice, consent, amendment, waiver or approval, together with full power and authority to demand, receive, enforce, collect or receipt for any of the foregoing or for any Limited Liability Company Asset, to enforce or execute any checks, or other instruments or orders, to file any claims and to take any action in connection with any of the foregoing; and

(F)     all other property hereafter delivered in substitution for or in addition to any of the foregoing, all certificates and instruments representing or evidencing such other property and all cash, securities, interest, dividends, rights and other property at any time and from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all thereof;

(c) all Partnership Interests owned by such Pledgor from time to time and all of its right, title and interest in each partnership to which each such Partnership Interest relates, whether now existing or hereafter acquired, including, without limitation, to the fullest extent permitted under the terms and provisions of the documents and agreements governing such Partnership Interests and applicable law:

(A)     all its capital therein and its interest in all profits, income, surpluses, losses, Partnership Assets and other distributions to which such Pledgor shall at any time be entitled in respect of such Partnership Interests;

(B)     all other payments due or to become due to such Pledgor in respect of Partnership Interests, whether under any partnership agreement or otherwise, whether as contractual obligations, damages, insurance proceeds or otherwise;

(C)     all of its claims, rights, powers, privileges, authority, options, security interests, liens and remedies, if any, under any partnership agreement or operating agreement, or at law or otherwise in respect of such Partnership Interests;

(D)     all present and future claims, if any, of such Pledgor against any such partnership for monies loaned or advanced, for services rendered or otherwise;

(E)     all of such Pledgor's rights under any partnership agreement or operating agreement or at law to exercise and enforce every right, power, remedy, authority, option and privilege of such Pledgor relating to such Partnership Interests, including any power to terminate, cancel or modify any partnership agreement or operating agreement, to execute any instruments and to take any and all other action on behalf of and in the name of such Pledgor in respect of such Partnership Interests and any such partnership, to make determinations, to exercise any election (including, but not limited to, election of remedies) or option or to give or receive any notice, consent, amendment, waiver or approval, together with full power and authority to demand, receive, enforce, collect or receipt for

any of the foregoing or for any Partnership Asset, to enforce or execute any checks, or other instruments or orders, to file any claims and to take any action in connection with any of the foregoing; and

(F)     all other property hereafter delivered in substitution for or in addition to any of the foregoing, all certificates and instruments representing or evidencing such other property and all cash, securities, interest, dividends, rights and other property at any time and from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all thereof;

(d) all other Investment Property that constitutes Equity Interests of a Person that is a Subsidiary of a Pledgor; and

(e) all Proceeds, rents, issues, profits, returns, income, allocations and of and from any and all of the foregoing;

provided that (x) except in the circumstances and to the extent provided by Section 9.16 of the Loan Agreement (in which case this clause (x) shall no longer be applicable), no Pledgor shall be required at any time to pledge hereunder more than 66-⅔% of the total combined voting power of all classes of Voting Equity Interests of any Exempted Foreign Entity, (y) each Pledgor shall be required to pledge hereunder 100% of the Non-Voting Equity Interests of each Exempted Foreign Entity at any time and from time to time acquired by such Pledgor, which Non-Voting Equity Interests shall not be subject to the limitations described in preceding clause (x) and (z) no Pledgor shall be required at any time to pledge hereunder any equity interests in any Excluded TNI Assets.

Notwithstanding anything in this Agreement to the contrary, it is the understanding of the parties that the Liens pledged pursuant to this Section 3.1 shall, (x) with respect to any such Liens granted in any Collateral comprising Common Collateral (as defined in the Lee Intercreditor Agreement), prior to the First Priority Obligations Payment Date (as defined in the Lee Intercreditor Agreement), be subject and subordinate to the First Priority Lien (as defined in the Lee Intercreditor Agreement) on such Collateral pursuant to the terms of the Lee Intercreditor Agreement and (y) with respect to any such Liens granted in any Collateral comprising Common Collateral (as defined in the Pulitzer Intercreditor Agreement), prior to the First Priority Obligations Payment Date (as defined in the Pulitzer Intercreditor Agreement), be subject and subordinate to the First Priority Lien (as defined in the Pulitzer Intercreditor Agreement) on such Collateral pursuant to the terms of the Pulitzer Intercreditor Agreement.

3.2 Procedures. (a) To the extent that any Pledgor at any time or from time to time owns, acquires or obtains any right, title or interest in any Collateral, such Collateral shall automatically (and without the taking of any action by such Pledgor) be pledged pursuant to Section 3.1 of this Agreement and, in addition thereto, such Pledgor shall (to the extent provided below) take the following actions as set forth below (as promptly as practicable and, in any event, within 10 days after it obtains such Collateral) for the benefit of the Pledgee and the other Secured Creditors (subject to the provisions of Section 3.6 below):

Exhibit I

(i)    with respect to a Certificated Security (other than a Certificated Security credited on the books of a Clearing Corporation or Securities Intermediary), such Pledgor shall physically deliver such Certificated Security to the Pledgee. endorsed to the Pledgee or endorsed in blank;

(ii)    with respect to an Uncertificated Security (other than an Uncertificated Security credited on the books of a Clearing Corporation or Securities Intermediary), such Pledgor shall cause the issuer of such Uncertificated Security to duly authorize, execute, and deliver to the Pledgee an agreement for the benefit of the Pledgee, and the other Secured Creditors substantially in the form of Annex G hereto (appropriately completed to the satisfaction of the Pledgee and with such modifications, if any, as shall be satisfactory to the Pledgee) pursuant to which such issuer agrees to comply with any and all instructions originated by the Pledgee without further consent by the registered owner and not to comply with instructions regarding such Uncertificated Security (and any Partnership Interests and Limited Liability Company Interests issued by such issuer) originated by any other Person other than a court of competent jurisdiction;

(iii)    with respect to a Certificated Security, Uncertificated Security, Partnership Interest or Limited Liability Company Interest credited on the books of a Clearing Corporation or Securities Intermediary (including a Federal Reserve Bank, Participants Trust Company or The Depository Trust Company), such Pledgor shall promptly notify the Pledgee thereof and shall promptly take (x) all actions required (i) to comply with the applicable rules of such Clearing Corporation or Securities Intermediary and (ii) to perfect the security interest of the Pledgee under applicable law (including, in any event, under Sections 9-314(a), (b) and (c), 9-106 and 8-106(d) of the UCC) and (y) such other actions as the Pledgee deems necessary or desirable to effect the foregoing;

(iv)    with respect to a Partnership Interest or a Limited Liability Company Interest (other than a Partnership Interest or Limited Liability Company Interest credited on the books of a Clearing Corporation or Securities Intermediary), (1) if such Partnership Interest or Limited Liability Company Interest is represented by a certificate and is a Security for purposes of the UCC, such Pledgor shall follow the procedure set forth in Section 3.2(a)(i) hereof, and (2) if such Partnership Interest or Limited Liability Company Interest is not represented by a certificate or is not a Security for purposes of the UCC, such Pledgor shall follow the procedure set forth in Section 3.2(a)(ii) hereof; and

(v)    with respect to cash proceeds from any of the Collateral, (i) establishment by the Pledgee of a cash account in the name of such Pledgor over which the Pledgee, shall have "control" within the meaning of the UCC and at any time any Default or Event of Default is in existence no withdrawals or transfers may be made therefrom by any Person except with the prior written consent of the Pledgee and (ii) deposit of such cash in such cash account.

(b)    In addition to the actions required to be taken pursuant to Section 3.2(a) hereof, each Pledgor shall take the following additional actions with respect to the Collateral:

(i)     with respect to all Collateral of such Pledgor whereby or with respect to which the Pledgee may obtain "control" thereof within the meaning of Section 8-106 of the UCC (or under any provision of the UCC as same may be amended or supplemented from time to time, or under the laws of any relevant State other than the State of New York), such Pledgor shall take all actions as may be requested from time to time by the Pledgee so that "control" of such Collateral is obtained and at all times held by the Pledgee; and

(ii)    each Pledgor shall from time to time cause appropriate financing statements (on appropriate forms) under the UCC as in effect in the various relevant States, covering all Collateral hereunder (with the form of such financing statements to be satisfactory to the Pledgee), to be filed in the relevant filing offices so that at all times the Pledgee's security interest in all Investment Property and other Collateral which can be perfected by the filing of such financing statements (in each case to the maximum extent perfection by filing may be obtained under the laws of the relevant States, including, without limitation, Section 9-312(a) of the UCC) is so perfected.

3.3  Subsequently Acquired Collateral.  If any Pledgor shall acquire (by purchase, stock dividend, distribution or otherwise) any additional Collateral at any time or from time to time after the date hereof, (i) such Collateral shall automatically (and without any further action being required to be taken) be subject to the pledge and security interests created pursuant to Section 3.1 hereof and, furthermore, such Pledgor will thereafter take (or cause to be taken) all action (as promptly as practicable and, in any event, within 10 days after it obtains such Collateral) with respect to such Collateral in accordance with the procedures set forth in Section 3.2 hereof, and will promptly thereafter deliver to the Pledgee (i) a certificate executed by an authorized officer of such Pledgor describing such Collateral and certifying that the same has been duly pledged in favor of the Pledgee (for the benefit of the Secured Creditors) hereunder and (ii) supplements to Annexes A through F hereto as are necessary to cause such Annexes to be complete and accurate at such time.  Without limiting the foregoing, each Pledgor shall be required to pledge hereunder the Equity Interests of any Exempted Foreign Entity at any time and from time to time after the date hereof acquired by such Pledgor, provided that (x) except in the circumstances and to the extent provided by Section 9.16 of the Loan Agreement (in which case this clause (x) shall no longer be applicable), no Pledgor shall be required at any time to pledge hereunder more than 66-⅔% of the total combined voting power of all classes of Voting Equity Interests of any Exempted Foreign Entity and (y) each Pledgor shall be required to pledge hereunder 100% of the Non-Voting Equity Interests of each Exempted Foreign Entity at any time and from time to time acquired by such Pledgor.

3.4  Transfer Taxes.  Each pledge of Collateral under Section 3.1 or Section 3.3 hereof shall be accompanied by any transfer tax stamps required in connection with the pledge of such Collateral.

3.5  Certain Representations and Warranties Regarding the Collateral.   Each Pledgor represents and warrants that on the date hereof: (i) each Subsidiary of such Pledgor, and the direct ownership thereof, is listed in Annex B hereto; (ii) the Stock (and any warrants or options to purchase Stock) held by such Pledgor consists of the number and type of shares of the stock (or warrants or options to purchase any stock) of the corporations as described in Annex C

Exhibit I

hereto; (iii) such Stock referenced in clause (ii) of this sentence constitutes that percentage of the issued and outstanding capital stock of the issuing corporation as is set forth in Annex C hereto; (iv) the Limited Liability Company Interests held by such Pledgor consist of the number and type of interests of the Persons described in Annex D hereto; (v) each such Limited Liability Company Interest referenced in clause (iv) of this paragraph constitutes that percentage of the issued and outstanding equity interest of the issuing Person as set forth in Annex D hereto; (vi) the Partnership Interests held by such Pledgor consist of the number and type of interests of the Persons described in Annex E hereto; (vii) each such Partnership Interest referenced in clause (vi) of this paragraph constitutes that percentage or portion of the entire Partnership Interest of the relevant partnership as set forth in Annex E hereto; (viii) the exact address of the chief executive office of such Pledgor is listed on Annex F hereto; (ix) such Pledgor has complied with the respective procedure set forth in Section 3.2(a) hereof with respect to each item of Collateral described in Annexes C through E hereto for such Pledgor; and (x) on the date hereof, such Pledgor owns no other Stock, Limited Liability Company Interests or Partnership Interests. Each Pulitzer Pledgor represents and warrants that on the date hereof all information with respect to the Collateral of such Pulitzer Pledgor set forth in any schedule, certificate or other writing at any time furnished by such Pledgor to the Pledgee or any Secured Creditor, and all other written information at any time furnished by such Pledgor to the Pledgee or any Secured Creditor, is and shall be true and correct in all material respects as of the date furnished.

3.6 <u>Bailee for Perfection</u>.  Notwithstanding anything herein to the contrary, subject to the terms of the Lee Intercreditor Agreement or the Pulitzer Intercreditor Agreement, as applicable, and until (but not after) their First Priority Obligations Payment Date (as defined in the Lee Intercreditor Agreement or the Pulitzer Intercreditor Agreement, as applicable), (i) the requirements of this Agreement to endorse, assign or deliver Collateral to the Pledgee or to provide the Pledgee "control" (within the meaning of the UCC) over the Collateral shall be deemed satisfied by endorsement, assignment or delivery of such Collateral to the applicable First Priority Representative or by exercise of control over such Collateral by such First Priority Representative, in each case as bailee and agent for the Pledgee pursuant to Section 2.3(c) of the Lee Intercreditor Agreement or the Pulitzer Intercreditor Agreement, as applicable, and (ii) any endorsement, assignment or delivery of Collateral to the First Priority Representative as bailee and agent for the Pledgee pursuant to Section 2.3(c) of the Lee Intercreditor Agreement or the Pulitzer Intercreditor Agreement, as applicable, shall be deemed an endorsement, assignment or delivery to, or control by, the Pledgee for all purposes hereunder.

4.  APPOINTMENT OF SUB-AGENTS; ENDORSEMENTS, ETC.  The Pledgee shall have the right to appoint one or more sub-agents for the purpose of retaining physical possession of the Collateral, which may be held (in the discretion of the Pledgee) in the name of the relevant Pledgor, endorsed or assigned in blank or in favor of the Pledgee or any nominee or nominees of the Pledgee or a sub-agent appointed by the Pledgee.

5.  VOTING, ETC., WHILE NO EVENT OF DEFAULT.  Unless and until there shall have occurred and be continuing an Event of Default and the Pledgee shall instruct the Pledgors otherwise (in writing), each Pledgor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Collateral owned by it, and to give consents, waivers or ratifications in respect thereof; <u>provided</u> that, in each case, no vote shall be cast or any consent, waiver or ratification given or any action taken or omitted to be taken which would violate, result

in a breach of any covenant contained in, or be inconsistent with any of the terms of any Secured Debt Agreement, or which could reasonably be expected to have the effect of impairing the value of the Collateral or any part thereof or the position or interests of the Pledgee or any other Secured Creditor in the Collateral, unless expressly permitted by the terms of the Secured Debt Agreements.   All such rights of each Pledgor to vote and to give consents, waivers and ratifications shall cease in case an Event of Default has occurred and is continuing and the Pledgee has notified the Pledgors (in writing) that such rights have ceased, and Section 7 hereof shall become applicable.

6.   DIVIDENDS AND OTHER DISTRIBUTIONS.   Unless and until there shall have occurred and be continuing an Event of Default, all cash dividends, cash distributions, cash Proceeds and other cash amounts payable in respect of the Collateral shall be paid to the respective Pledgor.   The Pledgee, in each case subject to the applicable Intercreditor Agreement, shall be entitled to receive directly, and to retain as part of the Collateral:

(i)      all other or additional stock, notes, certificates, limited liability company interests, partnership interests, instruments or other securities or property (including, but not limited to, cash dividends other than as set forth above) paid or distributed by way of dividend or otherwise in respect of the Collateral;

(ii)     all other or additional stock, notes, certificates, limited liability company interests, partnership interests, instruments or other securities or property (including, but not limited to, cash (although such cash may be paid directly to the respective Pledgor so long as no Event of Default then exists)) paid or distributed in respect of the Collateral by way of stock-split, spin-off, split-up, reclassification, combination of shares or similar rearrangement; and

(iii)    all other or additional stock, notes, certificates, limited liability company interests, partnership interests, instruments or other securities or property (including, but not limited to, cash) which may be paid in respect of the Collateral by reason of any consolidation, merger, exchange of stock, conveyance of assets, liquidation or similar corporate or other reorganization.

Nothing contained in this Section 6 shall limit or restrict in any way the Pledgee's right to receive the proceeds of the Collateral in any form in accordance with Section 3 of this Agreement.   All dividends, distributions or other payments which are received by any Pledgor contrary to the provisions of this Section 6 or Section 7 hereof shall be received in trust for the benefit of the Pledgee, shall be segregated from other property or funds of such Pledgor and shall be forthwith paid over to the Pledgee as Collateral in the same form as so received (with any necessary endorsement).

7.   REMEDIES IN CASE OF AN EVENT OF DEFAULT.   If there shall have occurred and be continuing an Event of Default, then and in every such case, the Pledgee shall be entitled to exercise all of the rights, powers and remedies (whether vested in it by this Agreement, any Intercreditor Agreement, any other Secured Debt Agreement, Section 11 of the Loan Agreement or by law) for the protection and enforcement of its rights in respect of the Collateral, and the Pledgee shall be entitled to exercise all the rights and remedies of a secured

Exhibit I

party under the UCC as in effect in any relevant jurisdiction and also shall be entitled, without limitation, to exercise the following rights, which each Pledgor hereby agrees to be commercially reasonable:

(i)    to receive all amounts payable in respect of the Collateral otherwise payable under Section 6 hereof to the respective Pledgor;

(ii)    to transfer all or any part of the Collateral into the Pledgee's name or the name of its nominee or nominees;

(iii)    to vote (and exercise all rights and powers in respect of voting) all or any part of the Collateral (whether or not transferred into the name of the Pledgee) and give all consents, waivers and ratifications in respect of the Collateral and otherwise act with respect thereto as though it were the outright owner thereof (each Pledgor hereby irrevocably constituting and appointing the Pledgee the proxy and attorney-in-fact of such Pledgor, with full power of substitution to do so);

(iv)    at any time and from time to time to sell, assign and deliver, or grant options to purchase, all or any part of the Collateral, or any interest therein, at any public or private sale, without demand of performance, advertisement or, notice of intention to sell or of the time or place of sale or adjournment thereof or to redeem or otherwise purchase or dispose (all of which are hereby waived by each Pledgor), for cash, on credit or for other property, for immediate or future delivery without any assumption of credit risk, and for such price or prices and on such terms as the Pledgee in its absolute discretion may determine, <u>provided</u> at least 10 days' written notice of the time and place of any such sale shall be given to the respective Pledgor. The Pledgee shall not be obligated to make any such sale of Collateral regardless of whether any such notice of sale has theretofore been given. Each Pledgor hereby waives and releases to the fullest extent permitted by law any right or equity of redemption with respect to the Collateral, whether before or after sale hereunder, and all rights, if any, of marshalling the Collateral and any other security or the Obligations or otherwise. At any such sale, unless prohibited by applicable law, the Pledgee on behalf of the Secured Creditors may bid for and purchase all or any part of the Collateral so sold free from any such right or equity of redemption. Neither the Pledgee nor any other Secured Creditor shall be liable for failure to collect or realize upon any or all of the Collateral or for any delay in so doing nor shall any of them be under any obligation to take any action whatsoever with regard thereto; and

(v)    to set off any and all Collateral against any and all Obligations, and to withdraw any and all cash or other Collateral from any and all accounts described in Section 3.2(a)(v) hereof and to apply such cash and other Collateral to the payment of any and all Obligations.

8.    REMEDIES, CUMULATIVE, ETC.  Each and every right, power and remedy of the Pledgee provided for in this Agreement, each Intercreditor Agreement or in any other Secured Debt Agreement, or now or hereafter existing at law or in equity or by statute shall be cumulative and concurrent and shall be in addition to every other such right, power or remedy.

The exercise or beginning of the exercise by the Pledgee or any other Secured Creditor of any one or more of the rights, powers or remedies provided for in this Agreement or any other Secured Debt Agreement or now or hereafter existing at law or in equity or by statute or otherwise shall not preclude the simultaneous or later exercise by the Pledgee or any other Secured Creditor of all such other rights, powers or remedies, and no failure or delay on the part of the Pledgee or any other Secured Creditor to exercise any such right, power or remedy shall operate as a waiver thereof. No notice to or demand on any Pledgor in any case shall entitle it to any other or further notice or demand in similar or other circumstances or constitute a waiver of any of the rights of the Pledgee or any other Secured Creditor to any other or further action in any circumstances without notice or demand. The Secured Creditors agree that, other than as provided in the applicable Intercreditor Agreement, this Agreement may be enforced only by the action of the Pledgee, in each case, acting upon the instructions of the Required Secured Creditors, and that no other Secured Creditor shall have any right individually to seek to enforce or to enforce this Agreement or to realize upon the security to be granted hereby, it being understood and agreed that such rights and remedies may be exercised by the Pledgee for the benefit of the Secured Creditors upon the terms of this Agreement.

9. APPLICATION OF PROCEEDS. (a) Subject to the terms of the applicable Intercreditor Agreement with respect to Common Collateral (as defined in the applicable Intercreditor Agreement), all monies collected by the Pledgee pursuant to the terms of this Agreement upon any sale or other disposition of Collateral, together with all other monies received by the Pledgee hereunder, shall be applied as provided in Section 13.17 of the Loan Agreement.

(b) All payments required to be made under Section 13.17 of the Loan Agreement shall be made to the Administrative Agent for the account of the Secured Creditors.

(c) It is understood and agreed that each Pledgor shall remain jointly and severally liable with respect to its Obligations to the extent of any deficiency between the amount of the proceeds of the Collateral pledged by it hereunder and the aggregate amount of such Obligations.

10. PURCHASERS OF COLLATERAL. Upon any sale of the Collateral by the Pledgee hereunder (whether by virtue of the power of sale herein granted, pursuant to judicial process or otherwise), the receipt of the Pledgee or the officer making such sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold, and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to the Pledgee or such officer or be answerable in any way for the misapplication or nonapplication thereof.

11. INDEMNITY. Each Pledgor jointly and severally agrees (i) to indemnify, reimburse and hold harmless the Pledgee and each other Secured Creditor and their respective successors, assigns, employees, agents and affiliates (individually an "Indemnitee", and collectively, the "Indemnitees") from and against any and all obligations, damages, injuries, penalties, claims, demands, losses, judgments and liabilities (including, without limitation, liabilities for penalties) of whatsoever kind or nature, and (ii) to reimburse each Indemnitee for all reasonable costs, expenses and disbursements, including reasonable attorneys' fees and

Exhibit I

expenses, in each case arising out of or resulting from this Agreement or the exercise by any Indemnitee of any right or remedy granted to it hereunder or under any other Secured Debt Agreement (but excluding any obligations, damages, injuries, penalties, claims, demands, losses, judgments and liabilities (including, without limitation, liabilities for penalties) or expenses of whatsoever kind or nature to the extent incurred or arising by reason of gross negligence or willful misconduct of such Indemnitee (as determined by a court of competent jurisdiction in a final and non-appealable decision)).  In no event shall the Pledgee hereunder be liable, in the absence of gross negligence or willful misconduct on its part (as determined by a court of competent jurisdiction in a final and non-appealable decision), for any matter or thing in connection with this Agreement other than to account for monies or other property actually received by it in accordance with the terms hereof.  If and to the extent that the obligations of any Pledgor under this Section 11 are unenforceable for any reason, such Pledgor hereby agrees to make the maximum contribution to the payment and satisfaction of such obligations which is permissible under applicable law. The indemnity obligations of each Pledgor contained in this Section 11 shall continue in full force and effect notwithstanding the full payment of all the Notes issued under the Loan Agreement, and the payment of all other Obligations and notwithstanding the discharge thereof.

12. PLEDGEE NOT A PARTNER OR LIMITED LIABILITY COMPANY MEMBER.  (a)  Nothing herein shall be construed to make the Pledgee or any other Secured Creditor liable as a member of any limited liability company or as a partner of any partnership and neither the Pledgee nor any other Secured Creditor by virtue of this Agreement or otherwise (except as referred to in the following sentence) shall have any of the duties, obligations or liabilities of a member of any limited liability company or as a partner in any partnership.  The parties hereto expressly agree that, unless the Pledgee shall become the absolute owner of Collateral consisting of a Limited Liability Company Interest or a Partnership Interest pursuant hereto, this Agreement shall not be construed as creating a partnership or joint venture among the Pledgee, any other Secured Creditor, any Pledgor and/or any other Person.

(b)     Except as provided in the last sentence of paragraph (a) of this Section 12, the Pledgee, by accepting this Agreement, did not intend to become a member of any limited liability company or a partner of any partnership or otherwise be deemed to be a co-venturer with respect to any Pledgor, any limited liability company, partnership and/or any other Person either before or after an Event of Default shall have occurred.  The Pledgee shall have only those powers set forth herein and the Secured Creditors shall assume none of the duties, obligations or liabilities of a member of any limited liability company or as a partner of any partnership or any Pledgor except as provided in the last sentence of paragraph (a) of this Section 12.

(c)     The Pledgee and the other Secured Creditors shall not be obligated to perform or discharge any obligation of any Pledgor as a result of the pledge hereby effected.

(d)     The acceptance by the Pledgee of this Agreement, with all the rights, powers, privileges and authority so created, shall not at any time or in any event obligate the Pledgee or any other Secured Creditor to appear in or defend any action or proceeding relating to the Collateral to which it is not a party, or to take any action hereunder or thereunder, or to expend any money or incur any expenses or perform or discharge any obligation, duty or liability under the Collateral.

13. FURTHER ASSURANCES; POWER-OF-ATTORNEY.  (a)  Each Pledgor agrees that it will join with the Pledgee in executing and, at such Pledgor's own expense, file and refile under the UCC or other applicable law such financing statements, continuation statements and other documents, in form reasonably acceptable to the Pledgee, in such offices as the Pledgee (acting on its own or on the instructions of the Required Secured Creditors) may reasonably deem necessary or appropriate and wherever required or permitted by law in order to perfect and preserve the Pledgee's security interest in the Collateral hereunder and hereby authorizes the Pledgee to file financing statements and amendments thereto relative to all or any part of the Collateral (including, without limitation, (x) financing statements which list the Collateral specifically and/or "all assets" as collateral and (y) "in lieu of" financing statements) without the signature of such Pledgor where permitted by law, and agrees to do such further acts and things and to execute and deliver to the Pledgee such additional conveyances, assignments, agreements and instruments as the Pledgee may reasonably require or deem advisable to carry into effect the purposes of this Agreement or to further assure and confirm unto the Pledgee its rights, powers and remedies hereunder or thereunder.

(b)    Each Pledgor hereby constitutes and appoints the Pledgee, its true and lawful attorney-in-fact, irrevocably, with full authority in the place and stead of such Pledgor and in the name of such Pledgor or otherwise, from time to time after the occurrence and during the continuance of an Event of Default, in the Pledgee's discretion, to act, require, demand, receive and give acquittance for any and all monies and claims for monies due or to become due to such Pledgor under or arising out of the Collateral, to endorse any checks or other instruments or orders in connection therewith and to file any claims or take any action or institute any proceedings and to execute any instrument which the Pledgee may deem necessary or advisable to accomplish the purposes of this Agreement, which appointment as attorney is coupled with an interest.

14. THE PLEDGEE AS COLLATERAL AGENT.  The Pledgee will hold in accordance with this Agreement (and subject to the Lee Intercreditor Agreement or the Pulitzer Intercreditor Agreement, as applicable) all items of the Collateral at any time received under this Agreement. It is expressly understood, acknowledged and agreed by each Secured Creditor that by accepting the benefits of this Agreement each such Secured Creditor acknowledges and agrees that the obligations of the Pledgee as holder of the Collateral and interests therein and with respect to the disposition thereof, and otherwise under this Agreement, are only those expressly set forth in this Agreement, the Intercreditor Agreements and in Section 12 of the Loan Agreement.  The Pledgee shall act hereunder on the terms and conditions set forth herein and in Section 12 of the Loan Agreement.

15. TRANSFER BY THE PLEDGORS.  Except as permitted by the Loan Agreement, no Pledgor will sell or otherwise dispose of, grant any option with respect to, or mortgage, pledge or otherwise encumber any of the Collateral or any interest therein.

16. REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE PLEDGORS.  (a) Each Pledgor represents, warrants and covenants as to itself and each of its Subsidiaries that:

Exhibit I

(i)      it is the legal, beneficial and record owner of, and has good and marketable title to, all of its Collateral and that it has sufficient interest in all of its Collateral in which a security interest is purported to be created hereunder for such security interest to attach (subject, in each case, to no pledge, lien, mortgage, hypothecation, security interest, charge, option, Adverse Claim or other encumbrance whatsoever, except the liens and security interests created by this Agreement and any other Permitted Liens and Permitted Encumbrances);

(ii)     it has full power, authority and legal right to pledge all the Collateral pledged by it pursuant to this Agreement;

(iii)    this Agreement has been duly authorized, executed and delivered by such Pledgor and constitutes a legal, valid and binding obligation of such Pledgor enforceable against such Pledgor in accordance with its terms, except to the extent that the enforceability hereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and by general equitable principles (regardless of whether enforcement is sought in equity or at law);

(iv)    except to the extent already obtained or made, no consent of any other party (including, without limitation, any stockholder, partner, member or creditor of such Pledgor or any of its Subsidiaries) and no consent, license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority is required to be obtained by such Pledgor in connection with (a) the execution, delivery or performance of this Agreement by such Pledgor, (b) the validity or enforceability of this Agreement against such Pledgor, (c) the perfection or enforceability of the Pledgee's security interest in such Pledgor's Collateral or (d) except for compliance with or as may be required by applicable securities laws, the exercise by the Pledgee of any of its rights or remedies provided herein;

(v)     neither the execution, delivery or performance by such Pledgor of this Agreement or any other Secured Debt Agreement to which it is a party, nor compliance by it with the terms and provisions hereof and thereof nor the consummation of the transactions contemplated therein:  (i) will contravene any provision of any applicable law, statute, rule or regulation, or any applicable order, writ, injunction or decree of any court, arbitrator or governmental instrumentality, domestic or foreign, applicable to such Pledgor; (ii) will conflict or be inconsistent with or result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien (except pursuant to this Agreement or any other Security Document) upon any of the properties or assets of such Pledgor or any of its Subsidiaries pursuant to the terms of any indenture, lease, mortgage, deed of trust, credit agreement, loan agreement or any other material agreement, contract or other instrument to which such Pledgor or any of its Subsidiaries is a party or is otherwise bound, or by which it or any of its properties or assets is bound or to which it may be subject; or (iii) will violate any provision of the certificate of incorporation, by-laws, certificate of partnership, partnership agreement, certificate of formation or limited liability company agreement (or equivalent organizational documents), as the case may be, of such Pledgor or any of its Subsidiaries;

(vi)     all of such Pledgor's Collateral has been duly and validly issued, is fully paid and non-assessable and is subject to no options to purchase or similar rights;

(vii)     the pledge, collateral assignment and delivery to the Pledgee (subject to Section 3.6 above) of such Pledgor's Collateral consisting of Certificated Securities pursuant to this Agreement creates a valid and perfected security interest in such Certificated Securities and the Proceeds thereof, subject to no prior Lien or encumbrance or to any agreement purporting to grant to any third party a Lien or encumbrance on the property or assets of such Pledgor (other than Permitted Liens and Permitted Encumbrances) which would include the Securities and the Pledgee is entitled to all the rights, priorities and benefits afforded by the UCC or other relevant law as enacted in any relevant jurisdiction to perfect security interests in respect of such Collateral, in each case subject to the provisions of the applicable Intercreditor Agreement; and

(viii)     subject to Section 3.6 above, "control" (as defined in Section 8-106 of the UCC) has been obtained by the Pledgee, over all of such Pledgor's Collateral consisting of Securities with respect to which such "control" may be obtained pursuant to Section 8-106 of the UCC, except to the extent that the obligation of the applicable Pledgor to provide the Pledgee with "control" of such Collateral has not yet arisen under this Agreement; provided that in the case of the Pledgee obtaining "control" over Collateral consisting of a Security Entitlement, such Pledgor shall have taken all steps in its control so that the Pledgee obtains "control" over such Security Entitlement.

(b)     Each Pledgor covenants and agrees that it will defend the Pledgee's right, title and security interest in and to such Pledgor's Collateral and the proceeds thereof against the claims and demands of all persons whomsoever; and each Pledgor covenants and agrees that it will have like title to and right to pledge any other property at any time hereafter pledged to the Pledgee by such Pledgor as Collateral hereunder and will likewise defend the right thereto and security interest therein of the Pledgee and the other Secured Creditors.

(c)     Each Pledgor covenants and agrees that it will take no action which would violate any of the terms of any Secured Debt Agreement.

17. LEGAL NAMES; TYPE OF ORGANIZATION (AND WHETHER A REGISTERED ORGANIZATION AND/OR A TRANSMITTING UTILITY); JURISDICTION OF ORGANIZATION; LOCATION; ORGANIZATIONAL IDENTIFICATION NUMBERS; CHANGES THERETO; ETC.  The exact legal name of each Pledgor, the type of organization of such Pledgor, whether or not such Pledgor is a Registered Organization, the jurisdiction of organization of such Pledgor, such Pledgor's Location, the organizational identification number (if any) of each Pledgor, and whether or not such Pledgor is a Transmitting Utility, is listed on Annex A hereto for such Pledgor.  No Pledgor shall change its legal name, its type of organization, its status as a Registered Organization (in the case of a Registered Organization), its status as a Transmitting Utility or as a Person which is not a Transmitting Utility, as the case may be, its jurisdiction of organization, its Location, or its organizational identification number (if any), except that any such changes shall be permitted (so long as not in violation of the applicable requirements of the Secured Debt Agreements and so long as same do not involve (x) a Registered Organization ceasing to constitute same or (y) any Pledgor changing its jurisdiction

Exhibit I

of organization or Location from the United States or a State thereof to a jurisdiction of organization or Location, as the case may be, outside the United States or a State thereof) if (i) it shall have given to the Pledgee not less than 15 days' (or, in the case of any Pulitzer Pledgor, 30 days') prior written notice of each change to the information listed on Annex A (as adjusted for any subsequent changes thereto previously made in accordance with this sentence), together with a supplement to Annex A which shall correct all information contained therein for such Pledgor, and (ii) in connection with such change or changes, it shall have taken all action reasonably requested by the Pledgee to maintain the security interests of the Pledgee in the Collateral intended to be granted hereby at all times fully perfected and in full force and effect.  In addition, to the extent that any Pledgor does not have an organizational identification number on the date hereof and later obtains one, such Pledgor shall promptly thereafter deliver a notification of the Pledgee of such organizational identification number and shall take all actions reasonably satisfactory to the Pledgee to the extent necessary to maintain the security interest of the Pledgee in the Collateral intended to be granted hereby fully perfected and in full force and effect.

18.  PLEDGORS' OBLIGATIONS ABSOLUTE, ETC.  The obligations of each Pledgor under this Agreement shall be absolute and unconditional and shall remain in full force and effect without regard to, and shall not be released, suspended, discharged, terminated or otherwise affected by, any circumstance or occurrence whatsoever (other than termination of this Agreement pursuant to Section 20 hereof), including, without limitation:

(i)    any renewal, extension, amendment or modification of, or addition or supplement to or deletion from any Secured Debt Agreement (other than this Agreement in accordance with its terms), or any other instrument or agreement referred to therein, or any assignment or transfer of any thereof;

(ii)    any waiver, consent, extension, indulgence or other action or inaction under or in respect of any such agreement or instrument including, without limitation, this Agreement (other than a waiver, consent or extension with respect to this Agreement in accordance with its terms);

(iii)    any furnishing of any additional security to the Pledgee or its assignee or any acceptance thereof or any release of any security by the Pledgee or its assignee;

(iv)    any limitation on any party's liability or obligations under any such instrument or agreement or any invalidity or unenforceability, in whole or in part, of any such instrument or agreement or any term thereof; or

(v)    any bankruptcy, insolvency, reorganization, composition, adjustment, dissolution, liquidation or other like proceeding relating to any Pledgor or any Subsidiary of any Pledgor, or any action taken with respect to this Agreement by any trustee or receiver, or by any court, in any such proceeding, whether or not such Pledgor shall have notice or knowledge of any of the foregoing.

19.  SALE OF COLLATERAL WITHOUT REGISTRATION.  (a) If an Event of Default shall have occurred and be continuing and any Pledgor shall have received from the Pledgee a written request or requests that such Pledgor cause any registration, qualification or

Exhibit I

compliance under any federal or state securities law or laws to be effected with respect to all or any part of the Collateral, such Pledgor as soon as practicable and at its expense will use its best efforts to cause such registration to be effected (and be kept effective) and will use its best efforts to cause such qualification and compliance to be effected (and be kept effective) as may be so requested and as would permit or facilitate the sale and distribution of such Collateral, including, without limitation, registration under the Securities Act, as then in effect (or any similar statute then in effect), appropriate qualifications under applicable blue sky or other state securities laws and appropriate compliance with any other governmental requirements; provided, that the Pledgee shall furnish to such Pledgor such information regarding the Pledgee as such Pledgor may request in writing and as shall be required in connection with any such registration, qualification or compliance. Each Pledgor will cause the Pledgee to be kept reasonably advised in writing as to the progress of each such registration, qualification or compliance and as to the completion thereof, will furnish to the Pledgee such number of prospectuses, offering circulars and other documents incident thereto as the Pledgee from time to time may reasonably request, and will indemnify, to the extent permitted by law, the Pledgee and all other Secured Creditors participating in the distribution of such Collateral against all claims, losses, damages and liabilities caused by any untrue statement (or alleged untrue statement) of a material fact contained therein (or in any related registration statement, notification or the like) or by any omission (or alleged omission) to state therein (or in any related registration statement, notification or the like) a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as the same may have been caused by an untrue statement or omission based upon information furnished in writing to such Pledgor by the Pledgee or such other Secured Creditor expressly for use therein.

(b)       If at any time when the Pledgee shall determine to exercise its right to sell all or any part of the Collateral pursuant to Section 7 hereof, and such Collateral or the part thereof to be sold shall not, for any reason whatsoever, be effectively registered under the Securities Act, as then in effect, the Pledgee may, in its sole and absolute discretion and in accordance with the applicable Intercreditor Agreement, sell such Collateral or part thereof by private sale in such manner and under such circumstances as the Pledgee may deem necessary or advisable in order that such sale may legally be effected without such registration. Without limiting the generality of the foregoing, in any such event the Pledgee, in its sole and absolute discretion (i) may proceed to make such private sale notwithstanding that a registration statement for the purpose of registering such Collateral or part thereof shall have been filed under such Securities Act, (ii) may approach and negotiate with a single possible purchaser to effect such sale, and (iii) may restrict such sale to a purchaser who will represent and agree that such purchaser is purchasing for its own account, for investment, and not with a view to the distribution or sale of such Collateral or part thereof. In the event of any such sale, the Pledgee shall incur no responsibility or liability for selling all or any part of the Collateral at a price which the Pledgee, in its sole and absolute discretion and in accordance with the applicable Intercreditor Agreement, may in good faith deem reasonable under the circumstances, notwithstanding the possibility that a substantially higher price might be realized if the sale were deferred until the registration as aforesaid.

20.  TERMINATION; RELEASE.  (a)  On the Termination Date, this Agreement shall terminate (provided that all indemnities set forth herein including, without limitation, in Section 11 hereof shall survive any such termination) and the Pledgee, at the request and expense

Exhibit I

of such Pledgor, will execute and deliver to such Pledgor a proper instrument or instruments (including UCC termination statements) acknowledging the satisfaction and termination of this Agreement (including, without limitation, UCC termination statements and instruments of satisfaction, discharge and/or reconveyance), and will duly release from the security interest created hereby and assign, transfer and deliver to such Pledgor (without recourse and without any representation or warranty) such of the Collateral as may be in the possession of the Pledgee and as has not theretofore been sold or otherwise applied or released pursuant to this Agreement, together with any moneys at the time held by the Pledgee or any of its sub-agents hereunder and, with respect to any Collateral consisting of an Uncertificated Security, a Partnership Interest or a Limited Liability Company Interest (other than an Uncertificated Security, Partnership Interest or Limited Liability Company Interest credited on the books of a Clearing Corporation or Securities Intermediary), a termination of the agreement relating thereto executed and delivered by the issuer of such Uncertificated Security pursuant to Section 3.2(a)(ii) or by the respective partnership or limited liability company pursuant to Section 3.2(a)(iv)(2).  As used in this Agreement, "Termination Date" shall mean the date upon which the Loan Agreement shall have been terminated and no Note is outstanding (and all Loans have been paid in full in cash), and all other Obligations (other than indemnities described in Section 11 hereof and described in Section 13.01 of the Loan Agreement, in each case which are not then due and payable) then due and payable have been paid in full.

(b)      In the event that any part of the Collateral is sold or otherwise disposed of (to a Person other than a Credit Party) (I) (x) at any time prior to the Termination Date, in connection with a sale or disposition permitted by Section 10.02 of the Loan Agreement or is otherwise released at the direction of the Required Lenders (or such other Lenders (or number or percentage thereof) as shall be necessary under Section 13.12(a) of the Loan Agreement) or (y) at any time thereafter, to the extent permitted by the other Secured Debt Agreements, and in the case of clauses (x) and (y), the proceeds of such sale or disposition (or from such release) are applied in accordance with the terms of the Loan Agreement or such other Secured Debt Agreement, as the case may be, to the extent required to be so applied, or (II) pursuant to a Joint-Venture Transaction in accordance with the terms of the Loan Agreement, the Pledgee, at the request and expense of such Pledgor, will duly release from the security interest created hereby, or in the case of a Joint-Venture Transaction, the security interests created hereby shall be automatically released (and, in each case, will execute and deliver such documentation, including termination or partial release statements and the like in connection therewith) and assign, transfer and deliver to such Pledgor (without recourse and without any representation or warranty) such of the Collateral as is then being (or has been) so sold or released and as may be in the possession of the Pledgee (or, in the case of Collateral held by any sub-agent designated pursuant to Section 4 hereto, such sub-agent) and has not theretofore been released pursuant to this Agreement.

(c)      At any time that any Pledgor desires that Collateral be released as provided in the foregoing Section 20(a) or (b), it shall deliver to the Pledgee (and the relevant sub-agent, if any, designated pursuant to Section 4 hereof) a certificate signed by an Authorized Officer of such Pledgor stating that the release of the respective Collateral is permitted pursuant to Section 20(a) or (b) hereof.  If reasonably requested by the Pledgee (although the Pledgee shall have no obligation to make any such request), the relevant Pledgor shall furnish appropriate

Exhibit I

legal opinions (from counsel, reasonably acceptable to the Pledgee) to the effect set forth in the immediately preceding sentence.

(d)    Upon the occurrence of the Termination Date, the Pledgors shall be automatically released from this Agreement and all security interests created hereunder shall be released automatically without further action on the part of the Pledgee and this Agreement shall, as to each Pledgor, terminate, and have no further force or effect (provided that all indemnitees set forth herein, including, without limitation, in Section 11 hereof shall survive any such termination).

(e)    The Pledgee shall have no liability whatsoever to any other Secured Creditor as the result of any release of Collateral by it in accordance with (or which the Pledgee in good faith believes to be in accordance with) this Section 20.

21.    NOTICES, ETC.    Except as otherwise specified herein, all notices, requests, demands or other communications to or upon the respective parties hereto shall be sent or delivered by mail, telegraph, telex, telecopy, cable or courier service and all such notices and communications shall, when mailed, telegraphed, telexed, telecopied, or cabled or sent by courier, be effective when deposited in the mails, delivered to the telegraph company, cable company or overnight courier, as the case may be, or sent by telex or telecopier, except that notices and communications to the Pledgee or any Pledgor shall not be effective until received by the Pledgee or such Pledgor, as the case may be.    All notices and other communications shall be in writing and addressed as follows:

(a)    if to any Pledgor, at its address set forth opposite its signature below;

(b)    if to the Pledgee, at:

Wilmington Trust, N.A.
50 South Sixth Street, Suite 1290
Minneapolis, MN 55402
Attn: Josh James
Tel.: (612) 217-5637
Fax: (612) 217-5651
Email: jjames@WilmingtonTrust.com

(c)    if to any Secured Creditor, either (x) to the Administrative Agent, at the address of the Administrative Agent specified in the Loan Agreement, or (y) at such address as such Secured Creditor shall have specified in the Loan Agreement;

or at such other address or addressed to such other individual as shall have been furnished in writing by any Person described above to the party required to give notice hereunder.

22.    WAIVER; AMENDMENT.    Except as provided in Sections 30 and 32 hereof, none of the terms and conditions of this Agreement may be changed, waived, modified or varied in any manner whatsoever unless in writing duly signed by each Pledgor directly affected thereby (it being understood that the addition or release of any Pledgor hereunder shall not constitute a change, waiver, discharge or termination affecting any Pledgor other than the

Exhibit I

Pledgor so added or released) and the Pledgee (with the written consent of the Required Secured Creditors).

23.  SUCCESSORS AND ASSIGNS.  This Agreement shall create a continuing security interest in the Collateral and shall (i) remain in full force and effect, subject to release and/or termination as set forth in Section 20 hereof, (ii) be binding upon each Pledgor, its successors and assigns; provided, however, that no Pledgor shall assign any of its rights or obligations hereunder without the prior written consent of the Pledgee (with the prior written consent of the Required Secured Creditors), and (iii) inure, together with the rights and remedies of the Pledgee hereunder, to the benefit of the Pledgee, the other Secured Creditors and their respective successors, transferees and assigns.  All agreements, statements, representations and warranties made by each Pledgor herein or in any certificate or other instrument delivered by such Pledgor or on its behalf under this Agreement shall be considered to have been relied upon by the Secured Creditors and shall survive the execution and delivery of this Agreement, the Intercreditor Agreements and the other Secured Debt Agreements regardless of any investigation made by the Secured Creditors or on their behalf.

24.  HEADINGS DESCRIPTIVE.  The headings of the several Sections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

25.  GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF JURY TRIAL.  (a)   THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE INTERNAL LAW OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.  ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, IN EACH CASE WHICH ARE LOCATED IN THE COUNTY OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PLEDGOR HEREBY IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE NON-EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS. EACH PLEDGOR HEREBY FURTHER IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH COURTS LACK PERSONAL JURISDICTION OVER SUCH PLEDGOR, AND AGREES NOT TO PLEAD OR CLAIM IN ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN ANY OF THE AFORESAID COURTS THAT ANY SUCH COURT LACKS PERSONAL JURISDICTION OVER SUCH PLEDGOR.  EACH PLEDGOR FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO ANY SUCH PLEDGOR AT ITS ADDRESS FOR NOTICES AS PROVIDED IN SECTION 21 ABOVE, SUCH SERVICE TO BECOME EFFECTIVE 30 DAYS AFTER SUCH MAILING.   EACH PLEDGOR HEREBY IRREVOCABLY WAIVES ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY

Exhibit I

ACTION OR PROCEEDING COMMENCED HEREUNDER OR UNDER ANY OTHER CREDIT DOCUMENT THAT SUCH SERVICE OF PROCESS WAS IN ANY WAY INVALID OR INEFFECTIVE.  NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE PLEDGEE UNDER THIS AGREEMENT, OR ANY SECURED CREDITOR, TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY PLEDGOR IN ANY OTHER JURISDICTION.

(b)    EACH PLEDGOR HEREBY IRREVOCABLY WAIVES ANY OBJEC-TION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (a) ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)    EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVO-CABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER CREDIT DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

26.  PLEDGOR'S DUTIES.  It is expressly agreed, anything herein contained to the contrary notwithstanding, that each Pledgor shall remain liable to perform all of the obligations, if any, assumed by it with respect to the Collateral and the Pledgee shall not have any obligations or liabilities with respect to any Collateral by reason of or arising out of this Agreement, except for the safekeeping of Collateral actually in Pledgor's possession, nor shall the Pledgee be required or obligated in any manner to perform or fulfill any of the obligations of any Pledgor under or with respect to any Collateral.

27.  COUNTERPARTS.  This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.  A set of counterparts executed by all the parties hereto shall be lodged with each Pledgor and the Pledgee.

28.  SEVERABILITY.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

29.  RECOURSE.  This Agreement is made with full recourse to each Pledgor and pursuant to and upon all the representations, warranties, covenants and agreements on the part of such Pledgor contained herein, in the Lee Intercreditor Agreement or the Pulitzer Intercreditor

Exhibit I

Agreement, as applicable, and in the other Secured Debt Agreements and otherwise in writing in connection herewith or therewith.

30.   ADDITIONAL PLEDGORS.  It is understood and agreed that any Subsidiary of the Borrower that is required to become a party to this Agreement after the date hereof pursuant to the requirements of the Loan Agreement, any Intercreditor Agreement or any other Secured Debt Agreement, shall become a Pledgor hereunder by (x) executing a counterpart hereof and delivering same to the Pledgee or executing a joinder agreement and delivering same to the Pledgee, in each case as may be required by (and in form and substance satisfactory to) the Pledgee, (y) delivering supplements to Annexes A through F, hereto as are necessary to cause such annexes to be complete and accurate with respect to such additional Pledgor on such date and (z) taking all actions as specified in this Agreement as would have been taken by such Pledgor had it been an original party to this Agreement, in each case with all documents required above to be delivered to the Pledgee and with all documents and actions required above to be taken to the reasonable satisfaction of the Pledgee.

31.  LIMITED OBLIGATIONS.  It is the desire and intent of each Pledgor and the Secured Creditors that this Agreement shall be enforced against each Pledgor to the fullest extent permissible under the laws applied in each jurisdiction in which enforcement is sought. Notwithstanding anything to the contrary contained herein, in furtherance of the foregoing, it is noted that the obligations of each Pledgor constituting a Subsidiary Guarantor have been limited as provided in the Subsidiaries Guaranty.

32.  RELEASE OF PLEDGORS.  If at any time all of the Equity Interests of any Pledgor owned by the Borrower or any of its Subsidiaries are sold (to a Person other than a Credit Party) in a transaction permitted pursuant to the Loan Agreement (and which does not violate the terms of any other Secured Debt Agreement then in effect), then, such Pledgor shall be released as a Pledgor pursuant to this Agreement without any further action hereunder (it being understood that the sale of all of the Equity Interests in any Person that owns, directly or indirectly, all of the Equity Interests in any Pledgor shall be deemed to be a sale of all of the Equity Interests in such Pledgor for purposes of this Section), and the Pledgee is authorized and directed to execute and deliver such instruments of release as are reasonably satisfactory to it.  At any time that the Borrower desires that a Pledgor be released from this Agreement as provided in this Section 32, the Borrower shall deliver to the Pledgee a certificate signed by an Authorized Officer of the Borrower stating that the release of such Pledgor is permitted pursuant to this Section 32.  If requested by Pledgee (although the Pledgee shall have no obligation to make any such request), the Borrower shall furnish legal opinions (from counsel acceptable to the Pledgee) to the effect set forth in the immediately preceding sentence.  The Pledgee shall have no liability whatsoever to any other Secured Creditor as a result of the release of any Pledgor by it in accordance with, or which it believes in good faith to be in accordance with, this Section 32.

33.  INTERCREDITOR AGREEMENTS.  Notwithstanding anything herein to the contrary, the exercise of any right or remedy by the Pledgee hereunder in respect of Common Collateral (as defined in the Lee Intercreditor Agreement) or Common Collateral (as defined in the Pulitzer Intercreditor Agreement) shall be subject to the provisions of the Lee Intercreditor Agreement and the Pulitzer Intercreditor Agreement, respectively.  In the event of any conflict between the terms of the Lee Intercreditor Agreement (with respect to Common Collateral (as

defined therein)) or the Pulitzer Intercreditor Agreement (with respect to Common Collateral (as defined therein)) and this Agreement, the terms of the Lee First Lien Intercreditor Agreement or the Pulitzer Intercreditor Agreement, as applicable, shall govern and control.

* * * *

Exhibit I

IN WITNESS WHEREOF, each Pledgor and the Pledgee have caused this Agreement to be executed by their duly elected officers duly authorized as of the date first above written.

Address:

201 North Harrison Street, Suite 600
Davenport, Iowa 52801
Attention:  Chief Financial Officer
Tel:  (563) 383-2179
Fax:  (563) 327-2600

c/o Lee Enterprises, Incorporated
201 North Harrison Street, Suite 600
Davenport, Iowa 52801
Attention:  Chief Financial Officer
Tel:  (563) 383-2179
Fax:  (563) 327-2600

LEE ENTERPRISES, INCORPORATED,
as a Pledgor

By:_____
    Title:

**[ADDITIONAL PLEDGORS, INCLUDING ALL PULITZER PLEDGORS]**

Exhibit I

Accepted and Agreed to:

WILMINGTON TRUST, NATIONAL ASSOCIATION,
   as Collateral Agent and Pledgee

By:_____
    Title:

ANNEX A
to
<u>PLEDGE AGREEMENT</u>

SCHEDULE OF LEGAL NAMES, TYPE OF ORGANIZATION
(AND WHETHER A REGISTERED ORGANIZATION AND/OR
A TRANSMITTING UTILITY), JURISDICTION OF ORGANIZATION,
<u>LOCATION AND ORGANIZATIONAL IDENTIFICATION NUMBERS</u>[2]

| Exact Legal Name <u>of Each Pledgor</u> | Registered Organization? <u>(Yes/No)</u> | Jurisdiction of <u>Organization</u> | Pledgor's Location (for purposes of <u>NY UCC § 9-307)</u> | Pledgor's Organization Identification Number (or, if it has none, so <u>indicate)</u> | Transmitting Utility? <u>(Yes/No)</u> |
| --- | --- | --- | --- | --- | --- |

---

[2] **All schedules to be confirmed, updated or provided by the Pledgors (N.B. all schedules must include all necessary information for the Pulitzer Pledgors in addition to the Lee Entities)**.

ANNEX B
to
PLEDGE AGREEMENT

SCHEDULE OF SUBSIDIARIES

| Entity | Ownership | Jurisdiction of Organization |
|--------|-----------|------------------------------|
|        |           |                              |

ANNEX C
to
PLEDGE AGREEMENT

SCHEDULE OF STOCK

1.    [Pledgor]

| Name of Issuing Corporation | Type of Shares | Number of Shares | Certificate No. | Percentage Owned | Sub-clause of Section 3.2(a) of Pledge Agreement |
|---|---|---|---|---|---|
| | | | | | |

2.    [Pledgor]

| Name of Issuing Corporation | Type of Shares | Number of Shares | Certificate No. | Percentage Owned | Sub-clause of Section 3.2(a) of Pledge Agreement |
|---|---|---|---|---|---|
| | | | | | |

3.    [Pledgor]

| Name of Issuing Corporation | Type of Shares | Number of Shares | Certificate No. | Percentage Owned | Sub-clause of Section 3.2(a) of Pledge Agreement |
|---|---|---|---|---|---|
| | | | | | |

4.    [Pledgor]

| Name of Issuing Corporation | Type of Shares | Number of Shares | Certificate No. | Percentage Owned | Sub-clause of Section 3.2(a) of Pledge Agreement |
|---|---|---|---|---|---|
| | | | | | |

5.    [Pledgor]

| Name of Issuing Corporation | Type of Shares | Number of Shares | Certificate No. | Percentage Owned | Sub-clause of Section 3.2(a) of Pledge Agreement |
|---|---|---|---|---|---|
| | | | | | |

6.    [Pledgor]

| Name of Issuing Corporation | Type of Shares | Number of Shares | Certificate No. | Percentage Owned | Sub-clause of Section 3.2(a) of Pledge Agreement |
|---|---|---|---|---|---|
| | | | | | |

7.    [Pledgor]

| Name of Issuing Corporation | Type of Shares | Number of Shares | Certificate No. | Percentage Owned | Sub-clause of Section 3.2(a) of Pledge Agreement |
|---|---|---|---|---|---|
| | | | | | |

8.    [Pledgor]

| Name of Issuing Corporation | Type of Shares | Number of Shares | Certificate No. | Percentage Owned | Sub-clause of Section 3.2(a) of Pledge Agreement |
|---|---|---|---|---|---|
| | | | | | |

9.    [Pledgor]

| Name of Issuing Corporation | Type of Shares | Number of Shares | Certificate No. | Percentage Owned | Sub-clause of Section 3.2(a) of Pledge Agreement |
|---|---|---|---|---|---|
| | | | | | |

ANNEX D
to
PLEDGE AGREEMENT

## SCHEDULE OF LIMITED LIABILITY COMPANY INTERESTS

1.    [Pledgor]

| Name of Issuing Limited Liability Company | Type of Interest | Percentage Owned | Sub-clause of Section 3.2(a) of Pledge Agreement |
|---|---|---|---|

2.    [Pledgor]

| Name of Issuing Limited Liability Company | Type of Interest | Percentage Owned | Sub-clause of Section 3.2(a) of Pledge Agreement |
|---|---|---|---|

3.    [Pledgor]

| Name of Issuing Limited Liability Company | Type of Interest | Percentage Owned | Sub-clause of Section 3.2(a) of Pledge Agreement |
|---|---|---|---|

(ii)

4.    [Pledgor]

| Name of Issuing Limited Liability Company | Type of Interest | Percentage Owned | Sub-clause of Section 3.2(a) of Pledge Agreement |
|---|---|---|---|

5.    [Pledgor]

| Name of Issuing Limited Liability Company | Type of Interest | Percentage Owned | Sub-clause of Section 3.2(a) of Pledge Agreement |
|---|---|---|---|

6.    [Pledgor]

| Name of<br>Issuing Limited<br>Liability Company | Type of<br>Interest | Percentage<br>Owned | Sub-clause of<br>Section 3.2(a)<br>of Pledge Agreement |
|---|---|---|---|

7.    [Pledgor]

| Name of<br>Issuing Limited<br>Liability Company | Type of<br>Interest | Percentage<br>Owned | Sub-clause of<br>Section 3.2(a)<br>of Pledge Agreement |
|---|---|---|---|

8.    [Pledgor]

| Name of<br>Issuing Limited<br>Liability Company | Type of<br>Interest | Percentage<br>Owned | Sub-clause of<br>Section 3.2(a)<br>of Pledge Agreement |
|---|---|---|---|

9.    [Pledgor]

| Name of<br>Issuing Limited<br>Liability Company | Type of<br>Interest | Percentage<br>Owned | Sub-clause of<br>Section 3.2(a)<br>of Pledge Agreement |
|---|---|---|---|

### SCHEDULE OF PARTNERSHIP INTERESTS

1.      [Pledgor]

| Name of Issuing Partnership | Type of Interest | Percentage Owned | Sub-clause of Section 3.2(a) of Pledge Agreement |
|---|---|---|---|

2.      [Pledgor]

| Name of Issuing Partnership | Type of Interest | Percentage Owned | Sub-clause of Section 3.2(a) of Pledge Agreement |
|---|---|---|---|

3.      [Pledgor]

| Name of Issuing Partnership | Type of Interest | Percentage Owned | Sub-clause of Section 3.2(a) of Pledge Agreement |
|---|---|---|---|

4.      [Pledgor]

| Name of Issuing Partnership | Type of Interest | Percentage Owned | Sub-clause of Section 3.2(a) of Pledge Agreement |
|---|---|---|---|

5.      [Pledgor]

| Name of Issuing Partnership | Type of Interest | Percentage Owned | Sub-clause of Section 3.2(a) of Pledge Agreement |
|---|---|---|---|

6.      [Pledgor]

| Name of<br>Issuing Partnership | Type of<br>Interest | Percentage<br>Owned | Sub-clause of<br>Section 3.2(a)<br>of Pledge Agreement |
|---|---|---|---|

7.      [Pledgor]

| Name of<br>Issuing Partnership | Type of<br>Interest | Percentage<br>Owned | Sub-clause of<br>Section 3.2(a)<br>of Pledge Agreement |
|---|---|---|---|

8.      [Pledgor]

| Name of<br>Issuing Partnership | Type of<br>Interest | Percentage<br>Owned | Sub-clause of<br>Section 3.2(a)<br>of Pledge Agreement |
|---|---|---|---|

9.      [Pledgor]

| Name of<br>Issuing Partnership | Type of<br>Interest | Percentage<br>Owned | Sub-clause of<br>Section 3.2(a)<br>of Pledge Agreement |
|---|---|---|---|

ANNEX F
to
<u>PLEDGE AGREEMENT</u>

<u>SCHEDULE OF CHIEF EXECUTIVE OFFICES</u>

<u>Name of Pledgor</u>                    <u>Address of Chief Executive Office</u>

<div align="right">ANNEX G<br>to<br>PLEDGE AGREEMENT</div>

Form of Agreement Regarding Uncertificated Securities, Limited Liability
Company Interests and Partnership Interests

AGREEMENT (as amended, modified, restated and/or supplemented from time
to time, this "Agreement"), dated as of [_____ __, 20__], among the undersigned pledgor (the
"Pledgor"), Wilmington Trust, National Association, not in its individual capacity but solely as
Collateral Agent (the "Pledgee"), and [_____], as the issuer of the Issuer Pledged Interests
(as defined below) (the "Issuer").

<div align="center">W I T N E S S E T H :</div>

WHEREAS, Lee Enterprises, Incorporated (the "Borrower"), the lenders from
time to time party thereto (the "Lenders"), Deutsche Bank Securities Inc. and Goldman Sachs
Lending Partners LLC, as Joint Lead Arrangers and Joint Book Running Managers, and
Wilmington Trust, National Association, as administrative agent (together with any successor
administrative agent, the "Administrative Agent"), have entered into a Second Lien Loan
Agreement, dated as of [_____] (as amended, modified, restated and/or supplemented from
time to time, the "Loan Agreement"), providing for the making and continuation of Loans to the
Borrower, all as contemplated therein (the Lenders, the Administrative Agent and the Pledgee
are herein called the "Secured Creditors"), the Pledgor has or will pledge to the Pledgee for the
benefit of the Secured Creditors (as defined in the Pledge Agreement), and grant a security
interest in favor of the Pledgee for the benefit of the Secured Creditors in, all of the right, title
and interest of the Pledgor in and to any an all ["uncertificated securities" (as defined in Section
8-102(a)(18) of the Uniform Commercial Code, as adopted in the State of New York)
("Uncertificated Securities")] [Partnership Interests (as defined in the Pledge Agreement)]
[Limited Liability Company Interests (as defined in the Pledge Agreement)], from time to time
issued by the Issuer, whether now existing or hereafter from time to time acquired by the Pledgor
(with all of such [Uncertificated Securities] [Partnership Interests] [Limited Liability Company
Interests] being herein collectively called the "Issuer Pledged Interests"; and

WHEREAS, the Pledgor desires the Issuer to enter into this Agreement in order to
perfect the security interest of the Pledgee under the Pledge Agreement in the Issuer Pledged
Interests, to vest in the Pledgee control of the Issuer Pledged Interests and to provide for the
rights of the parties under this Agreement;

NOW THEREFORE, in consideration of the premises and the mutual promises
and agreements contained herein, and for other valuable consideration, the receipt and
sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.    The Pledgor hereby irrevocably authorizes and directs the Issuer, and the
Issuer hereby agrees, to comply with any and all instructions and orders originated by the
Pledgee (and its successors and assigns) regarding any and all of the Issuer Pledged Interests
without the further consent by the registered owner (including the Pledgor), and, following its
receipt of a notice from the Pledgee stating that the Pledgee is exercising exclusive control of the

Issuer Pledged Interests, not to comply with any instructions or orders regarding any or all of the Issuer Pledged Interests originated by any person or entity other than the Pledgee (and its successors and assigns) or a court of competent jurisdiction.

2.   The Issuer hereby certifies that (i) no notice of any security interest, lien or other encumbrance or claim affecting the Issuer Pledged Interests (other than the security interest of the Pledgee) has been received by it, and (ii) the security interest of the Pledgee in the Issuer Pledged Interests has been registered in the books and records of the Issuer.

3.   The Issuer hereby represents and warrants that (i) the pledge by the Pledgor of, and the granting by the Pledgor of a security interest in, the Issuer Pledged Interests to the Pledgee, for the benefit of the Secured Creditors, does not violate the charter, by-laws, partner-ship agreement, membership agreement or any other agreement governing the Issuer or the Issuer Pledged Interests, and (ii) the Issuer Pledged Interests consisting of capital stock of a corporation are fully paid and nonassessable.

4.   All notices, statements of accounts, reports, prospectuses, financial statements and other communications to be sent to the Pledgor by the Issuer in respect of the Issuer will also be sent to the Pledgee at the following address:

> Wilmington Trust, N.A.
> 50 South Sixth Street, Suite 1290
> Minneapolis, MN 55402
> Attn: Josh James
> Tel.: (612) 217-5637
> Fax: (612) 217-5651
> Email: jjames@WilmingtonTrust.com

5.   Following its receipt of a notice from the Pledgee stating that the Pledgee is exercising exclusive control of the Issuer Pledged Interests and until the Pledgee shall have delivered written notice to the Issuer that all of the Obligations have been paid in full and this Agreement is terminated, the Issuer will send any and all redemptions, distributions, interest or other payments in respect of the Issuer Pledged Interests from the Issuer for the account of the Pledgee only by wire transfers to such account as the Pledgee shall instruct.

6.   Except as expressly provided otherwise in Sections 4 and 5 above, all notices, instructions, orders and communications hereunder shall be sent or delivered by mail, telegraph, telex, telecopy, cable or overnight courier service and all such notices and communications shall, when mailed, telexed, telecopied, cabled or sent by overnight courier, be effective when deposited in the mails or delivered to overnight courier, prepaid and properly addressed for delivery on such or the next Business Day, or sent by telex or telecopier, except that notices and communications to the Pledgee or the Issuer shall not be effective until received.  All notices and other communications shall be in writing and addressed as follows:

(a)    if to the Pledgor, at:

_____

_____

_____

_____

Attention: _____

Telephone No.:

Fax No.:

(b)    if to the Pledgee, at the address given in Section 4 hereof;

(c)    if to the Issuer, at:

_____

_____

_____

or at such other address as shall have been furnished in writing by any Person described above to the party required to give notice hereunder.  As used in this Section 6, "Business Day" means any day other than a Saturday, Sunday, or other day in which banks in New York are authorized to remain closed.

7.    This Agreement shall be binding upon the successors and assigns of the Pledgor and the Issuer and shall inure to the benefit of and be enforceable by the Pledgee and its successors and assigns.  This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which shall constitute one instrument.  In the event that any provision of this Agreement shall prove to be invalid or unenforceable, such provision shall be deemed to be severable from the other provisions of this Agreement which shall remain binding on all parties hereto.  None of the terms and conditions of this Agreement may be changed, waived, modified or varied in any manner whatsoever except in writing signed by the Pledgee, the Issuer and the Pledgor.

8.    This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to its principles of conflict of laws.

       IN WITNESS WHEREOF, the Pledgor, the Pledgee and the Issuer have caused this Agreement to be executed by their duly elected officers duly authorized as of the date first above written.

[_____],
  as Pledgor


By_____
  Name:
  Title:


WILMINGTON TRUST, NATIONAL ASSOCIATION,
  not in its individual capacity but solely as
  Collateral Agent and Pledgee


By_____
  Name:
  Title:


[_____],
  as the Issuer


By_____
  Name:
  Title:

**MILBANK DRAFT 12/02/11**

<u>**EXHIBIT I-2**</u>
<u>**TO SECOND LIEN LOAN AGREEMENT**</u>

FORM OF

SECURITY AGREEMENT[1]

among

LEE ENTERPRISES, INCORPORATED,

CERTAIN SUBSIDIARIES OF LEE ENTERPRISES, INCORPORATED

and

WILMINGTON TRUST, NATIONAL ASSOCIATION,
as COLLATERAL AGENT

_____

Dated as of [_____]

_____

---

[1] The Assignors (i) acknowledge that no disclosure schedules or similar information contemplated by this Agreement have been provided as of the date of this draft and (ii) agree that, to the extent that the information set forth in such disclosure schedules or other information differs in any respect from the information provided to the Backstop Parties prior to the Effective Date (as defined in the Lee Support Agreement), without prejudice to any other rights of any Backstop Party under its Backstop Commitment Letter, the Backstop Parties reserve the right in their reasonable discretion to make appropriate changes to this Agreement.

## SECURITY AGREEMENT

SECURITY AGREEMENT, dated as of [_____], made by each of the undersigned assignors (each, an "Assignor" and, together with any other entity that becomes an assignor hereunder pursuant to Section 10.12 hereof, the "Assignors") in favor of Wilmington Trust, National Association, as Collateral Agent (together with any successor Collateral Agent, the "Collateral Agent"), for the benefit of the Secured Creditors (as defined below). Certain capitalized terms as used herein are defined in Article IX hereof. Except as otherwise defined herein, all capitalized terms used herein and defined in the Loan Agreement (as defined below) shall be used herein as therein defined.

W I T N E S S E T H:

WHEREAS, Lee Enterprises, Incorporated (the "Borrower"), the lenders from time to time party thereto (the "Lenders"), Deutsche Bank Securities Inc. and Goldman Sachs Lending Partners LLC, as Joint Lead Arrangers and Joint Book Running Managers, and Wilmington Trust, National Association, as administrative agent (together with any successor administrative agent, the "Administrative Agent") for the Lenders, have entered into a Second Lien Loan Agreement, dated as of the date hereof (as amended, modified, restated and/or supplemented from time to time, the "Loan Agreement"), providing for the making (or deemed making) and continuation of Loans to the Borrower, all as contemplated therein (the Lenders, the Administrative Agent, the Collateral Agent and each other Agent are herein called the "Secured Creditors");

WHEREAS, pursuant to the Subsidiaries Guaranty, each Subsidiary Guarantor has jointly and severally guaranteed to the Secured Creditors the payment when due of all Guaranteed Obligations as described therein;

WHEREAS, it is a condition precedent to the making (or deemed making) and continuation of the Loans to the Borrower under the Loan Agreement that each Assignor shall have executed and delivered to the Collateral Agent this Agreement; and

WHEREAS, each Assignor will obtain benefits from the incurrence (or deemed incurrence) and continuation of the Loans by the Borrower under the Loan Agreement and, accordingly, desires to execute this Agreement in order to satisfy the condition described in the preceding paragraph and to induce the Lenders to make (or be deemed to make) and continue the Loans to the Borrower;

NOW, THEREFORE, in consideration of the benefits accruing to each Assignor, the receipt and sufficiency of which are hereby acknowledged, each Assignor hereby makes the following representations and warranties to the Collateral Agent for the benefit of the Secured Creditors and hereby covenants and agrees with the Collateral Agent for the benefit of the Secured Creditors as follows:

# ARTICLE I

# SECURITY INTERESTS

1.1 <u>Grant of Security Interests</u>.    (a)    As security for the prompt and complete payment and performance when due of all of its Obligations, each Assignor does hereby assign and transfer unto the Collateral Agent, and does hereby pledge and grant to the Collateral Agent, for the benefit of the Secured Creditors, a continuing security interest in all of the right, title and interest of such Assignor in, to and under all of the following personal property and fixtures (and all rights therein) of such Assignor, or in which or to which such Assignor has any rights, in each case whether now existing or hereafter from time to time acquired:

(i)      each and every Account;

(ii)     all cash;

(iii)    the Cash Collateral Accounts and all monies, securities, Instruments and other investments deposited or required to be deposited in the Cash Collateral Accounts;

(iv)     all Chattel Paper (including, without limitation, all Tangible Chattel Paper and all Electronic Chattel Paper);

(v)      all Commercial Tort Claims;

(vi)     all computer programs of such Assignor and all intellectual property rights therein and all other proprietary information of such Assignor, including but not limited to Domain Names and Trade Secret Rights;

(vii)    all Contracts, together with all Contract Rights arising thereunder;

(viii)   all Copyrights;

(ix)     all Equipment;

(x)      all Deposit Accounts and all other demand, deposit, time, savings, cash management, passbook and similar accounts maintained by such Assignor with any Person and all monies, securities, Instruments and other investments deposited or required to be deposited in any of the foregoing;

(xi)     all Documents;

(xii)    all General Intangibles;

(xiii)   all Goods;

(xiv)    all Instruments;

(xv)     all Inventory;

(xvi)   all Financial Assets;

(xvii)  all Joint Venture Investment Property;

(xviii) all Letter-of-Credit Rights (whether or not the respective letter of credit is evidenced by a writing);

(xix)   all Marks, together with the registrations and right to all renewals thereof, the goodwill of the business of such Assignor symbolized by the Marks and all causes of action arising prior to or after the date hereof for infringement of any of the Marks or unfair competition regarding the same;

(xx)    all Notes;

(xxi)   all Patents, together with all causes of action arising prior to or after the date hereof for infringement of any of the Patents or unfair competition regarding the same;

(xxii)  all Permits;

(xxiii) all Security Entitlements and other Investment Property (to the extent not already covered by another clause of this Section 1.1(a));

(xxiv)  all Software and all Software licensing rights, all writings, plans, specifications and schematics, all engineering drawings, customer lists, goodwill and licenses, and all recorded data of any kind or nature, regardless of the medium of recording;

(xxv)   all Supporting Obligations;

(xxvi)  all Fixtures;

(xxvii) all other goods and personal property, whether tangible or intangible; and

(xxviii) all Proceeds and products of, and all accessions to, substitutions and replacements for, and rents, profits and products of, any and all of the foregoing

(all of the above, the "Collateral").

Notwithstanding the foregoing, the term "Collateral" shall not include any Excluded Property or any Excluded TNI Assets.

(b)     The security interest of the Collateral Agent under this Agreement automatically (and without the taking of any action by any Assignor) extends to all Collateral which any Assignor may acquire, or with respect to which such Assignor may obtain rights, at any time during the term of this Agreement, and each Assignor shall (to the extent provided

below) take the following actions as set forth below (as promptly as practicable and, in any event, within 10 days (or, in the case of any Pulitzer Assignor, 5 Business Days) after it obtains such Collateral) for the benefit of the Collateral Agent and the other Secured Creditors:

(i)    with respect to a Certificated Security (other than a Certificated Security credited on the books of a Clearing Corporation or Securities Intermediary), such Assignor shall physically deliver such Certificated Security to the Collateral Agent, endorsed to the Collateral Agent or endorsed in blank;

(ii)    with respect to an Uncertificated Security (other than an Uncertificated Security credited on the books of a Clearing Corporation or Securities Intermediary), such Assignor shall cause the issuer of such Uncertificated Security to duly authorize, execute, and deliver to the Collateral Agent an agreement for the benefit of the Collateral Agent and the other Secured Creditors substantially in the form of Annex S (appropriately completed to the satisfaction of the Collateral Agent and with such modifications, if any, as shall be satisfactory to the Collateral Agent) pursuant to which such issuer agrees to comply with any and all instructions originated by the Collateral Agent without further consent by the registered owner and not to comply with instructions regarding such Uncertificated Security (and any Partnership Interests and Limited Liability Company Interests issued by such issuer) originated by any other Person other than a court of competent jurisdiction;

(iii)    with respect to a Certificated Security, Uncertificated Security, Partnership Interest or Limited Liability Company Interest credited on the books of a Clearing Corporation or Securities Intermediary (including a Federal Reserve Bank, Participants Trust Company or The Depository Trust Company), such Assignor shall promptly notify the Collateral Agent thereof and shall promptly take (x) all actions required (i) to comply with the applicable rules of such Clearing Corporation or Securities Intermediary and (ii) to perfect the security interest of the Collateral Agent under applicable law (including, in any event, under Sections 9-314(a), (b) and (c), 9-106 and 8-106(d) of the UCC) and (y) such other actions as the Collateral Agent deems necessary or desirable to effect the foregoing;

(iv)    with respect to a Partnership Interest or a Limited Liability Company Interest (other than a Partnership Interest or Limited Liability Company Interest credited on the books of a Clearing Corporation or Securities Intermediary), (1) if such Partnership Interest or Limited Liability Company Interest is represented by a certificate and is a Security for purposes of the UCC, the procedure set forth in Section 1.1(b)(i) hereof, and (2) if such Partnership Interest or Limited Liability Company Interest is not represented by a certificate or is not a Security for purposes of the UCC, the procedure set forth in Section 1.1(b)(ii) hereof;

(v)    with respect to any Note, such Assignor shall physically deliver such Note to the Collateral Agent, endorsed in blank, or, at the request of the Collateral Agent, endorsed to the Collateral Agent in accordance with Section 3.6 hereof; and

(vi)     with respect to cash proceeds from any of the Collateral, at the reasonable request of the Collateral Agent or upon an occurrence of a Default or an Event of Default, (i) establishment by the Collateral Agent of a cash account in the name of such Assignor over which the Collateral Agent shall have "control" within the meaning of the UCC and at any time any Default or Event of Default is in existence no withdrawals or transfers may be made therefrom by any Person except with the prior written consent of the Collateral Agent and (ii) deposit of such cash in such cash account.

(c)     In addition to the actions required to be taken pursuant to Section 1.1(b) hereof, each Assignor shall take the following additional actions with respect to the Collateral:

(i)     with respect to all Collateral of such Assignor whereby or with respect to which the Collateral Agent may obtain "control" thereof within the meaning of Section 8-106 of the UCC (or under any provision of the UCC as same may be amended or supplemented from time to time, or under the laws of any relevant State other than the State of New York), such Assignor shall take all actions as may be reasonably requested from time to time by the Collateral Agent so that "control" of such Collateral is obtained and at all times held by the Collateral Agent; and

(ii)     each Assignor shall from time to time cause appropriate financing statements (on appropriate forms) under the UCC as in effect in the various relevant States, covering all Collateral hereunder (with the form of such financing statements to be satisfactory to the Collateral Agent), to be filed in the relevant filing offices so that at all times the Collateral Agent's security interest in all Investment Property and other Collateral which can be perfected by the filing of such financing statements (in each case to the maximum extent perfection by filing may be obtained under the laws of the relevant States, including, without limitation, Section 9-312(a) of the UCC) is so perfected.

1.2 <u>Lien Subordination; Bailee for Perfection</u>.    (a) Notwithstanding anything herein to the contrary, it is the understanding of the parties that the Liens granted pursuant to Section 1.1 herein shall, (x) with respect to any such Liens granted in Common Collateral (as defined in the Lee Intercreditor Agreement) prior to the First Priority Obligations Payment Date (as defined in the Lee Intercreditor Agreement), be subject and subordinate to the First Priority Lien (as defined in the Lee Intercreditor Agreement) on such Collateral pursuant to the terms of the Lee Intercreditor Agreement and (y) with respect to any such Liens granted in Common Collateral (as defined in the Pulitzer Intercreditor Agreement) prior to the First Priority Obligations Payment Date (as defined in the Pulitzer Intercreditor Agreement), be subject and subordinate to the First Priority Lien (as defined in the Pulitzer Intercreditor Agreement) on such Collateral pursuant to the terms of the Pulitzer Intercreditor Agreement.

(b) Notwithstanding anything herein to the contrary, (x) subject to the terms of the Lee Intercreditor Agreement and the Pulitzer Intercreditor Agreement, as applicable, and until (but not after) the First Priority Obligations Payment Date (as defined in the Lee Intercreditor Agreement or the Pulitzer Intercreditor Agreement, as applicable), (i) the requirements of this Agreement to endorse, assign or deliver Collateral to the Collateral Agent, or to provide the Collateral Agent "control" (within the meaning of the UCC) over the collateral,

shall be deemed satisfied by endorsement, assignment or delivery of such Collateral to the First Priority Representative or by exercise of control over such Collateral by the First Priority Representative in each case as bailee and agent for the Collateral Agent pursuant to Section 2.3(c) of the Lee Intercreditor Agreement or the Pulitzer Intercreditor Agreement, as applicable, and (ii) any endorsement, assignment or delivery of Collateral to the First Priority Representative or control over the Collateral by the First Priority Representative, in each case as bailee and agent for the Collateral Agent pursuant to Section 2.3(c) of the Lee Intercreditor Agreement or the Pulitzer Intercreditor Agreement, as applicable, shall be deemed an endorsement, assignment or delivery to, or control by, the Collateral Agent for all purposes hereunder, and (y) the requirements of this Agreement to endorse, assign or deliver to the Collateral Agent, or to otherwise provide the Collateral Agent "control" (within the meaning of the UCC) over, any Investment Property or a Grantor, shall not apply to any Excluded TNI Assets.

   1.3 <u>Power of Attorney</u>. Subject to the Lee Intercreditor Agreement and the Pulitzer Intercreditor Agreement, each Assignor hereby constitutes and appoints the Collateral Agent its true and lawful attorney, irrevocably, with full power after the occurrence of and during the continuance of an Event of Default (in the name of such Assignor or otherwise) to act, require, demand, receive, compound and give acquittance for any and all moneys and claims for moneys due or to become due to such Assignor under or arising out of the Collateral, to endorse any checks or other instruments or orders in connection therewith and to file any claims or take any action or institute any proceedings which the Collateral Agent may deem to be reasonably necessary or advisable to protect the interests of the Secured Creditors, which appointment as attorney is coupled with an interest.

<div align="center">ARTICLE II</div>

<div align="center">GENERAL REPRESENTATIONS, WARRANTIES AND COVENANTS</div>

Each Assignor represents, warrants and covenants, which representations, warranties and covenants shall survive execution and delivery of this Agreement, as follows:

   2.1 <u>Necessary Filings</u>. All filings, registrations, recordings and other actions necessary or appropriate to create, preserve and perfect the security interest granted by such Assignor to the Collateral Agent hereby in respect of the Collateral have been accomplished and the security interest granted to the Collateral Agent pursuant to this Agreement in and to the Collateral creates a valid and, together with all such filings, registrations, recordings and other actions, a perfected security interest therein prior to the rights of all other Persons (other than the First Priority Representative) therein and subject to no other Liens (other than Permitted Liens) and is entitled to all the rights, priorities and benefits afforded by the UCC or other relevant law as enacted in any relevant jurisdiction to perfected security interests, in each case to the extent that the Collateral consists of the type of property in which a security interest may be perfected by possession or control (within the meaning of the UCC as in effect on the date hereof in the State of New York), by filing a financing statement under the UCC as enacted in any relevant jurisdiction or by a filing of a Grant of Security Interest in the respective form attached hereto in the United States Patent and Trademark Office or in the United States Copyright Office.

2.2  <u>No Liens</u>.  Such Assignor is, and as to all Collateral acquired by it from time to time after the date hereof such Assignor will be, the owner of all Collateral free from any Lien or other right, title or interest of any Person (other than Permitted Liens), and such Assignor shall defend the Collateral against all claims and demands of all Persons at any time claiming the same or any interest therein adverse to the Collateral Agent.

2.3  <u>Other Financing Statements</u>.  As of the date hereof, there is no financing statement (or similar statement or instrument of registration under the law of any jurisdiction) covering or purporting to cover any interest of any kind in the Collateral (other than financing statements filed in respect of Permitted Liens), and so long as the Termination Date has not occurred, such Assignor will not execute or authorize to be filed in any public office any financing statement (or similar statement or instrument of registration under the law of any jurisdiction) or statements relating to the Collateral, except financing statements filed or to be filed in respect of and covering the security interests granted hereby by such Assignor or in connection with Permitted Liens.

2.4  <u>Chief Executive Office, Record Locations</u>.  The chief executive office of such Assignor is, on the date of this Agreement, located at the address indicated on <u>Annex A</u> hereto for such Assignor.  During the period of the four calendar months preceding the date of this Agreement, the chief executive office of such Assignor has not been located at any address other than that indicated on <u>Annex A</u> in accordance with the immediately preceding sentence, in each case unless each such other address is also indicated on <u>Annex A</u> hereto for such Assignor.

2.5  [RESERVED].

2.6  <u>Legal Names; Type of Organization (and Whether a Registered Organization and/or a Transmitting Utility); Jurisdiction of Organization; Location; Organizational Identification Numbers; Federal Employer Identification Number; Changes Thereto; etc.</u>  The exact legal name of each Assignor, the type of organization of such Assignor, whether or not such Assignor is a Registered Organization, the jurisdiction of organization of such Assignor, such Assignor's Location, the organizational identification number (if any) of such Assignor, the Federal Employer Identification Number (if any), and whether or not such Assignor is a Transmitting Utility, is listed on <u>Annex C</u> hereto for such Assignor.  Such Assignor shall not change its legal name, its type of organization, its status as a Registered Organization (in the case of a Registered Organization), its status as a Transmitting Utility or as a Person which is not a Transmitting Utility, as the case may be, its jurisdiction of organization, its Location, its organizational identification number (if any), or its Federal Employer Identification Number (if any) from that used on <u>Annex C</u> hereto, except that any such changes shall be permitted (so long as not in violation of the applicable requirements of the Secured Debt Agreements and so long as same do not involve (x) a Registered Organization ceasing to constitute same or (y) such Assignor changing its jurisdiction of organization or Location from the United States or a State thereof to a jurisdiction of organization or Location, as the case may be, outside the United States or a State thereof) if (i) it shall have given to the Collateral Agent  not less than 15 days' (or, in the case of any Pulitzer Assignor, 30 days') prior written notice of each change to the information listed on <u>Annex C</u> (as adjusted for any subsequent changes thereto previously made in accordance with this sentence), together with a supplement to <u>Annex C</u> which shall correct all information contained therein for such Assignor, and (ii) in connection with such change or

changes, it shall have taken all action reasonably requested by the Collateral Agent to maintain the security interests of the Collateral Agent in the Collateral intended to be granted hereby at all times fully perfected and in full force and effect.  Notwithstanding anything to the contrary in the immediately preceding sentence, (i) no Pulitzer Assignor shall change its jurisdiction of organization without the prior written consent of the Collateral Agent and (ii) in the event that any Pulitzer Assignor shall change its chief executive office or principal place of business (provided that the new location is leased to such Assignor), then, concurrently with entering into the lease for the new location, such Assignor shall furnish to the Collateral Agent, an executed and delivered access agreement in favor of the Collateral Agent with respect to such new location, in form and substance reasonably satisfactory to the Collateral Agent.  In addition, to the extent that such Assignor does not have an organizational identification number on the date hereof and later obtains one, such Assignor shall promptly thereafter notify the Collateral Agent of such organizational identification number and shall take all actions reasonably satisfactory to the Collateral Agent to the extent necessary to maintain the security interest of the Collateral Agent in the Collateral intended to be granted hereby fully perfected and in full force and effect.

2.7  [RESERVED].

2.8  <u>Certain Significant Transactions</u>.  During the one-year period preceding the date of this Agreement, no Person shall have merged or consolidated with or into any Assignor, and no Person shall have liquidated into, or transferred all or substantially all of its assets to, any Assignor, in each case except as described in <u>Annex E</u> hereto.  With respect to any transactions so described in <u>Annex E</u> hereto, the respective Assignor shall have furnished such information with respect to the Person (and the assets of the Person and locations thereof) which merged with or into or consolidated with such Assignor, or was liquidated into or transferred all or substantially all of its assets to such Assignor, and shall have furnished to the Collateral Agent such UCC lien searches as may have been requested with respect to such Person and its assets, to establish that no security interest (excluding Permitted Liens) continues perfected on the date hereof with respect to any Person described above (or the assets transferred to the respective Assignor by such Person), including without limitation pursuant to Section 9-316(a)(3) of the UCC.

2.9  <u>Non-UCC Property</u>.  The aggregate fair market value (as determined by the Assignors in good faith) of all property of the Lee Assignors of the types described in clauses (1), (2) and (3) of Section 9-311(a) of the UCC (other than Copyrights, Marks and Patents which are the subject of a filing of a grant of security interest in the respective form attached hereto in the United States Patent and Trademark Office or in the United States Copyright Office) does not exceed $5,000,000.  If the aggregate value of all such property at any time owned by all Lee Assignors exceeds $5,000,000, the Lee Assignors shall provide prompt written notice thereof to the Collateral Agent and, upon the request of the Collateral Agent, the Lee Assignors shall promptly (and in any event within 30 days) take such actions (at their own cost and expense) as may be required under the respective United States, State or other laws referenced in Section 9-311(a) of the UCC to perfect the security interests granted herein in any Collateral where the filing of a financing statement does not perfect the security interest in such property in accordance with the provisions of Section 9-311(a) of the UCC.

2.10 <u>As-Extracted Collateral; Timber-to-be-Cut</u>.   On the date hereof, such Assignor does not own, or expect to acquire, any property which constitutes, or would constitute, As-Extracted Collateral or Timber-to-be-Cut.  If at any time after the date of this Agreement such Assignor owns, acquires or obtains rights to any As-Extracted Collateral or Timber-to-be-Cut, such Assignor shall furnish the Collateral Agent with prompt written notice thereof (which notice shall describe in reasonable detail the As-Extracted Collateral and/or Timber-to-be-Cut and the locations thereof) and shall take all actions as may be deemed reasonably necessary or desirable by the Collateral Agent to perfect the security interest of the Collateral Agent therein.

2.11 <u>Collateral in the Possession of a Bailee</u>.   If any material amounts of Inventory or other Goods (as to the Assignors taken as a whole) are at any time in the possession of a bailee, such Assignor shall promptly notify the Collateral Agent thereof and, if requested by the Collateral Agent, shall use its reasonable best efforts to promptly obtain an acknowledgment from such bailee, in form and substance reasonably satisfactory to the Collateral Agent, that the bailee holds such Collateral for the benefit of the Collateral Agent and shall act upon the instructions of the Collateral Agent, without the further consent of such Assignor. The Collateral Agent agrees with the Assignors other than the Pulitzer Assignors that the Collateral Agent shall not give any such instructions unless an Event of Default has occurred and is continuing or would occur after taking into account any action by the respective Assignor with respect to any such bailee.

2.12 <u>Recourse</u>.  This Agreement is made with full recourse to each Assignor and pursuant to and upon all the warranties, representations, covenants and agreements on the part of such Assignor contained herein, in the Secured Debt Agreements and otherwise in writing in connection herewith or therewith.

2.13 <u>Certain Representations and Warranties Regarding Certain Collateral</u>.  (a) Each Assignor represents and warrants that on the date hereof: (i) the Stock (and any warrants or options to purchase Stock) held by such Assignor consists of the number and type of shares of the stock (or warrants or options to purchase any stock) of the corporations as described in <u>Annex O</u> hereto; (ii) such Stock referenced in clause (i) of this sentence constitutes that percentage of the issued and outstanding capital stock of the issuing corporation as is set forth in <u>Annex O</u> hereto; (iii) the Notes held by such Assignor consist of the promissory notes described in <u>Annex P</u> hereto where such Assignor is listed as the Lender; (iv) the Limited Liability Company Interests held by such Assignor consist of the number and type of interests of the Persons described in <u>Annex Q</u> hereto; (v) each such Limited Liability Company Interest referenced in clause (iv) of this paragraph constitutes that percentage of the issued and outstanding equity interest of the issuing Person as set forth in <u>Annex Q</u> hereto; (vi) the Partnership Interests held by such Assignor consist of the number and type of interests of the Persons described in <u>Annex R</u> hereto; (vii) each such Partnership Interest referenced in clause (vi) of this paragraph constitutes that percentage or portion of the entire Partnership Interest of the relevant partnership as set forth in <u>Annex R</u> hereto; (viii) such Assignor has complied with the respective procedure set forth in Section 1.1(b) hereof with respect to each item of Collateral described in <u>Annexes O</u> through <u>R</u> hereto for such Assignor; and (ix) on the date hereof, such Assignor owns no other Stock, Limited Liability Company Interests or Partnership Interests.

(b)  Each Pulitzer Assignor represents and warrants that on the date hereof: (i) all Collateral of such Assignor comprising Chattel Paper, Instruments (in an outstanding or stated principal amount in excess of $25,000) or Investment Property comprising Certificated Securities is set forth in <u>Annex T</u> hereto; and (ii) all motor vehicles and other Equipment subject to a Certificate of Title owned, held or in which such Assignor otherwise has acquired or received any rights or interest are listed on <u>Annex U</u>, and such Grantor shall promptly amend <u>Annex U</u> from time to time to reflect any additions to or deletions from such list.

## ARTICLE III

### SPECIAL PROVISIONS CONCERNING ACCOUNTS; CONTRACT RIGHTS; INSTRUMENTS; CHATTEL PAPER AND CERTAIN OTHER COLLATERAL

3.1  <u>Additional Representations and Warranties</u>.  As of the time when each of its Accounts arises, each Assignor shall be deemed to have represented and warranted that each such Account, and all records, papers and documents relating thereto (if any) are genuine and what they purport to be, and that all papers and documents (if any) relating thereto (i) will, to the knowledge of such Assignor, represent the genuine, legal, valid and binding obligation of the account debtor evidencing indebtedness unpaid and owed by the respective account debtor arising out of the performance of labor or services or the sale or lease and delivery of the merchandise listed therein, or both, (ii) will be the only original writings evidencing and embodying such obligation of the account debtor named therein (other than copies created for general accounting purposes), (iii) will, to the knowledge of such Assignor, evidence true and valid obligations, enforceable in accordance with their respective terms, and (iv) will be in compliance and will conform in all material respects with all applicable federal, state and local laws and applicable laws of any relevant foreign jurisdiction.

3.2  <u>Maintenance of Records</u>.  Each Assignor will keep and maintain at its own cost and expense accurate records of its Accounts and Contracts pursuant to its historical customs and practices, including, but not limited to, originals of all documentation (including each Contract) with respect thereto, records of all payments received, all credits granted thereon, all merchandise returned and all other dealings therewith, and such Assignor will make the same available on any premise of any Assignor to the Collateral Agent for inspection, at such Assignor's own cost and expense, at any and all reasonable times upon prior notice to such Assignor and otherwise in accordance with the Loan Agreement.  Upon the occurrence and during the continuance of an Event of Default and at the request of the Collateral Agent, such Assignor shall, at its own cost and expense, deliver all tangible evidence of its Accounts and Contract Rights (including, without limitation, all documents evidencing the Accounts and all Contracts) and such books and records to the Collateral Agent or to its representatives (copies of which evidence and books and records may be retained by such Assignor).  Upon the occurrence and during the continuance of an Event of Default and if the Collateral Agent so directs, each Lee Assignor shall legend, in form and manner satisfactory to the Collateral Agent, the Accounts and the Contracts, as well as books, records and documents (if any) of such Assignor evidencing or pertaining to such Accounts and Contracts with an appropriate reference to the fact that such Accounts and Contracts have been assigned to the Collateral Agent and that the Collateral Agent has a security interest therein.

3.3  <u>Direction to Account Debtors; Contracting Parties; etc</u>.  Upon the occurrence and during the continuance of an Event of Default, and subject to the provisions of the Lee Intercreditor Agreement or the Pulitzer Intercreditor Agreement, as applicable, if the Collateral Agent so directs any Assignor, such Assignor agrees (x) to cause all payments on account of the Accounts and Contracts to be made directly to the applicable Cash Collateral Account, (y) that the Collateral Agent may, at its option, directly notify the obligors with respect to any Accounts and/or under any Contracts to make payments with respect thereto as provided in the preceding clause (x), and (z) that the Collateral Agent may enforce collection of any such Accounts and Contracts and may adjust, settle or compromise the amount of payment thereof, in the same manner and to the same extent as such Assignor.  Without notice to or assent by any Assignor, the Collateral Agent may, upon the occurrence and during the continuance of an Event of Default, apply any or all amounts then in, or thereafter deposited in, the applicable Cash Collateral Account toward the payment of the Obligations in the manner provided in Section 7.4 of this Agreement.  The reasonable costs and expenses of collection (including reasonable attorneys' fees), whether incurred by an Assignor or the Collateral Agent, shall be borne by the relevant Assignor.  The Collateral Agent shall deliver a copy of each notice referred to in the preceding clause (y) to the relevant Assignor, <u>provided</u> that (x) the failure by the Collateral Agent to so notify such Assignor shall not affect the effectiveness of such notice or the other rights of the Collateral Agent created by this Section 3.3 and (y) no such notice shall be required if an Event of Default of the type described in Section 11.05 of the Loan Agreement has occurred and is continuing.

3.4  <u>Modification of Terms; etc</u>.  Except in accordance with such Assignor's ordinary course of business and consistent with reasonable business judgment or as permitted by Section 3.5, no Assignor shall rescind or cancel any indebtedness evidenced by any Account or under any Contract, or modify any material term thereof or make any material adjustment with respect thereto, or extend or renew the same, or compromise or settle any material dispute, claim, suit or legal proceeding relating thereto, or sell any Account or Contract, or interest therein, without the prior written consent of the Collateral Agent.

3.5  <u>Collection</u>.  Each Assignor shall endeavor in accordance with reasonable business practices to cause to be collected from the account debtor named in each of its Accounts or obligor under any Contract, as and when due (including, without limitation, amounts which are delinquent, such amounts to be collected in accordance with generally accepted lawful collection procedures) any and all amounts owing under or on account of such Account or Contract, and apply forthwith upon receipt thereof all such amounts as are so collected to the outstanding balance of such Account or under such Contract.  Except as otherwise directed by the Collateral Agent, and subject to the terms of the Lee Intercreditor Agreement or the Pulitzer Intercreditor Agreement, as applicable, after the occurrence and during the continuation of an Event of Default, any Assignor may allow in the ordinary course of business as adjustments to amounts owing under its Accounts and Contracts (i) an extension or renewal of the time or times of payment, or settlement for less than the total unpaid balance, which such Assignor finds appropriate in accordance with reasonable business judgment and (ii) a refund or credit due as a result of returned or damaged merchandise or improperly performed services or for other reasons which such Assignor finds appropriate in accordance with reasonable business judgment.  The reasonable costs and expenses (including, without limitation, reasonable attorneys' fees) of

collection, whether incurred by an Assignor or the Collateral Agent, shall be borne by the relevant Assignor.

3.6 <u>Instruments</u>.  If any Assignor owns or acquires any Instrument in excess of $500,000 (or, in the case of any Pulitzer Assignor, $25,000) constituting Collateral (other than (x) checks and other payment instruments received and collected in the ordinary course of business and (y) any Intercompany Note), such Assignor will within 10 (or, in the case of any Pulitzer Assignor, 5) Business Days notify the Collateral Agent thereof, and upon request by the Collateral Agent (provided, that such request shall not be required with respect to any such Instrument of a Pulitzer Assignor) will promptly deliver such Instrument to the Collateral Agent appropriately endorsed to the order of the Collateral Agent.

3.7 <u>Assignors Remain Liable Under Accounts</u>.  Anything herein to the contrary notwithstanding, the Assignors shall remain liable under each of the Accounts to observe and perform all of the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise to such Accounts.  Neither the Collateral Agent nor any other Secured Creditor shall have any obligation or liability under any Account (or any agreement giving rise thereto) by reason of or arising out of this Agreement or the receipt by the Collateral Agent or any other Secured Creditor of any payment relating to such Account pursuant hereto, nor shall the Collateral Agent or any other Secured Creditor be obli-gated in any manner to perform any of the obligations of any Assignor under or pursuant to any Account (or any agreement giving rise thereto), to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by them or as to the sufficiency of any performance by any party under any Account (or any agreement giving rise thereto), to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to them or to which they may be entitled at any time or times.

3.8 <u>Assignors Remain Liable Under Contracts</u>.  Anything herein to the contrary notwithstanding, the Assignors shall remain liable under each of the Contracts to observe and perform all of the conditions and obligations to be observed and performed by them thereunder, all in accordance with and pursuant to the terms and provisions of each Contract.  Neither the Collateral Agent nor any other Secured Creditor shall have any obligation or liability under any Contract by reason of or arising out of this Agreement or the receipt by the Collateral Agent or any other Secured Creditor of any payment relating to such Contract pursuant hereto, nor shall the Collateral Agent or any other Secured Creditor be obligated in any manner to perform any of the obligations of any Assignor under or pursuant to any Contract, to make any payment, to make any inquiry as to the nature or the sufficiency of any performance by any party under any Contract, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to them or to which they may be entitled at any time or times.

3.9 <u>Deposit Accounts; Etc</u>.

(a)    No Assignor maintains, or at any time after the date of this Agreement shall establish or maintain, any demand, time, savings, passbook or similar account, except for such accounts maintained with a bank (as defined in Section 9-102 of the UCC) whose

jurisdiction (determined in accordance with Section 9-304 of the UCC) is within a State of the United States. Annex F hereto accurately sets forth, as of the date of this Agreement, for each Assignor, each Deposit Account maintained by such Assignor (including a description thereof and the respective account number), the name and address of the respective bank with which such Deposit Account is maintained, and the jurisdiction of the respective bank with respect to such Deposit Account, and indicates whether such Deposit Account constitutes an Excluded Account. For each Deposit Account (other than any Excluded Account), and, in the case of any Pulitzer Assignor, if requested by the Collateral Agent for the purposes of perfection, the respective Assignor shall cause the bank with which the Deposit Account is maintained to execute and deliver to the Collateral Agent (or to the person contemplated by Section 2.3(c) of the Lee Intercreditor Agreement or the Pulitzer Intercreditor Agreement, as applicable), on or before the date of this Agreement (or such later date as may be reasonably acceptable to the Collateral Agent in its sole discretion) or, if later, at the time of the establishment of the respective Deposit Account, a "control agreement" (A) in a form substantially consistent with the "control agreement" for such Deposit Account in effect with respect to the Prepetition Credit Agreement or the Pulitzer Debt Agreement, in each case on the Petition Date, with such changes thereto to account for or ensure the continuous perfection of the Collateral Agent's lien on such Deposit Account or, (B) if no such "control agreement" for a Deposit Account is in effect on the Petition Date, a "control agreement" in such other form as may be acceptable to the Collateral Agent. If any bank with which a Deposit Account (other than any Excluded Account) is maintained refuses to, or does not, enter into such a "control agreement", then the respective Assignor shall promptly (and in any event within such period as may be reasonably acceptable to the Collateral Agent in its sole discretion) close the respective Deposit Account and transfer all balances therein to the applicable Cash Collateral Account or another Deposit Account meeting the requirements of this Section 3.9. If any bank with which a Deposit Account (other than any Excluded Account) is maintained refuses to subordinate all its claims with respect to such Deposit Account to the Collateral Agent's security interest therein on terms satisfactory to the Collateral Agent, then the Collateral Agent, at its option, may (x) require that such Deposit Account be terminated in accordance with the immediately preceding sentence or (y) agree to a "control agreement" without such subordination, provided that in such event the Collateral Agent may at any time, at its option, subsequently require that such Deposit Account be terminated (within a reasonable period after notice from the Collateral Agent) in accordance with the requirements of the immediately preceding sentence. The Collateral Agent agrees that it will only give a "Notice of Exclusive Control" under a "control agreement" following the occurrence of an Event of Default.

(b)    The name and address of each Securities Intermediary or commodity intermediary at which any Pulitzer Assignor maintains any Securities Account or Commodity Account and the applicable account numbers and account names are set forth in Annex U. Each such Assignor agrees to amend Annex U from time to time within five Business Days after opening any additional Securities Account or Commodity Account, or closing or changing the account name or number on any existing Securities Account or Commodity Account.

(c)    After the date of this Agreement, no Assignor shall establish any new demand, time, savings, passbook or similar account, except for (i) Deposit Accounts established and maintained with banks and meeting the requirements of preceding clause (a) and (ii) Excluded Accounts. At the time any such Deposit Account (other than an Excluded Account) is

established, the appropriate "control agreement" shall be entered into in accordance with the requirements of preceding clause (a) and the respective Assignor shall furnish (in the case of a Pulitzer Assignor, within five Business Days) to the Collateral Agent a supplement to <u>Annex F</u> hereto containing the relevant information with respect to the respective Deposit Account and the bank with which same is established.

3.10  <u>Letter-of-Credit Rights</u>.  If any Assignor is at any time a beneficiary under a letter of credit with a stated amount of $500,000 or more, such Assignor shall promptly notify the Collateral Agent thereof and, at the request of the Collateral Agent, such Assignor shall, pursuant to an agreement in form and substance reasonably satisfactory to the Collateral Agent, use its reasonable best efforts to (i) arrange for the issuer and any confirmer of such letter of credit to consent to an assignment to the Collateral Agent of the proceeds of any drawing under such letter of credit or (ii) arrange for the Collateral Agent to become the transferee beneficiary of such letter of credit, with the Collateral Agent agreeing, in each case, that the proceeds of any drawing under the letter of credit are to be applied as provided in this Agreement after the occurrence and during the continuance of an Event of Default.

3.11  <u>Commercial Tort Claims</u>.  All Commercial Tort Claims of each Assignor in existence on the date of this Agreement in an amount (taking the greater of the aggregate claimed damages thereunder or the reasonably estimated value thereof) of $500,000 or more (or, in the case of each Pulitzer Assignor, $100,000 or more) are described in <u>Annex H</u> hereto.  If any Assignor shall at any time after the date of this Agreement acquire a Commercial Tort Claim in an amount (taking the greater of the aggregate claimed damages thereunder or the reasonably estimated value thereof) of $500,000 or more (or, in the case of each Pulitzer Assignor, $100,000 or more), such Assignor shall promptly notify the Collateral Agent thereof in a writing signed by such Assignor and describing the details thereof and shall grant to the Collateral Agent in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance reasonably satisfactory to the Collateral Agent.

3.12  <u>Chattel Paper</u>.  Upon the request of the Collateral Agent made at any time or from time to time, each Lee Assignor shall promptly furnish to the Collateral Agent a list of all Electronic Chattel Paper held or owned by such Lee Assignor.  Furthermore, if requested by the Collateral Agent, each Lee Assignor shall promptly take all actions which are reasonably practicable so that the Collateral Agent has "control" of all Electronic Chattel Paper in accordance with the requirements of Section 9-105 of the UCC.  Each Lee Assignor will promptly (and in any event within 10 days) following any request by the Collateral Agent deliver all of its Tangible Chattel Paper to the Collateral Agent.  At all times, each Lee Assignor will mark Tangible Chattel Paper with a legend provided by the Collateral Agent indicating the security interest herein.  In addition, each Pulitzer Assignor represents and warrants that there are no Accounts or Chattel Paper of such Assignor which arise out of a contract or contracts with the United States of America or any department, agency, or instrumentality thereof, except for those listed on <u>Annex T</u> hereto (as such Annex shall be updated from time to time).

3.13  <u>Further Actions</u>.  Each Assignor will, at its own expense, make, execute, endorse, acknowledge, file and/or deliver to the Collateral Agent from time to time such vouchers, invoices, schedules, confirmatory assignments, conveyances, financing statements,

transfer endorsements, certificates, reports and other assurances or instruments and take such further steps, including any and all actions as may be necessary or required under the Federal Assignment of Claims Act, relating to its Accounts, Contracts, Instruments and other property or rights covered by the security interest hereby granted, as the Collateral Agent may reasonably require.

<div align="center">

ARTICLE IV

SPECIAL PROVISIONS CONCERNING TRADEMARKS AND DOMAIN NAMES

</div>

4.1 <u>Additional Representations and Warranties</u>.  Each Assignor represents and warrants that it is the true and lawful owner of or otherwise has the right to use the registered Marks and, in the case of the Lee Assignors, Domain Names listed in <u>Annex I</u> hereto for such Assignor and that said listed Marks and Domain Names include all United States marks and applications for United States marks registered in the United States Patent and Trademark Office and, in the case of the Lee Assignors, all Domain Names that such Assignor owns or, except as described in <u>Annex I</u>, uses in connection with its business as of the date hereof, and, in the case of each Pulitzer Assignor, except as set forth on <u>Annex I</u> none of such Marks has been licensed to any third party except in the ordinary course of publishing newspapers and related products. Each Assignor represents and warrants that it owns, is licensed to use or otherwise has the right to use, all material Marks and material Domain Names that it uses.  Each Assignor further warrants that it has no knowledge of any third-party claim received by it that any aspect of such Assignor's present or contemplated business operations infringes or will infringe any trademark, service mark or trade name of any other Person other than as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Each Assignor represents and warrants that it is the true and lawful owner of or otherwise has the right to use all U.S. trademark registrations and, in the case of the Lee Assignors, Domain Name registrations listed in <u>Annex I</u> hereto for such Assignor and that, to each Assignor's knowledge, said registrations are valid, subsisting, have not been canceled and that such Assignor is not aware of any third-party claim that any of said registrations is invalid or unenforceable, and is not aware that there is any reason that any of  said applications for United States Marks will not mature into registrations, except to the extent the same, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  Subject to the Lee Intercreditor Agreement and the Pulitzer Intercreditor Agreement, as applicable, each Assignor hereby grants to the Collateral Agent an absolute power of attorney to sign, upon the occurrence and during the continuance of an Event of Default, any document which may be required by the United States Patent and Trademark Office or similar registrar in order to effect an absolute assignment of all right, title and interest in each Mark and/or Domain Name, and record the same.

4.2 <u>Licenses and Assignments</u>.  Except as otherwise permitted by the Secured Debt Agreements, each Assignor hereby agrees not to divest itself of any right under any material Mark or Domain Name absent prior written approval of the Collateral Agent.

4.3 <u>Infringements</u>.  Each Assignor agrees, promptly upon learning thereof, to notify the Collateral Agent in writing of the name and address of, and to furnish such pertinent information that may be available with respect to, any party who such Assignor believes is, or may be, infringing or diluting or otherwise violating any of such Assignor's rights in and to any

Mark or Domain Name in any manner that could reasonably be expected to have a Material Adverse Effect, or with respect to any party claiming that such Assignor's use of any Mark or Domain Name material to such Assignor's business violates in any material respect any property right of that party. Each Assignor further agrees to prosecute diligently in accordance with reasonable business practices any Person infringing any Mark or Domain Name in any manner that could reasonably be expected to have a Material Adverse Effect.

   4.4 <u>Preservation of Marks</u>. Each Assignor agrees to take all such actions as are reasonably necessary to preserve its Marks as trademarks or service marks under the laws of the United States (other than any such Marks which are no longer used or useful in its business or operations).

   4.5 <u>Maintenance of Registration</u>. Each Assignor shall, at its own expense, diligently process all documents reasonably required to maintain all Mark and/or Domain Name registrations, including but not limited to affidavits of use and applications for renewals of registration in the United States Patent and Trademark Office for all of its material registered Marks, and shall pay all fees and disbursements in connection therewith and shall not abandon any such filing of affidavit of use or any such application of renewal prior to the exhaustion of all administrative and judicial remedies without prior written consent of the Collateral Agent (other than with respect to registrations and applications deemed by such Assignor in its reasonable business judgment to be no longer prudent to pursue).

   4.6 <u>Future Registered Marks and Domain Names</u>. If any Mark registration is issued hereafter to any Assignor as a result of any application now or hereafter pending before the United States Patent and Trademark Office or any Domain Name is registered by any Lee Assignor, within 30 days of receipt of such certificate or similar indicia of ownership, such Assignor shall deliver to the Collateral Agent a copy of such registration certificate or similar indicia of ownership, and a grant of a security interest in such Mark and/or Domain Name to the Collateral Agent and at the expense of such Assignor, confirming the grant of a security interest in such Mark and/or Domain Name to the Collateral Agent hereunder, the form of such security to be substantially in the form of <u>Annex L</u> hereto or in such other form as may be reasonably satisfactory to the Collateral Agent.

   4.7 <u>Remedies</u>. If an Event of Default shall occur and be continuing, the Collateral Agent may, in accordance with the Lee Intercreditor Agreement and the Pulitzer Intercreditor Agreement, by written notice to the relevant Assignor, take any or all of the following actions: (i) declare the entire right, title and interest of such Assignor in and to each of the Marks and Domain Names, together with all trademark rights and rights of protection to the same, vested in the Collateral Agent for the benefit of the Secured Creditors, in which event such rights, title and interest shall immediately vest, in the Collateral Agent for the benefit of the Secured Creditors, and the Collateral Agent shall be entitled to exercise the power of attorney referred to in Section 4.1 hereof to execute, cause to be acknowledged and notarized and record said absolute assignment with the applicable agency or registrar; (ii) take and use or sell the Marks or Domain Names and the goodwill of such Assignor's business symbolized by the Marks or Domain Names and the right to carry on the business and use the assets of such Assignor in connection with which the Marks or Domain Names have been used; and (iii) direct such Assignor to refrain, in which event such Assignor shall refrain, from using the Marks or Domain

Names in any manner whatsoever, directly or indirectly, and such Assignor shall execute such further documents that the Collateral Agent may reasonably request to further confirm this and to transfer ownership of the Marks or Domain Names and registrations and any pending trademark applications in the United States Patent and Trademark Office or applicable Domain Name registrar to the Collateral Agent.

ARTICLE V

SPECIAL PROVISIONS CONCERNING PATENTS, COPYRIGHTS AND TRADE SECRETS

5.1 <u>Additional Representations and Warranties</u>.  Each Assignor represents and warrants that it is the true and lawful owner of all rights in (i) all material Trade Secret Rights, (ii) the Patents listed in <u>Annex J</u> hereto for such Assignor and that said Patents include all the United States patents and applications for United States patents that such Assignor owns as of the date hereof, and, in the case of each Pulitzer Assignor, except as set forth on <u>Annex J</u> none of such Patents has been licensed to any third party except in the ordinary course of publishing newspapers and related products, and (iii) the registered Copyrights listed in <u>Annex K</u> hereto for such Assignor and that, except as described in <u>Annex K</u> hereto, said Copyrights are all the United States copyrights registered with the United States Copyright Office and applications to United States copyrights that such Assignor owns as of the date hereof, and, in the case of each Pulitzer Assignor, except as set forth on <u>Annex K</u> none of such Copyrights has been licensed to any third party except in the ordinary course of publishing newspapers and related products. Each Assignor further warrants that it has no knowledge of any third-party claim that any aspect of such Assignor's present or contemplated business operations infringes or will infringe any patent of any other Person or such Assignor has misappropriated any Trade Secret or proprietary information which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.  In accordance with the Lee Intercreditor Agreement and the Pulitzer Intercreditor Agreement, each Assignor hereby grants to the Collateral Agent an absolute power of attorney to sign, upon the occurrence and during the continuance of any Event of Default, any document which may be required by the United States Patent and Trademark Office or the United States Copyright Office in order to effect an absolute assignment of all right, title and interest in each Patent or Copyright, and to record the same.

5.2 <u>Licenses and Assignments</u>.  Except as otherwise permitted by the Secured Debt Agreements, each Assignor hereby agrees not to divest itself of any right under any material Patent or Copyright absent prior written approval of the Collateral Agent.

5.3 <u>Infringements</u>.  Each Assignor agrees, promptly upon learning thereof, to furnish the Collateral Agent in writing with all pertinent information available to such Assignor with respect to any infringement, contributing infringement or active inducement to infringe or other violation of such Assignor's rights in any Patent or Copyright or to any claim that the practice of any Patent or use of any Copyright violates any property right of a third party, or with respect to any misappropriation of any Trade Secret Right or any claim that practice of any Trade Secret Right violates any property right of a third party, in each case, in any manner which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.  Each Assignor further agrees, absent direction of the Collateral Agent to the contrary, to diligently prosecute, in accordance with its reasonable business judgment, any Person infringing

any Patent or Copyright or any Person misappropriating any Trade Secret Right, in each case to the extent that such infringement or misappropriation, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

5.4 <u>Maintenance of Patents or Copyrights</u>.  At its own expense, each Assignor shall make timely payment of all post-issuance fees required to maintain in force its rights under each material Patent or Copyright, absent prior written consent of the Collateral Agent.

5.5 <u>Prosecution of Patent or Copyright Applications</u>.  At its own expense, each Assignor shall diligently prosecute all material applications for (i) United States Patents listed in <u>Annex J</u> hereto and (ii) Copyrights listed on <u>Annex K</u> hereto, in each case for such Assignor and shall not abandon any such application prior to exhaustion of all administrative and judicial remedies (other than applications that are deemed by such Assignor in its reasonable business judgment to no longer be necessary in the conduct of the Assignor's business), absent written consent of the Collateral Agent.

5.6 <u>Other Patents and Copyrights</u>.  Within 30 days of the acquisition or issuance of a United States Patent, registration of a Copyright, or acquisition of a registered Copyright, or of filing of an application for a United States Patent or Copyright, the relevant Assignor shall deliver to the Collateral Agent a copy of said Copyright or Patent, or certificate or registration of, or application therefor, as the case may be, with a grant of a security interest as to such Patent or Copyright, as the case may be, to the Collateral Agent and at the expense of such Assignor, confirming the grant of a security interest, the form of such grant of a security interest to be substantially in the form of <u>Annex M</u> or <u>N</u> hereto, as appropriate, or in such other form as may be reasonably satisfactory to the Collateral Agent.

5.7 <u>Remedies</u>.   If an Event of Default shall occur and be continuing, the Collateral Agent may, in accordance with the Lee Intercreditor Agreement or the Pulitzer Intercreditor Agreement, as applicable, by written notice to the relevant Assignor, take any or all of the following actions:  (i) declare the entire right, title, and interest of such Assignor in each of the Patents and Copyrights vested in the Collateral Agent for the benefit of the Secured Creditors, in which event such right, title, and interest shall immediately vest in the Collateral Agent for the benefit of the Secured Creditors, in which case the Collateral Agent shall be entitled to exercise the power of attorney referred to in Section 5.1 hereof to execute, cause to be acknowledged and notarized and to record said absolute assignment with the applicable agency; (ii) take and practice or sell the Patents and Copyrights; and (iii) direct such Assignor to refrain, in which event such Assignor shall refrain, from practicing the Patents and using the Copyrights directly or indirectly, and such Assignor shall execute such further documents as the Collateral Agent may reasonably request further to confirm this and to transfer ownership of the Patents and Copyrights to the Collateral Agent for the benefit of the Secured Creditors.

ARTICLE VI

PROVISIONS CONCERNING ALL COLLATERAL

6.1 <u>Protection of Collateral Agent's Security</u>.  Except as otherwise permitted by the Secured Debt Agreements, each Assignor will do nothing to impair, in any material respect,

the rights of the Collateral Agent in the Collateral.  Each Assignor will at all times maintain insurance, at such Assignor's own expense to the extent and in the manner provided in the Secured Debt Agreements.  Except to the extent otherwise permitted to be retained by such Assignor or applied by such Assignor pursuant to the terms of the Secured Debt Agreements, the Collateral Agent shall, at the time any proceeds of such insurance are distributed to the Secured Creditors, apply such proceeds in accordance with Section 7.4 hereof.  Each Assignor assumes all liability and responsibility in connection with the Collateral acquired by it and the liability of such Assignor to pay the Obligations shall in no way be affected or diminished by reason of the fact that such Collateral may be lost, destroyed, stolen, damaged or for any reason whatsoever unavailable to such Assignor.

6.2 <u>Warehouse Receipts Non-Negotiable</u>.  To the extent practicable, each Assignor agrees that if any warehouse receipt or receipt in the nature of a warehouse receipt is issued with respect to any of its Inventory, such Assignor shall request that such warehouse receipt or receipt in the nature thereof shall not be "negotiable" (as such term is used in Section 7-104 of the UCC as in effect in any relevant jurisdiction or under other relevant law).

6.3 <u>Additional Information</u>.  Each Assignor will, at its own expense, from time to time upon the reasonable request of the Collateral Agent, promptly (and in any event within 10 days after its receipt of the respective request) furnish to the Collateral Agent such information with respect to the Collateral (including the identity of the Collateral or such components thereof as may have been requested by the Collateral Agent, and the estimated value and location of such Collateral).  Without limiting the foregoing, each Assignor agrees that it shall promptly (and in any event within 20 days after its receipt of the respective request) furnish to the Collateral Agent such updated Annexes hereto as may from time to time be reasonably requested by the Collateral Agent.

6.4 <u>Further Actions</u>.  Each Assignor will, at its own expense and upon the reasonable request of the Collateral Agent, make, execute, endorse, acknowledge, file and/or deliver to the Collateral Agent from time to time such lists, descriptions and designations of its Collateral, warehouse receipts, receipts in the nature of warehouse receipts, bills of lading, documents of title, vouchers, invoices, schedules, confirmatory assignments, conveyances, financing statements, transfer endorsements, certificates, reports and other assurances or instruments and take such further steps relating to the Collateral and other property or rights covered by the security interest hereby granted, which the Collateral Agent deems reasonably appropriate or advisable to perfect, preserve or protect its security interest in the Collateral consistent with the provisions of this Agreement.  In addition, each Pulitzer Assignor will, at its own expense, from time to time upon the written request of the Collateral Agent, take such further action as the Collateral Agent may reasonably deem necessary or desirable to place the interest of the Collateral Agent as lienholder (or other similar designation) on the Certificate of Title of any motor vehicles or other Equipment constituting Collateral owned by such Assignor which is covered by a Certificate of Title and delivering the original thereof to the Collateral Agent (or its designated agent), it being understood that any such Assignor shall not be required to comply with the foregoing requirements of this sentence prior to an Event of Default unless the aggregate book value of motor vehicles and such Equipment exceeds $750,000 (in which case, and in the case of an Event of Default, all Certificate of Titles will be required to be delivered with the Collateral Agent's Lien properly noted thereon).

6.5  <u>Financing Statements</u>.  Each Assignor agrees to execute and deliver to the Collateral Agent such financing statements, in form reasonably acceptable to the Collateral Agent, as the Collateral Agent may from time to time reasonably request or as are reasonably necessary or desirable in the opinion of the Collateral Agent to establish and maintain a valid, enforceable, perfected security interest in the Collateral as provided herein and the other rights and security contemplated hereby.  Each Assignor will pay any applicable filing fees, recordation taxes and related expenses relating to its Collateral.  Each Assignor hereby authorizes the Collateral Agent to file any such financing statements without the signature of such Assignor where permitted by law (and such authorization includes describing the Collateral as "all assets" of such Assignor with further reference to those assets specifically excluded from the grant of the security interest contained in this Agreement).

6.6  <u>Federal Government Contracts</u>.  If any Account or Chattel Paper of any Pulitzer Assignor arises out of a contract or contracts with the United States of America or any department, agency, or instrumentally thereof, such Pulitzer Assignor shall (i) promptly notify the Collateral Agent thereof in writing, and execute and deliver in connection therewith (A) a collateral assignment of claims in favor of the Collateral Agent, and (B) a notice of collateral assignment of claims directed to the appropriate federal government agencies and agents thereof as required under applicable law, each in form and substance reasonably satisfactory to the Collateral Agent, (ii) promptly take any other steps reasonably required by the Collateral Agent in order to ensure that all moneys due or to become due under such contract or contracts shall be collaterally assigned to the Collateral Agent, for the benefit of the Secured Parties, and notice thereof given under the Assignment of Claims Act of 1940, as amended (31 U.S.C. 3727; 41 U.S.C. 15), or other applicable law, and (iii) promptly update <u>Annex T</u> hereto and deliver a copy of such revised schedule to the Collateral Agent, together with copies of all related contracts evidencing such Accounts and/or Chattel Paper.  Notwithstanding the foregoing, the Pulitzer Assignors shall not be required to comply with the foregoing in connection with purchase orders for the publication of notices so long as the aggregate amount owing under all of such purchase orders does not at any lime exceed $100,000.

6.7  <u>Maintenance of Insurance</u>.  Each Pulitzer Grantor shall maintain, with financially sound and reputable companies, insurance with respect to their respective properties and businesses against such casualties and contingencies, of such types, on such terms and in such amounts (including deductibles, co-insurance and self-insurance, if adequate reserves are maintained with respect thereto) as is customary in the case of entities of established reputations engaged in the same or a similar business and similarly situated.  In addition, each Pulitzer Grantor shall maintain, with financially sound and reputable companies, insurance policies insuring (a) its Equipment, Fixtures and Inventory against loss by fire, explosion, theft and such other casualties as are usually insured against by companies engaged in the same or similar businesses, and reasonably satisfactory to the Required Lenders, and (b) against liability for personal injury and property damage relating to such Equipment, Fixtures and Inventory, and reasonably satisfactory to the Required Lenders.  Each Pulitzer Grantor, at its expense, shall obtain a loss payable endorsement to each policy of property insurance in favor of the Collateral Agent for the benefit of the Secured Parties and each policy of liability insurance shall name the Collateral Agent for the benefit of the Secured Parties as an additional insured.  Each Pulitzer Grantor shall, if so directed by the Collateral Agent, deliver to the Collateral Agent as often as the Collateral Agent may reasonably request, a report of a reputable insurance broker with

respect to the insurance on its Equipment, Fixtures and Inventory. Within 60 days of the date hereof, all policies of insurance required to be maintained pursuant to this Section 6.7 shall (i) contain a clause which provides that the Collateral Agent's and the Secured Parties' interests under the policy shall not be invalidated by any act or omission to act of, or any breach of warranty by, the insured, or by any change in the title, ownership or possession of the insured property, or by the use of the property for purposes more hazardous than is permitted in the policy; and (ii) provide that, as to the interests of the Collateral Agent under such policies, no cancellation, reduction in amount or change in coverage thereof shall be effective until at least 30 days after receipt by the Collateral Agent of written notice thereof.

## ARTICLE VII

## REMEDIES UPON OCCURRENCE OF AN EVENT OF DEFAULT

7.1 <u>Remedies; Obtaining the Collateral Upon Default</u>.  Subject to the terms of the Lee Intercreditor Agreement, the Pulitzer Intercreditor Agreement, and Section 11 of the Loan Agreement each Assignor agrees that, if any Event of Default shall have occurred and be continuing, then and in every such case, the Collateral Agent, in addition to any rights now or hereafter existing under applicable law and under the other provisions of this Agreement, shall have all rights as a secured creditor under any UCC, and such additional rights and remedies to which a secured creditor is entitled under the laws in effect in all relevant jurisdictions and may:

(i) personally, or by agents or attorneys, immediately take possession of the Collateral or any part thereof, from such Assignor or any other Person who then has possession of any part thereof with or without notice or process of law, and for that purpose may enter upon such Assignor's premises where any of the Collateral is located and remove the same and use in connection with such removal any and all services, supplies, aids and other facilities of such Assignor;

(ii) instruct the obligor or obligors on any agreement, instrument or other obligation (including, without limitation, the Accounts and the Contracts) constituting the Collateral to make any payment required by the terms of such agreement, instrument or other obligation directly to the Collateral Agent and may exercise any and all remedies of such Assignor in respect of such Collateral;

(iii) instruct all banks which have entered into a control agreement with the Collateral Agent to transfer all monies, securities and instruments held by such depositary bank to the applicable Cash Collateral Account;

(iv) sell, assign or otherwise liquidate any or all of the Collateral or any part thereof in accordance with Section 7.2 hereof, or direct such Assignor to sell, assign or otherwise liquidate any or all of the Collateral or any part thereof, and, in each case, take possession of the proceeds of any such sale or liquidation;

(v) take possession of the Collateral or any part thereof, by directing such Assignor in writing to deliver the same to the Collateral Agent at any reasonable place or

places designated by the Collateral Agent, in which event such Assignor shall at its own expense:

(x)    forthwith cause the same to be moved to the place or places so designated by the Collateral Agent and there delivered to the Collateral Agent;

(y)    store and keep any Collateral so delivered to the Collateral Agent at such place or places pending further action by the Collateral Agent as provided in Section 7.2 hereof; and

(z)    while the Collateral shall be so stored and kept, provide such security and maintenance services as shall be reasonably necessary to protect the same and to preserve and maintain it in good condition;

(vi)    license or sublicense, whether on an exclusive or nonexclusive basis, any Marks, Domain Names, Patents or Copyrights included in the Collateral for such term and on such conditions and in such manner as the Collateral Agent shall in its sole judgment determine;

(vii)    apply any monies constituting Collateral or proceeds thereof in accordance with the provisions of Section 7.4;

(viii)    accelerate any Note which may be accelerated in accordance with its terms, and take any other lawful action to collect upon any Note (including, without limitation, to make any demand for payment thereon);

(ix)    transfer all or any part of the Collateral into the Collateral Agent's name or the name of its nominee or nominees;

(x)    vote (and exercise all rights and powers in respect of voting) all or any part of the Collateral (whether or not transferred into the name of the Collateral Agent) and give all consents, waivers and ratifications in respect of the Collateral and otherwise act with respect thereto as though it were the outright owner thereof (each Assignor hereby irrevocably constituting and appointing the Collateral Agent the proxy and attorney-in-fact of such Assignor, with full power of substation to do so); and

(xi)    take any other action as specified in clauses (1) through (5), inclusive, of Section 9-607 of the UCC;

it being understood that each Assignor's obligation so to deliver the Collateral is of the essence of this Agreement and that, accordingly, upon application to a court of equity having jurisdiction, the Collateral Agent shall be entitled to a decree requiring specific performance by such Assignor of said obligation.  By accepting the benefits of this Agreement and each other Security Document, the Secured Creditors expressly acknowledge and agree that this Agreement and each other Security Document may be enforced only by the action of the Collateral Agent acting upon the instructions of the Required Secured Creditors and that no other Secured Creditor shall have any right individually to seek to enforce or to enforce this Agreement or to realize upon the

security to be granted hereby, it being understood and agreed that such rights and remedies may be exercised by the Collateral Agent for the benefit of the Secured Creditors upon the terms of this Agreement and the other Security Documents.

7.2  Remedies; Disposition of the Collateral.  If any Event of Default shall have occurred and be continuing, then any Collateral repossessed by the Collateral Agent under or pursuant to Section 7.1 hereof and any other Collateral whether or not so repossessed by the Collateral Agent, may be sold, assigned, leased or otherwise disposed of under one or more con-tracts or as an entirety, and without the necessity of gathering at the place of sale the property to be sold, and in general in such manner, at such time or times, at such place or places and on such terms as the Collateral Agent may, in compliance with any mandatory requirements of applicable law, determine to be commercially reasonable.  Any of the Collateral may be sold, leased or otherwise disposed of, in the condition in which the same existed when taken by the Collateral Agent or after any overhaul or repair at the expense of the relevant Assignor which the Collateral Agent shall determine to be commercially reasonable.  Any such sale, lease or other disposition may be effected by means of a public disposition or private disposition, effected in accordance with the applicable requirements (in each case if and to the extent applicable) of Sections 9-610 through 9-613 of the UCC and/or such other mandatory requirements of applicable law as may apply to the respective disposition.  The Collateral Agent may, without notice or publication, adjourn any public or private disposition or cause the same to be adjourned from time to time by announcement at the time and place fixed for the disposition, and such disposition may be made at any time or place to which the disposition may be so adjourned.  To the extent permitted by any such requirement of law, the Collateral Agent may bid for and become the purchaser (and may pay all or any portion of the purchase price by crediting Obligations against the purchase price) of the Collateral or any item thereof, offered for disposition in accordance with this Section 7.2 without accountability to the relevant Assignor.  If, under applicable law, the Collateral Agent shall be permitted to make disposition of the Collateral within a period of time which does not permit the giving of notice to the relevant Assignor as hereinabove specified, the Collateral Agent need give such Assignor only such notice of disposition as shall be required by such applicable law.  Each Assignor agrees to do or cause to be done all such other acts and things as may be reasonably necessary to make such disposition or dispositions of all or any portion of the Collateral valid and binding and in compliance with any and all applicable laws, regulations, orders, writs, injunctions, decrees or awards of any and all courts, arbitrators or governmental instrumentalities, domestic or foreign, having jurisdiction over any such sale or sales, all at such Assignor's expense.

7.3  Waiver of Claims.  Except as otherwise provided in this Agreement, EACH ASSIGNOR HEREBY WAIVES, TO THE EXTENT PERMITTED BY APPLICABLE LAW, NOTICE AND JUDICIAL HEARING IN CONNECTION WITH THE COLLATERAL AGENT'S TAKING POSSESSION OR THE COLLATERAL AGENT'S DISPOSITION OF ANY OF THE COLLATERAL, INCLUDING, WITHOUT LIMITATION, ANY AND ALL PRIOR NOTICE AND HEARING FOR ANY PREJUDGMENT REMEDY OR REMEDIES, and each Assignor hereby further waives, to the extent permitted by law:

(i)  all damages occasioned by such taking of possession or any such disposition except any damages which are the direct result of the Collateral Agent's gross

negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision);

(ii)    all other requirements as to the time, place and terms of sale or other requirements with respect to the enforcement of the Collateral Agent's rights hereunder; and

(iii)    all rights of redemption, appraisement, valuation, stay, extension or moratorium now or hereafter in force under any applicable law in order to prevent or delay the enforcement of this Agreement or the absolute sale of the Collateral or any portion thereof, and each Assignor, for itself and all who may claim under it, insofar as it or they now or hereafter lawfully may, hereby waives the benefit of all such laws.

Any sale of, or the grant of options to purchase, or any other realization upon, any Collateral shall operate to divest all right, title, interest, claim and demand, either at law or in equity, of the relevant Assignor therein and thereto, and shall be a perpetual bar both at law and in equity against such Assignor and against any and all Persons claiming or attempting to claim the Collateral so sold, optioned or realized upon, or any part thereof, from, through and under such Assignor.

7.4    <u>Application of Proceeds</u>.  (a)  Subject to the terms of the Lee Intercreditor Agreement and the Pulitzer Intercreditor Agreement, as applicable, all moneys collected by the Collateral Agent (or, to the extent any Mortgage or any other Security Document requires proceeds of collateral under such other Security Document to be applied in accordance with the provisions of this Agreement, the Collateral Agent or other agent under such other Security Document) upon any sale or other disposition of the Collateral, together with all other moneys received by the Collateral Agent hereunder, shall be applied as provided in Section 13.17 of the Loan Agreement.

(b)    All payments required to be made hereunder shall be made to the Administrative Agent for the account of the Secured Creditors.

(c)    It is understood that the Assignors shall remain jointly and severally liable to the extent of any deficiency between the amount of the proceeds of the Collateral and the aggregate amount of the Obligations.

7.5    <u>Remedies Cumulative</u>.  Each and every right, power and remedy hereby specifically given to the Collateral Agent shall be in addition to every other right, power and remedy specifically given to the Collateral Agent under this Agreement, the other Secured Debt Agreements or now or hereafter existing at law, in equity or by statute and each and every right, power and remedy whether specifically herein given or otherwise existing may be exercised from time to time or simultaneously and as often and in such order as may be deemed expedient by the Collateral Agent.  All such rights, powers and remedies shall be cumulative and the exercise or the beginning of the exercise of one shall not be deemed a waiver of the right to exercise any other or others.  No delay or omission of the Collateral Agent in the exercise of any such right, power or remedy and no renewal or extension of any of the Obligations shall impair any such right, power or remedy or shall be construed to be a waiver of any Default or Event of

Default or an acquiescence thereof.  No notice to or demand on any Assignor in any case shall entitle it to any other or further notice or demand in similar or other circumstances or constitute a waiver of any of the rights of the Collateral Agent to any other or further action in any circumstances without notice or demand.  In the event that the Collateral Agent shall bring any suit to enforce any of its rights hereunder and shall be entitled to judgment, then in such suit the Collateral Agent may recover reasonable expenses, including reasonable attorneys' fees, and the amounts thereof shall be included in such judgment.

7.6  <u>Discontinuance of Proceedings</u>.  In case the Collateral Agent shall have instituted any proceeding to enforce any right, power or remedy under this Agreement by foreclosure, sale, entry or otherwise, and such proceeding shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Collateral Agent, then and in every such case the relevant Assignor, the Collateral Agent and each holder of any of the Obligations shall be restored to their former positions and rights hereunder with respect to the Collateral subject to the security interest created under this Agreement, and all rights, remedies and powers of the Collateral Agent shall continue as if no such proceeding had been instituted.

ARTICLE VIII

INDEMNITY

8.1  <u>Indemnity</u>.  (a) Each Assignor jointly and severally agrees to indemnify, reimburse and hold the Collateral Agent, each other Secured Creditor and their respective successors, assigns, employees, affiliates and agents (hereinafter in this Section 8.1 referred to individually as "<u>Indemnitee</u>," and collectively as "<u>Indemnitees</u>") harmless from any and all liabilities, obligations, damages, injuries, penalties, claims, demands, actions, suits, judgments and any and all costs, expenses or disbursements (including reasonable attorneys' fees and expenses) (for the purposes of this Section 8.1 the foregoing are collectively called "<u>expenses</u>") of whatsoever kind and nature imposed on, asserted against or incurred by any of the Indemnitees in any way relating to or arising out of this Agreement, any other Secured Debt Agreement or any other document executed in connection herewith or therewith or in any other way connected with the administration of the transactions contemplated hereby or thereby or the enforcement of any of the terms of, or the preservation of any rights under any thereof, or in any way relating to or arising out of the manufacture, ownership, ordering, purchase, delivery, control, acceptance, lease, financing, possession, operation, condition, sale, return or other disposition, or use of the Collateral (including, without limitation, latent or other defects, whether or not discoverable), the violation of the laws of any country, state or other governmental body or unit, any tort (including, without limitation, claims arising or imposed under the doctrine of strict liability, or for or on account of injury to or the death of any Person (including any Indemnitee), or property damage), or contract claim; <u>provided</u> that no Indemnitee shall be indemnified pursuant to this Section 8.1(a) for losses, damages or liabilities to the extent caused by the gross negligence or willful misconduct of such Indemnitee (as determined by a court of competent jurisdiction in a final and non-appealable decision).  Each Assignor agrees that upon written notice by any Indemnitee of the assertion of such a liability, obligation, damage, injury, penalty, claim, demand, action, suit or judgment, the relevant Assignor shall assume full responsibility for the defense thereof.  Each Indemnitee agrees to use its best efforts

to promptly notify the relevant Assignor of any such assertion of which such Indemnitee has knowledge.

(b)    Without limiting the application of Section 8.1(a) hereof, each Assignor agrees, jointly and severally, to pay or reimburse the Collateral Agent for any and all reasonable fees, costs and expenses of whatever kind or nature incurred in connection with the creation, preservation or protection of the Collateral Agent's Liens on, and security interest in, the Collateral, including, without limitation, all fees and taxes in connection with the recording or filing of instruments and documents in public offices, payment or discharge of any taxes or Liens upon or in respect of the Collateral, premiums for insurance with respect to the Collateral and all other fees, costs and expenses in connection with protecting, maintaining or preserving the Collateral and the Collateral Agent's interest therein, whether through judicial proceedings or otherwise, or in defending or prosecuting any actions, suits or proceedings arising out of or relating to the Collateral.

(c)    Without limiting the application of Section 8.1(a) or (b) hereof, each Assignor agrees, jointly and severally, to pay, indemnify and hold each Indemnitee harmless from and against any loss, costs, damages and expenses which such Indemnitee may suffer, expend or incur in consequence of or growing out of any misrepresentation by any Assignor in this Agreement, any other Secured Debt Agreement or in any writing contemplated by or made or delivered pursuant to or in connection with this Agreement or any other Secured Debt Agreement.

(d)    If and to the extent that the obligations of any Assignor under this Section 8.1 are unenforceable for any reason, such Assignor hereby agrees to make the maximum contribution to the payment and satisfaction of such obligations which is permissible under applicable law.

8.2    <u>Indemnity Obligations Secured by Collateral; Survival</u>.  Any amounts paid by any Indemnitee as to which such Indemnitee has the right to reimbursement shall constitute Obligations secured by the Collateral.  The indemnity obligations of each Assignor contained in this Article VIII shall continue in full force and effect notwithstanding the full payment of all of the other Obligations and notwithstanding the full payment of all the Notes (as defined in the Loan Agreement) issued, and Loans made, under the Loan Agreement and the payment of all other Obligations and notwithstanding the discharge thereof and the occurrence of the Termination Date.

<div align="center">ARTICLE IX</div>

<div align="center">DEFINITIONS</div>

The following terms shall have the meanings herein specified.  Such definitions shall be equally applicable to the singular and plural forms of the terms defined.

"<u>Account</u>" shall mean any "account" as such term is defined in the UCC as in effect on the date hereof in the State of New York, and in any event shall include but shall not be limited to, all rights to payment of any monetary obligation, whether or not earned by

performance, (i) for property that has been or is to be sold, leased, licensed, assigned or otherwise disposed of, (ii) for services rendered or to be rendered, (iii) for a policy of insurance issued or to be issued, (iv) for a secondary obligation incurred or to be incurred, (v) for energy provided or to be provided, (vi) for the use or hire of a vessel under a charter or other contract, (vii) arising out of the use of a credit or charge card or information contained on or for use with the card, or (viii) as winnings in a lottery or other game of chance operated or sponsored by a State, governmental unit of a State, or person licensed or authorized to operate the game by a State or governmental unit of a State.  Without limiting the foregoing, the term "account" shall include all Health-Care-Insurance Receivables.

"<u>Administrative Agent</u>" shall have the meaning provided in the recitals of this Agreement.

"<u>Agreement</u>" shall mean this Security Agreement, as the same may be amended, modified, restated and/or supplemented from time to time in accordance with its terms.

"<u>As-Extracted Collateral</u>" shall mean "as-extracted collateral" as such term is defined in the UCC as in effect on the date hereof in the State of New York.

"<u>Assignor</u>" shall have the meaning provided in the first paragraph of this Agreement.

"<u>Borrower</u>" shall have the meaning provided in the recitals of this Agreement.

"<u>Cash Collateral Account</u>" shall mean each of (i) the non-interest bearing cash collateral account of the Lee Entities maintained with, and in the sole dominion and control of, the First Priority Representative (as defined in the Lee Intercreditor Agreement) for the benefit of the First Priority Secured Parties (as defined in the Lee Intercreditor Agreement) and the Second Priority Secured Parties (as defined in the Lee Intercreditor Agreement), and (ii) the non-interest bearing cash collateral account of the Pulitzer Entities maintained with, and in the sole dominion and control of, the First Priority Representative (as defined in the Pulitzer Intercreditor Agreement) for the benefit of the First Priority Secured Parties (as defined in the Pulitzer Intercreditor Agreement) and the Second Priority Secured Parties (as defined in the Pulitzer Intercreditor Agreement).

"<u>Certificate of Title</u>" shall mean "certificate of title" as such term is defined in the UCC as in effect on the date hereof in the State of New York.

"<u>Certificated Security</u>" shall have the meaning given such term in Section 8-102(a)(4) of the UCC.

"<u>Chattel Paper</u>" shall mean "chattel paper" as such term is defined in the UCC as in effect on the date hereof in the State of New York.  Without limiting the foregoing, the term "Chattel Paper" shall in any event include all Tangible Chattel Paper and all Electronic Chattel Paper.

"<u>Clearing Corporation</u>" shall have the meaning given such term in Section 8-102(a)(5) of the UCC.

"Collateral" shall have the meaning provided in Section 1.1(a) of this Agreement.

"Collateral Agent" shall have the meaning provided in the first paragraph of this Agreement.

"Commercial Tort Claims" shall mean "commercial tort claims" as such term is defined in the UCC as in effect on the date hereof in the State of New York.

"Commodity Account" shall mean "commodity account" as such term is defined in the UCC as in effect on the date hereof in the State of New York.

"Contract Rights" shall mean all rights of any Assignor under each Contract, including, without limitation, (i) any and all rights to receive and demand payments under any or all Contracts, (ii) any and all rights to receive and compel performance under any or all Contracts and (iii) any and all other rights, interests and claims now existing or in the future arising in connection with any or all Contracts.

"Contracts" shall mean all contracts between any Assignor and one or more additional parties (including, without limitation, any Interest Rate Protection Agreements, Other Hedging Agreements, licensing agreements and any partnership agreements, joint venture agreements and limited liability company agreements).

"Copyrights" shall mean any United States or foreign copyright now or hereafter owned by any Assignor, including any registrations of any copyrights in the United States Copyright Office or any foreign equivalent office, as well as any application for a copyright registration now or hereafter made with the United States Copyright Office or any foreign equivalent office by any Assignor.

"Deposit Accounts" shall mean all "deposit accounts" as such term is defined in the UCC as in effect on the date hereof in the State of New York.

"Documents" shall mean "documents" as such term is defined in the UCC as in effect on the date hereof in the State of New York.

"Domain Names" shall mean all Internet domain names and associated URL addresses in or to which any Assignor now or hereafter has any right, title or interest.

"Electronic Chattel Paper" shall mean "electronic chattel paper" as such term is defined in the UCC as in effect on the date hereof in the State of New York.

"Equipment" shall mean any "equipment" as such term is defined in the UCC as in effect on the date hereof in the State of New York, and in any event, shall include, but shall not be limited to, all machinery, equipment, furnishings, fixtures and vehicles now or hereafter owned by any Assignor and any and all additions, substitutions and replacements of any of the foregoing and all accessions thereto, wherever located, together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto.

"Event of Default" shall mean any Event of Default under, and as defined in, the Loan Agreement and shall in any event include, without limitation, any payment default on any of the Obligations after the expiration of any applicable grace period.

"Excluded Accounts" shall mean (i) any Deposit Account used solely for funding payroll, pension contributions or segregating payroll taxes and (ii) in respect of any petty cash Deposit Account that does not have a cash balance at any time exceeding $50,000 (or, in the case of any such Deposit Account of a Pulitzer Assignor, $15,000) so long as the aggregate of all such petty cash Deposit Accounts that are not subject to a "control agreement" as provided in Section 3.9 hereof do not have cash balances at any time exceeding $500,000 (or, in the case of all such Deposit Accounts held by Pulitzer Assignors, $100,000).

"Excluded Property" shall mean (a) all ownership interests in (i) Lee Enterprises, Incorporated Retirement Account Plan and related trust, (ii) Lee Enterprises, Incorporated Outside Directors Deferral Plan (effective January 1, 2005), (iii) Lee Enterprises, Incorporated Supplementary Benefit Plan and Trust for Non-Qualified Deferred Compensation Benefit Plans of Lee Enterprises (dated January 1, 2006), (iv) Lee Enterprises, Incorporated 1977 Employee Stock Purchase Plan (amended May 17, 2008), and (v) Lee Enterprises, Incorporated Supplemental Employee Stock Purchase Plan (amended February 20, 2007) (each as amended modified, restated and/or supplemented from time to time), in each case so long as such plans are solely for the benefit of officers, directors and/or employees of any Assignor or any Subsidiary thereof, (b) any Equity Interests held by any Assignor in Madison Newspapers, Inc. or The Capital Times Company (each a "Specified Entity") so long as, in each case as to any Specified Entity, such Specified Entity is not a Subsidiary of the Borrower, (c) the Excluded TNI Assets, (d) any assets of Star Publishing other than (x) any such assets that are not Excluded TNI Assets and (y) any intercompany indebtedness (and any promissory note(s) evidencing same) of Pulitzer in favor of Star Publishing, and (e) 33-1/3% of the voting power of all classes of Equity Interests of any Foreign Subsidiary owned by an Assignor (except in the circumstances and to the extent provided by Section 9.16 of the Loan Agreement (in which case this clause (c) shall no longer be applicable)).

"Financial Assets" shall have the meaning given such term in Section 8-102(a)(9) of the UCC.

"First Priority Representative" shall have the meaning given such term in the Lee Intercreditor Agreement or the Pulitzer Intercreditor Agreement, as applicable.

"Fixtures" shall mean "fixtures" as such term is defined in the UCC as in effect on the date hereof in the State of New York.

"General Intangibles" shall mean "general intangibles" as such term is defined in the UCC as in effect on the date hereof in the State of New York.

"Goods" shall mean "goods" as such term is defined in the UCC as in effect on the date hereof in the State of New York.

"Health-Care-Insurance Receivable" shall mean any "health-care-insurance receivable" as such term is defined in the UCC as in effect on the date hereof in the State of New York.

"Indemnitee" shall have the meaning provided in Section 8.1(a) of this Agreement.

"Instrument" shall mean "instruments" as such term is defined in the UCC as in effect on the date hereof in the State of New York.

"Inventory" shall mean merchandise, inventory and goods, and all additions, substitutions and replacements thereof and all accessions thereto, wherever located, together with all goods, supplies, incidentals, packaging materials, labels, materials and any other items used or usable in manufacturing, processing, packaging or shipping same, in all stages of production from raw materials through work in process to finished goods, and all products and proceeds of whatever sort and wherever located any portion thereof which may be returned, rejected, reclaimed or repossessed by the Collateral Agent from any Assignor's customers, and shall specifically include all "inventory" as such term is defined in the UCC as in effect on the date hereof in the State of New York.

"Investment Property" shall mean "investment property" as such term is defined in the UCC as in effect on the date hereof in the State of New York.

"Joint Venture Investment Property" shall mean all Limited Liability Company Interests, Partnership Interests and Stock.

"Lee Assignor" shall mean any Assignor that is a Lee Entity.

"Lenders" shall have the meaning provided in the recitals of this Agreement.

"Letter-of-Credit Rights" shall mean "letter-of-credit rights" as such term is defined in the UCC as in effect on the date hereof in the State of New York.

"Limited Liability Company Interests" shall mean the entire limited liability company membership interest at any time owned by any Assignor in any limited liability company that is not a Subsidiary of such Assignor.

"Loan Agreement" shall have the meaning provided in the recitals of this Agreement.

"Location" of any Assignor, shall mean such Assignor's "location" as determined pursuant to Section 9-307 of the UCC.

"Marks" shall mean all right, title and interest in and to any trademarks, service marks and trade names now held or hereafter acquired by any Assignor, including any registration or application for registration of any trademarks and service marks now held or hereafter acquired by any Assignor, which are registered or filed in the United States Patent and Trademark Office or the equivalent thereof in any state of the United States or any equivalent

foreign office or agency, as well as any unregistered trademarks and service marks used by an Assignor and any trade dress including logos, designs, fictitious business names and other business identifiers used by any Assignor.

"Notes" shall mean (x) all intercompany notes at any time issued to each Assignor and (y) all other promissory notes from time to time issued to, or held by, each Assignor.

"Obligations" shall mean and include, as to any Assignor, all of the following:

(i) the full and prompt payment when due (whether at stated maturity, by acceleration or otherwise) of all obligations, liabilities and indebtedness (including, without limitation, principal, premium, interest (including, without limitation, all interest that accrues after the commencement of any case, proceeding or other action relating to the bankruptcy, insolvency, reorganization or similar proceeding of any Assignor at the rate provided for in the respective documentation, whether or not a claim for post-petition interest is allowed in any such proceeding), fees, costs and indemnities) of such Assignor to the Secured Creditors, whether now existing or hereafter incurred under, arising out of, or in connection with, each Credit Document to which such Assignor is a party (including, without limitation, in the event such Assignor is a Subsidiary Guarantor, all such obligations, liabilities and indebtedness of such Assignor under its Subsidiaries Guaranty) and the due performance and compliance by such Assignor with all of the terms, conditions and agreements contained in each such Credit Document;

(ii) any and all sums advanced by the Collateral Agent in order to preserve the Collateral or preserve its security interest in the Collateral;

(iii) in the event of any proceeding for the collection or enforcement of any indebtedness, obligations, or liabilities of such Assignor referred to in clauses (i) and (ii) above, after an Event of Default shall have occurred and be continuing, the reasonable expenses of retaking, holding, preparing for sale or lease, selling or otherwise disposing of or realizing on the Collateral, or of any exercise by the Collateral Agent of its rights hereunder, together with reasonable attorneys' fees and court costs;

(iv) all amounts paid by any Indemnitee as to which such Indemnitee has the right to reimbursement under Section 8.1 of this Agreement; and

(v) all amounts owing to any Agent pursuant to any of the Credit Documents in its capacity as such;

it being acknowledged and agreed that the "Obligations" shall include extensions of credit of the types described above, whether outstanding on the date of this Agreement or extended from time to time after the date of this Agreement.

"Partnership Interest" shall mean the entire general partnership interest or limited partnership interest at any time owned by any Assignor in any general partnership or limited partnership that is not a Subsidiary of such Assignor.

"Patents" shall mean any patent in or to which any Assignor now or hereafter has any right, title or interest therein, and any divisions, continuations (including, but not limited to, continuations-in-parts) and improvements thereof, as well as any application for a patent now or hereafter made by any Assignor.

"Permits" shall mean, to the extent permitted to be assigned by the terms thereof or by applicable law, all licenses, permits, rights, orders, variances, franchises or authorizations of or from any governmental authority or agency.

"Proceeds" shall mean all "proceeds" as such term is defined in the UCC as in effect in the State of New York on the date hereof and, in any event, shall also include, but not be limited to, (i) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Collateral Agent or any Assignor from time to time with respect to any of the Collateral, (ii) any and all payments (in any form whatsoever) made or due and payable to any Assignor from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any governmental authority (or any person acting under color of governmental authority) and (iii) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

"Pulitzer Assignor" shall mean any Assignor that is a Pulitzer Entity.

"Registered Organization" shall have the meaning provided in the UCC as in effect on the date hereof in the State of New York.

"Required Secured Creditors" shall mean the Required Lenders (or such other Lenders (or number or percentage thereof) as shall be necessary under Section 13.12(a) of the Loan Agreement).

"Secured Creditors" shall have the meaning provided in the recitals of this Agreement.

"Secured Debt Agreements" shall mean and include this Agreement and the other Credit Documents.

"Securities Account" shall mean "securities account" as such term is defined in the UCC as in effect on the date hereof in the State of New York.

"Securities Intermediary" shall have the meaning given such term in Section 8-102(14) of the UCC.

"Software" shall mean "software" as such term is defined in the UCC as in effect on the date hereof in the State of New York.

"Specified Entity" shall have the meaning provided in the definition of "Excluded Property" contained herein.

"Stock" shall mean (x) with respect to corporations incorporated under the laws of the United States or any State thereof or the District of Columbia (each, a "Domestic

Corporation"), all of the issued and outstanding shares of stock owned by any Assignor of any Domestic Corporation that is not a Subsidiary of such Assignor and (y) with respect to corporations not Domestic Corporations (each, a "Foreign Corporation"), all of the issued and outstanding shares of capital stock owned at any time by any Assignor of any Domestic Corporation  that is not a Subsidiary of such Assignor.

"Supporting Obligations" shall mean any "supporting obligation" as such term is defined in the UCC as in effect on the date hereof in the State of New York, now or hereafter owned by any Assignor, or in which any Assignor has any rights, and, in any event, shall include, but shall not be limited to all of such Assignor's rights in any Letter-of-Credit Right or secondary obligation that supports the payment or performance of, and all security for, any Account, Chattel Paper, Document, General Intangible, Instrument or Investment Property.

"Tangible Chattel Paper" shall mean "tangible chattel paper" as such term is defined in the UCC as in effect on the date hereof in the State of New York.

"Termination Date" shall have the meaning provided in Section 10.8(a) of this Agreement.

"Timber-to-be-Cut" shall mean "timber-to-be-cut" as such term is defined in the UCC as in effect on the date hereof in the State of New York.

"Trade Secrets" shall mean any secretly held existing engineering or other data, information, production procedures and other know-how relating to the design manufacture, assembly, installation, use, operation, marketing, sale and/or servicing of any products or business of an Assignor worldwide whether written or not.

"Trade Secret Rights" shall mean the rights of an Assignor in any Trade Secret it holds.

"Transmitting Utility" shall have the meaning given such term in Section 9-102(a)(80) of the UCC.

"UCC" shall mean the UCC as in effect from time to time in the relevant jurisdiction.

"Uncertificated Security" shall have the meaning given such term in Section 8-102(a)(18) of the UCC.

ARTICLE X

MISCELLANEOUS

10.1 Notices.   Except as otherwise specified herein, all notices, requests, demands or other communications to or upon the respective parties hereto shall be sent or delivered by mail, telegraph, telex, telecopy, cable or courier service and all such notices and communications shall, when mailed, telegraphed, telexed, telecopied, or cabled or sent by courier, be effective when deposited in the mails, delivered to the telegraph company, cable

company or overnight courier, as the case may be, or sent by telex or telecopier, except that notices and communications to the Collateral Agent or any Assignor shall not be effective until received by the Collateral Agent or such Assignor, as the case may be.  All notices and other communications shall be in writing and addressed as follows:

      (a)      if to any Assignor, c/o:

                  Lee Enterprises, Incorporated
                  201 North Harrison Street
                  Davenport, Iowa  52801
                  Attention:  Chief Financial Officer
                  Telephone No.:  (563) 383-2179
                  Telecopier No.:  (563) 327-2600

      (b)      if to the Collateral Agent, at:

                  Wilmington Trust, N.A.
                  50 South Sixth Street, Suite 1290
                  Minneapolis, MN 55402
                  Attn: Josh James
                  Tel.: (612) 217-5637
                  Fax: (612) 217-5651
                  Email: jjames@WilmingtonTrust.com

or at such other address or addressed to such other individual as shall have been furnished in writing by any Person described above to the party required to give notice hereunder.

      10.2  <u>Waiver; Amendment</u>.  Except as provided in Sections 10.8 and 10.12 hereof, none of the terms and conditions of this Agreement may be changed, waived, modified or varied in any manner whatsoever unless in writing duly signed by each Assignor directly affected thereby (it being understood that the addition or release of any Assignor hereunder shall not constitute a change, waiver, discharge or termination affecting any Assignor other than the Assignor so added or released) and the Collateral Agent (with the written consent of the Required Secured Creditors).

      10.3  <u>Obligations Absolute</u>.  The obligations of each Assignor hereunder shall remain in full force and effect without regard to, and shall not be impaired by, (a) any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or the like of such Assignor; (b) any exercise or non-exercise, or any waiver of, any right, remedy, power or privilege under or in respect of this Agreement or any other Secured Debt Agreement; or (c) any amendment to or modification of any Secured Debt Agreement or any security for any of the Obligations; whether or not such Assignor shall have notice or knowledge of any of the foregoing.

      10.4  <u>Successors and Assigns</u>.  This Agreement shall create a continuing security interest in the Collateral and shall (i) remain in full force and effect, subject to release and/or termination as set forth in Section 10.8 hereof, (ii) be binding upon each Assignor, its successors

and assigns; provided, however, that no Assignor shall assign any of its rights or obligations hereunder without the prior written consent of the Collateral Agent (with the prior written consent of the Required Secured Creditors), and (iii) inure, together with the rights and remedies of the Collateral Agent hereunder, to the benefit of the Collateral Agent, the other Secured Creditors and their respective successors, transferees and assigns. All agreements, statements, representations and warranties made by each Assignor herein or in any certificate or other instrument delivered by such Assignor or on its behalf under this Agreement shall be considered to have been relied upon by the Secured Creditors and shall survive the execution and delivery of this Agreement and the other Secured Debt Agreements regardless of any investigation made by the Secured Creditors or on their behalf.

10.5 Headings Descriptive.    The headings of the several sections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

10.6 GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF JURY TRIAL.    (a) THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE INTERNAL LAW OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.  ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH ASSIGNOR HEREBY IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE NON-EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS.  EACH ASSIGNOR HEREBY FURTHER IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH COURTS LACK JURISDICTION OVER SUCH ASSIGNOR, AND AGREES NOT TO PLEAD OR CLAIM IN ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN ANY OF THE AFORESAID COURTS THAT ANY SUCH COURT LACKS JURISDICTION OVER SUCH ASSIGNOR.  EACH ASSIGNOR FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO ANY SUCH ASSIGNOR AT ITS ADDRESS FOR NOTICES AS PROVIDED IN SECTION 10.1 ABOVE, SUCH SERVICE TO BECOME EFFECTIVE 30 DAYS AFTER SUCH MAILING.   EACH ASSIGNOR HEREBY IRREVOCABLY WAIVES ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER OR UNDER ANY OTHER CREDIT DOCUMENT THAT SUCH SERVICE OF PROCESS WAS IN ANY WAY INVALID OR INEFFECTIVE. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE COLLATERAL AGENT UNDER THIS AGREEMENT, OR ANY SECURED CREDITOR, TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY ASSIGNOR IN ANY OTHER JURISDICTION.

(b)     EACH ASSIGNOR HEREBY IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (a) ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)     EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER CREDIT DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

10.7    Assignor's Duties.  It is expressly agreed, anything herein contained to the contrary notwithstanding, that each Assignor shall remain liable to perform all of the obligations, if any, assumed by it with respect to the Collateral and the Collateral Agent shall not have any obligations or liabilities with respect to any Collateral by reason of or arising out of this Agreement, nor shall the Collateral Agent be required or obligated in any manner to perform or fulfill any of the obligations of any Assignor under or with respect to any Collateral.

10.8    Termination; Release.  (a)  After the Termination Date, this Agreement shall terminate (provided that all indemnities set forth herein including, without limitation, in Section 8.1 hereof, shall survive such termination) and the Collateral Agent, at the request and expense of the respective Assignor, will promptly execute and deliver to such Assignor a proper instrument or instruments (including UCC termination statements on form UCC-3) acknowledging the satisfaction and termination of this Agreement, and will duly assign, transfer and deliver to such Assignor (without recourse and without any representation or warranty) such of the Collateral as may be in the possession of the Collateral Agent and as has not theretofore been sold or otherwise applied or released pursuant to this Agreement.  As used in this Agreement, "Termination Date" shall mean the date upon which the Loan Agreement has been terminated, no Note is outstanding, and all Loans and other Obligations have been paid in full.

(b)     In the event that any part of the Collateral is sold or otherwise disposed of (to a Person other than a Credit Party) (I) (x) at any time prior to the Termination Date, in connection with a sale or disposition permitted by Section 10.02 of the Loan Agreement or is otherwise released at the direction of the Required Lenders (or such other Lenders (or number or percentage thereof) as shall be necessary under Section 13.12(a) of the Loan Agreement) or (y) at any time thereafter, to the extent permitted by the other Secured Debt Agreements, and in the case of clauses (x) and (y), the proceeds of such sale or disposition (or from such release) are applied in accordance with the terms of the Loan Agreement or such other Secured Debt Agreement, as the case may be, to the extent required to be so applied, or (II) pursuant to the Joint-Venture Transaction in accordance with the terms of the Loan Agreement, the Collateral Agent, at the request and expense of such Assignor, will duly release from the security interest created hereby or in the case of the Joint-Venture Transaction, the security interests created hereby shall automatically be released, (and in each case, will execute and deliver such

documentation, including termination or partial release statements and the like in connection therewith) and assign, transfer and deliver to such Assignor (without recourse and without any representation or warranty) such of the Collateral as is then being (or has been) so sold or otherwise disposed of, or released, and as may be in the possession of the Collateral Agent and has not theretofore been released pursuant to this Agreement.  Furthermore, upon the release of any Subsidiary Guarantor from the Subsidiaries Guaranty in accordance with the provisions thereof, such Assignor (and the Collateral at such time assigned by the respective Assignor pursuant hereto) shall be released from this Agreement.

(c)     At any time that an Assignor desires that the Collateral Agent take any action to acknowledge or give effect to any release of Collateral pursuant to the foregoing Section 10.8(a) or (b), such Assignor shall deliver to the Collateral Agent a certificate signed by a principal executive officer of such Assignor stating that the release of the respective Collateral is permitted pursuant to such Section 10.8(a) or (b).  At any time that the Borrower or the respective Assignor desires that a Subsidiary of the Borrower which has been released from the Subsidiaries Guaranty be released hereunder as provided in the last sentence of Section 10.8(b) hereof, it shall deliver to the Collateral Agent a certificate signed by a principal executive officer of the Borrower and the respective Assignor stating that the release of the respective Assignor (and its Collateral) is permitted pursuant to such Section 10.8(b). If reasonably requested by the Collateral Agent (although the Collateral Agent shall have no obligation to make such request), the relevant Assignor shall furnish appropriate legal opinions (from counsel, reasonably acceptable to the Collateral Agent) to the effect set forth in this Section 10.8(c).

(d)     The Collateral Agent shall have no liability whatsoever to any other Secured Creditor as the result of any release of Collateral by it in accordance with (or which the Collateral Agent in good faith believes to be in accordance with) this Section 10.8.

10.9 Counterparts.  This Agreement may be executed in any number of counter-parts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.  A set of counterparts executed by all the parties hereto shall be lodged with the Borrower and the Collateral Agent.

10.10 Severability.   Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

10.11 The Collateral Agent and the other Secured Creditors.   The Collateral Agent will hold in accordance with this Agreement (and subject to the Lee Intercreditor Agreement and the Pulitzer Intercreditor Agreement, as applicable) all items of the Collateral at any time received under this Agreement.  It is expressly understood and agreed that the obligations of the Collateral Agent as holder of the Collateral and interests therein and with respect to the disposition thereof, and otherwise under this Agreement, are only those expressly set forth in this Agreement and in Section 12 of the Loan Agreement.  The Collateral Agent shall

act hereunder on the terms and conditions set forth herein and in Section 12 of the Loan Agreement.

10.12  <u>Additional Assignors</u>.  It is understood and agreed that any Subsidiary Guarantor that desires to become an Assignor hereunder, or is required to execute a counterpart of this Agreement after the date hereof pursuant to the requirements of the Loan Agreement or any other Credit Document, shall become an Assignor hereunder by (x) executing a counterpart hereof and delivering same to the Collateral Agent or by executing a joinder agreement and delivering same to the Collateral Agent, in each case as may be requested by (and in form and substance satisfactory to) the Collateral Agent, (y) delivering supplements to <u>Annexes A</u> through <u>F</u>, inclusive, <u>H</u> through <u>K</u>, inclusive, and <u>O</u> through <u>R</u>, inclusive, hereto as are necessary to cause such Annexes to be complete and accurate with respect to such additional Assignor on such date and (z) taking all actions as specified in this Agreement as would have been taken by such Assignor had it been an original party to this Agreement, in each case with all documents required above to be delivered to the Collateral Agent and with all documents and actions required above to be taken to the reasonable satisfaction of the Collateral Agent.

10.13  <u>Intercreditor Agreements</u>.  Notwithstanding anything herein to the contrary, the exercise of any right or remedy by the Collateral Agent hereunder shall be subject to the provisions of the Lee Intercreditor Agreement and the Pulitzer Intercreditor Agreement, as applicable.  In the event of any conflict between the terms of the Lee Intercreditor Agreement or the Pulitzer Intercreditor Agreement and this Agreement, the terms of the Lee Intercreditor Agreement or the Pulitzer Intercreditor Agreement, as applicable, shall govern and control.

**[Remainder of this page intentionally left blank; signature page follows]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their duly authorized officers as of the date first above written.

<div style="margin-left:50%">

LEE ENTERPRISES, INCORPORATED, as an Assignor

By: _____
    Name:
    Title:

**[ADD SIGNATURE BLOCKS FOR ADDITIONAL ASSIGNORS, INCLUDING ALL PULITZER ASSIGNORS]**

</div>

Accepted and Agreed to:

WILMINGTON TRUST, NATIONAL
ASSOCIATION,
 as Collateral Agent


By: _____
     Name:
     Title:

ANNEX A
to
<u>SECURITY AGREEMENT</u>


<u>SCHEDULE OF CHIEF EXECUTIVE OFFICES</u>[2]


<u>Name of Assignor</u>                    <u>Address(es) of Chief Executive Office</u>

---

[2]  All schedules/annexes to be provided by Assignors.  **N.B., all schedules must include all necessary information for the Pulitzer Assignors and the Lee Assignors**.

ANNEX B
to
<u>SECURITY AGREEMENT</u>

[RESERVED]

ANNEX C
to
<u>SECURITY AGREEMENT</u>

SCHEDULE OF LEGAL NAMES, TYPE OF ORGANIZATION
(AND WHETHER A REGISTERED ORGANIZATION AND/OR
A TRANSMITTING UTILITY), JURISDICTION OF ORGANIZATION,
LOCATION, ORGANIZATIONAL IDENTIFICATION NUMBERS
<u>AND FEDERAL EMPLOYER IDENTIFICATION NUMBERS</u>

| Exact Legal Name of Each <u>Assignor</u> | Type of Organization (or, if the Assignor is an Individual, so <u>indicate)</u> | Registered Organization <u>(Yes/No)</u> | Jurisdiction of <u>Organization</u> | Assignor's Location (for purposes of NY <u>UCC § 9-307)</u> | Assignor's Organization Identification Number (or, if it has none, <u>so indicate)</u> | Assignor's Federal Employer Identification Number (or, if it has none, <u>so</u> indicate) | Transmitting Utility? <u>(Yes/No)</u> |
|---|---|---|---|---|---|---|---|

#4811-3592-1418v14

ANNEX D
to
SECURITY AGREEMENT

[RESERVED]

ANNEX E
to
SECURITY AGREEMENT

DESCRIPTION OF CERTAIN SIGNIFICANT TRANSACTIONS OCCURRING WITHIN
ONE YEAR PRIOR TO THE DATE OF THE SECURITY AGREEMENT

Name of Assignor

Description of any Transactions as required
by Section 2.8 of the Security Agreement

ANNEX F
to
SECURITY AGREEMENT

SCHEDULE OF DEPOSIT ACCOUNTS

| Name of Assignor | Description of Deposit Account | Account Number | Name of Bank, Address and Contact Information | Jurisdiction of Bank (determined in accordance with UCC § 9-304) | Excluded Accounts marked with ** |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

<u>FORM OF CONTROL AGREEMENT REGARDING DEPOSIT ACCOUNTS</u>

CONTROL AGREEMENT, dated as of [_____] (as amended, modified, restated and/or supplemented from time to time, this "<u>Agreement</u>"), among the undersigned assignor (the "<u>Assignor</u>"), WILMINGTON TRUST, NATIONAL ASSOCIATION, not in its individual capacity but solely as Collateral Agent (the "<u>Collateral Agent</u>"), and [_____] (the "<u>Deposit Account Bank</u>"), as the "bank" (as defined in Section 9-102 of the Uniform Commercial Code as in effect on the date hereof in the State of [New York] (the "<u>UCC</u>")) with which one or more deposit accounts (as defined in Section 9-102 of the UCC) are maintained by the Assignor (with all such deposit accounts now or at any time in the future maintained by the Assignor with the Deposit Account Bank being herein called the "<u>Deposit Accounts</u>").

<u>W I T N E S S E T H</u> :

WHEREAS, the Assignor, various other assignors and the Collateral Agent have entered into a Security Agreement, dated as of [_____] (as amended, amended and restated, modified or supplemented from time to time, the "<u>Security Agreement</u>"), under which, among other things, in order to secure the payment of the Obligations (as defined in the Security Agreement), the Assignor has granted a security interest to the Collateral Agent for the benefit of the Secured Creditors (as defined in the Security Agreement) in all of the right, title and interest of the Assignor in and into any and all "deposit accounts" (as defined in Section 9-102 of the UCC) and in all monies, securities, instruments and other investments deposited therein from time to time (collectively, herein called the "<u>Collateral</u>"); and

WHEREAS, the Assignor desires that the Deposit Account Bank enter into this Agreement in order to establish "control" (as defined in Section 9-104 of the UCC) in each Deposit Account at any time or from time to time maintained with the Deposit Account Bank, and to provide for the rights of the parties under this Agreement with respect to such Deposit Accounts;

NOW THEREFORE, in consideration of the premises and the mutual promises and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.    <u>Assignor's Dealings with Deposit Accounts; Notice of Exclusive Control</u>. Until the Deposit Account Bank shall have received from the Collateral Agent a Notice of Exclusive Control (as defined below), the Assignor shall be entitled to present items drawn on and otherwise to withdraw or direct the disposition of funds from the Deposit Accounts and give instructions in respect of the Deposit Accounts; <u>provided</u>, <u>however</u>, that the Assignor may not, and the Deposit Account Bank agrees that it shall not permit the Assignor to, without the Collateral Agent's prior written consent, close any Deposit Account.  If the Collateral Agent

shall give to the Deposit Account Bank a notice of the Collateral Agent's exclusive control of the Deposit Accounts, which notice states that it is a "Notice of Exclusive Control" (a "<u>Notice of Exclusive Control</u>"), only the Collateral Agent shall be entitled to withdraw funds from the Deposit Accounts, to give any instructions in respect of the Deposit Accounts and any funds held therein or credited thereto or otherwise to deal with the Deposit Accounts.

2.    <u>Collateral Agent's Right to Give Instructions as to Deposit Accounts</u>. (a) Notwithstanding the foregoing or any separate agreement that the Assignor may have with the Deposit Account Bank, the Collateral Agent shall be entitled, for purposes of this Agreement, at any time to give the Deposit Account Bank instructions as to the withdrawal or disposition of any funds from time to time credited to any Deposit Account, or as to any other matters relating to any Deposit Account or any other Collateral, without further consent from the Assignor. The Assignor hereby irrevocably authorizes and instructs the Deposit Account Bank, and the Deposit Account Bank hereby agrees, to comply with any such instructions from the Collateral Agent without any further consent from the Assignor. Such instructions may include the giving of stop payment orders for any items being presented to any Deposit Account for payment. The Deposit Account Bank shall be fully entitled to rely on, and shall comply with, such instructions from the Collateral Agent even if such instructions are contrary to any instructions or demands that the Assignor may give to the Deposit Account Bank. In case of any conflict between instructions received by the Deposit Account Bank from the Collateral Agent and the Assignor, the instructions from the Collateral Agent shall prevail.

(b)    It is understood and agreed that the Deposit Account Bank's duty to comply with instructions from the Collateral Agent regarding the Deposit Accounts is absolute, and the Deposit Account Bank shall be under no duty or obligation, nor shall it have the authority, to inquire or determine whether or not such instructions are in accordance with the Security Agreement or any other Loan Document (as defined in the Loan Agreement referred to in the Security Agreement), nor seek confirmation thereof from the Assignor or any other Person.

3.    <u>Assignor's Exculpation and Indemnification of Depository Bank</u>. The Assignor hereby irrevocably authorizes and instructs the Deposit Account Bank to follow instructions from the Collateral Agent regarding the Deposit Accounts even if the result of following such instructions from the Collateral Agent is that the Deposit Account Bank dishonors items presented for payment from any Deposit Account. The Assignor further confirms that the Deposit Account Bank shall have no liability to the Assignor for wrongful dishonor of such items in following such instructions from the Collateral Agent. The Deposit Account Bank shall have no duty to inquire or determine whether the Assignor's obligations to the Collateral Agent are in default or whether the Collateral Agent is entitled, under any separate agreement between the Assignor and the Collateral Agent, to give any such instructions. The Assignor further agrees to be responsible for the Deposit Account Bank's customary charges and to indemnify the Deposit Account Bank from and to hold the Deposit Account Bank harmless against any loss, cost or expense that the Deposit Account Bank may sustain or incur in acting upon instructions which the Deposit Account Bank believes in good faith to be instructions from the Collateral Agent.

4.    Subordination of Security Interests; Deposit Account Bank's Recourse to Deposit Accounts.  The Deposit Account Bank hereby subordinates any claims and security interests it may have against, or with respect to, any Deposit Account at any time established or maintained with it by the Assignor (including any amounts, investments, instruments or other Collateral from time to time on deposit therein) to the security interests of the Collateral Agent (for the benefit of the Secured Creditors) therein, and agrees that no amounts shall be charged by it to, or withheld or set-off or otherwise recouped by it from, any Deposit Account of the Assignor or any amounts, investments, instruments or other Collateral from time to time on deposit therein; provided that the Deposit Account Bank may, however, from time to time debit the Deposit Accounts for any of its customary charges in maintaining the Deposit Accounts or for reimbursement for the reversal of any provisional credits granted by the Deposit Account Bank to any Deposit Account, to the extent, in each case, that the Assignor has not separately paid or reimbursed the Deposit Account Bank therefor.

5.    Representations, Warranties and Covenants of Deposit Account Bank. The Deposit Account Bank represents and warrants to the Collateral Agent that:

(a)    The Deposit Account Bank constitutes a "bank" (as defined in Section 9-102 of the UCC) and agrees that the jurisdiction (determined in accordance with Section 9-304 of the UCC) of the Deposit Account Bank for purposes of each Deposit Account maintained by the Assignor with the Deposit Account Bank shall be [the State of New York].

(b)    The Deposit Account Bank shall not permit any Assignor to establish any demand, time, savings, passbook or other account with it which does not constitute a "deposit account" (as defined in Section 9-102 of the UCC).

(c)    The account agreements between the Deposit Account Bank and the Assignor relating to the establishment and general operation of the Deposit Accounts provide, whether specifically or generally, that the laws of [_____] govern secured transactions relating to the Deposit Accounts and that the Deposit Account Bank's "jurisdiction" for purposes of Section 9-304 of the UCC in respect of the Deposit Accounts is [New York].  The Deposit Account Bank will not, without the Collateral Agent's prior written consent, amend any such account agreement so that the Deposit Account Bank's jurisdiction for purposes of Section 9-304 of the UCC is other than a jurisdiction permitted pursuant to preceding clause (a).  All account agreements in respect of each Deposit Account in existence on the date hereof are listed on Annex A hereto and copies of all such account agreements have been furnished to the Collateral Agent.  The Deposit Account Bank will promptly furnish to the Collateral Agent a copy of the account agreement for each Deposit Account hereafter established by the Deposit Account Bank for the Assignor.

(d)    The Deposit Account Bank has not entered and will not enter, into any agreement with any other Person by which the Deposit Account Bank is obligated to comply with instructions from such other Person as to the disposition of funds from any Deposit Account or other dealings with any Deposit Account or other of the Collateral.

(e)    On the date hereof the Deposit Account Bank maintains no Deposit Accounts for the Assignor other than the Deposit Accounts specifically identified in Annex A hereto.

(f)    Any items or funds received by the Deposit Account Bank for the Assignor's account will be credited to said Deposit Accounts specified in paragraph (e) above or to any other Deposit Accounts hereafter established by the Deposit Account Bank for the Assignor in accordance with this Agreement.

(g)    The Deposit Account Bank will promptly notify the Collateral Agent of each Deposit Account hereafter established by the Deposit Account Bank for the Assignor (which notice shall specify the account number of such Deposit Account and the location at which the Deposit Account is maintained), and each such new Deposit Account shall be subject to the terms of this Agreement in all respects.

6.    <u>Deposit Account Statements and Information</u>.  The Deposit Account Bank agrees, and is hereby authorized and instructed by the Assignor, to furnish to the Collateral Agent, at its address indicated below, copies of all account statements and other information relating to each Deposit Account that the Deposit Account Bank sends to the Assignor and to disclose to the Collateral Agent all information requested by the Collateral Agent regarding any Deposit Account.

7.    <u>Conflicting Agreements</u>.  This Agreement shall have control over any conflicting agreement between the Deposit Account Bank and the Assignor.

8.    <u>Merger or Consolidation of Deposit Account Bank</u>.  Without the execution or filing of any paper or any further act on the part of any of the parties hereto, any bank into which the Deposit Account Bank may be merged or with which it may be consolidated, or any bank resulting from any merger to which the Deposit Account Bank shall be a party, shall be the successor of the Deposit Account Bank hereunder and shall be bound by all provisions hereof which are binding upon the Deposit Account Bank and shall be deemed to affirm as to itself all representations and warranties of the Deposit Account Bank contained herein.

9.    <u>Notices</u>.  (a)  All notices and other communications provided for in this Agreement shall be in writing (including facsimile) and sent to the intended recipient at its address or telex or facsimile number set forth below:

<u>If to the Collateral Agent, at</u>:

Wilmington Trust, N.A.
50 South Sixth Street, Suite 1290
Minneapolis, MN 55402
Attn: Josh James
Tel.: (612) 217-5637
Fax: (612) 217-5651
Email: jjames@WilmingtonTrust.com

If to the Assignor, at:

_____
_____
_____


If to the Deposit Account Bank, at:

_____
_____
_____

or, as to any party, to such other address or telex or facsimile number as such party may designate from time to time by notice to the other parties.

(b)  Except as otherwise provided herein, all notices and other communications hereunder shall be delivered by hand or by commercial overnight courier (delivery charges prepaid), or mailed, postage prepaid, or telexed or faxed, addressed as aforesaid, and shall be effective (i) three business days after being deposited in the mail (if mailed), (ii) when delivered (if delivered by hand or courier) and (iii) or when transmitted with receipt confirmed (if telexed or faxed); provided that notices to the Collateral Agent shall not be effective until actually received by it.

10.  Amendment.  This Agreement may not be amended, modified or supplemented except in writing executed and delivered by all the parties hereto.

11.  Binding Agreement.  This Agreement shall bind the parties hereto and their successors and assign and shall inure to the benefit of the parties hereto and their successors and assigns.  Without limiting the provisions of the immediately preceding sentence, the Collateral Agent at any time or from time to time may designate in writing to the Deposit Account Bank a successor Collateral Agent (at such time, if any, as such entity becomes the Collateral Agent under the Security Agreement, or at any time thereafter) who shall thereafter succeed to the rights of the existing Collateral Agent hereunder and shall be entitled to all of the rights and benefits provided hereunder.

12.  Continuing Obligations.  The rights and powers granted herein to the Collateral Agent have been granted in order to protect and further perfect its security interests in the Deposit Accounts and other Collateral and are powers coupled with an interest and will be affected neither by any purported revocation by the Assignor of this Agreement or the rights granted to the Collateral Agent hereunder or by the bankruptcy, insolvency, conservatorship or receivership of the Assignor or the Deposit Account Bank or by the lapse of time.  The rights of the Collateral Agent hereunder and in respect of the Deposit Accounts and the other Collateral, and the obligations of the Assignor and Deposit Account Bank hereunder, shall continue in effect until the security interests of Collateral Agent in the Deposit Accounts and such other Collateral have been terminated and the Collateral Agent has notified the Deposit Account Bank of such termination in writing.

13.  <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

14.  <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, all of which shall constitute one and the same instrument, and any party hereto may execute this Agreement by signing and delivering one or more counterparts.

**[Remainder of this page intentionally left blank; signature page follows]**

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement as of the date first written above.

Assignor:

[NAME OF ASSIGNOR]

By:_____
    Name:
    Title:

Collateral Agent:

WILMINGTON TRUST, NATIONAL
    ASSOCIATION

By:_____
    Name:
    Title:

Deposit Account Bank:

[NAME OF DEPOSIT ACCOUNT BANK]

By:_____
    Name:
    Title:

ANNEX H
to
SECURITY AGREEMENT

DESCRIPTION OF COMMERCIAL TORT CLAIMS

Name of Assignor                    Description of Commercial Tort Claims

ANNEX I
to
SECURITY AGREEMENT

SCHEDULE OF MARKS AND APPLICATIONS;
INTERNET DOMAIN NAME REGISTRATIONS

Marks

| Owner | Mark | Jurisdiction | Registration No. |
|---|---|---|---|
| Lee Enterprises, Incorporated | | | |
| | | | |
| | | | |
| | | | |
| Lee Procurement Solutions Co. | | | |
| | | | |
| | | | |
| | | | |
| Lee Publications, Inc. | | | |
| | | | |
| | | | |

Applications

| Owner | Mark | Jurisdiction | Serial No. |
|---|---|---|---|
| INN Partners, L.C. d/b/a TownNews.com | | | |
| | | | |
| | | | |
| | | | |
| Lee Enterprises, Incorporated | | | |
| | | | |
| | | | |

**The Assignors, in their reasonable business judgment, have deemed it no longer prudent to pursue or maintain the following registrations. Notwithstanding such intentions, Assignors shall grant a security interest in these trademarks and their registrations.**

| Owner | Mark | Jurisdiction | Registration No. |
|---|---|---|---|
| Lee Enterprises, Incorporated | | | |
| | | | |
| | | | |
| | | | |
| Lee Procurement Solutions | | | |

| Co. | | | |
|-----|-----|-----|-----|
| | | | |
| | | | |

**2.    Internet Domain Name Registrations:**

**Assignors may use domain names and/or be the registrant of record for domain names that are beneficially owned by third parties that are not subject to or a part of this Agreement and therefore those domain names are not listed in this Annex I.**

**Assignors may own immaterial domain names that are not used and thus not included in this Annex.  Assignors may also have included immaterial domain names in this Annex that are not in use.   Domain names are set forth in this Annex under the subsidiaries who are their beneficial owners; however, such domain names may be formally registered to parties including: [Lee Publications, Inc., Lee Procurement Solutions Co., Lee Enterprises, Lee Enterprises, Inc., INN Partners L.C., or Lee Consolidated Holdings Co.]**

| Owner | Domain Name |
|---|---|
| Lee Publications, Inc., Lee Procurement Solutions Co., or Lee Consolidated Holdings Co. | |
| | |
| | |
| | |
| Albany Democrat-Herald | |
| | |
| | |
| | |
| Beatrice Daily Sun | |
| | |
| | |
| | |
| Billings Gazette | |
| | |
| | |
| | |
| Casper Star-Tribune | |
| | |
| | |
| | |
| Columbus Telegram | |
| | |
| | |
| Corvallis Gazette-Times | |
| | |
| | |
| | |

| Elko Daily Free Press | |
|---|---|
| | |
| | |
| | |
| Fremont Tribune | |
| | |
| | |
| | |
| Globe Gazette | |
| | |
| | |
| | |
| Herald & Review | |
| | |
| | |
| | |
| Independent Record | |
| | |
| | |
| | |
| Journal Gazette | |
| | |
| La Crosse Tribune | |
| | |
| | |
| | |
| Lincoln Journal Star | |
| | |
| | |
| | |
| Missoulian | |
| | |
| | |
| | |
| Muscatine Journal | |
| | |
| | |
| North County Times | |
| | |
| | |
| | |
| Quad-City Times | |
| | |

| | |
|---|---|
| | |
| Rapid City Journal | |
| | |
| | |
| | |
| Ravalli Republic | |
| | |
| | |
| | |
| Sioux City Journal or Sioux City Newspapers, Inc. | |
| | |
| | |
| | |
| The Bismarck Tribune | |
| | |
| | |
| The Chippewa Herald | |
| | |
| | |
| The Citizen | |
| The Courier | |
| | |
| | |
| | |
| The Daily News | |
| | |
| | |
| The Journal Times | |
| | |
| | |
| The Ledger-Independent | |
| | |
| | |
| The Montana Standard | |

| | |
|---|---|
| | |
| | |
| | |
| The Post-Star | |
| | |
| | |
| The Sentinel | |
| | |
| | |
| | |
| The Southern Illinoisan | |
| | |
| | |
| | |
| The Times | |
| | |
| | |
| | |
| The Times and Democrat | |
| | |
| | |
| | |
| The Times-News | |
| | |
| | |
| | |
| TownNews.com | |
| | |
| | |
| | |
| Winona Daily News | |
| | |

ANNEX J
to
SECURITY AGREEMENT

SCHEDULE OF PATENTS

ANNEX K
to
SECURITY AGREEMENT

## SCHEDULE OF COPYRIGHTS

[In addition to those copyright registrations listed here, individual newspapers may have published books of local significance and may or may not have registered the copyright thereto. These copyrights are of immaterial value to the Assignors and their Subsidiaries taken as a whole.

Our search of the copyright office records includes only those documents available in the online search engine which only includes records created after January 1, 1978.

Our search of the copyright office database for copyrights owned by The Times returned nearly 1900 hits.  It is unknown if any of these documents are owned by the Munster, Indiana newspaper and this information is unascertainable without examining each of those records. These copyrights are of immaterial value to the Assignors and their Subsidiaries taken as a whole.]

| Owner | Copyright Title | Publication Date | Registration No. |
|---|---|---|---|
| Lee Enterprises, Incorporated | | | |
| | | | |
| | | | |
| Lee Enterprises, Incorporated dba The Billings Gazette | | | |
| | | | |
| Lee Enterprises, Incorporated dba Bismarck Tribune | | | |
| | | | |
| | | | |
| Lee Enterprises, Incorporated dba The Missoulian | | | |
| | | | |
| Lee Enterprises, Incorporated dba Quad-City Times | | | |
| | | | |
| | | | |
| Lee Enterprises, Incorporated dba Rapid City Journal | | | |
| | | | |

| Owner | Copyright Title | Publication Date | Registration No. |
|---|---|---|---|
| | | | |
| | | | |
| Lee Enterprises, Incorporated dba Muscatine Journal | | | |
| | | | |
| | | | |
| Lee Enterprises, Incorporated dba Winona Daily News | | | |
| | | | |
| | | | |
| Lee Procurement Solutions Co. dba The Southern Illinoisan | | | |
| | | | |
| | | | |
| Journal-Star Printing Company | | | |
| | | | |
| | | | |
| Sioux City Newspapers, Inc. | | | |
| | | | |
| | | | |
| Lee Enterprises, Incorporated dba Farcountry Press | | | |
| | | | |

GRANT OF SECURITY INTEREST
IN UNITED STATES TRADEMARKS


FOR GOOD AND VALUABLE CONSIDERATION, receipt and sufficiency of which are hereby acknowledged, [Name of Assignor], a _____ _____ (the "Grantor") with principal offices at _____, hereby grants to Wilmington Trust, National Association, as Collateral Agent, with principal offices at 50 South Sixth Street, Suite 1290, Minneapolis, MN 55402 (the "Grantee"), a continuing security interest in (i) all of the Grantor's right, title and interest in, to and under to the United States trademarks, trademark registrations and trademark applications (the "Marks") set forth on Schedule A attached hereto, (ii) all Proceeds (as such term is defined in the Security Agreement referred to below) and products of the Marks, (iii) the goodwill of the businesses with which the Marks are associated and (iv) all causes of action arising prior to or after the date hereof for infringement of any of the Marks or unfair competition regarding the same.

THIS GRANT is made to secure the satisfactory performance and payment of all the Obligations of the Grantor, as such term is defined in the Security Agreement among the Grantor, the other assignors from time to time party thereto and the Grantee, dated as of [_____] (as amended, modified, restated and/or supplemented from time to time, the "Security Agreement").[3]   Upon the occurrence of the Termination Date, the Grantee shall execute, acknowledge, and deliver to the Grantor an instrument in writing releasing the security interest in the Marks acquired under this Grant.

---

[3] All capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Security Agreement.

[The lien created hereby on the property described herein is junior and subordinate to the lien on such property created by any agreement, filing or recording now or hereafter granted to Deutsche Bank Trust Company Americas, as Collateral Agent (under the First Priority Documents (as defined in the Intercreditor Agreement referred to below)), and its successors and assigns, in such property, in accordance with the provisions of the Intercreditor Agreement dated as of _____, among DEUTSCHE BANK TRUST COMPANY AMERICAS, as First Priority Representative, WILMINGTON TRUST, NATIONAL ASSOCIATION, as Second Priority Representative, LEE ENTERPRISES, INCORPORATED, as Borrower, and the other Loan Parties referred to therein, as amended from time to time.]

This Grant has been granted in conjunction with the security interest granted to the Grantee under the Security Agreement. The rights and remedies of the Grantee with respect to the security interest granted herein are as set forth in the Security Agreement, all terms and provisions of which are incorporated herein by reference. In the event that any provisions of this Grant are deemed to conflict with the Security Agreement, the provisions of the Security Agreement shall govern.

**[Remainder of this page intentionally left blank; signature page follows]**

IN WITNESS WHEREOF, the undersigned have executed this Grant as of the ____ day of _____, ____.

[NAME OF ASSIGNOR], Grantor


By_____
  Name:
  Title:


WILMINGTON TRUST, NATIONAL ASSOCIATION,
  as Collateral Agent and Grantee


By_____
  Name:
  Title:

STATE OF _____)
                        ) ss.:
COUNTY OF _____)


       On this _____ day of _____, _____, before me personally came _____ _____ who, being by me duly sworn, did state as follows:  that [s]he is _____ of [Name of Grantor], that [s]he is authorized to execute the foregoing Grant on behalf of said _____ and that [s]he did so by authority of the [Board of Directors] of said _____.

                                   _____
                                   Notary Public

STATE OF _____ )

COUNTY OF _____ ) ss:

 

 

On this ____ day of _____, ____, before me personally came _____ _____ who, being by me duly sworn, did state as follows:  that [s]he is _____ of Wilmington Trust, National Association, that [s]he is authorized to execute the foregoing Grant on behalf of said _____ and that [s]he did so by authority of the Board of Directors of said _____.

_____
Notary Public

<u>SCHEDULE A</u>

| <u>MARK</u> | <u>REG. NO.</u> | <u>REG. DATE</u> |
|---|---|---|

## GRANT OF SECURITY INTEREST
## IN UNITED STATES PATENTS

       FOR GOOD AND VALUABLE CONSIDERATION, receipt and sufficiency of which are hereby acknowledged, [Name of Assignor], a _____ _____ (the "Grantor") with principal offices at _____, hereby grants to Wilmington Trust, National Association, as Collateral Agent, with principal offices at 50 South Sixth Street, Suite 1290, Minneapolis, MN 55402 (the "Grantee"), a continuing security interest in (i) all of the Grantor's rights, title and interest in, to and under the United States patents (the "Patents") set forth on Schedule A attached hereto, in each case together with (ii) all Proceeds (as such term is defined in the Security Agreement referred to below) and products of the Patents, and (iii) all causes of action arising prior to or after the date hereof for infringement of any of the Patents or unfair competition regarding the same.

       THIS GRANT is made to secure the satisfactory performance and payment of all the Obligations of the Grantor, as such term is defined in the Security Agreement among the Grantor, the other assignors from time to time party thereto and the Grantee, dated as of [_____] (as amended, modified, restated and/or supplemented from time to time, the "Security Agreement").[4]  Upon the occurrence of the Termination Date, the Grantee shall execute, acknowledge, and deliver to the Grantor an instrument in writing releasing the security interest in the Patents acquired under this Grant.

       [The lien created hereby on the property described herein is junior and subordinate to the lien on such property created by any agreement, filing or recording now or

---

[4] Relevant capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Security Agreement.

hereafter granted to Deutsche Bank Trust Company Americas, as Collateral Agent (under the First Priority Documents (as defined in the Intercreditor Agreement referred to below)), and its successors and assigns, in such property, in accordance with the provisions of the Intercreditor Agreement dated as of [_____], among DEUTSCHE BANK TRUST COMPANY AMERICAS, as First Priority Representative, WILMINGTON TRUST, NATIONAL ASSOCIATION, as Second Priority Representative, LEE ENTERPRISES, INCORPORATED, as Borrower, and the other Loan Parties referred to therein, as amended from time to time.]

This Grant has been granted in conjunction with the security interest granted to the Grantee under the Security Agreement.  The rights and remedies of the Grantee with respect to the security interest granted herein are as set forth in the Security Agreement, all terms and provisions of which are incorporated herein by reference.  In the event that any provisions of this Grant are deemed to conflict with the Security Agreement, the provisions of the Security Agreement shall govern.

**[Remainder of this page intentionally left blank; signature page follows]**

       IN WITNESS WHEREOF, the undersigned have executed this Grant as of the _____ day of _____, _____.

[NAME OF ASSIGNOR], Grantor


By_____
  Name:
  Title:


WILMINGTON TRUST, NATIONAL ASSOCIATION,
  as Collateral Agent and Grantee


By_____
  Name:
  Title:

STATE OF _____ )
                            ) ss:
COUNTY OF_____)


         On this ____ day of _____, ____, before me personally came _____

_____ who, being by me duly sworn, did state as follows:  that [s]he is

_____ of [Name of Grantor], that [s]he is authorized to execute the foregoing Grant

on behalf of said _____ and that [s]he did so by authority of the Board of Directors of

said _____.


                                _____
                                     Notary Public

STATE OF _____)
                            ) ss:
COUNTY OF _____)

        On this ____ day of _____, ____, before me personally came _____ _____ who, being by me duly sworn, did state as follows:  that [s]he is _____ of Wilmington Trust, National Association, that [s]he is authorized to execute the foregoing Grant on behalf of said _____ and that [s]he did so by authority of the Board of Directors of said _____.

                                               _____
                                               Notary Public

| PATENT | PATENT NO. | ISSUE DATE |
| --- | --- | --- |

## GRANT OF SECURITY INTEREST
## IN UNITED STATES COPYRIGHTS

WHEREAS, [Name of Assignor], a _____ _____ (the "Grantor"), having its chief executive office at _____, _____, is the owner of all right, title and interest in and to the United States copyrights and associated United States copyright registrations and applications for registration set forth in Schedule A attached hereto;

WHEREAS, WILMINGTON TRUST, NATIONAL ASSOCIATION, as Collateral Agent, with principal offices at 50 South Sixth Street, Suite 1290, Minneapolis, MN 55402, (the "Grantee"), desires to acquire a security interest in said copyrights and copyright registrations and applications therefor; and

WHEREAS, the Grantor is willing to grant to the Grantee a security interest in and lien upon the copyrights and copyright registrations and applications therefor described above.

NOW, THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, and subject to the terms and conditions of the Security Agreement, dated as of [_____], made by the Grantor, the other assignors from time to time party thereto and the Grantee (as amended, modified, restated and/or supplemented from time to time, the "Security Agreement"),[5] the Grantor hereby assigns to the Grantee as collateral security, and grants to the Grantee a continuing security interest in, to and under the copyrights and copyright registrations and applications therefor set forth in Schedule A attached hereto.

[The lien created hereby on the property described herein is junior and subordinate to the lien on such property created by any agreement, filing or recording now or hereafter granted to Deutsche Bank Trust Company Americas, as Collateral Agent (under the First Priority Documents (as defined in the Intercreditor Agreement referred to below)), and its successors and assigns, in such property, in accordance with the provisions of the Intercreditor Agreement dated as of [_____], among DEUTSCHE BANK TRUST COMPANY AMERICAS, as First Priority Representative, WILMINGTON TRUST, NATIONAL ASSOCIATION, as Second Priority Representative, LEE ENTERPRISES, INCORPORATED, as Borrower, and the other Loan Parties referred to therein, as amended from time to time.]

Upon the occurrence of the Termination Date, the Grantee shall execute, acknowledge, and deliver to the Grantor an instrument in writing releasing the security interest in the Copyrights acquired under this Grant.

_____

[5] All capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Security Agreement.

This Grant has been granted in conjunction with the security interest granted to the Grantee under the Security Agreement.  The rights and remedies of the Grantee with respect to the security interest granted herein are as set forth in the Security Agreement, all terms and provisions of which are incorporated herein by reference.  In the event that any provisions of this Grant are deemed to conflict with the Security Agreement, the provisions of the Security Agreement shall govern.

**[Remainder of this page intentionally left blank; signature page follows]**

IN WITNESS WHEREOF, the undersigned have executed this Grant as of the

_____ day of _____, ____.

[NAME OF ASSIGNOR], Grantor

By_____
  Name:
  Title:

WILMINGTON TRUST, NATIONAL
ASSOCIATION,
  as Collateral Agent and Grantee

By_____
  Name:
  Title:

STATE OF                    )

                                      ) ss:

COUNTY OF                  )

           On this __ day of _____, ____, before me personally came _____

_____, who being duly sworn, did depose and say that [s]he is

_____ of [Name of Grantor], that [s]he is authorized to execute the foregoing

Grant on behalf of said corporation and that [s]he did so by authority of the Board of Directors of

said corporation.

                                             _____

                                                 Notary Public

ANNEX N
to
<u>SECURITY AGREEMENT</u>

STATE OF _____ )

                        ) ss.:

COUNTY OF_____ )

On this _____ day of _____, ____, before me personally came _____ _____ who, being by me duly sworn, did state as follows:  that [s]he is _____ of Wilmington Trust, National Association, that [s]he is authorized to execute the foregoing Grant on behalf of said _____ and that [s]he did so by authority of the Board of Directors of said _____.

_____
Notary Public

ANNEX N
to
SECURITY AGREEMENT

<u>SCHEDULE OF STOCK</u>

1.      [ASSIGNOR]

| Name of Issuing Corporation | Type of Shares | Number of Shares | Certificate No. | Percentage Owned | Sub-clause of Section 1.1(b) of Security Agreement |
|---|---|---|---|---|---|
| | | | | | |

2.      [ASSIGNOR]

| Name of Issuing Corporation | Type of Shares | Number of Shares | Certificate No. | Percentage Owned | Sub-clause of Section 1.1(b) of Security Agreement |
|---|---|---|---|---|---|
| | | | | | |

ANNEX P
to
<u>SECURITY AGREEMENT</u>

<u>SCHEDULE OF NOTES</u>

1.  [ASSIGNOR]

| <u>Amount</u>* | <u>Maturity Date</u> | <u>Obligor</u> | <u>Sub-clause of<br>Section 1.1(b)<br>of Security Agreement</u> |
| --- | --- | --- | --- |

2.  [ASSIGNOR]

| <u>Amount</u>* | <u>Maturity Date</u> | <u>Obligor</u> | <u>Sub-clause of<br>Section 1.1(b)<br>of Security Agreement</u> |
| --- | --- | --- | --- |

3.  [ASSIGNOR]

| <u>Amount</u>* | <u>Maturity Date</u> | <u>Obligor</u> | <u>Sub-clause of<br>Section 1.1(b)<br>of Security Agreement</u> |
| --- | --- | --- | --- |

*Original principal amount.

## SCHEDULE OF LIMITED LIABILITY COMPANY INTERESTS

1.  [ASSIGNOR]

| Name of Issuing Limited Liability Company | Type of Interest | Percentage Owned | Sub-clause of Section 1.1(b) of Security Agreement |
|---|---|---|---|
| | | | |

2.  [ASSIGNOR]

| Name of Issuing Limited Liability Company | Type of Interest | Percentage Owned | Sub-clause of Section 1.1(b) of Security Agreement |
|---|---|---|---|
| | | | |

ANNEX R
to
<u>SECURITY AGREEMENT</u>

<u>SCHEDULE OF PARTNERSHIP INTERESTS</u>

1.      [ASSIGNOR]

FORM OF AGREEMENT REGARDING UNCERTIFICATED SECURITIES, LIMITED LIABILITY COMPANY INTERESTS AND PARTNERSHIP INTERESTS

AGREEMENT (as amended, modified, restated and/or supplemented from time to time, this "Agreement"), dated as of [_____ __, 20__], among the undersigned pledgor (the "Pledgor"), Wilmington Trust, National Association, not in its individual capacity but solely as Collateral Agent (the "Pledgee"), and [_____], as the issuer of the Uncertificated Securities, Limited Liability Company Interests and/or Partnership Interests (each as defined below) (the "Issuer").

W I T N E S S E T H :

WHEREAS, the Pledgor, certain of its affiliates and the Pledgee have entered into a Security Agreement, dated as of [_____], (as amended, modified, restated and/or supplemented from time to time, the "Security Agreement"), under which, among other things, in order to secure the payment of the Obligations (as defined in the Security Agreement), the Pledgor has or will pledge to the Pledgee for the benefit of the Secured Creditors (as defined in the Security Agreement), and grant a security interest in favor of the Pledgee for the benefit of the Secured Creditors in, all of the right, title and interest of the Pledgor in and to any and all ["uncertificated securities" (as defined in Section 8-102(a)(18) of the UCC, as adopted in the State of New York) ("Uncertificated Securities")] [Partnership Interests (as defined in the Security Agreement)] [Limited Liability Company Interests (as defined in the Security Agreement)], from time to time issued by the Issuer, whether now existing or hereafter from time to time acquired by the Pledgor (with all of such [Uncertificated Securities] [Partnership Interests] [Limited Liability Company Interests] being herein collectively called the "Issuer Pledged Interests"); and

WHEREAS, the Pledgor desires the Issuer to enter into this Agreement in order to perfect the security interest of the Pledgee under the Security Agreement in the Issuer Pledged Interests, to vest in the Pledgee control of the Issuer Pledged Interests and to provide for the rights of the parties under this Agreement;

NOW THEREFORE, in consideration of the premises and the mutual promises and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.    The Pledgor hereby irrevocably authorizes and directs the Issuer, and the Issuer hereby agrees, to comply with any and all instructions and orders originated by the Pledgee (and its successors and assigns) regarding any and all of the Issuer Pledged Interests without the further consent by the registered owner (including the Pledgor), and, following its receipt of a notice from the Pledgee stating that the Pledgee is exercising exclusive control of the Issuer Pledged Interests, not to comply with any instructions or orders regarding any or all of the

Issuer Pledged Interests originated by any person or entity other than the Pledgee (and its successors and assigns) or a court of competent jurisdiction.

2.    The Issuer hereby certifies that (i) no notice of any security interest, lien or other encumbrance or claim affecting the Issuer Pledged Interests (other than the security interest of the Pledgee) has been received by it, and (ii) the security interest of the Pledgee in the Issuer Pledged Interests has been registered in the books and records of the Issuer.

3.    The Issuer hereby represents and warrants that (i) the pledge by the Pledgor of, and the granting by the Pledgor of a security interest in, the Issuer Pledged Interests to the Pledgee, for the benefit of the Secured Creditors, does not violate the charter, by-laws, partnership agreement, membership agreement or any other agreement governing the Issuer or the Issuer Pledged Interests, and (ii) the Issuer Pledged Interests consisting of capital stock of a corporation are fully paid and nonassessable.

4.    All notices, statements of accounts, reports, prospectuses, financial statements and other communications to be sent to the Pledgor by the Issuer in respect of the Issuer will also be sent to the Pledgee at the following address:

> Wilmington Trust, N.A.
> 50 South Sixth Street, Suite 1290
> Minneapolis, MN 55402
> Attn: Josh James
> Tel.: (612) 217-5637
> Fax: (612) 217-5651
> Email: jjames@WilmingtonTrust.com

5.    Following its receipt of a notice from the Pledgee stating that the Pledgee is exercising exclusive control of the Issuer Pledged Interests and until the Pledgee shall have delivered written notice to the Issuer that all of the Obligations have been paid in full and this Agreement is terminated, the Issuer will send any and all redemptions, distributions, interest or other payments in respect of the Issuer Pledged Interests from the Issuer for the account of the Pledgee only by wire transfers to such account as the Pledgee shall instruct.

6.    Except as expressly provided otherwise in Sections 4 and 5, all notices, instructions, orders and communications hereunder shall be sent or delivered by mail, telegraph, telex, telecopy, cable or overnight courier service and all such notices and communications shall, when mailed, telexed, telecopied, cabled or sent by overnight courier, be effective when deposited in the mails or delivered to overnight courier, prepaid and properly addressed for delivery on such or the next Business Day, or sent by telex or telecopier, except that notices and communications to the Pledgee or the Issuer shall not be effective until received.  All notices and other communications shall be in writing and addressed as follows:

> (a)    if to the Pledgor, at:
>
> c/o Lee Enterprises, Incorporated
> 201 North Harrison Street

Davenport, Iowa  52801
Attention:  Chief Financial Officer
Telephone No.:  (563) 383-2179
Telecopier No.:  (563) 327-2600

(b)       if to the Pledgee, at the address given in Section 4 hereof;

(c)       if to the Issuer, at:

_____
_____
_____

or at such other address as shall have been furnished in writing by any Person described above to the party required to give notice hereunder.  As used in this Section 6, "Business Day" means any day other than a Saturday, Sunday, or other day in which banks in New York are authorized to remain closed.

7.    This Agreement shall be binding upon the successors and assigns of the Pledgor and the Issuer and shall inure to the benefit of and be enforceable by the Pledgee and its successors and assigns.  This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which shall constitute one instrument.  In the event that any provision of this Agreement shall prove to be invalid or unenforceable, such provision shall be deemed to be severable from the other provisions of this Agreement which shall remain binding on all parties hereto.  None of the terms and conditions of this Agreement may be changed, waived, modified or varied in any manner whatsoever except in writing signed by the Pledgee, the Issuer and the Pledgor.

8.    This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to its principles of conflict of laws.

*       *       *

IN WITNESS WHEREOF, the Pledgor, the Pledgee and the Issuer have caused this Agreement to be executed by their duly elected officers duly authorized as of the date first above written.

[_____],
   as Pledgor


By_____
   Name:
   Title:


WILMINGTON TRUST, NATIONAL ASSOCIATION,
   not in its individual capacity but solely as
   Collateral Agent and Pledgee


By_____
   Name:
   Title:


[_____],
   as the Issuer


By_____
   Name:
   Title:

ANNEX T
to
SECURITY AGREEMENT

CHATTEL PAPER, INSTRUMENTS AND CERTIFICATED SECURITIES

ANNEX U
to
SECURITY AGREEMENT

SECURITIES ACCOUNTS AND COMMODITY ACCOUNTS

ANNEX V
to
SECURITY AGREEMENT

MOTOR VEHICLES AND EQUIPMENT SUBJECT TO A CERTIFICATE OF TITLE

## TABLE OF CONTENTS

**Page**

ARTICLE I SECURITY INTERESTS.................................................................................2

    1.1 Grant of Security Interests ................................................................2
    1.2 Lien Subordination; Bailee for Perfection ....................................5
    1.3 Power of Attorney..............................................................................6

ARTICLE II GENERAL REPRESENTATIONS, WARRANTIES AND COVENANTS ...........6

    2.1 Necessary Filings ..............................................................................6
    2.2 No Liens...............................................................................................7
    2.3 Other Financing Statements.............................................................7
    2.4 Chief Executive Office, Record Locations .....................................7
    2.5 [RESERVED] ......................................................................................7
    2.6 Legal Names; Type of Organization (and Whether a Registered Organization
        and/or a Transmitting Utility); Jurisdiction of Organization; Location;
        Organizational Identification Numbers; Federal Employer Identification
        Number; Changes Thereto; etc ....................................................7
    2.7 [RESERVED] ......................................................................................8
    2.8 Certain Significant Transactions......................................................8
    2.9 Non-UCC Property ............................................................................8
    2.10 As-Extracted Collateral; Timber-to-be-Cut .................................9
    2.11 Collateral in the Possession of a Bailee .......................................9
    2.12 Recourse............................................................................................9
    2.13 Certain Representations and Warranties Regarding Certain Collateral......................9

ARTICLE III SPECIAL PROVISIONS CONCERNING ACCOUNTS; CONTRACT
    RIGHTS; INSTRUMENTS; CHATTEL PAPER AND CERTAIN OTHER
    COLLATERAL ..............................................................................................10

    3.1 Additional Representations and Warranties...............................10
    3.2 Maintenance of Records .................................................................10
    3.3 Direction to Account Debtors; Contracting Parties; etc .............11
    3.4 Modification of Terms; etc .............................................................11
    3.5 Collection...........................................................................................11
    3.6 Instruments.......................................................................................12
    3.7 Assignors Remain Liable Under Accounts...................................12
    3.8 Assignors Remain Liable Under Contracts..................................12
    3.9 Deposit Accounts; Etc.....................................................................12
    3.10 Letter-of-Credit Rights..................................................................14
    3.11 Commercial Tort Claims................................................................14
    3.12 Chattel Paper ..................................................................................14
    3.13 Further Actions ...............................................................................14

ARTICLE IV SPECIAL PROVISIONS CONCERNING TRADEMARKS AND
DOMAIN NAMES ....................................................................................................15

    4.1 Additional Representations and Warranties..............................................................15
    4.2 Licenses and Assignments .......................................................................................15
    4.3 Infringements ...........................................................................................................15
    4.4 Preservation of Marks .............................................................................................16
    4.5 Maintenance of Registration ...................................................................................16
    4.6 Future Registered Marks and Domain Names .........................................................16
    4.7 Remedies..................................................................................................................16

ARTICLE V SPECIAL PROVISIONS CONCERNING PATENTS, COPYRIGHTS AND
TRADE SECRETS ....................................................................................................17

    5.1 Additional Representations and Warranties..............................................................17
    5.2 Licenses and Assignments .......................................................................................17
    5.3 Infringements ...........................................................................................................17
    5.4 Maintenance of Patents or Copyrights.....................................................................18
    5.5 Prosecution of Patent or Copyright Applications ....................................................18
    5.6 Other Patents and Copyrights...................................................................................18
    5.7 Remedies..................................................................................................................18

ARTICLE VI PROVISIONS CONCERNING ALL COLLATERAL.........................................18

    6.1 Protection of Collateral Agent's Security ................................................................18
    6.2 Warehouse Receipts Non-Negotiable ......................................................................19
    6.3 Additional Information .............................................................................................19
    6.4 Further Actions ........................................................................................................19
    6.5 Financing Statements ...............................................................................................20

ARTICLE VII REMEDIES UPON OCCURRENCE OF AN EVENT OF DEFAULT ..............21

    7.1 Remedies; Obtaining the Collateral Upon Default ...................................................21
    7.2 Remedies; Disposition of the Collateral ..................................................................23
    7.3 Waiver of Claims .....................................................................................................23
    7.4 Application of Proceeds............................................................................................24
    7.5 Remedies Cumulative ..............................................................................................24
    7.6 Discontinuance of Proceedings................................................................................25

ARTICLE VIII INDEMNITY ...............................................................................................25

    8.1 Indemnity .................................................................................................................25
    8.2 Indemnity Obligations Secured by Collateral; Survival ...........................................26

ARTICLE IX DEFINITIONS..................................................................................................26

ARTICLE X MISCELLANEOUS ...........................................................................................33

    10.1 Notices ...................................................................................................................33
    10.2 Waiver; Amendment...............................................................................................34
    10.3 Obligations Absolute ..............................................................................................34

10.4 Successors and Assigns.................................................................................34
10.5 Headings Descriptive...................................................................................35
10.6 GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE;
    WAIVER OF JURY TRIAL.................................................................35
10.7 Assignor's Duties.......................................................................................36
10.8 Termination; Release..................................................................................36
10.9 Counterparts..............................................................................................37
10.10 Severability .............................................................................................37
10.11 The Collateral Agent and the other Secured Creditors ..........................37
10.12 Additional Assignors ...............................................................................38
10.13 Intercreditor Agreements ........................................................................38

| ANNEX A | Schedule of Chief Executive Offices Address(es) of Chief Executive Office |
| --- | --- |
| ANNEX B | [Reserved] |
| ANNEX C | Schedule of Legal Names, Type of Organization (and Whether a Registered Organization and/or a Transmitting Utility), Jurisdiction of Organization, Location, Organizational Identification Numbers and Federal Employer Identification Numbers |
| ANNEX D | [Reserved] |
| ANNEX E | Description of Certain Significant Transactions Occurring Within One Year Prior to the Date of the Security Agreement |
| ANNEX F | Schedule of Deposit Accounts |
| ANNEX G | Form of Control Agreement Regarding Deposit Accounts |
| ANNEX H | Schedule of Commercial Tort Claims |
| ANNEX I | Schedule of Marks and Applications; Internet Domain Name Registrations |
| ANNEX J | Schedule of Patents |
| ANNEX K | Schedule of Copyrights |
| ANNEX L | Grant of Security Interest in United States Trademarks |
| ANNEX M | Grant of Security Interest in United States Patents |
| ANNEX N | Grant of Security Interest in United States Copyrights |
| ANNEX O | Schedule of Stock |
| ANNEX P | Schedule of Notes |
| ANNEX Q | Schedule of Limited Liability Company Interests |
| ANNEX R | Schedule of Partnership Interests |
| ANNEX S | Form of Agreement Regarding Uncertificated Securities, Limited Liability Company Interests and Partnership Interests |
| ANNEX T | Schedule of Chattel Paper, Instruments and Certificated Securities |
| ANNEX U | Schedule of Securities Accounts and Commodity Accounts |
| ANNEX V | Schedule of Motor Vehicles and Equipment Subject to a Certificate of Title |

FORM OF

SOLVENCY CERTIFICATE

To the Administrative Agent and each of the Lenders
party to the Loan Agreement referred to below:

I, the undersigned, the Chief Financial Officer of Lee Enterprises, Incorporated, a Delaware corporation (the "Borrower"), in that capacity only and not in my individual capacity, do hereby certify as of the date hereof that:

1.      This Certificate is furnished to the Administrative Agent and the Lenders pursuant to Section 6.14(i) of the Second Lien Loan Agreement, dated as of the date hereof (the "Loan Agreement"), among the Borrower, the lenders from time to time party thereto (each, a "Lender" and, collectively, the "Lenders"), Deutsche Bank Securities Inc. and Goldman Sachs Lending Partners LLC, as Joint Lead Arrangers and Joint Book Running Managers,  and Wilmington Trust, National Association, as Administrative Agent.  Unless otherwise defined herein, capitalized terms used in this solvency certificate (this "Certificate") shall have the meanings set forth in the Loan Agreement.

2.      For purposes of this Certificate, the terms below shall have the following definitions:

(a)      "does or do not have Unreasonably Small Capital"

For the period from the date hereof through the stated maturity of all New Financing, each of the Borrower (on a stand-alone basis) and the Borrower and its Subsidiaries (taken as a whole), as the case may be, after the incurrence, issuance or assumption of all Indebtedness (including the Loans) being incurred, issued or assumed and Liens of such Person or of such group of Persons existing or created, as the case may be, on the Effective Date, has or have sufficient capital with which to conduct its or their respective businesses.

(b)      "Fair Value"

The amount at which the assets (both tangible and intangible), in their entirety, of each of the Borrower (on a stand-alone basis) and the Borrower and its Subsidiaries (taken as a whole), as the case may be, would change hands between a willing buyer and a willing seller, within a commercially reasonable period of time, each having reasonable knowledge of the relevant facts, with neither being under any compulsion to act.

(c)      "Identified Contingent Liabilities"

The maximum estimated amount of liabilities reasonably likely to result from pending litigation, asserted claims and assessments, guaranties, uninsured risks and other contingent liabilities (other than such contingent liabilities included within the term "Stated Liabilities") of each of the Borrower (on a stand-alone basis) and the Borrower and its Subsidiaries (taken as a whole), as the case may be, after giving effect to the transactions consummated on the Effective Date (including all fees and expenses related thereto but exclusive of such contingent liabilities to the extent reflected in Stated Liabilities), as identified and explained in terms of their nature and estimated magnitude by responsible officers of the Borrower and its Subsidiaries or that have been identified as such by an officer of the Borrower or any of its Subsidiaries, determined in accordance with GAAP.

(d)     "New Financing"

All Indebtedness incurred or to be incurred by the Borrower and its Subsidiaries under the Credit Documents, the First Lien Credit Documents (assuming the full utilization by the Borrower of the Commitments under (and as defined in) the First Lien Credit Agreement) and the Pulitzer Debt Documents, as applicable.

(e)     "Present Fair Salable Value"

The amount that could be obtained by an independent willing seller from an independent willing buyer if the assets of each of the Borrower (on a stand-alone basis) and the Borrower and its Subsidiaries (taken as a whole), as the case may be, are sold with reasonable promptness in an arm's-length transaction under present conditions for the sale of comparable business enterprises.

(f)     "Stated Liabilities"

The recorded liabilities (including contingent liabilities that would be recorded in accordance with GAAP) of each of the Borrower (on a stand-alone basis) and the Borrower and its Subsidiaries (taken as a whole), as the case may be, as of the date hereof after giving effect to the transactions consummated on the Effective Date, determined in accordance with GAAP consistently applied, together with the amount of the New Financing.

(g)     "will be able to pay its or their respective Stated Liabilities and Identified Contingent Liabilities as they mature or otherwise become payable"

For the period from the date hereof through the stated maturity of all New Financing, each of the Borrower (on a stand-alone basis) and the Borrower and its Subsidiaries (taken as a whole), as the case may be, will have sufficient assets and cash flow to pay its or their respective Stated

Liabilities and Identified Contingent Liabilities as those liabilities mature or otherwise become payable.

3.    For purposes of this Certificate, I, or officers of the Borrower and/or its Subsidiaries under my direction and supervision, have performed the following procedures as of and for the periods set forth below.

(a)    Reviewed the financial statements (including the pro forma financial statements) referred to in Section 8.05 of the Loan Agreement.

(b)    Made inquiries of certain officials of the Borrower and its Subsidiaries who have responsibility for financial and accounting matters regarding (i) the existence and amount of Identified Contingent Liabilities associated with the business of the Borrower and its Subsidiaries and (ii) whether the financial statements referred to in paragraph (a) above are in conformity with GAAP applied on a basis consistent with that of the Borrower's audited financial statements for the Borrower's fiscal year ended September 25, 2011.

(c)    Reviewed to my satisfaction the Credit Documents, the First Lien Credit Documents and the Pulitzer Debt Documents and the respective Schedules, Annexes and Exhibits thereto.

(d)    With respect to Identified Contingent Liabilities:

1.    inquired of certain officials of the Borrower and/or its Subsidiaries who have responsibility for legal, financial and accounting matters as to the existence and estimated liability with respect to all contingent liabilities associated with the business of the Borrower and its Subsidiaries;

2.    confirmed with officers of the Borrower and/or its Subsidiaries that, to the best of such officers' knowledge, (i) all appropriate items were included in Stated Liabilities or Identified Contingent Liabilities and that (ii) the amounts relating thereto were the maximum estimated amount of liabilities reasonably likely to result therefrom as of the date hereof; and

3.    to the best of my knowledge, in making the certification set forth in paragraph 4 below, considered all material Identified Contingent Liabilities that may arise from any pending litigation, asserted claims and assessments, guarantees, uninsured risks and other Identified Contingent Liabilities of the Borrower and its Subsidiaries (exclusive of such Identified Contingent Liabilities to the extent reflected in Stated Liabilities) and with respect to each such Identified Contingent Liability the estimable maximum amount of liability with respect thereto was used in making such certification.

(e)     Made inquiries of certain officers of the Borrower and/or its Subsidiaries who have responsibility for financial reporting and accounting matters regarding whether they were aware of any events or conditions that, as of the date hereof, would cause either Borrower (on a stand-alone basis) or the Borrower and its Subsidiaries (taken as a whole), as the case may be, after giving effect to the consummation of the financing transactions (including the incurrence of the New Financing), to (i) have assets with a Fair Value or Present Fair Salable Value that are less than the sum of its or their Stated Liabilities and Identified Contingent Liabilities; (ii) have Unreasonably Small Capital; or (iii) not be able to pay its or their respective Stated Liabilities and Identified Contingent Liabilities as they mature or otherwise become payable.

(f)     Had the Projections relating to the Borrower and/or its Subsidiaries which have been previously delivered to the Administrative Agent and the Lenders, prepared under my direction based on good faith estimates and assumptions, and have re-examined the Projections on the date hereof and considered the effect thereon of any changes since the date of the preparation thereof on the results projected therein.  After such review, I hereby certify that in my opinion the Projections are (and remain) reasonable and attainable (it being recognized by the Lenders that such projections of future events are not to be viewed as facts and that actual results during the period or periods covered by any such Projections may differ from the projected results contained therein) and the Projections support the conclusions contained in paragraph 4 below.

4.     Based on and subject to the foregoing, I hereby certify on behalf of the Borrower that, on and as of the date hereof and after giving effect to the consummation of the financing transactions (including the incurrence of the New Financing), it is my opinion that (i) the Fair Value and Present Fair Salable Value of the assets of each of the Borrower (on a stand-alone basis) and the Borrower and its Subsidiaries (taken as a whole), as the case may be, exceed its or their respective Stated Liabilities and Identified Contingent Liabilities; (ii) each of the Borrower (on a stand-alone basis) and the Borrower and its Subsidiaries (taken as a whole), as the case may be, do not have Unreasonably Small Capital; and (iii) each of the Borrower (on a stand-alone basis) and the Borrower and its Subsidiaries (taken as a whole), as the case may be, intends to and believes that it will be able to pay its or their respective Stated Liabilities and Identified Contingent Liabilities as they mature or otherwise become payable.

5.     The Borrower does not intend, in consummating the transactions contemplated by the New Financing, to delay, hinder, or defraud either present or future creditors.

IN WITNESS WHEREOF, the undersigned has set his hand this [__] day of [____].

LEE ENTERPRISES, INCORPORATED

By: _____
    Name:
    Title:

<u>EXHIBIT K</u>
**TO SECOND LIEN LOAN AGREEMENT**

FORM OF

FORM OF COMPLIANCE CERTIFICATE

This compliance certificate (this "<u>Compliance Certificate</u>") is delivered to you pursuant to Section 9.01(e) of the Second Lien Loan Agreement, dated as of [_____] (as amended, supplemented or modified from time to time, the "<u>Loan Agreement</u>"), among Lee Enterprises, Incorporated (the "<u>Borrower</u>"), the lenders from time to time party thereto, Deutsche Bank Securities Inc. and Goldman Sachs Lending Partners LLC, as Joint Lead Arrangers and Joint Book Running Managers, and Wilmington Trust, National Association, as Administrative Agent.  Terms defined in the Loan Agreement and not otherwise defined herein are used herein as therein defined.

1.    I am the duly elected, qualified and acting [insert Title of Authorized Officer] of the Borrower.

2.    I have reviewed and am familiar with the contents of this Compliance Certificate.  I am providing this Compliance Certificate solely in my capacity as an officer of the Borrower.  The matters set forth herein are true to the best of my knowledge after due inquiry.

3.    I have reviewed the terms of the Loan Agreement and the other Credit Documents and have made or caused to be made under my supervision a review in reasonable detail of the transactions and condition of the Borrower and its Subsidiaries during the accounting period covered by the financial statements attached hereto as ANNEX 1 (the "<u>Financial Statements</u>").  Such review did not disclose the existence during or at the end of the accounting period covered by the Financial Statements, and I have no knowledge of the existence, as of the date of this Compliance Certificate, of any condition or event which constitutes a Default or an Event of Default [, except as set forth below:].

4.    Attached hereto as ANNEX 2 are the computations showing (in reasonable detail) compliance with the covenants specified therein.

5.    Attached hereto as ANNEX 3 is the information required by Section 9.01(e)(ii) of the Loan Agreement as of the date of this Compliance Certificate and the Borrower and its Subsidiaries have taken all actions required to be taken by them pursuant to the Security Documents in connection with the information set forth on ANNEX 3.

6.    Attached hereto as ANNEX 4 is the information required to establish compliance with Section 10.02(iv) of the Loan Agreement for the period of four consecutive fiscal quarters of the Borrower last ended (taken as one accounting period).

IN WITNESS WHEREOF, I have executed this Compliance Certificate this [____] day of [_____, _____].

LEE ENTERPRISES, INCORPORATED

By: _____
    Name:
    Title:

<div align="right">

ANNEX 1
TO COMPLIANCE CERTIFICATE

</div>

Applicable Financial Statements

(*To Be Attached*)

The information described herein is as of _____ __, ____ (the "Computation Date") and pertains to (i) in the case of items I.A below, I.C below and I.D. below, the respective amounts outstanding as of the Computation Date, (ii) in the case of items I.B below and I.D. (iv) and (viii) below, the period from [the Effective Date] [_____ __, ____][1] through the last day of the Computation Date.

I.      Negative and Financial Covenants

        A.      Liens (Section 10.01)

                Section                                        Amount

        (i)     10.01(x)                                       $_____

        (ii)    10.01(xii)                                     $_____

        (iii)   10.01(xvii)                                    $_____

        B.      Dividends (Section 10.03)

                Section                                        Amount

        (i)     10.03(iii)                                     $_____

        C.      Indebtedness (Section 10.04)

                Section                                        Amount

        (i)     10.04(iv)                                      $_____

        (ii)    10.04(viii)                                    $_____

        (iii)   10.04(xii)                                     $_____

                                                               $_____

        D.      Investments (Section 10.05)

                Section                                        Amount

        (i)     10.05(v)                                       $_____

---

[1]     Insert the first day of the Borrower's fiscal year (beginning with the first day of its fiscal year commencing closest to [___]).

|       |              |          |
|-------|--------------|----------|
| (ii)  | 10.05(viii)  | $_____   |
| (iii) | 10.05(xiv)   | $_____   |
| (iv)  | 10.05(xv)    | $_____   |
| (v)   | 10.05(xvi)   | $_____   |
| (vi)  | 10.05(xvii)  | $_____   |
| (vii) | 10.05(xviii) | $_____   |
| (viii)| 10.05(xix)   | $_____   |

E. Capital Expenditures (Section 10.07)

| | Section | Amount |
|---|---------|--------|
| (i)   | Capital Expenditures under Section 10.07(a) | $_____ |
| (ii)  | Capital Expenditures under Section 10.07(b) | $_____ |
| (iii) | Capital Expenditures under Section 10.07(c) | $_____ |

Changes to Annexes to Security Documents

[Specify in reasonable detail any changes to the Annexes to each of the Pledge Agreement and the Security Agreement, in each case since the Effective Date or, if later, since the date of the most recent compliance certificate delivered pursuant to Section 9.01(e) of the Loan Agreement, but only to the extent that such changes are required to be reported to the Collateral Agent pursuant to the terms of the Security Documents.]

Asset Sales

| Section 10.02(iv) | Amount |
|---|---|
| (a) Consolidated EBITDA of the Borrower and its Subsidiaries generated by all assets sold during the covenant fiscal year of the Borrower | $_____ |
| (b) Consolidated EBITDA of the Borrower and its Subsidiaries for the immediately preceding fiscal year of the Borrower | $_____ |
| (c) Result of line (a) divided by line (b) (expressed as a percentage) | _____% |

EXHIBIT L
TO SECOND LIEN LOAN AGREEMENT

FORM OF ASSIGNMENT
AND
ASSUMPTION AGREEMENT[1]

      This Assignment and Assumption Agreement (this "Assignment"), is dated as of the Effective Date set forth below and is entered into by and between [the][each] Assignor identified in item [1][2] below ([the] [each, an] "Assignor") and [the] [each] Assignee identified in item 2 below ([the] [each, an] "Assignee").  [It is understood and agreed that the rights and obligations of such [Assignees][and Assignors] hereunder are several and not joint.] Capitalized terms used herein but not defined herein shall have the meanings given to them in the Loan Agreement identified below (as amended, restated, supplemented and/or otherwise modified from time to time, the "Loan Agreement").  The Standard Terms and Conditions for Assignment and Assumption Agreement set forth in Annex 1 hereto (the "Standard Terms and Conditions") are hereby agreed to and incorporated herein by reference and made a part of this Assignment as if set forth herein in full.

      For an agreed consideration, [the][each] Assignor hereby irrevocably sells and assigns to [the] [each] Assignee, and [the] [each] Assignee hereby irrevocably purchases and assumes from [the][each] Assignor, subject to and in accordance with the Standard Terms and Conditions and the Loan Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below, the interest in and to all of [the][each] Assignor's rights and obligations under the Loan Agreement and any other documents or instruments delivered pursuant thereto that represents the amount and percentage interest identified below of all of the [respective] Assignor's outstanding rights and obligations under the respective Tranches identified below ([the] [each, an] "Assigned Interest").  [Each] [Such] sale and assignment is without recourse to [the][any] Assignor and, except as expressly provided in this Assignment, without representation or warranty by [the][any] Assignor.

[1.     Assignor:     _____

2.     Assignee:     _____][2]

[1][3].  Loan Agreement:     Second Lien Loan Agreement, dated as of [____], among Lee Enterprises, Incorporated (the "Borrower"), the lenders from time to time party thereto, Deutsche Bank Securities Inc. and Goldman Sachs Lending Partners LLC, as Joint Lead Arrangers and Joint Book Running Managers, and Wilmington Trust, National Association, as Administrative Agent.

[2.     Assigned Interest:[3]

---

[1]   This Form of Assignment and Assumption Agreement should be used by Lenders for an assignment to a single Assignee or to funds managed by the same or related investment managers.

[2]   If the form is used for a single Assignor and Assignee, items 1 and 2 should list the Assignor and the Assignee, respectively.  In the case of an assignment to funds managed by the same or related investment managers, or an assignment by multiple Assignors, the Assignors and the Assignee(s) should be listed in the table under bracketed item 2 below.

| Assignor | Assignee | Aggregate Amount of Loans for all Lenders | Amount of Loans Assigned |
|---|---|---|---|
| [Name of Assignor] | [Name of Assignee] | _____ | _____ |
| [Name of Assignor] | [Name of Assignee] | [_____] | [_____] |

[4.    Assigned Interest:[4]

Effective Date _____, ____, ____.

**Assignor[s] Information**                    **Assignee[s] Information**

Payment Instructions:    _____    Payment Instructions: _____

_____    _____

_____    _____

_____    _____

Reference:_____    Reference:_____

Notice Instructions:    _____    Notice Instructions:    _____

_____    _____

_____    _____

_____    _____

Reference:_____    Reference:_____

---

[3]    Insert this chart if this Form of Assignment and Assumption Agreement is being used for assignments to funds managed by the same or related investment managers or for an assignment by multiple Assignors. Insert additional rows as needed.

[4]    Insert this chart if this Form of Assignment and Assumption Agreement is being used by a single Assignor for an assignment to a single Assignee.

The terms set forth in this Assignment are hereby agreed to:

ASSIGNOR                                ASSIGNEE
[NAME OF ASSIGNOR]                      [NAME OF ASSIGNEE][5]

By:_____             By:_____
   Name:                                      Name:
   Title:                                     Title:

[[Consented to and][6] Accepted:

WILMINGTON TRUST, NATIONAL ASSOCIATION,
   as Administrative Agent

By:_____
   Name:
   Title:

---

[5]    Add additional signature blocks, as needed, if this Form of Assignment and Assumption Agreement is being used by funds managed by the same or related investment managers.

[6]    [Insert only if assignment is being made to an Eligible Transferee pursuant to Section 13.04(b)(y) of the Loan Agreement.  Consent of the Administrative Agent shall not be unreasonably withheld or delayed.]

STANDARD TERMS AND CONDITIONS FOR ASSIGNMENT
AND ASSUMPTION AGREEMENT

1.    Representations and Warranties.

1.1.    Assignor.  [The] [Each] Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of [the] [its] Assigned Interest, (ii) [the] [its] Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with any Credit Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Agreement, any other Credit Document or any other instrument or document delivered pursuant thereto (other than this Assignment) or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or affiliates or any other Person obligated in respect of any Credit Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or affiliates or any other Person of any of their respective obligations under any Credit Document.

1.2.    Assignee.  [The] [Each] Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby and to become a Lender under the Loan Agreement, (ii) confirms that it is (A) a Lender, (B) a parent company and/or an affiliate of [the][each] Assignor which is at least 50% owned by [the][each] Assignor or its parent company, (C) an affiliate of any Lender which is at least 50% owned by such other Lender or its parent company (provided that any fund that invests in loans and is managed or advised by the same investment advisor of another fund which is a Lender (or by an Affiliate of such investment advisor) shall be treated as an affiliate of such other Lender for the purposes of this clause), (D) a fund that invests in loans and is managed or advised by the same investment advisor of any Lender or by an Affiliate of such investment advisor or (E) an Eligible Transferee under Section 13.04(b) of the Loan Agreement; (iii) from and after the Effective Date, it shall be bound by the provisions of the Loan Agreement and, to the extent of [the][its] Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Loan Agreement, together with copies of the most recent financial statements delivered pursuant to Section 9.01 thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and to purchase [the][its] Assigned Interest on the basis of which it has made such analysis and decision and (v) if it is organized under the laws of a jurisdiction outside the United States, it has attached to this Assignment any tax documentation required to be delivered by it pursuant to the terms of the Loan Agreement, duly completed and executed by it; (b) agrees that it will, independently and without reliance upon the Administrative Agent, [the][each] Assignor, or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Agreement; (c) appoints and authorizes each of the Administrative Agent and the Collateral Agent, and to take such action as agent on its behalf and to exercise such powers under the Loan Agreement and the other Credit Documents as are delegated to or otherwise conferred upon the Administrative Agent and/or the Collateral Agent, as the case may be, by the terms thereof,

together with such powers as are reasonably incidental thereto; and (d) agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Credit Documents are required to be performed by it as a Lender.

2.    Payment.    From and after the Effective Date, the Administrative Agent shall make all payments in respect of [the] [each] Assigned Interest (including payments of principal, interest, fees, commissions and other amounts) to [the][each] Assignor for amounts which have accrued to but excluding the Effective Date and to [the] [each] Assignee for amounts which have accrued from and after the Effective Date.

3.    Effect of Assignment.    Upon the delivery of a fully executed original hereof to the Administrative Agent, as of the Effective Date, (i) [the][each] Assignee shall be a party to the Loan Agreement and, to the extent provided in this Assignment, have the rights and obligations of a Lender thereunder and under the other Credit Documents and (ii) [the][each] Assignor shall, to the extent provided in this Assignment, relinquish its rights and be released from its obligations under the Loan Agreement and the other Credit Documents.

4.    General Provisions.    This Assignment shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment by telecopy shall be effective as delivery of a manually executed counterpart of the Assignment.    THIS ASSIGNMENT SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK (INCLUDING, WITHOUT LIMITATION, SECTION 5.1401 OF THE GENERAL OBLIGATIONS LAW).

*        *        *

<u>EXHIBIT M-1</u>
**TO SECOND LIEN LOAN AGREEMENT**

FORM OF

<u>INTERCOMPANY NOTE FOR THE LEE ENTITIES</u>

New York, New York

_____ __, ____

FOR VALUE RECEIVED, _____, a [_____ [corporation]] (the "<u>Payor</u>"), hereby promises to pay [on demand] [on [DATE]] to the order of _____, or its assigns (the "<u>Payee</u>"), in lawful money of the United States of America in immediately available funds, at such location in the United States of America as the Payee shall from time to time designate, the unpaid principal amount of all loans and advances made by the Payee to the Payor.

The Payor also promises to pay interest on the unpaid principal amount hereof in like money at said location from the date hereof until paid at such rate per annum as shall be agreed upon from time to time by the Payor and the Payee.

Upon the earlier to occur of (x) the commencement of any bankruptcy, reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar proceeding of any jurisdiction relating to the Payor or (y) any exercise of remedies pursuant to (i) Section 11 of the Lee Credit Agreement referred to below (including the termination of the Total Commitment) or (ii) Section 11 of the Second Lien Loan Agreement referred to below the unpaid principal amount hereof shall become immediately due and payable without presentment, demand, protest or notice of any kind in connection with this Note.

This Note is one of the Intercompany Notes referred to in (i) the Exit Credit Agreement, dated as of [____], among Lee Enterprises, Incorporated, the lenders from time to time party thereto, Deutsche Bank Securities Inc. and Goldman Sachs Lending Partners LLC, as Joint Lead Arrangers and Joint Book Running Managers, and Deutsche Bank Trust Company Americas, as Administrative Agent and Collateral Agent (as amended, restated, modified and/or supplemented from time to time, the "<u>Lee Credit Agreement</u>") and (ii) the Second Lien Loan Agreement, dated as of [___], among Lee Enterprises, Incorporated, Wilmington Trust, National Association, as Administrative Agent and the lenders from time to time party thereto, and Deutsche Bank Securities Inc. and Goldman Sachs Lending Partners LLC, as Joint Lead Arrangers and Joint Book Running Managers (as amended, restated, modified and/or supplemented from time to time, the "<u>Second Lien Loan Agreement</u>").

The Payee is hereby authorized (but shall not be required) to record all loans and advances made by it to the Payor (all of which shall be evidenced by this Note), and all repayments or prepayments thereof, in its books and records, such books and records constituting *prima facie* evidence of the accuracy of the information contained therein.

This Note, and all of obligations of the Payor hereunder, shall be subordinate and junior in right of payment to all Senior Indebtedness (as defined in the Intercompany Subordination Agreements referred to in each of the Lee Credit Agreement and the Second Lien Loan Agreement) as, and to the extent required by, such Intercompany Subordination Agreements.

All payments under this Note shall be made without offset, counterclaim or deduction of any kind.

The Payor hereby waives presentment, demand, protest or notice of any kind in connection with this Note.

**THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK.**

[NAME OF PAYOR]

By:_____
    Name:
    Title:

Pay to the order of

_____

[NAME OF PAYEE]

By:_____
    Name:
    Title:

<div align="right">

EXHIBIT M-2
TO SECOND LIEN LOAN AGREEMENT

</div>

<div align="center">

FORM OF

INTERCOMPANY NOTE  FOR THE PULITZER ENTITIES]

</div>

<div align="right">

New York, New York

_____ __, ____

</div>

FOR  VALUE  RECEIVED,  _____,  a  [_____  [corporation]]  (the  "Payor"),
hereby promises to pay [on demand] [on [DATE]] to the order of _____, or its assigns (the
"Payee"), in lawful money of the United States of America in immediately available funds, at
such location in the United States of America as the Payee shall from time to time designate, the
unpaid principal amount of all loans and advances made by the Payee to the Payor.

The Payor also promises to pay interest on the unpaid principal amount hereof in
like money at said location from the date hereof until paid at such rate per annum as shall be
agreed upon from time to time by the Payor and the Payee.

Upon  the  earlier  to  occur  of  (x) the  commencement  of  any  bankruptcy,
reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or
liquidation or similar proceeding of any jurisdiction relating to the Payor or (y) any exercise of
remedies pursuant to (i) Section 11 of the Second Lien Loan Agreement referred to below or (ii)
Paragraph 8 of the Pulitzer Debt Agreement referred to below, the unpaid principal amount
hereof shall become immediately due and payable without presentment, demand, protest or
notice of any kind in connection with this Note.

This Note is one of the Intercompany Notes referred to in (i) the Second Lien
Loan Agreement, dated as of [___], among Lee Enterprises, Incorporated, Wilmington Trust,
National Association, as Administrative Agent and the lenders from time to time party thereto,
and Deutsche Bank Securities Inc. and Goldman Sachs Lending Partners LLC, as Joint Lead
Arrangers  and  Joint  Book  Running  Managers  (as  amended,  restated,  modified  and/or
supplemented from time to time, the "Second Lien Loan Agreement") and (ii) the Note
Agreement, dated as of [___], among St. Louis Post-Dispatch LLC and the purchasers party
thereto (as amended, restated, modified and/or supplemented from time to time, the "Pulitzer
Debt Agreement")[1], and is subject to the terms thereof.

The Payee is hereby authorized (but shall not be required) to record all loans and
advances made by it to the Payor (all of which shall be evidenced by this Note), and all
repayments or prepayments thereof, in its books and records, such books and records constituting
*prima facie* evidence of the accuracy of the information contained therein.

---

[1]    To be reconciled with the Subordinated Intercompany Note referred to in the Pulitzer Debt Agreement upon
review of the proposed Pulitzer Debt Documents.

<u>EXHIBIT M-2</u>
TO SECOND LIEN LOAN AGREEMENT

This Note, and all of obligations of the Payor hereunder, shall be subordinate and junior in right of payment to all Senior Indebtedness (as defined in the Intercompany Subordination Agreements referred to in each of the the Second Lien Loan Agreement and the Pulitzer Debt Agreement) as, and to the extent required by, such Intercompany Subordination Agreements.

All payments under this Note shall be made without offset, counterclaim or deduction of any kind.

The Payor hereby waives presentment, demand, protest or notice of any kind in connection with this Note.

**THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK.**

[NAME OF PAYOR]

By:_____
    Name:
    Title:

Pay to the order of

_____

[NAME OF PAYEE]

By:_____
    Name:
    Title:

DRAFT 11/30/2011

## INTERCREDITOR AGREEMENT

Intercreditor Agreement (this "**Agreement**"), dated as of [_____], 2012, among THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., as Collateral Agent (in such capacity, with its successors and assigns, and as more specifically defined below, the "**First Priority Representative**") for the First Priority Secured Parties (as defined below), WILMINGTON TRUST, NATIONAL ASSOCIATION, as Collateral Agent (in such capacity, with its successors and assigns, and as more specifically defined below, the "**Second Priority Representative**") for the Second Priority Secured Parties (as defined below), ST. LOUIS POST-DISPATCH LLC (the "**Borrower**") and each of the other Loan Parties (as defined below) party hereto.

WHEREAS, the Borrower and certain financial institutions and other entities are parties to that certain Note Agreement dated as of May 1, 2000, as amended by (i) Amendment No. 1 to Note Agreement dated as of November 23, 2004, (ii) Amendment No. 2 to Note Agreement dated as of February 1, 2006, (iii) Amendment No. 3 to Note Agreement dated as of November 19, 2008, (iv) the Limited Waiver to Note Agreement and Guaranty Agreement (as amended), dated as of December 26, 2008, (v) Amendment No. 4 and First Amendment to Limited Waiver to Note Agreement and Guaranty Agreement, dated as of January 16, 2009, (vi) that certain Limited Waiver and Amendment No. 5 to Note Agreement dated as of February 18, 2009, (vii) Amendment No. 6 to Note Agreement dated as of April 6, 2011, and (viii) Amendment No. 7 to Note Agreement dated as of November 7, 2011, pursuant to which the Borrower issued and sold adjustable rate senior notes (collectively, the "**Exchanged Notes**");

WHEREAS, the Borrower and each of the holders of the Exchanged Notes are entering into that certain Note Agreement, dated as of the date hereof (as amended, supplemented, amended and restated or otherwise modified from time to time except as expressly prohibited hereby, the "**Existing First Priority Agreement**"), pursuant to which the Exchanged Notes are being exchanged for new adjustable rate senior notes of the Borrower (as amended, supplemented, amended and restated or otherwise modified from time to time, the "**Notes**");

WHEREAS, Lee Enterprises, Incorporated (the indirect parent of the Borrower, "**Lee**"), the Second Priority Representative and certain financial institutions and other entities are parties to the Second Lien Loan Agreement, dated as of the date hereof (as amended, supplemented, amended and restated or otherwise modified from time to time, the "**Second Priority Term Loan Agreement**"), pursuant to which such financial institutions and other entities have agreed to make (or be deemed to have made) loans to Lee;

WHEREAS, the Borrower is the obligor, and Pulitzer Inc. ("**Pulitzer**") and the other Loan Parties are the guarantors, of the First Priority Obligations and the Loan Parties have granted to the First Priority Representative security interests in the Common Collateral as security for payment and performance of the First Priority Obligations;

WHEREAS, pursuant to that certain Subsidiaries Guaranty, dated as of the date hereof (as amended, supplemented, amended and restated or otherwise modified from time to time except as expressly prohibited hereby, the "**Second Priority Guaranty Agreement**"), the Loan Parties (and certain other subsidiaries of Lee which are not Loan Parties and are not subject to the arrangements hereunder) have guaranteed the obligations under the Second Priority Term Loan Agreement and pursuant to the Second Priority Security Documents the Loan Parties have granted to the Second Priority Representative junior security interests in the Common Collateral as security for payment and performance of the Second Priority Obligations; and

WHEREAS, the First Priority Creditors under the Existing First Priority Agreement have agreed to permit the grant of such junior security interests in the Common Collateral on the terms and conditions of this Agreement.

NOW THEREFORE, in consideration of the foregoing and the mutual covenants herein contained and other good and valuable consideration, the existence and sufficiency of which are expressly recognized by all of the parties hereto, the parties agree as follows:

**SECTION 1**. *Definitions.*

1.1.    <u>Defined Terms</u>.  The following terms, as used herein, have the following meanings:

"**Agreement**" has the meaning set forth in the introductory paragraph hereof.

"**Bankruptcy Code**" means the United States Bankruptcy Code (11 U.S.C. §101 et seq.), as amended from time to time.

"**Borrower**" has the meaning set forth in the introductory paragraph hereof.

"**Common Collateral**" means all assets that are both First Priority Collateral and Second Priority Collateral.

"**Comparable Second Priority Security Document**" means, in relation to any Common Collateral subject to any First Priority Security Document, that Second Priority Security Document that creates a security interest in the same Common Collateral, granted by the same Loan Party, as applicable.

"**DIP Financing**" has the meaning set forth in Section 5.2.

"**Enforcement Action**" means, with respect to the First Priority Obligations or the Second Priority Obligations the exercise of any rights and remedies with respect to any Common Collateral securing such obligations or the commencement or prosecution of enforcement of any of the rights and remedies with respect to the Common Collateral under, as applicable, the First Priority Documents or the Second Priority Documents, or applicable law, including without limitation (a) the exercise of any rights of set-off or recoupment, (b) the exercise of any rights or remedies of a secured creditor under the Uniform Commercial Code of any applicable jurisdiction or under the Bankruptcy Code, and (c) the commencement of any judicial or nonjudicial foreclosure proceedings with respect to, attempting any action to take possession of any Common Collateral, exercising any right, remedy or power with respect to, or otherwise taking any action to enforce their interest in or realize upon, the Common Collateral.

"**Exchanged Notes**" has the meaning set forth in the recitals to this Agreement.

"**Existing First Priority Agreement**" has the meaning set forth in the recitals to this Agreement.

"**First Priority Agreement**" means the collective reference to (a) the Existing First Priority Agreement, (b) any other credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement or instrument evidencing or governing the terms of any indebtedness or other financial accommodation that has been incurred to extend, increase, renew, refund, replace (whether upon or after termination or otherwise) or refinance (including by means of sales of debt securities to institutional investors) in whole or in part from time to time the indebtedness and other obligations outstanding under

the Existing First Priority Agreement, the Notes or any other agreement or instrument referred to in this clause (b) unless such agreement or instrument expressly provides that it is not intended to be and is not a First Priority Agreement hereunder (a "**Replacement First Priority Agreement**").  Any reference to the First Priority Agreement hereunder shall be deemed a reference to any First Priority Agreement then extant.

"**First Priority Collateral**" means all assets, whether now owned or hereafter acquired by the Borrower or any other Loan Party, in which a Lien is granted or purported to be granted to any First Priority Secured Party as security for any First Priority Obligation.

"**First Priority Creditors**" means the holders of the Notes or any other First Priority Obligations under the First Priority Documents.

"**First Priority Documents**" means the First Priority Agreement, the Notes, each First Priority Security Document and each First Priority Guaranty.

"**First Priority Guaranty**" means any guaranty by any Loan Party of any or all of the First Priority Obligations.

"**First Priority Lien**" means any Lien created by the First Priority Security Documents.

"**First Priority Obligations**" means (a) with respect to the Existing First Priority Agreement, all "Secured Obligations" of each Loan Party as defined in the First Priority Security Documents and (b) with respect to each other First Priority Document, (i) all principal of, and interest (including without limitation any Post-Petition Interest), yield-maintenance amounts (if any) and premium (if any) on, all loans made or other indebtedness issued or incurred pursuant to the First Priority Agreement, (ii) all reimbursement obligations (if any) and interest thereon (including without limitation any Post-Petition Interest) with respect to any letter of credit or similar instruments issued pursuant to the First Priority Agreement, (iii) all Hedging Obligations and (iv) all guarantee obligations of, or fees, expenses and other amounts payable by any Loan Party, from time to time pursuant to the First Priority Documents, in each case whether or not allowed or allowable in an Insolvency Proceeding.  To the extent any payment with respect to any First Priority Obligation (whether by or on behalf of any Loan Party, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any Second Priority Secured Party, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of this Agreement and the rights and obligations of the First Priority Secured Parties and the Second Priority Secured Parties, be deemed to be reinstated and outstanding as if such payment had not occurred.

Notwithstanding the foregoing contained in this defined term of First Priority Obligations, if the sum of (1) the principal amount outstanding under the Existing First Priority Agreement and each other First Priority Agreement, plus (2) the aggregate undrawn face amount of any outstanding letters of credit under the Existing First Priority Agreement and each other First Priority Agreement and any unreimbursed drawings of any letters of credit issued under the Existing First Priority Agreement and each other First Priority Agreement (such sum, the "**First Priority Outstanding Amount**") exceeds  the Maximum First Priority Amount, then only that portion of the First Priority Outstanding Amount equal to the Maximum First Priority Amount shall be included in First Priority Obligations and interest, yield-maintenance amounts and reimbursement obligations with respect to the First Priority Outstanding

Amount shall only constitute First Priority Obligations to the extent related to the First Priority Outstanding Amount.

"**First Priority Obligations Payment Date**" means the first date on which (a) the First Priority Obligations (other than those that constitute Unasserted Contingent Obligations) have been paid in cash in full (or cash collateralized or defeased in accordance with the terms of the First Priority Documents), (b) all commitments to extend credit under the First Priority Documents have been terminated or expired, (c) there are no outstanding letters of credit or similar instruments issued under the First Priority Documents (other than such as have been cash collateralized or defeased in accordance with the terms of the First Priority Documents, but in no event greater than 105% of the aggregate undrawn face amount thereof) and (d) the First Priority Representative shall have either (x) delivered  written notice to the Second Priority Representative or any other Second Priority Secured Party of the occurrence of the events described in clauses (a), (b) and (c) hereinabove or (y) failed to timely comply with its notice obligation under Section 3.9 hereof.

"**First Priority Outstanding Amount**" has the meaning set forth in the definition of "First Priority Obligations".

"**First Priority Representative**" has the meaning set forth in the introductory paragraph hereof. In the case of any Replacement First Priority Agreement, the First Priority Representative shall be the Person identified as such in such Agreement.

"**First Priority Secured Parties**" means the First Priority Representative, the First Priority Creditors and any other holders of the First Priority Obligations.

"**First Priority Security Documents**" means the "Collateral Documents" as defined in the Existing First Priority Agreement (as in effect on the date hereof), and all other documents, instruments and agreements to which any Loan Party is a party from time to time which grant Liens in favor of the First Priority Representative to secure the First Priority Obligations.

"**Hedging Obligations**" means, with respect to any Loan Party, any monetary obligations of such Loan Party owed to any First Priority Creditor in respect of (i) any interest rate swap agreement, interest rate cap agreement, interest collar agreement, interest rate hedging agreement or other similar agreement or arrangement and (ii) any foreign exchange contracts, currency swap agreements, commodity agreements or other similar arrangements, or arrangements designed to protect against fluctuations in currency values or commodity prices, including, in each case, interest and Post-Petition Interest.

"**Insolvency Proceeding**" means any proceeding in respect of bankruptcy, insolvency, winding up, receivership, dissolution or assignment for the benefit of creditors, in each of the foregoing events whether under the Bankruptcy Code or any similar federal, state or foreign bankruptcy, insolvency, reorganization, receivership or similar law, in each case solely to the extent in respect of any Loan Party.

"**Lee**" has the meaning set forth in the recitals to this Agreement.

"**Lien**" means any mortgage, pledge, hypothecation, assignment, encumbrance, lien (statutory or other), or security interest or other security agreement of any kind (including, without limitation, any conditional sale or other title retention agreement, any financing or similar statement or notice filed under the Uniform Commercial Code or any other similar recording or notice statute, and any lease having

5

substantially the same effect as any of the foregoing), and any attachment or judgment lien contemplated in Section 3.3, in each case solely to the extent in respect of any asset of any Loan Party.

"**Loan Party**" means the Borrower, Pulitzer and each of their respective direct or indirect subsidiaries, in each case to the extent, and during such time as, such person is a party to any First Priority Security Document and any Second Priority Security Document.  All references in this Agreement to any Loan Party shall include such Loan Party as a debtor-in-possession and any receiver or trustee for such Loan Party in any Insolvency Proceeding.

"**Maximum First Priority Amount**" means (i) the aggregate principal amount of the Notes outstanding on the date hereof (after giving effect to the transactions contemplated to occur on the date hereof) under the Existing First Priority Agreement (which amount, for the avoidance of doubt, is $[_____]) or (ii) at any time following the repayment in full in cash of all outstanding obligations under the Existing First Priority Agreement and related First Priority Documents with the proceeds of Permitted Pulitzer Debt Refinancing Indebtedness (as defined in the Second Priority Term Loan Agreement), $150,000,000 <u>minus</u>, in each case of (i) and (ii), the aggregate amount of all payments of principal of (x) the Notes pursuant to the Existing First Priority Agreement and each other First Priority Agreement (including all such payments made on the date hereof), and (y) such Permitted Pulitzer Debt Refinancing Indebtedness.  For the avoidance of doubt, the amount of any DIP Financing shall not be included for purposes of determining the "Maximum First Priority Amount."

"**Notes**" has the meaning set forth in the recitals to this Agreement.

"**Person**" means any individual, partnership, joint venture, firm, corporation, association, trust or other enterprise or any government or political subdivision or any agency, department or instrumentality thereof.

"**Post-Petition Interest**" means any interest or entitlement to fees or expenses or other charges that accrues after the commencement of any Insolvency Proceeding, whether or not allowed or allowable in any such Insolvency Proceeding.

"**Pulitzer**" has the meaning set forth in the recitals to this Agreement.

"**Purchase**" has the meaning set forth in Section 3.6.

"**Purchase Notice**" has the meaning set forth in Section 3.6.

"**Purchase Price**" has the meaning set forth in Section 3.6.

"**Purchaser**" has the meaning set forth in Section 3.6.

"**Purchasing Parties**" has the meaning set forth in Section 3.6.

"**Replacement First Priority Agreement**" has the meaning set forth in the definition of "First Priority Agreement."

"**Second Priority Agreement**" means the collective reference to (a) the Second Priority Guaranty Agreement and (b) any guaranty to which any Loan Party is a party with respect to any other credit agreement, loan agreement, note agreement, promissory note, indenture, or other agreement or instrument

evidencing or governing the terms of any indebtedness (or guarantee thereof) or other financial accommodation that has been incurred to extend, increase, renew, refund, replace (whether upon or after termination or otherwise) or refinance (including by means of sales of debt securities to institutional investors) in whole or in part from time to time the indebtedness and other obligations outstanding (contingent or otherwise) under the Second Priority Term Loan Agreement or any other agreement or instrument referred to in this clause (b), provided that (i) the terms of any of the foregoing in this clause (b) are no less favorable to the Loan Parties than those set forth in the Second Priority Term Loan Agreement and (ii) the maximum aggregate principal amount of indebtedness (for the avoidance of doubt, not including interest, premium, yield-maintenance amounts, fees or reimbursement obligations (including expenses) payable in respect thereof, in each case including, without limitation, amounts capitalized in accordance with the First Priority Agreement and the Second Priority Agreement) which is guaranteed by any Loan Party as referenced in clauses (a) or (b) shall not exceed $175,000,000 or such greater amount as may then be expressly permitted by the First Priority Agreement.  Any reference to the Second Priority Agreement hereunder shall be deemed a reference to any Second Priority Agreement then extant.

"**Second Priority Collateral**" means all assets (whether now owned or hereafter acquired) of the Borrower or any other Loan Party in which a Lien is granted or purported to be granted to any Second Priority Secured Party as security for any Second Priority Obligation.

"**Second Priority Creditors**" means the "Secured Creditors" as defined in the Second Priority Security Documents, the "Lenders" as defined in each other Second Priority Agreement, or any Persons that are designated under the Second Priority Agreement as the "Second Priority Creditors" for purposes of this Agreement.

"**Second Priority Documents**" means the Second Priority Agreement and the Second Priority Security Documents.

"**Second Priority Guaranty Agreement**" has the meaning set forth in the recitals to this Agreement.

"**Second Priority Lien**" means any Lien created by the Second Priority Security Documents in respect of any assets of a Loan Party.

"**Second Priority Obligations**" means (a) with respect to the Second Priority Guaranty Agreement, all "Obligations" of each Loan Party as defined in the Second Priority Security Documents and (b) with respect to each other Second Priority Agreement, (i) all principal of, and interest (including without limitation any Post-Petition Interest), yield-maintenance amounts (if any) and premium (if any) on, all indebtedness (contingent or otherwise) of any Loan Party under the Second Priority Agreement, and (ii) all guarantee obligations of, or fees, expenses and other amounts payable by, any Loan Party from time to time pursuant to the Second Priority Documents, in each case whether or not allowed or allowable in an Insolvency Proceeding.  To the extent any payment with respect to any Second Priority Obligation (whether by or on behalf of any Loan Party, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any First Priority Secured Party, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of this Agreement and the rights and obligations of the First Priority Secured Parties and the Second Priority Secured Parties, be deemed to be reinstated and outstanding as if such payment had not occurred.

"**Second Priority Representative**" has the meaning set forth in the introductory paragraph hereof, but shall also include any Person identified as a "Second Priority Representative" in any Second Priority Agreement other than the Second Priority Term Loan Agreement.

"**Second Priority Required Adequate Protection**" has the meaning set forth in Section 5.4.

"**Second Priority Secured Party**" means the Second Priority Representative, the Second Priority Creditors and any other holders of the Second Priority Obligations.

"**Second Priority Security Documents**" means the "Security Documents" (as defined in the Second Priority Term Loan Agreement as in effect on the date hereof) to which any Loan Party is party and all other documents, instruments and agreements to which any Loan Party is a party from time to time which grant Liens in favor of the Second Priority Representative to secure the Second Priority Obligations.

"**Second Priority Term Loan Agreement**" has the meaning set forth in the recitals to this Agreement.

"**Secured Parties**" means the First Priority Secured Parties and the Second Priority Secured Parties.

"**Standstill Period**" has the meaning set forth in Section 3.2.

"**Surviving Obligations**" has the meaning set forth in Section 3.6(b).

"**Unasserted Contingent Obligations**" shall mean, at any time, First Priority Obligations for taxes, costs, indemnifications, reimbursements, damages and other liabilities (excluding (a) the principal of, and interest, yield-maintenance amount and premium (if any) on, and fees and expenses relating to, any First Priority Obligation and (b) contingent reimbursement obligations in respect of amounts that may be drawn under outstanding letters of credit) in respect of which no assertion of liability (whether oral or written) and no claim or demand for payment (whether oral or written) has been made (and, in the case of First Priority Obligations for indemnification, no notice for indemnification has been issued by the indemnitee) at such time.

"**Uniform Commercial Code**" shall mean the Uniform Commercial Code as in effect from time to time in the applicable jurisdiction.

1.2      <u>Terms Generally</u>.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (i) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (to the extent applicable, in accordance with Section 6 hereof), (ii) any reference herein to any Person shall be construed to include such Person's successors or permitted assigns, (iii) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Sections shall be construed to refer to Sections of this Agreement and (v) the words

"asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

**SECTION 2**. *Lien Priorities.*

2.1    Subordination of Liens. (a)  Any and all Liens on assets of any Loan Party now existing or hereafter created or arising in favor of any Second Priority Secured Party securing the Second Priority Obligations, regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise are expressly junior in priority, operation and effect to any and all Liens on assets of any Loan Party now existing or hereafter created or arising in favor of the First Priority Secured Parties securing the First Priority Obligations, notwithstanding (i) anything to the contrary contained in any agreement or filing to which any Second Priority Secured Party may now or hereafter be a party, and regardless of the time, order or method of grant, attachment, recording or perfection of any financing statements or other security interests, assignments, pledges, deeds, mortgages and other liens, charges or encumbrances or any defect or deficiency or alleged defect or deficiency in any of the foregoing, (ii) any provision of the Uniform Commercial Code or any applicable law or any First Priority Document or Second Priority Document or any other circumstance whatsoever and (iii) the fact that any such Liens in favor of any First Priority Secured Party securing any of the First Priority Obligations are (x) subordinated to any Lien securing any obligation of any Loan Party other than the Second Priority Obligations or (y) otherwise subordinated, voided, avoided, invalidated or lapsed.

(b)  The First Priority Representative, on behalf of itself and the other First Priority Secured Parties, acknowledges and agrees that the Second Priority Representative on behalf of itself and the other Second Priority Secured Parties, has been granted Liens upon all of the Common Collateral, and the First Priority Representative, on behalf of itself and the other First Priority Secured Parties, hereby consents thereto.  The subordination of Liens on assets of any Loan Party by the Second Priority Representative in favor of the First Priority Representative shall not be deemed to subordinate such Liens of the Second Priority Representative (or any Second Priority Secured Party) to any Liens other than (x) the Liens of the First Priority Secured Parties securing the First Priority Obligations and (y) Liens that are permitted under the First Priority Documents to be senior to the First Priority Liens, and (z) Liens permitted pursuant to Section 5 hereof.

2.2    Nature of First Priority Obligations.  The Second Priority Representative on behalf of itself and the other Second Priority Secured Parties acknowledges that in the event the First Priority Obligations include debt that is revolving in nature the amount of First Priority Obligations that may be outstanding at any time or from time to time may be increased or reduced and subsequently reborrowed, and that the terms of the First Priority Obligations may be modified, extended or amended from time to time, and that the aggregate amount of the First Priority Obligations may be increased, replaced or refinanced, in each event, without notice to or consent by the Second Priority Secured Parties and without affecting the provisions hereof but only so long as any such obligations are permitted to be incurred pursuant to the terms hereof or of the Second Priority Documents as in effect on the date of this Agreement.  The lien priorities provided in Section 2.1 shall not be altered or otherwise affected by any such amendment, modification, supplement, extension, repayment, reborrowing, increase, replacement, renewal, restatement or refinancing of either the First Priority Obligations or the Second Priority Obligations, or any portion thereof.

2.3    Agreements Regarding Actions to Perfect Liens.  (a)  The Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties, agrees that each patent, trademark or copyright filing or other filings or recordings (other than Uniform Commercial Code

financing statements) filed or recorded by or on behalf of the Second Priority Representative in respect of applicable Common Collateral shall, to the extent reasonably practicable, contain the following notation: "The lien created hereby on the property described herein is junior and subordinate to the lien on such property created by any agreement, filing or recording now or hereafter granted to The Bank of New York Mellon Trust Company, N.A., as Collateral Agent (under the First Priority Documents), and its successors and assigns, in such property, in accordance with the provisions of the Intercreditor Agreement dated as of [_____], among THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A. as First Priority Representative, WILMINGTON TRUST, NATIONAL ASSOCIATION, as Second Priority Representative, ST. LOUIS POST-DISPATCH LLC, as Borrower, and the other Loan Parties referred to therein, as amended from time to time."

(b) The Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties, agrees that all mortgages, deeds of trust, deeds and similar instruments now or hereafter filed against real property comprising Common Collateral in favor of or for the benefit of the Second Priority Representative and the other Second Priority Secured Parties shall contain the following notation: "The lien created by this mortgage on the property described herein is junior and subordinate to the lien on such property created by any mortgage, deed of trust or similar instrument now or hereafter granted to The Bank of New York Mellon Trust Company, N.A., as Collateral Agent (under the First Priority Documents), and its successors and assigns, in such property, in accordance with the provisions of the Intercreditor Agreement dated as of [_____], among THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A. as First Priority Representative, WILMINGTON TRUST, NATIONAL ASSOCIATION, as Second Priority Representative, ST. LOUIS POST-DISPATCH LLC, and the other Loan Parties referred to therein, as amended from time to time."

(c) The First Priority Representative hereby acknowledges and agrees that, to the extent that it holds, or a third party holds on its behalf, physical possession of or "control" (as defined in the Uniform Commercial Code) over Common Collateral pursuant to the First Priority Security Documents, such possession or control is also for the benefit of, and the First Priority Representative or such third party holds such possession or control as bailee and agent for, the Second Priority Representative and the other Second Priority Secured Parties solely to the extent required to perfect their security interest in such Common Collateral (such bailment and agency for perfection being intended, among other things, to satisfy the requirements of Sections 8-301(a)(2) and 9-313(c) of the Uniform Commercial Code). Nothing in the preceding sentence shall be construed to impose any duty on the First Priority Representative (or any third party acting on its behalf) with respect to such Common Collateral or provide the Second Priority Representative or any other Second Priority Secured Party with any rights with respect to such Common Collateral beyond those specified in this Agreement and the Second Priority Security Documents, provided that as soon as practicable after the occurrence of the events described in clauses (a), (b) and (c) of the definition of the First Priority Obligations Payment Date, the First Priority Representative shall (i) deliver, at the Borrower's sole cost and expense, the Common Collateral in its possession or control together with any necessary endorsements (x) *first*, to the Second Priority Representative to the extent any Second Priority Obligations remain outstanding and (y) *second*, to the Borrower to the extent no First Priority Obligations or Second Priority Obligations remain outstanding, or (ii) direct and deliver such Common Collateral as a court of competent jurisdiction otherwise directs, and provided, further, that the provisions of this Agreement are intended solely to govern the respective Lien priorities as between the First Priority Secured Parties and the Second Priority Secured Parties and shall not impose on the First Priority Secured Parties any obligations in respect of the disposition of any Common Collateral (or any proceeds thereof) that would conflict with prior perfected Liens or any claims thereon in favor of any other Person that is not a Secured Party.

(d)  To the extent that any deposit account or securities account of any Loan Party is subject to a control agreement in favor of the First Priority Representative, the First Priority Representative will act as bailee and agent for the Second Priority Representative solely to the extent required to perfect the Liens of the Second Priority Secured Parties in such deposit accounts and securities accounts and the cash and other assets therein.  Nothing in the preceding sentence shall be construed to impose any duty on the First Priority Representative (or any third party acting on its behalf) with respect to such Common Collateral or provide the Second Priority Representative or any other Second Priority Secured Party with any rights with respect to such Common Collateral beyond those specified in this Agreement and the Second Priority Security Documents.  Unless the Second Priority Liens on such First Priority Collateral shall have been or concurrently are released, after the First Priority Obligations Payment Date, the First Priority Representative shall cooperate with the Loan Parties and the Second Priority Representative (at the expense of the Loan Parties) in permitting control of any deposit accounts and securities accounts to be transferred to the Second Priority Representative (or for other arrangements with respect to each such deposit account and securities account reasonably satisfactory to the Second Priority Representative and in accordance with the Second Priority Documents to be made).

2.4    No New Liens.  So long as the First Priority Obligations Payment Date has not occurred, whether or not an Insolvency Proceeding has been commenced by or against any Loan Party the parties hereto agree that (a) there shall be no Lien, and no Loan Party shall have any right to create any Lien, on any assets of any Loan Party securing any Second Priority Obligation if these same assets are not subject to, and do not become subject to, a Lien securing the First Priority Obligations and (b) there shall be no Lien, and no Loan Party shall have any right to create any Lien, on any assets of any Loan Party securing any First Priority Obligation if these same assets are not subject to, and do not become subject to, a Lien securing the Second Priority Obligations.  To the extent that the foregoing provisions are not complied with for any reason, without limiting any other rights and remedies available to the First Priority Secured Parties, the Second Priority Representative and the other Second Priority Secured Parties agree that any amounts received by or distributed to any of them pursuant to or as a result of Liens granted in contravention of this Section 2.4 shall be subject to Section 4.1.

2.5    Prohibition on Contesting Liens.  Each of the Second Priority Representative, for itself and on behalf of each of the Second Priority Secured Parties, and the First Priority Representative, for itself and on behalf of each of the First Priority Secured Parties, agrees that it will not (and hereby waives any right to) object to or contest or support any other Person in objecting to or contesting, in any proceeding (including without limitation, any Insolvency Proceeding), the validity, extent, perfection, priority or enforceability of a Lien held by or on behalf of any of the First Priority Secured Parties in the First Priority Collateral or by or on behalf of any of the Second Priority Secured Parties in the Second Priority Collateral, as the case may be, or the provisions of this Agreement; provided, that nothing in this Agreement shall be construed to prevent or impair the rights of the First Priority Representative, any First Priority Secured Party, the Second Priority Representative or any Second Priority Secured Party to enforce this Agreement, including the provisions of this Agreement relating to the priority of the Liens securing the First Priority Obligations as provided in Sections 2.1 and 3.1.  Notwithstanding any failure by any First Priority Secured Party or Second Priority Secured Party to perfect its security interests in the Common Collateral or any avoidance, invalidation or subordination by any third party or court of competent jurisdiction of the security interests in the Common Collateral granted to the First Priority Secured Parties or the Second Priority Secured Parties, the priority and rights as between the First Priority Secured Parties and the Second Priority Secured Parties with respect to the Common Collateral shall be as set forth herein.

**SECTION 3**. *Enforcement Rights.*

3.1    <u>Exclusive Enforcement</u>.  Until the First Priority Obligations Payment Date has occurred, whether or not an Insolvency Proceeding has been commenced by or against any Loan Party, the First Priority Secured Parties shall have the exclusive right to take and continue any Enforcement Action with respect to the Common Collateral, without any consultation with or consent of any Second Priority Secured Party, but subject to the provisos set forth in Sections 3.2 and 5.1.  Upon the occurrence and during the continuance of a default or an event of default under the First Priority Documents, the First Priority Representative and the other First Priority Secured Parties may take and continue any Enforcement Action with respect to the First Priority Obligations and the Common Collateral in such order and manner as they may determine in their sole discretion.

3.2    <u>Standstill and Waivers</u>.  The Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties, agrees that, until the First Priority Obligations Payment Date has occurred, subject to the proviso set forth in Section 5.1:

(a)  they will not take or cause to be taken any Enforcement Action;

(b)  they will not take or cause to be taken any action, the purpose or effect of which is to make any Lien in respect of any Second Priority Obligation pari passu with or senior to, or to give any Second Priority Secured Party any preference or priority relative to, the Liens with respect to the First Priority Obligations or the First Priority Secured Parties with respect to any of the Common Collateral;

(c)  they will not contest, oppose, object to, interfere with, hinder or delay, in any manner, whether by judicial proceedings (including without limitation the filing of an Insolvency Proceeding in respect of any Loan Party) or otherwise, any foreclosure, sale, lease, exchange, transfer or other disposition of the Common Collateral by any First Priority Secured Party or any other Enforcement Action taken (or any forbearance from taking any Enforcement Action) by or on behalf of any First Priority Secured Party;

(d)  they have no right to (i) direct either the First Priority Representative or any other First Priority Secured Party to exercise any right, remedy or power with respect to the Common Collateral or pursuant to the First Priority Security Documents or (ii) consent or object to the exercise by the First Priority Representative or any other First Priority Secured Party of any right, remedy or power with respect to the Common Collateral or pursuant to the First Priority Security Documents or to the timing or manner in which any such right is exercised or not exercised (or, to the extent they may have any such right described in this clause (d), whether as a junior lien creditor or otherwise, they hereby irrevocably waive such right);

(e)  they will not institute any suit or other proceeding or assert in any suit, Insolvency Proceeding or other proceeding any claim against any First Priority Secured Party seeking damages from or other relief by way of specific performance, injunction or otherwise, with respect to, and no First Priority Secured Party shall be liable for, any action taken or omitted to be taken by any First Priority Secured Party with respect to the Common Collateral or pursuant to the First Priority Documents; and

(f)  they will not seek, and hereby waive any right, to have the Common Collateral or any part thereof marshaled upon any foreclosure or other disposition of the Common Collateral.

<u>provided</u> that, notwithstanding the foregoing, any Second Priority Secured Party may exercise its rights and remedies in respect of Common Collateral under the Second Priority Security Documents or applicable law after the passage of a period of 150 days (the "**Standstill Period**") from the first date of delivery of a notice in writing to the First Priority Representative and the Borrower of any Second Priority Secured Party's intention to exercise such rights and remedies in respect of Common Collateral, which notice may only be delivered following the occurrence of and during the continuance of an "Event of Default" under and as defined in the Second Priority Agreement; <u>provided</u>, <u>further</u>, however, that, notwithstanding the foregoing, in no event shall any Second Priority Secured Party exercise or continue to exercise any such rights or remedies if, notwithstanding the expiration of the Standstill Period, (i) the First Priority Representative or any First Priority Secured Parties to the extent constituting the Required Holders (as defined in the Existing First Priority Agreement as of the date hereof) shall have commenced and be diligently pursuing in good faith the exercise of any of its rights and remedies with respect to all or any material portion of the Common Collateral or (ii) an Insolvency Proceeding in respect of any Loan Party shall have been commenced; and <u>provided</u>, <u>further</u>, that in any Insolvency Proceeding commenced by or against any Loan Party, the Second Priority Representative and the Second Priority Secured Parties may take any action expressly permitted by Section 5.

Notwithstanding the foregoing contained in this Section 3.2, the Second Priority Representative and the Second Priority Secured Parties may:

(1)    take any action (not adverse to the priority status of the Liens on the Common Collateral, or the rights of any First Priority Representative or the First Priority Secured Parties to exercise remedies in respect thereof or the agreements set forth in Section 2) in order to create, perfect, preserve or protect its Lien on the Common Collateral;

(2)    file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any Person objecting to or otherwise seeking the disallowance of the claims of the Second Priority Secured Parties, including any claims secured by the Common Collateral, if any, in each case in a manner that is not inconsistent with, or in contravention of, the express terms of this Agreement;

(3)    file any pleadings, objections, motions or agreements or take any positions that assert rights or interests available to unsecured creditors of the Loan Parties arising under either any Insolvency Proceeding or applicable non-bankruptcy law, in each case in a manner that is not inconsistent with, or in contravention of, the express terms of this Agreement;

(4)    vote on any plan of reorganization, file any proof of claim or statement of interest, make other filings and make any arguments and motions that are, in each case, in a manner that is not inconsistent with, or in contravention of, the express terms of this Agreement, with respect to the Second Priority Obligations and the Common Collateral;

(5)    exercise any of its rights or remedies with respect to the Common Collateral after the termination of the Standstill Period to the extent permitted by this Section 3.2;

(6)    present a cash or credit bid (in the case of any such credit bid, so long as such bid provides for payment in full of the First Priority Obligations and the occurrence of the events described in clauses (a), (b) and (c) of the definition of the First Priority Obligations Payment Date) at any Section 363 hearing or with respect to any other Common Collateral disposition; and

13

(7)     bid for or purchase Common Collateral at any private or judicial foreclosure upon such Common Collateral initiated by the First Priority Representative or any of the First Priority Secured Parties.

3.3     Judgment Creditors.  In the event that any Second Priority Secured Party becomes a judgment lien creditor as a result of its enforcement of its rights as an unsecured creditor, such judgment lien shall be subject to the terms of this Agreement for all purposes (including in relation to the First Priority Liens and the First Priority Obligations) to the same extent as all other Liens securing the Second Priority Obligations are subject to the terms of this Agreement.

3.4     No Additional Rights For the Loan Parties Hereunder.  Except as provided in Section 3.5, if any First Priority Secured Party or Second Priority Secured Party shall enforce its rights or remedies in violation of the terms of this Agreement, no Loan Party shall be entitled to use such violation as a defense to any action by any First Priority Secured Party or Second Priority Secured Party, nor to assert such violation as a counterclaim or basis for set off or recoupment against any First Priority Secured Party or Second Priority Secured Party.

3.5     Actions Upon Breach.  (a)  If any Second Priority Secured Party, contrary to this Agreement, commences or participates in any action or proceeding against any Loan Party or the Common Collateral, such Loan Party, with the prior written consent of the First Priority Representative, may interpose as a defense or dilatory plea the making of this Agreement, and any First Priority Secured Party may intervene and interpose such defense or plea in its or their name or in the name of such Loan Party.

(b)  Should any Second Priority Secured Party, contrary to this Agreement, in any way take, attempt to or threaten to take any action with respect to the Common Collateral (including, without limitation, any attempt to realize upon or enforce any remedy with respect to this Agreement), or fail to take any action required by this Agreement, any First Priority Secured Party (in its own name or in the name of the relevant Loan Party) or the relevant Loan Party may obtain relief against such Second Priority Secured Party by injunction, specific performance and/or other appropriate equitable relief, it being understood and agreed by the Second Priority Representative on behalf of each Second Priority Secured Party that (i) the First Priority Secured Parties' damages from its actions may at that time be difficult to ascertain and may be irreparable, and (ii) each Second Priority Secured Party waives any defense that the Loan Parties and/or the First Priority Secured Parties cannot demonstrate damage and/or be made whole by the awarding of damages.

3.6     Option to Purchase.  (a)  The First Priority Representative agrees that it will give the Second Priority Representative written notice (the "**Enforcement Notice**") within five business days after commencing any Enforcement Action with respect to Common Collateral or the institution of any Insolvency Proceeding (which notice shall be effective for all Enforcement Actions taken after the date of such notice so long as the First Priority Representative is diligently pursuing in good faith the exercise of its default or enforcement rights or remedies against, or diligently attempting in good faith to vacate any stay of enforcement rights of its senior Liens on a material portion of the Common Collateral, including, without limitation, all Enforcement Actions identified in such notice).  Following the commencement of an Enforcement Action or the institution of any Insolvency Proceeding by the First Priority Representative or any other First Priority Secured Party, any Second Priority Secured Party shall have the option, by irrevocable written notice (the "**Purchase Notice**") delivered by the Second Priority Representative to the First Priority Representative at any time, to purchase all of the First Priority Obligations from the First Priority Secured Parties.  If the Second Priority Representative so delivers the

Purchase Notice, the First Priority Representative shall terminate any existing Enforcement Actions, and shall not take any further Enforcement Actions, <u>provided</u>, that the Purchase (as defined below) shall have been consummated on the date specified in the Purchase Notice in accordance with this Section 3.6.  For the avoidance of doubt, if the Purchase is not consummated on or before the date specified in the Purchase Notice for any reason, the First Priority Secured Parties shall be entitled to recommence taking Enforcement Actions.  In addition, following any such failure the Second Priority Secured Parties shall not be entitled to exercise any right pursuant to this Section 3.6 to Purchase the First Priority Obligations at any time thereafter, unless agreed to by the First Priority Secured Parties.

(b)       On the date specified by the Second Priority Representative in the Purchase Notice (which shall be a business day not less than five business days, nor more than ten business days, after receipt by the First Priority Representative of the Purchase Notice), the First Priority Secured Parties shall, subject to any required approval of any court or other governmental authority then in effect, sell to the Second Priority Secured Parties electing to purchase pursuant to Section 3.6(a) (the "**Purchasing Parties**"), and the Purchasing Parties shall purchase (the "**Purchase**") from the First Priority Secured Parties, the First Priority Obligations; <u>provided</u>, that the First Priority Obligations purchased shall not include any rights of First Priority Secured Parties with respect to indemnification and other obligations of the Loan Parties under the First Priority Documents that are expressly stated to survive the termination of the First Priority Documents (the "**Surviving Obligations**").

(c)       Without limiting the obligations of the Loan Parties under the First Priority Documents to the First Priority Secured Parties with respect to the Surviving Obligations (which shall not be transferred in connection with the Purchase), on the date of the Purchase, the Purchasing Parties shall (i) pay to the First Priority Secured Parties as the purchase price (the "**Purchase Price**") therefor the full amount of all First Priority Obligations then outstanding and unpaid (including principal, interest (including, to the extent applicable, interest at the default rate), Post-Petition Interest, fees, yield-maintenance amounts (if any), breakage costs, attorneys' fees and expenses, and, in the case of any Hedging Obligations, the amount that would be payable by the relevant Loan Party thereunder if it were to terminate such Hedging Obligations on the date of the Purchase or, if not terminated, an amount determined by the relevant First Priority Secured Party to be necessary to collateralize its credit risk arising out of such Hedging Obligations), (ii) furnish cash collateral (the "**Cash Collateral**") to the First Priority Secured Parties in such amounts as the relevant First Priority Secured Parties determine is reasonably necessary to secure such First Priority Secured Parties in connection with any outstanding letters of credit (not to exceed 105% of the aggregate undrawn face amount of such letters of credit), (iii) agree to reimburse the First Priority Secured Parties for any loss, cost, damage or expense (including attorneys' fees and expenses) in connection with any fees, costs or expenses related to any checks or other payments provisionally credited to the First Priority Obligations and/or as to which the First Priority Secured Parties have not yet received final payment and (iv) agree, after written request from the First Priority Representative, to reimburse the First Priority Secured Parties in respect of indemnification obligations of the Loan Parties under the First Priority Documents as to matters or circumstances known to the Purchasing Parties at the time of the Purchase which could reasonably be expected to result in any loss, cost, damage or expense to any of the First Priority Secured Parties, <u>provided</u> that, in no event shall any Purchasing Party have any liability for such amounts in excess of proceeds of Common Collateral received by the Purchasing Parties.

(d)       The Purchase Price and Cash Collateral shall be remitted by wire transfer in immediately available funds to such account of the First Priority Representative as it shall designate to the Purchasing Parties.  The First Priority Representative shall, promptly following its receipt thereof, distribute the amounts received by it in respect of the Purchase Price to the First Priority Secured Parties in accordance

with the First Priority Documents.  Interest shall be calculated to but excluding the day on which the Purchase occurs if the amounts so paid by the Purchasing Parties to the account designated by the First Priority Representative are received in such account prior to 12:00 Noon, New York City time, and interest shall be calculated to and including such day if the amounts so paid by the Purchasing Parties to the account designated by the First Priority Representative are received in such account later than 12:00 Noon, New York City time.

(e)     The Purchase shall be made without representation or warranty of any kind by the First Priority Secured Parties as to the First Priority Obligations, the Common Collateral or otherwise and without recourse to the First Priority Secured Parties, except that each First Priority Secured Party shall severally represent and warrant:  (i) the amount of the First Priority Obligations being purchased from such First Priority Secured Party, (ii) that such First Priority Secured Party owns the First Priority Obligations held by it free and clear of any liens or encumbrances and (iii) that such First Priority Secured Party has the right to assign the First Priority Obligations held by it and the assignment is duly authorized.

3.7     Rights as Unsecured Creditors.  The Second Priority Representative and the Second Priority Secured Parties may exercise rights and remedies available to unsecured creditors against the Loan Parties that have granted Liens to secure the Second Priority Obligations in accordance with the terms of the Second Priority Documents and applicable law to the extent that such exercise is not inconsistent with, or in contravention of, the express terms of this Agreement; provided that in the event that any Second Priority Secured Party becomes an attachment or a judgment Lien creditor in respect of the Common Collateral as a result of its enforcement of its rights as an unsecured creditor with respect to the Second Priority Obligations, such attachment or judgment Lien shall be subject to the terms of this Agreement for all purposes (including in relation to the First Priority Obligations) as the other Liens on Common Collateral securing the Second Priority Obligations are subject to this Agreement.

3.8     Second Priority Interest, Principal, Etc.  Nothing in this Agreement shall prohibit the receipt by the Second Priority Representative or any Second Priority Secured Parties of payments (including in cash) of interest, principal and other amounts owed in respect of the Second Priority Obligations unless such receipt is (x) the direct or indirect result of the exercise by the Second Priority Representative or any Second Priority Secured Parties of rights or remedies with respect to, or enforcement of, any Lien on Common Collateral held by any of them, which exercise or enforcement is inconsistent with, or in contravention of, the express terms of this Agreement or (y) from the proceeds of an Enforcement Action required to be applied in accordance with Section 4.1 below.  Nothing in this Agreement impairs or otherwise adversely affects any rights or remedies the First Priority Representative or the First Priority Secured Parties may have with respect to the Common Collateral.

3.9     Notice By First Priority Representative.  The First Priority Representative shall render to Second Priority Representative written notice of the occurrence of the events described in clauses (a), (b) and (c) of the definition of "First Priority Obligations Payment Date" as soon as practicable (and in any event within two business days) following the occurrence thereof, provided that such notice shall not be required in connection with the consummation of a Replacement First Priority Agreement.

**SECTION 4**.  *Application Of Proceeds Of Common Collateral; Dispositions And Releases Of Common Collateral; Inspection and Insurance.*

4.1     Application of Proceeds; Turnover Provisions.  All proceeds of Common Collateral (including without limitation any interest earned thereon) resulting from the sale, collection or other disposition of Common Collateral in connection with an Enforcement Action or the exercise by any First

Priority Secured Party or any Second Priority Secured Party of any of its respective rights and remedies with respect to Common Collateral, whether or not pursuant to an Insolvency Proceeding, shall be distributed as follows:  <u>first</u> to the First Priority Representative for application to the First Priority Obligations in accordance with the terms of the First Priority Documents, until the First Priority Obligations Payment Date has occurred and <u>thereafter</u>, to the Second Priority Representative for application in accordance with the Second Priority Documents.  Until the occurrence of the First Priority Obligations Payment Date, any Common Collateral, including without limitation any such Common Collateral constituting proceeds, that may be received by any Second Priority Secured Party in violation of this Agreement shall be segregated and held in trust and promptly paid over to the First Priority Representative, for the benefit of the First Priority Secured Parties, in the same form as received, with any necessary endorsements, and each Second Priority Secured Party hereby authorizes the First Priority Representative to make any such endorsements as agent for the Second Priority Representative (which authorization, being coupled with an interest, is irrevocable).

4.2    <u>Releases of Second Priority Lien</u>.  (a) Upon any release, sale or disposition of Common Collateral (other than in connection with the occurrence of the First Priority Obligations Payment Date) permitted pursuant to the terms of the First Priority Documents that results in the release of the First Priority Lien on any Common Collateral (excluding any sale or other disposition that is not permitted by the Second Priority Documents unless such sale or disposition is consummated in connection with an Enforcement Action or consummated after the institution of an Insolvency Proceeding in respect of any Loan Party), the Second Priority Lien on such Common Collateral (excluding any portion of the proceeds of such Common Collateral remaining after the First Priority Obligations Payment Date occurs) shall be automatically and unconditionally released with no further consent or action of any Person.

(b)  The Second Priority Representative shall promptly execute and deliver such release documents and instruments and shall take such further actions as the First Priority Representative shall request to evidence any release of the Second Priority Lien described in paragraph (a).  The Second Priority Representative hereby appoints the First Priority Representative and any officer or duly authorized person of the First Priority Representative, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power of attorney in the place and stead of the Second Priority Representative and in the name of the Second Priority Representative or in the First Priority Representative's own name, from time to time, in the First Priority Representative's sole discretion, for the purposes of carrying out the terms of this Section 4.2, to take any and all appropriate action and to execute and deliver any and all documents and instruments as may be necessary or desirable to accomplish the purposes of this Section 4.2, including, without limitation, any financing statements, endorsements, assignments, releases or other documents or instruments of transfer (which appointment, being coupled with an interest, is irrevocable).

4.3    <u>Inspection Rights and Insurance</u>.  (a)  Any First Priority Secured Party and its representatives and invitees may at any time inspect, repossess, remove and otherwise deal with the Common Collateral in accordance with the terms of the First Priority Documents, and the First Priority Representative may advertise and conduct public auctions or private sales of the Common Collateral, in each case without notice to, the involvement of or interference by any Second Priority Secured Party or liability to any Second Priority Secured Party; <u>provided</u> that the First Priority Representative shall provide the Second Priority Representative with notice of any sales.

(b)  Until the First Priority Obligations Payment Date has occurred, the First Priority Representative will have the sole and exclusive right (i) to be named as additional insured and loss payee under any insurance policies maintained from time to time by any Loan Party (except that the Second

Priority Representative shall have the right to be named as additional insured and loss payee so long as its second lien status is identified in a manner satisfactory to the First Priority Representative); (ii) to adjust or settle any insurance policy or claim covering the Common Collateral in the event of any loss thereunder in accordance with the terms of the First Priority Documents;  (iii)  to approve any award granted in any condemnation or similar proceeding affecting the Common Collateral in accordance with the terms of the First Priority Documents; and (iv) to apply the proceeds of any insurance or condemnation award to the First Priority Obligations in accordance with the terms of the First Priority Documents.

4.4     Subrogation.  With respect to the value of any payments or distributions in cash, property or other assets that any Second Priority Secured Party pays over to the First Priority Secured Parties under the terms of this Agreement, the Second Priority Secured Parties shall be subrogated to the rights of the First Priority Secured Parties; provided that, the Second Priority Representative, on behalf of itself and the Second Priority Creditors, hereby agrees not to assert or enforce all such rights of subrogation it may acquire as a result of any payment hereunder until the First Priority Obligations Payment Date has occurred.  Each Loan Party acknowledges and agrees that the value of any payments or distributions in cash, property or other assets received by any Second Priority Secured Party that are paid over to the First Priority Secured Parties pursuant to this Agreement shall not reduce any of the Second Priority Obligations.

**SECTION 5**.  *Insolvency Proceedings.*

5.1     Filing of Motions.  Until the First Priority Obligations Payment Date has occurred, the Second Priority Representative agrees on behalf of itself and the other Second Priority Secured Parties that no Second Priority Secured Party shall, in or in connection with any Insolvency Proceeding in respect of any Loan Party, file any pleadings or motions, take any position at any hearing or proceeding of any nature, or otherwise take any action whatsoever, in each case that (a) violates, or is prohibited by, this Agreement, (b) asserts any right, benefit or privilege that arises in favor of the Second Priority Representative or Second Priority Secured Parties in their capacity as secured creditors solely as a result of their interest in the Common Collateral or in the Second Priority Lien (unless the assertion of such right is expressly permitted by this Agreement) or (c) challenges the validity, priority, enforceability or voidability of any Liens or claims held by the First Priority Representative or any other First Priority Secured Party, or the extent to which the First Priority Obligations constitute secured claims under Section 506(a) of the Bankruptcy Code or otherwise; provided, that the Second Priority Representative may take the actions specifically set forth in Section 3.2.

The First Priority Representative agrees on behalf of itself and the other First Priority Secured Parties that no First Priority Secured Party shall, in or in connection with any Insolvency Proceeding, file any pleadings or motions, take any position at any hearing or proceeding of any nature, or otherwise take any action whatsoever, in each case that challenges the validity, priority, enforceability or voidability of any Liens or claims held by the Second Priority Representative or any other Second Priority Secured Party, or the extent to which the Second Priority Obligations constitute secured claims under Section 506(a) of the Bankruptcy Code or otherwise, except that the foregoing shall not limit the ability of any First Priority Secured Party to enforce the terms of this Agreement.

5.2     Financing Matters.  Until the First Priority Obligations Payment Date has occurred, if any Loan Party becomes subject to any Insolvency Proceeding, and if the First Priority Representative or the other First Priority Secured Parties consent to the use of cash collateral under the Bankruptcy Code or provide financing to any Loan Party under the Bankruptcy Code or consent to the provision of such

#4815-7614-1325v9

financing to any Loan Party by any third party that (w) is in an aggregate principal amount (including any undrawn portion of the revolving commitments thereunder and the face amount of any letters of credit issued and not reimbursed thereunder) of no more than $10,000,000, the proceeds of which are used solely by the Loan Parties (and not by, or for the benefit of, any Loan Party's affiliate which is not a Loan Party), (x) provides that the Second Priority Secured Parties retain the right to object to any ancillary agreements or arrangements regarding the cash collateral use or the financing that are materially adverse to the Second Priority Secured Parties, (y) provides the Second Priority Secured Parties with the Second Priority Required Adequate Protection, and (z) does not compel the Loan Parties to pursue any specific plan or to conduct a sale or other liquidation of the Common Collateral (any such financing that complies with such clauses (w)-(z), a "**DIP Financing**"), then the Second Priority Representative agrees, on behalf of itself and the other Second Priority Secured Parties, that each Second Priority Secured Party (a) will raise no objection to, nor support any other Person objecting to, the use of such cash collateral or to such DIP Financing, (b) will not request or accept adequate protection or any other relief in connection with the use of such cash collateral or such DIP Financing except as set forth in Section 5.4 below and (c) to the extent the Liens securing the First Priority Obligations are subordinated to or pari passu with such DIP Financing will subordinate (and will be deemed hereunder to have subordinated) the Second Priority Liens (i) to such DIP Financing on the same terms as the First Priority Liens are subordinated thereto (and such subordination will not alter in any manner the terms of this Agreement), (ii) to any adequate protection provided to the First Priority Secured Parties and (iii) to any "carve-out" agreed to by the First Priority Representative or the other First Priority Secured Parties in an amount not to exceed $2,500,000, and (d) agrees that notice received two calendar days prior to the entry of an interim order approving such usage of cash collateral or approving such financing and fifteen  days prior to the entry of a final order approving such usage of cash collateral or approving such financing shall be adequate notice.

5.3     Relief From the Automatic Stay.  The Second Priority Representative agrees, on behalf of itself and the other Second Priority Secured Parties, that none of them will seek relief from the automatic stay (or any analogous stay) in any Insolvency Proceeding in respect of a Loan Party or take any action in derogation thereof, in each case in respect of any Common Collateral, without the prior written consent of the First Priority Representative unless the First Priority Representative or any of the First Priority Secured Parties have concurrently sought relief from the automatic stay (or from any analogous stay) in any Insolvency Proceeding and the Second Priority Representative and/or the other Second Priority Secured Parties are not seeking relief from the automatic stay (or from any analogous stay) in any Insolvency Proceeding in order to take any Enforcement Action in any manner in violation of or otherwise inconsistent with the provisions of this Agreement.

5.4     Adequate Protection.  The Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties, agrees that none of them shall object, contest, or support any other Person objecting to or contesting, in respect of any Insolvency Proceeding of a Loan Party, (a) any request by the First Priority Representative or the other First Priority Secured Parties for adequate protection or any adequate protection provided to the First Priority Representative or the other First Priority Secured Parties or (b) any objection by the First Priority Representative or any other First Priority Secured Parties to any motion, relief, action or proceeding based on a claim of a lack of adequate protection or (c) the payment of interest, fees, expenses or other amounts to the First Priority Representative or any other First Priority Secured Party under Section 506(b) or 506(c) of the Bankruptcy Code or otherwise.  In any Insolvency Proceeding of a Loan Party, (i) if the First Priority Secured Parties (or any subset thereof) are granted adequate protection consisting of additional collateral (with replacement liens on such additional collateral) and superpriority claims in connection with any DIP Financing or use of cash collateral, then in connection with any such DIP Financing or use of cash collateral, the Second Priority Representative, on behalf of itself and any of the Second Priority Secured

Parties, may seek or accept adequate protection consisting solely of (w) a replacement Lien on the same additional collateral, subordinated to the Liens securing the First Priority Obligations and such DIP Financing on the same basis as the other Liens securing the Second Priority Obligations are so subordinated to the First Priority Obligations under this Agreement, (x) superpriority claims junior in all respects to the superpriority claims granted to the First Priority Secured Parties, (y) payment of the fees and expenses of the Second Priority Representative and the Second Priority Secured Parties, to the extent permitted in the Second Priority Documents (the adequate protection for the Second Priority Secured Parties described in clauses (w), (x), and (y), collectively, the "**Second Priority Required Adequate Protection**") and (z) subject to the right of the First Priority Secured Parties to object thereto, the payment of post-petition interest at the pre-default rate (provided, that in the case of this clause (z), that the First Priority Secured Parties have been granted adequate protection in the form of post-petition interest at a rate no lower than the pre-default rate), provided, however, that the Second Priority Representative shall have irrevocably agreed, pursuant to Section 1129(a)(9) of the Bankruptcy Code, on behalf of itself and the Second Priority Secured Parties, in any stipulation and/or order granting such adequate protection, that such junior superpriority claims in excess of $3,000,000 may with the consent of two-thirds in amount of the Second Priority Obligations be paid under any plan of reorganization in any combination of cash, debt, equity or other property having a value on the effective date of such plan equal to the allowed amount of such claims and (ii) in the event the Second Priority Representative, on behalf of itself and the Second Priority Secured Parties, seeks or accepts adequate protection consisting of additional collateral (with replacement liens on such additional collateral) and superpriority claims in connection with any DIP Financing or use of cash collateral with respect to an Insolvency Proceeding, and such adequate protection is granted in the form of additional collateral comprising assets of Pulitzer or any of its subsidiaries, then the Second Priority Representative, on behalf of itself or any of the Second Priority Secured Parties, agrees that the First Priority Representative shall also be granted a senior Lien on such additional collateral as security for the First Priority Obligations and any such DIP Financing and that any Lien on such additional collateral securing the Second Priority Obligations shall be subordinated to the Liens on such collateral securing the First Priority Obligations and any such DIP Financing (and all Obligations relating thereto) and any other Liens granted to the First Priority Secured Parties as adequate protection, with such subordination to be on the same terms that the other Liens securing the Second Priority Obligations are subordinated to such First Priority Obligations under this Agreement.  The Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties, agrees that except as expressly set forth in this Section none of them shall seek or accept adequate protection in respect of a Loan Party without the prior written consent of the First Priority Representative.

    5.5    Avoidance Issues.  If any First Priority Secured Party is required in any Insolvency Proceeding or otherwise to disgorge, turn over or otherwise pay to the estate of any Loan Party, because such amount was avoided or ordered to be paid or disgorged for any reason, including without limitation because it was found to be a constructively fraudulent and/or preferential transfer, any amount (a "**Recovery**"), whether received as proceeds of security, enforcement of any right of set-off or otherwise, then the First Priority Obligations shall be reinstated to the extent of such Recovery and deemed to be outstanding as if such payment had not occurred and the First Priority Obligations Payment Date shall be deemed not to have occurred.  If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto.  The Second Priority Secured Parties agree that none of them shall be entitled to benefit from any avoidance action affecting or otherwise relating to the First Priority Liens or the Second Priority Liens, it being understood and agreed that the benefit of such avoidance action otherwise allocable to them shall instead be allocated and turned over for application in accordance with the priorities set forth in this Agreement.

5.6     Asset Dispositions in an Insolvency Proceeding.  In an Insolvency Proceeding or otherwise, neither the Second Priority Representative nor any other Second Priority Secured Party shall oppose any sale or disposition of any assets of any Loan Party that is supported by the First Priority Secured Parties (or any right of the First Priority Secured Party to credit bid the First Priority Obligations in any such sale or disposition), and the Second Priority Representative and each other Second Priority Secured Party will be deemed to have consented under Section 363 of the Bankruptcy Code (and otherwise) to any sale (and related matters) supported by the First Priority Secured Parties and to have released their Liens on such assets provided that their Liens attach to the proceeds of such assets (subject to the priorities set forth in this Agreement) and that the proceeds remaining after payment of related transaction costs and expenses are applied as a permanent reduction of the First Priority Obligations (with a corresponding reduction in the Maximum First Priority Amount).  In an Insolvency Proceeding or otherwise, neither the First Priority Representative nor any other First Priority Secured Party shall oppose any right of any Second Priority Secured Party to credit bid the Second Priority Obligations in any sale or disposition, provided that such bid provides for the payment in full of the First Priority Obligations and the occurrence of the events described in clauses (a), (b) and (c) of the definition of First Priority Obligations Payment Date.

5.7     Separate Grants of Security and Separate Classification.  Each of the Secured Parties and the Loan Parties acknowledges and agrees that (a) the grants of Liens on the assets of each Loan Party pursuant to the First Priority Security Documents and the Second Priority Security Documents constitute two separate and distinct grants of Liens and (b) because of, among other things, their differing rights in the Common Collateral, the First Priority Obligations and the Second Priority Obligations are fundamentally different from each other and must be separately classified in any plan of reorganization proposed or adopted in an Insolvency Proceeding.  To further effectuate the intent of the parties as provided in the immediately preceding sentence, if it is held that the claims of the First Priority Secured Parties and Second Priority Secured Parties in respect of the Common Collateral constitute only one secured claim (rather than separate classes of senior and junior secured claims), then the Second Priority Secured Parties hereby acknowledge and agree that all distributions shall be made as if there were separate classes of senior and junior secured claims against the Loan Parties in respect of the Common Collateral, with the effect being that, to the extent that the aggregate value of the Common Collateral is sufficient (for this purpose ignoring all claims held by the Second Priority Secured Parties), the First Priority Secured Parties shall be entitled to receive, in addition to amounts distributed to them in respect of principal, pre-petition interest and other claims, all amounts owing in respect of Post-Petition Interest before any distribution is made in respect of the claims held by the Second Priority Secured Parties.  The Second Priority Secured Parties hereby acknowledge and agree to turn over to the First Priority Secured Parties amounts otherwise received or receivable by them to the extent necessary to effectuate the intent of the preceding sentence, even if such turnover has the effect of reducing the claim or recovery of the Second Priority Secured Parties.

5.8     No Waivers of Rights.  Nothing contained herein shall prohibit or in any way limit the First Priority Representative, the Second Priority Representative, any First Priority Secured Party, or any Second Priority Secured Party from objecting, in any Insolvency Proceeding or otherwise, to any action taken by any party not permitted hereunder.

5.9     Plans of Reorganization.  Nothing in this Agreement shall impair the rights of any Second Priority Secured Party to propose, support, or vote in favor of or against any plan of reorganization or similar plan or scheme in any Insolvency Proceeding, so long as such plan or scheme is not inconsistent with, or in contravention of, the express terms of this Agreement, provided that in the case of proposing such plan of reorganization or similar plan or scheme it shall, unless otherwise

approved by the First Priority Representative, provide for payment in full of the First Priority Obligations and the occurrence of the events described in clauses (a), (b) and (c) of the definition of the First Priority Obligations Payment Date.

5.10    <u>Effectiveness in Insolvency Proceedings</u>.  This Agreement, which the parties hereto expressly acknowledge is a "subordination agreement" under section 510(a) of the Bankruptcy Code, shall be effective before, during and after the commencement of an Insolvency Proceeding.

**SECTION 6**.  *Security Documents.*

(a)  Each Loan Party and the Second Priority Representative, on behalf of itself and the Second Priority Secured Parties, agrees that it shall not at any time execute or deliver any amendment or other modification to any of the Second Priority Documents that (x) applies with respect to any Loan Party or any Common Collateral and (y) is inconsistent with or in violation of this Agreement.

(b)  Each Loan Party and the First Priority Representative, on behalf of itself and the First Priority Secured Parties, agrees that it shall not at any time execute or deliver any amendment or other modification to any of the First Priority Documents inconsistent with or in violation of this Agreement.

(c)  In the event the First Priority Representative enters into any amendment, waiver or consent in respect of any of the First Priority Security Documents for the purpose of adding to, or deleting from, or waiving or consenting to any departures from any provisions of, any First Priority Security Document or changing in any manner the rights of any parties thereunder, then such amendment, waiver or consent shall apply automatically to any comparable provision of the Comparable Second Priority Security Document to the extent applicable to any Loan Party and Common Collateral without the consent of or action by any Second Priority Secured Party (with all such amendments, waivers and modifications subject to the terms hereof); <u>provided</u>, that (i) no such amendment, waiver or consent shall have the effect of removing assets subject to the Lien of any Second Priority Security Document, except to the extent that a release of such Lien is permitted by Section 4.2, (ii) any such amendment, waiver or consent that materially and adversely affects the rights of the Second Priority Secured Parties and does not affect the First Priority Secured Parties in a like or similar manner shall not apply to the Second Priority Security Documents without the prior written consent of the Second Priority Representative, (iii) no such amendment, waiver or consent with respect to any provision applicable to the Second Priority Representative under the Second Priority Documents shall be made without the prior written consent of the Second Priority Representative and (iv) notice of such amendment, waiver or consent shall be given to the Second Priority Representative no later than 15 days after its effectiveness, provided that the failure to give such notice shall not affect the effectiveness and validity thereof.

**SECTION 7**.  *Reliance; Waivers; etc.*

7.1    <u>Reliance</u>.  The First Priority Documents are deemed to have been executed and delivered, and all extensions of credit thereunder are deemed to have been made or incurred, in reliance upon this Agreement.  The Second Priority Representative, on behalf of itself and the Second Priority Secured Parties, expressly waives all notice of the acceptance of and reliance on this Agreement by the First Priority Secured Parties.  The Second Priority Documents are deemed to have been executed and delivered and all extensions of credit related thereto are deemed to have been made or incurred, in reliance upon this Agreement.  The First Priority Representative expressly waives all notices of the acceptance of and reliance by the Second Priority Representative and the Second Priority Secured Parties.

7.2    <u>No Warranties or Liability.</u>  The Second Priority Representative and the First Priority Representative acknowledge and agree that neither has made any representation or warranty with respect to the execution, validity, legality, completeness, collectibility or enforceability of any First Priority Document or any Second Priority Document.  Except as otherwise provided in this Agreement, the Second Priority Representative and the First Priority Representative will be entitled to manage and supervise their respective extensions of credit to any Loan Party in accordance with law and their usual practices, modified from time to time as they deem appropriate.

7.3    <u>No Waivers.</u>  No right or benefit of any party hereunder shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of such party or any other party hereto or by any noncompliance by any Loan Party with the terms and conditions of any of the First Priority Documents or the Second Priority Documents.

**SECTION 8**.  *Obligations Unconditional.*

8.1    <u>First Priority Obligations Unconditional.</u>  All rights and interests of the First Priority Secured Parties hereunder, and all agreements and obligations of the Second Priority Secured Parties (and, to the extent applicable, the Loan Parties) hereunder, shall remain in full force and effect irrespective of:

(a)  any lack of validity or enforceability of any First Priority Document;

(b)  any change in the time, place or manner of payment of, or in any other term of, all or any portion of the First Priority Obligations, or any amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of any First Priority Document;

(c)  prior to the First Priority Obligations Payment Date, any exchange, release, voiding, avoidance or non-perfection of any security interest in any Common Collateral or any other collateral, or any release, amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of all or any portion of the First Priority Obligations or any guarantee or guaranty thereof; or

(d)  any other circumstances that otherwise might constitute a defense available to, or a discharge of, any Loan Party in respect of the First Priority Obligations, or of any of the Second Priority Secured Parties, or any Loan Party, to the extent applicable, in respect of this Agreement.

8.2    <u>Second Priority Obligations Unconditional.</u>  All rights and interests of the Second Priority Secured Parties hereunder, and all agreements and obligations of the First Priority Secured Parties (and, to the extent applicable, the Loan Parties) hereunder, shall remain in full force and effect irrespective of:

(a)  any lack of validity or enforceability of any Second Priority Document;

(b)  any change in the time, place or manner of payment of, or in any other term of, all or any portion of the Second  Priority Obligations, or any amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of any Second Priority Document;

(c)  any exchange, release, voiding, avoidance or non-perfection of any security interest in any Common Collateral or any other collateral, or any release, amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of all or any portion of the Second Priority Obligations or any guarantee or guaranty thereof; or

(d)  any other circumstances that otherwise might constitute a defense available to, or a discharge of, any Loan Party in respect of the Second  Priority Obligations or any First Priority Secured Parties or any Loan Party, to the extent applicable, in respect of this Agreement.

**SECTION 9**.  Miscellaneous.

9.1      In the event of any conflict between the provisions of this Agreement and the provisions of any First Priority Document or any Second Priority Document (to the extent applicable to any Loan Party or any Common Collateral), the provisions of this Agreement shall govern.  Notwithstanding the foregoing, the parties hereto acknowledge that the terms of this Agreement are not intended to and shall not, as between the Loan Parties and the Secured Parties, negate, waive or cancel any rights granted to, or carry liability or obligation of, any Loan Party in the First Priority Documents and the Second Priority Documents or impose any additional obligations on the Loan Parties (other than as expressly set forth herein).

9.2      <u>Continuing Nature of Provisions.</u>  This Agreement shall continue to be effective, and shall not be revocable by any party hereto, until the First Priority Obligation Payment Date shall have occurred.  This is a continuing agreement and the First Priority Secured Parties and the Second Priority Secured Parties may continue, at any time and without notice to the other parties hereto, to extend credit and other financial accommodations, lend monies and provide indebtedness to, or for the benefit of, Borrower or any other Loan Party on the faith hereof.

9.3      <u>Amendments; Waivers.</u>  No amendment or modification of any of the provisions of this Agreement shall be effective unless the same shall be in writing and signed by the First Priority Representative (with the consent of the Required Holders under and as defined in the First Priority Agreement) and the Second Priority Representative (with the consent of the Required Lenders under and as defined in the Second Priority Term Loan Agreement or other then extant Second Priority Agreement), and, in the case of amendments or modifications of Sections 3.5, 3.6, 9.3, 9.5 or 9.6 that directly affect the rights or duties of any Loan Party, such Loan Party, and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time. Anything herein to the contrary notwithstanding, no consent of any Loan Party shall be required for amendments, modifications or waivers of any other provisions of this Agreement other than those that directly affect any obligation or right of the Loan Parties hereunder or under the First Priority Documents or the Second Priority Documents or that would impose any additional obligations on the Loan Parties.

9.4      <u>Information Concerning Financial Condition of the Borrower and the other Loan Parties.</u> Each of the Second Priority Representative and the First Priority Representative hereby assume responsibility for keeping itself informed of the financial condition of the Borrower and each of the other Loan Parties and all other circumstances bearing upon the risk of nonpayment of the First Priority Obligations or the Second Priority Obligations.  The Second Priority Representative and the First Priority Representative hereby agree that no party shall have any duty to advise any other party of information known to it regarding such condition or any such circumstances.  In the event the Second Priority

Representative or the First Priority Representative, in its sole discretion, undertakes at any time or from time to time to provide any information to any other party to this Agreement, it shall be under no obligation (a) to provide any such information to such other party or any other party on any subsequent occasion, (b) to undertake any investigation not a part of its regular business routine, or (c) to disclose any other information.

9.5     Governing Law.  This Agreement shall be construed in accordance with and governed by the law of the State of New York, except as otherwise required by mandatory provisions of law and except to the extent that remedies provided by the laws of any jurisdiction other than the State of New York are governed by the laws of such jurisdiction.

9.6     Submission to Jurisdiction.  (a)  Each First Priority Secured Party, each Second Priority Secured Party and each Loan Party hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each such party hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court.  Each such party agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that any First Priority Secured Party or Second Priority Secured Party may otherwise have to bring any action or proceeding against any Loan Party or its properties in the courts of any jurisdiction.

(b)  Each First Priority Secured Party, each Second Priority Secured Party and each Loan Party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so (i) any objection it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in paragraph (a) of this Section and (ii) the defense of an inconvenient forum to the maintenance of such action or proceeding.

(c)  Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.7.  Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

9.7     Notices.  Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given shall be in writing and may be personally served, telecopied, or sent by overnight express courier service or United States mail and shall be deemed to have been given when delivered in person or by courier service, upon receipt of a telecopy or five days after deposit in the United States mail (certified, with postage prepaid and properly addressed).  For the purposes hereof, the addresses of the parties hereto (until notice of a change thereof is delivered as provided in this Section) shall be as set forth below each party's name on the signature pages hereof, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

9.8     Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of each of the parties hereto and each of the First Priority Secured Parties and Second Priority Secured Parties and their respective successors and permitted assigns, and nothing herein is intended, or shall be

construed to give, any other Person any right, remedy or claim under, to or in respect of this Agreement or any Common Collateral.

9.9     <u>Headings</u>.  Section headings used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

9.10     <u>Severability</u>.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

9.11     <u>Counterparts; Integration; Effectiveness</u>.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this Agreement by email or telecopy shall be effective as delivery of a manually executed counterpart of this Agreement.  This Agreement shall become effective when it shall have been executed by each party hereto.

9.12     **<u>WAIVER OF JURY TRIAL</u>.  EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AND FOR ANY COUNTERCLAIM THEREIN.**

9.13     <u>Additional Loan Parties</u>.  Each Person that becomes a Loan Party after the date hereof shall promptly become a party to this Agreement by execution and delivery by such Person of a joinder agreement in form and substance reasonably satisfactory to the First Priority Representative and the Second Priority Representative

9.14     <u>Incorporation by Reference</u>.  In connection with their execution and acting hereunder, the Company Parties acknowledge that (i) the First Priority Representative is entitled to all rights, privileges, benefits, immunities, protections and indemnities provided to it as Collateral Agent under (and as defined in) the First Priority Documents, and (ii) the Second Priority Representative is entitled to all rights, privileges, benefits, immunities, protections and indemnities provided to it as Collateral Agent under (and as defined in) the Second Priority Documents.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.**, as First Priority Representative for and on behalf of the First Priority Secured Parties

By:_____
Name:
Title:

Address for Notices:
The Bank of New York Mellon Trust Company, N.A.
10161 Centurion Parkway, N.
Jacksonville, FL 32256
Attention:  Geraldine Creswell, Asst. Treasurer
Telecopy No.:  (904) 645-1921
Email: geri.creswell@bnymellon.com

**WILMINGTON TRUST, NATIONAL ASSOCIATION**, as Second Priority Representative for and on behalf of the Second Priority Secured Parties

By:_____
Name:
Title:

Address for Notices:
Wilmington Trust, N.A.
50 South Sixth Street, Suite 1290
Minneapolis, MN 55402
Attention:  Josh James
Telecopy No.:  (612) 217-5651
Tel.: (612) 217-5637
Email:  jjames@WilmingtonTrust.com

**[LOAN PARTIES]**

By:_____
Name:
Title:

Address for Notices:
Attention:
Telecopy No.:

DRAFT 11/30/2011

## INTERCREDITOR AGREEMENT

Intercreditor Agreement (this "**Agreement**"), dated as of [_____], 2012, among THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., as Collateral Agent (in such capacity, with its successors and assigns, and as more specifically defined below, the "**First Priority Representative**") for the First Priority Secured Parties (as defined below), WILMINGTON TRUST, NATIONAL ASSOCIATION, as Collateral Agent (in such capacity, with its successors and assigns, and as more specifically defined below, the "**Second Priority Representative**") for the Second Priority Secured Parties (as defined below), ST. LOUIS POST-DISPATCH LLC (the "**Borrower**") and each of the other Loan Parties (as defined below) party hereto.

WHEREAS, the Borrower and certain financial institutions and other entities are parties to that certain Note Agreement dated as of May 1, 2000, as amended by (i) Amendment No. 1 to Note Agreement dated as of November 23, 2004, (ii) Amendment No. 2 to Note Agreement dated as of February 1, 2006, (iii) Amendment No. 3 to Note Agreement dated as of November 19, 2008, (iv) the Limited Waiver to Note Agreement and Guaranty Agreement (as amended), dated as of December 26, 2008, (v) Amendment No. 4 and First Amendment to Limited Waiver to Note Agreement and Guaranty Agreement, dated as of January 16, 2009, (vi) that certain Limited Waiver and Amendment No. 5 to Note Agreement dated as of February 18, 2009, (vii) Amendment No. 6 to Note Agreement dated as of April 6, 2011, and (viii) Amendment No. 7 to Note Agreement dated as of November 7, 2011, pursuant to which the Borrower issued and sold adjustable rate senior notes (collectively, the "**Exchanged Notes**");

WHEREAS, the Borrower and each of the holders of the Exchanged Notes are entering into that certain Note Agreement, dated as of the date hereof (as amended, supplemented, amended and restated or otherwise modified from time to time except as expressly prohibited hereby, the "**Existing First Priority Agreement**"), pursuant to which the Exchanged Notes are being exchanged for new adjustable rate senior notes of the Borrower (as amended, supplemented, amended and restated or otherwise modified from time to time, the "**Notes**");

WHEREAS, Lee Enterprises, Incorporated (the indirect parent of the Borrower, "**Lee**"), the Second Priority Representative and certain financial institutions and other entities are parties to the Second Lien Loan Agreement, dated as of the date hereof (as amended, supplemented, amended and restated or otherwise modified from time to time, the "**Second Priority Term Loan Agreement**"), pursuant to which such financial institutions and other entities have agreed to make (or be deemed to have made) loans to Lee;

WHEREAS, the Borrower is the obligor, and Pulitzer Inc. ("**Pulitzer**") and the other Loan Parties are the guarantors, of the First Priority Obligations and the Loan Parties have granted to the First Priority Representative security interests in the Common Collateral as security for payment and performance of the First Priority Obligations;

WHEREAS, pursuant to that certain Subsidiaries Guaranty, dated as of the date hereof (as amended, supplemented, amended and restated or otherwise modified from time to time except as expressly prohibited hereby, the "**Second Priority Guaranty Agreement**"), the Loan Parties (and certain other subsidiaries of Lee which are not Loan Parties and are not subject to the arrangements hereunder) have guaranteed the obligations under the Second Priority Term Loan Agreement and pursuant to the Second Priority Security Documents the Loan Parties have granted to the Second Priority Representative junior security interests in the Common Collateral as security for payment and performance of the Second Priority Obligations; and

WHEREAS, the First Priority Creditors under the Existing First Priority Agreement have agreed to permit the grant of such junior security interests in the Common Collateral on the terms and conditions of this Agreement.

NOW THEREFORE, in consideration of the foregoing and the mutual covenants herein contained and other good and valuable consideration, the existence and sufficiency of which are expressly recognized by all of the parties hereto, the parties agree as follows:

**SECTION 1**. *Definitions.*

1.1.    <u>Defined Terms</u>.  The following terms, as used herein, have the following meanings:

"**Agreement**" has the meaning set forth in the introductory paragraph hereof.

"**Bankruptcy Code**" means the United States Bankruptcy Code (11 U.S.C. §101 et seq.), as amended from time to time.

"**Borrower**" has the meaning set forth in the introductory paragraph hereof.

"**Common Collateral**" means all assets that are both First Priority Collateral and Second Priority Collateral.

"**Comparable Second Priority Security Document**" means, in relation to any Common Collateral subject to any First Priority Security Document, that Second Priority Security Document that creates a security interest in the same Common Collateral, granted by the same Loan Party, as applicable.

"**DIP Financing**" has the meaning set forth in Section 5.2.

"**Enforcement Action**" means, with respect to the First Priority Obligations or the Second Priority Obligations the exercise of any rights and remedies with respect to any Common Collateral securing such obligations or the commencement or prosecution of enforcement of any of the rights and remedies with respect to the Common Collateral under, as applicable, the First Priority Documents or the Second Priority Documents, or applicable law, including without limitation (a) the exercise of any rights of set-off or recoupment, (b) the exercise of any rights or remedies of a secured creditor under the Uniform Commercial Code of any applicable jurisdiction or under the Bankruptcy Code, and (c) the commencement of any judicial or nonjudicial foreclosure proceedings with respect to, attempting any action to take possession of any Common Collateral, exercising any right, remedy or power with respect to, or otherwise taking any action to enforce their interest in or realize upon, the Common Collateral.

"**Exchanged Notes**" has the meaning set forth in the recitals to this Agreement.

"**Existing First Priority Agreement**" has the meaning set forth in the recitals to this Agreement.

"**First Priority Agreement**" means the collective reference to (a) the Existing First Priority Agreement, (b) any other credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement or instrument evidencing or governing the terms of any indebtedness or other financial accommodation that has been incurred to extend, increase, renew, refund, replace (whether upon or after termination or otherwise) or refinance (including by means of sales of debt securities to institutional investors) in whole or in part from time to time the indebtedness and other obligations outstanding under

the Existing First Priority Agreement, the Notes or any other agreement or instrument referred to in this clause (b) unless such agreement or instrument expressly provides that it is not intended to be and is not a First Priority Agreement hereunder (a "**Replacement First Priority Agreement**").  Any reference to the First Priority Agreement hereunder shall be deemed a reference to any First Priority Agreement then extant.

"**First Priority Collateral**" means all assets, whether now owned or hereafter acquired by the Borrower or any other Loan Party, in which a Lien is granted or purported to be granted to any First Priority Secured Party as security for any First Priority Obligation.

"**First Priority Creditors**" means the holders of the Notes or any other First Priority Obligations under the First Priority Documents.

"**First Priority Documents**" means the First Priority Agreement, the Notes, each First Priority Security Document and each First Priority Guaranty.

"**First Priority Guaranty**" means any guaranty by any Loan Party of any or all of the First Priority Obligations.

"**First Priority Lien**" means any Lien created by the First Priority Security Documents.

"**First Priority Obligations**" means (a) with respect to the Existing First Priority Agreement, all "Secured Obligations" of each Loan Party as defined in the First Priority Security Documents and (b) with respect to each other First Priority Document, (i) all principal of, and interest (including without limitation any Post-Petition Interest), yield-maintenance amounts (if any) and premium (if any) on, all loans made or other indebtedness issued or incurred pursuant to the First Priority Agreement, (ii) all reimbursement obligations (if any) and interest thereon (including without limitation any Post-Petition Interest) with respect to any letter of credit or similar instruments issued pursuant to the First Priority Agreement, (iii) all Hedging Obligations and (iv) all guarantee obligations of, or fees, expenses and other amounts payable by any Loan Party, from time to time pursuant to the First Priority Documents, in each case whether or not allowed or allowable in an Insolvency Proceeding.  To the extent any payment with respect to any First Priority Obligation (whether by or on behalf of any Loan Party, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any Second Priority Secured Party, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of this Agreement and the rights and obligations of the First Priority Secured Parties and the Second Priority Secured Parties, be deemed to be reinstated and outstanding as if such payment had not occurred.

Notwithstanding the foregoing contained in this defined term of First Priority Obligations, if the sum of (1) the principal amount outstanding under the Existing First Priority Agreement and each other First Priority Agreement, plus (2) the aggregate undrawn face amount of any outstanding letters of credit under the Existing First Priority Agreement and each other First Priority Agreement and any unreimbursed drawings of any letters of credit issued under the Existing First Priority Agreement and each other First Priority Agreement (such sum, the "**First Priority Outstanding Amount**") exceeds  the Maximum First Priority Amount, then only that portion of the First Priority Outstanding Amount equal to the Maximum First Priority Amount shall be included in First Priority Obligations and interest, yield-maintenance amounts and reimbursement obligations with respect to the First Priority Outstanding

Amount shall only constitute First Priority Obligations to the extent related to the First Priority Outstanding Amount.

"**First Priority Obligations Payment Date**" means the first date on which (a) the First Priority Obligations (other than those that constitute Unasserted Contingent Obligations) have been paid in cash in full (or cash collateralized or defeased in accordance with the terms of the First Priority Documents), (b) all commitments to extend credit under the First Priority Documents have been terminated or expired, (c) there are no outstanding letters of credit or similar instruments issued under the First Priority Documents (other than such as have been cash collateralized or defeased in accordance with the terms of the First Priority Documents, but in no event greater than 105% of the aggregate undrawn face amount thereof) and (d) the First Priority Representative shall have either (x) delivered  written notice to the Second Priority Representative or any other Second Priority Secured Party of the occurrence of the events described in clauses (a), (b) and (c) hereinabove or (y) failed to timely comply with its notice obligation under Section 3.9 hereof.

"**First Priority Outstanding Amount**" has the meaning set forth in the definition of "First Priority Obligations".

"**First Priority Representative**" has the meaning set forth in the introductory paragraph hereof. In the case of any Replacement First Priority Agreement, the First Priority Representative shall be the Person identified as such in such Agreement.

"**First Priority Secured Parties**" means the First Priority Representative, the First Priority Creditors and any other holders of the First Priority Obligations.

"**First Priority Security Documents**" means the "Collateral Documents" as defined in the Existing First Priority Agreement (as in effect on the date hereof), and all other documents, instruments and agreements to which any Loan Party is a party from time to time which grant Liens in favor of the First Priority Representative to secure the First Priority Obligations.

"**Hedging Obligations**" means, with respect to any Loan Party, any monetary obligations of such Loan Party owed to any First Priority Creditor in respect of (i) any interest rate swap agreement, interest rate cap agreement, interest collar agreement, interest rate hedging agreement or other similar agreement or arrangement and (ii) any foreign exchange contracts, currency swap agreements, commodity agreements or other similar arrangements, or arrangements designed to protect against fluctuations in currency values or commodity prices, including, in each case, interest and Post-Petition Interest.

"**Insolvency Proceeding**" means any proceeding in respect of bankruptcy, insolvency, winding up, receivership, dissolution or assignment for the benefit of creditors, in each of the foregoing events whether under the Bankruptcy Code or any similar federal, state or foreign bankruptcy, insolvency, reorganization, receivership or similar law, in each case solely to the extent in respect of any Loan Party.

"**Lee**" has the meaning set forth in the recitals to this Agreement.

"**Lien**" means any mortgage, pledge, hypothecation, assignment, encumbrance, lien (statutory or other), or security interest or other security agreement of any kind (including, without limitation, any conditional sale or other title retention agreement, any financing or similar statement or notice filed under the Uniform Commercial Code or any other similar recording or notice statute, and any lease having

substantially the same effect as any of the foregoing), and any attachment or judgment lien contemplated in Section 3.3, in each case solely to the extent in respect of any asset of any Loan Party.

"**Loan Party**" means the Borrower, Pulitzer and each of their respective direct or indirect subsidiaries, in each case to the extent, and during such time as, such person is a party to any First Priority Security Document and any Second Priority Security Document.  All references in this Agreement to any Loan Party shall include such Loan Party as a debtor-in-possession and any receiver or trustee for such Loan Party in any Insolvency Proceeding.

"**Maximum First Priority Amount**" means (i) the aggregate principal amount of the Notes outstanding on the date hereof (after giving effect to the transactions contemplated to occur on the date hereof) under the Existing First Priority Agreement (which amount, for the avoidance of doubt, is $[_____]) or (ii) at any time following the repayment in full in cash of all outstanding obligations under the Existing First Priority Agreement and related First Priority Documents with the proceeds of Permitted Pulitzer Debt Refinancing Indebtedness (as defined in the Second Priority Term Loan Agreement), $150,000,000 minus, in each case of (i) and (ii), the aggregate amount of all payments of principal of (x) the Notes pursuant to the Existing First Priority Agreement and each other First Priority Agreement (including all such payments made on the date hereof), and (y) such Permitted Pulitzer Debt Refinancing Indebtedness.  For the avoidance of doubt, the amount of any DIP Financing shall not be included for purposes of determining the "Maximum First Priority Amount."

"**Notes**" has the meaning set forth in the recitals to this Agreement.

"**Person**" means any individual, partnership, joint venture, firm, corporation, association, trust or other enterprise or any government or political subdivision or any agency, department or instrumentality thereof.

"**Post-Petition Interest**" means any interest or entitlement to fees or expenses or other charges that accrues after the commencement of any Insolvency Proceeding, whether or not allowed or allowable in any such Insolvency Proceeding.

"**Pulitzer**" has the meaning set forth in the recitals to this Agreement.

"**Purchase**" has the meaning set forth in Section 3.6.

"**Purchase Notice**" has the meaning set forth in Section 3.6.

"**Purchase Price**" has the meaning set forth in Section 3.6.

"**Purchaser**" has the meaning set forth in Section 3.6.

"**Purchasing Parties**" has the meaning set forth in Section 3.6.

"**Replacement First Priority Agreement**" has the meaning set forth in the definition of "First Priority Agreement."

"**Second Priority Agreement**" means the collective reference to (a) the Second Priority Guaranty Agreement and (b) any guaranty to which any Loan Party is a party with respect to any other credit agreement, loan agreement, note agreement, promissory note, indenture, or other agreement or instrument

evidencing or governing the terms of any indebtedness (or guarantee thereof) or other financial accommodation that has been incurred to extend, increase, renew, refund, replace (whether upon or after termination or otherwise) or refinance (including by means of sales of debt securities to institutional investors) in whole or in part from time to time the indebtedness and other obligations outstanding (contingent or otherwise) under the Second Priority Term Loan Agreement or any other agreement or instrument referred to in this clause (b), provided that (i) the terms of any of the foregoing in this clause (b) are no less favorable to the Loan Parties than those set forth in the Second Priority Term Loan Agreement and (ii) the maximum aggregate principal amount of indebtedness (for the avoidance of doubt, not including interest, premium, yield-maintenance amounts, fees or reimbursement obligations (including expenses) payable in respect thereof, in each case including, without limitation, amounts capitalized in accordance with the First Priority Agreement and the Second Priority Agreement) which is guaranteed by any Loan Party as referenced in clauses (a) or (b) shall not exceed $175,000,000 or such greater amount as may then be expressly permitted by the First Priority Agreement.  Any reference to the Second Priority Agreement hereunder shall be deemed a reference to any Second Priority Agreement then extant.

"**Second Priority Collateral**" means all assets (whether now owned or hereafter acquired) of the Borrower or any other Loan Party in which a Lien is granted or purported to be granted to any Second Priority Secured Party as security for any Second Priority Obligation.

"**Second Priority Creditors**" means the "Secured Creditors" as defined in the Second Priority Security Documents, the "Lenders" as defined in each other Second Priority Agreement, or any Persons that are designated under the Second Priority Agreement as the "Second Priority Creditors" for purposes of this Agreement.

"**Second Priority Documents**" means the Second Priority Agreement and the Second Priority Security Documents.

"**Second Priority Guaranty Agreement**" has the meaning set forth in the recitals to this Agreement.

"**Second Priority Lien**" means any Lien created by the Second Priority Security Documents in respect of any assets of a Loan Party.

"**Second Priority Obligations**" means (a) with respect to the Second Priority Guaranty Agreement, all "Obligations" of each Loan Party as defined in the Second Priority Security Documents and (b) with respect to each other Second Priority Agreement, (i) all principal of, and interest (including without limitation any Post-Petition Interest), yield-maintenance amounts (if any) and premium (if any) on, all indebtedness (contingent or otherwise) of any Loan Party under the Second Priority Agreement, and (ii) all guarantee obligations of, or fees, expenses and other amounts payable by, any Loan Party from time to time pursuant to the Second Priority Documents, in each case whether or not allowed or allowable in an Insolvency Proceeding.  To the extent any payment with respect to any Second Priority Obligation (whether by or on behalf of any Loan Party, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any First Priority Secured Party, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of this Agreement and the rights and obligations of the First Priority Secured Parties and the Second Priority Secured Parties, be deemed to be reinstated and outstanding as if such payment had not occurred.

"**Second Priority Representative**" has the meaning set forth in the introductory paragraph hereof, but shall also include any Person identified as a "Second Priority Representative" in any Second Priority Agreement other than the Second Priority Term Loan Agreement.

"**Second Priority Required Adequate Protection**" has the meaning set forth in Section 5.4.

"**Second Priority Secured Party**" means the Second Priority Representative, the Second Priority Creditors and any other holders of the Second Priority Obligations.

"**Second Priority Security Documents**" means the "Security Documents" (as defined in the Second Priority Term Loan Agreement as in effect on the date hereof) to which any Loan Party is party and all other documents, instruments and agreements to which any Loan Party is a party from time to time which grant Liens in favor of the Second Priority Representative to secure the Second Priority Obligations.

"**Second Priority Term Loan Agreement**" has the meaning set forth in the recitals to this Agreement.

"**Secured Parties**" means the First Priority Secured Parties and the Second Priority Secured Parties.

"**Standstill Period**" has the meaning set forth in Section 3.2.

"**Surviving Obligations**" has the meaning set forth in Section 3.6(b).

"**Unasserted Contingent Obligations**" shall mean, at any time, First Priority Obligations for taxes, costs, indemnifications, reimbursements, damages and other liabilities (excluding (a) the principal of, and interest, yield-maintenance amount and premium (if any) on, and fees and expenses relating to, any First Priority Obligation and (b) contingent reimbursement obligations in respect of amounts that may be drawn under outstanding letters of credit) in respect of which no assertion of liability (whether oral or written) and no claim or demand for payment (whether oral or written) has been made (and, in the case of First Priority Obligations for indemnification, no notice for indemnification has been issued by the indemnitee) at such time.

"**Uniform Commercial Code**" shall mean the Uniform Commercial Code as in effect from time to time in the applicable jurisdiction.

1.2    Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (i) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (to the extent applicable, in accordance with Section 6 hereof), (ii) any reference herein to any Person shall be construed to include such Person's successors or permitted assigns, (iii) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Sections shall be construed to refer to Sections of this Agreement and (v) the words

"asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

**SECTION 2**. *Lien Priorities.*

2.1     Subordination of Liens. (a)  Any and all Liens on assets of any Loan Party now existing or hereafter created or arising in favor of any Second Priority Secured Party securing the Second Priority Obligations, regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise are expressly junior in priority, operation and effect to any and all Liens on assets of any Loan Party now existing or hereafter created or arising in favor of the First Priority Secured Parties securing the First Priority Obligations, notwithstanding (i) anything to the contrary contained in any agreement or filing to which any Second Priority Secured Party may now or hereafter be a party, and regardless of the time, order or method of grant, attachment, recording or perfection of any financing statements or other security interests, assignments, pledges, deeds, mortgages and other liens, charges or encumbrances or any defect or deficiency or alleged defect or deficiency in any of the foregoing, (ii) any provision of the Uniform Commercial Code or any applicable law or any First Priority Document or Second Priority Document or any other circumstance whatsoever and (iii) the fact that any such Liens in favor of any First Priority Secured Party securing any of the First Priority Obligations are (x) subordinated to any Lien securing any obligation of any Loan Party other than the Second Priority Obligations or (y) otherwise subordinated, voided, avoided, invalidated or lapsed.

(b)  The First Priority Representative, on behalf of itself and the other First Priority Secured Parties, acknowledges and agrees that the Second Priority Representative on behalf of itself and the other Second Priority Secured Parties, has been granted Liens upon all of the Common Collateral, and the First Priority Representative, on behalf of itself and the other First Priority Secured Parties, hereby consents thereto.  The subordination of Liens on assets of any Loan Party by the Second Priority Representative in favor of the First Priority Representative shall not be deemed to subordinate such Liens of the Second Priority Representative (or any Second Priority Secured Party) to any Liens other than (x) the Liens of the First Priority Secured Parties securing the First Priority Obligations and (y) Liens that are permitted under the First Priority Documents to be senior to the First Priority Liens, and (z) Liens permitted pursuant to Section 5 hereof.

2.2     Nature of First Priority Obligations. The Second Priority Representative on behalf of itself and the other Second Priority Secured Parties acknowledges that in the event the First Priority Obligations include debt that is revolving in nature the amount of First Priority Obligations that may be outstanding at any time or from time to time may be increased or reduced and subsequently reborrowed, and that the terms of the First Priority Obligations may be modified, extended or amended from time to time, and that the aggregate amount of the First Priority Obligations may be increased, replaced or refinanced, in each event, without notice to or consent by the Second Priority Secured Parties and without affecting the provisions hereof but only so long as any such obligations are permitted to be incurred pursuant to the terms hereof or of the Second Priority Documents as in effect on the date of this Agreement.  The lien priorities provided in Section 2.1 shall not be altered or otherwise affected by any such amendment, modification, supplement, extension, repayment, reborrowing, increase, replacement, renewal, restatement or refinancing of either the First Priority Obligations or the Second Priority Obligations, or any portion thereof.

2.3     Agreements Regarding Actions to Perfect Liens.  (a)  The Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties, agrees that each patent, trademark or copyright filing or other filings or recordings (other than Uniform Commercial Code

financing statements) filed or recorded by or on behalf of the Second Priority Representative in respect of applicable Common Collateral shall, to the extent reasonably practicable, contain the following notation: "The lien created hereby on the property described herein is junior and subordinate to the lien on such property created by any agreement, filing or recording now or hereafter granted to The Bank of New York Mellon Trust Company, N.A., as Collateral Agent (under the First Priority Documents), and its successors and assigns, in such property, in accordance with the provisions of the Intercreditor Agreement dated as of [_____], among THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A. as First Priority Representative, WILMINGTON TRUST, NATIONAL ASSOCIATION, as Second Priority Representative, ST. LOUIS POST-DISPATCH LLC, as Borrower, and the other Loan Parties referred to therein, as amended from time to time."

(b) The Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties, agrees that all mortgages, deeds of trust, deeds and similar instruments now or hereafter filed against real property comprising Common Collateral in favor of or for the benefit of the Second Priority Representative and the other Second Priority Secured Parties shall contain the following notation: "The lien created by this mortgage on the property described herein is junior and subordinate to the lien on such property created by any mortgage, deed of trust or similar instrument now or hereafter granted to The Bank of New York Mellon Trust Company, N.A., as Collateral Agent (under the First Priority Documents), and its successors and assigns, in such property, in accordance with the provisions of the Intercreditor Agreement dated as of [_____], among THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A. as First Priority Representative, WILMINGTON TRUST, NATIONAL ASSOCIATION, as Second Priority Representative, ST. LOUIS POST-DISPATCH LLC, and the other Loan Parties referred to therein, as amended from time to time."

(c) The First Priority Representative hereby acknowledges and agrees that, to the extent that it holds, or a third party holds on its behalf, physical possession of or "control" (as defined in the Uniform Commercial Code) over Common Collateral pursuant to the First Priority Security Documents, such possession or control is also for the benefit of, and the First Priority Representative or such third party holds such possession or control as bailee and agent for, the Second Priority Representative and the other Second Priority Secured Parties solely to the extent required to perfect their security interest in such Common Collateral (such bailment and agency for perfection being intended, among other things, to satisfy the requirements of Sections 8-301(a)(2) and 9-313(c) of the Uniform Commercial Code). Nothing in the preceding sentence shall be construed to impose any duty on the First Priority Representative (or any third party acting on its behalf) with respect to such Common Collateral or provide the Second Priority Representative or any other Second Priority Secured Party with any rights with respect to such Common Collateral beyond those specified in this Agreement and the Second Priority Security Documents, provided that as soon as practicable after the occurrence of the events described in clauses (a), (b) and (c) of the definition of the First Priority Obligations Payment Date, the First Priority Representative shall (i) deliver, at the Borrower's sole cost and expense, the Common Collateral in its possession or control together with any necessary endorsements (x) *first*, to the Second Priority Representative to the extent any Second Priority Obligations remain outstanding and (y) *second*, to the Borrower to the extent no First Priority Obligations or Second Priority Obligations remain outstanding, or (ii) direct and deliver such Common Collateral as a court of competent jurisdiction otherwise directs, and provided, further, that the provisions of this Agreement are intended solely to govern the respective Lien priorities as between the First Priority Secured Parties and the Second Priority Secured Parties and shall not impose on the First Priority Secured Parties any obligations in respect of the disposition of any Common Collateral (or any proceeds thereof) that would conflict with prior perfected Liens or any claims thereon in favor of any other Person that is not a Secured Party.

(d)  To the extent that any deposit account or securities account of any Loan Party is subject to a control agreement in favor of the First Priority Representative, the First Priority Representative will act as bailee and agent for the Second Priority Representative solely to the extent required to perfect the Liens of the Second Priority Secured Parties in such deposit accounts and securities accounts and the cash and other assets therein.  Nothing in the preceding sentence shall be construed to impose any duty on the First Priority Representative (or any third party acting on its behalf) with respect to such Common Collateral or provide the Second Priority Representative or any other Second Priority Secured Party with any rights with respect to such Common Collateral beyond those specified in this Agreement and the Second Priority Security Documents.  Unless the Second Priority Liens on such First Priority Collateral shall have been or concurrently are released, after the First Priority Obligations Payment Date, the First Priority Representative shall cooperate with the Loan Parties and the Second Priority Representative (at the expense of the Loan Parties) in permitting control of any deposit accounts and securities accounts to be transferred to the Second Priority Representative (or for other arrangements with respect to each such deposit account and securities account reasonably satisfactory to the Second Priority Representative and in accordance with the Second Priority Documents to be made).

2.4    No New Liens.  So long as the First Priority Obligations Payment Date has not occurred, whether or not an Insolvency Proceeding has been commenced by or against any Loan Party the parties hereto agree that (a) there shall be no Lien, and no Loan Party shall have any right to create any Lien, on any assets of any Loan Party securing any Second Priority Obligation if these same assets are not subject to, and do not become subject to, a Lien securing the First Priority Obligations and (b) there shall be no Lien, and no Loan Party shall have any right to create any Lien, on any assets of any Loan Party securing any First Priority Obligation if these same assets are not subject to, and do not become subject to, a Lien securing the Second Priority Obligations.  To the extent that the foregoing provisions are not complied with for any reason, without limiting any other rights and remedies available to the First Priority Secured Parties, the Second Priority Representative and the other Second Priority Secured Parties agree that any amounts received by or distributed to any of them pursuant to or as a result of Liens granted in contravention of this Section 2.4 shall be subject to Section 4.1.

2.5    Prohibition on Contesting Liens.  Each of the Second Priority Representative, for itself and on behalf of each of the Second Priority Secured Parties, and the First Priority Representative, for itself and on behalf of each of the First Priority Secured Parties, agrees that it will not (and hereby waives any right to) object to or contest or support any other Person in objecting to or contesting, in any proceeding (including without limitation, any Insolvency Proceeding), the validity, extent, perfection, priority or enforceability of a Lien held by or on behalf of any of the First Priority Secured Parties in the First Priority Collateral or by or on behalf of any of the Second Priority Secured Parties in the Second Priority Collateral, as the case may be, or the provisions of this Agreement; provided, that nothing in this Agreement shall be construed to prevent or impair the rights of the First Priority Representative, any First Priority Secured Party, the Second Priority Representative or any Second Priority Secured Party to enforce this Agreement, including the provisions of this Agreement relating to the priority of the Liens securing the First Priority Obligations as provided in Sections 2.1 and 3.1.  Notwithstanding any failure by any First Priority Secured Party or Second Priority Secured Party to perfect its security interests in the Common Collateral or any avoidance, invalidation or subordination by any third party or court of competent jurisdiction of the security interests in the Common Collateral granted to the First Priority Secured Parties or the Second Priority Secured Parties, the priority and rights as between the First Priority Secured Parties and the Second Priority Secured Parties with respect to the Common Collateral shall be as set forth herein.

**SECTION 3**. *Enforcement Rights.*

3.1    <u>Exclusive Enforcement</u>.  Until the First Priority Obligations Payment Date has occurred, whether or not an Insolvency Proceeding has been commenced by or against any Loan Party, the First Priority Secured Parties shall have the exclusive right to take and continue any Enforcement Action with respect to the Common Collateral, without any consultation with or consent of any Second Priority Secured Party, but subject to the provisos set forth in Sections 3.2 and 5.1.  Upon the occurrence and during the continuance of a default or an event of default under the First Priority Documents, the First Priority Representative and the other First Priority Secured Parties may take and continue any Enforcement Action with respect to the First Priority Obligations and the Common Collateral in such order and manner as they may determine in their sole discretion.

3.2    <u>Standstill and Waivers</u>.  The Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties, agrees that, until the First Priority Obligations Payment Date has occurred, subject to the proviso set forth in Section 5.1:

(a)  they will not take or cause to be taken any Enforcement Action;

(b)  they will not take or cause to be taken any action, the purpose or effect of which is to make any Lien in respect of any Second Priority Obligation pari passu with or senior to, or to give any Second Priority Secured Party any preference or priority relative to, the Liens with respect to the First Priority Obligations or the First Priority Secured Parties with respect to any of the Common Collateral;

(c)  they will not contest, oppose, object to, interfere with, hinder or delay, in any manner, whether by judicial proceedings (including without limitation the filing of an Insolvency Proceeding in respect of any Loan Party) or otherwise, any foreclosure, sale, lease, exchange, transfer or other disposition of the Common Collateral by any First Priority Secured Party or any other Enforcement Action taken (or any forbearance from taking any Enforcement Action) by or on behalf of any First Priority Secured Party;

(d)  they have no right to (i) direct either the First Priority Representative or any other First Priority Secured Party to exercise any right, remedy or power with respect to the Common Collateral or pursuant to the First Priority Security Documents or (ii) consent or object to the exercise by the First Priority Representative or any other First Priority Secured Party of any right, remedy or power with respect to the Common Collateral or pursuant to the First Priority Security Documents or to the timing or manner in which any such right is exercised or not exercised (or, to the extent they may have any such right described in this clause (d), whether as a junior lien creditor or otherwise, they hereby irrevocably waive such right);

(e)  they will not institute any suit or other proceeding or assert in any suit, Insolvency Proceeding or other proceeding any claim against any First Priority Secured Party seeking damages from or other relief by way of specific performance, injunction or otherwise, with respect to, and no First Priority Secured Party shall be liable for, any action taken or omitted to be taken by any First Priority Secured Party with respect to the Common Collateral or pursuant to the First Priority Documents; and

(f)  they will not seek, and hereby waive any right, to have the Common Collateral or any part thereof marshaled upon any foreclosure or other disposition of the Common Collateral.

provided that, notwithstanding the foregoing, any Second Priority Secured Party may exercise its rights and remedies in respect of Common Collateral under the Second Priority Security Documents or applicable law after the passage of a period of 150 days (the "**Standstill Period**") from the first date of delivery of a notice in writing to the First Priority Representative and the Borrower of any Second Priority Secured Party's intention to exercise such rights and remedies in respect of Common Collateral, which notice may only be delivered following the occurrence of and during the continuance of an "Event of Default" under and as defined in the Second Priority Agreement; provided, further, however, that, notwithstanding the foregoing, in no event shall any Second Priority Secured Party exercise or continue to exercise any such rights or remedies if, notwithstanding the expiration of the Standstill Period, (i) the First Priority Representative or any First Priority Secured Parties to the extent constituting the Required Holders (as defined in the Existing First Priority Agreement as of the date hereof) shall have commenced and be diligently pursuing in good faith the exercise of any of its rights and remedies with respect to all or any material portion of the Common Collateral or (ii) an Insolvency Proceeding in respect of any Loan Party shall have been commenced; and provided, further, that in any Insolvency Proceeding commenced by or against any Loan Party, the Second Priority Representative and the Second Priority Secured Parties may take any action expressly permitted by Section 5.

Notwithstanding the foregoing contained in this Section 3.2, the Second Priority Representative and the Second Priority Secured Parties may:

(1) take any action (not adverse to the priority status of the Liens on the Common Collateral, or the rights of any First Priority Representative or the First Priority Secured Parties to exercise remedies in respect thereof or the agreements set forth in Section 2) in order to create, perfect, preserve or protect its Lien on the Common Collateral;

(2) file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any Person objecting to or otherwise seeking the disallowance of the claims of the Second Priority Secured Parties, including any claims secured by the Common Collateral, if any, in each case in a manner that is not inconsistent with, or in contravention of, the express terms of this Agreement;

(3) file any pleadings, objections, motions or agreements or take any positions that assert rights or interests available to unsecured creditors of the Loan Parties arising under either any Insolvency Proceeding or applicable non-bankruptcy law, in each case in a manner that is not inconsistent with, or in contravention of, the express terms of this Agreement;

(4) vote on any plan of reorganization, file any proof of claim or statement of interest, make other filings and make any arguments and motions that are, in each case, in a manner that is not inconsistent with, or in contravention of, the express terms of this Agreement, with respect to the Second Priority Obligations and the Common Collateral;

(5) exercise any of its rights or remedies with respect to the Common Collateral after the termination of the Standstill Period to the extent permitted by this Section 3.2;

(6) present a cash or credit bid (in the case of any such credit bid, so long as such bid provides for payment in full of the First Priority Obligations and the occurrence of the events described in clauses (a), (b) and (c) of the definition of the First Priority Obligations Payment Date) at any Section 363 hearing or with respect to any other Common Collateral disposition; and

(7)    bid for or purchase Common Collateral at any private or judicial foreclosure upon such Common Collateral initiated by the First Priority Representative or any of the First Priority Secured Parties.

3.3    Judgment Creditors.  In the event that any Second Priority Secured Party becomes a judgment lien creditor as a result of its enforcement of its rights as an unsecured creditor, such judgment lien shall be subject to the terms of this Agreement for all purposes (including in relation to the First Priority Liens and the First Priority Obligations) to the same extent as all other Liens securing the Second Priority Obligations are subject to the terms of this Agreement.

3.4    No Additional Rights For the Loan Parties Hereunder.  Except as provided in Section 3.5, if any First Priority Secured Party or Second Priority Secured Party shall enforce its rights or remedies in violation of the terms of this Agreement, no Loan Party shall be entitled to use such violation as a defense to any action by any First Priority Secured Party or Second Priority Secured Party, nor to assert such violation as a counterclaim or basis for set off or recoupment against any First Priority Secured Party or Second Priority Secured Party.

3.5    Actions Upon Breach.  (a)  If any Second Priority Secured Party, contrary to this Agreement, commences or participates in any action or proceeding against any Loan Party or the Common Collateral, such Loan Party, with the prior written consent of the First Priority Representative, may interpose as a defense or dilatory plea the making of this Agreement, and any First Priority Secured Party may intervene and interpose such defense or plea in its or their name or in the name of such Loan Party.

(b)  Should any Second Priority Secured Party, contrary to this Agreement, in any way take, attempt to or threaten to take any action with respect to the Common Collateral (including, without limitation, any attempt to realize upon or enforce any remedy with respect to this Agreement), or fail to take any action required by this Agreement, any First Priority Secured Party (in its own name or in the name of the relevant Loan Party) or the relevant Loan Party may obtain relief against such Second Priority Secured Party by injunction, specific performance and/or other appropriate equitable relief, it being understood and agreed by the Second Priority Representative on behalf of each Second Priority Secured Party that (i) the First Priority Secured Parties' damages from its actions may at that time be difficult to ascertain and may be irreparable, and (ii) each Second Priority Secured Party waives any defense that the Loan Parties and/or the First Priority Secured Parties cannot demonstrate damage and/or be made whole by the awarding of damages.

3.6    Option to Purchase.  (a)  The First Priority Representative agrees that it will give the Second Priority Representative written notice (the "**Enforcement Notice**") within five business days after commencing any Enforcement Action with respect to Common Collateral or the institution of any Insolvency Proceeding (which notice shall be effective for all Enforcement Actions taken after the date of such notice so long as the First Priority Representative is diligently pursuing in good faith the exercise of its default or enforcement rights or remedies against, or diligently attempting in good faith to vacate any stay of enforcement rights of its senior Liens on a material portion of the Common Collateral, including, without limitation, all Enforcement Actions identified in such notice).  Following the commencement of an Enforcement Action or the institution of any Insolvency Proceeding by the First Priority Representative or any other First Priority Secured Party, any Second Priority Secured Party shall have the option, by irrevocable written notice (the "**Purchase Notice**") delivered by the Second Priority Representative to the First Priority Representative at any time, to purchase all of the First Priority Obligations from the First Priority Secured Parties.  If the Second Priority Representative so delivers the

Purchase Notice, the First Priority Representative shall terminate any existing Enforcement Actions, and shall not take any further Enforcement Actions, <u>provided</u>, that the Purchase (as defined below) shall have been consummated on the date specified in the Purchase Notice in accordance with this Section 3.6.  For the avoidance of doubt, if the Purchase is not consummated on or before the date specified in the Purchase Notice for any reason, the First Priority Secured Parties shall be entitled to recommence taking Enforcement Actions.  In addition, following any such failure the Second Priority Secured Parties shall not be entitled to exercise any right pursuant to this Section 3.6 to Purchase the First Priority Obligations at any time thereafter, unless agreed to by the First Priority Secured Parties.

(b)      On the date specified by the Second Priority Representative in the Purchase Notice (which shall be a business day not less than five business days, nor more than ten business days, after receipt by the First Priority Representative of the Purchase Notice), the First Priority Secured Parties shall, subject to any required approval of any court or other governmental authority then in effect, sell to the Second Priority Secured Parties electing to purchase pursuant to Section 3.6(a) (the "**Purchasing Parties**"), and the Purchasing Parties shall purchase (the "**Purchase**") from the First Priority Secured Parties, the First Priority Obligations; <u>provided</u>, that the First Priority Obligations purchased shall not include any rights of First Priority Secured Parties with respect to indemnification and other obligations of the Loan Parties under the First Priority Documents that are expressly stated to survive the termination of the First Priority Documents (the "**Surviving Obligations**").

(c)      Without limiting the obligations of the Loan Parties under the First Priority Documents to the First Priority Secured Parties with respect to the Surviving Obligations (which shall not be transferred in connection with the Purchase), on the date of the Purchase, the Purchasing Parties shall (i) pay to the First Priority Secured Parties as the purchase price (the "**Purchase Price**") therefor the full amount of all First Priority Obligations then outstanding and unpaid (including principal, interest (including, to the extent applicable, interest at the default rate), Post-Petition Interest, fees, yield-maintenance amounts (if any), breakage costs, attorneys' fees and expenses, and, in the case of any Hedging Obligations, the amount that would be payable by the relevant Loan Party thereunder if it were to terminate such Hedging Obligations on the date of the Purchase or, if not terminated, an amount determined by the relevant First Priority Secured Party to be necessary to collateralize its credit risk arising out of such Hedging Obligations), (ii) furnish cash collateral (the "**Cash Collateral**") to the First Priority Secured Parties in such amounts as the relevant First Priority Secured Parties determine is reasonably necessary to secure such First Priority Secured Parties in connection with any outstanding letters of credit (not to exceed 105% of the aggregate undrawn face amount of such letters of credit), (iii) agree to reimburse the First Priority Secured Parties for any loss, cost, damage or expense (including attorneys' fees and expenses) in connection with any fees, costs or expenses related to any checks or other payments provisionally credited to the First Priority Obligations and/or as to which the First Priority Secured Parties have not yet received final payment and (iv) agree, after written request from the First Priority Representative, to reimburse the First Priority Secured Parties in respect of indemnification obligations of the Loan Parties under the First Priority Documents as to matters or circumstances known to the Purchasing Parties at the time of the Purchase which could reasonably be expected to result in any loss, cost, damage or expense to any of the First Priority Secured Parties, <u>provided</u> that, in no event shall any Purchasing Party have any liability for such amounts in excess of proceeds of Common Collateral received by the Purchasing Parties.

(d)      The Purchase Price and Cash Collateral shall be remitted by wire transfer in immediately available funds to such account of the First Priority Representative as it shall designate to the Purchasing Parties.  The First Priority Representative shall, promptly following its receipt thereof, distribute the amounts received by it in respect of the Purchase Price to the First Priority Secured Parties in accordance

with the First Priority Documents.  Interest shall be calculated to but excluding the day on which the Purchase occurs if the amounts so paid by the Purchasing Parties to the account designated by the First Priority Representative are received in such account prior to 12:00 Noon, New York City time, and interest shall be calculated to and including such day if the amounts so paid by the Purchasing Parties to the account designated by the First Priority Representative are received in such account later than 12:00 Noon, New York City time.

(e)     The Purchase shall be made without representation or warranty of any kind by the First Priority Secured Parties as to the First Priority Obligations, the Common Collateral or otherwise and without recourse to the First Priority Secured Parties, except that each First Priority Secured Party shall severally represent and warrant:  (i) the amount of the First Priority Obligations being purchased from such First Priority Secured Party, (ii) that such First Priority Secured Party owns the First Priority Obligations held by it free and clear of any liens or encumbrances and (iii) that such First Priority Secured Party has the right to assign the First Priority Obligations held by it and the assignment is duly authorized.

3.7     <u>Rights as Unsecured Creditors</u>.  The Second Priority Representative and the Second Priority Secured Parties may exercise rights and remedies available to unsecured creditors against the Loan Parties that have granted Liens to secure the Second Priority Obligations in accordance with the terms of the Second Priority Documents and applicable law to the extent that such exercise is not inconsistent with, or in contravention of, the express terms of this Agreement; <u>provided</u> that in the event that any Second Priority Secured Party becomes an attachment or a judgment Lien creditor in respect of the Common Collateral as a result of its enforcement of its rights as an unsecured creditor with respect to the Second Priority Obligations, such attachment or judgment Lien shall be subject to the terms of this Agreement for all purposes (including in relation to the First Priority Obligations) as the other Liens on Common Collateral securing the Second Priority Obligations are subject to this Agreement.

3.8     <u>Second Priority Interest, Principal, Etc</u>.  Nothing in this Agreement shall prohibit the receipt by the Second Priority Representative or any Second Priority Secured Parties of payments (including in cash) of interest, principal and other amounts owed in respect of the Second Priority Obligations unless such receipt is (x) the direct or indirect result of the exercise by the Second Priority Representative or any Second Priority Secured Parties of rights or remedies with respect to, or enforcement of, any Lien on Common Collateral held by any of them, which exercise or enforcement is inconsistent with, or in contravention of, the express terms of this Agreement or (y) from the proceeds of an Enforcement Action required to be applied in accordance with Section 4.1 below.  Nothing in this Agreement impairs or otherwise adversely affects any rights or remedies the First Priority Representative or the First Priority Secured Parties may have with respect to the Common Collateral.

3.9     <u>Notice By First Priority Representative</u>.  The First Priority Representative shall render to Second Priority Representative written notice of the occurrence of the events described in clauses (a), (b) and (c) of the definition of "First Priority Obligations Payment Date" as soon as practicable (and in any event within two business days) following the occurrence thereof, <u>provided</u> that such notice shall not be required in connection with the consummation of a Replacement First Priority Agreement.

**SECTION 4**.  *Application Of Proceeds Of Common Collateral; Dispositions And Releases Of Common Collateral; Inspection and Insurance.*

4.1     <u>Application of Proceeds; Turnover Provisions</u>.  All proceeds of Common Collateral (including without limitation any interest earned thereon) resulting from the sale, collection or other disposition of Common Collateral in connection with an Enforcement Action or the exercise by any First

Priority Secured Party or any Second Priority Secured Party of any of its respective rights and remedies with respect to Common Collateral, whether or not pursuant to an Insolvency Proceeding, shall be distributed as follows:  first to the First Priority Representative for application to the First Priority Obligations in accordance with the terms of the First Priority Documents, until the First Priority Obligations Payment Date has occurred and thereafter, to the Second Priority Representative for application in accordance with the Second Priority Documents.  Until the occurrence of the First Priority Obligations Payment Date, any Common Collateral, including without limitation any such Common Collateral constituting proceeds, that may be received by any Second Priority Secured Party in violation of this Agreement shall be segregated and held in trust and promptly paid over to the First Priority Representative, for the benefit of the First Priority Secured Parties, in the same form as received, with any necessary endorsements, and each Second Priority Secured Party hereby authorizes the First Priority Representative to make any such endorsements as agent for the Second Priority Representative (which authorization, being coupled with an interest, is irrevocable).

4.2    Releases of Second Priority Lien.  (a) Upon any release, sale or disposition of Common Collateral (other than in connection with the occurrence of the First Priority Obligations Payment Date) permitted pursuant to the terms of the First Priority Documents that results in the release of the First Priority Lien on any Common Collateral (excluding any sale or other disposition that is not permitted by the Second Priority Documents unless such sale or disposition is consummated in connection with an Enforcement Action or consummated after the institution of an Insolvency Proceeding in respect of any Loan Party), the Second Priority Lien on such Common Collateral (excluding any portion of the proceeds of such Common Collateral remaining after the First Priority Obligations Payment Date occurs) shall be automatically and unconditionally released with no further consent or action of any Person.

(b)  The Second Priority Representative shall promptly execute and deliver such release documents and instruments and shall take such further actions as the First Priority Representative shall request to evidence any release of the Second Priority Lien described in paragraph (a).  The Second Priority Representative hereby appoints the First Priority Representative and any officer or duly authorized person of the First Priority Representative, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power of attorney in the place and stead of the Second Priority Representative and in the name of the Second Priority Representative or in the First Priority Representative's own name, from time to time, in the First Priority Representative's sole discretion, for the purposes of carrying out the terms of this Section 4.2, to take any and all appropriate action and to execute and deliver any and all documents and instruments as may be necessary or desirable to accomplish the purposes of this Section 4.2, including, without limitation, any financing statements, endorsements, assignments, releases or other documents or instruments of transfer (which appointment, being coupled with an interest, is irrevocable).

4.3    Inspection Rights and Insurance.  (a) Any First Priority Secured Party and its representatives and invitees may at any time inspect, repossess, remove and otherwise deal with the Common Collateral in accordance with the terms of the First Priority Documents, and the First Priority Representative may advertise and conduct public auctions or private sales of the Common Collateral, in each case without notice to, the involvement of or interference by any Second Priority Secured Party or liability to any Second Priority Secured Party; provided that the First Priority Representative shall provide the Second Priority Representative with notice of any sales.

(b)  Until the First Priority Obligations Payment Date has occurred, the First Priority Representative will have the sole and exclusive right (i) to be named as additional insured and loss payee under any insurance policies maintained from time to time by any Loan Party (except that the Second

Priority Representative shall have the right to be named as additional insured and loss payee so long as its second lien status is identified in a manner satisfactory to the First Priority Representative); (ii) to adjust or settle any insurance policy or claim covering the Common Collateral in the event of any loss thereunder in accordance with the terms of the First Priority Documents;  (iii)  to approve any award granted in any condemnation or similar proceeding affecting the Common Collateral in accordance with the terms of the First Priority Documents; and (iv) to apply the proceeds of any insurance or condemnation award to the First Priority Obligations in accordance with the terms of the First Priority Documents.

4.4    Subrogation.  With respect to the value of any payments or distributions in cash, property or other assets that any Second Priority Secured Party pays over to the First Priority Secured Parties under the terms of this Agreement, the Second Priority Secured Parties shall be subrogated to the rights of the First Priority Secured Parties; provided that, the Second Priority Representative, on behalf of itself and the Second Priority Creditors, hereby agrees not to assert or enforce all such rights of subrogation it may acquire as a result of any payment hereunder until the First Priority Obligations Payment Date has occurred.  Each Loan Party acknowledges and agrees that the value of any payments or distributions in cash, property or other assets received by any Second Priority Secured Party that are paid over to the First Priority Secured Parties pursuant to this Agreement shall not reduce any of the Second Priority Obligations.

**SECTION 5**.  *Insolvency Proceedings.*

5.1    Filing of Motions.  Until the First Priority Obligations Payment Date has occurred, the Second Priority Representative agrees on behalf of itself and the other Second Priority Secured Parties that no Second Priority Secured Party shall, in or in connection with any Insolvency Proceeding in respect of any Loan Party, file any pleadings or motions, take any position at any hearing or proceeding of any nature, or otherwise take any action whatsoever, in each case that (a) violates, or is prohibited by, this Agreement, (b) asserts any right, benefit or privilege that arises in favor of the Second Priority Representative or Second Priority Secured Parties in their capacity as secured creditors solely as a result of their interest in the Common Collateral or in the Second Priority Lien (unless the assertion of such right is expressly permitted by this Agreement) or (c) challenges the validity, priority, enforceability or voidability of any Liens or claims held by the First Priority Representative or any other First Priority Secured Party, or the extent to which the First Priority Obligations constitute secured claims under Section 506(a) of the Bankruptcy Code or otherwise; provided, that the Second Priority Representative may take the actions specifically set forth in Section 3.2.

The First Priority Representative agrees on behalf of itself and the other First Priority Secured Parties that no First Priority Secured Party shall, in or in connection with any Insolvency Proceeding, file any pleadings or motions, take any position at any hearing or proceeding of any nature, or otherwise take any action whatsoever, in each case that challenges the validity, priority, enforceability or voidability of any Liens or claims held by the Second Priority Representative or any other Second Priority Secured Party, or the extent to which the Second Priority Obligations constitute secured claims under Section 506(a) of the Bankruptcy Code or otherwise, except that the foregoing shall not limit the ability of any First Priority Secured Party to enforce the terms of this Agreement.

5.2    Financing Matters.  Until the First Priority Obligations Payment Date has occurred, if any Loan Party becomes subject to any Insolvency Proceeding, and if the First Priority Representative or the other First Priority Secured Parties consent to the use of cash collateral under the Bankruptcy Code or provide financing to any Loan Party under the Bankruptcy Code or consent to the provision of such

financing to any Loan Party by any third party that (w) is in an aggregate principal amount (including any undrawn portion of the revolving commitments thereunder and the face amount of any letters of credit issued and not reimbursed thereunder) of no more than $10,000,000, the proceeds of which are used solely by the Loan Parties (and not by, or for the benefit of, any Loan Party's affiliate which is not a Loan Party), (x) provides that the Second Priority Secured Parties retain the right to object to any ancillary agreements or arrangements regarding the cash collateral use or the financing that are materially adverse to the Second Priority Secured Parties, (y) provides the Second Priority Secured Parties with the Second Priority Required Adequate Protection, and (z) does not compel the Loan Parties to pursue any specific plan or to conduct a sale or other liquidation of the Common Collateral (any such financing that complies with such clauses (w)-(z), a "**DIP Financing**"), then the Second Priority Representative agrees, on behalf of itself and the other Second Priority Secured Parties, that each Second Priority Secured Party (a) will raise no objection to, nor support any other Person objecting to, the use of such cash collateral or to such DIP Financing, (b) will not request or accept adequate protection or any other relief in connection with the use of such cash collateral or such DIP Financing except as set forth in Section 5.4 below and (c) to the extent the Liens securing the First Priority Obligations are subordinated to or pari passu with such DIP Financing will subordinate (and will be deemed hereunder to have subordinated) the Second Priority Liens (i) to such DIP Financing on the same terms as the First Priority Liens are subordinated thereto (and such subordination will not alter in any manner the terms of this Agreement), (ii) to any adequate protection provided to the First Priority Secured Parties and (iii) to any "carve-out" agreed to by the First Priority Representative or the other First Priority Secured Parties in an amount not to exceed $2,500,000, and (d) agrees that notice received two calendar days prior to the entry of an interim order approving such usage of cash collateral or approving such financing and fifteen  days prior to the entry of a final order approving such usage of cash collateral or approving such financing shall be adequate notice.

       5.3    <u>Relief From the Automatic Stay</u>.  The Second Priority Representative agrees, on behalf of itself and the other Second Priority Secured Parties, that none of them will seek relief from the automatic stay (or any analogous stay) in any Insolvency Proceeding in respect of a Loan Party or take any action in derogation thereof, in each case in respect of any Common Collateral, without the prior written consent of the First Priority Representative unless the First Priority Representative or any of the First Priority Secured Parties have concurrently sought relief from the automatic stay (or from any analogous stay) in any Insolvency Proceeding and the Second Priority Representative and/or the other Second Priority Secured Parties are not seeking relief from the automatic stay (or from any analogous stay) in any Insolvency Proceeding in order to take any Enforcement Action in any manner in violation of or otherwise inconsistent with the provisions of this Agreement.

       5.4    <u>Adequate Protection</u>.  The Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties, agrees that none of them shall object, contest, or support any other Person objecting to or contesting, in respect of any Insolvency Proceeding of a Loan Party, (a) any request by the First Priority Representative or the other First Priority Secured Parties for adequate protection or any adequate protection provided to the First Priority Representative or the other First Priority Secured Parties or (b) any objection by the First Priority Representative or any other First Priority Secured Parties to any motion, relief, action or proceeding based on a claim of a lack of adequate protection or (c) the payment of interest, fees, expenses or other amounts to the First Priority Representative or any other First Priority Secured Party under Section 506(b) or 506(c) of the Bankruptcy Code or otherwise.  In any Insolvency Proceeding of a Loan Party, (i) if the First Priority Secured Parties (or any subset thereof) are granted adequate protection consisting of additional collateral (with replacement liens on such additional collateral) and superpriority claims in connection with any DIP Financing or use of cash collateral, then in connection with any such DIP Financing or use of cash collateral, the Second Priority Representative, on behalf of itself and any of the Second Priority Secured

Parties, may seek or accept adequate protection consisting solely of (w) a replacement Lien on the same additional collateral, subordinated to the Liens securing the First Priority Obligations and such DIP Financing on the same basis as the other Liens securing the Second Priority Obligations are so subordinated to the First Priority Obligations under this Agreement, (x) superpriority claims junior in all respects to the superpriority claims granted to the First Priority Secured Parties, (y) payment of the fees and expenses of the Second Priority Representative and the Second Priority Secured Parties, to the extent permitted in the Second Priority Documents (the adequate protection for the Second Priority Secured Parties described in clauses (w), (x), and (y), collectively, the "**Second Priority Required Adequate Protection**") and (z) subject to the right of the First Priority Secured Parties to object thereto, the payment of post-petition interest at the pre-default rate (<u>provided</u>, that in the case of this clause (z), that the First Priority Secured Parties have been granted adequate protection in the form of post-petition interest at a rate no lower than the pre-default rate), <u>provided</u>, <u>however</u>, that the Second Priority Representative shall have irrevocably agreed, pursuant to Section 1129(a)(9) of the Bankruptcy Code, on behalf of itself and the Second Priority Secured Parties, in any stipulation and/or order granting such adequate protection, that such junior superpriority claims in excess of $3,000,000 may with the consent of two-thirds in amount of the Second Priority Obligations be paid under any plan of reorganization in any combination of cash, debt, equity or other property having a value on the effective date of such plan equal to the allowed amount of such claims and (ii) in the event the Second Priority Representative, on behalf of itself and the Second Priority Secured Parties, seeks or accepts adequate protection consisting of additional collateral (with replacement liens on such additional collateral) and superpriority claims in connection with any DIP Financing or use of cash collateral with respect to an Insolvency Proceeding, and such adequate protection is granted in the form of additional collateral comprising assets of Pulitzer or any of its subsidiaries, then the Second Priority Representative, on behalf of itself or any of the Second Priority Secured Parties, agrees that the First Priority Representative shall also be granted a senior Lien on such additional collateral as security for the First Priority Obligations and any such DIP Financing and that any Lien on such additional collateral securing the Second Priority Obligations shall be subordinated to the Liens on such collateral securing the First Priority Obligations and any such DIP Financing (and all Obligations relating thereto) and any other Liens granted to the First Priority Secured Parties as adequate protection, with such subordination to be on the same terms that the other Liens securing the Second Priority Obligations are subordinated to such First Priority Obligations under this Agreement.  The Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties, agrees that except as expressly set forth in this Section none of them shall seek or accept adequate protection in respect of a Loan Party without the prior written consent of the First Priority Representative.

5.5    <u>Avoidance Issues.</u>  If any First Priority Secured Party is required in any Insolvency Proceeding or otherwise to disgorge, turn over or otherwise pay to the estate of any Loan Party, because such amount was avoided or ordered to be paid or disgorged for any reason, including without limitation because it was found to be a constructively fraudulent and/or preferential transfer, any amount (a "**Recovery**"), whether received as proceeds of security, enforcement of any right of set-off or otherwise, then the First Priority Obligations shall be reinstated to the extent of such Recovery and deemed to be outstanding as if such payment had not occurred and the First Priority Obligations Payment Date shall be deemed not to have occurred.  If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto.  The Second Priority Secured Parties agree that none of them shall be entitled to benefit from any avoidance action affecting or otherwise relating to the First Priority Liens or the Second Priority Liens, it being understood and agreed that the benefit of such avoidance action otherwise allocable to them shall instead be allocated and turned over for application in accordance with the priorities set forth in this Agreement.

5.6     Asset Dispositions in an Insolvency Proceeding.  In an Insolvency Proceeding or otherwise, neither the Second Priority Representative nor any other Second Priority Secured Party shall oppose any sale or disposition of any assets of any Loan Party that is supported by the First Priority Secured Parties (or any right of the First Priority Secured Party to credit bid the First Priority Obligations in any such sale or disposition), and the Second Priority Representative and each other Second Priority Secured Party will be deemed to have consented under Section 363 of the Bankruptcy Code (and otherwise) to any sale (and related matters) supported by the First Priority Secured Parties and to have released their Liens on such assets provided that their Liens attach to the proceeds of such assets (subject to the priorities set forth in this Agreement) and that the proceeds remaining after payment of related transaction costs and expenses are applied as a permanent reduction of the First Priority Obligations (with a corresponding reduction in the Maximum First Priority Amount).  In an Insolvency Proceeding or otherwise, neither the First Priority Representative nor any other First Priority Secured Party shall oppose any right of any Second Priority Secured Party to credit bid the Second Priority Obligations in any sale or disposition, provided that such bid provides for the payment in full of the First Priority Obligations and the occurrence of the events described in clauses (a), (b) and (c) of the definition of First Priority Obligations Payment Date.

5.7     Separate Grants of Security and Separate Classification.  Each of the Secured Parties and the Loan Parties acknowledges and agrees that (a) the grants of Liens on the assets of each Loan Party pursuant to the First Priority Security Documents and the Second Priority Security Documents constitute two separate and distinct grants of Liens and (b) because of, among other things, their differing rights in the Common Collateral, the First Priority Obligations and the Second Priority Obligations are fundamentally different from each other and must be separately classified in any plan of reorganization proposed or adopted in an Insolvency Proceeding.  To further effectuate the intent of the parties as provided in the immediately preceding sentence, if it is held that the claims of the First Priority Secured Parties and Second Priority Secured Parties in respect of the Common Collateral constitute only one secured claim (rather than separate classes of senior and junior secured claims), then the Second Priority Secured Parties hereby acknowledge and agree that all distributions shall be made as if there were separate classes of senior and junior secured claims against the Loan Parties in respect of the Common Collateral, with the effect being that, to the extent that the aggregate value of the Common Collateral is sufficient (for this purpose ignoring all claims held by the Second Priority Secured Parties), the First Priority Secured Parties shall be entitled to receive, in addition to amounts distributed to them in respect of principal, pre-petition interest and other claims, all amounts owing in respect of Post-Petition Interest before any distribution is made in respect of the claims held by the Second Priority Secured Parties.  The Second Priority Secured Parties hereby acknowledge and agree to turn over to the First Priority Secured Parties amounts otherwise received or receivable by them to the extent necessary to effectuate the intent of the preceding sentence, even if such turnover has the effect of reducing the claim or recovery of the Second Priority Secured Parties.

5.8     No Waivers of Rights.  Nothing contained herein shall prohibit or in any way limit the First Priority Representative, the Second Priority Representative, any First Priority Secured Party, or any Second Priority Secured Party from objecting, in any Insolvency Proceeding or otherwise, to any action taken by any party not permitted hereunder.

5.9     Plans of Reorganization.  Nothing in this Agreement shall impair the rights of any Second Priority Secured Party to propose, support, or vote in favor of or against any plan of reorganization or similar plan or scheme in any Insolvency Proceeding, so long as such plan or scheme is not inconsistent with, or in contravention of, the express terms of this Agreement, provided that in the case of proposing such plan of reorganization or similar plan or scheme it shall, unless otherwise

approved by the First Priority Representative, provide for payment in full of the First Priority Obligations and the occurrence of the events described in clauses (a), (b) and (c) of the definition of the First Priority Obligations Payment Date.

5.10    Effectiveness in Insolvency Proceedings.  This Agreement, which the parties hereto expressly acknowledge is a "subordination agreement" under section 510(a) of the Bankruptcy Code, shall be effective before, during and after the commencement of an Insolvency Proceeding.

**SECTION 6**.  *Security Documents.*

(a)  Each Loan Party and the Second Priority Representative, on behalf of itself and the Second Priority Secured Parties, agrees that it shall not at any time execute or deliver any amendment or other modification to any of the Second Priority Documents that (x) applies with respect to any Loan Party or any Common Collateral and (y) is inconsistent with or in violation of this Agreement.

(b)  Each Loan Party and the First Priority Representative, on behalf of itself and the First Priority Secured Parties, agrees that it shall not at any time execute or deliver any amendment or other modification to any of the First Priority Documents inconsistent with or in violation of this Agreement.

(c)  In the event the First Priority Representative enters into any amendment, waiver or consent in respect of any of the First Priority Security Documents for the purpose of adding to, or deleting from, or waiving or consenting to any departures from any provisions of, any First Priority Security Document or changing in any manner the rights of any parties thereunder, then such amendment, waiver or consent shall apply automatically to any comparable provision of the Comparable Second Priority Security Document to the extent applicable to any Loan Party and Common Collateral without the consent of or action by any Second Priority Secured Party (with all such amendments, waivers and modifications subject to the terms hereof); provided, that (i) no such amendment, waiver or consent shall have the effect of removing assets subject to the Lien of any Second Priority Security Document, except to the extent that a release of such Lien is permitted by Section 4.2, (ii) any such amendment, waiver or consent that materially and adversely affects the rights of the Second Priority Secured Parties and does not affect the First Priority Secured Parties in a like or similar manner shall not apply to the Second Priority Security Documents without the prior written consent of the Second Priority Representative, (iii) no such amendment, waiver or consent with respect to any provision applicable to the Second Priority Representative under the Second Priority Documents shall be made without the prior written consent of the Second Priority Representative and (iv) notice of such amendment, waiver or consent shall be given to the Second Priority Representative no later than 15 days after its effectiveness, provided that the failure to give such notice shall not affect the effectiveness and validity thereof.

**SECTION 7**.  *Reliance; Waivers; etc.*

7.1    Reliance.  The First Priority Documents are deemed to have been executed and delivered, and all extensions of credit thereunder are deemed to have been made or incurred, in reliance upon this Agreement.  The Second Priority Representative, on behalf of itself and the Second Priority Secured Parties, expressly waives all notice of the acceptance of and reliance on this Agreement by the First Priority Secured Parties.  The Second Priority Documents are deemed to have been executed and delivered and all extensions of credit related thereto are deemed to have been made or incurred, in reliance upon this Agreement.  The First Priority Representative expressly waives all notices of the acceptance of and reliance by the Second Priority Representative and the Second Priority Secured Parties.

7.2    <u>No Warranties or Liability.</u>  The Second Priority Representative and the First Priority Representative acknowledge and agree that neither has made any representation or warranty with respect to the execution, validity, legality, completeness, collectibility or enforceability of any First Priority Document or any Second Priority Document.  Except as otherwise provided in this Agreement, the Second Priority Representative and the First Priority Representative will be entitled to manage and supervise their respective extensions of credit to any Loan Party in accordance with law and their usual practices, modified from time to time as they deem appropriate.

7.3    <u>No Waivers.</u>  No right or benefit of any party hereunder shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of such party or any other party hereto or by any noncompliance by any Loan Party with the terms and conditions of any of the First Priority Documents or the Second Priority Documents.

**SECTION 8**.  *Obligations Unconditional.*

8.1    <u>First Priority Obligations Unconditional.</u>  All rights and interests of the First Priority Secured Parties hereunder, and all agreements and obligations of the Second Priority Secured Parties (and, to the extent applicable, the Loan Parties) hereunder, shall remain in full force and effect irrespective of:

(a)  any lack of validity or enforceability of any First Priority Document;

(b)  any change in the time, place or manner of payment of, or in any other term of, all or any portion of the First Priority Obligations, or any amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of any First Priority Document;

(c)  prior to the First Priority Obligations Payment Date, any exchange, release, voiding, avoidance or non-perfection of any security interest in any Common Collateral or any other collateral, or any release, amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of all or any portion of the First Priority Obligations or any guarantee or guaranty thereof; or

(d)  any other circumstances that otherwise might constitute a defense available to, or a discharge of, any Loan Party in respect of the First Priority Obligations, or of any of the Second Priority Secured Parties, or any Loan Party, to the extent applicable, in respect of this Agreement.

8.2    <u>Second Priority Obligations Unconditional.</u>  All rights and interests of the Second Priority Secured Parties hereunder, and all agreements and obligations of the First Priority Secured Parties (and, to the extent applicable, the Loan Parties) hereunder, shall remain in full force and effect irrespective of:

(a)  any lack of validity or enforceability of any Second Priority Document;

(b)  any change in the time, place or manner of payment of, or in any other term of, all or any portion of the Second  Priority Obligations, or any amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of any Second Priority Document;

(c)  any exchange, release, voiding, avoidance or non-perfection of any security interest in any Common Collateral or any other collateral, or any release, amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of all or any portion of the Second Priority Obligations or any guarantee or guaranty thereof; or

(d)  any other circumstances that otherwise might constitute a defense available to, or a discharge of, any Loan Party in respect of the Second Priority Obligations or any First Priority Secured Parties or any Loan Party, to the extent applicable, in respect of this Agreement.

**SECTION 9**.  Miscellaneous.

9.1     In the event of any conflict between the provisions of this Agreement and the provisions of any First Priority Document or any Second Priority Document (to the extent applicable to any Loan Party or any Common Collateral), the provisions of this Agreement shall govern.  Notwithstanding the foregoing, the parties hereto acknowledge that the terms of this Agreement are not intended to and shall not, as between the Loan Parties and the Secured Parties, negate, waive or cancel any rights granted to, or carry liability or obligation of, any Loan Party in the First Priority Documents and the Second Priority Documents or impose any additional obligations on the Loan Parties (other than as expressly set forth herein).

9.2     Continuing Nature of Provisions.  This Agreement shall continue to be effective, and shall not be revocable by any party hereto, until the First Priority Obligation Payment Date shall have occurred.  This is a continuing agreement and the First Priority Secured Parties and the Second Priority Secured Parties may continue, at any time and without notice to the other parties hereto, to extend credit and other financial accommodations, lend monies and provide indebtedness to, or for the benefit of, Borrower or any other Loan Party on the faith hereof.

9.3     Amendments; Waivers.  No amendment or modification of any of the provisions of this Agreement shall be effective unless the same shall be in writing and signed by the First Priority Representative (with the consent of the Required Holders under and as defined in the First Priority Agreement) and the Second Priority Representative (with the consent of the Required Lenders under and as defined in the Second Priority Term Loan Agreement or other then extant Second Priority Agreement), and, in the case of amendments or modifications of Sections 3.5, 3.6, 9.3, 9.5 or 9.6 that directly affect the rights or duties of any Loan Party, such Loan Party, and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time. Anything herein to the contrary notwithstanding, no consent of any Loan Party shall be required for amendments, modifications or waivers of any other provisions of this Agreement other than those that directly affect any obligation or right of the Loan Parties hereunder or under the First Priority Documents or the Second Priority Documents or that would impose any additional obligations on the Loan Parties.

9.4     Information Concerning Financial Condition of the Borrower and the other Loan Parties. Each of the Second Priority Representative and the First Priority Representative hereby assume responsibility for keeping itself informed of the financial condition of the Borrower and each of the other Loan Parties and all other circumstances bearing upon the risk of nonpayment of the First Priority Obligations or the Second Priority Obligations.  The Second Priority Representative and the First Priority Representative hereby agree that no party shall have any duty to advise any other party of information known to it regarding such condition or any such circumstances.  In the event the Second Priority

Representative or the First Priority Representative, in its sole discretion, undertakes at any time or from time to time to provide any information to any other party to this Agreement, it shall be under no obligation (a) to provide any such information to such other party or any other party on any subsequent occasion, (b) to undertake any investigation not a part of its regular business routine, or (c) to disclose any other information.

9.5     Governing Law.  This Agreement shall be construed in accordance with and governed by the law of the State of New York, except as otherwise required by mandatory provisions of law and except to the extent that remedies provided by the laws of any jurisdiction other than the State of New York are governed by the laws of such jurisdiction.

9.6     Submission to Jurisdiction.  (a)  Each First Priority Secured Party, each Second Priority Secured Party and each Loan Party hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each such party hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court.  Each such party agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that any First Priority Secured Party or Second Priority Secured Party may otherwise have to bring any action or proceeding against any Loan Party or its properties in the courts of any jurisdiction.

(b)  Each First Priority Secured Party, each Second Priority Secured Party and each Loan Party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so (i) any objection it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in paragraph (a) of this Section and (ii) the defense of an inconvenient forum to the maintenance of such action or proceeding.

(c)  Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.7.  Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

9.7     Notices.  Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given shall be in writing and may be personally served, telecopied, or sent by overnight express courier service or United States mail and shall be deemed to have been given when delivered in person or by courier service, upon receipt of a telecopy or five days after deposit in the United States mail (certified, with postage prepaid and properly addressed).  For the purposes hereof, the addresses of the parties hereto (until notice of a change thereof is delivered as provided in this Section) shall be as set forth below each party's name on the signature pages hereof, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

9.8     Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of each of the parties hereto and each of the First Priority Secured Parties and Second Priority Secured Parties and their respective successors and permitted assigns, and nothing herein is intended, or shall be

construed to give, any other Person any right, remedy or claim under, to or in respect of this Agreement or any Common Collateral.

9.9     <u>Headings</u>.  Section headings used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

9.10     <u>Severability</u>.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

9.11     <u>Counterparts; Integration; Effectiveness</u>.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this Agreement by email or telecopy shall be effective as delivery of a manually executed counterpart of this Agreement.  This Agreement shall become effective when it shall have been executed by each party hereto.

9.12     **<u>WAIVER OF JURY TRIAL</u>.  EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AND FOR ANY COUNTERCLAIM THEREIN.**

9.13     <u>Additional Loan Parties</u>.  Each Person that becomes a Loan Party after the date hereof shall promptly become a party to this Agreement by execution and delivery by such Person of a joinder agreement in form and substance reasonably satisfactory to the First Priority Representative and the Second Priority Representative

9.14     <u>Incorporation by Reference</u>.  In connection with their execution and acting hereunder, the Company Parties acknowledge that (i) the First Priority Representative is entitled to all rights, privileges, benefits, immunities, protections and indemnities provided to it as Collateral Agent under (and as defined in) the First Priority Documents, and (ii) the Second Priority Representative is entitled to all rights, privileges, benefits, immunities, protections and indemnities provided to it as Collateral Agent under (and as defined in) the Second Priority Documents.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.**, as First Priority Representative for and on behalf of the First Priority Secured Parties

By:_____
Name:
Title:

Address for Notices:
The Bank of New York Mellon Trust Company, N.A.
10161 Centurion Parkway, N.
Jacksonville, FL 32256
Attention:  Geraldine Creswell, Asst. Treasurer
Telecopy No.:  (904) 645-1921
Email: geri.creswell@bnymellon.com


**WILMINGTON TRUST, NATIONAL ASSOCIATION**, as Second Priority Representative for and on behalf of the Second Priority Secured Parties

By:_____
Name:
Title:

Address for Notices:
Wilmington Trust, N.A.
50 South Sixth Street, Suite 1290
Minneapolis, MN 55402
Attention:  Josh James
Telecopy No.:  (612) 217-5651
Tel.: (612) 217-5637
Email:  jjames@WilmingtonTrust.com


**[LOAN PARTIES]**

By:_____
Name:
Title:

Address for Notices:
Attention:
Telecopy No.:

Exhibit O

Transactions between the Lee Entities (collectively "Lee"), on the one hand, and the Pulitzer Entities (collectively "Pulitzer"), on the other hand, to include: (i) pass through of all, or a portion of, revenue received by Lee for services rendered by Pulitzer for arm's length transactions with third parties; (ii) pass through of costs incurred by Lee for arm's length transactions with third parties to the extent such transactions are for the benefit of Pulitzer or such costs are properly allocable to Pulitzer; (iii) reimbursements to Lee for payments made by Lee for payroll and other third party costs incurred directly by (or for the account of) Pulitzer; (iv) reimbursements to Lee for compensation of certain employees of Lee paid by Lee whose primary responsibility is to manage operations of Pulitzer; (v) non-cash interest income on certain balances due from Pulitzer; (vi) non-cash interest expense on certain balances due to Pulitzer; (vii) allocation of certain costs of Pulitzer to Lee to the extent such costs are incurred for the benefit of Lee; (viii) reimbursements to Lee of allocation of certain costs (including, without limitation, corporate overhead) of Lee to Pulitzer to the extent such costs are incurred for the benefit of, or are otherwise allocable to, Pulitzer; (ix) allocation of income taxes or income tax benefits from Lee to Pulitzer to the extent such income taxes or income tax benefits are related to Pulitzer; (x) to the extent allowed, dividends from Pulitzer to Lee; and (xi) transactions specifically permitted pursuant to Section 5.8 of the Pulitzer Guaranty (as in effect on the date hereof).

Lee shall bill or otherwise record an intercompany charge to Pulitzer, and Pulitzer shall reimburse or pay to Lee, in advance of the actual costs or other amounts (including taxes) being incurred by Lee that are payable by, or allocable to, Pulitzer. Such advance payment by Pulitzer to Lee shall be an estimated amount determined in good faith by Lee. To the extent that the actual costs or other amounts were in excess of the amount of the advanced payment by Pulitzer, (a) Pulitzer shall promptly pay to Lee such deficiency, (b) Lee shall receive a credit against any future payments required to be made by Lee to Pulitzer until such credit is exhausted, or (c) such deficiency shall be netted against any outstanding intercompany balance owed by Lee to Pulitzer that was created after the Effective Date. To the extent that the amounts advanced by Pulitzer were in excess of the actual costs or other amounts billed by Lee to Pulitzer, (a) Lee shall promptly pay to Pulitzer such excess, (b) Pulitzer shall receive a credit against any future payments required to be made by Pulitzer to Lee until such credit is exhausted or (c) such excess shall be netted against any intercompany balance owed by Pulitzer to Lee that was created after the Effective Date.

All such payments, advances, credits, netting and intercompany balances between Lee and Pulitzer described on this [Schedule XI] [Exhibit O] shall be made by or with Lee Procurement Solutions Co. and no such payment, advance, credit, netting or intercompany balance between Lee and Pulitzer shall be made by or exist with the Lee Entities, other than Lee Procurement Solutions Co.

# **Exhibit 5.2.2**

*Directors and Officers of Reorganized Lee Enterprises*

**DIRECTORS AND OFFICERS**
**OF**
**REORGANIZED LEE ENTERPRISES, INCORPORATED**

**Mary E. Junck**              **Chairman, President, Chief Executive Officer, and Director**

Ms. Junck was elected Chairman, President and Chief Executive Officer of the Company in 2002. She is also a director of TNI Partners, which is owned 50% by the Company. Ms. Junck is a director and vice-chairman of the board of directors of the Associated Press and a director of The Newspaper Association of America. Ms. Junck leads the Company's senior executive team and provides the Board of Directors with in-depth knowledge of the Company and the publishing industry, in which she has worked in executive and senior management positions for more than 30 years. Ms. Junck provides a valuable and unique perspective in Board deliberations about the Company's business, competitive landscape, strategic relationships and opportunities, senior leadership and operational and financial performance.  Ms. Junck is Chairman of the Executive Committee of the Board of Directors.

**Michael R. Gulledge**          **Vice President – Publishing**

Mike Gulledge began his career with Lee in 1982 as a college intern at *The Southern Illinoisan* in Carbondale while earning a degree in journalism and advertising at Southern Illinois University. During his 29 years with Lee he has served as advertising manager at *The Southern Illinoisan*; advertising manager at the *Herald & Review* in Decatur; advertising manager at the *Quad-City Times* in Davenport; general manager at the *Herald & Review* in Decatur; publisher of the *Herald & Review* in Decatur and in 2000, he was appointed publisher of the *Billings Gazette*. He was elected an officer and operating vice president in 2005. The *Billings Gazette* received Lee's highest honor, Enterprise of the Year, in 2006.  He has direct or overall responsibility for 19 daily newspapers in California, Idaho, Montana, Nevada, New York, Oregon, Pennsylvania, Utah, Washington and Wyoming. He is active in the Billings community and has served on the boards of private college institutions, economic development organizations, and health organizations. He is chairman of the Montana Meth Project and past president of the Billings Chamber of Commerce.

**Kevin D. Mowbray**          **Vice President – Publishing**

Kevin Mowbray is a Lee vice president who became publisher of Lee's largest newspaper, the *St. Louis Post-Dispatch*, in 2006.  He also oversees all St. Louis operations, which include STLtoday.com, STL Distribution LLC, the Suburban Journals of Greater St. Louis and the Park Hills *Daily Journal*. He also has responsibility for *The Times* of Northwest Indiana, where he previously served as publisher. Mowbray began his career with Lee in 1986 as an advertising sales representative in his hometown of Kewanee, Ill. He advanced to sales positions in Helena, Butte and Billings, Montana, before moving to Chicago as Lee's national sales manager for corporate sales and marketing. In 1995, he joined the *Lincoln Journal Star* as advertising manager, where he served three years before becoming general manager at the *Missoulian* in Missoula, Montana, in 1998. In 2000, he advanced to publisher of *The Bismarck Tribune* in Bismarck, North Dakota, where he guided the newspaper to the 2001 Lee President's

1

Award for Enterprise of the Year. In 2002, he was appointed vice president for sales and marketing, and in 2004 he became a vice president for publishing, with responsibility for 13 newspapers, also serving as publisher in Northwest Indiana. In 2005, Suburban Newspapers of America honored *The Times* as Newspaper of the Year. He is a journalism graduate of Western Illinois University.

**Greg R. Veon                        Vice President – Publishing**

Greg Veon, a veteran of Lee Enterprises since 1976, has responsibility for 17 daily newspapers, primarily in Iowa, Illinois and Nebraska, as well as the Lee Agri-Media division.  He began his career at the *Chicago Tribune* and joined Lee as sales and marketing director at the *Muscatine Journal* in Iowa. He has since served as general manager of the *La Crosse Tribune* in Wisconsin; publisher of the *Muscatine Journal*; publisher of the *Herald & Review* in Decatur, Ill.; general manager of KOIN-TV, which was then a Lee station in Portland, Oregon; and Lee vice president for marketing. He became vice president for publishing in 1998 and, in addition, publisher of the *Quad-City Times* in Davenport, Iowa, in 2011.  He is a graduate of the University of Missouri School of Journalism and executive development programs at Stanford and the University of Michigan. He has been actively involved in community activities throughout his career, serving at the board and chair level for chambers of commerce, United Ways, economic development programs and many business, industry, social and educational support groups.

**Vytenis P. Kuraitis                 Vice President – Human Resources**

Vytenis Kuraitis joined Lee in 1994 as director of human resources and became vice president in 1997.  Before joining Lee, he was national practice director for executive compensation at Godwins Inc., a former international human resources consulting firm. He previously was a principal and practice leader for human resources consulting at the former Arthur Young and Co. Before beginning his consulting career, he was manager of personnel planning and development at Leaseway Transportation Co. and director of compensation, benefits and international personnel for Nordson Corp., an international manufacturing company.  He also has an extensive background as a human resources generalist. He is co-author of "Executive Compensation Answer Book" and author of several dozen compensation and training articles. He is a past member of the American Press Institute board of directors and is a graduate of the University of Illinois.

**Gregory P. Schermer                 Vice President – Interactive Media and Director**

Mr. Schermer is Vice President-Interactive Media of the Company. From 1989 to July 2006, Mr. Schermer also served as Corporate Counsel of the Company. Mr. Schermer leads the development of the Company's digital media strategies and platforms and represents the Company in several industry digital media initiatives, including The Newspaper Consortium (the "Consortium"), a group of 30 companies that represent nearly 800 local newspapers helping local advertisers to reach digital audiences. Mr. Schermer serves as a member of the Consortium's executive committee. Mr. Schermer provides the Board of Directors with insight and operational perspective on the Company's digital media strategies.

**Carl G. Schmidt**                **Vice President, Chief Financial Officer and Treasurer**

Carl Schmidt joined Lee in 2001 as vice president, chief financial officer and treasurer. In addition, he serves as an operating vice president with responsibility for newspapers in Wisconsin and Winona, Minnesota. He is a director of Madison Newspapers, Inc.
Before joining Lee, he was senior vice president and chief financial officer, secretary and treasurer of Johnson Outdoors, a publicly traded component of the SC Johnson group of companies, which he joined in 1994. He began his career in 1978 as a certified public accountant at the Big Four accounting firm of KPMG LLP, in Milwaukee, Wisconsin. After a series of promotions, he became a partner in 1988, responsible for audits, client mergers and acquisitions, public offerings and new business development. He is a graduate of Marquette University, where he now serves on the Advisory Board of the College of Communication. He has worked with many non-profit organizations and currently serves on the Board of the Genesis Health Services Foundation.

**Michele White**                **Vice President – Production and Chief Information Officer** *(A)*

Michele Fennelly White was appointed to vice president - information technology and chief information officer in June 2011.  She joined Lee in 1994 as an IT team leader and advanced to director of technical support in 1999. She previously was a systems engineer for IBM Corporation. She is a business administration graduate of the University of Illinois with a concentration in management information systems.  Among community activities, she has been member of the Scott County YMCA IT Advisory Board, a board member of the Pleasant Valley StingRays swim team, a Junior Achievement classroom teacher volunteer and a member and former president of the St. Paul Lutheran Church Council.

**Joyce Dehli**                **Vice President – News** *(A)*

Joyce Dehli, who was appointed vice president for news in 2006, leads strategic efforts to strengthen Lee's print and online journalism. She also oversees journalism training, which includes the news curriculum of Lee Online University, a companywide program she helped create.  From late 2004 to 2006, she served as Lee's editorial training manager and then director of editorial development. As managing editor of the *Wisconsin State Journal* from 2003 to 2004 and assistant managing editor from 2001 to 2003, she helped drive the newspaper's emphasis on investigative journalism. From 1996 to 2001, she served as night city editor, enterprise editor and city editor at the *State Journal*. She joined the newspaper in 1987 as a beat reporter. She began her journalism career in Louisville, Kentucky, where she reported for *The Courier-Journal* and *The Louisville Times* from 1981 to 1984.  She served as a juror for the Pulitzer Prize in Local Reporting in 2008 and later was elected to the Pulitzer Prize Board. She is a 2002 Poynter Ethics Fellow and has been a guest teacher and roundtable panelist at The Poynter Institute.  Recognition of her journalism and work that occurred under her leadership includes the Society of Professional Journalists' Sigma Delta Chi Award for Excellence in Journalism, the Batten Award for Civic Journalism, four Inland Press Association Awards, three Lee President's Awards for Excellence in Journalism and nine Milwaukee Press Club Awards. Other honors include placing as a finalist for the Goldsmith Prize for Investigative Reporting, and also a finalist for the Associated Press Managing Editors' Freedom of Information Award.  She holds a

bachelor's degree in journalism from Marquette University in Milwaukee and a master's degree in English literature from the University of Wisconsin-Madison.

**Suzanna Frank**                    **Vice President – Audience** *(A)*

Suzanna Frank was appointed vice president-audience in March 2008, responsible for print and online audience growth efforts, market research and advertising sales support. She previously served as director of research and marketing.  In 2005, she served two months as interim publisher of the *Quad-City Times* in Davenport, Iowa. Before joining Lee in 2003, she was market research manager for the *San Diego Union-Tribune* and was a senior consultant in marketing strategy at Kannon Consulting Inc. in Chicago.  She has a degree in international relations from Eastern Illinois University in Charleston and a master's degree in business administration and marketing from DePaul University in Chicago. She is a member of the Newspaper Association of America/Audit Bureau of Circulations Liaison Committee and is a frequent presenter at industry conferences.

**Paul M. Farrell**                    **Vice President – Sales and Marketing** *(A)*

Paul Farrell joined Lee in 2007 as vice president for sales and marketing.  His career includes serving as senior vice president of advertising at The Providence Journal Co., advertising director for retail and national advertising at the *Boston Globe*, senior vice president of advertising for Community Newspapers in Boston and senior vice president of sales and marketing at the St. Paul Pioneer Press. He also previously was director of sales and marketing at Miami Herald Publishing Company and was director of product marketing and advertising technologies at Atex, Inc., in Bedford, MA. He received a degree in marketing and finance from Providence College and a master's degree in business administration from Northeastern University in Boston. His industry and community service includes the board of the New England Newspaper Association, Boston Ad Club, the Boston Chapter of the Better Business Bureau and the Greater Boston Spinal Cord Association, the President's Council for Providence College, the Greater Providence Boys and Girls Club and Buttonhole Golf Club, an inner city course for underprivileged young people.

**Daniel K. Hayes**                    **Vice President – Corporate Communications** *(A)*

Dan Hayes joined Lee in 1969 at the *Quad-City Times* in Davenport, where he served as managing editor, executive editor and editor before moving to the corporate office in 1998. In his 29 years at the *Times*, he helped implement the world's first electronic production system and helped develop the *Quad-City Times Bix 7* into a world-known road race. While he was editor, the newspaper received numerous honors, including the Inland Press Association Community Service Award.  He began his career in 1966 at the *Galesburg Register-Mail* in Illinois. He has served as a discussion leader for the American Press Institute and is a past member of Mid-American Press Institute board of directors and the professional advisory board for the School of Journalism at the University of Iowa. He is a journalism graduate of Southern Illinois University and St. Ambrose Institute for Management Development.

**C. D. Waterman III**                    **Secretary and General Counsel**

4

Mr. Waterman is an attorney and has served as Secretary and General Counsel for the Company since 1989. He is managing partner of the law firm of Lane & Waterman LLP of Davenport, Iowa, where he has practiced law for 40 years. Mr. Waterman is a member of the Society of Corporate Secretaries & Governance Professionals, and has been listed in *The Best Lawyers in America* for over 10 years (Corporate Law, Mergers & Acquisitions Law, and Securities Law) and *Chambers and Partners* (Corporate Law/Mergers and Acquisitions).

**Richard R. Cole**               **Director**

Dr. Cole is the John Thomas Kerr Jr. Distinguished Professor at the School of Journalism and Mass Communication, University of North Carolina at Chapel Hill. From 1979 to 2005, Dr. Cole served as dean of the school and brings to the Board of Directors over 40 years experience in the profession of journalism and journalism-mass communication education. Dr. Cole is a member of the Nominating and Corporate Governance Committee.

**Nancy S. Donovan**               **Director**

Ms. Donovan is a founding partner of Circle Financial Group, LLC, New York, NY, a wealth advisory and private equity firm, and the founding partner of Oakmont Partners, LLC, Lake Forest, IL, a private equity firm. From 1989 to 2001, Ms. Donovan was President and Chief Operating Officer of Morgan Stanley Credit Corporation, Riverwoods, IL. Prior to 1989, Ms Donovan was instrumental in the development of the Discover ® Card, and led all marketing and merchant sales. Ms. Donovan provides the Board of Directors with experience in corporate finance, capital markets, risk analysis and strategic investment. Ms. Donovan is a member of the Audit Committee.

**Leonard J. Elmore**               **Director**

Mr. Elmore is an attorney. Mr. Elmore has been the Chief Executive Officer of iHoops, the official youth basketball initiative of the NCAA and the NBA, since May 2010 and served as a board member of iHoops from its inception in April 2009. Prior to joining iHoops, Mr. Elmore was a partner with the law firm of Dreier LLP from September 2008 until December 2008, and senior counsel with the law firm of Dewey & LeBoeuf from 2004 to 2008. Mr. Elmore is also a basketball analyst for ESPN and CBS Sports. Mr. Elmore serves as a trustee of the University of Maryland, and a commissioner on the John S. and James L. Knight Foundation's Knight Commission on Intercollegiate Athletics. Mr. Elmore also serves as a member of the board of directors and chairman of the nominating and corporate governance committee of 1-800-FLOWERS.COM, Inc. Mr. Elmore brings to the Board of Directors his skills and experience in diverse roles as a lawyer, broadcaster and executive and in public sector board service. Mr. Elmore is a member of the Audit Committee.

**William E. Mayer**               **Director**

Mr. Mayer is a founding partner of Park Avenue Equity Partners, L.P., New York, NY, a private equity firm. He is also a director of BlackRock Kelso Capital Corporation, a closed-end

management investment company, DynaVox, Inc. and a trustee of the Columbia Mutual Funds. Since 1976, Mr. Mayer has served on the boards of directors of 16 public companies, and as chairman of the board of the University of Maryland, College Park, and The Aspen Institute. Mr. Mayer also served as a professor and dean of the College of Business and Management at the University of Maryland from 1992 to 1996. Mr. Mayer provides the Board of Directors with business leadership experience, an understanding of the strategic, operational and financial issues confronting public companies, and experience with respect to corporate governance matters. Mr. Mayer is Chairman of the Executive Compensation Committee and a member of the Executive Committee and the Nominating and Corporate Governance Committee. Mr. Mayer has been designated as the Company's Lead Director by the independent directors to preside over executive sessions of non-management directors.

### Herbert W. Moloney III     Director

Mr. Moloney is President and Chief Operating Officer of Western Colorprint, Inc. ("Western Colorprint"), a privately-held company that provides advertising supplements and commercial printing services to the publishing industry. From April 2005 to November 2006, Mr. Moloney was President and Publisher of the *Washington Examiner*. From 2000 to March 2005 Mr. Moloney was the Chief Operating Officer, North America, and an Executive Vice President of Vertis, Inc., a premium provider of targeted advertising and marketing solutions to leading retail and consumer services companies. Mr. Moloney provides the Board of Directors over 30 years of executive and management experience in the publishing and television industries. Mr. Moloney is a member of the Audit Committee and the Executive Compensation Committee.

### Andrew E. Newman          Director

Mr. Newman is Chairman of Hackett Security, Inc., a security systems company with operations in several states; a private investor, and a trustee of Washington University, St. Louis. Mr. Newman has been a founder, principal and/or chief executive officer of several retail and restaurant companies and a group of business publications. Mr. Newman's business, executive and financial experience provide the Board of Directors with strong oversight of its financial and disclosure responsibilities, procedures and controls, and qualify him to serve as Chairman of the Company's  Audit Committee and as its designated financial expert.  Mr. Newman is Chairman of the Audit Committee and a member of the Executive Compensation Committee.

### Gordon D. Prichett          Director

Dr. Prichett is Professor of Mathematics, Finance and Computer Applications at Babson College, Babson Park, MA. From 1987 to 1992, Dr. Prichett served as Vice President and Dean of Faculty of the school and from 1994 until 2006 as Chairman of the Division of Mathematics, Sciences and Information Systems. He is a founder and investment committee member of Cairnwood Cooperative, Boston, MA, a private investment group. Dr. Prichett is also chairman of the Board of Trustees of the Pan-Mass Challenge, the largest single athletic fundraising event in the world. Dr. Prichett brings to the Board of Directors strong financial and analytical skills, as well as experience in organizational leadership, risk management and strategy development.  Dr. Prichett is a member of the Audit Committee and the Executive Committee.

**Mark B. Vittert**          **Director**

Mr. Vittert has been a private investor for more than 20 years. Over the past 40 years, Mr. Vittert has been involved as a founder, developer of, or investor in several companies involved in market research and youth marketing, publishing, sporting goods and the food and beverage industries. Mr. Vittert was a founder of Business Journals Publishing Corp., with publications in major metropolitan markets including Indianapolis, St. Louis, Pittsburgh, Philadelphia, Baltimore and Cincinnati. Since the sale of the business, he continues to be an investor in several publications. Mr. Vittert has also served on the boards of directors of several public companies, and provides the Board of Directors with insight and experience in corporate governance, risk management and the publishing industry.  Mr. Vittert is Chairman of the Nominating and Corporate Governance Committee and a member of the Executive Compensation Committee.

**Brent Magid**          **Director**

Mr. Magid is President and Chief Executive Officer of Frank N. Magid Associates, Inc., a research-based strategy consulting company with expertise in a wide range of media. From 2007 to 2009, Mr. Magid served as a director of Quattro Wireless, a mobile advertising company. Mr. Magid provides the Board of Directors with experience and insight into key marketing and advertising trends and related media industry strategies.  Mr. Magid serves as a member of the Nominating and Corporate Governance Committee.

**Patty Williamson**          **Assistant Secretary and Assistant Treasurer** *(A)*

Patty Williamson serves as Assistant Secretary, Assistant Treasurer, and Director of Taxation for the Company.  Her duties as Assistant Secretary and Assistant Treasurer are for corporate administrative convenience and are subject to direction by senior management.

**Jayne M. Hermiston**          **Assistant Secretary and Assistant Treasurer** *(A)*

Jayne Hermiston serves as Assistant Secretary, Assistant Treasurer and Vice President of Finance for Newspapers of the Company.  Her duties as Assistant Secretary and Assistant Treasurer are for corporate administrative convenience and are subject to direction by senior management.

**Bradley D. Junker**          **Assistant Secretary and Assistant Treasurer** *(A)*

Bradley Junker serves as Assistant Secretary, Assistant Treasurer and Corporate Controller of the Company.  His duties as Assistant Secretary and Assistant Treasurer are for corporate administrative convenience and are subject to direction by senior management.

*(A) - Appointed Officer*

# **Exhibit 5.2.3**

*Directors and Officers of the*
*Reorganized Debtors other than Reorganized Lee Enterprises*

**DIRECTORS AND OFFICERS OF THE REORGANIZED DEBTORS
OTHER THAN
REORGANIZED LEE ENTERPRISES, INCORPORATED**

<u>**ACCUDATA, INC.**</u>

| | |
|---|---|
| Gregory P. Schermer | President and Director |
| C. D. Waterman III | Secretary and Director |
| Jayne M. Hermiston | Treasurer |
| Patty Williamson | Assistant Secretary and Assistant Treasurer |

<u>**LEE PROCUREMENT SOLUTIONS CO.**</u>

| | |
|---|---|
| Carl G. Schmidt | President and Director |
| Al Struss | Vice President |
| C. D. Waterman III | Secretary and Director |
| Jayne M. Hermiston | Assistant Secretary and Assistant Treasurer |
| Patty Williamson | Assistant Secretary and Assistant Treasurer |

<u>**SIOUX CITY NEWSPAPERS, INC.**</u>

| | |
|---|---|
| Greg R. Veon | President and Director |
| C. D. Waterman III | Secretary and Director |
| Jayne M. Hermiston | Treasurer |
| Bradley D. Junker | Assistant Secretary and Assistant Treasurer |
| Patty Williamson | Assistant Secretary and Assistant Treasurer |

<u>**JOURNAL-STAR PRINTING CO.**</u>

| | |
|---|---|
| Greg R. Veon | President and Director |
| C. D. Waterman III | Secretary and Director |
| Jayne Hermiston | Treasurer and Director |
| Patty Williamson | Assistant Secretary and Assistant Treasurer |

<u>**K. FALLS BASIN PUBLISHING, INC.**</u> **(inactive)**

| | |
|---|---|
| Michael R. Gulledge | President and Director |
| C. D. Waterman III | Secretary and Director |
| Jayne M. Hermiston | Vice President and Treasurer |
| Patty Williamson | Assistant Secretary and Assistant Treasurer |

<u>**LEE CONSOLIDATED HOLDINGS CO.**</u>

| | |
|---|---|
| Shannon Brinker | President and Director |
| Jayne M. Hermiston | Vice President, Assistant Secretary, Assistant Treasurer and Director |
| C. D. Waterman III | Secretary and Director |
| (vacant) | Treasurer and Director |
| Brian Kroshus | Director |
| Patty Williamson | Assistant Secretary and Assistant Treasurer |

**FLAGSTAFF PUBLISHING CO.**

| | |
|---|---|
| Don Rowley | President |
| Greg R. Veon | Vice President and Director |
| C. D. Waterman III | Secretary and Director |
| Carl G. Schmidt | Treasurer |
| Bradley D. Junker | Assistant Secretary and Assistant Treasurer |
| Patty Williamson | Assistant Secretary and Assistant Treasurer |
| Mary E. Junck | Director |

**HANFORD SENTINEL, INC.**

| | |
|---|---|
| Manuel Collezo | President |
| Michael R. Gulledge | Vice President and Director |
| C. D. Waterman III | Secretary and Director |
| Carl G. Schmidt | Treasurer |
| Bradley D. Junker | Assistant Secretary and Assistant Treasurer |
| Patty Williamson | Assistant Secretary and Assistant Treasurer |
| Mary E. Junck | Director |

**KAUAI PUBLISHING CO.**

| | |
|---|---|
| Randy Kozerski | President |
| Greg R. Veon | Vice President |
| C. D. Waterman III | Secretary and Director |
| Carl G. Schmidt | Treasurer |
| Bradley D. Junker | Assistant Secretary and Assistant Treasurer |
| Patty Williamson | Assistant Secretary and Assistant Treasurer |
| Mary E. Junck | Director |

**NAPA VALLEY PUBLISHING CO.**

| | |
|---|---|
| Brenda Speth | President |
| Michael R. Gulledge | Vice President and Director |
| C. D. Waterman III | Secretary and Director |
| Carl G. Schmidt | Treasurer |
| Bradley D. Junker | Assistant Secretary and Assistant Treasurer |
| Patty Williamson | Assistant Secretary and Assistant Treasurer |
| Mary E. Junck | Director |

## NIPC, Inc. (inactive)

| | |
|---|---|
| Greg R. Veon | President |
| Carl G. Schmidt | Vice President and Treasurer |
| C. D. Waterman III | Secretary and Director |
| Bradley D. Junker | Assistant Secretary and Assistant Treasurer |
| Patty Williamson | Assistant Secretary and Assistant Treasurer |
| Mary E. Junck | Director |

## NORTHERN LAKES PUBLISHING CO. (inactive)

| | |
|---|---|
| Greg R. Veon | President |
| Carl G. Schmidt | Vice President and Treasurer |
| C. D. Waterman III | Secretary and Director |
| Bradley D. Junker | Assistant Secretary and Assistant Treasurer |
| Patty Williamson | Assistant Secretary and Assistant Treasurer |
| Mary E. Junck | Director |

## PANTAGRAPH PUBLISHING CO.

| | |
|---|---|
| Greg R. Veon | President and Director |
| Carl G. Schmidt | Vice President and Treasurer |
| C. D. Waterman III | Secretary and Director |
| Bradley D. Junker | Assistant Secretary and Assistant Treasurer |
| Patty Williamson | Assistant Secretary and Assistant Treasurer |
| Mary E. Junck | Director |

## PULITZER INC.

| | |
|---|---|
| Mary E. Junck | President and Director |
| Kevin D. Mowbray | Vice President and Director |
| Gregory P. Schermer | Vice President and Director |
| Vytenis P. Kuraitis | Vice President and Director |

## PULITZER INC. (continued)

| | |
|---|---|
| C. D. Waterman III | Secretary and Director |

| Carl G. Schmidt | Treasurer and Director |
| Bradley D. Junker | Assistant Secretary and Assistant Treasurer |
| Patty Williamson | Assistant Secretary and Assistant Treasurer |

## PULITZER MISSOURI NEWSPAPERS, INC.

| Kevin D. Mowbray | President |
| | Vice President |
| C. D. Waterman III | Secretary and Director |
| Carl G. Schmidt | Treasurer |
| Bradley D. Junker | Assistant Secretary and Assistant Treasurer |
| Patty Williamson | Assistant Secretary and Assistant Treasurer |
| Mary E. Junck | Director |

## PULITZER NEWSPAPERS, INC.

| Mary E. Junck | President and Director |
| Greg R. Veon | Vice President and Director |
| C. D. Waterman III | Secretary and Director |
| Carl G. Schmidt | Treasurer |
| Bradley D. Junker | Assistant Secretary and Assistant Treasurer |
| Patty Williamson | Assistant Secretary and Assistant Treasurer |

## PULITZER TECHNOLOGIES, INC.

| Mary E. Junck | President and Director |
| Kevin D. Mowbray | Vice President and Director |
| C. D. Waterman III | Secretary and Director |
| Carl G. Schmidt | Treasurer |
| Bradley D. Junker | Assistant Secretary and Assistant Treasurer |
| Patty Williamson | Assistant Secretary and Assistant Treasurer |

## PULITZER UTAH NEWSPAPERS, INC.

| Rona Rahlf | President |
| Michael R. Gulledge | Vice President and Director |
| C. D. Waterman III | Secretary and Director |
| Carl G. Schmidt | Treasurer |
| Bradley D. Junker | Assistant Secretary and Assistant Treasurer |
| Patty Williamson | Assistant Secretary and Assistant Treasurer |
| Mary E. Junck | Director |

## SANTA MARIA TIMES, INC.

| | |
|---|---|
| Cynthia Schur | President |
| Michael R. Gulledge | Vice President and Director |
| C. D. Waterman III | Secretary and Director |
| Carl G. Schmidt | Treasurer |
| Bradley D. Junker | Assistant Secretary and Assistant Treasurer |
| Patty Williamson | Assistant Secretary and Assistant Treasurer |
| Mary E. Junck | Director |

## SOUTHWESTERN OREGON PUBLISHING CO.

| | |
|---|---|
| Clark Walworth | President |
| Michael R. Gulledge | Vice President and Director |
| C. D. Waterman III | Secretary and Director |
| Carl G. Schmidt | Treasurer |
| Bradley D. Junker | Assistant Secretary and Assistant Treasurer |
| Patty Williamson | Assistant Secretary and Assistant Treasurer |
| Mary E. Junck | Director |

## STAR PUBLISHING COMPANY

| | |
|---|---|
| Greg R. Veon | President |
| John M. Humenik | Vice President |
| C. D. Waterman III | Secretary and Director |
| Carl G. Schmidt | Treasurer |
| Bradley D. Junker | Assistant Secretary and Assistant Treasurer |
| Patty Williamson | Assistant Secretary and Assistant Treasurer |
| Mary E. Junck | Director |

## YNEZ CORPORATION

| | |
|---|---|
| Cynthia Schur | President |
| Michael R. Gulledge | Vice President and Director |
| C. D. Waterman III | Secretary and Director |
| Carl G. Schmidt | Treasurer |
| Bradley D. Junker | Assistant Secretary and Assistant Treasurer |
| Patty Williamson | Assistant Secretary and Assistant Treasurer |
| Mary E. Junck | Director |

## FAIRGROVE LLC

Managing Member:  St. Louis Post-Dispatch LLC

## HOMECHOICE LLC

Managing Member:  Pulitzer Newspapers, Inc.

## HSTAR LLC

Managing Member:  Pantagraph Publishing Co.

## NLPC LLC (inactive)

Managing Member:  Northern Lakes Publishing Co.

## NVPC LLC

Managing Member:  Napa Valley Publishing Co.

## PULITZER NETWORK SYSTEMS LLC

Member:  Pulitzer Inc.

Managers:
Mary E. Junck
Kevin D. Mowbray
C. D. Waterman III
Carl G. Schmidt

Officers:
Kevin D. Mowbray          President
Fred Wilke                Vice President
C. D. Waterman III        Secretary
Carl G. Schmidt           Treasurer

## SHTP LLC

Managing Member:  Pulitzer Newspapers, Inc.

## SOPC LLC

Managing Member:  Southwestern Oregon Publishing Co.

## ST. LOUIS POST-DISPATCH LLC

Managing Member:  Pulitzer Inc.

| | |
|---|---|
| Kevin D. Mowbray | President |
| Nancy Long | Vice President Circulation Marketing |
| (vacant) | Vice President for Sales |
| C. D. Waterman III | Secretary |
| Mary Devish | Treasurer |

## STL DISTRIBUTION SERVICES LLC

Managing Member:  Pulitzer Inc.

| | |
|---|---|
| Kevin D. Mowbray | President |
| Thomas Livingston | Vice President |
| C. D. Waterman III | Secretary |
| Mary Devish | Treasurer |

## SUBURBAN JOURNALS OF GREATER ST. LOUIS LLC

Member:  Pulitzer Inc.

Managers:
Mary E. Junck
Kevin D. Mowbray
Carl G. Schmidt
C. D. Waterman III

Officers:

| | |
|---|---|
| David Bundy | President |
| vacant | Vice President |
| C. D. Waterman III | Secretary |
| Carl G. Schmidt | Treasurer |